UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Westfield Insurance Company,
Plaintiff,

v.

Civ. No. 00-987 (JNE/JSM)
ORDER

Weis Builders, Inc.; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,
Defendants,

and

Weis Builders, Inc.,
Third-Party Plaintiff,

v.

Waterproofing by Experts, Inc.; BRW Elness Architects, Inc., a/k/a/ Elness Swenson Graham Architects, Inc.; Colloid Environmental Technologies Co.; and J-Berd Mechanical Contractors, Inc.,
Third-Party Defendants,

and

Colloid Environmental Technologies Co.,
Fourth-Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,
Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,
Fourth-Party Plaintiff,

v.

Mikesh, Inc.,
Fourth-Party Defendant.

Andrea E. Reisbord, Esq., Cousineau, McGuire & Anderson, appeared for Plaintiff Westfield Insurance Company.

Dean B. Thomson, Esq. and Jocelyn L. Knoll, Esq., Fabyanske, Westra & Hart, P.A., and Chad J. Stepan, Esq., Meagher & Geer, P.L.L.P., appeared for Defendant and Third-Party Plaintiff Weis Builders, Inc.

Steven E. Rau, Esq. and Steven Gaskins, Esq., Fruth, Jamison, & Elsass, appeared for Defendant Promenade Village Townhomes, L.L.C.

Leo I. Brisbois, Esq., Stich, Angell, Kreidel & Dodge, P.A., appeared for Defendant Valley Forge Insurance Company.

Mark S. Brown, Esq., Iverson Reuvers, LLC, appeared for Third-Party Defendant Waterproofing by Experts, Inc.

William Dennis Hull, Esq., Coleman Hull & Van Vliet, appeared for Third-Party Defendant BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.

Patrick D. Reilly, Esq., Erstad & Riemer, P.A., appeared for Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Co.

Rolf E. Sonnesyn, Esq. and Chandelle L. Heyer, Esq., Tomsche, Sonnesyn, & Tomsche, P.A., appeared for Third-Party Defendant and Fourth-Party Plaintiff J-Berd Mechanical Contractors, Inc.

G. John Veith, Esq., Brown & Carlson, P.A., appeared for Fourth-Party Defendant Chris Craft Industrial Products, Inc.

Jonathan M. Bye, Esq., Lindquist & Vennum P.L.L.P., appeared for Fourth-Party Defendant Mikesh, Inc.

Westfield Insurance Company (Westfield) commenced this action against Weis Builders, Inc. (Weis), its insured, and various other interested parties to obtain a declaration regarding its duty to defend and indemnify Weis in connection with leaks in a townhome development built by Weis. Additional parties and claims were added through third-party practice. Eleven summary judgment motions are before the Court. Three of those motions are related to insurance issues, and eight are related to construction issues.

## I. BACKGROUND

In September 1996, Promenade Village Townhomes, L.L.C. (Promenade) entered into a contract with Weis for the construction of a townhome development (Development) designed by BRW Elness Architects, Inc, n/k/a Elness Swenson Granham Architects, Inc. (ESG). Weis hired various subcontractors to work on the project, including Mikesh, Inc. (Mikesh), J-Berd Mechanical Contractors, Inc. (J-Berd), and Waterproofing by Experts, Inc. (WBE). WBE used a product manufactured by Colloid Environmental Technologies Co. (CETCO), which in turn used a product manufactured by Chris Craft Industrial Products, Inc. (Chris Craft). Construction on the Development began in late 1996, with the majority of the construction occurring in 1997.

From January 1, 1997 to December 31, 1997, Westfield insured Weis under a commercial liability policy (the Westfield policy), and from January 1, 1998 through December 31, 1998, Valley Forge Insurance Company (Valley Forge) insured Weis under a commercial liability policy (the Valley Forge policy). Weis's subsequent insurers are not parties to the suit.

The Development consists of six units. Each unit has two rows of townhomes facing each other across a courtyard. The courtyard is a precast concrete plank deck that has been covered with soil, stoops, sidewalks, grass, and other landscaping. Beneath each courtyard is an underground garage, and in some areas, the townhome units extend below the courtyard and adjoin the parking garage. After a heavy rain in July 1997, water from the courtyard area leaked into some of the garages and townhomes causing damage in varying degrees.[1] After the July 1997 storm until 2002, when Promenade sold the Development, the Development experienced problems with water penetration, and Promenade submitted various claims for that damage to Weis. In response, Weis performed a variety of repairs to address the problems. Some of those

[1] This case does not involve any claims for property damage that occurred as a result of the July 1997 rain.

repairs damaged already completed work on the Development. This case involves two types of claims related to the damage from the water penetration—insurance-related claims and construction-related claims.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. Insurance Claims

Promenade seeks damages from Weis for breach of contract and negligence. Weis seeks coverage under the Westfield policy and Valley Forge policy for Promenade's claims and for money it has expended to address the water problems. There are three insurance-related summary judgment motions before the Court. Specifically, Westfield, Valley Forge, and Weis move separately for summary judgment, seeking a declaration regarding whether one or both

insurance companies must indemnify Weis for the claims alleged against it by Promenade.[2] They seek a declaration as to which, if any, of Promenade's claimed damages are covered by the Westfield and/or Valley Forge policies, not whether Weis is legally obligated to pay the claimed damages.

The Court applies general principles of contract interpretation in construing insurance contracts. *Lobeck v. State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249 (Minn. 1998). Words in insurance contacts are given their plain and ordinary meaning. *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn. 2001). The Court must consider the policy and its exclusions as a whole, and "the terms will not be so strictly construed as to lead to a harsh or absurd result." *Employers Mut. Liab. Ins. Co. v. Eagles Lodge*, 165 N.W.2d 554, 556 (Minn. 1969).

*1. Westfield Policy*

The Westfield policy is a comprehensive general liability (CGL) policy based on the 1986 revision to the CGL standard-coverage form. Today, most CGL insurance in the United States is written on standardized forms developed by the Insurances Services Office, Inc. *See, e.g. Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 74-75 (Wis. 2004) (discussing CGL insurance generally). The CGL standard-form policies are revised periodically, and major revisions to the standardized forms occurred most recently in 1973 and 1986. *Id*. The Westfield policy provides that Westfield will pay sums that Weis "becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." The policy's coverage grant applies only to "'property damage' [that] occurs during the policy period." It is further limited by exclusions contained within and endorsements attached to the Westfield

[2] Since this lawsuit began, Westfield and Valley Forge have agreed to provide Weis with a defense to the liability claims made against it in this lawsuit. Accordingly, whether the insurance companies must defend Weis is not before the Court.

policy. Thus, to determine if the Westfield policy provides coverage to Weis, the Court must determine whether there has been property damage, if that damage occurred during the policy period, if any exclusions or endorsements preclude coverage, and if there is coverage, what scope of coverage is provided by the phrase "because of . . . 'property damage.'"

*a. Property Damage*

The Westfield policy defines "property damage" as follows:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

As Westfield concedes, there is no factual dispute that "some" property damage occurred when water penetrated some parts of the Development. This caused physical injury to tangible property and resulted in loss of use of tangible property.

*b. Occurrence*

The Westfield policy defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful effects." Minnesota courts use the "actual injury" or "injury-in-fact" trigger rule when determining when an occurrence-based policy has been triggered. *See In re Silicone Implant Litig.*, 667 N.W.2d 405, 415 (Minn. 2003). Under that rule, "the time of the occurrence is not the time the wrongful act was committed but the time the complaining party was actually damaged." *Id*. To show that a policy was triggered, "an insured must how that *some damage* occurred during the policy period." *N. States Power Co. v. Fidelity & Cas. Co. of New York*, 523 N.W.2d 657, 663 (Minn. 1994) (emphasis in original). "For the purposes of the actual-injury trigger rule, an injury can occur even though the

injury is not 'diagnosable,' 'compensable,' or manifest during the policy period as long as it can be determined, even retroactively, that some injury did occur during the policy period." *In re Silicone*, 667 N.W.2d at 415.

In order to determine whether allocation of loss is appropriate under the actual-injury trigger rule, a court must first determine whether the claimed injuries are continuous. *Id*. at 421. If they are not, under the actual-injury trigger rule, the policies on the risk at the time of the injury pay all losses arising from that injury. *Id*. If the injuries are continuous, the Court must determine "whether the continuous injury arose from some discrete and identifiable event." *Id*. If it did, the policies on the risk at the time of that event are responsible; if not, allocation of the loss may be appropriate. *Id*. Allocation, however, is meant to be the exception and not the rule; if the Court can identify a discrete originating event that allows it to avoid allocation, it must do so. *Id*. at 421-22.

Westfield concedes that "some" of the property damage occurred, as a result of unintentional acts, during the policy period in the fall of 1997. Westfield disputes, however, that all of the claimed property damaged occurred during the policy period. Specifically, it asserts that most of the property damage occurred as a result of multiple events, which were unintentional, that occurred after the expiration of the Westfield policy period. In this way, Westfield urges the Court to allocate the duty to indemnify amongst Weis' insurers. In response, Weis argues that the injury or injuries that triggered the insurance coverage occurred in 1997 when the waterproofing and draining systems were installed and when the instances of water damage were discovered after the units were certified as complete and ready for occupancy. It contends that all subsequent water intrusion events and the damages flowing therefrom are derivatives of the damage that occurred in 1997.

Based on a review of the expert reports and Promenade's leak reports, the Court concludes that there is no genuine issue of material fact with respect to whether the water penetration is continuous. It is continuous. Next, the Court must determine whether the continuous injury arose from a discrete and identifiable event. After reviewing the record, the Court concludes that the water penetration results directly from the discrete and identifiable event of the installation of the drainage and waterproofing systems. Specifically, the experts allege the waterproofing system, draining system, and/or design errors in construction are the cause of the water penetration. For example, Promenade's expert, David Campbell, opines that the problems stem, in part, from design and installation errors with the waterproofing membrane and drainage pipes. Rich Koziol and Mark Chauvin, two of Weis' experts, conclude that there are several problems with the original design and installation of the courtyard waterproofing system, and Richard Stehly, ESG's expert, asserts that most of the problems result from the use of an inappropriate waterproofing membrane and inadequate soil fill. Westfield has offered no evidence to dispute these opinions with respect to the cause of the water penetration. Instead, it merely asserts the problem is not attributable only to the waterproofing and/or drainage system but rather to multiple events, including severe rains that occurred in the Eagan area and from work Weis did after 1997 to repair the leaks.

The Court finds Westfield's argument unpersuasive. Beginning in the fall of 1997, Promenade has a record of water penetration throughout the Development when either it rained or snow thawed. The experts trace those leaks to some type of problem in the construction of the Development, which occurred in 1997 when the Westfield policy was in place. Accordingly, the Court concludes that the Westfield policy was triggered by an occurrence during the policy period.

*c. Exclusions*

Westfield and Weis disagree about the impact of two exclusions contained in the Westfield policy. The burden is on the insurer to establish the applicability of an exclusion. *Caledonia Community Hosp. v. St. Paul Fire & Marine Ins. Co.*, 239 N.W.2d 768, 770 (1976). Exclusions are strictly construed against the insurer. *Hennings v. State Farm Fire & Cas. Co.*, 438 N.W.2d 680, 683 (Minn. Ct. App. 1989). The exclusions at issue provide:

> **2. Exclusions**
>
> This insurance does not apply to:
>
> * * *
>
> **l. Damage to Your Work**
>
> "Property damage" to "your work" arising out of it or any part of it and including the "products-completed operations hazard."
>
> This exclusion does not apply if the damaged work or the work out of which the damages arises was performed on your behalf by a subcontractor.
>
> **m. Damage to Impaired Property or Property Not Physically Injured**
>
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work;" or
>
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.
>
> * * *
>
> **Section V- Definitions**
>
> * * *
>
> 19. "Your work" means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

* * *

Westfield acknowledges that under exclusion (l), it must provide coverage for property damage to Weis's work, provided that the damaged work was performed by subcontractors on Weis's behalf. However, it asserts that the "business risk doctrine" applies to preclude coverage for the repair and replacement costs of defective work itself. *See Bor-Son Bldg. Corp. v. Employers Commercial Union Ins. Co. of Am.*, 323 N.W.2d 58, 61-63 (Minn. 1982) (endorsing the business risk doctrine); *Knutson Constr. Co. v. St. Paul Fire & Marine Ins. Co.*, 396 N.W.2d 229, 231-33 (Minn. 1986) (reaffirming *Bor-Son*). The business risk doctrine is a judicially-recognized doctrine related to manageable risks. Manageable risks include (1) risks which management can and should control or reduce to manageable proportions; (2) risks which management cannot effectively avoid because of the nature of the business operations; and (3) risks that relate to the repair or replacement of faulty work or products. *Knutson*, 396 N.W.2d 235. The doctrine provides that the types of risks that are a normal, foreseeable, and expected incident of doing business should be reflected in the price of the product or service rather than as a cost of insurance to be shared by others. *Id*. In response, Weis asserts that *Bor-Son* and *Knutson* are inapposite because they are based on the "your work" exclusion in the 1973 CGL standard-form policy whereas the Westfield policy is based on the 1986 CGL standard-form policy.

As if on cue, three days after the Court heard oral argument on these motions, the Minnesota Supreme Court issued an opinion dispensing with the *Bor-Son* and *Knutson* interpretation of the "your work" exclusion. *See Wanzek Constr., Inc. v. Employers Ins. of Wausau*, 679 N.W.2d 322 (Minn. 2004). In that case, the Minnesota Supreme Court held that the

extent to which a policy covers business risks must be governed by the specific terms of the contract, as opposed to the business risk doctrine. *Id.* at 327. Therefore, the Court finds that exclusion (l) does not apply to exclude coverage for those claimed damages that involve damaged work or work out of which the damage arises if that work was performed by a subcontractor on Weis's behalf.

Westfield asserts that exclusion (m) applies to Promenade's claims for damages against Weis for suppressed rentals for, vacancies in, or concessions regarding units that were not damaged by water. In response, Weis agrees that exclusion (m) does apply but argues that coverage is saved by the exception to exclusion (m), which provides that exclusion (m) does not apply to the "loss of use of other property arising out of sudden and accidental physical injury to . . . 'your work' after it has been put it its intended use." Specifically, Weis contends that Promenade's alleged damages relating to suppressed rentals, vacancies, and concessions for loss of use occurred after the Development was put to its intended use. Weis relies on the fact that the City of Eagan certified the Development as ready for occupancy before the loss of use occurred. Weis also argues that exclusion (m) is ambiguous in that the phrase "property that has not been physically injured" cannot be reconciled with the definition of "property damage" that includes "physical injury to tangible property, including all resulting loss of use of that property" and "loss of use of tangible property that is not physically injured."

Exclusion (m) precludes coverage for property damage arising out a specific type of activity. In this way, it is no different from other exclusions that limit the scope of coverage under the Westfield policy. After reviewing the policy as a whole and considering the plain and ordinary meaning of the terms used, the Court finds that exclusion (m) is not ambiguous. Rather, it precludes coverage for property damage, in the form of loss of use of tangible property that has

not been physically injured, if that loss of use results from "a defect, deficiency, inadequacy or dangerous condition in . . . 'your work.'" The exception to exclusion (m) saves coverage if the loss of use arises out of "sudden and accidental physical injury to . . . 'your work' after it has been put to its intended use." The Development was put to its intended use in the fall of 1997, as evidenced by documents showing rentals beginning in 1997 and the certification Promenade received from the City of Eagan. Because Promenade's claimed loss of use in the form of suppressed rental rates, vacancies and concessions occurred after the Development had been put to its intended use and because, as discussed previously the property damage was accidental, the Court concludes that exclusion (m) does not preclude coverage.

*d. Endorsements*

Westfield asserts that two endorsements to the Westfield policy preclude coverage.[3] The first endorsement provides:

> **EXCLUSION – ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABLITY**
>
> This endorsement modifies insurance provides under the following:
>
> COMMERICAL GENERAL LIABILITY COVERAGE PART
>
> This insurance does not apply to "bodily injury," "property damage," "personal injury," or "advertising injury" arising out of the rendering or failure to render any professional services by you or for you, including:
> 1. The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; and
> 2. Supervisory, inspection or engineering services.

Weis asserts that the first endorsement was erroneously attached to the Westfield policy and that its inclusion in the policy, together with the third exclusion, creates an ambiguity that must be resolved in Weis's favor. To support this assertion, Weis relies on a publication by the

[3] The parties agree that there is a factual dispute with respect to whether the alleged damages are attributable to design or construction errors.

International Risk Management Institute that explains that since 1996, the first endorsement is to be attached only to policies issued to insureds if they are actual engineers, architects or surveyors. Because Weis is not an engineering, architectural, or surveying company, it asserts that the endorsement does not apply. In response, Westfield asserts that the first endorsement must be considered because it is part of the Westfield policy and because it does not contradict the third endorsement.

The Court agrees with Westfield. The first endorsement states that the insurance does not apply to "property damage" that arises out of the "rendering or failure to render any professional services by you or for you." The professional services are then described in subsections (1) and (2), which relate to the title of the first endorsement. Nothing in the first endorsement limits its application to only engineers, architects, or surveyors. Rather, the focus of the first endorsement is on the nature of the service provided, not the title of the service provider. For this reason, the Court concludes that the first endorsement will apply to exclude coverage to the extent that the fact-finder determines that the alleged damages are attributable to rendering or failure to render professional services as described in the first endorsement.

Turning to the third endorsement, it provides:

> **EXCLUSION – CONTRACTORS – PROFESSIONAL LIABLITY**
>
> This endorsement modifies insurance provided under the following:
>
> COMMERICAL GENERAL LIABILITY COVERAGE PART
>
> The following exclusion is added to paragraph 2., Exclusions of Coverage A – BODILY INJURY AND PROPERTY DAMAGE LIABLILITY . . .
>
> * * *
>
> 1. This insurance does not apply to "bodily injury," "property damage," "personal injury," or "advertising injury" arising out of the rendering or failure to

> render any professional services by you or on your behalf, but only with respect to either or both of the following operations:
>
> a. Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and
>
> b. Providing or hiring independent professionals to provide engineering, architectural or surveying services in connection with construction work you perform.
>
> 2. Subject to paragraph 3 below, professional services include:
>
> a. The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and
>
> b. Supervisory or inspection activities performed as part of any related architectural or engineering activities.
>
> 3. Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

To the extent the claimed damages are found to be attributable to design errors, Westfield asserts that the third endorsement excludes coverage. Weis argues that the third endorsement applies only to work Weis performed. It bases its argument on the fact that the endorsement references "work you perform" as opposed to the defined term "your work," which includes work performed by subcontractors on Weis's behalf. Because Weis claims that it did not perform any design services, it asserts that the third endorsement is inapplicable.

The third endorsement excludes coverage for the "rendering or failure to render any professional services by you *or on your behalf*" but only if "either or both" of two conditions apply. Both of those conditions reference only work performed by Weis itself, not the broader "your work" definition. Giving the language in the third endorsement its plain and ordinary meaning, the Court finds the endorsement to be unambiguous. The language is clear that the endorsement only applies to exclude coverage for work Weis itself performs. Thus, the Court finds that the third endorsement applies only to Weis's rendering or failure to render professional services on the work it did itself. For this reason, the Court concludes that the third endorsement will only apply to preclude coverage to the extent that the fact-finder determines that the alleged

damages are attributable to Weis's rendering or failure to render professional services on the work it did itself.

*e. Scope of Coverage*

Given that the Court has concluded that the Westfield policy provides coverage to Weis as set forth above, the Court must now determine the scope of coverage provided under the policy. The Westfield policy provides that Westfield "will pay sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Westfield takes issue with specific categories of claimed damages. Specifically, it asserts that even if it is liable for some damages, the majority of the claimed damages do not fall within the scope of coverage provided under the Westfield policy. The Minnesota Supreme Court has explained that the phrase "because of . . . 'property damage'" requires the insurer to pay all damages which are causally related to an item of 'property damage' which satisfies either of the policy's definitions." *Federated Mut. Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 757 (Minn. 1985). Using this pronouncement, the Court will consider each category of claimed damages in turn.

*i. Repair and Remedial Work*

Weis asserts that it spent $36,808 to repair building interiors that were damaged by water, and Promenade seeks $190,041 from Weis for costs it asserts it incurred to repair damage to the Development's units and interior. These amounts include expenses related to removing, drying, and replacing carpets, painting damaged walls, and repairing drywall as a result of damage from water penetration. The Court finds that this type of damages is either actual property damage or causally related to property damage. Accordingly, the Court concludes that Westfield is required

to reimburse Weis for its costs of $36,808 and to indemnify Weis for Promenade's claim of $190,041.

Beginning in the fall of 1997, Weis asked its subcontractors to perform a variety of jobs in an attempt to cure the water leakage problems in the Development. For instance, counter-flashing was added to the termination of the vertical waterproofing between the stoops; the areas between the stoops and the door sills were caulked; and grout was injected into the stoops to fill void spaces and to act as a water barrier. This remedial work did not include repairing any physical damage to the courtyard areas. For this work, Weis seeks $669,022. Westfield asserts that these damages are not covered by the Westfield policy because they were not aimed at repairing property damage but rather geared to preventing future, unknown damage. The Court finds this argument unpersuasive. Weis added the counter-flashing, caulking, and grout in response to claims made against it by Promenade relating to property damage that was occurring in various sections of the Development. In this way, the repairs were causally related to the property damage that the Development incurred. Thus, the Court concludes that Westfield must indemnify Weis for these claimed damages, except to the extent discussed below.

Westfield also argues that if any of the $669,022 is attributable to damage to completed work sustained in connection with the remedial measures, that portion of the $669,022 is not covered because that property damage was not accidental. The Court agrees. With respect to any claimed damages that are determined by the fact-finder to result directly from remedial efforts undertaken to cure the water penetration problem, such damages are not covered because they were not accidental. *See Bright Wood Corp. v. Bankers Standard Ins. Co.*, 665 N.W.2d 544, 549 (Minn. Ct. App. 2003).

Finally, Westfield asserts that, even if such damages are covered under the policy, it is not responsible for those damages because Weis undertook the repairs without Westfield's consent in violation of the terms of the Westfield policy. Section IV of the policy provides that "no insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense . . . without [Westfield's] consent." Weis responds that Westfield had full knowledge of the repairs, as evidenced by the correspondence between the parties. After reviewing the parties' correspondence and arguments on this issue, the Court concludes that there are genuine issues of material fact with respect to whether Weis obtained Westfield's consent prior to making the repairs. Accordingly, if the fact-finder determines that Weis did not obtain Westfield's consent prior to undertaken the remedial efforts and repairs, there will be no coverage for the $669,022 pursuant to Section IV of the Westfield policy. If the fact-finder determines that Weis did obtain Westfield's consent prior to incurring the $669,022 in costs, then Westfield will be required to reimburse Weis for these costs insofar as they are attributable to accidental damage.

*ii. Diminution in Value*

Promenade claims damages in the amount of $2,695,513 for diminution in value relating to losses it suffered due to alleged higher vacancy rates and suppressed rental rates and $13,476,330 for the diminution in value in the sale of the Development.[4] Specifically, Promenade claims that it suffered damages because it was forced to offer rebates and lower rental rates in response to the water penetration problems. Westfield asserts that it is not required to indemnify Weis for these alleged damages because the Westfield policy does not

[4] The Court discusses Promenade's alleged damages in their totality while recognizing that Promenade has pled alternative theories of damages. Promenade will not be able to recover under all of its damages theories.

provide coverage for such claims. To support this argument, Westfield relies on *Federated Mutual Insurance Company v. Concrete Units*, 363 N.W.2d 751 (Minn. 1985). In that case, an insurer sought a declaration regarding whether it was obligated to defend and indemnify the insured with respect to claims asserted against the insured relating to allegedly supplying defective concrete. *Concrete Units*, 363 N.W.2d at 753. After reviewing the 1973 CGL definition of property damage, which is similar to the definition in the Westfield policy, the Minnesota Supreme Court concluded that a claim for diminution in value is not property damage because it is not a physical injury to tangible property nor does it represent loss of use of tangible property. *Id*. at 757.

In response, Weis points out that Westfield is ignoring the policy's coverage grant that provides that Westfield will pay sums which Weis becomes legally obligated to pay "*because of* . . . property damage." The Court agrees with Weis. Westfield is trying to suggest that its policy only covers property damage because of property damage. *See Western Nat'l Ins. Co. v. Frost Paint & Oil Corp.*, 1998 WL 27247, at *2-3 (Minn. Ct. App. Jan. 27, 1998) (discussing scope of the "because of" clause). *Concrete Units* did not address whether a claim for diminution in value was covered under the "because of" phrase. Thus, its holding is inapplicable to the determination of whether a claim for diminution in value can be covered under the "because of" language. Thus, given the "because of" coverage grant in the Westfield policy, the Court's inquiry does not stop after it determines that Promenade's claim of diminution in value is not property damage; rather, it must also determine whether such a claim is "causally related" to an item of property damage, namely the damage caused by water penetration in 1997. *Concrete Units*, 363 N.W.2d at 757. As one commentor explained: The real inquiry, however, is what is the cause of the diminution in value. Does it stem from the existence of physical injury to the

tangible property? If so, the 'property damage' element is satisfied." 4 Bruner & O'Connor, Construction Law, § 11:32 (2004). At this stage, the Court is faced only with the task of determining whether Promenade's claims for vacancies and reduced rents and for a reduced sale price, if proven, would be covered by the Westfield policy. The Court is not determining whether either claim for damages has been proven. Thus, the Court concludes that claims concerning higher vacancy rates and suppressed rentals and reduced sale price, if the fact-finder determines that these claims result from the water penetration problems, are covered by the Westfield policy because they are "causally related" to the property damage that occurred as a result of water leakage in 1997.

*iii. Replacement of Waterproofing System*

In the alternative, Promenade claims damages of $4,000,000 for the replacement of the waterproofing system and any other work directed at remedying the alleged defects. Westfield contends that this claim is not covered by its policy because *Concrete Units* determined that cost of replacement of a defective product is not covered by a CGL policy. *See Concrete Units,* 363 N.W.2d at 757. Again, *Concretes Units* is distinguishable. In that case, an exclusion not applicable to this instance applied to preclude coverage for replacement of the defective construction. Accordingly, the Court finds that Westfield is obligated to indemnify to Weis if the fact-finder determines that Weis is liable for Promenade's claim for replacement of the waterproofing system.

*2. Valley Forge Policy*

The Valley Forge policy is also a CGL policy based on the 1986 revision to the CGL standard-coverage form. It is similar to the Westfield policy except that it does not contain the professional services endorsements. It is an occurrence-based policy that provides coverage to

Weis for property damage occurring from January 1, 1998 to January 1, 1999. As discussed above, the Court has determined that the actual injury to the Development occurred in 1997. As a result, any damages resulting from the 1997 injury are not covered by the Valley Forge policy, which provided covered for Weis from January 1, 1998 through December 31, 1998. Moreover, any property damage that occurred during the Valley Forge policy period that resulted from work done to cure the leakage problem was "intentional," not "accidental," and therefore does not constitute an "occurrence" under the Valley Forge policy. *See Bright Wood*, 665 N.W.2d at 549 (explaining that "resulting damage is not an accidental occurrence" if the damage results from "repairs deliberately undertaken"). Accordingly, there is no genuine issue of material fact that the Valley Forge policy was not triggered. Therefore, the Court grants Valley Forge's motion for summary judgment.

**B. Construction Issues**

There are eight construction-related summary judgment motions before the Court. The Court considers each in turn.[5]

*1. Mikesh's Motion for Summary Judgment Against J-Berd*

Mikesh is engaged in the business of providing plumbing and heating design services. J-Berd, Weis's mechanical subcontractor responsible for the installation of the plumbing, heating, and fire protection systems for the Development, worked with Mikesh to draft mechanical drawings for the heating and plumbing systems.[6] Part of Mikesh's work involved determining the size and number of drains needed for the Development's garage roofs/plaza decks. Mikesh

---

[5] Any motions or issues raised with respect to attorney's fees and costs will be considered post-trial.

[6] There is a dispute with respect to whether Mikesh was a subcontractor of Weis or J-Berd. Because there is no genuine issue of material fact with respect to whether Mikesh was negligent, the Court will not address this issue.

was also asked to recommend a type of drain, and it recommended the Zurn Z-100-85 (Zurn) drain. Later, J-Berd learned that there would be two feet of soil on top of the courtyards. Because the Zurn drain did not have a long enough extension, J-Berd, *without consulting Mikesh*, selected a different drain, the Sioux Chief's Fat Max (Fat Max) drain. After the Fat Max drain was installed, a two-inch gap remained between the top of the precast deck and the lowest drainage hole, which allows water to collect on the deck.

In a fourth-party complaint, J-Berd asserted claims against Mikesh for negligence, breach of warranty, and/or strict liability. J-Berd has since stipulated to the dismissal of its breach of warranty and strict liability claims, leaving only the claim of negligence against Mikesh.

The elements of a cause of action for negligence are (1) duty, (2) breach of that duty, (3) that the breach of the duty be the proximate cause of plaintiff's injury, and (4) damages. *Minneapolis Employees Ret. Fund v. Allison-Williams Co.*, 519 N.W.2d 176, 182 (Minn. 1994). Duty in negligence cases may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. *Id*. The general standard of care required by law is that degree of care that a reasonably prudent person would exercise under the same or similar circumstances. *Id*. A person practicing a profession is bound to exercise the degree of care and skill usually exercised by members of the profession under similar circumstances. *City of Eveleth v. Ruble*, 225 N.W.2d 521, 525 (Minn. 1974). The circumstances to be considered in determining the standard of care, skill, and diligence to be required in this case include the terms of the employment agreement, the nature of the problem which the supplier of the service represented himself as being competent to solve, and the effect reasonably to be anticipated from the proposed remedies upon the balance of the system. *Id*. Expert testimony is usually needed to determine whether a professional breached his or her duty

of care; however, there are some instances when a fact-finder can determine if there has been a breach without the use of expert testimony. *Id*.

Mikesh moves for summary judgment, contending that there is no genuine issue of fact with respect to whether it breached its duty of care to J-Berd and to whether J-Berd has established causation. Mikesh points out that no expert in this case has opined that Mikesh's recommendations regarding placement and number of drains are a cause of the water problems and that no one has testified that Mikesh was involved in the decision to use the Fat Max drain instead of the Zurn drain.

J-Berd asks the Court to deny Mikesh's motion in the event that the Court finds a genuine issue of material fact "with regard to the causal relation of the design of the drain system and [Mikesh's] work on this Project and the alleged damages in this action." J-Berd acknowledges, however, that no expert has attributed the cause of the alleged water leaks to either the design or the installation of the plaza drain system. Moreover, J-Berd concedes that none of the experts in this case have opined that Mikesh breached its duty of care.

S.N. Bhatt, the only expert who is a mechanical engineer, concluded that Mikesh's methods used for calculating the number of drains and location of drains were proper. Because there is nothing in the record to create a genuine issue of material fact with respect to whether Mikesh breached its duty of care to J-Berd, the Court grants Mikesh's motion and dismisses with prejudice J-Berd's claim of negligence against Mikesh.

*2. Weis's and WBE's Cross-Motions for Summary Judgment*

Weis subcontracted with WBE for WBE to provide waterproofing for the Development. WBE designed the waterproofing system for the Development and chose to use CETCO's Swelltite 3000 product. Swelltite 3000 is a three-layered product. The bottom layer is a

polyvinyl alcohol-based polymer film, the middle layer consists of a bentonite/butyl composite, and the top layer is made of a polyethylene material. The three layers are meant to work together to form a waterproof membrane. Specifically, the film is designed to dissolve when it comes into contact with water, and then the bentonite/butyl composite expands to create a seal to prevent water intrusion.

The subcontract required WBE to be "responsible for providing and maintaining a water-tight system" and "responsible for any and all damages and costs due to repair of waterproofing . . . and any damages caused to the interior of building due to failure of the waterproofing system." The subcontract also required WBE to provide Weis with a warranty for each building and to indemnify Weis for all claims arising out of WBE's work. WBE was also required to maintain and pay for insurance in the amount of $1,000,000 per occurrence and $1,000,000 aggregate and to name Weis as an additional insured under WBE's insurance policy. WBE obtained a policy from Travelers (Travelers policy) for the period covering April 25, 1997 to April 25, 1998. Weis was not a named insured under the Travelers policy.

After Westfield brought this action against Weis, Weis filed a third-party complaint against WBE seeking indemnification and contribution for WBE's allegedly negligent services with regard to the courtyard waterproofing. Later, Weis obtained permission to amend its pleading to add a claim for breach of contract. Weis tendered defense of this suit to WBE and to Travelers. WBE did not respond to the tender, and Travelers denied the tender because Weis was not a named insured on the Travelers policy. Weis and WBE both move for summary judgment, seeking a declaration concerning whether the subcontract requires WBE to indemnify Weis in connection with Promenade's claims made against Weis. Construction of a contract is a

question of law for the court. *See e.g., Hunt v. IBM Mid-Am. Employees Fed. Credit Union*, 384 N.W.2d 853, 856 (Minn. 1986).

The parties dispute whether WBE must indemnify Weis under the Weis/WBE subcontract and if so, the scope of the indemnification. The focus of the parties' dispute involves paragraph 7 of the subcontract. That paragraph provides:

> The Subcontractor agrees to assume entire responsibility and liability, to the fullest extent permitted by law, for all damages or injury to all persons, whether employees or otherwise, and to all property, *arising out of, resulting from or in any manner connected with, the execution of the work provided for in the Subcontract*, or occurring or resulting from the use by the Subcontractor, his agents or employees, of materials, equipment, instrumentalities or other property, whether the same be owned by the Contractor, the Subcontractor or third parties, and *the Subcontractor, to the fullest extent permitted by law, agrees to indemnify and save harmless the Contractor, his agents and employees from all such claims* including, without limiting the generality of the foregoing, claims for which the Contractor may be or may be claimed to be liable and legal fees and disbursements paid or incurred to enforce the provisions of this paragraph . . . and the Subcontractor further agrees to obtain, maintain and pay for such *general liability insurance* coverage and endorsements as will ensure the provisions of this paragraph.

(Emphasis added).

Under Minnesota law, an indemnification contract is enforceable only "if the underlying injury or damage is attributable to the negligent or otherwise wrongful act or omission, including breach of a specific contractual duty, of the promisor or the promisor's independent contractors, agents, employees, or delegates." *See* Minn. Stat. § 337.02 (2002). If a subcontract requires a subcontractor to indemnify a general contractor for all claims, such a contract is unenforceable. *Id*. The Minnesota Supreme Court has explained that section 337.02 ensures that each party will remain responsible only for its own negligent acts or omissions. *Katzner v. Kelleher Constr.,* 545 N.W.2d 378, 381 (Minn. 1996).

With respect to the issue of indemnification, paragraph 7 provides that WBE will "indemnify and save harmless" Weis "to the fullest extent permitted by law." As discussed above, the "fullest extent of the law" in Minnesota allows WBE to indemnify Weis for claims arising from WBE's negligent or otherwise wrongful acts or omissions occurring during WBE's work on the Development.

WBE argues that if it has a duty to indemnify Weis under the subcontract, that duty has not been triggered because there is no evidence that the claims alleged against Weis relate to WBE's own negligence or otherwise wrongful acts. Weis, however, points to evidence such as the failures in the installation of the Swelltite 3000 and expert testimony that the selection of Swelltite 3000 was inappropriate for use in the Development to show that there are factual disputes with respect to whether WBE is responsible for the water penetration. After reviewing the record, the Court determines that there are genuine issues of material fact with respect to whether WBE is responsible for the water penetration. Accordingly, to the extent that the fact-finder determines that WBE's own negligence or wrongful acts or omissions are present in this case, WBE is required to indemnify Weis for Promenade's claims against Weis that relate to WBE's own negligence or wrongful acts or omissions.

There is a narrow exception to the general prohibition of indemnification for the indemnitee's own negligence. Specifically, section 337.02 "do[es] not affect the validity of agreements whereby a promisor agrees to provide specific insurance coverage for the benefit of others." Minn. Stat. § 337.05, subd. 1 (2002). Thus, if a subcontractor agrees to provide specified insurance and fails to do so, the general contractor is entitled to indemnification in the amount equal to the insurance required under the contract. *See id.*, subd. 2; *see also Seward Housing Corp. v. Conroy Bros. Co.*, 573 N.W.2d 364, 367 (Minn. 1998). The Minnesota

Supreme Court has interpreted sections 337.02 and 337.05 to uphold a construction contract that required the subcontractor to provide insurance coverage for all damages and injuries, including claims for which the contractor may be or may be claimed to be liable. *See Holmes v. Watson-Forsberg Co.*, 488 N.W.2d 473, 475 (Minn. 1992). In *Holmes*, the court determined that even though an indemnification provision may be unenforceable under section 337.02, a promise to purchase insurance to cover any negligent acts by the promisee is valid and enforceable. *Id*. at 475.

Weis asserts that WBE's failure to obtain insurance constituted a breach of the Weis/WBE subcontract. It is undisputed that WBE contracted to obtain a liability insurance policy that named Weis as an additional insured and that Weis failed to do so. Therefore, WBE breached the subcontract. *See Seward*, 573 N.W.2d at 367. Weis is entitled to indemnification for claims that would have been covered by the insurance, in the amount specified in the Weis/WBE subcontract. *See* Minn. Stat. § 337.05, subd. 2. The remaining issue before the Court is what damages arose from WBE's breach, namely whether the disputed claims against Weis "arise[] within the scope of the specified insurance." *See Seward*, 573 N.W.2d at 367. Under the language of paragraph 7, the scope of the specified insurance requires WBE to maintain insurance for "all such claims" as described in paragraph 7 that Weis may be liable for. Thus, WBE was required to maintain insurance sufficient to cover Weis for all damages for which Weis may be liable if they arise out of, result from, or are in any manner connected with the work under WBE's subcontract.

WBE essentially claims that its failure to procure insurance was a harmless omission because none of Promenade's claims against Weis would have been covered by the insurance because the claims arose after WBE completed its operations on the Development. WBE

maintains that it was only required to obtain general liability insurance, which applies only to losses that occur during performance of its work. *See id.* (discussing differences between completed-operations and general liability insurance). Weis agrees that the insurance would have protected it only for claims that arose during the performance of WBE's work. According to WBE, the leaks occurred after it finished installation of the Swelltite 3000 on each specific unit, and thus, even if it had obtained insurance, there would be no coverage for any claims against Weis. *See id*. at 368 (concluding that if subcontractor had purchased the required general liability insurance, the policy would not have provided coverage for the general contractor's alleged damages because the claims arose after the subcontractor had completed its work). In response, Weis asserts that the alleged claims arose during WBE's work because there is evidence that leaks occurred while WBE was installing the waterproofing at the Development. The difference between Weis's and WBE's arguments turns on their definitions of when WBE completed its work. WBE asserts that it completed its work after it finished each unit; Weis asserts that WBE completed the work when WBE finished all of its work on the Development.

After reviewing the record, the Court concludes that there are genuine issues of material fact with respect to whether the claims alleged arose during WBE's work on the Development. Accordingly, to the extent the fact-finder determines that Promenade's claims arose during WBE's work, WBE has a duty to indemnify Weis, up to the limits required under the subcontract, for those claims that arise out of, result from, or are in any manner connected with WBE's performance under the subcontract.

*3. Weis's and J-Berd's Cross-Motions for Summary Judgment*

Weis subcontracted with J-Berd for J-Berd to design and install the courtyard drainage system. In doing so, J-Berd selected the Fat Max drain and made other decisions regarding the

drainage system for the Development. The Weis/J-Berd subcontract is based on the same form as the Weis/WBE subcontract. It requires that J-Berd take "full responsibility of the design of the [drainage] system," provide Weis with a warranty for each building, and indemnify Weis for all claims arising out of J-Berd's work. The subcontract required J-Berd to maintain and pay for insurance in the amount of $1,000,000 per occurrence and $1,000,000 aggregate and to name Weis as an additional insured under WBE's insurance policy. WBE obtained a policy from Secura (Secura policy) for the period covering February 28, 1997 to February 28, 1998, but it did not list Weis as a named insured on the policy.

After Westfield brought this action against Weis, Weis filed a third-party complaint against J-Berd seeking indemnification and contribution for J-Berd's alleged negligent services with regard to the courtyard drainage system. Later, Weis obtained permission to amend its pleading to add a claims for breach of contract and contractual indemnity. Weis tendered defense of this suit to J-Berd and to Secura, and both rejected the tender. Weis and J-Berd now cross move for summary judgment, seeking a declaration concerning whether the subcontract requires J-Berd to indemnify Weis in connection with the claims made against Weis.

J-Berd asserts that Weis's amended breach-of-contract claim is barred by the statute of limitations because Weis did not bring it within six years of the breach. *See* Minn. Stat. § 541.05, subd. 1(1). Weis asserts that the claim relates back to its original pleading against J-Berd. Rule 15(c)(2) of the Federal Rules of Civil Procedure allows an amendment to a pleading to relate back to the date of the original pleading where the amendment arises from the same conduct, transaction, or occurrence as the original pleading. The basic inquiry is whether the amended complaint is related to the general factual situation alleged in the original pleading. *Alpern v. Utilicorp United, Inc.*, 84 F.3d 1525, 1543 (8th Cir. 1996). After reviewing the

original pleading, the Court concludes that the breach-of-contract claim relates back to the original pleading. Specifically, it is based on the same subcontract provision as described in the original pleading. Therefore, the Court finds that Weis's breach-of-contract claim is not barred by the statute of limitations.

Because the arguments raised in these cross-motions for summary judgment are nearly identical to the arguments raised in Weis's and WBE's cross-motions, the Court will summarily address Weis's and J-Berd's arguments. First, the Court concludes that under section 337.02, the Weis/J-Berd subcontract is unenforceable to the extent that it requires J-Berd to indemnify Weis for claims not arising from J-Berd's negligence or otherwise wrongful acts or omissions. *See* Minn. Stat. § 337.02. To the extent that the subcontract requires J-Berd to indemnify Weis for claims arising from J-Berd's negligence or otherwise wrongful acts or omissions during J-Berd's work on the Development, the contract is enforceable. *Id*. Second, the parties disagree about whether J-Berd's work caused the leaks and water penetration at the Development. This dispute centers around whether the two inches of standing water on the deck contributed to the water leaks. After reviewing the record, the Court concludes that there are genuine issues of material fact concerning whether J-Berd's own negligence or otherwise wrongful acts caused the water problems at the Development. Accordingly, to the extent that the fact-finder determines that J-Berd's own negligence or wrongful acts or omissions are present in this case, J-Berd is required to indemnify Weis for Promenade's claims against Weis that relate to J-Berd's own negligence or wrongful acts or omissions.

With respect to the breach-of-contract claim, J-Berd does not dispute that it failed to name Weis as an additional insured on the Secura policy. As a result, Weis is entitled to indemnification for claims that would have been covered by the insurance in the amount

specified in the Weis/J-Berd subcontract. *See Seward*, 573 N.W.2d at 367. J-Berd asserts that Weis waived its right to enforce this provision when J-Berd showed the insurance certificates to Weis and Weis failed to object to them. This argument is not supported by Minnesota law. Section 337.05 provides that a "promisor's obligation to provide specified insurance is not waived by either . . . (1) a promisee's failure to require or insist upon certificates or other evidence of insurance; or (2) a promisee's acceptance of a certificate or other evidence of insurance that shows a variance from the specified coverage." Minn. Stat. § 337.05, subd. 5.

J-Berd next argues that the insurance would not have provided coverage for Weis because the leaks occurred after J-Berd finished its work on the Development. It points to evidence to show that it finished its work on certain units before water leaks and penetration were discovered. In response, Weis presents evidence to show that J-Berd was still working when water penetration and leaks were discovered at the Development.

After reviewing the record, the Court concludes that there are genuine issues of material fact with respect to whether the claims alleged arose during J-Berd's work on the Development. Accordingly, to the extent the fact-finder determines that Promenade's claims arose during J-Berd's work, J-Berd has a duty to indemnify Weis, up to the limits required under the subcontract, for those claims that arise out of, result from, or are in any manner connected with J-Berd's performance under the subcontract.

*3. J-Berd's Second Motion for Summary Judgment Against Weis and CETCO*

Weis and CETCO alleged claims against J-Berd for contribution and indemnity. These claims are based on theories of strict liability, breach of warranty, negligence, and breach of contract. Contribution and indemnity are independent causes of action; they are equity actions and part of Minnesota's common law. *City of Willmar v. Short-Elliott-Hendrickson, Inc.,* 512

N.W.2d 872, 874 (Minn. 1994). Contribution requires a common liability of two or more actors to the injured party and payment by one of the actors of more than its fair share of the common liability. *Id.* Indemnity applies when, among other situations, a party fails to discover or prevent another's fault and, consequently, pays damages for which the other party is primarily liable. *Id.*

J-Berd maintains that there is no evidence to show that its work caused the water problems at the Development. Because causation has not been established, it maintains that it is entitled to summary judgment. Weis and CETCO[7] oppose J-Berd's motion by pointing to evidence in the record to show that J-Berd understood that the Fat Max drain, which has a solid, two inch neck that connects to the drain, would leave two inches of water on the courtyard deck and that it was J-Berd's unilateral decision to use the Fat Max drain. Moreover, Weis and CETCO rely on various experts' opinions that the two inches of water caused the sidewalks and concrete at the Development to heave, which resulted in property damage to the Development. In response to these arguments, J-Berd concedes that there are disputed facts with respect to whether there is two inches of standing water on the courtyard deck and if the drainage system is responsible for the standing water. Nonetheless, it argues that these disputed facts are irrelevant because there is nothing in the record to causally link its work with the design and installation of the Fat Max drain to the water damage at the Development.

Viewing the evidence in the light most favorable to Weis and CETCO, a reasonable fact-finder could conclude that J-Berd's design and installation of the Fat Max drains caused, at least in part, the water problems at the Development. Accordingly, the Court denies J-Berd's summary judgment motion.

---

[7] WBE, Chris Craft, and Mikesh also submitted memoranda in opposition to J-Berd's motion.

*4. CETCO's Motion for Summary Judgment Against Weis*

Weis, J-Berd, and ESG seek contribution and indemnity from CETCO based on its allegedly faulty product, the Swelltite 3000. These claims are based on theories of negligence, breach of warranty, and products liability. CETCO moves for summary judgment on the claims against it. It asserts that there is no genuine issue of material fact that its product was not defective or that any leaks at the Development were caused by a defect in the Swelltite 3000. CETCO's main argument attacks Campbell, Promenade's expert. CETCO asserts that Campbell did not perform adequate tests to render an opinion and that he is not qualified to render an opinion about Swelltite 3000. In response, Weis, J-Berd, and ESG submit separate memoranda detailing CETCO's involvement in choosing the Swelltite 3000 for the Development, evidence concerning CETCO's allegedly defective installation of the Swelltite 3000, and factual disputes among the various experts. For example, both Campbell and Weis's expert Koziol conclude that the Swelltite 3000 was an inappropriate material for the Development and that there were problems with its installation, including where and how it was installed and the use of flashing at the perimeter walls. Viewing these facts in the light most favorable to the parties opposing this motion, a reasonable fact-finder could conclude that CETCO is liable for contribution and indemnity based on its allegedly defective Swelltite 3000. For this reason, the Court denies CETCO's summary judgment motion.

*5. Chris Craft's Motion for Summary Judgment Against CETCO*

CETCO and J-Berd have asserted claims for contribution and indemnity against Chris Craft, alleging that its film was defective because it did not dissolve upon contact with water.

Chris Craft asserts that it is entitled to summary judgment for three reasons.[8] First, Chris Craft claims that it is entitled to summary judgment under the raw materials doctrine. Under that doctrine, "suppliers of inherently safe component products are not responsible for accidents that result when the parts are integrated into a larger system that the component part supplier did not design or build." *In re TMJ Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996). As the Eighth Circuit has explained, this doctrine focuses on determining the reasons why the component part turned out to be unsuitable for use in the finished product. *Id*. at 1056. If the finished product failed due to a flaw in the component part, then the component part itself is defective and its maker can be held liable. *Id*. If the defect is in the design of the finished product, such as a defect in choosing an unsuitable component, the manufacturer of the finished part can be held liable. *Id*.

Under the raw materials doctrine, Chris Craft asserts that its film is inherently safe and that it performed correctly. It contends that there is no evidence in the record to show that the Swelltite 3000's failure is attributable to Chris Craft's film. In response, Weis, J-Berd, and CETCO rely on the testimony of Campbell. He explains that he took six samples of the film from the Development, and at least four of those samples contained film that had not dissolved even though it had been in contact with water. Campbell opines that the film's failure to dissolve is, in part, a cause of the Development's leakage problem. Chris Craft responds to this assertion by presenting testimony by Weis's expert Koziol that there is no evidence that the film that did not dissolve ever actually came into contact with water.

The Court is sympathetic with Chris Craft's argument and notes that there is little in the record to show that there was water penetration at the locations of the nondissolving film.

[8] Although Chris Craft also discussed the economic loss doctrine in its memoranda, at oral argument it stated that it was not moving for summary judgment on that basis.

However, viewing, as it must, the evidence in the light most favorable to the nonmoving parties, the Court concludes on the record before it that there are genuine issues of material fact with respect to whether Chris Craft's film was defective. Accordingly, the Court denies Chris Craft's summary judgment motion on the basis of the raw materials doctrine.

Second, Chris Craft moves for summary judgment, asserting that there is no genuine issue of material fact with respect to whether its product caused the leakage at the Development. Based on a review of the record and Campbell's and Koziol's testimony, the Court concludes that there are genuine issues of material fact with respect to causation. Accordingly, the Court denies Chris Craft's motion for summary judgment insofar as it relates to causation.

Finally, Chris Craft asserts that it is entitled to summary judgment because it disclaimed any warranties, including the warranty of merchantability, when it sold the film to CETCO. The disclaimer CETCO signed provides:

> THERE ARE NO WARRANTIES; EXPRESS OR IMPLIED WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF.

CETCO asserts that this disclaimer is ineffective because it does not mention the word "merchantability" as required by Minnesota law and because the disclaimer was not conspicuous. *See* Minn. Stat. § 336.2-316, subd. 2 (2002). As the comments to section 336.2-316 explain, "the disclaimer of the implied warranty of merchantability is permitted under subsection (2), but with the safeguard that such disclaimers must mention merchantability and in case of a writing must be conspicuous." For this reason, the Court concludes that Chris Craft's motion fails with respect to the warranty of merchantability. With respect to the other express and implied warranties, CETCO offers no other arguments to show that there is a factual dispute concerning whether those warranties were effectively disclaimed. Therefore, the Court concludes that there is no genuine issue of material fact with respect to whether Chris Craft

effectively disclaimed other express or implied warranties. For this reason, the Court grants Chris Craft's motion with respect to the warranties other than the warranty of merchantability.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Westfield's Motion for Summary Judgment [Docket No. 214] is GRANTED IN PART AND DENIED IN PART.

2. Weis's Motion for Summary Judgment [Docket Nos. 229 & 294] is GRANTED IN PART AND DENIED IN PART.

3. Westfield Insurance Company has a duty to indemnify Weis Builders, Inc. for claims asserted against Weis Builders, Inc. by Promenade Village Townhomes, L.L.C. in *Westfield Insurance Company v. Weis Builders, Inc. et. al.*, No. 00-cv-987, except for those claims which are found to be excluded by the Engineers, Architects or Surveyors Professional Liability and/or Contractors-Professional Liability endorsements. In addition, if it is found that Weis Builders, Inc. did not obtain Westfield Insurance Company's consent for certain work undertaken prior to this action, Westfield Insurance Company will not be required to reimburse or indemnify Weis Builders, Inc. for that portion of claimed damages.

4. Valley Forge's Motion for Summary Judgment [Docket No. 221] is GRANTED.

5. Valley Forge Insurance Company does not have a duty to indemnify Weis Builders, Inc. for claims asserted against Weis Builders, Inc. by Promenade Village Townhomes, L.L.C. in *Westfield Insurance Company v. Weis Builders, Inc. et. al.*, No. 00-cv-987.

6. Mikesh, Inc.'s Motion for Summary Judgment [Docket No. 205] is GRANTED.

7. J-Berd Mechanical Contractors, Inc.'s Fourth-Party Complaint against Mikesh, Inc. [Docket No. 114] is DISMISSED WITH PREJUDICE.

8. Weis Builders, Inc.'s Motion for Summary Judgment Against Waterproofing by Experts, Inc. [Docket No. 304] is GRANTED IN PART AND DENIED IN PART.

9. Waterproofing by Experts, Inc.'s Motion for Summary Judgment [Docket No. 340] is GRANTED IN PART AND DENIED IN PART.

10. Waterproofing by Experts, Inc. has a duty to indemnify Weis Builders, Inc. for claims asserted against Weis Builders, Inc. by Promenade Village Townhomes, L.L.C. in *Westfield Insurance Company v. Weis Builders, Inc. et. al.*, No. 00-cv-987, to the extent those claims arise from Waterproofing by Experts, Inc.'s negligence or otherwise wrongful act or omission during Waterproofing by Experts, Inc.'s work on the Development. As a result of its breach of contract, Waterproofing by Experts, Inc. has a duty to indemnify Weis Builders, Inc. for claims asserted against it by Promenade Village Townhomes, L.L.C. in *Westfield Insurance Company v. Weis Builders, Inc. et. al.*, No. 00-cv-987, to the extent those claims arise out of, result from, or are in any manner connected with the work under Waterproofing by Experts, Inc.'s subcontract, if it is determined that the alleged negligence or other acts occurred before Waterproofing by Experts, Inc. completed its operations on the Development. This duty to indemnify is limited to the policy limit required under the subcontract.

11. Weis Builders, Inc.'s Motion for Summary Judgment Against J-Berd Mechanical Contractors, Inc. [Docket No. 303] is GRANTED IN PART AND DENIED IN PART.

12. J-Berd Mechanical Contractors, Inc.'s Motion for Summary Judgment [Docket No. 266] is GRANTED IN PART AND DENIED IN PART.

13. J-Berd Mechanical Contractors, Inc. has a duty to indemnify Weis Builders, Inc. for claims asserted against Weis Builders, Inc. by Promenade Village Townhomes, L.L.C. in *Westfield Insurance Company v. Weis Builders, Inc. et. al.*, No. 00-cv-987, to the extent those claims arising from J-Berd Mechanical Contractors, Inc.'s negligence or otherwise wrongful act or omission during J-Berd Mechanical Contractors, Inc.'s work on the Development. As a result of its breach of contract, J-Berd Mechanical Contractors, Inc. has a duty to indemnify Weis Builders, Inc. for claims asserted against it by Promenade Village Townhomes, L.L.C. in *Westfield Insurance Company v. Weis Builders, Inc. et. al.*, No. 00-cv-987, to the extent those claims arise out of, result from, or are in any manner connected with the work under J-Berd Mechanical Contractors, Inc.'s subcontract, if it is determined that the alleged negligence or other acts occurred before J-Berd Mechanical Contractors, Inc. completed its operations on the Development. This duty to indemnify is limited to the policy limit required under the subcontract.

14. J-Berd Mechanical Contractors, Inc.'s Motion for Summary Judgment [Docket No. 200] is DENIED.

15. Colloid Environmental Technologies Company's Motion for Summary Judgment [Docket No. 241] is DENIED.

16. Chris Craft's Motion for Summary Judgment [Docket No. 255] is GRANTED IN PART AND DENIED IN PART.

17. Weis Builders, Inc.'s Motion to Strike Affidavit of Affidavit of Stacy W. Byrd [Docket No. 349] is DENIED for the reasons stated on the record at the April 26, 2004 hearing.

Dated: July 1, 2004

S/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge