**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Civil File No. 00-CV-987 JNE/JSM

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc., Healey Ramme Co., sued as Healey Ramme Company, CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C., and Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

*and*

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a/ Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants.

*and*

Colloid Environmental Technologies Co.,

Fourth-Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

*and*

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

v.

Mikesh, Inc.,

Fourth-Party Defendant.

**CHRIS CRAFT'S MEMORANDUM OF LAW IN SUPPORT OF *DAUBERT* MOTIONS AND MOTIONS *IN LIMINE***

[Oral Argument Is Requested]

**INTRODUCTION**

Fourth-Party Defendant Chris Craft Industrial Products, Inc. ("Chris Craft") requests that this Court preclude Promenade Village Townhomes, LLC ("Promenade"), and / or any other party, pursuant to Rules 402, 403, 602, and 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), from offering or eliciting the opinions of David Campbell, AIA, ("Campbell") relating in any way to Chris Craft's polyvinyl alcohol component product, including: (1) whether the polyvinyl alcohol ("PVOH") film component of the Swelltite 3000 waterproofing product was defective; (2) whether an alleged failure of the PVOH film to dissolve at the seams or laps between sheets of Swelltite 3000 could have permitted water penetration and leakage; (3) whether an alleged failure of the PVOH film to dissolve could have permitted lateral water migration between the bottom surface of the membrane and the top surface of the concrete deck; and (4) whether an alleged failure of the PVOH film caused any particular leaks.

In similar fashion, Chris Craft requests that this Court preclude other experts from opining about Chris Craft's PVOH film as well. Such other experts include William Arockiasamy, Sidney Bhatt, Jon Camaya, Mark Chauvin, Richard Koziol, and Richard Stehley. To the extent these experts have any opinions about Chris Craft's PVOH film at all, their opinions are derived entirely from Campbell. Several of the experts candidly admit that any opinion they have about the PVOH is entirely reliant upon Campbell's report of May 1, 2001. In short, since Campbell's theories cannot be relied upon, neither can the purported opinions of these other retained experts.

In addition, Chris Craft requests, pursuant to Rules 402 and 403 of the Federal Rules of Evidence, that this Court preclude any party from offering or eliciting any evidence at trial which relates in any way to other alleged failures of the PVOH film component of Swelltite 3000 at other installations or projects around the country. Though it is anticipated that some parties may attempt to introduce such evidence, there is nothing to indicate that the PVOH film either failed or was a cause of leakage in any of these other locations. Moreover, in every case, the water leakage was ultimately attributable either to errors in the design of the building or faulty installation.

## ARGUMENT

### I. DAVID CAMPBELL'S OPINIONS RELATING TO CHRIS CRAFT'S POLYVINYL ALCOHOL FILM SHOULD BE EXCLUDED BECAUSE THEY ARE UNRELIABLE AND LACK FOUNDATION.

A trial court's role in enforcing Rule 702 of the Federal Rules of Evidence is that of a gatekeeper screening out unreliable and irrelevant evidence. *Gen. Elect. Co. v. Joiner*, 522 U.S. 136, 142 (1997. David Campbell's opinions are precisely the sort of unreliable, untested, and unfounded theories which this Court should exclude in the exercise of its gatekeeping duty. Unreliable and unfounded expert testimony must be excluded under Rule 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, ***if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.***

Fed. R. Evid. 702 (2000) (emphasis added).

Rule 702, in its present form, incorporates the United States Supreme Court's increased requirements that expert testimony be reliable, trustworthy and accurate as set forth in, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)[1]. In *Daubert*, the Court emphasized that it is the province of the district court to screen out unreliable scientific testimony or evidence.

In *Daubert*, the United States Supreme Court explained that an expert cannot testify as to a scientific conclusion unless it is based on "scientific knowledge" which "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds" that are obtained by someone with a "grounding in the methods and procedures of science." *Daubert,* 509 U.S. at 590 (*quoting* Webster's Third New Int'l Dictionary 1252 (1986)).

[I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. *Daubert,* 509 U.S. at 590. The Court must, therefore, assess "whether the reasoning or

[1] The Court in *Daubert* was interpreting the 1975 version of the rule, which ended after the phrase "in the form of an opinion or otherwise." The factors which now follow in the current form of the rule are meant to incorporate the decisions in *Daubert* and *Kumho*. *See* comments to Fed. R. Evid. 702 (2000).

methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592-93.

Subjective beliefs and unsupported speculation are not "scientific knowledge" within the meaning of Rule 702. *Daubert,* 509 U.S. at 590.

In assessing the validity and relevance of an expert's proffered opinion, a court should consider a number of factors, including: (1) whether the theory or technique in question can be (and has been) tested, (2) whether it has been subjected to peer review and publication, (3) its known or potential error rate, (4) the existence and maintenance of standards controlling its operation, and (5) whether it has attracted widespread acceptance within a relevant scientific community. *Daubert,* 509 U.S. at 594. These considerations are neither exhaustive nor exclusive. *See Daubert,* 509 U.S. at 593.

Though *Daubert* was limited to "scientific" testimony, the United States Supreme Court later expanded the holding to all expert testimony (e.g., any testimony based on scientific, technical, or other specialized knowledge). *Kumho Tire Company, Ltd. V. Carmichael*, 526 U.S. 137, 141 (1999). In *Kumho*, the Court re-emphasized the trial court's duty to decide whether or not an expert's testimony is reliable. *Kumho*, 526 U.S. at 152.

In *Kumho,*the expert in question was a Michelin engineer, who proposed to testify that a design defect in the defendant's tire was the cause of a blow-out which injured plaintiff. *Kumho, 526 U.S. at 142-44*. This opinion was based upon a visual and tactile inspection of the tire and upon the theory that in the absence of at least two of four specific, physical symptoms indicating tire abuse, the tire failure was caused by a defect. *Kumho,526 U.S. at 144*. The Supreme Court noted with approval the trial court's expressed concern about the engineer's "visual inspection method[ology]:"

> [The trial court] conceded that there may be widespread acceptance of a "visual-inspection method" for some relevant purposes. But the [trial] court found insufficient indications of the reliability of "the component of Carlson's tire failure analysis which most concerned the Court, namely, the methodology employed by the expert in analyzing the data obtained in the visual inspection,and the scientific basis, if any, for such an analysis."

*Kumho,* 526 U.S. at 146. Though the engineer claimed his visual inspection method was accurate, it had not been validated by any trade journals or papers. *Kumho,* 526 U.S.at 158.

Importantly, the Court explained that nothing requires a district court to admit the opinion of an expert simply because the expert says it is accurate. *Kumho,* 526 U.S. at 158 (*quoting General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997)). Even where a witness's expertise is based purely in his own experience, a court should consider whether the witness's method is of a kind generally acceptable to others in the field. *Kumho,* 526 U.S. at 151.

Other courts have added considerations where appropriate. For example, an expert's opinion must be excluded if it is so unsupported it offers the jury no assistance. *Archer Daniels Midland Co. v. Aon Risk Svcs, Inc., of Minn.*, 356 F.3d 850, 858 (8th Cir. 2004) (*quoting Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)). For example, a court may consider whether the expert has extrapolated an unfounded conclusion from an accepted premise. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that trial court may conclude there is too great an analytical gap between data and the opinion proffered). Or, if an expert has ignored possible alternative explanations, unreasonably favoring his or her own theory, a district court should factor that into its determination. *Claar v. Burlington Northern N.R.R.*, 29 F.3d 129 (D.C. Cir. 1996). In addition, a district court may use other factors where relevant. *See Kumho*, 526 U.S. at 152-53.

Rule 403 of the Federal Rules of Evidence is also an important consideration. Under that rule, the district court must, in the exercise of its discretion, exclude evidence when its probative value is outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

Campbell's opinions about Swelltite 3000 and Chris Craft's water-soluble film do not satisfy the requirements of Rule 702 of the Federal Rules of Evidence, as interpreted by the Supreme Court in the *Daubert* decision, and therefore, must be excluded at trial. Moreover, as will be discussed below, Campbell's opinions would tend to mislead the jury since his conclusions are based entirely upon assumptions which he presents as facts.

### A. David Campbell's Methods And Analysis Are Not Reliable And Lack Foundation.

Campbell's theories about Chris Craft's PVOH film are not reliable because he did not understand the material he was evaluating and because he performed no tests of any kind to see if his

suppositions were true.

First, Campbell was unabashed about his lack of knowledge about Chris Craft's product. At his deposition, Campbell testified that he had never reviewed any product literature relating to the PVOH film component of Swelltite 3000 [Campbell dep. Vol. 1 at 29], did not know the chemical make-up of the film, and had no understanding of the chemistry involved. [Campbell dep. Vol. 1 at 28-29]. Campbell further agreed that he did not understand how the film worked, that he had no knowledge about what might cause the film to become insoluble [Campbell dep. Vol. 1 at 28-29], and that he did not even know how to test the film for solubility. [Campbell dep. Vol. 1 at 30].

Second, in investigating the water leaks at the Promenade Oaks apartments, Campbell used a methodology which he developed largely by himself. [Campbell dep. Vol 1 at 33]. His investigation method consisted of reviewing construction drawings and specifications, reading CETCO's product literature and visually observing twenty excavations (also known as "destructive test openings" or "DTO's") made no the courtyards of the Promenade. [Campbell dep. Vol 1 at 31-33]. Entirely from his visual observations and CETCO's product literature, Campbell divined his theories about the PVOH film and about how water might have gotten through (or around) the Swelltite 3000 waterproofing membrane.

Campbell's methodology, however, did not include performing any tests. Campbell did not perform any water testing at the site to see if he could re-create any leaks. Campbell did not test the Swelltite 3000 membrane at the site. Nor did he test any samples of PVOH film either at the site or in the lab. In short, Campbell conducted no tests of any kind as part of his investigation. [Campbell dep. Vol. 1 at 8, 49, 53-54, 132, 135-136; Vol. 2 at 53, 57, 59, 60-61, 65-66, 79, 84, 107-108, 112]. Though he admitted that localized water tests could have been performed to try to identify the sources of leaks, he did not do so. [Campbell dep. Vol. 1 at 54-55].

The import of Campbell's failure to perform tests of any kind, is crucial to this Court's analysis under *Daubert* and *Kumho*. Had Campbell attempted to disprove his own hypotheses and failed, his opinions would have meaning. As it stands, however, Campbell has no way of knowing whether his ideas logically relate to the evidence (aside from his self-serving assertions that they are true). Moreover,

Campbell has no way of comparing his theories about the PVOH film as a cause of leaking against other more likely explanations.

An examination of Campbell individual theories demonstrates the inadequacy of his methodology and the impermissible gaps in logic.

*Campbell's Opinion That Film Insoluble*

First, Campbell's belief that the PVOH film "must not dissolve right away" is based exclusively on his discovery of undissolved PVOH film on four samples of Swelltite 3000 taken from the site. [Campbell dep. Vol. 1 at 132-33]. However, Campbell has no evidence that enough water ever came into contact with the PVOH film to completely dissolve it. Though PVOH will dissolve in water, some minimum quantity of water is required for the dissolution reaction to work its way to completion.

When questioned on this issue, Campbell admitted that he did not know whether water could get past the other components of the product to get to the water-soluble film (the film is the bottom layer of the membrane when properly installed). [Campbell dep. Vol. 2 at 48]. Moreover, Campbell agreed that the film's failure to dissolve would not mean that it had failed; it would mean that the product was functioning properly. [Campbell dep. Vol. 2 at 48].

Campbell could have tested the chemical composition and structure of the PVOH samples taken from the Promenade site. His failure to do so, however, means he has no way of knowing whether the chemical structure of the PVOH changed such that it became chemically insoluble in water.

Moreover, the evidence (even as found by Campbell) tends to show that he is wrong. Campbell only found undissolved or partially dissolved PVOH film in only four out of the twenty excavations he observed. [Campbell dep., Vol. 1 at 94.] This means that the film dissolved (80%) of the time. The logical conclusion from this evidence is that the film is indeed soluble, and will do so, when enough water comes into contact with it.

In other words, the methodology Campbell used did nothing to investigate likely alternative reasons for why the PVOH film might not have dissolved in the few places he found it intact.

*Campbell's Opinion that Leakage Could Have Occurred Through Seams*

In his May 1, 2001 report, Campbell theorized that a source of some leaks could have been at the "seams" formed where sheets of Swelltite 3000 come together and overlap. [Ex. 790]. Campbell believed this could happen if the water-soluble film component did not dissolve, thus preventing the bentonite at the seam from activating and bonding to the PVC component of the underlying sheet. [Campbell dep. Vol. 1 at 130-31]. However, Campbell admitted that he did not test any of the seams at the Promenade, and in fact, had never even seen a seam. [Campbell dep. Vol. 1 at 130 (emphasis added)].

Campbell admitted that he did not even know at the time of his report whether or not the seams between the sheets of Swelltite had been sealed with another waterproofing product, Volclay seam tape.[2] [Campbell dep. Vol. 1 at 129-30]. However, by the time of his deposition, Campbell believed that seam tape had been used because someone had told him. [Campbell dep. Vol. 1 at 130]. Upon further questioning, Campbell outright admitted that, aside from assumptions, he had no evidence upon which to base a conclusion that water could have penetrated the waterproofing system at the seams:

Q Do you know today, as you sit here today, whether seam tape was used out there?

A I've heard from somebody that seam tape was installed. I forget who told me that. The reason why I didn't know for sure by virtue of the destructive test openings is, as I testified before, just by happenstance. We did not locate a DTO right above the seam, so I couldn't say for certain whether the tape had been installed or not.

Q And you've never seen a seam yourself out at Promenade Oaks, is that correct?

A That's correct.

Q And you haven't observed any seams to see whether or not water actually went through the seam, correct?

A I have not seen a seam.

Q And you haven't done any testing either to find out whether any seams were allowing water to go through, have you?

A That's correct.

[2] Campbell first included seam tape in Diagram "O" of his draft report, but then realized he was making an assumption about the construction of the seams. [Ex. 796; Campbell dep. Vol. 1 at 133.] Later, he removed the depiction of seam tape from the diagram, this time assuming that the seam tape was not water-tight. [Ex. 790; Campbell dep. Vol. 1 at 133-34.]

Q So other than what you've read in Exhibit 206, what evidence do you have to support this assumption that water is penetrating the seams?

A If the water-soluble film does not dissolve in the locations where I did take samples, it's reasonable to assume that there may be some seams where it didn't dissolve at the seam.

Q Okay. But aside from assumptions, what evidence do you have?

A None.

[Campbell dep. Vol. 1 at 130-31].

Moreover, Campbell did not even know whether water had even gotten to the seams in the first instance given that the seams were covered with seam tape:

Q Well, since you never tested the seams and since you never tested the seam tape, how do you know that water actually got to the film? What evidence do you have?

MR. RAU: Asked and answered. Let's move along.

MR. VEITH: You can answer.

THE WITNESS: Restate the question.

Q (By Mr. Veith.) If you've never actually tested the seams and you've never tested the seam tape, how do you know that water actually got to the film? What evidence do you have?

A Within a seam? I don't have any evidence.

[Campbell dep. Vol. 1 at 132]. Campbell's theory that the seams could have failed due to undissolving PVOH film has little reliability since he did no testing and never even saw any of the seams about which he opines. Neither Campbell's methodology (or lack thereof) nor his resulting hypothesis have been the subject of any peer review. Moreover, there is no evidence that Campbell's methods or conclusions have been generally accepted in any relevant field or community. Rather, Campbell's theories are based on assumptions and conjecture, not hard evidence, and those assumptions contradict the existing evidence.

For example, later excavations by the Wiss Janney firm demonstrated that the seams in the waterproofing all appeared to be "nicely" sealed with Volclay® seam-tape and appeared to be water-tight:

Q . . . What observations did you make of the sample . . . ?

A . . . The Swelltite was nicely taped. The HDP portion of the Swelltite was nicely

taped over.

Q What do you mean by nicely taped?

A The taped application was nicely done. It was nice and smooth. There were no fish mouths in it. It was a clean contact.

Q And you didn't see any evidence that the water had infiltrated that seam tape; right?

A Correct.

[Koziol dep. at 63-64].

In addition, 2" of standing water has been almost universally observed by those witnesses who have inspected excavations on the Promenade courtyards. [*See, e.g.,* Kudder dep. Vol. 1 at 196; Chauvin dep. at 125-26; Camaya dep. Vol. 2 at 245, 298; Campbell dep. Vol. 2 at 27.] From these observations, it would follow that the seams in the waterproofing membrane were working properly.

*Campbell's Opinion That Water Could Migrate Laterally*

In similar fashion, Campbell theorized that, once past the membrane, a failure of the PVOH film to dissolve could permit water to migrate laterally between the membrane and the top of the concrete precast deck. [Ex. 790]. Once again, however, Campbell's failure to use any real methodology and conclusory analysis makes his idea highly suspect. Campbell performed no water tests, or any other kinds of tests, to see if his hypothesis was true:

Q. Now, have you -- you indicated that there's an effect when the film fails to dissolve as to the efficiency of the waterproofing system; correct?

A. Correct.

Q. Have you done any testing whatsoever to determine what is the effect of -- on water migration of the film failing to dissolve?

A. No, I've run no test.

[Campbell dep. Vol 2 at 57].

Nor has any other expert witness ever tested Campbell's hypothesis about lateral water migration between the top of the precast and the waterproofing membrane. [*see e.g.,* Koziol dep. 84-85]. In addition, other known paths of water migration beneath the membrane have not been ruled out. These include:

- Wicking and permeation through porous concrete CMU block at vertical wall and end wall locations;
- Water wicking / permation through the precast concrete planks;
- Free water flow through holes shot through the precast at stoop post anchor locations;
- Free water flow laterally through the hollow cores of the precast planks;
- Free water flow down the hollow cores of the concrete CMU block at vertical wall and end wall locations;
- Water flow beneath poorly bonded M-2000 mastic sealant at cant and keyway joint locations;
- Water permeation / flow in grouted keyway joints.

[Kozial dep 133-135; Thoreen dep. 115-117]. Moreover, Campbell agreed that he did not even know the extent to which the PVOH had dissolved (or not dissolved) underneath the bentonite could not be known because it cannot be seen. [Campbell dep. Vol. 1 51-56].

There is no evidence that Campbell's methods or theories have attracted widespread acceptance. Given Campbell's isolated development of his own 'visual inspection' method of conducting water leak investigations, Campbell does not appear to belong to any scientific or technical community.

In *Kumho*, the Supreme Court pointed out that a court need not take an expert's word that his theory is accurate, particularly when there is reliable evidence to the contrary. 526 U.S. at 158. Not only are Campbell's conclusions unfounded, he has ignored other, more likely explanations. Simply because Campbell believes his own theories, does not mean that they are reliable or based in any real evidence.

**B. Campbell's Opinions Are More Prejudicial Than Probative As They Will Only Tend To Confuse Or Mislead The Jury.**

As already seen, Campbell makes a host of assumptions and then jumps to his dubious conclusions. An expert like Campbell, whose "opinions" are nothing more than untested assumptions, can only confuse and mislead a jury. There is a significant danger that the jury would give more weight to Campbell's testimony about the film than it deserves simply because Campbell was hired as a so-called expert.

The purpose of Rule 702, served by the considerations set forth in *Daubert*, *Kumho*, and their progeny, is to ensure the relevance and reliability of expert testimony and evidence. But Campbell is operating, for all intents and purposes, in a scientific vacuum. His methods and theories are his own,

illogical and unsubstantiated by experience, facts, or his peers. As the Eighth Circuit decided in *Archer Daniels*, a district court must exclude an expert's opinion if it is so unsupported it offers the jury no assistance. 356 F.3d at 858. Since Campbell's methods and conclusions are not based on approved technique, specialized knowledge, or reliable facts, this Court should apply Rule 702 and the rule from *Daubert/Kumho* and *Archer Daniels*.

## II. THE OPINIONS OF ALL OTHER EXPERTS ABOUT THE PVOH FILM MUST BE EXCLUDED SINCE THEY RELIED ENTIRELY UPON CAMPBELL.

Though other experts have commented on the effectiveness of the waterproofing products used at Promenade, every one of them have testified in deposition that they either relied entirely upon Campbell's May 1, 2002 report or that they in fact have no opinion after all. As seen in the following discussion, these experts merely repeated Campbell's untested theories as their own, basing their conclusions solely on his unreliable report.

**William Arockiasamy**

J-Berd Mechanical retained William Arockiasamy ("Arockiasamy") to evaluate the drainage system installed on the Promenade. In his report, Arockiasamy concluded that, if the drains were not causing leakage, the waterproofing system must be. [Ex. 806]. However, at his deposition, Arockiasamy conceded that he has no basis to support any conclusion that the waterproofing products (including the PVOH film) failed:

Q And you don't have any knowledge yourself of any failure, specific failure of the material used in the waterproofing system?

A That's correct. I do not.

[Arockiasamy dep. at 41-42.]

Because Arockiasamy has no opinion about any specific failure of the waterproofing materials used at Promenade, he should not be permitted to testify about Chris Craft's PVOH film.

**Sidney Bhatt**

Like Arockiasamy, Sidney Bhatt ("Bhatt") was retained by J-Berd Mechanical to evaluate the drainage system. Bhatt was not charged with the task of evaluating the waterproofing materials.

Nevertheless, Bhatt opined in his report that "[t]he reason that the water leaked was the failure of the waterproofing membrane system." [Ex. 827].

At his deposition, however, Bhatt admitted that he did not have any opinions relating to the efficacy of the waterproofing membrane installed at the Promenade. [Bhatt dep. 14-16]. Thus, Bhatt should not be permitted to offer any opinions relating in any way to Chris Craft's PVOH film at trial.

**Jon Camaya**

Jon Camaya ("Camaya"), an architect, was hired by General Investment & Development ("GID") to evaluate the property immediately prior to purchasing the Promenade Oaks apartment in December 2002. Camaya also issued a report which was critical of the Swelltite3000 product, including the PVOH film component. Camaya's opinions, however, were <u>entirely</u> dependent upon Campbell's May 1, 2002 report. [Camaya dep. at 65-66.]. Camaya did nothing to either confirm or disprove Campbell's theories.

At his deposition Camaya readily admitted that his assumptions about Chris Craft's PVOH film are based solely upon the unsupported assumptions of Campbell:

Q But you didn't observe the film separator that's being referred to here, did you?

A That's correct.

Q [W]ith respect to that part of the membrane, you would be relying entirely on what Mr. Campbell has put in his report, correct?

A That's correct.

Q The next sentence says, "This condition allows water to freely pass between the precast concrete decking and the back of the waterproofing." Do you see that sentence?

A Yes.

Q And again, that sentence is derived from Mr. Campbell's report, correct?

A That's correct.

Q And that's the sole basis for that statement?

A For that statement, yes.

[Camaya dep., Vol. 1 at 65-66.]

Campbell's theories are not made more reliable through repetition. Like every other expert in this case, Camaya did not independently test Campbell's ideas. Thus, Campbell's opinions about the PVOH film, even by proxy through someone else's report, should be excluded.

**Mark Chauvin and Richard Koziol**

Weis Builders ("Weis") retained engineers Richard Koziol ("Koziol") and Mark Chauvin ("Chauvin") of Wiss Janney & Elstner to evaluate the Promenade courtyards. Once again, Campbell's opinions made their way into another expert report. The Wiss Janney report stated, "According to the investigative work performed by Inspec, the waterproofing system was improperly installed, damaged, and / or not functioning properly at several locations." [Ex. 822 at 8 (emphasis added).] Additionally, the report repeated Campbell's water migration theory, saying that "[w]ater penetrating the horizontal waterproofing system would be free to travel beneath the waterproofing system along the top surface of the precast planks and / or penetrate their hollow cores . . ." [Ex. 822 at 8.]

Though Koziol testified that water testing is an important step in identifying the sources or causes of leaks, neither he nor Chauvin performed any such water testing of the membrane. [Koziol dep. at 85; Chauvin dep. at 35]. In other words, neither Koziol nor Chauving did anything to investigate or independently verify the accuracy of Campbell's opinions.

Though willing to repeat Campbell's ideas in their report, neither Koziol nor Chauvin were able to provide any additional support for them:

Q Okay. Then on the next page there are some bulleted points and I'd like it if you could go down one, two, three, four, five, to the fifth bulleted point. And it reads, "According to the investigative work performed by Inspec, the waterproofing system was improperly installed, damaged, and/or not functioning properly at several locations." Do you see that?

A Yes.

Q You're basing that on the Inspec report and the Inspec report alone, correct?

A Correct.

[Koziol dep. 78].

Q (By Mr. Veith.) Do you have an opinion as to whether or not water was able to migrate between

the top of the precast and the product, the membrane?

A I have no firsthand knowledge of it based on observations made at the openings, but I believe that's the case that has been reported by Inspec.

Q And you would rely on and defer to Inspec for the basis for their opinion on that?

A Yes.

[Koziol dep. 84].

Q You did not do any testing to determine whether or not water ever penetrated any of the seams between sheets of Swelltite; correct?

A Correct.

Q So you would have no opinion about that; right?

A Well, I believe Inspec has identified in their report areas where seam problems were observed.

Q And you would defer to Inspec about that issue?

A Correct.

Q And you never did any testing to make any determination about whether water ever migrated between the top of the precast concrete deck and the underside of the Swelltite product; correct?

A Correct.

Q And you would defer to Inspec about that as well; correct? Your answer?

A Correct.

Q And you have as you sit here no opinion as to whether any alleged failure of the water-soluble film caused any particular leak; correct?

A Correct.

[Chauvin dep 38].

Because Koziol nor Chauvin relied entirely upon Campbell for any opinions they have about the solubility of the PVOH film component, and because neither of them performed any testing to independently verify Campbell’s ideas, Koziol and Chauvin should not be permitted to present such testimony to the jury.

**Richard Stehley**

Richard Stehley ("Stehley"), an engineer retained by ESG Architects, also repeated Campbell's theories in his report. Despite concluding in his report that, "the membrane did not seal at the lapped edges where the film remains," Stehley recanted at his deposition:

Q Did you make any determination that the film failed to dissolve when coming in contact with water?

A I didn't make that determination.

Q Are you able to determine that the membrane did not seal at the lapped edges where film remains?

A I haven't observed that. I haven't done any tests out there.

Q And that information that you've included in your report is solely as a result, is it not, of Mr. Campbell's, Inspec's report?

A Yes.

Q And you have no idea whether his conclusions are correct or not; is that true?

A I assume they are. I mean I'm relying on them.

Q You're relying on them?

A Yes.

[Stehley dep. 72.]

## III. EVIDENCE OF SWELLTITE 3000 INSTALLED AT OTHER LOCATIONS SHOULD BE EXCLUDED.

Chris Craft anticipates that other parties, realizing the weakness of Campbell's opinions about the efficacy of the waterproofing products, will try to bolster their product defect theory with evidence of alleged product failures at other construction sites. During discovery, CETCO's Patrick Carpenter was questioned extensively regarding other projects in which complaints were made about Swelltite, and Swelltite 3000 in particular.

Despite an exhaustive search through CETCO's files, the parties' efforts proved fruitless. As with any product, there have been a few complaints about Swelltite 3000; however, none of these complaints ever result in any demonstrated failure of the PVOH film component which resulted in leaking. Rather, the leaks at such other installations have been universally attributed to errors in

construction design or improper installation of Swelltite. Even where an allegation was made that the PVOH film did not dissolve, the leakage was ultimately attributed to something else.

Evidence of alleged Swelltite 3000 failures at other constructions projects should be excluded because they are irrelevant, misleading, and prejudicial. Even relevant evidence should be excluded where its evidentiary value is substantially outweighed by the danger of prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 403.

The danger of confusion of the issues or misleading the jury is especially great when a party introduces evidence of other accidents. *First Sec. Bank v. Union Pacific Railroad Co.*, 152 F.3d 877, 890 (8th Cir. 1998) (*quoting Drabilk v. Stanley-Bostitch, Inc.*, 997 F.2d 496, 508 (8th Cir. 1993). Evidence of other accidents may tend to confuse the issues even when such evidence is relevant for some purpose, because it may bring up extraneous controversial points and present prejudice disproportionate to its probative value. *Union Pacific* at 879-90. Consequently, other accidents are inadmissible unless they are substantially similar to the one at issue and their probative value outweighs the potential for prejudice. *Union Pacific* at 879-90.

This court should exclude evidence of alleged Swelltite 3000 failures at other installations, because of the differences in design, mistakes in installation, differences in the conditions, and the fact none of them show the PVOH film component was the reason for the leaks. Thus, the evidence of alleged failures at other installations is of dubious relevance and certain to confuse the issues and mislead the jury.

**A. The Medical College of Ohio**

Promenade, Weis and others will likely attempt to offer evidence about an alleged failure of Swelltite 3000 at the Medical College of Ohio. The Swelltite 3000 was installed on two plazas adjacent to the Collier Building of the College. The product was applied horizontally on concrete slab, and then topped with concrete pavers. Unlike the Promenade, the plazas at the Medical College were above grade such that no vertical applications were needed. Unfortunately, the design of the plaza waterproofing did not provide any method for terminating the membrane at the edges of the plazas, leaving an entry point

for water all around the edge of the plaza. In addition, trench drains were designed to circumvent the plazas at the edges, and these were determined to have leaked.

When leaking began, the Medical College retained Simpson, Gumpertz & Heger ("SGH") to investigate. SGH concluded that the leaking was due to faulty design by the project architect and improper installation by the subcontractor. Specifically, SGH attributed the cause of the leaking to areas where Swelltite 3000 had not been installed or had been installed improperly. [Aff. of SJG, Exs. A and C]. For example, most of the leaking was attributed to the gutter or trench drains which followed the perimeter of the plazas where Swelltite 3000 was not installed. [Aff. of SJG, Exs. A and C]. In addition, leaking was determined to have occurred because portions of the Swelltite 3000 product had been installed upside down, rendering the product ineffective. [Aff. of SJG, Exs. A and C].

Together, CETCO and SGH made certain recommendations for the repair of the plazas. These recommendations included filling in the gutter drains with concrete, extending the Swelltite 3000 to cover over those areas, and providing a proper water-tight termination for the membrane at the edges of the plazas. [Aff. of SJG, Ex. C]. In addition, Swelltite 3000 installed upside-down by the contractor had to be removed and replaced using proper installation procedures.

Though SGH claimed to have found samples of film that did not dissolve, it was never determined that any alleged failure of film component resulted in any leaks. Moreover, there is no evidence that the film samples SGH examined were manufactured by Chris Craft.

**B. Queens Tower Plaza**

At another project, the Queens Tower Plaza, Swelltite 3000 was installed as part of a plaza deck and driveway. [Ex. 315]. At the Queens Tower Plaza, the Swelltite was installed in an application very different from that of the Promenade. Unlike at the Promenade, no fill was placed on top of the membrane. Instead, concrete pavers were used, along with cellular fill material. [Ex. 315]. Photographs taken before the Swelltite 3000 was installed showed significant ponding on the installation surface, indicating the bentonite likely pre-hydrated during installation. [Ex. 315]. Gaps and cracks in the concrete appeared to have been larger than the membrane was designed to tolerate. [Ex. 315].

Additional installation errors were believed to have contributed to leakage at this site as well. In particular, the product was subjected to construction damage during installation. [Ex. 315]. Also, expansion joints on the deck were exposed to rainfall, which was determined to be the likely cause of the leaking and concrete damage. [Ex. 315]. The project was never investigated further, and no failure of the Swelltite 3000 was ever found. [Carpenter dep. vol. 1 at 140.]

None of the other parties should be permitted to offer evidence relating to the Queens Tower project because the design of the project was far different from that of the Promenade. In addition, it was never concluded that the Swelltite 3000 membrane failed or that the PVOH film component caused any leaks.

**C. Army War College**

Another project about which other parties may attempt to offer evidence at trial is the Army War College located in Carlisle, Pennsylvania. However, on this project, it was determined that the failure of the Swelltite 3000 membrane was due to a problem with the PVC plastic component of the product, not the PVOH film. Upon inspection, it was observed that the PVC plastic liner had shrunk, pulling the seams apart and allowing water to pass through. [Aff.. of SJG, Ex. E.] Several possible reasons for this shrinkage included insufficient containment pressure of the membrane, settlement or movement of the plaza itself, or too much exposure to hot sun before the membrane was covered. [Aff. of SJG, Ex. E]. No failure of the PVOH component was ever cited as a reason for the leaks. Accordingly, it would be prejudicial to permit any party to offer evidence relating to this project against Chris Craft at trial.

**D. Castro Commons**

Swelltite 3000 was also alleged to have failed at the Castro Commons project. At Castro Commons, the Swelltite was installed vertically with insufficient containment pressure. [Ex. 312]. The wall above the Swelltite was not waterproofed, and seepage around the membrane was a determined to be the likely cause of the leaks. Also, it appeared that the membrane had been fastened to the walls with nails rather than with adhesive, as recommended. [Ex. 312]. In addition, no counterflashing had been used to make a water-tight seal at the tops of the vertical walls. [Ex. 313]. In short, the installer failed

properly to install the Swelltite 3000 according to basic requirements.

Thus, the failure at Castro Commons was caused by poor design of the project and improper installation of the product. No determination was made that the failure had anything to do with the PVOH film component. Thus, use of evidence about this project would be irrelevant and as well as potentially prejudicial.

Since none of the leaks at other installations had anything to do with the PVOH film used on the membrane, evidence of those leaks will not make any fact of consequence to a determination of the instant case more or less probable than without the evidence. Relevant evidence would have to show that the PVOH film has failed before, and that its failure has resulted in leaks at other installations. None of the installations found Swelltite 3000 was the problem, and in the end, none found a reason to doubt the PVOH film's performance. Allowing the evidence would needlessly confuse the issues and mislead the jury. Evidence of the failure of Swelltite 3000 at other installations is useless to a determination of the case at bar, and so should be excluded.

## IV. EVIDENCE OF THE WATER-SOLUBLE FILM CHRIS CRAFT TESTED IN 1996 SHOULD BE EXCLUDED.

Evidence of an unidentified sample of water-soluble film tested by Chris Craft at CETCO's request in 1996 should be excluded because no party has provided a foundation for its admission. Personal knowledge is required to lay a foundation. Fed. R. Evid. 602. In the instant case, there is no evidence based on personal knowledge that can provide an adequate foundation for the admission of evidence about the sample of PVOH film from 1996.

Tom Yogan, Chris Craft's Director of Sales and Marketing, testified that the sample CETCO wanted to be tested was never identified, and CETCO did not provide Chris Craft with any information about who possessed the film or how the film had been altered, treated, or handled prior to being tested. [Yogan dep. at 125, 127.] In any event, the film sample remained soluble in water, though it was determined that something in CETCO's processes had somewhat reduced its solubility. [Yogan dep. at 125.] Yogan testified as follows.

Q And I assume you have no knowledge as to who actually had possession of that film between the time it left your plant and the time it was sent back to you by whoever had CETCO send it back to you?

A No.

Q And you have no idea what if anything it was exposed to during that period of time?

A No.

Q Or what use it was put to?

A No.

[Yogan dep. at 127.]

Given that there is no evidence as to who had manufactured the film sample, no evidence regarding what had been done with the sample prior to being given to Chris Craft for testing, no party should be permitted to inquire about this at trial. Such evidence would simply be too speculative and would be overly prejudicial.

## CONCLUSION

For the foregoing reasons, this Court should grant Chris Craft's *Daubert* Motions and Motions *In Limine*.

Respectfully submitted,

**BROWN & CARLSON, PA**

Dated: September 3, 2004

By: s/G. John Veith

G. John Veith (#241519)
Samuel J. Glover (#327852)
5411 Circle Down Avenue
Suite 100
Minneapolis, MN 55416
763.591.9950
763.591.9202 (facsimile)

*Counsel for Fourth Party Defendant Chris Craft Industrial Products, Inc.*