UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: DAVID CAMPBELL (VOLUME I)
TAKEN ON: TUESDAY, AUGUST 26, 2003
COMMENCING AT: 9:15 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562

and

Colloid Environmental Technologies Co.,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NOTES

Page Line

APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Co.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO I. BRISBOIS, Esq., Stich, Angell, Kreidler & Dodge, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

ROLF E. SONNESYN, Esq., and CHANDELLE L. HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant J-Berd Mechanical Contractors, Inc.

STEVEN E. RAU, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, MN 55402-2440, appeared representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared representing Westfield Insurance Company.

CAMERON BOYD, Esq., Lindquist & Vennum, 4200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402-2274,

appeared representing Fourth-Party Defendant Mikesh, Inc.
ALSO PRESENT: Kris Huether, Brown & Carlson.

I N D E X

PAGE
Pursuant to Notice................................. 6
WITNESS:
David Campbell................................ 6
Examination by Mr. Veith...................... 6
Examination by Mr. Sonnesyn................... 139
Examination by Mr. Boyd....................... 162
Witness Excused............................... 164
Signature/Correction Page..................... 166
Certificate Page.............................. 167

OBJECTIONS:
By Mr. Hull....... 66
By Ms. Heyer...... 71
By Mr. Reilly..... 89,95,106,159
By Mr. Rau........ 132
By Mr. Stepan..... 159,160,160

INDEX OF EXHIBITS

EXHIBIT NO. DESCRIPTION PAGE

Campbell No. 788....Professional Profile................ 6
Campbell No. 789....Proposal Dated Nov. 8, 2001......... 39
Campbell No. 790....Waterproofing Investigation Report.. 45
Campbell No. 791....Misc. Notes and Questions........... 60
Campbell No. 792....Contractor Assistance Request Form.. 73
Campbell No. 793....Diagrams of Promenade Oaks.......... 76
Campbell No. 794....Diagram, Site Plan A................ 77
Campbell No. 795....Box of Samples of Insulation (Retained by Mr. Rau)............... 89
Campbell No. 796....Inadequacies of the Existing Waterproofing Membrane.............. 124

# The original exhibits (except Exhibit No. 795) and original transcript are in the possession of Attorney G. John Veith.

THE DEPOSITION OF DAVID CAMPBELL, is taken on this 26th day of August, 2003, before Charles G. Williamson, a Notary Public in and for the State of Minnesota, County of Hennepin, at the Law Offices of Brown & Carlson, 5411 Circle Down Avenue, Suite 100, in the City of Minneapolis, Minnesota, commencing at the hour of approximately 9:15 a.m., pursuant to NOTICE:

* * * *

(Campbell Deposition Exhibit Number 788 was marked for identification at this time.)

DAVID CAMPBELL,

called as a witness, being first duly sworn, was examined and testified on his oath as follows:

EXAMINATION

BY MR. VEITH:

Q Good morning, Mr. Campbell. Would you please state your full name for the record?
A David William Campbell.
Q And could you state your current business address, please?
A Inspec Incorporated, 5801 Duluth Street, Golden Valley, Minnesota, 55422.
Q Mr. Campbell, you have been deposed before?
A No, I haven't.
Q You've never been deposed?
A Correct.
Q Have you ever testified under oath?

A No.
Q A couple of things about testifying. When the court reporter is taking things down, I would like you to try and keep in mind this is not like normal conversation, only one of us can talk at a time, okay, because Charlie needs to be able to take us down and he can't do both of us at the same time.
A Okay.
Q Also, you need to answer verbally. You need to answer out loud either a yes or a no. The court reporter can't take down shrugs, nods of the head, that sort of thing, okay?
A Right.
Q And then lastly, if you don't understand a question, please let me know and I will try and rephrase it for you or reask the question, okay?
A Understood.
Q If you answer a question, I will assume that you understood my question; is that fair?
A Yes.
Q What is your present position with Inspec?
A I'm an architect and head of the waterproofing department at Inspec.
Q I'm showing you Exhibit 788, which looks like a copy of your Professional Profile, I guess your resume, if you will?

A Correct.
Q I'd like to know when you received your bachelor of architecture degree from the University of Minnesota because it's not identified on it?
A Bachelor of architecture I received in 1976.
Q Okay. And what about your bachelor of environmental design; when did you get that?
A I'm hesitating because I may have confused the two. I received a bachelor of environmental design first. That's correct. I got bachelor of environmental design in 1976, bachelor of architecture was 1977.
Q So you went to college, then, for five years, or how did that work?
A Just one quarter shy of seven years.
Q Where did you do your foreign study?
A Many countries in western Europe. I could name them off, if you wish.
Q Well, what kind of architecture were you studying when you were over there?
A The emphasis of the three month study focused primarily on gothic architecture, tensile structures and historic architecture in general.
Q What's a bachelor's of environmental design? What is environmental design?
A It's related to architecture, but it's not a professional

degree. It deals with issues of the environment, natural environment, but oddly enough, it also includes instruction on how to problem solve in general. I never did understand myself just how that went along with that degree, but I -- that's the best I can recollect. It's been so long. It was a degree that I was advised to get by an advisor because it was related to architecture, so I did.
Q Sounds like something you don't use every day, though?
A Correct.
Q Okay. What did you have to do to become a licensed architect?
A I understand it's a little different now, but what I had to go through was get the professional degree, which is the bachelor of architecture, go through an apprenticeship for four years, during which time you have to function underneath a licensed architect for four years, satisfy a requirement of varied experiences during that four year apprenticeship, after which time you're a candidate to take the state license exam, and when you pass the exam, you are a licensed architect.
Q Where did you do your apprenticeship?
A One firm was Glen Cording Associates.
Q How do you spell Cording?
A C-O-R-D-I-N-G. Another firm was Krysunski, Krank and

Erickson.
Q Get the spellings later.
A KKE. They don't go by Krysunski, Krank and Erickson anymore. KKE is their common name. Brent Anderson Associates. A bit of clarification. Brent Anderson Associates today is a waterproofing and roofing contracting company who has done work for Healey Ramme in the past. They're not really involved in this case. But when I worked for Brent Anderson Associates, it was strictly a design entity. Brent Anderson dissolved the design entity after I had left, took the name and applied it to his construction company, but when I worked for him, Brent Anderson Associates meant Architects and Engineers.
Q Do you know when Brent Anderson changed focus?
A He had both the construction entities as well as the design firm while I was with him. However, he switched all his emphasis to just the construction end of it. I believe that was about 11 years ago.
Q When did you become members of the American Institute of Architects?
A Very shortly after I became licensed, and that was eight years ago.
Q So you received your license in what, 1996, 1995?
A Eight years ago, whatever that --

Q When did you join the American Society for Testing and Materials?
A Approximately 1997, I believe.
Q You have a list of or a section in your Professional Profile for published materials. Is that a complete list?
A Yes, it is.
Q And what about the relevant talks and seminars; is that a complete list of talks and seminars that you've given or do you have more to add to that?
A Now, I notice this is not my most current profile. The Published Materials in the more current version is the same, but I think there were one or two things added under Relevant Talks and Seminars. And also there was another award, another item under Awards that's not shown here.
Q When we're done here today, would you please get a copy of that and provide it, an updated version?
A Sure. Let me just review Relevant Talks and Seminars here to answer your question.
MR. RAU: I didn't know there was one.
THE WITNESS: Yes. I got that here. Actually, I think Relevant Talks and Seminars is current.
Q (By Mr. Veith.) You think it's current?
A Yes.
Q Do you know where we could get a copy of your book, Earth

Integrated Structures?
A Yes. It's not been in print for a long, long time.
Q Why is that? I was curious.
MR. RAU: It's such a best seller.
THE WITNESS: I have one copy. I only have one copy. I could certainly loan it to somebody who's interested, but I would like it back.
Q (By Mr. Veith.) Okay. I think that might be something we'd like to do. Who is Sarnafil?
A Sarnafil is a manufacturer based in Switzerland, a manufacturer of a polyvinyl chloride waterproofing membrane, and they also manufacture other waterproofing products and related products. They have manufacturing and distribution facilities in the U.S., but the mother company is in Switzerland.
Q Do you have some kind of a working relationship with that business or how did you come to be giving a seminar there?
A I've developed somewhat of a reputation in the industry for understanding waterproofing. They invited me to speak to their group. I had specified Sarnafil products in the past.
Q You mention in your profile that you have presented to many architectural and engineering firms. Which ones?
A Miller Dunwoody Architects, Architectural Alliance Architects, HNTB Engineers. There's a fourth that

escapes me right now.
Q Elness Swenson Graham?
A No. I'm sorry. I know there's a fourth, I just can't remember.
MR. RAU: If it comes to your mind, we can --
Q (By Mr. Veith.) Who was your first employer after completing your college degrees?
A Glen Cording Associates.
Q And how long were you there?
A I had worked for Glen summers while I was going to college; three summers, as a matter of fact. Then I worked for him after graduation for approximately three years.
Q What were you doing for Glen Cording?
A Preliminary and schematic building design, construction document drafting, construction drawing drafting, site observation, model building. I think that sums it up.
Q So you would've worked there till about 1980; does that sound right?
A Yes, approximately.
Q And where did you go after that?
A I believe Krysunski, Krank & Erickson, KKE, right after that.
Q Were you doing the same types of things? Was there

anything different that you were doing?
A Same types of things but in greater depth. Also, I was doing site planning as well at KKE.
Q How long were you at KKE?
A Eight months.
Q And then you went to Brent Anderson after that?
A No. After KKE I went to Cole Publications, not an architectural-related job. It was a sales job.
Q What got you into that?
A Money. I had a very difficult time finding architectural positions right then due to the economy. I had a wife, so I took what I thought was a lucrative sales job at the time as a temporary measure until I could find an architectural position.
Q What was your next architectural position, then?
A Northeast Planning and Design.
Q Were you still in your apprenticeship at this point?
A Yes. Had not taken the license exam yet.
Q What were you doing for them?
A House designs exclusively.
Q Residential, single family residential?
A Yes. Single family residential. We did have a few multifamily, but primarily single family.
Q And what was the period of time that you were with Northeast Planning?

A Boy, I'd have to look at my own employment history resume, but I think approximately three years.
Q Do you have a resume with your employment history?
A Yes. I don't have it with me.
Q And you'd be happy to provide that to me?
A Oh, certainly. It would clear up some of these dates that I'm not too sure of.
MR. RAU: Dave, is it available at your office?
THE WITNESS: Yes, I think it is.
MR. RAU: Maybe during one of the breaks we can have someone fax it over if you want.
THE WITNESS: Sure.
MR. VEITH: That would be good.
Q (By Mr. Veith.) All right. Up until this point, had you done anything with waterproofing ever?
A The first involvement with waterproofing I had was 18 years ago when I was working for Brent Anderson Associates.
Q Was that the job after Northeast Planning?
A Yes. Brent Anderson Associates was after Northeast Planning.
Q So did you leave Northeast Planning to go to Brent Anderson?
A No. Northeast Planning laid me off.

Q What was the reason for that?
A Lack of work.
Q How long were you out of work after that?
A Approximately two weeks.
Q And then you went to Brent Anderson?
A Correct.
Q What did you do for Brent Anderson?
A A bit of clarification. At that time, the firm that became known as Brent Anderson Associates was initially named Earth Integrated Technics Incorporated. The reason I hesitate is the name changed so many times before I finally decided on something. But Earth Integrated Technics Incorporated, I believe. That's also on the employment history resume.
Q How long were you at Brent Anderson?
A I worked for him for a total of 11 years, I believe.
Q Could you give me the years?
A Earth Integrated Technics began and I was with it from its inception.
Q And when was that?
A I believe it was 1983.
Q Okay.
A And then the name changed maybe three or four years after that and I left Brent Anderson Associates in 1993, I believe it was.

Q What were you doing for Brent Anderson? I think I asked that before but I didn't really get an answer from you on that.
A Can I assume when you refer to Brent Anderson Associates you're referring to --
Q Yes.
A -- the firm that Brent owned regardless of its name?
Q Unless things changed with the name change. Did your job duties change at all?
A Not as a result of that name change transition; for other reasons. Our involvement in our architectural concentration changed. But in the entire time span I worked for Brent Anderson I was involved in all aspects of building design. By that I mean client contact, marketing, schematic design, design development, construction documents, specification writing and site observation, construction observation I should say, for a wide variety of building types.
Q Multifamily housing?
A I don't believe we ever did any multifamily housing. And also, in approximately 1995, shortly after Earth Integrated Technics was founded, we also started doing waterproofing consulting for other architectural firms. We had developed a certain level of expertise in waterproofing design as a result of the earth-sheltered

houses we were designing and other architectural firms hired us as consultants on their design projects.
Q Is that what you mean when you told me that the architectural focus changed?
A The architectural focus of my 11 years with Brent changed for many reasons or changed in many ways. There was another time, I believe this was around 1987, where Brent Anderson bought out another small architectural firm, Charles Diekens Associates, and Charles Diekens Associates had been bank designers, they designed credit unions and banks exclusively. We hired Chuck Diekens, the principal, part time, and Phil Blasko, their registered architect, full time as part of that acquisition.
So from that point on, Brent Anderson Associates was now also designing banks as well as earth integrated homes, small office buildings and waterproofing consultation.
Q What is an earth integrated home?
A Simply a home that has either earth on the roof or earth bermed up along the sides or both. It's integrated with the earth, in other words.
Q Okay. What did you do after you left Brent Anderson?
A I was unemployed for approximately nine months and I came to where I was hired by Inspec.

Q While you were at Brent Anderson, and I'm talking collectively from 1983 to 1993, what percentage of your practice was devoted to investigating water leakage issues as opposed to designing?
A In terms of revenue or time involvement?
Q Time involvement.
A Ten to fifteen percent.
Q When is the first time you had ever done anything related to investigating water leak issues at Brent Anderson?
A Probably very shortly after the firm started. I'd be guessing, but I would say around 1984, 1985.
Q And was that investigating earth integrated homes, then, leak issues with those types of buildings?
A I'm assuming it would have to be since that was the only building type we were involved with at that time.
Q Do you recall what types of products you were using or involved with in those water leak investigations?
A I don't understand the question. Design is one thing, investigation of somebody else's products is another. You mean what products we were encountering during the investigation?
Q Yes.
MR. RAU: And you're talking about the first investigation?
MR. VEITH: Well, I'm talking about during

his time at Brent Anderson.
THE WITNESS: Oh, during the entire time?
MR. VEITH: Yes.
THE WITNESS: A wide variety of products. What the industry refers to as peel and stick waterproofing membranes, for example. Single ply membrane such as EPDM or butyl rubber, bentonite composite membranes such as paraseal, Swelltite, granular bentonite with a containment sheet of ten mil polyethylene. There was probably -- I probably encountered hot fluid applied rubberized asphalt membranes.
Q Sounds like you're guessing?
A No. I did encounter hot fluid applied like rubberized asphalt membranes at least once during my time with Brent Anderson Associates.
Q Do you remember what formulations of Swelltite you were dealing with back then?
A I can't say for sure, no.
Q All right. The next job after that? You were unemployed for a period of time?
A When I came to Inspec.
Q That's when you came to Inspec?
A Right.
Q In Exhibit 788, you say that you've been with Inspec since 1994, correct?

A I think that's right, yes.
Q And then it says you have devoted the last 16 years to the study, investigation and design of below ground waterproofing and drainage systems?
A Correct.
Q So would all of that experience either be at Inspec or Brent Anderson?
A Yes, that's right.
Q Okay. What positions have you -- well, how did you come to the Inspec job?
A My mother saw an article in the paper describing that Dick Phillips had become president of Inspec. I had been dropping my resume out of airplanes and been unsuccessful in getting too many interviews, and I said, "Okay, Mom, I'll give them a call." It turns out they were interested in expanding their design service to include below ground waterproofing. They had already developed a good reputation for themself in the area of roofing design and wall restoration. They wanted to round out their building envelope approach to solving building problems by adding below ground waterproofing. With my experience at Brent Anderson Associates, they hired me with the intent of doing waterproofing projects and maybe some day developing it further into a department, which is what they did.

Q What positions have you held at Inspec?
A I was a project manager the day I was hired, and from there I became department head of the waterproofing department.
Q When did that happen?
A I was named department head, it was 1998.
Q Did that involve a change in responsibility of any kind?
A Very definitely.
Q What was the nature of your job as project manager?
A Design, all aspects of design of waterproofing projects, managing the project from start to finish, all the way through the bidding process.
Q Is that all, is that all you were doing?
A Also construction observation.
Q As project manager, were you involved in investigation of water leak issues?
A Yes. We also did investigations.
Q Would you tell me about what you were involved in in that regard?
MR. BROWN: As a project manager?
MR. VEITH: Yes.
THE WITNESS: The investigation of a leak would -- sometimes we would carry out an investigation as a matter of verifying existing conditions in preparation for a design, for the design project. Other times we

would do an investigation as a service all by itself without any intent of going on making that a design project. But in both cases it pretty much involved the same thing. We would do destructive test openings, identify, verify existing materials and conditions. Sometimes it involved water tests to verify where the water was coming in, how it was getting through the structure. We would document this information with photographs, sketches. We would analyze the information and put it all together in an investigation report.
Q (By Mr. Veith.) What changed when you became head of waterproofing department?
A I continued to do everything I had done before as a project manager, just fewer projects. In addition to that, I now had to oversee and train people. At first only one or two. Today we have a total of five in our department. But I hire and train and review the work of those in my department as well as still doing investigations personally and design projects personally.
Q Are the people that you're overseeing and training, are they also licensed architects?
A No. None of them are.
Q What are they?
A Two have architectural degrees. Excuse me. Three have architectural degrees, one has a construction background.

Then there's another individual who's not formally part of my department but I borrow him from another department from time to time. He's a licensed engineer.
Q What percentage of your job while you were project manager was devoted to investigation of water leak issues as opposed to design?
A During my entire stay at Inspec?
Q Well, just during project manager first and then I'll ask about that.
A I would say 25 percent of my time.
Q What was the other 75 percent, design?
A Design, uh-huh.
Q How about after you became head of the department?
A It increased. I would say 40 percent of my involvement was investigation, below ground water infiltration investigation.
Q Did you review anything in preparation for your deposition today?
A Yes.
Q What did you look at?
A I reviewed my own report again, I reviewed my Professional Profile again, I read an updated report by Patrick Engineering which Flynn & Gaskins forwarded to me.
Q An updated what?

A An updated version of a report issued by Patrick Engineering.
Q Anything else that you reviewed?
A I reviewed CETCO product literature that involved the Swelltite product, both the literature that was published for the first version of Swelltite as well as literature published for subsequent versions of Swelltite. Over the last four months, as Flynn, Gaskins & Bennett would forward depositions to me, I would review those.
Q You reviewed depositions in preparation for today or you're talking now about other things you've looked at?
A Just other things I've looked at.
Q Anything else you've reviewed in preparation for today?
A Flynn, Gaskins & Bennett loaned to me a videotape of general things.
Q How to be a witness?
A Yes. I believe that's it.
Q That's it?
A Uh-huh.
Q Have you ever served as an expert witness before?
A Never have.
Q Prior to the Promenade Oaks project, had you ever encountered Swelltite 3000 before?
A Yes, I did on one occasion, but I would have to do some digging to find out just the circumstances surrounding

that. I don't recall the project or the occasion. The reason why I know I have encountered it before is because I remember wondering about the effectiveness of the bentonite component of the Swelltite product and then seeing it again on the Promenade project brought it back to mind.
Q What would you need to do to find out what your prior experience was with the Swelltite 3000?
A What would I need to do to find out what that occasion was?
Q Yes.
A I'd have to go back through files at Inspec. I'm hoping it was during Inspec. It may have been during my years with Brent Anderson Associates, and that would be extremely difficult, if not impossible.
Q So this experience was a significant period of time prior to getting involved with this situation?
A What do you mean by significant?
Q A long period of time, a number of years?
A A number of years, yes.
Q Any other concerns you had about it when you first experienced? You said you wondered about the bentonite. Was that your only concern?
A The -- yes. I'd have to say yes.
Q You don't remember the location of that project?

A No, I don't.
Q You don't remember the type of construction that it was used on?
A No, I really don't. My memory is very vague on that.
Q You don't remember the geometry of how it was applied?
A I seem to remember it was a horizontal application, but that's all I remember about that.
Q Do you remember whether it was a plaza or what was the nature of the horizontal application?
A I really can't say.
Q Do you remember what the issue was and why you were concerned with the Swelltite 3000?
A I can assume because there was leaks.
Q I don't want you to assume, I want you -- if you remember?
A I don't remember.
Q Have you ever recommended the use of Swelltite 3000 for an application?
A No, I haven't.
Q Have you ever recommended the use of other formulations of Swelltite for construction application?
A No.
Q Do you know what other, if any, formulations of Swelltite you've had experience with prior to Promenade?
A No.
Q Do you recall any specific instances where you worked with

other formulations of Swelltite prior to Promenade?
A Well, like I say, there was that one incident where I encountered Swelltite once before, but --
Q That's the only time?
A That's the only time.
Q Okay. Prior to working on the Promenade project, had you ever had any familiarity with or experience with a waterproofing membrane, a bentonite membrane using a polyvinyl alcohol film or water-soluble film?
A No.
Q Was Promenade Oaks the first project where you had ever had any experience with a polyvinyl alcohol film on a waterproofing membrane?
A I don't recall whether my first experience with Swelltite was a version that had the water-soluble film or not, so I don't know whether Promenade was the first occasion or not.
Q Have you reviewed -- you're familiar with, at least as we sit here today, you know what the composition of the Swelltite 3000 membrane is, correct?
A Yes.
Q Do you know what the chemical makeup of the film is?
A No, I don't.
Q Do you have any understanding of the chemistry of the film or how the film works?

A No.
Q So you wouldn't know what situations might make the film become insoluble, correct?
A Correct.
Q Do you know --
A Other than what the literature states.
Q What literature have you reviewed?
A Literature was forwarded to me by Terry, and I keep forgetting his last name, Steve. Terry with Healey Ramme.
Q Mr. Wiederhoft?
A Yes.
Q What did he send you?
A It was literature on the Swelltite 3000 which applied to the version of the product that was installed on Promenade Oaks, the version which relied on a water-soluble film to dissolve.
Q Do you know who manufactures that film?
A The film itself?
Q The film itself?
A I have no idea.
Q Have you ever reviewed any product literature relating to that component?
A No.
Q Do you know what cross-linking is?

A I don't believe I do.
Q Do you know whether the film component of Swelltite 3000 has a shelf life?
A I don't know that either.
Q Do you know how that component is manufactured?
A No.
Q Do you know how to test the film component of the product for solubility?
A No.
Q If you would go back to 788 for a moment, you have a partial list on page 3 of Exhibit 788. There is a partial list of previous waterproofing projects?
A Uh-huh.
Q Reviewing that page of projects, does that bring back a recollection for you as to where you would have encountered Swelltite 3000 prior to Promenade Oaks?
A I'm certain that first encounter with Swelltite predates all the projects on this list.
Q Are all the projects on this partial list projects that you worked on at Inspec?
A Yes.
Q Are you certain that your experience, your prior experience with Swelltite 3000 predated your employment with Inspec?
A No, I'm not.

Q The next two pages are fee schedules, and I had a question about which rate you're applying. On one page it indicates $130 an hour, the other page indicates $110. Which is it?
A I'm at Level 2, so it's $130 an hour.
Q Why is there a sheet for $110?
A We have several rate sheets at the company depending on which major client we're dealing with or whether our standard fee applies and we have special rates for forensic and pre-purchased due diligence, which is what our president told me to apply to this project.
Q Do you know, prior to Promenade Oaks, how many prior water leak investigations you had personally done involving below grade waterproofing on a precast concrete deck?
A I can't say for sure with regard to the precast concrete deck condition. Certainly a couple dozen. But that's a very -- that's a very -- that's an approximation.
Q What do you do when you perform a full-scale water leak investigation? Walk me through the process.
A It usually begins with a visual survey of both the above ground conditions and the evidence of infiltration on the interior. We review existing construction drawings, become familiar with the structure and the waterproofing. We review the original specifications, especially with regard to the waterproofing specified and any subsurface

drainage provisions that might have been designed.

Next we do destructive test openings. We call them DTOs. Sometimes it amounts to nothing more than digging a hole, as in the case of Promenade Oaks, and taking samples of all encountered materials down to and including the waterproofing.

We make a scale sketch of the destructive test opening, we note the condition of the materials encountered and identify the materials as best we can, we photograph the destructive test opening. If we've cut into the waterproofing and it is not -- the condition is not so flooded that we could patch it again, then we mop up what traces of water there is and we patch the cut membrane and then put all materials back to as close to the original condition as possible.

We analyze the situation and evaluate what we found, state our conclusions, recommended repair and sometimes related repair cost estimates and put it all in an investigation report. Sometimes, depending on our level of familiarity with the products we encounter, we'll do some research, we'll review product data sheets. However, if the waterproofing or any product, if we're lucky enough to encounter the label still on a product, which does happen, then we know for sure what it is.

That's about it.

Q Did you do any research with the Promenade Oaks project?
A Yes. That's how I obtained some of the literature I have.
Q So by research, you mean reviewing product literature?
A Yes.
Q Is this procedure that you've just described for me a procedure that you've developed just from your experience?
A Largely, but I've augmented my own experience with that of Brent Anderson, when I worked for him. I have attended waterproofing symposiums and seminars, I've read articles on the subject over the years.
Q What sort of specialized education or training have you had with respect to conducting water leak investigations?
A Investigations per se, none. Investigation-related talks and seminars. I attended a continuing education symposium, two day symposium at the University of Madison School of Engineering on three occasions. All three two day symposiums involved below ground waterproofing and subsurface drainage again, but none of the symposiums were specifically for investigation.
Q But you would consider this to be the best method for conducting an investigation of water leak issues?
A The method I just described?
Q Yes.
A Yes.

Q Is that the method that you've used with the Promenade Oaks project?
A Yes.
Q What are the documents that you want to be given when you do a full-scale -- well, let me back up. First of all, do you consider the investigation that you've done for Promenade Oaks to be a complete water leak investigation?
A You'll have to define complete for me.
Q Well, is there anything else that you'd want to do or do you think you've done an adequate job?
A In order -- I can't answer the question the way it's worded. I'm sorry.
Q Well, have you done what you would consider to be a full-scale water leak investigation on Promenade Oaks or did you leave things out?
A I conducted the investigation in the way I would any similar situation with multiple evidences of past infiltration on a plaza earth-covered situation such as Promenade Oaks.
Q Is that a yes, you believe you did a full-scale investigation?
A I did the type of investigation I thought was warranted for the project.
Q But that wasn't my question.
A Well, that was my answer.

Q It calls for a yes or no.
A Can't be answered with a yes or no.
Q Is there anything more that you believe that you could have done to further investigate the water leak issues at Promenade Oaks?
A There's nothing more I could've done that would have resulted in a more complete assessment of the infiltration situation.
Q What are the documents that you want to be given during the startup? You talked about your visual inspection or your initial involvement with the project. What are the documents that you look for at that point in the investigation?
A In the case of Promenade Oaks, I wanted to see the original structural documents, architectural drawings. Let me start over again. The original structural drawings, the original architectural drawings, any as-built drawings that they had, the original specifications, especially with regard to waterproofing and subsurface drainage. As far as the drawings, that's it.
Q Why is it important to have as-built drawings?
A Very often during the construction process, for a number of reasons, alternative products are proposed and accepted for installation other than those that are

originally specified. The as-built drawings represent what was installed, not necessarily what was specified.
Q What is the purpose of doing the initial visual investigation or -- you're not digging up anything at that point?
A No. That's correct.
Q What is the purpose of --
A Well, the purpose of the exterior visual survey is just to familiarize myself with the context of the situation. I don't want to do a destructive test opening right in front of somebody's entry stoop, for example. I want to know where the drains are with respect to where I eventually decide to take the destructive test openings. I want to survey what sources of water are being delivered to the waterproofed area, be it roof, downspouts, et cetera.
The reason for the interior visual survey, of course, is to get an idea as to where water is actually coming through the structure. And I say coming through the structure rather than where water marks are showing up on the surface because sometimes finished materials have to be removed in order to see clearly where water is actually coming through the structure. In the case of Promenade Oaks, that wasn't necessary down in the garage; it was an unfinished space. But I did want to see whether

water was coming through precast joints, for example, whether it was coming through the top of the wall where the precast bears on the wall. Where the water enters through the structure gives me insight into where best to do the destructive test openings.
Q Did you notice any interior leaks at Promenade Oaks when you went out there?
A Oh, yes.
Q In units?
A In units as well as in the garage, yes.
Q You felt it was not necessary to do any destructive test openings in the interiors of any units?
A I didn't myself because Healey Ramme had documented with photographs quite a history of past infiltration and I just made the judgment that it wasn't necessary.
Q When you went out -- well, do you recall when it was that you went out for your first visit to the Promenade Oaks site?
A I really don't other than saying roughly maybe two years ago. I'd have to look it up.
Q Did you go alone?
A No. On both occasions I was accompanied by Brent Anderson Associates only insofar as offering contractor assistance to help me dig the openings. Brent Anderson Associates is more than just a roofing waterproofing

contractor. They offer quite a variety of construction-related services and they will very often help Inspec from time to time with destructive test openings. This certainly was not the first occasion.
Q You said both occasions. Did you have two initial observation visits?
A I took seven destructive test openings initially.
Q Well, now, let's back up a minute because I thought you didn't do any destructive test openings when you go out to the site the first time?
A I'm sorry. You talking about the very first time?
Q Yes. I'm still dealing with your visual observation.
A That's correct. No destructive test openings during the visual survey. You're right.
Q Did you only have one visual observation visit to the site or were there more than one?
A No. There were three occasions I went out prior to the destructive test openings.
Q Why did you need to go three different times?
A Every time I went, observed things, went back to the office. After mulling over what I'd seen, I felt it necessary to go back and either verify something else or just become more familiar with the situation.
Q Did you have anyone with you on any of those three visual observation visits to the site?

A On one occasion Terry with Healey Ramme accompanied me, on another occasion Tom Healey accompanied me, and I believe on a third occasion I was by myself. However, Healey Ramme was aware that I was on the site.

(Campbell Deposition Exhibit Number 789 was marked for identification at this time.)

Q (By Mr. Veith.) You would have your initial site visits before you submit the proposal for your services?

A The initial site visit, yes. At least one initial site visit is routine before we submit a proposal.

Q Is Exhibit 789 a copy of your proposal for the Promenade Oaks?

A Yup.

MR. BROWN: Which number, John?

MR. VEITH: 789.

MR. STEPAN: What's the date on that, John?

MR. VEITH: Well, it's dated November 8, 2001.

Q (By Mr. Veith.) Is that right, Mr. Campbell?

A November 8, 2001, yes.

Q And looks like Mr. Raw accepted it the next day, accepted November 9th, 2001?

A Uh-huh. Yes, that's correct.

Q Is that your handwriting on the second page?

A The signature?
Q No. On the right margin, the small handwriting?
A Yes, it is.
Q Could you explain what that's all about?
A Additional -- we had to hire Brent Anderson Associates for an additional set of destructive test openings, and I believe after BA, that's what that figure is about. CPMI is a company that does estimating for us sometimes and we hired them with the permission of Healey Ramme in order to put a cost estimate of what our proposed ultimate repair or fix would be.
Q Does the date of this document help you pinpoint when it was that you would have first gone out to the Promenade Oaks?
A It certainly -- for the initial site visit, are you referring to?
Q Yes.
A I can't say for sure.
Q Do you remember what time of year it was when you first went out?
A Other than the fall of the year, I can't say for certain. I'm sure I have records that would pin that down, but I can't remember offhand.
Q So you think it was the fall of 2001 that you first went out there?

A I think so, yes.
Q Tell me about your first visit to the site?
A I walked up on the earth-covered courtyards. I believe we were outside first.
Q Who is "we"?
A Tom Healey, I believe, was with me. I'm not certain of that, but I think so. Somebody was with me. And then we went down into the garages and looked through all six garages and went into some units that had experienced water infiltration in the past.
Q Do you know which units those are?
A No, I don't. As well as some elevator towers that had experienced water infiltration in the past.
Q How long were you out there?
A I can't say for sure. Approximately two hours.
Q Did you take any notes or make any documentation while you were walking around out there? And again, we're just talking about this initial visit.
A Initial visit, right. I think I probably would have.
Q Do you know where those notes are?
A In the file that I left at Flynn, Gaskins & Bennett, I imagine.
MR. VEITH: Were those in the stack of documents, Steve, that you gave us?
MR. RAU: No. Of course they were. I

don't know whether -- I haven't been through to determine whether there are notes there. You got his file intact, so if they're there, they're there.
Q (By Mr. Veith.) As you walked through the courtyards, what did you observe? Anything stand out?
A The fact that the concrete collar around the drains in a great number of cases were elevated above the surrounding side, which indicated water would have to reach quite a high level to enter the drains. I think that was one of the first things I noticed right off the bat.
I noticed an unusual amount of sidewalk cracking, unusual amount for sidewalks that were as recently installed as they were. I noticed finished grade in quite a number of locations was up covering the vinyl siding of the units. I noticed there was an irrigation system.
Q In the courtyards?
A In the courtyards, right. It was -- I was made aware of where the repairs had been done recently by Weis Construction, Weis Builders.
Q Was Mr. Healey pointing that stuff out to you?
A I don't recall who was pointing it out to me. Somebody was with me at the time. It might have been either Mr. Healey or Terry. I really can't say which. My notes probably say. I remember noticing what I think was a PVC

clean-out breaking the surface and I was told later that this was where some shallower perforated PVC drains had been installed as a repair measure. I noticed there were no gutters on the roof right away and it appeared initially as though all roof water was emptying right into the courtyards. I noticed there was pre-finished sheet metal flashing that extended below grade. I noticed it because that's not good practice and it stood out in my mind.

I think that about sums up my initial observations.

Q Did you walk all of the courtyards?

A Yes. All six.

Q And you can't remember whether it was Mr. Wiederhoft with you or Mr. Ramme with you?

A Not that very first time, no, I can't.

Q Do you remember any of the conversation you had with those gentlemen during these walk-throughs?

A I know we discussed the extent of infiltration since very shortly after the buildings were constructed. They talked in detail about the types of infiltration they had experienced both in the units and in the garage. I remember Tom Healey on one occasion, I don't know whether it was the initial site visit or not, but on one occasion Tom Healey talked about how because of fire access they

had to redesign the link between Building 1 and 2. Whether this had any bearing on the infiltration or not, I had no idea of knowing at that time.

Other than just talking about the infiltration history at length, that's all I can recollect.

MR. VEITH: Okay. Why don't we take a break.

(A short recess was taken at this time.)

Q (By Mr. Veith.) Why don't you tell me about what your observations were, things that stood out to you as you walked through the garages, again during your initial site visit?

A I observed approximately eight active leaks originating from precast joints, concrete block walls, other various details. But the vast majority of what I observed was simply evidence of previous water infiltration.

Q The eight active leaks that you saw, you said joints in the precast and CMU walls and then various other details. What are the various other details?

A They were all unique in their own right. I'd have to point to a map to show you. Various junctures of structures coming together. They were all different from one another.

Q What kind of a map?

A I mean a plan. Excuse me.

(An off the record discussion took place at this time.)

(Campbell Deposition Exhibit 790 was marked for identification at this time.)

Q (By Mr. Veith.) We've marked your report as Exhibit 790. Is there a document in your report that can help you point out where these eight active leaks were?

A Yes. Borrow a pen or pencil? I can't recall all eight active ones, but I'll do the best I can.

MS. REISBORD: Which drawing are you referring to?

MR. RAU: Why don't you first identify you're looking at Schematic a, Site Plan in your report.

MR. SONNESYN: Is that marked as an exhibit?

MR. RAU: Yes.

MR. SONNESYN: Which one is it?

MR. RAU: 790.

Q (By Mr. Veith.) Okay. You're referring to Drawing A in your report, Site Plan?

A Site Plan a.

Q Okay. Go ahead.

A There was active water infiltration at the vertical CMU wall near the ceiling on the west side of the link

between Building 1 and 2. There was similar infiltration on the CMU wall --

Q You know, why don't we use a different symbol because they look an awful lot like the markings you're using for destructive test openings, so why don't you use red and maybe make it an open circle or something?

A (Witness complies.)

MR. REILLY: Are we using the site plan that's in his report?

MR. VEITH: Yes.

THE WITNESS: Yes.

MR. REILLY: Thank you.

Q (By Mr. Veith.) So there were two active leaks in the link area between Building 1 and 2?

A Yes. And by active, I mean there was recent moisture on the face of the concrete block. There was an active leak in this location, which is again just west of the link between Building 1 and 2.

Q Why don't you just maybe mark these with a letter or something because, you know, we're not going to be able to tell what ones you're marking at what point in time by reading the transcript if you don't put like a letter A, B, C or something?

MR. RAU: So A and B referring to the first two?

MR. VEITH: C will be the one you just drew.

Q (By Mr. Veith.) Okay. And where did you observe the leak actually in the garage? Was it coming from the joint in the plank or where was it coming from?

A It was originating at the juncture between some precast panel and I believe a wide flange beam support. There was another active leak just across the driving lane from leak C. We'll call this leak D. This was in the -- this was in a dumpster room. There was a fifth active leak. The last three active leaks I can't remember just by recollection what the location was. I'm certain of those four, though.

MR. BROWN: Did you say the last three?

THE WITNESS: Excuse me. The last four. But remember, I said approximately eight active leaks. I'm not sure of the exact count.

Q (By Mr. Veith.) Have you told me about all the things that stood out to you as you walked through the garages of the buildings?

A No. I also noticed -- well, the evidence of past infiltration was extensive. I saw evidence of what had to have been over 100, maybe even as many as 200 points of infiltration in the past that were not currently active. I also observed an injection material that had

oozed through the precast joints. I wasn't sure what it was at the time.
Q Do you know what it is now?
A I've heard that they have done some injection in those joints with a water stop material, but I wasn't involved in that repair at all.
Q And this was material that was oozing from between the joints in the plank?
A Correct.
Q Anything else that you observed in the garages?
A I noticed quite a bit of what we call construction water that had leaked through the precast joints. Construction water is just simply the water that naturally drains down through the freshly set grout that's put in the keyway joint shortly after it's installed. That's not to be confused with infiltration evidence.
I noticed efflorescence in a great number of locations on the CMU, interior facing the CMU walls. I noticed stainless steel gutters had been installed underneath certain joints that Terry told me was catching water through active leaks. I noticed there were floor drains. The floor was sloped to the interior floor drains. I noticed marks on the floor from water infiltration through the precast plank above.
Q Anything else?

A I noticed quite a bit of evidence of previous infiltration originating from the top of many columns, concrete columns.
Q Okay. Anything else?
A Evidence of previous infiltration originating from the top of many concrete beams that the plank were bearing on. I noticed blistering paint on a painted CMU wall in one of the hallways leading from the garage out to the exterior. As a matter of fact, I noticed that in two locations. I think that's it.
Q Is the only way that you know what the material was that was oozing from the joints in the plank based on what somebody told you?
A Yes. I ran no tests.
Q Who told you that, what the material was?
A I never was told what the material was.
Q Oh. You just were told that there were repairs and you were assuming that that's what the material is from the repairs?
A Yes. It appeared -- it looked like material I had seen in the past on other projects that had been injected for the purposes of water control.
Q All right. What did you do after that? What was the next thing you did after completing your initial visit? Was there anything else you did during your initial visit that

you haven't talked about?
A Healey Ramme gave me some -- I don't recall if this happened during my initial site visit or if this was after my initial site visit but before I wrote the proposal, but somewhere in there Healey Ramme gave me their record of infiltration history for the entire property.
Q All right. What was the next thing that you did as part of your investigation, then?
A I reviewed the existing drawings. I believe I did this on this occasion even before I wrote the proposal. And then I think I wrote the proposal.
Q What do you mean by the existing drawings? What are you referring to?
A The construction drawings prepared by at the time BRW Elness Architects.
Q You said you went back to the site two more times because you thought of some new things that you wanted to check?
A This was after the proposal had been accepted, so my visits were part of the investigation.
Q So prior to the proposal, you went out looking one time?
A Yes.
Q And then tell me about the two times that you went back? What was it that you wanted to check and verify?
A Just a more complete survey of the types of things I had

observed the first time.
Q But you don't recall anything in particular?
A Nothing new in particular, no.
Q Do you consider destructive test openings to be the primary source of your information when you're sourcing leaks?
A Primary source of existing conditions, yes.
Q So what you mean is primary source of information to pinpoint where existing leaks occur?
A Not necessarily where existing leaks occur because water can migrate underneath the waterproofing membrane and I didn't know at this point whether it was or not. Very often we have to do destructive test openings in places other than directly above the corresponding infiltration on the interior.
Q So do you consider destructive test openings to be your primary source of information in tracing paths of water travel?
A Yes.
Q But not necessarily to pinpoint the source of the leak, correct?
A Correct.
Q Well, then what information would you rely on to pinpoint the source of the leak if not what you observe in destructive test openings?

A Conclusions can be drawn based on the conditions of the material, the types of material used. That can lead one to obvious conclusions, even though there's no direct visual connection between a failure in a membrane and the infiltration corresponding to that.

Q What information are you referring to other than what you observed in destructive test openings?

A For example, if, like I said, if water can migrate underneath the membrane. It can travel for great distances before it finds an avenue through the structure.

Q But that's -- I'm sorry to interrupt you. That's not what I'm asking. I'm asking for the information that you are relying on in being able to pinpoint the source of a leak? And I understand, you know, the theoretical things that can happen. But I'm talking about what information that you are relying on when you try to pinpoint the source of a leak?

A The information from the destructive test opening and visual above ground observations.

Q And that's it, right?

A That's it.

Q Okay. What are the kinds of things that you take into consideration in determining where to put a destructive test opening if you don't necessarily put it over top of

where a leak might be?
A Whether it's -- if it's at a plane change, and by that I mean either the -- there's a deck drop or a change in elevation of a horizontal structural deck. That would be a key location. Or at another plane change vertical wall to horizontal, I do a DTO at that situation. Certainly drains, I do a DTO around an existing plaza drain. If I noticed an area where there was excessive ponding, I might do a destructive test opening there.
In the case of Promenade Oaks, since there was a typical system common to just about all of the horizontal precast plank, I wanted to take my openings in the earth area, not above sidewalk, obviously. So that was one factor, and convenience. Most of the openings were taken in Building 2 because of the convenience. However, there were at least two openings made at all buildings.
Q When you do a full-scale water leak investigation, do you typically do any testing aside from destructive test openings you might make?
A Sometimes.
Q What kinds of testing?
A Testing for asbestos in a given material that's sampled. We sometimes do that. Inspec has its own lab for such tests.

Q That wasn't a concern at Promenade Oaks, though, right?
A No, it was not.
Q What other kinds of tests might you do?
A There is a device called a tensometer and you can stretch a waterproofing material or membrane and record just at what point it failed in tensile strength, in tension. Sometimes we'll conduct that test. That's about it for waterproofing. Roofing is another matter, but that's it for waterproofing.
Q In what situations is it important to know the elasticity of the membrane?
A It's more important in roof design than it is waterproofing design, but it's important to know in waterproofing design when you have a membrane that is not fully adhered, for example, a loose-laid membrane, and there's very little containment weight on top of it, perhaps. That would be a situation. That situation doesn't exist at Promenade Oaks.
Q Did you do elasticity testing of the membrane?
A No. None at all.
Q How about water testing; do you ever do water testing as part of a --
A Yes.
Q What kind of water testing?
A It's usually no more involved than just taking, in the

case of waterproofing, taking a garden hose and applying it to the lowest level first and working yourself up.
Q What do you mean by the lowest level and then working your way up?
A If we're testing a bermed wall -- by bermed, I mean earth is up against a vertical wall but earth is also on top of a horizontal structure of waterproofing and we're not sure whether water is entering through the wall or through the horizontal, we do the water test on the lower horizontal first since gravity will keep the water down to that locale, and if that does not reveal anything, then we will do the water test on the higher area up on the wall rather than the reverse, obviously.
Q How does that work? Do you just point the hose at the higher elevation?
A Sometimes it's as simple as that. Depends on the situation.
Q And then what are you looking for? Are you looking to see where the water comes out?
A Basically, yes.
Q Did you do any of that at Promenade Oaks?
A No.
Q Why not?
A Because the earth was already so incredibly waterlogged that the waterproofing was exposed to hydrostatic

pressure 24 hours a day at the time of our destructive test openings. It was carrying out its own water test. By adding additional water, we didn't feel it was a good use of time or money.
Q Are there any factors or conditions that can make diagnosing or pinpointing the source of a leak more difficult?
A I guess I don't quite understand the question.
Q Well, does it make it more difficult to source or pinpoint a leak if you can't see the materials that are being used to do the waterproofing because they're below grade? Does that make it more difficult to pinpoint where a leak might come from?
A Yes.
Q It would also make it more difficult to know where water might be moving around under there, right?
A True.
Q Anything else along those lines that you can think of that would make it more difficult to pinpoint leaks or follow the path of water?
A If the waterproofing membrane was so flooded that even with a wet vac we couldn't evacuate enough water long enough to cut a sample through and examine under the membrane, that's difficult. That makes diagnosing the situation more difficult.

Q Why is that a problem?
A Well, if you cut through the waterproofing membrane and you can't repair it because you can't evacuate the water surrounding the cut, it goes unrepaired and you're just delivering water in great quantities into the interior of the building. We didn't want to do that.
Q You didn't want to do that with Promenade Oaks?
A That's correct. There were locations where it was so flooded, that even with a wet vac running for an hour, we couldn't evacuate the water enough to take a sample cut. The samples we did take were at locations where, even though it was wet, we could evacuate the water, vacuum the water up long enough to take the sample and repair the hole in the membrane.
Q Would the presence of porous materials, substrates, things like that underneath the waterproofing make it more difficult to pinpoint the source of the leak or trace the path of water flow?
A What structural materials would be porous?
Q Well, is concrete?
A More porous than concrete?
Q Is concrete porous? Can water permeate concrete?
A It can. Actually, if the material is very porous, it aids to setting up a relationship between where the water is showing up in the interior of the failure of the

membrane because shortly after going through the failed membrane, it would absorb into the structure and show up underneath in a more immediate vicinity.
Q So the presence of absorptive materials would make your job easier in pinpointing the source of a leak?
A In that regard, yes.
Q In what regard?
A With regard to the absorptivity of the structure, of the concrete. There are other things, too, such as keyway joints.
Q In the Promenade Oaks, what absorptive or porous materials are there present on the horizontal areas of the deck below membrane?
A Certainly the grouted keyway joints are very absorptive, more so than the precast concrete plank. The concrete block that rests on the plank at the building walls, that's more absorptive than the plank as well.
Q Are you referring to -- when you talk about the joints in the keyways or the joint in between the plank, are you talking about the grout material?
A Yes. Those keyways are profiled to accept grout and hold the plank stable together.
Q You mentioned that Promenade Oaks had a hydrostatic environment. Does that have any impact or make it more difficult for you to pinpoint the source of leaks or trace

water migration?
A No. It makes carrying out the destructive test openings just a little more sloppy and difficult.
Q What are the optimal weather conditions that you would want when you do destructive test openings such as the ones that you did at Promenade?
A Oh, optimum, it's not raining on my head, the ground is not frozen solid, it's nice if it's not 110 degrees outside. That's about it.
Q What weather conditions do you want to avoid?
A Simply for comfort rain, extreme temperatures, hot or cold. Even when the ground is frozen, that doesn't stop us. If we have to hire a contractor to come out with a jackhammer to hammer through a lens of frozen ground, we do that all the time. But I would say with regard to ideal weather conditions for DTOs, it's largely just a comfort issue.
Q So you're not that concerned with what the weather is when you do destructive testing?
A Apart from comfort, no.
Q During your initial site visit, did you document the water infiltration?
A No.
Q During your initial site visit, did you take any photographs at that point?

A Yes.
Q Did you make any sketches?
A No. No sketches.
Q Did you determine where to set the destructive test openings at Promenade Oaks based more upon the details or the structural detail type areas, you know, drain areas, post areas, that kind of thing, rather than upon what you observed as far as water infiltration?
A Correct.
Q After you were done with your initial site visit and reviewing the documents that you were provided with, the construction drawings, did you at that point have enough information to pinpoint where you wanted the destructive test openings?
A Yes, I did.
Q What were your conclusions at that point as far as what you needed to do as far as field work out at the site?
A I had to dig the destructive test openings and document the materials. I wanted to count and locate the existing plaza drains. I wanted to make note of how effective the drains were draining water visually from above. That's about it.
(Campbell Deposition Exhibit Number 791 was marked for identification at this time.)
Q (By Mr. Veith.) Would you take a look at Exhibit 791 and

identify it for me?
A This is a routine list of notes and questions I develop once a project starts and it could be made up of any number of miscellaneous questions I want to ask the owner, questions I want to ask anybody, instructions or reminders to me of things to do. Hence the name miscellaneous.
Q Is the handwriting throughout this exhibit all your handwriting or did someone else have any hand in preparing these?
A No. It appears to be all mine, yes.
Q And were these notes made all at the same time, this entire packet, --
A Oh, no.
Q -- or were they made throughout the course of your --
A Throughout the whole project.
Q Okay. Go ahead.
A It's an ongoing list, a living list.
Q What do the check marks indicate, looking at page 1?
A It indicates to me that it's either been resolved or I have tended to it or the question has been asked. The check just means I don't have to reread that item again.
Q At what point in your investigation was it that you put together the first page of Exhibit 791?
A Oh, I can't begin to answer that. I have no idea. I

very well could have added items to this first page throughout the whole project. Sometimes I'll erase items and put new items there. I'll erase items that have been checked and I'll put a new item there just so I keep all my current issues on the front page so I don't have to keep turning back to subsequent pages.
Q The third line down talks about categorize and locate all leaks, and did you do that? It's checked off, so I'm assuming you did?
A Yes, I did.
Q And if you go to the fourth page of the document, there is a list of leak types?
A Uh-huh.
Q Is that sort of the answer, if you will, to your categorize and locate all leaks referenced on page 1?
A Probably in part, uh-huh. I'm sure it's not a complete list.
Q Are the categories of leaks -- well, how did you categorize the leaks?
A I used the word leak types intentionally to be general because, well, a leak through a keyway is one type, a damp CMU wall face, just a damp face, that's another leak type. I can go on and on forever.
Q Well, looking at page 4 of the exhibit, are there any leak types that are left off of that page?

A Oh, sure. At this point, I didn't bother to list the interior, the leaks in the interior units. I don't know why I didn't make a list of those leaks, but maybe at the time I was just thinking of garage leaks when I made this sheet. But those are missing.
Q Did you write these notes, that particular page, while you were out at the site or did you do that later?
A Probably a combination of both.
Q Why are certain leak types crossed out?
A I don't know. It could have been because I consolidated that leak with another. Maybe I thought the types were too similar to warrant two different entries.
Q Going back to page 1, about the fifth line down you've got a question, keyways grouted? Do you see that?
A The fifth line down?
Q Fifth check mark down.
A Yup, uh-huh.
Q What did you learn about that?
A I learned that the keyways were grouted.
Q What was the question there for?
A I was asking myself -- I was telling myself to verify that, that the deck was flat, and it turned out it was. I wanted to find out if there was a topping put on the precast deck, because if there was, it might have been tapered. And if it was tapered, that would tell me

something about the logic of the waterproofing design. As it turns out, there was no topping. And I wanted to know if the keyways had been grouted, because obviously if the membrane had failed and the keyways were not grouted, that would account for a lot of infiltration through the keyways, or that can happen even with grouted keyways. I just wanted a thorough understanding of the precast system.

Q Three lines down from that, why is that line crossed out? You've written Study 1997, proper Bituthene installation.

A I really don't know why I crossed this out.

Q What are you referring to?

A Bituthene is a peel and stick waterproofing product manufactured by W. R. Grace, and I had been told that peel and stick -- this is before I had done the DTOs. I had been told that a peel and stick product was used on the project, and so I thought -- I can only assume I thought it might be valuable to review the Bituthene literature installation. I don't know why I crossed it off.

Q Were you the one that made the decision about where to place the destructive test openings?

A Yes.

Q Okay. A couple of lines down, two lines down from that, there is a line Review Invest Manual. Is that what that

says?
A I wrote a quality control manual for conducting water infiltration investigations for internal use in the office at Inspec. I refer to my own manual before I start a project to make sure I follow my own procedure.
Q A few lines down from that, do you see where it talks about Weis responsible for waterproofing?
A I just wanted to find out whether Weis Builders was responsible. I don't say design, but I meant design of the waterproofing. Obviously they're responsible for the installation.
Q So you're asking a question to yourself here?
A Yes.
Q What about there's a question where do pc -- two lines down from that, where do pc ends occur, is that correct?
A Yes.
Q Did you ever get that question answered?
A Yes.
Q What was the answer?
A They occur over both the CMU foundation walls as well as over the cast in place concrete beams.
Q Okay. And you learned that from looking at drawings?
A Yes, right.
Q A few lines down from that, do you see where there's a Q in the margin and then it reads how can waterproof design

be by G.C. when arch signed spec w/wp?
A The Q means it's a question I have to ask. I thought it was curious that the written specification called out a waterproofing product and the architectural firm of BRW Elness signed the specification, so they are therefore designing the waterproofing in effect. I found out later no, as a matter of fact, I'm still bewildered by that. But since that has no bearing on my investigation report, it's more of a legal matter. I didn't pursue it.
Q Was that an unusual situation? Is that why you were referencing it here?
A Yes.
Q In your experience, if the architect signs off on the waterproofing specs, does that mean that the architect is therefore designing the waterproofing system?
MR. HULL: Objection, foundation.
THE WITNESS: Should I answer the question?
MR. VEITH: Yes.
THE WITNESS: In the absence of any other agreement otherwise, it would imply the architect is having a hand in the design of the waterproofing, yes.
Q (By Mr. Veith.) Would that be your experience, would that be based on your experience, 16 years in the business of waterproofing investigation?

A Uh-huh. Definitely.
Q All right. About four lines down from that you've listed that you want to review requested -- is that contractor info?
A Yes.
Q -- forwarded from Flynn Gaskins. What was the contractor info that you had requested?
A I really don't recall.
Q So you don't know what contractor info is referring to?
A I really don't. It might have been construction documents, it might have been a number of things. I really don't remember.
Q It says analyze rain load and drain capacity two lines down from that?
A Uh-huh.
Q Did you analyze the rain load and drain capacity?
A I did insofar as using a method in the chart we use at Inspec. It's not an all-comprehensive method, but it is an abbreviated method of estimating the appropriateness of a drainage design.
Q What is a pilaster?
A A pilaster is a structural element in a wall offering additional lateral support to that wall. For example, if you had a CMU wall and a cast in place pilaster either integral with the wall or interior, slightly interior to

the wall, very often that's there to add added lateral support to the wall. It's a rather general term.
Q All right.
A Not as specific as the term beam, for example.
Q Could you go to the third to the last page of the exhibit, and it begins with an underlined word Deficiencies?
A Uh-huh.
Q When did you put these notes together; at what point?
A Probably throughout the whole project. That's usually how I do it.
Q Would these have been done before you did the destructive test openings?
A Depending on the entry, some of them might have been, yes. I'd have to read through every one here.
Q Do these last three pages of this exhibit all refer to what you've titled Deficiencies?
A Yes.
Q What is the significance of the check marks on these last three pages?
A It means either I have incorporated that item in the report or I made the decision not to include it in the report so I don't have to read it again.
Q How do you know if you made the decision not to include it in the report? Can you tell from looking at this?
A No, I couldn't.

Q What are the tick marks across some of the checks that you have in the margin? What does that mean?
A I have no idea. I usually don't do that. I don't know why I might have done that on this occasion.
Q Three lines down on the first page of the Deficiencies section it talks about the post, frame nailed through waterproofing into precast. Do you see that?
A Uh-huh.
Q Do you know whether the waterproofing actually went under the frame that was nailed to the precast?
A I wouldn't have said that if I didn't believe it was.
Q Do you know whether that's true?
A Yes, it is true.
Q Where did you observe waterproofing continuously extending under posts?
A I made destructive test openings at two posts. I don't recall which one I saw that at.
Q Could you identify it by looking at your report?
A Probably not which detail, you know.
Q Did you document the DTOs?
A As to the locations?
Q Yes. I mean, did you document the conditions of each DTO as you reviewed it?
A Yes.
Q Did you document it by taking notes of the conditions?

A By making quick little field sketches.
Q You made field sketches and you made photographs?
A Uh-huh.
Q Did you do anything else to document the conditions in each DTO?
A No. Just took samples and the sketches.
Q The quick little field sketches, are they just handwritten sketches that you draw on a piece of paper?
A Yes. They're pretty crude, they're pretty messy.
Q Do you keep those?
A No. After I have incorporated those more formally, had them CAD drafted, I usually toss those.
Q Why?
A It's just what I always do. It keeps the file from getting too full.
Q So those sketches are gone?
A Yes.
Q Would those sketches be the only way you would know where you saw the condition that you're describing here on the third line?
A Unless I saw it at both post DTOs, that's correct.
Q A few lines down from that where you start talking about drains, it says you saw flooded -- in parentheses -- you saw flooded membrane with no water spilling in drain.
A I'm sorry, how many lines down?

Q Oh, it's about -- I'm one, two, three, four lines below the last post entry.
A Okay. Saw flooded membrane with no water spilling in drain. Yes.
Q Are you able to tell us at what locations you saw that condition?
A I saw that at both of the DTOs which I took at a drain.
Q And we'd be able to identify those by looking at your report if we wanted to, right?
A That's correct.
Q The line below that talks about a survey of how well drains work. Did you do that?
A Yes, I did. It was simply a visual survey. I removed the grate of every drain on the property in the courtyards and just visually looked inside and noted how much water was dripping in. It was not scientific, it was just visual. And it was -- it was after we had had a couple days of good rain, so I assume that the surcharge of water in the earth was pretty substantial and that if the drains were working, it certainly would appear so if I just looked in.
Q What was your assessment as a result of the survey? What conclusions did you reach?
MS. HEYER: Objection, foundation.
THE WITNESS: In virtually all the drains,

nothing was entering in through the top grate. There was very little water entering in through the repair perforated PVC that was installed after construction. There was very little water, and in many cases none at all entering through the perforated PVC collar which connected the top frame of the grate with the bottom bolt. My overall assessment was that the vast majority of drains were not draining the way they should after having had two days of the rain we had.

Q (By Mr. Veith.) Do you know the dates when you did your destructive test openings?

A Not offhand, but I can look it up.

Q Where would you look?

A I have a planner that I use, a Franklin planner. That would be one way. I might even say in the report when I did the destructive test openings.

MR. RAU: Photos.

MR. VEITH: I'm sorry, Steve?

MR. RAU: I'm wondering aloud whether the photos have any dating on them.

THE WITNESS: No, they don't.

Q (By Mr. Veith.) Do you know whether the destructive test openings were excavated in November 2001, shortly after your proposal?

A I can't say for sure whether it was in November or not.

Not offhand.
Q Would you be present on the site when they're excavating the destructive test openings?
A Most definitely.
Q And you'd be going along with the contractor, you'd be working with the contractor step by step through digging up or excavating the test opening?
A Yes, I would be. Sometimes a multiple person crew will be working on more than one opening and I'll be going from opening to opening, but yes, I'll be on the site all during the process, yes.
Q You don't want them to go out there, dig the holes and then when they're done let you know and you come out, in other words?
A No.
(Campbell Deposition Exhibit Number 792 was marked for identification at this time.)
Q (By Mr. Veith.) Showing you Exhibit 792, is this a form that you prepared?
A Uh-huh.
Q And is that your handwriting on the fax cover sheet and the request form?
A It is.
Q And you would have prepared this on the date October 31, 2001?

A Uh-huh, yes.
Q Now, is this form a form that you fill out to the contractor to come out and do the destructive test openings?
A Yes, it is.
Q On the first page, there are a number of days. You've written, "Any two days, November 13, 14, 15, 19 or 20, your pick." Do you see that?
A Uh-huh.
Q Do you know which of those days the destructive test openings were done?
A I can't say for sure, but it's not unusual for me to go back and forth between associates and myself or whatever contractor we're using and finally end up with a day that isn't even listed on here sometimes three, four weeks later.
Q So you don't know whether these days were used or not?
A I can't say for certain, no.
Q What are the test openings A and B? What is that referring to?
A Simply that there are -- the A openings involve only earth, the B openings involve four inches of concrete as well, and that tells the contractor that he has to bring out the appropriate tools.
Q The four inches of concrete is referring to what with

regard to Promenade Oaks?
A That would be where the concrete stoop is at the entries.
Q Now, at this point you wanted six openings dug in earth and you wanted six dug near stoops, is that what this is saying?
A At this time, yes, but I changed that later.
Q Why did you change it, or don't you recall?
A Probably just didn't feel that I needed six openings at the stoops and didn't want to inconvenience the tenants as much as that would.
Q You indicate here that you needed a torch to thaw the frozen ground?
A I thought one should be brought out just in case the ground is frozen.
Q Did you end up using a torch?
A A very little bit. The ground was not as frozen as I anticipated.
Q Did you have to use the torch at all at the openings or just one, a couple of them?
A I believe there was one opening on Building A where they had to use the torch underneath the topsoil, or in the top.
Q Which building?
A Building 1, excuse me, not A. Building 1. But for the most part, all the DTOs, although the ground was firm and

full of moisture, it was not frozen.
Q You recall that -- was there snow on the ground when the destructive test openings were done?
A During one of the times I went out to do the destructive test openings, yes, there was snow on the ground.
Q I'm sorry?
A Some of the pictures in the report reveal that.
Q How many different days did you go out for destructive test opening work?
A The first batch of DTOs I did during the winter, or when there was snow on the ground, and I thought, if possible I may to go out to do another batch, but I would reserve assessment of that until I had analyzed the information I had gotten from the first DTOs. I believe the first time I was out there it was a two day process. Again, I'd have to check my planner, but I believe the second time I was out there it was a one day process.
Q So a total of three days?
A Four at the most. The second time out there we might have taken two days. I'm not sure.
Q Do you remember what order you dug the holes in?
A Not precisely. I couldn't tell you.
(Campbell Deposition Exhibit Number 793 was marked for identification at this time.)
Q (By Mr. Veith.) Now, you said you found undissolved film

at some of the destructive test openings?
A That's correct.
Q Are you able to tell me which destructive test openings you found the film?
A Yes, I can. I'd have to refer to my report. I made pencil marks later, after the report had been issued, as to those locations because I neglected to put those locations in my report, though I do mention the presence of film that had not dissolved.
Q Was that an oversight that you forgot to put it in your report or did you leave it out intentionally?
A Didn't leave it out intentionally. I don't know how important it was at the time I wrote the report, but later on I just found it a convenience for myself in discussing the matter with Healey Ramme.
Q Well, why don't you tell me which openings had the film?
A Like I say, I've got it marked in pencil on my copy of the report.
Q Where is your copy of the report?
A In my car.
Q Why don't you get it?
A Okay.

(A short recess was taken at this time.)

(Campbell Deposition Exhibit Number 794 was marked for identification at this time.)

Q (By Mr. Veith.) Okay. Mr. Campbell, 794, you've produced a copy of a report that you had written some notes on and I have just copied the page, the Site Plan A from that which you had apparently made some notations on, is that right?

A That's correct.

Q When did you put those notations on your report? Did you do that in preparation for your deposition today?

A No. This was done quite a while ago, after I had issued the report, but when I was going through the samples one last time before I stored them deep and dark up in our closet, a special closet we have at Inspec, and I thought it would be good at the time to differentiate which sample still had the film on and which did not, so that's why I grouped them the way I did, and at the same time I noted just where the film, what DTOs had a sample with the film still on it. So to answer your question, that was done approximately four or five months ago.

Q So you didn't make a notation contemporaneously with excavating the destructive test opening, you came back after the fact and figured out based upon the samples where the film was?

A That's correct. I write on the sample bag where the location was, DTO 1, DTO 2, and the date, and that's how I knew to associate that film sample with the DTO

location.

MR. RAU: So this is simply a compilation of information that's contained on the samples?

THE WITNESS: That is correct.

Q (By Mr. Veith.) So the circles represent destructive test openings where the film is still there?

A That's correct.

Q There's a circle here I don't understand, and I'll just point to it. Maybe you can clear it up for me on the record?

A That circle is referring to number 9, DTO 9. Apparently that DTO both was an example of a drainage sheet that was 100 percent clogged as well as film remaining.

Q All right. So by my count, I count six destructive test openings where there was film?

A That's correct.

Q Can you tell me what the configurations are for each of these, or what the geometry is for each of these openings that have film remaining?

A I don't understand the question.

Q Well, I want to know what the detail is? Let's take destructive test opening number 1.

MR. REILLY: John, before you go there, could you just have him list which ones that he claims the film was remaining?

MR. VEITH: Oh, sure.
Q (By Mr. Veith.) You want to list so everybody knows what destructive test openings we're talking about?
A DTO number 1, DTO number 4, number 5, number 7, number 9, number 14 and number 17 all had film remaining.
MR. BROWN: Was it seven?
THE WITNESS: 1, 2, 3, 4, 5, 6. Let me repeat them just to be safe. Number 1, number 4, number 7, number 9, number 14 and number 17.
MR. REILLY: Earlier you said number 5, sir.
THE WITNESS: I'm sorry. 5 is incorrect.
MR. REILLY: Thank you.
Q (By Mr. Veith.) You were present during the excavation of all of those destructive test openings?
A All 20, yes.
Q Who was with you during the excavations of -- were the same people with you at all 20 excavations?
A I used Brent Anderson Associates on both occasions, but they sent out different crew. They didn't use the same crew each time.
Q Would you walk me through the excavation of destructive test opening number 1?
A Number 1 was through a sodded area in the middle of the courtyard apparently. We cut through the sod and

topsoil. The opening at the top was usually about 36 inches by 36 inches, so that by the time the sides taper down to the bottom there's still enough area revealed to work with. There is sod, topsoil, backfill material, extruded polystyrene insulation, a drainage composite sheet, the Swelltite waterproofing membrane and structural data. That is documented in here in a detail.

MR. RAU: When you're tapping "in here," you're referring to your report?

THE WITNESS: Excuse me. I'm referring to my report.

Q (By Mr. Veith.) Why don't you tell me about the conditions of each layer as you went down through? You know, kind of in a chronological order walk me through the excavation?

A I'd have to refer to my report.

Q Go ahead. Just tell me where you are so I can follow along.

A Uh-huh. I'm looking at detail C, titled Existing Condition At Precast.

Q Okay.

A And also as part of the title I identify that this is typical of DTOs number 1, number 2, number 6, number 12, number 15, 17 and 20.

Q Now, before you start, let me just ask you, do you have an

independent memory of these openings or are you relying entirely on your report for what the conditions were?
A Probably for the most part just relying on the report, with very few exceptions. I might remember some details particular to one location, but for the most part I'd have to rely on my report. It's been too long ago.
Q Is this detail C the only documentation you have of this destructive test opening?
A Yes.
Q Okay. Why don't you go ahead?
A First we encountered sod, then earth backfill, and I noted at the time it was poorly percolating, extremely high moisture content. There is a photo number 28 to substantiate that. Next, after getting through about two feet, two and a half feet of backfill we encountered the extruded polystyrene insulation. It was pink, which tells me it was a Foamular product. I lifted up the insulation and saw that the drainage composite sheet -- the dimples of the drainage composite sheet had been driven up into the underside of the insulation by the weight of the earth.
Q Let me just back you up for a second. When you had excavated the dirt off the top of the insulation, how big around was that hole where you --
A The hole down at the insulation or up at the top?

Q You still see the top surface of the insulation, but you've excavated the dirt. How big is the hole at that point?
A Probably in the neighborhood of two feet square. We could look at a photo, photo 28.
Q At that point, when you saw the top surface of the insulation, did you see any water in the hole?
A Yes.
MR. BROWN: Excuse me. Photo 28 is DTO 2, I believe?
THE WITNESS: That's right.
Q (By Mr. Veith.) I think you're actually talking about 25?
A Yes. DTO 1, photo 25.
Q So before you had cut into the insulation, you were already seeing water at that point, correct?
A At DTO number 1, I can't say for sure. It appears as though that was the case since we have the wet vac hose in photo 25 down there. However, we would've had the wet vac hose down there had we encountered water just under the insulation as well, so I can't say.
Q Would you vacuum the water out before proceeding on to the next layer or would you just keep going down?
A No. We would definitely vacuum the water out, yes.
Q Would the vacuum be running continuously?
A In the case of some DTOs, it was, yes.

Q How about this one?
A As far as number 1 goes, I can't say for sure.
Q After you cut through the polystyrene, or the insulation, you pulled that out, what was the next thing that you saw?
A The drainage, or composite drainage sheet, as it's called.
Q Did you see any water at that point?
A Again, I would have to refer to my detail. But since I am stating this detail is typical of all those DTOs, 1, 2, 6, 12, 15, 17 and 20, all the notes on here are true of all those DTOs. I don't mention one way or another whether there was water standing on top of the insulation or not.
Q Well, if the statements made in Drawing C are true for all of these DTOs, that doesn't make sense to me because you've got a statement here that says parts of bentonite not in contact with concrete because of undissolved film and you're talking about it lists some DTOs where you didn't find undissolved film. So that can't be true, correct?
A Correct.
Q So we can't take it for granted that statements made in this sheet are going to be true for each of these DTOs?
A No. I guess you're right. I meant this to be rather typical but maybe not exactly what all those DTOs are.

Q Can we safely assume that the reason you were using this vac is because there was water on top of the waterproofing system?
A Yes. We wouldn't have had the wet vac piped down there if there hadn't at least been water on top of the waterproofing.
Q For example, in some of the photos for DTO 2, you mentioned photo 28, there is water in the bottom of that opening, correct?
A Which photo again?
Q Number 28.
A Yes. That is definitely water.
Q And was that typical of the conditions that you would find on the horizontal applications when you went down?
A In more than 50 percent of the DTOs, yes.
Q There was water like that as depicted in photo 28?
A Yes.
Q The samples that you removed from each destructive test opening, will they contain all of the film that you found in each opening? In other words, did you leave any film in any of the destructive test openings or did you take all of it with you when you left the site?
A When I cut a sample out, I'm very careful to try to remove the sample piece representative of the way it was in place. The film was very poorly bonded to the

material even though it still existed in some cases. I wouldn't be a bit surprised if some of the film is flaking away from the material just sitting in the bags like that.

Q So you found areas where the film had dissolved as well, or it was no longer there?

A No. Yes, I did.

Q And when you would remove -- say for example with destructive test opening number 1, you took out a sample of the Swelltite?

A Uh-huh.

Q Is that sample the only way we would know how much of the film was still on at that test opening or not?

A Yes. It would be the only way.

Q You have no other documentation; in other words, you can't tell me how much film?

A Well, since the -- I do know this much. In every case I removed a small sample, the film was occupying the entire underside of the sample.

Q So you took small samples from each of the openings?

A Each of the openings, each of the DTOs where we could evacuate, we could vacuum the water out. There were some where the water rushed in so quickly we just could not remove the water, so I couldn't take a sample cut at that location.

Q Which locations were those?
A I think I would have to go through the labeled samples, look through them as to which ones were absent a sample of the Swelltite and then relate that to the plan. I couldn't say just offhand.
Q Okay. Why don't we pull out the one for number 1?
MR. REILLY: Off the record for a second.
(An off the record discussion took place at this time.)
(A noon recess was taken at this time.)
Q (By Mr. Veith.) Mr. Campbell, why don't we go back to -- if you could turn back to photos 25 and 26 relating to the first opening?
A Uh-huh.
Q I have a couple more questions about that opening. Mr. Campbell, I'm wondering how, in looking at these photos, tell me how you went about removing the sample of the Swelltite? How did you do that? Did you climb down in the hole in the destructive test opening and --
A That's correct. I wait until Brent Anderson Associates has removed all the dirt down to the insulation, then standing with my feet over on the edges I remove the insulation and I remove the drainage composite sheet and then I cut a little sample just using an ordinary utility knife through the Swelltite and remove the sample.

Q Did you save samples of the insulation, too?
A Usually not because it's -- I think there's at least one example of the insulation in here, but usually I didn't. I figured the photographs clearly show it's pink. There's only one manufacturer of extruded polystyrene that uses pink.
Q Okay. So typically what you were keeping as far as samples would be the composite drainage sheet --
A Correct.
Q -- and a sample of the membrane?
A Correct.
Q How did you go about making sure that no water got underneath the membrane as you were cutting it open?
A In the case -- well, I can't speak to DTO number 1 specifically, but what I do when water is rushing in, as I've said before, I put the mouth of the wet vac down on top of the drainage composite sheet and make sure I get all the water that are within the dimples of the sheet out in the vicinity of the opening. Then I remove the sheet, and if water rushes into the -- if water rushes in on top of the Swelltite, I didn't take a sample. If water rushed in over the Swelltite, I did not take a sample. It was always moist or wet, but only when there was no standing water did I actually cut into it and take a sample of the Swelltite. Did I answer your question?

Q Well, if you're done with your answer, I guess you've answered my question.
A Yes.
Q Why don't you pull out the sample from number 1?
A (Witness complies.)
MR. REILLY: By the way, has the box been made an exhibit now?
MR. VEITH: I think we did. Oh, we didn't? We better do that.
(Campbell Deposition Exhibit Number 795 was marked for identification at this time.)
THE WITNESS: In the case of DTO number 1, I did save a piece of insulation apparently. There's also a sample of the drainage board or drainage composite sheet minus the fabric apparently. The fabric must have, I assume, just come off. No, here's the fabric. It's no longer adhered because of the water.
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Here's one sample of the Swelltite. In this case, apparently the hydrated bentonite component left or debonded from the plastic component of the material, and in this case there is a scant amount of film remaining on the bentonite that did come along with the plastic component.

Q (By Mr. Veith.) Do you know whether this sample is in the same condition that it was when you removed it?
A This is only the second time these bags have been opened. The first time was --
Q I understand that, but do you understand my question?
A Yes. The answer is yes.
Q So when you took this -- well, first of all, this is what, a one and a half by two and a half inch piece?
A Yes.
Q Why did you take -- is there any significance to the size of the sample?
A Apparently, if the sample doesn't have all the bentonite component that go along, correspond with the plastic sheet, it's only because in its hydrated state it wasn't something you could collect up. I always tried to keep the bentonite component with the size of the plastic sheet whenever possible. So if it's absent, it just wasn't something you could -- it was too mushy. You just couldn't collect it up apparently.
Q Prior to doing these destructive test openings, had you ever seen hydrated Swelltite?
A I can't say for sure if it was hydrated or not, but I did see Swelltite that one other time we talked about earlier, that one I couldn't recall which project it was connected with.

Q What's your basis for -- well, are you saying this is hydrated?
A Partially hydrated. That piece there was partially hydrated.
Q Which part of the bentonite is hydrated and which isn't?
A The bentonite is mixed in with another compound to serve as a medium. I know this just from reading the CETCO literature and the --
Q Well, when I'm using the word bentonite, I'm referring to the compound. So which part of this compound here, which part of this sample is hydrated?
A This part right here is just barely hydrated. It's not hydrated very much any longer.
Q What do you mean by it's not hydrated any longer?
A I'm assuming that it's lost a little bit of its hydration in the many months it's been in this bag.
Q Are you familiar with the characteristics of bentonite?
A Very much so.
Q Do you know whether it can lose hydration?
A I'm not -- I'm familiar with bentonite as a material and its behavior, but when you mix it with the medium that CETCO does, I'm not familiar with that.
Q So as far as -- this is all of the undissolved film that you pulled out of that first destructive test opening, what's shown here in this sample?

A There is another piece. That's also the film. This very likely came off other parts of the plastic; that's why it's in the bag. So that's the balance of the film that I was able to recover in DTO number 1.
Q Looks like the film is partially hydrated -- or partially dissolved. Do you agree?
A I would agree.
MR. REILLY: John, may I talk to you just a second?
MR. VEITH: Sure.
(An off the record discussion took place at this time.)
Q (By Mr. Veith.) When you removed the Swelltite sample from destructive test opening number 1, you were able to see the concrete?
A Yes, I was. There were -- let me take that back. I don't know whether I did or not in the case of DTO number 1.
Q Because you don't remember DTO number 1?
A The reason why is because --
MR. RAU: Do you want him to answer your question? Which one, the first one or the second one, Mr. Veith?
Q (By Mr. Veith.) Well, let's start with do you remember DTO number 1?

MR. RAU: I don't think he finished the question you asked earlier.

MR. VEITH: Well, I don't care. There's no trick to this.

MR. RAU: I know there isn't, but if you ask him three questions, I want the record to be clear as to what he's being responsive to.

Q (By Mr. Veith.) Did you see the concrete? He said, "I don't know."

A In the case of DTO number 1, I can't say. I don't remember.

Q And the reason that you can't remember -- the reason that you don't know is because you can't remember?

A It's because in the case of some DTOs on the horizontal deck, there was a mastic accessory product that CETCO recommends be used on top of the keyway joints before the Swelltite is put on top.

Q Okay. But if Mr. Rau is going to make me do this question by question, I want an answer to my question. My question is, you can't remember DTO number 1, you're relying entirely on this photo and on the sketch, Drawing C, I think it was?

A I remember quite a bit about it specifically, but I don't remember everything about it. I don't remember if I saw the concrete or not.

Q What evidence do you have that water came into contact with the parts of the film that aren't dissolved?
A There was water underneath the Swelltite. In every one of the cases -- excuse me. In four of the cases where I found film intact, there was water underneath the Swelltite membrane.
Q What did that look like? Was it just damp?
A Dampness, yes.
Q Now, how do you remember this -- I mean, you don't remember this destructive test opening, so if you don't remember this destructive test opening, how do you know -- what evidence do you have that water -- let me finish my question -- that water came in contact with this film that's not dissolved? I mean, you can't remember?
A If this was one of the two that I did not find water in the membrane, you're right.
Q And you don't know if this is one of the two, right?
A That is correct.
MR. BROWN: Just to be clear for the record, one of the two what, DTOs?
THE WITNESS: There are six DTOs where I found film remaining on the sample of Swelltite. For only four of those did I find water under this Swelltite membrane.
MR. RAU: So there's only partial failure,

66 percent.

MR. REILLY: I'll object to your description of whatever it is, counsel.

MR. RAU: You can object all you want.

MR. REILLY: If you're going to testify, we'll put you under oath.

MR. RAU: Okay. Let's go.

Q (By Mr. Veith.) When you excavated, did you ever make any dams around the Swelltite area where you were going to cut out the sample before actually removing a sample to prevent water from getting in?

A No, we didn't.

Q You didn't use any other types of precautions to prevent water from getting through the membrane when you were cutting it other than using that vac, is that right?

A That's correct.

Q What did you use to patch it back up?

A We used granular bentonite, quite a bit of it, and a containment sheet of EPDM rubber on top of that.

Q How did you seal it?

A Bentonite will self-seal to the surface of the Swelltite, especially under the load that all this earth would apply to once it was hauled back, using the same principle as the Swelltite material itself.

Q Did you have to hydrate the bentonite to seal it?

A No. If water never reaches the repair bentonite, there's no reason for it to seal. If water reaches the repair bentonite, it will hydrate and seal just like bentonite does.
Q Did you put insulation back -- you know, did you fix the drain tile?
A We did.
Q How did you fix those parts up as you're filling it?
A We left -- we did not put the drainage composite sheet back. However, we did replace the insulation.
Q So you just left it without the drainage sheet out there?
A That's correct.
Q Did that concern you, leaving that out?
A Not at all.
Q Why not?
A Because there was water under the drainage sheet, within the drainage sheet. As long as the membrane was repaired. There was already water between the membrane and the underside of the drainage sheet throughout the whole project, so interrupting the drainage sheet would have no effect on the watertightness of the system.
Q In any of the destructive test openings, did you ever remove a sample of the membrane involving a seal or a seam between two overlapping layers?
A Never encountered a seam. I was hoping I would, but I

never did. It's a hit or miss situation.
Q All right. Let's go to the next one that you said had film in it. That's number 4? First of all, can you tell me why you chose that location?
A I chose DTO number 4 location -- I chose the location for DTO number 4 based on what Terry had told me. He said there was water entering that elevator shaft, or there had been in the past. And I also wanted to take a look at a vertical wall application of a waterproofing adjacent to an elevator shaft, so that's why I picked that one.
Q Was there any evidence that you had found before making this opening that this might be a source of a leak other than Terry's statement or was it hit or miss, as you were saying?
A No. It was just based on Terry's statement, right.
Q Okay. How big was this particular opening?
A Like I said, I'd have to look at a picture.
Q It's photos 31 and 32?
A We had to cut through the sidewalk. It's approximately 30 inches square at the sidewalk opening.
Q And that's based on your view of the photograph?
A It is.
Q Okay.
A And also you can count the brick coursing on the wall.

Q In which photograph now?
A Photograph 31. We have two bricks approximately eight inches apart, so I'm wrong on that. It's more like 16 inches square.
Q Based on the size of the brick?
A The length of the brick, yes.
Q Length of the brick?
A Yes.
Q Can you tell me what materials we're looking at in photo 31? Maybe you can tell because I see a lot of black and I'm not sure what it is we're looking at?
A The blue material is extruded polystyrene insulation like we've seen before, but this is a Dow product. That's why it's blue.
Q What is the black material between those two pieces of insulation?
A Most likely the --
Q Well, do you know what it is?
A I'd have to refer to my report. On the lower half, the lower half of the black area is composite drainage sheet.
Q Well, what are you looking at right now? You're not looking at the photograph, right? Can you tell by looking at the photograph what that is?
A No.
Q You'd have to rely on your sketch, and your sketch is

which one?
A E.
Q Okay. So based on sketch E, what do you think that material is?
A The lower half is, which would also be dark, is the composite drainage sheet, whereas the upper half, because the drainage capacity sheet stops short, stops at mid-wall, the upper half then would be the Volclay Swelltite which also has a black back.
Q Okay. Now, when you say the lower half, are you talking about the horizontal part of the deck in photograph 31?
A No. When I said the lower half, I meant of the vertical wall, the lower half. But now I see by photo 32 that when I took the photo, the composite drainage sheet has already been removed. So I'm correcting myself to say that in photo 31, what we're looking at for the full height of the wall is the Swelltite product.
Q So on the vertical part of the wall, on the vertical wall, you have not removed any Swelltite?
A At the time this photo was taken, that's correct.
MR. RAU: In reference to which photograph?
THE WITNESS: I would have taken both these photographs at the same time.
Q (By Mr. Veith.) Okay. So in both of these photographs,

we're looking on the vertical wall at the top of the Swelltite still in place?

A Yes.

MR. RAU: And "these photographs" are referring to photographs 31, 32, just so it's clear.

MR. VEITH: Thank you.

Q (By Mr. Veith.) What about on the horizontal part of this excavation; what are we looking at here?

A At the time the photo was taken, I have removed the composite drainage sheet -- I've removed the insulation first, then the composite drainage sheet, and I've scraped up some of the -- I've scraped up some of the granular bentonite that was placed on top of the Swelltite membrane.

Q I'm not real clear on that, what you were just talking about, so let's deal with photograph 32 because I think that's more clear. On the horizontal part that you've excavated out, there's some composite drainage sheet, and it looks like there's a cut in the drainage sheet, is that right?

A Right.

Q Okay. What have you cut away out of that drainage sheet, if anything?

A The entire composite drainage sheet, which is comprised of filter fabric and the plastic core.

Q So at this point we're looking at the top of the Swelltite? You haven't removed any Swelltite, is that right, in this photograph?
A That's correct.
Q Now, when you said you scraped off some granular bentonite, how did that granular bentonite get there?
A I have no idea. It was there and I documented it in detail E.
Q Can you tell me where in E that you've documented the granular bentonite? Maybe I'm just not seeing it.
A Sure. It says Bentonite Waterproofing, second note from the bottom. It's graphically depicted by a stipple, stipple pattern.
Q Okay. Let's have a look-see at the sample.
A We've got composite drainage sheet first.
Q First of all, let's take a look at the label on it. This is labeled DTO 2-3. What is that referring to, because I thought we were referring to DTO 4?
A Building 2 and DTO 3. I sometimes use a different labeling system out in the field than when I put the report together. It was getting so complicated having two numbers and having the plan on here so small, I decided to change the numbering system to just a simple 1, 2, 3, 4, 5, 6, 7.
Q Well, how can we make this connection between what the

label is on this baggy and what the number is in your report?
A Because I say that's where it came from.
Q Other than that?
A That's all. I had two different systems for labeling bags when I was out there. I don't know why.
Q Why don't we back up and take a look at the first sample we looked at?
A Sure. This one is 1-A, which means Building 1 and DTO A. I did this DTO when I was out there on a different occasion. Remember I was out there on two different occasions doing destructive test openings. I had a numbering system for DTOs or a labeling system whereby the building was first and then DTO sequence was using a letter. Another time when I was doing DTOs I used the building number and then I used a numeral to indicate which detail it was. But when I started putting the report together, I realized I had used two different systems and so I had to get rid of both of them and simplify it and just go 1, 2, 3, 4 up to 20 when I wrote the report.
Q But there's no way for us to verify other than you say it is that this is where it came from?
A That's correct.
Q Is there any rhyme or reason as to when you'll use one

system versus another system?
A No.
Q Are the dates on the baggies the date that the sample was removed?
A Very definitely, yes.
Q So you would have removed -- is this the one from destructive test opening number 1?
A Yes.
Q So you would have removed this sample on January 15th of 2002?
A That's correct.
MR. RAU: And by "this," you're referring to the bag that says Promenade Oaks, 1502 1-A?
MR. VEITH: Right.
MR. RAU: Just so that we're completely clear.
MR. VEITH: That's right.
Q (By Mr. Veith.) All right. And then with respect to DTO -- and I'm reading off the bag now -- DTO 2-3, you removed that sample November 28th, 2001?
A That's correct.
MR. RAU: Well, counsel, it's your record and your time, so I just want to make sure you use it efficiently.
Q (By Mr. Veith.) Let's take a look at the sample now.

A This right here is the Swelltite, and you can see by the wrinkle the film that's still present on top of this piece here.
Q I'm not sure I can see a wrinkle. Maybe you can show me where the wrinkle is because I don't see it other than unless you're talking about folds, that the sample is folded up? By the way, how did the sample get folded up?
A When I stuck it in the bag. It was bent like this because I took the sample at the inside corner of the cut. You can see that that top material is a thin plastic film and it appeared to me as though by these wrinkles that it is common to the whole sheet here, especially by the sheen that I see here. I didn't want to chance damaging the evidence by pulling at it or trying to remove it.
Q Can you tell me where the film is?
A Yes. Over this entire piece, from here to here. Bentonite wouldn't have a sheen like that. And based on the fact that I can pull an edge up of a material, it doesn't seem to stop anywhere.
Q So the way that you know film is there is by color?
A No. By sheen.
Q What do you mean by sheen?
A It reflects, it's shiny. It's shinier than bentonite alone would be.

Q Other than that shininess, is there any other evidence that there's film on that?
A The corner. I don't want to destroy the evidence, but it looks as though the film that you see on the edge here continues over the entire sheet. To me it does.
Q What evidence do you have that water came into contact with the areas where you think there's film on it?
A Because the bentonite -- it was not fully hydrated, it was partially hydrated and it wrinkled up around the edges, pulled away from the material.
Q What areas of the bentonite are you saying are partially hydrated?
A These edges right here.
MR. BROWN: The bentonite or the --
MR. VEITH: I thought he said bentonite.
MR. BROWN: Hydrated bentonite?
MR. VEITH: Partially.
THE WITNESS: The bentonite right here has been partially hydrated.
Q (By Mr. Veith.) On the one end of the sample, the end of it?
A Right. The bentonite underneath the center portion very likely has not been hydrated. It's too close to the original thickness of the Swelltite.
Q So what evidence do you have that water came into contact

with it at that point where you don't think it's activated?
A Well, as I said, this is the only part that looks like it's been activated. The center of this probably has not been.
Q You would agree with me that you don't see any film here at the point where you think the film -- where the bentonite started to activate, correct?
A I can't agree with you yet until I've torn this apart.
Q Well, you don't see any visually, right?
MR. RAU: Well, let's refrain from tearing it apart.
THE WITNESS: Exactly.
Q (By Mr. Veith.) You don't see any, though, do you?
A No. If bentonite had not come in contact -- excuse me. If water had not come in contact with the bentonite component of this sample, you'd see a sample that looked just like you pulled it out of the catalog.
MR. REILLY: Object, foundation.
THE WITNESS: Or very closely to it. It would not look like this.
Q (By Mr. Veith.) Is there any other evidence?
A On this sample or do you mean other DTOs?
Q Any evidence that you have about water coming in contact with that?

A No.
Q Okay. You can put that back, too. Now, you said that you took the sample -- this sample covers both, a portion of the vertical and the horizontal wall, or the horizontal floor and the vertical wall?
A Yes.
Q And that's why it's bent in this shape?
A I believe so, yes.
Q But wouldn't it, if that were true, then --
A You're right.
Q Wouldn't the brown side of the Swelltite be against the concrete?
A No. You're absolutely right. So maybe that is not the reason why it's bent.
Q So you don't know why it's bent?
A No. That's true.
MR. REILLY: He testified that that was from an inside corner.
THE WITNESS: Yes.
MR. REILLY: Thank you.
Q (By Mr. Veith.) What did you use to patch that part of the membrane in that corner area, especially on the vertical wall?
A If it was on the vertical, I used a mastic, a roofing mastic in conjunction with an EPDM rubber sheet and then

built-up granular bentonite around that as well as over the horizontal patch.
Q So you used granular bentonite on both the vertical and the horizontal?
A That's correct.
Q Did you repair or replace the drainage sheet or did you just leave it out?
A Just left it out.
Q How about the insulation?
A Insulation we always put back.
Q Is that the case for all of these destructive test openings; when you took the composite drainage sheet out, you just left it out?
A That's correct.
Q You didn't put in any kind of replacement for it?
A No.
Q Now, as I'm looking at Drawing E of your report, I don't see any mention of undissolved film on this drawing. Do you?
A No.
Q Did you prepare this drawing yourself?
A I sketched it and gave it to a technician to CAD draft.
Q Who is WFM?
A William, and I don't know his middle name, but William Miller.

Q Is he a drafter?
A He's a drafter and a project manager in the waterproofing department, yes.
Q So what would you give him to prepare these drawings and prepare the test in the drawing?
A A hand sketch. Just a free-hand sketch drawn to scale.
Q Did you write the text that goes with the drawing?
A Yes.
Q You don't have your original hand sketches, do you?
A No.
Q You got rid of them?
A It's customary we throw those away when the CAD version is done.
Q Would you have notes that would have the text that you would add to this after William was done drafting the sketch?
A My sketch that I gave to William would've had these notes already on it.
Q And he wouldn't mess with the text, he would just put it right into the drawing the way you had it written?
A That's correct. And then I review the drawing to make sure it matches my sketch.
Q And you want it to be accurate and you check it to make sure that it is?
A Of course.

Q And was that the procedure that was used for all of these sketches or drawings that are attached to your report?
A That's correct.
Q All right. What was the next one that had undissolved film?
A Number 7, DTO 7.
Q Where is that located?
A Building 2. It's on the plan, Plan A.
Q So the documentation for this one would be Drawing H?
A That's correct.
Q And this is a drawing -- this would be a destructive test opening at an entry slab, so beneath a stoop?
A That's correct.
Q Do we have some photographs in here that will match that taken of this destructive test opening?
A Let's try photograph 38.
Q Okay. Now, for this you apparently had removed concrete to get down in here?
A No. Correction. Photo 38 is not correct.
Q Photo 38 is labeled destructive test opening number 7?
A You're right. The labeling is wrong. Photo 38 -- photo 37, which is the same as 38, shows there is grass on both sides of the destructive test opening, not concrete. So the drawing that refers to photo 38, Drawing H, is obviously in error.

Q So what drawing would refer to photos 37 and 38?
A Photo 39 and 40.
Q Those should be labeled DTO 7 instead of DTO 8, the way they're labeled here, and photos 39 and 40 should be relabeled as well?
A Well, Detail H is representative of the condition at both DTO 7 and DTO 8.
Q Can you explain, then, why there's no concrete in photos 37 and 38, or why there would be grass there?
A Well, that is the one exception to the two DTOs. Apparently the concrete is common just to DTO 8, and there is grass at DTO 7. But if I paired the two together, that means that the wall system and the materials down in the horizontal must have been identical or I wouldn't have used the same detail for the same two DTOs. But the concrete on top is the exception to that similarity.
MR. BROWN: Could I ask a clarification off the record for a second?
MR. VEITH: Sure.
(An off the record discussion took place at this time.)
Q (By Mr. Veith.) Back on the record. With the exception of the concrete missing, Drawing H would reflect the conditions of DTO 7?

A That's exactly right. I had forgotten myself about the note I put at the top.
Q So then this would just be along a vertical wall, no stoop involvement? DTO 7 would be a vertical wall opening without any stoop present?
A That's correct.
Q Okay. Are you able to tell how big an opening this is? There's no brick, so maybe there's another way to --
A I think it's safe to say it's probably three and a half feet wide by three and a half feet -- well, three and a half feet square.
Q And that's just an estimate that you're making on the photograph, right?
A It is.
Q Okay. Which photograph would you prefer to use to explain the conditions that are depicted?
A Let's use photographs 39 and 40 since the photographs actually show the concrete which is what's depicted in the sketch.
Q Well, what I'm interested in is talking about the opening where you found undissolved film, which would be number 7?
A Oh, okay. Well, of course, then we have to look at photos 37 and 38 because that is the DTO where I found undissolved film.
Q Okay. Well, let's talk about the horizontal part of this

picture. What are we looking at in the bottom of the picture there?
A Which picture?
Q 37. I'm sorry.
A We're looking at mud, muddy water on top of the drainage composite sheet. The insulation has been removed, but the drainage composite sheet is still there with muddy water on top.
Q So the horizontal part of this, you didn't remove any membrane?
A Not at the time of the photograph.
Q How about on the vertical wall; have you taken any Swelltite off the vertical part in either photograph 37 or 38?
A It appears as though I have removed not only some of the Swelltite but also some of the flashing, self-adhering flashing that goes up over the top of the CMU and knee wall.
Q Do you know whether the sample that you took out of DTO 7 came from the horizontal portion of the DTO or off the vertical wall?
A It was off the vertical wall.
Q How do you know that?
A Because whenever I took a sample from the horizontal -- well, in this case it was so flooded. I remember now

because if you look in photograph 37, the arrow is pointing to something white. That was an electrical cord, and when we discovered that, we didn't know whether it was hot or not, so we didn't want to chance cutting it or another cord that's hidden, so we did not take a cut through the horizontal at that DTO for that reason.
Q Okay. Where's the sample? Let's identify the bag.
A I am opening up bag DTO 2-6, dated 11/28/01, some composite drainage sheet with a non-woven filter fabric indicating a wall installation. Typically I found the woven filter fabric version on the horizontal. This is the Swelltite product. The bentonite is barely hydrated and there appears to be a film --
MR. RAU: Not a sheen?
THE WITNESS: A film on top of the bentonite component here. It looks like it's present over here, too, based on that discoloration.
Q (By Mr. Veith.) Actually, there is not a sheen, is there?
A No, there isn't.
Q Okay. So where is the -- well, this bentonite doesn't look activated to me. Am I wrong? It doesn't look anywhere like it's activated to me.
A Based on thickness, it does appear to be just slightly thicker than the original product. And also based on the fact that it's pulling away from the plastic component to

the product tells me that there's a very small amount of hydration there.

Q Okay. Now, --

MR. REILLY: Before you do that, John, can you tell which side is the top and which is the bottom of that? In other words, this is a vertical piece of material. What side was closest to the roof and what side was closest to the ground?

THE WITNESS: In all cases throughout all my DTOs, the product was properly installed in that the bentonite and film side was towards the concrete.

MR. REILLY: What I'm saying is was this up? In other words, it was this way. Do you know which side was closest to the -- it was like this. Is this the right way, or should it be the other way, if you can tell? (Indicating.)

THE WITNESS: It was like this. And the reason I know that is because this is the Swelltite right on this -- this product that laps over it, shingle laps over the top, is the self-adhering peel and stick product which continues up and on the ledge.

MR. REILLY: So the part that's thicker is near the top?

THE WITNESS: That's correct.

MR. REILLY: All right.

(A short recess was taken at this time.)
Q (By Mr. Veith.) All right. Let's get out the next -- the next destructive test opening is what, 9?
A Would be 9.
Q Okay.
A The bag I'm opening is labeled 2-C, dated January 15th, 2002.
MR. RAU: Mr. Campbell, let me make a suggestion. Usually Mr. Veith has a bunch of preliminary questions before he asks you to open a bag, so wait until he does that given the delicacy of the materials in there. And maybe he's asking you to do that right now. I don't know.
MR. VEITH: I am.
MR. RAU: Okay.
Q (By Mr. Veith.) Let's figure out which photographs will go with this opening. 41 and 42, it looks like, of your report, right?
A That's correct.
MR. REILLY: I'm sorry, John. What DTO are we on now?
MR. VEITH: 9.
MR. REILLY: Thank you.
Q (By Mr. Veith.) Now, are you able to tell me from these photographs where you took the Swelltite sample from?

A No, I'm not.
Q In either of these photographs -- were these photographs taken before any removal of Swelltite?
A Apparently they were.
Q Is that blue knife, or is that blue tool in 42, is that the knife you used to cut the Swelltite out?
A Yes.
Q When you cut out the Swelltite, do you pull it out with your hand? What do you do? You hold the top part, you cut and you pull the Swelltite away from the wall a little bit as you're cutting? How do you do that?
A Since my plan is to remove the sample, not just fold it back, I cut all four edges with the blue knife that you see in the photograph. Then if it's hydrated, then I'll use a putty knife to pull it away from the surface. If it's not hydrated, I seem to remember one case it just came off quite easily.
Q So are you pulling it from the top out?
A On the vertical? Are you talking about a vertical removal or horizontal?
Q Well, either?
A On a vertical, if it were bonded to the substrate and I used a putty knife, I'm sure I would come up from below. On the horizontal, if the bentonite were hydrated, it wouldn't matter at which direction I used the putty knife

to remove it.
Q Let's see the sample. Which baggy is it? Why don't you tell us what the label is?
A The bag I'm about to open is labeled 2-C, dated January 15th, 2002.
Q Let's just look at the Swelltite. I don't need to look at the -- what are you pulling apart?
A I'm trying to remove the Swelltite from this other material.
Q What is the other material that you're pulling apart?
A This is a filter fabric.
Q It looks like it's been bonded to the Swelltite or something?
A Yes, it does. I think it happened in the bag. Here's what we're looking for. This is a sample of Swelltite. I'm saying the film is still on there. That's my opinion.
Q What is that based on?
A Based on just visual examination the way the surfaces wrinkle like that. Bentonite wouldn't do that. This looks like this is film material right here that's pulled away.
Q It doesn't look to me like that bentonite is hydrated, is that right?
A This has been hydrated. Not fully hydrated, but it has

been.
Q Well, what areas? At the ends?
A The entire thing. Because I've seen the Swelltite product before installation and it is not this thick. This is not full hydration. It would have a lot more -- it would swell quite a bit more.
Q You know, what's your view of how thick that is?
A Well, I'm just going by visual, but that's definitely thicker than the Swelltite product samples I have.
Q And we're talking about a sample that's maybe one and a half inches by three inches?
A (Witness nods head in the affirmative.)
Q What's this other -- is this a Swelltite sample, too? What is this?
A It looks like this was --
MR. REILLY: Don't want you to take it apart, sir.
THE WITNESS: Okay. It looks like this was Swelltite as well. No. Excuse me. I'm not going to commit to what this is. No. I will commit to what this is. This is a peel and stick flashing product that's used after the Swelltite material stops.
Q (By Mr. Veith.) The next opening is number 14, is that right, sir?
A I'm checking here. 14, DTO 14. That's correct.

Q And that's just at a vertical wall, right?
A Yes, that's correct.
Q Are there any photos? Yes. Numbers 51 and 52.
A That's correct.
Q Okay. In either of these photos, numbers 51 or 52, have you removed the Swelltite yet?
A No.
Q Okay. Since I see a vacuum in photograph 51, is it safe to assume that there was water on top of the membrane?
A Yes.
Q Do you have a recollection of how much water was there on top, how deep it was?
A I do not with respect to DTO 14.
Q Do you know where the sample was removed from when it was removed from the vertical versus the horizontal?
A I don't. I'd have to look at the sample.
Q Can you tell from looking at the sample?
A Perhaps.
Q Okay.
A I'm opening up bag 5-1, dated November 28th, 2001.
Q Well, if it's --

MR. RAU: David, explain what you're doing on the record and the problem you're having so that it's memorialized.

THE WITNESS: Okay. A piece of the

Swelltite sample has stuck to the inside of the bag. I'm having a hard time removing. Or at least what I think is the Swelltite sample.
Q (By Mr. Veith.) Can you tell whether you removed it from the horizontal or the vertical looking at that piece?
A No, I can't.
Q That doesn't -- go ahead.
A No, I can't answer your question.
Q You would agree that the bentonite is not hydrated there?
A That's correct.
Q Can I see that?
A Right now I'm still trying to determine whether that in fact is Swelltite.
Q You're not sure if this is Swelltite even, huh?
A No, I'm not. When not hydrated at all, Swelltite is very similar to a peel and stick flashing in appearance, but let me just look a little further. I can't say for certain whether it's the Swelltite or the peel and stick flashing product.
Q All right. Is there any other samples in there?
A No. That was the only membrane sample.
Q Did you read the baggy into the record so we all know what you were looking at?
A I did, yes.
Q All right. I think that brings us to 17, is that right,

DTO 17?
A That's correct.
Q That's the last one. And DTO 17 was just an excavation down to the horizontal deck, is that right?
A That's correct.
Q In the middle of the courtyard of Building 5?
A That's correct.
Q Now, the photographs that would go with DTO 17 are photographs 57 and 58?
A That's correct.
Q In photograph 17, it looks like --
MR. REILLY: It says photograph 57.
Q (By Mr. Veith.) I'm sorry. Photograph 58. Are you with me?
A Yes.
Q In photograph 58, what has been excavated? What point are you down to, because I can't really tell? Maybe you can.
A We have removed the sod and all backfill down to the insulation and I have removed a section of insulation.
Q To your knowledge, have you removed anything else by the time of this photo?
A No.
Q And is that a vacuum pipe? What is that in photograph 58?
A Which pipe? There are two.
Q Oh. Your picture is better than mine. That doesn't look

like a pipe. This one that looks like it goes down to the bottom?
A We suspect that that's an irrigation pipe.
Q Okay. Let's see the sample.
A I'm opening bag dated November 28th, 2001, 5-2. This is a sample of Swelltite. The bentonite was at one time partially hydrated because of the cracking, because of the pulling away from the plastic component, and the film is clearly on top.
MR. RAU: Kind of a partial sheen.
THE WITNESS: There's the film. Yes, there's the film.
Q (By Mr. Veith.) What evidence do you have that water came in contact with the bottom of that sample, with the film?
A The bentonite is partially hydrated. As I mentioned before, four of the six locations where film was present I saw water under the membrane, which means water was in contact with the film. I can't say for sure whether 17 was one of the four, but --
Q Can you tell me any of the four DTOs where you found water for certain below the membrane?
A Identify which ones had water below?
Q Yes.
A No, I can't.
Q There is no documentation anywhere?

A My report doesn't say that. No, there isn't.
Q Okay.
A My point -- the document talks about that in the body of the text, but I don't have those locations on the plan.
(Campbell Deposition Exhibit Number 796 was marked for identification at this time.)
Q (By Mr. Veith.) Showing you Exhibit 796, can you tell me what that is?
A This is a CAD-drafted drawing illustrating how water could enter the seam of Swelltite if the film had not decomposed the way it's designed to, and also how it could migrate under the Swelltite if that film had not dissolved.
Q Did you write the text?
A I did.
Q Let's start with -- well, did you draw the drawing in this or did somebody else do that?
A I sketched it and it was CAD drafted like the other drawings by another technician.
MS. REISBORD: Is this drawing in the report?
MR. VEITH: No, it's not. It's not in the report.
THE WITNESS: This is in the report, sure.
MR. SONNESYN: Let's go off the record.

(An off the record discussion took place at this time.)
Q (By Mr. Veith.) Now, let's talk about point number 1. You have written, "Since manufacture's literature states that Volclay seamtape, quote, seals the membrane edges against inclement weather and construction traffic, perhaps it is not intended to have the same watertightness characteristics as the membrane itself." Where did you get that theory?
A It's not a theory, it's the fact that the tape is recommended to be used by the manufacturer as a convenience on a job site to keep the edge from flipping up during construction or when the contractor expects rain before the material is backfilled.
Q Well, where do you -- I mean, you've written here perhaps it is not intended to have the same watertightness. Where are you getting that from?
A Because if it was intended to be an integral part of the watertightness of the membrane, it would be required installation under all circumstances.
Q In your opinion?
A In my opinion.
Q Do you have any product literature that would state that the tape is not intended to be watertight?
A Yes. Not in those words, but that's the meaning.

Q What literature did you look at about this seam tape?
A It's Volclay literature dated to apply to the vintage of this installation.
Q I'm showing you Exhibit 206. Is that the literature?
A That is.
Q Can you show me where in that literature it says seam tape is not intended to be watertight?
A As I said, those are not the words used.
Q Well, but that's what you've said in this drawing, in Exhibit 791?

MR. RAU: And what he said is the inference that he makes from the literature, counsel.

MR. VEITH: Well, let him do the testifying, counsel.

MR. REILLY: Which exhibit number?

MR. VEITH: 791.

MR. RAU: Then state his testimony properly.

MR. BROWN: It's Exhibit 206. What is 206? Could you identify that for the record? What are you reading?

MR. RAU: From John Wiegand's deposition.

MR. BROWN: Isn't that the subsequent version? What does it say on the bottom?

THE WITNESS: This is my writing.

Swelltite literature for product version installed at Promenade.
Q (By Mr. Veith.) Sir, is this the literature you were relying on in developing the text you've put in Exhibit 791?
A Some of the text. Which sentence are you referring to?
Q Well, I'm talking about point 1 in Exhibit 791. Is that the number?
MR. STEPAN: 791, John, or 796?
MR. VEITH: 796.
Q (By Mr. Veith.) By the way, is that your handwriting on Exhibit 206, Mr. Campbell?
A Yes, it is. You'll have to give me a minute. I'll find it because I saw it before the deposition.
Q Did you review this literature in preparation for your deposition today?
A I did. I don't see it here, but that might be because it was the product data sheet that I read it on. I do have a copy with me.
Q In your briefcase?
A I do.
Q Okay. If you have something that says that the seam tape is not supposed to be watertight, I'd like to see that. Let's mark it.
A Want me to find it first and then you can use the one

that contains it or do you want to mark it all?
Q Sure.
MR. RAU: Sure which?
MR. VEITH: He can take a look at it and see if it --
THE WITNESS: Okay. Found it. Trying to find the front page here. Well, this is taken from what's labeled as Section 7, Horizontal Surface Installation, from Volclay Swelltite Installation Manual. This is page 4. And I quote, "When specified, or for any anticipated inclement weather, seal all overlap seams with Volclay seam tape, Figure 7.5."
Q (By Mr. Veith.) Is that what you're looking for?
A That is it.
Q And we're back in Exhibit 206 A. He's looking at the same thing.
A Yes. Same thing.
Q So where does it say here that it's not supposed to be watertight, the seam tape?
A It says, "When specified."
Q Yes.
A In other words, the manufacturer is leaving it up to the discretion of the architect as to whether their membrane needs the tape to be watertight or not. In my opinion, no manufacturer would open themselves up to such

liability. The watertightness of the manufacturer's membrane depends on there being no other way to install it but the way it's supposed to be installed without giving the architect discretion.
Q Okay. I understand that you might interpret that to say that, but you don't have anything to say that seam tape is not supposed to be watertight, do you?
A Not in those words, no, I don't.
MR. RAU: Which I think is what you testified to ten minutes ago.
Q (By Mr. Veith.) Going on in point number 1, back on Exhibit 796, the next sentence talks about if it was not installed at all. Are you referring to -- do you see where I'm at, if it was not installed at all? (Indicating.)
A Okay. I see. "If it was not installed at all, then the watertightness of all the seams is highly suspect for the reasons stated in point #2."
Q "If it was not installed at all," you're referring to the seam tape?
A That's correct.
Q And that's not the case, though, is it? Seam tape was used out there, right?
A I only had the word of or the -- no. At the time I wrote the report, I didn't know one way or another whether the

tape had been installed.
Q Do you know today, as you sit here today, whether seam tape was used out there?
A I've heard from somebody that seam tape was installed. I forget who told me that. The reason why I didn't know for sure by virtue of the destructive test openings is, as I testified before, just by happenstance. We did not locate a DTO right above the seam, so I couldn't say for certain whether the tape had been installed or not.
Q And you've never seen a seam yourself out at Promenade Oaks, is that correct?
A That's correct.
Q And you haven't observed any seams to see whether or not water actually went through the seam, correct?
A I have not seen a seam.
Q And you haven't done any testing either to find out whether any seams were allowing water to go through, have you?
A That's correct.
Q So other than what you've read in Exhibit 206, what evidence do you have to support this assumption that water is penetrating the seams?
A If the water-soluble film does not dissolve in the locations where I did take samples, it's reasonable to assume that there may be some seams where it didn't

dissolve at the seam.
Q Okay. But aside from assumptions, what evidence do you have?
A None.
Q By the way, do you know why Exhibit 796 was not included in your final report?
A Because it wasn't my final report, it was a draft.
Q But I mean the information that's in here is not in your final report, is it?
A I reworded it to be -- I thought it would be clearer reworded the way I finally did it.
Q Did you include the text of point 1 in your final report?
A I don't believe I did.
Q Why is that? Let me back up. Was that a decision that you made not to put it in your final report?
A Well, of course. Who else's decision would it be? I was the sole project manager on this investigation. Nobody in my firm assisted me. You'll have to give me a minute to read both paragraphs here to answer your original question.
Q Oh. Are you comparing to your report, then?
A Uh-huh.
Q Okay. I'll follow along. We're comparing Exhibit 796 with Drawing O of your final report, which is Exhibit 790, is that right?

A Yes, that's correct.
Q And point number 1, is that contained in this drawing?
A Let me read and I'll answer the question momentarily. No. The information in point 1 of Exhibit 796 I left out of the final version of detail O of my final report.
Q Why is that? What was your thinking?
A I guess I thought it would muddy the water, no pun intended. The salient issue here was the fact that the film did not dissolve. That alone was reason enough, I thought, to be suspect of the seams of the Swelltite product.
Q Well, since you never tested the seams and since you never tested the seam tape, how do you know that water actually got to the film? What evidence do you have?
MR. RAU: Asked and answered. Let's move along.
MR. VEITH: You can answer.
THE WITNESS: Restate the question.
Q (By Mr. Veith.) If you've never actually tested the seams and you've never tested the seam tape, how do you know that water actually got to the film? What evidence do you have?
A Within a seam? I don't have any evidence.
Q Back on Exhibit 796, moving to point 2, you've written, "The water soluble film must not dissolve right away since

I recovered some four year old film still intact." Now, just dealing with that language that you've written, is that the only evidence you have that the water-soluble film must not dissolve right away, the fact that it's four years old, or do you have something else?
A I have just the samples we've looked at, which is a four year old installation and the film is supposed to dissolve prior to that.
Q I understand that, the age of the samples. Is there anything else that you have?
A No.
Q In Exhibit 796, this drawing indicates -- it looks like there's an indication for seam tape in that drawing. Do you see that?
A That's correct.
Q But that is missing from Drawing O in your final report?
A When I did the first draft that shows the seam tape, I was making the incorrect assumption that the product was installed with seam tape. I realized that I was making an assumption. I had not encountered a seam. So I really didn't know one way or another whether there was seam tape there.
Q And you would agree that if you're making an assumption, that's not necessarily a good thing? It doesn't lead necessarily to an accurate result, right?

A I realized if I hadn't seen it, I can't put it in my report.
Q If you don't know something to be true, you don't want it in your report, right?
A Apart from my experience with waterproofing and my opinion. I'll put opinions in my report, certainly, based on my experience.
Q If you don't know something to be true, you don't want it in your report, right?
A I will put opinions in my report.
MR. RAU: Just answer his question, Dave.
Q (By Mr. Veith.) Right?
A Repeat one more time.
Q If you don't know something to be true, you don't want it in the report, right? You don't want to make assumptions?
A That's true.
Q If that's true, why are you assuming that the tape wasn't used? In Drawing O, why are you assuming that there's no tape in this drawing?
A Because it's actually immaterial. I realized one way or another it's immaterial because based on what we read in the literature with regard to the architect specifying the use of the tape or not, it tells me that the manufacturer gives the tape no waterproofing characteristics at all and therefore is immaterial in

evaluating the watertightness of the seam.
Q Did you look to see if there were any specifications for using seam tape at Promenade Oaks?
A I looked, but I couldn't see -- it wasn't clear to me in the specifications whether it was to be used or not.
Q So then you assumed that it wasn't based on the product literature, Exhibit 206, correct?
A I really -- the absence of the tape in detail O is not to indicate there wasn't any. This is an illustration, this isn't a DTO. This is an illustration showing an idea. It's not an actual condition I encountered at the site, so therefore the tape I deemed as irrelevant to get the point across I was trying to make.
Q Did you do any hydrostatic pressure testing at the site?
A No, I didn't.
Q Was it your opinion that there was inadequate lateral containment pressure at some locations for the bentonite?
A Yes. Yes, it was my opinion.
Q If you did no hydrostatic pressure testing, how would you know that? What's the basis for that?
A I couldn't quantify it, but I do know that you don't get 20 pounds of containment pressure four inches below earth, the surface of earth. How much pressure there is, I don't know because I ran no tests. But it's certainly less than the 20 pounds required by the manufacturer.

Q Why did you decide not to do any tests on that issue?
A Because it was obvious it was well below the 20 pounds per square foot required.
Q What did you base that on?
A It was four inches below the surface and my years of experience as an architect and doing investigations in the earth.
Q Did you ever determine how long the grout had been allowed to cure in the keyway joints?
A No, I didn't.
Q Did you ever determine how long the liquid flashing at the joints had been allowed to cure?
A No.
Q What is Exhibit 793?
A This is a site plan of the Promenade Oaks development with reduced plans from their construction documents. And the last sheet is another site plan of the development but is not a construction document, it's simply indicating which -- what the unit numbers are.
Q Do the pages of Exhibit 793 go together as a packet in your file? I mean, did you put this together as a packet for your use or reference?
A Yes. Yes, I did.
Q What is it? What is it documenting?
A It's in one of my earlier visits to the site loosely

documenting the types of leaks, both current and past leaks that I encountered. My only history, if you will, based on type of leak.
Q And what was the information that you used to identify the leaks and document them on this exhibit?
A Purely visual.
Q Was this document generated as a result of your initial site review before any destructive test openings were done?
A It was during one of the initial site visits. I don't know whether it was the very first one or not, but it was definitely generated prior to my doing the destructive test openings.
Q Okay. And it looks like -- well, a couple of questions about it. Let's go to page 2. First of all, is this all in your handwriting, all the handwritten portion? Is that all your writing?
A Yes, it is.
Q And on page 2, there is some hash -- well, I'll just show you. Let's look at the very left-hand -- I'm sorry -- right-hand edge of the sheet. Near the end of the courtyard, the end of Building Number 1, there are some looks like handwritten lines, diagonal lines. Do you see that?
A Uh-huh. Yes, I do.

Q Do you know what that represents?
A I think I was trying to indicate -- since I don't have it coded, I'm not certain what I was trying to say to myself there.

MR. RAU: Just so the record is clear, page 2 of this exhibit is labeled Building One Roof Framing Plan on the bottom left and it has a big 1 just so it's not confusing later. Thank you.

MR. VEITH: Or it could just be page 2 of the exhibit, but that's fine.

MR. RAU: It could be. And the second page could be page 2 as well, counsel, so --

Q (By Mr. Veith.) It looks like this is documenting repair work? Were you trying to document repair work or leaks, because you mention a lot of things about repairs?
A Might have been a combination of both. When I'm out at the site visually surveying the leak history, I'll make notes of anything else I think is noteworthy.

MR. VEITH: Okay. I'm ready to pass the baton.

MR. RAU: Great.

MR. BROWN: Well, I have more than 35 minutes. Rolf, if you want to --

MR. SONNESYN: Sure. I'll give it a try, see what I get done. Do want to take a short break?

MR. RAU: Let's take a short break.

(A short recess was taken at this time.)

EXAMINATION

BY MR. SONNESYN:

Q Mr. Campbell, while I was gone but my colleague, Ms. Heyer, was here, apparently you testified about a survey to determine drain capacity, am I correct?

A The performance of the plaza drains would be a better way to put it.

Q And there was some type of methodology or survey that you used?

A All I did was remove the grate from the top of the drain and just observe how much water was entering the drain through the various ways water is designed to enter.

Q So it was a visual inspection on your part?

A Purely visual.

Q Did you use a standard methodology to analyze the rain load?

A Yes.

Q Do you have documents in your file describing that methodology or evidencing that methodology?

A I should. I would think I would.

Q Would it take very long to find it? I was looking and I couldn't find it in the documents I have.

A If it's not in the file, I couldn't tell you where it is.

But we have a method at Inspec for determining this. Inspec does a lot of roof design, as you can imagine. There is a method in the office that we use for determining -- for analyzing that.
Q Did you use it to analyze the Promenade project?
A Yes.
Q Is that somewhere in your report, Exhibit 790?
A I mention how the drains were not working properly.
Q Take a look at 790, then, and then find that in there, if you would?
A Okay. On page 4, under paragraph E 3.
Q Yes. And that references Drawing I, correct?
A Correct.
Q All right. Okay, I'm with you. Now, is there a methodology that you used to determine that 30 courtyard drains are not draining adequately to keep up with the surcharge of water?
A The methodology that I was referring to was simply to determine whether there was the right quantity of plaza drains with respect to the roof water that was emptying onto the courtyard.
Q I see. And as I understand it, you've concluded that there were enough drains?
A The number of drains is adequate, yes.
Q Okay. The Patrick -- I think right at the beginning of

your testimony this morning you referred to an updated Patrick Engineering report?

A That's correct.

Q Do you have that handy?

A Yes, I do.

MR. SONNESYN: Off the record.

(An off the record discussion took place at this time.)

Q (By Mr. Sonnesyn.) Okay. We're back on the record. If you look at your report, which is Exhibit 790, and -- let's see if I can find it here. It's on page 2, under B, Problem Issues, item number 2? You with me?

A Yes.

Q It says, "The courtyard drains do not seem to be draining the volume of water that they should," and you refer to photo number 2 --

MR. REILLY: 22.

MR. SONNESYN: 22. Thank you, Pat.

Q (By Mr. Sonnesyn.) And then when I look at 22, right here, it looks dry to me. Am I interpreting that photograph correctly?

A You are. The reason for referencing the photograph in connection with that statement was simply to show what a drain looked like.

Q I see. Again looking at Exhibit 790, your report, page 4

under Design Errors, Subsurface Drainage, item number 1, it says, "The waterproofing membrane was flat, not sloped to the drains." Refers to without adequate slope. Do you see that?
A Yes, I do.
Q What is the adequate slope for this project?
A I wasn't hired to determine that. I can't say without having time to study the situation and calculate.
Q You concluded, though, that the slope was inadequate?
A I concluded that slope -- there needed to be slope.
MR. STEPAN: Rolf, just so I'm clear, what slope? Are you talking about the slope of the membrane itself?
MR. SONNESYN: Oh, okay. Let's ask Mr. Campbell.
Q (By Mr. Sonnesyn.) Again looking at Exhibit 790, when you are referring to the waterproofing membrane was flat, not sloped to the drains, what slope are you referring to?
A The slope of the membrane itself, immaterial of what it's sitting on. The slope of the membrane impacts the effectiveness of subsurface drainage.
Q If you look at page 5 of Exhibit 790, under subpart e, "The lowest perforations drilled into the side of the drain were two and a half inches above the waterproofing membrane, --

A Yes.
Q -- which means that at least two and a half inches of water will always be resting on the membrane." What is your understanding of the process that went into the decision to drill holes into the side of the drain? Do you know anything about that?
A On this particular project?
Q Yes.
A No, I don't.
Q While we're on it, Exhibit 790, a little bit further down on page 5, it refers to the newer drain pipes? Do you see that in the paragraph right below subpart f?
A Yes.
Q What are the newer drain pipes? What is that describing?
A Apparently there was a repair effort made in some locations by putting perforated PVC drain pipes just a few inches below the surface in order to take some of the water away in the earth.
Q Are you talking about the drain tile?
A The reason why we don't use tile any longer in the industry is it's not tile, it's PVC, polyvinyl chloride. But if we say tile all the time, then people won't know whether we really mean tile, which does still exist out there as well. So it would be incorrect to call it drain tile. It's perforated PVC.

Q Oh, it's incorrect to call it drain tile?
A That is right.
Q The next paragraph refers to the drains, and it says, in your opinion, may some day contribute to the overloading of the structural capacity of the precast deck as the permanent water content of the soil keeps increasing. Do you see that?
A Yes, I do.
Q Is that speculation on your part?
A Purely speculation. There is a bathtub situation created. Water is being delivered to the courtyard by virtue of the roofs and by directly being rained on. However, the drains are not keeping up with the surcharge of water that's being supplied. That was confirmed in my destructive test openings by the large quantities of water I encountered at each and every opening. I think it's a reasonable assumption that given enough time, and I don't know how much time, the earth could be so completely saturated that the resultant weight might exceed the design load of the structural precast plank.
Q Did you measure the amount of water that was -- let's see. At each DTO you found water?
A Yes.
Q Was there any way to measure that water?
A Only by recollection. I could -- there were DTOs where I

encountered six, seven inches of water standing in the bottom. Then there were other DTOs where there was only an inch and I could vacuum that up effectively. And various levels of water in between.
Q How do you characterize that? Is that standing water? How do you want to describe it?
A It's subsurface water that was not draining as fast as water was being supplied to the courtyards, which meant there's a net increase all the time in the quantity of water contained in the backfill.
Q Well, how do you know that there is a net increase all of the time?
A I don't know that quantitatively. It's simply an educated assumption.
Q Again, it's speculation?
A It's speculation.
Q And do you know why the water is accumulating?
A The plaza drains are not functioning as efficiently as I think they should.
Q And you set forth the reasons in your report, Exhibit 790?
A That's right.
Q Have you set forth all of the reasons?
A All that I'm aware of.
Q And you don't know -- in terms of why the drains are not operating as efficiently as you think they should, as to

who is responsible, you haven't formed any opinion or asserted any opinion in that regard?
A No, I don't. No, I haven't.
Q Then you don't have an opinion in that regard?
A No, I don't.
Q And then again Exhibit 790, you said, "We observed the following errors in the design of more recently installed perforated drain pipe, which was a repair measure and not part of the original construction, Drawings D and G."
A Yes. I see it.
Q So again, that's -- you're referring to the repair measures, not the original installation?
A That's correct.
Q On page 7 of Exhibit 790, under Installation Errors, under subpart 3, it says, "At three wall locations, the top edge of the composite drainage sheet was not wrapped with the filter fabric, as recommended by the manufacturer." Do you see that?
A Yes, I do.
Q What manufacturer?
A The manufacturer of the drainage composite sheet.
Q Identify the manufacturer, please, and identify the recommendations that you found?
A I'll have to refer to the drawings here. Give me a moment.

Q Sure. You're talking about your Drawings A through --
A Yes.
Q -- R?
A A through R.
Q All right.
A I'm referring to Volclay Aquadrain, either --
Q What diagram are you referring to, Mr. Campbell?
A I'm looking at Detail E, for example.
Q Okay.
A The composite drainage sheet on the vertical was Volclay Aquadrain 10X or 15X. Those are two versions of the product and I wasn't able to determine which.
Q But you looked at -- back on your report, it says, "as recommended by the manufacturer." What I'm curious about is you must have looked at some documents from a manufacturer to --
A Yes. The Volclay.
Q Go ahead.
A Sorry.
Q You must have looked at some documents from a manufacturer that you then incorporated into your report on page 7, and that's what I'm asking about. Do you know where the documents are and do you know the manufacturer? Is it Volclay?
A Yes. The manufacturer is Volclay. I reviewed the

Volclay installation recommendations from their catalog that I have in my office.

Q Okay.

MR. REILLY: Actually, the manufacturer is CETCO.

THE WITNESS: Or -- yes.

Q (By Mr. Sonnesyn.) I'm going to ask you a broad question about the waterproofing membrane. What is the purpose of the waterproofing membrane?

A The definition -- the industry definition of waterproofing as opposed to damp proofing or other terms is material that stops the migration of water into a substrate under hydrostatic pressure.

Q Is the purpose to stop it completely?

A The definition is to stop while under hydrostatic pressure.

Q I think we've covered this, but I just want to make sure. On page 9 of your report, Exhibit 790, under Recommendations, part F?

A I see it.

Q And it says, number 3, "Even though the quantity, size, and locations of the existing courtyard drains are adequate, the inefficiency of the subsurface drainage system, as a whole, is such that we expect the courtyard areas to experience a net increase in surcharged moisture

content each year." We did cover that, didn't we?
A Yes, we did.
Q And you concluded that that's speculation?
A Yes.
MR. REILLY: It's four o'clock.
MR. SONNESYN: Okay. We'll just go off the record here.
(A short recess was taken at this time.)
Q (By Mr. Sonnesyn.) I'm going to ask another general question, Mr. Campbell. You've noted some what you deemed design and installation errors in relation to the subsurface drainage system, correct?
A Correct.
Q And those are set forth in your report marked as Exhibit 790?
A That's correct.
Q Are your opinions, do you consider them to be scientific opinions?
A Which one are you referring to?
Q Well, under Exhibit 790, page 4, subpart E, under Design Errors, Subsurface Drainage, items 1, 2, 3, 4, carries over up to the top of page 6.
A Number 1 is my opinion based on widely accepted design practice.
Q All right.

MR. BROWN: I'm sorry. Which one are we looking at?

MR. RAU: Page 4.

THE WITNESS: Number 2 was my describing of a fact.

Q (By Mr. Sonnesyn.) So that's a fact, actual observation rather than an opinion?

A Correct. The first sentence of 3 is an opinion.

Q Is that a scientific opinion?

A No, it is not. Subletter a is a fact, subletter b is a fact, subletter c is a fact, subletter d is a fact, subletter e is a fact, subletter f is a fact, the following paragraph after subletter f is a fact, the following paragraph is an opinion. Number 4 --

MR. BROWN: Was that a scientific opinion?

THE WITNESS: No, it was not. Number 4 is an opinion.

Q (By Mr. Sonnesyn.) All of number 4?

A No. Top sentence number 4 is an opinion. Subletter a of 4 is an opinion, subletter b is a combination fact and opinion depending on the sentence you're referring to, subletter c is an opinion. I'm sorry. How far were we to go?

Q I think that was it. Now, going back to page 5 of Exhibit 790, referencing subpart f -- I'm sorry -- subpart e about

the lowest perforations drilled into the side of the drain were two and a half inches, you said obviously the fact that -- where they were drilled, that's a fact?
A Yes.
Q But it says, "which means that at least two and a half inches of water will always be resting on the membrane." That part is an opinion, is it not?
A In the absence of any other design provision to evacuate water on a flat deck, how would the water escape?
Q So it's resting there because it's flat?
A The membrane is flat.
Q And we're back to the sloping inadequacy?
A That's correct.
Q All right. You've described all of the tests that you ran, correct?
A Correct.
Q I want to ask you about the drains themselves because in your report you talk about replacing the drains, and I think you've got in some materials some references to -- well, let me ask you this. Is there anything wrong with the drains themselves, the selection of the drains?
A Could you describe what portion of the drain you're talking about?
Q The top part that you see?
MR. RAU: The surface part?

MR. SONNESYN: The surface part, yes.
THE WITNESS: Apart from the fact that the spill elevation is well above the surrounding earth, there is nothing wrong with the device itself.
Q (By Mr. Sonnesyn.) All right. And when you refer to drains that Inspec prefers, again, that's professional preference on the part of Inspec?
A It is.
Q Was the selection of -- the courtyard drains that were used are called a Fat Max. Are you familiar with that description?
A I'm heard the term, but I'm not familiar.
Q Does the Fat Max violate any code that you know of?
A Not that I know --
Q Or does the use of the Fat Max in this application violate any code?
A Not being familiar with it, I can't say.
Q Did you identify any violation of codes, plumbing or building codes, in relation to the drainage system?
A No, I didn't.
MR. RAU: You know, Fat Max is a term like those other kind of terms that Mr. Sonnesyn --
MR. SONNESYN: What's that now? I like it.
MR. RAU: I know.

MR. SONNESYN: I'm going to use it as much as I can.
MR. RAU: It's one of those terms that you like using, Rolf.
MR. SONNESYN: It is.
Q (By Mr. Sonnesyn.) Do you have an estimate as to how much Inspec would have charged Weis Builders to design the courtyard drainage system?
A I could only give a very general figure.
Q What is the very general figure?
A Could you specify the level of service? Be more specific because it really does vary.
Q Well, I guess that's implicit in my question, that -- how much would Inspec have charged Weis Builders to design the courtyard drain system that you think should have been done?
MR. RAU: Drain system or waterproofing system?
MR. SONNESYN: Drain system.
THE WITNESS: If by design you mean developing construction documents only up to bidding, not including bidding or site observation, I would say --
MR. SONNESYN: And this would be a 1996, 1997 time frame.
THE WITNESS: Okay. I would say anywhere

between five and $12,000.
Q (By Mr. Sonnesyn.) How about to install the courtyard drainage system?
A Inspec doesn't do construction.
Q Do you have an idea of how much it would have cost?
A For 30 drains? I couldn't even hazard a guess, no, other than to refer to my report.
Q When you say other than to refer to your report, your report refers to -- what are you referring to there because there's a figure of $4,307,316 on page 12?
A I mentioned it just in case there was a breakout line item for the cost of the drains alone. I wasn't sure if it mentioned that or not. There is a line item, it says New Courtyard Drains.
Q Where are you?
A The two pages preceding the photographs. The pages are not numbered.
Q Oh, I see what you're talking about. You're looking at still Exhibit 790, right?
A Yes.
Q All right. Now I got to find it. Okay, I got it. It says Budget Cost Management Report?
A That's correct.
Q What line item are you referring to?
A The very bottom of the sheet.

Q New Courtyard Drains, $15,000?
A Yes.
Q Okay. And that would do what? That's replacement and reinstall?
A It's installing the new drains as we designed on the previous pages in this report.
Q Okay. Those are in 2001 dollars or 19 -- that's 2001 dollars?
A I'm trying to remember what our instructions to our consultant who put this together was.
Q So it would be a little higher now in 2003?
A I don't recall what our instructions were.
Q Okay.
A I can find out.
Q What is it that you can find out, the instructions to the consultant?
A Yes. It's in writing in my file.
Q Do you have it handy?
A No. It's in my file which Flynn, Gaskins & Bennett has.
Q I've got another question. I'm going to come around. I don't think I'm going to mark it as an exhibit unless we need to, but this is information that Flynn Gaskins provided. Oh, it's from Waterproofing Quality Control Manual Design Services?
A Right.

Q And that's an Inspec document?
A That's correct.
Q Under the index labeled Drains, it says General Information About Drains. Do you see that?
A That's right.
Q Is this information that you wrote?
A Yes, I did.
Q What is the source of this information?
A My experience, information I've obtained from seminars, talks, generally speaking. Largely my own personal experience.
Q So there's really no textbook that we can go to and find this information, general information about drains?
A That's correct.
Q And then in that same manual that we referred to, Waterproofing Quality Control Manual Design Services, again in the section labeled Drains, it's copy here 4715.2780. What is that from? Is that a Minnesota regulation?
A I don't recall where I got that, but I would imagine it would be an official publication.
Q Okay. And then we've got some more items, or information here about rain water systems. What is this? Oh, here we got -- from the Uniform Plumbing Code, right?
A Yes, that's right.

Q And then we've got information from -- is it Josam Conventional Roof Drainage Systems?
A That's right. Josam is a manufacturer of drains.
Q And again, that's just the manufacturer of the drains that you prefer using?
A Only the manufacturer, yes.
Q If we go then to under Design of the same manual, it says Designing The Building For Waterproofing. Do you see that?
A Yes.
Q Is that again your -- you drafted that?
A Yes, it is.
Q Under Mechanical, item 3, "Plaza drains must be the type that drains at all levels as a non-functioning clamping ring and could withstand the anticipated superimposed loads. Inspec typically prefers to select the drain for the mechanical engineer. See drains."
A Yes.
Q "See drains," meaning go back to this subpart of the manual, right?
A That's right.
Q Why does Inspec prefer to select the drain for the mechanical engineer?
A We -- some years back we had instances where we let the mechanical engineer select the drain not being familiar

with the needs of the waterproofing that we typically specify.

Q Now, let's back up. Some years back -- say that again?

A There have been past experiences where when we let the mechanical engineer specify the drain, they didn't adequately take the needs of our waterproofing system into account in doing so.

Q "They," meaning the mechanical engineer?

A That's correct.

Q Okay. Continue, please.

A We've learned by that experience to prefer to specify the drain ourselves in the technical specification sections that our office generates in a project. We coordinate that drain selection with the mechanical contractor -- with the mechanical engineer, but we prefer to specify the drain.

Q What is Inspec's role when you're -- you talk about Inspec prefers to do this or that or the next thing. What is Inspec's role in those projects?

A It varies. Sometimes we are what's called the prime. In other words, we have the contract with the building owner, our client, and we hire subconsultants to assist us in areas that we feel inadequate to deal with. Other times we are a subconsultant to a prime architect or to a prime engineer. It varies quite a bit.

Q Okay. For each drain that is selected, I take it that there are going to be advantages and disadvantages for each drain selected?
A I would assume so.
Q Maybe you've already answered this. What role does the grade play at the courtyard level in terms of the drains or the drainage system?
MR. REILLY: I'm going to object to the form of the question as being vague, whether you're talking surface or subsurface.
Q (By Mr. Sonnesyn.) Do you understand my question?
A I'm interpreting your word grade as meaning the surface slope?
Q Yes. So you understand my question?
A Yes, I do. The grade surrounding each concrete collar, as I refer to it in the report, in the vast majority of cases was one to two inches below the spill elevation of the drain. In other words, water that is flowing towards the drain stops at the edge of that concrete -- that raised concrete collar.
MR. STEPAN: Object as nonresponsive.
Q (By Mr. Sonnesyn.) Go ahead.
A Answer complete.
Q Okay. So the role of the grade is what, to get the water to the drain so that it can drain?

A The role of the grade? The purpose of the grade?
Q Yes.
A Yes.
Q The Fat Max drain, are there disadvantages to the Fat Max drain other than this dome?
MR. STEPAN: Objection, lack of foundation.
THE WITNESS: I don't know what you mean by dome.
Q (By Mr. Sonnesyn.) Oh. Maybe I misunderstood. How did you describe it?
A I don't know what component of the drain system you're referring to.
Q Are there any disadvantages to the Fat Max drain?
MR. STEPAN: Same objection.
THE WITNESS: You will have to be more specific as to what aspect of the -- what comprises what you're calling the Fat Max drain. I don't know how inclusive that is.
Q (By Mr. Sonnesyn.) The part that you see on the surface?
A You are referring to only the drain grate at the surface?
Q Right.
A I know of no problem -- I had no problems with the drain grate.
Q Okay. When you were there on your inspections, did you

see water flowing in the courtyard?
A No.
Q Let me rephrase that. Did you see water flowing into the courtyard from any source?
A Yes.
Q From where and to where?
A At downspout locations. There was -- I believe there were two downspouts that emptied directly into the sodded courtyard area.
Q Did you actually see water flowing from the downspouts into the courtyard?
A That I can't say. I don't recall.
Q You testified earlier today that the earth was very waterlogged so that there was constant hydrostatic pressure and the site was carrying out its own water test. Did I write it down correctly?
A That's correct.
Q Okay. Was there a control subject?
A Since I saw no dry areas, no.
Q So there was no control?
A No.
MR. SONNESYN: I'm going to -- I'll pass and double-check my notes, but I think I'm done. Is that all right?
MR. RAU: Do we want to go on to someone?

All right. Go for it.

EXAMINATION

BY MR. BOYD:

Q Are you familiar with the Fat Max drain?

A No, I'm not.

Q So you're not aware what portions of the drains that were actually used in this case were actually a Fat Max product?

A That's correct. I am not.

Q Okay. During the questioning of Mr. Sonnesyn, he stated with reference to page 9 of Exhibit 790, paragraph F 3, I believe?

A Okay.

Q He read the first sentence there, "Even though the quantity, size, and locations of the existing courtyard drains are adequate, the inefficiency of the subsurface drainage system, as a whole, is such that we expect the courtyard areas to experience a net increase in surcharged moisture content each year." Then he referenced a previous question when he asked you about covering that before and asked if it was correct that that was speculation. Does that sound correct to you?

A That does.

Q When you said that it was speculation, you were referring to the statement as to a net increase in surcharged

moisture, correct?
A That's correct.
Q So the part of the statement referring to the quantity, size, and locations of the existing courtyard drains being adequate is still correct and adequate, or intact?
A Yes.
Q Okay. I'll train your attention also to drawing I to the same exhibit. You indicate in the text on the right-hand portion there at the top that the diameter of the grate is nine inches. That's right?
A Yes.
Q And is the grate nine inches alone or is the pipe going down from the grate nine inches as well?
A Well, based on the drawing, it would appear that I mean the diameter of the -- what did you refer to the --
Q Maybe you could just tell me how far --
A Repeat the question, please.
Q Sure. What portion of the drain system as it currently exists is nine inches in diameter?
A The grate.
Q And even though your notes may not reflect it here, is the pipe continuing down into the ground also nine inches in diameter?
A It would appear so from my drawing.
Q And that would continue on down all the way to -- how far?

A To what's referred to as the clamping ring down at the waterproofing level as illustrated in the drawing.

MR. BOYD: Okay. I think that's all I have.

MR. SONNESYN: I don't have any follow-up.

MR. RAU: Want to wait? If you want to be done now, that's fine, or not.

MR. SONNESYN: What time is it, five to five?

THE WITNESS: That's what I have.

MR. SONNESYN: How are you doing, Mr. Campbell?

THE WITNESS: I'm fine.

MR. SONNESYN: My suggestion is, unless somebody has to leave at five, that we get some more done today. That's my suggestion. Has anybody got half an hour? Leo, what do you have?

MR. BRISBOIS: Well, if it's my preference, I'd just as soon wait till the liability questions are done because the coverage questions might be answered.

MR. SONNESYN: Okay.

MR. RAU: Enough deliberating. We've deliberated a lot.

(Witness excused.)

(The deposition was adjourned at approximately 4:55 p.m.)

(The original exhibits and original transcript are in the possession of Attorney G. John Veith.)

(End of Volume I.)

DEPOSITION SIGNATURE/CORRECTION PAGE

I, DAVID CAMPBELL, do hereby certify and state, that I have read and examined the typewritten transcript of the deposition taken of me, at the time and place therein named, consisting of Volume I, pages 1 through 165, and find the same to be true and correct. (Except as follows:)

PAGE NO. LINE NO. CORRECTION/REASON

Dated this ______ day of __________, 2003.

________________________________
David Campbell

RETURN THIS SHEET TO: Charles G. Williamson, Court Reporter, 4209 113th Street West, Bloomington, MN 55437.

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA)
ss.
COUNTY OF HENNEPIN)

I, Charles G. Williamson, a Notary Public within and for the County of Hennepin, and State of Minnesota, do hereby certify:

That I reported the deposition of David Campbell, on the 26th day of August, 2003, in Minneapolis, Minnesota, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed under my direction and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition by the witness was not waived.

WITNESS my hand and seal this 2nd day of September, 2003.

Charles G. Williamson
Notary Public
Hennepin County, Minnesota

My Commission Expires January 31, 2005.