[scroll down page]

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff,

vs. Civil File No. 00-CV-987(PAM/JGL)

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.; Promenade Village Townhomes; Valley Forge Insurance Company; Colloid Environmental Technologies Company; and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.; and Mikesh, Inc.,

Fourth-Party Defendants.

---

DAVID WILLIAM CAMPBELL OCTOBER 8, 2003

VOLUME II

The Deposition of DAVID WILLIAM CAMPBELL, taken pursuant to Notice of Taking Deposition, taken before Barbara F. Schwegman, a Notary Public in and for the County of Washington, State of Minnesota, taken on the 8th day of October, 2003, at 8500 Normandale Lake Boulevard, Suite 2110 Minneapolis, Minnesota, commencing at approximately 9:00 a.m.

APPEARANCES:

ANDREA E. REISBORD, ESQUIRE, of the Law Firm of COUSINEAU, McGUIRE, ANDERSON, CHARTERED, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, Minnesota, 55416-5318, appeared for and on behalf of Plaintiff, Westfield Insurance Company.

CHAD J. STEPAN, ESQUIRE, of the Law Firm of MEAGHER & GEER, PLLP, 4200 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota, 55402-3788, appeared for and on behalf of Defendant and Third-Party Plaintiff, Weis Builders, Inc.

STEVEN E. RAU, ESQUIRE, of the Law Firm of FLYNN, GASKINS & BENNETT, LLP, 333 South Seventh Street, Suite 2900, Minneapolis, Minnesota, 55402, appeared for and on behalf of Defendants, Promenade Village Townhomes, LLC and Healey Ramme Company.

LEO I. BRISBOIS, ESQUIRE, of the Law Firm of STICH, ANGELL & KREIDLER, P.A., The Crossings, Suite 120, 250 Second Avenue South, Minneapolis, Minnesota, 55401, appeared for and on behalf of Defendant, Valley Forge Insurance Company.

APPEARANCES:

MARK S. BROWN, ESQUIRE, of the Law Firm of MURNANE, CONLIN, WHITE & BRANDT, P.A., 444 Cedar Street, Suite 1800, Saint Paul, Minnesota, 55101, appeared for and on behalf of Third-Party Defendants, Waterproofing By Experts, Inc.

WILLIAM D. HULL, ESQUIRE, of the Law Firm of COLEMAN, HULL & VAN VLIET, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, Minnesota, 55437, appeared for and on behalf of Third-Party Defendant, BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.

CHANDELLE L. HEYER, ESQUIRE, of the Law Firm of TOMSCHE, SONNESYN & TOMSCHE, P.A., 610 Ottawa Avenue North, Minneapolis, Minnesota, 55422, appeared for and on behalf of Third-Party Defendant, J-Berd Mechanical Contractors, Inc.

PATRICK D. REILLY, ESQUIRE, of the Law Firm of ERSTAD & RIEMER, P.A., 200 Riverview Office Tower, 8009 34th Avenue South, Minneapolis, Minnesota, 55425, appeared for and on behalf of Third-Party Defendant and Fourth-Party Plaintiff, Colloid Environmental Technologies Company.

G. JOHN VEITH, ESQUIRE, of the Law Firm of BROWN & CARLSON, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, Minnesota, 55416, appeared for and on behalf of Fourth-Party Defendant, Chris Craft Industrial Products, Inc.

CAMERON BOYD, ESQUIRE, of the law firm of LINDQUIST & VENNUM, PLLP, 4200 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota, 55402-2274, appeared for and on behalf of Fourth-Party Defendant, Mikesh, Inc.

*The Original is in the possession of Attorney William D. Hull.*

INDEX


| | Page |
|---|---|
| DAVID WILLIAM CAMPBELL | |
| Cross-examination by Mr. Hull | 5 |
| Cross-examination by Mr. Reilly | 46 |
| Cross-examination by Mr. Stepan | 68 |
| Cross-examination by Mr. Brown | 102 |
| Cross-examination by Ms. Reisbord | 143 |
| Cross-examination by Mr. Brisbois | 147 |
| Cross-examination by Mr. Veith | 148 |
| Recross-examination by Mr. Hull | 153 |
| Recross-examination by Mr. Reilly | 155 |
| Recross-examination by Mr. Stepan | 156 |
| Recross-examination by Mr. Brown | 158 |
| Direct examination by Mr. Rau | 161 |
| Continued Recross-examination by Mr. Brown | 164 |
| Continued Recross-examination by Ms. Reisbord | 165 |


EXHIBITS


| | |
|---|---|
| Exhibit 808, Campbell General file, handwritten notes | 86 |
| Exhibit 809, 11-1-02, Fax to Robb Van Martin | 88 |
| Exhibit 810, 2-13-02, E-mail to Campbell from Goodwin | 90 |
| Exhibit 811, 9-30-03, E-mail to Campbell from Semke | 141 |

DAVID WILLIAM CAMPBELL,
the Witness in the above-entitled
matter, after having been first duly
sworn, deposes and says as follows:

CROSS-EXAMINATION

BY MR. HULL:

Q. Mr. Campbell, my name is Bill Hull. I represent Elness Swenson and Graham in this case. We have a limited amount of time today, so let's get kind of right to the meat of this. I'd like to have you turn in your report to -- let's start out at diagram C if you would. Partway down there you have a note that starts out with "waterproofing membrane," and the last part of that says "parts of bentonite not in contact with concrete because of undissolved film." First of all, what is the significance of parts of the bentonite not being in contact with the concrete?

MR. REILLY: Objection; lack of foundation, calls for speculation.

MR. BRISBOIS: Join.

THE WITNESS: Should I answer?

MR. HULL:

Q. Yes. Yes. In fact, let me just tell you: Every question I ask you, there will be objections to.

A. Oh, okay.
Q. Unless your attorney tells you not to answer them, go ahead and answer the question.
MR. RAU: And you'll be able to tell who your answer hurts the most by who objects. That's kind of a standard operating procedure in this case.
BY MR. HULL:
Q. Do you have the question in mind?
A. Yes. The intention of the Swelltite material is to seal against the concrete substrate. The only component of the Swelltite material that seals is the bentonite part of the lower underside of the membrane. However, when there is something -- when there's a material interfering between the bentonite component and the structural deck, it keeps the bentonite from sealing to the concrete and water can then flow underneath the film, between the film and the concrete deck.
Q. And if the bentonite seals to the concrete, what happens to the water flow then?
A. It is supposed to stop water migration underneath the Swelltite material.
Q. And I think you testified last time that you had samples of some of the Swelltite with the undissolved film; is that right?
A. That's correct.

Q. How could you tell that the film was on there and undissolved?
A. Visual observation. It was quite apparent.
Q. Now, have you done any further investigation since your last deposition with respect to this film on the bentonite?
A. I have. I called a Tony Perales. He's with Poggemeyer Design Group. And I called a Dean Rutila who is with the engineering firm of Simpson, Gumpertz & Heger.
Q. What was the purpose of your calls to those individuals?
A. I understand that they were both involved in investigations of similar failures of Swelltite or a similar failure of Swelltite at the Medical College of Ohio.
Q. Give me their names again if you would.
A. Tony Perales, P-E-R-A-L-E-S. I don't know if I'm pronouncing that right.
Q. Okay.
A. And Dean Rutila, R-U-T-I-L-A.
Q. Did you find out from Mr. Perales what expertise he had?
A. No, I didn't.
Q. What did he tell you?
A. He said that he didn't find -- he did in fact

find samples of the Swelltite material, the installed Swelltite material that still had film remaining on them, and in fact he still had some of the film removed from the sample in a test tube of water that still hadn't dissolved to this date.

Q. How long did he have it in a test tube? Did he say?

A. No, he didn't.

Q. And did Mr. Perales tell you anything else?

A. No.

Q. And what about Mr. Rutila?

A. He also -- he concurred with Mr. Perales that there were samples taken that had film remaining on them, and he offered his opinion as to why that might be that the film is not dissolving. He said that typical of polyvinyl acetate, which according to Mr. Rutila is the chemical composition of this film on the Swelltite material, typical of polyvinyl acetate, it can cross-link or vulcanize based on a combination of heat and time, and his explanation of cross-linking or vulcanization with respect to this material is that small molecules link together to form larger molecules and that impedes the material's natural ability to dissolve.

Q. And why did he say that that was occurring?

A. He said since it's a function of heat and

time, he theorized that it might be that the rolls were stored longer than they should have been with respect to the temperature they were stored in. It was just a theory on his part.

Q. Now, as we go down to the bottom of diagram E, you have a note referring to liquid-applied flashing at the keyway joint, and you said that the material was poorly bonded at some locations. Can you describe or tell me what the effect of the M-2000 being poorly bonded at the keyway joints was?

MR. REILLY: Objection, lack of foundation.

A. If water was migrating under the adjacent Swelltite, then it stands to reason it could migrate underneath that M-2000 liquid flashing as well since it was poorly bonded to the substrate; and if it did migrate under the flashing right at that keyway joint, that's a weakness in the structure with respect to watertightness and water would come right into the building.

BY MR. HULL:

Q. And how could you tell that the M-2000 was poorly bonded?

A. It came up quite readily in my hand.

Q. Do you have an opinion as to the cause of the M-2000 being poorly bonded?

MR. BROWN: Objection.
MR. REILLY: Objection, foundation.
MR. STEPAN: Join.
A. Possible causes?
BY MR. HULL:
Q. Yes.
A. The grout put into the keyway may have not been allowed to cure adequately. It might have rained and the grout -- the upper surface of the grout may have been slightly damp before they put the product down. The temperature, there could have been a temperature issue, the precast plank and the grout. The surface temperature of those two materials, that is, might have been too cold for the product to properly bond to or a combination thereof of what I've listed.
Q. Is it your opinion that the failure of the M-2000 to properly bond was something that occurred at the time of the installation?
MR. REILLY: Objection, lack of foundation.
MR. BROWN: Objection, lack of foundation.
A. It was not necessarily my impression.
BY MR. HULL:
Q. Take a look at diagram D if you would. Now,

in diagram D you show the sod and the earth higher than the top of the concrete masonry units; is that right?

A. That's correct.

Q. Now, the fact that the earth is higher than the concrete masonry units, does that -- can that condition be waterproofed?

A. It can.

Q. And is dealing with that condition an important part of designing a waterproofing system?

A. Very much so.

Q. You also have a note here of a woven filter fabric underneath the sod. Was that a condition you found in all of your test openings or was that isolated?

A. This was an isolated incident, yes.

Q. The next note you have refers to a flashing material being either a Volclay Swelltite term tape of a self --

A. That's a typo. It should say "self-sealing product."

Q. "Or a self-sealing product," okay. Was that some type of a sheet good product?

A. Correct.

Q. And your note goes on to say the aggregate -- "appeared to be aggregate puncturing to the flashing." How would you prevent that from occurring?

A. Either a more -- you could install -- in lieu of the material that was used, you could install more durable waterproofing material or install a protection material over the waterproofing such as sheet metal or various asphalt-impregnated protection boards. There's a lot of products on the market that would be appropriate.

Q. Were you told whether or not that was an original construction condition or a repair?

A. I was told that that was a repair, that these two drain pipes were put in after the original construction.

Q. What about the flashing material?

A. I was told nothing about the flashing with respect to when it was installed.

Q. Now, as you go down further, you have a note that says "waterproofing membrane Volclay Swelltite 3000, inadequate lateral containment at top portion." Tell me what you mean by that?

A. The bentonite component of the Swelltite, as any bentonite, has to be properly contained to resist its natural tendency to swell for it to develop a watertightness characteristic. The closer you get to finish grade, the less lateral containment pressure is exerted on the material. Finally, when you get to within approximately one foot of finish grade, the amount of

lateral pressure is so minimal as to make the bentonite component of the Swelltite ineffective as a waterproofing barrier.

MR. REILLY: Objection; calls for speculation, lack of foundation, nonresponsive.

BY MR. HULL:

Q. And what is the effect then if there is inadequate containment at the top of the Swelltite 2000 -- 3000?

MR. REILLY: Objection, lack of foundation.

A. The watertightness characteristic of the Swelltite is relying solely then on the high-density polyethylene component. However, the seams of the Swelltite rely on the bentonite component to seal, so the -- since the seams are now not effectively sealed because the bentonite component does not have adequate lateral containment pressure against it close to the surface, the total watertight effectiveness of the Swelltite is greatly reduced.

BY MR. HULL:

Q. Did you find termination bar anywhere near the top of the Swelltite in your test openings?

A. No, I didn't.

Q. Did you find any areas where there was only a

liquid flashing applied at the top of the bentonite?
A. I guess I'd have to -- I don't recall offhand. I'd have to page through my own report.
Q. Does the fact that there is inadequate containment in the essentially top foot on the vertical elevation make the Swelltite -- or how should that be terminated then?
MR. REILLY: Objection.
MR. BROWN: Object to the form.
MR. BRISBOIS: Objection, lack of foundation.
MR. BROWN: Vague.
A. As with any waterproofing product that relies on the bentonite component to self seal at the seams, a completely different waterproofing material that does not rely on bentonite for its watertightness component would have to be used in that top portion of the assembly.
BY MR. HULL:
Q. You're familiar with M-2000 as a liquid flashing; is that correct?
A. That's correct.
Q. Do you have an opinion as to whether that is an appropriate flashing to seal the top of the Swelltite 2000 on the vertical elevations?
MR. STEPAN: Objection.

MR. REILLY: Objection, lack of foundation.

MR. BROWN: Objection, lack of foundation.

A. If that was used along the top edge, it would effectively seal the very top edge of the bentonite component of the Swelltite from hydrating out of the top, but, as I mentioned before, that would do nothing to seal the seams of the Swelltite sheet in that upper one-foot region below finish grade and the Swelltite would still be ineffective as a waterproofing in that upper one foot.

BY MR. HULL:

Q. If M-2000 is used as a liquid flashing at the top of the Swelltite 2000 and even up the wall, do you need to have any protection over that in order to keep it functioning?

A. Yes. The Swelltite material itself does have a durable high-density polyethylene sheet component, but the Swelltite -- or rather the M-2000 mastic is material that would have to be protected.

Q. And what type of protection options are there?

A. Stainless steel sheet metal, copper sheet metal, perhaps asphalt-impregnated protection board -- there are a number of manufacturers that make the latter -- high-density polyethylene. There are many materials that

could be used as protection.

Q. And what is it that you're trying to protect the flashing from?

A. Subsequent landscaper damage, subsequent trade damage during the initial construction of the project, settlement of soil over time, compaction of soil during original construction. Those are some.

Q. Does it need any protection from ultraviolet rays?

A. I'd have to check the literature. I believe it does, but I can't say for sure.

Q. Now, is some type of protection over the flashing at the top of the waterproofing material an important consideration in designing a waterproofing system?

A. Yes, definitely.

Q. Let's take a look at diagram E if you would. The second -- and this is condition at an elevator repair tower. The second note you have is "A color-coated sheet metal flashing should not extend into the concrete." Why is that?

A. Color-coated sheet metal will corrode if exposed to moisture for long periods of time, and that's the condition it's under when it's adjacent to the concrete like that. Moisture can be trapped for very long periods

of time right at the edge of the concrete between the sheet metal and the concrete, and the corrosion would eventually dissolve all the sheet metal below the top of the concrete, but that corrosion and rust, if you will, would migrate its way up to where it's visual.

Q. If you were designing a waterproofing system, what would you recommend as an alternative to that?

A. If I elected to take the sheet metal down past the edge of the concrete as they've done in this design, I would only use stainless steel or copper.

Q. Now, the next note refers to the flashing material, and you note there that it's poorly bonded. Do you have an opinion as to why that was poorly bonded?

MR. REILLY: Objection, lack of foundation.

A. Possible reasons, again, surface temperature of the substrate during installation, moisture content of the substrate during installation. And when I say "moisture content," I mean the type of moisture -- traces of moisture that would not necessarily be visible to the naked eye to the person installing it. Two possible reasons.

BY MR. HULL:

Q. What options are there to address that problem? Do you need to use a different material or do you

need to be particularly careful about the conditions under which it is installed?

MR. REILLY: Objection, lack of foundation.

A. First of all, you have to make sure that the air temperature is higher than the minimum required in the literature of the product. You have to make sure then that the surface temperature of the substrate is at least the minimum temperature required, two different things. It can take the surface temperature of a building, especially with the mass of concrete block or cast-in-place concrete, a while to warm up to the same temperature as the surrounding air. If there was any suspicion that the concrete substrate was not as dry as it should be, there are very simple, inexpensive tests to be made on the surface to make sure it is dry enough for application. There are many measures that can be taken.

BY MR. HULL:

Q. If you were designing a waterproofing system, is the type of information you just related the type of thing you would put in specifications?

MR. BROWN: Object to the form.

A. The three things I just mentioned would be in the execution portion of the -- of each specification section; making sure that the surface temperature of the

substrate was correct, the air temperature was correct, and that the moisture content of the substrate was correct.

BY MR. HULL:

Q. And what would be the purpose of putting that in the specifications?

A. To reinforce and buttress the requirements of the manufacturer. Very often an architect will require more stringent requirements, but at very least I would require at least the same requirements that the product manufacturer did.

Q. Now, you also note there that there is a liquid flashing, Volclay M-2000, and can you describe for me what that flashing covered?

MR. REILLY: Object to the form of the question. It says "probably Volclay M-2000" in that.

MR. HULL: Actually, I'm looking at the one up above that does not refer to "probably."

MR. REILLY: That's --

MS. REISBORD: Bill, you're talking about right under where it says "concrete sidewalk"?

MR. HULL: Right.

A. Is that one of the early drafts? That's not the final draft.

MR. REILLY: All right.

BY MR. HULL:

Q. Well, in any event, what was that flashing covering?
A. It was covering the seam between the flashing material above on the wall and the Swelltite in the lower portion of the wall.
Q. Let's take a look at diagram F if you would. There is a note that refers to flashing as either Volclay Swelltite term tape or self-adhering butyl-based material or no protection. What do you mean here by "no protection"?
A. The earth and the rocks contained in the earth were in direct contact with the flashing.
Q. And this is the type of condition that you testified earlier should be protected by a stainless steel or copper --
A. That's correct.
Q. -- material? And what is the effect of the lack of protection?
A. If there are materials in the soil that are sharp-edged such as small rocks, pebbles, pieces of wood, those can be driven down into the unprotected flashing by loads exerted up on the soil just a few inches above; for instance, a large lawn mower, landscaping equipment running over it, a wheelbarrow, people walking. And in fact I did find -- I do have photographic evidence of just that very

thing happening.

Q. Further down you refer to "the bentonite waterproofing and gaps in the insulation provided poor containment." Can you describe the gaps in the insulation that you found?

A. The insulation stopped and started at this location I did the test cut of. There were two examples of what I mean by gaps. One was where, like I say, the insulation actually stopped and started. There was an uninsulated portion of the wall, and, as a result, earth was not tight up against the Swelltite or the assembly in that narrow area. Then there was another occasion where two-inch insulation board slightly lapped over the lower insulation board creating quite a sliver-shaped void behind the insulation, an area where there would be no lateral containment pressure against the Swelltite.

Q. What is the effect of no lateral containment pressure?

MR. REILLY: Objection, lack of foundation.

MR. VEITH: Asked and answered.

A. The watertightness characteristics of the bentonite component is greatly compromised.

BY MR. HULL:

Q. Now, you also note that the typical composite

drainage sheet was missing. Was this a condition that you found in more than one of your test openings?

A. I'm looking for the note here. Do you mean missing on the horizontal?

Q. It looks that that's the note, that it's missing on the horizontal, the very bottom note.

A. Oh, I'm sorry. That's right. It was not present at all at that DTO location.

Q. Did you find that condition at other opening locations?

A. I'd have to look through my report, but I believe that was the only location.

Q. And what's the effect of that?

MR. BROWN: Objection, foundation.

MR. REILLY: Join.

A. It -- water -- there are no subsurface drainage provisions on top of the waterproofing membrane at that location if the drainage composite sheet isn't there and that results in a permanent hydrostatic condition. That would never be drained away.

BY MR. HULL:

Q. Okay. Let's go on to diagram G. You have a note directed to finish grade. My question is did you find the finish grade, the elevation above the concrete masonry units differ from between the different test openings?

A. It did differ quite a bit, yes.

MS. REISBORD: I'm sorry. I didn't catch that answer.

MR. REILLY: "It did differ quite a bit, yes."

BY MR. HULL:

Q. Then the fourth note down you have a reference to a liquid-applied material poorly bonded. Can you describe that condition for me?

A. When I lifted up the self-adhering flashing sheet, the liquid-applied material came off quite easily in my hands without use of tools.

Q. Did you note if that liquid-applied material extended up the wall?

A. Since my drawing shows it stopping at the wall, I can only assume that I lifted up the flashing and noted that it stopped where it's drawn.

Q. And what was on the top of the concrete masonry units below the liquid flashing?

A. It's concrete block. However, I don't recall. If it had been open cores of the concrete block, I certainly would have noted that. Since I did not, I assume it appeared to be a solid, flat concrete surface.

Q. Let's go to diagram H. The top note at the end says "top of wall insulation is five inches lower."

Five inches lower than what? What are you referring to?
A. Let me reread the paragraph here. I'm just referring to the top edge of the extruded polystyrene. What I'm saying is at DTO 7, that top edge is five inches lower than it's shown in this particular detail.
Q. Let's go on to diagram I. The second note refers to the concrete ring around the drain blocking surface drainage due to settlement of surrounding earth. Did you observe that condition at more than one drain?
A. Yes, I did.
Q. And what is the effect of that condition?
MS. HEYER: Objection, asked and answered.
A. Water that's draining along the top of the sod is blocked or dammed by the raised edge of that concrete collar.
BY MR. HULL:
Q. And how would that condition be prevented?
A. The highest edge of the concrete collar should be flush or slightly lower than the surrounding sod.
Q. Now, sometimes it's certainly possible that you're going to have some settlement of the earth around that collar; isn't that right?
MR. BROWN: Objection, foundation.
A. Not necessarily.

BY MR. HULL:
Q. Tell me why that's not correct.
A. Depending on the type of soil specified, the compaction specification that the architect wrote, you can create a situation where settlement over long periods of time is extremely small.
Q. Were you aware that the general contractor was responsible for the design and the installation of the waterproofing?
MR. STEPAN: Objection as to form.
A. That's what I was told.
BY MR. HULL:
Q. Now, is the type of soil used in these plazas an important consideration in designing a waterproofing system?
MR. STEPAN: Objection as to form and foundation.
A. Yes, it is.
BY MR. HULL:
Q. And is the compaction, the degree of compaction of that soil an important consideration in designing a waterproofing system?
MR. STEPAN: Objection as to form and foundation.
A. It is.

BY MR. HULL:

Q. Now, do you know if the architect in fact specified the level of compaction in the plazas?

A. That I don't know.

Q. Do you know if anyone specified the level of compaction in the plazas?

A. I don't know whether anyone did or did not.

Q. The last note on that page refers to the lowest perforations in the drain extension being two-and-a-half inches above the membrane. We've talked at length about that in other depositions and the effect, but what would be the solution to that? How would you prevent that from occurring?

MS. HEYER: Objection, lack of foundation.

A. Either perforations could be drilled much, much closer to the bottom edge of that collar, of that PVC collar, or the PVC collar could be rested down on intermittent shims which raise the bottom edge up, allowing the water to drain in at 360 degrees around the collar. Those are two methods that could be used.

BY MR. HULL:

Q. Now, the effect of having holes two-and-a-half inches above the precast is that water will sit at the bottom of the plazas; is that right?

A. That's correct.

Q. What is the impact of that on this particular waterproofing system?

A. Well, especially in this case where the structural deck is dead flat, that means that two inches of water will always be sitting on the waterproofing membrane. With this particular waterproofing membrane, the Swelltite 3000 -- well, with this condition it's particularly critical that the seams seal effectively as you might imagine, and since there are -- there were areas on this project where I took samples of the Swelltite 3000 that still had the film undissolved, that questions the watertightness of all the seams since the bentonite component at the seam was not allowed to seal against the high-density polyethylene component of the lag sheet underneath it.

Q. Do you have an opinion to the appropriateness of the use of this type of waterproofing material for this application?

MR. RAU: Personally?

MR. REILLY: Your answer to that is "yes" or "no," not what it is. He hasn't asked you that.

THE WITNESS: Repeat the question.

MR. HULL: Why don't you read it back.

MR. RAU: I thought he was my witness,

but go ahead.

MR. REILLY: No. I'm going to object and I want to object at a proper time. If he's going to be nonresponsive, I want to prevent that before he answers the question. He asked if he had an opinion.

(Whereupon the requested portion of the record was read aloud by the Court Reporter.)

A. Before I conducted this --

MR. REILLY: I'll object. That's nonresponsive. The answer is "yes" or "no." Do you have an opinion or don't you?

MR. HULL: And that's true. Just you can answer "yes" or "no," and I will then ask you what your opinion is.

MR. BROWN: If you have one.

MR. RAU: And Mr. Reilly will then object, but go ahead.

A. No.

BY MR. HULL:

Q. You don't have an opinion?

A. Oh, sorry.

Q. Do you have an opinion about the appropriateness of the waterproofing?

A. I'm sorry. Yes, I do have an opinion.

Q. And specifically about the use of bentonite

for this application, do you have an opinion as to that?

A. I do.

Q. And what is that opinion?

MR. REILLY: Object, lack of foundation.

MR. BROWN: Join.

A. I see nothing wrong with the use of bentonite in this installation, that is the bentonite component of the Swelltite. I have a problem with using any product that relies on the dissolving of a component in an application like this.

BY MR. HULL:

Q. And the "component" meaning the water-soluble film?

A. That's correct.

Q. What about the use of the Swelltite on the vertical applications?

MR. REILLY: Same objection.

MR. BROWN: Object to the form also.

BY MR. HULL:

Q. Do you have an opinion as to the appropriateness of that?

MR. REILLY: Once again, it's a "yes" or "no."

A. Yes, I do.

BY MR. HULL:

Q. And what is your opinion.

MR. REILLY: Object, lack of foundation.

A. The -- I would have the same concerns even on areas where there's proper lateral containment for the same argument that I gave earlier with regard to the watertightness of the seams being that the film doesn't always dissolve. I would have an added concern about that material on a vertical surface as it approaches within a foot of finish grade because of lack of lateral containment.

BY MR. HULL:

Q. Let's go to diagram J if you would. You have a note referring to an irrigation line. Is that irrigation line in the appropriate place?

A. I would have to compare my observation with some drawing or design that located the irrigation line, and I can't do that. I have not seen any drawings or original design that locates it at a given elevation.

Q. Where would you recommend an irrigation line being placed?

MR. STEPAN: Objection, vague.

A. I am not familiar with irrigation systems to answer that question.

BY MR. HULL:

Q. I'm sorry. I keep thinking of this as a

drain -- drain tile, and I'm incorrect in that. The next -- the note further down refers to a "liquid flashing Volclay 2000 extremely poor bond due to moisture entering above flashing." Tell me what you --

MR. REILLY: "Entering post above flashing."

BY MR. HULL:

Q. "Entering post above flashing," tell me what you mean by that.

A. The unprotected wood just above the flashing will absorb moisture since it's not waterproofed. That moisture will migrate throughout the wood post by virtue of capillary action and make the substrate behind the flashing very wet and compromise the bond of the flashing.

Q. What would you do -- what are the options available to prevent that from occurring?

A. One option would be to use -- instead of a wood post to use a material that does not absorb water. Another option would be to flash all the way up to the surface regardless of what material was used for the post. Another option would be to bear the loads that the post is holding up -- or excuse me. Another option would be to slide the waterproofing system completely underneath the post regardless of what material the post was. Those are three options.

Q. Is M-2000 an appropriate product to waterproof those posts?

MR. REILLY: Objection, lack of foundation.

MR. BRISBOIS: Join.

A. No, it is not.

BY MR. HULL:

Q. And why do you say that?

MR. REILLY: Same objection.

A. Because it will debond if its substrate gets wet from within the material.

BY MR. HULL:

Q. Well, what about if you extended the flashing material up to the grade level or to the -- you know, to the concrete?

MR. BROWN: Objection to the form and objection, lacks foundation.

MR. REILLY: Join.

MR. BRISBOIS: Join.

A. Then it may very well be an effective flashing material.

BY MR. HULL:

Q. Would it need any protection?

A. Yes, it would.

Q. And what type of protection under this

application would be appropriate?
A. I think either eighth-inch asphalt-impregnated protection board, high-density polyethylene 10 mil or better. Those are the two common protections.
Q. And the purpose of the protections would be to prevent rocks or any other objects from penetrating the flashing; is that right?
A. That's correct. It would also protect against the material being damaged during the compaction operation adjacent to it during initial construction.
Q. Now, is the waterproofing of those posts, the canopy support posts, an important consideration in designing a waterproofing system for the plazas?
A. Yes, it is.
Q. Now, you mentioned that one option would be to slide the waterproofing material under those canopy support posts. In this instance, the canopy support posts were installed prior to the installation of the waterproofing. What problems does the support posts bearing directly on the precast create for the waterproofing system?
A. It means that the entire length of the post that occurs below grade has got to be waterproofed. It's one way to do it. It's perhaps not the way I would design it.
Q. And whether or not the waterproofing extends

below the posts or not, is that an important consideration or would that be an important consideration in designing a waterproofing system for those plazas?

A. I'm sorry. Could you repeat the question?

Q. Whether or not you extend the waterproofing membrane under the canopy support posts, would that be an important consideration in designing a waterproofing system for these plazas?

A. Yes.

Q. Now, there's been some testimony that the canopy support posts were attached to the precast with metal brackets installed with a powder-actuated nailer. Is that an appropriate way to attach those canopy support posts?

MR. STEPAN: Objection, lack of foundation.

A. Not an appropriate way if those posts were not effectively waterproofed all the way to finish grade.

BY MR. HULL:

Q. And tell me what you mean by that.

A. If water can enter the wood posts at any elevation below grade, then the possibility always exists that the water can migrate down through the posts and enter the building through the powder-actuated fastener which penetrates the precast panels.

Q. Are there other methods of attaching those posts to the precast?
A. I can't think of any.
Q. All right. Let's go to detail K. You have a reference here, a note to a damp-proofing product. Can you describe for me where that damp-proofing product was located?
A. It was on the horizontal edge of the masonry and it extended down the wall, the vertical wall.
Q. Now, is that a different product from M-2000?
A. Yes. Yes.
Q. And how is it different in terms of function?
MR. BROWN: Object to foundation. He doesn't even know what it is.
A. I deemed the material damp-proofing as opposed to a waterproofing product because it was incredibly thin and resembled damp-proofing products I'd seen many times previous. The M-20 material is much thicker and is a waterproofing product.
BY MR. HULL:
Q. Now, at this location did the self-adhering flashing extend up the wall behind the siding?
A. That I can't say.
Q. There is a detail that comes out of the wall, up, and curls over. Can you tell me what that is?

A. That was -- that was metal flashing of some sort.
Q. And did that metal flashing then extend over the top of the concrete masonry unit and down the wall or where did it terminate?
A. No, it didn't. It simply was returned up close to the exterior surface of the siding, and there was a hemmed edge as the drawing indicated.
Q. That extends down vertically? I'm wondering where it terminates against the building.
A. Oh, that I can't say. I didn't remove any above-ground building siding materials, so I didn't know where it was terminating.
Q. And did the damp-proofing product extend down the concrete masonry units?
A. Yes, it did.
Q. And were you able to determine how far down it extended?
A. Just down to the base of the wall.
Q. Was there M-2000 applied to the concrete masonry units at this test opening?
A. Yes, there was. It was sealing a seam between the self-adhering flashing and the Swelltite 3000.
Q. How wide -- were you able to determine how wide a band of M-2000 was used to seal that seam?

A. I can't recall.
Q. Is that an appropriate application for M-2000?
MR. REILLY: Objection, lack of foundation.
MR. STEPAN: Join.
A. I can't say for sure.
BY MR. HULL:
Q. As far as you could tell, at this test opening there was no M-2000 up to the top of the masonry units and over the top of those units; is that correct?
A. That is correct.
Q. Okay. Let's go to diagram M.
MS. REISBORD: Is that "M" or "N"?
MR. HULL: "M."
BY MR. HULL:
Q. Again you have a note of a color-coated sheet metal flashing, and you note that it's not appropriate when extended below grade. Would that be for the same reasons you've testified earlier to in an earlier diagram?
A. That's correct.
Q. Was there any evidence of moisture in the end wall?
A. Yes, there was.
Q. What was the evidence you observed?
A. There was efflorescence appearing on the

opposite side of what one would call a parapet wall indicating that water was in the wall system and migrating towards the surface and drawing out and leaving mineral deposits on the surface.

Q. Do you have an opinion as to where that water came from and how it got into that wall?

MR. REILLY: Objection, lack of foundation.

MR. STEPAN: Objection, lack of foundation.

A. Yes, I do.

BY MR. HULL:

Q. Go ahead.

MR. REILLY: Same objection.

A. It could very well be entering the wall from above, getting through the cap -- the precast cap stone and dropping down in the cores of the masonry units. It could also be coming through -- laterally through the vertical waterproofed wall at any number of locations.

BY MR. HULL:

Q. How would you recommend preventing water from coming through the cap stone and entering the wall at that location?

A. It's a widely recognized technique to use either metal flashing or a combination of metal flashing

and a membrane as what we call cap flashing which extends from one face of the wall to the other right under the cap stone. It makes a watertight barrier so that the joints in the cap stone, the lateral joints -- as water comes through the lateral joints in the cap stone, rather, it's stopped at the cap flashing. It doesn't continue down into the wall assembly.

Q. Now, would that be an important component of designing a waterproofing system for the plazas at the Promenade?

MR. STEPAN: Object as to form.

A. Most definitely.

BY MR. HULL:

Q. The last note you have on that page refers to the self-adhering waterproofing sheet. It says it's well bonded at the top of the waterproofing membrane. However, water under the membrane will not be stopped by a self-adhering sheet. How would you prevent water underneath the membrane at that location?

A. In my opinion, the self-adhering waterproofing sheet should have been placed underneath the Swelltite 3000 waterproofing on the horizontal deck. That way if water was migrating under the Swelltite 3000, it would be stopped at the adhered self-adhering sheet in those few inches before it got to the wall.

Q. Would there then have to be a flashing at the edge of the self-adhering sheet?

MR. BROWN: Objection, foundation.

A. I guess I'd have to revisit the manufacturer's recommendations as far as installation.

BY MR. HULL:

Q. Is the self-adhering sheet goods an appropriate waterproofing product for the end wall application?

A. It is.

Q. Does that require any type of protection?

A. Yes, it does.

Q. And was there any there?

A. There was protection by virtue of the composite drainage sheet which was placed over it, and, in my opinion, that is adequate protection.

MR. RAU: Bill, you've used almost an hour.

BY MR. HULL:

Q. All right. Well, let me just go for a couple more minutes and we'll wrap this up. Turn to diagram P if you would. The top note refers to this is a new typical system of the precast, refers to a free-draining backfill. What is the purpose of that?

A. So that water that falls on the courtyard can

percolate down through all the soil materials quickly and get down to the subsurface drainage provisions which I've designed into this assembly.

Q. Is getting the water out of the plazas an important consideration in designing a waterproofing system --

A. Yes.

Q. -- for the plazas?

A. Yes.

Q. I also note that you refer in the second to the last item in your notes there to a concrete topping. Explain to me how that would be designed and what purpose it would serve.

A. The purpose of the concrete topping which isn't in the current design is to slope the water -- provide a sloped substrate for the waterproofing to be applied to so that all subsequent materials, including subsurface drainage provisions, have a slope to drain. Percolating water and then slope to the drains, much like a sloped floor in a garage, would be a -- would be sloping floor drains.

Q. And is that concrete topping slope to drain an important component in designing a waterproofing system?

A. Very much so.

Q. You also are recommending a thermoplastic

waterproofing membrane with welded seams. How is that different from what is there now?

A. A thermoplastic membrane, more specifically a polyvinyl chloride thermoplastic membrane, does not -- is a homogenous material, and either by a mechanized welder or a hand-held heat welder the material is heated at the seams and actually melts and fuses together at the seams so there are no accessory products used in conjunction with forming the seams. What is typically thought of as the weakest part of a membrane, namely the seam, in the case of this product becomes one of the strongest parts of the membrane because the two membranes are actually melted together.

Q. You also have granular bentonite in the new system. What is the difference between that and the Swelltite 3000?

A. The difference -- one difference is the quantity of bentonite. In this assembly I'm calling out for a half inch of pure granular bentonite. The Swelltite material uses considerably less bentonite than that. Not only is the thickness of the bentonite component of the Swelltite much less than a half inch, but only a certain percentage of that bentonite component of the Swelltite actually has bentonite, is made up of actually bentonite.

Q. How is that applied?

A. Granular bentonite is just -- is bagged. It's

just poured out and it's raked to a consistent depth. It resembles gray kitty litter.

Q. Okay. Let's go to Q, detail Q. Describe for me, if you would, what your new typical termination of building wall consists of?

A. First of all, the primary waterproofing, which is the thermoplastic membrane, the primary waterproofing is continuous up the wall, across the top block ledge, and then up a minimum of nine inches onto the sheathing of the wood-framed -- or of the framed wall, the framed stud wall. Then there is a protection material, high-density polyethylene in this case, that goes over that and across the top of the block wall. Then the protection duties are taken up by the stainless steel sheet metal flashing that comes down over the thermoplastic membrane above grade and continues down four inches below the top of the concrete block.

Q. Now, again in your new termination at the wall you have the grade above the top of the concrete masonry unit. Are you confident that the system you're calling out here will prevent water from entering the building at that location?

A. Most definitely.

MR. RAU: You know, Bill, I'd be just as happy that the others would cede their time to you, but I

don't think they're going to.

BY MR. HULL:

Q. Yeah. Well, I think that that's probably about it. Let me just ask you one other question. At the grade level, would you slope the grade to the surface drains?

A. I would.

Q. And would that be an important part of designing a waterproofing system for the plazas?

A. Yes.

MR. STEPAN: Objection as to form.

BY MR. HULL:

Q. When you design a waterproofing system or if you were designing a waterproofing system in this case, would you prepare drawings?

A. Most definitely.

Q. And what would those drawings show?

A. It would involve plans, section cut details such as this (indicating), overall building sections very quite possibly, and then of course there are the technical specification sections that would be in the project manual.

Q. So you would prepare both a set of drawings and a set of specifications?

A. Definitely.

Q. Are you confident that these plazas can be

waterproofed to keep water out of the buildings and out of the garages?

A. I am.

Q. Are you confident that these plazas can be repaired so that they will keep water out of the buildings and out of the garages?

A. Not over long term, no.

Q. Tell me why that is.

A. Assuming we're successful --

MR. REILLY: Before you answer that, I want to interject an objection. Lack of foundation.

A. Assuming that we can relate water on the interior of the structure with the corresponding failure of the Swelltite membrane and therefore patch that portion of the Swelltite that's failing. Since I've found evidence of water migration under the Swelltite, there could be other failures resulting in water that just hasn't found a place through the structure to enter yet.

BY MR. HULL:

Q. Okay. I guess my -- I think maybe we weren't connected on the question here. You recommended completely replacing the waterproofing system in the plazas; am I correct?

A. That's correct.

Q. Are you confident that by replacing that

system you can adequately waterproof those plazas so that water will stay out of the building and out of the garages?

A. Definitely.

MR. HULL: That's all I have.

MR. REILLY: Let's take a two-minute break.

(At this time a brief recess was taken.)

CROSS-EXAMINATION

BY MR. REILLY:

Q. Mr. Campbell, my name is Pat Reilly. I represent CETCO, and I have some questions for you. You indicated in your prior testimony that you ran across Swelltite on one prior occasion. Do you remember that testimony, sir?

A. I do.

Q. And you do not recall the circumstances of that?

A. No, I'm afraid I don't.

Q. And you've done nothing since your last deposition to determine the circumstances of that encounter?

A. No, I haven't.

Q. You do not recall the application of the -- the particular type of application that was involved in

that?
A. No, I do not.
Q. Other than that, you have no other experience with Swelltite prior to this case; correct?
A. Firsthand experience, no.
Q. Now, you've indicated that there is some reliance on the film to dissolve for the bentonite to operate in the Swelltite design?
A. Correct.
Q. For the film to dissolve, that requires water getting to the film, does it not?
A. As I understand the literature, yes.
Q. So, for instance, if the top layer of the Swelltite -- which is what kind of material? It's a rubberized material?
A. High-density polyethylene.
Q. Okay. The polyethylene prevents the water from reaching below it, you would expect the film to be present?
A. Repeat the question, please.
Q. In other words, if water does not penetrate that first layer of the Swelltite, you would expect underneath that area film to be present?
A. True. Not necessarily.
Q. You don't know?

A. Correct.
Q. It does not mean that the system has failed if the film hasn't dissolved where water has not attacked?
MR. BROWN: You're asking him to confirm that he doesn't know, Bill -- or Pat?
BY MR. REILLY:
Q. No. What I'm asking you is you know that if the poly -- the material you called --
A. High-density polyethylene.
Q. The polyethylene prevents water from penetrating the membrane and water isn't getting at the membrane from any other direction, the film would still be there years after it's installed?
A. That's correct.
Q. And that does not mean that the system failed? In fact it means that the system in that area is functioning?
A. Yes.
Q. All right. Now, in your prior testimony you talked that at the time you were out there you saw eight active leaks in the entire project; is that correct?
A. I believe that's correct.
Q. And that's in six buildings?
A. Yes.
Q. And you were only able to identify the

location of four of them, and I think that on Exhibit 790 you drew circles where you believed the leaks to be, is that correct, and that's on BC 00553 bates stamp?

A. Yes, I recall that.

Q. Do you notice that all the drawings you -- all the circles, leaks are located at under or near the linkage between Buildings 1 and 2?

A. That's correct.

Q. Do you understand what waterproofing was done in the linkage areas?

A. No, I don't.

Q. Do you know whether those leaks are being caused by water infiltration at the links themselves, the four leaks that you identified?

A. You'll have to define "link" for me.

Q. Okay. There's an area between Building 1 and Building 2 as a pass-through for fire trucks and other safety equipment. It's an elevated area with a cement patio type area at the top. Are you familiar with that area?

A. Yes, I am.

Q. It's outside of the scope of these courtyards we've been talking about?

MR. HULL: I'll object to the form of the question.

A. That's correct.
BY MR. REILLY:
Q. That's the area I'm defining as the link; all right?
A. Understood.
Q. And you've done nothing to examine whether water is penetrating the building in that link area?
A. Through the top surface, no, I have not.
Q. You have seen, have you not, in that linkage area cracks in the cement?
A. In the wearing slab cement, yes.
Q. Have you seen also gaps between the slabs and the walls without caulk in them?
A. I don't recall offhand.
Q. Do you remember seeing in the stairwells at or about the links separations between the stairwell steps and the walls?
A. Yes, I do remember seeing that.
Q. Without caulking or without adequate caulking?
A. I believe it was failed caulking.
Q. All right. Those were all areas where water can penetrate the building?
A. Potentially.
Q. As you sit here today, do you know -- do you have an opinion whether -- where the source of four leaks

that you were able to identify their location, where the source of the water is coming from?
A. No.
Q. Could that be from that linkage area?
A. Possibly.
Q. All right. The other four leaks -- you said there were four additional leaks but you could not identify their location at the time of your deposition?
A. That's correct.
Q. Can you identify them today where they were?
A. No, I can't.
Q. Do you recall any leaks at a special unit called 3-115 which is at the end of a -- and underneath the end of a courtyard?
A. I don't recall it by that name.
Q. Okay. You see Building 3? It sits by itself, and down at the very southern -- I think it's -- yeah, very southern end of the building there are two units, one of which is up underneath the courtyard?
A. Now I recall.
Q. Do you recall that?
A. Yes.
Q. Was that one of the places where you saw leakage, active leakage at the time you were out there?
A. I saw evidence on finish materials of leakage,

yes.

Q. Do you know that a water test was performed by an employee of Promenade in that area?

A. I did not know that.

Q. Have you since learned of that?

A. No. It's the first I've heard of that.

Q. And a water test, as you described it, would be, for instance, using a source of water such as a hose, putting it on a particular area and testing whether that area leaks essentially; correct?

A. That's one method.

Q. If the water test included using a hose for seven hours in the actual courtyard area where the -- where this system that we've been talking about exists, where the grass exists, without a leak, would that be a good indication to you that the waterproofing system in that location is functioning?

A. That would so indicate.

Q. If in fact after turning the water onto the wall, the end wall in that area, in 15 minutes leaks developed in the apartment, would that be evidence to you of a problem in the wall itself?

A. That would be a reasonable assumption.

Q. Now, you also indicated in your inspection that you saw various evidence of leaks that were not active

at the time you were out there throughout the garage areas; correct?

A. Correct.

Q. And as I understand from your prior testimony, you're unable to testify where any particular leak came from?

A. Correct.

Q. Now, you know that there were repairs done, for instance, to the entranceways of various apartments in the courtyards; correct?

A. Correct.

Q. And that as a result of that leakage, some leakage was diminished -- or locations were diminished?

A. Yes.

Q. You also understand that there were repairs done to the posts and waterproofing around the posts?

A. Not all the posts, but yes.

Q. And where that was done, leakages were diminished?

A. Yes.

Q. You also understand there was some additional caulking and other work done that contributed to at least diminishing the leakage on the property; correct?

A. That's my understanding, yes.

Q. The eight remaining active leaks that you saw,

is there any that you can say "In my opinion, it was a result of this particular area failure, function"?

A. No, I can't.

Q. In fact, as you indicate in your prior testimony, in the courtyards the waterproofing membrane is being water-tested 24/7?

A. That's correct.

Q. Because there's two inches of standing water essentially in the entire waterproofing?

A. That's correct.

Q. Now, you've indicated that you're not familiar yourself with either the formulation of the bentonite, correct, in the Swelltite product?

A. The Swelltite's version of bentonite, yes, that's correct.

Q. And you're not familiar yourself with the chemical or properties of the film that was used with the Swelltite?

A. That's correct, other than what I just recently learned from this other individual.

Q. And that person, do you know personally the one you talked to?

A. I don't know him personally. I know of him.

Q. Okay. Are you aware of any treatises or materials which are commonly recognized in this trade

regarding Swelltite that spells out the effects of water getting between the film and the substrate?

A. Could you rephrase the question?

Q. In the last two days of testimony you've testified regarding your opinions as to the effect of the film not dissolving?

A. Correct.

Q. Are you aware of any treatises that address that issue?

A. Define "treatise."

Q. Something that is recognized -- a document, an article, a book that is recognized in your occupation as learned.

A. It is not good waterproofing design practice to design a system that would allow water to migrate underneath the primary waterproofing material should the failure occur.

MR. STEPAN: Object as nonresponsive.

MS. HEYER: Join that objection.

MR. REILLY: Could you read back the question, please.

(Whereupon the requested portion of the record was read aloud by the Court Reporter.)

BY MR. REILLY:

Q. Do you understand what I'm talking about? The

issue that I'm discussing with you is the effect of the film not dissolving on Swelltite product and its waterproofing capacity. Are you aware of any treatises including books, articles, written studies that have been done by anybody in your profession that would be considered a learned document?

A. No.

Q. Now, when you described the moisture that you saw in the -- on the substrate in four of the openings, you described it as dampness. Do you remember testifying to that?

A. Yes.

Q. Do you know if any of that dampness was a result of you working in that environment and cutting through the Swelltite?

A. No. I'm positive it was not because that would be a flawed technique of retrieving a sample.

Q. You indicated that in every hole you dug there was standing water; correct?

A. That's correct.

Q. And in some of the areas, as much as two or three inches of standing water?

A. That is correct.

Q. Did you also notice that in some of the areas -- strike that. In the areas you've indicated

dampness, do you know when that water entered that area where you found the dampness?
A. Other than to say it did not enter during any test cut, no, I cannot.
Q. And when you say "dampness," does that mean a physical staining of the material underneath?
A. A moisture you can feel with your fingers and pick up on your fingers.
Q. Now, have you -- you indicated that there's an effect when the film fails to dissolve as to the efficiency of the waterproofing system; correct?
A. Correct.
Q. Have you done any testing whatsoever to determine what is the effect of -- on water migration of the film failing to dissolve?
A. No, I've run no test.
Q. Do you know whether that film and undissolved film such as that is water soluble or not?
A. According to the literature, it's supposed to be water soluble.
Q. Do you believe that it is?
A. I believe certain factors can keep it from functioning the way the manufacturer expects it to.
MR. BRISBOIS: Objection, nonresponsive.
BY MR. REILLY:

Q. Do you believe it's water soluble or not?
MR. RAU: This film on this deck or in general?
MR. REILLY: The film that was used on the Swelltite 3000.
A. In general, probably, yes.
BY MR. REILLY:
Q. You do not know in this situation whether the Swelltite film was water soluble or not?
A. Based on the samples I've retrieved that have film still intact, it stands to reason there are more areas that are -- that still have intact film, but I couldn't quantify that.
MR. VEITH: Objection, nonresponsive.
BY MR. REILLY:
Q. Can water permeate this film when it's not dissolved?
A. The purpose of the film is not to stop water.
MR. VEITH: Objection, nonresponsive.
BY MR. REILLY:
Q. Can it permeate the film when it's not dissolved?
A. I don't understand the question.
Q. Assuming the film is not dissolved, do you know whether water can permeate?

A. "Permeating" means go through.
Q. Exactly.
A. I don't know whether it can or can't.
Q. Now, if I understand the way this product is designed to work, if there is a hole in the product, for instance in the membrane, as the water gets into that hole, bentonite swells around it and seals that hole shut; correct?
A. That's what it's supposed to do, yes.
Q. All right. If the penetration is from above, in other words, going vertically into the bentonite material, it doesn't matter whether the film dissolves or not. It will still expand around that penetration; correct?
A. The portion of the bentonite that's in contact with the concrete right at the hole will expand --
Q. All right.
A. -- however.
Q. Whether it will stop the leak or not, you don't know?
A. That's correct.
Q. You've done no testing to determine that?
A. That's correct.
Q. You've already testified you never saw any of the seams, so you do not know whether the seams leaked or

not, do you?

A. Not by firsthand observation, no, I do not.

Q. And you've done no testing of seams?

A. No, I have not.

Q. Now, if a piece of Swelltite let's say the size of a piece of paper were lying in a position where water approached it from the side, you would expect, would you not, that the edge of it would hydrate the bentonite? The bentonite would be hydrated on the edge?

A. It would.

Q. It would not necessarily penetrate all the way through the product?

A. The hydrated bentonite though, keep in mind, is separated from the substrate by the film which also extends out to the edge.

Q. All right. It would extend through -- and whether that film dissolved or not -- let's assume the film is dissolving properly in this instance. The film would dissolve along the area where the bentonite expanded and hydrated; correct?

A. Correct.

Q. But assuming the water then was stopped by that expanded bentonite and expanded and dissolved film, there would be no effect to the remaining bentonite or the remaining film once you got beyond the area where the

stoppage occurred?
A. That is correct.
Q. So for instance, if you were to take a sample from the middle of this sample, you would expect to find unhydrated bentonite and film?
A. Yes. Right.
Q. During your inspections either of active leaks or of evidence of former leakage, were you able to determine any particular leak -- the location or cause of any particular leak that ever existed in that property?
A. I was never able to associate the evidence of infiltration on the interior with a specific failure of the membrane on the exterior.
Q. Now, you talked a bit about the posts, and you understand that those posts are single pieces of wood that extend all the way from the roof line of the overhang of the patios down all the way to the -- almost all the way down to the cement planks?
A. That's correct.
Q. And water can enter at any area of the unprotected wood in that post; correct?
A. Correct.
Q. It could enter at the ground level, for instance, in other words, where the stoop -- where it matches up with the top of the patio block?

A. Yes.
Q. It could enter from the top if there were water entering into the end of the post?
A. The area of the post which is adjacent to air would not be so prone to absorb moisture permanently because of the evaporation process.
Q. But since it's a permeable material, wherever water enters, it is possible for it to eventually by gravity feed to the bottom of the post?
A. By gravity or capillary action, yes, it is possible.
Q. And it would be -- the best method of waterproofing would be to put a waterproofing material beneath the post between the post and the substrate?
A. That would be the best, yes.
Q. And in fact that's the repairs that were made at least in the one dig that you did examine the repair?
A. That's correct.
Q. And are you aware that as a result of those repairs that the water leakage has been diminished?
A. That's what I was told, yes.
Q. Now, you were asked some questions, and I mentioned it earlier, about the two-and-a-half inches or two inches of standing water on the membrane. Do you believe that that contributes to the leaks in the Promenade

project?

MS. HEYER: Objection; lack of foundation, calls for speculation.

A. It puts tremendous demands on the waterproofing membrane regardless of what material it is.

BY MR. REILLY:

Q. Even with the most expensive waterproofing membrane that you could devise, you would still want to move that water off of it?

A. That's correct.

Q. Why is that even with the most expensive waterproofing membrane you could devise? Why do you want to move water to a drain and get it off the waterproofing membrane as fast as possible?

A. The simplest way I can explain it is it's much like holding a hand of cards. Even though there are four aces in the deck, you wish there were six. You're always trying to stack the deck in your favor in matters of waterproofing design and subsurface drainage because the cost of going back and fixing such installations are traditionally so expensive.

Q. Now, we don't have those samples of --

MR. RAU: They're coming.

BY MR. REILLY:

Q. They're coming but maybe you can answer the

question without looking at the samples. Are you able to determine on those samples where you believe film to be --

A. Yes, I do.

Q. -- in existence --

A. Yes, I do.

Q. I haven't finished my question.

A. I'm sorry.

Q. What portion of the film in each of those instances has been exposed to the water and what portion has not?

A. Can I --

MR. BROWN: Of the existing film, Pat?

BY MR. REILLY:

Q. Of those -- the film that you find on those samples that you found, can you determine based upon your inspection of those samples what portion of the film that's remaining has been exposed to water and what has not?

A. Based on the condition of the bentonite underneath the film I can and also based on the fact of there was water present underneath the sample that was removed.

Q. But not all the samples that were removed, so we don't know which of those samples had water underneath them because you don't remember; correct?

A. The -- that's correct.

Q. So put that aside because we don't know which one of those samples you found dampness underneath the samples, so the evidence that you would use to determine whether the film had been exposed to moisture would be the hydration of the bentonite?

A. Yes.

Q. Is there any other basis for that?

A. I'm confident that there were samples taken that still had film on them that also had water below the sample.

Q. My point is, other -- if I hand you one of those samples today and I say "Tell me which -- was this film exposed to moisture?" and you say "Well, I think so and here's why," and the only reason you could give me an opinion today as to that particular sample is because of the condition of the bentonite?

A. That is correct.

Q. All right. Now, if a waterproofing system such as the Swelltite system used here in these courtyards is circumvented by water, for instance, water enters the building walls from other areas above or beyond the waterproofing membrane, that's not a defect in the waterproofing membrane itself?

A. No, it wouldn't be.

Q. Have you done any test to determine whether

water can enter the vinyl siding of these buildings?
A. No, I've done no tests.
Q. If water were able to enter the vinyl siding into the wall structure of these buildings, would that be a possible cause for leakage below those walls?
A. Yes, it could.
Q. If, as you've indicated at least on one occasion, there is insufficient flashing in end walls or knee walls which allows water to penetrate into the block of the wall itself that can in fact create leakage below?
A. That's correct.
Q. And defeat the waterproofing system by circumventing it?
A. That's correct.
Q. With there being two inches of standing water or thereabouts on this product all the time, is it significant if the testimony were to be at the time of trial that the only time there are leaks, active leaks now, is when it rains?
MS. HEYER: Object to the form of the question.
A. Not necessarily.
BY MR. REILLY:
Q. Why?
A. There could be Swelltite seams that because of

the fact that the film is not dissolving adequately could allow water in without there having to be a full two inches of water-head on the membrane.

Q. Well, you know the membrane has water on top of it all the time?

MS. HEYER: Objection to the form of the question, calls for speculation.

A. Not necessarily.

BY MR. REILLY:

Q. Is there any place that you dug a hole you didn't find standing water?

MS. HEYER: Objection, argumentative.

A. True. I found standing water at every destructive test opening to varying degrees.

BY MR. REILLY:

Q. Is there any basis for an opinion by you at this point that there would be any place on those membranes that does not have water standing on it of some depth?

A. No.

MS. HEYER: Objection, calls for speculation.

BY MR. REILLY:

Q. Assuming that to be the case, the fact that it only leaks in the rain, and I'm asking you to assume that fact, doesn't that indicate to you that those leaks that

are being caused when it rains are a result of the waterproofing membrane being circumvented in some manner?

A. That's highly likely.

MR. REILLY: Thank you. I have no other questions.

(At this time a discussion was held off the record.)

CROSS-EXAMINATION

BY MR. STEPAN:

Q. Mr. Campbell, my name is Chad Stepan. I'm one of the attorneys for Weis Builders in this matter. Have you ever been a general contractor?

A. No, I haven't.

Q. Is it fair to say you are not an expert regarding the standards of care for a general contractor?

A. Safe to say.

Q. You weren't retained to testify regarding the standards of care of a general contractor?

A. That's correct.

Q. Are you a soils engineer?

A. No.

Q. Any expertise in the line of work that a soils engineer does?

A. Only things I've picked up through the course

of involving myself in waterproofing for the last 16 years.
Q. I believe you made reference -- it's either in your report or during your previous testimony -- about Braun Intertec's conclusion that the backfill in the plazas met the specifications. Do you recall that?
A. That is correct.
Q. And would you defer to Braun Intertec's conclusion that the backfill met the specifications?
A. Most definitely.
Q. As part of your analysis for this case, did you have an opportunity to review any of the RFI's?
A. No, I did not.
Q. Did you review any sketches or drawings indicating changes that were made to the architectural plans during the project?
A. I don't honestly recall.
Q. Do you recall seeing any drawing showing that there was a change in the one side of the buildings, a change made from a bottom bearing truss to a top bearing truss? Did you ever see a drawing like that?
A. No, I did not.
Q. As part of your work in this case, were you asked to analyze and/or criticize the architectural drawings?
A. No, I wasn't.

Q. Did you look at the architectural drawings for the project?
A. Yes, I did.
Q. For how long? How much time did you spend with them?
A. Approximately three hours, not in all one sitting.
Q. What did you look for in the architectural drawings? What was your purpose in reviewing that?
A. I wanted to see if there was a slope to the structural deck. I wanted to see what the structural deck was. Was it cast-in-place concrete? Was it precast? As it turns out, it was precast. I wanted to see if there was a concrete topping on top of the precast. There was. I wanted to see what waterproofing design, if any, was in those documents. I wanted to -- I wanted to review any notes pertaining to backfill requirements, compaction requirements, and I wanted a general idea as to the configuration of the structure with respect to the courtyard and the habitable units. I also wanted to review any drain design that was in the documents.
Q. Any other reasons why you looked at them?
A. I think that about covers it.
Q. Did you have any criticisms of the drawings that you looked at?

MR. HULL: Objection, foundation.
A. The only criticism I can recall is the lack of tapered concrete topping on top of the precast.
BY MR. STEPAN:
Q. And why did you have a criticism of that?
A. As I mentioned earlier, it's good waterproofing design practice to introduce a slope to the waterproofing membrane directing the subsurface water towards collection drains.
Q. And that's something -- a tapered concrete topping is something you would expect to see in an architectural drawing?
MR. HULL: Objection, foundation.
A. Most definitely.
BY MR. STEPAN:
Q. And as you've indicated here today, you haven't seen any sketches or RFI's or anything that occurred during the project that would have changed details to the drawings; is that right?
A. No, I haven't. That's correct.
Q. Did you look at any of the deposition transcripts of any of the employees of ESG in this case?
A. ESG?
Q. The architect.
A. I think I probably have.

Q. Did you look at John Feges's transcript?
A. No.
Q. Jim Timm's?
A. I believe Jim Timm's yes.
Q. Kirk Velett?
A. No.
Q. Why did you look at Mr. Timm's and not Mr. Velett's and Mr. Feges's?
A. I do not know.
Q. Were you provided Mr. Feges's transcript?
A. I've been provided so many deposition transcripts. I'd really have to review them to give you a definite answer.
Q. You indicated that since your -- you stated that since your previous deposition you contacted a couple of individuals to do some further analysis about the waterproofing on this project, Mr. Perales and Mr. Rutila?
A. That's correct.
Q. Did you contact anybody else since your --
A. No.
Q. -- first deposition? Have you performed any other analysis on this project since your first deposition?
A. No, I haven't.
Q. Do you plan to do any other analysis?
A. No.

Q. Do you plan to contact anybody else to discuss the waterproofing or any other aspect of the project?

A. Not at this point, no.

MR. RAU: But if he does, Chad, we'll recognize our obligations under the rules.

MR. STEPAN: I appreciate that.

BY MR. STEPAN:

Q. You worked -- previously you worked for Brent Anderson; isn't that right?

A. That's correct.

Q. And would you have confidence in a repair that Brent Anderson has put forth for this project?

A. Under most circumstances, yes.

Q. What do you mean by that, "under most circumstances"?

A. There have been occasions where Brent Anderson and myself have differed as to the most appropriate waterproofing design.

Q. Did you discuss this with him?

A. No.

Q. And on what occasions have you differed?

A. Oh, I can't remember any specific examples. It doesn't happen very often, but it has happened.

Q. If Brent Anderson were to provide a replacement plan for the courtyards of the Promenade, is

that something you would have confidence in?
A. Most likely.
Q. Can you take a look at Exhibit 790, in particular page 8.
A. Should I look at it in here (indicating) just to make sure it's the same?
Q. Sure.
A. 790?
Q. Yeah, I think it's the first -- it's your report.
MR. RAU: This is -- oh, yeah. Okay.
BY MR. STEPAN:
Q. 790 there (indicating).
A. Oh, okay.
Q. Page 8 is what I'm looking for. Are you there?
A. Uh-huh.
Q. In particular, you see where item number 6 is and then there's a new paragraph, the one below that starting with "In conclusion"?
A. Yes.
Q. You say "In conclusion, the subsurface drainage design there was not well thought out." What are you referring to when you say "subsurface drainage design"?
A. That would include the slope or lack thereof

of the substrate that the waterproofing was put on. It would include any drainage composite sheets that might be specified as part of the assembly. That would include the drains themselves, making sure that -- making sure that the area around the drains and the drains themselves will freely allow water below ground to enter those drains for a long period of time, and to assure that, there are many, many things an architect can do. But to sum up, it would include the drains, the subsurface capability of the drains, the slope of the waterproofing, any drainage composite sheets that might have been specified, also the percolation of the backfill soil, the slope of finish grade. I think that about covers it.

Q. Now, if I recall correctly, you recommend in your report replacing the drains themselves; is that right?

A. That's correct.

Q. Why is that?

A. Could you point to where I say that?

Q. Yeah, page 10, under "Subsurface Drainage," you say "The replacement subsurface drainage design utilizes new courtyard drains."

A. I would use a drain that doesn't rely on a customized perforated sleeve like was used in this project. I would specify a drain that was designed at the factory for the express purpose of draining at all levels.

I think that's a more reliable long-term type of drain to use in an application like this.

Q. Part of having a sufficient drain is to -- a sufficient drain will help get the water away from the courtyards as quickly as possible; is that right?

MS. HEYER: Object to the form of the question.

A. To remove water both from the surface and from the surrounding earth, yes.

BY MR. STEPAN:

Q. Now, you say on the previous page, page 9, that the quantity, size -- I'm looking at number 3 on page 9 -- the quantity, size, and location of the existing drains are adequate. Do you see that?

A. Yes.

Q. What do you base that on?

MS. HEYER: Objection, asked and answered.

A. It's a process we use at Inspec in roof and plaza design that matches a quantity of runoff water with the necessary pipe diameter that you discharge that water with. It uses a table.

BY MR. STEPAN:

Q. Are you a mechanical engineer?

A. No.

Q. Do you have any mechanical engineers employed at Inspec?
A. No.
Q. Did you consult with any mechanical engineers in making your calculation to determine if the quantity, size, and location of the existing courtyard drains --
A. No, I didn't.
Q. -- is adequate? Do you know if the methodology you used to determine if the quantity, size, and locations of the existing drains are adequate is a methodology that others in the industry use?
A. Yes, I believe it is.
Q. What do you base that on?
A. The success our firm has had with the procedure for 30 years.
Q. Do you know if anybody else uses the methodology you use?
A. Within Inspec I do, yes.
Q. Outside of Inspec?
A. Not specifically, no. I don't know of anybody who doesn't either.
Q. You just don't know one way or the other?
A. I just don't know one way or the other.
Q. Were you involved at all in the sale of this project? Did you meet with some of the engineers that the

potential buyers sent out to the site?
A. After I started my investigation?
Q. At any time.
A. I don't believe so.
Q. Did you ever meet a Mr. Camaya?
A. Camaya, the name rings a bell, but I don't think I've met him.
Q. How about Scott Vanderburg?
A. Yes, I think I've met Scott Vanderburg.
Q. Did you meet him at the site?
A. I'm sure it must have been.
Q. Robb Van Martin?
A. I don't believe so.
Q. Tim Sharbino (phonetic)?
A. The name doesn't ring a bell.
Q. Do you recall any discussions that you had with Mr. Vanderburg?
A. I can't even put a face to the name. It's just the name sounds familiar.
Q. Can you go ahead and turn to page -- or diagram R of the Exhibit 790.
A. Okay.
Q. And that's a detail you've put together showing "New Typical Courtyard Drain"; is that right?
A. Yes.

Q. At the very top of the diagram you show a concrete apron around a surface drain, the apron sloping down to the drain, and then the soil to the right of the apron is essentially flush with that apron; is that right?
A. Correct.
Q. Do you know -- you said earlier that there's some drains out at the site right now where the soil around the apron has come down so it's not flush to the apron?
A. That's correct.
Q. Do you know why that happened?
MS. HEYER: Objection, lack of foundation.
A. I'm assuming compaction of the soil, settlement of soil or -- no. Excuse me. No "or" -- settlement of the soil around the concrete collar.
BY MR. STEPAN:
Q. But do you know why? Did you do any testing to verify what the type of compaction was?
A. No, I didn't.
Q. When you looked at the architectural drawings and the specifications, did you find any criteria set forth as to what the compaction of the soil should be in the courtyards?
A. I don't believe so, no.
Q. Is that information you would expect to

receive from an architect or a design professional on a project?

MR. HULL: Objection, foundation.

A. I'll have to take back my answer. I don't recall whether I saw that in the spec or not.

BY MR. STEPAN:

Q. Is that information you'd expect if it's going to be there, it's going to come from an architect or an engineer, some kind of design professional?

A. Most likely, yes.

MR. HULL: Objection, foundation.

BY MR. STEPAN:

Q. As you move down the notations you've got here on diagram R, there's one that says "drawing smooth the top of the structural deck around openings to receive drain flange." Do you see that?

A. Yes.

Q. What is the purpose of that?

A. If the -- if the flange is raised up off the deck by virtue of little irregularities, the granular bentonite, if water ever were to hit it and make it hydrate, the granular bentonite could ooze right inside the building underneath the flange, underneath those little gaps under the flange, so it's important for that granular bentonite to work that the flange be seated evenly all the

way around the top opening.

Q. So the flange is flush with the top of the precast deck?

A. Or it's not flush with because there's thickness to the flange but it is setting on a flat, true structural deck, yes.

Q. Can you take a look at Exhibit 791, and I believe you stated that these were notes that you took during your analysis of questions you wanted answered as you went along; is that right?

A. Questions and notes, yes.

Q. Did you ever get a chance to review any of the contracts that were in play in this project?

A. I don't believe so.

Q. On I believe it's the fourth page of Exhibit 791, at the bottom there's an entry that says "sidewalk heaving," and then right below that it says "no water entering drains. See survey." Do you see that?

A. Uh-huh.

Q. What were the conditions that you observed that led you to the entry of "no water entering drains"?

A. There were some drains, not all drains, but there were some where just by visual observation from the top there was absolutely no water entering the drain from the top or from any of the perforations around the side.

Q. How could you tell that?

A. Just I removed the top grate, looked down inside. You could see no water entering at all, and this was after -- I made special note to go out to the site to check for this the day after we had had a real hard rain.

Q. Do you know why there was no water entering the drains?

A. I can only assume that it's for the reasons I've talked about in the report: The aggregate clogging the holes, the concrete collars being higher than the surrounding earth, the aggregate that was chosen having interlocking crushed limestone parcels which impede free flow of water, a buildup of fines in the holes of the drain perforations as a result of having no filter fabric. There are several reasons.

Q. Did you do any testing or further analysis other than removing the grate and looking down into the drain to verify whether any of these conditions were actually preventing water from entering the drains?

A. I did a destructive test opening around a drain.

Q. One drain?

A. One drain, yes.

Q. Out of the 30 or so that are out there?

A. That's right.

Q. Did you see all or any of those conditions at that drain you looked at?

MS. HEYER: Objection, foundation.

A. All of the conditions that I just mentioned I saw at that one drain, yes.

BY MR. STEPAN:

Q. During your analysis on this project, do you recall at some point reaching a conclusion that you believed the amount of bentonite in the Swelltite 3000 was inadequate for long-term watertight performance?

A. That's correct.

Q. And did you -- I don't recall seeing that in your final report, that conclusion. Is that something you included in your final report?

A. The reason for my hesitation here is I believe I had it in a draft at one point, but now I'm trying to remember if I took it out or not.

Q. Let me start with this: On what basis did you come to that conclusion initially?

A. Years of observation of bentonite products failing and working properly. Only a certain percent -- first of all, the bentonite component of the Swelltite material is only, oh, a little more than an eighth of an inch thick, and not even all that is bentonite. Only a percentage of that is bentonite. Knowing that, I have seen

installations of pure bentonite a quarter of an inch thick to sometimes under certain circumstances be inadequate to stop water.

I personally always design -- I design waterproofing systems when I do use bentonite of a half inch minimum of pure bentonite, so if you consider a percentage of an eighth inch versus a hundred percent of a half inch, there's quite a difference in bentonite content, poundage per square foot. It's just based on my years of experience of observing bentonite installations that work, that don't work. I have a very strong feeling that the amount of bentonite in the Swelltite is -- can be inadequate under certain circumstances.

Q. Is it inadequate under the circumstances existing at Promenade?

MR. REILLY: Objection, lack of foundation.

A. I believe it is.

BY MR. STEPAN:

Q. Assuming that you didn't put that conclusion in your final report, why would you not?

A. Perhaps too anecdotal.

Q. What do you mean by that?

A. I could not back it up with any test results.

Q. It's simply based on your own experience?

A. That's right.

Q. Also during your analysis, I believe in one of your drafts you put together a chart giving -- what you said, giving some indication to show how poorly the drains were functioning?

A. That's correct.

Q. Do you recall that?

A. That's correct.

Q. What were you trying to show in the chart?

A. Without quantifying it, I just wanted to indicate that in general there were an alarming number of drains not functioning to the extent they should.

Q. And not functioning in what way? They didn't transport any water?

A. That's right, both surface and below-grade water.

Q. Is part of that the fact that the way the drain assembly is installed it allows for two-and-a-half inches of water to sit on the deck?

MS. HEYER: Objection, no foundation, calls for speculation.

A. I would not know that two inches of water was sitting on the deck simply by my above-ground observations of the drains. That I discovered later when I measured the lowest perforation when I did the destructive test opening.

BY MR. STEPAN:

Q. Is it fair to say that there's two -- roughly two to two-and-a-half inches of water sitting on the deck as a result of the drain assembly that was used?

MS. HEYER: Object to the form of the question, calls for speculation.

A. In part.

BY MR. STEPAN:

Q. Is there anything else that contributes to that water being there other than the type of drain assembly being used?

A. The lack of slope of the waterproofing.

MR. REILLY: Excuse me. Could you read back the last question and answer.

(Whereupon the requested portion of the record was read aloud by the Court Reporter.)

(At this time Campbell Deposition Exhibit Number 808 was marked for identification by the Court Reporter.)

BY MR. STEPAN:

Q. Mr. Campbell, I'm going to show you what has been marked as Exhibit 808. On the top page is written "General," I think that's from a manila folder, and then there's some handwritten notes attached. Are you familiar with the handwritten notes?

A. Yeah, looks like my writing.

Q. The first page of handwritten notes, which is the second page of the exhibit, at the top it says "Purchaser: GID, Inc." and then it lists out some names: Bob Parasof, Scott Vanderburg, Robb Van Martin, Thad Palmer, Gary Kroll, and John Camaya. Do you see that?

A. Uh-huh.

Q. What do these notes reference?

A. If memory serves, I was talking to Tom Healey on the phone very early in the project, and he was telling me all the players involved in this drama if you will.

Q. Do you know who any of these people are?

A. I couldn't tell you whether I've met them or not. I may have. We had one meeting out at the job site when there were several people from out of town flown in, but I can't put faces to names right now.

Q. Is it your understanding that these people are affiliated with a potential purchaser of the site?

A. Yes. Yes. Well, purchaser? Yeah, that's right.

Q. Below that there is more notes and then you've got a list of four items. What is that list of four?

A. Okay.

Q. Why did you make that list?

A. It's a partial list of some things that would

have to be done to the site to improve the infiltration problem.

Q. You indicate there at number 1 that some of the posts were successfully repaired?

A. Uh-huh.

Q. Is that a "yes"?

A. Yes. I'm sorry.

Q. Number 2 you indicated that on the C side, the full length of, I'm assuming, the long wall of the building had been repaired, and you're saying including then stoops?

A. That's right.

Q. And then under that you say the B side, the full length excluding the stoops had been repaired and you note that the stoops should be addressed; is that right?

A. That's how I'm interpreting it, yes.

(At this time Campbell Deposition Exhibit Number 809 was marked for identification by the Court Reporter.)

BY MR. STEPAN:

Q. Showing you what has been marked as Exhibit 809, a one-page document, are you familiar with this?

A. Uh-huh.

Q. And what is it?

A. I remember sending this. I'm trying to

remember the situation surrounding it.
MR. REILLY: Can you just describe generally what it is, sir? Is it a letter?
THE WITNESS: Yeah. It's a fax transmittal to a Robb Van Martin of GID, Incorporated.
MR. REILLY: And what's the date of that, sir?
THE WITNESS: 11-1-02.
MR. REILLY: Thank you.
THE WITNESS: And then I copied Scott Vanderburg of GID as well.
BY MR. STEPAN:
Q. And what is -- your comments refer to locations where you found that the water-soluble film had not dissolved in the samples you took; is that right?
A. That's correct, and that the drainage composite sheet was 100 percent clogged with fines at two locations.
Q. And looking at this, do you know at all -- looking particularly at the part of this letter that addresses the areas where the water-soluble film had not dissolved, do you know from looking at the destructive test openings that are listed here which ones had water underneath them?
A. No. I couldn't say.

(At this time Campbell Deposition Exhibit Number 810 was marked for identification by the Court Reporter.)

BY MR. STEPAN:

Q. I'm going to show you what has been marked as Exhibit 810. The first page is an e-mail from Peter Goodwin to you, and on the back of the page there are notes, handwritten notes. I'm particularly interested in the handwritten notes.

A. Uh-huh.

Q. Is that your handwriting?

A. Yeah.

Q. What are you reflecting in these notes?

A. This is a diagrammatic representation of two possible relationships in a building project. The one on the left I refer to as traditional. It's where the owner hires the contractor and the architect and then the architect hires his subconsultants. The design-build version on the right shows the owner hiring a contractor and the contractor in turn hiring the various design professionals involved in designing the project.

Q. For what purpose did you make these diagrams?

A. I remember making this just to clear my own mind as to the two possible ways of doing the building, and of course just one of these applies to this project. I was

told that the one on the right, the design-build, was closer to the situation at Promenade Oaks.

Q. Are you aware that the owner hired the architect on this project?

A. No, that's right. I was aware the owner hired the -- okay. No, the traditional one on the left is what Promenade Oaks is. It's just that the architect left out the design of the waterproofing, I was told, and gave that -- and the owner gave that design responsibility to the contractor, so the diagram on the left is the one that applies to the Promenade Oaks situation.

MS. HEYER: Chad, did you identify the date or could you do so?

MR. STEPAN: Yeah, I will.

BY MR. STEPAN:

Q. Did you have something to add after your counsel pointed something out to you?

MR. RAU: Prompted him.

A. Yes, actually --

MR. STEPAN: After you coached him to do that.

MR. VEITH: Objection, coaching.

MR. BROWN: Objection, coaching.

A. Yeah. The reason I laid out the two diagrams was just so I could see in my mind's eye how the Promenade

Oaks project is really, in a way, a blend of the two in that one portion -- one aspect of the design was given to the contractor like the design-build scenario. However, the majority of the architectural design was given to an architect by the owner, so in a way it's a hybrid version of both.

MR. STEPAN: And for the record, the e-mail that this is written on the back of is dated February 13, 2002. Is that what you were looking for, Chandelle?

MS. HEYER: Yes. Thank you, Chad.

MR. BROWN: Is the e-mail going to be a part of it too or just the diagram?

MR. STEPAN: They're one and the same. They're on the same page.

MR. BROWN: So does one exhibit have both pages?

MR. STEPAN: It does.

MR. BROWN: Okay.

BY MR. STEPAN:

Q. On the traditional side, looking at Exhibit 810, you say it's typical for the architect to make sure everybody's coordinated on the project and all the designs are going to work together?

A. It's the most --

MR. HULL: Objection, foundation.
A. It's the most traditional arrangement, yes.
BY MR. STEPAN:
Q. And when there's a design-build aspect of the project -- you say it's kind of a hybrid where you have a section where it's design-build -- do you still look to the architect to make sure that his components of the project are going to coordinate with what's been set aside as design-build?
MR. HULL: Lack of foundation.
A. Who is "he"?
BY MR. STEPAN:
Q. The architect.
MR. HULL: Same objection, foundation.
A. It would be good professional practice for an architect to review design elements designed by others not under his own contract though not required.
BY MR. STEPAN:
Q. A good practice to do so?
A. A good practice, yes.
Q. To make sure that everything is going to mesh in the end?
A. Yes.
MR. HULL: I'm going to object to the last two questions on foundation grounds.

BY MR. STEPAN:

Q. Would you agree on this project that the courtyard spaces, sidewalks, and the entryways into the building are subject to various building codes, including ADA codes and Fair Housing codes?

A. Yes, they are.

Q. Would you agree that it would be the architect's responsibility to make sure that those codes are met?

MR. HULL: Objection.

A. Under normal circumstances.

MR. HULL: Objection to foundation.

BY MR. STEPAN:

Q. Have you looked at that aspect on this project?

A. No, I have not. I was not hired to do that.

Q. Do you recall reviewing a report produced by Pope Associates?

A. Yes, I do.

Q. Do you recall noting on the report you reviewed that you agreed that the architect should have been aware of code requirements and design the courtyards according?

A. Yes.

Q. Do you still agree with that today?

A. I do.
Q. You testified earlier today and I believe on your first day regarding this sheet metal that was installed below grade. Do you recall that?
A. Yes.
Q. Is that something that's more of an aesthetic concern than a functional concern?
A. Yes.
Q. Does it have any functional concern to you or is it aesthetic?
A. Obviously if the sheet metal below grade corroded and disintegrated over a long period of time, it would no longer offer any protection to the waterproofing underneath it.
Q. When you say a long period of time, what are you talking about?
A. For color-coated sheet metal installed below ground permanently to completely disintegrate would take a very long period of time, perhaps 15, 20 years.
MR. BROWN: Colored sheet metal?
THE WITNESS: Color-coated sheet metal.
BY MR. STEPAN:
Q. Is there any guarantee that that's going to happen or it's just possible that it could?
A. It's just highly possible.

Q. Do you know how many -- well, tell me how many locations when you were doing your investigation at the site where you observed damage to waterproofing that occurred because of the content of the soil?

A. There were at least two locations where the unprotected flashing where it goes over the top of the block below ground, where that had been punctured by aggregate driven into it.

Q. And did you note those with photographs?

A. I believe I have at least one photograph. I know I have at least one of that damage.

Q. But you recall two areas where you saw that?

A. I guess I'd have to look through my report to verify that there were two. I know there is at least one.

Q. Do you know if any leaks occurred at those areas?

A. I can't say for sure, no.

Q. At the drains, the surface drains, the concrete aprons where the soil has settled next to them, would it be possible to add soil to those areas to bring it back up to help the drainage?

A. Oh, yes.

Q. Is that something that you would look to the owner to do as part of their maintenance?

A. The owner is capable of doing it if they

understand soil compaction adequately or if they want to hire somebody for that purpose.

Q. Are you abe -- basically your testimony now is that you're aware that there were some -- after completion of the project and discovery of leaks, there were repairs made; is that right?

A. Yes.

Q. Are you able to determine -- are there any -- are you able to point to any of the evidence you saw, the efflorescence or any leak evidence, to say this leak occurred because of something with the original construction versus occurring because of something that was done during repair?

A. In some cases I'd be able to, yes.

Q. In what cases would you be able to do that?

A. There are areas -- there are courtyard areas completely remote from any subsequent repairs that have considerable evidence of infiltration directly below them.

Q. How about at the areas where there are repairs? Would you be able to determine whether it was a repair that led to the leak or it was the original construction?

A. Actually, since no active flowing leak water was observed underneath any repairs during any of my site visits, I can't -- I can't say for sure. Of course, there

was the remaining evidence of previous leaks that may have predated the adjacent repair.

Q. You don't know one way or the other?

A. That's correct.

Q. And by "evidence," you're referring to efflorescence or stains, things like that?

A. Correct.

Q. You don't know that -- would it be fair to say that you don't know the age of any given stain or evidence of leaks out there?

A. That would be fair to say generally, yes.

Q. Were you ever told about any repairs that Promenade made itself, whether they hired somebody to do it or actually did repairs itself, to the courtyard?

A. I can't say if -- I don't know if there were some repairs that they did on their own or not.

Q. The samples -- you removed samples of the waterproofing from the system and you found water beneath them and the water-soluble film still intact. Is the water beneath them, was that -- I'm just trying to get a better sense of what kind of condition that was. Was it damp to touch? Could you feel the water?

A. It wasn't flowing water, but it was certainly damp enough to touch with your fingers and bring it up and moisten your hands.

Q. When you worked for Brent Anderson Associates previously, did you have any familiarity with the Southwind project?

A. I've heard the name, of course, in connection with this project, but I hadn't prior to this.

Q. Where did you hear the name in connection with this project?

A. Isn't Southwind the other property that Healey Ramme either owned or managed and they had similar water infiltration?

Q. The property in Burnsville that's got a similar courtyard setup?

A. Right.

Q. Who told you about that?

A. Initially Tom Healey.

Q. What did he have to say about that?

A. He didn't go into great detail, but he said there was a property that they had that had a similar situation with leaky courtyards and that Brent Anderson Associates was the original waterproofing contractor, and they came back and did warranty repairs that seemed to fix the problem.

Q. Did he have anything else to say about Southwind?

A. No. That was about it.

Q. Did you talk to Peter Ramme about Southwind at all?
A. I might have. It was either Tom Healey or Peter Ramme that brought it up initially. I think it was Tom Healey though, but I've never been out to the site. I don't even know where it is.
Q. Do you believe the installation of gutters along the roof lines on the courtyard sides of the buildings would have helped?
A. Gutters by themselves, no.
Q. Gutters with anything else?
A. The point is to discharge the water off the courtyards entirely. Gutters collect the water, but the collected water then has to be routed off the courtyard entirely or plumbed into those drains.
Q. If the gutters had leaders that led away from -- deposited the water away from the courtyards, would that have helped?
A. That would have helped, yes.
Q. Or if it funneled the water, somehow plumbed it into the drain, was hooked up to the drain system somehow?
A. That would take some of the demands off any waterproofing system, yes.
Q. Earlier today you were asked some questions

about it was termed as a link between Buildings 1 and 2. Do you recall that?

A. Yes.

Q. Did you ever have any discussions with Tom Healey or Peter Ramme about that link?

A. I believe it was Tom Healey. He said that during the original design -- I don't know if this was during design phase or during construction phase, but somewhere in that process it was discovered that they needed to be able to bring emergency equipment into that area, and that link area was designed after the fact -- or I shouldn't say after the fact, but it was designed either towards the end of the design process or actually during the construction process. I don't recall which he said.

Q. Did you get the understanding that the timing of the design caused problems for the project being completed in that area?

A. I sensed that from Tom, yeah. What problems, I can't say.

Q. When you design a waterproofing system, do you call out flashings in your design?

A. Most definitely.

MR. STEPAN: That's all I have for now. I'll pass you off. Thank you.

MR. HULL: Take a little break?

(At this time a brief recess was taken.)

CROSS-EXAMINATION

BY MR. BROWN:

Q. Sir, my name is Mark Brown. I represent Waterproofing By Experts. I believe we met out at the location last August, I think, during --

A. That's right.

Q. -- some investigative work by some other experts in this case. Do you remember that?

A. That's right.

Q. Were you asked by Mr. Healey to provide information to those various individuals whose names you were somewhat familiar with and you couldn't quite put a face to their names from GID?

A. I very well may have, yeah.

Q. Specifically did you provide a copy of the report that's been marked here as Exhibit 790 to any of those individuals named on what was just marked a few minutes ago as Exhibit 808?

A. I may have. I'd have to check my records more closely to verify.

Q. Well, have you withheld any portion of your records from our --

A. No.

Q. -- inspection? So if it's not in your records, then how would you be able to come up with that answer?
A. Good point. I guess I couldn't. I honestly may have, but I can't say for sure.
Q. Do you recall being asked by Mr. Healey or Mr. Ramme to do that?
A. No.
Q. You don't recall? The reason I ask you that is if you look at the first, I guess -- yeah, the first page with text on it in Exhibit 808, and that's your handwriting you agree?
A. Yes, it is.
Q. There is some somewhat cryptic or truncated phrases under the first section with all the names and companies and it says "understand issues, help formulate and invest," which is short for --
A. Investigation.
Q. -- investigation "programs, give them data facts not opinion or speculation. We have they don't, photos, Volclay manufacturer literature." Now, my interpretation of that was somebody told you that would be helpful because of possession of that information by you that they didn't have. Does that refresh your memory at all about furnishing them with your report?

A. No. I still can't say one way or another based on this.

Q. And beyond the names of these individuals named on this page of this exhibit, do you recall being out on-site at any time when various prospective buyers of the Promenade project were touring the site?

A. I believe so.

Q. Why were you out there for those reasons -- on those occasions? I'm sorry.

A. If it happened at all, it was one occasion, and I suppose I can only imagine it would be for helping document the extent of the history of water infiltration to the prospective buyers.

Q. Did you furnish copies of the report marked as Exhibit 790 to at least that prospective buyer or whichever prospective buyers were there on that one occasion?

A. Like I said, I can't remember if I handed them one in person, mailed it to them, or not at all.

Q. Were you asked by Mr. Healey or Mr. Ramme or anyone else to prepare a document that was to be used in conjunction with Healey Ramme's efforts to sell the Promenade that was essentially a version of your report?

A. No.

Q. Now, you mention as one of the things that you had and they didn't, "they" being these names on

Exhibit 808, the Volclay manufacturer's literature. Did you testify on day one of your deposition that you had reviewed Volclay specifications and installation manuals?

A. Yes, that's correct.

Q. Were you able to determine based on a few destructive test openings you made and what I have to gather from your report was somewhat limited ability to observe everything in those openings whether these installation specifications that applied in 1997 when this project was constructed were complied with or not? Can you even tell?

MR. RAU: Object to the form.

MS. HEYER: Same objection.

MR. RAU: Mischaracterizes the evidence.

THE WITNESS: Do I not answer?

MR. RAU: Go ahead.

A. On the horizontal installation of the Swelltite, the answer is no because I encountered no seams as I previously testified to. As far as I know, the horizontal application of Swelltite may have been installed properly.

BY MR. BROWN:

Q. Now, you were asked by Mr. Hull whether you observed any product called term bar during your investigation. Do you remember that question?

A. Yes.
Q. Do you even know as you sit here today to any degree of certainty whether term bar was even specified in the product literature for Swelltite in 1997?
A. Yeah. I don't believe it was.
Q. Term tape was specified? Is that what you recall?
A. Either term tape or a mastic product.
Q. Now, what's the purpose of term tape or the mastic product?
A. One of the purposes is to keep the bentonite that's exposed at the cut edge of a membrane from hydrating out the edge. Another purpose is to hold the top edge fast to the substrate.
Q. Until the dirt can be put in; right?
A. Yeah.
Q. And the purpose of the dirt is -- or the dirt is really the material that with the chemical formulations and so on of the Swelltite is what works to allow that process to do what it's intended to do? In other words, if it gets wet, it expands, but it's limited in how far it can expand on the basis of the compression of the dirt; right?
A. That's the concept, yes.
Q. The tape has nothing to do with that other than holding it up until the dirt can be put in?

A. That is correct.

Q. And you also understand that -- based on your review of the Swelltite literature, that the material itself is to terminate -- by "material" I mean the Swelltite 3000 -- is to terminate an inch or two below the top of grade; correct?

A. The proper installation of Swelltite, regardless of what the literature says should be to terminate it far lower than that.

Q. What's your source for that statement, sir?

A. It's an ineffective material as the lateral pressure decreases the closer you get to grade. Generally speaking, I would expect that lateral pressure to be insufficient to a depth as low as 10 to 12 inches.

Q. Now, what expertise in any industry would actually determine effectiveness of lateral compression at various depths of soil? Would that be a soils engineer, a geotechnical engineer, a hydrological engineer? Who would do that if you even know?

A. It could be -- there's several professionals that would be qualified to put together a test to test something like that.

Q. One of which wouldn't be your profession; correct?

A. No, I would think an architect who specialized

in waterproofing given the resources and the proper laboratory could put together a test like that.

Q. Did you conduct such a test during your investigation in this matter?

A. No.

Q. Why not?

A. Because based on 16 years of experience of -- and understanding how bentonite works and requires that lateral pressure, I didn't feel it was worth the time and money for Healey Ramme, who hired me, to do such a test.

Q. Did you ask them if they could afford a little bit more money to conduct that kind of a test that's evidently so important?

A. No. It's --

MR. RAU: Don't answer that question..

BY MR. BROWN:

Q. You can answer the question.

MR. RAU: I told him not to. It's argumentative.

BY MR. BROWN:

Q. Did you request any further funding to conduct that kind of a test?

MR. RAU: You can answer that.

A. No.

BY MR. BROWN:

Q. Now, my real question that you never did answer is what's your source? What documentation, what literature in the field, what learned treatise, as that term has been defined to you today already, says Swelltite 3000 is not to be installed within 12 inches of the top of grade?
A. With respect to Swelltite 3000 specifically, none.
Q. How about Swelltite of any model or any brand?
A. None.
Q. How about any bentonite sheet membrane waterproofing? What literature, what learned treatise in the industry specifies not to install that material within 12 inches of the top of grade?
A. There isn't anything I've read with respect to a marketed waterproofing product.
Q. Now, your attorney made available some additional documentation that supposedly you used or relied upon in formulating your opinions. Are you aware of that just recently?
A. Repeat the question.
Q. Are you aware of any recent production by your attorney of some additional documentation that was related to us as documentation you relied upon in part to formulate your opinions? Are you even aware of that?

A. Oh, yes. Yes.

Q. All right. And among --

A. CSI monograph, yes.

Q. The CSI monograph is entitled "Bentonite Clay Waterproofing"; correct?

A. Yes.

Q. And it talks about various types of bentonite at least that were available on the market back in August 1986; correct?

A. Yes.

Q. Now, that was authored by Brent Anderson?

A. That's right.

Q. You were working for Brent at the time; is that right?

A. Yes.

Q. You were working for his company at the time this was authored?

A. That's correct.

Q. Did you have a hand in authoring this document?

A. In a very small way.

Q. All right. What small way?

A. A little bit of research on his part, maybe some of those drawings I did, but not enough to take any credit for even a partial coauthor.

Q. Can you show me one drawing in this document or one sentence in here that supports the assertion that you have made that bentonite is not to be installed within one foot of the top of grade?

A. I'd have to read that. It's been too long since I've read through it.

Q. All right. Well, since I'm limited in time, I'm going to give you that opportunity to read it. If you find any statement like that, then I'm going to ask you to identify it through your attorney and have him distribute copies to us.

A. I can do that.

Q. You've testified already today that you are unable to trace the source of any leak, either the eight that you observed or any other leak that you ever heard of, to any discrete source?

A. To any specific source --

Q. Yes, sir.

A. -- you're right.

Q. And you've also agreed that there's a myriad of possibilities, possible routes of entry into the buildings and garages of moisture --

A. Yes, that's true.

Q. -- correct? Some of which could include the vinyl siding? That was one; correct?

A. Yes.
Q. You didn't investigate that possibility; right?
A. I didn't -- I didn't remove any vinyl siding.
Q. Did you conduct any hose testing on the vinyl siding out at the site to see if you observed any water that infiltrated down behind the waterproofing system?
A. No, I did not.
Q. That wouldn't cost any additional money, would it, to conduct that kind of a test?
A. No.
Q. And another of the possible areas of entry of water infiltration or water defeating the waterproofing membrane system would be over the top of grade that was installed too high in the courtyards, and you observed and identified that condition out there, didn't you?
A. That's -- yes.
Q. Another one, as you've described today, was through the cap stones at the ends of the courtyards; correct?
A. That's correct.
Q. Another one was through the wood in the wood posts that were drilled directly into the precast; correct?
A. Through the penetration of the anchorage of the wood posts, yes.

Q. And through the wood itself which is touching directly on the precast and the condition as it existed prior to any repairs of the project; correct?

A. That's correct.

Q. Now, in all of those and any of the other cases that you've identified, the water can get right into the concrete composition of the precast planks? That's a permeable construction material; correct?

A. That's correct.

Q. And those are hollow-core planks; is that right?

A. That's correct.

Q. And once in the hollow cores, the water can travel conceivably any direction until theoretically it finds some route out of those cores --

A. That's --

Q. -- correct?

A. That's true too.

Q. Now, is it a true statement that in any of those possibilities that you've described and some of the examples of which I just gave you, that if water gets into those planks, those hollow cores of those planks, the cement itself surrounding those cores would or should get moist?

A. Depending on the amount of water, it could,

yes.

Q. At least moist to the touch if not filled with water; right?

A. Yes.

Q. Now, you specified or put together a recommended or possible replacement system; correct?

A. Yes.

Q. And I don't have your cost estimate anywhere. Is that in the exhibit? I don't have that whole thing. I'm sorry. It's on the last page. A couple questions: One, you knew that you were not asked -- you weren't requested to bid on any actual repair or replacement project at the Promenade; correct?

A. A bid on the design of the repair you mean?

Q. Yes, sir.

A. That's correct.

Q. Now, does Brent Anderson's company put together bids like this these days?

A. Sure. Yes.

Q. Did you consult with Brent before you put this bid together rather than the contractor you did use to find out how much he would charge to do a project like this?

A. We hired CPMI to put the cost estimate together because they're professionals in cost estimating. As an architectural firm, we haven't a made a profession

out of accurate cost estimating like this outfit has. It's their job to corroborate their estimates with real life subcontractors if they want their final figure to have any credence, so I was assuming that CPMI would contact one of the local waterproofers for the waterproofing component of their estimate.

Q. Did they?

A. I found out later that they had used Brent Anderson Associates, but I did not so specify when I hired CPMI. I really didn't care who he contracted with.

Q. And the waterproofing component of the overall estimate here is what, sir, what subtotal?

A. It's most likely not just under one line called "waterproofing." We'll have to search through here. Well, "drains" is a line item. "Earth backfill" is a line item.

Q. I'm sorry. Which page of the two are you looking at, sir?

A. The first one down towards the bottom.

Q. Under "replacement and reinstall"?

A. That's correct. "Bentonite layer" --

Q. Let met start over, sir. I'm sorry for interrupting you --

A. That's okay.

Q. -- and then I will ask you to state those

again. Are you just going to state right now the ones that a waterproofing contractor such as Brent Anderson would bid on and perform?
A. Yes.
Q. All right. So start again, please, then. The "bentonite layer" I presume?
A. I'm checking "demolition and excavation" first here just to be sure.
Q. Okay.
A. The "excavation and haul-off" could be done by Brent Anderson Associates. I don't know whether in this case it was.
Q. You don't know if that's his number?
A. Correct.
Q. All right.
A. Now I'm looking under "replacement and reinstall." "4000 PSI tape or concrete topping" could have been -- that could be a Brent Anderson number because I know that he has capacity to do some concrete work.
Q. If Brent is an engineer -- or an architect or an engineer?
A. No, he is a licensed engineer.
Q. He has professionals on staff; correct?
A. Yes.
Q. And you would need professionals and, I

assume, dump trucks and that kind of thing to do that sort of work?

A. Well, he would probably contract with a Ready-Mix company to actually deliver the concrete.

Q. And you need some sort of professional to specify what was needed in that sort of --

A. Brent is more than capable of doing that.

Q. All right. Go on.

A. "The bentonite layer, half inch," that very likely, most certainly would be part of Brent Anderson's estimate. The "thermoplastic waterproofing membrane, protective sheet, drainage board, two inches of insulation," those entire two lines there or three lines, I guess, would be by Brent Anderson Associates. The line "vertical without drain board," that would most likely be by Brent Anderson; "termination bar SS fastened" by Brent Anderson; "stainless steel flashing" most likely by Brent Anderson because I know he does -- he has a flashing crew in his outfit, but not necessarily. The "river rock" might have been by Brent Anderson, but I can't say for sure. Sometimes he does that and sometimes he doesn't. The "filter fabric" again may or may not have been Brent Anderson.

Q. Is it true that any of these may or may not have been? Is that the best you're going to be able to

say?

A. Oh, no, some for sure like the bentonite layer, the thermoplastic waterproofing membrane itself, those are definitely by Brent Anderson.

Q. Okay. Just tell me the ones that definitely are.

A. Okay. Sorry. The bentonite layer, the thermo -- the next three lines below that, thermoplastic waterproofing membrane slash protective sheet slash drain board slash two inches insulation board on the horizontal and on the vertical, that would all be by Brent Anderson Associates. The term bar SS fastened at 12 inches on center, that would definitely be by Brent Anderson, and that's all the definites.

Q. Now, the total though outside of even including the ones that aren't definite for Brent Anderson for this replacement and reinstall, if you turn to the second page, is $2.67 million. Do you see that?

A. Yes.

Q. Do you have any idea how much the waterproofing, the Swelltite and the Swelltite component system, was on the Promenade project?

A. No idea at all.

Q. Do you have any idea what this exact replacements and reinstallation itemization would have cost

in dollars -- or in 1997?
A. I'd only be taking an educated guess.
Q. All right. Do you have any idea what restrictions for budgeting, if any, bidders for the waterproofing were operating under for the Promenade project?
A. Back then originally?
Q. Yes, sir.
A. No, I have no idea.
Q. Did you ever ask Mr. Healey?
A. No.
Q. Did you ever ask Mr. Healey if he would have accepted and paid for a bid of $2.67 million for the waterproofing system originally on the Promenade?
A. I never asked him that question.
Q. Now, the system that you've identified by drawing -- and am I correct that Q and R represent -- actually, is it P, Q, and R that represent cutaways of the system that you would --
A. The proposed --
Q. -- recommend?
A. -- yes.
Q. All right. I'm sorry. Did you say "posts"?
A. Proposed.
Q. Oh, proposed. I'm sorry.

A. Yeah.
Q. All right. I want you to assume that for whatever reason, the precast level -- the precast deck was just going to remain flat, no sloping concrete topping was going to be applied. Would that be a concern for you as somebody being asked to bid a system such as you've designed here?
A. As a waterproofing contractor?
Q. Yes, sir.
A. Yes, it would concern me.
Q. And would the system that you've even proposed here, and it's all described as far as the various components in the drawings and then the price list, would just the waterproofing components in that system alone such as you said Brent Anderson definitely would install, would that be adversely impacted if all the other conditions that you've described in your report were still in existence?
A. Yes.
Q. And that includes all the drain details that you've talked about, the soil details, the level of the soil and those things. In other words, would it really matter in terms of the efficacy of the waterproofing whether the kind of waterproofing components that were in what Brent Anderson evidently proposed here or any other waterproofing system, if all those other conditions

remained the same?

MS. HEYER: Object to the form of the question.

MR. HULL: Yeah, I'm going to object because I really have no idea what you're asking.

A. Yeah. I'm happy to answer, but you'll have to repeat it there.

BY MR. BROWN:

Q. All right. Let's try and break it down a little bit. Was the system that's proposed here -- I'll ask you this: Would you be concerned enough to insist that a change be made if you knew that the posts were still going to be anchored directly to the precast such as the condition at the Promenade?

A. Yes, I would.

Q. Would you be concerned enough to demand a change if the drains were still going to be configured in the same way and have the same filter fabric issues and so on and so forth as you've described earlier today?

A. Yes, I would.

MS. HEYER: Object to the form of the question.

BY MR. BROWN:

Q. Would you have the same concerns and insist on a change if the soil in terms of its composition and

compaction was as exists in those courtyards --
A. Again --
Q. -- as you're proposing in this product --
A. Yes, I would.
Q. -- or this system?
A. Yes, I would. Of course, this system does take care of the backfill. I call out free-draining backfill.
Q. I understand. You change the backfill in your system, don't you?
A. Yes.
MR. RAU: You're not going to ask him whether Waterproofing By Experts demanded those changes, are you, Mark?
BY MR. BROWN:
Q. That does lead to a question. Do you have any idea why the posts were installed the way they were installed?
A. The repair or the original design?
Q. Originally.
A. I have no idea.
Q. Now, you've been trained as an architect and went to school and obtained a degree in architecture; is that right?
A. That's right.

Q. Have you acted as an architect for an overall project in your professional past?
A. Definitely.
Q. And if you as the project architect were to be specifically approached by a supervisor or a foreman for the general contractor asking for specific specifications and construction details and you responded to that request with construction details, would you expect that to be followed by the trades on the project?
MR. HULL: I object to the form of the question, lack of foundation.
A. I would expect that.
BY MR. BROWN:
Q. And if in fact you were to be told that in this case the architect, Mr. Feges specifically, was approached by a supervisor for Weis asking how to install the posts to the precast and how to waterproof that detail and he actually specifically responded with a method of installing the posts and for waterproofing, would you expect the trades involved in both the installation of the posts and the waterproofing to follow that architect's specification?
MR. HULL: Objection, foundation.
A. It all depends on the contractual relationships. Were I in the architect's position in that

scenario you just laid out, I would be reluctant to offer any design having to do with waterproofing since my firm is not being paid for that service.

BY MR. BROWN:

Q. I want you to assume for the purpose of this question that the architect was approached with that exact request and specifically responded. In that case, would you expect that whatever trades were involved in putting that detail into practice would follow that detail?

MR. HULL: Object again to foundation.

A. No, I would not expect it. It depends on the contractual situation. I would understand the architect volunteering a design like that for the overall good of the project, but I could also understand the contractor feeling no obligation to follow that design.

MS. REISBORD: Mark, why don't you break it down to fixing versus --

MR. BROWN: Fixing? Affixing?

MS. REISBORD: Fixing.

MR. BROWN: You can do that.

BY MR. BROWN:

Q. Do you know why the dirt ended up in the courtyards several inches above the top of the concrete block walls?

A. I confess people have tried to explain the

circumstances sounding that decision, but I don't fully understand what took place.

Q. Do you know whether any recommendation was made by the waterproofing contractor to the general contractor, owner, and architect to put a counterflashing material at the point where the concrete block walls met the wooden construction members above?

A. I hadn't heard one way or another.

Q. Did you read the deposition of Steve Messerich?

A. Yes, I believe I did. Yes.

Q. Do you recall reading him testifying about making that recommendation?

A. Not offhand I don't.

Q. Did you read the whole thing?

A. Yeah. Well, I'd say 90 percent.

Q. Maybe that was in the 10 percent you didn't read, huh?

A. Well, I skipped over some of the beginning stuff.

Q. Just a couple questions actually about the drain board now. What's the purpose of drain board, sir?

A. Drain board or composite drainage sheet, as it's both to referred to as, is to provide a medium in which water can be managed below ground.

Q. What do you mean by "managed"?
A. Routed to various collection points.
Q. Drains?
A. Drains for one.
Q. To assist in draining the water off the decks; correct?
A. That's right.
Q. Out of the courtyards?
A. Yep.
Q. Now, with the conditions that you observed on-site and which are included within your report, was any water that was routed through the drain board going to get off those decks?
A. Not really --
MS HEYER: Object to the form of the question.
A. -- because of the height, the lowest height -- because of the height of the lowest perforation through the drain bar.
BY MR. BROWN:
Q. Would you say that the drain board in the conditions that existed in those courtyards was irrelevant given the flat surface and what you just described there?
A. I would say it was indeed irrelevant apart from the protection aspects that offered the waterproofing.

Q. And you agree, do you not, that some fines are expected to filter into the grooves in that drain board; correct?

A. Yes, some fines. Right.

Q. And the way those fines are conveyed through the drain board depends upon the surrounding conditions such as slope to drain and some of those other conditions that you've described; correct?

A. That's true.

Q. And the reason that fines would clog up a channel in a drain board would be because it wasn't being conveyed the way it should; correct?

MS. HEYER: Object to the form of the question.

A. Could be for a number of reasons.

BY MR. BROWN:

Q. Did you investigate the actual reasons or expected reasons for the clogging that you observed?

A. There was one -- there was one situation in particular at one of the destructive test openings that I talked about where the drainage composite sheet was absolutely packed solid with mud. In fact, there's a photograph in here of it, and I believe in that case it was largely because the top end was not properly wrapped with the filter fabric component -- or the top edge rather like

the manufacturer recommends.
Q. Was that at a side wall in the courtyards?
A. It was.
Q. At a site where some of the repairs that you learned of took place out there?
A. No. None of my destructive test openings were at a repair -- excuse me. That's not true. But to answer your question, that particular example of the drainage composite sheet being full of mud, that was not at a repair.
Q. You didn't -- first of all, it doesn't matter, you've already said, because the drain board was serving no function given the rest of the conditions in those courtyards; correct?
A. On the vertical it is.
Q. What's the water that filters through the drain board on the vertical going to do when it gets to the bottom?
A. Well, if hydrostatic pressure up within the soil can be dropped down so it's not coming in contact with the vertical waterproofing, it helps the waterproofing do its job.
Q. But the water has to go somewhere still; correct?
A. Exactly. When it gets down to the bottom,

then you're right.

Q. And you also observed in the conditions that you make any mention of it, that the backfill that you examined or touched or whatever you did was saturated with water? It was muddy; correct?

A. Highly saturated, yes.

Q. Water is just staying in those courtyards basically with the configuration that you've seen; correct?

A. Not only because of the two inches we've talked about because of the perforation, but also because of the type of soil. It had a very high clay content which does not percolate water very well.

Q. Brent Anderson's -- again assuming and I guess you've testified that you heard it was Brent Anderson who pitched in with the waterproofing component of this kind of proposed bid --

A. Yes.

Q. -- specifically indicates no drain board on the vertical surfaces; correct?

A. To tell you the truth -- well, I'm assuming -- I was instructing CPMI to base their estimate on this prototypical design that I offered here in these three pages, P through R.

Q. Well, it says here, unless I'm misunderstanding the term, under the "thermoplastic

membrane, protective line sheet, drain board, insulation drain board, horizontal," nothing next to it, "vertical without drain board." Do you see that? I'm sorry. It's in the estimate part.

A. Oh, no. I'm sorry. My design doesn't call for the drain board on the vertical, so they were following my design.

Q. So vertical drain board isn't even required; correct?

A. No. I didn't think it was necessary for this design.

Q. Why not?

A. Because the soil was of a better quality as far as percolation characteristics than what was in there right now, and the waterproofing was, in my opinion, far superior to the Swelltite material. It can withstand a lot more hydrostatic pressure.

Q. And that's Brent Anderson's system basically, isn't it?

A. No. It's my system.

Q. It's Brent Anderson waterproofing; correct?

A. I don't know what you're asking.

Q. The waterproofing that you just said is much better than Swelltite is what Brent Anderson installs?

A. Well, they install what the architect

designs. This is my design. They base their number on this design.

Q. You've just said it was Brent Anderson's waterproofing that's in this number; correct?

MR. RAU: Objection, misstates the evidence.

A. It's their number, yeah. It's their cost to installing my design.

BY MR. BROWN:

Q. Look at page 3. I guess it's the third page anyway, the second page of text in Exhibit 808.

A. This one right here (indicating)?

Q. Yes. Is that your handwriting as well?

A. Yeah.

Q. Was this a list summarizing a conversation you had with somebody before you did your investigation?

A. Give me a minute to read it here.

MR. RAU: Mischaracterizes the evidence as well.

MR. BROWN: Well, I don't think there's any evidence of that. I'm asking him what it is.

MR. RAU: I don't think that he's testified that this is a checklist that he made in doing the investigation.

MR. BROWN: I'm just asking him if it

was.

A. It's just a miscellaneous laundry list of key issues that I wanted to either address or look into further.

BY MR. BROWN:

Q. And I'm asking you if this list was created in conjunction with or in connection with any conversations you had with anybody at the beginning of your involvement?

A. No, not right off the phone I'm sure because I can tell by the style. When I'm talking on the phone, I don't use a hash mark in front of each item like this.

Q. Okay. Well, let's go through a couple of them. It says about halfway down "original construction in Feb '97 wp" which I assume --

A. Waterproofing.

Q. "Save time," what does that mean?

A. "Original construction in Feb '97 waterproofing save time." I haven't a clue. I don't know what the "save time" part means.

Q. Did you converse at all with either Mr. Healey or Mr. Ramme or both early on when you were just beginning your investigation or when you were called to conduct an investigation?

A. Oh, sure. There were a lot of phone conversations, mostly with Mr. Healey.

Q. Did Mr. Healey give you some data that resulted in at least this line of the list you're looking at?

A. He may have told me it was constructed in '97, but I could have also taken those off the drawings too.

Q. So you don't remember as you sit here what the "save time" phrase relates to?

A. I really don't, no.

Q. What does the following line mean, "original wp," waterproofing, "was used everywhere"?

A. "Original waterproofing was used everywhere." Oh, I wanted to make sure that once I did discover what was specified, regardless of who specified it, was that typical throughout the whole project. I've done investigations where some buildings were built subsequent to others and different waterproofing products were used, so I wanted to make sure that whatever was specified, it was typical of the entire complex.

Q. Were you asked, by the way, to investigate any waterproofing outside of the -- outside of the scope of the actual courtyards themselves?

A. No, I wasn't.

Q. So whether there was any waterproofing originally specified or installed kind of in the area of the 1-2 link, for example, and some other --

A. In the area of the what?

Q. The Building 1-2 link that Mr. Reilly was telling you about.

A. Oh, link.

MR. HULL: I'll object to the form of the question.

MR. BROWN: Let me finish it first, Bill.

BY MR. BROWN:

Q. Whether that was done or not, you don't know because you weren't asked to investigate?

A. That's correct.

MR. HULL: Now I'll object to the form of the question.

BY MR. BROWN:

Q. Now, you also were asked about Braun Intertec's studies which were furnished to you by somebody at Healey Ramme; is that right?

A. That's correct.

Q. Did you notice that Braun actually had a drawing that reflected the waterproofing membrane installed by my client extending underneath those posts?

A. I wasn't aware of that.

Q. You're aware that that's not accurate; correct?

A. As I understand it, the subsequent repairs take that approach.

Q. Right. I'm talking about the original drawings of the existing conditions out there.

A. That's correct. The original drawings do not have the waterproofing going under the posts as I recall.

Q. Well, we're two ships passing in the night here.

A. Sorry.

Q. And it's sort of secondary. You were aware and you observed during your investigation that waterproofing was not installed before the posts were anyway; correct?

A. Correct.

Q. You wouldn't have recommended that; was that your testimony?

A. I would have recommended that.

Q. You wouldn't have recommended the actual existing -- originally existing posts -- let me start this whole thing over. As originally constructed, the posts were installed and secured to the precast decks before the waterproofing membrane was applied to the courtyards, correct, or to the precast surfaces; correct?

A. That's correct.

Q. And you've testified that that wouldn't -- and

I don't have a quote for what you said, but you wouldn't recommend that sequence; correct?
A. That's correct.
Q. In fact, you consider that a poor and improper construction method with respect to the posts and the waterproofing membrane?
A. With those same materials and that same method, yes, that's inappropriate.
Q. Now, is it fair to say that the mastic that you've been asked questions about that was applied to portions of those posts wouldn't even have to be applied at all if the membrane was covering those whole precast surfaces before the posts were installed?
A. That is true.
Q. And the second to last line again on this page 3 though where you say "Braun investigated soil met specs," now, in your own report and in fact in your recommended replacement details, you distinguish between the soil that was outside the scope of the courtyards and the soil that would have been necessary for proper drainage within the courtyards; correct?
A. Uh-huh.
Q. Correct? Say "yes."
A. Yes. I'm sorry.
Q. And the soil that Braun evidently reported met

specifications was not the soil within those courtyards; correct?

A. I was told it was the soil in the courtyard.

Q. But you had specified a different soil composition for your own project; correct?

A. That's correct.

Q. Have you ever been involved in a project that had a kind of hybrid, to use your word, relationship between the parties? And I'll specify you when I'm asking about the word "hybrid" to the back page of Exhibit 810.

A. Uh-huh.

Q. Yes, you have?

A. Yes, I have.

Q. What about that? What was the hybrid component of that project?

A. Oh, I thought I was responding in the affirmative to --

Q. Okay.

A. By recognizing the --

Q. Let me ask you again. I'm referring to your diagram of a traditional versus a -- a traditional relationship versus a design-build relationship --

A. Yes.

Q. -- on the back of Exhibit 810. Have you ever been involved in a project that had the kind of -- you use

the word hybrid relationship that now you understand supposedly existed at Promenade?
A. I don't believe so.
Q. The Seamtape itself is not a waterproofing product; correct? It's not composed of bentonite or HDP; correct?
A. That's correct.
MR. VEITH: Object, lack of foundation.
BY MR. BROWN:
Q. If you know, the Seamtape specified by CETCO that is.
A. It is implied by the literature that it is not an integral part of the watertightness integrity of the membrane.
Q. I'm trying to understand my own notes which is a challenge. There's a couple more things from your various diagrams and that's about it. Did you ever see the subcontract between my client and the general contractor?
A. I don't believe so. If I was given any -- I don't know whether I've been given any --
MR. RAU: You've answered the question.
BY MR. BROWN:
Q. You don't think you ever saw it?
A. No.
Q. And I think you've answered this question, and

I apologize if I'm being repetitive. You weren't assigned the task or you weren't charged by Mr. Healey and Mr. Ramme with investigating the contracts or the contractual relationships between the parties?

A. Definitely not.

Q. Now, you've given some testimony and your drawings also include some comments that flashing material was not protected; correct?

A. Correct.

Q. Unless it specifically says so on any of your lettered diagrams if you've observed that -- if you observed that condition, it wasn't damaged unless you said so in your drawing; right?

MR. RAU: I don't understand the question.

A. Yeah.

BY MR. BROWN:

Q. Well, for example, like for example on Exhibit F or letter F you start off "flashing is either Volclay Swelltite term tape or self-adhering butyl-based material," then in parens "no protection"; correct?

A. That's correct.

Q. Unless it says "damaged" or "punctured," that was just an observation you were making; correct?

A. That's correct at that DTO Number 5.

Q. Right. And you've already testified that what actually provides the containment for the waterproofing membrane itself is the earth fill. That's the function of specifying the pressure and so forth; right?
A. The need for specifying proper compaction --
Q. Compaction, thank you.
A. -- is to properly contain the bentonite. That's one of the reasons.
Q. And the method of containing the bentonite is the fill and the proper compaction of the fill; correct?
A. That's correct.
Q. Now, just as I think you answered some questions earlier about not knowing the age of various stains or efflorescence and so forth on the project, let alone their source, you don't know when the various conditions that you have written about in your report were originally constructed or installed or came into existence; correct?
A. Other than to discern between the subsequent repairs versus the original construction, no.
Q. Were you ever shown a drawing that was made by Mr. Hanuschak -- actually, I'm going to ask this question first: Did you review Mr. Hanuschak's deposition?
A. I don't believe so.
Q. Do you know who he was?

A. No.
Q. Did you ever review a drawing by somebody named Mr. Hanuschak that was called a Sketch 2 and it had to do with -- well, first I'll just ask if you ever saw that?
A. No.
Q. Do you know anything about a change in the way the floor trusses were set on the concrete blocks during the course of construction?
A. A change?
MR. RAU: Asked and answered.
BY MR. BROWN:
Q. Were you asked that? I'm sorry if you were.
A. Yeah. I didn't know anything about it.
Q. I think that's it. Oh, I'm sorry. I did have one, and if you were asked this during the first 15 minutes when I was late, I apologize. How did you hear about this Mr. Perales and Mr. Rutila?
A. Steve Rau's office brought them to my attention.
Q. How did they bring those persons to your attention?
A. Via an e-mail that was actually sent by Laura Semke of their office.
Q. Was that e-mail furnished in connection with

producing the rest of your file?

MR. RAU: It's right there (indicating).

BY MR. BROWN:

Q. Okay. I didn't see that.

A. I just got this Monday.

Q. I don't think I've seen that.

A. Or rather September 30. That's when it was sent.

Q. Can I see it real quick?

A. Yep (handing).

MR. REILLY: Can we mark it quick?

(At this time Campbell Deposition Exhibit Number 811 was marked for identification by the Court Reporter.)

MR. BROWN: Let's go off the record for one second.

(At this time a discussion was held off the record.)

BY MR. BROWN:

Q. Was there any follow-up planned based on any conversations you had with either of those two gentlemen?

A. No.

Q. Did you get whatever information you think you needed or wanted from them?

A. You can always use more, but I was satisfied.
Q. Do you have any further plans to go out to the Promenade to conduct any further testing or investigation?
A. Not at this time.
Q. Have you reviewed every single document thoroughly other than the 10 percent of my client's deposition that you haven't read that you've been produced in connection with your assignment in this case?
A. Not every single one, no.
Q. Did you intend to review any more or read any more -- let me ask it this way: Whatever you haven't reviewed, do you plan to?
A. Frankly, no.
Q. And if you do and if any review that you do changes your opinions in any way, you will advise your attorney as you're required to do anyway?
A. I shall.
MR. BROWN: That's all I have, sir. Thanks a lot for being patient.

CROSS-EXAMINATION

BY MS. REISBORD:
Q. I've got just a few. Not enough to justify moving. Mr. Campbell, my name is Andrea Reisbord, and I represent Westfield Insurance in this case. Can you turn

to page 6 of your report. I want to ask you about conclusion 1B regarding the waterproofing membrane being subject to damage during construction. Are you saying in 1B that the membrane was actually damaged during construction or that it was subject to conditions where it could have been damaged?

A. It was subject to conditions whereby it could be damaged.

Q. As you sit here today, do you have any information whatsoever that it in fact was damaged during construction?

A. No, I do not with respect to the horizontal installation of the membrane.

Q. Was 1B referring specifically to the horizontal or was that referring to both the horizontal and the vertical?

A. It was referring to both the horizontal and the vertical.

Q. What information do you have regarding the vertical, if that was subject to damage or was damaged during the original construction?

A. There were a couple destructive test openings on the vertical where I make note of damage to the -- not the Swelltite on the vertical but rather the self-adhering product.

Q. You're talking about the Chris Craft product?
A. The -- well, the self-adhering Miradri product I believe.
Q. What was the damage that you observed to the Miradri?
A. I'll have to leaf through my destructive test opening sketches here if you can bear with me. Detail K, I'm correcting myself. It was the Swelltite 3000. I note that on the vertical installation it appeared as though the bentonite had once been hydrated but was now dry and cracked.
Q. And how do you trace that to something that occurred during the original construction?
A. I'm sorry. I can't. That is not an example of what you're asking.
MR. RAU: Maybe you should restate the question so we've got it in mind and listen to what she says.
THE WITNESS: Okay.
BY MS. REISBORD:
Q. The question was what conditions -- damaged conditions did you observe that you relate back to damage -- or damage that occurred at the time of the original construction?
A. I can't cite any examples that happened

definitely at the time of original construction.
Q. Can you turn to Exhibit 791. Those are your handwritten notes. On the first page, three lines down from the crossed-out line you've got a reference to Weis Builders, Westfield Insurance, and Valley Forge Insurance.
A. Uh-huh.
Q. Do you know why you've got the notation of Westfield and Valley Forge on your notes?
A. It was becoming apparent there was so many players involved in this entire drama that I just wanted to get these names down somewhere so if someone referred to them. There's no particular reason why they're all together on the same line.
Q. And they are listed because they are parties to this lawsuit? Is that --
A. Either parties or very interested organizations, yeah.
Q. Did you specifically ask for any information from Promenade regarding or Healey Ramme Company regarding insurers of any of the parties?
A. No. It was of no interest to me.
Q. In fact, that's not even relevant to any -- insurance coverage one way or the other is not relevant to your investigation?
A. None whatsoever.

MS. REISBORD: That's all I have. Thank you.

MR. RAU: Leo.

CROSS-EXAMINATION

BY MR. BRISBOIS:

Q. My name is Leo Brisbois. I represent Valley Forge Insurance Company. I just wanted to clear up something that I had in my own mind. You were not involved or retained to consult or participate in any of the remedial measures that were undertaken at the Promenade in an effort to prevent future leaking; is that correct?

A. That is correct.

Q. And then the next question is therefore you're not here today offering any opinions regarding those remedial measures?

A. No. I was retained to offer an opinion on the remedial measures as well as the original design, and I so state in my report.

MR. RAU: I think he's getting confused about GID's proposed remedial measures and his.

BY MR. BRISBOIS:

Q. I'm not talking about the remediation design that you've come up with or that GID is contemplating. I'm talking about the remedial measures that were undertaken in

'98, '99, 2000, 2001.
A. I was not involved in the design of those. I was hired to evaluate those.
Q. In what regard?
A. Their effectiveness as a remedial measure.
Q. You're talking about long-term effectiveness?
A. Yes.
Q. But not for the purpose for which they were originally undertaken? I mean, by that I mean since you weren't involved when they were originally undertaken, you were not a party to discussions or plans or intentions of the people who came up with those measures and implemented them?
A. That's correct. I was not.
Q. Have you interviewed anybody to come up with that information?
A. No.
MR. BRISBOIS: That's all I have.

CROSS-EXAMINATION

BY MR. VEITH:
Q. I have some follow-up. Mr. Campbell, have you only had one conversation with each of those two individuals, Mr. Perales and Mr. Rutila?
A. Yes.

Q. One apiece?
A. One apiece, right.
Q. And those conversations have been since Monday?
A. One was -- I talked to -- no. I talked to both of them Monday, yes.
Q. Monday?
A. Yes.
Q. How long did you talk with Mr. Perales?
A. It wasn't very long, maybe two, three minutes. He was in a hurry.
Q. Did you call him then?
A. I called him, yeah.
Q. Tell me what was discussed as much as you can recall.
A. I said I was providing expert testimony in a case that involves Swelltite 3000 and that the attorney that I was working with had told me that he did an investigation on another project, the Medical Center of Ohio, that also had Swelltite 3000 installed. And I asked him -- I said "I'm just calling up to touch bases with you to see if you can offer any general information that someone in my situation would find helpful," and he right away responded with "Oh," and then I'd also -- I also told him that I had found samples of the Swelltite in our

project that did have some film remaining, and I said "Was that true in the case of your investigation as well?" and he said "Yeah, it sure was. In fact, I still have some film in a test tube of water that still hasn't disintegrated," and that's almost verbatim. In fact, those notes are margin notes on that new exhibit. And then he said he was in a hurry, and I said well, could I call him back sometime, and he said "Sure, but you'll have to call my cell phone number when I'm in transit tomorrow morning around 10:00." Well, I didn't call him. It just slipped my mind. So that was the only conversation I had with him.

Q. And that's the extent of the conversation?

A. That's it, yeah.

Q. How about the conversation with Mr. Rutila?

A. It started out by just reminding him who I was because I had been at a couple seminars in the past where he spoke about waterproofing. He knew Inspec very well but he did not remember me, which doesn't surprise me. I said pretty much the same preamble to him as I did to the other gentleman as far as my involvement in this case that also had Swelltite 3000 involved in it, and I asked him also if there were samples where there was film remaining, and he said there was. And then he started offering his theory or his reason why he thinks sometimes the film doesn't always disintegrate.

He told me that polyvinyl acetate, which he said is what the film is basically made up of, has a tendency to vulcanize or cross-bond, cross-link, and what that means is smaller molecules link together to form larger molecules and that keeps the material from disintegrating the way it's designed to and that condition can be brought about by -- based on heat and time.

Then I said "Well, do you mean that maybe some rolls of the product were stored too long in too warm a situation?" and he said that might have -- that's one way it could have happened. He also then said if you took some of the film fresh off assembly -- fresh out of the factory and just put it on your desk for some time, it would vulcanize by itself. Those are almost his words. And I must admit this was new information to me. I'm not a chemical engineer, so I hadn't heard this analysis before.

Q. Is that the extent of the conversation then or is there more that he told you?

A. No, that's it.

Q. Do you know what his background is, Mr. Rutila's background?

A. I think he's a registered engineer. I don't believe he's a registered architect. I think he's a registered engineer.

Q. Do you know what kind of engineer?

A. No, I don't.
Q. Do you know whether he knows anything about chemistry in general?
A. I can't say.
Q. Do you know whether he knows anything about the chemistry of the film aside from what he told you? Does he know the chemical makeup for example?
A. I don't know anything further than what he told me.
Q. Did he tell you about any tests that he did?
A. I don't believe so, no.
Q. He was giving you in essence then unproven theories that he thought might apply but wasn't really sure?
A. I can't say whether they're proven or not.
Q. Did you document either of these conversations aside from this Exhibit 811?
A. Just the margin notes, yeah.
Q. Could you tell me how you -- what the difference is or how you can tell what the difference is between construction water and evidence of infiltration?
A. One always -- one can't be 100 percent positive all the time, but generally speaking, construction water has a lot of mineral deposits in it, what appear to be mineral deposits. It's the lime of the concrete. Very

often when we say "construction water," it's most often associated with the water from fresh mortar, in the case of this project, the keyway -- the mortared keyway joints between the planks. If there is actually a suspended residue at the drip point in a project this recently built, it's most likely not a watermark because for a stalactite to develop from dripping water takes a much longer time. It most probably is construction water.

MR. BROWN: I'm going to object belatedly as lack of foundation. He's answered the wrong question.

MR. VEITH: I don't have any more.

RECROSS-EXAMINATION

BY MR. HULL:

Q. I've got just a couple. Mr. Campbell, when Mr. Stepan was asking you questions, you testified that you would expect the architectural drawings to show a slope to the drain on the precast plank; is that right? Do you remember that testimony?

A. Yes, I do.

Q. I want to give you some facts and ask you if these facts would change your testimony; okay?

A. Okay.

Q. The architectural drawings were dated in

August of 1996 with the latest revision in September of 1996. The contract with Waterproofing By Experts is dated February 20 of 1997 and is signed by Waterproofing By Experts on March 10, 1997. That contract contains the following language: "This contract is for the design-build waterproofing system for the plaza areas. This subcontractor is completely responsible for providing and maintaining a watertight system. It is noted that this is a design-build contract and all incidental for the scope of work are included under this subcontract. Subcontractor is to be 100 percent responsible for design criteria." Now, with those -- knowing those facts, would that change your testimony as to whether or not you would expect the architectural drawings to show a slope to the drain as part of the waterproofing system?

MR. STEPAN: Objection, incomplete hypothetical.

MR. REILLY: Objection.

MS. HEYER: Same objection.

MR. BROWN: Objection; form of the question, improper hypothetical.

A. Yes, it would.

BY MR. HULL:

Q. And why is that?

A. Part of a waterproofing design is the managing

of subsurface water or subsurface drainage provisions. An integral part of good subsurface drainage provision design is the slope of the waterproofing, in other words, a tapered concrete topping. If the architect absolves himself of any responsibility of waterproofing design, then I could understand the architect not addressing the slope of the tapered topping.

Q. Are you also aware that the mechanical systems and the electrical systems for the project were design-build in addition to the waterproofing?

A. That I wasn't aware of, no.

MR. HULL: Thank you.

RECROSS-EXAMINATION

BY MR. REILLY:

Q. Sir, I'm looking at Exhibit 811, and I'm going to just read that according to Ms. Semke's memo to you, she says "The overall conclusion" -- she's talking about Tony Perales -- "The overall conclusion is that faulty installation of Swelltite caused the problem." Do you remember reading that?

A. Uh-huh.

Q. That's a "yes"?

A. That's a "yes." I'm sorry.

Q. When you talked to Mr. Perales, did you

discuss that as being the case?

A. Actually, we didn't, no.

Q. And she also talks in paragraph number 2 about Dean Rutila that "confirmed Poggemeyer's conclusion that it was improperly installed." Did you talk with Mr. Rutila about that conclusion?

A. Not that it was improperly installed, no, we didn't.

Q. And as I read this e-mail to you, Ms. Semke was informing you that neither person indicated that in their opinion the cause -- the overall conclusion was that the cause of these leaks was a defective product but was in fact faulty installation. Was that your understanding as well?

A. Yes.

MR. REILLY: Thank you.

MR. STEPAN: I've got one.

MR. RAU: Not to leave this horse unwhipped.

MR. STEPAN: That's right.

RECROSS-EXAMINATION

BY MR. STEPAN:

Q. Mr. Campbell, you testified a little bit here today about this Exhibit 810 and the design-build versus

traditional relationships, and, as you explained, it's your understanding that what existed here in this case was the hybrid between the two; isn't that correct?

A. That's correct.

Q. With your understanding of the relationships here, this hybrid relationship, if the architect made changes to its drawings, to its scope of the project that impacted the design-build work, would you expect the architect to make sure that the design-build work and his work were going to be on the same page?

MR. HULL: Objection to the form of the question.

BY MR. STEPAN:

Q. And that they were going to be able to coordinate?

A. Explain "be on the same page."

Q. Would you expect that the architect -- assume the architect made changes to its drawings that are going to impact what the design-build work is going to involve.

A. Okay.

Q. Would you expect the architect to communicate and coordinate with the design-build people to make sure that change is known and to make sure that the design-build work is going to mesh with the architectural work?

A. I would expect him to do that, yes.

Q. It would be good practice to do that, wouldn't it?
A. It would be.
Q. You would do that?
A. I would.
MR. STEPAN: That's all I have.

RECROSS-EXAMINATION

BY MR. BROWN:
Q. You weren't asked to give opinions about the responsibility in this particular project for ensuring that there was slope to grade, were you?
A. Repeat the question. I'm sorry.
Q. You were not charged with the task by Mr. Healey and Mr. Ramme with determining who was responsible, if anybody, for ensuring that there was a slope to the grade?
A. No, I was not.
Q. And that would include a concrete topping or some other method of sloping on the precast planks; correct?
A. Correct.
Q. So regardless of what questions and limited information Mr. Hull gave you, you do not have an opinion to any reasonable degree of certainty as an architect or

engineer with respect to that responsibility; is that true?
A. I have an opinion. I wasn't hired to offer it though --
Q. All right.
A. -- in answer to your question.
Q. You haven't been provided with enough information nor have you investigated that issue; correct?
A. I believe I have enough information.
Q. Based on what? What information do you have?
A. To the timing of the contractual agreements.
Q. Did you review any of the contracts that Mr. Hull gave you snippets from?
A. Not prior to today, no.
Q. Wouldn't you want to review the contracts before rendering such an opinion?
A. Based on the dates and if what Mr. Hull says is true, that the architect is absolved of any design responsibilities with regard to the waterproofing or drainage, then I stand by my earlier testimony.
Q. So you're basing your answer on the question that came out of Mr. Hull's mouth and no more; correct?
A. That's correct.
Q. And, sir, one last thing: Are you familiar with -- you're an architect and you went to school, I presume, one class a week and it had to do with AIA

documents?

A. Correct.

Q. Do you know what "AIA" stands for?

A. Yes. I'm a member.

Q. Do you know whether there is such a thing as the standard form of an agreement, an AIA contract specifically designed to be effective between an owner and a design-builder?

A. Yes, I believe there is a design-build form.

Q. Do you know what was in place on the Promenade project?

A. No, I don't know.

Q. Do you know though under the specific AIA contract document between owners and design-builders that the owner has to first provide extensive program and criteria to the design-builder?

A. I'm familiar with that language in the more conventional form of the traditional scenario. It stands to reason it would also be in AIA's design-build format as well.

Q. And you're not aware though of any AIA form, a hybrid kind of -- kind of traditional, kind of design-build contract, are you?

A. I'm not aware of any.

Q. But you understand and you learned in

architectural school and in practice as a professional performing architectural services that the purpose of the owner retaining the responsibility to provide extensive program and criteria to the design-builder is so it's own -- the owner's own experts can oversee and make sure components of the project are coordinated; correct?

MR. HULL: Object to foundation and to the form of the question.

A. That's one of the reasons.

MR. BROWN: I don't have anything more, sir. Thanks.

DIRECT EXAMINATION

BY MR. RAU:

Q. I have a few. Mr. Campbell, I want to direct your attention to your report and in particular, paragraph 3 on page 4 where you addressed design errors. The first time you were deposed Mr. Sonnesyn was asking you about the listing of design errors that you had. Do you see that section?

A. Yes.

Q. And in particular, he first asked you about the first sentence of paragraph 3, and he asked you whether that was a scientific opinion. Do you recall that testimony?

A. Yes, I do.
Q. Is "None of the 30 courtyard drains are draining adequately to keep up with the surcharge of water for the following reasons" a scientific opinion?
A. It is even though originally I said it wasn't, and it's a matter of definition of "scientific." I guess I was using too narrow a focus of definition for proceedings like this. When someone says "scientific" to me, I was thinking it could be distilled down into a formula or something, but I retract that and I'd call that a scientific observation.
Q. And similarly you had the same testimony with respect to paragraph 4. You said the top sentence, number 4, is an opinion. Do you see that?
A. Yep. I'm reading it.
Q. Is that a scientific opinion?
A. Yes.
Q. Is it an opinion that you base on technical expertise?
A. Yes.
Q. I want to turn a minute to Mr. Stepan's questions on gutters. Would the installation of gutters by themselves have solved the water leakage problems that existed in this courtyard?
MR. REILLY: Objection, lack of

foundation.

MR. VEITH: Join.

A. It would have had no effect.

BY MR. RAU:

Q. Why not?

MR. REILLY: Same objection.

A. In addition to gutters, you have to have downspouts. The downspouts then, if they just dump the water into the courtyard bathtub, all you've done is collected the water in a different way, but you've delivered it to the same problematic area.

BY MR. RAU:

Q. What types of weather -- strike that. Would the installation of gutters create other additional potential problems?

MR. STEPAN: Objection, lack of foundation.

MR. REILLY: Join.

MR. VEITH: Join.

MR. REILLY: Beyond the scope of this expert's testimony and expertise and beyond the scope of cross-examination.

MR. RAU: List them all, Pat.

MR. REILLY: They're all valid.

MR. RAU: Mr. Stepan opened the door.

A. I guess I'd have to say I don't see any other problems that would be created by installing it. I just don't see it as solving any problem in and of itself.

BY MR. RAU:

Q. Could ice be a problem?

MR. REILLY: Objection, leading.

MR. VEITH: Calls for speculation.

MR. STEPAN: Join.

A. You're absolutely right. I retract my earlier answer. Ice buildup is more common when you have a gutter at the edge of the roof.

MR. RAU: Thank you. I'm sure that these gentlemen will want more now.

CONTINUED RECROSS-EXAMINATION

BY MR. BROWN:

Q. Are you saying that gutters in the configuration that you just described would be a bad idea out at the Promenade --

A. No.

Q. -- because of the ice issue?

A. Not necessarily, no.

Q. Do you know if there are now gutters out at the Promenade that tie into the below-grade drainage system?

A. No, there are not.
Q. When was the last time you were out there?
A. Some months ago.
MR. BROWN: I don't have anything more, sir.

CONTINUED RECROSS-EXAMINATION

BY MS. REISBORD:
Q. I've got actually one quick question. On the fee schedule that was attached to your CV, it notes that it's valid through October 31, 2002. Has that changed at all?
MR. RAU: Is that at the very back?
MS. REISBORD: It's the very front.
A. Yes. We have a 2003 version fee schedule.
BY MS. REISBORD:
Q. Can you give that to your counsel --
A. Sure.
Q. -- so he can circulate it?
A. Sure.
Q. And then on the front is a list of previous waterproofing projects. Are those all design projects or do any of them include any investigation?
A. I believe -- well, I'll run down the list: Health Science plaza was an investigation project that

turned into a design project. Minnesota State Capitol exterior terrace renovation was an investigation project turned into a design project. The same is true of Cargill office courtyard. Minnesota State Capitol dome lantern was only a design project. Central Elementary School leak repairs was both an investigation first and then a design project. GTC's vertical circulation at the airport was only a design project. Minneapolis/St. Paul airport tunnel and foundation waterproofing was only a design project.

Northrop Auditorium plaza restoration was both an investigation project and a design project. William Hall plaza restoration was investigation and design. Minneapolis Institute of Art was a design project only. Glen Sheen Mansion terrace restoration was an investigation and design project. West Bank bridge head was an investigation and design project. Tri-County Hospital was only a design project. Earth shelter waterproofing replacement was only a design project. Friendship Village garage commons expansion was only a design project, and the Kansas State Capitol was only a design project.

MS. REISBORD: That's all.

(Whereupon, at 1:25 p.m., October 8, 2003, the taking of the deposition of David William Campbell was adjourned.)

(UPON COMPLETION forward this original Reading and Signing Certificate to Attorney Hull, who already has the Sealed Original.)

DAVID WILLIAM CAMPBELL

I, David William Campbell, do hereby certify that I have read the foregoing transcript of my Deposition and believe the same to be true and correct (or, except as follows, noting the page and the line number of the change or addition desired and the reason why):

Page Line Change or Addition Reason

_____________________________________

Dated this _____ day of ___________, 2003.

BFS

STATE OF MINNESOTA )
) SS.
COUNTY OF WASHINGTON )

Be it known that I took the deposition of DAVID WILLIAM CAMPBELL, on the 8th day of October, 2003, at 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis Minnesota;

That I was then and there a Notary Public in and for the County of Washington, State of Minnesota and that by virtue thereof, I was duly authorized to administer an oath;

That the witness before testifying was by me first duly sworn to testify the whole truth and nothing but the truth relative to said cause;

That the testimony of said witness was recorded in Stenotype by myself and transcribed into typewriting under my direction, and that the deposition is a true record of the testimony given by the witness to the best of my ability;

That I am not related to any of the parties hereto nor interested in the outcome of the action;

That the reading and signing of the deposition by the witness was executed and evidenced by the preceding page;

That Notice of Filing was waived.

WITNESS MY HAND AND SEAL this ________ day

of __________________, 2003.

______________________________
Barbara F. Schwegman
Court Reporter