UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL FILE NO.: 00-CV-987 JEL/JGL

---

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: JON CAMAYA, VOLUME I OF II
TAKEN ON: THURSDAY, MAY 8, 2003
COMMENCING AT: 10:10 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586

and
Colloid Environmental Technologies, Co.,
Fourth-Party Plaintiff,
v.
Chris Craft Industrial Products, Inc.,
Fourth-Party Defendant,
and
J-Berd Mechanical Contractors, Inc.,
Fourth-Party Plaintiff,
v.
Mikesh, Inc.,
Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NOTES

Page Line

APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 - 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Company.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO BRISBOIS, Esq., Stich, Angell & Kreidler, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared via speakerphone representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE L. HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant and Fourth-Party Plaintiff J-Berd Mechanical Contractors, Inc.

BRIAN BAUMGARTNER, Esq., Baumgartner Law Office, LLP, 3320 West Owasso Boulevard, Shoreview, MN 55126, appeared via speakerphone representing Fourth-Party Defendant Mikesh, Inc.

LORI SEMKE, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, mn 55402-2440, appeared via speakerphone representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared via speakerphone representing Westfield Insurance Company.

# I N D E X


| | PAGE |
|---|---|
| Pursuant to Notice | 6 |
| WITNESS: | |
| Jon Camaya | 6 |
| Examination by Mr. Veith | 6 |
| Examination by Mr. Reilly | 75 |
| Examination by Mr. Brown | 87 |
| Examination by Mr. Stepan | 106 |
| Examination by Mr. Baumgartner | 185 |
| End of Volume I | 190 |


## INDEX OF EXHIBITS


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Camaya No. 591 | Field Report, November 13, 2002 | 17 |
| Camaya No. 592 | Field Report, December 4, 2002 | 17 |

THE DEPOSITION OF JON CAMAYA, is taken on this 8th day of May, 2003, at the Law Offices of McDermott, Will & Emery, 50 Rockefeller Plaza, 11th Floor, in the City of New York, New York, commencing at the hour of approximately 10:10 a.m. (Eastern Standard Time), pursuant to NOTICE:

JON CAMAYA,

called as a witness, being first duly sworn, was examined and testified on his oath as follows:

EXAMINATION

BY MR. VEITH:

Q Good morning. Would you please state your name for the record?

A My name is Jonathan Camaya.

Q And that's spelled C-A-M-A-Y-A?

A Correct.

Q Have you ever been deposed before, Mr. Camaya?

A Yes.

Q How many times?

A I'd say approximately three or four times.

Q Were those --

MS. HEYER: Can I ask both of you to speak up a little bit?

Q (By Mr. Veith.) Were those depositions that you gave in connection with your employment at Israel Berger & Associates?

A Yes.
Q And were you serving as an expert witness in those depositions?
A Yes.
Q So then you understand the rules, basic procedure that we're going to go through today in terms of how a deposition works and that sort of thing?
A More or less.
Q You understand that we can't talk over each other, that you let me finish asking my questions and then I'll give you an opportunity to answer the questions, but only one of us should speak at a time so that the court reporter can take us down clearly and accurately?
A That's understood.
Q And you do have to give verbal answers rather than nods of the head and shrugs and that sort of thing; you understand?
A Understood.
Q Okay. What's your current residential address?
A It's Jersey City, New Jersey. 72 Broadman Parkway, Jersey City, New Jersey.
Q Thank you. Would you give us a brief description of your educational background?
A I graduated from New York Institute of Technology in '92 with a degree in architecture, and I spent from 1988 to

'93 with the Army Corps of Engineers on a full time and reserve time basis. From '94, I worked for Israel Berger & Associates. In 2000, I worked for the firm of Prisco & Edwards, and now I'm currently back with Israel Berger & Associates.
Q Was your degree in architecture from the New York Institute of Technology, was that a bachelor's degree?
A Yes.
Q So you have a bachelor's degree in architect -- a bachelor of science in architecture?
A Yes.
Q Any other education after that?
A Other than continuing education, no.
Q What were you doing for the Army Corps of Engineers?
A In the Army Corps of Engineers, I was assigned to the 469th Engineering Battalion and we were responsible for renovation of existing army structures, barracks, various buildings, motor pools. It was essentially a construction battalion.
Q Did any of that ever involve working with waterproofing?
A On a limited basis, yes.
Q What do you mean by that?
A The installation of flashing around windows, sealing, coatings.
Q So at that point you were dealing with above grade type

waterproofing products?
A That's correct.
Q And you were in the Army Corps of Engineers for what, one year?
A Well, I was assigned from out of boot camp to the Army Corps of Engineers.
Q And then after -- again, you were in the Army Corps of Engineers for what, a year? How long were you in?
A The entire time was -- my entire service was with the Corps of Engineers. The 469th is an engineering battalion.
Q You went to Israel Berger & Associates in 1994?
A Right.
Q Did you leave the Army Corps of Engineers at that time?
A No. I was serving as a reserve there.
Q What was your initial position with Israel Berger & Associates?
A A field inspector.
Q What does that involve?
A Quality control, site monitoring.
Q What kind of projects are we talking about at this point in your career?
A Waterproofing.
Q Above grade or below grade?
A Both.

Q And did your position title change or did your job duties change during your time there?
A Yes.
Q When was the next job change, or the next position change, I should say?
A I'd say '96.
Q What happened in 1996?
A I was assigned to a project in the Midwest that involved more than just site monitoring and inspection. It involved the development of details, field coordination; more of a field management position.
Q So this project involved actual design work --
A Correct.
Q -- as well as, you know, monitoring the actual construction project?
A Yes.
Q What kind of a project was it?
A This was a repair, a waterproofing repair project. This involved repair of waterproofing in exterior walls, below grade, roofing, deck coatings, investigations, water leak tests.
Q What kind of a construction project was it? Was it residential?
A It was residential.
Q Multifamily?

A Yes.
Q So apartments or townhome type complex?
A This was apartments.
MR. BRISBOIS: John, you guys are fading out on us. You got to speak up, please.
MR. VEITH: I think we're both guilty of it.
Q (By Mr. Veith.) Now, what happened in 2000? You went from Israel Berger & Associates to Prisco & Edwards?
A That's correct.
Q But you're back at Israel Berger & Associates now?
A Yes.
Q When did you come back to Israel Berger & Associates?
A 2001.
Q And so you've been basically involved in waterproofing construction projects since 1994, when you first started with Israel Berger & Associates?
A Yes.
Q Okay. In your current position, are you involved in design as well or are you limited strictly to inspection and troubleshooting leaks and that kind of thing?
A I'm involved in all of those, from field investigations to design of solutions and inspection.
Q Do you hold any professional licenses?
A No, not currently.

Q Do you belong to any professional groups or organizations?
A RCI, Roofing Consultants Institute; CSI, Construction Specifiers Institute.
Q Anything else?
A That's all.
Q What percentage of your job would you say is devoted to working with below grade waterproofing systems?
A Percentage. Currently I'd say 40 percent of it, of my workload is with below grade.
Q And of that, how much is devoted to waterproofing below grade on multifamily residential construction?
A At this point, all of it.
Q All of it?
A Yes. Meaning all the projects I'm handling right now involve below grade are multifamily residential units.
Q How many projects prior to the Promenade project would you have worked on in which you were dealing with below grade waterproofing for multifamily residential housing?
A I'd say three projects I was involved with.
Q And was one of those projects the one that you were talking about earlier out in the Midwest?
A Yes.
Q Where in the Midwest was that project?
A That was in Ohio.
Q What was the name of it?

A That was the Adams Crossing project, Adams Landing and Adams Crossing.
Q What kind of waterproofing product was involved in that?
A For the below grade? It was bentonite, a bentonite clay system.
Q Do you know who the manufacturer was?
A I believe it was Paraseal.
Q I'm sorry?
A Paraseal.
Q Paraseal?
A Paraseal.
MR. BRISBOIS: John?
MR. VEITH: Yes, Leo.
MR. BRISBOIS: Can you move the phone closer?
MS. SEMKE: We can't hear hardly any of the answers.
MR. BRISBOIS: The questions are fairly audible, but the answers, we can barely hear them.
Q (By Mr. Veith.) Could you speak up?
A Yes, yes.
Q Okay. What kind of an application was involved with the Adams Crossing project? Did that have an underground horizontal deck of any kind?
A Yes. It was a clay-based waterproofing system applied

onto a horizontal deck above a multistory parking garage adjacent to private spaces on one side.
Q Can you give us a basic idea of what that product is and how it works just generally?
A Paraseal is -- the bentonite is a sodium morillonite, clay-based waterproofing. It's a natural product. Sometimes polymers are added to it depending on the use. When activated by moisture, it swells or increases in its volume 15 times its dry volume. The swelling is caused by an electrochemical process by which the molecules of the bentonite actually attract moisture, water molecules, until they are full, for lack of a better term, which restricts the acceptance of more water molecules. In this state, under pressure, confining pressure, it acts in a gel state as a barrier that is waterproofing.
Q So it works in a similar way to Swelltite? You're familiar with Swelltite 3000?
A Yes.
Q And it works in a similar way to that product?
A That's correct.
Q And does it have different composite layers to it, the plastic composite?
A Bentonite is known to be trowel applied or in tubes or applied to biodegradable laminates or high density polyethylene.

Q What were the other two projects that you were involved in?
A I don't recall the name of one, but one was in Boston. Longwood Towers, I believe, and it involved a below grade system by -- I believe it was a rubberized asphalt laminate used below grade. I don't recall which particular manufacturer of product it was.
Q And were you involved in inspecting it and troubleshooting that project or initial design?
A Correct. It was a leak investigation. We were responsible for making recommendations.
Q And incidentally, with regard to these first two projects, were you working for GID; were you hired by General Investment Development?
A No.
Q What was the last project?
A That is the last project. I don't remember the --
Q You said there were three?
A Right. The second one, I don't recall the name of the project. It was also in Ohio.
Q Do you remember what product was involved there?
A It was an asphalt-based product.
Q Prior to working on the Promenade project, had you ever been involved with any other projects with GID?
A Yes.

Q How many projects?
A One.
Q Which one was that?
A This is Alexan Liberty House in Jersey City.
Q What kind of a building is that?
A It's also a residential multifamily complex.
Q And were you involved with a below grade waterproofing on that project?
A I was asked to assess the existing conditions of the below grade waterproofing after initial construction.
Q What type of a waterproofing?
A It's also an asphalt-based modified polyurethane, liquid applied to concrete deck over a parking garage, also adjacent to occupied private spaces.
Q So the only project on which you've actually worked with a bentonite-based or a clay-based waterproofing project is the Adams Crossing project in Ohio?
A That's correct.
Q And that was a liquid-applied bentonite system?
A No. It was panelized.
Q Oh, it was panelized?
A It was laminated to a high density polyethylene.
Q That project in Adams Crossing, did that have like a precast concrete deck?
A No. It was cast in place.

Q Cast in place?
A No. Let me correct that. It was actually a waffle slab. It was a waffle slab deck.
Q What do you mean by a waffle slab?
A It was also a -- it can be considered a precast. I wasn't there for original construction. It may have been brought to site or it could have been poured in place.
Q Now, you were served with a deposition notice by my office, do you recall that?
A Yes.
Q And that had an attachment to it that asked you to produce your file --
A Correct.
Q -- with respect to Promenade Oaks?
A Yes.
Q And I received from you late last week, maybe it was early this week, some documents from you.
(Camaya Deposition Exhibits 591 and 592 were marked for identification at this time.)
Q (By Mr. Veith.) Back on the record. Showing you Exhibits 591 and 592, those are the documents that I received from your office pursuant to the subpoena that was served on you?
A That's correct.
Q Is that your entire file on the Promenade Oaks project as

it exists today?
A No. There were e-mails, or there are e-mails and an electronic file with digital photos that I -- that are in the process of being recovered. They were lost in an office network crash that we had. And at one time I had two sets of full-sized drawings, architecturals, and a copy of a disclosure report that was sent to me by GID, and they were sent back at their request.
Q So you had a computer crash sometime? When did that happen?
A It was around the -- around Christmas, the holiday season, into January.
Q Do you expect to be able to recover the items that were on the --
A I'm told so.
Q And you'll be willing to provide those when you get the system back up and running?
A Yes.
Q Tell me what documents were sent back to GID?
A There was two sets of drawings -- they were full-sized drawings, architecturals, it wasn't a complete set -- and a copy of a disclosure report regarding Promenade Oaks and the reported leaks.
Q When you say "two sets of drawings," were they two sets of the same set of drawings?

A No. They were two separate -- two types of drawings. One was architectural that gave the basic layout, and the other set was a landscape drawing.
Q Of the courtyards?
A Yes.
Q Okay. Is there anything else that was ever in the file, in your file with regard to the Promenade Oaks project?
A No.
Q How did you first become involved with the Promenade Oaks project?
A Through Scott Vanderberg of GID. I was currently working with him on the project in Jersey City and he had mentioned Promenade Oaks. He referred to it as a property out west that had a courtyard similar to the one in Jersey City and asked if we would also provide similar services to him.
Q Similar to the ones you were doing with the Alexan project?
A Right.
Q And was this an in-person conversation that you had with him?
A That's correct.
Q And this was at the Alexan project that he talked to you about it?
A Yes.

Q Anything else that he told you about the project?
A No, other than I would be briefed more about it by Bob Tarasov.
Q And did you agree to do the project at that first discussion with Mr. Vanderberg?
A No. I actually told him that I would have to go to my superiors first before I took on any more work.
Q And did you do that?
A Yes.
Q Did you do that before dealing with Mr. Tarasov?
A No.
Q What happened next after that conversation? What was the next thing that happened with regard to the Promenade Oaks project?
A I spoke to Mr. Tarasov. He was on site later that same day.
Q At the Alexan project?
A Yes.
Q And what happened in that conversation?
A And he described roughly that they wanted similar services for the Promenade Oaks project; to visit the site and give an assessment of the existing conditions and any recommendations.
Q And then after that is when you went back to your superior at Israel Berger & Associates and talked to him about

whether or not you could take on an additional project?
A Correct.
Q Who is your superior at Israel Berger?
A Mr. Berger.
Q And what was discussed about that? Were you capable of taking it on?
A Yes, with some limitations.
Q What were those limitations?
A The limitations were I had a stipulation that if we were to take on any more consulting work in the Midwest, that it couldn't be full time.
Q Meaning what?
A Meaning with my prior work in the Midwest, it was full time; I was in residence. I was living in the Midwest at the time, and that takes a personal toll, and if I were to take on any more work in the Midwest, I would either need more help to get the job done or I wouldn't take the job at all or I'd have to pass it on to another consultant in the firm. It was basically because I didn't want to spend more time in the Midwest like the other projects.
Q So when you were working on, say, the Adams Crossing project, --
A Right.
Q -- that was a full time job for you, just that project

alone?
A Right. I was on site full time. I had some other projects going on as well that I would have to travel out to.
Q And then at some point did you call Mr. Tarasov back and say, "This is the situation, I can take the project"? What happened next?
A I interact more with Scott Vanderberg and I asked him to speak to Mr. Berger directly and I told him basically why I didn't want -- why I was hesitant to the job and Mr. Berger explained that in more detail.
Q Was there any discussion with GID about whether or not, you know, they were looking for, you know, that -- what level of commitment they were looking for on this project?
A Yes. The description, the verbal description given to me was they were looking to upgrade and repair the conditions at Promenade Oaks, and if it took a full time field consultant or quality control personnel, then that's what they would do, that's what they were willing to do. And that was the statement that primarily caused me to balk at the situation, because if we were to take on this work, I knew from prior experience that that's exactly what would be needed. This was prior to being on the job site.
Q So your understanding from the outset was that they wanted

to upgrade the system?
A Yes.
Q Meaning they wanted to replace the system?
A If that's what it came to, yes.
Q So they hadn't decided that yet?
A No.
Q What was your understanding of what you were being asked to do initially?
A Initially, I was -- my understanding of the Promenade Oaks was to visit the job site, view the existing conditions, review available documentation regarding the project and render an assessment and options.
Q Would you consider that to be a -- well, you wouldn't consider that to be a full scale investigation, would you?
A No. When you say "full scale investigation," do you mean --
Q Well, I mean it's a limited scope type investigation, you're not starting from scratch?
A Like a failure investigation?
Q Right.
A That's correct.
Q Did you ever enter into a written agreement, or did Israel Berger & Associates enter into a written agreement with GID relative to the Promenade Oaks project?
A I believe so. I believe I sent them a proposal for the

initial visit.
Q You did?
A Right.
Q Do you know what happened to that?
A I believe it was signed by Mr. Vanderberg and sent back, but I'd have to go through accounting's records.
Q That would be at --
A Israel Berger.
Q -- Israel Berger & Associates?
A Right.
Q And you would have that today? That would be something you would have access to?
A Yes.
Q I would ask you -- you have no problem providing that?
A No, not at all. A copy of the proposal?
Q Right. As well as -- was the proposal signed off on by GID and that becomes the contract?
A Correct.
Q At the time that you were retained by, or Israel Berger was retained by GID, were you given documentation relative to the Promenade Oaks project?
A At the time that -- after the proposal was signed?
Q Yes.
A I don't recall which came first because I never saw the signed proposal. At that time, Mr. Vanderberg and Mr.

Berger were in contact with each other.
Q You were given various documents before you ever went out to Minneapolis to see the Promenade Oaks site, correct?
A That's correct.
Q What were you given prior to going out for your site inspection?
A The two sets of drawings and the copy of the disclosure report.
Q Showing you what's previously been marked as Exhibit 540, is that a copy of the Promenade Oaks disclosure report that you were provided?
A Yes. It seems a little thicker, though.
Q It seems thicker than the one you remember?
A Right, that I recall.
Q Are there things in there that weren't included that you're able to identify?
A I don't recall this table, the last table.
Q The last page?
A Right.
Q That's GID 252?
A Correct.
Q Is there anything else that you don't recall being included in this document when it was first given to you?
A Yes. Appendix C, D.
Q So you were not provided with the pages of the document

relating to mold?
A Correct.
Q Was everything else, the rest of the document included in what you were given?
A Yes. To my recollection, yes.
Q Showing you also what's been marked as Exhibit 545, --
MR. REILLY: What's the exhibit number again?
MR. VEITH: 545.
Q (By Mr. Veith.) -- is that also a document that you were provided by GID when you were initially retained or in that general time frame?
A Yes. I recall this cover but not the document being so hefty.
MR. BROWN: I'm sorry. What was your answer, sir?
THE WITNESS: I recall the cover, but I don't recall it being this thick.
Q (By Mr. Veith.) Would you just look through that document and tell me if there's anything in there that you were not provided when you were retained by GID relative to the Promenade Oaks?
A I believe that the version that I had only went up to page 8.
MR. BROWN: Up to and including page 8?

THE WITNESS: Including page 8.
Q (By Mr. Veith.) Were you ever given the remaining pages?
A No.
Q Do you know where GID received these documents from?
A No, I don't.
Q Do you know who authored Exhibit 540, the Promenade Oaks Pending Litigation and Disclosure report?
A I believe I met the gentleman. I don't know his name, I don't recall his name, but I believe he was out at Promenade Oaks the day I visited the site.
Q Was it authored by someone other than Mr. Campbell from Inspec?
A That I don't know. I do recall meeting Mr. Campbell.
Q You do?
A Right.
Q But you don't know whether Mr. Campbell was the one who created Exhibit 540?
A That's correct.
Q Do you think it was someone other than Mr. Campbell or you just don't know?
A I wouldn't know.
Q Did GID provide you with any photographs prior to going out to Minneapolis?
A No. Not prior.
Q So the Exhibit 545 did not contain any photographs --

A That's correct.
Q -- when it was provided to you?
A That's correct.
Q Other than Exhibit 545 and Exhibit 540 and the two sets of architectural drawings, were you provided with any other documentation by GID prior to going to Minneapolis?
A No.
Q Was it your understanding that what you were being asked to do by GID was to review that documentation and then go out to Minneapolis to make a limited review of the site and verify what was contained in those reports?
A Yes.
MR. HULL: Object to form of the question.
Q (By Mr. Veith.) If you were to be retained to perform a full scale failure investigation, what would that entail?
A Disclosure of all the documents.
Q What kind, for example?
A Original CDs, specs, details, architecturals, any test reports, progress reports, all submittals, progress photographs, video, contractors' reports, daily reports, correspondence from product manufacturers, entail field probes, material sampling.
Q I'm sorry?
A Material sampling, laboratory testing.
Q Laboratory testing of what?

A Of the samples.

Q Okay.

A Water testing, or testing, an overall survey, interviews with building staff or any parties involved with repair or any chore of response to any of the failures, interviews with residents. Off the top of my head, that's what I would start with.

Q So this wasn't anything near that type of investigation?

MR. HULL: Objection, form of the question.

Q (By Mr. Veith.) Is that correct?

A That's correct.

MR. HULL: Same objection.

Q (By Mr. Veith.) For example, you weren't provided -- prior to issuing your report in this case, you weren't provided with most of the documents that you recited, correct?

A That's correct.

Q So I take it you reviewed this exhibit, you reviewed the documentation that GID initially provided you with, and then you went out for your site visit?

A That's correct.

Q How many times did you actually visit the site?

A Twice.

Q Do you know the dates?

A I believe it was November 5th or 6th was the initial visit, and a second visit happened -- I don't recall the exact date, but it was a few weeks after that.
Q When you went out for your first visit, who went with you?
A From my office or was I accompanied by anyone?
Q Yes. Were you accompanied by anyone?
A No.
Q Who was at the site on that visit November 5th or 6th?
A Scott Vanderberg was there, I recall Mr. Campbell being there, Tim -- a gentleman, Tim Charbonea. I don't recall his last name exactly, but he was -- he is a contractor retained by GID to perform site work for that day. There were other gentlemen present, but I don't recall their names. One of them was definitely responsible -- he was part of the property management, I believe. He's the one that toured us through the property.
Q Was it your understanding that you were collaborating with, so to speak, any other engineers, repair experts that GID had retained?
A No. To my understanding, I was the only one that was working for GID.
Q How long were you out at the site at that first visit?
A The whole day.
Q Eight hours?
A Yes.

Q And were you working alone or were you working with other individuals that day?
A There was a group of us that were walking through the property. At one point or another, everyone went their own direction. I was mostly with Mr. Vanderberg.
Q Would you tell me generally what your review of the site consisted of?
A Mr. Vanderberg had I believe five or six probes excavated in different areas of the plaza and I reviewed those. There was a walk-thru of the spaces below the plaza, the private garage space, as well as some units, some private units that were either available or -- available for access or unoccupied.
Q Anything else?
A As well as a walk-thru, a walk-thru of the exterior. And the gentleman that took us on the tour was able to provide a few binders with photographs of the initial construction.
Q Do you know who that was that had the binder of photographs?
A I don't recall his name.
Q It wasn't Mr. Campbell?
A It wasn't Mr. Campbell.
Q Was it the property manager?
A I would say yes. I don't know if he was exactly the

property manager, but he was, to my understanding, present during initial construction and was still in the employ of the Promenade Oaks facility.
Q Were the probes that you reviewed, the five or six probes that you described, were they all on one plaza?
A No. They spread them out in different areas.
Q And were they already excavated prior to your arrival?
A Yes.
Q And Mr. Vanderberg had had that done?
A That's correct.
Q Do you recall the layout of the Promenade Oaks Townhomes, how the buildings are laid out?
A More or less, yes.
Q Did you walk through all of the plazas?
A Yes.
Q Did you walk through all of the underground garages?
A Yes.
Q How many underground units did you go into?
A Two. Two below grade units and one above grade.
Q Do you know whether the five or six probes that were excavated for you to review were at the same locations that prior excavations had been done by Mr. Campbell or don't you know?
A I don't know if they were -- I don't know if they had chosen areas that were already excavated. When I was

asked for preference, I said I would rather see areas that were not excavated during Mr. Campbell's review of the property. I didn't want a redundancy of the probes.
Q Why was that? Why did you want to avoid redundancy?
A I wanted to see conditions that had not been disturbed before my view of the condition.
Q Do you know when the excavations that you reviewed were done?
A Other than before I arrived on the site, no.
Q Do you know, for example, whether it had rained or something after the excavations were dug or between the time they were dug and the time you arrived on site?
A When I arrived on site, there was a drizzle, so --
Q It was raining?
A Right. There was a drizzle, and there was still snow on the ground thawing out.
Q Do you remember what the temperature was, what it was like?
A It was cold. I remember it was cold.
Q I'm going to show you or ask you to look at -- it's page GID 232 of Exhibit 540 and ask you if you can identify for me on which plazas the test pits that you reviewed were located? Are you able to do that?
A No. I could do that through the photographs, the file of digital photographs because I did photograph -- I did

photograph overviews of the plazas as well as the numbers on units where the probes were done. So I do recall, say, photographing residence X, Y, Z and saying the probe's here. Looking at this, I couldn't pinpoint where the areas were, but through the photographs, I could do that.
Q How did you take those? Were they aerial photographs?
A No. They were digital. They were on the ground, and if there was a probe done at the base of the wall against unit X, Y, Z, I took a picture of the door at X, Y, Z and took a picture of the probe.
Q Would you take a look at Exhibit 592, and there are a number of photographs in that exhibit, and I wonder if these are the photographs that you're talking about?
A Right. These are among -- these are some of the photographs that I took during that day.
Q But not all of them?
A Not all of them.
MR. STEPAN: John, what is 592?
MR. VEITH: 592 is the December 4, 2002 field report.
MR. STEPAN: Thank you.
Q (By Mr. Veith.) Are the overview photographs that you were talking about contained within your field report?
A No.

Q Could you describe for me what different details were excavated for your review?
A There was an excavation at a typical surface drain, there was an excavation at the base of a porch or a stoop where -- the main entrance of the unit. There were two of those excavations. There were two excavations at the base of the wall of a typical unit.
Q Base of a vertical wall?
A Base of a vertical wall, correct. And there were two probes like that.
Q That's five?
A Right.
Q Was there another?
A I don't recall what the last probe was.
Q You're familiar with the fact that there is a courtyard and there is a building on either side of the courtyard?
A Right.
Q And there is a concrete deck underground that extends underneath one of the buildings but terminates at the vertical wall on the other side?
A Yes.
Q When you're talking about the base of the vertical wall, there were two of those excavations, were they on either side of a plaza or were they of the same detail?
A No. They were on different sides. They were on opposing

sides but in different plazas.
Q Okay. Tell me about the conditions as you saw them at the typical surface drain excavation? Did that go all the way down to the deck?
A Yes, but they didn't disturb the drainage mat or the membrane below it. So it excavated down to the surface of the drainage mat.
Q Were you able to see the clamping collar around the drain or was that submerged beyond what you could see?
A It was visible. The clamping collar was visible.
Q You couldn't see the actual waterproofing product itself in that detail?
A Well, you'd have to pull back -- without pulling back the drainage mat or the protection board, you wouldn't be able to see that.
Q And you didn't do that?
A I pulled it back as far as I could to be able to view it, but because of the rain, more water was rushing in. So even if I had gotten down to the membrane, I wouldn't be able to see the interface of the membrane to the clamping ring. So there wasn't -- the conditions weren't conducive to being able to view a pristine waterproofing membrane, and cutting it was -- cutting anything out there was an option that I discouraged, especially if Mr. Charbonea wasn't prepared to re-seal the membrane.

Q So you weren't able to see underneath the drainage mat?
A Only partially.
Q Only partially?
A Right. Only partially.
Q And you didn't pull back the membrane at all?
A No. The membrane was not destroyed or disturbed. That was a point that Mr. Vanderberg stressed as well.
Q That he didn't want to cut the membrane?
A Right. Not to disturb anything or cause anything that would result in any more interior leaks or damage to the property.
Q How much water was down there, if any?
A At the drain -- at the drain, there was probably a quarter inch of water. At other probes, there were two or three inches.
Q Was the level of the water above the drainage mat?
A No. Not in the condition that I viewed. You had to pick up the drainage mat and water would rush in under it.
Q Under the drainage mat?
A Right.
Q When you were looking at this excavated pit with the surface drain, Mr. Vanderberg and Mr. Campbell were both with you at that time?
A Yes.
Q Were you taking notes as you went through?

A I had a checklist that I had made for myself, a legal pad, I had my own questions, and I wanted to verify.
Q That wasn't a document that you produced. Do you know what happened to that checklist?
A No. But everything that I had on my field notes I incorporated in my report to Mr. Tarasov.
Q Were you writing down, you know, the conditions of each excavated pit as you reviewed it?
A Yes.
Q And what happened to those notes?
A I didn't see a need for them because I incorporated them into the report. I discarded them.
Q You discarded them?
A Yes.
Q Did you discard them before you wrote the report or after?
A Oh, no. After I was happy with the final report.
Q Is that normal, a standard practice for you to discard notes?
A For me, it cuts down on clutter, cuts down on paper.
Q Do you do that on all projects?
A Most of them.
Q Tell me about the details that you reviewed at the excavated pits at the porch or the stoop areas?
A The areas that they had excavated showed a condition of the wooden posts supporting the awning above the

entrance, going through the concrete slab to the structural deck and resting on a -- what looked like an insulation board.
Q Were you able to see any of the waterproofing membrane?
A No. There was too much mud and water in the area, so every time I scooped away some, it just would come back in.
Q The water would flow back in?
A Yes.
Q How deep was the water that was in --
A I'd say over an inch. It was more mud than anything.
Q Now, were the conditions the same at both of the excavated posts?
A At both, yes. They were the same at both.
Q Were you able to see any Swelltite at all at either of those post excavations?
A No.
Q How about the excavated vertical wall pits, were you able to see Swelltite at those?
A Yes, on the vertical surface, not on the horizontal because the water was covering everything.
Q How deep were the test pits at the vertical wall areas?
A I'd say about two and a half, three feet deep.
Q Was there water in the bottom of those as well?
A Yes.

Q How deep was the water that was in those pits?
A I'd say about two inches.
Q Were you able to see behind the -- did you peel back the Swelltite membrane?
A No.
Q You didn't look behind it?
A No.
Q Why not?
A Didn't want to disturb the membrane.
Q Were you able to see the membrane going from the top of the -- where it terminated all the way down to the horizontal deck?
A No.
Q How far down were you able to see the Swelltite?
A Just the upper portion of it.
Q So you weren't able to see the portion of the membrane that was on the base or the horizontal deck area?
A No. That's correct.
Q But you were able to see the Swelltite, at least the outside of it, from the point where the water ended up to the point where it terminated?
A That's correct.
Q And it wasn't cut away or anything like that?
A No.
Q Did you see anything about that Swelltite that gave you

cause for concern about -- at least with respect to those areas?

MR. BROWN: Object to the form, vague.

Q (By Mr. Veith.) I mean, it looked like it was -- you were able to see the PVC plastic, correct?

A Correct.

Q And you can't see the clay part of the bentonite?

A No. It's behind the polyethylene.

Q Were there any seal areas, or areas where there were two sheets that were put together?

A No. That wasn't viewed. One condition that caught my attention was that as the upper portion of the Swelltite made a transition to above grade, a separate flashing or tape was used to make this transition, and as it abutted the slab of the porch, it looked like a remedial detail, or it may have been a leftover from original construction, but it was duct taped to the slab against the building.

Q Okay. But that wouldn't have to do with the Swelltite itself, correct?

A No. I don't believe that the membrane that makes a transition above grade to give a positive seal to the Swelltite has bentonite on it. I think it's designed -- the system is designed in such a way that they must have the clay portion of the assembly below grade so it has

enough confining pressure, and to keep it sealed, you need a counterflashing type of membrane to make that kind of transition.
Q Did you see any of the Swelltite product anywhere else that day other than these two excavation pits at the vertical wall areas?
A No.
Q So that was the only place?
A That's correct.
Q Was somebody taking you around or were you basically free to do whatever you wanted?
A I was walking around with Mr. Vanderberg and we were taking our direction from Tim Charbonea because he formed the test pits. And prior to that, we were being led by a gentleman that I referred to as, I guess, the property manager or -- the gentleman that had the progress photos.
Q So I take it that since you didn't want any of the membrane cut that you didn't take any samples from the site --
A No.
Q -- of the product? Do you know whether Dave Campbell had ever taken samples from the site?
A I don't recall if he had taken physical samples, but I do recall him mentioning that he had been able to view the clay on the back side of the polyethylene.

Q Did you have discussions with Mr. Campbell prior to going out for your first visit to the site?
A No. Not unless he was part of a conference call that I had with Mr. Tarasov.
Q What was that conference call about?
A It was to coordinate the trip out to Promenade Oaks.
Q Was there a reason that you were supposed to -- or that Mr. Campbell was to be there at the same time? Was that something that --
A At the conference call or at the --
Q Was it something that GID wanted?
A No. Not to my knowledge.
Q Do you know why it was important for Mr. Campbell to be there when you did your walk-thru?
A No. He was just there when I arrived.
Q Did Mr. Campbell, when you were at the walk-thru, did Mr. Campbell show you samples of the Swelltite product?
A No.
Q Did you see anyone carrying around any samples of the product?
A No. There were several people there, but I didn't see anything by way of sample.
Q Were you ever provided with any samples of Swelltite?
A No.
Q Were you shown any product literature?

A No.

MR. BROWN: Swelltite product literature?

MR. VEITH: Yes. Swelltite product literature.

THE WITNESS: No.

Q (By Mr. Veith.) Did you do anything else that day other than review these sites and walk through the plazas and garages?

A Other than that, no.

Q How much later was the second trip to the Promenade Oaks site?

A I'd say a few weeks.

Q A few weeks after that?

A Yes.

Q Was it before you issued your final field report?

A Right. It was before.

Q And you don't know the date?

A No. I can find the date, but I don't know it off the top of my head.

Q And how long were you out there the second time?

A A little more than half the day. Past noon.

Q What were you doing that time?

A I was asked to meet other personnel from GID.

Q Who?

A I don't recall their names. I didn't receive minutes

from that day. But my understanding was that they were the executive -- they were high on the ladder in GID and they wanted to walk through the property.
Q Was Mr. Vanderberg there again?
A No, he wasn't this time.
Q Was Mr. Campbell there that time?
A No. Not to my recollection, or I didn't see him on the property.
Q Was it just people from GID or were there other people there as well?
A It was -- I met only with people from GID and one person from the Promenade Oaks area that helped in leading the touring around of the property.
Q Was it a man or a woman?
A It was a female.
Q You don't know her name, right?
A No. I believe she worked in the office, the management office.
Q At the property site?
A Right.
Q Do you know whether Mr. Campbell ever ran any tests or analysis on the product itself?
A No.
Q He never told you about any testing he had ever done?
A No.

Q Other than that one possible time when you spoke with Mr. Campbell in that conference call prior to your first visit, did you ever have any other discussions with Mr. Campbell before going to the site?
A No.
Q Did you talk with him between your first visit and your second visit at all?
A No.
MR. REILLY: When you get a chance, John, I'd like to take a break when it's convenient.
MR. VEITH: We can actually do that right now.
MR. REILLY: All right. Let's take about five.
MR. VEITH: Sure.
(A short recess was taken at this time.)
Q (By Mr. Veith.) Mr. Camaya, the second visit out to the Promenade Oaks site, what was the purpose of going out there again?
A To walk with the new group from GID that wanted to view the property.
Q So you were there basically to answer questions they would have, correct?
A That's correct.
Q You weren't there to get additional information at this

point, you were there to kind'a try to tell a potential buyer about the property and answer any questions they might have?
A That's correct.
Q What questions were you asked?
A They asked what kind of system it was.
Q What kind of --
A Waterproofing system it was, I guess how many units had been affected.
Q Okay.
A How many units were still affected.
Q Is that it?
A No. They asked -- the questions came about as we walked through the property and we observed conditions. They asked about staining on the underside of the plaza concrete deck as well as on the structural concrete in the garage. They asked how the waterproofing assembly was applied to the concrete deck and how leaks occurred into private units as well as the garage.
Q By the time of your second site visit, had the excavations that you had seen on your first visit been filled back in?
A I don't recall.
Q Did you review additional excavations on the second site visit?
A No.

Q You didn't review any excavations on the second site visit, I should say?
A No.
MR. REILLY: I'm sorry. Your answer to that was?
THE WITNESS: Was no.
MR. REILLY: Thank you, sir.
THE WITNESS: I believe I heard Mr. Charbonea tell his workmen to start closing up the excavations because it was a safety issue for the residents since they were going through the plaza.
Q (By Mr. Veith.) When did he say that; on your first visit?
A During the first visit.
Q Okay. So would it be fair to say that most of the information you have relating to how the product is applied and what the conditions are under which the product is applied all were derived from your document review, or the documents that you reviewed that were provided to you by GID?
A As well as conditions in the field.
MS. HEYER: What was the response?
THE WITNESS: As well as conditions I viewed in the field.
MS. HEYER: Thank you.

Q (By Mr. Veith.) Mr. Camaya, I'm going to show you what's previously been marked as Exhibit 549 and ask you to take a look at that?
A (Witness complies.)
Q Have you ever seen this exhibit before?
A No. I remember --
Q You haven't seen it in hard copy before?
A No, I haven't.
Q But you are the author of this e-mail?
A Yes, yes.
Q And you sent it, apparently, to -- well, it looks like a combination of e-mails, actually. Looks like originally you sent it to Scott. Is that Scott Vanderberg?
A Right.
Q Your answer was?
A That's correct. Scott Vanderberg.
Q And then it looks like you forwarded --
A Actually, it's sent to Bob Tarasov.
Q Well, do you see halfway down the page it says "Scott," and then it says right above that "from email sent to Scott," so apparently you were forwarding at least part of an e-mail that you had sent to Scott Vanderberg and you're now forwarding that on to Mr. Tarasov?
A That's correct.
Q Do you know whether this e-mail was created before your

second visit or after your second visit to the site, Promenade Oaks?
A I believe this was after the second visit.
Q Do you see there is a paragraph at the top that's addressed to Bob and then there is a full paragraph, and then at the bottom of that paragraph, or towards the end of it there is a statement that says, "The report for Promenade Oaks will be ready for the following Wednesday, December 4th, provided there are no other documents you want reviewed for the report." Do you see where I'm reading?
A Yes.
Q Were there any other documents that you were asked to review other than the ones that we've talked about?
A No.
Q Then after that, it says, "The proposal for Promenade will be issued by accounting shortly." What is the proposal that's being referenced here?
A I believe after the visit they had asked for a proposal from our office for services of a continuing investigation and to develop remedial CDs for waterproofing on Promenade Oaks.
Q When you say "CDs," what do you mean?
A Construction documents, details, drawings, specifications. They also asked for other

recommendations.
Q When did you first learn that GID was interested in having you do that additional work?
A Well, during our first meeting, they said that the property that they wanted us to look at may entail that.
Q So you understood that in addition to the cursory inspection that you were doing, GID was potentially interested in having you do a lot more work with regard to the project?
A Right.
Q Down under the portion of the document that's addressed to Scott, there are various bulleted points, do you see that?
A Yes.
Q Who is KC in the first bulleted point?
A She is our office manager, our receptionist.
Q Was this bulleted point referring to Promenade?
A No.
Q Was it referring to the Alexan project?
A Yes.
Q Was this sort of a mix and match -- this e-mail, was it addressing both properties?
A Yes.
Q On the second page of the document, there is a number 2 towards the top of the page; do you see where I'm looking at?

A Yes.
Q And then it talks about replacement and repair of waterproofing, and it says, "depending on other findings and probes." Do you see that? Can you just tell me what you're talking about here?
A Where are you on this one?
Q The paragraph number 2.
A Oh, I see.
Q It says, "replacement & repair of waterproofing - installation of new below grade waterproofing assembly suitable to deck and adjacent substrates, depending on other findings and probes." What other findings and probes are you --
A I had recommended to GID that more probes, more investigation is needed before making determination of what the final solution to the leaks were.
Q I'm sorry. I didn't understand what you mean by termination of the final solution?
A Determination.
Q Oh, determination?
A Determination, right.
Q Okay. So in other words, you didn't want this to be your final result; you wanted the opportunity to do more investigation before they would consider your conclusion that it needed to be replaced to be a final conclusion,

correct?
A Yes.
MR. HULL: I'll object to the form of the question.
MS. HEYER: Same objection.
Q (By Mr. Veith.) Could you pull out Exhibit 592 for me?
A (Witness complies.)
Q Exhibit 592 is your field report of December 4, 2002, correct?
A Yes.
Q And you are the author of this document?
A Yes.
Q Did anyone else contribute or help you author the document itself?
A No.
Q Did you actually type it up, in other words, on the computer yourself?
A Yes.
Q And the subject line says Initial Assessment of Courtyard Waterproofing, right?
A Correct.
Q So you weren't necessarily considering this to be a final report, is that true?
A That's correct.
Q In the first paragraph under the caption, it's labeled

Summary, and it says, "IBA visited the Promenade Oaks property on November 6th for an initial visit and cursory walk-thru of the buildings." Can you tell me why you described the walk-thru that you did as cursory?
A It only took a day, and I would liked to have spent more time with the property to look at more conditions.
Q What sorts of conditions?
A More probes, more available units, time to look at more documents, if they were available.
Q Then the next sentence says, "The purpose of this initial visit was to evaluate and verify the existing conditions of the below-grade waterproofing in the common courtyard area described in the September 18, 2002 Promenade Oaks Pending Litigation and Disclosure report." Is the document that you are referring to there Exhibit 540?
A Yes.
Q So the purpose of your initial visit is to go out and verify what's contained in Exhibit 540?
MR. HULL: I'll object to the form of the question.
THE WITNESS: That was one. That was one purpose.
Q (By Mr. Veith.) Well, what other purpose would there be? Well, to examine conditions?
A Right.

Q Any other purpose for that cursory visit?
MR. HULL: Object to the form of the question.
THE WITNESS: To see what kind of options they would have.
Q (By Mr. Veith.) What do you mean; what options?
A In terms of repair, replacement. That's what reviewing the existing conditions would provide.
Q If you go to page 2, and at the top of the page there is a paragraph, it's actually a continued paragraph of the first page. The last sentence of that says, "This configuration is expected to be wet from the initial installation and backfill." What are you referring to by "this configuration"?
A Configuration --
Q Are you talking about how the product is installed?
MR. HULL: I'll object to the form of the question.
THE WITNESS: No.
Q (By Mr. Veith.) What are you referring to?
A When I say configuration, I'm referring to the assembly as a below grade unit. The understanding is is when you do below grade waterproofing, similar to an inverted roof, it will be wet from day one because it's buried and moisture within the soil or whatever the load is over the

waterproofing will contain moisture.
Q So not that the installer would, you know, add any moisture to it by hydrating the substrate first, you're talking about moisture that's already contained within the substrate, whatever it comes in contact with?
A No. By configuration, I mean the difference between a roof, a standard flat roof that's exposed or a sloped roof will shed water and dry off and not have moisture on it. The configuration we have is below grade waterproofing, which is similar in concept to an IRMA roof, an inverted roofing membrane assembly, where the roof goes onto the deck and it's covered and protected and water is allowed to filter through the layers above the waterproofing and get to the drains, so it doesn't stay dry. For the better part of its life, it's always wet.
Q What is the source of the information that you're communicating here that it's expected to be wet? Are you getting that from somewhere?
A Below grade waterproofing is under soil and it doesn't shed water the way a shingle roof or a sloped roof would and dry off, so whatever water or moisture contained within the soil is in the soil, that's what the membrane of an IRMA or a below grade system will be exposed to. Below grade waterproofing has to protect against

hydrostatic pressure, water with force behind it, and any water that's contained within the soil above it ends up on the membrane itself. It won't shed it the way a sloped roof would. That's what I mean by configured.
Q You mean that it's not sloped?
MR. HULL: I'll object to the form of the question.
THE WITNESS: No, in that a sloped roof isn't wet all of its life, or a sloped flat roof without any layers on it ultimately dries off for most of its life. Below grade waterproofing and IRMA roofs tend to stay wet most of their service life.
Q (By Mr. Veith.) So you're talking about moisture contained in soil but not moisture underneath the membrane itself?
A That's correct.
Q So really all this sentence is talking about is that the soil above the membrane has moisture in it; that's what you're trying to say, correct?
A Yes.
Q And really nothing more than that?
A That's correct.
Q In paragraph c on that same page, it says -- there's two paragraphs to sub c, and the last sentence of the first paragraph there, it says, "The moisture content of the

substrate is responsible for this activation over time." Where are you getting that information from? Was that something you learned from reviewing the documents?
A No. That's how a clay-based waterproofing system works. It's activated by moisture. Like I said earlier, when the clay, the clay system is applied, it has to be applied dry. It can't be activated by moisture prior to its backfill or it loses its waterproofing effect. It swells or expands to 15 times its dry volume in the presence of water. That's how the system works, as opposed to a system that's already wet in a prior application and is allowed to cure and form a coating or a membrane.
Q So you're basing this information on your own personal knowledge of bentonite?
A That I've learned.
Q Do you know why it's important for bentonite not to be activated before the backfill is applied?
A If the gel -- it has to be activated under pressure. The swelling -- once the backfill is applied and the latent moisture activates the gel -- the higher the pressure of the confinement on the membrane, the better the waterproofing capability of the bentonite is. If you activate it and allow it to swell prior to that, you lose that confining pressure.

Q Have you ever heard of a modified proctor of 85 percent?
A Yes.
Q Where have you heard that?
A Usually with applications of bentonite. It refers more to the backfill. Soil or the grade of soil that you have has a certain weight to it per volume and that weight is prescribed depending on the material.
Q Have you ever worked with Swelltite, ever?
A No.
Q Have you ever heard of Swelltite 3000?
A Yes.
Q Have you ever been involved with a project that involved Swelltite 3000?
MR. BROWN: You talking about his knowledge of that product prior to his involvement in this Promenade investigation?
MR. VEITH: Yes.
THE WITNESS: No. Not to my knowledge.
Q (By Mr. Veith.) Have you ever seen Swelltite 3000, other than what you saw in those test pits that day?
A Not before that, no.
Q Do you know what Swelltite 3000 is made up of?
A Other than the basic clay?
Q Yes.
A No. Not exactly what its chemical makeup is other than

it is a bentonite-based system.
Q Do you understand that it has various components to it, or don't you know?
MR. HULL: Object to the form of the question.
THE WITNESS: Components in terms of?
MR. VEITH: To the Swelltite. I mean, in addition to the bentonite clay, are there other components to that membrane?
THE WITNESS: My understanding is, yes, the clay can be modified depending on its intended use.
Q (By Mr. Veith.) What do you mean by that?
A If the area that it's going to be waterproofed in has particular characteristics within the soil, like salinity or acids, I know that the bentonite itself can be modified to be able to accommodate that because the process is electrochemical.
MR. BROWN: I don't think he's answered your question. I'm going to object to that as nonresponsive.
Q (By Mr. Veith.) Do you know whether bentonite is manufactured in sheets or comes in sheets?
A I don't understand the question.
Q Well, do you know what Swelltite looks like when it comes from the manufacturer?

A My understanding is it's paneled. I haven't seen a package of it come from a manufacturer on a job site.
Q Do you understand that it comes in sheets? When you say "panels," --
A In panels. Well, laminated against a high density polyethylene sheet.
Q Do you have an understanding that the Swelltite also has a water-soluble film layer? Have you ever heard that?
A Yes, in the report.
Q What report?
A The September 18th report.
Q Exhibit 540? That's how you learned -- you learned that there's a water-soluble film layer to the Swelltite from Exhibit 540?
A Yes.
Q Do you know what that water-soluble film -- what the chemical makeup of that film is?
A No, I don't.
Q Is your understanding of how the film works derived solely from Exhibit 540?
A Yes.
Q Are you basing your statement that the moisture content of the substrate is responsible for activation of the bentonite based upon your general knowledge of bentonite?
A Yes.

Q And nothing else?
A Yes.
Q On page 3 of your field report, at the bottom, there is a section called Waterproofing, and then the very last paragraph is identified as paragraph i; do you see that?
A Yes.
Q It says, "The existing bentonite-based waterproofing assembly is not suitable for the existing construction and configuration of the courtyard at Promenade Oaks." Are you saying here that you wouldn't use any bentonite-based product at the Promenade Oaks; is that what you're saying?
MR. HULL: I'll object to the form of that question.
THE WITNESS: No. What I'm saying is, in this particular scenario, I would not have chosen bentonite as the waterproofing.
Q (By Mr. Veith.) Well, when you say "this particular scenario," you're talking about Promenade Oaks, aren't you?
A Well, no. Promenade Oaks, but within the bathtub of the plaza.
Q Oh, I see. So you're specific to the courtyard here?
A Yes.
Q So you wouldn't use any bentonite-based product in those courtyard areas at Promenade Oaks?

A Yes. I would not have chosen the bentonite.
Q You would have used, I assume, an asphalt rubberized type product?
MR. BROWN: Object to the form of the question, calls for speculation.
THE WITNESS: I didn't get that far. That would be an option. There is several different kinds of systems; hot rubberized, cold rubberized, asphalt, resin, sheetgood.
Q (By Mr. Veith.) Do you know whether Dave Campbell recommended the use of a bentonite product for the courtyard areas?
A No.
Q You don't know that?
A No, I don't.
Q If he had, would you disagree with him?
A For the courtyard areas?
Q Yes.
A Yes.
Q Why would you disagree with him?
A I think there's a more suitable product other than bentonite for that particular scenario.
Q What are you basing that on?
A Knowledge of the other materials.
Q What other materials?

A Hot rubberized asphalt systems, cold-applied epoxy resin systems.
Q And by the way, those types of systems are products that you're much more familiar with?
MR. HULL: I'll object to the form of the question.
Q (By Mr. Veith.) Is that true?
A Yes, I'm more familiar with them.
Q And you have a higher level of comfortability with product like that?
MR. HULL: I'll object to the form of the question.
THE WITNESS: In this particular scenario, yes.
Q (By Mr. Veith.) On the next page, page 4, there is a paragraph roman numeral iv; do you see where I'm at now?
A Yes.
Q Would you take a second to refamiliarize yourself with that paragraph?
A (Witness complies.)
Q You ready?
A Yes.
Q It says, "According to the disclosure report, the material failed to perform as expected in that the film separator on the bentonite did not dissolve according to its design.

This was observed in the destructive test openings and the samples recovered by the owners consultant." The owner's consultant is Dave Campbell, is that right?
A Yes.
Q And so are you saying here that it's Dave Campbell that observed this condition?
A Yes. According to his report, yes.
Q Because you didn't observe these conditions, right?
A That's correct.
Q So you're relying entirely on Mr. Campbell's work?
MR. HULL: Object to the form of the question.
THE WITNESS: With respect to that, yes.
Q (By Mr. Veith.) Was this entire paragraph, paragraph 4, based on what you learned from Mr. Campbell's report?
A No.
Q What else was it based on, if anything?
A There were conditions in the field that led me to believe that the water was able to bypass the panel, the bentonite.
Q But you didn't observe the film separator that's being referred to here, did you?
A That's correct.
Q So at least with respect to that part of the membrane, you would be relying entirely on what Mr. Campbell has put in

his report, correct?
A That's correct.
Q The next sentence says, "This condition allows water to freely pass between the precast concrete decking and the back of the waterproofing." Do you see that sentence?
A Yes.
Q And again, that sentence is derived from Mr. Campbell's report, correct?
A That's correct.
Q And that's the sole basis for that statement?
A For that statement, yes.
Q How about the next sentence; is that also based entirely on Mr. Campbell's report?
MR. HULL: Which sentence are you referring to, John?
MR. VEITH: "This allows the water to migrate at the level of the concrete planks and into any paths of least resistance like cold joints, keyways, open cells, cracks, and interior spaces." That's based on Mr. Campbell's report as well, is it not?
MR. HULL: I'll object to the form of the question.
THE WITNESS: No. There are conditions in the field that would lead me to believe that water is able to work its way into those areas.

Q (By Mr. Veith.) What conditions?

A Stains. The typical stains between the joints between concrete planks, water flow stains that occur where the planks end, where they terminate against the walls of occupied areas, and a system that looked like a catch basin system that was mechanically attached to the concrete structures in the garage level.

Q Would you say that again?

A It looked like a catch basin system, like a gutter, that would mechanically attach to the concrete beams in the garage, and the stains would run directly into the gutters and they looked like they were positioned to catch water that was running off the beams.

Q Well, once the water bypasses the membrane, I mean, it can go down into -- well, strike that. Concrete is a porous material, correct?

A That's correct.

Q And water can go into concrete and move around within the concrete itself, correct?

A That's correct.

Q So the water could get -- and these precast concrete planks are hollow, right?

A That's correct.

Q So water can move around within the concrete and the water can also move around within those hollow areas of the

plank, right?

MR. HULL: I'll object to the form of the question.

THE WITNESS: That's correct.

Q (By Mr. Veith.) So it would be speculation as to whether or not water is moving between the top of the substrate and the bottom of the membrane as well, correct?

MR. HULL: I'll object to the form of the question.

Q (By Mr. Veith.) You can't see that area, can you?

A No, I can't see it.

MR. HULL: Same objection.

MS. HEYER: Same objection.

Q (By Mr. Veith.) You can't see that point where the membrane and the substrate come together, can you?

MR. HULL: Object to the form of the question.

THE WITNESS: That's correct. I can't see it from my vantage.

Q (By Mr. Veith.) So you would be speculating as to whether or not water would migrate in those places?

MR. HULL: I'll object to the form of the question.

THE WITNESS: Only if you base it on whether or not I actually saw water running across the

deck. But the stains, the path of the stains run into these gutters, these catch gutters. Whether or not that was from the top or through the cells or through the joints --

Q (By Mr. Veith.) That's what I'm talking about. You really can't tell for sure, right?

MR. HULL: I'll object to the form of the question.

THE WITNESS: Whether or not the water that's designed to be caught within the gutters comes from the top of the deck versus through water that comes through the open cells?

MR. VEITH: Right.

THE WITNESS: That's correct.

Q (By Mr. Veith.) The next sentence says, "The extent of this condition is undeterminable without exposing the entire membrane." Do you see that?

A Yes.

Q Doesn't that reinforce the point that you can't tell for certainty where the water is moving around?

MR. HULL: I'll object to the form of the question.

THE WITNESS: Where it's moving around?

Q (By Mr. Veith.) Uh-huh. Whether it's moving within the cores of the planks or in concrete or what have you?

MR. HULL: Same objection.
THE WITNESS: No. There are ways to determine whether or not water is moving in the cells through the cores. To know whether or not there's water between the back side of the waterproofing and the top of a precast concrete plank, you'd probably have to peel back the membrane, but there are different ways of being able to tell whether or not it's running between keyways or joints or between the hollow cores of the planks.
Q (By Mr. Veith.) How would you do that?
A Well, if you wanted to know if water was running within a core, you could drill through the core and have it drained.
Q You never did that?
A No.
Q You don't know whether anyone else ever did that?
A No. Not to my knowledge.
Q Mr. Campbell never told you whether he did that?
A No.
Q Have you ever spoken with any of the attorneys for the former owners of the Promenade Oaks?
A I don't know what their names are. I had several phone calls last week while I was in the field around the same time you had called me in the field to confirm, but because I was literally hanging off the side of a

building in an investigation, I wasn't able to write down names. The name Tim Solan is a name that I remember.
Q Tim was with my office.
A Okay. Tim Solan. Mr. -- I want to say his name correctly -- Baumgartner had called me to confirm, and at one point --
Q Could you speak up because I'm pretty sure they might have trouble hearing.
A Okay. At one point I received another phone call from a female attorney that said she represented Promenade Oaks, but I don't recall her name.
Q Ms. Semke?
A Yes, yes.
Q What did you talk to Ms. Semke about?
A She asked the same questions everyone else did, whether I was going to appear for the deposition and if I had any questions.
Q Did she talk to you about the substance of, you know, of the case at all or just to talk about arrangements?
A It was arrangements, and I actually asked her what it was all about.
Q What did she tell you?
A She said they want to know what you've seen out at Promenade Oaks.
Q Is that all she told you?

A Yes.
Q How about Mr. Baumgartner; did you discuss the Promenade Oaks project with Mr. Baumgartner?
A Well, it was through him that I learned I was being deposed because I had spent most of my time in the field during the investigation and I learned from him that I was being deposed. That was before you had called and I had seen the correspondence. And he basically wanted to confirm that I was an employee of Israel Berger & Associates and that I had received the notice of deposition.
Q Showing you what's Exhibit 559, would you take a look at that document and let me know if you've ever seen that before?
A (Witness complies.)
MR. HULL: Would you identify that for the record, please?
MR. VEITH: Yes. This is the December 30, 2002 proposal, GID number 933 through 939.
MR. REILLY: And that exhibit number again?
MR. VEITH: 559.
Q (By Mr. Veith.) Have you ever seen that before?
A Yes, once.
Q Once? When?

A Before it went out.
Q Before what?
A Before it went out to Scott Vanderberg.
Q Did you write it?
A No.
Q Do you know who does write up this?
A Yes. Accounting does.
Q You reviewed it before it went out to GID?
A Yes.
Q Was this proposal ever agreed to by Israel Berger & Associates?
A You mean was it signed?
Q Yes. I mean, did this proposal --
A Did it go through?
Q Yes. Did it go through?
A No. Not to my knowledge.
Q Do you know why?
A No.
Q Are you still working with GID on the Promenade Oaks project?
A No. Not actively.
Q What happened after you did your field report?
A That was the end of it at that point until further notice came.
Q Did someone at GID ask you to prepare this proposal?

A Yes.
Q Who asked for it?
A Mr. Tarasov.
Q And you sent it over there on December 30, 2002, correct? It looks like there's a date on it, the first page?
A Right.
Q Did you ever hear back from GID after you sent this proposal?
A Other than they're putting the project on hold and wait until further notice, no.
Q Who told you they're putting the project on hold?
A Scott Vanderberg.
Q Did he tell you why they're putting it on hold?
A No.
Q Was that a telephone call that you had with Mr. Vanderberg?
A Yes.
Q Did he call you?
A I don't recall. We speak often because of the other project I'm working on with him.
Q Was there anything more to that conversation?
A No.
Q Was it a very brief telephone call?
A I don't recall how long the call was.
Q Was that the last time you've talked to anybody at GID

about the Promenade Oaks project?
A Yes, other than telling them that I got a notice of deposition.
Q When did you do that?
A The day I received it, or the day -- the day you called, actually.
Q Who did you call?
A Scott Vanderberg.
Q What was discussed in that telephone call?
A I basically told him I have just been told by an attorney in Minneapolis that I'm going to be deposed and that another attorney just called me and said that he had sent me a notice of deposition and I asked him if he knew about it and he said no.
Q Was anything else discussed in that phone call?
A No, other than his surprise.

MR. VEITH: Thank you. I don't have any more questions.

MR. REILLY: I'm willing to keep going. Would you like to stop, sir, for lunch, or what would you like to do?

THE WITNESS: Keep on going.

MR. REILLY: All right.

EXAMINATION

BY MR. REILLY:

Q Sir, my name is Pat Reilly. I represent Colloid. I don't have a whole lot of questions.
During your investigation in this project, did you ever contact CETCO or Colloid regarding Swelltite to obtain information?
A No.
Q Have you ever reviewed any literature from CETCO or Colloid regarding Swelltite?
A Yes.
Q What did you review?
A I believe we have a binder or a brochure in the office in the product library.
Q Did you review that material in preparing your report of December 4th?
A No.
Q And why did you choose not to review that material?
A It didn't occur to me to review material before the visit.
Q I said before your report.
A Before the report? No, it didn't occur to me to review it.
Q And I take it you did not contact anybody at CETCO or Colloid for input regarding your report of December 4th?
A No.
Q Did you ever obtain any information upon the nature of how

Swelltite is appropriately installed in the courtyard such as at the Promenade Oaks?
A Can you say that again?
Q Did you ever obtain information from any source as to the appropriate method of installing Swelltite 3000 in an application such as at the Promenade?
A No.
Q Have you yourself ever installed bentonite waterproofing?
A No.
Q Looking at Exhibit Number 592, which is your field report, I just wanted to ask you about some of the observations that you made. These are things that you actually saw while you were out there, correct?
A Which observation?
Q It's page 2 of your report.
A Page 2? Okay.
MR. HULL: I'll object to the form of the question, vague.
Q (By Mr. Reilly.) You see where it starts with number 3, Observations?
A Yes.
Q Okay. One of the things was regarding perimeter roof gutters, and you found that those were not in existence, correct?
A That's correct.

Q What was the significance, if any, of there not being roof gutters on the roofs that drain to the courtyards, in your opinion?
A I believe that it should have had gutters with direct drainage lines to surface level drains and that because water was freely running off the eave of the roof, it was ultimately compacting the soil at the base of the wall creating a depression.
Q I think your next observation was that the surface drains were not low enough to accept surface water, is that essentially what --
A That's correct.
Q -- a ii is?
MS. HEYER: Object to the form of the question.
THE WITNESS: a ii? Yes.
Q (By Mr. Reilly.) And the next paragraph was essentially the test probe that you saw showed that the beneath grade drainage was not correctly configured?
MS. HEYER: Object to the form of the question.
Q (By Mr. Reilly.) Correct?
A That's correct.
Q Is that because that drain should be at the very bottom of the courtyard?

A When you say "that drain"?
Q I mean those beneath grade drains should be down to the level of the deck of the courtyard itself?
A They should be at the low point.
MS. HEYER: Object to the form of the question.
Q (By Mr. Reilly.) And at all times when you dug, or saw these holes dug, there was at least some water at the bottom of all these holes, correct?
A Yes.
MR. HULL: I'll object to the form of the question.
MS. HEYER: Same objection.
Q (By Mr. Reilly.) Well, you saw some water at the bottom of all these holes, did you not?
A Yes.
Q And no matter what kind of waterproofing it is, whether it's asphalt, bentonite or any kind of waterproofing, one of the things that you design in a system is to move that water off the waterproofing as quickly as possible, correct?
A That's correct.
Q And that has nothing to do with the nature of the waterproofing itself, but that is just a common principle that, whether it's a roof waterproofing system, below

ground waterproofing system, you want to move water off the system as quickly as possible?

MR. HULL: I'll object to the form of the question.

THE WITNESS: Yes.

Q (By Mr. Reilly.) And one of the ways you do that, for instance, is to put a slope to a drain?

MR. HULL: Object to the form of the question.

Q (By Mr. Reilly.) Is that correct?

A That's correct.

Q Do you know who decided in this design at the Promenade not to slope or put a slope in the courtyard's two drains?

A No.

MR. BROWN: Talking about precast or dirt?

MR. REILLY: We've been talking about underground.

THE WITNESS: You mean the deck itself?

MR. REILLY: The deck itself, right.

THE WITNESS: No, I don't.

Q (By Mr. Reilly.) Okay. You were asked some questions about location of evidence of leakage. Do you remember talking about that?

A Yes.

Q You were not able at any time you were there to

definitively determine where water was getting into the buildings?

MR. HULL: I'll object to the question.

Q (By Mr. Reilly.) In other words, the source of any particular leak, were you?

MR. HULL: Same objection.

THE WITNESS: To identify the source of an interior leak?

MR. REILLY: Yes.

THE WITNESS: In the garage or as opposed to an occupied space?

Q (By Mr. Reilly.) Yes. In other words, that water is coming from that hole or that spot or that detail?

A I just want to make sure I understand the question. When you say identify the source of the leak, you mean from the outside to the inside or correlate damage, interior water damage to a specific source of water?

Q Well, for instance, let me ask you this. You see water in a garage; you know it's coming from someplace. You don't know the specific location in the courtyard, the walls, or some other entrance plane where that water is coming from?

MR. HULL: Objection to the form of the question.

THE WITNESS: With respect to this specific scenario?

MR. REILLY: Yes.
THE WITNESS: That's correct.
Q (By Mr. Reilly.) And one of the things you mentioned was wood posts, for instance, going down to the waterproofing or going through the waterproofing?
A That's correct.
Q Did you make that determination in your observations, whether those posts penetrated the waterproofing or not?
A I wasn't able to do that.
Q All right. So if that's a source of leak, you were not able to determine?
A That's correct.
Q If there is water getting into the block wall -- and I'm talking block walls that surround the courtyard, this bathtub as you described?
A Correct.
Q And it's getting into that block wall, that block wall is porous, correct?
A Yes.
Q And it's hollow?
A I was not able to determine if it was hollow.
Q In any event, even -- let's assume it's not hollow. Water is still able to transfer through cement block?
MR. HULL: Object to the form of the question.

Q (By Mr. Reilly.) Correct?
A Untreated, yes.
Q And if it gets into the cement block behind the waterproofing, the waterproofing has been defeated, there's nothing you can do, the waterproofing cannot do anything to prevent that from occurring?
MR. HULL: I'll object to the form of the question.
THE WITNESS: Once it gets past it.
MR. REILLY: Right.
THE WITNESS: That's correct.
Q (By Mr. Reilly.) And if it gets past it because it's entering above the waterproofing, the waterproofing can't prevent that?
MR. HULL: I'll object to the form of the question.
THE WITNESS: You mean above and then entering behind it?
MR. REILLY: Yes.
THE WITNESS: That's correct.
Q (By Mr. Reilly.) Did you ever notice the level of the dirt or grass as it related to the building construction itself in the courtyards?
A You mean how high --
Q How high it was?

A In relation to the --
Q The structure itself. In other words, the siding, the stoops, that sort of thing?
MR. HULL: Just a second. When somebody objects, just give them a second, if you wouldn't mind, Mr. Camaya.
THE WITNESS: Okay.
MR. HULL: I'm going to object to the form of the question. Do you mean from his personal observations or from all the material he had?
MR. REILLY: I'm asking what he saw, what you observed.
THE WITNESS: From what I observed, it varied.
Q (By Mr. Reilly.) And in some of those locations, was there grass at the top of the grade above the bottom of the siding?
MR. HULL: I'll object to the form of the question.
THE WITNESS: It was just -- from what I observed, it was at the level of the siding, but I don't know if the siding went below the soil or the top of the grade itself.
Q (By Mr. Reilly.) Okay. Did you see evidence of water entering walls at or around staircases on the ends of

buildings and in the middle of building connectors?
A Do you mean in public corridors?
Q Yes. Actually outside stairwells where there's a block wall and there's outside stairwells; did you see evidence of water on those blocks?
MR. HULL: Object to the form.
THE WITNESS: Not active leaking.
Q (By Mr. Reilly.) But did you see evidence of water?
A Yes.
Q Did you determine where that came from, for instance?
A No.
Q Did you note whether the stairwells had some shifting or movement in them, those outside stairwells?
A The stairwells themselves?
Q Yes. The structure of the stairwells?
A The stairs themselves or the walls?
Q Okay. Let's talk about the walls. Did you see some evidence of movement around those stairwell walls?
A I observed some cracking, vertical cracking within the blocks of the walls.
Q Did you form any opinion as to what caused that?
A Nothing solid.
Q All right. Who had advised you that bentonite waterproofing accepts a negligible amount of interior water leakage?

A Who advised?
Q Yes. What's the basis of that statement?
A No one in particular. It's an opinion shared by other consultants other than myself.
Q Is there any written material to verify that, that you're aware of?
A Not to my knowledge, no. I'd have to look.
Q Any studies that you're aware of?
A Perhaps something written by older consultants.
Q You were talking about other kinds of waterproofing systems that could be used, and one of them I think you indicated was a hot-applied system?
A That's correct.
Q Does that include on top of the material that is spread or put on a rubberized cover of some sort?
A You mean is it applied over an existing?
Q Or how -- is a rubber cover put over that waterproofing to protect it?
A Is there -- are you asking me if there's any form of protection over the actual element that is the waterproofing?
Q Yes.
A Yes.
Q Is that a rubberized or a vinyl or some sort of material?
A No. It's usually an asphaltic hard board.

Q Is that prepped in any manner to make it waterproofing?
A No. It serves a purpose to protect.
Q All right. Do you know whether Swelltite is designed to have a water barrier above; in other words, between the water source and the bentonite?
A Other than the high density polyethylene, no, I wouldn't know specifically as to the specification of Swelltite.
MR. REILLY: Sir, that's all the questions I have. Can we just take about a two minute break?
(A short recess was taken at this time.)

EXAMINATION

BY MR. BROWN:
Q Mr. Camaya, my name is Mark Brown and I have about as few questions as Mr. Reilly did. I represent Waterproofing By Experts.
Did you have any opportunity to discuss any of the installation procedures on the Promenade project with any representative of my client?
A No.
Q Now, you gave a long list of items that you would normally want to make sure you did in a full-blown failure analysis or failure investigation, if you were to conduct one; do you remember that list?
A Yes.
Q And I'm wondering if the cases that you mentioned earlier

that you had testified about on behalf of your employer were done in connection with cases involving these full-blown failure inspections?

A Were they?

Q Yes, sir.

A Yes.

Q So you weren't asked to give expert opinions in any case where you only conducted the type of cursory inspection that you did for the Promenade project, true?

MR. HULL: I'll object to the form of the question.

THE WITNESS: Can you ask that again?.

Q (By Mr. Brown.) You've testified, it sounds like from your earlier testimony today, three or four times in litigation cases, is that true?

A Yes.

Q And on those occasions, you were asked to provide expert opinion testimony, is that right?

A When you say "opinion"?

Q Were you asked to give expert opinions in those three or four cases that you mentioned?

A Defining opinion as what I observed?

Q Well, I don't know if I'm going to give a definition of a word. Were you retained and paid by anybody in those cases to act as an expert witness and give testimony and

opinions in that context?
A Yes.
Q All right. And in each of those three or four cases in which you've been asked to testify on behalf of Israel Berger, had you conducted the type of full-blown failure investigation you earlier described for us?
A Yes.
Q So then in none of those cases, conversely, were you asked to give expert opinion testimony when all you had done was the kind of cursory investigation that you did on behalf of GID for the Promenade project?
MR. HULL: Object to the form of the question.
THE WITNESS: That's correct.
Q (By Mr. Brown.) Did you consider Mr. Campbell -- or did you form the conclusion that Mr. Campbell performed more of a comprehensive failure type investigation for the Promenade?
MR. HULL: Objection, foundation.
THE WITNESS: Yes.
Q (By Mr. Brown.) Did you at least make that assumption based on having seen his reports and so forth?
MR. HULL: Same objection.
THE WITNESS: Yes.
Q (By Mr. Brown.) Did you defer to Mr. Campbell in terms of

forming opinions and conclusions about the issues that were contained in his report?
A Ask that again.
Q I'll withdraw that question. Let me ask it this way. You knew that you were not sent out there by Israel Berger on behalf of GID to perform the type of investigation that you concluded Mr. Campbell had performed, true?
A That's correct.
Q I have a few questions about your report as well. If you would turn, please, to page 3 of 19, Exhibit 592, and subparagraph numeral 4, you mention an issue with the composite drainage mats, is that right?
MR. HULL: What page are we on?
MR. BROWN: Page 3, item numeral 4, Arabic 4. Are you there?
THE WITNESS: Yes.
Q (By Mr. Brown.) Now, my first question about this paragraph, are the probes that are stated in this subparagraph to have indicated some capping off probes that were dug by Mr. Vanderberg or were these probes that were mentioned in the Campbell report?
A These are -- this is what I observed in the probes Mr. Vanderberg made.
Q Okay. Now, do you know what brand or type of composite drainage mats you are mentioning in this paragraph?

A No. Not the specific manufacturer.
Q Have you had experience with composite drainage mats in your career?
A In terms of?
Q Well, have you ever installed composite drainage mats?
A No, I've never installed them.
Q Have you ever included in the course of a full-blown failure inspection such as you've earlier described an analysis of composite drainage mats?
A Yes.
Q And did you do that in one or more of the projects that you talked about at the very beginning of your deposition today?
A No.
Q Okay. I should have asked you that earlier. What was the problem or the issue you were being asked to look at on the one project that had bentonite product?
A It leaked into the garage space below it and the occupied spaces that it was adjacent to.
Q Was a determination and ultimate conclusion reached by you as to why those leaks were occurring?
MR. HULL: I'll object to the form of the question.
THE WITNESS: No.
Q (By Mr. Brown.) Do you know why those leaks were

occurring on that project?
A Yes. I know why some of the leaks were occurring.
Q Why?
A It was installation failure.
Q In what sense? In what way?
A Improper detailing.
Q Now, that's not your opinion in this case, if I can sort of summarize your report? Your report in this case generally just states that the system itself was not compatible with the existing design of these particular courtyards?
MR. HULL: I'll object to the form of the question.
MR. REILLY: I'll join.
MR. VEITH: I will too.
MR. REILLY: Calls for speculation.
THE WITNESS: That's correct.
Q (By Mr. Brown.) And again, based upon your cursory review and your review of Mr. Campbell's report?
MR. HULL: Objection to the form of the question.
THE WITNESS: That's correct.
Q (By Mr. Brown.) Now, in this paragraph 4 again, regarding the composite drainage mats, the last line states, "the composite was filled and clogged with fines." Was that at

the top or the upper edge of that composite drainage mat, at least in the probe that you're mentioning here?
A I observed that at the upper edge.
Q So you have no idea whether there was clogging of the composite drainage mat anywhere below just the upper edge that you visualized out there, true?
A That's correct.
Q Are you aware of whether the kind of composite drainage mat installed at the Promenade project is itself permeable on its face?
A That's what it appeared to be.
Q All right. And do you know whether the composite drainage mat was actually draining below the very top edge of even the sections that you observed in those probes?
A No, I don't.
Q Do you know whether the composite drainage mat on this system would even have mattered whether it was operated or not given the other observations that you made or verified that Campbell had made about two inches of standing water and no slope to drain in the precast and all the courtyard drainage details that are discussed?
MS. HEYER: Object to the form of the question.
THE WITNESS: Considering that, no.
Q (By Mr. Brown.) You don't know?

A No. Considering that, I don't think it would matter.
Q Is the man that was employed, or at least it was your conclusion he was an employee of the Promenade that was assisting you in the first meeting out at the Promenade, was his name Terry Wiederhoft, do you recall?
A No, I don't recall that.
Q You mentioned in your report construction sequencing, and specifically you talked about some photographs that evidently gave you an impression that backfill was installed in a courtyard or more than one courtyard some extended time after the waterproofing material itself was installed; do you recall making that observation?
A Yes.
Q Did somebody chronicle those events for you by showing you those photographs or how is it that you were able to make that time sequence determination?
A I asked if there were any progress photos and that individual said he did, he did have progress photos in a binder and they all had time date stamps in the lower right-hand corner.
Q And what was it about these photographs that you were shown that led you to surmise that there were time lags between when the waterproofing membrane was installed and when dirt was filled in those courtyards?
A It was a photograph of the waterproofing membrane

installed on the deck with a date on it and there was another photograph of a similar area and there was a few weeks difference in the time date stamp and there was still no backfill on the waterproofing.

Q And does that even matter, when the backfill was put on, if there is a protective or plastic course on the outer face of a membrane and it's secured at the seams and held up in place on those walls?

MR. HULL: I'll object to the form of the question.

MS. HEYER: Same objection.

MR. REILLY: Objection, lack of foundation.

MR. BROWN: And if you don't know, that's fine.

THE WITNESS: Typically you'd want to backfill as prompt as possible after the installation of that type of waterproofing.

Q (By Mr. Brown.) You have no idea and nobody told you who was responsible for installing backfill on the Promenade project, do you?

A No.

Q You mentioned also on page 3 of your report, and you talked a little bit about it today, that the existing bentonite-based waterproofing assembly is not suitable for

the existing construction and configuration of the courtyard at Promenade Oaks. Do you see that at the bottom of page 3?
A Yes.
Q And I took that to mean, and correct me if I'm wrong, that by existing construction and configuration, you're talking about the system with all the observations that you made or that you verified Campbell had made, and those are listed in part on page 19 of 19, true?
A Yes.
MR. HULL: I'll object to the form of the question.
Q (By Mr. Brown.) So in other words, what you're saying here is, with all these other items that are listed on page 19 of 19, this particular design as existing and configured at the time you did your cursory walk-thru was not compatible with the particular waterproofing system that was installed, is that what you're saying?
MR. REILLY: Objection, lack of foundation.
MR. HULL: I'll object to the form of the question.
THE WITNESS: Yes.
Q (By Mr. Brown.) Do you know if given all those other items that you list in this report or that you verified

Mr. Campbell had observed whether any waterproofing system would have been compatible with these courtyards as in the existing configuration that you observed during your walk-thru?
A Are you asking me what else I would have used?
Q I'm just asking you if there's any waterproofing system that you're aware of that would have worked given all the issues that you mention with -- I don't want to go through each and every one of them, but with, you know, no slope to drain and with no gutters and downspouts and with dirt being piled 12 inches higher than it was in the plans that you observed and all those issues. In that existing condition, as mentioned in your report, are you aware of any waterproofing system that would have worked given those circumstances?
MR. REILLY: Objection, lack of foundation?
MR. HULL: Object to the form of the question.
MS. HEYER: I'll join in that objection.
MR. STEPAN: I think it misstates what's contained in the report.
Q (By Mr. Brown.) And I understand that maybe -- if I'm not interpreting paragraph small roman numeral i correctly, then just tell me, but what I'm trying to say is, by the

use of the word "existing," I took that to mean with all the observations that are listed in your report, that's what you meant by the existing construction and configuration?

MR. HULL: I'll object to the form of the question.

Q (By Mr. Brown.) I'm asking you if I'm interpreting that word in a proper way?

MR. HULL: Same objection.

MS. HEYER: Mark, can you clarify for the record where you're at right now in the report?

MR. BROWN: Yes. The very last -- the beginning of the paragraph on page 3 of 19.

THE WITNESS: In this case, existing, I'm speaking specifically of the precast concrete plank deck and just the wall construction.

MR. BROWN: Okay. Then you have clarified that. Thank you.

MS. SEMKE: Was there ever an answer to that? We didn't hear it. There was a bunch of mumbling.

MR. BROWN: I think that was coughing.

MR. REILLY: Charlie will read back the answer.

(The court reporter read back the last question at this time.)

Q (By Mr. Brown.) If you turn to page 4 of 19, sir, the small roman numeral v at the bottom, you're talking about spot repairs and remedial waterproofing. You were told about those repairs and remedial waterproofing efforts by somebody during your investigation, is that how you learned of those?
A Yes.
MR. HULL: I'll object to the form of the question.
Q (By Mr. Brown.) And therefore, the source of any information contained in this paragraph about specific interior leaks was verbalized to you by whoever told you about those remedial efforts and/or contained in the Campbell materials that you reviewed, is that true?
MR. HULL: I'll object to the form of the question.
THE WITNESS: Yes. In addition to seeing some of the repairs in the field.
Q (By Mr. Brown.) Now, in terms of some of those repairs, you mentioned a couple of them. The last sentence, though, I'm interested in, where you say, "Failures in these locations also contribute to interior leaks and water that migrates behind the virtually applied waterproofing." Did I read that accurately?
A Yes.

Q Did you actually observe active interior leaks and/or water migrating behind vertically applied waterproofing during your cursory walk-thru inspection?
A No.
Q You mentioned in several parts of your report and during your testimony today, there's some photographs as well, of water staining in various locations, correct?
A Yes.
Q Did the limited nature of your cursory inspection allow you to determine how old those stains were?
MR. HULL: I'll object to the form of the question.
THE WITNESS: No.
Q (By Mr. Brown.) Were the stains that are depicted, for example, in photographs numbers 1, 2 and 3 on page 8 of 19 of your report consistent with water that had defeated vertical membrane by entering the courtyards above the termination point of that membrane?
MR. HULL: I'll object to the form of the question and foundation.
MS. HEYER: Same objection.
MR. STEPAN: Same objection.
MR. REILLY: Join.
THE WITNESS: I'd say it's water that -- it's an interior leak that I did not pinpoint where the

actual point of infiltration was.
Q (By Mr. Brown.) I understand that, sir, and I know that you said you did not and could not pinpoint where any of those leaks arose that you talked about seeing staining of. What I'm asking, though, is whether the stains that you photographed were consistent with water -- and I think Pat touched on this during his questioning -- water getting into the block vertical walls above and behind the waterproofing membrane?
MR. HULL: Object to the form of the question and foundation.
MR. STEPAN: Join.
MS. HEYER: Same objection.
THE WITNESS: Yes, it was consistent.
Q (By Mr. Brown.) Were you given any understanding of any repairs done or remedial work done with respect to the posts in the courtyards?
A Yes. That was verbalized to me.
Q By whom?
A The same gentleman who produced the progress photos.
Q The Promenade employee?
A Yes.
Q Did the gentleman indicate to you one way or another whether leaks were reduced or eliminated following the repair work regarding the posts?

A I don't recall.
Q Can you turn to photograph 8 on page 10 of 19, please? I have a black and white. I'm sorry. Do you have color copies in front of you?
A No. I have black.
Q What is that?
A That is a photograph of the waterproofing membrane extending above the soil and intended to be fully adhered to the vertical wall behind it and is now delaminated from that surface.
Q Do you know whether the -- I can't make anything out on this photograph, but do you recall from what was photographed whether the waterproofing material you just mentioned was Swelltite material?
A No. This was not Swelltite.
Q All right. That was something that was put above the termination of the Swelltite, is that right?
A Yes.
Q And the third point on paragraph 8, where it says, "Delaminating facer of exterior sheathing board exposes the gypsum core," true?
A Yes.
Q You're talking about the wall sheathing, are you not, --
A That's correct.
Q -- on the exterior of the courtyard sides?

A Yes.
Q Do you know whether it's good construction practice to install dirt or fill in a courtyard configuration such as this that is higher than the bottom of the exterior sheathing?
MR. HULL: I'll object to the form of the question and foundation.
THE WITNESS: No. It's something that I wouldn't design.
Q (By Mr. Brown.) Is that a condition, though, that you observed during your cursory walk-thru inspection?
MR. HULL: I'll object to the form of the question.
Q (By Mr. Brown.) And in other words, is that what you're mentioning in point 3 under photograph 8?
A Right. That's what I'm mentioning in the photograph.
Q Were you given any understanding of the sequencing during the construction of when the posts were installed in connection with when the waterproofing membrane was installed? In other words, which of those two was installed first?
A No one told me about the sequencing.
Q If you look at the second point in photograph 12 on page 11, what is that telling us about the sequencing, if anything?

A I interpreted the repair detail as being a response to the wooden posts being in direct contact with the concrete deck, which would lead me to believe that they came before the waterproofing.
Q Is that a good design when using a membrane system such as this?
MR. HULL: I'll object to the form of the question.
THE WITNESS: Typically you would want to avoid as many penetrations through waterproofing.
Q (By Mr. Brown.) Do you know whether the posts are permeable?
A Yes.
Q Do you know whether water can migrate down those posts?
A They can.
Q Do you know what blind-siding is?
A I'm sorry?
Q Do you know what blind-siding is?
A If it's referring to blind-side waterproofing, then I know what it is.
Q Why don't you tell me your understanding of that term?
A Blind-side waterproofing is applying waterproofing to the interior side as opposed to the exterior surface that would be in direct contact with water.
Q That would be something that would be, for example, with a

cast-in-place concrete, it would be cast right into the form of the concrete?
A Yes.
Q I think I must have misunderstood an answer you gave to one of Pat's questions about Swelltite literature. Did you say that you never reviewed any Swelltite literature in connection with your work on the Promenade project?
A That's correct.
Q And therefore, you never installed any installation requirements or installation procedures for that material?
MR. VEITH: I'll object because I don't understand the question.
MR. REILLY: You said installed instead of reviewed.
MR. BROWN: I'm sorry.
Q (By Mr. Brown.) You never, then, reviewed any literature that described how to properly install Swelltite 3000, is that true?
A Other than whatever is in our library.
Q All right. But you didn't review any of that, if I understood your answer correctly, in connection with your cursory inspection and report, true?
A That's correct.
MR. BROWN: I think that's all I have, sir. Thanks.

MR. HULL: Why don't we take our lunch break?

MR. REILLY: All right. It's 1:20. What time do you want to get back?

MR. VEITH: One hour.

(A recess for lunch was taken at this time.)

EXAMINATION

BY MR. STEPAN:

Q Mr. Camaya, my name is Chad Stepan. I'm one of the attorneys for Weis Builders, who was the general contractor on the Promenade project. I have some questions for you today as well.

Are you familiar at all with a company named Criterium?

A No.

MR. REILLY: What was your answer, sir?

THE WITNESS: No.

Q (By Mr. Stepan.) Do you know a man at all named Rob Vanmarter?

A No.

Q Are you familiar at all with a company named Bjorkstrand Company?

A No.

Q Have you ever heard of a company known as Demera

Construction Services?
A Yes.
Q How do you know that company?
A I believe that that's the company of Tim Charbonea, the gentleman that was retained by Mr. Vanderberg to perform the excavations prior to my visit.
Q Had you ever met Mr. Charbonea prior to your work on this project?
A Yes.
Q Where did you meet him before?
A At the Liberty House Alexan, the other GID property.
Q Did you have any discussions with Mr. Charbonea out on site?
A Yes. How many probes, where are they, --
MS. SEMKE: Chad, we're not hearing the answers again.
Q (By Mr. Stepan.) I had asked you, Mr. Camaya, if you had had any conversations with Mr. Charbonea out at the Promenade site?
A My answer was yes, and it was to the extent of how many probes have you done, where are they, how does it look? To that extent.
Q How does it look; did he have a response to that one?
A Yes. He said it looked wet, going to have a hard time seeing what's down there.

Q Did he have anything else to say?
A No.
Q Do you know if Mr. Charbonea had any other involvement with the Promenade site other than digging those test pits?
A No.
Q Have you talked to him regarding this project since you saw him out at the site in November?
A No.
Q Are you familiar at all with a company known as Virginia Concrete Company?
A No.
Q Are you familiar with a company known as Roof Spec?
A No.
Q Are you familiar with a company known as Larson Engineering?
A No.
Q Are you familiar with a company known as Integrated Loss Control?
A No.
Q Have you ever spoken to a man named Gary Capel in relation to this project?
A No, not to my knowledge. Again, there were people out there at the site that I wasn't introduced to as well, so --

Q Did any of your work out at the Promenade project involve investigating mold or looking for the possibility of mold?
A No.
Q Would you consider that to be something beyond your area of knowledge?
A Yes. That's something that I would get a separate entity to test for air quality and so on.
Q Have you ever been a general contractor before?
A No.
Q Would it be fair to say that you don't hold yourself out as an expert regarding standards under which a general contractor operates?
MR. HULL: I'll object to the form of the question.
THE WITNESS: Yes, that's fair.
Q (By Mr. Stepan.) Have you ever heard the phrase a hung courtyard before?
A No.
Q You mentioned that at the library in your office you have some CETCO literature, is that right?
A That's correct.
Q Have you ever looked at that literature?
A Yes.
Q Do you recall when?
A The time of -- I was involved with the other project

involved, bentonite waterproofing system.
Q Which project was that again?
A The Adams Landing.
Q Was it CETCO materials on that project?
A No.
Q Why did you look to the CETCO literature?
A I was just grabbing everything that involved bentonite.
Q And when were you involved with that project, the Adams Landing?
A Between 1995 and 2000.
Q Over that whole course of time you worked on that project?
A Yes. I was involved with that project as well.
Q Do you recall when during that time frame you looked at the CETCO literature?
A No, I don't.
Q Closer to '95 or closer to 2000?
A Closer to 2000.
Q Do you recall what comprises the CETCO literature that you have at your office?
MR. REILLY: Objection, calling for speculation.
THE WITNESS: Other than loose brochures, no.
Q (By Mr. Stepan.) Are they installation brochures or just general information about the product?

A Yes. They were product description sheets, data sheets.
Q Did they discuss installation as well?
A I don't recall.
Q You mentioned that the Promenade person who was out on the site when you were out there doing your inspection told you that there had been repairs done to the posts, is that right?
A Yes.
Q What did he say about the repairs to the posts?
A Other than saying that they were repairs to the posts, he described them as correcting the condition of not having the wooden posts in direct contact with the concrete slab and then he described them as floating.
Q He described what as floating?
A The posts. The base of the post was floating on a plate, for lack of a better word, to keep it from direct contact with the membrane.
Q So was it your understanding that, as originally constructed, the posts actually rested on top of the deck itself?
A Yes.
Q And then after repairs, they were now floating on a plate?
A Right.
Q Did he say anything else about the repairs, that you recall?

A No, not to my recollection.
Q You mention in your report, which is Exhibit 592 -- do you still have that in front of you?
A No.
Q Right here. In particular at page 4, roman numeral v, you mention the fact that there were repairs done out at the site. Do you see that?
A Yes.
Q Did the individual from Promenade talk to you about these repairs as well? These meaning aside from the posts, did he address the repairs that were done on the vertical wall?
A No, he did not.
Q Did anybody tell you anything about the repairs on the vertical walls?
MR. BROWN: Object to the form.
Q (By Mr. Stepan.) Anybody at the site when you were out there?
A No. No one outside of the gentleman that produced the progress photos.
MS. SEMKE: Can you repeat that answer?
THE WITNESS: No one outside of the gentleman that produced the progress photos.
MS. SEMKE: Thanks.
Q (By Mr. Stepan.) You mentioned that the gentleman who

produced the progress photos -- that from the project photos you got the sense that the backfill wasn't placed -- or some time went by after the waterproofing was put in and the backfill was placed, is that right?
A That's correct.
Q The person who produced the photos to you, the Promenade person, did he indicate to you that those were all the photos he had in his possession from the project?
A No.
Q Do you recall the dates of the photos?
A No, I don't.
Q You mentioned that there was a photo of a deck after waterproofing was installed and then you saw a photo of a similar area that had a different date stamp on it with no backfill installed yet, do you recall?
A That's correct.
Q Do you know if that second photo, the photo with a different date from the first, was of the same courtyard as the first photo?
A That's how it appeared in the photo.
Q Do you know for certain?
A Not unless I looked at the photo again.
MR. HULL: Object, form of the question.
Q (By Mr. Stepan.) Do you know with any certainty the sequence of events that occurred on the project with

regard to when the waterproofing was installed and when the backfill was placed in any of the courtyards?
A Specific dates, times? No.
Q The only information you have about that is some progress photos that were shown to you when you were at the site, is that right?
A That's correct.
Q This was the first time you had ever been out to that site?
A Yes.
Q So it would be fair to say you don't have firsthand knowledge of anything that went on during construction?
A That's correct.
Q Have any of the other bentonite products that you've worked with had a water-soluble film?
MR. VEITH: Objection, speculation and mischaracterizes his earlier testimony. He said he never worked with -- he'd worked with another product.
MR. STEPAN: You can go ahead and answer.
THE WITNESS: No, I don't recall.
Q (By Mr. Stepan.) You've worked with other bentonite products in the past, haven't you?
A Worked in terms of applied, installed?
Q Your experience with bentonite products investigating sites where bentonite products were installed, is

that correct?
A That's correct.
Q And to your knowledge, none of those products had a water-soluble film?
A To my knowledge, no.
Q Have you ever heard of Weis Builders before?
A No.
Q The drawings that you were provided as part of your review prior to going out to the site, did they contain structural drawings as well?
A I don't recall.
Q Who gave you the drawings?
A They were sent to me by Mr. Tarasov.
MR. HULL: Excuse me. By who?
THE WITNESS: Mr. Tarasov, Bob Tarasov.
Q (By Mr. Stepan.) Did Mr. Tarasov tell you where he got them?
A No.
Q Along with those drawings, did you see any -- were there any addendums to the drawings?
A No. There were just the drawings.
Q No sketches or changes, construction changes, anything like that attached to the drawings?
A No. There was nothing attached to the drawings. Just a roll.

Q How long did you spend looking over the drawings you received?
A Less than a day.
Q Did the drawings that you looked at raise any concerns for you?
MR. VEITH: Objection, vague.
MR. BROWN: Objection, foundation.
THE WITNESS: In terms of?
Q (By Mr. Stepan.) Anything? Any red flags pop up while you were looking at the drawings?
A Yes.
Q With regard to what?
A Causes me to ask questions what happens with certain interfaces.
Q Do you recall what details you were looking at?
A Specifically where the deck meets the wall.
Q Are you talking about the deck, where the deck meets the vertical wall of the courtyards?
A That's correct.
Q What about that drawing concerned you?
A I would like to have seen more detail. The drawings that were made available to me only had basic building sections and elevations in them.
Q What kind of more detail were you looking for?
A An actual architectural detail focused on a transition

from horizontal to vertical that shows what materials are there, calls out what products are going to be used, the extent of those products, attachments, accessories, relation to soil heights, window openings.
Q Did you have any other concerns with the drawings that you reviewed?
A No. Those were typical concerns.
Q Did you talk to anybody about those concerns?
A Yes.
Q Who?
A Mr. Vanderberg.
Q And what did you say to Mr. Vanderberg?
A I told him that those would be the areas that I would focus on.
Q Did he have any response to that?
A He said, "If that's where you want the probes, that's where we'll do them."
Q Did you request to see architectural plans for the project or did somebody just send them to you?
A I asked if there were any available drawings.
Q And why did you want to see the drawings?
A I wanted to at least have a handle on how large the property was, what kind of configurations may have existed out there, like to know what the details look like.

Q Have you ever spoken to anybody from the office of the architect for this project?
A No.
Q Put aside the probes for a moment and your inspection of those. Just walking through the site and the exterior of the building, down the courtyards, anything that stood out to you on your initial walk-thru?
A Yes.
Q What stood out to you?
A The absence of gutters at the eaves and that several of the surface drains were raised.
Q Anything else?
A The level of the grade in relation to the lowest windows and the walls.
Q Anything else?
A Some of the stoops didn't match. It looked as though it had been chopped out at one point and repoured.
Q Anything else?
A I observed some metal coping that had become detached, provided some voids.
MR. HULL: I'm sorry. I didn't catch that.
THE WITNESS: Metal coping that had been detached; it created voids. Vertical cracking in blocks, efflorescence.
MR. BROWN: Just for clarification, are

you talking about a particular area of blocks?

MR. STEPAN: I'm going to take him back through that, Mark.

MR. BROWN: All right.

Q (By Mr. Stepan.) Anything else?

A No. Not that I can recall.

Q You talked about the gutters already here today. The surface drains, you indicated some of them were raised, were higher than the grade around them, is that right?

A Correct.

Q Could you tell, was that because the ground around them had settled?

A I tripped over one, actually.

Q Do you know how the drains ended up being above the ground around them?

A No.

Q I mean, was it a result of settling, or do you have any idea?

A No.

Q Do you know how many of the drains were above the ground?

A More than three.

Q Do you know how many more?

A No. They were throughout the -- through the walk.

Q You mentioned the level of the grade in relation to the lowest windows. Why did that stick out to you?

A There's a detail in the drawings that were provided that indicated that the sill of the lowest window was at least a block's height from the top of grade.
Q And what did you see on site -- was there a condition on site that was different from what you saw in the drawings?
A Yes.
Q And what was different?
A The level of the soil was just below the sill.
Q Do you remember where this was, which courtyard?
A No, I don't, not specifically.
Q Did it occur on all the courtyards?
A I noticed it enough to think that it was typical. Not all of them were that way, but enough of them to give that impression.
Q Do you recall if they were all on one side of the courtyards or were they interspersed on both sides?
A I don't recall if they were.
Q And the reason I ask, are you familiar with the fact that one side of the courtyards you have a two story unit, or its lowest level is at the courtyard grade, and then there's another separate living unit below it, and then the other side you essentially have a split entry unit where you can walk down or walk up?
A Yes.
Q Do you recall on which side these windows were?

A No.

Q Was there something about that condition, the fact that the dirt was just below the window sill that -- was there something about it that troubles you?

A I wondered how that would affect the existing waterproofing system.

Q In what way? What do you mean by that?

A If there was enough room to be able to install a good seal. Generally that; to be able to provide a good water -- if there was enough room for a workman to provide a good watertight condition.

Q Did you investigate that? Did you take a look at the area directly below the sill?

A No. Didn't disassemble it because I felt that it would involve disassembling of the sill itself.

Q You mentioned that you noticed that some stoops didn't match. Tell me what you mean by that?

A It would be about two feet, approximately two feet of the slab that constitutes the stoop had a different texture pattern, a different concrete, and it had seemed to me that that had been opened up and replaced.

Q Did you ask anybody about that, why there was some concrete in the stoops that was different than the rest?

A The gentleman that produced the progress photos said that was part of remedial repair but didn't give any other

detail other than that.
Q You mentioned that you noticed some metal coping that was detached as well. Do you recall where that was on site?
A I noticed that in one area. It was at one of the main stairwells. It was at the top of a block wall just at the base of a wall with vinyl siding.
Q What's the purpose, in your understanding, of metal coping at such a location?
A It acts as a cladding to terminate the top of the wall so water doesn't pour down into the blocks or behind it.
Q Now, in your mind, is that something that's a maintenance issue that caulking or sealant in that area needs to be updated over the course of time?
MR. HULL: Objection to the form of the question and foundation.
THE WITNESS: It could be addressed as a maintenance issue. I didn't investigate the condition deep enough to be able to determine why it became undone, but it seems like a maintenance issue.
Q (By Mr. Stepan.) You mentioned vertical cracking in the blocks. What blocks are you referring to?
A There was one specific stairwell at an end wall that exhibited vertical cracking. I don't recall which end wall it was, but the vertical cracks through the block extended for more than about three feet.

Q Is this your basic gray masonry blocks or is it the kind of decorative --
A It's the decorative split face.
Q Did you investigate that at all to see what caused the cracking?
A No.
Q Cracking cause you any concern?
A Yes, in that I felt that more investigation probably was needed to determine why, but the cracks provide areas that wind-driven rain can get into the interior of the building.
Q Do you know what was behind this particular wall?
A No. It may have been -- I believe it was an exit from the garage, the garage base.
Q The wall was up above or around an exit to a garage door?
A Correct.
Q So would behind that wall, probably the garage?
A The garage.
Q Did you notice vertical cracking anyplace else?
A No. Not that I can recall.
Q And you also mentioned efflorescence. Where did you notice that?
A The same wall.
Q Coming from the cracks?
A No. Just through the block itself.

Q Did you notice efflorescence anyplace else?
A Yes.
Q Where?
A Within the walls of the garage, interior walls of the garage, and the underside of the deck.
Q Anyplace else on the exterior?
A No.
Q Do you have any idea as to how many of these progress photos that the person from Promenade had, how many photos he provided to you?
A I remember there being at least two binders. There was another binder on the table I didn't get to look through, but I wasn't sure if that also had photos. But I was able to look through two binders.
Q Were there a number of photos on each page?
A No. To my understanding, he had taken these photos on his own initiative for his own record keeping. It wasn't a strict numbering system associated with them. They were in plastic sleeves.
Q Did he tell you how often he took photos during the project?
A No, he didn't.
Q Did the person from Promenade go through the photos with you, point things out, or did you just look at them on your own?

A I looked at them on my own.
Q I believe you testified earlier that you said you went into two units that were below grade?
A Yes.
Q Do you recall what units they were?
A No, I don't, not the specific number.
Q Do you recall which building they were in?
A No.
Q And you went to one above grade unit, is that right?
A Yes.
Q Do you recall which unit that was?
A No, other than it was in close proximity to the main office.
Q Do you recall the building number?
A No.
Q I believe in the Exhibit 540, there's a map of the site. Would you be able to look at the map and determine which building, units you looked at?
A Is this -- can I ask a question? Is this an entrance to the garage right here? This is, right?
Q Which one?
A Here. This is the causeway to the main garage space, right?
Q Yes. I believe that's the pass-thru link between the two buildings. You go into there and you go off either way to

the garages.
A Right. I believe the above grade unit was here.
Q And you're indicating --
A I'm indicating where the number 2 probe is called out on the drawing.
Q And we're looking at Appendix A to Exhibit 540?
A Right.
Q And that number 2 is located in the right-hand side of building number 1 near the pass-thru, is that right?
A Right. I wouldn't be able to pinpoint the other units without being able to look through the file of photos.
Q Did somebody have those units identified -- you know, did somebody lead you to those units as these are the three units we're going to look at?
A Yes.
Q Or were you able to pick out units as you went along?
A No. They were predetermined that we would go through those units.
Q Do you know who predetermined those units?
A No, I don't. I think it was based on availability or occupancy.
Q Did you ever hear that any of those three units were not able to be rented?
A There was a term used by the Promenade Oaks staff member that toured us around my second trip used the term called

downed unit. The question was asked by one of the GID people how many downed units there are.
Q And was it just one unit that he identified?
A I wasn't -- I didn't hear enough of the conversation to be able to determine. I just remember the term downed unit.
Q And I'm sorry, the unit that's near number 2 probe on Appendix A, was that the above ground unit?
A Yes.
Q With regard to the surface drain that you inspected where Mr. Charbonea actually dug the pit, how big was the pit that was made there?
A The surface drain?
Q Yes.
A Enough for me to step into. Probably approximately two feet around the radius.
Q Around the drain?
A Around the drain, yes.
Q And you talked about there being about a quarter of an inch of water at that location?
A Right.
Q Is that after you lift up the insulation and the drainage mat, you saw about a quarter of an inch sitting on top of the membrane?
A Yes.

Q And were you able to see, when you pulled up the drainage mat and insulation, see the actual drain in the waterproofing?
A No. Just the ring, just the mechanical clamping ring.
MS. HEYER: The what?
THE WITNESS: The mechanical clamping ring.
Q (By Mr. Stepan.) Were you able to tell if the waterproofing had been clamped down in the ring?
A It appeared that way.
Q There were two sites where there were -- or two probes near the stoops, is that right?
A That's correct.
Q How big were those openings?
A Down to the deck to be able to see the bottom of the post. I'd say two-by-two, two-by-two.
Q Big enough so you could stand in it again?
A Yes, but I didn't want to stand in it.
Q Because it was muddy and water in there?
A I just didn't want to stand on the stoop.
Q And there was also openings made at the base of the vertical -- or along the vertical wall at two locations, right?
A That's correct.
Q How big were those openings?

A I would say one and a half by three. They were more rectangular in their shape.
Q Rectangular with the long way along the wall?
A That's correct.
Q Were you able to stand in those?
A I could've, but I didn't.
Q You mentioned that you observed material that was applied over the top of the waterproofing through the top of that vertical block wall. I think you identified it as the transition to above grade, do you recall that?
A Yes.
Q Do you know what kind of material that was?
A I don't know what the specific material manufacturer was, but it appeared to be a rubberized asphalt membrane.
Q Have you seen a rubberized asphalt membrane installed in such a location before?
A Yes.
Q Something you would consider to be suitable for that application?
A Yes, only if it was protected.
Q What kind of protection would you recommend for that?
A Protection from impact, abrasion and the ultraviolet degradation. So there would have to be something rigid over it and secured.
Q What do you base that on, that there needs to be

protection from impact, abrasion and ultraviolet exposure?
A Rubberized asphalt membranes degrade in ultraviolet light, so it is not advisable to leave them exposed. They're surface-adhered, fully adhered systems most of the time. Since it's in proximity to the grade, anything from a lawn mower, a weed whacker or shovel may damage it if it's not protected with a rigid clad protection border or a continued piece of cladding around the base of the wall.
Q Was there any such protection at the two sites you looked at?
A No. These were exposed. It seemed as though the soil had fallen below the height of the exposed membrane. Whether it was erosion or washed away, I couldn't tell. I knew that they were exposed and that was -- it was a matter of time before that kind of membrane would degrade in the sun.
Q So you're saying -- you said that the soil had fallen away. So was the condition such that you have the siding coming down, siding stops, you actually see the membrane and then the soil's below that?
A Yes.
Q And was that the condition at both locations you inspected?
A It was at least at one of the probes, and it occurred in

other areas around the compound.
Q Do you know where else around the site?
A No, not specifically.
Q Did you make any note of these other locations?
A I may have taken a photo of a location. I'd have to see what the actual photo file looked like once they recover it, but I don't have anything in the report that notes it.
Q You indicated that one of these sites along the vertical walls indicated that there was some duct tape. I didn't get a clear picture what you were talking about. Can you explain that to me?
A At one of the probes done at the base of the wall next to the stoop, where the fully adhered rubberized membrane terminated against the edge of the slab of the stoop there was duct tape transitioning from the membrane to the slab.
Q So you've got the membrane coming up the vertical wall and the stoop meeting the wall at a 90-degree angle?
A Correct.
Q And the duct tape at that 90-degree angle?
A Correct.
Q Could you tell, was the duct tape doing anything?
A At first I thought that it may have been to tack on temporarily and it was left there. It came away quite

easily. I didn't want to disrupt the membrane any more because of the area it was in.
Q So did you remove the duct tape?
A I pulled at it to see how loose it was or if it was just -- if it was fully adhered.
Q When you pulled at it, did the membrane come away from the wall as well?
A No.
Q So it's possible it may have been something there temporarily --
MR. HULL: Objection, foundation.
Q (By Mr. Stepan.) -- and just got left there after the work was done?
MR. HULL: Objection, foundation.
THE WITNESS: It may have been.
Q (By Mr. Stepan.) Have you ever heard of a waterproofing product known as Miradri?
A Yes.
Q Is that an asphaltic membrane?
A They provide one.
Q Have you ever worked in a project where Miradri was installed?
A Yes.
Q What kind of application was it used for?
A It was used as below grade waterproofing under a plaza

that had sand-set pavers and it was also used as a transition from that waterproofing into a masonry wall.
Q So from a horizontal deck to a vertical masonry wall?
A Correct.
Q Have you ever read any Miradri literature?
A Yes.
Q When is the last time you've looked at Miradri literature?
A A few months ago.
Q And what was that for?
A That was a product -- one of the products used in the plaza as a retrofit product.
Q In the Promenade plaza?
A Oh, no. When I read the literature for it, it was for another project, not the Promenade.
Q Do you know if any Miradri products were used at Promenade?
A No.
Q Are you familiar at all with liquid counterflashings, mastics?
A The mastics or the liquid flashings?
Q Are you familiar with liquid flashing?
A Yes.
Q What types of liquid flashing are you familiar with?
A Well, there's rubberized asphalt, something comparable to American Hydrotech 6090. It's a cold-applied, pourable,

rubberized, asphalt liquid membrane.
Q Would you consider a liquid flashing to be different than a mastic?
A Yes.
Q What's a mastic?
A Mastic, I would describe the use of them as being different. As an example, you can use 6090 to flash larger areas, and depending on the situation, it could stand -- it can be a stand-alone waterproofing system, whereas a mastic I would associate with the sealing of lap seams, corners, penetrations. Mastics are typically trowel-applied emulsions material.
Q Would you consider a liquid flashing to be appropriate material to use for a transition from a below grade waterproofing to above grade?
MR. HULL: Object to the form of the question.
MR. BROWN: I'll object, lacks foundation.
THE WITNESS: It would depend on the situation.
Q (By Mr. Stepan.) How about such as at Promenade where you've got waterproofing that terminates below grade, the intent of the flashing there is to move to above grade in the plazas?
MR. HULL: I'll object to the form of the

question.

THE WITNESS: I personally wouldn't use that configuration.

Q (By Mr. Stepan.) Why is that?

A You would be relying on the liquid membrane to hold up the transition between the high density polyethylene and the substrate that it's flashing.

Q And why is that something you wouldn't do?

A I would think that would -- that would lead to a compromise because of the seams, that you have the top seams as well as the lap seams between each of the panels. It would probably be wiser to mechanically fasten the top of the panel and come over it with a sheetgood type membrane and then use, if the liquid flashing were to be used, apply it over that. At least it would have more of a continuous substrate with a minimum of seams.

Q I apologize if you were asked this and already testified to it. Do you know why Dave Campbell was out at the site when you went out there, your visit in November, the first one?

MR. HULL: Objection, foundation.

MS. SEMKE: Objection.

THE WITNESS: No. When I was out there?

MR. STEPAN: Yes.

THE WITNESS: No.
Q (By Mr. Stepan.) Did anybody from GID tell you that he would be there?
A I don't recall.
Q Your second visit out to the site, you said you were out there to walk some GID personnel through the site, right?
A That's correct.
Q Who asked you to do that?
A Mr. Vanderberg.
Q And I believe you said that there was one person from Promenade at that site visit as well?
A That's correct.
Q And it was a woman this time?
A Right.
Q Does the name Carolyn Roby mean anything to you?
A I don't recall.
Q How about Ann Kimball?
A I don't recall the name.
Q Lisa Dahl?
A No.
Q Did you walk the GID folks through the entire site?
A Yes.
Q Did you take them basically on the same trip that you went on the first time you were out there?
A Yes.

Q Through the garages, through the courtyards?
A That's correct.
Q Did you go into the three units again?
A Yes.
Q Did you notice any changes in the conditions of the site from the time you were out there in the beginning of November to the time you went out there with the GID personnel?
A It was a lot drier. It wasn't drizzling. Other than the weather, no.
Q The weather and the grounds in general were drier, or what was drier?
A Just the atmosphere, the actual -- the weather itself was a lot drier.
Q Did you notice anything different about the buildings, though, the garages, the units you went into, anything like that?
A No.
Q On either visit that you had out to Promenade, did you see any active leaks?
A No.
Q Did you talk to Dave Campbell at all after your visits but before you produced your report which is Exhibit 592?
A Will you repeat that?
Q Sure. Did you talk to Dave Campbell at all after your

visits but prior to producing your report?
A No.
Q You were asked I believe by Mr. Veith whether the GID folks had any questions for you during the walk-thru and you had listed off a number of questions you got from those people. I don't recall if you had come to the end of your list or we just got off on another subject. Were there any more questions?
A There probably were. I just don't recall them. As far as your question regarding active leaks, you mean in apartments? Was that in relation to the question with apartments that we went into?
Q Well, we can break it down. Did you see any active leaks in the three units that you went into?
A No.
Q Did you see any active leaks in the garages?
A A drip.
Q Do you recall where?
A Near this main entry, as soon as you went through the large rolling garage doors.
Q And the entry you're referring to is the pass-thru between buildings 1 and 2?
A Right, if that's -- right.
Q Was that the only drip you saw in the garages?
A Yes, that I can recall.

Q Do you recall where the drip was coming from? I know you said as you go through the big garage door into that pass-thru, but where?
A It was -- it was in the overhead concrete beam just at the opening in the beginning of the actual garage below, below the plaza. It was past the rolltop doors but just the beginning of the actual parking slots.
Q On which side of the pass-thru?
A When you say which side, what do you mean?
Q As you enter the pass-thru, you have garages on either side of you, is that right?
A Right.
Q Which side?
A It was the concrete crossbeam right before you entered in. If you looked straight up, you'd see some active moisture development.
Q So it's a beam that's cutting perpendicular across the pass-thru?
A Right, that's correct.
Q In answering some questions about your report, you indicated there were conditions in the field that led you to believe that water was bypassing the membrane. Do you recall testifying to that?
A Right.
Q What conditions?

A The underside of the concrete deck typically exhibited efflorescent stains and water stains in between the joints, at the joints. There's particularly one area outside of a vacated apartment that exhibited heavy water staining that appeared to be emanating from the hollow cores in the planks and stains stretching down onto the face of the concrete block in the garage.
Q Do you recall where that was?
A It was an end unit. I don't recall.
Q Would that be -- I'm looking at your report, Exhibit 592. Would that be the wall in the garage at photos 16 and 17?
A That's correct.
Q Any other conditions on site that led you to believe that water was bypassing the membrane?
A Yes. There was an area near the area of the -- I guess it was the dumpster, the garbage dumpster or the trash dumpster, in that area, where there was heavy efflorescence and evidence of water coming in from above.
Q Do you recall where that was?
A I can -- I remember that it was near the mechanical room, a mechanical room, the trash compactor near a transition point.
Q What do you mean by a transition point?
A It was at the end of a garage.
MR. REILLY: Is that like a link?

THE WITNESS: Right. Like a link.
Q (By Mr. Stepan.) And on this site, there's a link between buildings 1 and 2 and then there's a link between buildings 4 and 5. Do you recall which?
A I don't recall which one.
Q Do you have any idea as to the age of those stains?
A No.
Q Do you have any idea as to the age of any of the stains that you saw on site?
A No.
Q Do you know if there is any way to determine the age of the stains?
A Not that I know.
Q Did you notice any other conditions that indicated to you that water was bypassing the membrane?
MR. HULL: I'll object to the form of the question.
MR. REILLY: Same objection.
THE WITNESS: The installation of those gutters that ran along the concrete members in the garage.
Q (By Mr. Stepan.) Do you know when those were installed?
A No, I don't.
Q Did the Promenade person who was on site with you address those gutters at all to you?
A No. Not to me.

Q Any other conditions?
A No. Not that I can recall.
Q Did you ever have any discussions with Mr. Tarasov or Mr. Vanderberg as to whether GID intended to repair, make repairs to the courtyards?
A That was a question they had asked me.
Q They asked you whether they should repair them?
A They asked me if that was an option.
Q And what did you tell them?
A I said yes, it is.
Q And did they ever relay to you that they, in fact, intended to make repairs?
A Yes.
Q Who relayed that to you?
A Mr. Vanderberg.
Q What did he say?
A He said he had to make a decision whether it was going to be a spot repair or a complete repair, complete replacement.
Q And did he tell you what he intended to do, whether it was a spot repair, complete replacement?
A He leaned towards a complete replacement because of the logistics that would be involved with the spot repairs.
Q Do you know when this was when he told you that?
A This was at the site.

Q Back in November?
A That's correct.
Q You said he was leaning towards that. Did he indicate to you that he had actually made up his mind that he was going to go forward with a complete replacement?
A No. I think he was weighing out his options. He wanted to know what other recommendations I would have, whether -- I had made it clear to him that it would probably require more study, more investigation, and a mock-up would probably be necessary, which would involve excavation, testing of different types of waterproofing.
Q What did he say in response to that?
A He didn't give me a response to it. He just took it all in.
Q Have you had any discussions with Mr. Vanderberg since your visit to the site about the kinds of repairs he's considering for the site?
A After the visit. I mean after the walk-thru, it seemed apparent that he would lean towards a complete repair, so his questions were more along the lines of what kind of products would be suitable to use in a complete replacement.
Q And did you provide him with information responsive to that?
A I told him the options that he had, whether or not he

wanted to go with hot applied, cold applied, the drawbacks of each, if it was a sheetgood or a liquid membrane.
Q Did he indicate to you at all which method he would use?
A No.
Q Was there anything else said between you and Mr. Vanderberg about repairs?
A He asked me if I had a handle on a quantity and I said not at the time only because you'd have to sit down and actually do the take-off and estimate and calculate all that.
Q A quantity, meaning the cost of the repairs?
A Right. How much square footage they would be talking about, how much volume they would be talking about.
Q Have you ever produced such numbers for Mr. Vanderberg?
A No. I didn't provide any formal breakdown or take-off. I believe that that was something that he was working out in his own office as well with input from Mr. Charbonea.
Q Do you know today if GID plans to do any repairs to the courtyards?
A No. It still stands as a further notice. I haven't had any other involvement other than that.
Q Earlier today in discussing your report, you commented about a statement you made in your report regarding the lack of gutters and the fact that because the water just

running off the roofs was creating a depression on the
grade below, do you recall that?
A Yes.
Q What is problematic about that, in your mind?
A Typically you'd always want the grade to slope away from the side of a building so that any moisture, any water runoff runs away from the building.
Q And why do you want that?
A It's good design principle to have positive slope.
Q And the runoff from the roofs was creating a negative slope?
A Yes.
Q At all the courtyards?
A I could say at every area that didn't have the gutters, so --
MR. STEPAN: Let's take a quick break.
(A short recess was taken at this time.)
Q (By Mr. Stepan.) You indicated that the first site visit you were out at Promenade, I believe you said you were out there for a full day, is that right?
A Right.
Q Do you recall how much time you spent inspecting each of the test pits?
A No. I don't recall exactly how much time I spent.
Q Do you have a general idea?

MS. SEMKE: We can't hear any of the answer there.
MR. REILLY: All right. We'll keep working on it.
MS. HEYER: I can't even hear it, just so you guys know.
THE WITNESS: Under an hour. I'd say 45 minutes is safe.
Q (By Mr. Stepan.) About 45 minutes or so at each pit?
A Right.
Q And did you take photos of each pit?
A Yes.
Q Those are the photos that you were trying to retrieve from your computer system?
A Right.
Q Any idea or ballpark as to when those photos can be retrieved?
A I'll find out probably the end of today.
Q Did you request that any other testing be done during your site visit?
A No. It was the understanding that we would do more investigatory work as the job progressed, which it didn't, so --
Q The report that's Exhibit 592, were there drafts put together before you actually sent what is Exhibit 592 to

Mr. Tarasov?
A No. It was a work in progress on the computer between photographs and my notes.
Q Have you ever talked to Tom Healey?
A The name doesn't ring a bell.
Q How about Peter Ramme?
A No.
Q Tom Webber?
A No. Probably have to put a face to the name.
Q Sure. At any of your site visits, do you know if there were attorneys there who represent Promenade?
A Not to my knowledge.
Q In your work, do you ever come across situations where vinyl siding has leaked?
A Vinyl siding?
Q Yes.
A No.
Q Is that something you've ever been asked to investigate?
A No.
Q Have you investigated projects where precast planks were used before, other than the Promenade project?
A I don't recall. I recall one in particular, not all of them.
Q And which project was that?
A It was called Woodward Hall.

Q Woodward Hall?
A Right.
Q Where is that?
A That's in New Jersey.
Q Did those precast planks have hollow cores?
A Yes.
Q It's your understanding that that's the way precast planks are, that those cores are left hollow?
A Not all the time.
Q What's your understanding of when precast plank cores are filled in?
A If you want to post-tension them with steel cable to be filled with grout anchored on one end to give it structural reinforcement.
Q If you can go ahead in your report, turn to page 2, and in particular paragraph c, the second paragraph of paragraph c, the second sentence says, "Its success is contingent upon the suitability of the surrounding existing conditions." Do you see that?
A Yes.
Q And you name off, "substrates, moisture content, construction sequencing, deck construction, sensitivity of adjacent interior spaces and the acceptable level of negligible interior leaks." Do you see that?
A Yes.

Q What is that list based upon? Where did you come up with those?
A It's a criteria that I would have for choosing a waterproofing assembly; in particular a clay-based, how it would apply to a clay-based system.
Q How these would apply to a clay-based system?
A Right.
Q Bentonite system?
A Correct.
Q And how does the substrate come into play?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: It would probably be preferable for the substrate to be smooth, free of fins, protrusions, cracks. If the substrate is of concrete, I would prefer it not to be hollow, for it to be a straight slab or solid slab.
Q (By Mr. Stepan.) Why is that?
A In the case of Promenade Oaks, precast planks are hollow. I doubted there would be enough moisture in it to be able to activate the clay as opposed to laying the actual bentonite material on concrete that had more latent moisture.
Q And the next item is moisture content. What are you referring to there?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: That same, the same -- how it relates to the substrate.

Q (By Mr. Stepan.) And the next item is construction sequencing. What does that refer to?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: I would be referring to the backfill, how it's sequenced, along with the installation of the membrane.

Q (By Mr. Stepan.) The next one is deck construction. What does that refer to?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: That referred to I wouldn't have placed it over precast planks unless it had a topping slab that made it more of a monolithic substrate.

Q (By Mr. Stepan.) And the next one is sensitivity of adjacent interior spaces. What does that refer to?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: The choice of the waterproofing. It's also affected by what you're waterproofing. If it was a subway or an access tunnel or

a utility, it wouldn't be as sensitive as someone's kitchen or bedroom or an electrical room.
Q (By Mr. Stepan.) Sounds like that ties into the last one there, the acceptable level of negligible interior leaks?
A Correct.
Q Move down into the section entitled Observations, the three little i's. The last sentence in that section says, "However, invasive test probes indicate that the vertical pipe extension is incorrectly configured for drainage." Do you see that?
A Yes.
Q What are you referring to there?
MS. HEYER: Object to the form of the question.
THE WITNESS: The way the probe -- or the pipe extension was described in Mr. Campbell's report was that the filter fabric was actually wrapped around the perforated pipe extension and then surrounded with gravel rather than the gravel being around the pipe extension and then filter fabric being wrapped around that layer of gravel. I believe the gravel was also sized so that it could fit within the penetrations in the pipe extension.
Q (By Mr. Stepan.) Sounds like your statement there at the last sentence of the paragraph, the three little i's, that it's based exclusively on Mr. Campbell's report, is that

right?
A Yes. It's when the probes were done around the pipe extensions, they had already removed the layer of gravel around the pipe extension itself and it was already disassembled in pieces around the drain.
Q When you saw it?
A When I saw it, right.
Q So when you came out to see it, you just saw the pipe?
A The pipe extension.
Q If you turn over to the next page, page 3, the first two numbers, the first one refers to what you talked about, that the aggregate around the pipe is of such a size that it could clog the perforations, is that right?
A Right.
Q And then the second one indicates the filter fabric is around the pipe rather than a layer of aggregate?
A Right.
Q How do those two -- I don't see how they fit together? It would seem to me that, and correct me if I'm wrong, if filter fabric is around the pipe, then how could that aggregate clog the perforations?
A It could penetrate the filter fabric.
Q Do you know if that ever occurred?
A No.
Q These two items you based on the Campbell report?

A That's correct.
Q And did you base item number 3 on the Campbell report as well?
A The aggregate itself is of a nature?
Q Yes.
A That as well as looking at the aggregate, the field.
Q But because of the condition in which that test pit was when you got there, you didn't really see the aggregate interacting with the pipe?
A That's correct.
Q What's a below grade utilitarian application?
A A sub-basement, pumping room, causeway.
Q What does that mean, below grade utilitarian application?
A It would be a non-residential, non -- it would be a lesser sensitive -- it would be less sensitive than someone's living room, kitchen or bedroom.
Q If you flip over to page 4 of your report, in particular roman numeral v, where you discuss the repairs. It says -- I believe you talked about this before. The sentence that says, "Failures in these locations also contribute to interior leaks and water that migrates behind the vertically applied waterproofing." Do you see that sentence?
A Yes.
Q Do you know that for a fact, that failure at the repair

locations contributed to interior leaks?
A No. Not for a fact.
Q What is that based on, that sentence?
A Seeing the existing conditions in the field and how the membrane was pulling away and delaminated from vertical surface, it was a void behind that actual membrane that would allow water behind the membrane itself and potentially behind the bentonite panel that it counterflashed, and if not there, through the concrete block that it was fully adhered to.
Q These two vertical walls, did both walls have repairs that had been done to them, is your understanding?
MR. BROWN: Objection, foundation.
THE WITNESS: I don't recall. I don't recall.
Q (By Mr. Stepan.) Were all the test pits done before you got on site?
A Yes.
Q Do you know if the membrane, you said it pulled away from the wall, if that occurred while the test pit was being created?
A I don't know.
Q Is it possible that that could have happened?
MR. HULL: Objection, foundation.
THE WITNESS: It's a possibility.

Q (By Mr. Stepan.) Can you go ahead and turn to page 5 of the report?
A (Witness complies.)
Q It's a Typical Building Section. Where did that come from?
A This was scanned off of the architecturals that were sent by Mr. Tarasov.
Q Under point 3, down below the picture, it says, "Figure 1, Typical Building Section: Points of Interest." Under point 3, it says, "Vertical Termination of Waterproofing at CMU wall adjacent to living spaces." Below that there is a subdivision a, it says, "Depressed soil with negative slope." Do you see that?
A Yes.
Q Why is that included under this subdivision 3?
A The absence of the -- the depression of the soil I believe exposed the vertical membrane even more. And if it was delaminating, even more water, because of the negative slope, would go towards the areas that were delaminating.
Q Item number 5, "Open cells of pre-cast concrete planks at terminations against interior places." What are you referring to there?
A The way the typical concrete, precast concrete plank butts against or is perpendicular to the typical seamy

wall in the garage, the open cells face those interior walls. So if water is running in the cells and in the joints, it would likely end up in that area against the walls.
Q Do the planks butt up against a concrete wall?
A Right.
Q So the cells are running into a concrete wall?
A Right. The ends of the plank are supported by concrete beams, and below them are seamy walls, so if you follow -- if water is running through these joints or these hollow cores, it would end up on these beams and onto these blocks.
Q Can you go ahead and flip to the next page?
A Sure.
Q Where did you get this drawing?
A The same set of drawings Mr. Tarasov sent me.
Q And right now we're looking at page 6 of 19, is that right?
A That's correct.
Q And it says in the box of print over the top of the drawing, "Figure 02 indicates the likely path of water infiltration through the existing exterior wall and virtually and horizontally applied waterproofing of the courtyard." Do you see that?
A Yes.

Q I don't follow where the likely path of water infiltration is? Is it indicated on this picture at all?
A Yes, the arrows. There's dotted arrows there that indicate likely points where water could travel once it got past the waterproofing membrane. It could get through it at the top areas that were delaminated, through the soil down to any breaches on the horizontal deck, down into the joints, into the hollow cores following its path to the left and onto the CMU walls. Although it wasn't determined that the CMU walls were grouted solid, you could still dump the water into these walls through the interior wall and possibly into the base of the wall.
Q Considering -- and we've got basically this line of -- you've got stud wall coming down to the top of the vertical block walls in the courtyard to the plank, and then the vertical block wall to the garage; it's kind of a straight line from top to bottom, right?
A Right.
Q If water were to get in, say, through the siding or some location anywhere on that stud wall, is it your understanding that it could make its way down through the concrete and get into the interior at any point that you've indicated along here?
A Yes.

Q Page 7, is that another drawing that you got from the architectural plans?
A That's correct.
Q And is it your understanding that together, page 6 and page 7 indicate or represent the two sides of the courtyard?
A Yes. That's my understanding.
Q And again, like as on page 6, on page 7 you've indicated with the dotted lines and the arrows what you've noted as the likely paths of infiltration?
A That's correct.
Q Similar -- or I'll ask you the same question I asked you with regard to the figure on page 6. If water were to come in anywhere on that stud wall, is it your understanding that it can move down inside of that wall and infiltrate at any one of the points that you've indicated for a path of infiltration?
A You're referring to the stud wall right here, right, below the sill?
Q Yes, or even above the sill.
A I have no knowledge of water getting in above the sill. With reference to page 6, I was under the impression that you were talking about the stud wall right above where the block starts, and on page 7, the part of the stud wall that's below the bottom of the window sill.

Q I appreciate the clarification. My question was intended to be if it comes in anywhere on that stud wall, through the siding at any point, is it your understanding that it could travel down inside that wall and then infiltrate it at any of the points that you've indicated where infiltration is likely to occur?
MR. HULL: Objection, foundation.
THE WITNESS: I have no knowledge of that, but it's possible.
Q (By Mr. Stepan.) You have no knowledge that that occurred, but if there is water getting through, it could travel at those paths, is that right?
MR. HULL: Objection, foundation.
THE WITNESS: It could.
Q (By Mr. Stepan.) And that would apply to both the detail on page 6 and the detail on page 7?
MR. HULL: Objection, foundation.
THE WITNESS: That's correct. Certain conditions would have to be in place for something like that to happen.
Q (By Mr. Stepan.) What conditions would those be?
A The flashing within the wall itself would probably have to fail.
Q And where would that flashing be? What are you talking about?

A It's not revealed here in these drawings, but if there is a flashing designed into the actual stud wall itself, that would be the last line of defense against water within that wall, if it got past any of the siding, to allow it to wick out. I don't know of any detail that shows that, I'm just supposing that there is flashing it out, the only thing keeping it from getting into the rest of the wall below the level of the stud wall.
Q Is that something you consider to be separate from the waterproofing system, a flashing like that?
MR. HULL: Objection, foundation.
THE WITNESS: Yes. That's more -- it is waterproofing, but it's more related to the exterior wall.
Q (By Mr. Stepan.) Something you'd expect to see in an architectural design?
MR. HULL: Objection, foundation.
THE WITNESS: Yes, in details.
Q (By Mr. Stepan.) On page 8, photograph number 2, you indicate at bullet point 4, "Path of water stains indicate origins from concrete planks and cmu wall." Do you see that?
MR. HULL: I'm sorry. Where are we at?
MR. STEPAN: Page 8, photo 2, bullet point 4.
THE WITNESS: Yes, I see that.

Q (By Mr. Stepan.) And you say it indicates that the water was coming from the planks of the wall. Do you have any idea, beyond the fact that it looked like it was coming from the planks of the wall, where that water would have started?

MR. VEITH: Objection, speculation.

MR. REILLY: Join. Lacks foundation.

THE WITNESS: No.

Q (By Mr. Stepan.) Did you do any tests to trace where leaks would be starting on the site?

A No.

Q Flip over to page 9, photograph 5?

A (Witness complies.)

Q Do you see noted that it's a ruptured water blister in paint?

A Yes.

Q Do you know where that location is?

A It looks like unit 242.

Q How do you know that? The picture above looks like it says unit 242?

A Right.

Q And this is inside that doorway?

A Right.

Q Do you know what building?

A No, I don't. I would imagine it's unit 42 in building 2,

if that's how they -- I'm not sure how their numbering system is.
Q Is there any way for you to determine how old that blister is, the ruptured blister?
A No. You could ask the building staff if it's ever been reported.
Q Can you go ahead and flip to page 13?
A (Witness complies.)
Q Photograph number 18 is the outside of one of the units on an end wall, is that right?
A That's correct.
Q Is this one of the units, do you recall, that you inspected?
A Yes.
Q And there appears to be a circle that's on the photo; is that accurate?
A Yes.
Q What is the circle referring to?
A It's the area depicted in photo number 19.
Q And what's being highlighted with that circle is the split --
A There's efflorescence and water stains on the face of the split-face block. And number 20, that's the same doorway, door head. The sheetrock above, in the ceiling above the head of the door is stained and warped from

water. And then number 21 is the actual stud wall above that doorway that frames out the sheetrock above it. And behind the plastic that holds back the insulation, there are water stains in the wood studs that correlate to the water stains at the joints between the two precast concrete planks.
Q Do you by chance know if this is unit 115 of building 3?
A I don't recall -- it's either building 3 or building 1.
Q You have no --
A I don't know definitely. I know it's an end wall configuration.
Q Are photographs 16 and 17, the ones of the wall inside the garage, do you know if that's the wall that butts up to the garage side of the unit?
A Yes.
Q Did you notice any other evidence of water staining inside that particular unit, do you recall?
A On the underside of the deck, on the ceiling.
Q In the garage?
A No. Inside the actual unit itself, it showed similar efflorescence of the joints.
Q On the ceiling to the unit?
A Right.
Q Do you recall where in the unit?
A Right in the door path. Right in the same line of the

joint in the photo number 21, photograph number 21. So as soon as you walked through the door, if you looked up, you'd see the joints running to the door that led to the garage. So those joints would have some of the similar staining.
Q Is it your understanding that this unit is one of, if not the only unit that sits actually under the precast deck?
A I don't know if it's the only unit that does that, but that's how it appeared.
Q If you turn to page 15?
A (Witness complies.)
Q Photograph number 22, you're referring to missing sealant between the stairs and the stair wall?
A Right.
Q Is that something that, like similar to a homeowner who should caulk their windows around the house and make sure the caulking of the windows is adequate, is that something you consider to be a maintenance issue, that the sealant should be checked there?
A Yes, that's a maintenance issue. It's easily enough addressed.
Q Do you know which building this is at, which stairwell?
A No, not exactly.
Q Did you inquire of the Promenade person what kind of maintenance they do on the property?

A No.
Q And page 16 is a picture of some loose coping? Is that the loose coping you talked about before?
A Right.
Q Is that the only site where you found such a condition?
A Yes. There was one coping stone, I recall, that moved. It was on a stairwell. It was a stone coping, though; it wasn't metal. It was a cast stone coping.
Q Any idea what caused that?
A Lack of a bond with the mortar to the substrate. I don't know what the detail calls out for. It may have called out for dowels or an anchorage.
Q You just saw the condition?
A Right.
Q And page 17, it's entitled Conclusion, and the second sentence says, "Leaks were observed at private living spaces." Do you see that?
A Right.
Q Where did that information come from? To me, it doesn't sound like you saw any leaks?
A That's correct. That was just told to me verbally.
Q And who told you that?
A Mr. Tarasov, the gentleman at Promenade Oaks.
Q Did Mr. Tarasov tell you where he learned that information?

A No, other than it leaks into private residences.
Q Did the individual from Promenade indicate to you the last time he saw a leak in a residence?
A No, he didn't.
Q You said in the one unit that we were just talking about at the end of one of the buildings where you said you saw some staining in there. Did you see any staining or evidence of water infiltration in either of the other two units you went into?
A No.
Q And you go on in this first paragraph under Conclusions to say, "The leaks resulted in interior damage." Do you see that?
A Right.
Q Where did you get that information?
A From the gentleman at the Promenade as well as my observation of blisters, ruptured water blisters in the unit; I believe it was 242.
Q Was that the only ruptured water blister you saw?
A There were more water blisters in that area of 242.
Q In that area?
A In that area, right.
Q Did you see any anyplace else inside?
A No.
Q Did the individual from Promenade give you any details

regarding interior damage?
A No, other than he made a comment that they had to repair interior damage in terms of painting and repairing walls.
Q Did he mention units where this occurred?
A No.
Q Did he say when it occurred?
A No, he didn't.
Q You go on in that paragraph to reference breaches in the composite bentonite clay waterproofing panels; do you see that?
A Yes.
Q What are you referring to there?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same.
THE WITNESS: That would be a point of infiltration, potential point of infiltration in the bentonite panel.
Q (By Mr. Stepan.) Are you talking about actual, like a hole through the membrane?
A No. Just -- a breach would basically determine or describe the actual point of infiltration. Whether it's a penetration or if it's a delamination or a deficient lap, it's a breach.
Q You go on to say, "These breaches are likely the result of

improper insulation." What do you base that information on?

MR. REILLY: Objection, lack of foundation.

MR. BROWN: Objection, lack of foundation.

THE WITNESS: I would be relating that to the sequencing. If the bentonite activated prematurely before backfilling, it may have had an adverse effect on how it performed.

Q (By Mr. Stepan.) Would you agree with me that your information regarding sequencing is really at best speculation?

MR. HULL: I'll object to the form of the question.

THE WITNESS: I would say it would be based on the dates observed on the progress photos taken by the gentleman at Promenade Oaks.

Q (By Mr. Stepan.) And as you said before, you don't know how often he took photos, is that right?

A That's correct.

Q You don't know if he was out there every day taking photos?

A That's correct.

Q You don't know even if the photos that you saw were all related to the same plaza, is that right?

MR. HULL: I'll object to the form of the question.

THE WITNESS: You mean the two photos with the same date -- the different dates?

MR. STEPAN: Yes.

THE WITNESS: Not without looking at the photos.

Q (By Mr. Stepan.) Did you take copies of those photos?

A No. I was given nothing at Promenade Oaks.

Q And that sentence goes on to say, "These breaches are likely the result of improper installation and exacerbating existing conditions." What are you referring to there, exacerbating existing conditions?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: The deck construction, the choice of the building components, the joints, the hollow cores in the planks.

Q (By Mr. Stepan.) What building components? You say the choice of building components?

A Precast hollow planks as opposed to a solid slab.

Q Any other building components?

A The way the posts were configured onto the deck.

Q Anything else?

A The transition of the fully-adhered flashing membrane at

the top of the bentonite panel as it transitioned out of the soil line, of the grade line.
Q The asphalt sheet product we talked about before?
A Yes.
Q Anything else, any other components?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Drains, the lack of the gutters, the way the pipe extensions were configured.
Q (By Mr. Stepan.) Anything else?
A That's all at this point.
Q On page 18, you kind'a give a laundry list of what you've termed as the flawed installation; do you see that? There's ten items set out there in the middle paragraph?
A Right.
Q And at number 5, you refer to the questionable -- you say, "questionable membrane laps and joint in the planks." Did you actually ever see enough of the membrane to see where it lapped over?
A No.
Q Is that something you take from Mr. Campbell's report?
A That and knowledge of the sequencing of the backfill.
Q Which is limited to some photos that you were shown by the person from Promenade?
A That's correct.

Q In the photos, could you see the lapping of the membrane?
A Yes, but I didn't -- I don't recall seeing close-ups of lapping. You could see the seams, which is essentially the lapping.
Q Were you able to see the seams with enough clarity to make any interpretation as to whether the lapping was appropriate?
A No.
Q How many photos that you looked at would you say went to sequencing of the project?
MR. VEITH: I'll object, vague. Sequencing of what?
MR. STEPAN: Well, I'm using the terms he's used the entire time. Do you understand my question?
THE WITNESS: I understand the question. I don't recall how many photos. I don't recall how many photos. I'm citing the two only because of the dates, the difference in the dates.
Q (By Mr. Stepan.) You don't recall the dates?
A No, I don't.
Q Do you recall the time of year?
A No, I don't.
Q You go on to say in the last paragraph on page 18, in the middle of it, "The only thing that is certain is the strong possibility for similar leaks in the future." Do

you see that?
A Right.
Q Is that the most, what you can say about the future of this project, that it's possible there would be leaks?
A At this point, yes, without further investigation.
Q In the very last page, item letter l, you refer to scraping and painting of corroded steel lintels. Where is that on the site?
A That was observed over typical garage entrances.
Q On the exterior of the building?
A Right. The ends of those lintels exhibited rusting, some expansion, the blocks there exhibited some cracking.
Q Item k says, "Repair of cracked masonry." Is that the vertical cracks we talked about before?
A Correct.
Q And you only noticed that at one location, is that right?
A That's correct.
Q You mention at letter i thru-wall flashing at the end walls?
A Right.
Q Where is that? Where on the end walls?
A Which end walls?
Q What area are we talking about, what detail? Where would you like to see there be thru-wall flashing?
A The end walls, the end walls where garage entrances are

or entrances like the ones depicted in photo 23. These are end walls. And the steel lintels that span those openings also exhibited the rust and the cracking but didn't exhibit any line or sign of a flashing in that wall.
Q Would you like to see the flashing above the lintel?
A I would recommend that, right, or at least at the level of the lintel to prevent water from sitting on it.
MR. HULL: I'm sorry. Would you repeat that, or maybe just read the answer back for me?
(The court reporter read back the last answer at this time.)
Q (By Mr. Stepan.) The thru-wall flashing, is that something you'd expect to see in the architectural plans?
MR. HULL: Objection, foundation.
THE WITNESS: Yes. It would be called out on the details.
Q (By Mr. Stepan.) Take a look at Exhibit 549. It's the e-mail that you talked about before. And you testified earlier that you were forwarding, as part of this e-mail, you were forwarding to Bob Tarasov a section of an e-mail that you had previously sent to Scott Vanderberg, is that right?
A Right.
Q Do you recall when you sent the e-mail to Scott

Vanderberg?
A No, not without seeing it. I could probably ask Scott Vanderberg.
Q It looks like from a -- as you move down -- actually, if you go up about -- if you go up to the second star from the bottom in that e-mail to Scott, you refer to the group; do you see that?
A Right.
Q Is that the GID group?
A That's correct.
Q So this e-mail would have gone out sometime after you walked through with the GID group, is that right?
A Right.
Q Go back up to the part that goes to Bob. The second sentence, it says, referring to the e-mail that went to Scott, "This was sent to him to confirm that the budget proposed for the repair included the items in the list as well as the other contingencies he included in the scope." Do you see that?
A You're up here at the -- okay. Yes, right.
Q What budget proposed for the repair are you referring to?
A I believe Scott Vanderberg had put together an initial budget for the repair of the plaza with input from me in terms of what kind of options he had in terms of material and waterproofing assemblies.

Q And was the budget for just the repair of the plazas or was it for repairs throughout the site?
A I would say it was throughout the site.
Q And then as you go on in this sentence, it refers to items in the list. Are the items in the list those bullet points that are in the e-mail to Scott?
A Yes.
Q Then it says, "as well as other contingencies." What are the other contingencies?
A Logistics, how to -- logistics such as now that the complex is occupied, you would have to probably provide safety measures, temporary access, egress, the logistics of just getting an operation like that under way. I don't believe there's an elevator or a service elevator that would access from ground level to the plaza level. Contingencies such as that. Testing, stopping the work flow and schedule for testing.
Q If you go back down to the part that goes to Scott and back to that second bullet point from the end, you refer to a $3.6 million number; do you see that?
A Yes.
Q Is that the budget that you referred to above?
A Yes.
Q And it was your understanding this $3.6 million included repairs for the whole site?

A Right.
Q And that all of the $3.6 million also included, to your understanding, these contingencies that you've talked about?
A Right. That would be depending on the system that you would be using as well, how complicated the system got.
Q Did you come up with any of the numbers that went into the $3.6 million?
A Other than asking me what square foot prices were for particular systems, no. I didn't calculate any of it.
Q Did you provide him square foot prices?
A Verbally, from the job site depending on the kinds of materials that he had asked about.
Q Do you recall what numbers you gave to him?
A I'd say anywhere between 30 to 45 dollars a square foot depending on the material that he had.
Q What materials did you reference to him?
A Anything from hot-applied, fabric reinforced, rubberized asphalt monolithic membranes to fabric reinforced, cold-applied epoxy resin systems to monolithic PVC mechanically fastened controlled systems so that he -- he had a choice. Urethane, liquid-applied, screen reinforced systems. So that's why it ranged from 30 to 45.
Q So between those four systems you named off there,

anywhere between 30 and 45 dollars a square foot?
A Right.
Q Do you know if he had decided on one of those systems?
A No.
MR. BROWN: You don't know or he had not?
THE WITNESS: I don't know.
Q (By Mr. Stepan.) The 3.6, is that the top end of the budget if you were to go 45 dollars per square foot as opposed to 30, do you know?
A I don't know. I don't know what kind of quantities he had.
Q The third bullet point from the bottom, the one right above the 3.6 million bullet point, indicates that -- you pointed out that although the thrust of the repair would be to the courtyards, the other points of water entry and drainage problems should also be addressed at the time of repair; do you see that?
A Where are you?
Q I'm three bullet points up.
A Okay, okay.
Q Do you see that?
MR. HULL: Would you read it again, which one?
Q (By Mr. Stepan.) The one that's three up from the bottom that says, "Although the thrust of the intended repair

would be the repairs in the courtyard, -- and I'm paraphrasing -- there are other points of water entry and water drainage problems that should be addressed." Do you see that?
A Yes.
Q And those were part of the 3.6 million as well?
A Right.
Q What other points of water entry and water drainage are you talking about?
A Water entry that would come in from detached copings, potentially missing thru-wall flashing, open joints in copings.
Q Things outside the courtyard that are addressed in the report, is that right?
A Right. Outside of the courtyard observations.
Q When you were out on site walking around, did you notice that at some locations the exterior of the buildings -- outside the courtyards and outside the buildings, there is locations where the surrounding site basically runs in a hill right to the base of the building? Did you notice such construction?
A Yes.
Q Is that of any concern to you?
A Yes, if it's not waterproofed correctly, but we didn't probe at that time. There weren't any details that

described it as such.
Q You weren't asked to investigate those areas?
A No. Not at the time.
Q Have you been asked about those areas since?
A No.
Q As you go on in this e-mail, I think it's also mentioned in your report, you recommend the replacement of the existing drain assemblies; do you see that?
A You're on the second page?
Q Yes. Second page.
A Number 2?
Q Yes. Under number 2, as you move down four bullet points.
A Right.
Q Were you asked to give a recommendation as to what you would replace the existing drain assemblies with?
A No. That would probably have been addressed once we got into the design after investigations.
Q And it says below that, "Possible adjustment of drain and piping sizes." Do you see that?
A Yes.
Q Is that something you were just throwing out there as a possibility or did you inspect, do any research?
A No. It's a possibility based on that there were no gutters at the eaves of the roofs. So not only is the plaza responsible for the water that accepts through the

square footage area of the plaza, it's also responsible for water runoff from the surface area of the roof throughout the complex.
Q And that's why you also -- would it be fair to say that's why you also recommend the possible installation of additional drains?
A Right.
Q Because it's taking on not only the water that actually hits the surface of the courtyard but everything that's coming off the roofs?
A That's correct.
Q Item number 5 refers to installation of flashing under concrete copings, which we talked about before, right?
A Right.
Q And it says, "Add perimeter walls," meaning the copings that are on the exterior of the buildings, right, not in the courtyards?
A That's correct.
Q Number 8, you refer to the installation of vertical control joints in the masonry walls. What location are you referring to there?
A That would be the block wall where the stairway exhibited the vertical cracking. I was asked to what I could attribute that to, and that would be one of the solutions.

Q And that would tie in with number 9, which is repairing that crack?
A Right. Depending on the severity of the crack.
Q Did you ever discuss with Mr. Campbell if he had any recommendations for repairs to the courtyards?
A No.
Q Next to some of the photos in your report, you refer to typical water staining. What do you mean by typical water staining?
A Seen throughout the property. There wasn't any distinction made between different kinds of severity of staining.
Q I believe you were asked a question about -- well, I'll just ask it. After you issued your report, you sent a proposal to Mr. Tarasov for consulting and monitoring services that you indicated you would provide if they went forward with repairs?
A That's correct.
Q And that's at the point where you heard that the project was on hold and that they never entered into any agreement for those services?
A It wasn't until after I had sent the proposal, and after I sent the proposal, it was probably sometime after. But I followed up on the proposal, then he said everything is on hold for now.

Q And you haven't heard from him regarding this project since?
A Mr. Tarasov?
Q Yes.
A That's right, I haven't heard, other than his assistant.
Q Who is that?
A Priscilla?
Q Priscilla Berny?
A Correct.
Q What did you hear from her?
A She usually follows up on where reports are, what's the status of the report.
Q So did she follow up with you?
A Usually, yes, through e-mail.
Q And what have you heard from her?
A Just that, what's the status of the report, and Bob would like to know when he's going to receive it.
Q With reference to the December 4th report?
A Correct.
Q Have you heard from her since you submitted your proposal?
A Only a request to send back everything that they had sent me, the report, the two sets of drawings.
Q When was that, that you sent everything back?
A It was after the report was issued.
Q Sometime after the first of the year?

A I don't recall. I could find that in the FedEx record.
Q When is the last time you spoke to Mr. Campbell?
A Mr. Campbell?
Q Yes.
A On site.
Q You said earlier that it's your opinion and you felt the opinion of others that bentonite waterproofing accepts negligible amounts of leaking?
A Right.
Q Who are the others that you're referring to?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Mike DiFrancesco was another consultant.
Q (By Mr. Stepan.) Where is he a consultant?
A He's an independent.
Q Do you know where?
A In Philadelphia. He recently passed. I believe Justin Henchel.
Q Is he a consultant as well?
A Yes.
Q Where is he a consultant?
A He's also in New Jersey.
Q Do you know with what office?
A Henchel & Buccellato.

Q Any idea on the spelling of Buccellato?
A I wouldn't want to venture. B-U-C-C-E-L-L-A-T-O, Buccellato.
Q Anybody else?
A Guido Capalino.
Q He's a consultant as well?
A Yes.
Q Do you know with what office?
A I believe he's retired now, but he was a consultant for Lorenco.
Q Where is Lorenco?
A I don't know where their corporate office is.
Q Do you know where he officed?
A His offices?
Q Yes.
A I believe he's in -- he's either in Connecticut or upstate New York.
Q Anybody else?
A Mike Kubal.
Q How do you spell Kubal?
A K-U-B-A-L.
Q Where is he a consultant?
A I don't know.
Q Anybody else?
A That's all I can think of at the time. You could try

Shane Manning.
Q Manning?
A Manning.
Q Where is he a consultant?
A THP, Ltd. in Cincinnati. And Richard Versen.
Q What was the last name?
A Versen. V-E-R-S-E-N.
MR. BROWN: Chad, was the question which consultants actually have that opinion about the negligible --
MR. STEPAN: Yes. He had referred to others and I asked him who the others were.
Q (By Mr. Stepan.) Where is Richard Versen a consultant?
A He's in Cincinnati.
Q Do you know what firm?
A Virtech.
MR. STEPAN: That's all I have for now, sir. Thank you.
THE WITNESS: Thank you.
(An off the record discussion took place at this time.)

EXAMINATION

BY MR. BAUMGARTNER:
Q My name is Brian Baumgartner. I represent Mikesh, Incorporated. You were talking earlier about the Inspec

report by Mr. Campbell, which I believe is Exhibit 545, and there's a section entitled Recommendations in that report, and under number 3 of that, there is a statement that, "Even though the quantity, size, and locations of the existing courtyard drains are adequate, the inefficiency of the subsurface drainage system, as a whole, is such that we expect the courtyard areas to experience a net increase in surcharged moisture content each year." Can you tell me if you agree or disagree with that statement?

MR. REILLY: Objection, lack of foundation.

MR. BROWN: Where are you referring to, Brian?

MR. BAUMGARTNER: Page 9 of the Inspec report, GID 00985.

MR. HULL: And what paragraph?

MR. BAUMGARTNER: Paragraph number 3 under section F, Recommendations.

MS. HEYER: Same objection.

Q (By Mr. Baumgartner.) Perhaps I should back up. Were you provided with a copy of page 9 of the Inspec report, Exhibit 545?

A No. I don't recall page 9 in the copy that I was given.

Q Okay. So in the copy you were given -- all right. You

don't recall there being any recommendations in the copy you were given?
A Correct.
Q Okay. Notwithstanding that fact, do you agree or disagree with the statement that I just read? I can read it again if you would like.
A No, that's all right.
MR. REILLY: Objection, lack of foundation.
MS. HEYER: Same objection.
THE WITNESS: That would require more study. I couldn't comment on that now.
Q (By Mr. Baumgartner.) Okay. I believe you testified a little while ago that you had inserted some language in your own report or in an e-mail discussing possibly adding drains to the system?
A That's correct.
Q Okay. And you mentioned that that concern was prompted by the lack of gutters on the building?
A That's correct.
Q So your concern was that possibly whoever designed the system might not have taken into account the surface area being drained to include the roof area of the building?
A That's something I don't know.
Q Okay. Can you explain what your concern was, then,

please?
A That is my concern, but what I'm saying I don't know is I don't know if whoever did the calculations for the drainage accounted for the runoff from the roof.
Q Right. I understand that, but that did express your concern about the adequacy of the drain size?
A That's correct.
Q And you did not perform yourself any calculations on rainfall and the necessary drain size to drain an area?
A No. Not at that point, no.
Q Okay. I believe you mentioned before that you worked on an Adams project earlier?
A That's correct.
Q And that project, did that involve a courtyard area above garage space?
A Yes.
Q Okay. And you mentioned that in this case, you thought there was some architectural detail lacking in the drawings that you were given; in the Promenade project, that is?
A It lacked details.
Q And what were those lack of details again? I'm sorry if you've already given an answer to that, but I don't recall.
A Okay. It didn't show in close enough detail the

transitions from horizontal to vertical. What I was looking for in particular were waterproofing details that showed waterproofing membrane, flashing, counterflashing, accessories, that level of detail.
Q Wouldn't that also normally show slope in the courtyard area as well?
MR. HULL: I'll object to foundation.
THE WITNESS: Yes, it would.
Q (By Mr. Baumgartner.) All right. And in the project that you were referring to that you had worked on earlier, had such details been provided on the architectural drawings?
MR. HULL: Objection, foundation.
THE WITNESS: In the remedial, you mean, or in the original?
Q (By Mr. Baumgartner.) In the Adams project that you worked on, do you recall if such information was available on the architectural drawings?
A Are you talking about the architectural provided for the remedial action or from original construction?
Q Original construction.
A I don't recall. But a sloped topping slab was part of the remedial detail.
Q Okay. Are you aware that the plaza area in the Promenade project was a design-build component of the construction?
A No.

Q Would that have any effect on your expectation as to what sort of details would be necessary in order to do the work?

MR. BROWN: Objection, foundation.

MR. STEPAN: Same objection. Also as to form.

THE WITNESS: No.

MR. BAUMGARTNER: I think that's all the questions that I have. Thank you very much. Would you like Lori to start?

MR. REILLY: Hang on a second.

(An off the record discussion took place at this time.)

MR. REILLY: Okay. We're going to knock it off, pick it up at nine, which is eight o'clock your time, same game, same station, and then I think -- who's going to go first?

MR. HULL: I'll go tomorrow.

MR. REILLY: Bill will start tomorrow.

(The deposition was adjourned at 5:05 p.m. and continued to May 9, 2003, at 9:00 a.m.)

(End of Volume I)