UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL FILE NO.: 00-CV-987 JEL/JGL

---

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: JON CAMAYA, VOLUME II OF II
TAKEN ON: THURSDAY, MAY 9, 2003
COMMENCING AT: 9:00 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586

and

Colloid Environmental Technologies, Co.,

Fourth-Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

v.

Mikesh, Inc.,

Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NOTES

Page Line

APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 - 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Company.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO BRISBOIS, Esq., Stich, Angell & Kreidler, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared via speakerphone representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE L. HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant and Fourth-Party Plaintiff J-Berd Mechanical Contractors, Inc.

BRIAN BAUMGARTNER, Esq., Baumgartner Law Office, LLP, 3320 West Owasso Boulevard, Shoreview, MN 55126, appeared via speakerphone representing Fourth-Party Defendant Mikesh, Inc.

LORI SEMKE, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, mn 55402-2440, appeared via speakerphone representing Defendant Promenade Village Townhomes, LLC.

CHRISTOPHER MALONE, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared via speakerphone representing Westfield Insurance Company.

I N D E X

PAGE

Pursuant to Notice.................................. 196

WITNESS:

Jon Camaya.................................. 196

Examination by Mr. Hull................... 196,359

Examination by Ms. Heyer...................... 291

Examination by Ms. Semke...................... 304

Examination by Mr. Brisbois.................. 323

Examination by Mr. Veith...................... 324

Examination by Mr. Reilly................. 328,370

Examination by Mr. Brown.................. 329,372

Examination by Mr. Stepan..................... 346

Examination by Mr. Baumgartner................ 365

Witness excused.............................. 374

SIGNATURE/CORRECTION PAGE..................... 375

CERTIFICATE PAGE............................. 376

THE CONTINUING DEPOSITION OF JON CAMAYA, is taken on this 9th day of May, 2003, at the Law Offices of McDermott, Will & Emery, 50 Rockefeller Plaza, 11th Floor, in the City of New York, New York, commencing at the hour of approximately 9:00 a.m. (Eastern Standard Time), pursuant to NOTICE:

JON CAMAYA,

called as a witness, being previously duly sworn, was examined and testified on his oath as follows:

EXAMINATION

BY MR. HULL:

Q Mr. Camaya, I just want to remind you you're still under oath from yesterday. And I'm Bill Hull, I represent Elness, Swenson & Graham, which was the architectural firm that did the original design on the Promenade Oaks Apartments and I've got a few questions for you.

When did you graduate from architectural school.

A '92.

Q And was that a four or five year program?

A That was a four year program.

Q And you ended up with a B.S.?

A That's correct.

Q And that was a B.S. in architecture?

A Right.

Q Did you have any specialties that you focused on or is it

a general architecture degree?
A It's a general architecture degree.
Q Can you give me some idea of the type of classes you take in the process of getting an architectural degree?
A I took design classes, building construction, management, construction management, structural courses.
MR. BRISBOIS: We're having difficulty hearing again. If you could speak up a little, please?
Q (By Mr. Hull.) Anything else?
A I'm sure. I'd have to go look.
Q What classes would you have had in architectural school that would bear some relevance to the work you're now doing at Israel Berger & Associates?
A I'd say design, construction drawings, building construction, plan reading.
Q Did you take any classes dealing with materials, building materials?
A There was a class in strength of materials, and materials were also covered in building construction.
Q What did you do, for example, in building construction class; what types of things did that cover?
A Basic building construction practice, methods, materials.
Q Would that have touched on any roofing and waterproofing materials?
A Yes.

Q And when did you join the Army Corps of Engineers?
A In 1988.
Q So that was before you were in architectural school or about the time you started?
A About the time.
Q What was your job in the Army Corps?
A I was an enlisted man.
Q And what did you do?
A Assigned to the 469th, I was a specialist in the construction battalion. We worked with heavy construction equipment, we did renovation, repair, basic construction on existing facilities.
Q Had you had any experience in the construction business before you joined the Army Corps of Engineers?
A Nothing professional.
Q Now, what type of renovations, repairs were you involved in in the Army Corps of Engineers?
A Gutting of buildings and installation of interior work. Some exterior work as well.
Q And I think did you also say you did some just general building construction there also?
A Yes.
Q Would that be new construction?
A No.
Q All part of the renovation and repair process?

A That's correct.
Q Were you actually doing the construction work yourself?
A Yes.
Q And you were going to architectural school at the same time, is that right?
A Not during the full time, the first two years of full time, which encompasses boot camp and your initial training, and after that it's a reserve. So the first part of that is no, and then when you enter reserve duty and the time that you're referring to, yes, I was attending school at the time and serving.
Q When did you actually start architectural school?
A I enrolled in '86.
Q So did you have two years, then go to the Army Corps for two years and then finish up?
A About a semester, then I went in.
Q And then when did you join -- what did you do after the Army Corps?
A I worked for Mr. Berger.
Q You're speaking of Israel Berger & Associates?
A That's correct.
Q And what business are they in?
A They're exterior wall and roofing consultants.
Q How many employees do they have?
A Approximately 20.

MR. BROWN: How many?
THE WITNESS: Approximately 20.
Q (By Mr. Hull.) And what were you hired to do when you started there?
A Initially to perform quality control, control inspection, field monitoring.
Q Give me some idea of the type of projects Israel Berger & Associates gets involved in?
A Well, on the exterior wall, they consult on forensic projects; they consult on new construction; restoration; repair; landmark; historic structures; curtain wall, both high rise and smaller scale; masonry; EIFS walls; stone work; stone cladding; roofing and waterproofing, both sloped and low sloped; steep; sometimes control testing.
Q Where does Israel Berger do its work? Is this a local company, a national, international?
A There are both national and international projects.
Q What is encompassed in the forensic work that Israel Berger does?
A From what I've seen, we're involved with failure investigations, expert witness, peer reviews.
Q What about with respect to new construction, what type of work does Israel Berger do?
A They provide consulting to architects as they design, review of new construction prior to actual breaking of

ground construction, mock-up testing, test facility observation, monitoring, review of proposed contract documents such as drawings, detail specifications.
Q And would that work be primarily in the area of exterior walls and waterproofing type work?
A That's correct.
Q Now, when you say part of what they do is consulting with architects as they design, could you be a little more specific and tell me what they would be consulting with them on, what they would be helping the architects with typically?
A Reviewing the architect's initial design.
Q For what?
A For feasibility.
Q But I mean what type of -- what components of the design, the waterproofing exterior wall designs or roofs or what?
A All of the above. Everything to do with the exterior wall, with the roofing and waterproofing.
Q Would part of that process be helping the architects develop designs and design criteria?
A Yes.
Q Now, you also specifically mentioned that Israel Berger is involved in waterproofing. Can you tell me what type of work the company does in connection with waterproofing?
A They consult with architects as to what types of assembly

materials can be used, investigate the failures of waterproofing systems.
Q Is Israel Berger involved at all in the design of waterproofing systems?
A Yes.
Q And would that be one of the things that they would be working with architects on, is the actual design of a waterproofing system?
A That's correct.
Q And what all would that include? Would that include preparation of drawings?
A It may depending on -- depending on the scope of work requested by the architect.
Q Would it include the development of waterproofing details?
A Yes.
Q Would it include advising the architect on the selection of materials?
A Yes.
Q And when you started out, you were doing quality control, inspections, field monitoring. Can you tell me what all that involved?
A Yes. Israel Berger would provide a field inspector on projects that required part time or full time inspection or site monitoring on behalf of whatever party would request that service, whether it be the architect or the

client or the resident.
Q And would that have involved new construction at all?
A Yes.
Q Would that be limited, though, to the waterproofing exterior wall construction?
A Yes.
Q Okay. Can you give me an example of some of the projects where you have performed those type of quality control inspections, field monitoring services?
A Yes. Specific names?
Q Well, I'm not so interested in the names as the type of projects.
A Okay. I've monitored the application of deck coatings on concrete decks in exterior and below grade parking structures; I've monitored the installation of waterproofing assemblies in exterior walls; I've monitored the installation of new roofing assemblies, primarily flat and low sloped roofs; I've monitored the installation of below grade waterproofing in plazas; I've monitored the installation of curtain wall panels and installation of new window components; I've monitored the retrofit and repair of historic masonry structures and masonry buildings.
Q Would any of that work have been similar to the type of waterproofing work that was done in the plazas at the

Promenade project?
MR. BROWN: Object to the form, vague.
MR. HULL: You can go ahead and answer that.
THE WITNESS: Are you asking me if there was -- if I monitored a project with material similar to?
Q (By Mr. Hull.) I'm not so interested in the materials as I am in the basic design of a structure where you would have a dirt-covered plaza over a usable space?
A Yes.
Q And the objective there would be to keep the water out of the usable space? Have you done projects like that?
A Yes.
Q What other jobs have you had, then, as you've progressed through your career at Berger besides the quality control, inspection, field monitoring type work?
A I assisted and eventually performed controlled water testing and air leakage testing, performed adhesion tests, cohesion testing, coatings, sealants, cladding. I assisted and ultimately developed waterproofing details and specifications. I've reviewed submittals for projects.
Q Anything else that you've done as you've progressed through your career at Berger?
A Performed leak investigations, prepared reports,

participated in expert witness.
Q Now, this quality control, inspection, field monitoring, you did that on new construction projects as well as renovation projects, is that right?
A Yes.
Q And your job there would be to make sure that the contractor was following the drawings and specifications and conducting its work, is that right?
MR. STEPAN: Objection as to form.
Q (By Mr. Hull.) Well, maybe you could tell me just a little bit --
A Well, ultimately we're there to make sure that the work performs according to the approved drawings and specifications.
Q Now, when you say you developed waterproofing details and specifications, what does that include?
A In new construction or in renovation or just in general?
Q Well, let's talk about both. First let's talk about new construction. What would you do to develop waterproofing details and specifications; what would that include?
A Typically an architect would provide us with their design drawings and specify locations where they would require more detail design.
Q And then what would you do?
A We'd review the condition, we would design the detail

based on materials that we believed were appropriate.
Q Now, when you say you'd design the detail, would you prepare drawings?
A We prepare sketches. Drawings if the architect or client requested them.
Q And what would the sketches show?
A It would show the transitions, the -- they would show how the actual materials would be configured in the field as a finished detail.
Q Now, you made a distinction between sketches and drawings. What is the difference?
A Sketches are hand drawn, usually on eight and a half by eleven, maybe larger. Drawings we would classify as the sketch being transferred to a draftsman to convert into a hard line drawing, if not to scale, to scale, and if not hand drawn with hard lines to be put on a CAD form, a CAD type drawing.
Q And then would your role in that be to prepare the sketches themselves?
A Yes.
Q And then would you transfer that to someone else in the office to do the CAD drawings or the hard line drawings?
A Yes, typically.
Q And Israel Berger does have draftsmen on staff?
A Yes.

Q And when you're developing waterproofing detail and specifications, would that include assisting the designer in the selection of materials?
A Yes. We do make recommendations, not unless they already have their preferences.
Q And what about specifications; what would you do in terms -- you indicated you develop waterproofing details and specifications. What would the specifications include?
A If the architect already has an existing body, a specification, we'd either review it and modify it for them, or if they requested a specification from scratch, we would develop one.
Q And who would that specific -- let's say they requested a specification from scratch; what would that include?
A That includes, of course, a description of the material, scope of work, related sections, description of materials, standards, description of guarantees, handling.
Q What do you mean by handling?
A Handling of materials.
Q Special instructions about how the materials are to be handled once they arrive on site?
A That's correct.
Q Anything else that the specifications would include?

A Installation procedures, quality control, any applicable testing, safety issues.
Q All right. Now, you also indicated that you are involved in the review of submittals. What does that mean?
A Typically an architect has materials that they have in mind or have been submitted to them by other parties and they submit them to us as their consultant for review.
Q And what would be the purpose, then, of your review?
A Look for issues such as feasibility, compatibility, ease of use, anything that would red flag a condition out in the field that may result because of a particular material.
Q Now, would those submittals typically come from the contractors?
A Sometimes they do.
Q And if they didn't come from the contractors, where would they come from?
A The architect may have them.
Q And the submittals would be of what, particular types of products?
A Yes. They'd be checked for compliance to whatever the specifications were calling.
Q So would it be fair to say that in your work in developing waterproofing details and specifications, that you were assisting in the design of a waterproofing system,

providing information on how that was to be installed and incorporated into the building?
A As far as installation goes, we don't really have the same means and methods of a contractor. Our details would reflect the correct configuration as the detail or drawing would show it. The actual logistics are something to be worked out on the field by a construction manager and the contractor.
Q When you say a construction manager and a contractor, are those one and the same or are they in one instance you would have a contractor and in another you would have a construction manager?
A That's correct.
MR. BROWN: Objection, vague, broad. Also foundation.
Q (By Mr. Hull.) Tell me what a construction manager is?
A A construction manager oversees multiple trades on a construction project, whereas a contractor would represent a single entity, not unless it was a general contractor. You have multiple trades on a job site. You have masons, you have waterproofers, roofers. Those would be deemed as separate contractors.
Q Now, a construction management and a general contracting arrangement are different types of construction delivery systems, aren't they?

A Yes, to my understanding.
Q And in the general contractor context, there would be one entity that is responsible for -- has overall responsibility for the construction, is that right?
MR. STEPAN: Objection as to form, foundation, legal conclusion also.
MR. BROWN: Calls for a legal conclusion.
MR. REILLY: Join.
MR. HULL: You can still answer that.
THE WITNESS: Yes, my understanding is.
Q (By Mr. Hull.) And in the construction management context, the owner would typically hold multiple contracts with contractors and then the construction manager's job would be to coordinate between the various contractors the construction of the project?
MS. SEMKE: Objection, foundation.
THE WITNESS: Yes, my understanding.
Q (By Mr. Hull.) All right. Now, when you left Berger, who did you go to work for?
A I worked for a firm, Prisco & Edwards.
Q Prisco?
A Prisco with a P.
Q P-R-I-S-C-O?
A Right.
Q Where are they located?

A They are -- at the time, they were located in Lawrenceville, New Jersey.
Q And what business is Prisco & Edwards in?
A They're an architectural design firm.
Q Do they specialize in any particular areas?
A Institutional buildings, primarily educational.
Q I think yesterday you indicated you didn't have any license, you don't have an architectural license?
A Not at present.
Q What do you need to do, once you get an architectural degree, to get an architectural license?
A You need to first apply with the board, the NCARB board, to register yourself.
MR. BROWN: Which board?
THE WITNESS: The NCARB.
Q (By Mr. Hull.) What does that stand for?
A I forget what the C is, but it's basically the Architectural Registration Board, the National Architectural Registration Board, and they monitor your progress as an unregistered architect and you accumulate experience that would be vouched for by professional firms that have registered architects.
Q And how long do you need to do that, where you'd be working under the direction of a registered architect?
A The amount of experience, between three to five years

before you can qualify to take the registration exam.
Q And then you take the registration exam?
A That's correct.
Q Anything else that you need to do?
A You need to provide proof that you have been working for registered architects and engineers to the board, and there's usually a review of that evidence as well as your application.
Q And why haven't you gone through that process?
A It's -- it's lower on my priority list when compared to actual field experience, on actual projects in the field. I value the field experience more so than the professional degree that I can acquire later on.
Q What can you do as a licensed architect that you cannot do as an unlicensed architect?
A I cannot sign and seal drawings.
Q Anything else?
A Primarily that.
Q So how would that affect your work -- let's go back to Berger. You're developing waterproofing details and specifications. What part of that process can't you do?
A I can't sign or seal the elements of the design that I'm responsible for as a registered architect. It would have to go to a registered architect in the firm or a registered architect that we have an arrangement with as

a client. Primarily when you're consulting, that distinction is drawn before the work is actually done, whether or not our office will sign and seal details or the architect will sign and seal the details.
Q And you indicated that Israel Berger would work for, in some instances, architects, in some instances owners. Do you ever work for contractors?
A Yes.
Q And what type of work would you do for contractors?
A We would review shop drawings, submittals, provide site monitoring as well.
Q Why would a contractor hire a company like Israel Berger & Associates?
MR. STEPAN: Objection, foundation.
MR. REILLY: Calls for speculation.
MS. HEYER: Same objection.
THE WITNESS: For those reasons.
MS. SEMKE: What was the answer to that one?
THE WITNESS: For those reasons.
Q (By Mr. Hull.) What did you do at Prisco & Edwards?
A I was involved with the design of new construction, I was part of their roofing and waterproofing division, I performed leak investigations, reviewed construction drawings that were produced by Prisco & Edwards and

participated in new design.
Q So Prisco & Edwards had a roofing and waterproofing division?
A Yes.
Q So when you were reviewing construction drawings that Prisco & Edwards produced, what would your role in that process be?
A I would act as an in-house consultant to our designers when I was with the firm.
Q And your work would be focused on the waterproofing and roofing elements of the project?
A That's correct.
Q So you would be helping the design professionals in the firm develop the waterproofing details and specifications?
A That's correct, in addition to other tasks.
Q And what would those other tasks include?
A I would also assist in the development and review of specifications that they made. I'd also assist on the design end of it as well.
Q Did you do any field monitoring at Prisco & Edwards?
A Not to the degree that I did for Israel Berger & Associates. They don't provide -- "they" meaning Prisco & Edwards don't provide a similar service in terms of providing an on site staff member to act as an inspector for a full time or extended time period. They are

basically design architects without field inspectors. They weren't staffed for that.
Q And how long were you at Prisco & Edwards?
A A little over a year.
Q Can you give me some examples of projects that you worked on at Prisco & Edwards?
A Sure. Repair and restoration of masonry walls and the waterproofing within them on university dormitories.
Q What university was that for?
A Ruttgers. Leak investigations and development of remedial details for their repair, window replacement details, the development of details for new construction, for additions as well as new construction in terms of schools, restoration of below grade waterproofing for religious institutions.
Q What project did you work on where you prepared remedial details for the repair of waterproofing?
A It was a cathedral. St. Francis I believe was the cathedral.
Q Where was that at?
A It's in New Jersey. I believe the town is Metuchen. The firm was tasked with the repair and renovation of the existing cathedral as well as the construction of a new wing that would be attached or linked to the cathedral. They needed to continue the waterproofing from the

existing structure to the new structure.
Q So were you responsible for developing the details on how you would connect the waterproofing in the old structure to the waterproofing in the new structure?
A Yes.
Q And what type of waterproofing was this? Was this a below grade basement wall or foundation wall or what?
A Yes. It was a below grade foundation.
Q Then you also said that you worked on restoration of below grade waterproofing. What project was that?
A That would be the same because they would have to disturb the existing.
Q All right. And why did you leave Prisco & Edwards?
A The firm relocated and it was -- it was inconvenience in travel just to get to. It doubled my commute time.
Q Why did you join them in the first place?
A They provided me with an opportunity to work in design as well as come in with my specialty. They saw a need for my specialty in leak investigations and knowledge in building envelope and they wanted to incorporate that into their design.
Q How did you get in contact with Prisco & Edwards in the first place?
A There was an independent consultant that worked for Israel Berger & Associates as well that also consulted

for Prisco & Edwards. He mentioned to me that there was a firm that he worked for that provided an opportunity for architects to participate in actual design rather than strictly the practice of building envelope, roofing and waterproofing detailing and design.
Q After you left Prisco & Edwards, you went back to Israel Berger, is that right?
A That's correct.
Q And when was that?
A I'd say the late summer of 2001. 2001.
Q And what did you do -- what was your job when you went back to Berger?
A I resumed my role, with less travel. It was less traveling.
Q Now, your area of expertise is, you indicated, leak investigations and building envelope design, is that right?
A Yes.
Q Is there anyone else at Berger with that particular expertise?
A Yes.
Q Is that really the focus of Berger's practice?
A That's one of them.
Q What other focuses does Berger's practice have besides leak investigations and building envelope design?

A Well, it's building envelope consulting.
Q Excuse me.
MR. BROWN: I'm sorry. Could you clarify that? Building envelope consulting and not design?
THE WITNESS: That's correct.
Q (By Mr. Hull.) Now, you say -- first of all, what other areas besides that does Berger focus on?
A Monitoring, especially with mock-ups.
Q Now, you indicated that Berger's expertise was not in design. What did you mean by that?
A We -- what I mean by that is we're not typically asked to design a system for a project. Usually the architect has his design in mind already and we'll work in there to assist and consult with the architect how to make that design work in the field.
Q Now, when you say the architect typically has a design in mind, are you referring to a design for a building or are you referring to a design for a waterproofing system?
A A design for a building.
Q So the architect would come to you with a design for a building and then it would be your job and Israel Berger's job to develop the waterproofing details and specifications that would fit that design?
A That's correct. Unless the architect already had part of that waterproofing design done and they wanted a specific

part of it designed by us.
Q Now, when you testified yesterday, you mentioned a particular project that you were involved in for Israel Berger; Adams Crossing, is that right?
A That's correct.
Q And you worked on that from, you said, 1996 to -- for how long?
A Till 1999.
Q And how big a project was Adams Crossing? This was a residential project?
A That's correct. It was a two tower residential masonry building, a concrete structure, approximately 14 levels above grade, four levels below grade with a plaza and a below grade parking deck, masonry cladding, masonry veneer, metal roofing.
Q And what was your role in that project?
A My role in the project initially was as the field monitoring, to perform field monitoring and field inspection for Israel Berger & Associates for the repair and restoration of the waterproofing in the masonry walls.
Q Would that be both above and below grade masonry walls or just below grade?
A Above grade. Above and below grade.
Q And I believe you testified that that project involved a

bentonite clay waterproofing system, is that right?
A Yes.
Q And that was the below grade waterproofing system that was part of the original construction of the Adams Crossing project?
A Correct.
Q Now, you said it started out as field monitoring of the repair and restoration of the waterproofing. Did it change during the course of the project?
A Yes.
Q How did it change?
A The more we -- the more of the building that we exposed, the worse the conditions got and the scope of work grew.
Q So what did it grow to include?
A It grew to include setback terraces with protected membrane roofing, it grew to repair of spalling and cracked concrete on balconies, the adjustment and replacement of structural steel lintels, replacement of exterior sheathing boards, the investigation and testing of roofing components, flood testing of planters.
Q Who brought you into that project, Israel Berger?
A In Israel Berger?
Q No. Who brought Israel Berger into that project? Was it the owner?
A Yes. The owner of the property.

Q And what was Israel Berger's original scope of work? Were you to develop a waterproofing system?
A Yes.
Q Tell me the full scope of their initial work?
A Of the initial work? Was to perform a leak investigation, field visits, prepare a report, and based on the findings of leak investigation, develop a scope of work that would include the repair of the waterproofing and masonry, architectural drawings, details, specifications, ultimately bidding the project out to contractors.
Q So what role did you play in the leak investigation portion of that scope of work?
A In the initial investigation, I didn't have an active role. I was brought in after the job had kicked off and was awarded and I was brought in as the full time field inspector. As the job went on, more conditions were revealed through the course of the work and conditions that were not visible in the initial investigation warranted more work.
Q Now, after the initial leak investigation was done by Berger, you said that they were also responsible, then, for designing a waterproofing system which would include preparation of drawings and specifications, is that right?
A Yes.

Q Were you involved in that part of the process?
A No.
Q The work had already started when you came on site and then additional problems were discovered, is that right?
A Yes.
Q So were you involved at all in the design of repairing these additional problems that came to light?
A Yes.
Q And what did you do in that role, your design role, in solving these additional problems?
A I would document existing conditions, prepare sketches, provide materials that could be used for the repair.
Q So what type of sketches would you have been responsible for preparing?
A Do you mean hand drawn versus hard line?
Q Let's talk about the hand drawn because that's one of the things you would do is prepare hand drawn sketches, is that right?
A That's correct.
Q What would those sketches have been of?
A Of existing conditions, especially the problematic conditions, and develop prototype solutions based on the materials that were already on site to be used by the contractor, particularly conditions that are not typical of -- that you wouldn't typically find in typical

literature for a waterproofing product.
Q Particularly difficult conditions?
A Yes.
Q So your job, then, would have been to prepare sketches to show the contractor how to waterproof certain specific conditions?
A That's correct.
Q Did you have any role in the selection of materials?
A From the initial or based on --
Q Well, you said you weren't involved initially?
A Right.
Q So at what point did you have any role in selection of materials?
A I would recommend material. The ultimate decision and selection rely on the office, the project manager at the time, my office.
Q Israel Berger's office?
A Right.
Q And the materials you're referring to would be waterproofing materials?
A In some cases.
Q In some cases it would be what else?
A In some cases it would be retrofit masonry, accessories, pins, anchoring, metal.
Q Can you tell me some of the other projects you worked on

at Israel Berger?
A I participated in the survey of Worldwide Plaza, which was a masonry defect.
Q What is Worldwide Plaza?
A It's one of the -- it's probably the tallest brick masonry building in Manhattan. It's located on Eighth Avenue. It has the Golden Pyramid. Investigated leak problems for historic properties in the New England area.
Q Any that are particularly well-known?
A I don't know if they're well-known. They're well-known in that area, but I don't know if --
Q What was your role in the Worldwide Plaza project?
A To survey and document the existing conditions of the exterior masonry wall prior to any repair.
Q Was this above or below grade?
A Above grade.
Q Any below grade work on that project?
A No. Not that I was involved with.
Q All right. Anything other than that and the historic properties in New England?
A Any particular work that you have in mind, like specifically below grade? The office consulted on the construction of New York Hospital on the east side where existing structures were excavated because of the failure in below grade waterproofing as well.

Q What project was that?
A New York Hospital.
Q And what was your role in that?
A I was asked to view an excavated area above a below grade utility tunnel.
Q And what was the purpose of that?
A The client wanted to know the condition of the existing waterproofing in the exposed area. It was currently being replaced. My understanding was that a different below grade waterproofing system was being used in the new construction, and because this utilitarian tunnel was preexisting, a decision had to be made whether or not they were going to keep the existing waterproofing intact or continue with the new waterproofing system from the new construction. My understanding was that the tunnel leaked.
Q What type of waterproofing was on the tunnel originally?
A It was a clay-based system.
Q Bentonite type material?
A Yes.
Q And did you recommend that that be replaced?
A Yes.
Q And what was the replacement product?
A It was an asphalt-based material.
Q And why did you recommend that it be replaced?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: A cut sample of the membrane itself indicated that it had not been activated, and tying in the new system to the existing system we viewed as a weak point in the overall below grade waterproofing system.

Q (By Mr. Hull.) Okay. So you were hired initially to conduct an investigation. What did you do in the process of conducting your investigation?

A It was -- well, the client had had their contractor expose the area and they asked us basically to render an opinion. It wasn't a full-blown investigation. A report was produced for it. Another consultant came out with me that was more involved with the project, but they wanted my input regarding the two systems.

Q Another consultant from Berger?

A Right.

Q So you went out there. How long was your investigation?

A I was out there for the day. Maybe less than the day. They had the probe ready and the sample cut.

Q So you viewed the conditions and you took a sample, is that right?

A Right. The sample was taken by the other consultant.

Q What happened to the sample? What was done with the

sample?
A It was shown to the client.
Q Could you tell from looking at it that the bentonite had not been activated?
A Yes.
MR. REILLY: Objection, lack of foundation.
Q (By Mr. Hull.) Did you say yes?
A Yes.
Q And how could you tell that?
MR. REILLY: Same objection.
THE WITNESS: Because I've seen bentonite activated.
Q (By Mr. Hull.) Could you tell from your investigation why the bentonite system didn't activate?
A No, other than it didn't come into contact with a sufficient amount of moisture to activate it.
Q So following your inspection of that property, did you prepare a report?
A Yes. It was more of a memo.
Q What did your report include?
A A description of the findings and -- I'd have to look at the report. It was quite some time ago.
Q Did it contain recommendations for a replacement system?
A No. I don't recall that it did because they had -- they

had their system chosen already. It was more of a matter of whether or not they continued it over the tunnel or not.
Q Did your recommendation suggest that they take the old system off and continue with the new system, then?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: I'd have to look at the report.
Q (By Mr. Hull.) Do you have any recollection of what your report recommended?
A I believe that it would lean towards that.
MR. REILLY: Same objection.
Q (By Mr. Hull.) Did you believe that you had enough information after one day's investigation to make a recommendation?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: No. I left that to the consultant that was assigned to the job.
Q (By Mr. Hull.) Any other projects that you worked at at Berger that come to mind?
A That bear any relevance to Promenade Oaks or below grade?
Q Yes. Below grade waterproofing.
A No. None that come to mind.

Q Okay. Now, you said that you were a member of the Roofing Contractors Institute, is that right?
A The RCI is the Roofing Consultants Institute.
Q Okay. And what is that?
A It's an association of parties that are involved with roofing and waterproofing, architects, engineers and contractors.
Q Is that a national organization?
A I believe they're national now. At the time that I joined, they weren't.
Q What do they do?
A Their mandate is to promote the education of the architectural engineering, building construction industry and the most updated and sound information for roofing and waterproofing.
Q Does the RCI have any publications?
A Yes.
Q And do you receive those publications?
A Yes.
Q And what type of publications do they have?
A It's a monthly publication called Interface where they discuss new roofing products, legislations regarding building codes, pertinent roofing and waterproofing practices, methods, failures, studies, case analysis.
Q And do you review those newsletters when you get them?

A Yes, when I have a chance to.
Q Are you an officer or have any other involvement than simply as a member of the RCI?
A No. I'm just a member.
Q And you also said that you were a member of the Construction Specifications Institute, is that right?
A Yes.
Q And what does that organization do?
A It's also a membership-based organization of architects, engineers, developers, parties involved with architecture and building construction. They address a wider scope than RCI. Where RCI is more concentrated on roofing and waterproofing, CSI is more of building construction. They address the industry on a broader scope.
Q Does CSI also have a publication?
A Yes, they do.
Q And what type of publication is that?
A It's a magazine, a monthly magazine called The Construction Specifier.
Q And what type of articles would be in that magazine?
A Somewhere along the lines of RCI, of course with a broader scope. There's a column there on failures that our office contributed to.
Q Are you involved other than as a member in CSI?
A No. Just a member.

Q Now, at RCI, would their publications discuss different types of waterproofing products?
A Yes.
Q Would it ever contain case studies or things like that?
A I'm sure.
Q Would it ever contain research studies on different types of waterproofing products?
A Yes, I'm sure it would.
Q Are you involved in any other professional organizations?
A No.
Q Do you receive any other publications that are relevant to your expertise in waterproofing and roofing and building envelopes?
A No.
Q Does Israel Berger subscribe to any other publications besides what comes from RCI and CSI?
A Yes.
Q Any that you come in contact with on a regular basis?
A Well, whatever is in the conference room. Everything is made accessible to all staff members in the archive in the library.
Q Yes. You mentioned that Israel Berger & Associates had a library. How big a library is that?
A It's a collection of product binders, periodicals. I couldn't tell you how many volumes or articles there are.

Q But there would be product information in there?
A Yes. There's one section on product information.
Q How many different types of waterproofing systems are there?
A Exactly?
Q Well, I don't mean exactly and I don't mean, you know, by product name, but are there categories of waterproofing systems?
A Yes, to my understanding.
Q Okay. Tell me what those are?
A Well, it can be broken down into cold applied and hot applied. Under cold applied, it can be broken down into liquid-applied membranes, referred to as LAMs. These can be asphalt-based rubberized asphalt. These types can be reinforced or non-reinforced monolithic. These could be polyurethane or modified rubberized polyurethane. These can also be silicone. They can also be epoxy and resin-based. They can also be acrylic. That's all off the top of my head for the cold liquid applied.
On hot applied, it can also be hot rubberized asphalt with reinforcement, or non-reinforced. It could be a traditional built up roof membrane. It could also be torch-applied modified bitumen membrane. It can be a sheetgood, fully adhered sheetgood membrane, peel and stick. It could be a prefabricated rubberized sheet,

which would include EPDM, neoprene. It could also be a chlorosulfonated polyethylene, something like Hypalon. It could also be a PVC sheet. I'm sure there are more.
Q Where would bentonite fall in?
A It would depend on its configuration, whether it was trowel applied, panelized, in tubes. It's not a hot application.
Q Now, you indicated under cold applied a number of products that were liquid membranes. Are there any cold applied non-liquid?
A Cold applied non-liquid. Right. That would be the sheetgood.
MR. BROWN: I'm sorry. For clarification, was that big list you just gave that ended up with PVC sheet, was that cold-applied materials?
THE WITNESS: No. Those were separate. Those were separate.
Q (By Mr. Hull.) Okay. And would the bentonite type product that was used at the Promenade, would that fall under the cold-applied sheetgoods category?
A I would categorize it as that.
Q So as I look at your list here, you've got cold-applied liquid membranes and cold-applied sheet goods, and then you have hot-applied products; would those be three categories?

A Yes.
Q Are there any other categories of waterproofing products?
A Not that I can think of.
Q And then you indicated that bentonite comes in several forms. Can you review those for me?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: There's a trowel grade.
Q (By Mr. Hull.) Let me just back up for a second. Are you aware of different types of bentonite products?
A In terms of manufacturers?
Q No. Just different types. You mentioned sheetgoods, you mentioned troweled on. That's what I'm talking about. Are you familiar with different types of bentonite products?
A I'm aware that it comes in different form.
Q And did you develop that awareness from your experience working as a roofing and waterproofing consultant?
A I'd come across information during that time, yes.
Q Tell me the different forms, then, that bentonite comes in?
MR. REILLY: Objection, foundation.
THE WITNESS: I understand it can be troweled, that it comes in tubes, that it comes in biodegradable panels, and laminated to high density

polyethylene panels.
Q (By Mr. Hull.) What type was used at the Promenade?
A I believe it was the type that was laminated to a high density polyethylene panel.
Q Now, Israel Berger's task at the Promenade project was to evaluate and verify the existing conditions of the below grade waterproofing in the courtyards, is that right?
A That's correct.
Q Did you believe that you had sufficient background and experience to perform that work?
A Yes.
Q Before you went out to that project, you received a disclosure report that we talked about yesterday that was marked as Exhibit 540, is that correct?
A Yes.
Q Now, I think that you had testified that the Promenade Oaks Pending Litigation and Disclosure form document that you got was different than Exhibit 540. Was that your testimony?
A That's correct.
MR. REILLY: I'll object to the form of the question as inconsistent with his prior testimony. His prior testimony was that it was the same document only less pages and didn't include as much, is my recollection of his testimony.

Q (By Mr. Hull.) Okay. Is that correct?
A That's correct.
Q Same document, but included less pages?
A Correct, to my recollection.
Q Okay. And I believe your testimony was that there were certain exhibits attached to the end of the report that were not included in yours, is that correct?
A That's correct.
Q And can you tell me again what those were?
A I don't recall the appendices in the rear of the report.
Q Can I see that for just a second?
A Sure.
Q Did the Pending Litigation and Disclosure report that you received include any recommendations?
A In 540?
Q Yes.
A No, not that I recall.
Q Then the other thing you indicated you received were some drawings, is that right?
A That's correct.
Q Did you have anything else before you went out there to the site, for your initial site visit?
A Other than the disclosure and the drawings?
Q Yes.
A No.

Q You indicated at some point you got this Waterproofing Investigation Report from Inspec, is that correct?
A Yes.
Q Do you recall when that was?
A It may have been at the same time I received the disclosure report, but I don't recall exactly when I got it.
Q All right. And let me show you what we've marked as Exhibit 545, which is the Waterproofing Investigation Report by Inspec, and I think you testified yesterday that the report you got had fewer pages than Exhibit 545, is that correct?
A That's correct.
Q And where did the report you received leave off?
A I don't recall --
MR. STEPAN: Asked and answered.
Q (By Mr. Hull.) Go ahead.
A I don't recall seeing Recommendations or Cost Estimates, the back end of that report.
Q So when you went out there, had you seen any recommendations for remedial work that anyone else had prepared?
A No. Anyone else? No.
Q Was it your understanding that you were charged with the responsibility of conducting an independent investigation

and coming up with your own recommendations and conclusions?
A Yes.
Q Do you recall how many pages of drawings you actually got?
A No, I don't.
Q The report that you did contained copies of two details from the drawings, which would be pages 6 of 19 and 7 of 19 in your report, and I just want to see if you can tell me where you got those from. I'm going to show you what's been marked as Exhibit 34, which is a set of drawings, and I'll direct your attention to page A5.1. Was that the source of the drawings that are incorporated in your report?
A Yes. It looks like the details of the sections.
Q Do you recall reviewing the notes on that page prior to the time you went out to the Promenade Oaks apartment project?
A Yes.
Q Did you happen to notice note 3a?
A Yes.
Q Were you aware at the time you went out there that this was a design-build waterproofing system by the general contractor?
A No.
Q Was the first time you learned that yesterday while you

were testifying here?
A Yes.
Q Does design-build have a particular meaning in the construction industry that you are aware of?
A Yes. It's usually fast-tracked. It's usually equated with the term in-house; the same entity that designs also includes the same entity that builds.
Q Have you been involved in any design-build projects before?
A Not that I'm aware of.
Q All right. So you went out to the project for a site visit and you were there one day?
A Do you still want these?
Q You can roll those up. You were at the project for one day, is that correct?
A Yes.
Q And you testified that you observed a number of excavations, is that right?
A Yes.
Q I think you referred to those as probes, is that correct?
A Correct.
Q And two of those excavations were near patio slabs, is that right?
A Yes.
Q I want you to focus on the first of those patio slab

excavations that you observed and I want you to tell me what you saw?
A The first probe was approximately two-by-two, or two and a half by two and a half, dug deep enough to be able to view the bottom of the wooden post through the concrete slab and to show the plate that it rested on on the deck.
Q Did you make any other observations from that first excavation?
A Other than that the post was not in contact, directly in contact with the waterproofing and the deck, no.
Q Post not in contact with the waterproofing?
A Correct.
Q Can you explain that a little more for me? I'm having trouble visualizing that, because the post -- was the post resting on the deck?
A Not directly on the deck.
Q What was it resting on?
A It was resting on a plate.
Q Can you describe what this plate looked like?
A It resembled a section of insulation cut in rectangular form set underneath the base of the column. It was covered in mud, so it was difficult to determine exactly what the product was, but the way it was described was a post floating.
Q How thick was this plate that it was resting on?

A I'd say approximately two inches, from what I could see.
Q Did anyone say anything to you about that while you were observing the excavation?
A The gentleman that provided the progress photos described it as a post floating.
Q Were there any other comments made as you were observing this initial excavation?
A Other than it was described as part of a remedial repair, no.
Q And did you discern any waterproofing at all either around the post or around this plate?
A It was very difficult because of the amount of water and the mud. No. There was no clear view.
Q You had described for us yesterday, or you identified for us some people that were there and you said there was a representative from the building?
A Right.
Q There was Mr. Campbell, is that right?
A Right.
Q Mr. Vanderberg?
A Right.
Q Yourself?
A Right.
Q Anybody else? Oh, Mr. Charbonea?
A Right.

Q Anybody else?
A The workmen.
Q Who were, you understood to be, employees of Mr. Charbonea's?
A That's correct.
Q Did you form any impressions from viewing that first excavation?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Objection, vague.
MS. HEYER: Objection, vague.
THE WITNESS: I don't understand what you mean by impression.
Q (By Mr. Hull.) Did you form any opinions about the waterproofing?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Objection, foundation.
THE WITNESS: Since the post was floating on the slab, it indicated to me that, in addition to the information that was part of remedial repair, that was a solution, not to have the wood post in direct contact with the deck through the waterproofing.
Q (By Mr. Hull.) Okay. You concluded, it was your opinion that the repair works was intended to keep the post from

being in contact with the waterproofing, is that what you're saying?
A That's correct.
Q Did you formulate any other opinions based on your experience and observations of that first excavation?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same.
THE WITNESS: Other than it was a difficult condition, probably -- I asked myself how I would detail it.
Q (By Mr. Hull.) You're talking about the detailing of that post as it interfaced with the precast planks?
A That's correct.
Q And you considered that to be a difficult detail?
MR. REILLY: Objection, lack of foundation.
MR. BROWN: Object to the form also.
THE WITNESS: Yes.
Q (By Mr. Hull.) So as you were thinking about how you would detail that, did you arrive at any conclusions at that point?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Join in that.

THE WITNESS: Other than I wouldn't want the wooden post in contact with -- directly in contact with the precast. I considered the idea of minimizing the possibility of water getting through whatever interface detail would be used to support the post.
Q (By Mr. Hull.) Okay. Why did you conclude that you would not want the wooden post in contact with the precast?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Because you would want to avoid any penetrations through the membrane that would come in direct contact with the precast that could act as a point of entry for water on the waterproofing.
Q (By Mr. Hull.) All right. Then I want you to focus next on the second post excavation that you observed, okay? Was that different in any way from the first excavation you observed?
A I believe it was similar. I'd have to refer to more photographs to recall.
Q Would those be photographs that are in your report?
A No. This is more of the first probe.
Q Do you recall anything as you sit here today that you observed about that second excavation?
A No.
Q And do you have additional photographs back at your office

of that second excavation?
A In an electronic form, yes.
Q Now, I think you said yesterday you were in the process of trying to recover those. Did you have any success?
A No.
Q You also indicated that there was an original proposal that Israel Berger & Associates had sent to General Investment & Development. Did you ever locate that?
A No. I didn't have the opportunity to.
Q All right. Then you also testified that there were two excavations next to the plaza wall, is that right?
A Yes.
Q Let me ask you to focus on the first excavation near the plaza wall. Were you able to identify where that was?
A It was near an end wall.
Q And describe the excavation for me?
A It was approximately one and a half to two feet by three feet long, dug down to the deck -- or to the waterproofing, with approximately two inches of water at the base of -- at the bottom of the probe. It was in a corner against a stoop with the long side along the side of the building.
Q Was the wall of the apartment building visible in that excavation?
A I don't understand the question.

MR. STEPAN: Objection.
Q (By Mr. Hull.) Well, the side wall of the plaza, was that side wall of the plaza visible?
MR. STEPAN: You talking about the vertical concrete wall?
MR. HULL: Yes. The vertical concrete block wall in the plaza; could you see that in this excavation?
THE WITNESS: That surface, that is covered with waterproofing?
MR. HULL: Yes.
THE WITNESS: Yes.
Q (By Mr. Hull.) Okay. Now, tell me what observations you made as you looked at that first excavation along the plaza wall?
A The drainage mat -- the top of the drainage mat, I recall, was clogged.
Q Anything else?
A There was a lot of water at the bottom.
Q Anything else that you observed?
A Transitional flashing above grade was terminated next to the slap of the stoop.
Q Any other observations?
A There was a piece of duct tape at that end termination against the stoop.

Q Any other observations?
A Made me wonder the purpose, the original purpose of the duct tape.
Q Any other observations?
A That's all I can recall at the time.
Q Were there any photographs of that probe in your report?
A Yes.
Q Tell me which ones?
A I believe that's photograph number 11.
Q All right. And what does that photograph show?
A Well, the first bullet point is a view of the vertically applied waterproofing that counterflashes the bentonite. That's a transitional flashing I'm referring to as it transitions from the bentonite waterproofing above grade to the wall.
Q Now, did that waterproofing that counterflashes the bentonite waterproofing cover the transition between the concrete blocks and the sheathing covering the wood frame portion of the building?
MR. BROWN: Objection, lacks foundation.
THE WITNESS: To my understanding, yes, based on another condition that I observed.
Q (By Mr. Hull.) And tell me what that other condition was?
A I believe that's depicted in photograph number 8, page 10.

Q Describe that photograph for me?
A It shows a rubberized asphalt membrane or a flashing transition membrane extending beyond the surface of grade behind the vinyl siding and it's delaminating from the sheathing board exposing the gypsum core.
Q Was this photograph number 8, then, the other excavation at the plaza wall that you observed?
A No.
Q Same?
A It's not -- this was in a different area and it was an area that showed a detached section of vinyl siding, and because it was detached and exposed, it presented an opportunity to inspect what was behind it not having to disturb an undisturbed condition.
Q So from this, this condition you viewed in photograph 8, you concluded that the flashing referred to in photograph 11 covered the transition between the block wall and the wood sheathing?
A Yes.
Q Do you recall any comments that were made by any of the other people observing this excavation?
A No. By the time that I observed the condition in number 8 and number 11, I was only with Mr. Vanderberg and Mr. Charbonea.
Q Did you ever learn whether or not that membrane that you

referred to as a counterflashing was part of the original construction or part of remedial work?

A No, not in this instance. I associated the remedial work with stoops that had modified concrete slabs.

MR. HULL: Why don't we take a break.

(A short recess was taken at this time.)

Q (By Mr. Hull.) Now, Mr. Camaya, we were talking about this third excavation you observed. Did you formulate any opinions based on your observations at that third excavation?

MR. REILLY: Objection, lack of foundation.

MR. VEITH: Lack of foundation.

THE WITNESS: Other than it was similar to the third -- the third being --

MR. HULL: This would be the first wall excavation.

MR. BROWN: The second one was discussed.

MR. HULL: Yes. First wall excavation. Did you formulate any opinions after viewing that?

MR. REILLY: Same objection.

THE WITNESS: Opinions in terms of the repair?

Q (By Mr. Hull.) Well, either in terms of the existing conditions or the repairs or the proper functioning of the

waterproofing system that existed?
A Seeing the clogged top edge of the drainage mat verified the description in the disclosure report. Not being able to see the bottom of -- the lower portion of the drainage mat made we wonder how far the fines had gotten into the system because it was clogged at the top. And assuming that it did clog extensively, it would limit the capacity of the drainage mat to perform its function at the vertical as well as at the transition at the bottom.
Q And that function would be what?
MR. REILLY: What was the question?
MR. HULL: I asked him what the function of that drainage mat along the vertical surface would be?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same objection.
MR. STEPAN: Asked and answered.
THE WITNESS: It would be to expedite the flow of water below grade at the vertical to allow it to drain at the deck level drains.
Q (By Mr. Hull.) Let me just back up here for a second. Did you review the plan sheets that you had received prior to the time you went out to the project for your site visit?
MR. VEITH: Talking about the

architectural drawings, Bill?
MR. HULL: Well, whatever drawings you got.
THE WITNESS: To my recollection, yes.
Q (By Mr. Hull.) Did you see anything in there referencing plaza waterproofing?
A I would have to look at the drawings again. I don't recollect exactly what my impressions were at the time. I was looking more for the basic configuration of wall to deck transitions.
Q Did you ever see any specifications for the project?
A No.
Q All right. Now, the next excavation I want to ask you about is, you said there were two excavations near plaza walls. I want to ask you about the second one of those that you observed. Can you tell me anything that would help us locate that?
A Not without -- other than being able to tell you the typical area, typical condition up against a wall, no, unless I had access to the other photos, unless -- not unless Mr. Charbonea kept a record of the probes.
Q What did you observe at the second wall excavation?
A Much the same as the first probe against the base of the wall and the side of the stoop.
Q Anything different that you can recall about the second

wall excavation?
A There was more mud. It wasn't as clear.
Q In either of the wall excavations, did you observe waterproofing material being separated from block wall?
A No, not that I recall.
Q Did you formulate any opinions after viewing the second wall excavation?
MR. VEITH: Objection, lack of foundation.
MR. REILLY: Objection. I'll join.
THE WITNESS: Other than I probably would like to see more probes and more extensive level for scale.
Q (By Mr. Hull.) Then you also discussed excavation near a plaza drain, is that right?
A There was one impression I recall.
Q Okay. Go ahead, tell me what that is?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same.
THE WITNESS: I wondered whether or not the transition flashing continued behind and underneath the slab, the stoop.
Q (By Mr. Hull.) Why were you wondering about that?
A In observing a modified stoop with the new pour, with the textured concrete, I would think that after doing all

that, the waterproofing continued behind the slab in front of the two doors to the residences. I wondered if in an original condition did the flashing continue behind the stoop that was not modified with the cutout and the re-pour.
Q And this is the kind of rubberized flashing material that you were referring to, is that right?
A Yes.
Q And if you were responsible for designing that transition point, would you have designed the flashing behind the stoop also?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Speculation.
MR. STEPAN: Objection as to form.
THE WITNESS: Would I have designed it that way?
MR. HULL: Yes.
THE WITNESS: Yes. Flashing is designed to be continuous.
Q (By Mr. Hull.) All right. Then there was an excavation near a drain, a plaza drain, is that right?
A Yes.
Q Tell me what you observed at that excavation?
A They had excavated around a typical drain to expose the

top of the drain with the sloped concrete collar around it, the perforated pipe extension. The aggregate had been pulled away from it already to expose a pipe extension. The filter fabric was no longer engaged and it exposed the base of the drain as it interfaced with the existing drainage mat. There was approximately a quarter inch of water around the drain.

Q Any other observations?

A I wondered why the water wasn't going straight into the drain.

Q Did you view that as a problem, that there was a quarter inch of water sitting around the drain?

MS. HEYER: Object to the form of the question, as to foundation.

THE WITNESS: Yes.

Q (By Mr. Hull.) Why?

MS. HEYER: Same objection.

THE WITNESS: Locations of drains are usually the low point in an underground system or a roofing system so that you have positive slope to expedite drainage off the surface.

Q (By Mr. Hull.) Any other observations you made?

A I noticed that some of the aggregate was small enough to get into the penetrations of the perforated extension pipe.

Q Anything else?
A That's all I can recall at the moment.
Q Were there any comments made as you were observing that excavation that you heard from other people?
A No, not that I can recall.
Q Did you formulate any opinions based on your view of that excavation?
MR. REILLY: Objection, lack of foundation.
MS. HEYER: Same objection.
MR. VEITH: Same.
THE WITNESS: Other than the observation of the standing water and why it wasn't draining freely, no.
Q (By Mr. Hull.) Now, following your site visit, what did you do next with respect to this project?
A You mean at the end of the day?
Q No. When you left, after you left?
A When we left? Based on what I had seen in the field and read in the disclosure and looked at in the drawings, I tried to put together a picture in my mind of how water could get through the system and into the interiors.
Q So how did you think it could happen?
MR. REILLY: Objection, lack of foundation.

MR. VEITH: Objection, lack of foundation.
MS. HEYER: Join.
THE WITNESS: Assuming it was getting past the waterproofing, I had to correlate the stains observed in the underside of the deck in the garage. The water was getting through the joints in the keyways and the hollow cores, moving laterally, draining onto the concrete beams, manifesting as leaks over the edge of the beams which were being collected by the retrofit pans that were mechanically attached along the length of some of these beams. I associated that with the heavy water stains coming out of exposed hollow cores in the precast deck -- I mean the precast concrete deck. I associated that with the typical staining in between concrete planks.
Q (By Mr. Hull.) When you put all those things together, did you come to any conclusions?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Other than that the water was getting through and manifesting itself as stains in the garage and damage in specific apartments that we saw, no. I would need more study. But I believe that that was the likely route that it was taking.
Q (By Mr. Hull.) All right. After you had your site visit, you prepared a field report, and that was marked

yesterday, I think, as an exhibit.
MR. REILLY: 592.
Q (By Mr. Hull.) Which is actually Exhibit 591. Let me show you Exhibit 591. Is that a field report that you authored?
A Yes.
Q Now, this was --
(A short recess was taken at this time.)
Q (By Mr. Hull.) Back on the record. Exhibit 591, is that the field report that you authored?
A Yes.
Q Okay. By the way, you mentioned this disclosure report that you received before you did your site visit. What role did that play in your investigation of the Promenade Oaks?
MR. VEITH: Asked and answered.
THE WITNESS: The report?
MR. HULL: Yes.
THE WITNESS: It provided me with some documentation with relevance to the existing conditions prior to me getting out there.
Q (By Mr. Hull.) Did it play any role in the final report that you authored?
A Other than being referenced to, no.
Q Is it common in your business to consider reports and

investigations that others have done in conducting your own investigation?
A Yes.
Q And did you do that in this case?
A Yes.
Q All right. I want you to turn to page 2 of your November 13th, 2002 field report, and I want to direct your attention to Observations, and under that, I want to ask you some questions about your observations. The first is your comment that, quote, "The existing bentonite based waterproofing assembly is not suitable for the existing construction and configuration of the courtyard at Promenade Oaks." Explain to me what you meant by that?
MR. REILLY: Objection, lack of foundation.
MR. STEPAN: Asked and answered.
MR. VEITH: And I join in the objection as to foundation.
THE WITNESS: What I meant by that was that I would not have chosen bentonite as the system for this particular scenario.
Q (By Mr. Reilly.) And why is that?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: And asked and answered.

THE WITNESS: I believe that there are other materials that are better suited for this condition.
Q (By Mr. Hull.) And why do you think that bentonite is not particularly well suited to this condition?
MR. REILLY: Objection, lack of foundation.
MR. STEPAN: Asked and answered.
MR. VEITH: Join both.
MR. STEPAN: Bill, are you going to go through all the questions that were asked yesterday with regard to this report?
MR. HULL: Let's go off the record for just a second.
(An off the record discussion took place at this time.)
(The court reporter read back the last question at this time.)
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Asked and answered.
MR. HULL: Go ahead.
THE WITNESS: I believe that -- I believe that bentonite should not be used to waterproof areas that are as sensitive as a personal residence, such as someone's living room or bedroom or kitchen or an area

that isn't tolerant of a certain amount of leakage.
Q (By Mr. Hull.) And why is that?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Join.
MR. STEPAN: Asked and answered.
THE WITNESS: Assuming that description, if the designer would choose a type of waterproofing that would assume a certain amount of leakage, it would fail to qualify as 100 percent waterproofing.
Q (By Mr. Hull.) And is that a characteristic of bentonite; is that the basis for your opinion?
MR. REILLY: Objection, lack of foundation.
MR. STEPAN: Join.
THE WITNESS: In some instances, I believe that that would happen.
Q (By Mr. Hull.) What do you mean by in some instances?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Bentonite is one of the older forms of waterproofing, used in many different areas, but I don't believe that it can be used in all areas. It's fine for a tunnel, it's fine for a subway, it's fine for some areas that can tolerate a negligible

amount of leakage, but not for a personal residence or other sensitive areas as such. If it does allow that kind of leakage and its acceptable, it isn't totally waterproof, so a designer would more than likely go to another system which would provide more of a waterproof condition.

Q (By Mr. Hull.) And you go on to say a monolithic liquid membrane would be better suited for this. Why is that?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: A rubberized asphalt monolithic membrane is applied in a liquid state after its been melted in a double jacket kettle. Because of its liquid state, it resembles the old blacktop tar roofs that have been used throughout history. One of the nature of using a liquid-applied hot membrane is that because it flows, it seeks the path of least resistance and has an ability to go into cracks and voids, has an ability to bridge. It's self-healing, it's fully adhered.

Q (By Mr. Hull.) What do you mean by self-healing?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: It's tolerant of penetrations, it's easier to maintain, it can be tested in sections or in whole, it can be configured as a bathtub.

Q (By Mr. Hull.) When you say self-healing, do you mean that if it's punctured, it will somehow seal that puncture?

MR. REILLY: Objection, lack of foundation.

MR. STEPAN: Objection.

THE WITNESS: It has an ability to do that to some limits.

Q (By Mr. Hull.) And what do you base that on?

MR. REILLY: Same objection.

THE WITNESS: Other opinions, observations in the field, product literature.

Q (By Mr. Hull.) And why would it be important for the waterproofing of these plaza areas to have a membrane that was self-adhered?

MR. REILLY: Objection, lack of foundation.

MR. STEPAN: Objection as to form.

THE WITNESS: It has a vertical application to it where the waterproofing has to provide continuous surface from horizontal to vertical. It would be advantageous for waterproofing to be fully adhered to both surfaces so that you would not be depending upon mechanical termination or attachment to the top of the waterproofing if it was not fully adhered.

Q (By Mr. Hull.) And what do you mean by fully adhered?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: A fully adhered system stays in place because of its adhesion properties on a horizontal and vertical surface. So if you applied a hot, liquid-applied rubberized asphalt membrane onto a vertical surface and allowed it to cure, it would stay in place provided there wasn't excessive movement in that substrate.

Q (By Mr. Hull.) What effect would a fully adhered system have on water migrating from one area where it might get through the waterproofing to somewhere else?

MR. VEITH: Objection, lack of foundation.

MR. REILLY: Calls for speculation.

THE WITNESS: I don't understand the question.

Q (By Mr. Hull.) I'm wondering about water migrating underneath waterproofing. Did you understand what I mean by that?

A What happens to water? What happens if it gets past a fully adhered system?

Q Right.

A And underneath the layer of waterproofing? Are you saying that if there is water, a fully adhered system on

the deck and on the wall, what happens when water gets past it?
Q Right.
MR. BROWN: I'd object. It's an inadequate and improper hypothetical.
MR. VEITH: Lack of foundation and speculative.
THE WITNESS: I would believe that it would do the same. The conditions would still remain the same.
Q (By Mr. Hull.) Do the same as what?
A Do the same as move laterally and find the paths of least resistance regardless of what was on the deck or on the wall.
Q So you're telling me that regardless of what type of waterproofing system is used, if water gets through it, it's still going to move laterally?
MR. REILLY: I'll object. That's not what he said. He said if it gets around it or behind it.
THE WITNESS: Can you ask that again?
Q (By Mr. Hull.) If water gets around, behind or through a fully adhered system, it's your testimony that it will have a tendency to move laterally?
A Yes.
Q And is that true of a bentonite system also?

A That if it gets past it, if bentonite was the waterproofing and got behind it, in and around it, the water would move freely and find the path of least resistance?
Q Yes.
A Yes.
Q Now, you go on in your observations, in number 3, to state that the nature of the waterproofing does not allow for water testing. Why is that important?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same.
THE WITNESS: Application of waterproofing in new construction is considered to be one-way, meaning as soon as the structure is set and the substrates are prepared for waterproofing, waterproofing is applied. If it's below grade, it's then protected, assuming it's protected and buried. The assumption is that if all goes well, the system shouldn't leak. But it should be tested before backfill only because of the nature of the product and the design itself.
Q (By Mr. Hull.) Is water testing particularly important for an application such as the Promenade apartment projects?
MR. REILLY: Objection, lack of

foundation.
THE WITNESS: In terms of the plaza?
MR. HULL: Yes.
THE WITNESS: So would testing be important to that sort of configuration?
Q (By Mr. Hull.) Well, more important than, say, other configurations?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Yes. I would stress water testing on a below grade application.
Q (By Mr. Hull.) Now, when you prepared this field report, --
MR. STEPAN: What's the date on that report?
MR. HULL: This is November 13th of 2002. Did you believe that you had adequate information to develop the observations contained in that report?
MR. REILLY: Objection, calls for speculation.
THE WITNESS: This report or the following report?
MR. HULL: This report.
THE WITNESS: Yes, to make these observations. Yes.

Q (By Mr. Hull.) And those observations were based both on your personal inspection of the site, the disclosure report and your knowledge, experience and education in the industry, is that right?

MR. VEITH: Objection, asked and answered.

MR. STEPAN: Objection as to form.

THE WITNESS: That's correct.

Q (By Mr. Hull.) Well, let me ask you, what were these observations in your report of November 13th based on?

MR. BROWN: Objection, form, vague.

MR. VEITH: The document speaks for itself.

MR. REILLY: Lack of foundation.

THE WITNESS: Exactly what you said. The documents given to me for review, conditions exposed in the field, and with knowledge I had from my background.

Q (By Mr. Hull.) Thank you. All right. Then --

THE WITNESS: Could I just request a break?

MR. HULL: Yes.

(A short recess was taken at this time.)

Q (By Mr. Hull.) All right. Then you also issued a report, which was the last report you issued on this project, dated December 4th, 2002, and I believe is Exhibit 592. Do you have that in front of you?

A Yes.
Q Now, did you do any additional investigation between the time of your November 13th report and your December 4th report?
MR. STEPAN: Objection, asked and answered.
MR. VEITH: Asked and answered.
THE WITNESS: No.
Q (By Mr. Hull.) What was the purpose of your December 4th, 2002 report?
A To give a more comprehensive report compared to the November 13th report.
Q And you took all the photographs that are contained in your December 4th report, is that correct?
A Yes, that's correct.
Q And did you provide all the labeling that appears next to those photographs?
A Yes, that's correct.
Q Now, the last page of your report is page 19 of 19, and I would like to have you turn to that, if you would?
A (Witness complies.)
Q Item a, -- actually, the page, the top of it has "The following scope of remedial work is recommended," and item a is "Replacement of the typical waterproofing assembly." What did you mean by that?

MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same objection.
THE WITNESS: To replace the existing waterproofing with a new system.
Q (By Mr. Hull.) And why did you think that was necessary?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same objection.
THE WITNESS: I didn't believe it was an effective solution to commit to spot repairs and localized repairs of the existing waterproofing.
Q (By Mr. Hull.) And why is that?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same objection.
THE WITNESS: Because of the logistics involved and what I believe to be the low probability of effectiveness of such a program.
Q (By Mr. Hull.) What is your belief that the spot repairs would have a low probability of success based on?
MR. REILLY: Objection, lack of foundation.
MR. STEPAN: Calls for speculation.
MR. VEITH: Objection, lack of foundation.

THE WITNESS: Repairing the system would mean the disruption of the plaza, possibly the disruption of the existing waterproofing, the release of confinement, the inability to test the repair.

MR. BROWN: What was that last one?

THE WITNESS: The inability to test the repair.

Q (By Mr. Hull.) Did the history of attempts to repair the project have anything to do with your opinion that the entire waterproofing system needed to be replaced?

MR. REILLY: Objection, lack of foundation.

MR. VEITH: Same objection.

MR. STEPAN: Join in that objection. Also objection as to form, calls for speculation.

THE WITNESS: No. I wasn't aware of the details of the facility's history of remedial repairs.

Q (By Mr. Hull.) The second item you have here is "Installation of structurally correct topping slab with a two degree slope for drainage." Why did you make that recommendation?

A It's important to have to provide a positive slope at the level of the deck, to the deck level drains, to avoid a collection of water to expedite flow, water filtering through the layers.

Q So in that recommendation, did you envision a concrete topping slab that would slope from the plaza walls towards the center of the plaza?
A Or to drains.
Q Wherever the drains were located?
A Right. To the low point.
Q Is it your opinion that a topping slab sloping towards the drains was an important design component of the waterproofing system for the plazas?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Typically as a principle, or you mean with respect to this particular project?
Q (By Mr. Hull.) Well, let's talk about typically as a principle and then secondly as respects to this particular project?
A Typically you'd always want positive slope. You'd always want the water to move freely to the drains.
MS. SEMKE: Can you speak up a little louder, please?
Q (By Mr. Hull.) If you were designing the remedial work for replacement of the waterproofing in this particular plaza, wouldn't that design include a topping slab sloped to drains?
MR. REILLY: Objection, lack of

foundation.

MR. STEPAN: Objection.

THE WITNESS: Yes.

Q (By Mr. Hull.) And the next item is "Installation of suitable vertical substrates." What do you mean by that?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: Depending on the particular waterproofing system, we would have to treat the vertical walls in a way so that they would accept and provide the best adhesion for that waterproofing.

MR. VEITH: I join in that objection as to foundation.

Q (By Mr. Hull.) The next item is "Installation of new drain assemblies and possibly additional drains." What do you base that recommendation on?

MR. REILLY: Objection, lack of foundation.

MS. HEYER: Same objection.

MR. STEPAN: Join.

THE WITNESS: I base that on the fact that the eaves of the existing roofs do not have gutters.

Q (By Mr. Hull.) Actually, I'm talking about the new drain assemblies. Is that --

A Right.

Q Okay, go ahead. I'm sorry. I didn't mean to interrupt. Go ahead.
A I was unaware if the runoff from the roofs, the water runoff from the roofs involved the sizing of drains in terms of quantity and capacity. It would be important to add drains to expedite drainage, moisture within the layers of the plaza.
Q Is your reference in item d to installation of new drain assemblies at all associated with the bottom assembly of the drain at the plaza deck level?
MR. REILLY: Objection, lack of foundation.
MS. HEYER: Same objection. Also as to form.
THE WITNESS: Yes, in that the observation is -- the recommendation references the lack of the gutters. If gutters were to be installed, they should have their own dedicated drain through the deck.
Q (By Mr. Hull.) You don't know why gutters weren't installed on this project, do you? Did anybody tell you?
A No.
Q Your concern about gutters is twofold, if I understand your testimony. One is that it allows water to drip down off the eaves next to the building and alter the grade, is that right?

A That's correct.
MR. STEPAN: Objection, foundation.
Q (By Mr. Hull.) And the other reason is that you aren't sure if the roof areas that drain into the plaza were included in the calculation of the size and quantity of drains, is that the other reason?
MR. REILLY: Objection, lack of foundation.
MS. HEYER: Same objection.
THE WITNESS: That's correct.
Q (By Mr. Hull.) Are there other types of landscaping designs that would alleviate the problem of water creating a depression underneath the eaves?
MR. STEPAN: Objection as to form and foundation.
MR. VEITH: Objection, vague.
MR. REILLY: Foundation.
THE WITNESS: Are you asking me what are the various solutions to?
Q (By Mr. Hull.) Yes. Aside from gutters, would there be other solutions to that?
A Providing an impact surface that would not sag or be compressed.
Q And what type of surface might that be?
A Might be pavers, may be poured concrete, the walkway,

sidewalk, for example.
Q Okay. Item f, you have recommended "Replacement of soil with type with improved breatheability and percolation." What do you mean by that?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Join.
THE WITNESS: Selection of the soil aids in the breatheability of the plaza layers. It allows it to percolate. It only adds in the removal of the water from the system, or excessive water in the system.
Q (By Mr. Hull.) And what type of soil would that be?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: The type that allows it to breathe, something that -- I would say less, less clay, with less clay in it. That would probably be -- I would defer that to a soil engineer in terms of what to spec.
MR. BROWN: Sorry, Bill. Item f is what you were just talking about?
MR. HULL: Yes.
Q (By Mr. Hull.) So item f, the actual selection of the type of soil would be something you would rely on others to determine?
A Yes.

Q And do you have any people with that expertise at Israel Berger & Associates?
A Whether they're in the office, I'm not sure, or whether we have our own consultant.
Q Do you consider the type of soil an important part of a plaza waterproofing drainage system?
MR. REILLY: Objection, foundation.
MR. VEITH: Objection, lack of foundation.
MR. STEPAN: Objection.
THE WITNESS: It plays a factor. To what degree, I couldn't answer. It would help, though.
Q (By Mr. Hull.) Item g is "Modified post assemblies at typical porch entrances." What did you mean by that?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same objection.
THE WITNESS: That refers to the conditions observed, the remedial repair of the post originally touching a concrete deck. It would be preferable not to have the kind of penetration that could possibly allow water through.
Q (By Mr. Hull.) Did you in the process of preparing your report develop any opinions about what that assembly could be?
MR. REILLY: Objection.

MR. VEITH: Lack of foundation.
MR. REILLY: Join.
THE WITNESS: I thought about it.
Q (By Mr. Hull.) What do you think?
MR. VEITH: Same objection.
MR. REILLY: Same objection.
THE WITNESS: It would be more prudent to provide an assembly that the waterproofing system that's chosen could easily seal around as opposed to a system that provided potential point of infiltration.
Q (By Mr. Hull.) So are you saying it should be something other than wood?
A Yes.
Q Now, item h is "Regular water testing per area completed," I think is pretty self-explanatory. You believe that water testing of below grade waterproofing is important --
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Objection.
Q (By Mr. Hull.) -- is important, is that right?
A Yes.
Q And item i, "Thru-wall flashing at end walls." And you discussed this a little bit yesterday, but I'm not entirely clear on what that is. Could you explain that to me?

A Sure. Flashing is a waterproofing element in walls. Its primary function is to prevent the entry of water within the walls, to redirect it and allow it to weep out of the walls. Promenade Oaks, some of the entrances, particularly the garage and the utility entrances, exhibited efflorescence and rusting on lintels, which would indicate that a fair amount of moisture was either sitting on the lintel or not being allowed to drain out of the wall. The answer to that would be to treat the metal that's been affected as well as introduce a line of flashing. It didn't appear as though there was flashing beneath the copings of the end walls.

Q And the copings, you're talking about at the top, the top of the end walls?

A Right. The cast stone copings at the end walls. It would also be wise to introduce flashing underneath those because the precast stone copings are in segments and have joints between them. The joints are prone to water infiltration, and without flashing underneath them, there would be no way to get the water out of the wall. Better to have flashing beneath it to allow water to be redirected out of the wall.

Q So what would that flashing look like? Would it simply be a piece of metal that would go over the top of the wall?

A It could be metal. You could use various materials in

using -- in implementing flashing. It could be metal, it could be laminated copper.
Q But it would be some material that would go over the top of the wall and below the coping?
A That's correct.
Q Okay. Now, we have a couple other recommendations here that I'm going to skip over the last two, k and l, because I think they're fairly self-explanatory. Did you feel you had enough information, based on your investigation, the materials you had and your experience, to develop the recommendations contained in the last page of your report?
MR. REILLY: Objection, calls for speculation, lack of foundation.
MS. HEYER: Same objections.
THE WITNESS: Yes.
Q (By Mr. Hull.) Now, you had indicated yesterday that this was a different type of investigation than a full-blown failure investigation, is that correct?
A That's correct.
Q Despite that, did you think you had enough information to do what the owner wanted you to do here?
MR. REILLY: Objection, lack of foundation.
MR. STEPAN: Objection, form of the question.

MS. HEYER: Same objections.
MR. VEITH: Same objections.
MS. SEMKE: We'll join.
THE WITNESS: Did you say what the owner wanted?
Q (By Mr. Hull.) Well, let me put it this way. Did you have enough information to prepare your report, make your observations and recommendations?
MR. REILLY: Objection, lack of foundation, calls for speculation.
MR. VEITH: Same objections.
THE WITNESS: Yes. These particular observations and limited to these recommendations?
MR. HULL: Right.
THE WITNESS: With the understanding that more investigation would be needed.
Q (By Mr. Hull.) Tell me what you mean by that? If you were actually going to do the replacement work, you would want to do additional investigation, is that right?
A Yes.
Q And why is that?
A It helps in the development and the scope of the work, selection of material, narrowing it down to the best assembly.
Q Did you have enough information to conclude, to conclude

in your mind that bentonite was not an appropriate product for this application?

MR. REILLY: Objection, lack of foundation, calls for speculation.

MR. VEITH: Same objections.

THE WITNESS: Yes.

Q (By Mr. Hull.) Now, the final thing from Israel Berger was Exhibit 559, which is a fax cover sheet along with a proposal directed to General Investment & Development, is that right? Is that the last item that came out of Berger's office with respect to this project?

A That I know of, yes.

Q On the front page -- who filled the front page of this out, To Bob Tarasov, General Investment? Do you know?

A No. I don't know whose writing that is.

Q Any of the material on the front of this your handwriting?

A No.

Q Did you have any role in the preparation of the December 30th, 2002 proposal?

A Yes.

Q What role did you play in that?

A I indicated to accounting the services that GID was requesting and they implemented it into the proposal.

Q Would that include the consulting services listed under Scope of Services on -- I guess we'll just refer to it as

GID 00934?

A That's correct.

Q So you anticipated that before actual construction would start, that Berger would do some additional field investigation, is that right?

A Yes. It's our practice to do so.

Q And that would help to further refine the scope of work to be done by the contractors?

MR. STEPAN: Would you read that back?

(The court reporter read back the last question at this time.)

Q (By Mr. Hull.) Is that correct?

A To an extent.

Q Then the next is Schematic Design Phase. What did you mean by that?

A Where are you?

Q I'm under Consulting Services. It says, "Field Investigation, Schematic Design Phase." What is the schematic design phase?

A That would be development of the prototype systems that would be used, sketching of the initial details. That would probably involve mock-ups of proposed details, feasibility for testing, see how they perform, how well does the contractor implement them, ease of use. All the information aids in narrowing down the better system for

the field.
Q This would include preparation of some drawings?
A Yes.
Q And some details?
A Yes.
Q Would it involve preparation of the specifications?
A Yes.
Q And what is the difference between that and the design development phase?
A Design development? By that stage, we would have narrowed down the particular systems that we'd want to use and proceed in developing solutions for very specific details knowing the material that we want.
Q Now, you go on, then, in item 2 under Consulting to talk about preparation of contract documents. How does that differ from the design development phase?
A Design development phase is referring only to schematic sketches, the details, selection of material, the technical end, specifically the technical preparation of the documents, to not get involved the rest of the body of the work, the rest of the drawings that may be necessary, the rest of the spec. It encompasses the entire package. The difference would be schematic design and development is basically the technical sections.
Q So would the contract document phase, then, be the final

drawings, final details and final specifications for the replacement of the waterproofing system?
A And all the bid documents.
Q Okay. The construction documents, would, however, include plans, details and specifications, wouldn't it?
A Yes, they would include those.
Q And would those construction documents, they would identify the type of waterproofing system to be used, is that right?
MR. VEITH: Objection, leading.
MR. REILLY: Objection, calls for speculation.
MR. HULL: Let me withdraw that question, try it again.
Q (By Mr. Hull.) Would the contract documents identify the type of waterproofing system to be used?
A Yes.
Q And that would be after you had gone through and examined various alternatives?
A Yes.
Q And would that include drawings and details on installation of a structurally correct topping slab sloped to drain?
A Yes.
Q And would it include installation of suitable vertical

surfaces?
A Yes.
Q And would it include details on drain assemblies?
A Yes.
Q Would you also calculate the amount of water surface area that would be drained into the plaza and determine the amount and location of drains based on that?
MR. REILLY: Objection, calls for speculation, lack of foundation.
MS. HEYER: Same objections.
THE WITNESS: Yes. That would be done prior to the selection. That's part of the design process.
Q (By Mr. Hull.) And would that be done by you or would that be done by someone else?
A It would be done by the office.
Q What type of expertise would you need to select the type of drain assemblies and the location and number of drains?
MR. REILLY: Objection, lack of foundation.
MS. HEYER: Same objection.
THE WITNESS: You would need to know the square footage of surface that will accept water; you'd need to know the type of deck; you'd need to know where supports, structural supports are; you'd need to know the

sizing charts for the drains as well as the connections below for capacity; you'd need to be able to reference that to a geographic storm chart to be able to calculate things such as the hundred year storm, worst case scenario, to develop a benchmark; you'd need to be familiar with the different assemblies that you could choose from.

Q (By Mr. Hull.) What type of engineer or what type of professional would you go to for that type of design work?

A Mechanical engineer.

Q All right. Would your contract documents, then, also include references to gutters and drainage of those gutters?

A Yes.

Q And what if the owner told you that they did not want gutters on this project, period, end of story?

MR. VEITH: Objection, speculation.

MR. REILLY: Join.

MS. SEMKE: I'll join in that objection.

MR. BROWN: I'll just object to the form, when you ask "what is, what if," as vague.

THE WITNESS: Are you asking me typically or what would I do?

Q (By Mr. Hull.) Well, on this particular project, if it was determined that no gutters were going to be used, what

would be the alternative that you would choose?

MR. REILLY: Same objections.

MR. VEITH: Same objections.

MS. HEYER: Same objections.

MR. STEPAN: Join.

MS. SEMKE: Same as well here.

THE WITNESS: I would treat the ground surface in a manner that it wouldn't result in a depression or negative slope from impacting rainfall.

Q (By Mr. Hull.) Would the contract documents address the type of soil to be used in the plaza areas?

MR. REILLY: Objection, calls for speculation.

MR. VEITH: Same objection.

THE WITNESS: For new construction or for what we would actually?

MR. HULL: Well, I'm talking about the remedial work at the Promenade.

THE WITNESS: Yes.

Q (By Mr. Hull.) Would that include the type of soil to be used in the plaza areas?

MR. REILLY: Same objection.

THE WITNESS: Yes.

Q (By Mr. Hull.) And would the type of soil -- and maybe you don't know this. Tell me if you don't. Would the

type of soil vary depending on the type of waterproofing system that you selected?
MR. VEITH: Objection, speculation.
MR. REILLY: Objection, lack of foundation.
THE WITNESS: I would have to defer that to the soil engineer.
Q (By Mr. Hull.) And would the contract documents address the post assemblies or some type of support for the balconies and stoops?
A Yes.
Q And would the contract documents specify water testing?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Yes.
Q (By Mr. Hull.) If you were asked by GID, Israel Berger was asked by GID to prepare contract documents for the remedial work at the Promenade Oaks, would that include a drainage plan for the plazas that established slopes to drains?
MS. HEYER: Objection, calls for speculation.
MR. REILLY: Join.
THE WITNESS: Yes.
Q (By Mr. Hull.) Would you consider that to be an important

part of the design of a waterproofing system for those plazas?

MS. HEYER: Objection, foundation.

THE WITNESS: Yes.

Q (By Mr. Hull.) And what would you envision being included in a drainage plan?

MR. REILLY: Objection, lack of foundation.

MS. HEYER: Same objection. Also calls for speculation.

MR. STEPAN: Join.

THE WITNESS: A basic layout plan of the property. Specifically, a concrete deck surface which would indicate locations of drains. With respect to structure, the slope of the topping slab. The drawings should clearly indicate what the slope is from wall to each drain or to each cricket.

Q (By Mr. Hull.) Cricket, what is that?

A Slope; the creation of a slope to a drain. The drawings should indicate the sizes of drains, should indicate sizes of the connections below.

Q Would the contract documents include a detail on how to transition from the concrete block walls in the plaza to the wood framing of the building?

MR. REILLY: Objection, lack of

foundation.

THE WITNESS: You mean the ones that we would prepare?

MR. HULL: Yes.

THE WITNESS: Yes.

Q (By Mr. Hull.) And what would you -- do you have enough information to formulate an opinion as to what type of product you would use at that transition location?

MR. REILLY: Objection, lack of foundation.

MR. VEITH: Same objection.

THE WITNESS: Yes. I could categorize it, but not the specific manufacturer or product.

Q (By Mr. Hull.) Categorize the product for me?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: It would definitely be fully adhered, a sheetgood or a sheet in the liquid monolithic membrane.

Q (By Mr. Hull.) Would there be any protection over the top of that?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: It would have to be protected anywhere that it would be exposed to the

exterior, not unless the design incorporated its own cladding.

Q (By Mr. Hull.) Would you consider that transition from the block wall to the wood framing of the building to be an important detail of the waterproofing system that you would design?

MR. REILLY: Objection, lack of foundation.

MR. STEPAN: Objection as to form.

MR. VEITH: Lack of foundation.

THE WITNESS: Yes.

MR. HULL: That's it.

MR. REILLY: Let's take about two minutes.

(A short recess was taken at this time.)

EXAMINATION

BY MS. HEYER:

Q Mr. Camaya, we met yesterday. My name is Chandelle Heyer and I represent J-Berd Mechanical Contractors, Inc. in this action. And other than perhaps becoming aware of the name of my client through the fact that you were noted for a deposition, have you ever heard of J-Berd Mechanical Contractors, Inc. before?

A No.

Q Most of my questioning is going to concentrate on Exhibit 592. Could I have you, if you don't already have that in

front of you, pull it out?
A Yes.
Q Throughout the December 4th, 2002 report that you did, you make reference to drain assemblies, and I think I know what that means, but I just want to clarify just so that I'm sure that we're both on the same page here. When you say drain assemblies, are you referring to the PVC vertical piping that you observed at the site?
A No. Assemblies is the entire system from the surface drain, including the perforated pipe extension and the deck drain.
Q And then if I could refer you first to page 2 of the report, starting at three observations in the middle of that page, and then more specifically a, little ii, or little roman numeral ii?
A ii?
Q The observation that you made in this subsection that many of the surface level drains are set at a level above the top of the soil, resulting in the inability of the surface drains to function as intended, that is a condition that you observed when you were out at the site on whether it was November 5th or 6th, 2002, correct?
A That's correct.
Q So you don't know whether these surface drains at the Promenade site were originally set at a level above the

top of the soil, do you?
A No, I don't.
Q And also, you don't know one way or another whether or not the soil at the site, like due to the moisture, has settled or compacted around the drains due to the moisture of the soil, do you?
A No. No, I don't.
Q When you were out at the site on either of the two times that you were there in 2002, did you observe any slope of the grade in any of the courtyards towards the drain?
A The surface of the grade is what you're asking about?
Q Yes. The surface of the grade in the courtyard area. Let me break it down a little bit. Did you make any observations with regard to the grade in the courtyard area when you were out at the site?
A Only at the base of the wall where the depression was. As far as the grade in the typical plaza, I didn't measure that, no. Other than the depression, no.
Q So you didn't make any observations one way or another whether or not the grade was flat versus sloped in the courtyard area?
A No. Not enough to be able to quantify it in terms of percentage or an exact measurement, no. It certainly wasn't steeply sloped, however.
Q Based on your observations at the site, do you believe

that sloping the grade in the courtyard area away from the building foundations towards the drains would facilitate drainage at this site?

A Yes.

Q If I can refer you back again to Exhibit 592, and moving down to the little iii, under Observations. Specifically your observation that invasive test probes indicate that the vertical pipe extension is incorrectly configured for drainage, and then if you go to page 3 of this document, you have five subsections to this, and my question is, are these five items noted on page 3 the conditions that you believe resulted in incorrect configuration of the vertical pipe extension?

A Yes.

Q And I believe you testified previously that these items were based on Mr. Campbell's findings, correct?

A Yes.

Q And just for my own clarification here, when you reference in this iii invasive test probes in the plural, my understanding from your previous testimony was that there was one invasive test probe done by you or done by Mya's outfit on November 5th, correct?

MR. HULL: Charbonea's.

MS. HEYER: Demera's. Thank you.

THE WITNESS: That's correct.

MS. HEYER: Relating to the surface drain? I should probably clarify that.
THE WITNESS: Yes.
Q (By Ms. Heyer.) So when you reference invasive test probes in this subsection here, subsection iii, are you also referring back to invasive test probes that Mr. Campbell had conducted on the site?
A Yes.
Q Going to page 3, subsection iv of Exhibit 592, your comment or your observation that "Invasive probes at several locations indicate that the existing deck level drains are set approximately two inches above the concrete deck." First of all, are you referencing, when you say invasive probes, are you referencing more than just your probe on November 5th, 2002?
A I'm sorry. Where are you again?
Q Oh, I'm sorry. Page 3. I'm at the little iv, not the 1, 2, 3, 4, 5, but below that?
A Okay.
Q The roman numeral iv.
A Thank you.
Q And then just so we're all clear, I'm at the "Invasive probes at several locations indicate that the existing deck level drains are set approximately two inches above the concrete deck." My first question to you is, is the

invasive probes phrase in that sentence, is that referring
to more than just your invasive probe on November 5th,
2002?
A Yes.
Q When you looked at the probe at the surface drain, or at
the drain area on November 5th, 2002, did you personally
observe the deck drain, the drain set at the deck?
A The actual body of the drain?
Q Correct.
A No. Other than the clamping ring, the actual body of the
drain is not visible.
Q So I guess I'm wondering what the basis of your comment,
then, in the subsection roman numeral iv is from when you
say that the existing deck level drains are set
approximately two inches above the concrete deck?
A That would be a comment from Mr. Campbell as well as the
observation of water standing around the collar of the
existing drain that I observed.
Q And I believe you testified previously that when you
looked and observed water at this probe at the surface
level drain on November 5th, 2002, that you observed a
quarter of an inch?
A That's correct.
Q Then I'm wondering is the comment regarding approximately
two inches referencing back to Mr. Campbell's observations

at the site previously?
A Yes.
Q You personally only observed in this probe at the surface level drain on November 5th, 2002 a quarter of an inch?
A That's correct.
Q Then going on to the next sentence in that subdivision iv, Consequently, water that settles to the bottom of the courtyard assembly must build up to a level of two inches to enter the existing deck level drains." I'm wondering the basis of that comment? Is that based on Mr. Campbell's findings?
A Yes. And the observation of water standing around the drains in two of the other probes.
Q And then the next sentence following that one, "Nonetheless, there will likely always be at least two inches of water accumulated at the bottom of the courtyard assembly." Is that based on Mr. Campbell's findings?
A Yes. And the observation of water, standing water in the other probe.
Q But you only personally observed one probe, and that probe that you observed had a quarter of an inch?
A A quarter inch, right.
Q And I'm wondering what the basis of your comment here that you believe that there will always be at least two inches of water accumulated at the bottom of the courtyard

assembly is based on?
A In addition to Mr. Campbell's observation and my observation of the drain, there was approximately two inches of water in the drain -- in the probe, excuse me, against the wall of the building. It was an indicator to me that water had the ability to stand at the level of waterproofing.
Q And I believe you testified yesterday that during your site visit on November 5th or 6th, 2002, whichever of those days it was, that the conditions of the site and the conditions of the weather in general were it was drizzling out, correct?
A That's correct.
Q And that also, I believe, and correct me if I'm wrong, that it was snowing or that there was snow falling at the time, was that correct?
A That's correct.
Q Do you believe or do you know whether or not any of the weather conditions at the site on that day may have contributed to the wet conditions that you observed when you excavated into the probes?
A I'm sure they did, but to what extent, I don't know. If you're asking me for a quantity of water, I --
Q No. I was just asking you in general.
A I would say they certainly did.

Q If I could have you turn back to page 2 of Exhibit 592?
A (Witness complies.)
Q And under your observations with regard to drainage, the little i, you observed that "The area directly below the gutterless eave is typically compacted and depressed from dripping run-off, creating a depression in the landscaping along the base of the exterior wall. This results in negative slope towards the building and a depression for water to collect." My question is -- or actually, let me just follow that up with another observation that you made before I pose a question to you. Under the next subdivision, the little subdivision ii, or the little ii, you further observed that "The runoff from the roof falls to the courtyard and is intended to be collected at the surface level drains." And I'm wondering -- my question to you is this: Do you belive that the negative slope that you observed at the site, at the point where the water runs off from the roofs, do you believe that that negative slope contributed or affects the ability of the runoff to get to the surface drains?
A Yes.
Q If you could turn to page 11 of 592, photograph 10, and under -- or next to that photograph you have some observations, and the last observation is that the lowest perforations are set above the level of the deck. I just

wanted to clarify. You perhaps already testified about this. Did you personally observe this condition at the site, that the lowest perforations are set above the level of the deck?
A In the -- in the extension, yes. You mean the perforations in the extension?
Q Correct.
A Yes.
Q Did anybody during this site visit share with you any information as to why these particular drains or drain assemblies were selected for the site?
A No. No information was given.
Q And similarly, did anybody at the site, when you were there, share with you or tell you why the perforations start two or two and a half inches above the precast plank level?
A No.
Q And if you could go to page 18 of your document, 592? And the second full paragraph, and starting the second sentence in where you talk about "The flawed installation of the assembly's components responsible for this complicated and likely compromised the system's ability to properly drain," and then you go on and delineate a number of different things with regard to the drains. And similar to the question that I posed to you earlier, one

of the comments that you make in here is with regard to the surface level drains being approximately one inch above grade rendering them useless as surface collection points, again, you don't know one way or another whether or not these were installed that way, do you?

A No. That's correct.

Q And you only know what you observed when you were at the site in late 2002?

A That's correct.

Q If you could turn to page 19, to your recommendations on this document. Under subdivision d, when you were referencing the installation of the new drain assemblies, are you -- when you say drain assemblies, are you referencing more than just the PVC piping? Are you referencing the whole system, the drain system?

A That's correct.

Q And I believe Mr. Stepan asked you a question as to like what new drain assemblies you would place at this site or you would install at this site, and I believe -- maybe my recollection fails me, but that you said that that would be taken care of at the design phase of the project, like if you guys were to -- if Israel Berger was to take on the responsibility or be consulted with regard to remedial work, that that would be something that you guys would determine later on, is that correct?

A The specific new assembly.
Q Correct.
A Yes.
Q And with regard to your recommendation under subsection d, I believe that you stated that this could be done by your office, and I just want to clarify. Is this something that someone within your office would do or would you have to consult with somebody such as like a mechanical engineer or somebody with some plumbing expertise in order to be able to do this within your office?
A No. We have personnel that can do it within the office. It would depend upon the present workload whether or not we would seek another consultant. If the question is whether or not there is personnel within our office that can size and choose drainage assemblies, the answer is yes.
Q So you do have a mechanical engineer on staff?
A I don't know whether or not he's a mechanical. I'm not sure of the type of engineering that they practice.
Q Was there any conversations with anybody from GID or anyone else after your December 4th, 2002 report, was there any conversations with anybody with regard to your recommendations under subsection d on page 19?
A No. You mean further questions regarding assemblies? No.

Q And I believe you testified yesterday that this project has been put on hold. Do you have an understanding about whether or not GID is intending to do any remedial work with regard to the drain or drain assemblies based on this recommendation in this report?
A No. I haven't been notified formally of anything like that.
Q On page 19 of your report, you talk about, or you recommend, rather, replacement of soil with type with improved breatheability and percolation, and I'm wondering if based on your observations at the site when you were there, do you believe that the choice of soil that was used at the site or that you saw at the site affected the ability of the water to drain vertically to get to the drain system?
MR. REILLY: Objection, lack of foundation.
MR. STEPAN: Join.
THE WITNESS: The thought had occurred to me, but that's something that I would probably ask a soil engineer.
MS. HEYER: That's all the questions I have for right now.
MR. REILLY: Somebody in Minneapolis?
MS. SEMKE: Yes. I have questions.

MR. HULL: Let's go. Fire away.

EXAMINATION

BY MS. SEMKE:

Q All right. Mr. Camaya, this is Lori Semke. I represent Promenade in this case. I have a couple questions just about your experience, and you've covered it pretty completely, so I won't go into much detail. You testified that you had no experience in actually applying Swelltite or other bentonite systems, is that correct?

A That's correct.

Q And can you please, you know, speak as clearly into the speaker as possible so I can get your full answer?

A Yes.

Q So was that a yes?

A Yes.

Q Thanks. Do you have any experience applying other types of waterproofing besides bentonite or clay-based systems?

A No.

Q Now, I would like to follow up on this. Earlier this morning you talked about projects you worked on at Israel Berger. You mentioned some historic properties in New England. Just give me a little bit of detail about what that work entailed?

A It was a property in -- outside of Boston.

Q What kind of work did you do?

A It was a historic masonry project with three towers and a below grade facility. Its name is Avalon. It's owned by Avalon, or managed by Avalon, and it's named Longwood Towers. The facility, it was a turn of the century building with historic masonry that had a history of leaks through the masonry as well as roof problems. Some of the residents were below grade units and these units were being renovated, and in the course of the renovation, leaks into these units were discovered.
Q Were you retained to do an investigation into the cause of the leaks?
A We were originally retained to investigate the leaks through the historic masonry walls at the parapets, at the bays and the top three floors. When leaks were discovered in the below grade spaces, we were asked to address those as well, perform an investigation, testing and provide recommendations for repair.
Q So it involved below grade waterproofing to the extent that it addressed the outside of those lower units?
A Right. Those units that leaked.
Q What kind of a waterproofing system was that, was on this place that you investigated?
A What was in place appeared to be an eroded asphalt-based system. No sample testing was done, but there was evidence of bitumen-based material during the

excavations.
Q Did you recommend repair or replacement on that one?
A We consulted to the point where we were asked what materials would be appropriate for repair and replacement, but the consulting didn't go to the point where they had asked us to provide complete documents for replacement. We had recommended -- I'm sorry?
Q Go ahead.
A We had recommended the option of using liquid applied as well as sheetgood bitumen-based materials. The final product that was installed was chosen by the client, and I believe it was a rubberized asphalt laminated to high density polyethylene fully adhered to the base of the wall, below grade and extending above grade, clad with siding to protect it from UV degradation.
Q How many total projects have you either assisted with or been the named consultant for that involved waterproofing repairs of any kind? I'm not just talking about bentonite or below grade systems.
A I don't understand the question. You're asking me how many projects I've been the lead consultant on?
Q Well, let me break it down a little bit. At Israel Berger, you stated that one of the aspects of your work is to investigate defects in waterproofing systems and recommend repairs, correct?

A That's correct.
Q And in some cases the work goes further into actually monitoring and facilitating the repair process --
A That's correct.
Q -- of waterproofing issues, correct?
A That's correct.
Q So overall at your time in -- actually, let me strike that. This waterproofing consulting work, that includes above grade, below grade, and we talked about this, but it's pretty much anything related to waterproofing on various surfaces, correct?
A Correct.
Q So overall at your time at Israel Berger, how many total projects do you think you've participated on that involved waterproofing repairs of any kind?
A I'd have to go back to the files to see how many.
Q Can you give an estimate?
A Just strictly waterproofing, right?
Q Right.
A More than ten come to mind right now going back chronologically.
Q More than ten?
A Right.
Q These projects typically take a certain amount of time, they take a long amount of time, correct?

A That's correct.
Q You're not working on several at once, I take it?
A Depends on the nature of the project. If our involvement is limited -- it depends on the degree of our involvement. It's typical for us to be able to address several projects at a time depending upon the requirements of the client, if they request full time consultation or on site, depending on what we've agreed to. It may only be one that may take up more than 50 percent of your time, or it may be several split up into small percentages.
Q If you think it's more than ten, would it be less than 20?
A Of just below grade -- of just waterproofing projects, the number of waterproofing projects?
Q Correct.
A That I was involved with? I would think that it's more than 20.
Q As many as 50?
A I'd have to go check.
Q I think we've pretty much clearly established that you read the Campbell report or a portion of it before you went to the site for your first visit on November 6, 2002, correct?
A Yes.
Q I'm sorry? Did you answer?

A Yes.
Q You only received and read the first eight pages, correct?
A Of the disclosure report?
Q No. I'm talking about the Inspec report, Exhibit 545.
A I recall receiving everything with the exception of Recommendations, Cost Estimates.
Q So you read and considered these observations before you went to the site?
A Yes.
Q Did you take Mr. Campbell's observations as true when you reviewed it?
A As true?
Q Yes. Did you go there with the perception that assuming that they are true and you were going to verify those observations with your own observations?
MR. VEITH: Objection, calls for speculation.
THE WITNESS: No. I didn't attach any characterization of true or false. I just read it as a report and would base my opinion on what I'd see and if conditions verified.
Q (By Ms. Semke.) So one of your purposes was to verify the observations in Mr. Campbell's report, isn't that correct?
MR. STEPAN: Objection, misstates his prior testimony.

THE WITNESS: Yes, that was part of it.
MS. SEMKE: I'm sorry?
THE WITNESS: Yes, that was part of it.
Q (By Ms. Semke.) You mentioned a checklist that you used of your own to -- that you used in walking around the property. Is that a form checklist that you use for all inspections or initial reviews of sites or is that something that you created specifically for this project?
A No. That was something that was specifically for this project. I had a list of questions that I wanted to write down and answer as I walked through the property.
Q What were those questions specifically, can you recall?
A What are the conditions of the undersides of the plaza deck, what are the terminations of the concrete plank to the building walls, are the planks hollow, are they grouted solid, are there cracks in the planks, is there sealant between the joints, is there evidence of spalling or cracking, how severe is staining, has calcium carbonate developed?
Q Anything else?
A What is the existing condition of waterproofing above grade, what are the conditions at end walls, do end wall masonry units exhibit excessive efflorescence or carbonation.
Q Anything else?

A How widespread are the leaks, what does typical interior damage look like, are there progress photos, are there documents on site, how many accessible units are there, are there roof leaks? I'm sure there are more. That's all I can think of at the moment.

Q You walked around the site, you viewed some units and the space in the garages and spent about, I think you said about 45 minutes investigating each probe hole, correct?

A Yes.

Q Did you see anything inconsistent with the observations in Mr. Campbell's report during your first site inspection?

MR. REILLY: Objection, calls for speculation, lack of foundation.

MR. STEPAN: Join.

MS. HEYER: Same objections.

THE WITNESS: Are you referring to any specific conditions?

Q (By Ms. Semke.) Just, you know, overall you were looking at similar observations, similar conditions.

A Are you asking me that --

MS. HEYER: Object to the form of the question.

MR. STEPAN: Same objection.

MS. SEMKE: I'll restate that.

Q (By Ms. Semke.) You had seen his observations, you had an

idea of what some of the problems might be and you were making your own observations. I'm just asking if while you were making your observations you saw anything inconsistent with the observations made in Mr. Campbell's report?

MR. VEITH: Objection, lacks foundation.

MR. REILLY: Objection, calls for speculation.

MS. HEYER: Same objections.

MR. BROWN: Join. It's also vague.

MR. STEPAN: Misstates the evidence. He saw the report, he didn't see the observations of --

MS. SEMKE: I can't hear any of those objections, by the way.

THE WITNESS: I can answer that with conditions that I did observe were also found in Mr. Campbell's report. But I believe Mr. Campbell performed many more invasive probes compared to my visit, and I didn't see those conditions.

Q (By Ms. Semke.) But to the extent of the things you were able to observe, you didn't see anything inconsistent with his report?

MR. REILLY: Objection, lack of foundation, speculation.

MR. STEPAN: Join.

MS. HEYER: Same objections. Also to form of the question.

MR. VEITH: Same objections.

THE WITNESS: With relevance to what I've seen, what I was able to view?

MS. SEMKE: Right.

THE WITNESS: That's correct.

Q (By Ms. Semke.) You read his report and you relied on it in portions of your own report, so you found his observations credible for the most part?

MR. REILLY: Object, calls for speculation.

MS. HEYER: Same objection.

MR. STEPAN: Objection as to form.

MR. VEITH: And foundation.

THE WITNESS: Yes.

Q (By Ms. Semke.) If you were to take all of the facts stated in Campbell's report as true and had substantiated to whatever extent by your own observations, did you see full replacement as the best option to deal with this problem at that time?

MR. REILLY: I'm going to object. This is asking this expert, alleged expert, to testify regarding an opinion of another expert. It's got no foundation, calls for speculation and is an improper form of the

question.

MS. HEYER: I would join in all of those objections.

MR. STEPAN: I join as well.

MR. VEITH: I do, too.

MR. HULL: Not me.

THE WITNESS: Yes. That's a yes.

Q (By Ms. Semke.) Mr. Camaya?

A Yes.

Q At some point did you come to an opinion that full replacement would be the best option here?

MR. REILLY: Objection, lack of foundation.

MR. VEITH: Same objection.

MR. STEPAN: Same objection.

MS. HEYER: Same objection. It's also vague.

MR. STEPAN: Objection as to form as well.

THE WITNESS: Yes.

Q (By Ms. Semke.) Now, shortly after your first visit on November 6, 2002, did you participate in a telephone conference about your investigation or about that visit?

A On that day?

Q At some time shortly after that, on that day or the next week or so, did you ever participate in any telephone

conference with any individuals about your observations or about that visit?
A I remember speaking to Mr. Vanderberg about the observations. He had questions regarding what kind of options he had.
Q Did he contact you by telephone?
A I don't recall. I'd been working with him on other projects as well, so it was common for us to speak often.
Q So you recall speaking with him by telephone shortly after your visit?
A Yes.
Q Do you know what dates?
A No, I don't.
Q So there was a point at which you spoke on the telephone with Mr. Vanderberg and it was -- tell me again what the purpose was of your conversation?
MR. STEPAN: Objection, asked and answered.
THE WITNESS: I remember one conversation where he was asking me what type of options he had in terms of assemblies, materials.
Q (By Ms. Semke.) Was anybody else participating in that telephone conference?
A No. Not in this particular conversation that I recall.
Q To your recollection, did that occur between your two

visits to the Promenade site?
A Yes.
Q And you shared your initial recommendations of options to Mr. Vanderberg at that time?
A Yes.
Q What did you recommend to him at that time?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same objection.
MR. STEPAN: Objection, asked and answered.
THE WITNESS: I told him that I was leaning towards a replacement of the membrane rather than localized spot repairs.
Q (By Ms. Semke.) Did you provide him with a list of other specific waterproofing products that you thought might be preferable?
MR. REILLY: Objection, form of the question.
MR. VEITH: And foundation.
THE WITNESS: Yes.
Q (By Ms. Semke.) Do you recall what those specific products were?
MR. REILLY: Objection, lack of foundation.

MR. VEITH: Same.
THE WITNESS: Yes, I do.
Q (By Ms. Semke.) What were they?
A I had recommended as options hot rubberized reinforced monolithic membranes, cold-applied epoxy resin reinforced membranes and a fully adhered sheetgood as an option.
Q Did you recommend specific product brands?
A Yes. He had asked me about particular brands.
Q Which brands did he recommend?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same objection.
THE WITNESS: American Hydrotech, Henry, Kemper, Liquid Plastic, Sarnafil as an option.
Q (By Ms. Semke.) Is that it?
A That I can recollect, yes.
Q So even though you did not do a full investigation, at that point, your observations were sufficient to lead you to the conclusion that there were products you felt were better suited for this application?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Lack of foundation.
THE WITNESS: Yes.
Q (By Ms. Semke.) You said that further investigation would

be needed if you were going to make more specific or final recommendations about what actual product or system to actually use, am I correct?
A That's correct.
Q Did you do some calculations during this meeting, during this phone conversation with Scott Vanderberg?
A No. Calculations in terms of?
Q In terms of an initial estimate of what you think it might cost to do a full replacement?
A No. He had already had a number in mind that he had developed. I remember he had -- he had discussed that with me at the site when he also asked me for what type of systems that I could recommend.
Q Do you recall speaking with Steve Gaskins and myself last week in regards to your upcoming deposition?
A Yes.
Q And do you recall mentioning in that conversation that during a telephone conference, you had brought out an envelope or some piece of paper and done some calculations or figures and arrived at an estimate of four million dollars for the cost of what you think it would be to replace the system? Do you recall talking about that?
A Yes.
MR. REILLY: Object to the form of the question.

MS. HEYER: Same objection.
MR. STEPAN: Join.
Q (By Ms. Semke.) Do you recall that, Mr. Camaya?
A Yes.
Q What estimate were you referring to?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Mr. Vanderberg had a number. I don't know where he generated the number from as a quantity and was asking me about square footage prices, and keeping that number in mind, I used my own square footage prices to estimate what it would cost based on grade of systems, whether it be a premium system or an option, but it wasn't a formal take-off. It was based on a number that was estimated or guesstimated.
Q (By Ms. Semke.) Who arrived at the four million dollar number that you mentioned?
A Oh, I did.
Q You did?
A Right.
Q Tell me specifically again what factors or what figures were going into this four million dollar estimate?
MR. REILLY: Objection, lack of foundation, asked and answered.
MR. VEITH: Same objections.

MR. STEPAN: Join.
MS. HEYER: I'll join in those as well.
THE WITNESS: I base it on a square footage price range between $30 to $45 a square foot of waterproofing installed multiplied with an approximate square footage of between 100,000 to 125,000 square feet.
Q (By Ms. Semke.) So was this four million dollar number like a top end number?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Yes.
MR. BROWN: Objection to form.
MS. HEYER: Same objection. Also to form.
Q (By Ms. Semke.) You had given a range, and that was put at the outer end of the range that you gave, is that correct?
A That's correct.
MS. HEYER: Object to the question.
Q (By Ms. Semke.) Did you answer that? I didn't hear it.
A I said yes.
Q Is it your regular practice in doing initial investigations into waterproofing defects to do an initial preliminary estimate of costs such as you did with Mr. Vanderberg?
MR. REILLY: Object to the form of the

question.

MR. STEPAN: Join.

THE WITNESS: You mean verbally or retained to do an actual take-off cost estimate? At the time, it was a conversation. Ultimately we would do a preliminary cost estimate based on scale drawings and investigation in the field. I think the nature of the conversation Mr. Vanderberg and I had, he was trying to get a grasp of what kind of options he had and the numbers associated with them based on the material that would be chosen to be appropriate for a complete waterproofing replacement. I think the number that we came to represented a worst case scenario, but there were options to that.

Q (By Ms. Semke.) So the range of costs that you discussed with Mr. Vanderberg was some -- just give me the range, some amount to four million? Was it 3.6?

A Right.

Q So in your discussion with him, your estimate was it would be about 3.6 million to four million?

MR. STEPAN: Objection to form.

MR. REILLY: Lack of foundation.

MR. VEITH: Same.

MS. HEYER: Same objections.

MR. STEPAN: Misstates his testimony.

Q (By Ms. Semke.) And I'm talking about with respect to the cost of a full replacement.

MR. REILLY: Same objection.

MR. STEPAN: Same.

MS. HEYER: Same.

Q (By Ms. Semke.) Is that correct?

A That's correct.

Q I'm assuming your answer was yes. I didn't hear anything.

A Yes.

Q Do you know what the final number is that GID arrived at for the cost of repair or replacement of the waterproofing at Promenade?

MR. REILLY: Objection, assuming facts not in evidence.

MR. STEPAN: Same objection. Also lack of foundation.

MR. VEITH: Join, lack of foundation.

MS. HEYER: Same objections.

THE WITNESS: You asked me if I've seen any formal estimate?

Q (By Ms. Semke.) Following your recommendations and involvement, do you know what final number they have arrived at for what they expect or what they are allowing for cost of repair or replacement?

A No, I don't.

MS. SEMKE: I don't think I have any other questions. Thank you, Mr. Camaya.

MR. REILLY: Let's just take about a two minute break and then we'll get this thing wrapped up.

(A short recess was taken at this time.)

EXAMINATION

BY MR. BRISBOIS:

Q Mr. Camaya, my name is Leo Brisbois. I represent Valley Forge Insurance and I have one question that I want to ask. It's in regard to the recommendations that you've been talking about in response to Mr. Hull's questioning and Ms. Semke's questioning, the remedial recommendations you made to GID, and my question is simply this. The purpose behind that remedial work, if it's undertaken, is it your understanding that that work would be done to prevent the possibility of future leaking?

MR. STEPAN: Objection as to form, calls for speculation.

MR. REILLY: Lack of foundation.

MS. HEYER: Same objections.

THE WITNESS: Yes, that's my understanding.

Q (By Mr. Brisbois.) That's a yes?

A Yes.

Q I didn't hear you, sir?

A Yes.

MR. BRISBOIS: Okay. That's all I have.

MR. HULL: Andrea?

MS. HEYER: Or Chris?

MR. HULL: Oh. Andrea's not there. Anybody else? Okay.

MR. REILLY: John?

EXAMINATION

BY MR. VEITH:

Q Mr. Camaya, I would like to follow up a little bit on the telephone conference you had with Mr. Gaskins and Ms. Semke last week. Was it just the two of them that were involved in that conversation or was anyone else present for that?

A I don't know if anyone else was on the other end. Like I said, I was on the side of a building and it's very difficult to discern how many people are on the line.

Q How long were you on the phone?

A Not very long. Under ten minutes.

Q Less than ten minutes?

A I mean, you have to consider the position that I was in, so --

Q Okay. Tell me everything that you were asked?

A They asked if I was attending the deposition, they asked if I had ever been deposed before, they asked if I knew

why I was in the deposition.
Q They asked you what?
A Why I was in the deposition.
Q What deposition?
A This deposition, why I was brought into the deposition. And they asked me if I had received -- or if I had viewed the disclosure report by Mr. Campbell.
Q Is that one of the exhibits in front of you over there?
A Yes. 540.
Q 540?
A Yes.
Q What did you tell them as far as why you were brought in? What did you say?
A I told them that I had received a phone call from Mr. Baumgartner and that I received a phone call from you telling me that you had sent me notice, which I hadn't seen yet at the time, and that I was going to be asked questions about Promenade Oaks.
Q They asked you specifically about money, apparently?
A Yes. They had asked me if I had ever done a formal cost estimate, and I said no, but I had an estimate in my mind of what I think a cost may be depending on a wide range of square footage prices based on different materials.
Q Did they ask you about any other substantive topics relating to the Promenade Oaks in that phone call?

MS. SEMKE: Is that a question?
MR. VEITH: Yes, it is a question.
Q (By Mr. Veith.) Did they ask you about any other substantive topics relating to the Promenade Oaks in that phone call?
A Other than the one that I prepared a formal estimate, no, not that I can recall.
Q And would you just give me a brief synopsis of what each of the cases -- I think you said earlier that you have testified or served as an expert witness on three occasions?
A Yes.
Q Is that correct, three occasions?
A That's correct, as I can recollect, yes.
Q Would you give me a brief synopsis of what each of those entailed; just a brief description?
A I was asked about my experience, I was asked about my employment with Mr. Berger, --
Q No, no, no. I think we're maybe miscommunicating. I'm looking -- what was each of the cases about, just briefly?
A It was one case. I was deposed three times for one case.
Q Oh, you were?
A Right.
Q What was that case?
A That was the Adams Crossing -- Adams Landing and Adams

Crossing case.
Q When were those depositions?
A I'd say in 2000. 2000.
Q Were you given copies of the transcripts and permitted to review them?
A Yes.
Q Do you still have those?
A I would -- I personally don't have them. No, I don't know where they are. It was at a time when I was no longer working for Israel Berger & Associates.
Q Do you know how to get them?
A No, I don't.
Q Do you know any of the individuals involved in taking the deposition, any of the attorneys?
A I'd have to look back at a list of them.
Q Do you have a list?
A No. I surrendered all my files regarding that case when I left the company.
Q Do you remember what the name of the case was?
A No, other than that it was the Adams Landing, Adams Crossing case.
Q Where did the depositions take place?
A Here in New York and in Cincinnati.
Q Is there any way that we can get copies of those depositions, that you know of?

A I wouldn't know how to instruct you on that.
Q Would someone at Israel Berger know how to do that?
A They might.
Q Who?
A You could ask Mr. Berger.
Q Did Mr. Campbell ever show you any of his investigative materials relating to Promenade Oaks, his notes, anything like that?
A No.
Q Did he ever tell you whether he took notes during his investigative work?
A No.
MR. VEITH: I don't have any more questions.

EXAMINATION

BY MR. REILLY:
Q Let me ask you this, sir. As I recall from your testimony yesterday, there was staining that you saw, but you could not tell the age of those stains, correct?
A That's correct.
Q And as I recall from your testimony, you could not tell where the origin of the water came from that created those stains; in the garages, for instance, correct?
A The pinpoint?
Q Yes.

A That's correct.
Q And you do know that between the time the building was first built and the time you were out there, various remedial measures were done to correct or to fix what was perceived to be possible leak sources, correct?
A That's correct.
Q And you do not know, therefore, that any of the leaks that might have created those stains were in fact repaired or not prior to your arriving there?
A That's correct.
MR. REILLY: Thank you, sir. I have no other questions.

EXAMINATION

BY MR. BROWN:
Q Was the Adams Landing case a state case, in other words, in state court, or was it a federal case?
A I don't recall.
Q Where was the case venued; in other words, where was it situated?
A In Cincinnati.
Q What was the actual name of the case, Adams Landing versus Israel Berger, or what was the title of that case?
A I don't remember the exact title.
Q Who were the attorneys that Israel Berger retained to defend it?

A Israel Berger --
Q Or to represent it, I should say?
A We were represented by our client's attorney.
Q And your client was whom?
A Beninson Capital.
Q Do you know the name of your client's attorney?
A It was Vorees, Sather, Seymore, Pease.
Q Were you paid for your testimony time in the Adams Landing case?
A I don't understand. When I gave testimony, I wasn't working for Israel Berger & Associates then.
Q I'm just asking if you were paid for your time to testify in that case, sir?
A I don't know. I'd have to go to accounting.
Q You don't remember receiving any check yourself from anybody for the time it took you to testify and take time away from your other job?
A No, I don't recall that.
Q Did Mr. Gaskins suggest to you that you had any right to be compensated for your time here in this deposition?
A No.
Q Can you tell me whether on page 19 of your report, which again is exhibit -- the December 4th report, that is. Do you have that in front of you now?
A 19?

Q Yes, sir.
A Yes.
Q Can you tell me whether it would be possible to do all the items, b through l, without replacing the waterproofing assembly in there? And that would include installing a structurally correct topping slab.
MS. HEYER: Object to the form of the question.
Q (By Mr. Brown.) Do you understand my question, sir?
A You're asking me if all the items, a through l -- or b through l?
Q Yes, sir. In order to do all the items, b through l, could those be done without replacing the waterproofing that's in the Promenade project right now?
A With the exception of items i, j, k and l.
Q Okay. Thank you for that clarification. So in order to do b through h, you would have to tear out the waterproofing that's in there, isn't that true?
A Yes.
Q And in fact, was it your statement that even just to replace the dirt with proper fill, because you'd be removing the containment pressure and the load that's in those courtyards, you would have to replace that type of bentonite system, in your view anyway?
A Yes.

Q All right. Even if there wasn't anything wrong with any of the bentonite waterproofing, since some or all of it had already over the years activated, just to take the dirt out, you'd have to, in your view, remove that waterproofing membrane, is that your understanding?
A Yes.
MS. HEYER: Object to the form of the question.
Q (By Mr. Brown.) Did you also mention somewhere in your report the lack of flashing in the doorways and windows that you observed out there on site, threshold flashing and window flashing?
A I don't recall other than the flashing I'd recommend at lintels and under copings.
Q And that wouldn't be something that a waterproofing installer would be responsible for, at least based on the 20 or so projects you've ever been involved with?
MR. HULL: I'll object to the form of the question.
THE WITNESS: Can you ask that again?
Q (By Mr. Brown.) Scraping and painting corroded steel lintels, flashing under end wall copings, thru-wall flashing at end walls, those aren't the type of things that in your experience a waterproofing membrane installer is responsible for?

MR. HULL: I'll object to foundation.
THE WITNESS: They can be.
Q (By Mr. Brown.) Have you known that to be the case?
A Yes.
Q And if it's not specified in their contract, then necessarily someone else on the project would be responsible for those, is that true?
MR. HULL: Object to foundation.
Q (By Mr. Brown.) In your experience?
A Yes.
Q Have you had the experience or known of any waterproofing installers in the 20 or so projects that you've been involved with that had something to do with waterproofing where the installers were responsible for pushing dirt into a covered courtyard?
A The actual applicators of the waterproofing membrane?
Q Yes, sir.
A No, not that I'm aware of.
Q That would be some other trade or some other contractor on the project, typically, in your experience, is that true?
A Yes.
Q Do you know whether any of the number of waterproofing systems that you ticked off for Ms. Semke there can be applied to below grade wooden construction members?
A Wooden, did you say?

Q Yes, sir.
A Can they be applied to wood?
Q Yes.
A Yes.
Q Which ones?
A Some of them. You'd have to read back that list. Some of the sheetgoods can be applied to wood.
Q Below grade?
A Yes.
Q Do you know whether any bentonite materials -- well, in fact, I'll restrict it to this. Do you know whether Swelltite can be applied directly to below grade wooden construction members?
A No, not specifically.
Q Do you know whether Swelltite is restricted to below grade applications?
A Not specifically Swelltite, no.
Q In your experience on your consulting work with various construction projects involving waterproofing, what is the responsibility of the architect to make sure other trades, including waterproofing contractors, know of design changes that occur during the course of a project that may implicate, for example, the waterproofing?
MR. HULL: Objection, foundation.
THE WITNESS: Are you asking me if an

architect has to make a change or has to get information out, how would he make sure it gets implemented in the field?

Q (By Mr. Brown.) If the architect or the design team on an overall project creates a design change that implicates, for example, the waterproofing, what's been your experience is the responsibility of the architect to ensure that information gets to the waterproofing contractor?

A He would have to go through the project manager or the construction manager and make sure that it's disseminated and understood by the contractor's foreman and then disseminated to the people in the field how to actually install it.

Q Did you learn some of those basics in your architectural school?

A Yes. I would think that's the typical hierarchy.

Q Pretty fundamental?

A Yes.

Q Would any of the systems that you claim are more suited to the Promenade project, would any of them be suitable if items b through l were not completed, as recommended on page 19 of your report?

A Can you ask that again?

Q Would any of the four, five or two or three systems that

you believe are more suited to the Promenade project be suitable if items b through l on your list were not completed, were not done?

MS. HEYER: Object to the form of the question. Also calls for speculation.

THE WITNESS: No. I would want them all to incorporate, b through l.

Q (By Mr. Brown.) Do you know whether any of your waterproofing systems that you believe were more suited to the Promenade project would have performed had the fill in the courtyards been installed at a point several inches above their termination and there had been no waterproofing between the termination of even your kind of products and the top of that fill?

MR. HULL: Objection to form and foundation.

THE WITNESS: Let me see if I understand it correct, the question. Would it still perform as a waterproofing system if the soil -- if the grade was above the termination of the membrane?

MR. BROWN: Yes. Let's say something like eight inches.

MR. HULL: Same objection.

THE WITNESS: That would depend on the conditions above the termination of the waterproofing.

Q (By Mr. Brown.) What would it depend upon?
A It would also need to be watertight.
Q Let's say they weren't.
A Then there's the strong possibility of failure.
Q Would you expect the same sort of staining and so forth to be observed out at the site regardless of the kind of system that was installed if those kinds of conditions existed?
A Yes.
Q Do you know whether -- do you have enough knowledge of Swelltite to know whether it's been applied in many residential type settings?
A Can you ask the question again?
Q Do you even know whether Swelltite 3000 has been applied in many residential projects?
A No, I don't.
Q Now, any of these guys you mentioned last night were these consultants who supposedly had the belief that Swelltite -- or sorry, I won't even restrict it to Swelltite -- that bentonite waterproofing systems wouldn't be suitable for a residential project, was that basically your characterization of those beliefs?
A No. I would specify it to the actual scenario of the Promenade Oaks, that typical configuration where you have a plaza with below grade waterproofing adjacent to

sensitive areas over an occupied space.
Q Who determines whether it's sensitive? Does that depend upon actual complaints from residents, for example?
A That's one way of determining. I guess it would depend on which stage of the project you're in. If it's new construction and design, the architect would design around what he would deem a sensitivity.
Q But really what I wanted to know -- thank you for that -- but did these seven or eight guys that you listed yesterday, did you actually consult with each and every one of those before creating your report for GID on this Promenade project?
A Did I consult with them with reference to writing the report?
Q Swelltite. Yes, sir.
A No.
Q Because I thought your answer just a moment ago was these beliefs that they share about this sensitive area issue was specific to the Promenade. That's not accurate?
A Well, no. What I mean by that is a configuration similar to the Promenade.
Q So you didn't consult with any other consultant or waterproofing expert about what they thought of the suitability of Swelltite 3000 in the Promenade project?
A No.

Q You didn't see that in any written literature anywhere, I think you said yesterday?
A For the Promenade? No.
Q The kind of investigation work that you did on this Adams Landing project was the full-blown failure analysis and investigation that you described yesterday, correct?
A Yes.
Q You don't consider yourself a contractor, do you?
A No.
Q And you would actually defer to other experts to come up with an actual pricing for a particular project, true?
A What do you mean by other experts?
Q Well, you'd defer to other industry groups or trades or experts to determine the actual cost to install a particular system on a particular project, wouldn't you?
A Yes.
Q I'm a little bit unclear about this. Was it your perception or did you draw the inference or was it even directly expressed to you when you were retained by GID to perform this cursory walk-thru verification that GID was already leaning toward or had already sort of decided to do a full replacement?
MR. HULL: I'll object to the form of the question.
THE WITNESS: At the time they asked me to

look at the property?
MR. BROWN: Yes, sir.
THE WITNESS: No.
Q (By Mr. Brown.) You didn't draw that inference?
A No.
Q But it sounds like that Mr. Vanderberg had at least reached that conclusion by the time you had this conversation where you scribbled down some numbers on an envelope, right?
A Yes.
Q Have you ever relied upon the reports of an expert witness retained by the owner of a property which was in litigation attempting to maximize their monetary recovery in a lawsuit?
MR. HULL: I'll object to the form of the question.
THE WITNESS: No, not that I'm aware of.
Q (By Mr. Brown.) Did you know what Mr. Campbell's report pertained to, what it was even for when you got it?
A No.
MS. SEMKE: Objection, foundation.
Q (By Mr. Brown.) Do you now?
A I'm sorry?
Q Do you now know what it is?
A No, not completely.

Q Did Mr. Gaskins or Ms. Semke tell you that Mr. Campbell was an expert witness that they had hired to attempt to maximize the recovery of their client in this lawsuit?

MR. HULL: I'll object to the form of the question.

MS. SEMKE: I'll join.

THE WITNESS: No.

Q (By Mr. Brown.) Did they even tell you that Mr. Campbell was their expert witness?

A No.

Q Did they tell you or did anybody tell you that there were other expert reports generated by engineers who had expertise in waterproofing systems and that were available by the time you got Mr. Campbell's report?

MR. HULL: Object to the form of the question.

THE WITNESS: No.

Q (By Mr. Brown.) Would you have been interested in seeing those kinds of reports, too, in connection with the work you did on the Promenade?

A Yes.

Q Did you know that the owners had -- and by owners, I mean the owners of the Promenade project. Did you know that they had developed another project a few years earlier that was nearly identical in terms of the configuration of

filled-in, precast plank courtyards?
MS. SEMKE: Objection to form.
MR. BROWN: You can answer.
THE WITNESS: No.
Q (By Mr. Brown.) Did you know that the owners had insisted that the waterproofing system created for the Promenade be identical to that installed on a previous project they owned that was also bentonite?
MS. SEMKE: Object to the form.
Q (By Mr. Brown.) Did you know that?
A No.
Q Have you ever been involved in a project where after you did your consulting work, or Israel Berger did its consulting work, a conclusion was arrived at at a type of waterproofing system that was recommended for installation that the owners rejected?
A No.
Q Did you learn anything in your bachelor program for architecture of what an architect's role is in a design-build project?
A No, not in design-build.
Q Have you come to gain in your work experience an understanding of what an architect's role is in a design-build project?
A No, I haven't had that.

Q You mentioned and identified some conditions that either you heard about from Mr. Campbell or you observed during your cursory investigation, a number of conditions that you described as exacerbating the waterproofing? Do you remember using that word in your report?
A I recall that word.
MR. HULL: I'll object to the form of the question.
Q (By Mr. Brown.) Do you even have any idea whether there would ever have been any leaks had each and every one of those exacerbating conditions never occurred?
MR. HULL: I'll object again to the form of the question.
THE WITNESS: No.
Q (By Mr. Brown.) Do you know why there was this sort of vertical flashing membrane material that you observed in the courtyards, do you know why that was ever installed?
A Was I ever told?
Q Yes.
A No. I was not told.
Q Were you ever told why some of the stoops had apparently part of their concrete replaced with newer concrete?
A Yes.
Q What were you told about that?
A I was told that that was part of a repair.

Q Were you told specifically why the repair was necessitated?
A No.
MR. HULL: I'll object to the form of the question.
THE WITNESS: No. Nothing specific.
Q (By Mr. Brown.) Who decided what documents you reviewed or got to review in preparation for the work you did on the Promenade?
MR. HULL: Objection, foundation.
MS. SEMKE: Objection, speculation and foundation.
THE WITNESS: I'm not aware of anyone deciding what I received.
Q (By Mr. Brown.) You didn't request a certain set or group of documents that you believed you needed for your work, you were given what you identified you reviewed, correct?
A That's correct. But I had also made a request for whatever documentation was available to help in the investigation.
Q Who did you make that request of?
A Mr. Vanderberg in the field.
Q And one last thing, and I don't know -- if you've answered this, I apologize, but I'm not quite clear on what if anything you actually discussed or spoke about with Mr.

Campbell on site?

A Nothing of significance I recall. He basically followed the group as they went from area to area in the plaza. He didn't discuss anything in detail.

Q And I lied. That wasn't the last question. There was one more. Has it been your experience that the architect or architect's response -- let me rephrase that. Has it been your experience that trades and contractors on a construction project rely upon and follow the advice of the architect or architect's representatives when it comes to design and installation details?

MR. HULL: I'll object to the form of the question.

THE WITNESS: Do you mean do they actually go straight to the architect for direction?

Q (By Mr. Brown.) Well, that's a good question. I'll clarify it. If an architect is asked to provide design or installation instructions or directions, has it been your experience that the trades that receive those instructions rely upon them and follow them?

MR. HULL: I'll object to the form of the question.

THE WITNESS: You're asking whether or not the trades will follow the details that are given to them?

MR. BROWN: By an architect or an

architect's representative.

MR. HULL: I'll object to the form of the question.

THE WITNESS: Typically they do. They should.

Q (By Mr. Brown.) You wouldn't expect them to intentionally deviate from or disregard those design or installation instructions or details, would you?

A No. They shouldn't.

MR. HULL: I'll object to the form of question and to foundation.

MR. BROWN: I don't have anything more, sir. Thanks.

EXAMINATION

BY MR. STEPAN:

Q Mr. Camaya, I too have some follow-up questions for you. Do you recall yesterday we talked a little bit about your assertions regarding the sequencing of the project, do you remember that?

A Yes.

Q And you had indicated that you looked at some photos that you used to make your assertions regarding sequencing. I'm wondering if the representative from Promenade told you anything about the sequencing of the project?

A No, not that I recall.

Q Did you ever hear from anybody at any time any information about the sequencing of the project?
A No.
Q The statements that you make in your report regarding sequencing are based strictly on the photos that you observed?
A That's correct.
Q Did you ever hear any comments by anyone about coordination of the trades on this project?
A No.
Q Was that an aspect of the project that you gave any attention to?
A In what terms?
Q Is it part of your analysis or were you even able to --
A No. It's something that I eventually asked, if there was more information.
Q And I want to clarify. I believe you said earlier today that you consider your own expertise to be in leak investigation and building envelope design, is that right?

MR. BROWN: I think that misstates his testimony, Chad.

MR. HULL: I'll object. I think it does, too.

MR. STEPAN: I want to clarify, then.

THE WITNESS: Not so much the design, but

the consulting issues and building envelope, yes.
Q (By Mr. Stepan.) The drawings that you were provided, did you ever take note of the date on those drawings?
A No, not that I recall.
Q Did you ever take note to see if they were signed drawings?
A No, not that I recall.
Q Just so I'm clear, I think it got a little muddled for me when you were testifying today about the probe down at the drain. That excavation work around that drain was done prior to your arrival to the site, is that right?
A That's correct.
Q You never saw the condition around that drain as it was before the excavation?
A That's correct.
Q And when the excavation was done, that moved away from the drain any aggregate or filter fabric or anything that was around there? Whatever condition existed, that excavation messed it up?
MR. HULL: I'll object to the form of the question.
Q (By Mr. Stepan.) Is that right?
A That's correct. There was no aggregate when I saw it.
Q And you had mentioned today about locating the drains at a low point; do you recall saying that?

A Yes.
Q Were you referring to the surface or the precast deck or both?
A The precast deck.
Q In other words, to have the deck slope in some way so the drains would be at a low point?
MR. HULL: I'll object to the form of the question.
THE WITNESS: Yes. Or locate drains at low points as opposed to high points where the water would have to work up.
Q (By Mr. Stepan.) In your report which is Exhibit 592, items -- do you have it in front of you there?
A 592.
Q Yes. Page 19, items i through l, were those items that are outside of the courtyards?
A When you say outside of the courtyard, do you mean not adjacent? The copings I'm referring to are the cast stone copings at the end walls of the courtyard.
Q On the exterior side of the courtyards? They're not within the box that is the courtyards, they're on the exterior wall, is that right?
MR. HULL: I'll object to the form of the question.
THE WITNESS: They are part of that

exterior wall. So one side of the coping is part of the plaza and the other half is to the exterior.

Q (By Mr. Stepan.) Okay. And there's a picture -- is there a picture of the coping here on page 16?

MR. HULL: Which photograph are you looking at?

MR. STEPAN: There's two photographs that both refer to coping.

THE WITNESS: Oh. That's metal coping. That is outside of the actual plaza. My reference was to a cast stone coping, which is more like the coping you have in photograph 22, along the stairs. That would be an example of a cast stone coping. But the wall, this wall, part of this wall would actually wrap around and be adjacent to the plaza, and you can see at the top of the stairs that the stone coping is there.

Q (By Mr. Stepan.) You're looking at photo 22?

A 22.

Q And where did you see the need for flashing on the end wall?

A In this area.

Q Do you recall how many locations?

A There's one location where the coping was loose and it shifted and it didn't appear that there was any flashing below it.

Q And I guess what I was getting at earlier, you've got the end wall, you've got one side of the end wall is the courtyard, going towards the courtyard, the other side of the end wall is what I would say the exterior wall?
A Yes.
Q Where you saw the flashing missing, was that on the courtyard side of the end wall or exterior side of the wall?
A Well, the flashing would actually run under the entire width of the coping, so it serves both sides. It was one piece. It would be through the entire -- through the section of the wall.
Q And flashing like that, is that something you'd expect to see called out in the architectural plans?
MR. HULL: I'll object to form and foundation.
THE WITNESS: Yes.
Q (By Mr. Stepan.) You testified again today about the posts in the courtyards; do you recall talking about them?
A Yes.
Q And just so I'm clear, is it your concern with those posts that they not be installed so they're directly on the plank; is that your concern?
A Yes.
Q So you don't have a penetration through the waterproofing?

A That's correct.
Q Were you ever told if the soil that was used as backfill met the specifications for the project?
MR. HULL: I'll object to the form of the question.
THE WITNESS: No.
Q (By Mr. Stepan.) In your experience, have you worked on projects where topping slabs have been used before on the top of a deck?
A Yes.
Q In your experience, is a topping slab something that's typically called out by a structural engineer or architect?
MR. HULL: I'll object to the form of the question and to foundation.
THE WITNESS: Yes.
Q (By Mr. Stepan.) You made some comment today and I don't recall exactly what it was, but you commented something about the slope of the grade in the courtyards? At least you were asked some questions about that. Do you recall that?
A Yes.
Q Have you ever worked on projects where you've actually seen a plan that provided a slope for site grading?
MR. HULL: I'll object to the form of the

question.

THE WITNESS: Do you mean the slope of the soil as it was to be installed?

MR. STEPAN: Yes. Indicating that --

THE WITNESS: You mean a grading plan?

MR. STEPAN: Yes.

MR. HULL: I'll object again to the form of the question.

THE WITNESS: Yes, I've seen grading plans.

Q (By Mr. Stepan.) Is a grading plan something that's put together typically by an engineer or architect?

MR. HULL: I'll object to the foundation.

THE WITNESS: It's usually a soil engineer or a landscape architect.

Q (By Mr. Stepan.) Somebody in the design realm, is that right?

MR. HULL: Object to the foundation.

THE WITNESS: Yes.

Q (By Mr. Stepan.) When you submitted your report to GID, did you receive any questions back from GID regarding items a through l in your recommendations?

A Yes.

Q And who did you receive questions from?

A Mr. Vanderberg.

Q Do you recall what he asked you about items a through l?
A He asked me the different type of systems, waterproofing systems that would be available.
Q Which we've talked about here today?
A Right.
Q Did he ask you anything else regarding items a through l?
A No, not that I can recall. He was more concerned with the type of systems that we had options with.
Q When you were out at the site, did you do anything to test the ability of the drain system?
A No.
Q If you recall, yesterday I asked you some questions about maintenance items?
A Yes.
Q We talked about sealants, things like that; do you recall that?
A Yes.
Q Were there any other issues that you observed on site that you would consider to be maintenance items?
A No, not that I can think of.
Q You mentioned the term today calcium carbonate?
A Right.
Q What is that?
A It's a formation as a result of water moving through masonry or concrete, through the soil, developing into a

hard, crusty layer, possibly a stalactite, yellowish in color, yellowish-whitish, that builds up over time as more water leaks to the point where it initially started to form.
Q Did you see any calcium carbonate out at Promenade?
A Yes.
Q Do you recall where?
A The underside of the plaza deck. It would be I believe the compactor room.
Q Do you recall which building that is?
A No, not specifically.
Q Was that just one area?
A Right. That comes to mind because it appeared to be a severe leak, a lot of severe staining and buildup.
Q Do you recall if that was near that pass-thru we talked about yesterday?
A Yes. That's what I'm associating it with.
Q Yesterday, if you recall, we looked at Exhibit 549, which is the e-mail that you had sent to Bob Tarasov. Also, it's got a portion on there of an e-mail you had sent to Scott Vanderberg. Do you recall looking at that?
A Yes.
Q And we talked quite a bit about this $3.6 million figure that's referenced in the e-mail, do you recall that?
A Yes.

Q The 3.6 million dollar number, was that GID's number?
A Yes.
Q Do you know where that number came from?
A No.
Q Mr. Vanderberg just indicated it to you at some point?
A Yes.
Q The four million dollar number that you referenced here today -- well, let me back up. As you said yesterday, this 3.6 million dollar number, that included not only repairs to the courtyard but also other repairs you noted throughout the site, right?
A Yes.
Q The four million dollar number that you put together for him, is that site-inclusive as well, the entire site?
A Yes.
Q Back to those posts for a moment, at the stoops. If the posts below the stoops, running below the stoops were concrete and they were sitting right on the deck, the waterproofing was wrapped around the concrete, would you still have the same issue of water proceeding through the concrete and getting to the deck?
A If they were concrete, sitting on the deck and the waterproofing -- you mean the penetrations?
Q Yes. So it's not -- so that the configuration is --
A Is like this. If this is the actual deck and this is the

column, --

Q Yes. You set the column right on the deck --

A You'd have to waterproof around it.

Q Exactly. The condition I'm talking about is, you have the precast deck, you set the column right on top of the deck, and now you've got to waterproof around it?

MR. HULL: I think I'll object to the form of the question.

Q (By Mr. Stepan.) Do you follow me?

A I understand. I would have concerns only if the waterproofing didn't wrap the entire concrete column and terminate at the top with a tight connection.

Q So up above grade?

A Up above grade.

Q Otherwise, you basically have the same condition you do as you would with the wood posts; you've got a conduit that goes to the deck?

MR. HULL: I'll object to the form of the question.

THE WITNESS: That's correct.

Q (By Mr. Stepan.) Just so I'm clear, yesterday you indicated to me that you're not a general contractor, you've never been a general contractor, right?

A Right.

MR. HULL: Object to the form of the

question.
Q (By Mr. Stepan.) And do you hold yourself out anyway as an expert regarding the standard of care for a general contractor?
MR. HULL: Objection to form of the question.
THE WITNESS: When you say standard of care, can you elaborate?
Q (By Mr. Stepan.) For the standards of care -- do you consider yourself to be an expert regarding the standards of care --
A Do I tell them what to do, is that what you're asking?
Q The standards of care that a general contractor has to meet to do their job.
MR. HULL: I'll object to the form of the question.
THE WITNESS: They'd have to meet the standards and specifications that we would put out.
Q (By Mr. Stepan.) But you're not here -- let's put it this way. Are you here to testify regarding the standard of care of a contractor?
A No.
MR. STEPAN: That's all I've got for you, sir. Thank you.
MR. HULL: I just have a couple of

follow-up questions.

EXAMINATION

BY MR. HULL:

Q Did you formulate an opinion through your experience, the documents you reviewed in the course of your investigation as to whether or not the plazas at the Promenade Oaks could be waterproofed?

MR. VEITH: Objection, lack of foundation.

MR. REILLY: Join.

THE WITNESS: Could be waterproofed?

MR. HULL: Yes.

THE WITNESS: Yes.

Q (By Mr. Hull.) And what was your opinion?

MR. REILLY: Same objection.

MR. VEITH: Same objection.

THE WITNESS: When you say waterproofed, you mean re-waterproofed or originally waterproofed?

MR. HULL: Well, let's talk about re-waterproofed.

MR. REILLY: Same objection.

Q (By Mr. Hull.) Do you have an opinion as to whether or not those plazas could be repaired so that they would be watertight?

MR. REILLY: Objection.

MR. VEITH: Lack of foundation.

MR. REILLY: Calls for speculation.
THE WITNESS: No, I don't believe so.
Q (By Mr. Hull.) You don't believe that they could be?
A You mean -- if you're referring to localized repair?
Q No, no. I'm talking about --
A A replacement?
Q A replacement. I just want to know if, in your opinion, the plazas could be waterproofed?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Same.
THE WITNESS: Yes. Re-waterproofed.
Q (By Mr. Hull.) If you started over, took all the waterproofing out, prepared the surfaces, it's your opinion that you could design and install a watertight waterproofing system for the plazas, is that right?
A Yes.
MR. VEITH: Objection, lack of foundation.
Q (By Mr. Hull.) Do you have an opinion as to whether or not the plazas could originally have had a waterproofing system designed and installed that would have been watertight?
MR. REILLY: Objection, lack of foundation.
MR. STEPAN: Objection as to form and

foundation.

MR. VEITH: Objection, lack of foundation.

MS. HEYER: Same objections.

THE WITNESS: Yes.

Q (By Mr. Hull.) And what is your opinion?

MR. REILLY: Same objection.

MS. HEYER: Same objections.

MR. STEPAN: Same objections.

MR. VEITH: Same.

THE WITNESS: It would have taken a different material, waterproofing material.

Q (By Mr. Hull.) If a different material had been used, could those plazas have originally been waterproofed if the design and construction were appropriate?

MR. REILLY: Same objection.

MR. VEITH: Same.

MR. STEPAN: Objection to form and foundation.

THE WITNESS: Yes.

Q (By Mr. Hull.) And your opinion is that they could?

A Yes.

MR. REILLY: Objection, form, foundation.

MR. VEITH: Same objections.

Q (By Mr. Hull.) You were asked a number of questions about what you would expect to find in an architect's plans both

yesterday and today, do you recall that?
A Yes.
Q What you would expect to find in an architect's plans would depend on what the scope of the architect's work is, wouldn't it?
A Yes.
MR. STEPAN: Objection as to form.
Q (By Mr. Hull.) And if an architect had no design responsibility for a particular building component, you wouldn't expect to find design details for that component in the architect's plans, would you?
MR. REILLY: Objection, calls for speculation.
MR. STEPAN: Same objection.
MS. HEYER: Same objection.
THE WITNESS: Yes.
Q (By Mr. Hull.) Meaning you would not expect to find those details?
MR. REILLY: Same objection.
MR. STEPAN: Same objection.
MS. HEYER: Same objection.
Q (By Mr. Hull.) I'm just not sure what you were answering to?
A Not -- you know, if it wasn't part of his scope of work, I wouldn't expect it.

Q So if an architect wasn't responsible for designing, for example, the electrical system in the building, you wouldn't expect that the drawings that the architect did to contain a lot of details about the electrical components, is that right?

MR. REILLY: Objection, form of the question, relevance.

MR. STEPAN: I join in the objection.

MS. HEYER: Objection, calls for speculation and foundation as well.

THE WITNESS: Yes.

Q (By Mr. Hull.) You were asked a question by Mr. Brown about changes that an architect might make and how that gets distributed. Based on your experience in the construction industry, is it your experience that if an architect makes a change, that change is communicated to the general contractor and then the general contractor then communicates that change to the relevant subcontractors?

MR. STEPAN: Objection as to form and foundation.

THE WITNESS: Yes, that's my understanding.

Q (By Mr. Hull.) Well, since we had an objection to form, let me ask you this question. Based on your experience in

the construction industry, what is the communication chain if an architect is to make changes to its drawings?

MR. REILLY: Objection, lack of foundation.

MS. HEYER: Same objection.

MR. STEPAN: Same objection. Also calls for speculation.

THE WITNESS: From the design architect, it usually goes to the field architect. From the field architect, it would go to the project manager of the site.

Q (By Mr. Hull.) Now, the project manager, are you referring to that as someone employed by the general contractor?

MR. STEPAN: Objection as to form and foundation.

THE WITNESS: It could also be the general contractor.

Q (By Mr. Hull.) Okay. And then what?

A From the general contractor, it would be disseminated to each trade that would be responsible for that change and then into the field, to the actual applicator.

Q (By Mr. Hull.) Did you get all of the information you needed from the owners, from GID, from your client to formulate the opinions and observations contained in your December 4th report?

MR. STEPAN: Owners and GID at that time? I don't think GID is the owners -- or were the owners.

MS. HEYER: Yes. I'll object to the form of the question.

MR. HULL: Yes. Let me withdraw that and let's try that again.

Q (By Mr. Hull.) Did you get all the information you felt was necessary in order to formulate the observations and opinions contained in your December 4th, 2002 report?

MR. REILLY: Objection.

MR. VEITH: Objection as to foundation.

MS. HEYER: Also calls for speculation.

MR. REILLY: Objection to the form as well.

THE WITNESS: Yes, with the understanding that these were the only documents that were available to me.

MR. HULL: I don't have any other questions.

MR. REILLY: Anybody in Minneapolis?

MR. SEMKE: Yes, we do.

EXAMINATION

BY MR. BAUMGARTNER:

Q Hello, Mr. Camaya. This is Brian Baumgartner again representing Mikesh, and I have a few questions to follow

up. Did the architectural plans that you reviewed prior to your visit out to the site show design elements of the plaza?

MR. HULL: I'll object to the form of the question.

THE WITNESS: What do you mean by design elements of the plaza?

Q (By Mr. Baumgartner.) Did it show anything about how the plaza was designed?

A Yes. It showed the actual precast concrete deck and its interface with the adjacent walls and the extent, the basic extent of the waterproofing and the depth of soil.

Q Okay. Did anything on those architectural plans indicate that the plans lacked detail for contractual reasons?

MR. HULL: I'll object to the form of the question.

MR. STEPAN: Same objection.

MR. VEITH: Calls for a legal conclusion.

THE WITNESS: I'd have to review the drawing again. I don't recall. Nothing jumped out at me.

Q (By Mr. Baumgartner.) Did anything in the plans refer you to another document to obtain details that were not available in the plans you were reviewing?

MR. HULL: I'll object to the form of the question.

MS. HEYER: Same objection.
THE WITNESS: No.
Q (By Mr. Baumgartner.) Okay. I believe you said based on your evaluation, you believe that gutters should have been used on the Promenade project?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Yes. I believe that would have been a good idea.
Q (By Mr. Baumgartner.) Are you aware of any problems with the use of gutters in a climate such as Minnesota?
A Yes.
Q And what would those problems be?
A There could be a buildup of snow and ice. A buildup of that could expand up and below the roof topping, whether it be shingle or whatever the finished roof surface is, if it was improperly designed.
Q Have you seen documents on previous projects that showed slope to drain in areas such as the plaza?
MR. HULL: I'll object to the form of the question.
THE WITNESS: Not that I can recall.
Q (By Mr. Baumgartner.) Okay. I believe you stated earlier that it was a good idea to show the slope to drains somewhere in the drawings, is that correct?

A Oh, okay.
MR. HULL: I'll object to the form of the question.
THE WITNESS: You're talking about at the deck now, no longer the roof?
Q (By Mr. Baumgartner.) On the surface of the plaza, would it have been a good idea to show the slope to the drains in use on that surface of the plaza?
A That's correct.
Q And have you ever seen documents that in fact did show such slope?
MR. HULL: I'll object to the form of the question.
THE WITNESS: Yes.
Q (By Mr. Baumgartner.) And what sort of documents have you seen that showed that slope?
MR. HULL: Same objection.
THE WITNESS: Roof plans have that kind of information, plaza deck plans have that kind of information.
Q (By Mr. Baumgartner.) I'm sorry. What was the first thing that you said?
A The roof plan. Roof plans usually indicate slope to drain, the degree of slope.
Q And who commonly prepares such plan?

A The architect.

MR. HULL: I'll object to form of the question.

THE WITNESS: An architect or the designer of the roof.

Q (By Mr. Baumgartner.) Okay. I believe you stated earlier that the design of a drain system is the responsibility of a mechanical engineer, is that correct?

A Yes.

Q Have you ever designed a drain system?

A When you say drain, the drain assembly system, the body, is that the question?

Q Well, there was a drain system in use at the Promenade, correct?

A Yes.

Q Consisting of a drain and then a vertical pipe with another drain and then pipe continuing to connections with outside water systems?

A Yes.

Q Have you ever designed such a system?

A No. I've recommended them, though.

Q I'm sorry. I couldn't hear the answer.

A I haven't designed them, but I've recommended the use of them.

Q Do you feel you're qualified to design such a system?

A No. I would defer that to a mechanical engineer.

MR. BAUMGARTNER: Okay. That's all the questions that I have. Thank you very much.

MR. REILLY: Anybody else in Minneapolis?

EXAMINATION

BY MR. REILLY:

Q Sir, I have a question. Since you weren't able to do your full-blown investigation, since you had limited amount of data and information in front of you and did not do all the testing, for instance, that you would do, that sort of thing, would you agree with me that the observations and the opinions you espoused in your report are preliminary in nature?

MR. HULL: I'll object to the form of the question.

THE WITNESS: Preliminary?

Q (By Mr. Reilly.) Yes. In other words, that in order to fulfill, to complete your report, you would have to do more investigation, more data obtaining, that sort of thing?

MR. HULL: I'll object to the form of the question.

THE WITNESS: Based on what I reviewed and saw, the observations and the report, I wouldn't change them. I would probably add to them with more

investigation.
Q (By Mr. Reilly.) So there could be more information that -- you don't know what other information because you haven't done a full investigation yet, right? You don't know what information you might find?
MR. HULL: I'll object to the form of the question.
THE WITNESS: That's correct.
Q (By Mr. Reilly.) So it would be pure guesswork on your part and mine to speculate as to what you might find in that investigation, correct?
MR. HULL: I'll object to the form of the question.
THE WITNESS: Yes.
MS. SEMKE: I'll object as well.
Q (By Mr. Reilly.) And you've only testified once as an expert, and that was regarding a full-blown investigation that you did, correct?
A Yes.
Q And you were able to do all the testing and obtain all the documents that you felt were appropriate or relevant in that case?
MR. HULL: I'll object to the form of the question.
Q (By Mr. Reilly.) Correct?

A Yes.
Q And in this case, you haven't been able to do that yet because you were not given that mandate?
MR. HULL: I'll object to the form the question.
THE WITNESS: Yes.
MR. REILLY: Thank you, sir. I have no other questions.

EXAMINATION

BY MR BROWN:
Q Sir, even in a case where, as Mr. Bill hypothesized, an architect does not have certain responsibilities regarding a certain portion of a project, is it the case and has it been your experience that the overall project architect is nonetheless responsible for coordinating and interfacing with all the components of the project to make sure that the overall design maintains its integrity?
MR. HULL: I'll object to the form of the question and to foundation.
THE WITNESS: Typically, unless it's been specifically taken out of his scope.
Q (By Mr. Brown.) What do you mean by that?
MR. HULL: I'll object. Same objection.
THE WITNESS: If he was excused from any task or if he was told he wasn't responsible for any

specific phase.

Q (By Mr. Brown.) Even if that's the case, I guess my question, though, is has it been your experience and is it an accurate statement that a project architect, even for components of a project that someone else may have design responsibilities for, is still responsible to make sure that those components coordinate with and are properly interfaced with the overall project design?

MR. HULL: I'll object to the form of the question and to foundation.

THE WITNESS: Yes, typically.

MR. BROWN: That's all I have, sir. Thank you.

MR. STEPAN: I don't have anything else.

MR. HULL: That's a wrap. Thanks.

MR. STEPAN: John, do you want to advise him?

MR. VEITH: Yes, sure. None of us here represent you, Mr. Camaya, but I do want to let you know that you do have the right to review the transcript of your deposition just as soon as the court reporter's transcribed it, and you can also waive that right if you want. It's up to you. But you should let the court reporter know.

THE WITNESS: I'd like to see a copy of

the transcript.

(Witness excused.)

(The deposition was adjourned at approximately 2:25 p.m.)

(The original transcript was provided to Attorney John Veith.)

(End of Volume II).

DEPOSITION SIGNATURE/CORRECTION PAGE

I, JON CAMAYA, do hereby certify and state, that I have read and examined the typewritten transcript of the deposition taken of me, at the time and place therein named, consisting of Volumes I and II, pages 1 through 374, and find the same to be true and correct. (Except as follows:)

PAGE NO. LINE NO. CORRECTION/REASON

Dated this ______ day of __________, 2003.

______________________________
__________

RETURN TO: Charles G. Williamson, Court Reporter, 4209 113th Street West, Bloomington, MN 55437.

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA)
ss.
COUNTY OF HENNEPIN)

I, Charles G. Williamson, a Notary Public within and for the County of Hennepin, and State of Minnesota, do hereby certify:

That I reported the deposition of Jon Camaya, on the 8th and 9th days of May, 2003, in New York, New York, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed under my direction and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition by the witness was not waived.

WITNESS my hand and seal this 21st day of May, 2003.

Charles G. Williamson
Notary Public
Hennepin County, Minnesota

My Commission Expires January 31, 2005.