**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Westfield Insurance Company,

Civil File No. 00-CV-987 JNE/JSM

Plaintiff,

v.

Weis Builders, Inc., Healey Ramme Co., sued as Healey Ramme Company, CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C., and Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

*and*

Weis Builders, Inc.,

**FOURTH-PARTY DEFENDANT CHRIS CRAFT INDUSTRIAL PRODUCTS' TRIAL BRIEF**

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a/ Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants.

*and*

Colloid Environmental Technologies Co.,

Fourth-Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

*and*

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

v.

Mikesh, Inc.,

Fourth-Party Defendant.

## INTRODUCTION

Colloid Environmental Technologies Company (CETCO) brought Chris Craft Industrial Products (CC) into this case by a fourth-party complaint for contribution and indemnity. The only remaining Chris Craft issues to present to a trier of fact are whether CC's polyvinyl alcohol (PVOH) water-soluble film was a defective product and, if so, whether that defect caused the leaks at the Promenade Village Townhome complex.

## STATEMENT OF FACTS

The Promenade Oaks project developed out of a predecessor project, "Southwind," located in Burnsville, Minnesota. Southwind was designed by ESG (or its predecessor, Arvid Elness Architects). The Southwind project had a similar courtyard plaza setup, a design-build implementation, and was intended as a design prototype for Promenade. The developers experienced leaks at Southwind. Promenade sent contractors and subcontractors out to Southwind to view a prototype of its expectations for Promenade.

Promenade, as the owner, and BRW Elness Architects (ESG), the architect, entered into an Architect for Housing Services Agreement on September 1, 1996 for the construction of the Promenade Oaks. The contract required ESG to design and develop the construction documents for Promenade, and to administer the construction contract. The agreement provided that ESG would have authority to act on behalf of the Owner and to determine if the work was completed in accordance with the specifications and contract documents.

ESG's on-site administrator was John Feges. Feges was the inspecting architect responsible for answering questions pertaining to design aspects of the building. During the early stages of construction, Feges was at the site approximately three or four times per week. However, complaints by other parties that ESG was not responding to Requests for Information ("RFI's") in a timely manner resulted in an agreement that Feges would be on-site every day.

Promenade and Weis entered into a general construction contract on September 19, 1996 for the construction of Promenade Village Townhomes. Under the contract, Weis was required to obtain bids from subcontractors and material suppliers, and to submit the subcontractor names to Promenade for approval. In addition, ESG was to be the owner's representative during construction to ensure compliance with contract documents, including drawings, with the authority to prepare change orders and issue construction change directives. However, the contract also charged Weis with the responsibility for the means, methods, techniques, sequences and procedures of the construction.

The original plans specified the waterproofing system would be 'design-build' by Weis. However, Promenade expected ESG would ensure the design-build aspects of the project would tie into the entire project. ESG had the final call as to the coordination of the waterproofing design with the remainder of the design. During the course of construction, many documents concerning design-build components (e.g., the waterproofing system and the drainage system) were sent to ESG. In turn, ESG provided instruction regarding such issues as the use of metal flashing for the termination of the waterproofing on the concrete plaza walls and how to waterproof the support posts for the courtyard stoops.

To carry out the construction of the courtyards, Weis entered into a subcontractor agreement with J-Berd Mechanical, Inc. ("J-Berd") for the mechanical work at Promenade on October 16, 1996. J-Berd agreed to provide HVAC, plumbing, irrigation system, plaza drainage system, vents, and other mechanical work. J-Berd also agreed to design and install a complete plaza drain system and connect it to the nearest outside storm drain. J-Berd agreed Weis and ESG would only review shop drawings for informational purposes and J-Berd would be responsible for all dimensional specifications, technical specifications and coordination with the architectural, structural, and electrical drawings.

Weis also entered into a subcontractor agreement with Waterproofing by Experts ("WBE") for waterproofing services in the plaza area on March 10, 1997. WBE's subcontract was also design-build with respect to the construction of the waterproofing system. The contract required WBE to install a

"water-tight system" which would be installed to meet the manufacturer's recommendations and details.

ESG was responsible for ensuring that the design-build aspects of the project tied into the entire project. In practice, Weis submitted RFI's to ESG who would then respond with the necessary instructions. This was the practice even for design-build portions of the project. For example, ESG provided a drawing for the drainage in the plaza catch basin and information on installing a drain tile system. On another occasion, ESG instructed Weis to install drain tile above the precast plank and plastic tubing in the plaza in order to address seasonal weather changes in the ramp area between buildings one and two.

The precast deck was within the scope of ESG's work and a part of the original architectural design. The decision of whether to add a topping layer onto the precast deck (to create positive-sloped drainage for the courtyards) was to be considered by ESG during the design development phase of the project.

The original design of the slopes and sidewalks of the courtyards were drawn by McCombs Frank Roos, the civil engineers on this project. However, Feges provided slope elevations for the ramps and determined the grade in the plazas. Feges was also involved in determining the correct level for the waterproofing and instructed Weis how high to place the dirt in the plazas, which resulted in dirt over the top of the waterproofing.

As originally designed, wood framing for the walls of the building were to be located above grade, but after a construction modification to use a top cord bearing truss rather than a bottom cord bearing truss, the wood framing dropped below grade by over four inches. Hanuschak, an ESG subcontractor, designed this truss change and in his design detail, he wrote that new waterproofing detail was needed because dirt would now be above the waterproofing. Unfortunately, neither Hanuschak, Feges or anyone else at ESG communicated this change to Weis or any other subcontractor. WBE was unaware of this truss change as it did not receive any updated plans after July, 1996 and first learned of this change in 1998.

WBE understood that Weis would ensure that counterflashing was installed behind the siding, but it was discovered in July 1997 that Weis failed to counterflash along the vertical walls. During repairs, WBE corrected this by applying counterflashing.

Because of the changes to the grade, slope of the plazas and the trusses, the level of finished grade was approximately 6 to 8 inches higher than the top edge of the waterproofing at the vertical walls of the courtyards; such that water could go over the top of the waterproofing and move through the vertical walls without ever coming in contact with the waterproofing.

Later, after leaking was discovered, repairs were made by excavating the dirt and extending the waterproofing to grade level using a waterproofing product known as Mira-Dry (commonly referred to as "Peel n' Stick"). After this correction was made between the stoops, it was discovered that waterproofing also did not extend behind the concrete stoops and was allowing leaks. So, at each stoop, Weis removed the concrete to expose the vertical wall; WBE then applied Mira-Dry over the top edge of the original Swelltite3000 and extended it up to the stoop unit entrances; and Weis poured new concrete stoops.

The original design for the Promenade called for concrete block piers to be used as support for the canopy roofs of the stoops. But Promenade decided to switch to wooden posts. When the posts were originally installed, Weis anchored the posts to the concrete deck with a metal bracket that was secured by nails shot directly into the precast deck and then applied six inches of a black liquid mastic up the post. This was done at the instruction of Feges. Because only six inches of liquid mastic was applied, water could seep into the wooden posts from above and travel through the post to the precast below. In addition, because many of the nails shot into the precast reached the precast's hollow core, there were gaping holes for water to penetrate into the precast.

The drainage system was also a problem. Originally, the design for the plaza drain system called for the use of a Zurn drain. Later, J-Berd decided to use a Sioux Chief Fat Max drain, and installed it in the precast deck. The decision to use this drain was approved by Weis. Because the new drain was higher, the

tops of the drains were two inches higher than the floor of the precast deck. This meant standing water up to two inches would remain on the waterproofing membrane at all times.

Originally, no outdoor gutters were installed at Promenade, even though the owners originally believed they were necessary. Because there were no gutters, rainwater from the rooftops washed directly into the plaza areas.

**I.**

**DESIGN AND CONSTRUCTION ERRORS CAUSED THE LEAKING AT THE PROMENADE; NOT CHRIS CRAFT'S POLYVINYL ALCOHOL FILM.**

Under Minnesota law, the plaintiff must prove that there is causation as to each defendant where theories of product liability are involved. *Souder v. Owens-Corning Fiberglas Corp.*, 939 F.2d 647 (8th Cir. 1991). Minnesota law also requires the injured party to prove a causal link between the damages sustained and the alleged product defect. *Moe v. MTD Products, Inc.*, 73 F.3d 179, 183 (8th Cir. 1995) (citing *Bilotta*, 346 N.W.2d at 623, n. 3). "A mere possibility of causation is not enough." *Nguyen v. Control Data Corp.*, 401 N.W.2d 101, 105 (Minn. App. 1987).

Failure to prove the essential element of causation is fatal. An injured party must prove that a defective product was the proximate cause of the plaintiff's harm. *McCormick v. Custom Pools, Inc.*, 376 N.W.2d 471, 475 (Minn. App. 1995) (Citing *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 623, n. 3 (Minn. 1984) (emphasis added).

There is no evidence of any causal link between the PVOH film and the property damage to the Promenade. No expert has provided a fact-based theory that the film caused any specific water leaks. David Campbell has only an untested theory that water leaked through the seams of the Swelltite 3000 because he found a few areas where the film had not dissolved. However, Campbell found no seams in the many destructive test openings he made. Another expert, who did discover seams, found all the seams were watertight. Campbell's theories are almost entirely uncorroborated by the facts.

All other experts who claim the theory that defective film caused water leaks base their theories on

Campbell's report. Thus, because Campbell's theories are faulty, the rest of the experts who relied on them, are faulty as well.

While there is no evidence allegedly defective film caused leaks, there is overwhelming evidence of alternative sources of leaks due to poor design, construction and/or installation.

**A. ESG's Design Errors.**

An architect has both contractual duties and professional duties to a client. The contractual duties arise out of the agreement amongst the parties; and the professional fiduciary duties arise because an architect is rendering professional services and "is under a duty to the person for whom the service is performed to exercise such care, skill, and diligence as men in that profession exercise under like circumstances." *Moundsview Indp. Sch. Dist. No. 621 v. Beutow & Assoc., Inc.*, 253 N.W.2d 836, 839 (Minn. 1977). Regardless of whether a claim arises out of tort or breach of contract, an architect is required to "perform the services for which they were engaged in good faith and with reasonable care and competence and would be liable for damages occasioned by a failure to do so." *Kostohryz v. McGuire*, 212 N.W.2d 850, 854 (Minn. 1973). In an early Minnesota Supreme Court case, the Court explained that, when a professional engineer takes on a contractual duty to inspect and supervise construction, he or she must exercise reasonable care to see construction is performed properly, even though a contractual clause does not make the professional an insurer of the contractor. *Crowles v. City of Mpls.*, 151 N.W. 184, 185 (Minn. 1915).

Here, ESG had both contractual and professional duties to the owner, the general contractor and the subcontractors. ESG had a contractual duty to provide instructions for the integration of the design-build portions of the project into the overall design of the project.

Further, if a person voluntarily assumes a duty, that person must act with ordinary, reasonable care under the circumstances. *Isler v. Burman*, 232 N.W.2d 818, 822 (Minn. 1975). Liability for damages arises if there is reasonable reliance by another, as the reliance causes the other person to refrain from

taking a different course of action. *Williams v. Harris*, 518 N.W.2d 864, 868 (Minn. App. 1994).

Here, ESG took on duties additional to its basic contractual and professional duties to update and supply drawings and instructions to the general contractor and Weis. Weis repeatedly asked Feges for the grading plan, which was delayed. While it was delayed, Feges gave oral instructions. ESG took on duties outside of its contract when Feges provided instructions of design-build areas that were not originally within their design requirements. For example, WBE, not ESG, was responsible for designing the waterproofing system in the plaza, but Feges nevertheless took on the responsibility of providing instructions on how to waterproof the wooden posts in the plaza. Feges was also responsible for ensuring that the design-build portions were not hazardous to the overall building design.

Feges was on-site daily for many months during construction. While he was on site, he received many RFI's concerning design-build portions of the project. Feges instructed the level at which the waterproofing should terminate on the vertical walls and then instructed the level of grade over the waterproofing. He provided instructions on waterproofing the wooden posts. He recommended metal flashing for waterproofing. Feges also drew a drainage tile system for the plaza. He determined the grade and slope of the plaza area.

Weis and the subcontractors relied on Feges' field instructions. The evidence of this reliance is overwhelming. There are an inordinate number of RFI's to Feges demonstrating that the contractor and subcontractors looked to Feges for answers to general design questions and design-build questions. Feges repeatedly (even if belatedly), answered these RFI's. Weis and the subcontractors repeatedly followed Feges' directions.

**B. Lack of Slope.**

ESG was responsible for the design of the precast, which had no slope to allow for positive water drainage. This faulty decision resulted in flat waterproofing, such that no water would flow to drains at the precast level. This put an added burden on the waterproofing.

J-Berd installed a different kind of drain in the precast (the Sioux Chief "Fat Max") than originally specified. The new drains were raised two inches up off the precast floor, making it impossible for the last two inches of water to flow into the drain.

This combination of no slope to drain and two inches of standing water on the waterproofing has placed a strain on the waterproofing system.

**C. Failure to Install Gutters.**

At the request of Promenade, no gutters were installed. Thus, all water run-off from the roof, fell directly into the courtyards.

**D. Erroneous Elevation of Grade in Plazas.**

ESG failed to allocate the proper elevation for finished grade in the plazas. The result was a grade level six to eight inches higher than the termination of the waterproofing. This error meant ground water was able to flow continuously from the ground into the wooden walls. The water was able to travel down through the courtyard walls without ever coming in contact with the waterproofing.

In addition, because there was no waterproofing directly behind the stoops of each unit, water was free to enter behind the stoops themselves and travel down through the walls without ever coming in contact with the waterproofing.

**E. Stoop Posts.**

ESG poorly designed the pillars or posts that supported each canopy over the stoops. These posts were untreated wood and extended from the canopy through the ground and rested on the precast deck. When Weis installed the posts, they anchored the posts to the concrete deck with metal brackets and nails shot into the precast deck. WBE then applied black liquid waterproofing mastic only six inches up the post. This design was provided by Feges. The result of this combination was to allow a large section of untreated wood to sit in the dirt and to rest directly on top of the precast deck. Because the posts were in place before the waterproofing membrane, there was no Swelltite 3000 under each post. This error

allowed ground water to travel freely through the post and to the concrete deck without ever coming in contact with any waterproofing membrane.

**II.**

**CHRIS CRAFT'S POLYVINYL ALCOHOL FILM IS NOT DEFECTIVE.**

Opponents have claimed liability against Chris Craft based upon strict liability, negligence, and breach of the implied warranty of merchantability. Minnesota Courts have held that strict liability, negligence and breach of the implied warranty of merchantability merge into a single product liability theory because they are so closely related and involve similar proof. *See Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 623 (Minn. 1984) (stating the proposition that negligence, strict liability and implied warranty of merchantability merge into one product-liability theory). As addressed below, Chris Craft is not liable under any theory.

There are three components to a general product liability theory: (1) the product was in a defective condition unreasonably dangerous to the user; (2) the defect existed when the product left the manufacturer and (3) the defect proximately caused the plaintiff's personal or property injury. *Westbrock v. Marshalltown Mfg. Co.*, 473 N.W.2d 352, 356 (Minn. App. 1991) (citing *Bilotta v. Kelley Co., Inc*, 346 N.W.2d 616, 623 (Minn. 1984)); *Farr v. Armstrong Rubber Co.*, 179 N.W.2d 64, 68 (Minn. 1970).

Chris Craft is a supplier of an inherently safe component part. It is well established that suppliers of inherently safe component parts "are not responsible for accidents that result when the parts are integrated into a larger system that the component part supplier did not design or build." *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Lit.*, 97 F.3d 1050, 1055 (8th Cir. 1996). For the component part supplier to be liable, the complainant must present evidence the defect was in the component part, not the final product. *Id*. at 1056.

A component product is defective when it has a propensity to cause harm beyond what could be contemplated by a foreseeable ordinary user or consumer. *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380,

(Minn. App. 2004). Merely because the product could cause damage, it is not defective. Where the component is an inherently safe material, and the final assembly is what makes the product dangerous, the component part supplier is not liable. *In re TMJ*, 97 F.3d at 1057.

Further, the injured party must show the component product was defective when it left the manufacturer's control. *Billota v. Kelley Co.,* 346 N.W.2d 616, 623 n.3 (Minn. 1984).

Here, the PVOH film manufactured by Chris Craft is an inherently safe raw material used in a variety of capacities, mostly for packaging. It is a chemically inert material and its solubility characteristics are predetermined by the laws of chemistry. Since its development in 1961, there has been no change to its chemical formulation. It was CETCO's decision to use the film on Swelltite 3000; it was CETCO that was in the business of developing waterproofing products; it was CETCO that incorporated the film into its finished product; it was CETCO that designed Swelltite 3000; it was CETCO that tested the film on its waterproofing membrane; and it was CETCO that patented the product.

Not one expert witness has been able to provide any evidence the film did not work. Moreover, the evidence indicates the film did work. For example, the film always dissolved in CETCO's tests. Also, the film dissolved at the Promenade site at eighty percent of the locations Campbell examined. Gary Nelson, who was commissioned by Weis to track leaks, never found activated bentonite with any undissolved film remaining.

Where the film samples did not dissolve, there is no evidence enough water came in contact with the film such that it should have dissolved. Though Campbell has hypothesized the film "cross-linked," there is absolutely no evidence to support the idea since neither he nor anyone else ever conducted any tests on the component product.

Consequently, the alternative explanation that insufficient amounts of water ever reached the few remaining areas of undissolved film has never been ruled out. The burden is on opposing parties to present evidence contrary to this theory and no party has done so.

## III.

## PROMENADE'S DAMAGES ARE LIMITED TO THE COST OF REPAIR OR THE DIMINISHED VALUE OF THE PROPERTY, WHICHEVER IS LESS.

If the jury should find Promenade has sustained any damage to its property as a result of water intrusion, then Promenade's recovery is limited to the lesser of the cost of repair or the diminished value of the property before and after the harm.

When property is not destroyed beyond repair, the measure of damages is the either the difference in value before and after the loss or the cost of restoration, whichever is less. *See In re Commodore Hotel Fire & Explosion Cases*, 324 N.W.2d 245, 248 (Minn. 1982); *Rinkel v. Lee's Plumbing & Heating Co.*, 257 Minn. 14, 99 N.W.2d 779, 783 (1959). Damages are limited to the lesser of diminution in value or cost of repair or restoration to the original condition; the property owner is not entitled to costs of repair that result in a betterment. *Id. See also O'Connor v. Schwartz*, 304 Minn. 155, 229 N.W.2d 511, 158 (1975). This general measure of damages applies in cases arising out of the negligent breach of a construction contract:

> The preferred measure of damage in a case such as this [i.e., a construction defect case] is to take either the cost of reconstruction in accordance with the contract, if this is possible without unreasonable economic waste, or the difference in value of the building as contracted for and the value as actually built, if reconstruction would constitute economic waste.

*See Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.*, 297 Minn. 118, 211 N.W.2d 159, 165 (1973).

Instruction 92.10 from the Minnesota Jury Instruction Guides sets forth the alternative measure of damages set forth in the *In re Commodore Hotel Fire* and *Northern Petrochemical* cases, but does not advise the jury that damages are the lesser of either diminution in value or cost of repair.

The federal pattern instruction, §129.01, makes clear only the lesser of the two damages may be awarded, but does not advise the jury regarding betterment. Westfield's proposed instruction combines the

relevant provisions of CIVJIG 92.10 with the federal instruction. It fully and adequately states Minnesota's law regarding damage to real property and should, therefore, be given to the jury in this case.

Respectfully submitted,

**BROWN & CARLSON, PA**

By: s/G. John Veith
G. John Veith (#241519)
Samuel J. Glover (#327852)
5411 Circle Down Avenue
Suite 100
Minneapolis, MN 55416
763.591.9950

*Counsel for Fourth Party Defendant*
*Chris Craft Industrial Products, Inc.*

Dated: September 2, 2004.