POPE
ASSOCIATES

April 20, 2001

Architects
Interior Designers

Jocelyn L. Knoll
Fabyanske, Westra & Hart
Suite 1100
920 Second Avenue South
Minneapolis, Minnesota 55402

Re: **Westfield Insurance Company v. Weis Builders, Inc. et al.**
**Your File No.: 70426-018**
**Court File No.: 00-CV-987 PAM/JGL**
**Our File No.: 21181-01015**

Dear Ms. Knoll:

The Promenade Townhouses Project in Eagan, Minnesota has experienced significant water leakage problems. Specifically, as regards my involvement with this matter, these water leakage problems have arisen at the interface between building courtyards and the exterior walls of the adjacent residential units. You requested that I review available documents pertinent to the project, with a view toward determining, to the best of my knowledge, information and belief, the cause of the leakage.

## DATA AND INFORMATION REVIEWED

In order to assist me in my work you provided me with several documents and other information for review. Among these are the following:

- Correspondence, meeting notes, construction records, etc. from the files of Weis Builders, Inc. that were made available to me at your offices.
- Undated architectural drawings for the project prepared by BRW Elness Architects, Inc.
- Project progress photographs, taken by Weis Builders, Inc. personnel.

DEPO. EXH. 37
BARBARA SCHWEGMAN
COURT REPORTER

1255 Energy Park Drive
St. Paul, MN 55108-5118
Phone: (651) 642-9200
Fax: (651) 642-1101

EXHIBIT A

In addition to my review of the above documents, I also had telephone conversations with Peter Desai and Les Lawson of Weis Builders, Inc., and Steve Messerich of Waterproofing by Experts, Inc., regarding background matters pertinent to the issues here.

In addition to the project-specific data described above, I also reviewed pertinent editions of the Minnesota State Building Code ("SBC"), including Chapter 1340 (Accessibility Code) (1985, 1990 and 1995 editions), the Uniform Building Code ("UBC") (1988 and 1994 editions), and the 1992 edition of ANSI A117.1 ("ANSI Code"), the accessibility code adopted by reference by the Uniform Building Code.

## PROJECT DESCRIPTION

The Promenade project is comprised of six residential and one recreational building. It is my understanding that the water leakage has occurred only at the residential buildings.

Each of the residential buildings is constructed similarly: two or three levels of residential units adjacent to and/or above a one-story, underground parking garage. Units in the buildings are arranged in "wings" that are separated by an open space courtyard approximately 30' across. These courtyards serve as the entry court for most of the units in the building, and lie directly above the roof deck of the parking garage below. Unit entries are typically paired, shared entry stoops for adjacent units. Except for the few units on the opposite side of the building wings, the courtyards are the only means by which visitors can visit individual units. The Building residents also enter their specific units via the courtyards, or via shared stairways leading directly from the parking garages up to a common hallway with separate entries into individual units.

The grade level in the center of the courtyards was designed to be approximately 8"-12" below the entry level of the units facing the courtyard. The top of the poured-in-place concrete stoop serving each entry (or combined entry) was designed to be at the first floor level of the units.

The top of the garage roof deck (precast concrete planks) was designed to be approximately 24" below courtyard grade level. This roof deck was to be protected by a waterproofing membrane that provided a complete horizontal waterproof membrane at the deck and that then turned up vertically at the concrete masonry units that provided the underground foundation wall for the building's wood-framed exterior walls.

The Project's developer was Healey-Ramme Company ("HRC"). The architect was BRW Elness Architects Inc. ("BRW/E"). The general contractor for the project was Weis Builders, Inc. ("Weis") The subcontractor that installed the waterproofing was Waterproofing by Experts, Inc. ("WBE").

Prior to the project's being bid, HRC determined that they preferred that the waterproofing of the garage deck be done on a design/build basis. As a result, BRW/E's construction documents paid little, if any, attention to the deck's waterproofing.

As was directed in the bidding documents, Weis' bid proposal for the project included an allowance for waterproofing the deck. Competing subcontractors made several submissions for waterproofing design. These submissions were reviewed HRC, BRW/E and Weis. WBE's submission was selected and WBE's contract for the work was then assigned to Weis.

## THE ONSET OF THE WATER LEAKAGE PROBLEM

As best as I am presently able to determine, the project was constructed in general accordance with the design documents. According to Weis personnel, during the construction process the drawings were found to be lacking in many respects, including accurate dimensioning and grades, and inadequate and/or inaccurate detailing. Again according to Weis personnel, their repeated "Requests for Information" ("RFI's") frequently met with no response.

As best as can be presently determined, WBE installed the waterproofing (a betonite-based product called "Volclay") in accordance with the manufacturer's installation procedures. As a part of their subcontract a manufacturer's representative was to be present during the installation in order to insure proper installation. Whether that was the case or not, I have seen no information that would indicate anything other than that the material was correctly installed. The architectural drawings indicated a level to which the waterproofing was to be installed on the vertical face of the masonry. According to the information reviewed, including the photographs, the waterproofing appeared to have been installed at the called-for level.

The buildings were constructed consecutively, in reverse order, beginning with Building #6. The courtyard at Building #6 was at grade, with its entry stoops poured, in April, 1997. A month or two later, the City's Building Inspector visited the site and directed that the courtyard's sidewalks needed to be raised in order to comply with accessibility requirements – the architect's design had indicated that there would be a step up from the sidewalk to the entry stoop. This step was, and is, not acceptable as a part of an accessible entrance to a building.

In lieu of the step up, the sidewalk would need to be sloped, at a maximum rate of 1:20, to meet the elevation of the stoop.

In order to accommodate the City's directive, in August, 1997 the grade in all of the courtyards was raised approximately 8". The raising of the grade created several new issues: the planned-for drainage slope within the courtyards was almost totally eliminated; the vinyl siding on the unit exterior walls was now below grade, as were the sheathing and studs of the wood-framed exterior wall; and the waterproofing now terminated approximately 8" below grade, not at grade, as had been the case previously.

Water leakage into the units apparently began shortly after the grades were raised. It was at this point in time that it was determined that the waterproofing needed to be raised in order to accommodate the new courtyard grade level. Weis excavated around the perimeter of the courtyards (except at the stoops) and WBE extended their waterproofing membrane vertically to grade level, which now meant extending the waterproofing membrane upward onto the exterior wall's sheathing. The grades were then returned to their appropriate levels.

However, continuing water leakage was observed, apparently arising out of the area directly between the entry stoops and the exterior walls of the units, where the waterproofing had not been extended upward. It is my understanding that this additional leakage has now been repaired and the leakage has stopped almost completely.

## ANALYSIS AND CONCLUSIONS

In my professional opinion, the City's inspector acted correctly in requiring that the unit entries be accessible. Based upon my research into the State's accessibility requirements, entries such as these would have been required to be accessible since at least 1985 and, arguably (depending upon interpretation), even before that. There is no question at all, that Chapter 1340 of both the 1990 and 1995 SBC required they be accessible. The 1994 edition of the UBC also required the entries be accessible, as also did the ANSI Code. The architect, BRW/E should have been aware of these requirements and designed the courtyards accordingly.

The early 1990's were a period when accessibility rules, codes and civil rights laws were very much in the forefront for the design professions. Beginning with the Americans With Disabilities Act, which required design compliance no later than January 26, 1993, the A.I.A., as well as national and state code agencies and other interested parties, held highly publicized seminars to help architects understand and deal with the many new accessibility design standards. Although

Minnesota had had its own accessibility code for many years, new emphasis was put on its requirements. It would have been almost impossible not to have known about accessibility requirements.

In addition, on page 3 of a letter dated November 15, 1996, from Accessible Building Consultants (ABC) to KKE Architects, Inc., regarding this project, ABC states: *"To promote the ability of community residents to interact, all courtyard-level unit entries should provide access to a level of each unit. This requires step-less access from the courtyard and lever-handle hardware."* The purpose of ABC's review was, according to ABC, *"...This review was to verify that the completed project will meet relevant accessibility regulations."* The two primary regulations against which the construction documents were compared were *"the Fair Housing Amendments Act of 1988 and the 1996 Minnesota Building Code Requirements for accessibility (MN 1340.)"* ABC's letter was forwarded to John Fegis of BRW/E on November 19, 1996, by Kermit Duncan of KKE Architects, Inc.

Thus, in November 1996, long before any grading or significant construction was started, BRW/E was made aware of a design problem in the courtyards. They apparently did nothing about it. There is no record of BRW/E having done anything in relation to the ABC letter or, for that matter, in relation to the Building Inspector's requirements several months later.

BRW/E's failure to design in accordance with the SBC's accessibility requirements is, in my professional opinion, directly causal to the water leakage as well as other significant issues:

- In its simplest form, the raising of the grade by 8" caused the grade to be above the top of the installed waterproofing. Thus any water lying against the exterior wall and above the waterproofing, had the direct ability to penetrate the exterior wall. This would be true for any water – that water which came off of the roof, that which struck the siding and ran down the wall, or that which was not able to drain toward the courtyard's field drains. Had the architect's design been in compliance with accessibility design requirements, the construction documents would have reflected the appropriate courtyard grade level and, relatedly, the appropriate level for the top of the waterproofing.

- Once having received the City's requirement, BRW/E should have responded with a revised courtyard design. BRW/E was the architect of record for the project and is the one responsible for the buildings' compliance with all code requirements.

April 20, 2001
Ms. Jocelyn Knoll
Promenade Townhouses
Page -6-

- Raising the grade to a point above the level of the top of the masonry foundation wall caused some of the wood frame construction to be at or below grade level. This also is in violation of the building code (1994 UBC, Section 2317). The fact that WBE returned to the site and raised the waterproofing level to include a portion of the sheathing somewhat mitigates the code violation, but that would be a matter for the City to decide. Since they were aware of the repairs made, it is assumed that the City has accepted these conditions. In any event, in my opinion, as the project architect, BRW/E should have provided instruction with regard to this apparent code violation and should have taken the lead in resolving this matter with the City.

- The increased height of the grade and the maximum sidewalk slope requirement of 1:20 combined to create a significant drainage issue. According to Weis personnel, grade in the courtyards is now almost dead level, with very little, if any, positive drainage characteristics. As a result of the lack of positive drainage, standing water is a recurring problem in the courtyards. As a rule of thumb, a gradient of 2% is the typical minimum acceptable slope in unpaved conditions such as the courtyards. Once the grade in the courtyards was raised, there was no hope in being able to achieve that kind of slope and still be in compliance with all aspects of the building code.

- Since Weis apparently constructed the courtyards and adjacent buildings in accordance with BRW/E's design drawings, once the City's requirements were known, the entire matter should have been resolved by BRW/E. The solution called for a re-thinking and a re-design of the courtyards based upon the professional expertise of the architect. Since it was the architect's design that was not in compliance with code requirements, in my opinion it was the architect's responsibility to resolve the code compliance issues to the City's satisfaction. I have found no evidence that BRW/E assisted in the resolution process.

- In my opinion, Weis was caused to expend considerable expense in their attempt to resolve the water leakage issue, an issue that was caused by the architect's failure to design in accordance with the building code's accessibility requirements. Had the buildings originally been designed in compliance with those requirements the reasons for the water leakage would never have arisen.

April 20, 2001
Ms. Jocelyn Knoll
Promenade Townhouses
Page -7-

We trust the above report satisfactorily responds to your request that we review this matter. Please advise if you have any questions or require additional information.

Very truly yours,

POPE ASSOCIATES INC.

Marshall M. Levin, A.I.A.
Director of Architecture

Encl.
1) Part 1340.02000, 1990 Minnesota State Building Code
2) Part 1340.1103, 1996 Minnesota State Building Code
3) Sections 1101, 1102 and 1103, 1994 Uniform Building Code (Adopted by reference as the Minnesota State Building Code on March 20, 1995)
4) Sections 4.1 through 4.3, CABO/ANSI A117.1-1992
5) Accessible Building Consultants Letter to KKE Architects, Inc., dated 15 November 1996
6) Section 2317, 1994 Uniform Building Code
7) Personal Resume, Marshall M. Levin, A.I.A.

F:\USERS\MARSHALL\21151\01015\042001rpt.doc