# (UPDATED REPORT) EVALUATION OF COURTYARD WATERPROOFING

PROMENADE VILLAGE TOWNHOUSES
HEALEY-RAMME COMPANY
EGAN, MINNESOTA

**Prepared For:**

Mr. Mark S. Brown of Iverson Reuvers, L.L.C.,
Mr. Patrick D. Reilly of Erstad & Riemer, P.A., and
Mr. G. John Veith of Brown & Carlson, P.A.

RRJ 02038

**Prepared By:**

Raths, Raths & Johnson, Inc.
Structural/Architectural Engineers
835 Midway Drive
Willowbrook, Illinois 60527-5591
630/325-6160
www.rrj.com

August 15, 2003

10-14-03 DEPO. EXH. 829
Kudder
BARBARA SCHWEGMAN
COURT REPORTER

Blumberg No. 5208
EXHIBIT
B

# TABLE OF CONTENTS


PAGE

INTRODUCTION .......... 1
Documents Reviewed .......... 2
RRJ Activities and Investigative Program .......... 3

RELEVANT PROJECT HISTORY AND FEATURES .......... 4

OBSERVED CONDITIONS .......... 7
Test Pits, August 2002 .......... 8

SUBCONTRACT BETWEEN WBI AND WBE .......... 10

EVALUATION .......... 12
Repairs .......... 12

SUMMARY .......... 13

APPENDED
Photographs P1 Through P23

# (UPDATED REPORT)
# EVALUATION OF COURTYARD WATERPROOFING
# PROMENADE VILLAGE TOWNHOUSES
# HEALEY-RAMME COMPANY
# EAGAN, MINNESOTA

## INTRODUCTION

At the request of Mr. Mark S. Brown of Iverson Reuvers, L.L.C. (previously of Murname, Colin, White & Brandt), Mr. Patrick D. Reilly of Erstad & Riemer, P. A., and Mr. G. John Veith of Brown & Carlson, P. A., the architectural and structural engineering firm of Raths, Raths & Johnson, Inc. (RRJ) performed an evaluation of reported leakage problems, courtyard design and construction features relevant to the reported leakage problems at the Promenade Village Townhouses in Eagan, Minnesota. Mr. Brown initially contacted RRJ on March 11, 2002. This report updates and supercedes an RRJ report dated September 23, 2002, and presents findings to date. As with the previous report, this report may be supplemented as additional information or investigative findings become available.

The project was designed in 1996 by BRW Elness Architects (BRW) of Minneapolis, Minnesota for Healey-Ramme (Owners), and constructed by Weis Builders, Inc. (WBI) of Minneapolis, Minnesota. BRW was renamed Elness, Swenson, Graham Architects, Inc. (ESG). Structural engineering was provided by Hanuschak-Kowalchuk (H-K) of Winnipeg, Manitoba, Canada. The courtyard waterproofing subcontractor was Waterproofing By Experts (WBE) of Lino Lakes, Minnesota.

The Promenade Village Townhouses consist of a series of linear residential blocks in pairs that are separated by landscaped courtyards, as shown in Photo P1. On one side of the courtyard, the units have one story below the level of the courtyard. On the other side, the first story of the unit is above a parking garage and partially below grade. The garage also extends under the courtyard. The structure of the courtyard consists of precast concrete structural framing and precast prestressed concrete hollow core planks. The units themselves are framed with dimension lumber, with prefabricated wood floor trusses, and are clad with

gypsum sheathing and vinyl siding. The roofs are sloped and shingled, and were designed without gutters. At selected locations, sheet metal diverters, installed after construction was completed and water issues began, direct rain runoff away from sidewalks, but it still discharges directly onto the courtyard.

The Property Manager has issued various "leak reports" in various versions. However, leakage into the garages and some units was immediately evident following a heavy rainfall in the summer of 1997, and repair work was undertaken, which proved only partially effective. Other courtyard concerns and problems expressed during the original construction and reported by original parties to the construction and by previous investigators included heaving of the sidewalks, lack of surface drainage, concerns about the density and properties of the fill soil compared to those assumed by the structural engineer, concerns about hydrostatic pressures from freezing of trapped water, and deficient design documents particularly the absence of site and courtyard grading drawings. The original design details and modifications to the original details that caused the leaks, the repairs undertaken, and the repairs not undertaken, are discussed later in this report.

**Documents Reviewed**

RRJ was provided with copies of a large number of documents from the original construction, reports prepared previously by other investigators, and transcripts of depositions and correspondence related to litigation in this matter. The documents reviewed in detail, which are judged relevant to the physical aspects of the leaks and the courtyard waterproofing, were reviewed for the RRJ September 23, 2002 report, and are as follows:

1. BRW Elness (ESG) drawing dated August 19, 1996.
2. Section 07110 - Waterproofing, from the Project Specifications by BRW Elness (ESG).
3. Various leak reports compiled by the Property Manager.
4. Report dated May 1, 2002, by Inspec, Inc. (II).
5. Product literature and Spec Data sheets for Volclay Products by American Colloid Company, 1994.
6. Fax dated November 11, 1996, from John Feges with Drawing SK2.
7. RFI Number 37 dated December 13, 1997.
8. Standard Subcontractor Agreement dated February 20, 1997, between Weis Builders, Inc. (WBI) and Waterproofing By Experts (WBE).
9. Report dated May 30, 2002, by Pope Associates, Inc. (PAI).
10. Report dated May 31, 2002, by Wiss, Janney Elstner Associates (WJE).

11. Color photos taken during original construction (32 total).
12. Fax dated April 29, 1997, from Bill Hanuschak of H-K to John Ferges of ESG.
13. Preliminary verbal communications with Mr. Drew Ptak of Patrick Engineering, Inc. Their involvement is described below.
14. Report dated April 20, 2001, by Pope Associates, Inc.
15. Letter dated June 11, 1998, from John Feges of ESG to Peter Ramme (Owner).
16. An unsigned letter dated October 16, 1997, to Peter Ramme, apparently from ESG.

Additional documents made available since the September 23, 2002 report, which were reviewed for this updated report, include the following:

1. Deposition of Al Thoreen, given March 31, 2003.
2. Deposition of William Hanuschak, given May 2, 2003.
3. Deposition of Gary Nelson, given May 12, 2003.
4. Portions of Terry Weiderhoft deposition given June 2, 2003.
5. "Preliminary Report, Hydrologic Investigation of the Promenade Townhomes" by Patrick Engineering, dated September 27, 2002.

**RRJ Activities and Investigative Program**

As part of our evaluation, RRJ visited the site on June 17, 2002, for an escorted tour through the complex, the garages, and the interiors of several units. The tour was escorted by representatives of the Property Manager. The tour group consisted of representatives of other interested parties as well as RRJ, and the areas selected for inspection were determined by the Property Manager. As part of the tour, RRJ was also briefed on the objectives of the development and features that were considered unique in the market, some limited history of the construction and leakage, and some limited information about previous repairs. Many, but not all, of the relevant documents listed in the previous section were available to RRJ prior to the initial RRJ site visit on June 17, 2002.

The RRJ's investigative program was based on a preliminary assessment of the project documents and observations made during the initial site visit. The actual and specific in-place details of the original courtyard waterproofing and subsequent repairs were judged to be pertinent because of the following observations: (1) portions of the buildings, which would normally be well above grade, were actually below grade, contrary to good practice and code requirements; (2) cutting back of the entryway stoops to facilitate

wall modifications, as shown in Photo P2, was applied to only one side of the courtyard; (3) repairs to entryway support posts were selectively applied; (4) ambiguities in the design documents and the absence of a viable and properly designed subsurface drainage concept.

In addition, RRJ determined that the hydrological properties of the site were pertinent because of the following initial observations: (1) the unit roofs drained onto the courtyards without gutters and downspouts to take roof water directly from the roof into a drainage system, resulting in a drainage load much larger than the courtyard itself; (2) the apparent scarcity and high elevation of surface drains in the courtyards; (3) retrofit drainage tile, which appeared to be too high, too scarce, and essentially inadequate; (4) standing, undrained water reported previously, and saturated soil observed during the initial site visit; (5) the soil fill materials questioned during the original construction, but no evaluation and resolution were found in the project documents; (6) symptoms of frost heave damage to the courtyard sidewalks and concerns expressed during the original construction about frost heave and pressures from frozen soils on the building walls.

RRJ is qualified to address the waterproofing issues, and recommended that Mr. Brown also engage Patrick Engineering, Inc. (PEI) of Lisle, Illinois, to address the soils and hydrology issues. Both Mr. Brown and the writer briefed PEI on project particulars and preliminary findings. Mr. Brown provided relevant documents and RRJ, PEI and other interested parties visited the site on August 26, 27 and 28, 2002, for additional inspection pits and soils samples. A preliminary PEI report was being prepared simultaneously with RRJ's September 23, 2002 report, and has subsequently been provided to RRJ.

## RELEVANT PROJECT HISTORY AND FEATURES

The project drawings prepared by ESG contain numerous ambiguities, contradictions, missing information, and poor coordination between the architectural and structural aspects of the project. A thorough delineation of these problems is given in the PAI report dated May 30, 2002, and will not be repeated here. While no drawing set is expected to be perfect, deficiencies in the design documents are customarily corrected through a clarification process during construction. The shortcomings of the ESG drawings for this project are excessive. In addition, the requirements of the State of Minnesota Facilities for the Handicap (SMFH) requirements were not addressed in the original design, mandating changes that were poorly coordinated by ESG, and which had a direct impact on the functionality of the courtyard waterproofing. In order to comply with SMFH requirements at the entry door thresholds, it was reported to

RRJ that a decision was made to raise the entryway stoops and the grade next to the buildings. Apparently, the grade was raised on the order of 8 inches without a corresponding change in the original wall construction framing or kneewall elevations and details. As a consequence, the bottoms of wood-framed walls, sheathing, and siding ended up below grade. This is in violation of good construction practice and building code requirements.

The original drawings are ambiguous as to how the posts supporting the entryway roofs were to be founded. Sheet S1.7 and the sketch attached to an April 29, 1997 facsimile transmittal by H-K indicated that the posts were to be founded on concrete block piers, but the integration of the post piers with the precast concrete planks of the garage is unclear. In the actual construction, ESG apparently directed that the entryway wood posts be founded directly on the top surface of the courtyard precast concrete planks before the waterproofing was installed. Prefabricated commercial metal post bases, installed with powder-actuated nails (i.e., installed with a 22 caliber bullet casing and shot into the concrete), were used to secure the bottom of the wood posts. These commercial bases are not intended for subsurface applications, and the powder-actuated fasteners caused cracks and spalls in the precast planks. When the courtyard was subsequently waterproofed, ESG apparently directed that the bases of the posts be covered with a liquid-applied elastomeric membrane, directly on the submerged wood surfaces and the top of the deck waterproofing. The elastomeric membrane only covers a short six to ten-inch portion of the wood post, and the top of the elastomeric membrane is below grade. It was reported to RRJ that this change was motivated by weather and construction scheduling concerns. However, this change to the construction sequence and the post foundations is not trivial and its effects on other construction operations and the overall waterproofing concept were inadequately resolved by ESG.

The courtyard waterproofing consists of a composite bentonite clay panel called "Volclay Swelltite," with a geomembrane top liner and a water-soluble bottom film, manufactured by American Colloid Company, later known as Cetco Building Materials Group. Bentonite clay is a traditional waterproofing material that has the desirable properties of dimensional and chemical stability when dry and the ability to swell when wet. Before installing these panels, joints in the precast concrete deck were dressed with a trowel-applied mastic, and vertical surfaces where prepared with a liquid-applied adhesive primer. The trowel-applied mastic material was also used to create a cant between the knee wall supporting the wood-framed walls of the buildings and the courtyard deck. Joints between the Swelltite panels were sealed with a self-adhering seam tape. A plastic drainage board with a woven skin was then installed over the Swelltite panels, and both were covered with 2-inch thick extruded expanded polystyrene insulation board. The precast concrete plank deck is not sloped to drain, and the courtyard surface drains lack a deck-level inlet

to drain the membrane. The design of the courtyard resulted in two to three inches of undrainable water standing on the waterproofing at all times, or at least until its unlikely evaporation through the soil fill and landscaping. The courtyard waterproofing was installed to approximately 2 inches below the top of the concrete block knee walls, which is consistent with the original waterproofing contract and would have been comfortably above the original design grade before the SMFH changes were made. The top termination of the waterproofing system was flashed with a liquid-applied material. The use of bentonite waterproofing products and the details described above are consistent with the manufacturer's recommendations and the subcontract between WBI and WBE. The selection of a bentonite system was apparently dictated by the Owners based on their experience with a similar project.

Leakage was experienced from the beginning of the project. A repair program consisting of two aspects was undertaken. First, modifications to the waterproofing at the base of the wood-framed building walls were undertaken. Sections of siding were removed and a trench was excavated between stoops to expose the gypsum sheathing. A self-adhering membrane (MiraDri) was applied to the sheathing from approximately 12 inches above the wall sill plate, over the liquid-applied termination membrane on the upper portions of the concrete block wall, and lapped approximately two inches over the top of the knee wall waterproofing. On the side of the courtyards where the buildings have a lower level, the stoops were cut back so that the repair could be installed between the stoop and the wall, although it does not appear that the door frames and thresholds were removed during the repair process. On the other side of the courtyard, the stoops were not cut back and the repair simply terminates at the ends of each stoop.

Second, the bases of posts which were suspected of leaking were excavated, the liquid-applied elastomeric on the post base was removed, the bottom of the post was cut off, and a concrete block with waterproofing integrated with the deck waterproofing was installed. In other words, the construction was modified to more closely approximate the original design details to correct the deficiencies of the ESG directives. The original sheet metal base shoes for the wood posts were anchored using powder-actuated nails. During these repairs, WBI reported observing that at approximately half of the sixty post bases they exposed, the powder-actuated nails damaged the top shell of the precast concrete planks, thereby opening a water entry path. Apparently, the damage was not detected and the top shells were not repaired during the original construction. It is not clear to RRJ how an observed leak in the garage or in the interior was correlated to a particular post base, or how a particular post base was selected over any other post bases for this repair program. It is also not clear to RRJ if, or how any of the remaining leaks reported by the Owner might be related to unrepaired posts.

## OBSERVED CONDITIONS

During the walk-through tour on June 17, 2002, several observed conditions were indicative of past leaks, although very few were actually active at the time. Also observed, were attempts at prior topical repairs. In the garages below the courtyards, water streaks, rust staining, and mineral deposits indicative of leakage were observed, as shown in Photos P3 through P5. An expansive foam material was injected in some plank-to-plank and plank-to-beam joints from the underside, and sheet metal troughs (called "gutters" in the project documents) were installed to capture leaking water, as shown in Photos P 4 and P5. Similar troughs were installed in corridor spaces, as shown in Photo P6.

Other areas exhibiting symptoms of water leakage were the endwalls and stairways adjacent to the courtyards. For example, Photo P7 shows a stairway and elevator access area in which the decorative concrete block surfaces were damp and stained with efflorescence deposits from chronic leakage. The hidden, non-decorative, concrete block surfaces in stairwells were heavily stained by efflorescence deposits, as shown in Photo P8. The coping on the tops of the concrete block walls and the stairs are dressed stone, but RRJ did not observe any flashing projecting from under the coping stones or drip grooves in the bottom edge of the coping stones. Photo P9 shows the underside of a typical coping stone. There did not appear to be a functioning weep and flashing system in the concrete block walls. The interface between the stairwell walls and the adjacent walls had wide gaps that appear to have been repeatedly, but unsuccessfully, sealed with elastomeric sealant, as shown in Photo P10. All of the observed conditions indicate potential water entry and leakage paths, which are independent of the courtyard waterproofing.

To the east of Building Number1, it was reported to RRJ that the original design and construction had to be modified to create a "link" to accommodate emergency vehicles. The "link" has high operable garage doors, as shown in Photo P11, and the top surface has a concrete patio and SMFH compliant ramps, as shown in Photo P12. Apparently, the ramps had to be demolished and rebuilt to achieve that compliance. RRJ has not received clear and thorough documentation on this "link." At this time, RRJ is not certain what the waterproofing configuration is except for verbal reports that it is different from the typical courtyard, was constructed out of sequence, and may not have waterproofing at all. It is interesting to note that this area, which is directly above the garage conditions described earlier in Photo P5, is one of the worst areas in the garage. A more thorough assessment of this area can be undertaken when the Owner provides complete design and construction documentation.

Unit Number 115 in Building Number3 is one of the unique units in the complex. It occupies a space which in other buildings is occupied by the garage. The interior of Unit Number115 had a variety of symptoms of water leakage, one example of which is shown in Photo P14. This unit is under an endwall with coping that lacks flashing and drip grooves. It has a masonry wall that lacks a functioning top-of-wall or window-head flashing systems, has various penetrations, and is under a courtyard with a grade higher than originally designed. Any of the features mentioned above, alone or in combination with courtyard waterproofing features, can account for the observed leakage. RRJ accepts that water has been observed to infiltrate through the precast concrete courtyard planks. Chronic leakage has been experienced in this unit since early in the project history. A memo dated May 26, 1999, by Mr. Terry Weiderhoft addressed to Mr. Tom Healey, Mr. Peter Ramme and Mr. John Feges, describes attempts to diagnosing leaks in this unit between April 26, 1999 and May 19, 1999. The diagnosis was performed by Mr. Gary Nelson of Weis Builders, as described in the depositions of both Mr. Weiderhoft and Mr. Nelson. A hose was used to investigate several potential leakage paths. Spraying areas of the wall, including exposed areas of the courtyard endwall, quickly produced leaks on the interior. Flooding the plaza above the unit for seven hours did not produce any leaks. Attributing leakage in Unit Number115 to the courtyard waterproofing has not been substantiated by a systematic and thorough diagnosis of the water entry paths into and onto the planks, or water entry paths related to the exterior walls of the unit and the endwalls of the courtyard. An investigation consistent with good engineering methodology is required to properly evaluate this area, and until such a program is undertaken by the Owner, no further evaluation is possible.

**Test Pits, August 2002**

Four inspection test pits in the courtyard of Building Number1 were excavated during the week of August 26, 2002. The first was at one of the surface drains, as shown in Photo P15. The concrete ring for the grate was above grade, which will result in standing surface water at least two inches deep before it will flow into the grate. The vertical PVC pipe connecting the grate to the flange at deck level had a series of manually drilled holes approximately $^3/_8$ inch in diameter, and the lowest level of holes was at least 3 inches above the deck. Based on photographs from the original construction, the flange appears to be at least 1 inch above the deck. A smaller PVC pipe for the retrofit surface drainage tiles penetrated the side of this pipe approximately half way up. The pipe was partially wrapped in a geotextile. Functionally, this drain appears to have been intended primarily for surface drainage, and any subsurface drainage that it might accommodate would be low volume seepage, at best. The geometry also defeats the functionality of the AquaDrain drainage board because the flange obstructs drainage from the AquaDrain. The fill material used in the courtyard is a silty sand, which is not considered a good draining material and does not provide good lateral

movement of water over the large horizontal distances between the drains. Given the poor drainage qualities of the fill material, the height of the drain body and standpipe perforations above the deck and the large distances between the drains, standing water on the deck was inevitable. The net result of this design, aside from considerations of the capacity of the drainage plumbing, is obstructed surface drainage, slow and ineffective subsurface drainage, and standing water at least 2 inches deep on the deck waterproofing.

On the south side of the courtyard, an inspection test pit was excavated along the north wall where the wall lumber framing is installed on the interior side of the concrete block knee wall, and neither the wall framing nor any floor trusses bear directly on the knee wall, as shown in Photo P16. Grade was approximately 3 inches above the top of the concrete block knee wall at this location. The siding, retrofit peel-and-stick membrane installed as part of the modifications after grade was raised, and the gypsum sheathing was opened to expose the wall framing and insulation, as shown in Photo P17. Both were in good condition. The drain board in this area had a non-woven skin, unlike the woven skin observed at other locations. The drain board was also installed backwards, with the skin against the knee wall. Since this is atypical, RRJ interprets this as a localized error made during earlier repairs.

On the north side of the courtyard, an inspection pit was excavated along the south wall where the wall framing and floor trusses bear on the top of the concrete block knee wall. RRJ expected to see some wood framing on top of the original knee wall based on sketches provided by H-K. However, it appears that a partial-height concrete block was used instead to raise the bearing level for the trusses. This was a prudent decision and more consistent with normal construction practices. Finished grade was approximately 7½ inches above the top of the knee wall, and bottom of the siding was at least one course below grade, as shown in Photo P18. The siding, retrofit membrane, and sheathing were removed to expose the wall and truss framing, as shown in Photo P19. The sheathing screws exhibited moderate corrosion and the face paper of the sheathing had stains suggesting prior wetting, but the gypsum core was relatively sound. When this opening was made, standing water was observed to be trapped between the retrofit membrane flashing and the original liquid-applied flashing on the top of the knee wall. This water on the interior side of the courtyard waterproofing could have infiltrated through several features in the immediate vicinity, such as the termination of the entryway roof, the door frame and trim, electrical and lighting box penetration of the siding, vent penetrations of the siding, or the window penetration of the siding. The drain board in this area was properly installed and had the expected woven skin. The drain board was partially silted, as would be expected for an installation below grade without a coarse fines-free fill at the top of the board. The Swelltite panel exhibited activated bentonite in the top regions, indicating that it had gotten wet at some time in the past and reacted as expected. Below the top region, the bentonite was not activated, and as expected, the

water-soluble film had not dissolved because it had not gotten wet. Approximately 2-inches of standing water was found at the bottom of the knee wall, which had to be pumped out before a section of the Swelltite could be removed to expose the cant, joint dressing and top of the planks as shown in Photo P20. The exposed concrete plank was dry, despite the continuously standing water on the deck. The bentonite in this area was not activated, and the water-soluble film was still in place. Clearly, the membrane face and seal tape of the Swelltite system were functioning properly, and the neither the bentonite nor the concrete plank had gotten wet.

The last excavation was at an entryway post on the south side of the courtyard, as shown in Photo P21. WBI was asked to use the same procedures used during earlier post repairs, as reported to RRJ and described earlier in this report. When the post base was exposed and the 2-inches of standing water was pumped out, the conditions exposed, as shown in Photo P22, were as expected. The base of the post had a liquid-applied waterproofing material on the lower six inches, and the material was no longer bonded to the wood. However, it was bonded to the surface of the Swelltite panel and to the concrete plank surface around the post. The bottom of the post was cut off and set aside. Inspection verified that the post was installed directly on the surface of the concrete plank, as shown in Photo P23. Also visible in this photo, are the metal post base and the powder-actuated nails used to secure the post base. There did not appear to be any damage to the top shell of the concrete plank at this location. A section of Swelltite panel adjacent to the post base was removed. The liquid-applied waterproofing, which adhered to both the concrete surface and the top of the Swelltite panel, appears to have formed a "gasket" at the edge of the panel. The water-soluble film was still in place, and the bentonite at the edge of the panel was not activated, indicating that the "gasket" had prevented it from getting wet. Since the liquid-applied waterproofing material was no longer bonded to the wood post, and since the post itself had normal checks and splits in it, subsurface water will easily infiltrate behind the "gasket" and remain trapped and standing against the concrete deck and the metal post base and nails, resulting in corrosion, deterioration and possible leakage.

## SUBCONTRACT BETWEEN WBI AND WBE

RRJ reviewed the subcontract between WBI and WBE. Without attempting to offer a legal opinion about the contract or the contractual relationship between the parties, RRJ can evaluate the contract in terms of normal construction practices and the technical aspects of its contents.

There is a handwritten notation on the subcontract between WBI and WBE dated February 20, 1997, indicating that it is a "design-build" agreement, with its meaning qualified to require inclusion of all

incidentals for the agreed-to scope of work. The handwritten notations further state that the subcontractor is "100% responsible for design criteria," interpreted by RRJ to mean the design of the waterproofing system and not the courtyard itself or any other aspect of the project. The use of the term "design-build" in this context is inappropriate. In a traditional design-build arrangement, where design responsibilities are assigned to a contractor or subcontractor through the project document, carefully defined criteria for performance and quality parameters, and a method to measure and enforce them, are thoroughly defined in the project documents. There are not such criteria in the Promenade Village Townhouses project documents. *Section 07110 - Waterproofing* of the Specifications is only one and one-half pages long and addresses the foundation walls only, omitting the courtyards. There are no defined quality or performance parameters, and no other design criteria. There are no requirements for the submittal of design documents generated and stamped by a licenced design professional; none were expected or submitted. This project proceeded with ordinary submittals that included product literature and manufacturer's recommendations, as would be expected for a straightforward waterproofing subcontract agreement. The directives issued by ESG and H-K during construction demonstrate that this was the understanding among the parties, and the directives pre-empt spurious WBE's "design-build" responsibilities. WBE had no control over critical issues relevant to the design of the courtyard other than the installation of a membrane. Those critical design issues under the control of parties other than WBE include but are not limited to:

1. Surface water and storm water loads and required flow rates.
2. Concrete deck slope and structural capacity.
3. Drain body type, number, location, and invert elevation.
4. Fill type and drainage characteristics.
5. Grading and top of foundation elevations.
6. Incorrectly sequenced work.
7. Modifications to accommodate links.
8. Other sources of potential leakage such as concrete block walls, coping stones, stairways, siding, and roof/wall intersections.
9. Omission of gutters and downspouts.
10. Durability, material selection, detailing, and weather resistance of building cladding.

The subcontract between WBI and WBE also included "flashing at the plaza where block wall meets frames [sic] wall," qualified with the handwritten note "no metal, only liquid plus membrane." This is exactly what WBE installed in the original construction and is consistent with the manufacturer's recommendations. There is no mention of counterflashing for the wall, which at the time the contract was executed, would be expected to be above grade and provided by others.

Another relevant clause in the subcontract is "Waterproofing By Experts to be responsible for any damage to the interior of the building due to ~~any leaks~~" [strike-out included in the document] with the handwritten qualifier "failure of the waterproofing system." The *system* is interpreted to mean those waterproofing items specifically delineated in the subcontract and any associated but undelineated incidentals, not the courtyard itself or any other aspect of the project.

Although the term "design build" is handwritten on the WBE subcontract, customary construction practices indicate that it does not qualify as such.

## EVALUATION

Based on the program described above, it is RRJ's opinion that the courtyard waterproofing is in essential accord with the manufacturer's recommendations for the original construction. The waterproofing products were properly selected and are performing properly. The fact that the courtyards have experienced years of undrainable standing water at the unsloped concrete deck level, repeated soil saturation and freezing, and standing surface water, and yet still has large areas of unactivated bentonite and discrete leaks due to identifiable causes, which are not related to the efficacy of the Swelltite membrane, verify this conclusion. It has not been established by any investigator that the waterproofing *system* has failed. It has not been established that leaks occur except at locations where the waterproofing system has been modified or breached due to a change in grade, or due to out-of-sequence installation of the entryway posts using improper details under specific directives from ESG or H-K. Likewise, it has not been established that small isolated areas where activated bentonite and undissolved panel backer film have been observed caused any leaks or render the membrane system ineffective.

### Repairs

RRJ has reviewed the repairs proposed by Inspec, Inc. The scope of the work is essentially a complete re-engineering of the courtyard, addressing many of the critical design issues identified earlier in this report that should have been dealt with by ESG or H-K before construction began. The proposed work scope cannot be considered remediation of the Swelltite membrane system. RRJ characterizes the proposed scope of work as an Owner's preference, which they are certainly entitled to implement if they wish, but it is not a repair of the membrane system. Swelltite panels could again be used as part of the reconstruction of the courtyards. Likewise, if the courtyards were originally designed as proposed in the Inspec report with the original termination elevations, and then subjected to the same unanticipated change in grade, out-of-

sequence installation of the wood posts according to the ESG directives and the associated damage to the concrete below the post, incorrectly selected fill material, incorrect type and elevation of subsurface drains, inadequate surface drainage, and the absence of gutters and downspouts, the courtyards would probably leak regardless of the membrane used.

## SUMMARY

Leakage experienced at Promenade Village Townhouses is due to design deficiencies and inconsistencies. Leakage is also exacerbated by directives for out-of-sequence installation of entryway posts, and changes in design grade. These directives were deficient in design and had consequences that were not properly or adequately addressed. Repair attempts to correct the effects of these directives appear to have been only partially and selectively implemented, and are only partially effective.

Some of the reported leaks probably have causes unrelated to the courtyard waterproofing. At this time, RRJ does not believe that they have been systematically or thoroughly investigated by the Owner, and no further evaluation of them can be offered.

Respectfully submitted,

RATHS, RATHS & JOHNSON, INC.

Robert J. Kudder, S.E., PhD.
Principal

August 15, 2003

G:\02038\Updated Report\Promenade_rpt_rev.wpd