**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Westfield Insurance Company,

Civil File No. 00-CV-987(JNE/JSM)

Plaintiff,

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third Party Plaintiff,

vs.

Waterproofing By Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.; Promenade Village Townhomes; Valley Forge Insurance Company; Colliod Environmental Technologies Company; and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Company; and J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiffs,

vs.

Chris Craft Industrial Products, Inc.; and Mikesh, Inc.,

Fourth-Party Defendants.

**TRIAL BRIEF OF THIRD-PARTY DEFENDANT ELNESS SWENSON GRAHAM ARCHITECTS, INC.**

---

## INTRODUCTION

This Trial Brief is submitted on behalf of Third-Party Defendant Elness Swenson Graham Architects, Inc. ("ESG"). ESG was the architect for the Promenade Apartments. Because ESG did not present any dispositive motions, this brief will summarize some anticipated trial testimony significant to ESG.

## FACTUAL BACKGROUND

This case arises out of the construction of a 282 unit, six building apartment project in Eagan, Minnesota, known as Promenade Apartments ("Project"). The Project was developed by Healey Ramme Company ("Healey Ramme"). The principals of Healey Ramme are Tom Healey and Peter Ramme, both of whom are expected to testify at the trial. The Project was owned by Promenade Village Townhomes, LLC, a single purpose entity.

Each of the six buildings are divided into two wings, separated by a plaza. There are apartments on each side of the courtyard with a parking garage below the courtyard. The Project is modeled after a similar project developed by Healey Ramme in Burnsville, Minnesota, known as Southwind.

Healey Ramme solicited bids from several contractors in the spring and early summer of 1996. Weis Builders, Inc. ("Weis") was the low bidder, and represented to Healey Ramme that they had extensive experience in building apartment projects. On that basis, Healey Ramme selected Weis as the general contractor and began working with Weis to refine the scope of work and arrive at a price.

Tom Healey will testify that from the very beginning he told Weis that he wanted the general contractor to be responsible for both the design and construction of the courtyard waterproofing. The reason for this was because of Healey Ramme's

experience with the Southwind project which they had developed in the late 1980's. That project had a similar design. The first two of five buildings constructed at Southwind had problems with leaks in the courtyard area. The design of the waterproofing for the third, fourth and fifth buildings was changed, and they have experienced no significant courtyard water leaks.

On the Southwind project, the architect, which happened to be ESG, was responsible for the design of the courtyard waterproofing system. The general contractor, Bor-Son Construction Company, was responsible for installation of the courtyard waterproofing. Bor-Son Construction Company subcontracted that work to Brent Anderson & Associates, Inc. When the leaks appeared, there was a dispute between the architect and the general contractor as to who was responsible. Mr. Healey wanted to avoid that division of responsibility on the Promenade Project. Consequently, he chose to have the courtyard waterproofing done on a design-build basis, so that he would have one person, the general contractor, to look to if there were any problems.

In addition to the plaza waterproofing, the mechanical and electrical systems for the Project were both design-build by the general contractor. The mechanical systems included the drainage system for the courtyards.

The Project plans clearly stated that the general contractor was responsible for both the design and construction of the plaza waterproofing. Note A on Drawing Sheet A5.1 states under the heading "Courtyard over Garage" that, "waterproofing and insulation system design and installation by General Contractor."

Because waterproofing, especially of above-grade courtyards was a difficult and critical component of the Project, Weis was careful to use great detail in delegating the design and construction responsibility for the courtyard waterproofing system to its

subcontractor, Waterproofing by Experts, Inc. ("WBE"). On February 19, 1997, Weis entered into a contract with WBE. The contract contains the following provisions:

1. This contract is for design/build waterproofing for the plaza areas.

2. The subcontractor is completely responsible for providing and maintaining a watertight system.

3. The subcontract includes, but is not limited to the following:

   a. includes installing waterproofing system per manufacturer's recommendation;

   b. includes waterproofing all details (joints, anchors, etc.) per manufacturer's recommendations;

   c. includes installing drain tile at plaza in order to get water away from building (no drain tile)*;

   d. includes monitoring the backfill operations to insure there is no penetration of system;

   e. includes all deck preparation;

   f. includes all weather conditions;

   g. includes flashing at plaza where block wall meet wood frame members . . . (no metal only liquid and membrane)*;

   h. includes providing manufacturer warranty for each building;

   i. Waterproofing by Experts to be responsible for any and all damages and costs due to repair of waterproofing;

   j. Waterproofing by Experts to be responsible for any damages caused to interior of building due to <u>any leaks</u> . . . (failure of waterproofing system)*;

   k. (<u>there are to be no change orders to this being a design/build contract</u> . . . it is noted that this is a design/build contract and all incidental for the scope of work are included under this subcontract)*;

   l. (subcontractor is to be 100% responsible for design criteria)*;

m. (no change orders will be accepted based on any discrepancies in design and documents)*.

Neither Weis or WBE prepared any design drawings, details or specifications for the courtyard waterproofing. No design professional was hired to assist with the design of the waterproofing system.

Construction on the Project began in the fall of 1996 and was completed in the fall of 1997. Beginning in the summer of 1997, even before the Project was completed, water leaks originating from the courtyards appeared. Water entering the courtyards has leaked into apartment units and the underground garage below the courtyards.

Leaks have occurred in all six buildings to varying degrees. Because the courtyards are covered by dirt, no one can trace any particular leak to its source. Various experts have opined that two probable sources of leaks are the junction of the wood frame walls and the concrete block walls in the courtyards, and where the canopy support posts attach to the pre-cast deck. Others have testified to seeing punctures or cuts in the waterproofing in various locations. In addition, the end walls of the courtyards have been identified as another possible source of leaking.

The owner has not asserted any claims against ESG, despite the fact that ESG contracted directly with the owner. Weis brought ESG into the case as a third-party defendant seeking contribution and indemnity.

## I. ESG HAS REQUESTED AN INSTRUCTION ON SUPERCEDING CAUSE.

One of the areas identified as a probable source of water leaks is the junction of the concrete block wall and wood frame walls in the courtyards of each building. Weis and WBE have contended that this area became a problem because of a design change made by ESG in November of 1996. The evidence will show that this design change was

communicated to Weis on December 16, 1996, two months before Weis entered into its contract with WBE.

Steve Messerich, the President of WBE who was responsible for designing and installing the waterproofing system, testified in his deposition that he never was notified of the design change. Weis' failure to notify its subcontractor of the design change was a superceding cause. Weis' conduct meets all of the four (4) elements required for finding an intervening cause to be a superceding cause as set forth in the comments to CIVJIG 27.20, Minnesota District Judge Association, 1999.

## II. ESG HAS REQUESTED A MODIFICATION TO THE STANDARD INSTRUCTION ON THE DUTY OF CARE FOR ARCHITECTS.

Unlike traditional construction projects, three components of this Project were design/build by the general contractor. Those three components were the courtyard waterproofing system, the mechanical system which included the courtyard drainage system, and the electrical system. There are no issues in this case involving the Project's electrical system. However, Weis and WBE assumed in their contracts, design responsibility for the plaza waterproofing system. In addition, Weis and J-Berd Mechanical Contractors, Inc. ("J-Berd"), assumed design responsibility for the Project's mechanical system, which included the plaza drainage system. As a result of assuming those design responsibilities, they should be held to the same standards as an architect or engineer who has design responsibility.

## III. ESG HAS REQUESTED SEVERAL INSPECTIONS RELATING TO VICARIOUS LIABILITY AND IMPUTED FAULT.

ESG, as the Project architect, was the owner's agent for purposes of preparing the plans and specifications, observing construction, and administrating and interpreting the contract documents.

ESG agreed to observe of the work during construction on behalf of the owner in the contract with Promenade. Section 2.5.5 of the architect's contract with the owner provides in pertinent part as follows:

> The architect shall visit the site at intervals appropriate to the stage of construction (or as otherwise agreed by the architect in writing) to become generally familiar with the progress and quality of the work, and to determine in general if the work when completed will be in accordance with the contract documents. . . . On the basis of onsite observations as an architect, the architect shall keep the owner informed of the progress and quality of the work, and shall endeavor to guard the owner against defects and deficiencies in the work.

The contract between the owner and the general contractor, in Section 4.2.11, provides that the architect shall "Interpret and decide matters concerning performance under and requirements of the contract documents on written request of either the owner or the contractor."

Finally, the architect's contract with the owner provides in Section 2.5.4 as follows:

> The architect shall be a representative of and shall advise and consult with the owner (1) during construction and until final payment to the contractor is due . . . . The architect shall have authority to act on behalf of the owner only to the extent provided in this agreement unless otherwise modified by written instruction.

On the basis of the foregoing provisions in the contract documents, ESG has requested that JIG instructions 30.25, *Principal and Agent Relationships*, and 30.30,

*Principal and Agent – Scope of Authority*. ESG has also included corresponding questions on its Proposed Special Verdict Form.

Courts have recognized architects as agents of owners. "An architect employed by the owner is the agent of such owner in supervising construction work and in the interpretation of plans and specifications relating thereto." *Fuchs v. Parsons Const. Co.*, 111 N.W.2d 727, 733 (Neb. 1961). The California Court of Appeals explained:

> As a general rules, an architect, as far as the preparation of plans and specifications is concerned, acts as an independent contractor; but so far as the performance of his supervisory functions with respect to a building under construction is concerned, he ordinarily acts as an agent and representative of the person for whom the work is being done.

*Trane Co. v. Gilbert*, 73 Cal. Rptr. 279, 283 (Cal.Ct. App. 1968). See *Mortrude v. Martin*, 172 N.W. 17, 21 (Iowa 1919) (owner liable for negligence of architect acting as owner's agent in the scope of employment); *Manton v. H.L. Stevens & Co.*, 153 N.W. 87, 88-89 (Iowa 1915) (architect was not an independent contractor, but was an agent of owner). For a general discussion of architects as agents of owners, see 2 Construction Law ¶¶ 5A.039[2][a]-[3][4] (Steven G.M. Stein, et., 2004); Construction and Design Law § 4.3 (C. Allen Foster et al. eds., 1995); 2 James Acret, Construction Litigation Handbook §§ 16:26, 17:24 (2d ed. 2003).

In general, "a principal is liable for the acts of an agent committed in the course and within the scope of the agency." The significance of finding that ESG was the agent of the owner and acting within the scope of its agency, is that the fault of ESG would be imputed to the owner for purposes of comparative fault.

**ORDER OF PROOF AT TRIAL**

ESG agrees with Westfield's request that the caption of the case be realigned and that Promenade by designated the Plaintiff, with the contractors, subcontractors, material suppliers and architect designated as Defendants. All of the Defendants should be deemed to have asserted crossclaims for contribution and indemnity against each other, and counterclaims for contributions and indemnity against the Promenade.

ESG requests that the order of presentation at trial have the Plaintiff present its case in chief, followed by Weis, its subcontractors WBE and J-Berd, CETCO, the material supplier to WBE, Chris Craft, which supplied a component part to the waterproofing membrane to CETCO, followed by the architect, ESG.

ESG requests that it be allowed to present its case in chief last, because it has not been sued by the owner, it has no contractual relationship with any of the contractors or material suppliers, and each of the contractors and material suppliers have made allegations against ESG. The strategy of the contractors and material suppliers throughout this case has been to shift as much liability to the design team as possible. Allowing ESG to proceed last will allow it to present a coherent response to all of the contractors' allegations.

COLEMAN, HULL & VAN VLIET, PLLP

September 3, 2004.

By */s/ William D. Hull*

William D. Hull (#47995)
8500 Normandale Lake Boulevard
Suite 2110
Minneapolis, Minnesota 55437
952-841-0001
*Attorneys for Third-Party Defendant Elness Swenson Graham Architects, Inc.*

*elness_trial brief*