COPY

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 (JEL/JGL)

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.; Promenade Village Townhomes; Valley Forge Insurance Company; Colloid Environmental Technologies Company; and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: SCOTT VANDERBURG, VOLUME I
TAKEN ON: MONDAY, JUNE 30, 2003
COMMENCING AT: 9:00 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562

2

and

Colloid Environmental Technologies Company,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.; and Mikesh, Inc.,

Fourth-Party Defendants.

---

EXHIBIT I

3

NOTES

Page Line

4

APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 - 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Company.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO BRISBOIS, Esq., Stich, Angell & Kreidler, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared via speakerphone representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE L. HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared via speakerphone representing Third-Party Defendant J-Berd Mechanical Contractors, Inc.

LORI SEMKE, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, mn 55402-2440, appeared via speakerphone representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared via speakerphone representing Westfield Insurance Company.

A **being a REIT.**
Q So Equity Residential Properties was a real estate investment trust?
A **Yes. And so was Avalon.**
MR. BROWN: So was what?
THE WITNESS: Avalon.
Q (By Mr. Hull.) When you refer to capital improvements, what types of projects are you referring to?
A **Roof leaks, window leaks, storm damage.**
Q And the capital improvement part of that would be reroofing a project, for example, right?
A **Sure.**
Q Or replacing all the windows of a project, right?
A **Right.**
Q Okay. What did you do after you left Equity Residential?
A **I became -- I bought into a partnership in Richmond, Virginia called Richmond Decorating.**
MR. BROWN: Did you ask him how long he was at Equity Residential?
MR. HULL: He said approximately two years.
Q (By Mr. Hull.) So you went into a partnership in Richmond, Virginia. What did you do?
A **I was CEO and president.**
Q And what did the partnership do?



A **One of the partners worked with me running accounts.**
Q Running what?
A **Running accounts.**
Q What did the partnership own?
A **A cabinet company and a flooring company.**
Q What market did the partnership serve?
A **Central and southern Virginia.**
Q And what type of projects were you involved in?
A **Some new multifamily contracts, residential reflooring, recarpeting, worked with a lot of single family home companies like Centex putting in cabinets and flooring. So we did both replacement and new carpet, flooring and cabinetry.**
Q Would you manufacture the cabinets?
A **No, sir. Negotiated a pre-manufactured box and did custom kitchens off of those.**
Q And then you would do the installations?
A **Yes, sir.**
Q What was the name of the partnership?
A **The partnership was called Engeren, E-N-G-E-R-E-N, I believe is the way it's spelled. I think it's Engeren with an E.**
Q And how long were you with Engeren?
A **One year.**
Q And where did you go from there?



A **Right here, GID.**
Q GID. Okay. So you've had approximately 30 years experience with multifamily housing projects and construction maintenance and repair, is that right?
A **Yes, sir.**
Q You have to answer orally so he can take it down.
A **Yes, sir. I'm sorry.**
Q In that 30 years, have you become familiar with how to read plans?
A **I'm sorry. I misunderstood.**
Q In the 30 years you've been involved in this construction work, have you learned how to read a set of plans?
A **I believe I can, yes, sir.**
Q And you're familiar with how specifications are set up and you can read and understand those, too, is that right?
A **Yes, sir.**
Q Now, how did you become involved in the Promenade project?
A **Due diligence on potential acquisitions is my -- is my position with GID.**
Q Do you have a territory you cover?
A **Yes, sir.**
Q What is that?
A **United States.**
Q Is that the scope of GID's businesses?
A **To the best of my knowledge. I don't know.**



Q Do you have overall responsibility for that aspect of GID's work, the due diligence for acquisitions?
A **Overall, would you clarify that for me?**
Q What department are you in? What's the name of your department?
A **Well, I really am my own department. I'm the only acquisition services title holder in the company.**
Q Who do you report to?
A **I report to Bob Tarasov.**
Q What's his position?
A **Vice-president.**
Q Do you have anyone that reports to you?
A **On these acquisitions, I recruit certain maintenance associates in the area to help me do my unit walks and they give me information off of check sheets.**
Q What are maintenance associates?
A **They're company employees that keep the air conditioners running when it's hot, make sure the compactors are working when people put their stuff in, fix plumbing when their toilets are stuffed up, things like that.**
Q And what are your responsibilities when it comes to a due diligence investigation?
A **I review the information provided, if I can get it in time, and plan each visit accordingly to the size, the type of property, and then I approach it from those**

conditions.
Q And then would you be responsible for hiring outside consultants as you deem necessary?
A **I participate in that. Yes, sir.**
Q So how did you get involved in the Promenade project?
A **I was asked to go to Minnesota and look at this property, that I would be getting some information and review it and --**
Q So who asked you to get involved in the Promenade?
A **I think Thad was the first one that I heard from. Thad Palmer. I'm sorry.**
Q Do you know if GID had a letter of intent in place at the time Thad got you involved in the project?
A **That's not an area that I focus on, so I can't give you an answer on that. I'm not aware of -- that's not a concern that I focus on. I focus on the asset and how I can do the best effort at determining what kind of condition it's in.**
MR. BROWN: He just asked if you knew.
THE WITNESS: I'm sorry?
MR. BROWN: He just asked if you knew there was a letter of intent or not at that time?
THE WITNESS: No.
MR. SPRINGER: You want him to give one word answers?



MR. BROWN: I want him to give an answer is what I want.
MR. HULL: Actually, I thought the answer was fine.
THE WITNESS: I did too.
Q (By Mr. Hull.) Okay. So do you remember about when Mr. Palmer got you involved in the Promenade?
A **Gosh. Fall -- I guess it would be fall of 2002. Seemed like it was end summer, going into winter sometime.**
Q So did he call you on the phone?
A **Yes, sir.**
Q What did he tell you:
A **"I got a deal I'd like for you to look at."**
Q Then what did you do?
A **I told him to let me know when and where when it all came together.**
Q Did he provide you with any written material?
A **Yes, sir. I was provided with -- it might have been a broker package. I'm not sure.**
Q Did he provide you with any drawings of the project initially?
A **I don't believe I got the drawings until I was on the property, but there was also -- there was some more information, just some disclosure information with the broker report that was given me.**



Q What did Mr. Palmer tell you about the project?
A **To the best of my recollection, something like this one may be a tough one.**
Q Did he tell you why it might be a tough one?
MR. BROWN: At any time, Bill, or right away?
MR. HULL: Initially.
THE WITNESS: I'm sorry. I couldn't hear that.
Q (By Mr. Hull.) He was asking for what time and I want to know initially when he told you, you know, this might be a tough one, did he tell you why?
A **Yes. It has a history of water -- potential water penetration issue.**
Q Now, had you had some experience in dealing with water leaks, water penetration issues in the 30 years you've been in the construction business? That would be yes?
A **I've seen water leaks, yes, sir.**
Q Okay. Let me show you what we've previously marked as Exhibit 540, and Mr. Palmer identified this. It's entitled Promenade Oaks Pending Litigation and Disclosure?
A **Yes, sir.**
Q Have you ever seen that before? Is that one of the documents that Mr. Palmer gave you?
A **This looks like it.**



Q Do you think he gave you anything more than that? I'm talking about initially, you know, at the start.
A **Oh, initially? I believe that I had a broker report -- or a broker package with I believe the company was Inspec, engineering consultant company report, and this looks like the report. I'm used to the cover page. I've looked at a lot of reports since then, but it has a lot of the information that I saw in there.**
Q Okay. Among the information that you saw, did you get any information from the owner of the cost of repairs?
A **No.**
Q And I'm talking about cost of repairs of plaza waterproofing?
A **Initially, no.**
Q Did the owner ever give you any information on what they estimated the cost of repairing the plaza waterproofing would be?
MR. BROWN: Object to the form.
MR. HINKLE: You can answer.
THE WITNESS: Not exact figures, just a perception.
Q (By Mr. Hull.) And how did you get that perception?
A **The repair efforts that I observed during my due diligence process didn't come anywhere near the cost that I estimated that it would probably take to completely**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff,

vs. Civil File No. 00-CV-987(PAM/JGL)

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.; Promenade Village Townhomes; Valley Forge Insurance Company; Colloid Environmental Technologies Company; and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.; and Mikesh, Inc.,

Fourth-Party Defendants.

---



VOLUME I

The Videotaped Deposition of THADDEUS DUDLEY PALMER, taken pursuant to Notice of Taking Deposition, taken before Barbara F. Schwegman, a Notary Public in and for the County of Washington, State of Minnesota, taken on the 9th day of April, 2003, at One McKinley Square, Boston, Massachusetts, commencing at approximately 10:08 a.m.

APPEARANCES:

ANDREA E. REISBORD, ESQUIRE, of the Law Firm of COUSINEAU, McGUIRE, ANDERSON, CHARTERED, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, Minnesota, 55416-5318, appeared for and on behalf of Plaintiff, Westfield Insurance Company.

CHAD J. STEPAN, ESQUIRE, of the Law Firm of MEAGHER & GEER, PLLP, 4200 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota, 55402-3788, appeared for and on behalf of Defendant and Third-Party Plaintiff, Weis Builders, Inc.

STEVE GASKINS, ESQUIRE, of the Law Firm of FLYNN, GASKINS & BENNETT, LLP, 333 South Seventh Street, Suite 2900, Minneapolis, Minnesota, 55402, appeared for and on behalf of Defendants, Promenade Village Townhomes, LLC and Healey Ramme Company.

LEO I. BRISBOIS, ESQUIRE, of the Law Firm of STICH, ANGELL & KREIDLER, P.A., The Crossings, Suite 120, 250 Second Avenue South, Minneapolis, Minnesota, 55401, appeared for and on behalf of Defendant, Valley Forge Insurance Company.

EXHIBIT J



APPEARANCES:

MARK S. BROWN, ESQUIRE, of the Law Firm of IVERSON REUVERS, 8585 West 78th Street, Suite 230, Bloomington, Minnesota, 55438, appeared for and on behalf of Third-Party Defendants, Waterproofing By Experts, Inc.

WILLIAM D. HULL, ESQUIRE, of the Law Firm of COLEMAN, HULL & VAN VLIET, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, Minnesota, 55437, appeared for and on behalf of Third-Party Defendant, BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.

CHANDELLE L. HEYER, ESQUIRE, of the Law Firm of TOMSCHE, SONNESYN & TOMSCHE, P.A., 610 Ottawa Avenue North, Minneapolis, Minnesota, 55422, appeared for and on behalf of Third-Party Defendant, J-Berd Mechanical Contractors, Inc.

PATRICK D. REILLY, ESQUIRE, of the Law Firm of ERSTAD & RIEMER, P.A., 200 Riverview Office Tower, 8009 34th Avenue South, Minneapolis, Minnesota, 55425, appeared for and on behalf of Third-Party Defendant and Fourth-Party Plaintiff, Colloid Environmental Technologies Company.

G. JOHN VEITH, ESQUIRE, of the Law Firm of BROWN & CARLSON, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, Minnesota, 55416, appeared for and on behalf of Fourth-Party Defendant, Chris Craft Industrial Products, Inc.

BRIAN BAUMGARTNER, ESQUIRE, of the BAUMGARTNER LAW OFFICE, PLLC, 3320 West Owasso Boulevard, Shoreview, Minnesota, 55126, appeared for and on behalf of Fourth-Party Defendant, Mikesh, Inc.

JOSEPH G. SPRINGER, ESQUIRE, of the Law Firm of FREDRIKSON & BYRON, P.A., 4000 Pillsbury Center, 200 South Sixth Street, Minneapolis, Minnesota, 55402-1425, appeared for and on behalf of General Investment & Development Company.



APPEARANCES:

TIMOTHY J. HINKLE, ESQUIRE, GENERAL INVESTMENT & DEVELOPMENT COMPANY, IN-HOUSE COUNSEL, 600 Atlantic Avenue, Suite 2000, Boston, Massachusetts, 02210, appeared for and on behalf of General Investment & Development Company

ALSO PRESENT: Jason Moschella, videographer

*The Original is in the possession of Attorney William D. Hull.*

INDEX

| | Page |
|---|---|
| THADDEUS DUDLEY PALMER | |
| Cross-examination by Mr. Hull | 8 |
| Cross-examination by Mr. Reilly | 169 |

EXHIBITS

| | |
|---|---|
| Exhibit 539, 9-18-02, Brokerage package from Mr. Jaffe | 14 |
| Exhibit 540, 9-18-02, Pending Litigation and Disclosure | 22 |
| Exhibit 541, 7-25-02, Mold survey letter to Mr. Nelson | 38 |
| Exhibit 542, Executive Summary | 44 |
| Exhibit 543, 10-24-02, Offer letter to Mr. Jaffe | 76 |
| Exhibit 544, 10-25-02, Letter to Windsor Realty Fund | 78 |
| Exhibit 545, 5-1-02, Inspec Waterproofing report | 84 |
| Exhibit 546, 11-6-02, Criterium Engineers report | 87 |
| Exhibit 547, 11-12-02, Memo to Scott Vanderburg | 110 |
| Exhibit 548, 11-17-02, E-mail from Scott Vanderburg | 112 |
| Exhibit 549, 11-20-02, E-mail from Bob Tarasov | 118 |

designated to appear pursuant to the deposition notice; is that correct?
A. Yes.
Q. Have you had your deposition taken before?
A. No.
Q. Let me tell you a little bit about the process. I'll be asking you questions. The court reporter will be taking those questions down verbatim and your answers. The deposition is being videotaped also. It's important for you to understand the questions that I ask, so if you have any doubt about the meaning of the words I'm using or the context of the question, I want you to tell me. Will you do that?
A. Yes.
Q. Okay. You'll need to answer audibly so that the court reporter can pick that up and the taping equipment can pick that up; okay?
A. Yes.
Q. Do you have any questions before we start about the process?
A. No, I do not.
Q. Okay. You may hear some objections from counsel throughout the course of this deposition. Unless your attorney instructs you not to answer a question, you can answer the question despite the objections; all right?



A. Uh-huh.
Q. Okay. Tell me about your post high school education.
A. I went to the University of Rochester, Rochester, New York, and graduated with a political science degree, a minor in psychology.
Q. Any postgraduate work?
A. No.
Q. What did you do after you got out of college?
A. I immediately went to work for Berkshire Realty Company here in Boston.
Q. And when was that?
A. That was in 19 -- December of '89.
Q. And what business is Berkshile Re -- Berkshire Realty in?
A. At the time they were a syndicator raising money and acquiring real estate assets, and I worked in the marketing department.
Q. And what did you do in the marketing department?
A. I --
Q. What was your job?
A. I basically provided customer service to people who had made investments in the syndication.
Q. How long were you with Berkshire?



A. Until 1999.
Q. And did you maintain that same position your entire -- during your entire time at Berkshire?
A. No, I did not.
Q. Tell me what other positions you held there.
A. Within a year I was a -- an ana -- made an analyst and moved to Georgia, and I was a real estate acquisitions analyst, and I was -- held that position through I believe it's '96. I can -- I can't remember the exact date. I became an assistant vice president and a vice president in '98.
Q. What was your -- what were your duties as an assistant vice president?
A. Acquiring and disposing and providing asset management services for Berkshire's commercial real estate portfolio.
Q. And when did you become a vice president?
A. I believe I said '90 -- '97, '98.
Q. First you were assistant vice president?
A. Right. Yeah.
Q. Then you became vice president. What was your duties as a vice president then?
A. Much the same. Much the same. I was involved in acquisitions except for at that point I was the -- directly involved for acquiring assets.



Q. And what did you do after you left Berkshire in 1999?
A. I took a job as a vice president of real estate acquisitions with GID.
Q. And is that the position you currently hold?
A. No. I now hold another title which is -- I'm the director of multifamily investments at GID and vice president of real estate acquisitions.
Q. What is the full name of GID?
A. General Investment and Development.
Q. Is that a corporation?
A. I believe so.
Q. What is the business of GID?
A. GID advises -- invests on its own account and advises pension funds in investments in real estate.
Q. Are you familiar with the Promenade Oaks apartment project in Eagan, Minnesota?
A. Familiar as in?
Q. Do you know -- you know about it?
A. Yes.
Q. Okay. What was -- what was your role in the acquisition of that project?
A. I was the project manager for that acquisition.
Q. How did you -- how did you find out about the

Page 13

project initially?
A. I was made aware through a brokerage package and phone call.
Q. And what was your first contact? Was it with a broker or did you see something advertised?
A. It was -- define "contact."
Q. How did you first learn about it? I mean, did you --
A. I -- I got a flier in the mail regarding Promenade Oaks from CB Richard Ellis.
Q. And who was the broker at CB Richard Ellis?
A. Phillip Jaffe.
Q. Had you worked with Mr. Jaffe before?
A. Yes.
Q. So he sent the flier directly to you?
A. Uh-huh.
Q. Okay.
MR. REILLY: That's a "yes," sir?
A. Yes.
BY MR. HULL:
Q. And when was that?
A. I believe that was sometime in October.
Q. Now, you also mentioned a brokerage package. Had you received a flier before you got the actual brokerage package?

Page 14

A. I don't believe so in this case. The --
Q. Go ahead if you're not finished.
MR. HULL: All right. Let's mark this as an exhibit. Do we know what number we're on?
MR. STEPAN: 539 is the next one.
THE COURT REPORTER: Is the last one?
MR. STEPAN: No. The next one should be 539.
(At this time Palmer Deposition Exhibit Number 539 was marked for identification by the Court Reporter.)
BY MR. HULL:
Q. All right. Mr. Palmer, I'm going to show you what we've marked as Exhibit 539.
MR. REILLY: Are there bates stamped numbers on that document?
MR. HULL: There are, and the bates stamped numbers are GID 01217 to GID 01266.
MR. REILLY: Thank you.
BY MR. HULL:
Q. Did you have an opportunity to briefly scan Exhibit 539?
A. Yes.
Q. Is this the brokerage package that you earlier referred to?

Page 15

A. Yes.
Q. Now, had you received something prior to the receipt of this brokerage package?
A. I can't recall.
Q. The first page, 01217, is simply a cover page marked "Brokerage Package." The second page is a letter dated September 18. The third page is a letter dated September 11, 2002. Was the September 11 letter the first notice you received about this project? Do you recall?
A. I can't recall.
Q. Do you recall receiving the September 11 letter?
A. I just recall getting the package.
Q. Okay.
A. I get a lot of letters.
Q. All right. What did you do when you got the brokerage package?
A. I reviewed the package.
Q. Does Exhibit 539 appear to be the complete brokerage package that you received?
A. Yes, it does.
Q. And is this a document that was produced by GID in response to our subpoena?
A. I believe it was, yes.
Q. And this was a document that you kept in the

Page 16

normal course of your business in the files of GID; is that right?
A. Yes.
Q. All right.
MR. GASKINS: One more question: Is it in the normal course of their business to keep such documents?
BY MR. HULL:
Q. And is it in the normal course of your business to keep such documents in your files?
A. Yes.
Q. Now, you said after you got it, you reviewed it. Did you have anybody else review it at GID?
A. Yes.
Q. Who?
A. My analyst.
Q. And that is whom?
A. Gary Kroll.
Q. And what did you conclude or what did you do after you reviewed the package?
A. I concluded that I might have an interest in acquiring the asset.
Q. Did you have any conversations with Mr. Kroll after he reviewed the package?
A. Yes.

Page 17

Q. And what did he tell you and what did you say to him about this property as best you can recall?
A. I -- I instructed him to provide me some analysis on this property.
Q. Now, in the September 18 letter, which is GID document 01218, the second to the last paragraph indicates that they are requesting that all offers be submitted by Tuesday, October 15 and that closing occur prior to December 31, 2002. What was your reaction to that?
A. That they needed to get the deal closed by year-end.
Q. Is that typical for a transaction of this size to expect offers and a closing that quickly?
A. I would say it's not uncommon.
Q. After you concluded that you might have some interest in this property, what did you do?
A. I visited the property. I took an initial tour of the property.
Q. And do you recall when that was?
A. Again, I think that was late September or early October.
Q. And who did you tour the property with?
A. The property manager.
Q. Do you recall who that was?
A. I can't recall.

Page 18

Q. Anybody else with you?
A. My analyst was with me. I'm sorry. He was not with me. I re -- I toured that property by myself.
Q. Was Mr. Jaffe with you?
A. I don't believe he was there the day I toured the property by myself, no.
Q. Had you gotten any information or analysis back from Mr. Kroll by the time you toured the property?
A. I can't recall.
Q. What was it about this brokerage package that attracted your interest?
A. I think you'd have to define that question better.
Q. Well, I guess I'm interested in why you wanted to go out there and why you became interested in acquiring it.
A. It's --
Q. What --
A. Go ahead.
Q. What information was provided in the brokerage package that made you think this would be a good investment for GID?
A. The package noted the location of the asset. That location is in Eagan. We own an asset in Eagan. I'm familiar with that market.

Page 19

Q. What asset is it that you own in Eagan?
A. Alden Pond Apartments.
Q. I'd like you to turn, if you would, to GI -- to document number GID 01231. At the top under "income" there are a couple of line items I want to ask you about. One is "vacancy."
A. Uh-huh.
Q. What does that refer to?
A. That refers to the number -- or the -- the rent of the units that are empty and not receiving rent.
Q. And "concessions," what does that refer to?
A. Concessions can be defined two ways. They're either up front as a discount in your first monthly or second monthly paycheck -- or rent check or they could be a prorated concession where they are prorated through the life of the lease. I don't --
Q. And that -- excuse me. Go ahead.
A. You cannot tell the difference from that line item.
MR. SPRINGER: And I'm going to object on the basis of foundation in that -- in that this witness did not prepare this document. You can go ahead.
BY MR. HULL:
Q. Was that your understanding of what "concessions" meant as you reviewed the document?

Page 20

A. Yes.
Q. And the next line item is "office/model vacancy." What was your understanding of what that line item meant?
A. That models are typically -- that that was the lost rent to having a model on the property. You cannot lease out your model.
Q. All right. I want to go back for just a second to the September 18 letter to you. That letter in the second to the last paragraph indicates that the offering price represents a 7.5 percent capitalization rate. Do you see that?
A. Yes.
Q. Does GID have any parameters that it looks for in cap rates on investments?
A. It's one of many parameters.
Q. And what are the boundaries of the cap rate parameter that GID expects on its investments?
MR. GASKINS: Objection, time frame.
MR. SPRINGER: Objection, relevance.
BY MR. HULL:
Q. At the time of this transaction in the fall of 2002.
A. Can you say that question again?
Q. Okay. What are the limits of the parameters

on cap rates that GID was looking for for real estate investments in the fall of 2002?
A. There aren't a limit on the cap rate.
Q. Were there any minimum cap rates that you looked for that you required?
A. No.
Q. All right. Let me ask you, if you would, to turn to GID document 01235, and this document is, of course, still part the brokerage package. There's a handwritten notation on the bottom that says 30 million. Do you see that?
A. Yes.
Q. Do you know whose handwriting that is?
A. That is my handwriting.
Q. And what did that represent? What did that mean?
A. I wanted to check the consequences of a $30 million valuation on the real estate taxes.
Q. How did you come up with 30 million?
A. That was what I was -- thought it would -- the property would be worth before due diligence.
Q. Was this a number you thought the property would be worth before you made your site visit?
A. No.
Q. It was after you made your site visit?



A. Yes.
Q. What information did you have about the property other than the brokerage package that we marked as Exhibit 539 and your site visit to come up with the number 30 million?
A. I had a copy of the -- the -- I can't define it, but the litigation memo that was submitted, and I was led to believe that was submitted to all potential buyers.
MR. HULL: Okay. As long as we're talking about that, let's identify that and mark it. This will be Exhibit 540.
(At this time Palmer Deposition Exhibit Number 540 was marked for identification by the Court Reporter.)
BY MR. HULL:
Q. Mr. Palmer, I've -- you've been handed Exhibit 540. Can you identify that for me? And that Exhibit 540 is composed of document numbers GID 00224 through GID 00252.
A. This is the document or facsimile of the document I received with the package.
Q. And it's entitled "Promenade Oaks, Pending Litigation and Disclosure"; is that correct?
A. Yes.
Q. And you received it at the same time you



received a brokerage package; is that correct?
A. At or near that time.
Q. So at the time you felt the property might be worth $30 million, you had the brokerage package and the pending litigation disclosure and you had made a site visit to the property; is that correct?
A. Yes.
Q. Did you have any other information about the property when you originally came up with the number of 30 million?
A. No.
Q. Had you received any analysis from Mister --
MR. GASKINS: Kroll.
BY MR. HULL:
Q. -- Kroll?
A. Yes.
Q. And what did you receive from him prior to the time you came up with the $30 million value?
A. I merely asked him to put the income and expense numbers on a model so that I could manipulate that model.
Q. All right. Now, Exhibit 540, did you receive that from Mr. Jaffe also?
A. Yes, I did.
Q. And is that a document that GID produced in



response to our subpoena?
A. I believe it is.
Q. And is that a document that GID maintained in its files in the ordinary course of its business?
A. Yes.
Q. And did you -- I'll withdraw that. Okay. What impact did the litigation disclosure, Exhibit 540, have on your estimate of the value of $30 million?
A. Difficult to say. It mentions that they had completed $750,000 worth of repair, and I estimated that may be a half a million dollars because I hadn't done any physical due diligence so was unaware of what else to use.
Q. So you recall quantifying the impact of the pending litigation disclosure at approximately a half million dollars? Is that -- is that what you're telling me?
A. No.
Q. Okay. Maybe you could explain that. How did you quantify the impact on the price?
A. I did not quantify the impact of this litigation at all. I quantified the -- what I thought might be enough money to reserve to resolve the issues given that I hadn't done physical due diligence.
Q. And the amount you thought might be enough to resolve the issues was a half million dollars?

A. Yes.
Q. Okay. So would it be fair to say that absent the litigation disclosure, your $30 million estimated value would have been 30,500,000?
A. No.
Q. Tell me why that's not correct.
A. During physical inspection, you could see that there had been leaking into the garages. I was unaware of -- I can't tell you now what I would have allocated, but I would have attempted to throw a number at that issue, and you could also see the -- the issues with the stairways.
Q. Can you tell me -- can you quantify for me what impact the litigation disclosure and your observations during your site visit of the water problems at the Promenade Oaks had on your estimated value of $30 million?
A. Say that again. I'm sorry.
Q. I'm looking -- I'm wondering if you can quantify for me the impact of the litigation disclosure and your observations during your site visit of the water problems had on your estimated value of $30 million?
A. At the time, half a million dollars was what I allocated towards it.
Q. Okay. Then I -- I don't want to beat a dead horse here, but it seems to me what you're telling me is that absent the water problems, you would have valued the



property at a half million dollars more. Am I missing something?
A. As long as you're -- as long as you're relating it -- and again, at the time unaware of what fixes or the consequences of those repairs would be, I would have not put into my financial modeling a half a million dollars.
Q. And the half a million was what you put into your financial modeling attributable to the water problems that resulted in the $30 million value; is that correct?
A. Yes.
Q. And the $30 million was a calculation that came out of the models that you were using; is that correct?
A. That is correct.
Q. Okay. Now, can you tell me what information went into the models?
A. Basically the economic performance attributes of the asset. That would be the income and the expenses along with projections.
Q. And was that all information that you obtained from the brokerage package?
A. No.
Q. Okay. What information aside from what was in the brokerage package went into your models?



A. My estimates of future performance, my estimates of future capital costs in terms of maintaining the asset, my -- my estimates of what we would manage the asset for, and my estimate of what -- the income we would be able to generate from that property.
Q. Okay. All right. Turn, if you would, to GID 01238.
A. I've just got a --
Q. This is in Exhibit 539. Excuse me. This page of the brokerage package has on the top a caption of "Investment Highlights," and the last item listed there is "Historical occupancy averaging 95 percent." Do you see that?
A. Yes, I do.
Q. How did that relate to your experience with your other asset in Eagan, Minnesota, Alden Pond?
A. Are you asking whether my asset in Eagan, Minnesota had a historical average occupancy of over 95 percent?
Q. Yeah.
MR. SPRINGER: Objection, relevance.
You can answer.
BY MR. HULL:
Q. You can still answer the question.
A. You know, I can't -- I can't recall the



average occup -- the exact average occupancy of Alden Pond. I --
Q. Do you have a reaction to that average occupancy that was disclosed by the brokerage package for the Promenade Oaks? Did you think that was good, bad, indifferent?
A. An average historical occupancy of over 95 is considered good.
Q. And when you say "good," are you referring to in the markets served by Promenade Oaks? Are you referring to a national market? Are you referring to GID's experience? What are you referring to?
A. In general, 95 percent is considered a good operating occupancy for a multifamily investment.
Q. All right. If you would, turn to GID document number 01249 which is also a part of Exhibit 540 for -- Exhibit 539 for me, please.
A. Yep.
Q. All right. The graph on the lower right-hand section of the page indicates average rents and vacancy rates by unit type for the Twin Cities area. Do you see that?
A. Yes.
Q. Did you as you were analyzing this investment make any comparison between the occupancy rates of

Page 29

Promenade Oaks and the average occupancy or vacancy rates in the Twin Cities area?
A. Did I make a comparison?
Q. Yes.
A. No.
Q. All right. If you could, turn to GID page number 01262, also a part of Exhibit 539, for me. Page 01262 and 01263 appear to be comparable properties' rent values or rent rates I guess would be a better term; is that correct?
A. Yes.
Q. Did you review that as you were reviewing the brokerage package?
A. I looked at this page and the other page regarding the rents.
Q. And how did the rents at Promenade Oaks compare to the rents at the comparable properties?
A. Define "comparable properties."
Q. Well, I'm referring to the four properties on the two pages that we just have been discussing, and I guess what I'm -- maybe we should --
A. Yeah.
Q. -- I should ask you a question, a preliminary question first. Is rent per square foot an appropriate method for comparing properties?

Page 30

A. It's one way of doing it. It's hard to rely on either by unit or by square foot because of the differences between properties. It's a gauge.
Q. Okay. When you say the differences between properties, I'm familiar with different classes of properties, Class A property, Class B property. What are you referring to when you say the differences?
A. I'm referring to the fact that a one-bedroom apartment may rent for a dollar a square foot because it's 650 square feet, and you would not then take that information and build a 3000 square foot unit next door and assume you will get a dollar per square foot.
Q. Okay. Now, these comparables are broken down, I see, by size. Is that an important part of the analysis then?
A. It's important to compare similar unit types to each other.
Q. Do you know if the four properties identified on pages 01262 and 3 fall into a particular class, referring to Class A, Class B rental property?
A. Yes.
Q. And which class do they fall into?
A. Would you like that by the -- each one?
Q. Yes.
A. Name each one?

Page 31

Q. Yes. Let's go through each one starting with Grand Reserve at Eagle Valley.
A. Class A.
Q. And what about Avalon at Towne Center?
A. Class B.
Q. And what about Av -- is there a second Avalon at Towne Center?
A. Oh, I'm sorry. I'm sorry. Yeah. Well, he -- what he -- right. The Avalon at Towne Center located in Woodbury, Minnesota --
Q. Yes.
A. -- Class A.
Q. And there's a second Avalon at Town Centre in Eagan. What would you classify that as?
A. B.
Q. And Windsor at Alden Ponds in Eagan, what would you classify that as?
A. B plus.
Q. And is this the other property in Eagan that GID has an interest in?
A. Yes.
Q. Now, how did the rent per square foot rates in the Class A comparables -- let me ask you this first: How did you classify Promenade Oaks?
A. An A.

Page 32

Q. And how did the rents per square feet at the other Class A's, Grand Reserve and Avalon in Woodbury, compare to Promenade Oaks?
A. Other than an empirical observation of this, I think they seem to be comparable or a little higher.
Q. Promenade Oaks seemed to be a little higher?
A. No. It's comparable to those, those two.
Q. What was your reference to a little bit higher?
A. When you talk about rents, you're going to have to talk about whether those are concessed rents or not.
Q. Well, you were -- you've indicated a --
A. For example, I wouldn't consider Woodbury a particular competitor.
Q. Okay. How did the rents per square foot at Promenade compare to Windsor at Alden Ponds in Eagan?
A. I can't remember. I can't recall the exact per square foot comparison.
Q. Do you recall an impression you had as to whether or not it was --
A. The face rents are higher at Promenade Oaks than they are at Alden Pond.
Q. Would you consider Alden Pond a competitor of Promenade Oaks?

Page 33

A. Absolutely.
Q. Then the next page, GID 01264, is entitled "Sales Comparables." Do you see that?
A. Uh-huh.
Q. Now, when you're looking at sales comparables, what are the important numbers to look at from your perspective?
A. Price per unit.
Q. Okay. Anything else?
A. Sometimes price per square foot and, again, to make a comparison, the age.
Q. Okay. Did you compare the comparables on GID page 01264 to your estimated value at Promenade Oaks?
A. Yes.
Q. And how did they come out?
A. You know, we were a -- you're going to have to define that.
Q. Well --
A. Define "estimated value" to GID.
Q. You had indicated earlier that you came up with a number of $30 million, so why don't we use that number. Is that --
A. Right. Okay.
Q. So how did they compare on a per-unit basis, if that's an important measure for comparing?

Page 34

A. One of the highest in the market.
Q. Promenade Oaks was?
A. No, it wasn't the highest. It was over a hundred dollars a unit -- hundred thousand dollars a unit.
Q. All right. Now, after you had a chance to do your walk-through at Promenade Oaks, review the pending litigation disclosure, and review the brokerage package, what was it that attracted your interest to Promenade Oaks?
A. At -- at that time after I had reviewed all those?
Q. Yes.
A. I believed it was a good location for a multifamily investment.
Q. What -- after you reviewed the pending litigation disclosure, what did you do with that?
A. I sought the advice of my attorney in-house.
Q. And that would be Mr. Hinkle?
A. That's correct.
Q. What did you do in terms of analyzing the issues that were disclosed by the pending litigation disclosure?
A. I sought his advice as to the implications of that litigation on GID, on --
Q. Did you reach any conclusions yourself as to the impact of what was contained in the litigation

Page 35

disclosure?
MR. SPRINGER: Is your question other than as -- other than as the result of advice that he received from Mr. Hinkle?
MR. HULL: Yeah. I'm just asking him for his own conclusions.
MR. SPRINGER: If you can -- if you can answer that question without also factoring in Mister -- Mr. Hinkle's advice to you.
A. Ask that question one more time.
MR. HULL: Why don't you read it back for me, will you?
(Whereupon the requested portion of the record was read aloud by the Court Reporter.)
MR. SPRINGER: Objection on the basis of the attorney-client privilege. You can answer to the extent that you are able to discuss your own impressions without also disclosing any discussions that you've had with Mr. Hinkle.
A. My impressions after discussing it with Mr. Hinkle was that it was likely to be an issue.
BY MR. HULL:
Q. And --
MR. GASKINS: Objection, responsiveness. It was unclear what was likely to be an

Page 36

issue, the water or the litigation.
BY MR. HULL:
Q. Can you tell us which --
THE WITNESS: Say that again. The --
MR. GASKINS: Yeah. The -- because of the way the question was asked and the objection raised, it is unclear. You said you thought it was going to be an issue, but "it" had no reference. There are two things in the disclosure statement.
THE WITNESS: Right.
MR. GASKINS: One is the litigation and two is the water problem.
THE WITNESS: Right.
MR. GASKINS: So I was just trying to get some clarification as to what you were talking about when you said "it."
THE WITNESS: Well, it's my understanding that I answered that when I first read it from a dollar denomination, that I had guessed a half a million dollars, so now I'm speaking strictly on whether or not pending litigation would have any effect on GID, and there was concern that it would. That it would be drawn in in some way.
BY MR. HULL:
Q. But you decided to go ahead with the

Page 153

objection, other than the attorney-client privilege of that, lack of foundation.
A. Let's restate that question then.
BY MR. HULL:
Q. What I -- I guess what I'm really after you -- I think you told me that your counsel would be the one familiar with claims made in other acquisitions?
A. My counsel?
Q. He would be the one at GID that would -- that would be handling those things and would be familiar with kind of the pattern of -- of claims?
A. The legal department would be in -- in a real estate company would be familiar with the claims coming off assets that have been under management.
MR. BROWN: Bill, are you restricting your questions to claims of litigation or are you talking about complaints?
BY MR. HULL:
Q. No. I'm talking about any claims that would be subject to this indemnity premium. Who would those claims initially be made to?
A. Again, I'm not involved in those claims. If you want a conjecture, my conjecture is that someone would attempt to contact GID and ask for the legal department if they were represented by a lawyer.

Page 154

Q. Well, let's say they're not. I mean, you've got -- you've got a building with 282 apartments out there. Somebody's got a complaint. Who do they go to?
A. They would go to the property manager.
Q. Okay. Do you know if -- if the property managers for GID keep records of tenant complaints?
A. Yes.
Q. They do?
A. Well, let me -- typically on a property, work orders, you could call them a complaint. Work orders are kept in the maintenance file. That would be anything that someone comes and says is broken in their apartment or water has leaked or something else.
Q. And who is the property manager for the Promenade?
A. I do not know. There is a new property manager there. I can't remember her name.
Q. So was it your opinion that the net present value of the 24 million with the $2 million holdback was 25.4 million?
A. Yes.
Q. All right. Let me just make sure we've established a foundation for this document. This is a document that you generated in the ordinary course of GID's business activities; is that correct?

Page 155

A. Yes.
Q. And maintained in GID's files in the ordinary course of GID's business --
A. Yes.
Q. -- is that correct? And produced pursuant to our subpoena; right?
A. Yes.
Q. Now, the Purchase Agreement itself is now at 24.5 million with a $1.5 million indemnity premium; is that correct?
A. Yes.
Q. So if you use the same analysis you did in the second to the last paragraph here, you would have a net present value of something over $25.4 million; is that right?
A. Yeah, it would be a little bit higher than that.
Q. Did you calculate the net present value of the $24.5 million purchase price with the $3 million holdback?
A. Not that I'm aware of.
Q. What discount rate were you using to present value the holdback?
A. Unfortunately I did not write this in the memo. I believe it's ten and a half to 10 percent, somewhere in that range; the reason being, I believe that

Page 156

that's the appropriate discount rate.
Q. And what do you base that on that that's the appropriate discount rate?
A. If you -- the return you try to draw -- an internal rate of return is essentially the discount rate used to reduce all your cash flows to zero, as if you discounted them all to zero, back today to zero. I wanted to achieve a premium over a stand-alone deal to accompli -- to accommodate for the risk involved in acquiring an asset with the issues that this asset had, so I put a premium over -- of 100 to 150 basis points over what a typical internal rate of return would be, and in order to -- and that became effectively your discount rate.
Q. All right. Let me show you what we've marked as Exhibit 554. Can you tell me what that is?
A. I haven't seen this document, so I can only tell you that it is whatever it appears to be in terms of --
Q. Do you know who DeMara Construction Services is?
A. No.
Q. Did you have any discussion about DeMara with Scott Vanderburg?
A. No. The only conversations I had with Scott Vanderburg were regarding his attempting to ascertain

Page 173

A. That is correct.
Q. All right. And historically in those kind of situations, the seller will minimize the -- the problems that they're having on their property prior to the sale?
A. They will attempt to minimize.
Q. Now, you also owned in Minnesota a property in Eagan very close to this property, the Promenade; correct?
A. Yes.
Q. In fact it's basically kitty-corner across the major intersection?
A. It's not kitty-corner on that intersection.
Q. Within a mile?
A. It's within a mile of this asset, yes.
Q. And I think you indicated that those two pieces of property are in direct competition to each other?
A. They -- they are.
Q. Now, the fact that there -- you own two pieces of property so close to each other and that are in direct competition to each other, does that give you some economies in the management and operation of those properties?
A. Define "economies."
Q. For instance, a reduction in costs because you can either dup -- avoid duplication either in management costs or management operation expenses?

Page 174

A. We have generally not found that to be true, the same staff. We staffed Alden Pond fully and we staffed Promenade Oaks fully. Typically when you're talking economies of scale, you're talking about somebody maybe sharing a manager or a maintenance. That's -- we receive no benefit from that on this -- on this deal.
Q. Do you receive some benefit because you control a significant number of apartments in a -- in a localized area?
A. GID receives benefits from that.
Q. What did -- how does GID receive benefits from that?
A. We run a corporate housing program. The larger your corporate housing program is maybe the better you can negotiate say your leased furniture rates for your corporate apartments because you can go to Cort Furniture and say "I have, you know, 200 units that I use as corporate apartments. Therefore, we are going to be a big part of your business and you should give me a better discount on the rental furniture than you would someone who only had ten units to give you," so we derive benefits from that and we derive benefits from being able to offer someone multiple locations when they have a corporate housing job or assignment. If someone wants to live in Minnetonka and someone wants to leave in Eagan or Alden

Page 175

Pond, I can offer them both. Whereas if I didn't have one of the other properties, I would be able to offer them the one and they might choose another provider.
Q. Did that at all affect your desire to pay less money for Promenade -- a small amount for the Promenade as possible?
A. No.
Q. Now, one of the advantages that you had in this negotiations is that you had a seller who was motivated; correct?
A. I believed I had a seller that was motivated.
Q. Did you ever check the financials on this property prior to your purchase?
A. Check the income and expense statements from this property prior to the purchase?
Q. How about the debt arrangement on this property prior to the purchase?
A. I received no copy of the debt documents for this property.
Q. At any time prior to your purchase of this property, were you aware that the seller was in default on their loan to UNUM?
A. No, I was not aware of that.
Q. Were you aware that they were in fact a fault -- they were in default on their loan on Heller?

Page 176

A. No, I was not aware of that.
Q. Were you aware that if they sold this property by December of 2001, that they would benefit to the -- approximately $2 million in their deal with their loan -- lenders?
MR. BROWN: 2002 I think you mean.
BY MR. REILLY:
Q. I mean two thou -- December of 2002.
A. No, I was not aware of that.
Q. You did know, however, that they wanted for some reason to close this matter by December of 2002?
A. That is correct.
Q. And you knew that there was something to do with financing, but you never -- and you never took the time to -- or effort to find out what that was?
MR. GASKINS: Objection, that misstates his prior testimony to the extent you were trying to --
MR. SPRINGER: I'll join in that objection.
MR. REILLY: You can answer the question.
MR. SPRINGER: I'll join in the objection to the not taking the time and effort.
MR. GASKINS: I will also join in. I will also object on the grounds that it states a fact not

MR. BROWN: Swing that camera over towards Mr. Gaskins.
BY MR. GASKINS:
Q. Okay. Do you -- do you know today what that -- that $27 reduction for utility reimbursement, how that affected the income stream?
A. The quick math would be merely to take $27 times 288 units.
Q. 282, right?
A. Is it 200 -- let's see. 282, sorry. One of my acquisitions in Minneapolis was 288. In any event, this was -- and you multiply it by that. Multiply it by then whatever economic occupancy you're going to proforma for that year, so, you know, it would be a pretty significant effect, and -- and the other issue is it's a permanent effect, which means it carries through every year and it carries through on a capitalized basis on your exit. In other words, it may be an income stream hit of -- I'm not going to do the math in my head -- 40, $50,000 a year, but when you capitalize that, it's a 500 to pick a number hit at the end of the year --
Q. Okay.
A. -- at the end -- at the sale and --
Q. Okay.
A. -- and therefore on the purchase price as



well.
Q. Right. Now, on the RUB -- the RUBS income was one -- was one effect on the income stream. The other effect on the income stream was that the current market rent structure would not hold in the current economic environment; is that right?
A. That's what I believe.
Q. And that's what redult -- resulted in the 7.04 percent reduction in the revenue stream, those two, the combination of those two things together?
A. Yes, they are tied together in -- yes, they're tied together.
Q. Okay. Now, was there any further reduction at this -- at this time in the second jump as a result of your calculations of the increased vacancy rate due to the waterproofing work?
A. Say that again, please.
Q. Yes.
A. Thank you.
Q. One of the things that you considered in reducing your purchase price was that you were going to have to increase your vacancy rate as a result of the three-staged --
A. Uh-huh.
Q. -- capital improvements due to the



waterproofing?
A. Right.
Q. Did this second jump from 24.5 with a 3 million holdback down to 24.5 with a $1.5 million holdback factor any of that effect in?
A. I can't recall. It's a very fluid situation when you have the kind of volume of numbers being thrown at me on a daily basis from multiple groups and I'm trying to process those numbers, predict forward as to where I'm going to end up, and try to give direction to a seller of whether or not we're able to strike a deal, so it's a very fluid basis. I would hate to imply that I could pick particular points in time and recollect exact issues, particular issues were being solely analyzed at that time.
Q. Okay.
A. As you can see from the number of e-mails, my estimates of occupancy changed a number of times.
Q. So is -- is there any clean way to tell how much of the -- to your knowledge today, how much of the reduction of the $30 million purchase price was due to the plaza deck rehabilitation, the mold, the contract management for the fire watch, the contract management for the supervisor, and the capital expenses that you were going to pay to rehab the plaza deck --
MR. BROWN: Object to the form of the



question as compound.
MR. VEITH: Multiple questions.
BY MR. GASKINS:
Q. -- versus the RUBS and reduction in income stream?
MR. STEPAN: Objection as to form and compound.
MR. VEITH: Multiple questions.
BY MR. GASKINS:
Q. Do you understand the question, sir?
A. You have to restate that question.
Q. Okay. Fair enough. The reduction in purchase price from $30 million to $24.5 million plus the 1.5 --
A. Uh-huh.
Q. -- was a result of several factors. Can you name them all now?
A. I could not name every single factor that went into all those line items.
Q. Can you name the principal five?
A. The principal factors that went into our valuation of this asset would be the costs to repair the a -- the asset, the economic cost to turn the asset around and to accommodate the type of repair and disturbance that would be caused by the repair on the property. It encompassed all the costs necessary to staff and

accommodate the repairs. A reduction for the RUBS was another one, and other esoterics such as my perception of risk and where the pricing should be on this asset and where the yield should be.
Q. Okay. Was your perception of risk driven primarily by the uncertainty generated by this big construction problem you were going to have to undertake?
MR. BROWN: Objection to form.
MR. STEPAN: Objection, leading.
MR. VEITH: Objection.
MR. REILLY: Leading.
MS. HEYER: Same objections.
A. My view of risks -- it is my job to -- one of my jobs is to communicate or have some understanding of our probability of success in a business plan and make sure that -- that the risks that we are taking are justified by the rewards we expect to receive upon execution of that business plan. As I learned more about what it was going to take to execute the business plan, I adjust my risks accordingly and pricing accordingly so --
BY MR. GASKINS:
Q. Okay. My question is actually -- I appreciate that answer. My question is a little bit narrower.
A. Okay.
Q. And that is was the majority of the risk that



you were considering on this property as a result of the water problems and construction that you were going to have to undertake to remediate it?
A. If you use the word "majority," I would say the majority of the risks that I had to -- that I had to deal with, the majority were caused by that issue.
Q. Okay.
MR. BROWN: I'll object. That's nonresponsive to your question.
BY MR. GASKINS:
Q. And a sub -- two sub issues were the RUBS and the erosion of the market?
MR. REILLY: Object, that's leading and argumentative.
MR. VEITH: Same.
A. Those two were also issues that had a substantial impact given that they are both -- you have to understand that reduction of rents is also capitalized at the term, at the end, so a reduction of rents today is a reduction of cash flow each and every year plus, on a capitalized basis, a reduction of your exit price, so that reduction of rents has a significant value. It's not without impact, and the -- the same goes for the reduction of the RUBS income.
BY MR. GASKINS:



Q. Okay. Why is it that a reduction of rents has an impact on -- throughout the income stream? Why can't you just get over the little hump and then raise the rents up to what you had previously projected?
A. It depends on the depth of the downturn. If you're having a short-term blip in a market that's otherwise adding jobs, you can get away at times with an up-front concession. That's why the first concession everyone attempts to do is an up-front concession because it is done in one time. The tenant then pays 11 months at the previous rent. If the market has then grown, it's very easy to say "Your new rent is $20 more." Okay.
The next level of rent reduction or concession is a prorated concession. In my view, that becomes a tacit admission that the market rents are no longer what they were. It's not all the time. However, you know, sometimes a leased-up property may do that for a while and affect a submarket. However, if you do a market research of all the properties in that immediate area and you happen to own a property which has reduced its market rents, you can reach the conclusion, as I did, that there had been a permanent adjustment down.
The rents at Alden Ponds we had adjusted down perm -- in our view, to a new market rent. If we felt it was going to pop back, we would have left it and tried to



do some sort of up-front concessions. We felt that it wasn't. We didn't want to prorate. We wanted to move the market rents down and fill the units up. Again, Minneapolis has had a very difficult period, as in a lot of markets right now. In fact, there's very few markets that are actually going -- having top-line revenue growth or are able to produce top-line revenue growth for their apartment.
Q. At this time?
A. At this time, yes.
Q. Okay. Now, my question was a little bit different than that though. You say that the reduction of rents then continues for the remainder of the income stream. Why -- I still don't understand why that's so. Is it because you can't jump up the rents too high from a level or --
A. Let's -- yes. Simply, I don't foresee any reason why we would get a 7 percent rent increase any time in the near future in Minneapolis, which would then accommodate, say, if I had decreased rents three-and-a-half percent, then next year I can get the three-and-a-half I budgeted plus my three-and-a-half back. That's a 7 percent rent increase. There is -- you know, the economy has -- is still slowing. Job stata is still poor. We're still likely to push up the unemployment rate, in my belief, and

Page 389

A. Yes.
Q. All right. Now, I also recall you saying that you knew at least one other project that your company has used Mr. Camaya on that involved waterproofing; is that true?
A. Yes.
Q. Can you tell me what kind of waterproofing issues were involved in that project?
A. I cannot.
Q. Were you involved as the person that sold that property -- or purchased that property? I'm sorry.
A. No, I was not.
Q. Where was that?
A. It was in new -- in Jersey City.
Q. Was it a multiunit apartment complex?
A. It was a garden-style multiunit apartment complex.
Q. Do you even know if that complex had filled courtyards such as the Promenade does?
A. It does not.
Q. Now, you'd agree with me that these extrapolations that you calculated and that you presented to the City of Eagan in terms of people being shifted around and disruptions in the courtyards and so forth are purely that at this stage? They're -- they're

Page 390

extrapolations because none of that work has -- has gotten underway; true?
MR. GASKINS: Object to the form "agree with me."
BY MR. BROWN:
Q. I'm sorry. That's true. I will restate it. None of the work that is described in the letter to the City of Eagan that you proposed or that is described in the engineering reports generated by the pe -- the firms you retained has actually gotten underway; true?
A. I am unaware of that.
Q. Would you be aware of something like that?
A. As I said, asset -- once I acquire the asset, the responsibility for executing those types of business plans would fall to asset management.
Q. And is asset management in a different office than you occupy?
A. They're in the same office building.
Q. But it wouldn't be at least part of the scope of your involvement with the Promenade project officially anyway to take part in or -- or be involved with any of that type of work; correct?
A. That's correct.
Q. Did you consult -- and if you did say this, I apologize. Did you consult with your asset management

Page 39

people in coming up with any of the information that you conveyed then to the City of Eagan in terms of the disruption issue?
A. No.
Q. That's something that you came up with on your own?
A. No.
Q. How did you -- what was the basis for the information in that letter that you sent to the City of Eagan?
A. I asked Mr. Vanderburg to detail to me, and Mr. Tarasov, what they thought this whole repair would entail, and then I reduced all of that into that memo which I sent to Mr. Wegleitner so that he would have an understanding.
Q. All right. Now, I guess what I was trying to say, and I'm obviously asking it poorly, this issue of disruptions of courtyards and people that face the courtyards that in your belief were going to require some inducement to stay and so on, that's not based on any real life experience that you've had professionally anyway; true?
A. That's not correct.
Q. It's not correct? Have you had a similar situation where a multi-building property required the kind

Page 39

of construction that's detailed in these reports and disruptions to tenants and so on?
A. It depends how -- let's put it this way: I have bought assets that have been renovated which involvec disruption to tenants. As I was the acquisition person for that, I did take the time to learn what -- the extent of the disruptions of a renovation type transaction so that I could accurately underwrite those going forward, so it's not uncommon for disruptions to affect the operations on a property.
Q. Do you know whether any disruptions involved with the remedial work that was done during the earlier stages of Promenade resulted in disruptions and -- and affected occupancy or rents? Do you have any data?
A. I do -- I do not.
Q. Was that part of your due diligence to look into that historical type of evidence when you were creating this sort of three-year plan?
A. I -- again, I don't know that I got any historical data exactly detailing how they performed during that period of time.
Q. Is it a fact that you have no historical data at all that substantiates or demonstrates any adverse effect on either rent rates charged by the Promenade or occupancy rates attributable to leaks or water issues on

that project?
A. Is the question am I aware that the water leaks on that property -- if those have affected rents in any way?
Q. The question is whether you have any documentary evidence supporting such a conclusion.
A. No.
Q. You mentioned that CalPERS -- that this is a -- I'm probably going to get the terminology wrong, but your company has full discretion on this project. Is that what you said?
MR. SPRINGER: Objection, relevance to the extent the question asks for relationships between GID and CalPERS.
BY MR. BROWN:
Q. You can still answer the question.
A. In my discussion of the Executive Summary, there is a "Partner Investment Parameters," and I believe I stated that as long as it falls within the investment parameters shown here as well as some other parameters regarding environmental, we have discretion to acquire the asset.
Q. All right. And you did actually answer part of the next question I had. You're referring, by the way, to Exhibit 542 --



A. 542 --
Q. -- is it?
A. -- yes.
Q. Let me look at that quickly. There are parameters that we talked about yesterday, and I don't want to get into them, that are actually contained on page 1 of this exhibit; correct?
A. Yes.
Q. And let me see. I'm sorry. It says "Investment Parameters." That's why it's hard for me to find. What other parameters -- you did just touch on it right now and you touched on it earlier in your testimony -- besides what are contained on page 1 of Exhibit 542 does CalPERS have in place?
MR. SPRINGER: Objection, relevance.
A. If there was a significant environmental problem, you would notify CalPERS. In -- in general, we would notify them of anything that would be out of the ordinary in any event.
BY MR. BROWN:
Q. Was CalPERS, to your knowledge, sent a copy of the litigation report that's depicted in Exhibit 540?
A. To my knowledge, no.
Q. Would that be something that you would be the person to provide to CalPERS if it was within one of these



parameters?
A. No.
Q. Who would do that?
A. Bill Roberts of asset management.
Q. Would he copy you on something like that?
A. Maybe or maybe not.
Q. But you were not copied? If he did send something -- send a copy of the litigation report to CalPERS, you weren't copied on that transmittal; correct?
A. That is correct.
Q. Was Mister -- or "Mr. CalPERS." Was CalPERS sent a copy of the environmental reports pertaining to the mold issue to your knowledge?
A. To my knowledge, no.
Q. Now, you mentioned yesterday that mold is a big bugaboo, so to speak, in the commercial real estate industry today; is that true?
MR. SPRINGER: Objection, misstates the witness's testimony. He never --
BY MR. BROWN:
Q. Yeah, I'm not -- I'm certainly not quoting you, but is it a true statement that mold is a significant concern and a significant industry to companies such as yours and specifically GID?
A. Mold is an -- is an issue.



Q. And is the issue the potential liability implications from claims and so forth pertaining to mold? Is that the concern?
A. That is the concern.
Q. Okay. It's not -- it's not the cost of replacing a piece of sheet rock in an apartment that concerns the investors? It's the liability issues down the road potentially; correct?
A. Well, liabilities involving also the cost of cleanup --
Q. Okay.
A. -- and if you want to add to that potentially a diminution in the market perception of that asset.
Q. Who would be the person at G -- GID to answer questions best about the current intentions with respect to the property vis-a-vis repairs and those sorts of things?
A. The asset management group.
Q. All right. Who involved with the group would be the best person to ask those questions of?
A. Bill Roberts.
Q. All right. Now, is also, and I think some correspondence bears it out, Mr. Tarasov involved in -- in that type of activity after a property is acquired?
A. Yes.
Q. All right. And if indeed there is some sense

Page 421

A. You know, no, I do not know how --
Q. What he was intending?
A. -- what -- what his intent is for the full phase 2.
MR. SPRINGER: Thad, you've got to wait for him to finish his questions.
THE WITNESS: Sorry.
BY MR. BRISBOIS:.
Q. And I know in regard to line 1049 you don't recall what that was. That's the mold line for a total of 106,000 over three years. I know you don't recall what was meant by that or intended by that. Is there anyone that you dealt with during the due diligence process that -- that might know what that is that you can think of?
A. Scott Vanderburg would.
Q. And he's part of the --
A. The creat -- yeah, the creator of the ten-year cap plan would know why that number is -- what that number is specifically allocated for. I cannot recall.
Q. Did anyone from Promenade either directly or through Mr. Jaffe communicate to you that during the previous five years on at least one occasion, and there may be more, but at least one occasion they conducted some investigation for mold and found nothing?
A. I only had the documents that they gave me,

Page 422

and I don't remember anyone saying to me "We've done extensive testing and found none." I would have asked for proof of that.
MR. BRISBOIS: Andrea?
MS. REISBORD: Yes.
MR. BRISBOIS: Anything else?
MS. REISBORD: No.
MR. BRISBOIS: That's all I have. Thanks.
MR. LIBBARES: The time is 3:44. We're off the record.
(At this time a brief recess was taken.)
MR. LIBBARES: The time is 3:44. We're on the record.
MS. HEYER: Hi, Mr. Palmer. My name is Chandelle Heyer, and I represent J-Berd Mechanical Contractors, Inc., and as I stated previously when we were off the record, I don't have any questions for you at this time. I may after redirect though.
MR. HULL: I don't have any questions.
MR. GASKINS: Wait, we've got one more.
MR. HULL: Oh, excuse me.
MR. BAUMGARTNER: Hello, Mr. Palmer, my name is Brian Baumgartner. I represent Mikesh, Incorporated, and you'll be disappointed to learn that I

Page 423

also have no questions.
MR. HULL: Now I have no questions.
MR. REILLY: I have no further questions.
MR. GASKINS: In response to -- I'm sorry. I've got to do the mike. I've got one, Mark.
MR. BROWN: All right.

RECROSS-EXAMINATION

BY MR. GASKINS:
Q. In response to a question by Attorney Brown, you said that you had no documentary evidence supporting conclusion that disruption and leaking affected rents or occupancy prior to 12-12-02?
A. Yeah, not --
Q. Do you remember that?
A. Yes.
Q. Okay. Do you have -- is there anything about this transaction that would support a conclusion that the disruption and leaking did affect the rents and the occupancy prior to 12-12-02?
A. There was nothing that I was given that I could connect those two dots together definitively for past operations.
Q. Did you make any effort to do that?

Page 424

A. I did ask the people at Alden Pond, the competitors if they had heard of -- I mean, that would be one way that would affect the market rents would be that other people would say "What other properties are you intending to move into?" and they would say "Well, I'm looking at Alden Pond" or "I'm looking at Promenade Oaks." If that marketing person is up on -- on their game, they would say "Well, you know, geez, that property, you shouldn't move there, has this wrong with it." I asked around. I -- I was unable to ascertain -- we've owned Alden Pond for several years -- that -- that it was something that was common in the marketplace that my leasing agents were using against Promenade to win deals from them so --
Q. Did you inquire of Healey Ramme or Phillip Jaffe whether the disruption and leaking that had occurred from 1998 through the date of closing had affected rents or occupancy prior to the day of closing?
A. I had a -- if we can go back to the exhibit -- I'm sorry. If you look at this exhibit showing the operations from '99, 2000, and 2001, the average occupancy was 96.4 for '99, 95.3 in 2000, 96.6 in 2001. I looked at those. You look at the monthly occupancies, and I, you know, found nothing disturbing there. You know, if you're going to lower rents, you would probably have started to

Case 0:00-cv-00987-JNE-JSM Document 418-4 Filed 09/03/2004 Page 19 of 20





UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

File # 00-CV-987 JEL/JGL

Westfield Insurance Company,

Plaintiff,

vs. VOLUME I

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF ROBERT J. STRACHOTA, taken pursuant to Notice and Agreement under the Rules of Civil Procedure for the District Courts of Minnesota, and taken at 200 Riverview Office Tower, 8009 34th Avenue South, Minneapolis, Minnesota, and taken on the 27th day of August, 2003, commencing at the hour of 9:25 a.m., before Martin R. Huber, a Notary Public in and for the County of Stearns, State of Minnesota.



* CAPTION CONTINUED *

Waterproofing by Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., and Colloid Environmental Technologies Company,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Third-Party Defendant and Fourth-Party Plaintiff,

vs.

Chris Craft, Industrial Products, Inc.,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXHIBIT K



I N D E X


| EXAMINATION OF WITNESS: | Page |
|---|---|
| Mr. Stepan | 6 |

| OBJECTION BY: | Page |
|---|---|
| Mr. Brown | 35 |
| Mr. Gaskins | 58 |
| Mr. Brown | 59 |
| Mr. Gaskins | 60 |
| Mr. Gaskins | 69 |
| Mr. Gaskins | 70 |
| Mr. Veith | 78 |
| Mr. Brown | 78 |
| Mr. Reilly | 92 |
| Mr. Gaskins | 94 |
| Mr. Reilly | 110 |
| Mr. Reilly | 111 |
| Mr. Reilly | 113 |





| DEPOSITION EXHIBITS | Page |
|---|---|
| Exhibit 797 marked | 7 |
| Exhibit 798 marked | 9 |
| Exhibit 799 marked | 13 |
| Exhibit 800 marked | 43 |
| Exhibits 801-802 marked | 44 |
| Exhibit 803 marked | 93 |
| Exhibit 804 marked | 119 |


** Deposition Exhibits 801 and 802 were retained by Mr. Strachota.

matters you're going to question me about.
(WHEREUPON, Strachota Deposition Exhibit 798 was marked for identification by the court reporter.)
Q Mr. Strachota, we've marked as Exhibit 798 the black three-ring binder that you produced here today; is that right?
A Correct.
Q What are those documents? Just in general, what do you have there?
A These documents are a recap of the sale of Promenade Oaks as it was handled by the CB commercial people.
Q CB Richard Ellis?
A CB Richard Ellis.
Q Did you request those documents or do you know why they were provided to you?
A I requested them.
Q And why is that?
A Because they are the kind of information that I am interested in as it relates to the sale of this property impacted with the water condition.
Q Did you use any of those documents as -- did you rely on any of those documents to put together your reports for this case?
A Yes.



Q Which documents did you rely on?
A I would suggest that all of them had some influence in the decisions I made in doing the most recent report of the valuation of Promenade Oaks.
Q We will come back to that. Did you review any of your materials in preparation for the deposition here today?
A Yes.
Q What did you review?
A The two appraisals that we have performed, they are dated October of 2001 and December of 2002. Those are the dates of valuation.
Q Did you review anything else?
A No.
Q You have got two appraisals. How do you view them? Does one supplement the other, does one trump the other, both out there standing on their own?
A The first appraisal was requested prior to the sale of the subject property, and I was being asked as a professional to give an opinion of the value of Promenade Oaks without any influence of the water condition and with the influence of the water condition. The second appraisal does not deal with the second condition, which is with the water condition. We simply appraise the property without



any consideration of the water problem, and then we rely on the actual sale of the property as the after condition.
Q Is there any value to the first appraisal, or is the second appraisal the one that has the most meaning, in your mind?
A No, I don't think that I would agree with that. I think the first appraisal is one where we exercised our best judgment in both scenarios. The second appraisal is done with additional information and in many regards validates the first appraisal.
(WHEREUPON, there was a discussion off the record.)
Q The first appraisal that you did where you were asked to give an opinion of the value without leaks and with leaks, is that the kind of appraisal you have done before?
A Yes.
Q Just generally -- well, how many times have you done an appraisal like that before?
A And I'm going to answer in the context of a damages appraisal where I'm trying to measure the impact of a situation. I have done dozens of appraisals like that --
Q Do you have -- I'm sorry, I didn't mean to cut you



off.
A It would be difficult for me to count the number over my career that I have done, but it's more than 25 or 50. We're probably talking, you know, a hundred or 200 types of appraisals like that.
Q Is there a typical procedure you follow in putting together such an appraisal? From the beginning, assembling documents you need, up to visiting the site, and then producing the final product?
A I don't think there is any typical procedure in terms of how you conduct the appraisal, but there is a typical procedure in terms of how you measure the impacted situation. In other words, the appraisal methodology.
Q What do you mean by that, the appraisal methodology?
A Well, the challenge for the appraiser in conducting this kind of an appraisal is to measure the impact of the detriment or the problem, and do it in as pure a way as possible. And so the challenge for the appraiser is to measure the value in a before situation, before the impact of the problem, before the detriment, and try to do that in as pure a fashion as possible, and then, of course, compare that valuation to the valuation in an after situation or a situation which involves the impact. And then