**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Westfield Insurance Company,

Civil File No. 00-CV-987 JNE/JSM

Plaintiff,

vs.

Weis Builders, Inc., Promenade Village Townhomes, L.L.C., Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants, and

**THIRD PARTY DEFENDANT J-BERD MECHANICAL CONTRACTORS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTIONS IN LIMINE**

Weis Builders, Inc.,

Third Party Plaintiff,

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Company,

Third Party Defendant and
Fourth Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,

Fourth Party Defendant,

and

---

J-Berd Mechanical Contractors, Inc.,

Third Party Defendant and
Fourth Party Plaintiff,

v.

Mikesh, Inc.,

Fourth Party Defendant.

## INTRODUCTION

Third-Party Defendant and Fourth-Party Plaintiff J-Berd Mechanical Contractors, Inc. ("J-Berd") submits the following memorandum of law in support of its motion in limine to limit testimony, evidence, and argument regarding: 1) the depth of the standing water found at the bottom of the plaza deck level of the courtyards of the Property during various excavations; 2) the frequency of the occurrence of said standing water; and 3)the plaza drain configuration's role in the existence of such water.

J-Berd also submits this memorandum of law in support of its motion in limine to exclude certain opinions asserted by civil engineer, Jeffery Schuh, the proposed expert retained by Third-Party Defendant Colloid Environmental Technologies Company ("CETCO"). J-Berd seeks to exclude from evidence the following opinions asserted by Mr. Schuh:

1. The surface water drainage systems in the courtyards at the Promenade Townhomes are inadequately designed based on the special circumstances surrounding the courtyard. The design does not meet City requirements and results in water ponding adjacent to the buildings (Ex. 836 pg. 20 #1).
2. Due to the extremely flat topography and small size of the courtyards, the drainage system should have been designed with additional safeguards. The system should have been designed to accommodate the 100-year storm without significant ponding. Any ponding resulting from the 100-year event should have been minimal and should not have resulted in a water surface within 1 foot below the top of foundation or any other opening that could be conduit to seepage (Ex. 836 pg. 20 #2).

3. The top of foundation should not be located within one foot in elevation to the inlets. There needs to be more margins for potential ponding because the result of ponding is seepage into the buildings. The top of foundation should have been located above the surrounding grade to eliminate the potential for seepage to occur through the framed portion of the building (Ex. 836 pg. 20 #3).
4. Seepage may be the result of melting snow during periods of freezing weather. When the ground is frozen, melt water cannot reach the inlets or percolate into the drainage system. Instead, water can seep into thawed ground near the buildings and enter the units (Ex. 836 pg. 20 #4).
5. The drainage problems within the courtyard could have been significantly reduced if a well-designed surface drainage system were constructed. Such a system would have taken the special needs of the courtyard into consideration. A combination of adding gutters to the buildings to divert flow from the roof, lowering the rims of the inlets, and installing a larger grate and frame would have reduced, but not eliminated, the potential for ponding and subsequent seepage (Ex. 836 pg. 21 #5).
6. The precast concrete slabs should either have been sloped towards the drains or a topping should have been provided to promote subsurface drainage. Instead with a flat drainage system that has no potential for complete drainage because of the configuration of the outlet pipe, there is a continual source of water on top of the waterproofing system. (Ex. 836 pg. 21 #6).
7. Frost heave of soils in the courtyard is a direct result of using silty sand and silt to coaly backfill above the subsurface drainage system. Silty sand is highly frost susceptible. A free draining, non-frost susceptible soil should have been used for backfill below all structure in the courtyard, including sidewalks. (Ex. 836 pg. 21 #7).

## ARGUMENT

## I. THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THAT THERE IS ALWAYS APPROXIMATELY TWO INCHES OF STANDING WATER ON THE WATERPROOFING MEMBRANE AT THE COURTYARD PLAZA DECK LEVEL

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> Fed.R.Evid. 702.

A foundational rule of evidence is that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

Fed.R.Evid. 602. Such evidence may consist of the witness' own testimony, subject to the provisions of federal rule 703 governing opinion testimony by expert witnesses. Id.

Under Federal Rules of Evidence 703 instructs that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or opinions need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

The district court's function is to ensure that expert testimony admitted under Rule 702 "is not only relevant, but reliable." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993). The seminal federal case Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) addresses the issue of how a trial court should analyze the reliability of scientific testimony. Daubert suggests that the following factors be among those considered in determining whether proffered scientific evidence is scientifically valid: 1)whether the underlying theory or technique can be or has been tested; 2)whether the theory or technique has been subjected to peer review and publication; 3)whether the technique has a known or knowable rate of error; and 4)whether the theory or technique is generally accepted in the relevant community. Id. at 593-94. A witness' qualification as an expert does not give him or her carte blanche to speculate before the jury as to causation by relying on inferences that have no evidentiary support in the record. *See* Weisgram v. Marley Co., 169 F.3d 514, 519 (8th Cir. 1999). Foundation must be established before an expert can testify in that regard. *See* id.

In the present case, J-Berd takes issue with various parties' characterization of the standing water found at the bottom of the plaza deck level of the courtyards of the Property as always being two inches in depth. In addition, the record does not support parties' factual

assertions that standing water, rain or shine, always exists on the plaza deck. Moreover, J-Berd maintains that the evidence does not support any argument that the drain configuration at the plaza deck results in two inches of water being present on top of the membrane at all times. Contrary to parties' arguments, the evidence instead supports that the existence of standing water in general as well as the depth and frequency of the standing water on the plaza deck at this property is very much disputed. Accordingly, J-Berd asks that the court disallow any evidence, testimony, or argument to the effect that there is always standing water on the plaza deck.

As an example, Gary Nelson's testimony with regard to the standing water that he observed during Weis' repair efforts at the Property specifically reads as follows:

> Q: Did you see water standing at the bottom of the subsequent excavations around those posts?
> A: Yes.
> Q: How deep.
> A: About two inches.
> ***
> Q: You also mentioned when you were talking about some post excavation, that you observed a couple of inches of standing water in a couple of those excavations…Did you measure in that area to come up with the two inches, or how did you come to find out that that was about what the area of the water was?
> A: Well, once the drain board and the foam is cut out of there, the foam is two inches thick, the drain board is a half inch thick. The water level typically reached at least in the area of the top of the foam. **Sometimes it was more, sometimes was less, depending on how much moisture was on the plaza. If you had a dry stretch during the summer, and there was minimal use of the irrigation system; because, there again, when we were digging out those holes, we didn't want them flooding our holes. And most of the irrigation went through those areas that we built – cut, had to dig these holes. So, as long as the irrigation system was off, the plaza would get a lot dryer, (sic) there would be a lot less moisture on there than the two inches that I indicated.**
>
> *See* Heyer Aff. In Response to Chris Craft's and Colloid's Motions for Summary Judgment, Ex. A, Gary Nelson Dep., at 107, 171-172 (emphasis added).[1]

Any factual assertions regarding a supposed ever-present existence of at least two inches of standing water on the waterproofing membrane at the plaza deck level is similarly untested

[1] These pleadings are already on file with the court and thus are not being resubmitted herein to avoid unnecessary duplication of the record.

and unsupported by the evidence in this case. For example, Promenade's proposed expert David Campbell's testimony relative to the existence of standing water at the plaza deck level and the plaza drain configuration reads:

> Q: You indicated that in every hole you dug there was standing water; correct?
> A: That's correct.
> Q: And in some of the areas, **as much as two or three inches** of standing water?
> A: That is correct.
> ***
> Q: Well, you know the membrane has water on top of it all the time?
> ***
> A: **Not necessarily**.
> ***
> Q: Is there any place that you dug a hole you didn't find standing water?
> ***
> A: …I found standing water at every destructive test opening **to varying degrees.**
> ***
> **Q: Is it fair to say that there's two – roughly two to two-and-a-half inches of water sitting on the deck as a result of the drain assembly that was used?**
> *******
> **A: In part.**
> **Q: Is there anything else that contributes to that water being there other than the type of drain assembly being used?**
> **A: The lack of slope of the waterproofing.**
> ***
> Q: …At each DTO [destructive test opening] you found water?
> A: Yes.
> Q: Was there any way to measure that water?
> A: Only by recollection. I could – there were DTOs where I encountered six, seven inches of water standing in the bottom. **Then there were other DTOs where there was only an inch** and I could vacuum that up effectively. And various levels in between.
> ***
> Q: Your testified earlier today that the earth was very waterlogged so that there was constant hydrostatic pressure and the site was carrying out its own water test. Did I write that down correctly?
> A: That's correct.
> **Q: …Was there a control subject?**
> ***
> **A: No.**
>
> *See* Heyer Aff. In Response to Chris Craft's and Colloid's Motions for Summary Judgment, Ex. B, Campbell Dep., Vol. I, at 144-145, 161 and Vol. II, at 56, 67, 86 (emphasis added).

While not an exhaustive recitation of all proposed expert testimony, the following additional excerpts of proposed expert testimony also echo Mr. Campbell's thoughts regarding the issues of standing water and plaza drain configuration:

**Richard Stehly**

> Q: Given the fact that there is this permanent amount of water that's on the waterproofing membrane, in this case somewhere up to two inches of water, and that's what you believe existed at this condition; correct?
> ***
> A: **It can be as much**. Well, it could be more, but it can.
> ***
> Q: …You said that there are two inches of water; did you not?
> A: **There can be. There can be**.
> Q: Okay. At least I think is what you said?
> A: Yes. **It will allow it to accumulate. Not saying that it's there, but the configuration will allow it to be that deep.**
>
> *See* Heyer Aff. In Response to Chris Craft's and Colloid's Motions for Summary Judgment, Ex. C, Stehly Dep., at 65-66 (emphasis added).

**Richard Kozial**

> Q: If the courtyard drainage system is not draining surface and subsurface water off the deck, does that have a potentially damaging effect on the waterproofing membrane or of the ability of the waterproofing membrane to perform.
> A: Well, by definition, a waterproofing membrane is a material that can withstand hydrostatic pressure. That's just any material. It doesn't matter. If it's a waterproofing membrane, it should be able to withstand hydrostatic pressure and water should be able to sit on it and it should be unaffected by it. But by the same token, it is good practice to remove water from the system…. *** …I would be surprised of somebody coming forward and saying it's not good practice, you don't have to slope the structural surface with drainage or create some kind of slope to drain. I think anyone who is worth their weight would agree with the fact that **it's just good practice to slope surfaces to keep water from ponding in the first place.**
>
> *See* Heyer Aff. In Response to Chris Craft's and Colloid's Motions for Summary Judgment, Ex. D, Kozial Dep., at 110-111 (emphasis added).

**Mark Chauvin**

> Q: And the standing water that you saw in the bottom of those excavations was roughly two inches to three inches deep; correct?
> **A: Roughly.**

> ***
> Q: So assuming that to be true and assuming that you have this two and a half inches and that obviously from your inspection the drainage mat is below that two and a half inches, it's not moving water at all anyways, is it?
> A: Horizontally, no. You're probably correct. But again, it would – **I can't speak knowledgably about the performance of the courtyard when it comes to retaining water, how much water evaporates over time. If during the course of, say, this summer, where we did not get rain for an extended period of time, if there would even still be two inches of water,** I think you would need to ask a soil engineer or a hydrologist what to expect in terms of fluctuations, in that sense.
>
> *See* Heyer Aff. In Response to Chris Craft's and Colloid's Motions for Summary Judgment, Ex. E, Chauvin Dep., at 36-37, 139-140 (emphasis added).

**<u>Sid Bhatt</u>**

> Q: In your opinion, what part of the assembly in the courtyard drain system results in there being roughly two and a half inches of water standing on the – or the bottom two and a half inches of soil being saturated at all times?
> A: The fact that the holes or perforations in the side of the riser are roughly two and a half inches above the concrete deck is one of the principal reasons for the standing water. **The second reason would be the fact that the concrete deck or the drain mats above it do not incorporate a slope bringing the water positively towards the risers.**
>
> *See* Heyer Aff. In Response to Chris Craft's and Colloid's Motions for Summary Judgment, Ex. F, Bhatt Dep., at 52 (emphasis added).

**<u>Robert Kudder</u>**

> Q: Do you know that there are two inches of water everywhere on that membrane?
> A: **Well, I haven't excavated everywhere**, but it's relatively level and there's drainage board to distribute the water in a horizontal direction, so I would expect there's water everywhere. **It may or may not be two inches**, but it's thereabouts.
>
> *See* Heyer Aff. In Response to Chris Craft's and Colloid's Motions for Summary Judgment, Ex. G, Kudder Dep., at 196 (emphasis added).

In addition to the above-referenced proposed expert testimony, Patrick Engineering also performed site investigation at the Property and made observations about the conditions at the bottom of the courtyard plaza at the waterproofing membrane level. More specifically, Patrick Engineering employees dug several small hand augers in the grassy courtyard areas and noted that the soil condition at the bottom of many of these augers was dry. *See* Heyer Aff. In

Response to Chris Craft's and Colloid's Motions for Summary Judgment, Ex. H, Schuh Dep., at 64-68 and Schuh dep. ex. 842. Mr. Schuh also testified that the type of soil that exists at the Property inhibits water drainage to the drain system. *See* Heyer Aff., Ex. H, Schuh Dep., at 137.

Given all of this testimony, J-Berd maintains that the record in this action establishes that the depth and the frequency of the standing water at the courtyard plaza deck level of the property is not a constant. It is unlikely that any party will be able to establish to a reasonable degree of scientific certainty that there are two inches of water that lie constantly on the waterproofing membrane. The court should therefore consider the "two inches of water" theory as no more than that: a theory. In addition, the record in this case also creates a fact question about what role the drain configuration played in the existence of any standing water at the courtyard plaza deck level. Thus, any evidence, testimony, or argument that it is the drain configuration at the plaza deck that results in two inches of water being present on top of the membrane at all times is similarly unsupported.

## II. <u>CERTAIN OPINIONS ASSERTED BY PROPOSED EXPERT JEFFREY SCHUH OF PATRICK ENGINEERING SHOULD BE EXCLUDED BASED ON GROUNDS OF RELEVANCY, CONFUSION, FOUNDATION, AND RELIABILITY</u>

### *A. Mr. Schuh's opinions are not relevant. Alternatively, if there is probative value to his opinions, his opinions are outweighed by the confusion that they engender and should be excluded by operation of Fed. R. Evid. 403.*

The overarching reason that these proffered opinions should be excluded from evidence is relevancy. FRE 402 states:

> All relevant evidence is admissible, except as otherwise proved by the Constitution of the United States, by Act of Congress, by the these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

In the present case, Mr. Schuh cannot identify the cause of the leaks. (Schuh deposition page 184). None of the parties have provided any evidence tying the courtyard drains to the leaks that

occurred. Mr. Schuh's opinions are therefore irrelevant. FRE 402 mandates that his opinions be excluded.

> However, even assuming that there is some probative value to his opinions, FRE 403 blocks admissibility: "Although relevant, evidence may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." For example, J-Berd Mechanical Contractors, Inc. was the plumbing subcontractor for the Promenade Village Townhomes project. If Mr. Schuh offered an opinion that J-Berd installed the kitchen plumbing fixtures negligently, it should be inadmissible. The kitchen plumbing fixtures obviously relate to water, but there is no evidence that the kitchen plumbing fixtures relate to the leaks in the garages. This case is complicated. The question of causation and the question of the source of the leaks lie at the heart of the case. Allowing Mr. Schuh to testify to his opinions presents a substantial chance that confusion and speculation will occur.

***B. Jeffery Schuh's opinions do not satisfy the Daubert criteria for reliability.***

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> Fed.R.Evid. 702.

A foundational rule of evidence is that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed.R.Evid. 602. Such evidence may consist of the witness' own testimony, subject to the provisions of federal rule 703 governing opinion testimony by expert witnesses. Id.

Under Federal Rules of Evidence 703 instructs that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or opinions need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

The district court's function is to ensure that expert testimony admitted under Rule 702 "is not only relevant, but reliable." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).

The seminal federal case Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) addresses the issue of how a trial court should analyze the reliability of scientific testimony. Daubert suggests that the following factors be among those considered in determining whether proffered scientific evidence is scientifically valid: 1)whether the underlying theory or technique can be or has been tested; 2)whether the theory or technique has been subjected to peer review and publication; 3)whether the technique has a known or knowable rate of error; and 4)whether the theory or technique is generally accepted in the relevant community. Id. at 593-94. A witness' qualification as an expert does not give him or her carte blanche to speculate before the jury as to causation by relying on inferences that have no evidentiary support in the record. *See* Weisgram v. Marley Co., 169 F.3d 514, 519 (8th Cir. 1999). Foundation must be established before an expert can testify in that regard. *See* id.

Mr. Schuh asserts that the courtyard drain system is unable to keep water more then one foot below the entry elevation to prevent water from seeping over the foundation. First, Mr. Schuh's standards are not sufficiently ascertainable:

> Q. And if I understand you correctly item number two and three on page two of your report, those are items that you have just found to be standards throughout your experience almost universally?
> A. Me and other people in Patrick have all agreed that that's reasonable.
> Q. Is that something that you found other engineers in the industry to believe is reasonable standards?
> A. Yes.
>
> (Schuh Deposition pg. 205)

Second, Mr. Schuh has not designed a courtyard drain system similar to the Promenade Project.

(Schuh deposition pg. 226). Third, rather than rely on scientifically obtained data to form a scientific conclusion, Mr. Schuh predicts what would have happened in 2001:

> The April 6-7 2001 and June 21, 2002 storms had a brief duration with an intensity of greater then 1 inch/hour. During this time, the computer models predict that water ponded 1-6 inches over the inlets. The duration of these intensities was only 11 min. for the April event and 15 min. for the June event. In an intense storm of longer duration, ponding would likely be more severe and water would reach the elevation adjacent to the building or entry way.
>
> (November 12, 2003 Addendum to the Hydrologic Investigation of the Promenade Townhomes report dated August 12, 2003, pg. 5)

It is an attempt to recreate history with insufficient data. Mr. Schuh does not provide evidence that it actually happened the way he asserts it did. A scientist works with reported data to form a conclusion. Mr. Schuh relies on the scantiest of data - some leakage was reported somewhere - to then speculate that ponding happened somewhere. An historian might theorize that a society died out based upon the historian's study of the society's dietary habits. It can be a plausible historical theory. Historical criteria are not the same as scientific criteria. Mr. Schuh's analysis is insufficiently certain to pass the Daubert criteria. Mr. Schuh employs the same historical analysis when he asserts:

> The analysis results for the originally constructed drainage system, considering the local standards and generally accepted engineering standards, are summarized in tabular and graphical form. These tables and graphs show that there is ponding at Building 1 (Overall condition) in all modeled storm events (four total events were modeled; the 2-year, 5-year, 10-year, and 100-year events, and that this ponding reaches the lowest adjacent building grade (ground surface at Building 1) in the 100-year storm event. For Building 5, there is ponding for all four modeled storm events and the ponding reaches the lowest adjacent building grade in the 5, 10, and 100 year events.
>
> (November 12, 2003 Addendum to the Hydrologic Investigation of the Promenade Townhomes report dated August 12, 2003, pg. 5)

Mr. Schuh's phrasing of his conclusion implies why it is unreliable. Mr. Schuh describes the phenomena in the present tense; a close reading of his opinion reveals that he is describing

phenomena that he claims occurred in the past. Mr. Schuh does not point to any evidence of observable phenomena that supports his opinion. In essence, Mr. Schuh thinks it happened but he does not present any evidence that it did happen.

The essence of the Daubert test is reliability. The expert's opinion should be amenable to testing of the theory. Mr. Schuh's retrospective models are not subject to testing. How does one test what would have happened in the past unless the scientist can recreate the circumstances of the past? Mr. Schuh cannot recreate a particular day in a particular courtyard. For example, what was the moisture content of a courtyard soil on April 6 and April 7, 2001? Were the courtyard drain grates clogged with leaves and grass? How often had Promenade utilized its sprinkler system to water the courtyard grass?

There is no evidence that Mr. Schuh performed any tests to substantiate his models when he was at the Promenade project. Mr. Schuh did not perform a test fitting the circumstances of the particular days in the spring of 2001 when leaks reportedly occurred. As an example of the unreliability of his models, Mr. Schuh is unable to comment on what the effect would be if different soil were in the courtyards in relation to the ability of the courtyard to drain:

> Q. And thus the compensation of the soil – well, let me back up. I mean, I gather from what your telling me is that the soil isn't a terribly significant feature in the analysis that Patrick Engineering conducted. Is that correct?
> A. No. I'm saying that we have evaluated based on what is there and you're asking me what if they put something else there how would it affect the system and I'm saying we didn't look at if they would have put something else there.
> Q. You don't know?
> A: If they had put something else there it could cause other – if you have more permeable material then less water would get to the surface drain, but then more water would get down to the, you know, down to the soil underneath it. I don't know what affect that would have on the system either.
>
> (Schuh deposition pg. 137 - 138).

Furthermore, he standards upon which Mr. Schuh relies for his opinions are his "beliefs." Mr. Schuh does not refer to a textbook, code, or industry standard:

Q. And if I understand you correctly items number two and three on page two of your report, those are items that you have just found to be standards throughout your experience almost universally?
A. Me and other people in Patrick have all agreed that that's reasonable.
Q. Is that something that you found other engineers in the industry to believe is reasonable standards?
A. Yes.

(Schuh deposition pg. 205).

There is no specific reference upon which Mr. Schuh relies to establish his opinion about the standard of care.

Q. You referred to the methodology that you used I think is the one which other engineers agree is reasonable.
A. I believe so.
Q. And in saying that, you're not talking about mechanical engineers, I take it.
A. Correct.
Q. And can you point me to some text which would indicate that other engineers agree that this methodology is reasonable with respect to an application involving a garage roof slash plaza area?
A. As I sit here I don't have a reference.
Q. And do you have any - - have you ever discussed or ever heard other engineers or ever read other engineers opining that this is the correct methodology to use with respect to the situation of a garage roof slash plaza deck area is as opposed to an exterior storm system?
A. I have not discussed it with anybody.
Q. Never seen that in writing anywhere?
A. I have not seen it in writing.

(Schuh deposition pg. 247-248).

Lastly, in his November 12, 2003 report, Mr. Schuh states:

The freeze/thaw cycle has a significant effect on the courtyard drainage. The shallow soils over the garage slab are entirely within the frost depth of Minnesota. It is likely that these soils will be frozen for several of the winter months. The frozen clay soil will act as a totally impervious surface since the void spaces in the soil would be frozen solid. When analyzed using the SCS-TR-55 methodology, the ponding is more extreme than with non-frozen soils, as expected. In addition, if snow melts with the water equivalent of 1 inch, several inches of ponding would occur above the inlets.

The ponding is, according to Mr. Schuh, more likely to occur on frozen ground. (One does not need to be a scientist to reach this insight.) However, the question remains: does he have any

evidence that ponding did occur during wintertime at Promenade? Is there any evidence that connects the presence of ponds during a winter to leakage into the garages?

***C. Jeffrey Schuh's opinion that "continued seepage is expected" should be excluded from evidence.***

Mr. Schuh testified:

> Continued seepage in the building should be expected unless improvements are made to prevent water from entering the building in locations above the waterproofing system. Merely lowering the inlets and providing gutters will not eliminate seepage problems.
>
> (Schuh deposition pg. 239).

Mr. Schuh's opinion is speculative. He acknowledges that he is unable to state what the cause and the source are for the leaks. (Schuh deposition pg. 184). It follows logically that if Mr. Schuh is unable to identify the cause of the leaks that he is unable to predict whether or not leaks will occur in the future.

***D. Mr. Schuh's opinion that the sidewalks heaved because of the drain system is inadmissible.***

Mr. Schuh attributes the heaving of the sidewalks to the drain system:

> Q. You assert; "As the ground in the courtyard freezes, water within the soil forms ice lenses. These ice lenses grow and cause the ground to heave. Ice lens growth continues as long as free water is present to allow the growth. The presence of water above the waterproofing in conjunction with the frost susceptible soil caused the heaving of sidewalks in the courtyards." Do you know that for a fact?
> A. Based on the photographs and other information that I had in the file that that was a problem. Out there yesterday you could see that there was a lot of cracking of the sidewalks and other signs of that damage.
> Q. But do you know that for a fact?
> A. Other than the information that was provided to me I wasn't out there in the winter or the spring.
> Q. What is the analysis that you used to reach that opinion?
> A. One, you can look at the grain size distribution of the soil, which is the sand, and silty sand is very frost susceptible. And the fact that you had water near the bottom of the sand layer, it can wick that water up and by wicking it up and freezing it can cause ice lenses to form because there is water present in the, you know, that lower two inches.
> Q. All right.

A. And so the presence of that water in conjunction with the silty sand causes the ice lenses to grow.
Q. Again, the silty sand has a role in the phenomenon?
A. Yes.
Q. Did Patrick Engineering conduct any tests during the wintertime to confirm this opinion that you have asserted?
A. No, we were not there in the winter.
Q. There were no augers, there no hand auger holes dug, no test pits dug during the wintertime?
A. That’s correct.

(Schuh deposition pgs. 165-166).

It is rank speculation. There is neither direct nor circumstantial evidence to support this assertion, nor is there evidence that the heaving of the sidewalks caused any leaks.

***E. Jeffrey Schuh’s reliance upon the City of Eagan Code is not justified.***

Mr. Schuh testified that the City of Eagan Code sets forth the minimum standard that one would try to achieve for a drainage project. (Schuh deposition pg. 75). Mr. Schuh testified that he spoke with somebody at the City of Eagan Engineers Office. He apparently did exchange an e-mail with John Gorder, the Assistant City Engineer in the engineering division at the City of Eagan Department of Public Works. (Schuh deposition pgs. 76-77; deposition Exh. 846). It was significant to Mr. Schuh because he relied on it for establishing the standard of care. (Schuh deposition pgs. 82-84).

Mr. Schuh thinks that J-Berd deviated from the appropriate standard of care. He thinks that the City of Eagan engineering standards are a minimum applicable requirement. (Schuh deposition pg. 109).

Mr. Schuh states in his initial report and in his testimony:

Q. On page three of your report you state, and this is at the bottom; “Because the main drains in the courtyard are considered to be collector sewers (they collect water from the courtyard and convey it to the detention pond), they should be sized to accommodate the 10-year storm event without ponding.
The basis of your assertion in that regard are the City of Eagan criteria. Is that correct?

A. I mean, the City of Eagan requires that for – I'm going to say public improvements, they're going to require that for anything that is done in the street or any parking lots. But I'm saying in general that's – I don't want to say every project we're working on, but almost all projects that can recollect working on require that you look at the 10-year storm event and make sure that you don't have ponding in areas that pedestrians are going to use, people are going to use.
Q. What is the source or authority that underlies that assertion that you just made? In other words, is there a hydrology textbook that you look at? Is there a civil engineering textbook that you look at or is this just based on your knowledge of the industry.
A. I'd have to go back and see which textbooks say it. I can say that we have done this for so long that it's more or less I'm going to call it a standard.
Q. I mean is there a code like a building code? We have the building code, we have the plumbing code, you referred to the City of Eagan code. Is there a code out there or an industry code?
A. I guess I don't know of an overall code that's a standard. It could be in certain areas that they may have something different, depending on the locality. But I'm saying in general this is a pretty recognized standard.

(Schuh deposition pgs. 128-130).

Mr. Schuh further asserts that the courtyard drain system was not designed in accordance with the City of Eagan engineering standards for storm water management systems. However, Mr. Schuh acknowledges that he does not know and in fact did not verify whether the City of Eagan standards were required for this particular project. (Schuh deposition pgs. 131-132). Mr. Schuh only assumes that the courtyard drain system would have had to meet the City of Eagan engineering standards. (Schuh deposition pgs. 139-140).

Mr. Schuh also testified that the water probably got as high as the doorway thresholds in the plazas. The basis of this assertion is the City of Eagan storm water management plan. Mr. Schuh testified that that was the information that was provided to his office by the City of Eagan. (Schuh deposition pg. 222). However, as stated previously, Mr. Schuh did not verify whether the city's storm water standards apply to the courtyard area of this project. Thus, this testimony of Schuh is unreliable.

## CONCLUSION

Based on the foregoing discussion, Defendant J-Berd Mechanical Contractors, Inc. respectfully requests that the court grant its motions in limine and limit and/or exclude all forms of evidence and argument as described herein.

Dated: September 3, 2004

_/s/ Rolf E. Sonnesyn _______________

Rolf E. Sonnesyn (#131027)
Chandelle L. Heyer (#286114)
Tomsche, Sonnesyn & Tomsche, P.A.
610 Ottawa Avenue North
Minneapolis, MN 55422
Telephone: (763) 521-4499
Fax: (763) 521-4482

Roger C. Justin (#197270)
RINKE-NOONAN
Suite 300, U.S. Bank Plaza
1015 West St. Germain Street
P. O. Box 1497
St. Cloud, MN 56302-1497
(320) 251-6700

Attorneys for Third-Party Defendant and Fourth-Party Plaintiff J-Berd Mechanical Contractors, Inc.