UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Westfield Insurance Company,

Civil File No. 00-CV-987 JEL/JGL

Plaintiff,

vs.

Weis Builders, Inc., Promenade Village Townhomes, L.L.C., Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants, and

Weis Builders, Inc.,

Third Party Plaintiff,

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Company,

Third Party Defendant and
Fourth Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,

Fourth Party Defendant.

**AFFIDAVIT OF CHANDELLE L. HEYER IN SUPPORT OF DEFENDANT J-BERD MECHANICAL CONTRACTORS, INC.'S MOTIONS IN LIMINE**

STATE OF MINNESOTA )
) ss:
COUNTY OF HENNEPIN )

**CHANDELLE L. HEYER**, being first duly sworn on oath, deposes and states as follows:

1. I am one of the attorneys representing J-Berd Mechanical Contractors, Inc. ("J-Berd") in this action. I make this Affidavit in support of J-Berd Mechanical Contractors, Inc.'s Memorandum of Law in Support of Its Motions in Limine.

2. Attached hereto as **Exhibit 1** is a true and correct copy of the August 12, 2003 report of Jeffrey Schuh of Patrick Engineering.

3. Attached hereto as **Exhibit 2** are true and correct copies of excerpts of the October 15, 2003 deposition of Jeffrey Schuh.

4. Attached hereto as **Exhibit 3** is a true and correct copy of the November 12, 2003 addendum report of Jeffrey Schuh of Patrick Engineering.

s/Chandelle L. Heyer
Chandelle L. Heyer (286114)

Subscribed and sworn to before me
this 3rd day of September, 2004.

Notary Public

SARAH B KEELING
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2005

# HYDROLOGIC INVESTIGATION OF THE PROMENADE TOWNHOMES

DEPOSITION EXHIBIT
836 Schuh

## PATRICK PROJECT NO. 9402.A0

AUGUST 12, 2003

PREPARED BY:

PATRICK ENGINEERING INC.

1970 Varsity Drive
Lisle, IL 60532

(630) 795-7200
Fax (630) 434-8400

EXHIBIT
1

# TABLE OF CONTENTS

PROJECT DESCRIPTION ..... 1

SCOPE OF STUDY ..... 1

STANDARD OF CARE ..... 2

STORM WATER MANAGEMENT SYSTEM ..... 4

HISTORY OF SEEPAGE PROBLEMS ..... 5

FIELD INVESTIGATION ..... 6
- Original Construction ..... 7
- Supplemental Construction ..... 7

GEOTECHNICAL INVESTIGATION ..... 9
- Geotechnical Field Investigation ..... 9
- Soil Testing ..... 9
- Results ..... 10

HYDROLOGIC INVESTIGATION ..... 11
- Analysis following Local Design Criteria ..... 11
- Analysis for Post-Construction Improvements ..... 13
- Historical Rain Event Analysis ..... 15
- Freeze/Thaw Cycle Analysis ..... 16
- Appropriate Design Recommendations ..... 18

CONCLUSIONS ..... 20

EXHIBITS
- Exhibit 1 – Typical Building Cross-section
- Exhibit 2 – Existing Conditions Building 1
- Exhibit 3 – Existing Conditions Building 5
- Exhibit 4 – Hydrologic Investigation Typical Soil Profile

APPENDICES
- Appendix A – Site Photographs
- Appendix B – Soil Condition Summary
- Appendix C – Laboratory Test Results
- Appendix D – Hydrologic Design and Methodology References
- Appendix E – Hydrologic Calculations
- Appendix F – Hydrologic Results Summaries

p:\lisle\mamane\9402 a0\apr\hydrologic investigation\table of contents final.doc

## PROJECT DESCRIPTION

The Promenade Townhomes are located in Eagan, Minnesota, at the northwest corner of the intersection of Yankee Doodle Road and Lexington Avenue. Since construction of the townhomes in 1997, some areas of the underground parking garages, the stairwells, and residential units themselves have been subject to occasional seepage. The locations where seepage has been noted are either adjacent to or underlie an interior courtyard area between the units of each building. ***Exhibit 1*** shows the typical building sections, as designed by BRW ELNESS Architects, Inc., the Project Architect.

Patrick Engineering Inc. (Patrick) was retained by Iverson Reuvers, LLC, Erstad & Riemer, PA, and Brown & Carlson, PA to investigate the potential for ineffective drainage of surface water runoff from the courtyard areas to have caused the seepage. The purpose of this study was to determine if the site/civil design and construction of the courtyard and its drainage system was adequate to properly convey runoff away from the townhomes such that seepage and the resulting damage would not occur.

## SCOPE OF STUDY

The scope of Patrick's involvement was limited to the investigation of the drainage conditions within the courtyard areas, including the surface drainage and movement of water in the soils located above the waterproofing system. The scope included:

1. Providing an opinion on the standard of care that should be have been followed for design of the courtyard storm water management system.
2. Reviewing information on the design of the storm water management system for the Promenade Townhomes.
3. Performing a field investigation to observe site conditions and to gather information on select drainage features at the site and the soils used to construct the courtyard.

4. Performing hydrologic and hydraulic analyses for the areas tributary to the courtyards to determine the ability of the drainage system to handle the design storm events.

5. Providing opinions on the following:

   a) The adequacy of the design of the storm water management system to control surface water runoff.

   b) The potential for inadequate surface drainage to have caused the seepage into the townhomes.

   c) The potential for inadequate surface and groundwater drainage to cause frost heave of the sidewalks in the courtyards.

## STANDARD OF CARE

The design of storm water management systems generally is performed in accordance with the following criteria:

1. Local codes and requirements.

2. Underground pipe systems are designed to convey storm water runoff from a 10-year storm event without ponding at the ground surface.

3. The water level adjacent to inhabitable structures should be at least 1 foot below the lowest entry point for the runoff from the 100-year storm event.

Local codes and requirements are satisfied for project permitting, but may not be adequate for unusual circumstances. Such criteria are considered minimum design standards, and can be modified depending on the unique features of each project and client requirements.

The purpose of satisfying Item 2 is to minimize the potential for flooding at the ground surface for storms that have the probability of occurring once every 10 years. This criterion is typically required to minimize ponding in streets, parking lots, and other areas with pedestrian or vehicle traffic.

The purpose of satisfying Item 3 is to prevent the flow of water into residences for storms that have the probability of occurring once every 100 years. The one foot vertical clearance provides additional safety against flood damage to residences. For areas that do not have an emergency overflow area or where there is a limited outlet, or where flooding could be catastrophic, additional freeboard (vertical clearance) would be appropriate.

Patrick contacted the City of Eagan Engineering Department to verify the design criteria for the courtyard drainage system. Per the City of Eagen:

1. Storm sewers that are tributary to main collector sewers should be designed to accommodate the 5-year event without ponding.
2. Storm sewers that are considered collector sewers should be designed to accommodate the 10-year event without ponding.
3. The required freeboard is 3 feet above the calculated 100-year high water level of a pond with emergency overflows provided at or within 2 feet above the high water level.

Because the courtyards were not designed as detention ponds, it is not reasonable to require that the lowest entry point be located 3 feet above the design high water level in the courtyard. However, it is reasonable to provide the 1 foot vertical clearance between the high water level and the first floor entry. This is consistent with the City of Eagan design criteria: provide one foot of vertical clearance between the emergency overflow and the lowest entry point.

Because the main drains in the courtyard are considered to be collector sewers (they collect water from the courtyard and convey it to the detention pond), they should be sized to accommodate the 10-year storm event without ponding. Also, ponding in the courtyard under frequent events would, at a minimum, be inconvenient to residents, and under worst case conditions could result in flooding of units.

Therefore, it is Patrick's opinion that the courtyard should have been analyzed by a professional engineer and designed following standard engineering practice to meet the following criteria:

1. First floor entry elevations (and top of foundation) should be located a minimum of 1 foot above the high water level within the courtyard for a 100-year storm event.
2. The storm sewer pipe within the courtyard should be designed to accommodate the runoff from a 10-year storm event without ponding of water at the inlet.

## STORM WATER MANAGEMENT SYSTEM

The storm water management system, outside the limits of the courtyards, was apparently designed by McCombs Frank Roos Associates, Inc. (MFRA) of Plymouth, Minnesota. Plan Sheet 3 D of 14 by MFRA presents the Grading and Erosion Control Plan for the areas outside the buildings, including the parking lots and roadways. This Plan does not indicate drainage structures within the courtyards. No information is shown in the Architectural Plan set dated August 19, 1996 to indicate the grading requirements for the courtyards.

Information provided in numerous depositions and subpoenaed documents indicates that the design of the courtyard drainage system was to have been performed as part of the mechanical contractor's contract. The Mechanical Contractor, J-Berd Mechanical reportedly subcontracted this responsibility to Mikesh, Inc. No detailed plans or specifications were apparently produced for construction of the courtyard drainage system. However, sketches and notes were provided to indicate that the system was likely designed following the Minnesota Plumbing Code for roof drainage. It was not in accordance with the City of Eagan requirements for storm water management systems.

Based on information reviewed by Patrick, the original courtyard storm water management system for the Promenade Townhomes was constructed of the following:

1. Inlets within each courtyard that collected surface water runoff from both the roofs and courtyard. These inlets were 6-inch diameter drains surrounded by a concrete collar. The drains were generally located near to above the surrounding ground surface.

2. The inlets were connected to a perforated 6-inch diameter PVC pipe that was connected into the bell end of a 6-inch diameter pipe that penetrated the top of the garage roof. The bell end of the pipe extended above the top of the roof. The lowest perforation was approximately 2 inches above the top of waterproofing. The top of the garages (bottom of the waterproofing) was not sloped to the drains, and therefore water ponds on the waterproofing at all times.

3. The drain passing through the roof eventually connects to a 10-inch diameter storm sewer that in turn discharges to a detention pond.

No as-built plans were prepared for the storm water management system. As such, inspection of the drainage system and documentation of system components was performed by Patrick as part of the field investigation. The results of Patrick's investigation are provided in a subsequent section of this report.

## HISTORY OF SEEPAGE PROBLEMS

The history of the leakage problems is summarized in the following documents:

1. A letter dated May 21, 1998 from Lisa Dahl of Healey Ramme Company to Thomas Weber. This letter indicates that leaking first began in July 1997 when there were two heavy rains in one week. The letter also indicates "building 6 (which did not leak) was built with a greater sloping to the center on the plaza deck. After this building was completed we were forced by the inspector to change our design, stating that the center slope was a problem for handicapped people." Other periods when leaks were identified occurred during periods of heavy rain: (Dates of August 1997, May 1998). The letter also stated that in the Spring of 1998 many of the leaks resurfaced as the ground thawed.

2. A letter dated June 11, 1998 from John Feges of Elness Swenson Graham Architects, Inc. to Peter Ramme of Healey Ramme Company. This letter indicates "standing water has been observed on the plaza during heavy down pours of rain (1 to 2 inches per hour)." It

also states "Experience has shown that Building No. 6 has not experienced the water leaks as in other building. The assumption is that Building 6 has more positive drainage; therefore, water moves away from the stoop quicker and does not allow water to buildup.

3. A letter dated May 27, 1999 from Peter Ramme of Healey Ramme Company to John Davis of the Eberhardt Company. This letter indicates that the plaza decks leaked in 26 locations as a result of the snow melting. In May 1999, the plaza decks had 82 leaks as a result of three rainfalls, the lowest being 1.5 inches and the highest being 3.5 inches.

4. Revised leak report dated September 4, 2002 from Steven Rau to All Counsel of Record. This document provides information on leaks between and including the dates 1/1/01 to 6/7/02. All leaks are associated with either rain or snow thaw.

## FIELD INVESTIGATION

On August 26 and 27, 2002, Patrick staff visited the project site. The purpose of the visit was to examine the as-built conditions of the courtyards, investigate the soils in the courtyards, and perform a survey of select features in two of the courtyards. This information was collected for future use in evaluating the ability of the courtyard drainage system to accommodate the design storm events in accordance with the Standard of Care.

As previously stated, no calculations for the design of the drain system nor construction drawings for the courtyards were made available to Patrick for this evaluation. Therefore it was necessary to visit each courtyard and determine the locations and sizes- of sidewalks, landscaping, patios and drainage inlets. ***Exhibits 2 and 3*** show the plan view of the main surface features within the courtyards for Buildings 1 and 5. (These two buildings were selected for the evaluation of courtyard conditions because the majority of the seepage problems were identified at these locations in the Leak Report.) ***Exhibits 2 and 3*** are based on photographs, sketches, and measurements taken during the field visit and are meant to represent general site conditions. These exhibits are not intended to show all features present in the courtyards.

An important aspect of the as-built conditions shown in ***Exhibits 2 and 3*** is the layout and components of the original drainage system and the portions of the system that have been added since the original construction. The components for the original system and the added features are further described in the following paragraphs.

Original Construction. The drainage system in each courtyard relies on inlets to collect surface water and convey the water to the project storm sewer system. Each inlet in the two representative courtyards was located and measured. The main inlets were 6 inches in diameter with a 6-inch diameter grate at the ground surface. The inlet pipes (vertical pipes that extend from the ground surface to the top of the concrete roof of the garages) are perforated PVC risers 2 feet to 3 feet long. Each inlet is connected to a 6-inch diameter iron pipe that continued straight down into the garage and then through the garage floor. It is assumed that these pipes discharge into a main collector pipe located under the garage floor.

The parking lot storm sewer system was inspected in an attempt to locate the main collector pipe. Connections were located at manholes outside Building 1, Building 3, Building 4, and Building 6. Since no connections could be found for Buildings 2 or 5, it is assumed that the drainage from these buildings is collected and conveyed into the system of an adjoining building. Therefore, the courtyard drainage from Building 2 is assumed to be collected under the garage of Building 2 and conveyed to the collection system under Building 1. All of this flow is then discharged to the parking lot storm sewer system at the curb inlet located just north of and central to Building 1. It is assumed that the drainage for Building 5 connects similarly to Building 4.

Supplemental Construction. Following the original construction of the project, Promenade Townhome Management attempted to collect additional surface and subsurface flows by installing small drainage inlets at the corners of select patios. These small drains were located and measured during the field visit. In addition, the pipes connecting the drains were exposed, examined and measured. The inlets are 4-inch diameter PVC pipes. A 4-inch diameter perforated PVC pipe collects surface water from these inlets and conveys flow to the nearest 6-inch drain. The perforated PVC is wrapped with a geotextile fabric and a limited quantity of drainage material is backfilled around the pipe. The perforated PVC pipe could potentially

collect subsurface water as well. The installation of these inlets and pipes was purportedly sporadic and inconsistent, likely covering more problematic areas. At Building 1, the new drains were installed at every patio on the north side of the courtyard. Other courtyards only had drains at a few patio locations.

Part of Patrick's investigation included excavating a 2-foot by 2-foot pit around one inlet in the courtyard of Building 1 (see photographs in *Appendix A*). This work was performed to examine the physical characteristics of the inlet and the material surrounding it. The PVC riser sections were perforated, apparently to allow subsurface water to enter the riser section. The perforations were approximately ¼-inch in diameter. The riser was wrapped with a geotextile fabric, however the fabric did not extend to the bottom of the perforations. The inlet was backfilled with drainage stone to approximately 6 inches around the outside diameter of the inlet pipe. The stone consisted of nominal ½-inch size crushed gravel. At the location where the inlet meets the drainage mat located on top of the garage slabs, approximately 2 inches of standing water was observed. This standing water was the result of the perforated riser being connected to the 6-inch iron pipe approximately 2 inches above the top of slab. Therefore the perforations could only remove water located at least 2 inches above the slab. (There is no feature present that will provide an avenue to drain the remaining 2 inches of water.)

Lastly, a simple survey was performed at Buildings 1 and 5 to determine relative elevations within the courtyards. The survey did not include determining the horizontal position of the features. In both courtyards, one drainage inlet was chosen to be the "benchmark" and it was designated an assumed elevation of 100.00. It is specifically noted that because the benchmark elevations are assumed for each courtyard, elevations between courtyards cannot be compared. All other drainage inlets, elevations at buildings and overflow elevations were determined relative to the benchmark inlet in each courtyard. The survey calculations can be found in *Appendix D*. The elevations of surveyed features are reflected on *Exhibits 2 and 3*.

# GEOTECHNICAL INVESTIGATION

Geotechnical Field Investigation. In addition to the hand-dug excavations performed in Courtyard #1, Patrick performed a series of hand-auger soil borings in the courtyards of buildings 1 through 6 to ascertain the soil types used in courtyard construction. A total of twelve (12) hand auger borings (HA-1 through HA-12) were performed in the courtyard areas. Four (4) hand auger borings made in both courtyards 1 and 5 were left open overnight to obtain 24-hour water level readings in the open boreholes.

The soil profile at each of the courtyards generally consisted of the following:

- Topsoil -- 0-3± inches
- Black to dark brown silt to clay, slightly organic (ML-OL to CL-OL) -- 3 inches to 15± inches
- Brown silty sand (SM) -- 15 inches to 24± inches.
- Foam insulation board -- 24 inches and deeper

***Exhibit 4*** is a typical cross section through the courtyard area, showing the general types of soils that were encountered. One exception to this observed soil profile was at courtyard 6, where at boring HA-12 the silty sand layer was not encountered. ***Appendix B*** contains the Soil Condition Summary, which includes a description of the soil conditions encountered in each of the courtyards. Bulk composite samples were obtained of the silt to clay and drainage sand from the four (4) hand auger borings performed in Courtyard 1 for laboratory testing. All borings were backfilled by Patrick with soil cuttings or sand and re-sodded prior to leaving the site.

Soil Testing. Patrick performed Atterberg Limits Testing (ASTM D 4318), hydrometer and sieve analysis testing (ASTM D 422), constant head hydraulic conductivity testing (ASTM D 2434), and washed gradation testing on selected composite samples obtained from Courtyard #1. Atterberg Limits Testing was performed to ascertain soil plasticity to assist in soil classification and in estimating engineering properties of the soil. Generally, the more plastic a soil (i.e. the higher the plasticity index (PI)), the less permeable the soil. Hydrometer and sieve analyses

were performed to determine grain-size distributions for the various soil types and was used to estimate the engineering properties of the soil. Hydraulic conductivity testing was performed to ascertain the coefficient of permeability (k) of the silty sand drainage layer (i.e. performed to determine its drainage characteristics). ***Appendix D*** provides a summary of the test results.

Results and Analysis. The silt/clay soils below the topsoil are considered low permeability material. An Atterberg Limits Test performed on a composite sample of this material indicated a liquid limit of 43%, plastic limit of 27%, and a plasticity index of 16%. This soil classifies just below the A-line in the USGS classification system (ASTM D 2487) delineating ML from CL type soils. A 15-inch thick layer of this soil type will significantly limit the infiltration of storm water into the underlying soil and drainage structures. Based on the test results, this soil is plastic and will have associated low permeability. A Hydrologic Group C classification (soils having a moderately high run-off potential due to slow infiltration rates of 0.05 to 0.5 in/hr) was selected for subsequent hydrologic analysis of the courtyards. The clay soil also meets some criteria of Hydrologic Group D (soils having high run-off potential due to very slow infiltration rates less than 0.05 in/hr); however, the coloration of dark brown to black indicates the presence of organics in the soil that tends to increase porosity. Also, freeze/thaw effects will tend to increase the permeability. Therefore, a Group C classification is considered appropriate for use in evaluating the courtyard drainage system.

The underlying silty sand (SM) was tested for permeability in our laboratory. The soil had a measured permeability on the order of $2 \times 10^{-4}$ cm/sec under the lowest gradient tested. This test value is consistent with published literature for silty sand. It appears that the silty sand layer was provided to help collect and transport groundwater to the inlet. However, the overlying clay layer will tend to inhibit the percolation of surface water runoff such that significant horizontal flow through the sand layer to the inlet is not anticipated. Any water that does pass through the clay layer will tend to move vertically through the sand and into the underlying Aquadrain that conveys water to the outlet. This was confirmed during the site visit, as the sand layer was not saturated even though there was a precipitation event within the week prior to the visit.

# HYDROLOGIC INVESTIGATION

The analysis of the hydrologic conditions of the courtyard drainage system required the investigation of many different components. Among the areas of analysis are:

- Analysis based on local design standards and criteria
- Analysis of post-construction attempts to alleviate problems
- Analysis of recent historical rain events
- Study of freeze/thaw cycle effect on drainage system
- Recommendation of appropriate drainage design standards

The following sections present the approach, methodology, results and discussion for each listed analysis.

## Analysis Following Local Design Criteria

*Approach*

The City of Eagan Building Department was the permitting authority for construction of the courtyard drainage system. Therefore, it is assumed the system would have needed to meet City Standards. The City Engineering Department requires the use of the Soil Conservation Service (SCS), also known as the National Resource Conservations Service (NRCS), methodology to design surface water drainage systems. Eagan utilizes the design rainfall amounts published by the US Weather Bureau and the SCS Type II rainfall distribution. These references can be found in *Appendix D*. This data was used in combination with the SCS methodology to determine the effectiveness of the drainage system relative to the City Standards.

*Methodology*

The analysis followed local design standards using the SCS methodology and Technical Release 55 (TR-55). SCS methodology uses a specific design storm event over a 24-hour duration. TR-55 is a hydrograph routing methodology that converts a rainfall distribution (hyetograph)

into a runoff hydrograph (runoff flow versus time). The runoff hydrograph was then used to compare the flow into the system and the flow out of the system via the courtyard inlets at each time increment on the hydrograph. When there was an excess of flow into the system, ponding, or storage, occurs over the inlets. The survey of the courtyards was used to determine the amount of storage available at incremental elevations over the inlets. A relationship was also established between the water surface elevation (ponding elevation) and discharge rate for the system. The storage required at each time increment was used to determine the ponding elevation over the inlet at each increment. Flow out of the system was then determined for that ponding elevation, which was used as the flow out of the system for the next time increment.

The first step in this analysis was to analyze several inlet tributary areas individually. This was done to determine the capacity of a single inlet and its effect on ponding within each building's courtyard. The tributary areas are delineated in ***Exhibits 2 and 3***. Next, the entire courtyard area for Buildings 1 and 5 were analyzed as a whole to determine how the system works together, i.e., how each inlet works in conjunction with the other inlets and what the maximum elevation of ponding is within each courtyard.

*Results and Discussion*

A summary of the results of all hydrologic calculations is found in ***Appendix F***. The analysis results for the originally constructed drainage system, considering the local standards and generally accepted engineering standards, are summarized in tabular and graphical form. These tables and graphs show that there is ponding at Building 1 (Overall condition) in all modeled storm events, and that this ponding reaches the lowest adjacent building grade (ground surface at the building) in the 10- and 100-year storms. For Building 5, there is ponding for all modeled storm events (four total events were modeled; the 2-year, 5-year, 10-year, and 100-year events) and the ponding reaches the lowest adjacent building grade in all modeled storm events.

Typically, a storm sewer system would be designed to convey the 10-year storm event by gravity, with no ponding on the surface. The City of Eagan requires that all storm sewers be sized to drain a 5-year storm by gravity and storm sewers located in "low points" be sized to

accommodate a 10-year storm. Clearly, the drainage system in the courtyard does not meet this standard of care.

The drainage system in the courtyards of all buildings is built such that the rim of the inlet is less than one foot below the lowest grade adjacent to a building. As discovered during the site visit, the top of the building foundation is located below the ground surface (soil covers the siding), and information from the depositions indicates that the top of foundation is approximately 8 inches below grade. Therefore, the rims of the inlets are significantly less than one foot below the top of foundation, and in fact are near the grade of the top of foundation. Because of the relatively small vertical separation between the rims of the inlets and the entryways and tops of foundations, the drainage system should have been designed to convey all storm runoff away from the courtyards without any ponding. It is noted that even if this were done, because the top of foundation is located below the ground surface, there would remain the potential for seepage to enter the buildings at a location above the waterproofing and below the ground surface. John Feges acknowledged this problem in his letter to Peter Ramme dated June 11, 1998.

The modeling performed by Patrick demonstrates that the drainage system is not able to satisfy the City's freeboard criterion. No modeled storm events meet this criterion, as there is ponding to some degree for all events. Especially problematic is the 100-year storm, which not only contributes to the seepage problems but also results in a water surface higher than the lowest entry point of some of the units. This demonstrates that the drainage system is considerably under designed.

Analysis for Post-construction Improvements

*Approach*

When the Townhomes began having seepage problems, the owner or developer made attempts to address the drainage problems within the courtyard. As noted in the Field Investigation section of this report, perforated pipes and small diameter inlets were installed sporadically throughout the courtyards. Also, gutters were installed in some locations. These conditions were analyzed to evaluate their effectiveness.

*Methodology*

In analyzing the post-construction improvements made to the courtyards, the same general methodology was used as that followed for the Analysis following the Local Design Criteria. However, TR-55 was used to calculate the runoff hydrograph, ponding depth, and discharges. However, the elevation-discharge relationship was adjusted to account for the additional discharge capacity provided by the small patio inlets. Upon examination of the gutters that were installed after the original construction, it was determined further analysis would not be required to evaluate their effectiveness because the gutters do not redirect the flow away from the courtyards. Since the gutters merely concentrate the flow to one location in the courtyard, the overall hydrology was not significantly affected. The gutters and downspouts would need to be directed away from the courtyard, and directly into the main sewer system, to be effective.

*Results and Discussion*

The addition of the small, perforated pipe and small inlets adjacent to the patios changes the ponding elevation slightly. Only Building 1 was analyzed for this condition. Building 5 had fewer additional inlets and pipes, and therefore would have had less effect on ponding than the improvements to Building 1. The results of the analyses indicate that the ponding elevation for Building 1 stays the same for the 2-year event, which would be expected since the ponding elevation is below the rim elevations of the new inlets. However the other modeled events were lowered by approximately one tenth of a foot. The addition of these pipe and inlets slightly lowered the ponding elevation but does not alleviate ponding.

It is noted that the perforated pipes are located very near the ground surface. In most cases the pipe was buried 3 to 6 inches. Occasionally the pipe was exposed. Because the pipe is so shallow, it is unlikely it will capture any significant quantities of groundwater, and the surface area tributary to the pipes is very small such that even if surface water did reach the pipe, collection would be minimal. These pipes will only be effective in controlling groundwater in the area immediately above and adjacent to the bottom of the pipe.

## Historical Rain Event Analysis

*Approach*

Historical data is important to analyze and correlate with the storm events suspected of causing seepage. Promenade Townhome Management has kept a leak report documenting the times of seepage and possible causes of the seepage. (Refer to the report identified in the History of Seepage Problems section.) This report tracks leakage during specific days in which there was considerable snowmelt or a significant rain event.

Hydrologic analyses were performed for significant rainfall events of the past several years, especially those events documented in the leak report. These analyses were performed to assess the adequacy of the drainage system under conditions that likely occurred in the past year. For these analyses, historical rain data was obtained from the National Oceanic and Atmospheric Administration, National Climatic Data Center (NOAA/NCDC). This data provides daily and hourly rainfall amounts on a monthly basis for Minneapolis/St. Paul International Airport (MSP), located near Eagan.

*Methodology*

To analyze the recent historical rain events, the inflow-outflow methodology described above was again used, however the SCS methodology is no longer appropriate since it requires a storm that is 24 hours in duration. The storm events of interest were between 3 and 14 hours in duration. In order to calculate the inflow into the system, a rainfall hyetograph and runoff hydrograph were created. The hourly rainfall data from NOAA/NCDC was used and supplemented when possible by the Maximum Short Duration Precipitation Data, when available. This data was used to create the rainfall hyetograph. Next, a synthetic unit hydrograph was created to represent each courtyard (Buildings 1 and 5) based on its time of concentration. The hyetograph was then combined with the unit hydrograph using the methodology described in Applied Hydrology and Sedimentology for Disturbed Areas by Barfield, Warner and Haan (See ***Appendix D***). The historical hyetograph and created runoff hydrograph were then used to calculate ponding depths using the same methodology as the Local Design Criteria Analysis.

*Results and Discussion*

The analysis of the historical events shows that in rather intense storms, no matter how brief, ponding occurs over the inlets. Analysis of the significant storm events of April 6-7, 2001; April 22, 2001; May 6, 2001; and June 21, 2002 showed that only the April 6-7, 2001 and June 21, 2002 events were intense enough to cause ponding. The runoff from the April 22, 2001 event was low enough that a detailed analysis of ponding was not performed. The April 6-7, 2001 and June 21, 2002 storms had a brief duration with an intensity of greater than 1 inch/hour. During this time, the computer models predict that water ponded 1 to 4 inches over the inlets. The duration of these intensities was only 6 minutes for the April event and 11 minutes for the June event. In an intense storm of longer duration, ponding would likely be more severe and water would reach the elevation adjacent to the building or entryway.

The April 6-7 event reportedly caused seepage in one garage location in Building 1 and one garage location in Building 5. The April 22 event reportedly caused seepage into one garage location and a stairwell in Building 1 and no interior seepage in Building 5. No seepage was reported for the May 6th event. The latest date of the leakage reports that Patrick reviewed is June 7, so no report data was available to compare the results of the analysis to actual leakage in the buildings for the June 21, 2002 precipitation event.

Freeze/Thaw Cycle Analysis

*Approach*

The freeze/thaw cycle appears to play a role in the seepage problems as four out of the thirteen leak reports were identified during periods of snow melt. The average temperature at MSP is below freezing for 4 to 5 months a year and there is an average of 49.4 inches of snowfall per year. The 2 to 3 feet of earth in the courtyards is inevitably frozen solid for months at a time. The melting of piled up snow and the inability for subsurface drainage to be effective because of frozen ground conditions and possibly frozen drainpipes was investigated to assess how it contributes to the seepage.

*Methodology*

The freeze/thaw cycle in Minnesota was first researched with various state and data collection agencies. According to the 2001 Annual Local Climatological Data published by NOAA/NCDC, the average temperature over the past 60 years of record keeping has been below freezing from December to March. Additionally, the average temperature for November is 32.9 degrees Fahrenheit, just above freezing. The Minnesota State Climatology office also states that the typical frost depth in the state is approximately 1 meter and sometimes exceeds this depth. Through this research and conversations with these offices, conclusions can be made about the freeze/thaw effect on the courtyard drainage.

*Results and Discussion*

The freeze/thaw cycle has a significant effect on the courtyard drainage. The shallow soils over the garage slab are entirely within the frost depth of Minnesota. It is likely that these soils will be frozen for several of the winter months. The frozen clay soil will act as a totally impervious surface since the void spaces in the soil would be frozen solid. When analyzed using the SCS-TR-55 methodology, the ponding is more extreme than with non-frozen soils, as expected. In addition, if snow melts with the water equivalent of 1 inch, several inches of ponding would occur.

Another hazard of the shallow soils during the freeze/thaw cycle is that once the soil is frozen solid, it would not thaw evenly. The surface of the soil and outer areas adjacent to the building would thaw first. As snow along the building melts, it would try to drain towards the center of the courtyard, but would be restricted by unmelted snow and ice within the center of the courtyard. Water could not percolate down into the sand drainage layer because the clay would still be frozen. The water resulting from melting snow would be trapped and local saturation of the thawed soil and ponding will occur directly next to the building. Because the ground surface is above the top of foundation, seepage into the building is expected for this condition.

Frost Heave

The soils used to cover the waterproofing system consisted of silty sand overlain by clay and silt soil. The silty sand sample tested by Patrick had approximately 20% fines. This is consistent

with the test results by Braun Intertec dated October 8, 2001 that indicated the silty sand had 38.6% fines. Silty sand is highly susceptible to frost heave.

The waterproofing system was installed directly on the precast concrete slabs without any pitch to the drains. This, coupled with the fact that the subsurface drainage layer cannot completely drain because the outlet is restricted by the elevation of the perforations in the vertical PVC pipe, results in a permanent water source directly below the silty sand.

As the ground in the courtyard freezes, water within the soil forms ice lenses. These ice lenses grow and cause the ground to heave. Ice lens growth continues as long as free water is present to allow the growth. The presence of water above the waterproofing in conjunction with the frost susceptible soil caused the heaving of sidewalks in the courtyards.

Appropriate Design Recommendations

*Approach*

The final segment of analysis was to determine what would be required to meet design standards and good engineering practices. The suggestions made as a result of this portion of the investigation provide insight to how the drainage system could have been designed, considering the site constraints, such that seepage problems could have been avoided.

*Methodology*

In order to develop an appropriate design of the drainage system, the same methodology (SCS/TR-55) was followed as for the Local Design Criteria Analysis. The elevation-storage relationships were changed to reflect a drainage design that meets the City's design requirements.

*Results and Discussion*

The development of a reasonable design to address general engineering practices and City standards considered the courtyard layout, roof layout and runoff collection system, and the need to meet ADA standards. The first, and simplest issue to address is the roof drainage. Currently, all runoff from the roof sheet flows onto the courtyard. This is not good practice considering that

the roof makes up approximately one half of the tributary area to the courtyard drainage system. Since it is entirely impervious, the peak flows into the drainage system are extremely high. An appropriate design would include gutters on the roofs throughout the courtyard and these gutters would direct the sheet flow to downspouts that would convey the runoff outside the courtyard drainage system. An SCS/TR-55 analysis of the as-built conditions with gutters shows that the peak water surface elevations in the courtyard would be reduced by several inches and the elevation would reach the lowest grade adjacent to the building in only the 100-year condition.

Next, the inlet pipes in the courtyard were evaluated and designed to be more effective. The SCS/TR-55 analysis entitled "With Gutters and Drainage Design" uses an elevation-discharge relationship based on the 6-inch pipe capacity instead of the inlet grate capacity, which in the as-built condition is highly restrictive. (The inflow rate into the inlet structure is controlled by the inlet grate, not by the inlet pipe.) The existing 6-inch pipes cannot accept the design inflows with the existing rim elevations. This is because additional head is needed on the inlet to increase the inflow rate. However, if all rims were to be lowered to an elevation of 99.8, the additional required inflow is attained and the pipes can handle all modeled storm events with virtually no ponding. Lowering the rims promotes better drainage because it allows all inlets to work together to collect and transport runoff. In the existing condition, the inlets within each courtyard are place at a variety of rim elevations. Those with higher rims do not collect water from the system while those with lower rims are relied upon to collect all of the water from the system. Lowering the rims to the same elevation causes the inlets work cooperatively as a system.

Since the 6-inch inlet pipe has the capacity to handle these design storm events, once the rims are consistently lowered, a grate should be selected that has a greater capacity than the pipe. A standard 12-inch grate produced by Nyoplast has an open area that is greater than the cross-sectional area of a 6-inch pipe. Nyoplast also makes 12-inch drains and frames that connect to a 6-inch pipe. Drawings by Nyoplast of the grate, frame, and drain are included in Appendix E.

It is noted that even if the above changes were made to the drainage system, the problem of having the top of foundation below the ground surface will continue to be an issue that is not

simple to resolve. Because the grade in the courtyard is essentially flat, seepage through the topsoil layer and towards the buildings will continue to occur. Continued seepage into the building should be expected unless improvements are made to prevent water from entering the building at locations above the waterproofing system. Merely lowering the inlets and providing gutters will not eliminate seepage problems.

## CONCLUSIONS

Based on the analyses that were performed, the following is concluded:

1. The surface water drainage systems in the courtyards at the Promenade Townhomes are inadequately designed based on the special circumstances surrounding the courtyard. The design does not meet City requirements and results in water ponding adjacent to the buildings.

2. Due to the extremely flat topography and small size of the courtyards, the drainage system should have been designed with additional safeguards. The system should have been designed to accommodate the 100-year storm without significant ponding. Any ponding resulting from the 100-year event should have been minimal and should not have resulted in a water surface within 1 foot below the top of foundation or any other opening that could be a conduit to seepage.

3. The top of foundation should not be located within one foot in elevation to the inlets. There needs to be more margin for potential ponding because the result of ponding is seepage into the buildings. The top of foundation should have been located above the surrounding grade to eliminate the potential for seepage to occur through the framed portion of the building.

4. Seepage may be the result of melting snow during periods of freezing weather. When the ground is frozen, melt water cannot reach the inlets or percolate into the drainage system. Instead, water can seep into thawed ground near the buildings and enter the units.

5. The drainage problems within the courtyard could have been significantly reduced if a well-designed surface drainage system were constructed. Such a system would have taken the special needs of the courtyard into consideration. A combination of adding gutters to the buildings to divert flow from the roof, lowering the rims of the inlets, and installing a larger grate and frame would have reduced, but not eliminated, the potential for ponding and subsequent seepage.

6. The precast concrete slabs should either have been sloped towards the drains or a topping should have been provided to promote subsurface drainage. Instead, with a flat drainage system that has no potential for complete drainage because of the configuration of the outlet pipe, there is a continual source of water on top of the waterproofing system.

7. Frost heave of soils in the courtyard is a direct result of using silty sand and silt to clay backfill above the subsurface drainage system. Silty sand is highly frost susceptible. A free draining, non-frost susceptible soil should have been used for backfill below all structures in the courtyard, including the sidewalks.

This report was prepared by PATRICK ENGINEERING INC.

Analyses Reviewed by: ____________________

Report Approved by: ____________________

p:\hsle\murtane\9402.a0\rpts\hydrologic investigation\final report 081203.doc

I hereby certify that this plan, specification, or report was prepared by me or under my direct supervision and that I am a duly Registered Professional Engineer under the laws of the State of Minnesota.

Date 8/13/03 Registration No. 21965
License expires 06/30/04

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Westfield Insurance Company,

Plaintiff,

vs.

Weis Builders, Inc., Promenade Village Townhomes, LLC, Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA companies,

Defendants, and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Third-Party Defendant,
Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Plaintiff,

and

J-Berd Mechanical Contractors, Inc.,

Third-Party Defendant and
Fourth-Party Plaintiff,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

EXHIBIT
2

DEPOSITION OF

JEFFREY SCHUH, P.E.

16 October 2003

9:00 a.m.

DEPOSITION OF JEFFREY SCHUH, P.E., taken pursuant to Notice and agreement of and between counsel, at 3009 34th Avenue South, Suite 200, Minneapolis, Minnesota 55425, at approximately 9:00 o'clock a.m. on October 16, 2003, before Paula R. Berg, Notary Public, County of Hennepin, State of Minnesota, to be used in the above-entitled cause.

APPEARANCES:

On Behalf of the Third-Party Defendant and Fourth Party Plaintiff J-Berd Mechanical:
Rolf Sonnesyn, Esquire
TOMSCHE, SONNESYN & TOMSCHE
610 Ottawa Avenue North
Minneapolis, MN 55422

On Behalf of the Third-Party Plaintiff Weis Builders:
Chad Stepan, Esquire
MEAGHER & GEER
1200 Multifoods Tower
33 South Sixth Street
Minneapolis, Minnesota 55402

A. That's either a perforated section or a slotted section of the PVC pipe that they would put in to get a water level.

(Whereupon, Deposition Exhibit No. 842 was marked for identification.)

BY MR. SONNESYN:

Q. Take a look at No. 842. What is No. 842? Again this we took from your file.

A. These are field notes that were prepared by Drew Ptak.

Q. And were they prepared when your crew was up here for the first site visit?

A. It was prepared by him as a result of his first site visit, yes.

Q. On the last page it refers to these hand augers. Do you see that?

A. Are you referring to auger #9, #10, #11, #12.

Q. Last page?

A. Yes.

Q. Are those the same augers, that same procedure that was referenced in the checklist?

A. On No. 841?

Q. Yes.

A. Those are the hand augers, yes.

Q. And so those are Mr. Braz's notes?
A. Yes.
Q. And some of these, the way that I interpret some of these hand auger tests turned up dry soil. Is my interpretation correct?
A. That's what he notes is dry, yes.
Q. Let's just take the first one as an example. It says hand auger #8, courtyard #2. Do you see that?
A. Yes, yes.
Q. And then I can't read his handwriting there. Is it zero to 2 inches top soil?
A. Yes.
Q. And then 2 inches to 13 inches silty clay?
A. Yes.
Q. And then to the right what does that say?
A. I believe it says brown.
Q. Brown, and then 13 inches to 16 inches, what does that say?
A. Brown sand.
Q. Brown sand, wet?
A. Yes.
Q. And then underneath that, what does

that say, E-O-B?

A. End of boring.

Q. End of boring at?

A. 16 inches.

Q. 16 inches and then it says dry?

A. Right.

Q. Okay. So then if we --

MR. REILLY: It says something else there. There is a word there. I want to make sure it's complete.

THE WITNESS: Brown silty sand.

BY MR. SONNESYN:

Q. Sure, that's where the 13 inches to 16 inches level there was silty brown sand?

A. From 13 to 16 is brown sand, and then I believe it's brown silty sand, but I can go to the report.

MR. REILLY: Just for reference, what are you looking at?

THE WITNESS: In Exhibit Appendix B it has the various comments that he had taken.

BY MR. SONNESYN:

Q. Appendix B as in boy?

A. Yes.

Q. Appendix B of your report I take it is

where someone -- was it Mr. Ptak?
A. Yes.
Q. Took his handwritten notes and then put it into what, word processing?
A. Correct.
Q. Let's go back to Exhibit No. 342. The next entry, this is on the last page of Exhibit No. 342, it says H-A, that is presumably hand auger.
A. Yes.
Q. Number 10?
A. Yes.
Q. Courtyard #3, is that right?
A. Yes.
Q. And then again we have zero to 2 inches top soil, 2 inches to 13 inches silty clay. Is that black and brown?
A. Black and brown, yes.
Q. 13 inches to 17 inches brown silty sand. What does that next thing say?
A. S-M.
Q. S-M, what does that mean?
A. Silty sand.
Q. Silty sand, and then it says wet in parenthesis?

A. Yes.

Q. And then what does the bottom say there?

A. End of boring at 17 inches.

Q. Dry?

A. Dry.

Q. And then the next entry hand auger #11, courtyard #4, we would interpret it the same way?

A. Zero to 2 inches top soil, 2 inches to 15 inches brown silty clay, 15 inches to 17 inches brown silty sand wet, end of boring, 17 inches dry.

Q. And H, hand auger #12, courtyard #6?

A. Yes.

Q. Maybe again interpret his notes, please.

A. Zero to 2 inches top soil, 2 inches to 26 inches dark silty clay. I can't read the -- I can't read the last. End of boring at 26 inches.

Q. Dry?

A. Dry.

(Whereupon, Deposition Exhibit No. 843 was marked for identification.)

BY MR. SONNESYN:

THE WITNESS: I would not consider that part of the surface water drainage system.

MR. SONNESYN: Let's mark this.

(Whereupon, Deposition Exhibit No. 845 was marked for identification.)

BY MR. SONNESYN:

Q. This is Exhibit No. 845, again it was in your file. What is 845, do you know?

A. I don't know specifically.

Q. Does 845 have anything to do, have any impact on the opinions that you have rendered?

A. I believe it has to do with the City of Eagan code for drainage requirements.

Q. What is the relevance?

A. Well, I think the code gives you the minimum standard that you would try to achieve for a drainage project.

Q. And when you say "the code" to what code are you referring to?

A. Well, the code would be, you know, if Eagan has a drainage code or if there is a code for surface water management you would evaluate that code and see how it would apply to your project and then use that with engineering judgment to see if you have designed it

appropriately.

Q. Have you reviewed that code?

A. I'm aware of the Eagan code and I've talked to the City of Eagan engineer.

Q. Have you reviewed the code itself?

A. I don't believe I've -- well, I looked at the code on the Internet. I can't remember if I've read the entire code.

Q. Did you print it off?

A. I don't remember printing it off.

Q. I didn't see it. We didn't see it in your file, so --

A. I don't recall printing it off.

Q. And when did you look at the code on the Internet? And when we talk about the code, you're referring to an Eagan code.

A. It would have been in the last two or three months.

Q. And I think you said that you talked to somebody at the City of Eagan.

A. Yes.

Q. When did you talk to somebody at the City of Eagan?

A. I don't recall the date.

Q. I'll show you your e-mail. I'm just

seeing if you remember off the top of your head.

A. It was within the last few months is my recollection.

(Whereupon, Deposition Exhibit No. 846 was marked for identification.)

BY MR. SONNESYN:

Q. I'll show you what has been marked as Hamm Deposition Exhibit 846. Actually this one, why don't we have copies for everybody.

MR. BE[illegible]: Sure.

BY MR. SONNESYN:

Q. While we're waiting for the copies, you said that the soil is not part of the drainage system and the slope of the courtyards is not part of the drainage system. Correct?

A. Correct.

Q. And are the roofs of the townhouses themselves part of the drainage systems?

A. I would say no.

Q. And are the gutters or lack of gutters part of the drainage system?

A. Well, that would be dependent on how they're connected to -- if they had gutters with downspouts that are connected to storm sewers then I would say those are really part of the system.

A. I don't recall who they met with.

Q. They simply said somebody from the City of Eagan was there at the site visit?

A. No, they weren't at the site visit. They went to the City of Eagan's offices to inquire what are the general requirements for design of drain systems.

Q. I see. Let's go back to Exhibit No. -- do you have any other knowledge about their -- the information that they obtained from the City of Eagan during that first site visit?

A. I believe it's consistent with the information that I have here.

Q. All right. And that's here meaning Exhibit No. 946?

A. Correct.

Q. But do you have any other information that KoryCo and Drew obtained from their site visit about the information that they obtained from the City of Eagan?

A. No, I do not.

Q. So you have got an e-mail that you sent to the -- an e-mail site at the City of Eagan and your response was from Eric Macbeth on August 4th, 2003. Is that right?

A. The first response, yes.
Q. Why are you making this inquiry on August 4th, 2003?
A. Because I was confirming what MaryJo and Drew had told me and to verify it to put in the standard of care section of the report dated August 12, 2003.
Q. And you got a response back from Eric Vanneman who directed you to John Gorder?
A. Yes.
Q. And there is an August 5, 2003 e-mail back from John Gorder, is that right?
A. Yes.
Q. And then there is also a handwritten note, presumably that is a telephone conference between the two of you?
A. Yes.
Q. Is your telephone call with him before or after Mr. Gorder's e-mail to you?
A. After.
Q. He e-mails you 9:03 a.m.?
A. Yes.
Q. And then you spoke with him later that day?
A. Yes.

Q. And your handwritten note says "spoke
with John on August 5, 2003 for pipe design,
[illegible]-year storm for"
A. Upstream.
Q. "Upstream pipes, 10-year storm for
main pipe."
A. Yes.
Q. And then your initials?
A. Yes.
Q. Do you remember anything else about
that telephone conversation with Mr. Gorder?
A. Yes.
Q. Tell me what you remember.
A. When I spoke -- the reason why I
called him was the information that he gave to me
was for a detention pond design.
Q. And that's you're talking about his
August 5, 2003 e-mail at 8:03 a.m.?
A. Yes.
Q. And so that e-mail was for a detention
pond?
A. That's really for a detention pond for
a development.
Q. I see.
A. And my question to him was for an area

don't believe that the system is designed to follow the standard of care.

Q. So you think that the required standard of care was deviated from?

A. Yes.

Q. And the required standard of care is defined as you have defined it?

A. Well, the standard of care would be what an engineering firm would do in this certain circumstance, the majority of the engineering firms would do in this circumstance.

Q. When you say the majority of engineering firms, what majority is that? 99 percent or 51 percent?

A. I mean, if -- go back. If they have a code or requirement then you need to follow that as a minimum.

Q. And the code or requirement, is that the plumbing code?

A. I believe there are several codes that Eagan would have, but again the code is a minimum requirement. You have to look at it and see if there are other issues that could apply. Just following the code doesn't mean that the system is acceptable.

elevation?

THE WITNESS: Which is the inlet elevation.

BY MR. SONNESYN:

Q. So that's how you got to the inlet elevation?

A. That's how you can see that the top of foundation is lower than the inlet elevation.

Q. I think I understand.

A. Okay.

Q. On page three of your report you state, and this is at the bottom; "Because the main drains in the courtyard are considered to be collector sewers (they collect water from the courtyard and convey it to the detention pond), they should be sized to accommodate the 10-year storm event without ponding."

The basis of your assertion in that regard are the City of Eagan criteria. Is that correct?

A. I mean, the City of Eagan requires that for -- I'm going to say public improvements, they're going to require that for anything that is done in the street or any parking lots. But I'm saying in general that's -- I don't want to say

every project we're working on, but almost all projects that I can recollect working on require that you look at the 10-year storm event and make sure that you don't have ponding in areas that pedestrians are going to use, people are going to use.

Q. What is the source of authority that underlies that assertion that you just made? In other words, is there a hydrology textbook that you look at? Is there a civil engineering textbook that you look at or is this just based on your knowledge of the industry?

A. I'd have to go back and see which textbooks say it. I can say that we have done this for so long that it's more or less I'm going to call it a standard.

Q. I mean, is there a code like a building code? We have the building code, we have the plumbing code, you referred to the City of Eagan code. Is there a code out there or an industry code?

A. I guess I don't know of an overall code that's a standard. It could be in certain areas that they may have something different, depending on the locality. But I'm saying in

general that is a pretty recognized standard.

Q. I see. This is a logical time for a break or we can keep going. Do you have a preference?

MR. REILLY: Just so we're clear, we had the same problem we had with all experts, we have one day here to get it done. I have no problem with doing lunch, I just want to make sure that everybody is aware we have to be done about supper time about today.

MR. SONNESYN: I'm not going to be that much longer. I'm going to walk through the report. Let's go off the record here.

(Whereupon, a one hour recess was had.)

BY MR. SONNESYN:

Q. Let's look at page four of your report, and again that is exhibit -- I keep forgetting.

A. No. 836.

Q. No. 836. Page four of your report, Mr. Gonun, under STORM WATER MANAGEMENT SYSTEM. Are you with me?

A. Yes.

Q. Second paragraph, last two sentences.

"However, sketches and notes were" -- well, I guess it refers to the mechanical contractor J-Berd Mechanical and Mikesh and then it states; "No detailed plans or specifications were apparently produced for construction of the courtyard drainage system."

And I think I touched on this earlier. Did you look at some plans drawn by Mikesh?

A. I believe I recall seeing sketches or notes, but I don't remember seeing any real detailed plans or specifications.

Q. And these were for a drain system, were they not?

A. I believe it was for a drain system, yes.

Q. And the next thing in your report, it states "However, sketches and notes were provided to indicate that the system was likely designed following the Minnesota Plumbing Code for roof drainage." And I think we touched on that before.

You next assert; "It was not accordance with the City of Eagan requirements for storm water management systems." Do you see that?

A. Yes.

Q. Is it your testimony that the City of

Eagan requirements were required for this project?

A. I do not know if they were required.

Q. Down towards the bottom of page four, item number one refers to inlets, and those are the surface grates in the courtyards. Right?

A. Yes.

Q. And it says "These inlets were 6-inch diameter drains surrounded by a concrete collar." Correct?

A. Correct.

Q. And actually the inlet grates were nine inches in diameter, correct?

A. The grates are, yes.

Q. So that where it says 6 inch diameter drains, that figure of six inches, that's incorrect?

A. Based on what is out there, yes.

Q. Well, do you have any reason to assert that the surface grates were anything other than nine inches from the date of installation?

A. I don't know that they changed.

Q. And your calculations are in part based upon the inlet grates being six inches, correct?

A. Yes, yes.

made an inference as to the intent of the system if you have asserted a criticism of the system. Is my inference incorrect?

A. I think what we looked at was is the system able to keep the water more than a foot below the entry elevation or to keep water out, from seeping over the top of the foundation. We're saying that it's not.

Q. That really was the full extent of your analysis?

A. To evaluate that. We didn't look at if you had brought in the different material how would that also effect the ability to collect surface water.

Q. Well, wouldn't this soil have an effect on the ability of the system to drain?

A. It would have an effect on the ability to bring water to the system.

Q. Yes.

A. Yes.

Q. And thus the compensation of the soil -- well, let me back up. I mean, I gather from what you're telling me is that the soil isn't a terribly significant feature in the analysis that Patrick Engineering conducted. Is that

correct?

A. No, I'm saying that we have evaluated based on what is there and you're asking me what if they put something else there how would it affect the system and I'm saying we didn't look at if they would have put something else there.

Q. You don't know?

A. If they had put something else there it could cause other -- if you have more permeable material then less water would get to the surface drain, but then more water would get down to the, you know, down to the soil underneath it. I don't know what affect that would have on the system either.

Q. In other words, you do not have a criticism of the type of soil, is that correct?

A. Well, I didn't say that. What I'm saying is that --

Q. All right.

A. the type of soil has an effect on -- the clay soil keeps water at the surface, so if you have no slope to it water is going to be at the surface.

Q. Okay.

A. Okay. And there is top soil above

that so the clay soil should keep water near the surface rather than percolating down to the sand that is underneath.

Q. All right. Page 11 under Analysis Following Local Design Criteria. Under subheading Approach.

A. Yes.

Q. "The City of Eagan Building Department was the permitting authority for construction of the courtyard drainage system. Therefore, it is assumed the system would have needed to meet City standard." Do you see that?

A. Yes.

Q. And I think what you have -- in this instance Patrick Engineering made an assumption, correct?

A. That it would need to meet the City standard, yes.

Q. And I think you have testified that you don't know whether or not the City standard would have been needed to have been met, correct?

MR. REILLY: Object to the form of the question as being a misstatement of his prior testimony.

BY MR. SONNESYN:

Q. Well, tell me if I'm wrong or right. That's what I'm asking you is it what I just stated is your testimony?

A. I don't have anything from the City in writing that says that the City code is required for the courtyard.

Q. And I think you said before that you don't know if the City code is required for the courtyard. Is that correct?

A. My interpretation is that it would be.

Q. Well, do you know?

A. I didn't get anything from the City on that.

Q. So you don't know?

A. I don't know.

Q. It next asserts here on page 11, "The City Engineering Department requires the use of the Soil Conservation Service, (SCS) also known as the National Resource Conservation Service (NRCS) methodology to design surface water drainage systems." Do you see that assertion?

A. Yes, yes.

Q. And I gather from your testimony, I interpret your testimony to mean that you can't tell me definitively that the City Engineering

to allow the growth. The presence of water above the waterproofing in conjunction with the frost susceptible soil caused the heaving of sidewalks in the courtyards." Do you know that for a fact?

A. Based on the photographs and other information that I had in the file that that was a problem. Out there yesterday you could see that there was a lot of cracking of the sidewalks and other signs of that damage.

Q. But do you know that for a fact?

A. Other than the information that was provided to me I wasn't out there in the winter or the spring.

Q. What is the analysis that you used to reach that opinion?

A. One, you can look at the grain size distribution of the soil, which is the sand, and silty sand is very frost susceptible. And the fact that you had water near the bottom of the sand layer, it can wick that water up and by wicking it up and freezing it can cause ice lenses to form because there is water present in the, you know,

that lower two inches.
Q. All right.
A. And so the presence of that water in conjunction with the silty sand causes the ice lenses to grow.
Q. Again, the silty sand has a role in the phenomenon?
A. Yes.
Q. Did Patrick Engineering conduct any tests during the wintertime to confirm this opinion that you have asserted?
A. No, we were not there in the winter.
Q. There were no augers, there no hand auger holes dug, no test pits dug during the wintertime?
A. That's correct.
Q. Bottom of page 18.
A. Okay.
Q. It states, "Currently all runoff from the roof sheet flows onto the courtyard. This is not good practice considering the roof makes up approximately one half of the tributary area to the courtyard drainage system." So the roof is

BY MR. DYE:

Q. I just want to make sure I didn't miss anything. I didn't see anything in your report where you render an opinion as to what caused any leaks on this property.

A. Correct.

MR. DYE: Okay. No further questions.

EXAMINATION

BY MR. STEPAN:

Q. Mr. Schuh, my name is Chad Stepan and I'm one of the attorneys for Weis Builders in this case and I have some questions for you here as well.

As part of your analysis of the Promenade project did you take into consideration distance between the surface inlets in courtyards?

A. We considered that the inlets -- let me try to answer your question right. We considered that the inlets were separate but that water could move between one and the other one.

Q. Does distance -- I mean, did the

say one foot is okay, but the local code may say, no, you have to use two feet so then you use the local code requirement.

Q. And if I understand you correctly items number two and three on page two of your report, those are items that you have just found to be standards throughout your experience almost universally?

A. Me and other people in Patrick have all agreed that that's reasonable.

Q. Is that something that you found other engineers in the industry to believe is reasonable standards?

A. Yes.

Q. Now, we spent most of the time here today talking about the surface inlets. Did you do any analysis of the drain that sits on top of the deck?

A. The 6-inch perforated drain?

Q. Well, maybe I just missed it when you were talking about it or was confused by the terms. Moving from the top down, the surface, you have the concrete apron with the grate?

A. Right.

100-year event, wouldn't you?
A. Yes.
Q. Do you have any information, have you seen any evidence that water has actually gotten as high as the doorway thresholds in those places?
A. I don't remember seeing that information.
Q. And the basis for the application of this 100-year event is the Eagan Storm Water Management Plan. Is that correct?
A. That's the information that was provided to us by Eagan.
Q. Okay. And that information was provided in response to your e-mail, is that correct?
A. We --
Q. I'm looking at Exhibit No. 346.
A. We had requested that information from them, yes.
Q. Was it in response to your e-mail?
A. Well, we had that information before. There are other charts and data that provide that information. They confirmed it when I had sent that to John, I

grade at the center, but I --

Q. Okay. As you sit here now have you seen anything that said the grade at the edge of the building was raised to meet ADA requirements or a fair housing requirements?

A. I don't recall.

Q. Now, have you ever designed a drain system for inside of a building footprint?

MR. STEPAN: Objection as to form, vague.

THE WITNESS: Can you identify footprint to me?

BY MR. HULL:

Q. The confines of the foundation.

A. Well, I've had drainage systems under floor slabs for buildings.

Q. Okay. You have never designed any for plazas like this I understand earlier?

A. Not for a plaza, no.

Q. Mr. Stepan asked you about design/build contracts and you made some reference to being provided with a set of criteria.

A. Yes.

Q. Can you tell me what you meant by

A. Yes.

Q. Now I'd like to direct your attention to page 20, the last two sentences in the carry over paragraph. You state; "Continued seepage in the building should be expected unless improvements are made to prevent water from entering the building in locations above the waterproofing system. Merely lowering the inlets and providing gutters will not eliminate seepage problems."

Maybe I've just been here too long today. Are the statements on 19 and the two sentences on 20 consistent with each other or do they contradict each other?

A. I think they're consistent.

Q. They are? Can you explain to me why?

A. Because the comment on page 19 has to do with the 100-year condition where seepage through the area above the top of foundation is located eight inches lower than the 100-year condition so you can still get water seeping in at that location. You're looking at two different elevations.

Case 0:00-cv-00987-JNE-JSM Document 431 Filed 09/03/2004 Page 56 of 65

A. Correct.
Q. If you had done all six fold to say that it's approximately three times the cost?
A. No, once you get it set up then it shouldn't be that much more.
Q. You've discussed at some length grates and how ever the grate that is there still impinges the flow below what a 6 inch open pipe would be?
A. Right.
Q. What if the grate were domed?
A. If you had a dome or some type of grate that would help reduce the potential for clogging.
Q. And also increases the area that water can access into the open area of the grate, correct?
A. Potentially, depending on the type of grate that you pick.
Q. You referred to the methodology that you used I think is one which other engineers agree is reasonable.
A. I believe so.
Q. And in saying that, you're not

talking about mechanical engineers, I take it.

A. Correct.

Q. And can you point me to some text which would indicate that other engineers agree that this methodology is reasonable with respect to an application involving a garage roof slash plaza area?

A. As I sit here?

Q. Yes.

A. As I sit here I don't have a reference.

Q. And do you have any -- have you ever discussed or ever heard other engineers or ever read other engineers opining that this is the correct methodology to use with respect to the situation of a garage roof slash plaza deck area is as opposed to an exterior storm system?

A. I have not discussed it with anybody.

Q. Never seen that in writing anywhere?

A. I have not seen it in writing.

Q. You said that you didn't think that

**Schuh, Jeffrey**

---

**From:** John Gorder [JGorder@ci.eagan.mn.us]
**Sent:** Tuesday, August 05, 2003 8:03 AM
**To:** 'Schuh, Jeffrey'
**Cc:** Eric Macbeth
**Subject:** RE: Drainage Design Requirements

This is in response to your inquiry below to Eric Macbeth.

The storm sewer pipe system design event is a 10-year, 4.2 inch rainfall,
for ponds it is a 100-year, 6 inch rainfall event.

The required freeboard is 3 feet above calculated 100-year high water level
of a pond, with emergency overflows provided at or within 2 feet above the
high water level. Easement is dedicated to 3 feet above the high water
level, and that dictates where buildings can be placed or set back from
water bodies.

A 30-foot un-graded buffer should be provided around all existing delineated
wetlands.

I hope this answers your questions. If not, please contact me.

John Gorder, P.E.
City of Eagan
Assistant City Engineer
3830 Pilot Knob Road
Phone: 651-675-5645
Fax: 651-675-5694
jgorder@ci.eagan.mn.us

Spoke w/ Gorder on 8/5/03
For Pipe design -
5 yr Storm for upstream
pipes
10 yr Storm for main pipe
JS

-----Original Message-----
From: Eric Macbeth
Sent: Monday, August 04, 2003 2:33 PM
To: 'Schuh, Jeffrey'
Cc: John Gorder
Subject: RE: Drainage Design Requirements

Jeffrey:

John Gorder, Eagan's Assistent City Engineer, is best suited to provide you
the information you request. By copy of this response, I am asking him to
respond to you.

Thanks.

Eric Macbeth
Water Resources Coordinator
City of Eagan
3501 Coachman Point
Eagan, Minnesota 55122-1211
Phone: (651) 675-5300
Fax: (651) 675-5360
Email: emacbeth@cityofeagan.com
WWW: http://www.cityofeagan.com/water_resources/water_resources.htm

DEPOSITION EXHIBIT
846 Schuh

- ---Original Message-----
From: Schuh, Jeffrey [mailto:jschuh@patrickengineering.com]
Sent: Monday, August 04, 2003 2:24 PM
To: 'waterres@ci.eagan.mn.us'
Subject: Drainage Design Requirements

I tried to find the design criteria for new subdivision/residential developments on the web. Can you tell me where to locate them? What I am looking for is the design storm events, the freeboard required for buildings, building setbacks from water bodies, what the storm sewer should be designed for as far as flow rates for what storm event, etc. Please send me a message regarding where to search for these items.

Jeffrey C. Schuh
Patrick Engineering Inc.
4970 Varsity Drive
Lisle, IL 60532
Phone 630-795-7212
Fax 630-724-9279

# ADDENDUM TO THE HYDROLOGIC INVESTIGATION OF THE PROMENADE TOWNHOMES REPORT DATED AUGUST 12, 2003

PATRICK PROJECT NO. 9402.A0

NOVEMBER 12, 2003

PREPARED BY:
PATRICK ENGINEERING INC.

4970 Varsity Drive
Lisle, IL 60532
(630) 795-7200
Fax (630) 434-8400

EXHIBIT
3

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. DRAINAGE SYSTEM .......... 1

III. HYDROLOGIC INVESTIGATION .......... 2

IV. CONCLUSION .......... 4

**APPENDICES**

Appendix EA – Hydrologic Calculations

Appendix FA – Hydrologic Results Summaries


P:\Lisle\MURNANE\9402.A0\Rpts\Hydrologic Investigation\ADDENDUM TABLE OF CONTENTS.doc

## INTRODUCTION

On October 14, 2003, Jeffrey C. Schuh, P.E. of Patrick Engineering Inc. visited the Promenade Townhomes for the purpose of observing the conditions of the courtyard drainage system. During the course of the site reconnaissance, it was observed that the grate and perforated PVC riser system had dimensions that were different than those assumed for the analyses that were included in the August 12, 2003 report. The purpose of this Addendum is to present the results of additional analyses that were performed using the new data.

## DRAINAGE SYSTEM

Based on the site reconnaissance, the drainage system within the courtyard consists of the following:

1. Gutters and downspouts connected to the underground pipe network. (This system was apparently added after the original construction.)

2. Drains connected to 4-inch diameter pipe that in turn connects to the perforated riser. These drains are generally located near the concrete aprons outside doorways.

3. Grates having concrete collars, both connected to an 8-inch ± diameter perforated PVC pipe. The grate is approximately 9-3/8 inches ± in diameter.

4. The perforated pipe is connected to a 6-inch diameter iron pipe that passes through the concrete slab over the garage and in turn connects to the storm sewer system.

Based on information provided by Engineering Evaluations, Inc. dated October 1, 2003, the open area of the grate is approximately 23.5 square inches.

## HYDROLOGIC INVESTIGATION

The results of the analyses presented in the August 12, 2003 report reflect the condition of a grate having an open area equal to approximately ½ the pipe area. For that analysis, it was assumed that the pipe was 6 inches in diameter. While this condition does not reflect the size of the grate that was observed on October 14, it could represent the condition of a partially clogged grate, which was the condition observed on October 14. On that date, many of the grates were partially to totally covered by leaves and other debris.

The analyses that were presented in the August 12 report were re-performed using a grate opening of 23.5 square inches (0.163 square feet) and a pipe riser diameter of 8 inches. (It is noted that changing the pipe diameter from 6 inches to 8 inches has no affect on the calculations because the effective open area of the grate is less than the opening of a 6-inch diameter pipe.) The approach and methodology for these calculations are consistent with the approach and methodology used for the August 12 report.

The results of the analyses are presented in Appendices EA and FA. A summary of the results and discussion for each situation analyzed are presented below.

Analysis for As-constructed Improvements

The analysis results for the originally constructed drainage system, considering the local standards and generally accepted engineering standards, are summarized in tabular and graphical form. These tables and graphs show that there is ponding at Building 1 (Overall condition) in all modeled storm events (four total events were modeled; the 2-year, 5-year, 10-year, and 100-year events), and that this ponding reaches the lowest adjacent building grade (ground surface at Building 1) in the 100-year storm event. For Building 5, there is ponding for all four modeled storm events and the ponding reaches the lowest adjacent building grade in the 5, 10, and 100-year events.

Analysis for Post-construction Improvements

The addition of the small, perforated pipes and small drains adjacent to the patios changes the ponding elevation slightly. Only Building 1 was analyzed for this condition. The results of the analyses indicate that the ponding elevation for Building 1 stays the same for the 2-, 5-, and 10-year events. This is expected since the additional discharge through the relatively high rim elevation of the patio drains is only fully realized when a hydraulic head (ponding) occurs above the inlet. However the 100-year event response was lowered by approximately one tenth of a foot. The addition of these pipes and inlets slightly lowered the ponding elevation but does not alleviate ponding.

Historical Rain Event Analysis

The analysis of the historical events shows that in rather intense storms, no matter how brief, ponding occurs over the inlets. Analysis of the significant storm events of April 6-7, 2001; April 22, 2001; May 6, 2001; and June 21, 2002 predict that only the April 6-7, 2001 and June 21, 2002 events were intense enough to cause ponding. The runoff from the April 22, 2001 event was low enough that a detailed analysis of ponding was not performed. The April 6-7, 2001 and June 21, 2002 storms had a brief duration with an intensity of greater than 1 inch/hour. During this time, the computer models predict that water ponded 1 to 6 inches over the inlets. The duration of these intensities was only 11 minutes for the April event and 15 minutes for the June event. In an intense storm of longer duration, ponding would likely be more severe and water would reach the elevation adjacent to the building or entryway.

The April 6-7 event reportedly caused seepage in one garage location in Building 1 and one garage location in Building 5. The April 22 event reportedly caused seepage into one garage location and a stairwell in Building 1 and no interior seepage in Building 5. No seepage was reported for the May 6th event. The latest date of the leakage reports that Patrick reviewed is June 7, so no report data was available to compare the results of the analysis to actual leakage in the buildings for the June 21, 2002 precipitation event. During this event, the computer model predicted that water ponded up to 6 inches over the inlets.

Freeze/Thaw Cycle Analysis

The freeze/thaw cycle has a significant effect on the courtyard drainage. The shallow soils over the garage slab are entirely within the frost depth of Minnesota. It is likely that these soils will be frozen for several of the winter months. The frozen clay soil will act as a totally impervious surface since the void spaces in the soil would be frozen solid. When analyzed using the SCS-TR-55 methodology, the ponding is more extreme than with non-frozen soils, as expected. In addition, if snow melts with the water equivalent of 1 inch, several inches of ponding would occur above the inlets.

## CONCLUSIONS

The results of these additional analyses confirm that ponding of water occurs during the design storm events, and that there is potential for the ponding to reach the buildings. The conclusions made in the August 12 report are unchanged by the results of this additional investigation and analysis of courtyard conditions.

This Addendum was prepared by PATRICK ENGINEERING INC.

Analyses Reviewed by: ____________________

Report Approved by: ____________________

P:\Lisle\MURNANE\9402.A0\Rpts\Hydrologic Investigation\Addendum Text V3.doc

6