UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff,

vs. Civil File No. 00-CV-987(PAM/JGL)

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.; Promenade Village Townhomes; Valley Forge Insurance Company; Colloid Environmental Technologies Company; and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.; and Mikesh, Inc.,

Fourth-Party Defendants.

---

DAVID WILLIAM CAMPBELL OCTOBER 8, 2003

COPY



EXHIBIT A

VOLUME II

The Deposition of DAVID WILLIAM CAMPBELL, taken pursuant to Notice of Taking Deposition, taken before Barbara F. Schwegman, a Notary Public in and for the County of Washington, State of Minnesota, taken on the 8th day of October, 2003, at 8500 Normandale Lake Boulevard, Suite 2110 Minneapolis, Minnesota, commencing at approximately 9:00 a.m.

APPEARANCES:

ANDREA E. REISBORD, ESQUIRE, of the Law Firm of COUSINEAU, McGUIRE, ANDERSON, CHARTERED, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, Minnesota, 55416-5318, appeared for and on behalf of Plaintiff, Westfield Insurance Company.

CHAD J. STEPAN, ESQUIRE, of the Law Firm of MEAGHER & GEER, PLLP, 4200 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota, 55402-3788, appeared for and on behalf of Defendant and Third-Party Plaintiff, Weis Builders, Inc.

STEVEN E. RAU, ESQUIRE, of the Law Firm of FLYNN, GASKINS & BENNETT, LLP, 333 South Seventh Street, Suite 2900, Minneapolis, Minnesota, 55402, appeared for and on behalf of Defendants, Promenade Village Townhomes, LLC and Healey Ramme Company.

LEO I. BRISBOIS, ESQUIRE, of the Law Firm of STICH, ANGELL & KREIDLER, P.A., The Crossings, Suite 120, 250 Second Avenue South, Minneapolis, Minnesota, 55401, appeared for and on behalf of Defendant, Valley Forge Insurance Company.

system you can adequately waterproof those plazas so that water will stay out of the building and out of the garages?

A. Definitely.

MR. HULL: That's all I have.

MR. REILLY: Let's take a two-minute break.

(At this time a brief recess was taken.)

CROSS-EXAMINATION

BY MR. REILLY:

Q. Mr. Campbell, my name is Pat Reilly. I represent CETCO, and I have some questions for you. You indicated in your prior testimony that you ran across Swelltite on one prior occasion. Do you remember that testimony, sir?

A. I do.

Q. And you do not recall the circumstances of that?

A. No, I'm afraid I don't.

Q. And you've done nothing since your last deposition to determine the circumstances of that encounter?

A. No, I haven't.

Q. You do not recall the application of the -- the particular type of application that was involved in

that?

A. No, I do not.

Q. Other than that, you have no other experience with Swelltite prior to this case; correct?

A. Firsthand experience, no.

Q. Now, you've indicated that there is some reliance on the film to dissolve for the bentonite to operate in the Swelltite design?

A. Correct.

Q. For the film to dissolve, that requires water getting to the film, does it not?

A. As I understand the literature, yes.

Q. So, for instance, if the top layer of the Swelltite -- which is what kind of material? It's a rubberized material?

A. High-density polyethylene.

Q. Okay. The polyethylene prevents the water from reaching below it, you would expect the film to be present?

A. Repeat the question, please.

Q. In other words, if water does not penetrate that first layer of the Swelltite, you would expect underneath that area film to be present?

A. True. Not necessarily.

Q. You don't know?

A. Correct.

Q. It does not mean that the system has failed if the film hasn't dissolved where water has not attacked?

MR. BROWN: You're asking him to confirm that he doesn't know, Bill -- or Pat?

BY MR. REILLY:

Q. No. What I'm asking you is you know that if the poly -- the material you called --

A. High-density polyethylene.

Q. The polyethylene prevents water from penetrating the membrane and water isn't getting at the membrane from any other direction, the film would still be there years after it's installed?

A. That's correct.

Q. And that does not mean that the system failed? In fact it means that the system in that area is functioning?

A. Yes.

Q. All right. Now, in your prior testimony you talked that at the time you were out there you saw eight active leaks in the entire project; is that correct?

A. I believe that's correct.

Q. And that's in six buildings?

A. Yes.

Q. And you were only able to identify the

location of four of them, and I think that on Exhibit 790 you drew circles where you believed the leaks to be, is that correct, and that's on BC 00553 bates stamp?

A. Yes, I recall that.

Q. Do you notice that all the drawings you -- all the circles, leaks are located at under or near the linkage between Buildings 1 and 2?

A. That's correct.

Q. Do you understand what waterproofing was done in the linkage areas?

A. No, I don't.

Q. Do you know whether those leaks are being caused by water infiltration at the links themselves, the four leaks that you identified?

A. You'll have to define "link" for me.

Q. Okay. There's an area between Building 1 and Building 2 as a pass-through for fire trucks and other safety equipment. It's an elevated area with a cement patio type area at the top. Are you familiar with that area?

A. Yes, I am.

Q. It's outside of the scope of these courtyards we've been talking about?

MR. HULL: I'll object to the form of the question.

A. That's correct.

BY MR. REILLY:

Q. That's the area I'm defining as the link; all right?

A. Understood.

Q. And you've done nothing to examine whether water is penetrating the building in that link area?

A. Through the top surface, no, I have not.

Q. You have seen, have you not, in that linkage area cracks in the cement?

A. In the wearing slab cement, yes.

Q. Have you seen also gaps between the slabs and the walls without caulk in them?

A. I don't recall offhand.

Q. Do you remember seeing in the stairwells at or about the links separations between the stairwell steps and the walls?

A. Yes, I do remember seeing that.

Q. Without caulking or without adequate caulking?

A. I believe it was failed caulking.

Q. All right. Those were all areas where water can penetrate the building?

A. Potentially.

Q. As you sit here today, do you know -- do you have an opinion whether -- where the source of four leaks

at the time you were out there throughout the garage areas; correct?

A. Correct.

Q. And as I understand from your prior testimony, you're unable to testify where any particular leak came from?

A. Correct.

Q. Now, you know that there were repairs done, for instance, to the entranceways of various apartments in the courtyards; correct?

A. Correct.

Q. And that as a result of that leakage, some leakage was diminished -- or locations were diminished?

A. Yes.

Q. You also understand that there were repairs done to the posts and waterproofing around the posts?

A. Not all the posts, but yes.

Q. And where that was done, leakages were diminished?

A. Yes.

Q. You also understand there was some additional caulking and other work done that contributed to at least diminishing the leakage on the property; correct?

A. That's my understanding, yes.

Q. The eight remaining active leaks that you saw,

is there any that you can say "In my opinion, it was a result of this particular area failure, function"?

A. No, I can't.

Q. In fact, as you indicate in your prior testimony, in the courtyards the waterproofing membrane is being water-tested 24/7?

A. That's correct.

Q. Because there's two inches of standing water essentially in the entire waterproofing?

A. That's correct.

Q. Now, you've indicated that you're not familiar yourself with either the formulation of the bentonite, correct, in the Swelltite product?

A. The Swelltite's version of bentonite, yes, that's correct.

Q. And you're not familiar yourself with the chemical or properties of the film that was used with the Swelltite?

A. That's correct, other than what I just recently learned from this other individual.

Q. And that person, do you know personally the one you talked to?

A. I don't know him personally. I know of him.

Q. Okay. Are you aware of any treatises or materials which are commonly recognized in this trade

issue that I'm discussing with you is the effect of the film not dissolving on Swelltite product and its waterproofing capacity. Are you aware of any treatises including books, articles, written studies that have been done by anybody in your profession that would be considered a learned document?

A. No.

Q. Now, when you described the moisture that you saw in the -- on the substrate in four of the openings, you described it as dampness. Do you remember testifying to that?

A. Yes.

Q. Do you know if any of that dampness was a result of you working in that environment and cutting through the Swelltite?

A. No. I'm positive it was not because that would be a flawed technique of retrieving a sample.

Q. You indicated that in every hole you dug there was standing water; correct?

A. That's correct.

Q. And in some of the areas, as much as two or three inches of standing water?

A. That is correct.

Q. Did you also notice that in some of the areas -- strike that. In the areas you've indicated

dampness, do you know when that water entered that area where you found the dampness?

A. Other than to say it did not enter during any test cut, no, I cannot.

Q. And when you say "dampness," does that mean a physical staining of the material underneath?

A. A moisture you can feel with your fingers and pick up on your fingers.

Q. Now, have you -- you indicated that there's an effect when the film fails to dissolve as to the efficiency of the waterproofing system; correct?

A. Correct.

Q. Have you done any testing whatsoever to determine what is the effect of -- on water migration of the film failing to dissolve?

A. No, I've run no test.

Q. Do you know whether that film and undissolved film such as that is water soluble or not?

A. According to the literature, it's supposed to be water soluble.

Q. Do you believe that it is?

A. I believe certain factors can keep it from functioning the way the manufacturer expects it to.

MR. BRISBOIS: Objection, nonresponsive.

BY MR. REILLY:

A. "Permeating" means go through.

Q. Exactly.

A. I don't know whether it can or can't.

Q. Now, if I understand the way this product is designed to work, if there is a hole in the product, for instance in the membrane, as the water gets into that hole, bentonite swells around it and seals that hole shut; correct?

A. That's what it's supposed to do, yes.

Q. All right. If the penetration is from above, in other words, going vertically into the bentonite material, it doesn't matter whether the film dissolves or not. It will still expand around that penetration; correct?

A. The portion of the bentonite that's in contact with the concrete right at the hole will expand --

Q. All right.

A. -- however.

Q. Whether it will stop the leak or not, you don't know?

A. That's correct.

Q. You've done no testing to determine that?

A. That's correct.

Q. You've already testified you never saw any of the seams, so you do not know whether the seams leaked or

not, do you?

A. Not by firsthand observation, no, I do not.

Q. And you've done no testing of seams?

A. No, I have not.

Q. Now, if a piece of Swelltite let's say the size of a piece of paper were lying in a position where water approached it from the side, you would expect, would you not, that the edge of it would hydrate the bentonite? The bentonite would be hydrated on the edge?

A. It would.

Q. It would not necessarily penetrate all the way through the product?

A. The hydrated bentonite though, keep in mind, is separated from the substrate by the film which also extends out to the edge.

Q. All right. It would extend through -- and whether that film dissolved or not -- let's assume the film is dissolving properly in this instance. The film would dissolve along the area where the bentonite expanded and hydrated; correct?

A. Correct.

Q. But assuming the water then was stopped by that expanded bentonite and expanded and dissolved film, there would be no effect to the remaining bentonite or the remaining film once you got beyond the area where the

stoppage occurred?

A. That is correct.

Q. So for instance, if you were to take a sample from the middle of this sample, you would expect to find unhydrated bentonite and film?

A. Yes. Right.

Q. During your inspections either of active leaks or of evidence of former leakage, were you able to determine any particular leak -- the location or cause of any particular leak that ever existed in that property?

A. I was never able to associate the evidence of infiltration on the interior with a specific failure of the membrane on the exterior.

Q. Now, you talked a bit about the posts, and you understand that those posts are single pieces of wood that extend all the way from the roof line of the overhang of the patios down all the way to the -- almost all the way down to the cement planks?

A. That's correct.

Q. And water can enter at any area of the unprotected wood in that post; correct?

A. Correct.

Q. It could enter at the ground level, for instance, in other words, where the stoop -- where it matches up with the top of the patio block?

Q. So put that aside because we don't know which one of those samples you found dampness underneath the samples, so the evidence that you would use to determine whether the film had been exposed to moisture would be the hydration of the bentonite?

A. Yes.

Q. Is there any other basis for that?

A. I'm confident that there were samples taken that still had film on them that also had water below the sample.

Q. My point is, other -- if I hand you one of those samples today and I say "Tell me which -- was this film exposed to moisture?" and you say "Well, I think so and here's why," and the only reason you could give me an opinion today as to that particular sample is because of the condition of the bentonite?

A. That is correct.

Q. All right. Now, if a waterproofing system such as the Swelltite system used here in these courtyards is circumvented by water, for instance, water enters the building walls from other areas above or beyond the waterproofing membrane, that's not a defect in the waterproofing membrane itself?

A. No, it wouldn't be.

Q. Have you done any test to determine whether

water can enter the vinyl siding of these buildings?

A. No, I've done no tests.

Q. If water were able to enter the vinyl siding into the wall structure of these buildings, would that be a possible cause for leakage below those walls?

A. Yes, it could.

Q. If, as you've indicated at least on one occasion, there is insufficient flashing in end walls or knee walls which allows water to penetrate into the block of the wall itself that can in fact create leakage below?

A. That's correct.

Q. And defeat the waterproofing system by circumventing it?

A. That's correct.

Q. With there being two inches of standing water or thereabouts on this product all the time, is it significant if the testimony were to be at the time of trial that the only time there are leaks, active leaks now, is when it rains?

MS. HEYER: Object to the form of the question.

A. Not necessarily.

BY MR. REILLY:

Q. Why?

A. There could be Swelltite seams that because of