5801 Duluth Street
Minneapolis, MN 55422
Ph. 763-546-3434
Fax 763-546-8669

Suite 420
555 West Layton Ave.
Milwaukee, WI 53207
Ph. 414-744-6962
Fax 414-744-6981

# Waterproofing Investigation Report



## Promenade Oaks Apartments

### Eagan, Minnesota

*Engineering & Architectural services for roofs, waterproofing, pavements, and building exteriors.*

INSPEC, INC.

www.inspec.com

EXHIBIT B

5801 Duluth Street, Minneapolis, MN 55422 • Ph. 763-546-3434 Fax 763-546-8669
555 West Layton Ave., Suite 420, Milwaukee, WI 53207 • Ph. 414-744-6962 Fax 414-744-6981

Engineering & Architectural services for roofs, pavements, and building exteriors.

INSPEC, INC.

**PROJECT:** Waterproofing Investigation Report
Promenade Oaks Apartments
1160 Northwood Drive
Eagan, MN 55121

**DATE:** May 1, 2002
**FILE NO.:** 205903

**REPORTED TO:** Flynn, Gaskins, and Bennett, LLP
333 South Seventh Street, Suite 2900
Minneapolis, MN 55402

Attn: Steven Rau

---

# WATERPROOFING INVESTIGATION REPORT

A. BACKGROUND INFORMATION

B. PROBLEM ISSUES

C. THE INVESTIGATION

D. EXISTING CONDITIONS

E. EVALUATIONS AND CONCLUSIONS

F. RECOMMENDATIONS

G. COST ESTIMATES

Attachments: Drawings (Existing Conditions): A through O
Drawings (Proposed Design): P through R
Photos (General Site): 1 through 4
Photos (Infiltration): 5 through 18
Photos (Additional Issues): 19 through 24
Photos (DTOs): 25 through 64
Photos (Miscellaneous): 65 through 66
Construction Cost Estimate (CPMI, Inc.)

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.

A. BACKGROUND INFORMATION

The Promenade Oaks Apartment complex was built in 1997 and is comprised of six linear buildings, all similar in style, with a lower-level garage, rental units along both sides of the long building dimension, and a long earth-covered courtyard running down the center of each building between the units and above the garage (Drawings A and B and photos 1 through 4).

In the same year that the buildings were constructed, each building began experiencing water infiltration into the rental units and the garage below. Since then, numerous repairs have been made which have stopped most of the leaks. Nevertheless, water infiltration has reoccurred at some repaired areas, as well as at new nonrepaired locations. In spite of repairs, it appears that there remains a chronic leakage problem.

The purpose of this investigation is to:

1. Evaluate the original and repaired below-ground waterproofing system in the earth-covered courtyard areas with respect to long-term performance.

2. To determine a repair strategy to assure that the infiltration is solved, if constructed properly.

3. To provide cost estimates of the repairs.

B. PROBLEM ISSUES

1. Water Infiltration: Prior to the repair work, there was water infiltration occurring at hundreds of different locations (photos 5 through 18) throughout all six buildings. The extensive water marking can still be seen and many leaks are still active, even after the repairs. Sheet metal gutters have been installed at some locations as a temporary measure to manage the infiltration (photos 19 through 21).

2. Courtyard Drains: The courtyard drains do not seem to be draining the volume of water that they should (photo 22).

3. Sidewalk Heaving and Cracking: The courtyard sidewalks have been heaving, creating trip hazards and, also, cracking prematurely (photos 23 and 24).

C. THE INVESTIGATION

Our investigation of the aforementioned problem issues included the following:

1. We made 20 destructive test openings (DTOs) at strategic locations throughout all six buildings (Drawing A). Since it would be impractical and cost prohibitive to dig a DTO at every different existing condition at all six buildings, we, instead, assumed Building Two as

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.

typical and concentrated most of our DTOs at that convenient location. The horizontal and wall waterproofing systems, however, were actually verified at all six buildings.

2. We reviewed the original construction documents as prepared by BRW Elness Architects, Inc. and the recorded history of leaks and repairs.

3. We visually surveyed all water infiltration (past and present) in the garages of all six buildings.

4. We conducted a visual survey of the performance of all 30 courtyard drains.

D. EXISTING CONDITIONS

The three most typical existing waterproofing conditions revealed by the 20 DTOs are listed below. For a more detailed description of all materials and their condition, refer to existing condition Drawings A through N and photos 25 through 64.

Throughout the report, we have referenced specific products by name; however, it should be noted that, with so many similar waterproofing-related products on the market and since most markings have worn off, we cannot always make such identifications with 100 percent certainty.

1. Typical Existing Materials at Precast (Drawing C)

   - 2' 2" to 2' 6" of soil backfill.
   - 2" of extruded polystyrene insulation (Foamular).
   - Composite drainage sheet with woven filter fabric (Aquadrain 20 H).
   - Waterproofing membrane (Volclay Swelltite 3000).
   - Liquid-applied flashing at precast keyways (Volclay M-2000).
   - 12" precast concrete deck.

2. Typical Existing Materials at Building Walls (Drawing G)

   - Soil backfill.
   - 2" of extruded polystyrene insulation (typically Foamular).
   - Composite drainage sheet with nonwoven filter fabric (Aquadrain 10x or 15x).
   - Waterproofing membrane (Volclay Swelltite 3000).
   - Concrete Masonry Unit (CMU) wall
   - Self-adhering grade line flashing (Miradri by Mirafi.)

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.

3. Typical Existing Materials at end Walls-Repaired (Drawings M and N)

    - Soil backfill.
    - 2" of extruded polystyrene insulation (Foamular).
    - Composite drainage sheet with nonwoven filter fabric (Aquadrain 10x or 15x).
    - Self-adhering waterproofing membrane (Miradri by Mirafi).
    - CMU or CIP end wall.
    - Color-coated sheet metal grade line flashing.

E. EVALUATIONS AND CONCLUSIONS

Instead of describing the cause of every past and present leak, which would number in the hundreds, we will evaluate the existing waterproofing system by, instead, discussing the "errors" we have discovered and dividing them into the two general categories of design errors and installation errors.

In addition, since waterproofing incorporates issues of "subsurface drainage," as well as the "waterproofing membrane," itself, we have broken our discussion of errors down further into these two categories.

Design Errors

Subsurface Drainage:

1. The waterproofing membrane was flat, not sloped to the drains (Drawings C and I). Without adequate slope, the membrane never drains completely, and the drainage that does occur does so at an extremely slow rate. Good practice requires that waterproofing membranes are sloped by either tapering the structure, sloping the structure, or installing a tapered topping on the structure.

2. The compressive strength of the insulation was inadequate, given the weight of the soil backfill. As a result, the insulation was being "driven" down into the raised "dimples" of the composite drainage sheet, thereby reducing the space within which drainage water travels by approximately 10 percent (photo 35). Since this was the result after only four years, in my opinion, this drainage space could be reduced further during the life of the building.

3. None of the 30 courtyard drains are draining adequately to keep up with the surcharge of water (Drawing I) for the following reasons:

    a. No filter fabric was used to filter out the fines in the water. This resulted in a premature clogging of the aggregate around the drain, as well as the perforations in the side of the drain itself (photo 43).

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.

b. The aggregate size was such that the individual stones were partially plugging the perforations in the side of the drain (photo 44).

c. The aggregate was a crushed material, which will tend to interlock, thereby reducing the free flow of water between each individual stone.

d. The aggregate was a relatively soft limestone material, which will produce its own fines when exposed to water. These fines will then contribute to the plugging of the drain holes if not filtered out.

e. The lowest perforations drilled into the side of the drain were 2-1/2" above the waterproofing membrane, which means that at least 2-1/2" of water will always be resting on the membrane (photo 44).

f. At 19 of the 30 drains, the soil had settled around the concrete "collar" at the top of the drain so that surface water was being blocked by the collar from flowing into the top grate (photo 22).

All drains were barely draining and a few were not draining at all. These drains were designed to receive water in three ways: (1) by surface runoff entering through the top grate, (2) via the newer drain pipes which penetrated the sides of the drain, and (3) through numerous holes drilled through the sides of the cylindrical drain body.

As a result of the poorly performing drains, the moisture content of the soil was extremely high. This not only places increased demands on the waterproofing membrane, but, in my opinion, may someday contribute to the overloading of the structural capacity of the precast deck as the permanent water content of the soil keeps increasing.

4. We observed the following errors in the design of the more recently installed perforated drain pipe, which was a repair measure and not part of the original construction (Drawings D and G, photos 29 and 30).

   a. The pipes were not buried deep enough, at the lowest level of water accumulation. In order for the pipes to drain at their current depth, water would have to accumulate from the bottom up to a depth of approximately 22" before reaching the underside of the pipe. Otherwise, the only water intercepted by the pipe is that which percolates directly down on top of the 4" wide pipe.

   b. The filter fabric was wrapped around the pipe itself, instead of around the aggregate. In accordance with proper practice, the installation functions longer if it is, instead, wrapped around the aggregate, so that a much greater area of fabric filters the same volume of water. This helps prevent the fabric from clogging up prematurely.

c. The surrounding aggregate was a soft material with a lot of sharp edges that could damage the filter fabric.

The Waterproofing Membrane:

1. The waterproofing membrane used (Volclay Swelltite 3000) failed to perform on this particular project for the following reasons (Drawing O):

   a. The product literature for the Volclay Swelltite 3000 waterproofing membrane that was installed states that the water-soluble film component of the membrane is supposed to dissolve in the presence of water, thereby allowing the bentonite/butyl component to come into direct contact with and seal against adjacent surfaces. However, we recovered samples of the now 4-year-old membrane with the water-soluble film still intact and not yet dissolved. This means that water is free to enter the seam, because the undissolved film is keeping the bentonite/butyl component from sealing against the HDPE component of the adjacent membrane. This also means that, once through the seam, the water is also free to migrate under the membrane. Again, this is because the undissolved film is separating the bentonite/butyl component from the precast concrete. This is evidenced by the fact that we found water below the membrane at four DTO locations. Once water is permitted to migrate under the membrane, it is only a matter of time until it finds a convenient point of entry through the structure, such as a keyway joint, expansion joint, construction joint, or stress crack.

   b. The membrane was subject to damage during construction, and this damage could have gone undetected since, according to the product literature, this particular membrane cannot be flood tested to check for failures, as other membranes can be.

2. The flashing at the bottom of the nonrepaired canopy posts will never retain a long-term bond to the post and remain watertight, since moisture can enter the post above the flashing and migrate down behind the flashing within the wood (Drawing J and photos 45 and 46).

3. There is no material protecting the waterproofing flashing (Miradri by Mirafi) at the ledge (Drawings D, F, G, H, and K and photos 29, 30, 33, 37 through 41, and 49 through 52). This type of flashing is easily damaged, as we observed at several locations.

4. Many walls, which rely on the Volclay Swelltite 3000 membrane for waterproofing, extend the product too close to the soil surface, where there is inadequate containment pressure exerted by the backfill for the bentonite component of the membrane to function properly (Drawings D, H, and M).

5. Color-coated sheet metal is incorrectly used as flashing at finished grade where the sheet metal extends below the soil (Drawings E, M, and N and photos 31 and 59 through 62). In a few years, the paint will flake off and the metal will start to corrode from the ground up.

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.

This will not affect the waterproofing, but it will become an embarrassing eyesore for an upscale property. Repainting will not work, and replacing the sheet metal with a more appropriate material, such as stainless steel or copper, will be costly.

Installation Errors

Subsurface Drainage:

1. The filter fabric component of the composite drainage sheet was torn open at three DTO locations, allowing fines to enter the core of the sheet, thereby clogging it (photos 36, 42, and 62).

   Note: A composite drainage sheet is a plastic-like sheet with raised vaccuum-formed dimples (the core) and a filter fabric factory adhered to the dimples. The purpose of the product is to facilitate the movement of water to the drains.

2. At two DTO locations, the dimples of adjoining composite drainage sheets were not interlocked, as required by the manufacturer, to facilitate the uninterrupted flow of draining water. As a result, the open seam permitted water to flow beneath the adjacent sheet instead of on top of it (photo 36).

3. At three wall locations, the top edge of the composite drainage sheet was not wrapped with the filter fabric, as recommended by the manufacturer, which resulted in the sheet becoming 100 percent clogged with mud and fines (Drawings E, F, G, H, K, and N and photos 33 and 34).

The Waterproofing Membrane:

1. At several locations, the flashing installed over the precast keyway (Volclay M-2000) was poorly bonded, resulting in traces of moisture under the flashing (Drawing C and photos 35, 26, and 36). This may have been caused by inadequately cured grout, though it is hard to know for sure.

2. At two locations near the wall, a bentonite accessory product to the membrane (Volclay Bentoseal) was covered by a poorly fitting insulation board, so there were gaps and voids, resulting in inadequate containment for the bentonite which compromised its waterproofing integrity (Drawing G and photos 42, 51, and 52).

3. At one of the repaired walls, the self-adhering waterproofing sheet (probably Miradri by Mirafi) was not well bonded (Drawing N and photos 61 and 62). This could be the result of low air or substrate temperature, moisture in the wall, inadequate rolling pressure, or a combination thereof.

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.

4. The self-adhering waterproofing flashing (either Volclay Termtape or Miradir by Mirafi) at two wall ledges was poorly bonded with traces of moisture underneath (Drawings G and H and photos 37 through 41, 51, and 52). This could also be caused by the reasons given in #3 above.

5. At two locations, the self-adhering wall waterproofing sheet was incorrectly placed on top of the composite bentonite membrane on the precast instead of under it (Drawings M and N and photo 26). As a result, when water migrates under the membrane toward the wall joint, there is nothing to stop it from continuing under the wall.

6. There were many 18" diameter rocks mixed in with the backfill (photo 65). These rocks have no impact on drainage, but, to have rocks of this size in backfill is poor practice because of the damage they can do to other materials during the backfilling operation. Rocks of this size are not in compliance with the original specifications. Prior to this investigation, Braun-Intertec Engineering was hired to analyze the soil and found it in compliance with the specification. Even though the soil complied with the general backfill specification, the courtyard design should have included a more free draining backfill.

In conclusion, a subsurface drainage design that was not well thought out, in conjunction with some drainage installation mistakes, placed enormous demands on a waterproofing membrane that, in our opinion, would have trouble performing long term under even the best of circumstances. This resulted in a great many failures. However, most profound is the fact that moisture is most likely migrating underneath the waterproofing membrane itself, due to the film component of the membrane that does not always dissolve the way it is supposed to. This makes it virtually impossible to locate the individual failures.

Of particular interest is the fact that the manufacturer of Volclay Swelltite 3000 has since apparently changed the product and their installation recommendations so that what was a "water soluble film" intended to be left on the membrane is now a "release film," which is to be removed prior to membrane installation.

Lastly, the concrete sidewalks are heaving because of the high moisture content in the earth below the sidewalk, especially without there being any granular base. Since most of the sidewalk cracks appear to be stress related and not simply hairline shrinkage cracks, it is my opinion that the high moisture content and the resultant heaving of the earth is the cause. However, the cracks may not have been so obvious if the tooled control joints had been at least one-quarter the depth of the slab, or 1" to 1¼" deep. This would have directed the stress failure to the control joint locations, which is the weakest part of the sidewalk.

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.

F. RECOMMENDATIONS

In order to stop all current and future water infiltration associated with the courtyards, we recommend that all courtyard waterproofing membrane and subsurface drainage provisions be completely replaced utilizing a more appropriate design.

We recommend complete replacement instead of isolated repairs for the following reasons:

1. The deficiencies inherent to the existing composite bentonite waterproofing product will result in continued failure for the life of the property.

2. Due to the fact that there is water migrating underneath the membrane, it will be virtually impossible to determine with confidence where the membrane requires repair simply by observing the interior infiltration. In addition, the fact that water can also migrate within the precast keyways, as well as the precast cores, before entering the interior, only serves to further frustrate leak localization.

3. Even though the quantity, size, and locations of the existing courtyard drains are adequate, the inefficiency of the subsurface drainage system, as a whole, is such that we expect the courtyard areas to experience a net increase in surcharged moisture content each year. This will result in three things: (1) the ever-increasing hydrostatic pressure will place greater demands on the current waterproofing system, resulting in more failures and infiltration, (2) the ever-increasing weight of the waterlogged earth may create structural safety issues, and (3) premature degradation of mortars, grouts, CMUs and other structural-related elements as the result of continued exposure to moisture will more likely than not occur over an extended period of time.

4. Even though the recent repairs have reduced the infiltration significantly, we believe that these repairs will not continue to perform long term, due to the many design and installation errors we have observed, as well as the fact that once the containment weight of the soil is removed from the bentonite component of the waterproofing membrane during repair excavation, the membrane loses its waterproofing integrity once backfilled.

5. Since the scope of this investigation does not include the assessment of mold, mildew, or air quality in the units, we recommend that such a service be performed and any necessary abatement costs be added to the estimated construction value at the end of this report.

The Replacement Design

For the purposes of cost estimating only, we have proposed a replacement (Drawings P, Q, and R).

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.

This new design does not repeat any of the errors or deficiencies previously discussed. This new design is not the only good alternative available, but does represent the caliber of system required for this particular project.

Subsurface Drainage:

The replacement subsurface drainage design utilizes new courtyard drains, a drainage sheet with remote filter fabric, and a tapered concrete topping, all designed to perform more successfully over a much longer period of time (Drawings P and R).

The Waterproofing Membrane:

The replacement membrane is comprised of two products, a thermoplastic polyvinyl chloride (PVC) sheet over a ½" thick layer of granular bentonite. This approach offers proven long-term performance (Drawings P and Q).

G. COST ESTIMATES

To assist us with project cost estimating, INSPEC, INC., retained the services of a general contractor (Sheehy Construction) and an estimating service (CPMI, Inc.).

We retained Sheehy Construction to review the scheduling, sequencing, and staging requirements unique to this project for the purposes of determining whether the work could be completed within one calendar year. They determined that the work could, in fact, be completed between April and November, provided that:

1. Weather conditions are normal for the Minnesota climate.
2. All demolition and removal work can stay ahead of the waterproofer so that the waterproofing can advance from one building to the next uninterrupted.
3. There are no construction delays related to renters vacating their units in an untimely fashion.
4. The contractor is allowed to "follow" the work with multiple staging areas throughout the property.
5. There are no strikes by any of the construction trades.

Next we retained CPMI, Inc., to estimate the construction portion of the project cost. We provided them with a partial set of the original bid drawings, photos of the courtyards, Drawings A, B, and C of the existing conditions, and Drawings P, Q, and R of INSPEC's replacement design (including technical specifications). We instructed them to base their estimate on the following assumptions:

1. Assume that the replacement design follows INSPEC's design, as depicted by Drawings P, Q, and R.

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.

2. Assume that all existing waterproofing, flashing, related materials, and earth must be completely removed from the courtyard prior to new work.

3. Assume that all removed landscaping and site features will be repeated at the same location to match existing, including, but not necessarily limited to:

   a. Concrete sidewalks and entry slabs (on a sand base without frost footings).

   b. Planters with precast unit retaining walls (assume precast units are salvaged and reinstalled with 20 percent new, bearing on precast).

   c. New footlights in planters installed at same location and branch feeders to existing circuits.

   d. Assume that all green railings are salvaged and reinstalled at same location with touch-up painting.

   e. Assume that the irrigation system is replaced with new at same location and tied into existing controllers.

   f. Assume that the Entry canopies will be temporarily shored to facilitate waterproofing installation beneath the posts. (Currently, 4" x 4" wood columns pass through concrete slab and bear directly on precast garage roof.)

   g. Assume that all trees, sod, and other plant materials will be new and at the same locations.

4. Assume that all work is to take place in one construction season (April to November).

5. Assume a maximum construction equipment gross weight of 5,000 lbs. with load. Capacity restriction is increased to 10,000 lbs. with load, if precast plank is re-shored from below in the garage. Assume two building courtyards maximum will be shored at any one time.

6. Assume that apartments which have egress off the courtyards will not be occupied during the work. (Units which exit outside, other than courtyard exits or exits through the garage, can be occupied during construction.)

7. Assume that all existing courtyard drains will be replaced, but remain at existing locations.

8. Assume that all existing courtyard drain leaders will have to be cleaned out just prior to the completion of the work at each building.

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.

9. Assume that an allowance for temporary working platforms at the ends of courtyards for removal and replacement of materials in the courtyard is included. The driveways into the parking garages will be blocked by construction activities. Contractor will schedule the work with the Complex Management.

10. Assume that all work is competitively bid.

11. Assume cost estimate uses 2002 pricing.

12. Items not included in the construction estimate include stairs, entry canopies, structural repairs, and mold/mildew abatement.

Cost Estimates

| | |
|---|---|
| Design/construction observation services estimate (4% of const. cost estimate)* | $ 165,666 |
| Construction cost estimate (see CPMI, Inc., attachment) | $4,141,650 |
| Total | $4,307,316 |

*For a waterproofing project of this nature, we strongly recommend that the design firm provide extensive construction observation beyond the typical. This 4 percent fee reflects that assumption.

REMARKS

This report is a summary of the waterproofing investigation conducted on the above project. This report is not intended to cover structural features. Photographs and field notes will be retained in our files for future reference. If you have any questions, please feel free to call.

INSPEC, INC.

By: [signature]
David W. Campbell, AIA
Waterproofing Department Manager

DWC/clb

As a mutual protection to clients, the public and ourselves, all reports are submitted as the confidential property of clients and our written authorization is necessary to publish any statements, conclusions or extracts from or regarding our reports.