UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: WILLIAM D. AROCKIASAMY, P.E.
TAKEN ON: TUESDAY, OCTOBER 7, 2003
COMMENCING AT: 9:40 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562

**EXHIBIT C**

A Yes.
Q And the overall system, including materials, the structure, the way it was designed, all that was supposed to prevent that from occurring?
MR. HULL: Object to the form of the question.
THE WITNESS: In this case we are dealing with the drain system and the waterproofing system.
Q (By Mr. Reilly.) Okay. And the waterproofing system be -- would you agree with me that it can be defeated penetrating it, circumventing it?
A Yes.
Q Okay. Did you do any studies to determine whether th waterproofing system was either being penetrated or circumvented?
A No, I did not.
Q So you don't have an opinion as you sit here today what is causing the leaks in the waterproofing system?
A If the drain system did not leak, then the waterproofing system allowed water to leak, whether it is all the things that you mentioned.
Q But what I'm asking is you don't know why water is getting through the waterproofing system or around the --
A I don't know.
MR. SONNESYN: Make sure that Mr. Reilly

allowing that to happen?
A That is correct.
Q You do not know the specific cause of that water reaching there?
A I can form the opinion that it has to do with the waterproofing, but what I don't know is specifically what happened to the waterproofing.
Q For instance, if the water was entering above and behind the waterproofing system, just as a hypothetical question, in other words, it's entering through the walls of the building above where the waterproofing material is applied, and allowed to enter into the garages that way, you wouldn't have an opinion one way or the other whether that's occurring?
A I wouldn't have an opinion.
Q And you don't have an opinion as to any penetrations that may have been existing in the waterproofing system?
A Yes.
Q And you don't have any knowledge yourself of any failure, specific failure of the material used in the waterproofing system?
A That's correct. I do not.
Q Let's go to Exhibit 807. Take your time and look at that, if you would?
A Okay.

ENGINEERING EVALUATIONS, INC.

7167 Shady Oak Road
Eden Prairie, MN 55344
Phone: (952) 937-0121
Fax : (952) 937-0139
engevaluations@aol.com

August 15, 2003

Ms. Chandelle L. Heyer
Tomsche, Sonnesyn & Tomsche, P.A.
610 Ottawa Avenue North
Minneapolis, MN 55422

Re: Promenade Oaks Apartments
Eagan, Minnesota
J-Berd Mechanical Contractors, Inc. (J-Berd)
Your File #: 138-039
EEI #: 03A110

Dear Ms. Heyer:

This letter presents our opinions on the water leakage occurrences from the courtyard into the below grade (underground) parking garage and into the lower level rental units of the apartment complex. These opinions are based on our review of the following documents:

1. "Waterproofing Investigation Report" by Inspec, Inc. (Inspec) dated 5/1/02.

2. "Review of Courtyard Waterproofing Design and Repairs" by Wiss Janney Elstner Assoc. Inc. (WJE) dated 5/31/02

3. "Evaluation of Courtyard Waterproofing" by Raths, Raths & Johnson, Inc (RRJ) dated 9/23/02

4. "Hydrologic Investigation of the Promenade Townhomes" by Patrick Engineering Inc. (PEI) dated 9/27/02.

Based on the information presented on these documents, we were requested to provide opinions on the adequacy of the drainpipe and its inlet assembly which were intended to

EXHIBIT D

receive and convey the surface and sub-surface water from the courtyard area. These documents dealt with the adequacy of the Drainage and the Waterproofing System of the courtyard area. Regarding the drainpipe and the inlet assembly, the following observations were presented in these documents:

a. RRJ mentioned their observation of "an apparent scarcity of the surface drains" to justify the need for a hydrological study. However, no specific information was given on the verification of this apparent scarcity.

b. Inspec stated that the quantity, size and locations of the existing drains were adequate.

c. PEI suggested that the size of the inlet grate be increased so that the area of flow through the inlet grate would be equal to or greater than the cross-sectional area of the 6" drainpipe. It is not clear whether a verification was made that the net area of the grate was inadequate to convey the water expected at the location of the drain inlet.

d. PEI also has suggested lowering of the elevations of all the surface inlet grates to 99.8'. We understand that the inlet elevations were based on the as-built finish grade established by others.

## OPINIONS

1. We understand the 2½" height of the first set of drain holes in the vertical PVC drainpipe was necessitated by the attachment of the PVC to the body of the drain base at the level of the concrete deck. This condition was recognized and accepted by the general and specialty construction teams. This meant that the retention of the ±2½" water was also accepted. This retained water would not have leaked but for the failure of the waterproofing system.

2. There is no indication that any leakage occurred from the inlet assembly of the drainpipe or the drainpipe itself.

3. Part of the water falling on and/or reaching the courtyard will percolate into the ground. It is not possible to eliminate this percolation and hence prevent water from reaching the top of the waterproofing layer. Since leakage of water occurred due to the failure of the waterproofing system at the concrete decking, adding more inlets or

increasing the size of the inlet grates would not have prevented or minimized the leakage. With the failed condition of the waterproofing, the leakage would have occurred long before the 2½" retention height was filled.

4. We concur that the leakage occurred due to the lack of an adequate site grading plan and the inadequacy and the failure of the waterproofing system.

Please contact us if we can be of further assistance to you on this project.

Respectfully,
Engineering Evaluations, Inc.

William D. Arockiasamy

William D. Arockiasamy, P.E.
WDA/ck

File: 03A110R.doc

COPY



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: SID N. BHATT, P.E.
TAKEN ON: MONDAY, OCTOBER 13, 2003
COMMENCING AT: 9:30 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562

**EXHIBIT E**

efficacy of the waterproofing membrane?
A That is correct.
Q All right. I'm going to show you what's now been marked as Exhibit 827.
A I've seen that.
Q All right. What is that, sir?
A It is a report that I produced.
Q Okay. And it's dated August 15th, 2003?
A Yes.
Q Is that the only report you have provided in this case, sir?
A Yes.
Q Now, in addition to the materials that you described, counsel today has provided some additional materials you've reviewed; is that correct?
A Yes.
Q And what additional materials have you reviewed?
A I have looked at City of Eagan's document entitled -- I don't remember it from memory. I have to look at the title again.
Q Go right ahead.
A Engineering Standards Manual dated May 1993, and I've also reviewed two reports written by Engineering Evaluations, Incorporated.
Q That's Mr. Arockiasamy?

**S. N. BHATT, P.E.**
**MEM ENGINEERING**
**4200 KINGS POINT ROAD, EXCELSIOR, MINNESOTA 55331**
**Tel: (952) 472-5595**
**Fax: (952) 472-6945**

August 15, 2003

Mr. Rolf Sonnysyn
Ms. Chandelle Heyer
Tomsche Sonnesyn & Tomsche, P.A.
610 Ottawa Avenue North
Minneapolis, MN 55422

Re: Westfield Insurance Company v. Weis Builders, Inc. et al.
Court No. 00-CV-987 JEL/JGL
Your File No. 138-039
MEM Proj. No. S038

## 1. INTRODUCTION

MEM Engineering was retained by your office to perform an engineering analysis of the cause of water leaks that were reported to have occurred at The Promenade Oaks Townhomes, 1160 Northwood Drive, Eagan, MN. In particular, claims that water leaks occurred due to deficiencies in the work performed by mechanical subcontractor J-Berd Mechanical Contractors, Inc. were at issue.

## 2. ACTIVITIES

I inspected the Promenade Apartments site on August 27 and 28, 2002.

I have reviewed the following documents:

J-Berd bid to Weis Builders, June 10, 1996;
Weis Builders, Inc. Standard Subcontract Agreement, dated October 16, 1996;
WJE report dated May 21, 2002;
Inspec, Inc. report dated May 1, 2002;
American Engineering Testing, Inc. report dated October 9, 2002;
Pope Associates memorandum dated May 30, 2002;
Pope Associates report dated April 20, 2001;
Raths, Raths & Johnson, Inc. report dated September 23, 2002;
Patrick Engineering, Inc. report dated September 27, 2002;
Guy Engineering Corp. report dated June 24, 1998;
GME Consultants, Inc. report dated August 19, 1999;
Tucker Alan Inc. report dated April 27, 2001;

Larson Engineering of Minnesota bid dated June 19, 2003.

Drawings: Grading & erosion control plan; Storm Sewer Buildings 1&2; Storm Sewer Building 3, 4 & 5; A1.5a; M1.1a; M1.2a; M1.3a; M1.4a; M1.6a; M2.2; M2.3; M2.4: M2.5; M2.6; M2.7; M5.0

Depositions:
- Prashant Desai
- Leslie Howard Lawson
- Stacy Wayne Byrd
- Steve Messerich
- Al Thoreen
- Curt Johnson
- Gary Nelson
- Kirk Velett
- Jim Timm
- Jon Camaya
- Chad Filek
- John Mikesh
- Thomas Henry Weber
- Mike Blaskowski
- William Hanuschak

## 3. FACTS RELIED UPON

The Promenade Oaks project had six complexes. Each complex had a courtyard portion built on top of garage areas. The garages had pre-cast concrete plank ceilings. The courtyards were built by placing earth fill above these plank decks. The earth fill was contained on the sides by perimeter walls, which on two sides were the exterior walls of townhouses. The lower portions of the exterior walls were constructed of concrete masonry units. The courtyards had sodded areas, concrete walkways, and entry stoops to the townhouses. Wood support posts for the stoops rested on the pre-cast concrete plank.

The courtyards, being open, were subject to receiving precipitation directly. The courtyards also received water runoff from adjacent roofs. There were no roof gutters and downspouts channeling the water away from the courtyard areas.

J-Berd had installed the original piping for drainage of water from the courtyards to storm sewers. Above the pre-cast concrete planks the piping consisted of vertical six-inch diameter, perforated plastic pipes (risers). The risers were connected through openings in the deck to piping in the garage to piping leading to storm sewers. The risers had perforations in the pipe walls. The lowest perforations were about 2-1/2 inches above the pre-cast concrete decks.

J-Berd Mechanical Contractors, Inc. was the mechanical subcontractor who was to install the piping for courtyard drainage. J-Berd did install the drainage piping, but was not

involved in the other construction work, which included waterproofing, back-filling, and initial grading of the courtyard. The earth fill in the courtyard had a layer of clay, approximately 12" thick, below the topsoil layer. The initial slope of the courtyard grade was not specified in drawings. Subsequent changes of the courtyard grading were made, which included raising the grade level by 8". Subsequent addition of extra drain piping in the courtyards was performed. J-Berd was not involved in the work involving the initial slope and grading and the subsequent changes.

The Promenade Oaks Townhomes project was completed in 1997. Water leaks into residential areas, stair towers and garages have been reported for all six complexes during the years from 1997 onward.

Site inspections were conducted to investigate the cause of the reported water leaks. The inspections reported conditions of discontinuities in the waterproofing in courtyard areas, lack of waterproofing fully extending over the exterior building walls that were against the courtyard earth fill, and water being able to find a path under the waterproofing at the base of the wood posts resting on the pre-cast concrete deck. There were areas where the level of courtyard earth fill was above the bottom of siding on the wall. The site inspections also found areas where there was two inches of ponding of water over the concrete decks. Conditions of cracking and settling were observed on the courtyards.

## 4. OPINIONS

The water leakage at the Promenade project was not caused by the drains installed by J-Berd Mechanical Contractors, Inc. The reason that the water leaked was the failure of the waterproofing membrane system and/or improper grading in the courtyards. I hold these opinions to a reasonable degree of scientific and engineering certainty.

The courtyards in the Promenade project, being open areas, were subject to receiving precipitation directly. In addition, runoffs from adjacent roof areas also flowed into courtyards, adding to the water that had to be drained from the courtyards.

J-Berd Mechanical was a mechanical subcontractor for this project. The drains installed by J-Berd Mechanical to drain water from courtyard areas to storm sewer system included vertical piping, or risers, in the courtyards, and lateral connections to sewer drains. J-Berd was not involved in waterproofing, courtyard backfilling and courtyard grading.

The risers installed by J-Berd were to collect the water from the courtyards, and direct it to storm sewers through connecting piping. There were two paths for the entry of water into the risers: drain openings at the top, at courtyard level; and, perforations in the side of the risers, below the courtyard grade level.

Grading, or sloping, of the courtyard surface towards the drain openings was necessary to make surface water flow towards the openings. However, the existing grading contained low areas that would cause surface water to pond instead of flowing to the drain

openings, and to seek other paths via percolation through the soil or surface flow. The use of clay layer in the earth fill reduced the ability of the water to percolate through the soil. Combined effect of these conditions was to promote water ponding in the courtyard, and water seeking alternate paths, including leaks into the building,

Effective waterproofing at the bottom and sides of the earth backfill of the courtyards, and effective drain mats and slope at the bottom of the earth backfill for the courtyards were essential to prevent the subsurface water from entering the building, and for drainage of the water through the perforations in the sides of the risers. Waterproofing and drain mats had indeed been installed at Promenade Oaks; however, site inspections showed that the waterproofing had leaks, that the waterproofing at the base of the wooden posts resting on the pre-cast concrete plank below the earth fill allowed moisture to penetrate behind the waterproofing, and that waterproofing had not been present in some areas where the earth fill was against the walls of townhouse building.

These conditions had created paths through which the water could enter the building, and were probably responsible for water leaks into the buildings. Had the waterproofing functioned properly, the subsurface water would not have leaked into the buildings. The drainage mats were not sloped; hence, there would have been standing water regardless of the height of the lowest perforation in the riser above the mat. The lowest perforations were about two inches above the drainage mat; hence, the depth of ponding of water could have reached up to about two inches. Had the waterproofing system functioned, the water would not have leaked into buildings.

SNBhatt

S. N. Bhatt, P.E.

COPY



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

*  *  *  *  *  *

DEPOSITION OF: RICHARD D. STEHLY, P.E.
TAKEN ON: THURSDAY, OCTOBER 9, 2003
COMMENCING AT: 9:30 A.M.

*  *  *  *  *  *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562

**EXHIBIT G**

referred to as a scrim sheet on one face of the membrane.
Q And that includes the bentonite material?
A There is bentonite between it and the protective material.
Q And that sheet, is that the film you're talking about, the water-soluble --
A Yes. The water-soluble film.
Q Did you do any testing yourself of any Swelltite film, protective sheet or bentonite materials?
A No.
Q Did you bring with you, sir, the National Roofing Contractors Association manual to which you refer in your report?
A No. I have it on a CD disk. I don't have it in printed form.
Q What I would ask, then, sir, is that you would provide a copy of the pages you referred to in your report to your counsel so that he can send copies to us?
A Sure.
Q Can you do that?
A You bet.
Q Have we covered all the things that you did to inform yourself of the details and the issues involved in this project?
A Well, I can't think of anything else.

be an appropriate waterproofing system here; correct?
A Yes.
Q And even if you used the American Hydrotech or the EPDM or polymer-modified bitumen sheet membrane that you suggest, you would still want the subsurface drains to completely drain all the subsurface water?
A Be preferable.
Q You would still want it to be sloped?
A It would be preferable.
Q And without those things, would you still have concerns that even with the American Hydrotech, the EPDM or the polymer-modified bitumen sheet membrane would still be at risk in failing?
A It would probably shorten the life of those systems.
Q All right. At any time were you able to determine what leaks were caused by any particular problem or situation at the Promenade?
A No.
Q Were you aware that there are links between Building 1 and 2, for instance; there's a link between those two?
A Yes.
Q Do you know how that area was waterproofed?
A I don't know that it's different than this. No, I don't.
Q All right. Did you see any active leaks at the time you visited the site on those three visits?

Q Okay. Do you know what kind of waterproofing was done in any of those areas at the time the building was built?
A No. I don't know that it's different than what is described elsewhere.
Q Do you know who did the waterproofing in those areas?
A No.
Q Did you yourself determine that water-soluble film on the face of the Swelltite was still intact in some places?
A No.
Q Did you make any determination that the film failed to dissolve when coming in contact with water?
A I didn't make that determination.
Q Are you able to determine that the membrane did not seal at the lapped edges where film remains?
A I haven't observed that. I haven't done any tests out there.
Q And that information that you've included in your report is solely as a result, is it not, of Mr. Campbell's, Inspec's report?
A Yes.
Q And you have no idea whether his conclusions are correct or not; is that true?
A I assume they are. I mean I'm relying on them.
Q You're relying on them?
A Yes.