COPY



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: RICHARD S. KOZIOL
TAKEN ON: FRIDAY, OCTOBER 10, 2003
COMMENCING AT: 9:00 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562

EXHIBIT J

photograph yet.

MR. REILLY: I'm sorry. This here. Thank you.

Q (By Mr. Veith.) So there was standing water, and you had to remove two inches of standing water; right?

A Yes. At least two inches of water.

Q And you vacuumed it out?

A It was first pumped out and then vacuumed out to get it cleaner.

Q And the Swelltite sample, did you take that from the wall portion or from the horizontal portion?

A I think both. We cut on the wall and the horizontal.

Q Did you put up a bentonite sausage, I think you put it, to prevent water from getting in there before you cut the membrane?

A I don't remember if he did or not, the person who was doing it. We didn't do the work. It was done by someone else.

Q I see. What observations did you make of the sample that was taken from it?

A The sample of the Swelltite looked -- it was taped. First of all, the sample was taken over a joint in the concrete planking, which is why we chose it. We wanted to see what and how a typical joint between precast planks was handled and treated. The Swelltite was nicely

taped. The HDP portion of the Swelltite was nicely taped over.

Q What do you mean by nicely taped?

A The taped application was nicely done. It was nice and smooth. There were no fish mouths in it. It was a clean contact.

Q And you didn't see any evidence that the water had infiltrated that seam tape; right?

A Correct.

Q Did you look at the bentonite on the Swelltite?

A I did.

Q Did it look like it had not hydrated?

A Correct.

Q And you saw a film on there, a water-soluble film still there?

A Still there.

Q And you don't have any evidence, do you, that water actually hit that sample; do you?

A It appeared as though water had never hit that sample at that location.

Q The other place that you looked at a sample of Swelltite was at the post configuration; is that right?

A Yes.

Q Okay. Was there standing water on the bottom of that? Can you tell from your notes or photographs of that

THE WITNESS: WJE's?

MR. REILLY: Your final report.

THE WITNESS: May 31st, 2002.

MR. REILLY: Thank you.

Q (By Mr. Veith.) Could you go to page 8 of Exhibit 822?

A Page 8?

Q Yes.

A Okay.

Q Now, actually back up to page 7 for a second. There is a section on page 7 with a heading Preliminary Findings?

A Yes.

Q But those are actually the final conclusions or opinions, correct?

A Correct.

Q Okay. Then on the next page there are some bulleted points and I'd like it if you could go down one, two, three, four, five, to the fifth bulleted point. And it reads, "According to the investigative work performed by Inspec, the waterproofing system was improperly installed, damaged, and/or not functioning properly at several locations." Do you see that?

A Yes.

Q You're basing that on the Inspec report and the Inspec report alone, correct?

A Correct.

Q And you did no testing to see if that was in fact even possible; right?

A We did not do any testing.

Q You're in agreement with my statement? Strike that.

MR. BROWN: He answered.

MR. VEITH: That's fine.

Q (By Mr. Veith.) You do not have any opinion as to whether the film, the water-soluble film component of Swelltite 3000 is incompatible with any materials or substances out at the Promenade Oaks, do you?

A No.

Q You don't know whether the water-soluble film component of Swelltite 3000 is permeable to water, do you?

A You mean can water pass through it?

Q Right.

A In the form of a vapor or liquid?

Q Liquid.

A Well, I think it's intended -- the intent is that it should dissolve.

Q I understand that, but that wasn't my question. Let's assume it's not dissolving.

A Okay.

Q You don't have any knowledge as to whether it would be permeable or whether water would be able to permeate that membrane, or that film, do you?

Q Now, you talked about seeing evidence of leaks, apparently leaks that had occurred at some time in the past in the garages; do you remember testifying about that?
A Yes, I do. I recall testifying that I saw staining.
Q Staining. And is it possible from your observation to determine the age of that staining?
A Not really.
Q Now, you know that repairs have been done, and we just heard some discussion of that, to the stoop areas, to the flashing at the top of the wall, at the top of the CMU walls, to the posts, all of which apparently has reduced to some extent the leaking in the buildings. Do you know whether any of these leaks postdate those repairs? And I'm talking about the stains that you saw.
A No, I do not.
Q Were you able to a reasonable degree of scientific certainty locate the source of any particular stains that you saw out there?
A No.
Q Now, there has been some discussions about other possible sources of leakage other than through the membrane. One was discussed, I think, about the area of the side walls where the dirt was raised above the level of the CMU?
A Within the courtyards.
Q Courtyards, correct. You mentioned something about the

COPY

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: MARK R. CHAUVIN
TAKEN ON: MONDAY, NOVEMBER 10, 2003
COMMENCING AT: 9:00 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562

3

NOTES

Page Line

2

and

Colloid Environmental Technologies Co.,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

4

APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Co.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

STACEY SEVER, Esq., Stich, Angell, Kreidler & Dodge, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant J-Berd Mechanical Contractors, Inc.

STEVEN GASKINS, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, MN 55402-2440, appeared representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared representing Westfield Insurance Company.

EXHIBIT K

MR. STEPAN: Join.

THE WITNESS: I would speculate that it's -- it was designed to reduce the amount of ground water within the courtyards.

Q (By Mr. Gaskins.) All right. Now, what is the basis of that speculation?

A **Simply that that's typically what drain tile is used for, to collect and divert ground water.**

Q Was there anything in the background information that you reviewed that revealed where this suggestion came from or what they expected the result to be?

A **No. It was simply that drain tile had been installed.**

Q Did you see any evidence in your review that the installation of the drain tile had a positive effect on the leakage rates at the Promenade?

A **Not individually, no.**

Q Did you come to an opinion as to whether it did or not?

A **I would doubt that it is overly effective.**

Q Now, your last repair that you list here on the bullet point is installing additional surface drains in the courtyard areas. When did that occur?

MR. STEPAN: Objection, lack of foundation.

MS. HEYER: Objection.

THE WITNESS: I believe at or around the



time the drain tile was installed in 1998 or '99.

Q (By Mr. Gaskins.) And where did the surface drains drain into?

MR. STEPAN: Objection, lack of foundation.

MS. HEYER: Join.

THE WITNESS: I believe they were directed towards the main drains, the main vertical drain pipes.

Q (By Mr. Gaskins.) Did you see any drawing revised that would indicate where the additional surface drains drained into?

A **No.**

Q Did you see any drawings indicating where the additional surface drains were located?

A **No. But my site inspection, I observed them generally near post locations.**

Q Do you know how many additional surface drains were placed at the site?

A **No.**

Q Do you know whether they were placed at all buildings?

A **No, I do not know. I believe they were.**

Q Do you have an opinion, based on what you observed at the site and your expertise, as to whether the additional surface drains had any material effect on the water leakage problems at the plaza decks?



A **Again, I [illegible]d doubt that they are overly effective.**

Q Do you have an opinion whether in order to cure the water problems currently existing at the Promenade Oaks, the only reasonable solution is to dig up the plaza decks and re-waterproof?

MR. STEPAN: Objection.

MR. BROWN: Objection, foundation.

MR. STEPAN: Lack of foundation, assumes facts not in evidence.

THE WITNESS: Could you repeat the question?

MR. GASKINS: Maybe.

Q (By Mr. Gaskins.) Do you have an opinion, based on your review, whether the only reasonable method for curing the water leakage problems currently existing at the Promenade Oaks is to dig up the courtyards and re-waterproof?

MR. STEPAN: Objection, lack of foundation, assumes facts not in evidence.

MR. VEITH: Join. Mischaracterizes the evidence.

MR. REILLY: I'll join.

Q (By Mr. Gaskins.) You do have an opinion?

A **Yes.**

Q And what is your opinion?

A **I don't believe that's a necessary solution.**



Q And why?

A **Based on the previous performance of the repair work that has been -- based on the performance of the repair work that has been previously completed.**

Q And what do you think would solve the problem?

A **I believe similar repair efforts in areas of leakage.**

Q What specifically?

A **The flashing repairs at grade. However, I think those have been performed in the majority of areas where they would apply. Also, post repairs. And -- yes. And similar repairs at concrete stoops, again, if those had not been installed, and everywhere they would apply.**

Q The repairs of the concrete stoops or the threshold repairs?

A **Correct. But again, I believe those had been performed in most areas where they are relevant.**

Q So what you would do is you would extend the waterproofing vertically up the walls of the townhouse units where it hasn't been done?

A **Correct.**

Q You would repair the thresholds where it hasn't been done?

A **Correct.**

Q And you would repair all the posts?

MR. STEPAN: Objection, misstates his testimony.

Q All right. Would it be fair to assume it's not coming through the horizontal membran—ce it's not leaking there all the time?
A No, I don't think you could assume that.
Q Did you -- you looked at the seams that were exposed by those test pits that you saw, correct, and you said that they were properly sealed?
A Correct.
Q And they had seam tape on them?
A Correct.
Q And you saw no evidence of water penetrating those seams?
A At those four openings, no.
Q Do you know of anybody ever looking at a seam and finding water penetrating through the seam?
A I believe Inspec identified seams that were problematic. However, I don't know if they identified seams that had evidence of leakage through them.
Q Mr. Campbell, I will suggest to you, ask you as a hypothetical, testified that he never examined one seam.
A Okay.
Q All right. Other than Mr. Campbell's assertion that there might be leaks to seams, are you aware of any other evidence to support that?
A No.
Q Now, you're aware that the Swelltite product has multiple



layers; correct?
A Correct.
Q The top layer, as you're looking from the top down, would be a poly type material; correct?
A Correct.
Q And that would act, would it not, as a water barrier?
A My understanding is that it's essentially impermeable, yes.
Q And if the seam tape is also a water barrier and properly applied, the entire bentonite would be covered by an impermeable layer of poly; correct?
A Ideally, yes.
Q And then the bentonite would only react if a penetration or some other way the water got beyond the poly; correct?
A Correct.
Q Now, are you familiar, or at least in your reading of literature, that there are other kinds of bentonite waterproofing materials?
A Yes.
Q Including you can actually put down raw bentonite and then cover it with a material?
A Yes.
Q In your report on page -- let me find it real quick here.
MR. VEITH: Which report, Pat?
MR. REILLY: It would be Exhibit 822, page

7.
Q (By Mr. ...ily.) You talk about the National Roofing Contract...s Association Waterproofing Manual and its reference to bentonite waterproofing. Do you know if they refer to Swelltite specifically in that manual?
A I don't -- the section to which this paragraph refers I believe simply states bentonite waterproofing. I don't believe it identifies any particular product aside from the general identification of bentonite waterproofing.
Q And it is true that if bentonite were put down in its raw state, for the waterproofing component of that system to operate, the waterproofing is going to have to get wet; correct?
A Correct.
Q And with Swelltite you have more than one component, so this can function without the bentonite ever getting wet; correct?
A In theory.
Q And in fact, in the areas you saw when you were out there, you did find areas under water where the bentonite had never come in contact with water?
A Correct.
Q Now, when the repairs that you've talked about are being done, and specifically to the posts, what they are actually doing is completing the membrane so it is a



continual membrane underneath where the post is; correct?
A In essence, yes.
Q And that hasn't apparently been effective?
A It would appear so, yes.
Q They haven't had to replace the membrane, they're actually extending the membrane in that area?
A They are in essence completing it, yes, or sealing a penetration in it.
Q Now, are you aware of any water tests that were done by anybody on this site at the Promenade?
A Yes.
Q What water tests are you familiar with?
A The only water test that I'm familiar with is one that I was not a party to and only read through the reports o others, being Bob Kudder, who identified a water test that Mr. Healey testified to performing with a -- again, it would be my review of words of others, but it sound as though a water test was performed in the vicinity o Unit 3-115.
Q And as I recall, it wasn't Mr. Healey himself but at his direction or one of his employees who performed it, but it was done with a hose in the area of 3-115?
A Right. And again --
MR. HULL: Object to foundation.
THE WITNESS: Aside from the reference in