ISRAEL BERGER & ASSOCIATES, INC.
EXTERIOR WALL & ROOFING CONSULTANTS
[illegible] New York, NY [illegible] Tel [illegible] Fax [illegible]

# Field Report

| | |
|---|---|
| **Date:** | December 4, 2002 |
| **To:** | **Bob Tarasov - GID** |
| **Cc:** | Scott Vanderburg, File |
| **Project:** | Promenade Oaks – Minneapolis, MN |
| **Subject:** | Initial Assessment of Courtyard Waterproofing |
| **Prepared by:** | Jon Camaya |

## 1) Summary:

IBA visited the Promenade Oaks property on November 6th for an initial visit and cursory walk-thru of the buildings. The purpose of this initial visit was to evaluate and verify the existing conditions of the below-grade waterproofing in the common courtyard area described in the September 18, 2002 'Promenade Oaks Pending Litigation and Disclosure' report. Leaks and water damage have been observed and reported on the interior of private living spaces and the private parking garage below the public courtyard. The brief descriptions and observations in this report were made in the field and with the available documentation regarding the building's construction and existing condition. IBA reserves the right to amend this report as supplemental information becomes available.

## 2) Description:

Promenade Oaks is a six-year-old sprawling residential complex composed of six clusters. Each cluster is made of two multi-level buildings sharing an exposed courtyard and a common garage space directly below. The common courtyard is also adjacent to private interior living spaces of the residential buildings. It is in these adjacent areas and the common garage space that interior leaks have been reported and observed.

a) The basic construction of the existing exterior walls is stud framing with gypsum based exterior sheathing board and vinyl siding. This rests on CMU block walls below soil-level at the courtyard. The existing courtyard deck is constructed of pre-cast concrete planks with open cells. The cross-section of the courtyard is spanned by the decking across its length with the open cells butted against the CMU walls.

b) The waterproofing assembly is a below grade system that is intended to prevent water infiltration through the walls and deck of the courtyard. The water on the surface is intended to be collected by surface level drains. Water within the soil is

intended to be drained through perforated vertical drain assemblies, and the remainder of the water that settles to the deck is intended to be drained at the level of the waterproofing membrane through deck level drains. The below-grade waterproofing is intended to function in a bathtub like configuration. This configuration is expected to be wet from the initial installation and backfill.

c) The courtyard waterproofing is a bentonite clay based material. This material is dependant on moisture to activate the gel like quality of the bentonite clay. The material must also be activated under the pressure of backfilled soil. The sequencing of the backfill is critical to the success of the waterproofing. The material must not be pre-maturely activated by moisture before backfill is applied. The moisture content of the substrate is responsible for this activation over time.

This waterproofing is what makes up the "bath-tub" configuration of the courtyard. Its success is contingent upon the suitability of the surrounding existing conditions: substrates, moisture content, construction sequencing, deck construction, sensitivity of adjacent interior spaces and the acceptable level of negligible interior leaks.

3) **Observations:**

The following is a list of key observations and issues developed during the initial cursory walk-thru and review of available documentation. The list will be amended as supplemental information becomes available.

a) Drainage:

i) The existing sloped roofs do not have perimeter roof gutters at the bottom of the slope. The existing roof assembly is designed to allow runoff to be collected at the level of the courtyard. The area directly below the gutterless eave is typically compacted and depressed from dripping run-off, creating a depression in the landscaping along the base of the exterior wall. This results in negative slope towards the building and a depression for water to collect.

ii) The runoff from the roof falls to the courtyard and is intended to be collected at the surface level drains. Many of the surface level drains are set at a level above the top of soil, resulting in the inability of the surface drains to function as intended.

iii) Since the majority of the water does not enter the surface drains, it is absorbed into the soil. At this point, the existing drainage system is designed to have a perforated pipe extension that water migrating vertically through the soil should drain through. However, invasive test probes indicate that the vertical pipe extension is incorrectly configured for drainage.

(1) The aggregate around the perforated vertical pipe extensions is sized so that some aggregate fit and clog the perforations of the pipe extension, retarding the flow of water draining through the pipe extension.

(2) The filter fabric is wrapped around the pipe rather than a layer of the aggregate. The existing configuration reduces the filtering effect.

(3) The aggregate itself is of a nature that produces fines that migrate through the filters and clog the drainage paths.

(4) The vertical drainage against the walls is handled by the composite drainage mats. However, probes indicate that the top edges were typically not capped off and the composite was filled and clogged with fines.

(5) These combined conditions adversely affect the drainage capability of the vertical components of the drainage assembly, leaving most of the water to be handled at the level of the deck level drains.

iv) The final line of drainage is at the level of the concrete deck. Invasive probes at several locations indicate that the existing deck level drains are set approximately two inches above the concrete deck. Consequently, water that settles to the bottom of the courtyard assembly must build up to a level of two inches to enter the existing deck level drains. Nonetheless, there will likely always be at least two inches of water accumulated at the bottom of the courtyard assembly. This is an unfavorable condition as the basic goal of any low sloped roofing and waterproofing system is to move the water to drainage and off the substrate it is intended to protect.

b) Waterproofing:

The courtyard waterproofing is a bentonite clay based material. This material is dependant on moisture to activate the gel like quality of the bentonite. The material must also be activated under the pressure of backfilled soil. The sequencing of the backfill is critical to the success of the waterproofing. The material must not be activated by moisture before the pressure of the backfill is applied or the material will be rendered useless. Its success is contingent upon the suitability of the surrounding existing conditions: substrates, moisture content, construction sequencing, containment pressure, deck construction, sensitivity of adjacent interior spaces and the acceptable level of negligible interior leaks. Bentonite is typically used in below grade utilitarian applications like subway tunnels and below grade spaces that are willing to accept a negligible amount of interior leaks.

i) The existing bentonite-based waterproofing assembly is not suitable for the existing construction and configuration of the courtyard at Promenade Oaks. The existing pre-cast concrete plank deck and cmu wall construction are not

substrates conducive for the use of this type of waterproofing. They are materials that are typically fully cured by the time of their delivery and installation at the job-site which would be adverse to the activation of the bentonite since it depends on latent moisture from the substrate it is intended to waterproof.

ii) The sequencing of the waterproofing installation and the backfilling of the courtyard is questionable, according to the available progress photographs viewed at the property. The available photographs indicate that a substantial amount of time (weeks) may have elapsed before any backfill was applied to the waterproofing, which is critical to the performance of the bentonite.

iii) The nature of the waterproofing does not allow for water-testing which is typically an important part of the final product quality control. Bentonite is activated in the presence of water, and since the purpose of water-testing is to detect breaches in the membrane this would prematurely activate the material, rendering it useless. The detection of deficiencies in the product, its installation and the discovery of leaks would not be determined until much later and when the backfill was installed and the latent substrate moisture activated the waterproofing material, or an interior leak manifested. Considering the adjacent spaces to the courtyard are interior public spaces as well as private living quarters, the choice of a below grade waterproofing system that accepts a negligible amount of interior water leakage is extremely questionable.

iv) According to the disclosure report, the material failed to perform as expected in that the film separator on the bentonite did not dissolve according to its design. This was observed in the destructive test openings and the samples recovered by the owners consultant. This condition allows water to freely pass between the precast concrete decking and the back of the waterproofing. This allows the water to migrate at the level of the concrete planks and into any paths of least resistance like cold joints, keyways, open cells, cracks, and interior spaces. The extent of this condition is undeterminable without exposing the entire membrane and casts the waterproof integrity of the membrane into question.

v) Spot repairs and remedial waterproofing were reportedly performed in several areas of the property in response to specific interior leaks. The flashing material used to tie in and counter flash the vertically applied waterproofing is often unprotected and exposed. The nature of the flashing material requires it to be shielded from abrasion and impact and also exposure to ultra-violet rays. The material is exposed to all three in the areas observed. Failures in these locations also contribute to interior leaks and water that migrates behind the vertically applied waterproofing.

4) **Graphics:**




**Figure 01 - Typical Building Section: Points of Interest**

1) Roof Eaves w/out Gutters.
2) Same.
3) Vertical Termination of Waterproofing at CMU wall adjacent to living spaces.
   a) Depressed soil w/negative slope.
   b) Unprotected and exposed waterproofing.
4) Level of soil at typical window opening.
5) Open cells of pre-cast concrete planks at terminations against interior spaces.
6) Typical water staining at concrete beam and plank intersection.
7) Same.




Figure 02: typical building wall section

Figure 02 indicates the likely path of water infiltration through the existing exterior wall and vertically and horizontally applied waterproofing of the courtyard. Note the various paths water can potentially take should it breach the waterproofing: leaks at the remedial work, window sill, vertical and horizontal laps, block to deck intersection, joints between pre-cast concrete planks, through interior walls, base of interior walls.




**Figure 03: typical wall section 2**

Figure 03 indicates possible and likely paths of water infiltration through the existing exterior wall and vertically and horizontally applied waterproofing of the courtyard. Note the various paths water can potentially take should it breach the waterproofing. Note the soil level in the detail does not reflect the existing conditions. The actual level of the top of soil is directly at the window sill and not the depicted 12" below top of sill.



Photograph No.01

- Garage level interior.
- View of underside of pre-cast concrete plank deck and cmu back-up wall.
- Active leak on concrete beam.
- Water staining on cmu block wall.



Photograph No.02

- View of underside of pre-cast concrete plank deck and cmu back-up wall.
- Active leak on concrete beam.
- Water staining on cmu block wall.
- Path of water stains indicate origins from concrete planks and cmu wall.



Photograph No.03

- View of deck underside.
- Water staining and carbonation deposits at joints between pre-cast concrete planks and intersection with concrete beam.



Photograph No.04

- Plank deck and cmu wall intersection at private interior space.



Photograph No.05

- Interior wall of space depicted above.
- Ruptured water blister in paint.



Photograph No.06

- Intersection of deck, cmu wall, and concrete beam at end wall of garage.
- Exhibits typical water staining patterns.
- Cracking cmu blocks.



Photograph No.07

- Base of exterior wall at courtyard level.
- Localized waterproofing repair.



Photograph No.08

- Same as above.
- Note breach in waterproofing.
- Delaminating facer of exterior sheathing board exposes the gypsum core.
- The asphalt based flashing material has no protection board and is exposed to abrasion and ultra-violet degradation.



Photograph No.09

- Probe at typical dual level drain assembly.



Photograph No.10

- Same as above.
- Note use of crushed fill for aggregate.
- Size of aggregate clogs perforations.
- Lowest perforations are set above the level of the deck.



Photograph No.11

- View of vertically applied waterproofing that counter flashes the bentonite waterproofing at the cmu walls of the courtyard wall.
- Note clogged and unwrapped top of drainage composite mat.




Photograph No.12

- View of modified wooden posts supporting porch roofs that penetrate the porch slab and rest on pad composed of rigid roof insulation.
- Remedial detail in response to existing detail of wooden posts in direct contact with bare concrete and waterproofed around base providing a direct conduit through the waterproofing.



Photograph No.13

- Close-up.




Photograph No.14

- View of underside of deck as it extends into private space from garage level.




Photograph No.15

- Same as above.
- Note water staining at joints between pre-cast concrete planks.




Photograph No.16

- View of same unit's cmu wall from garage.
- Note water staining emanating from concrete beam and plank intersection on wall.
- Note broad water stain situated directly below exposed open cells of pre-cast concrete plank.




Photograph No.17

- Close-up.




Photograph No.18

- View of unit below courtyard and courtyard end-wall.



Photograph No.19

- Split face block at head of door below courtyard and end-wall.
- Moisture stains.
- Cracking and flaking of split face block.




Photograph No.20

- Same unit, view of interior door head.
- Water stains in sheetrock on head and jambs.



Photograph No.21

- Same unit, view of pre-cast concrete plank underside directly above door head.
- Note water stains at joints between planks and down face of cmu block wall.




Photograph No.22

- Missing sealant between stairs and stair wall.




Photograph No.23

- Same stair, note saturated blocks, efflorescence stains, and vertical cracking.



Photograph No.24

- Base of typical exterior wall in courtyard directly below eaves without gutters.
- Note depression in ground cover resulting from runoff saturation.



Photograph No.25

- Loose and unsecured metal coping on block wall.



Photograph No.26

- Close-up.
- Loose and unsecured metal coping on block wall.

5) **Conclusion:**

The below grade waterproofing assembly at the courtyard of the Promenade Oaks property failed to provide waterproof protection to several interior spaces. Leaks were observed at private living spaces as well as at the level of the public parking garage below the courtyard. The leaks resulted in interior damage and limited spot repairs. Based on the available information from other investigations, earlier reports, and invasive probes, the water infiltration occurs through breaches in the composite bentonite clay waterproofing panels. These breaches are likely the result of improper installation and exacerbating existing conditions surrounding the likely points of entry.

The existing composite waterproofing of bentonite clay laminated with high-density polyethylene was not the best choice of waterproofing, considering the existing construction and configuration of occupied spaces. Although bentonite is widely used in a variety of waterproofing applications it should not be considered a waterproofing cure-all. It is especially well suited for blind-side waterproofing in deep excavations and in below-grade utilitarian spaces like sub-basements, vehicular tunnels and subways. These are commonly utilitarian spaces where a marginal amount of leakage is acceptable. However, for sensitive interior spaces like these private occupancies requiring waterproof conditions and controlled humidity, bentonite would likely not be able to guaranty a foolproof and leak free configuration.

The bentonite clay is activated by the latent moisture in the substrate it waterproofs. The existing hollow core pre-cast concrete planks may likely not contain the latent moisture to do this. The typical joints between pre-cast concrete planks is also a potential liability for a system that usually relegates the waterproofing of such joints to "others." The joints themselves can act as paths for any leaks through the waterproofing. Likewise, the hollow cores can do the same. These joints and their terminations can act as paths for water migration. Since the planks terminate against the walls of living spaces adjacent to the courtyard, these areas have been the locations for some of the more typical leaks corroborating the hypothetical path for leaks through the joints and cores in the planks. The multitude of these typical joints also magnifies the potential occurrence for these types of leaks in the future. (figure 2 and 3)

According to earlier probes, the performance of the waterproofing itself potentially comes into question. Excavated and sampled bentonite panels indicated that the separation film designed to dissolve in the presence of water and activate the clay did not and allowed water to travel freely between panels. Consequently, the amount of latent moisture, lack of backfill, and or the failure of the film to dissolve are key concerns and contributors to the failure of the system regardless of which bore more responsibility.

This is exacerbated by the existing configuration since it cannot be water tested prior to backfill and assumes a negligible amount of tolerable leakage. The sequencing of the backfill is questionable because of the dates observed on the owner's construction progress photos. The span of time and weather conditions the membrane was exposed to before backfill is of concern to the success and failure of the waterproofing. Unfortunately, no documentation was reviewed that determined either, other than the span of time observed on the date stamp on progress photos.

Assuming that breaches existed in the field of the waterproofing, it would be advantageous to the assembly to remove water from the membrane's surface as quickly as possible. The flawed installation of the assembly's components responsible for this complicated and likely compromised the system's ability to properly drain: 1. the surface level drains were approximately one inch above grade rendering them useless as surface collection points. 2. the perforated vertical extension pipes were partially clogged by the improper aggregate used. 3. it was also improperly wrapped with the filter fabric. 4. the aggregate produced fines that clogged the existing drainage mat. 5. deck level drains were also raised above the level of the planks rendering them useless until water rose to a level it could drain into the openings, ironically creating an un-conducive and likely permanent build-up of standing water at the deck level further exposing the questionable membrane laps and joints in the planks to more water and possible infiltration. 6. the self-adhering rubberized flashing used in vertical applications in some repairs exhibited adhesion failure and delaminating. 7. vertically applied bentonite sheets were installed too close to the surface resulting in insufficient backfill containment pressure. 8. the sealant between copings at end walls is deteriorated and open. 9. the drawings of end walls also do not call out for the installation of thru-wall flashing and could possibly be taking water behind the face of the split face block. 10. the poorly detailed wooden posts at individual entrances at the courtyard penetrate the waterproofing acting as a direct conduit for water to the deck.

Given the existing deck and wall configurations, it can be argued that bentonite was the incorrect choice for waterproofing, considering its limitations in specific applications intolerant of any leakage or moisture infiltration. Although there are no reported widespread leaks typically throughout the system, it is near impossible and futile to predict the possibility and location of the next leaks and the circumstances that surround them. The only thing that is certain is the strong possibility for similar leaks in the future. Consequently, spot repairs of new and existing leaks are ill advised because of the potential for recurring leaks as a result of remedial work in the same areas and the cost and logistics associated with the excavation and the repair. The repair itself would involve the release of assumed containment pressure important to the membrane, rendering the clay useless and resulting in a questionable connection from the repair waterproofing to the existing. There would be no guaranties with such a repair. This could also possibly result in consequential leaks outside of the corrective scope of work. It should be understood that any recommendations short of total replacement of the waterproofing assembly would entail the risk of reoccurrence.

The following scope of remedial work is recommended:

a. Replacement of the typical waterproofing assembly.
b. Installation of structurally correct topping slab with a 2% slope for drainage.
c. Installation of suitable vertical substrates.
d. Installation of new drain assemblies and possibly additional drains.
e. Installation of roof eave gutters with direct connections to drain bodies.
f. Replacement of soil with type with improved breathability and percolation.
g. Modified post assemblies at typical porch entrances.
h. Regular water-testing per area completed.
i. Thru-wall flashing at end walls.
j. Flashing under end wall copings.
k. Repair of cracked masonry.
l. Scraping and painting of corroded steel lintels.

End.

COPY



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL FILE NO.: 00-CV-987 JEL/JGL

---

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: JON CAMAYA, VOLUME I OF II
TAKEN ON: THURSDAY, MAY 8, 2003
COMMENCING AT: 10:10 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586

EXHIBIT M

A Hot rubberized asphalt systems, cold-applied epoxy resin systems.

Q And by the way, those types of systems are products that you're much more familiar with?

MR. HULL: I'll object to the form of the question.

Q (By Mr. Veith.) Is that true?

A Yes, I'm more familiar with them.

Q And you have a higher level of comfortability with product like that?

MR. HULL: I'll object to the form of the question.

THE WITNESS: In this particular scenario, yes.

Q (By Mr. Veith.) On the next page, page 4, there is a paragraph roman numeral iv; do you see where I'm at now?

A Yes.

Q Would you take a second to refamiliarize yourself with that paragraph?

A (Witness complies.)

Q You ready?

A Yes.

Q It says, "According to the disclosure report, the material failed to perform as expected in that the film separator on the bentonite did not dissolve according to its design.

This was observed in the destructive test openings and the samples recovered by the owners consultant." The owner's consultant is Dave Campbell, is that right?

A Yes.

Q And so are you saying here that it's Dave Campbell that observed this condition?

A Yes. According to his report, yes.

Q Because you didn't observe these conditions, right?

A That's correct.

Q So you're relying entirely on Mr. Campbell's work?

MR. HULL: Object to the form of the question.

THE WITNESS: With respect to that, yes.

Q (By Mr. Veith.) Was this entire paragraph, paragraph 4, based on what you learned from Mr. Campbell's report?

A No.

Q What else was it based on, if anything?

A There were conditions in the field that led me to believe that the water was able to bypass the panel, the bentonite.

Q But you didn't observe the film separator that's being referred to here, did you?

A That's correct.

Q So at least with respect to that part of the membrane, you would be relying entirely on what Mr. Campbell has put in