**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Westfield Insurance Company,

Plaintiff

vs.

Weis Builders, Inc., Promenade Village Townhomes, LLC, Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants, and
Third Party Plaintiff,

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Company,

Third Party Defendant and
Fourth Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth Party Defendant.

Civil File No. OO-CV-987 JEL/JGL

**THIRD PARTY DEFENDANT WATERPROOFING BY EXPERTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE SEEKING THE COURT'S INTERPRETATION OF THE SCOPE OF ITS SUBCONTRACT**

## INTRODUCTION

Waterproofing By Experts moves in limine for a ruling from the Court defining the scope of its subcontractual obligations to Weis. WBE seeks this ruling in order to narrow the issues for trial. Specifically, WBE insists the scope of its contractual duties was restricted to selecting and installing the Swelltite 3000 waterproofing membrane system on the horizontal and vertical concrete substrates below grade in the six courtyards on the Promenade project, and assuming responsibility for interior damage due to a failure of that system. It seems clear, nevertheless, that some of the parties intend to argue at trial that WBE's contractual responsibilities far exceeded that scope. It is for the Court, however, not the jury, to construe that agreement. The terms of the contract regarding the scope of WBE's duties should be left for the jury to interpret only if the Court determines they are ambiguous.

If the Court concludes the terms are unambiguous, based on the language in the contract alone or with the aid of extrinsic evidence explaining the circumstances surrounding the execution of the contract as well as the subsequent conduct of the parties, WBE should be entitled to an instruction specifying those duties. If the Court concludes certain terms are ambiguous and cannot be clarified with extrinsic evidence, then those terms can be left to the jury to interpret. In that event, the jury should be instructed that the ambiguities are to be construed against Weis, the party which drafted the agreement.

Because of the importance of this issue, WBE further respectfully requests the Court consider this its trial brief.

## DISCUSSION

As a preliminary matter, it is not entirely clear to WBE whether the Court has already interpreted its subcontract, specifically Exhibit F, which defines the scope of its work. WBE briefed this issue quite thoroughly in its previous memoranda opposing Weis' summary judgment motion and in support of its own summary judgment motion regarding contractual indemnity. WBE consequently refers the Court to those memorandums to assist in the disposition of the present motion.

### A. Canons of Contract Interpretation.

The construction and effect given to a contract are questions of law to be determined by the Court. Fox Sports Net North, LLC v. Minnesota Twins Partnership, 319 F.3d 329, 334 (8th Cir. 2003). "A contract is to be interpreted to give effect to the mutual intention of the parties at the time of contracting, and in so doing the language used governs if it is clear and does not involve an absurdity." Id. Moreover, "in interpreting a contract, the language is to be given its plain and ordinary meaning." Id. (citations omitted). A binding contract requires an offer, acceptance, and consideration. Harchanko v. Newco Construction of America, Inc., 2002 WL 31815161, *3 (D. Minn. Dec. 10, 2002). In addition, a contract requires "a meeting of the minds concerning its essential elements." Id., quoting Minneapolis Cable Systems v. City of Minneapolis, 299 N.W.2d 121, 122 (Minn. 1980).

Whether or not a contract term is ambiguous is a question of law. Mies Equipment, Inc. v. NCI Building Systems, L.P., 167 F.Supp.2d 1077, 1083, n.10 (D. Minn. 2001). A contract is ambiguous if it is susceptible to more than one interpretation based on its language alone. Lamb Plumbing & Heating Co. v. Kraus-Anderson of

Minneapolis, Inc., 296 N.W.2d 859, 862 (Minn. 1980). Just because a word has more than one meaning, however, does not mean it is ambiguous. Board of Regents v. Royal Ins. Co. of America, 517 N.W.2d 888, 892 (Minn. 1994). The language at issue must be subject to more than one *reasonable* interpretation in order for ambiguity to arise. Cousineau v. Norstan, Inc., 322 F.3d 493, 496 (8th Cir. 2003). Only if the word has multiple meanings *within the context of the contract* is there ambiguity. Board of Regents, 517 N.W.2d at 892.

Moreover, evidence outside the contract cannot be used to create an ambiguity; the ambiguity must be in the contract itself. Kenko, Inc. v. Lowry Hill Constr. Co., 392 N.W.2d 18, 20 (Minn. App. 1986), pet. for rev. denied (Minn. Oct. 22, 1986). And while parol evidence cannot be allowed to alter or contradict the terms of a final and integrated written agreement, "parol evidence may be considered to explain the circumstances surrounding the execution of a document." Mies Equipment, Inc., 167 F.Supp.2d at 1082-1083; Cousineau, 322 F.3d at 497. Parol evidence explaining time, place, parties, and other circumstances may also be received to aid in interpreting contract terms. Id. In addition, the most probative evidence of intent is the subsequent action of the parties to the contract. Id.

The court can further look to the circumstances surrounding the making of the contract and the parties' own subsequent conduct to infer the intent as a matter of law even if a contract term is ambiguous. Medtronic, Inc. v. Catalyst Research Corp., 518 F.Supp. 946, 951 (D. Minn. 1981), aff'd and remanded, 664 F.2d 660 (8th Cir. 1981).

If the court is unable to divine the meaning of ambiguous contract language from such extrinsic evidence, the ambiguous terms are matters of fact to be determined by a

jury. Ring v. Minnesota Road Builders, Inc., 116 N.W.2d 582, 585 (Minn. 1962). In that event, the jury is "permitted to adopt the interpretation more favorable to the party who did not draft the instrument." Id. at 584. See also Hilligoss v. Cargill, Inc., 649 N.W.2d 142, 148 (Minn. 2002) (ambiguous contract terms must be construed against the drafter).

With those principals in mind, we turn to the relevant facts and circumstances that will aid the Court in interpreting WBE's subcontract.

**B. The Contract.**

A copy of the relevant portions of WBE's subcontract is attached as Exhibit A to the Affidavit of Brown. The body of the contract itself is entitled "Standard Subcontract Agreement – Labor and Materials." Weis sent the identical agreement to all of the subcontractors on the project. Weis' project manager, Peter DeSai, mailed the agreement to WBE's president Stephen Messerich on February 21, 1997, for his review. (Exhibit B, Affidavit of Brown). The first page of the form agreement provides in part:

> THE SUBCONTRACTOR AGREES AS FOLLOWS:
>
> 1. To furnish all labor, material, skill and equipment necessary or required and to perform all the work necessary for:
>
> SEE EXHIBIT "F" ATTACHED.

Exhibit "F," attached separately as Exhibit C to the Affidavit of Brown, is a typewritten document prepared by Mr. DeSai. Page 2 of Exhibit "F" contains handwriting added by Mr. DeSai on February 26 after Messerich returned the original page to DeSai with certain notations (Exhibit D, Affidavit of Brown). The notations referenced several numbered items Messerich deemed unacceptable, including No. 5, which Messerich changed from "Waterproofing By Experts to be responsible for any damages caused to

interior of building due to any leaks" to those "due only to failure of waterproofing system."

Exhibit "F" was modified in response to Mr. Messerich's concerns. As modified, Exhibit "F" provided:

> This subcontract includes, but is not limited to the following:
>
> - includes providing drainage board for horizontal and vertical surfaces.
> - includes providing 2-inch insulation on horizontal and vertical surfaces.
> - includes installing ***waterproofing system per manufacturer's recommendation.***
> - includes waterproofing all details (joints, anchors, etc.) per manufacturer recommendation.
> - includes monitoring the backfill operations to insure there is no penetration of ***system.***
> - includes all deck preparation.
> - includes all water conditions.
> - includes completing each building in three weeks.
> - includes working on up to two buildings at a given time.
> - includes installing weights on top of insulation to keep insulation boards from blowing off.
> - includes flashing at plaza where block wall meets wood frame wall "no metal. Only liquid membrane."
> - includes providing manufacturer warranty for each building.
> - Waterproofing By Experts to be responsible for any and all damages and costs due to repair of waterproofing.
> - Waterproofing By Experts to be responsible for any damages caused to interior of building due to failure of *waterproofing system*.

(Exhibit C, Affidavit of Brown). Exhibit "F" as modified expressly deleted from the original proposal the obligation to install drain tile or overflow scuppers.

Exhibit "F" further stated at the bottom of page 1 "this contract is for design-build waterproofing system for the plaza areas." DeSai added in handwriting at the bottom of page 2, "it is noted that this is a design build contract and all incidental for the scope of work are included under this subcontract. Subcontractor is to be 100% responsible for design criteria." Messerich signed the agreement on March 10, 1997 (Exhibit A, page 2).

**1. The subcontract is unambiguous.**

WBE is asking the Court to interpret the scope of its responsibilities in the context of Exhibit "F." WBE contends its responsibilities were restricted to selecting and installing the Swelltite 3000 waterproofing membrane system and components designed and manufactured by CETCO in accordance with CETCO's product literature, and to assume responsibility for any interior damage resulting from the failure of that system. WBE contends the subcontract is unambiguous in that regard. The contract plainly states WBE is responsible for providing and maintaining a water tight system. The only "system" identified in the contract is the "waterproofing system" WBE was required to install "per manufacturer's recommendations." The only reasonable interpretation of "waterproofing system" in that context is the Swelltite 3000 system, and the only reasonable interpretation of "manufacturer" is CETCO.

Moreover, each and every item of work listed on Exhibit "F" is clearly confined to the horizontal and vertical concrete surfaces in the courtyards, as evidenced by the provision "includes flashing at plaza *where block wall meets wood frame wall*." In other words, that flashing marks the vertical limits of WBE's responsibilities. Thus, Exhibit "F" on its face unambiguously defines the scope of WBE's subcontract work as installing the Swelltite 3000 system on the concrete substrates in the courtyards of the six Promenade Oaks buildings.

Some of the other parties have seized upon the term "design-build" in the contract to argue WBE's responsibilities were much broader than that. To be sure, that phrase is nowhere defined in the contract. However, that does not mean it is ambiguous. Contract language is ambiguous only if susceptible to competing *reasonable* interpretations.

The phrase "design build" is not ambiguous in the context of Exhibit "F." "Design-build" in that context simply means WBE was responsible for selecting the system and system components (which is did, with CETCO's endorsement), installing the system and components in accordance with the manufacturer's specifications (instead of specifications created by the architect), and assuming responsibility for interior water damage should the system fail. The Court need look no further than Exhibit "F" itself to interpret "design build" in precisely that manner.

**2. The much broader interpretation urged by the other parties is unreasonable.**

Some of the other parties argue "design-build" has a much broader meaning. However, their interpretation is not reasonable in the context of Exhibit "F" and therefore does not create an ambiguity. Specifically, those parties would suggest the term obligated WBE to, among other things, slope the waterproofing membrane to the precast drain; coordinate the courtyard drainage system design and installation; select the soil for the courtyards; include in its design build responsibilities waterproofing on the stud walls above the point the Swelltite membrane terminated. You will recall a major issue in this case is the floor truss design change which resulted in unprotected wood walls being exposed directly to earth fill; failing to hire a design professional or generate design drawings, details or specifications for what is obviously an overly-broad definition of a "plaza waterproofing system;" failing to design and install an adequate plaza drainage system, including design details for the incorporation of the plaza drains with the waterproofing system, and failing to generate a plaza grading plan; failing to coordinate the design of the (again, overly-broad) waterproofing system with the plaza grading, including addressing waterproofing at grade on the side walls of the plazas; using powder

driven nails to attach the entryway posts to the precast surface, and improperly sequencing installation of the waterproofing and posts; negligently designing and installing end-wall waterproofing. (Exhibit E, Affidavit of Brown, ESG's Responses to J-Berd's Interrogatories, No. 4.)

That interpretation is not reasonable, however. The clear and simple language of Exhibit "F" is incapable of the construction ESG and others attempt to ascribe to it. The work described in Exhibit "F" undeniably relates exclusively to the installation of a waterproofing membrane system (meaning the membrane and components) per manufacturer's instructions (meaning CETCO's Swelltite literature). The described work cannot be construed to expand those straightforward duties to encompass the broad design, coordination and oversight responsibilities alleged by some of the other parties. (Exhibit E.)

The Court is bound to ascertain the parties' intentions from the language of their agreement, unless it is ambiguous. The language is unambiguous, however. The scope of WBE's subcontract work was limited to installing the Swelltite 3000 waterproofing system in accordance with CETCO's recommendations on the horizontal and vertical concrete substrates in the courtyards, and assuming responsibility for interior damage resulting from the failure of that system. "Design-build" in the context of that agreement meant nothing more than selecting that system and installing it consistent with the manufacturer's recommendations. That is what the contract says and that is what the contract means, nothing more.

**B. Extrinsic evidence of the circumstances surrounding the execution of the contract and the parties' subsequent conduct supports WBE's interpretation.**

Even if the Court concludes Exhibit "F" is not entirely clear as to the limits of WBE's contractual duties, that does not mean the jury gets to decide. Parol evidence rule permits the Court to consider extrinsic evidence to explain or supplement the meaning of uncertain terms, including the circumstances surrounding the execution of the agreement and the subsequent conduct of the parties. The extrinsic evidence is entirely consistent with WBE's interpretation and the language in Exhibit "F".

**1. Pre-contract conduct and circumstances support WBE's interpretation.**

**Bids for courtyard waterproofing**

Weis invited a number of local waterproofing contractors to bid on the courtyard waterproofing for the Promenade Oaks project. No documentation such as a formal introduction to bidders or instructions to bidders has been produced in discovery. Waterproofing By Experts submitted an initial bid proposal on July 9, 1996 (Exhibit F, Affidavit of Brown). That bid contained a price for materials and labor only. The materials proposed were a *sheet membrane* using a product called Miradri 861, *liquid membrane* for detail work, *drainage board*, and two inches of extruded *insulation* – essentially the same system components identified in Exhibit "F" to the subcontract.

WBE's president Steve Messerich was subsequently told by Weis to submit another bid proposing a different system backed by a stronger manufacturer's warranty (Exhibit G, affidavit of Brown, deposition of Messerich at 12). Messerich contacted a local representative for CETCO products to determine the appropriateness of a Swelltite 3000 system for the below -grade courtyard application. CETCO's regional manager confirmed CETCO's support of the project in a July 25, 1996, letter (Exhibit H, Affidavit of Brown). In it, he wrote that "Swelltite was specifically created for split slab and plaza

deck/courtyard applications," and that suitable toppings included dirt. The letter further contained CETCO's installation recommendations for the project as follows:

1. Spancrete blocks must be grouted together.
2. Joints must be detailed with Volclay M2000 liquid flashing mastic.
3. Install Swelltite 3000 PVC side up.
4. Tape Swelltite seams with Volclay seamtape, a 2" butyl rubber strip.
5. Detail all penetrations with Volclay M2000 liquid flashing mastic.
6. Install any additional specified materials, i.e., drainboard, insulation, etc.

This list mirrors the installation steps and components identified in the subcontract as well.

Messerich then submitted a second bid on August 22, 1996, specifying the use of a Swelltite 3000 system (Exhibit I, Affidavit of Brown). Again, the bid price of $383,000 was for materials and labor only. The materials proposed included Swelltite 3000 sheet waterproofing, M2000 liquid flashing "over all joints," 3-inch insulation, and drainage board. Id. Two-inch insulation was ultimately substituted at a cost savings to Weis of $10,000. Again, the items bid tracked CETCO's recommendations and Exhibit "F" to the subcontract.

**11/12 waterproofing meeting and prior review of courtyard plans showing 4-course block walls and grade terminating below top**

CETCO and WBE convened a waterproofing meeting on November 12 for representatives of Promenade, ESG, and Weis. Swelltite 3000 was explained and demonstrated to the group at the meeting. CETCO's product literature was also distributed. (Exhibit J, CETCO product literature and spec-data sheets furnished at meeting).

The CETCO representative testified the architectural drawings he reviewed revealed 4-course concrete block foundation walls to which the Swelltite would be applied. The drawing further showed grade terminating below the top of block at about the point the waterproofing membrane would terminate. (Exhibit K, wall section drawing.) Suter stated Swelltite 3000 was at the time typically recommended for applications to horizontal and vertical concrete substrates. Swelltite was expressly not designed for below grade wood installations. (Exhibit L, selected pages from deposition of Thomas Suter). Suter endorsed the Swelltite system for the Promenade project based on his review of the drawings. Id. at 130-131, 135-136. The evidence surrounding the bidding process and waterproofing meeting demonstrate the parties were well aware of just what WBE would be expected to do if awarded the contract. Specifically, WBE would be installing the Swelltite 3000 system, which, by virtue of the November 12 presentation and product literature, Weis and the owners knew in no uncertain terms would entail only the Swelltite product. Therefore they also knew the Swelltite 3000 system was for below grade applications on concrete surfaces only.

**Counterflashing**

In addition, Mr. Messerich strongly recommended installation of a counterflashing material over the termination of the Swelltite membrane and under the siding. ESG's contract administrator ultimately assumed the responsibility to address that issue. Counterflashing necessarily extends above grade. The fact others affirmatively assumed the duty suggests the parties were well aware WBE's responsibilities did not extend above grade.

Finally, other terms in the contract itself revealed the parties intended to proceed in accordance with WBE's interpretation. Page 2 of the form contract (Exhibit B) provides the total contract price was $365,000. WBE's bid for materials and labor only to install the Swelltite system was $373,000. WBE obviously received no additional consideration beyond the price it bid to install the Swelltite 3000 system.

The parties' conduct leading up to the execution of the contract strongly supports WBE's interpretation of the scope of its subcontract work. All the extrinsic evidence cited above points to no other conclusion but that there was a meeting of the minds between the parties as to what WBE's responsibilities would be if the contract was awarded. Namely, that WBE would select, install and be responsible for a below grade waterproofing membrane system backed by a manufacturer's warranty for the courtyards. An examination of the parties' pre-contract conduct can lead to no other conclusion.

**2. Post-contract conduct supports WBE's interpretation.**

The parties' conduct after they executed the contract clearly reveals their true intentions. Simply put, WBE proceeded to perform precisely those services it now says the subcontract required. WBE obtained the Swelltite 3000 system and components and installed them according to CETCO's recommendations. (Exhibit M, Affidavit of Brown.) There could be no clearer manifestation of the parties' understanding of WBE's obligations.

Based on the foregoing, WBE respectfully requests the Court instruct the jury that WBE's contractual duties to Weis were limited to selecting and installing the Swelltite 3000 system on the concrete surfaces below grade in the buildings' courtyards, and

assuming full responsibility for interior damages in the event the Swelltite 3000 waterproofing system failed.

Dated: September 3, 2004.

IVERSON REUVERS, LLC.

By_s/ Mark Brown________
Mark S. Brown, #226774
Attorneys for Waterproofing By Experts
9321 Ensign Avenue South
Bloomington, MN 55438
(952) 548-7200