**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Westfield Insurance Company,

Civil File No. OO-CV-987 JEL/JGL

Plaintiff

vs.

Weis Builders, Inc., Promenade Village Townhomes, LLC, Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants, and

Weis Builders, Inc.,

Third Party Plaintiff,

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Company,

Third Party Defendant and
Fourth Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth Party Defendant.

**THIRD PARTY DEFENDANT WATERPROOFING BY EXPERTS, INC.'S MOTION IN LIMINE TO EXCLUDE CERTAIN OPINIONS PROFFERED BY DEFENDANT PROMENADE VILLAGE TOWNHOMES, LLC'S LIABILITY EXPERT DAVID CAMPBELL**

---

## INTRODUCTION

Waterproofing by Experts, Inc. ("WBE") moves in limine for an order excluding certain opinions and conclusions proffered by David Campbell. Mr. Campbell was retained by Defendant Promenade to conduct a limited investigation and render opinions regarding the below-grade waterproofing system designed by Third-Party Defendant CETCO and installed by WBE, as well as the courtyard drainage system designed and installed by Third-Party Defendant J-Berd. Mr. Campbell produced a waterproofing investigation report (**Exhibit A, Affidavit of Brown, Report**), and gave deposition testimony pertaining to his investigation and the opinions and conclusions he reached. WBE now moves to exclude Mr. Campbell's proffered testimony regarding a number of his evaluations and conclusions at trial, on the grounds they do not satisfy the reliability and relevance requirements of Federal Rule of Civil Procedure 702 as the "gatekeeping" rules interpreted and applied by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and the many cases applying Daubert.

## DISCUSSION

The court is familiar with the underlying facts and positions of the parties, given its previous consideration of the various summary judgment motions briefed and argued by most of the parties. WBE will accordingly not burden the court with unnecessary repetition.

As noted, David Campbell performed what he termed a "waterproofing investigation" of the courtyard waterproofing and drainage systems installed below grade in the six courtyards on the Promenade project (**Exhibit A**). It is important to note Mr. Campbell's assignment expressly excluded conditions above grade or outside the immediate courtyards that the undisputed evidence demonstrates, and Mr. Campbell testified, could account for signs of water leaks in the garages and elsewhere. (**Exhibit B,** Affidavit of Brown, November 8, 2001, proposal).

Campbell had no relevant or direct experience with Swelltite 3000 before the Promenade project (**Exhibit C**, Affidavit of Brown, Campbell Deposition Vol. I ["Depo. I"] 25-26; **Exhibit D**, Affidavit of Brown, Campbell Deposition Vol. II ["Depo. II"] 6). He was unfamiliar with the characteristics of the membrane components, including the bentonite and water-soluble film (Campbell Depo. I 28-30, 91). He conducted no testing of any sort, whether attempting to recreate leaks by isolating and applying water to the openings, or by subjecting the various system components to testing. (Campbell Depo. I 54-55).

Campbell's opinions and conclusions are based predominantly on his visual observations during the investigation. (Campbell Depo. I 50-53). Specifically, his investigation involved making 20 destructive test openings (DTOs) at various locations in the courtyard for building 2 (**Exhibit A**; **Exhibit E**, Affidavit of Brown, site map).

The opinions and conclusions WBE seeks to exclude are contained in Section E of Mr. Campbell's report, beginning at page 4 under the headings "Design Errors" and "Installation Errors." WBE is naturally focusing only on the unreliable and/or irrelevant opinions and conclusions implicating the Swelltite 3000 waterproofing membrane system as well as those implicating WBE's installation of that system. WBE also seeks to exclude Mr. Campbell from offering any of the opinions set forth in points 1 through 3 contained in the preliminary report (**Exhibit F**, Affidavit of Brown), because, even though points 1 and 3 are not specifically contained in his final report, it is unclear from his testimony whether Promenade nevertheless may try to offer them. Finally, WBE seeks to exclude Mr. Campbell's recommendation that the entire membrane system "be completely replaced utilizing a more appropriate design" as he recommends at page 9 of his report, as well as his proposed replacement design (**Exhibit A** – drawings P, Q and R).

**A. Legal Standard for Determining the Admissibility of Expert Testimony.**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness, qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 was amended in 2000 in response to Daubert and its progeny. Advisory Committee Notes, 2000 Amendments.

> The amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony. Consistently with Kumho [Tire Co. v. Carmichael, 119 S. Ct. 1167 (1999)], the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful. Consequently, the admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.

Id. (citation omitted).

The Court emphasized in Daubert that the Federal Rules of Evidence left in place the "gatekeeper" role of the trial judge when ascertaining the admissibility of "scientific" testimony (which the court clarified in Kumho extended to all expert testimony. Kumho, 119 S. Ct. at 1178): "Under the rules the trial judge must and ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." General Electric Co. v. Joiner, 522 U.S. 136, 142 (1997), quoting Daubert, 509 U.S. at 589.

In Jaurequi v. Carter Manufacturing Co., Inc., 173 F.3d 1076 (8th Cir. 1999), the Eighth Circuit affirmed the trial court's order excluding Plaintiff's expert testimony and granting summary judgment. Id. at 1078. The experts were a mechanical engineer and human factors

engineer who proffered design and warning opinions regarding a piece of agricultural machinery on which the plaintiff was injured. Id. at 1080.

The court first noted that Daubert primarily addressed the issue of reliability, quoting the nonexclusive list of factors a trial court should consider in determining the validity of proffered expert testimony. These include: (1) whether the underlying theory or technique can be or has been tested [“- that is, whether the expert’s theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.” Advisory Committee Notes, 2000 Amendments]; (2) whether the technique or theory has been subject to peer review in publication; (3) the known or potential rate of error of the technique or theory when applied; and (4) whether the technique or theory has been generally accepted in the scientific community. Jarequi, 173 F.3d at 1081, quoting Daubert, 509 U.S. at 593-94.

The list of factors is not exclusive. “The trial court is left with great flexibility in adapting its analysis to fit the facts of each case. “ Id. “The polestar, however, must always be ‘scientific validity – and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission.’” Id., quoting Daubert, 509 U.S. at 594-95. Moreover, while experience alone may provide a sufficient foundation for expert testimony, an opinion from a technical expert based primarily on experience or is still subject to the same rigorous scrutiny as an opinion from an expert purporting to be a scientist. See, Advisory Committee Notes, 2000 Amendment, citing Watkins v. Telsmith, Inc., 121 F.3d 984, 991 (5th Cir. 1997).

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court’s gatekeeping function requires more than simply “taking the expert’s word for it.”

Id, citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1319 (9th Cir. 1995).

Based on those principles, the court in Jarequi concluded the experts' proffered opinions were nothing "more than unabashed speculation," due to their failure to design the suggested protective device or test its utility or compatibility." Jarequi, 173 F.3d at 1084. For much the same reasons their opinions regarding sufficiency of warnings were deemed unreliable. Id. The court further stated that any opinion that has not considered all the relevant facts is subject to exclusion. Id. at 1056.

Finally, the court concluded the "more serious problem" with the opinions was their lack of relevance, since there was no evidence the alleged absence of the warnings they suggested should have been on the machine caused plaintiff's injuries. Id. at 1084.

Perhaps the most crucial task for the court in judging the reliability and relevance of proposed expert testimony is to make sure the basis for the opinion directly ties into the actual evidence. In General Electric Co. v. Joiner, 522 U.S. 146 (U.S. 1997), the Court explained that, while it had earlier suggested in Daubert that the focus must be on principles and methodology, not on the conclusions that they generate:

> Conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

Id. at 146 (reversing Court of Appeals by holding in part that studies relied upon by plaintiff's experts insufficient to support conclusions).

Put another way, the court must ensure the proffered expert testimony is sufficiently "tied to the facts of the case that it will aid the jury in resolving a factual dispute." Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir. 2000), quoting Daubert, 509 U.S. at

591. The expert testimony must therefore not only be based on reliable science, but must "fit" the facts of the case. Id.

**B. Application of Legal Principles to Campbell's Opinions and Conclusions.**

With these principles in mind we turn now to Mr. Campbell's expected testimony to test its reliability and relevance. It does not pass muster, as the following discussion makes plain.

**Opinion 1: The Volclay Seamtape component of the Swelltite 3000 system may not have the same watertightness characteristics as the membrane itself, and may therefore allow water to enter seams between membrane panels through a failure or poorly bonded seam (Exhibit F, Preliminary Report, point #1).**

This opinion has no foundation and is irrelevant. The sole source of this opinion is Campbell's inference, drawn from a statement in the Swelltite literature that the seamtape "seals the membrane edges against inclement weather and construction traffic" that the makers must not intend for it to be waterproofing. (**Exhibit F**). This theory is based on three false premises: the seam tape is not waterproofing; seams failed or were poorly bonded; and water entered the seams.

First, nowhere does the literature say the seamtape is not a waterproofing component. (**Exhibit G**, Affidavit of Brown, Swelltite Literature). In fact, the seamtape is composed of butyl rubber, a water-impregnable material itself. Id. Moreover, the tape is an integral component of the waterproofing system. (See Stacy Byrd deposition excerpts in submissions by CETCO and Chris Craft).

More importantly, there is absolutely no evidence any seam ever failed. In fact, Campbell never even encountered a seam during his investigation (Campbell Depo. I 96, 130). Importantly, he performed no testing of any kind to verify his hypothesis water passed through any seams (Campbell Depo. I 130; Campbell Depo. II 59-60). In addition, he agreed the

horizontal application of the membrane was installed properly, as far as he knew. (Campbell Depo. II 105).

Equally important is Campbell's inability to cite any evidence or render the opinion that water did in fact penetrate any seams. He further acknowledges the signs he observed of past water staining and leaks in the garages and so forth could be explained by any number of conditions outside the perimeter of the Swelltite membrane that had nothing whatsoever to do with water penetrating the membrane, let alone the seams.

For example (one of many), Campbell observed water several inches deep in his test openings, which he attributes to the fact the precast deck is level and the lowest perforations in the vertical PVC pipe connecting the surface drains to the deck drains are 2 ½ inches above the membrane. (Campbell Depo. I 142-45). He agreed that condition coupled with the fact the very few active leaks remaining after the years of remediation occurred only when it rained meant the membrane itself was functioning and water was bypassing the Swelltite 3000 system. (Campbell Depo. II 65-68).

Campbell acknowledged numerous other conditions outside the scope of the membrane existed on site which created potential avenues for water intrusion. This nonexclusive list included gaps or seams in the vinyl siding; unprotected exterior wood walls where finished grade was improperly installed a foot above the membrane; the wood entryway posts; holes in the precast planks created by the nails anchoring the post brackets; and improperly flashed or detailed concrete block endwalls, kneewalls, and stairwells and ramps associated with the building 1-2 link and elsewhere in and adjacent to the courtyards (Campbell Depo. II 66, 111-112).

Consequently, Campbell's contention that seamtape may not be a waterproofing component and water can therefore enter failed or improperly sealed seams is "rank speculation" with no foundational value. Allowing Promenade to elicit this opinion at trial would force the jury to speculate and be much more prejudicial than probative. Finally, this conclusion is irrelevant, because the seamtape is a waterproofing component, and there is no evidence the seams failed or that water got through them.

> **Opinion 2: The water soluble film component of the Swelltite 3000 membrane does not always dissolve when it gets wet, allowing water to enter the seam because the undissolved film keeps the bentonite component from sealing against the HDPA component of the adjacent membrane, and once through the seam, the water is free to migrate under the membrane because the undissolved film separates the bentonite component from the precast concrete. (Exhibit F, point #2; Exhibit A, page 6, point #1a and diagram O).**

Mr. Campbell describes this alleged phenomenon as the most "profound" cause of the leaks and forms the centerpiece of his proffered testimony. (**Exhibit A**, page 8). However, his opinion in this regard is a two-legged stool: it cannot stand. First, opinion point #1 in his preliminary report (**Exhibit F**) is conspicuously absent from his final report. That is because his premise is fatally flawed if the seams are sealed with seamtape such that water cannot enter the seams and come into contact with the film in the first place.

Indeed, the diagram in this preliminary report depicts tape over the seam while Diagram O in the final report does not. He tried to explain that away during his deposition by dismissively stating he did not think the seamtape was relevant (Campbell Depo. I 135). But we have already seen that Campbell has no foundation for concluding the seams were not taped, the tape is not a waterproofing component, the seams fail, or any water passed through them. In fact, he agrees whether the film dissolves or not is irrelevant if the HDPE component of the membrane is not penetrated, because in that event the bentonite layer is not called to action

(Campbell Depo. II 46, 59, 65-66). For those reasons, his untested theory that the water-soluble film does not dissolve when it is supposed to not only lacks foundation but is irrelevant.

Aside from that fatal flaw in his premise, Campbell's opinion regarding the solubility of the film utterly lacks foundation. He reaches that conclusion solely on his belief that portions of the film remained on samples of bentonite he took from 6 of his 20 DTOs (Campbell Depo. I 80). He concludes the film did not dissolve like he thinks it should have because it was four years old, and he allegedly detected dampness to the touch under the membrane in 4 of those 6 openings (**Exhibit A**).

He marked the DTOs where he thought he saw film remaining on a site plan, but did not make those designations in his final report. Perhaps that is because he could not recall in which 4 of the 6 subject DTOS he supposedly detected dampness. (Campbell Depo. I 123).

Campbell's opinion that some film remains on those 6 samples is entirely unscientific and would be of no assistance to the jury. He was questioned about each of the actual samples and their corresponding photographs during his deposition. His descriptions of what he thought he was looking at reveal the speculative nature of his conclusions.

With respect to the first sample, he thought both the bentonite and film had "partially hydrated" which, even if true, would at best suggest both components worked as designed. (Campbell Depo. I 90-92).

He said he saw film on the second sample but thought the bentonite was "partially hydrated" because it was "wrinkled on one end." (Campbell Depo. I 104-105).

As for the third sample, he described the bentonite as "barely hydrated and there appears to be a film." (Campbell Depo. I 114).

He testified the film on the fourth sample was undissolved in his opinion "based on just a visual examination the way the surfaces wrinkle like that. Bentonite wouldn't do that. This looks like this is film material right here that has pulled away." (Campbell Depo. I 118).

Campbell did not believe the bentonite on the fifth sample was hydrated, but acknowledged he was not even sure if the material was Swelltite or a peel and stick membrane (the material installed during remedial measures). (Campbell Depo. I 121).

Finally, he thought the sixth sample reflected partially hydrated bentonite because it was cracking and pulling away from what he surmised was a plastic film on top. (Campbell Depo. I 123).

What is a jury to do with Mr. Campbell's opinion on the basis of these conjectural and conclusory observations? His opinion has no more validity than any layperson's would under the circumstances. That is because Campbell has absolutely no knowledge of the physical characteristics of the film or the properties or circumstances under which the film component of Swelltite 3000 should or should not dissolve, other than the inferences he draws from his visual observations of what is actually on those samples.

Again, he did not test the Swelltite to determine if in fact it did hydrate (Campbell Depo. I 54). He has no prior relevant experience with Swelltite 3000. (Campbell Depo. I 25-26). He is unfamiliar with the characteristics of Swelltite. (Campbell Depo. I 91). He has no experience with water soluble film. (Campbell Depo. I 28). He knows nothing about the film's chemical properties, chemistry, or how it works. (Campbell Depo. I 28). He never reviewed the manufacturer's literature regarding the film. (Campbell Depo. I 28). Campbell is furthermore unaware of any learned treatise concerning the effect of undissolved film on Swelltite. (Campbell Depo. II 55-56), nor did he conduct any testing to determine that effect, or for any other purpose.

(Campbell Depo. II 55-56). Indeed, he did not even know how to test the film. (Campbell Depo. II 55-56).

He nevertheless offers his opinion on the basis of his visual observations alone. Defendants disagree with Campbell. However, Promenade has the burden of proof. If their expert cannot do more than offer opinions that force the jury to speculate, they cannot meet that burden, at least not with this expert. That is precisely what the jury will have to do if the court allows Campbell to offer this opinion. The jury will be left to decide simply by looking at the same photos and samples. Their decision would necessarily be based on pure conjecture even if they reached the right one.

In short, Campbell can satisfy none of the Daubert factors for reliability. The court need not and should not allow Mr. Campbell's proffered testimony regarding the alleged insolubility of the film under these circumstances just on his say so. See J.B. Hunt Transport, Inc. v. General Motors Corp., 243 F.3d 441, 444 (8th Cir. 2001) (accident reconstructionist's proffered testimony theorizing three-impact collision premised primarily on his impressions from photographs of scratches in paint of involved vehicles was "mere speculation and pure conjecture. . . . Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis") (citations omitted).

Campbell's theory is undermined further by the absence of evidence any seams were not sealed tightly or that water ever passed through them. His proffered opinion that water could enter the seam and migrate between the membrane and precast because the film does not always dissolve when it gets wet is therefore mere speculation.

> An expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case. Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis. An expert opinion cannot sustain

> a jury's verdict when it is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable.

Concord Boat Corp., 207 F.3d at 1057 (citations omitted). This opinion must, therefore, be excluded as both unreliable and irrelevant.

> **Opinion 3: "Contributing to the problem inherent to this membrane is the fact there is inadequate bentonite present in the product to provide good long-term water tightness performance." (Exhibit F, point #3).**

Campbell did not include this opinion in his final report. He testified he did not because he "could not back it up with any test results." (Campbell Depo. II 84). Campbell consequently disqualifies himself from offering this opinion. The Court should prohibit Promenade from eliciting it at trial.

> **Opinion No. 4. The Swelltite 3000 membrane terminated too close to the soil surface, where there is inadequate containment pressure exerted by the backfill for the bentonite component of the membrane to function properly. (Exhibit A, page 6, alleged waterproofing membrane installation design error #4).**

This is a slightly different version of Campbell's seam/soluble film theory. This opinion is, like the others, unreliable and irrelevant. The sole basis for his opinion that lateral containment pressure twelve inches or less below grade is inadequate is his experience. (Campbell Depo. I 135-136; Campbell Depo. II 12).

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, **and how that experience is reliably applied to the facts**. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

Advisory Committee Notes, 2000 Amendment, citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1319 (9th Cir. 1995) (emphasis ours).

He performed no hydrostatic or compaction testing. (Campbell Depo. I 135-136; Campbell Depo. II 107-108). He does not know what or even if there were compaction

specifications for the courtyard fill. (Campbell Depo. II 79-80). He is aware of no literature stating Swelltite is ineffective within twelve inches of grade. (Campbell Depo. II 109). In short, Campbell does not know whether containment pressure was in fact inadequate.

Even if it was, the true thrust of this conclusion is that the seams between Swelltite panels will be ineffectively sealed due to their reliance on the bentonite to form the seal if hydrated, which he concludes the inadequate pressure prohibits. (Campbell Depo. II 13). This, therefore, is just another way of advancing his theory that water can enter the seams and get behind the membrane because the film component does not always dissolve when it should. Since this opinion relies upon that flawed premise, it necessarily follows Campbell's inadequate containment pressure opinion lacks foundation. Accepting Campbell's conjectural assertion would amount to nothing more than "taking his word for it", his *ipse dixit.* Joiner, 522 U.S. at 146.

Finally, this opinion is irrelevant. So what if Swelltite should not be terminated less than 12 inches below the surface (despite the product and technical literature to the contrary)? There is no evidence water entered the buildings through seams in the top 12 inches of Swelltite, whether because of inadequate lateral containment or otherwise. Nor does Campbell say it did. He simply surmises water could get in that way.

His conclusion is based solely on his belief, from past experience - none of which ever involved Swelltite 3000 - that there could be inadequate lateral containment which, coupled with his absolutely baseless seam/soluble film theory. This theory does not assist the jury or support in any way Promenade's (Weis') burden or establishing direct causation. This theory is also irrelevant for a more ironic reason: as things turned out, there is no Swelltite within 8 to 12 of the grade line! This opinion lacks any indicia of reliability or relevance and must be excluded.

For all these reasons, Promenade should be prohibiting from eliciting opinions and testimony from Campbell at trial regarding the alleged design and installation errors discussed above. The basis for his conclusions do not meet he reliability or relevance requirements of Rule 702. They must be excluded.

**Opinion 5: the entire courtyard waterproofing system be removed and replaced with his design (Exhibit A, page 9, Recommendations).**

Finally, Promenade should be excluded from eliciting testimony from Campbell recommending "that all courtyard waterproofing membrane and subsurface drainage provisions are completely replaced utilizing a more appropriate design." His recommendation is based primarily on his theory regarding the alleged partial insolubility of the film and resulting migration of water beneath the membrane. We have already established there is no basis for that conclusion and therefore, no basis for concluding the Swelltite 3000 system would need to be replaced. He candidly admits, "I was never able to associate the evidence of infiltration on the interior with a specific failure of the membrane on the exterior." (Campbell Depo. II 61). There is simply no foundation for Campbell's total replacement recommendation.

In addition, replacement would be excessive and ineffectual (or would have been; the property has been sold and Plaintiff is obviously not going to perform any repairs. This is all the more reason to exclude the testimony if offered, since it would be much more prejudicial than probative). After all, Campbell acknowledges, and the undisputed evidence suggests, that those remedial efforts were largely successful in arresting the leaks. Campbell himself testified he could identify only four active leaks by the time of his investigation nearly 3 years ago – all of which were associated with the building 1-2 link. (Campbell Depo. I 46-47). That link is outside the scope of the Swelltite 3000 system. He has no idea where or when even those supposedly "active" leaks originated, let alone all the past leaks. Nor does he know what caused

them. (Campbell Depo. II 51, 53, 97-98). The stated basis for Campbell's replacement recommendation lacks foundation.

Moreover, Campbell's own testimony betrays the fact tearing out and replacing just the membrane system would not only be a huge waste, but would likely not solve a thing. That is because many conditions were identified outside the bounds of the membrane that could account for the past leaks. (Campbell Depo. II 60-68, 111-113). In fact, he agrees no system, regardless of expense, would be sure to work if some of those conditions were not also remedied, many of which his proposal does not address. (Campbell Depo. II 100, 120).

Finally, the redesign and cost estimate attached to Campbell's report should be excluded. As noted, the property has been sold. The system was not replaced. The replacement design and estimate are irrelevant.

## CONCLUSION

Based on the foregoing, Waterproofing by Experts respectfully requests the court rule in limine that Mr. Campbell's testimony and conclusions discussed are inadmissible and shall not be offered at trial.

Dated: September 3, 2004.

IVERSON REUVERS, LLC.

By_s/ Mark Brown________
Mark S. Brown, #226774
Attorneys for Waterproofing By Experts
9321 Ensign Ave. South
Bloomington, MN 55438
(952) 548-7200