**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Westfield Insurance Company, Civil File No. OO-CV-987 JEL/JGL

Plaintiff

vs.

Weis Builders, Inc., Promenade Village Townhomes, LLC, Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants, and Third Party Plaintiff

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Company,

Third Party Defendant and Fourth Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth Party Defendant.

**Attached hereto is Exhibit D - a true and correct copy of the cited pages from the Deposition of Campbell, Volume II taken on October 8, 2003.**

A. Oh, okay.

Q. Unless your attorney tells you not to answer them, go ahead and answer the question.

MR. RAU: And you'll be able to tell who your answer hurts the most by who objects. That's kind of a standard operating procedure in this case.

BY MR. HULL:

Q. Do you have the question in mind?

A. Yes. The intention of the Swelltite material is to seal against the concrete substrate. The only component of the Swelltite material that seals is the bentonite part of the lower underside of the membrane. However, when there is something -- when there's a material interfering between the bentonite component and the structural deck, it keeps the bentonite from sealing to the concrete and water can then flow underneath the film, between the film and the concrete deck.

Q. And if the bentonite seals to the concrete, what happens to the water flow then?

A. It is supposed to stop water migration underneath the Swelltite material.

Q. And I think you testified last time that you had samples of some of the Swelltite with the undissolved film; is that right?

A. That's correct.

A. Either a more -- you could install -- in lieu of the material that was used, you could install more durable waterproofing material or install a protection material over the waterproofing such as sheet metal or various asphalt-impregnated protection boards. There's a lot of products on the market that would be appropriate.

Q. Were you told whether or not that was an original construction condition or a repair?

A. I was told that that was a repair, that these two drain pipes were put in after the original construction.

Q. What about the flashing material?

A. I was told nothing about the flashing with respect to when it was installed.

Q. Now, as you go down further, you have a note that says "waterproofing membrane Volclay Swelltite 3000, inadequate lateral containment at top portion." Tell me what you mean by that?

A. The bentonite component of the Swelltite, as any bentonite, has to be properly contained to resist its natural tendency to swell for it to develop a watertightness characteristic. The closer you get to finish grade, the less lateral containment pressure is exerted on the material. Finally, when you get to within approximately one foot of finish grade, the amount of

lateral pressure is so minimal as to make the bentonite component of the Swelltite ineffective as a waterproofing barrier.

MR. REILLY: Objection; calls for speculation, lack of foundation, nonresponsive.

BY MR. HULL:

Q. And what is the effect then if there is inadequate containment at the top of the Swelltite 2000 -- 3000?

MR. REILLY: Objection, lack of foundation.

A. The watertightness characteristic of the Swelltite is relying solely then on the high-density polyethylene component. However, the seams of the Swelltite rely on the bentonite component to seal, so the -- since the seams are now not effectively sealed because the bentonite component does not have adequate lateral containment pressure against it close to the surface, the total watertight effectiveness of the Swelltite is greatly reduced.

BY MR. HULL:

Q. Did you find termination bar anywhere near the top of the Swelltite in your test openings?

A. No, I didn't.

Q. Did you find any areas where there was only a

system you can adequately waterproof those plazas so that water will stay out of the building and out of the garages?

A. Definitely.

MR. HULL: That's all I have.

MR. REILLY: Let's take a two-minute break.

(At this time a brief recess was taken.)

CROSS-EXAMINATION

BY MR. REILLY:

Q. Mr. Campbell, my name is Pat Reilly. I represent CETCO, and I have some questions for you. You indicated in your prior testimony that you ran across Swelltite on one prior occasion. Do you remember that testimony, sir?

A. I do.

Q. And you do not recall the circumstances of that?

A. No, I'm afraid I don't.

Q. And you've done nothing since your last deposition to determine the circumstances of that encounter?

A. No, I haven't.

Q. You do not recall the application of the -- the particular type of application that was involved in

that you were able to identify their location, where the source of the water is coming from?

A. No.

Q. Could that be from that linkage area?

A. Possibly.

Q. All right. The other four leaks -- you said there were four additional leaks but you could not identify their location at the time of your deposition?

A. That's correct.

Q. Can you identify them today where they were?

A. No, I can't.

Q. Do you recall any leaks at a special unit called 3-115 which is at the end of a -- and underneath the end of a courtyard?

A. I don't recall it by that name.

Q. Okay. You see Building 3? It sits by itself, and down at the very southern -- I think it's -- yeah, very southern end of the building there are two units, one of which is up underneath the courtyard?

A. Now I recall.

Q. Do you recall that?

A. Yes.

Q. Was that one of the places where you saw leakage, active leakage at the time you were out there?

A. I saw evidence on finish materials of leakage,

at the time you were out there throughout the garage areas; correct?

A. Correct.

Q. And as I understand from your prior testimony, you're unable to testify where any particular leak came from?

A. Correct.

Q. Now, you know that there were repairs done, for instance, to the entranceways of various apartments in the courtyards; correct?

A. Correct.

Q. And that as a result of that leakage, some leakage was diminished -- or locations were diminished?

A. Yes.

Q. You also understand that there were repairs done to the posts and waterproofing around the posts?

A. Not all the posts, but yes.

Q. And where that was done, leakages were diminished?

A. Yes.

Q. You also understand there was some additional caulking and other work done that contributed to at least diminishing the leakage on the property; correct?

A. That's my understanding, yes.

Q. The eight remaining active leaks that you saw,

regarding Swelltite that spells out the effects of water getting between the film and the substrate?

A. Could you rephrase the question?

Q. In the last two days of testimony you've testified regarding your opinions as to the effect of the film not dissolving?

A. Correct.

Q. Are you aware of any treatises that address that issue?

A. Define "treatise."

Q. Something that is recognized -- a document, an article, a book that is recognized in your occupation as learned.

A. It is not good waterproofing design practice to design a system that would allow water to migrate underneath the primary waterproofing material should the failure occur.

MR. STEPAN: Object as nonresponsive.

MS. HEYER: Join that objection.

MR. REILLY: Could you read back the question, please.

(Whereupon the requested portion of the record was read aloud by the Court Reporter.)

BY MR. REILLY:

Q. Do you understand what I'm talking about? The

issue that I'm discussing with you is the effect of the film not dissolving on Swelltite product and its waterproofing capacity. Are you aware of any treatises including books, articles, written studies that have been done by anybody in your profession that would be considered a learned document?

A. No.

Q. Now, when you described the moisture that you saw in the -- on the substrate in four of the openings, you described it as dampness. Do you remember testifying to that?

A. Yes.

Q. Do you know if any of that dampness was a result of you working in that environment and cutting through the Swelltite?

A. No. I'm positive it was not because that would be a flawed technique of retrieving a sample.

Q. You indicated that in every hole you dug there was standing water; correct?

A. That's correct.

Q. And in some of the areas, as much as two or three inches of standing water?

A. That is correct.

Q. Did you also notice that in some of the areas -- strike that. In the areas you've indicated

A. "Permeating" means go through.
Q. Exactly.
A. I don't know whether it can or can't.
Q. Now, if I understand the way this product is designed to work, if there is a hole in the product, for instance in the membrane, as the water gets into that hole, bentonite swells around it and seals that hole shut; correct?
A. That's what it's supposed to do, yes.
Q. All right. If the penetration is from above, in other words, going vertically into the bentonite material, it doesn't matter whether the film dissolves or not. It will still expand around that penetration; correct?
A. The portion of the bentonite that's in contact with the concrete right at the hole will expand --
Q. All right.
A. -- however.
Q. Whether it will stop the leak or not, you don't know?
A. That's correct.
Q. You've done no testing to determine that?
A. That's correct.
Q. You've already testified you never saw any of the seams, so you do not know whether the seams leaked or

not, do you?

A. Not by firsthand observation, no, I do not.

Q. And you've done no testing of seams?

A. No, I have not.

Q. Now, if a piece of Swelltite let's say the size of a piece of paper were lying in a position where water approached it from the side, you would expect, would you not, that the edge of it would hydrate the bentonite? The bentonite would be hydrated on the edge?

A. It would.

Q. It would not necessarily penetrate all the way through the product?

A. The hydrated bentonite though, keep in mind, is separated from the substrate by the film which also extends out to the edge.

Q. All right. It would extend through -- and whether that film dissolved or not -- let's assume the film is dissolving properly in this instance. The film would dissolve along the area where the bentonite expanded and hydrated; correct?

A. Correct.

Q. But assuming the water then was stopped by that expanded bentonite and expanded and dissolved film, there would be no effect to the remaining bentonite or the remaining film once you got beyond the area where the

stoppage occurred?

A. That is correct.

Q. So for instance, if you were to take a sample from the middle of this sample, you would expect to find unhydrated bentonite and film?

A. Yes. Right.

Q. During your inspections either of active leaks or of evidence of former leakage, were you able to determine any particular leak -- the location or cause of any particular leak that ever existed in that property?

A. I was never able to associate the evidence of infiltration on the interior with a specific failure of the membrane on the exterior.

Q. Now, you talked a bit about the posts, and you understand that those posts are single pieces of wood that extend all the way from the roof line of the overhang of the patios down all the way to the -- almost all the way down to the cement planks?

A. That's correct.

Q. And water can enter at any area of the unprotected wood in that post; correct?

A. Correct.

Q. It could enter at the ground level, for instance, in other words, where the stoop -- where it matches up with the top of the patio block?

A. Yes.

Q. It could enter from the top if there were water entering into the end of the post?

A. The area of the post which is adjacent to air would not be so prone to absorb moisture permanently because of the evaporation process.

Q. But since it's a permeable material, wherever water enters, it is possible for it to eventually by gravity feed to the bottom of the post?

A. By gravity or capillary action, yes, it is possible.

Q. And it would be -- the best method of waterproofing would be to put a waterproofing material beneath the post between the post and the substrate?

A. That would be the best, yes.

Q. And in fact that's the repairs that were made at least in the one dig that you did examine the repair?

A. That's correct.

Q. And are you aware that as a result of those repairs that the water leakage has been diminished?

A. That's what I was told, yes.

Q. Now, you were asked some questions, and I mentioned it earlier, about the two-and-a-half inches or two inches of standing water on the membrane. Do you believe that that contributes to the leaks in the Promenade

project?

MS. HEYER: Objection; lack of foundation, calls for speculation.

A. It puts tremendous demands on the waterproofing membrane regardless of what material it is.

BY MR. REILLY:

Q. Even with the most expensive waterproofing membrane that you could devise, you would still want to move that water off of it?

A. That's correct.

Q. Why is that even with the most expensive waterproofing membrane you could devise? Why do you want to move water to a drain and get it off the waterproofing membrane as fast as possible?

A. The simplest way I can explain it is it's much like holding a hand of cards. Even though there are four aces in the deck, you wish there were six. You're always trying to stack the deck in your favor in matters of waterproofing design and subsurface drainage because the cost of going back and fixing such installations are traditionally so expensive.

Q. Now, we don't have those samples of --

MR. RAU: They're coming.

BY MR. REILLY:

Q. They're coming but maybe you can answer the

question without looking at the samples. Are you able to determine on those samples where you believe film to be --

A. Yes, I do.

Q. -- in existence --

A. Yes, I do.

Q. I haven't finished my question.

A. I'm sorry.

Q. What portion of the film in each of those instances has been exposed to the water and what portion has not?

A. Can I --

MR. BROWN: Of the existing film, Pat?

BY MR. REILLY:

Q. Of those -- the film that you find on those samples that you found, can you determine based upon your inspection of those samples what portion of the film that's remaining has been exposed to water and what has not?

A. Based on the condition of the bentonite underneath the film I can and also based on the fact of there was water present underneath the sample that was removed.

Q. But not all the samples that were removed, so we don't know which of those samples had water underneath them because you don't remember; correct?

A. The -- that's correct.

Q. So put that aside because we don't know which one of those samples you found dampness underneath the samples, so the evidence that you would use to determine whether the film had been exposed to moisture would be the hydration of the bentonite?

A. Yes.

Q. Is there any other basis for that?

A. I'm confident that there were samples taken that still had film on them that also had water below the sample.

Q. My point is, other -- if I hand you one of those samples today and I say "Tell me which -- was this film exposed to moisture?" and you say "Well, I think so and here's why," and the only reason you could give me an opinion today as to that particular sample is because of the condition of the bentonite?

A. That is correct.

Q. All right. Now, if a waterproofing system such as the Swelltite system used here in these courtyards is circumvented by water, for instance, water enters the building walls from other areas above or beyond the waterproofing membrane, that's not a defect in the waterproofing membrane itself?

A. No, it wouldn't be.

Q. Have you done any test to determine whether

water can enter the vinyl siding of these buildings?

A. No, I've done no tests.

Q. If water were able to enter the vinyl siding into the wall structure of these buildings, would that be a possible cause for leakage below those walls?

A. Yes, it could.

Q. If, as you've indicated at least on one occasion, there is insufficient flashing in end walls or knee walls which allows water to penetrate into the block of the wall itself that can in fact create leakage below?

A. That's correct.

Q. And defeat the waterproofing system by circumventing it?

A. That's correct.

Q. With there being two inches of standing water or thereabouts on this product all the time, is it significant if the testimony were to be at the time of trial that the only time there are leaks, active leaks now, is when it rains?

MS. HEYER: Object to the form of the question.

A. Not necessarily.

BY MR. REILLY:

Q. Why?

A. There could be Swelltite seams that because of

the fact that the film is not dissolving adequately could allow water in without there having to be a full two inches of water-head on the membrane.

Q. Well, you know the membrane has water on top of it all the time?

MS. HEYER: Objection to the form of the question, calls for speculation.

A. Not necessarily.

BY MR. REILLY:

Q. Is there any place that you dug a hole you didn't find standing water?

MS. HEYER: Objection, argumentative.

A. True. I found standing water at every destructive test opening to varying degrees.

BY MR. REILLY:

Q. Is there any basis for an opinion by you at this point that there would be any place on those membranes that does not have water standing on it of some depth?

A. No.

MS. HEYER: Objection, calls for speculation.

BY MR. REILLY:

Q. Assuming that to be the case, the fact that it only leaks in the rain, and I'm asking you to assume that fact, doesn't that indicate to you that those leaks that

are being caused when it rains are a result of the waterproofing membrane being circumvented in some manner?

A. That's highly likely.

MR. REILLY: Thank you. I have no other questions.

(At this time a discussion was held off the record.)

CROSS-EXAMINATION

BY MR. STEPAN:

Q. Mr. Campbell, my name is Chad Stepan. I'm one of the attorneys for Weis Builders in this matter. Have you ever been a general contractor?

A. No, I haven't.

Q. Is it fair to say you are not an expert regarding the standards of care for a general contractor?

A. Safe to say.

Q. You weren't retained to testify regarding the standards of care of a general contractor?

A. That's correct.

Q. Are you a soils engineer?

A. No.

Q. Any expertise in the line of work that a soils engineer does?

A. Only things I've picked up through the course

Q. At the very top of the diagram you show a concrete apron around a surface drain, the apron sloping down to the drain, and then the soil to the right of the apron is essentially flush with that apron; is that right?

A. Correct.

Q. Do you know -- you said earlier that there's some drains out at the site right now where the soil around the apron has come down so it's not flush to the apron?

A. That's correct.

Q. Do you know why that happened?

MS. HEYER: Objection, lack of foundation.

A. I'm assuming compaction of the soil, settlement of soil or -- no. Excuse me. No "or" -- settlement of the soil around the concrete collar.

BY MR. STEPAN:

Q. But do you know why? Did you do any testing to verify what the type of compaction was?

A. No, I didn't.

Q. When you looked at the architectural drawings and the specifications, did you find any criteria set forth as to what the compaction of the soil should be in the courtyards?

A. I don't believe so, no.

Q. Is that information you would expect to

receive from an architect or a design professional on a project?

MR. HULL: Objection, foundation.

A. I'll have to take back my answer. I don't recall whether I saw that in the spec or not.

BY MR. STEPAN:

Q. Is that information you'd expect if it's going to be there, it's going to come from an architect or an engineer, some kind of design professional?

A. Most likely, yes.

MR. HULL: Objection, foundation.

BY MR. STEPAN:

Q. As you move down the notations you've got here on diagram R, there's one that says "drawing smooth the top of the structural deck around openings to receive drain flange." Do you see that?

A. Yes.

Q. What is the purpose of that?

A. If the -- if the flange is raised up off the deck by virtue of little irregularities, the granular bentonite, if water ever were to hit it and make it hydrate, the granular bentonite could ooze right inside the building underneath the flange, underneath those little gaps under the flange, so it's important for that granular bentonite to work that the flange be seated evenly all the

installations of pure bentonite a quarter of an inch thick to sometimes under certain circumstances be inadequate to stop water.

I personally always design -- I design waterproofing systems when I do use bentonite of a half inch minimum of pure bentonite, so if you consider a percentage of an eighth inch versus a hundred percent of a half inch, there's quite a difference in bentonite content, poundage per square foot. It's just based on my years of experience of observing bentonite installations that work, that don't work. I have a very strong feeling that the amount of bentonite in the Swelltite is -- can be inadequate under certain circumstances.

Q. Is it inadequate under the circumstances existing at Promenade?

MR. REILLY: Objection, lack of foundation.

A. I believe it is.

BY MR. STEPAN:

Q. Assuming that you didn't put that conclusion in your final report, why would you not?

A. Perhaps too anecdotal.

Q. What do you mean by that?

A. I could not back it up with any test results.

Q. It's simply based on your own experience?

understand soil compaction adequately or if they want to hire somebody for that purpose.

Q. Are you abe -- basically your testimony now is that you're aware that there were some -- after completion of the project and discovery of leaks, there were repairs made; is that right?

A. Yes.

Q. Are you able to determine -- are there any -- are you able to point to any of the evidence you saw, the efflorescence or any leak evidence, to say this leak occurred because of something with the original construction versus occurring because of something that was done during repair?

A. In some cases I'd be able to, yes.

Q. In what cases would you be able to do that?

A. There are areas -- there are courtyard areas completely remote from any subsequent repairs that have considerable evidence of infiltration directly below them.

Q. How about at the areas where there are repairs? Would you be able to determine whether it was a repair that led to the leak or it was the original construction?

A. Actually, since no active flowing leak water was observed underneath any repairs during any of my site visits, I can't -- I can't say for sure. Of course, there

was the remaining evidence of previous leaks that may have predated the adjacent repair.

Q. You don't know one way or the other?

A. That's correct.

Q. And by "evidence," you're referring to efflorescence or stains, things like that?

A. Correct.

Q. You don't know that -- would it be fair to say that you don't know the age of any given stain or evidence of leaks out there?

A. That would be fair to say generally, yes.

Q. Were you ever told about any repairs that Promenade made itself, whether they hired somebody to do it or actually did repairs itself, to the courtyard?

A. I can't say if -- I don't know if there were some repairs that they did on their own or not.

Q. The samples -- you removed samples of the waterproofing from the system and you found water beneath them and the water-soluble film still intact. Is the water beneath them, was that -- I'm just trying to get a better sense of what kind of condition that was. Was it damp to touch? Could you feel the water?

A. It wasn't flowing water, but it was certainly damp enough to touch with your fingers and bring it up and moisten your hands.

Q. Did you talk to Peter Ramme about Southwind at all?

A. I might have. It was either Tom Healey or Peter Ramme that brought it up initially. I think it was Tom Healey though, but I've never been out to the site. I don't even know where it is.

Q. Do you believe the installation of gutters along the roof lines on the courtyard sides of the buildings would have helped?

A. Gutters by themselves, no.

Q. Gutters with anything else?

A. The point is to discharge the water off the courtyards entirely. Gutters collect the water, but the collected water then has to be routed off the courtyard entirely or plumbed into those drains.

Q. If the gutters had leaders that led away from -- deposited the water away from the courtyards, would that have helped?

A. That would have helped, yes.

Q. Or if it funneled the water, somehow plumbed it into the drain, was hooked up to the drain system somehow?

A. That would take some of the demands off any waterproofing system, yes.

Q. Earlier today you were asked some questions

Exhibit 808, the Volclay manufacturer's literature. Did you testify on day one of your deposition that you had reviewed Volclay specifications and installation manuals?

A. Yes, that's correct.

Q. Were you able to determine based on a few destructive test openings you made and what I have to gather from your report was somewhat limited ability to observe everything in those openings whether these installation specifications that applied in 1997 when this project was constructed were complied with or not? Can you even tell?

MR. RAU: Object to the form.

MS. HEYER: Same objection.

MR. RAU: Mischaracterizes the evidence.

THE WITNESS: Do I not answer?

MR. RAU: Go ahead.

A. On the horizontal installation of the Swelltite, the answer is no because I encountered no seams as I previously testified to. As far as I know, the horizontal application of Swelltite may have been installed properly.

BY MR. BROWN:

Q. Now, you were asked by Mr. Hull whether you observed any product called term bar during your investigation. Do you remember that question?

A. That is correct.
Q. And you also understand that -- based on your review of the Swelltite literature, that the material itself is to terminate -- by "material" I mean the Swelltite 3000 -- is to terminate an inch or two below the top of grade; correct?
A. The proper installation of Swelltite, regardless of what the literature says should be to terminate it far lower than that.
Q. What's your source for that statement, sir?
A. It's an ineffective material as the lateral pressure decreases the closer you get to grade. Generally speaking, I would expect that lateral pressure to be insufficient to a depth as low as 10 to 12 inches.
Q. Now, what expertise in any industry would actually determine effectiveness of lateral compression at various depths of soil? Would that be a soils engineer, a geotechnical engineer, a hydrological engineer? Who would do that if you even know?
A. It could be -- there's several professionals that would be qualified to put together a test to test something like that.
Q. One of which wouldn't be your profession; correct?
A. No, I would think an architect who specialized

in waterproofing given the resources and the proper laboratory could put together a test like that.

Q. Did you conduct such a test during your investigation in this matter?

A. No.

Q. Why not?

A. Because based on 16 years of experience of -- and understanding how bentonite works and requires that lateral pressure, I didn't feel it was worth the time and money for Healey Ramme, who hired me, to do such a test.

Q. Did you ask them if they could afford a little bit more money to conduct that kind of a test that's evidently so important?

A. No. It's --

MR. RAU: Don't answer that question..

BY MR. BROWN:

Q. You can answer the question.

MR. RAU: I told him not to. It's argumentative.

BY MR. BROWN:

Q. Did you request any further funding to conduct that kind of a test?

MR. RAU: You can answer that.

A. No.

BY MR. BROWN:

Q. Now, my real question that you never did answer is what's your source? What documentation, what literature in the field, what learned treatise, as that term has been defined to you today already, says Swelltite 3000 is not to be installed within 12 inches of the top of grade?

A. With respect to Swelltite 3000 specifically, none.

Q. How about Swelltite of any model or any brand?

A. None.

Q. How about any bentonite sheet membrane waterproofing? What literature, what learned treatise in the industry specifies not to install that material within 12 inches of the top of grade?

A. There isn't anything I've read with respect to a marketed waterproofing product.

Q. Now, your attorney made available some additional documentation that supposedly you used or relied upon in formulating your opinions. Are you aware of that just recently?

A. Repeat the question.

Q. Are you aware of any recent production by your attorney of some additional documentation that was related to us as documentation you relied upon in part to formulate your opinions? Are you even aware of that?

Q. Can you show me one drawing in this document or one sentence in here that supports the assertion that you have made that bentonite is not to be installed within one foot of the top of grade?

A. I'd have to read that. It's been too long since I've read through it.

Q. All right. Well, since I'm limited in time, I'm going to give you that opportunity to read it. If you find any statement like that, then I'm going to ask you to identify it through your attorney and have him distribute copies to us.

A. I can do that.

Q. You've testified already today that you are unable to trace the source of any leak, either the eight that you observed or any other leak that you ever heard of, to any discrete source?

A. To any specific source --

Q. Yes, sir.

A. -- you're right.

Q. And you've also agreed that there's a myriad of possibilities, possible routes of entry into the buildings and garages of moisture --

A. Yes, that's true.

Q. -- correct? Some of which could include the vinyl siding? That was one; correct?

A. Yes.
Q. You didn't investigate that possibility; right?
A. I didn't -- I didn't remove any vinyl siding.
Q. Did you conduct any hose testing on the vinyl siding out at the site to see if you observed any water that infiltrated down behind the waterproofing system?
A. No, I did not.
Q. That wouldn't cost any additional money, would it, to conduct that kind of a test?
A. No.
Q. And another of the possible areas of entry of water infiltration or water defeating the waterproofing membrane system would be over the top of grade that was installed too high in the courtyards, and you observed and identified that condition out there, didn't you?
A. That's -- yes.
Q. Another one, as you've described today, was through the cap stones at the ends of the courtyards; correct?
A. That's correct.
Q. Another one was through the wood in the wood posts that were drilled directly into the precast; correct?
A. Through the penetration of the anchorage of the wood posts, yes.

Q. And through the wood itself which is touching directly on the precast and the condition as it existed prior to any repairs of the project; correct?
A. That's correct.
Q. Now, in all of those and any of the other cases that you've identified, the water can get right into the concrete composition of the precast planks? That's a permeable construction material; correct?
A. That's correct.
Q. And those are hollow-core planks; is that right?
A. That's correct.
Q. And once in the hollow cores, the water can travel conceivably any direction until theoretically it finds some route out of those cores --
A. That's --
Q. -- correct?
A. That's true too.
Q. Now, is it a true statement that in any of those possibilities that you've described and some of the examples of which I just gave you, that if water gets into those planks, those hollow cores of those planks, the cement itself surrounding those cores would or should get moist?
A. Depending on the amount of water, it could,

A. Yeah.
Q. All right. I want you to assume that for whatever reason, the precast level -- the precast deck was just going to remain flat, no sloping concrete topping was going to be applied. Would that be a concern for you as somebody being asked to bid a system such as you've designed here?
A. As a waterproofing contractor?
Q. Yes, sir.
A. Yes, it would concern me.
Q. And would the system that you've even proposed here, and it's all described as far as the various components in the drawings and then the price list, would just the waterproofing components in that system alone such as you said Brent Anderson definitely would install, would that be adversely impacted if all the other conditions that you've described in your report were still in existence?
A. Yes.
Q. And that includes all the drain details that you've talked about, the soil details, the level of the soil and those things. In other words, would it really matter in terms of the efficacy of the waterproofing whether the kind of waterproofing components that were in what Brent Anderson evidently proposed here or any other waterproofing system, if all those other conditions