**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Court File No. 00-CV-987 JEL/JSM

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Counter-Claimant,

v.

Westfield Insurance Company,

Counter-Defendant,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Promenade Village Townhomes, L.L.C. and Valley Forge Insurance Company,

Third-Party Defendants,

and

Weis Builders, Inc.,

Cross-Claimant,

**PROMENADE VILLAGE TOWNHOMES, L.L.C.'S TRIAL BRIEF**

v.

Promenade Village Townhomes and Valley Forge Insurance Company,

Cross-Defendants,

and

Promenade Village Townhomes, L.L.C.,

Cross-Claimant,

v.

Weis Builders, Inc.,

Cross-Defendant,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing by Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., and Colloid Environmental Technologies Company,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Fourth-Party Plaintiff,

and

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant.

and

| | |
|---|---|
| J-Berd Mechanical Contractors, Inc., | ) |
| Third Party Defendant and Fourth Party Plaintiff, | ) |
| v. | ) |
| Mikesh, Inc., | ) |
| Fourth Party Defendant. | ) |

## INTRODUCTION

Plaintiff (Cross-Claimant) Promenade Village Townhomes, L.L.C. owned Promenade Oaks. Promenade Oaks is a 282 unit townhouse apartment rental complex plagued by water leaks from the day it was completed in 1997, through the day it was sold at a discounted value in 2002. The leaks were due to negligent design and construction of the waterproofing system for landscaped plaza decks between the buildings in each of six townhouse clusters. These plaza decks were adjacent to living areas and formed the roof of the garage. (*See* Illustration).



This trial is about Promenade's claims against Weis Builders, Inc. for breach of contract and warranty and for negligence. Promenade has no claim against anyone else in this litigation; of additional parties in this case are implicated through contribution and indemnity claims.

Promenade's case against Weis arises out of its negligent and defective design and construction of the plaza deck waterproofing, which Weis undertook to "design and build." Promenade's damages total over $17 million dollars.

**FACTS**

In 1996, Promenade contracted to have Weis to build six townhome building complexes with 282 units at the intersection of Yankee Doodle Road and Lexington Avenue in Eagan, Minnesota. At the time it was built, it was the only luxury Class A rental property in Eagan. The cost of constructing the six buildings was $19,102,763. Weis was the general contractor on the project and was responsible for all construction. Promenade's architect, BRW Elness Architects Inc. (n/k/a Elness Swenson Graham Architects, Inc., "ESG") a third-party defendant, was responsible for the architectural design of the project with one important exception; Weis assumed responsibility for both design and construction of the plaza deck waterproofing and the mechanical systems.

The Promenade project was distinctive because the two-story townhomes all faced a landscaped inner plaza that covered an underground parking garage. Each living unit had access to a parking garage via its own separate entrance. A schematic view is shown below.



As you can see, a leaking deck will leak into the garage and may leak into living spaces. Since the construction in 1997, the project experienced significant water leaks. According to a September 12, 1997 Promenade report, 77 of the 282 units and the garages underneath all the inner plazas experienced water leakage. Leaks continued for the entire time Promenade owned the project and negatively affected the project's sale in 2002. Between the project's completion and sale, Promenade incurred damages, including lower rents, increased vacancy, lost revenues, increased expenses, and, ultimately, a property with significantly diminished value. There is no factual dispute about the presence of leaks, nor is there any dispute that these leaks damaged Promenade.

**A. <u>The Assignment of Responsibility for the Waterproofing System</u>**

In general, the architectural firm, ESG, designed and provided drawings for the Promenade Oaks project. However, Weis accepted the responsibility to design and build the waterproofing system to prevent water on the plaza from entering the dwelling units and the garage below. Weis' contract with Promenade included the architectural drawings (which the contract between Weis and Promenade incorporated) that explicitly stated that the plaza deck waterproofing was "design/build." Weis admits that it assumed "design/build" responsibility.

The only thing Weis did to fulfill its obligation to design and build the waterproofing system, was to subcontract the work to Third-Party Defendants Waterproofing By Experts and J-Berd Mechanical Contractors, Inc. ("Waterproofing By Experts" and "J-Berd"). Waterproofing By Experts was subcontracted to design and build the plaza deck waterproofing system. However, the only thing Waterproofing By Experts did to discharge its design/build obligation for the Waterproofing system was to recommend and install a subsurface waterproofing membrane manufactured by third-party defendant Colloid Environmental Technologies Company ("CETCO"). The plaza waterproofing has never worked. J-Berd's subcontract with Weis obligated it to design and install drain and piping for surface water runoff and subsurface drainage of water from the plaza

soil. J-Berd only calculated pipe size and installed drains to discharge its responsibility. The subsurface drainage system doesn't drain.

Despite the subcontracts, under its general contract with Promenade, Weis maintained ultimate responsibility in both contract and tort for the work of Waterproofing By Experts and J-Berd. The 1987 General Conditions contained in the Standard Form of Agreement Between Owner and Contractor (contractor cost plus a fee) AIA between Weis and Promenade provided as follows:

> 3.3.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, subcontractors and their agents and employees and other persons performing portions of the work under a contract with the Contractor.

Furthermore, Paragraph 3.3.3 of the same document provided that Weis was not relieved of its obligation to perform the contract in accordance with the "contract documents either by activities or duties of the Architect [ESG] in the Architect's administration of the contract."

In the late summer and early fall of 1996, Weis solicited bids for the design and installation of the plaza deck waterproofing. Weis received three bids from waterproofing subcontractors and met with them prior to making a final presentation to Promenade. The willingness of CETCO to supervise installation of the membrane and to issue a warranty made Waterproofing By Experts' proposal attractive to Weis. Accordingly, in late October or early November, Weis selected Waterproofing By Experts, a "CETCO-approved applicator," to design and build the water proofing system. Waterproofing by Experts signed the subcontract with Weis March 10, 1997.

Though Waterproofing By Experts was a "CETCO-approved applicator," it did not have substantial experience applying the CETCO membrane, Swelltite 3000. Both CETCO and Waterproofing By Experts admit that the training required to become approved involved watching, at most, several hours of video tape and attending CETCO-sponsored sales conferences; none of the video tapes concern the overall design of waterproofing systems but rather deal only with application techniques for specific types of CETCO materials. Waterproofing By Experts were not

really "experts" and CETCO's representative, John Weigand, designated to supervise Waterproofing By Experts' installation, had no previous experience supervising the installation of the CETCO materials.

Neither Weis nor Waterproofing By Experts engaged in any meaningful design work for the plaza deck waterproofing system. In fact, for "design drawings," Waterproofing By Experts relied on the generic diagrams in CETCO's literature rather than creating drawings, which would have involved some analysis and appreciation of the specific characteristics of the project.

**B. <u>The Waterproofing System</u>**

The way the waterproofing system was supposed to work was this: The surface of the plaza was supposed to be sloped so that surface water would travel to surface drains that were connected to the storm sewer system. Water that reached the subsurface was to be contained by a membrane installed on the precast concrete plank floor and on the vertical walls of the courtyard plaza. This created, in effect, a "bathtub" with drains. The membrane was intended to act as a barrier between the plaza soil on the one hand and the garage below and the dwelling units adjacent on the other while subsurface water percolated through the soil to be carried away by the subsurface drains. For the reasons discussed below, the subsurface system never worked. The membrane leaked. The water did not drain away.

The Swelltite membrane was supposed to have worked this way: Swelltite contained bentonite, a clay-like substance which, when hydrated and subjected to compression, expands and forms a watertight seal. The bentonite was sandwiched between a water-soluble film facing the concrete deck and a waterproof liner that acted as the interior surface of the "bathtub." On the deck side, the water soluble film was supposed to dissolve upon exposure to water allowing the bentonite to expand and seal against the deck. Swelltite was designed such that if the liner was penetrated or if water circumvented the waterproof liner, the bentonite reacted with the water, swelled, and sealed off further water intrusion. The water-soluble film, according to CETCO, is

present only to "eliminate the necessity of using non-biodegradable release paper." Fourth-party defendant Chris Craft International, Inc. ("Chris Craft") which was sued by CETCO, manufactured the water-soluble film in place at Promenade. The film did not dissolve, negated the bentonite, and proved to be **not** waterproof.

## C. What Went Wrong

Weis' abandonment of its contractually assumed responsibilities and its negligence is exemplified in its failure to account for and incorporate three significant changes in the design and installation of plaza deck waterproofing system. Each of these changes occurred between the date Weis selected Waterproofing By Experts as its subcontractor and the date Waterproofing By Experts actually signed its subcontract with Weis. Each change had a significant impact on the overall integrity of the plaza waterproofing system. Those three changes were as follows:

1. As originally designed, bottom load-bearing trusses supported the floors of the units. This original design contemplated that only concrete masonry would be exposed to the interior of the courtyard. In late 1996, because of supply problems, Weis advised ESG that top load-bearing trusses would be needed for one side of each of the six plaza courtyards; ESG formally changed the drawings on November 11, 1996. The result was that the wood members forming the top load-bearing trusses were exposed to the interior plaza fill soil. This change made waterproofing more difficult.

2. Because the waterproofing was design/build, no provision for the plaza deck waterproofing was made in the architectural drawings or in the project's specifications but, as originally designed, the plaza stoop support posts rested on concrete footings formed and poured on top of the plaza deck precast concrete. Neither Weis nor Waterproofing By Experts thought through the problem of how the footings were to be waterproofed. In December of 1996, Weis changed the design to avoid the difficulties of pouring concrete in the winter by omitting the concrete footings altogether. Consequently, the wood posts rested directly on the precast concrete deck in the courtyards. This was going to make waterproofing harder as well.

3. The drains originally specified for the subsurface drainage of the plaza deck were intended to be flush with the level of the precast concrete deck. In November of 1996, Weis and J-Berd agreed to use a different drain which extended 2 to 2 ½ inches above the precast concrete deck. These drains prevented the free flow of water out of the plaza deck system and created a moisture-rich environment within the plaza deck fill; this affected the wood

posts and every other part of the system where water could circumvent the membrane.

When Waterproofing By Experts initially provided Weis its bid for the plaza waterproofing, it used the architectural drawings and plans provided to it in August of 1996. None of the above-referenced changes were incorporated into the drawings Weis initially provided to Waterproofing By Experts. Each change had a significant effect on the waterproofing installation, and neither Weis nor Waterproofing by Experts adequately adapted the waterproofing to the change.

First, the Swelltite membrane was not designed to be used with wood. The change from a bottom to top loading-bearing truss resulted in exposed wood on half of the interior plaza walls. Notwithstanding CETCO's literature's assertion that Swelltite membrane would not work with wood, Waterproofing By Experts, with CETCO representatives purportedly monitoring the Swelltite membrane installation, allowed the Swelltite membrane to be applied to the wood.

Second, the wood posts were resting on the precast deck when Waterproofing By Experts arrived at the jobsite. Instead of waterproofing membrane being applied to the originally designed, but later abandoned, concrete footings, Waterproofing By Experts detailed around the wood posts, which were attached to the precast deck with metal brackets and concrete nails. Even with Waterproofing By Experts' detailing, significant portions of each wood post were exposed to the moisture-saturated plaza deck fill. Only if the wood posts were protected from exposure to any water – in other words, completely encased – then, and only then, would water permeating the wood and traveling to the precast deck be prevented.

Finally, the drain change resulted in water being required to reach the height of the subsurface drain at least two inches above the plaza deck before being diverted into the storm sewer system. Thus, the plaza decks were exposed to constant hydrostatic pressure. This exacerbated another flaw in the waterproofing system, the use of fill with poor drainage qualities. As a result, the plaza sidewalks heaved during the freeze-thaw cycle. The heaving of the plaza sidewalks and the

saturation of the unprotected portions of the wood posts were direct results of the use of fill with poor drainage qualities and near constant hydrostatic pressure.

Compounding the above-noted problems with the plaza deck waterproofing system, discovery revealed at least three other installation problems. All of these problems were identified prior to the retention of experts and establish that water circumvented the Swelltite membrane that Waterproofing By Experts installed with CETCO's supervision.

First, Weis' representatives testified that the waterproofing applied to the vertical walls of the courtyards terminated below grade. This allowed water to overflow the bathtub and was exacerbated by the absence of flashing over the terminus of the vertical waterproofing. The Weis/Waterproofing By Experts contract contemplated flashing; Weis and Waterproofing By Experts disagree about who was responsible for installing the flashing.

Second, CETCO's literature describing the installation of Swelltite membrane on a horizontal subsurface deck calls for a "slope to drain," facilitating subsurface drainage. It is undisputed that no slope to drain exists nor was any ever called for by any entity involved in the "design/build" of the waterproofing.

Third, photographs of the installation of the waterproofing show that, at times, the Swelltite bentonite membrane was exposed to water prior to being covered with fill. CETCO's representatives testified that bentonite that is hydrated prior to being subjected to a load loses its efficacy.

**D. <u>The Leak Problems and Efforts to Solve Them (In Vain)</u>**

In July of 1997, when the plaza decks were almost completed, and after a heavy rain, five of the six buildings began to experience a significant number of water leaks in the garages and the dwelling units. This rendered garage spaces unusable and caused dwelling units to experience wet carpet and wet walls, which the residents did not like. Promenade notified Weis of these problems, and Weis began attempting to fix the leaks. From July of 1997, until the summer of 2001, Weis

assumed responsibility for and attempted to solve the leak problems, spending approximately $700,000.00 in the effort and disrupting the residents with construction equipment and activity. Nevertheless, during the initial rent-up period which ran through December, 1997, Promenade was successful in renting up the project at premium rates befitting a luxury rental complex. This was before either Promenade or the residents understood the continuing nature of and extent of the leaks.

Initially, Weis thought the leaks were caused by landscaping wood chips clogging the surface drains in the plaza, which in turn caused the "bathtub" to overflow. Steps were then taken to make sure that the drains were clear and the landscaping wood chips were replaced with rock. At the time, no one considered this a major problem because it was remedied easily. As it turned out, this was not the problem, or, rather, was only one of many. The leaks continued.

The leaks subsided over the winter, but in the spring of 1998, more leaks appeared. Some of the leaks appeared in the same locations as in 1997; others were new. Additional stoops were injected with waterproofing material. Digging occurred around virtually all of the front door stoops, drain tile was installed and the level of the Swelltite membrane on the vertical surfaces between the stoops was raised. This required the removal and replacement of siding and the repair and replacement of the waterproofing. All of these remedies were designed to fix the leak problems that were presumed to be the result of the application of Swelltite membrane to wood, the termination of the waterproofing below grade and the absence of flashing at the termination of the waterproofing. During this period, there was a lot of commotion on the plazas. That and the leaks themselves were affecting the residents and were inconsistent with a luxury rental complex. In some instances, to assuage resident unhappiness, Promenade offered concessions to residents. The project was experiencing higher turnover and vacancy and, consequently, Promenade was unable to raise its rents commensurate with the market.

Even with the stoop and siding work done in 1998, leaks continued to appear. Gary Nelson, a Weis employee in charge of attempting to resolve the problem, determined that the wood posts supporting the stoops acted as wicks and conducted water down to the concrete deck thereby bypassing the first layer of the waterproofing and the detailing around the posts. This problem was a direct result of the deviation from the original design calling for concrete waterproofed footings - all a consequence of Weis' not wanting to pour concrete in the winter. Once at the deck, the water was free to travel under the Swelltite because 20% of the membrane had undissolved film preventing the bentonite from sealing the deck.

Weis concluded that to resolve the wood post wicking phenomenon, the areas around each post had to be dug up. Weis represented to Promenade that it would repair all the posts. The waterproofing membrane around where the posts penetrated was patched, the post sawed off and supported by a concrete masonry unit. Weis did not repair all the posts and ceased this remedial work in mid-summer 2001. There is some evidence of continued leakage in garage areas directly underneath repaired posts although the source of this water cannot be conclusively determined to be from posts.

Parts of the townhomes were unusable periodically; and, since 1997, the nature, location and extent of the water leaks changed from month to month and season to season. But the leaks remained a chronic unsolved problem. Each of Weis' solutions acted as a "band-aid." None of Weis' solutions solved the problems. Other than the leaks, the project was well-run and was a first-class property that should have led the market, but did not. Promenade's rent increases lagged the market substantially. Ultimately, on December 12, 2002, Promenade sold the entire complex for (in round numbers) $24,500,000 to Windsor Realty Fund III-B Investors Corporation.[1] Had the project

[1] There is, in addition to the $24,500,000 sale price, additional consideration to be paid three years after the closing, namely, a fund of $1.5 million from which will be subtracted any claims made by tenants, including mold damage injury and costs expended by the buyer in this litigation.

been built properly and not experienced the water leaks, it would have increased in tune with the market and would have been worth $38.8 million dollars as of the date of sale.

**E.** **<u>The INSPEC Report</u>**

In the late winter/early spring of 2001, Promenade retained INSPEC, Inc. ("INSPEC") to investigate the leak problems and to act as an expert witness in this litigation. David Campbell, INSPEC's waterproofing department manager and a licensed architect with 16 years of experience in the study, investigation and design of below-ground waterproofing systems, supervised and led INSPEC's investigation.

The INSPEC investigation relied upon the following information:

1. The original construction documents and recorded history of leaks and repairs;

2. A visual survey of evidence of past and present water infiltration in the garages of all six buildings; and

3. The observations from 20 destructive test openings (DTO's) at strategic locations throughout all six plazas.

The conditions that currently exist at the plaza decks are best illustrated in drawings found in the INSPEC report. The various layers on the plaza deck are in the following order from the surface down: soil, insulation, drain board, Swelltite membrane, concrete.




Sod.
Earth backfill. (approximately 2')

2" extruded polystyrene insulation. Foamular.

Composite drainage sheet. A "dimpled" plastic core with a woven filter fabric adhered to the top. Volclay Aquadrain 20H.

Waterproofing membrane. A bentonite containing compound sandwiched between an HDPE sheet on the top and a clear film on the bottom. Volclay Swelltite 3000. Parts of bentonite not in contact with concrete because of the undisolved film. Water found below membrane.

Liquid-applied flashing at precast keyway joint. Volclay M-2000 liquid flashing. (Material was poorly bonded at some locations. Traces of moisture underneath.

Concrete deck.

Grouted keyway.

INSPEC concluded that the waterproofing system was failing because:

1. The precast decks were not topped to facilitate a slope to the subsurface drains;

2. The courtyard drains were not draining adequately because the drains were being clogged (a result of not wrapping the drains with crushed rock and then filter fabric);

3. The subsurface drains required more than 2 ½ inches of hydrostatic pressure before draining; and

4. At 19 of the 30 drains, soil settled around the collar of the surface drain so surface water was blocked.

INSPEC also observed the following installation errors:

1. There were tears in the filter fabric drainage sheet that allowed fines to clog the core of the sheet;

2. The filter fabric drainage sheet was not interlocked properly and in some instances installed upside down;

3. At several locations the top vertical edge of the drainage sheet was not wrapped in filter fabric which ultimately allowed fines to clog the sheet;

4. The flashing over grouted keyways on the concrete precast was poorly bonded, which resulted in water migrating under the flashing;

5. The fill was uneven, did not provide for uniform drainage, had a high water retention rate, and was filled with large rocks that could penetrate the waterproofing membrane;

6. The drain tiles Weis installed in a subsequent attempt to remedy the leaks were not buried deep enough to appreciably alleviate water accumulation;

7. The vinyl siding extended below grade with no waterproofing;

8. There was no counter-flashing where the waterproofing terminated below grade.

Finally, INSPEC observed that CETCO's product failed in at least four DTO locations and water was present which should have dissolved it. At those locations, approximately 20% of all DTO's, the water soluble film did not dissolve. This allowed water to migrate under the membrane, and it prevented the water from hydrating the bentonite, thereby negating the bentonite's waterproofing capabilities. Some of these various problems are illustrated below:



Drain board—improperly installed; fabric ripped allowing sediment to clog and impede water flow.

Waterproofing—installed partially hydrated.

Waterproofing—not sloped to drains.

Drain board missing.



No counterflashing was used on the posts to ensure water would not seep behind the waterproofing. Further exacerbating the problem was the fact that wood acts as a conduit for water.

Wood support post at entry canopy. Notice post is setting directly on precast deck.

Concrete stoop at ground level. Post passes through slab.

Earth backfill.

Wood post exposed directly to moisture in backfill

Irrigation line.

Waterproofing flashing, without counterflashing.

Waterproofing detailed in drawing on page 13 *supra*.

Concrete deck

In the course of discovery, a number of other building projects using CETCO bentonite membranes were disclosed. There was at least one other building project involving Swelltite membrane where the water-soluble film did not dissolve and which experienced significant leakage problems. CETCO has since discontinued its use of the water-soluble film and reverted to using release paper. CETCO will try to persuade a jury that its discontinued use of the water-soluble film was a cost-saving decision and had nothing to do with the fact that its failure to dissolve negated the waterproofing capabilities of the bentonite. In sum, the methods to facilitate subsurface drainage were poorly designed, and the membrane itself failed to work as intended.

## LEGAL ANALYSIS

The basic legal claims involved in this case are straightforward and involve negligence, breach of contract and breach of warranty. Weis promised and was obligated to provide Promenade with a plaza deck that was waterproof. The plaza deck was never waterproof and Promenade is entitled to the damages that result from Weis' breaches of contract and warranty and its negligence.

### A. Weis is Liable for Negligence.

Weis was negligent in the construction and design of the waterproofing at Promenade Oaks. The essential elements of a negligence claim are: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) the breach of the duty was the proximate cause of the injury.

Schmanski v. Church of St. Casimir, 243 Minn. 289, 292, 67 N.W.2d 644, 646 (1954). Each of these elements is met in this case.

Weis owed a duty of care to Promenade. Minnesota courts consistently hold that "a contractor has a duty, independent of the contract itself, to erect a building in a reasonably good and workmanlike manner." Arden Hills North Homes Ass'n v. Pemtom, Inc., 475 N.W.2d 495, 499-500 (Minn. Ct. App. 1991). "[A] contractor owes his contractee a duty to use due care in the performance of his undertaking and that … duty is **nondelegable**" Brasch v. Wesolowsky, 138 N.W.2d 619, 623 (Minn. 1965) (emphasis added). Even where the general contractor does not perform the actual work, it is "bound [ ] to respond in damages to plaintiff for unworkmanlike performance **within the scope of his undertaking**, notwithstanding the fact that someone else may have actually performed the work." Id. (emphasis added). As the general contractor, and as the person responsible for design of the waterproofing system (including drainage), Weis had a duty to Promenade to use reasonable care in designing and building the plaza deck to assure there were no leaks; this duty existed regardless of whether Weis, J-Berd, or Waterproofing by Experts did the work.

Weis breached its duty of care when it or its subcontractors failed to design and build the townhomes in a workmanlike manner. Weis' liability in this regard derives from a variety of sources. First, the contract between Weis and Promenade contains a provision wherein Weis contractually agrees to be responsible for the negligence of its subcontractors. Second, Weis is liable for the acts and omissions of Waterproofing By Experts and J-Berd under hornbook principles of agency law. Finally, Weis is, obviously, liable for the acts and omissions of its own and its employees. As discussed above, the problems in the design and installation of the waterproofing system ran throughout: Weis failed to communicate initial design changes that affected waterproofing to Waterproofing by Experts; the waterproofing terminated below grade with no counterflashing; the waterproofing was installed after it had partially hydrated; the plaza surface did not slope to drain

contrary to manufacturers directions; the earth fill was of inferior quality; the wood posts were waterproofed improperly; the drains were improper, impeding drainage and actually creating pools of standing water; the membrane itself was defective. In sum, neither Weis nor its subcontractors used the care, skill and diligence others in the industry would have used under similar circumstances. These failures proximately caused leaks and resulting damages to Promenade.

**B. Weis Breached its Contract and Warranty With and to Promenade.**

Weis breached its contract with Promenade. A contract is breached when there is a failure to perform a substantial part of the contract. See Associated Cinemas of America, Inc. v. World Amusement Co., 201 Minn. 94, 99, 276 N.W. 7, 10 (1937); McGuire v. J. Neils Lumber Co., 97 Minn. 293, 297, 107 N.W. 130, 132 (1906). When Weis contracted with Promenade to build the Promenade Oaks, Weis agreed to use its best skill, efforts and judgment; furnish efficient business administration and supervision; and perform its work in the best way and most expeditious and economical manner. See Contract between Weis and Promenade, Article 3.1. In addition, Weis warranted that its work would be of good quality, free from improper workmanship, and in conformance with the architect's drawings and specifications. Id. at 3.2. Weis further agreed to design and build waterproofing for the plazas.

Weis failed to perform a substantial part of the contract when it failed to design and build waterproof plazas; constructed the townhomes in an unworkmanlike manner; failed to supervise the subcontractor's installation of the waterproofing system; and failed to use its best skill, efforts, and judgment with regard to the waterproofing. As such, it is liable in damages for its breach of contract. By affirming that it would design and build a waterproof plaza deck, Weis provided Promenade with an express warranty. Just as with its breach of contract, the fact of the leaks demonstrates, unequivocally, that Weis breached its warranty to Promenade and should be liable in damages for the breach of that warranty.

### C. **Promenade has Suffered Damages from Weis' Negligence and Breach of Contract and Warranty**

Financially Promenade was unable to repair the project, to refinance it, or to continue to make mortgage payments; therefore, it sold the project on December 12, 2002. Promenade sold the project for $24,500,000 (in round numbers) plus $1.5 million which was held back to cover the buyer's attorneys' fees related to this litigation and any other costs related to potential tenant claims for mold or other problems. This hold-back fund or the balance, if any, will be released on December 12, 2005. If the project had had no water problems, expert testimony will establish that its value on the date of sale, December 12, 2002, would have been $39.8 million dollars. Promenade seeks to recover this difference in value, approximately $14.3 million dollars. Further, Promenade seeks damages for its lost use of the buildings while Promenade owned the buildings, including lost rents. See *In re* Commodore Hotel Fire & Explosion Cases, 324 N.W.2d 245, 248 (Minn. 1982).

The three basic elements of Promenade's damages are as follows:

1. Difference in value from sale of the property: $14,300,000;
2. Income loss from 1998 to 2002: $2,700,000; and
3. Other costs related to the leaks: $190,000.

Total: $17,190,000 (assuming the present value of the balance of the hold back fund to be $1,023,667).

Under Minnesota law, under contract and negligence theories, where property is damaged but not totally destroyed, the plaintiff may elect to measure damages based on either the difference in value of the property before and after the harm or the reasonable cost of repair. See Lesmeister v. Dilly, 330 N.W.2d 95, 102-03 (Minn. 1983); *In re* Commodore Hotel Fire & Explosion Cases, 324 N.W.2d at 248; Asp v. O'Brien, 277 N.W.2d 382, 384 (Minn. 1979); O'Connor v. Schwartz, 304 Minn. 155, 158, 229 N.W.2d 511, 513 (1975); Hart v. North Side Firestone Dealer, 235 Minn. 96, 98, 49 N.W.2d 587, 588 (1951); Kopischke v. Chicago, St. P., M. & O. Ry. Co., 230 Minn. 23, 30-31, 40 N.W.2d 834, 839 (1950); Restatement, Second, Torts § 928 (1979).

Here, because Promenade has sold Promenade Oaks, it seeks to recover the diminution in value between the contracted for building and the building actually delivered. See Wentworth v. Air Line Pilots Ass'n, 336 A.2d 542 (D.C. App. 1975) (holding that after a property is sold the proper measure of damages is diminution in value). Recovery of estimated costs of repair does not compensate Promenade adequately for its damage, because the property was not repaired but was sold, is the cost of repair relevant to Promenade's damages case; cost of repair, however, does show that Promenade was forced to sell the property.

In addition, Promenade is entitled to damages for its loss of use of the buildings, including its lost rents. *In re* Commodore Hotel Fire & Explosion Cases, 324 N.W.2d 245, 248 (Minn. 1982) (allowing damages for loss of use and for lost profits caused by damage to hotel); Northern Petrochemical Co. v. Thorsen & Thorshov, Inc., 211 N.W.2d 159, 165-66 (Minn. 1973) (allowing damages for loss of use and lost profits for defective construction of industrial building); R.E.T. Corp. v. Frank Paxton Co., Inc., 329 N.W.2d 416, 421 (Iowa 1983) (allowing damages for loss of rentals for defective construction of apartment complex and for diminution of value).

R.E.T is factually similar to this case and instructive on the recovery of damages for the defective construction of an apartment complex. In R.E.T., an apartment complex was built using the wrong type of insulation. 329 N.W.2d at 418. As a result, the apartments were cold and tenants experienced high heating bills. Id. While the problem was being diagnosed and fixed, which took several years, the owners were forced to give tenants reductions and offer special rates to induce rentals. Id. The vacancy rate also increased and the owners were not able to bring in enough revenue to cover their costs. Id. As a result, the owners were forced to sell the property at a substantial discount. Id. The owners sued the construction company for breach of contract, negligence, and breach of warranty. Id. They were awarded damages for repair costs they had expended prior to sale, lost rents, and the diminution in market value. Id. The Iowa Supreme Court upheld the award of damages stating:

> The purpose of a damage suit is compensation; the goal is to place the injured party in as favorable position as though no wrong had occurred. Damages are limited to the actual loss. **In defective construction cases, damages may include diminution in value, cost of construction, and completion in accordance with the contract, or loss of rentals.**

Id. at 421 (emphasis added) (citations omitted).

Just as in R.E.T., Promenade has suffered loss of rent from the defective construction of the Promenade Oaks. At trial, the evidence will show that the Promenade Oaks experienced increased vacancy and turnover rates that were higher than the market average. In an effort to keep the vacancy rates as low as possible and to slow the turnover rate, the owners were not able to raise rents commensurate with market increases. Promenade also gave rent concessions to tenants that experienced water problems in an effort to keep them from leaving. As a result of the water problems, the evidence will show Promenade's lost rents and rent concessions to be $2.7 million dollars.

**D. Weis is Jointly and Severally Responsible for All of Promenade's Damages.**

In spite of Weis' obligation to "design/build" the plaza waterproofing system and four years of attempts to solve the problem, Weis now disclaims responsibility. Weis also asserts that various other parties are responsible for the leak problems, including Promenade, because of the alleged negligence of its agent and architect ESG. None of Weis' arguments in this regard have merit. Each of these arguments and Promenade's brief rebuttal of the arguments are as follows:

1. Weis alleges the absence of gutters, allegedly because of a conscious decision by Promenade, led to surface drainage problems in the courtyard interior. Weis never included gutters in the waterproofing system it designed and never told Promenade that the waterproofing would not work without gutters;

2. Weis alleges that ESG initially failed to ensure that the plaza sidewalks conformed to ADA accessibility requirements. As a result, Weis alleges that the slope of the sidewalks needed to be adjusted and this affected surface drainage. There were no problems due to water rising above the level of the stoops (at least after the 1997 wood chip incident), however, so surface drainage issues are red herrings. Moreover, Weis never calculated, initiated, or implied that the placement of existing drains could not handle the water and would overtax the subsurface waterproofing system;

3. Weis alleges that ESG approved the design changes for the top load-bearing truss and answered a Request for Information concerning the detailing around the wood posts for the stoops and, therefore, is responsible for the water leaks related to those changes. Weis' argument here attempts to impliedly delegate waterproofing design responsibility to ESG when that nondelegable duty in fact, was assumed by and explicitly assigned to Weis. Moreover, Weis knew that ESG was not authorized by Promenade to give waterproofing advice, and Weis acted at its own peril in relying on any such advice; ESG was acting on its own in rendering any such advice;

4. Weis argues that Waterproofing By Experts, CETCO and J-Berd were also negligent. Nonetheless, Weis contractually assumed responsibility for the negligence of its subcontractors and agents and, therefore, cannot escape ultimate responsibility in whatever amount the subcontractors cannot pay.

## CONCLUSION

The evidence is substantial that Weis breached its contract with Promenade, breached its warranties to Promenade, and failed to exercise reasonable care in designing and building the plaza deck waterproofing system at the Promenade Project. There is little dispute that since the project was built, it has experienced significant water leakage problems that all are directly related to the plaza deck construction. This was Weis' obligation and regardless of whether reliability prism that is used is contract, warranty or negligence, Weis is liable for Promenade's damages.

Respectfully submitted,

Dated: September 3, 2004

**FLYNN, GASKINS & BENNETT, L.L.P.**

s/Steven E. Rau
Steve Gaskins, #147643
Steven E. Rau, #147990
333 South Seventh Street
Suite 2900
Minneapolis, MN 55402
(612) 333-9500
***Attorneys for Defendant Promenade Village Townhomes, L.L.C.***