**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Westfield Insurance Company,

Civil File No. OO-CV-987 JEL/JGL

Plaintiff

vs.

Weis Builders, Inc., Promenade Village Townhomes, LLC, Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants, and
Third Party Plaintiff

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Company,

Third Party Defendant and
Fourth Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth Party Defendant.

---

**Attached hereto is Exhibit A - a true and correct copy of the cited pages from the Deposition of Richard Stehly, taken on October 9, 2003.**

COPY



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: RICHARD D. STEHLY, P.E.
TAKEN ON: THURSDAY, OCTOBER 9, 2003
COMMENCING AT: 9:30 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562



and

Colloid Environmental Technologies Co.,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -



NOTES

Page Line



APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Co.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO I. BRISBOIS, Esq., Stich, Angell, Kreidler & Dodge, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant J-Berd Mechanical Contractors, Inc.

STEVEN E. RAU, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, MN 55402-2440, appeared representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared representing Westfield Insurance Company.

Q Prior to this case, have you ever dealt with Swelltite in any of its forms?
A **I don't recall having dealt with them.**
Q Have you since dealt with any project involving Swelltite?
A **No. Not that I know of.**
Q Did you do anything other than reviewing CETCO literature to familiarize yourself with Swelltite?
A **I don't believe so. I didn't get any samples or anything like that, no.**
Q I assume you're not familiar with the chemical composition of the Swelltite materials?
A **I assume it's a high grade sodium bentonite, but I don't know that for a fact.**
Q And how about the other components of the Swelltite other than the bentonite, are you familiar with any of those?
A **Only what's disclosed in their information sheets.**
Q And what's your understanding?
A **That there is a protective -- well, I need to look if it's polyethylene. I'm probably going to say it's the wrong thing, but I'd have to look. There's a protective sheet on the face.**
Q Okay. Let's just call it the protective sheet.
A **Okay. And whether it's polyethylene or not, I'd have to look at the data sheets. And then there's a -- I think it's one and a half mil thick water-soluble, probably**



**referred to as a scrim sheet on one face of the membrane.**
Q And that includes the bentonite material?
A **There is bentonite between it and the protective material.**
Q And that sheet, is that the film you're talking about, the water-soluble --
A **Yes. The water-soluble film.**
Q Did you do any testing yourself of any Swelltite film, protective sheet or bentonite materials?
A **No.**
Q Did you bring with you, sir, the National Roofing Contractors Association manual to which you refer in your report?
A **No. I have it on a CD disk. I don't have it in printed form.**
Q What I would ask, then, sir, is that you would provide a copy of the pages you referred to in your report to your counsel so that he can send copies to us?
A **Sure.**
Q Can you do that?
A **You bet.**
Q Have we covered all the things that you did to inform yourself of the details and the issues involved in this project?
A **Well, I can't think of anything else.**



Q Okay. You have issued a report of October 9th, 2002; correct?
A **Yes.**
Q I'm going to show you what's been marked Exhibit 813. Would you take a look at that, please?
A **(Witness complies.)**
Q Have you had a chance to look at that, sir?
A **Yes.**
Q Is that a copy of your first report of October 9th, 2002?
A **Yes.**
Q Is there any -- there's nothing missing; that's your total report? Just want to make sure we have the whole thing.
A **I believe it is.**
Q All right. I'm going to show you what's now been marked as Exhibit Number 814. I believe it's a six page document. Would you take a look at that, please?
A **(Witness complies.) Yes.**
Q All right. Is that a complete copy of your August 11th, 2003 report?
A **I believe it is.**
Q What caused you to issue a new report in August of 2003?
A **I was asked to look at some additional information.**
Q What additional information did you review?
A **A deposition of Gary Nelson, deposition of Scott Vanderburg, some deposition exhibits from John Feges,**



**also some exhibits from Chad Filek, some exhibits from Patrick Carpenter, exhibits from Steve Messerich and Al Thoreen. Also, I think I was given this Project Manual-Promenade Oaks Townhomes Courtyard Waterproofing, some waterproofing bids, and then some Larson Engineering drawings.**
Q Was this information provided to you by Mr. Hull?
A **Yes.**
Q Have you received information from anybody other than Mr. Hull and your own review of the standards, et cetera, in your preparation for working on this case?
A **I can't think of any other.**
Q I'm going to show you a letter that was faxed to you apparently on August 14th, 2003 from Mr. Hull?
A **Yes.**
Q And that has been marked as Exhibit --
A **815.**
Q 815. Thank you.
MS. REISBORD: Pat, what was the date on the letter?
MR. REILLY: August 14th, I believe.
MS. REISBORD: 2003?
MR. REILLY: 2003.
Q (By Mr. Reilly.) Did you receive that letter from Mr. Hull, sir?

37

A Yes.
Q And did you receive this after you completed your second report?
A **Well, the dates seem to suggest so.**
Q Okay. Well, what do you remember?
A **I think I sent him a draft to review and I think this letter is probably in response to that draft.**
Q Okay. Do you know whether this letter then was used to assist you in preparing your final report?
A **I would -- I would have thought so, yes. From reading it, I would think so, yes.**
Q Do you have a copy of that draft that predated this letter?
A **I don't have it in this file, but I could recover it from our computers.**
Q I'm going to ask you to do that?
A **Sure.**
MR. REILLY: Counsel, I would ask a copy of that draft.
Q (By Mr. Reilly.) Is the report marked as Exhibit 814 your final report, as far as you know, in this case?
A **Yes.**
Q Let's address the opinions and conclusions and so forth in that report. But before we do, in your materials -- I'm not going to mark this until I know there's a reason to --

38

was some materials from the Uniform Building Code, 1994 Edition, and Appendix Chapter 18, three pages of it. Apparently that was in your file?
A **Yes.**
Q Did you review this material and use it in forming your conclusions?
A **I was looking -- I did review it before I formed my -- or wrote my report.**
Q Did it have any impact on your opinions or conclusions?
A **No.**
Q All right. Does it affect your assessment of the appropriateness for bentonite waterproofing materials in this application, the UBC?
A **I didn't see any specific prohibition for the use of bentonite, and that's what I was looking for.**
Q Now, your first conclusion in your report of August 11, 2003 is that the use of a bentonite membrane was inappropriate for this design and it should not be used on a horizontal surface which will be exposed to standing water. What is the basis for those opinions?
A **That is my opinion. It is also the opinion of the National Roofing Contractors Association.**
Q And what is the basis for that opinion?
A **Would be my experience, my judgment, my engineering judgment.**

39

Q Now, the material that we're dealing with here, Swelltite, is not solely a bentonite material; correct?
A **There are other materials in the membrane; that's true.**
Q Including I think what you called a protective material --
A **Yes.**
Q -- that also acts as a waterproofing material?
A **Yes, it would. And protection.**
Q Is that similar to sheet goods that are normally used in waterproofing?
A **It would be similar.**
Q And sheet goods such as that, is that appropriate for a horizontal surface exposed to standing water?
MR. HULL: Object to the form of the question.
THE WITNESS: In this case it may be a little bit thinner than what you would want to use. I would need to go back and see how thick it is, if it's 30 mils thick or 20 mils thick. You would want something in this application that was thicker, but it could be of that type.
Q (By Mr. Reilly.) Do you know whether the National Roofing Contractors Association in its roofing and waterproofing manual discusses Swelltite per se as opposed to generic bentonite material?
A **I hadn't seen anything specific about Swelltite in my**

40

**review of the manual.**
Q Okay. You have dealt in the past with bentonite being sprayed on?
A **Yes.**
Q And in your opinion, that would not be appropriate for this application?
A **I wouldn't use it in that way.**
Q And why is that?
A **As the primary membrane?**
Q Yes.
A **I would use something that is more reliable in this regard.**
Q Why is sprayed-on bentonite not reliable in this application?
A **Well, I think it is easy to scratch it, gouge it, rub it off. In this application, too, you would need water to activate it. Usually there's some leakage associated with that. That's probably not a good thing either in this application, in my opinion.**
Q If you used a sprayed-on bentonite and you put over it a butyl or polyethylene or some kind of cover and sealed that as well, could that be an acceptable application in this --
A **That would be a very good application. What it would do is anything that got through the butyl would tend to get**

**isolated by the bentonite and so it wouldn't tend to travel horizontally.**
Q Isn't that the basic theory of Swelltite, as you understand?
A **I don't know what the basic theory of Swelltite is.**
Q Okay. But you do know that it has, and you're not sure what the makeup of it, but a butyl or polyethylene cover and then underneath that bentonite material?
A **Yes. And then a water-soluble, I think it's a mil and a half thick sheet.**
Q Did you ever review the depositions of Stacy Byrd, the person who invented this product?
A **No.**
Q Do you think that might have been of some assistance to you?
A **Well, it may or may not. I mean, it would be interesting, certainly. I don't know that it would change my opinion. I don't think it would change my opinions, but --**
Q Do you believe that the more information you have, generally, the better your chances are of making an appropriate assessment of the situation?
MR. HULL: I'll object to the form of the question as vague.
THE WITNESS: I don't think volume



improves anything. If you have the right information to review, it improves everything.
Q (By Mr. Reilly.) All right. And therefore, you're interested not only in quantity but in quality?
MR. HULL: Object. That mischaracterizes the testimony.
THE WITNESS: I think the quality of the information is important.
Q (By Mr. Reilly.) Now, you indicate in your first conclusion that because the courtyard drains will allow an accumulation of at least two inches of water on the membrane, it creates an exposure to standing water?
A **Yes.**
Q And that is why you believe this membrane would not be appropriate?
MS. HEYER: Object to the form of the question.
Q (By Mr. Reilly.) Is that correct?
A **I think that I would not use bentonite in this situation where there's going to be standing water on the surface.**
Q If the subsurface drainage was such that there was an appropriate slope and there was an appropriate drain so that water would drain off the waterproofing and not leave any standing water on it, would you have an opinion whether the membrane would be appropriate or not?



MS. HEYER: Object to the form of the question.
THE WITNESS: So if you were to configure your waterproofing so there would be no standing water, would a bentonite membrane be appropriate? The way I read the Roofing Contractors Association's manual, I don't think they would recommend against it. Whether I personally would recommend the use of the bentonite as the membrane, I may or may not.
Q (By Mr. Reilly.) Okay. You haven't thought that all the way through?
A **It would be specific to the job and how well I thought things would drain and how damaging it is when there's a leak. If you have something that is like a tunnel or like, you know, something that there isn't going to be a real, real problem with a leak, I would be inclined to use it. Where there's a real problem with interior surfaces and things like that, I probably wouldn't use it.**
Q Let me -- apparently you're not familiar with the way Swelltite is installed, or are you? Let me ask you, are you familiar with the way Swelltite is installed?
A **I've only seen photos of what was on this job. I haven't seen any installed.**
Q And are you aware that the top layer of the Swelltite,



which is this butyl or polyethylene layer, acts as a waterproofing membrane?
A **It will.**
Q And that if the seams are sealed or overlapped enough, that it will make a continuous waterproofing membrane?
A **Well, if they are overlapped a lot, it may or may not make a continuous membrane. You have to have a seal, and if they were to be sealed, then they would.**
Q And then the bentonite in the waterproofing, which would be beneath that layer and above the substrate in this case, concrete, would be a secondary protection; would it not?
A **Well, you could think of it that way. You have that one and a half mil water-soluble layer that's underneath the bentonite portion of the membrane, but I suppose you could think of it as that. I think more, in this system more is the -- bentonite is being the primary water stopper.**
Q Water will not get to the bentonite if it doesn't pass through that material that's above it?
A **That's right.**
Q And if that material keeps the water out, then the bentonite will not activate, will not need to activate; correct?
A **Correct.**

Q And as you understand it, the water-soluble film that's beneath that would not activate because it doesn't get wet?
A **Right.**
Q So --
A **But at the seams, at the edges, for this scheme to work, there has to be a seal. There has to be a seal between the upper sheet of Swelltite and the lower sheet of Swelltite where the lap is, right? So there has to be some moisture to dissolve the mil and a half water-soluble layer, there has to be some moisture that would activate the bentonite, and then there has to be some pressure to push those two leaves together to create a seal.**
**Now, you're right, in the main run or the main field of the membrane, if no water goes through the outer layer, there would be no activation of the bentonite in that zone and there would be no dissolving of the sheet, the mil and a half sheet underneath.**
Q All right. So it is, in your opinion, where the edge of the seam would be exposed, maybe an inch or two overlap, but it would be in that situation the seam on the top layer of the Swelltite, that edge, it would have to have activated bentonite to seal the seam?
A **Yes. And I think the overlap is six inches, isn't it?**



Q Whatever --
A **Whatever it is.**
Q Whatever it is. And it doesn't need to activate the entire overlap, it just needs to activate enough of that bentonite to create a seal?
A **Yes.**
Q If there is seam tape over that seam, then the bentonite doesn't have to activate unless it gets exposed to water?
MR. HULL: Well, I'm going to object to the form of the question. I think it assumes that the seam tape is impermeable.
THE WITNESS: If the seam tape creates a seal that's entirely effective and there's no leakage through the seam tape, then there would be no activation of the edge of the bentonite.
Q (By Mr. Reilly.) Assuming that the seam tape is not permeable, assuming that the material that the Swelltite is made out of above the bentonite is not permeable, and assuming the seam tape were on the seams, then the bentonite would in fact be a secondary protective mode in this application?
A **It would function that way.**
Q All right. And in that scenario, its purpose would be -- for instance, if a puncture from a nail or something went through that first layer, the bentonite is meant to swell



around that and stop the leak?
A **Well, it will localize it so it doesn't travel horizontally.**
Q And will it swell and stop the leak if, for instance, a nail were to penetrate the waterproofing material?
A **It may.**
Q Have you done any testing to determine the manner in which Swelltite operates in this application?
A **I haven't tested the Swelltite.**
MR. HULL: Pat, is this a good time to take a break?
MR. REILLY: Sure.
(A short recess was taken at this time.)
Q (By Mr. Reilly.) Now, in your first conclusion you talk about there being an accumulation of at least two inches of water on the membrane?
A **Yes.**
Q And that is based upon information you received from other people; in other words, from the materials that you reviewed?
A **Yes.**
Q It's nothing that you determined on your own independently?
A **I did not.**
Q All right. You have learned, apparently, that the drains



are two inches -- the lowest portion of the drains that accept water are two inches above the precast concrete planks?
A **I believe the perforations in the drain body are located two inches above the concrete plank.**
Q And have you also learned whether there is a slope to the substrate underneath the waterproofing?
A **I haven't made any independent measurements, but I believe it to be pretty flat.**
Q All right. Would you agree that, first off, it would be appropriate to have a slope in that substrate underneath the waterproofing to the drains?
A **It's appropriate to have it flat or it could slope.**
Q Would sloping be better than flat?
A **Either is workable.**
Q How do you work it being flat?
A **If it were flat, I would probably -- or I would taper something above it.**
Q Okay. So to allow the water that permeates through the soil to still have gravity flow?
A **Yes.**
Q So whether the substrate is flat or the substrate is built up in some manner to allow the waterproofing to be sloped, in some way the waterproofing should be sloped, in your opinion?

Q Yes. Is that what you're talking about, liquid applied flashing, Miradry?
A **The liquid applied is the CETCO product.**
Q Okay.
A **Is it the M-2000, I think, is the reference?**
Q All right.
MR. BROWN: Are you asking what he saw in the photographs?
MR. REILLY: No. I'm asking -- let's back up a little bit.
Q (By Mr. Reilly.) Do you know whether there is flashing, Miradry out there now?
A **I believe there is.**
Q Is that over the applied flashing, liquid applied flashing?
A **Yes.**
Q Okay. Do you know whether at the time the waterproofing was first installed and completed by Waterproofing By Experts the grade was intended to be above or below the top of block?
A **The drawing indicates it would be below.**
Q Do you know when the change was ultimately made to raise the grade above the top of block in relation to when the waterproofing was initially applied?
A **I don't know when that happened.**



Q You indicate that the flashing below ground was unprotected and that you recommend some kind of metal covering to be used?
A **Yes.**
Q Is that in any application where flashing of a building or liquid flashing is used or a waterproofing membrane is used that is subject to being damaged in the manner in which you're describing here?
A **Should you apply a flashing over it?**
Q A metal flashing.
A **I think it's a good practice.**
Q Okay. Is the metal flashing designed to keep water out or is it meant really to protect the underlying protective flashing from being damaged?
A **Well, it can do both, but it's there to protect the flashing that's under it.**
Q Okay. Do you have any concern with the flashing that was there as far as keeping water out as opposed to protecting it from damage?
MR. HULL: Object to the form of the question. Are you talking about the liquid flashing or are you talking about the Miradry?
MR. REILLY: Let's start with the liquid flashing.
THE WITNESS: The liquid flashing, the



M-2000, I have concern about it leaking.
Q (By Mr. Reilly.) Why?
A **I think it is not very robust, could easily be scratched or torn or breached and cause a leak.**
Q Do you have any evidence that that occurred?
A **There is evidence of a lot of leaks. I don't know -- I don't have any firsthand evidence.**
Q Okay. And did you see any place where that flashing existed without Miradry over the top of it?
A **I think it existed without Miradry over it at one time and the Miradry was applied later as a correction to leaks.**
Q Do you have any problem with the Miradry?
A **No.**
Q So as you understand it to be now with the Miradry over the liquid flashing, you feel that that's an appropriate system out there?
A **If there are places where the Miradry is exposed to -- if it were exposed to weed whackers and, you know, things like that, it would be better to protect it.**
Q Okay. And then you put some metal or something heavier --
A **Metal. Yes, yes.**
Q Now, going to your opinion number 3 regarding the canopy posts, are you aware of who gave the drawing designs on how to flash the canopy posts?



MR. HULL: I'll object to the form of the question. I'm not sure anybody did. I think it assumes facts not in evidence.
THE WITNESS: I am not aware of any drawings showing any details of the waterproofing system for the job.
Q (By Mr. Reilly.) Were you given any exhibits from Mr. Feges's deposition?
A **Yes.**
Q And do you have them with you today?
A **I was given Exhibits 111 through 119. They're photos.**
Q Have you seen the RFI of John Feges dated 12/13/1996, which is Deposition Exhibit Number 100?
A **Yes.**
Q And you'll see the response that Mr. Feges gave at the bottom; do you see that?
A **Yes.**
Q And it says post to extend to precast end --
A **Secured.**
Q -- secured by a galvanized post bracket fastened to the precast. Waterproof --
A **Contractor.**
Q -- contractor should wrap post with membrane and secure with adhesive. Do you see that?
A **Uh-huh.**

Q And that will -- why do you call that non-frost susceptible? Why isn't it susceptible to frost?
A **Because the voids in the soil are such that ice lenses will form.**
Q And why is this important?
A **If you are going to have a waterproofing system that you have standing water in and if you are going to use a soil that is susceptible to frost heave, during the winter, it's likely that you will have frost heave.**
Q Would this concern of frost heave be lessened if the water were totally drained, allowed to be -- or capable of being totally drained in the subsurface of the courtyard?
A **Yes.**
Q So that the fact that there is continuous standing water contributes to the problem of frost heaves?
A **Yes.**
MS. HEYER: Object to the form of the question.
THE WITNESS: Yes.
Q (By Mr. Reilly.) Your next point is that basically sloping the membrane in some way would have been desirable, essentially; correct?
A **Yes.**
Q And that's so that drainage of the subsurface water, the water that gets below the top of the surface of the



ground, will be able to drain quickly and efficiently off the waterproofing membrane?
A **So there won't be any standing water on the membrane.**
Q Okay. And if you purchased the best, the most expensive waterproofing membrane money can buy, would it be fair to say you'd still want to slope the membrane?
A **Yes.**
Q And why do you want to do it even if you bought the most expensive waterproofing membrane money could buy?
A **It will last longer if it's not standing in water.**
Q Sooner or later it will leak?
A **Yes.**
Q And that leakage will be delayed if there's a slope in the drain and it's allowed to drain?
MS. HEYER: Object to the form of the question.
THE WITNESS: Yes.
Q (By Mr. Reilly.) Okay. Now, your next point is that the waterproofing system was constructed without drawings. Why was that a concern?
A **I think it is important that drawings be prepared of what is going to be built.**
Q All right. Did you find any drawings regarding the waterproofing system?
A **No.**



Q Do you know if any as-built drawings of this project were made?
A **I don't.**
Q Now, in number 8, it says, "The use of explosive powder driven nails to attach the canopy post boot to the precast concrete was poor practice."
A **Yes.**
Q And that is because the powder driven nails damage the concrete that they're being driven into; correct?
A **Precast concrete, they tend to shatter.**
Q And if it goes into where the hollow core is, you end up with a large damaged portion of the concrete with a hole penetrating into the core?
A **Yes.**
Q And that can allow water to penetrate into the core?
A **And then move laterally.**
Q Now, your last conclusion is the waterproofing membrane that has the American Hydrotech is vastly superior to that provided and much more expensive; correct?
A **Yes.**
Q The choice of a membrane -- and you've recommended in this case, for instance, a less expensive one than American Hydrotech; correct?
A **Yes.**
Q There are various options you can go with that will still



be an appropriate waterproofing system here; correct?
A **Yes.**
Q And even if you used the American Hydrotech or the EPDM or polymer-modified bitumen sheet membrane that you suggest, you would still want the subsurface drains to completely drain all the subsurface water?
A **Be preferable.**
Q You would still want it to be sloped?
A **It would be preferable.**
Q And without those things, would you still have concerns that even with the American Hydrotech, the EPDM or the polymer-modified bitumen sheet membrane would still be at risk in failing?
A **It would probably shorten the life of those systems.**
Q All right. At any time were you able to determine what leaks were caused by any particular problem or situation at the Promenade?
A **No.**
Q Were you aware that there are links between Building 1 and 2, for instance; there's a link between those two?
A **Yes.**
Q Do you know how that area was waterproofed?
A **I don't know that it's different than this. No, I don't.**
Q All right. Did you see any active leaks at the time you visited the site on those three visits?

A **No.**
Q And did you visit those sites at any time when it was raining out?
A **I don't recall it raining on any of the three.**
Q Given the fact that there is this permanent amount of water that's on the waterproofing membrane, in this case somewhere up to two inches of water, and that's what you believe existed at this condition; correct?
MS. HEYER: Object to the form of the question.
THE WITNESS: It can be as much. Well, it could be more, but it can.
Q (By Mr. Reilly.) Unless it evaporates, it's going to be there; correct?
MS. HEYER: Object to the question.
THE WITNESS: Or it leaks out.
Q (By Mr. Reilly.) Okay. And assume that the testimony has been from some of the employees of Promenade that it only leaks when it rains in the Promenade complex, would you agree that the waterproofing membrane must be being circumvented as opposed to penetrating to cause the leaks when it rains?
MR. HULL: I'll object to form of the question.
MS. HEYER: Same objection.



THE WITNESS: By circumvented, do you mean to go around the edge of it?
MR. REILLY: Yes, somehow.
THE WITNESS: Rather than to go through it?
MR. REILLY: Yes.
THE WITNESS: I think either could be happening.
Q (By Mr. Reilly.) And if there is no leakage, even though there's two inches of water sitting on top of the waterproofing, would you agree that it's doing its job?
MS. HEYER: Object to the form of the question.
MR. HULL: You're asking him to assume that; is that correct?
THE WITNESS: Assuming that there is two inches of water on the horizontal portion of the --
Q (By Mr. Reilly.) Well, you've assumed that from your conclusion. You said that there are two inches of water; did you not?
A **There can be. There can be.**
Q Okay. At least I think is what you said?
A **Yes. It will allow it to accumulate. Not saying that it's there, but the configuration will allow it to be that deep.**



Q And assuming that there is not ongoing leaks, except when it rains, isn't that indicative to you that that waterproofing is holding those two inches of water out of the garages and out of the living space?
MR. HULL: I'm going to again object to the question as an incomplete hypothetical. Are you asking him to assume that there is in fact two inches of water there?
THE WITNESS: If you assume there is two inches of water there and there is no leaks, then that portion of membrane that is under water is functioning properly.
Q (By Mr. Reilly.) All right. Are you aware of any evidence to show that there are any leaks presently occurring that are a result of penetrations of the membrane in the vertical surface?
A **I don't have any evidence.**
Q Okay. Are you aware of whether the type of siding used on these buildings -- let me ask you this. Are you aware of what type of siding was used on these buildings?
A **I think it was described as vinyl siding.**
Q Whether that allows water to get through?
A **I would expect it would.**
Q And if it does, what do you have to do to prevent that water from getting behind the waterproofing, into the CMU walls and down to the garages beneath?



A **Well, I think you would put a 15 pound felt paper behind the vinyl siding and you would run it down over the flashing of the waterproofing system.**
Q Do you know whether that was done here?
A **I don't know.**
Q If it was not, or if it was not completely done, could that allow water to circumvent the waterproofing system in the courtyards?
A **You could have leaks through the wall above the waterproofing system.**
Q Okay. You also, I assume, have read some materials regarding the problems that they discovered at the entrances to some of the apartments in the courtyard areas?
A **Yes.**
Q You're also aware that they did repairs to those areas?
A **I believe it was Aquaseal injection.**
Q Okay. And then they ultimately tore up some of the patio cement pads and raised the waterproofing level; are you aware of that?
A **They removed some of the concrete entrances?**
Q Yes.
A **I wasn't aware of that.**
Q Were you aware that as a result of that, the number of

leaks diminished considerably?
A **I was not aware that they did this and I'm not aware that this stopped the leaks considerably.**
Q Were you aware that they made repairs to the areas of the bottom of the wooden posts of some sort?
A **Yes.**
Q And are you aware that as a result of those repairs, the number of leaks diminished?
A **I believe that's true.**
Q Okay. Are you aware that a water test was performed by an employee of Promenade at or about the area of Unit 3-115?
A **No.**
Q I'm going to ask you to hypothetically assume that the man took a hose to the area of the courtyard immediately adjacent and above where Unit 3-115 exists and ran that hose for seven hours so that there would be enough water in the area and found that there was no leaking going on as a result of that, and then for 15 minutes he put the hose up against the wall, the concrete block wall that extended at the end of the courtyard, and within that 15 minutes he had leakage into 3-115.
A **This is an end wall?**
Q An end wall of the courtyard in Building 3. And that 3-115, by the way, is a unit that's had a history of leaks. Would that be an appropriate test to determine the



cause or the location of the -- the avenue of the water getting into the apartment?
A **Sure.**
Q Would that be consistent with the source of the water being through the knee wall as opposed to through the waterproofing membrane?
A **Well, it probably is. Running a hose for seven hours in this area may or may not reveal breaches in the waterproofing system. You'd probably want to dig a hole and see how much water you're accumulating in the soil before you made that kind of a judgment.**
Q All right. But hitting the water on the wall and then having an immediate -- or not immediate, but within 15 minutes is indicative -- is the way you would test it, for instance, if you could?
A **Yes.**
Q And if you did have that result, you would then come to the conclusion, would you not, that you would have to do something to prevent water permeating into that wall?
A **Sure.**
Q What would you do in those knee walls?
A **Well, you could put a water repellent on, you could tuckpoint the wall, you could put a metal panel in front of it. There's a number of things that you could do.**
Q In the links -- well, there's two link areas. There's one



between 1 and 3 and one between I think 5 and 6. Did you look at both of those?
A **You mean between 1 and 2?**
Q 1 and 2, yes. Excuse me. 5 and 6 -- 4 and 5. Excuse me. Let's start again. There are two links; one between 1 and 2 and 4 and 5. Did you look at both of those links?
A **Yes.**
Q And did you find that there was areas where, for instance, the stairs in those areas had separated from the walls and that there were -- an area of separation between the stairs and the wall?
A **I believe there are some of those types of defects.**
Q Did you find cracks in the cement in the top of those areas?
A **Cement is a powder.**
Q Okay. Concrete?
A **Concrete is a solid material.**
Q Thank you. Concrete.
A **Yes.**
Q Did you find that there was caulking that was missing in some of the areas that should have been caulked in those areas?
A **Yes.**
Q Are those all sources of possible water intrusion?
A **Yes.**



Q Okay. Do you know what kind of waterproofing was done in any of those areas at the time the building was built?
A **No. I don't know that it's different than what is described elsewhere.**
Q Do you know who did the waterproofing in those areas?
A **No.**
Q Did you yourself determine that water-soluble film on the face of the Swelltite was still intact in some places?
A **No.**
Q Did you make any determination that the film failed to dissolve when coming in contact with water?
A **I didn't make that determination.**
Q Are you able to determine that the membrane did not seal at the lapped edges where film remains?
A **I haven't observed that. I haven't done any tests out there.**
Q And that information that you've included in your report is solely as a result, is it not, of Mr. Campbell's, Inspec's report?
A **Yes.**
Q And you have no idea whether his conclusions are correct or not; is that true?
A **I assume they are. I mean I'm relying on them.**
Q You're relying on them?
A **Yes.**

Q But as far as the testing or the methodology he does to come to that conclusion, you're not aware of that?
A **No.**
Q Do you know his expertise or ability to make those judgments?
A **Mr. Campbell?**
Q Yes.
A **He has a good reputation, if that's what you mean, in the waterproofing area.**
Q Has he ever worked with Swelltite, to your knowledge?
A **That I don't know.**
Q In your work at Twin City Testing, in order to determine whether a product such as Swelltite was operating precisely, there would be a significant amount of testing that would be necessary to do that; correct?
A **You could test it to see if it works the way it's supposed to work.**
Q And that would have a protocol?
A **Well, I don't know if it would have one or you would make one up.**
Q Exactly.
A **I mean, you can design a test that could evaluate that.**
Q And you would use a scientific method to do that?
A **Well, I wouldn't think it was scientific, but maybe others would disagree.**



Q I mean, you would attempt to follow the scientific method?
A **Yes.**
Q And take me through what the scientific method --
A **If you mean test and observe as being scientific method, that's what I would do, yes.**
Q If you come up with a hypothesis, you then test it, you observe; if it doesn't meet your original hypothesis, you would adjust your hypothesis to meet what the testing shows?
A **Yes.**
Q Do you know if that was ever done in any of the conditions out there in this matter?
A **For the Swelltite membrane?**
Q Let's start with the Swelltite membrane.
A **I don't know of any tests that were run on the Swelltite membrane.**
Q How about with the --
A **The liquid applied flashing?**
Q The liquid applied flashing?
A **I don't know of any tests that were run on the liquid flashing.**
Q How about where the posts were attached to the substrate; any testing done there?
A **Other than observation, not that I know of.**
Q Any testing done to determine the effect of the two inches



of water on the membrane?

MS. HEYER: Object to the form of the question.

THE WITNESS: I don't know of any deterioration tests that have been done.

Q (By Mr. Reilly.) And just to make sure I understand, as you sit here today, you cannot identify one leak that is as a result of either a defect in the design, the manufacture or the installation of the Swelltite membrane; is that true?
A **That's true.**

MR. REILLY: I have no other questions. Let's just take about a two minute break.

(A noon recess was taken at this time.)

EXAMINATION

BY MR. STEPAN:

Q Mr. Stehly, my name is Chad Stepan. I'm one of the attorneys for Weis Builders in this matter. I've got some questions for you as well and I may bounce around a little bit in following up on what Mr. Reilly had to ask you.

Are you an architect, sir?
A **No.**
Q Have you had any training as an architect?
A **I've taken architecture courses in college. I think I've taken two.**



Q Two courses in college?
A **Yes.**
Q Were you asked to analyze the architectural drawings for this project?
A **No.**
Q Asked to offer any criticism about them?
A **I was asked to review them and look at them. If I saw something that I would view as a criticism, I think I was expected to tell Mr. Hull that.**
Q Did you have any criticisms as you went through?
A **No.**
Q The documents that you reviewed you talked about here earlier today and that are also listed in your report, were those documents provided to you by counsel or did you have an opportunity to go through project materials and select documents?
A **They were given to me.**

MR. HULL: But if you would like to give him some other documents, I'm sure he'd be happy to review them.

Q (By Mr. Stepan.) Did you have a chance to analyze the mechanical drawings in this project?
A **I don't recall seeing mechanical drawings.**
Q During the course of your work, have you had an opportunity where you've relied on recommendations from a

responsible for making sure that the courtyards would meet handicap requirements?
A **I don't believe the architect is responsible for the construction.**
Q Is the architect responsible for making sure it provides a design that meets the applicable codes?
MR. REILLY: Object, lack of foundation.
MR. BROWN: Yes. Second.
THE WITNESS: I haven't seen their contract and I don't know what's in their contract.
Q (By Mr. Stepan.) Did you ever ask Mr. Hull to see any additional information other than what was provided to you.
A **No.**
Q Earlier today when Mr. Reilly was asking you questions, you indicated that when you worked for Twin City Testing, part of your work would be to try to determine how much bentonite would be needed for I think a particular system. I think in particular you were talking about sewage lagoons; do you recall that?
A **Yes.**
Q Would it be fair to take from that that you think at some point if you have too little bentonite, it's not going to be a sufficient waterproofing?
A **Yes.**



MR. REILLY: Well, I'm going to object to the form of the question. He was talking about mixing soils with bentonite. And it's a misstatement of prior testimony.
Q (By Mr. Stepan.) Would you agree that a bentonite waterproofing system needs a certain amount of bentonite to function as a waterproofing system; there has to be a thickness of bentonite?
A **Yes.**
Q Do you have an idea of what that level is?
MR. VEITH: Objection, lack of foundation.
MR. REILLY: Lack of foundation.
THE WITNESS: You're asking me what the minimum thickness should be?
MR. STEPAN: Yes.
MR. BROWN: Object as an inadequate hypothetical.
MR. RAU: The new pet peeve objection.
THE WITNESS: I don't know what that would be.
Q (By Mr. Stepan.) At the Promenade project, would damp-proofing be sufficient for the vertical walls, in your opinion, or is a waterproofing system necessary?
A **In the courtyard?**
Q Yes.



A **I don't believe damp-proofing would be sufficient.**
Q Because there's hydrostatic pressure on the vertical walls?
A **Yes.**
Q And that's why damp-proofing wouldn't be sufficient?
A **Correct.**
Q Did you ever receive any explanation or any information as to the events that occurred in constructing the link between Buildings 1 and 2?
A **I understand there was a need to be able to get a fire truck through the link.**
Q What do you know about that?
A **Other than that they needed to get a fire truck through the link and the doors needed to be big enough to get the fire truck through the link, I can't think of anything else.**
Q Were you told how that impacted the design of that link?
A **Are you talking about the structural design?**
Q The architectural and structural design for that link?
A **No.**
Q Were you told how it impacted construction, the fact that there was going to be a need to get a fire truck through the link?
A **No.**
Q Earlier today, in relation to discussing conclusion number



1 of your report, you indicated, or it sounded like you indicated that in your opinion, you wouldn't use a bentonite waterproofing if what was being waterproofed would be sensitive to leaks, such as a living area; is that fair to say?
MR. REILLY: Objection. I'm going to object. It's a misstatement of prior testimony.
THE WITNESS: Because bentonite to function needs water to activate it, it's likely that some leakage will occur, and I would not use this where any leakage is going to be a problem.
Q (By Mr. Stepan.) Such as a situation where you're trying to keep water out of living areas?
A **Yes.**
Q You mention that the usual criteria for the amount of time it would be okay to allow water to remain on a waterproofing is 48 hours?
A **I believe that's correct.**
Q Where does that number come from?
A **I think it's from the National Roofing Contractors Association.**
Q You mentioned that a drawing you had looked at indicated that the grade at the Promenade project was to be below the top vertical block wall in the courtyards; is that right?

A **I don't remember reading anything about that.**
Q Do you have any knowledge of whether the owner, architect and general contractor were given a formal demonstration of the American Colloid product, the Swelltite 3000, had any questions about the product and how it would work on the conceived project answered and were furnished with samples of the product as well as literature? Are you aware of that occurring at all?
A **No.**
Q Are you aware of any objection or request for additional information beyond what American Colloid provided either at that meeting or any other time lodged by the architect, the general contractor or the project owner?
A **No.**
Q You are aware that there was an architect on the project, I assume?
A **Yes.**
Q All right. And would it be your understanding that in terms of the Promenade project, one of the roles of the architect would be to act as sort of a liaison between the owner group and the entities in the field in terms of making sure that the overall concept was meshing with the various construction components?
A **I haven't read the contract between the owner and the architect. I don't know what the scope of work agreed to was.**



Q Go through a couple of your opinions here for a second for some clarification. One of the opinions, and I think it was number 2, talks about flashing on page 1 of your report?
A **Yes.**
Q And by the way, and I don't know that I saw -- maybe it was asked of you, whether your second opinion is any different in terms of its text as written in the exhibit than what it was before Mr. Hull commented on your draft? And let me ask it in a more simple way. Do you know if you changed your second opinion in response to Mr. Hull's comments?
A **I don't know. I will try to find a copy of that draft so that you can compare them.**
Q Okay. Do that. Thanks. Now, you already testified that there was an original drawing by Elness Swenson Graham that depicted the grade line in the courtyards terminated at a point some inches below the top of the CMU; correct?
A **In the courtyard.**
Q Yes, sir.
A **Yes.**
Q And you also, I take it from your answer to Mr. Rau's question, reviewed some of the CETCO documentation that's in your file anyway; correct?



A **I reviewed it all. I read it all.**
Q And you understand that the Swelltite 3000 material, at least as specified in the manufacturer's literature, is a product that is exclusively used for below grade applications; correct?
A **In some of the CETCO details, they show -- they show some above grade applications of Swelltite.**
Q Why don't you tell me which one you're talking about?
A **I'm looking at ESG01832. These are details of Volclay Swelltite.**
Q Can I see what you're looking at?
A **Yes. The detail in the center is a covering of a masonry wall, the detail in the lower right is covering a wood wall, and the one in the lower left is covering a lagging, wood lagging, which would be above grade, I think.**
Q Do you know?
A **I don't know. That's the way I would interpret the drawing.**
Q Well, the first sentence under Product Description on the first page of this same document in your file, numeral 3, Product Description, Basic Use, Volclay Swelltite membranes are designed for waterproofing below grade vertical and horizontal structural surfaces, which is what we're dealing with in the Promenade; is that right?



A **Yes.**
Q At any rate, let's get to the meat of this. As initially conceived, anyway, and based on the drawing that you saw, A5.1 or A1.5, whichever one it was, the liquid flashing would have been several inches above the grade line had the grade line stayed where it's depicted in that drawing; correct?
A **Probably.**
Q And do you know whether the installers of the Swelltite system were consulted about the change that resulted in the grate being installed at a level some several inches above the top of the CMU blocks during construction?
A **I don't know.**
Q Did you read Mr. Desai's deposition transcripts, by the way?
A **Peter?**
Q I think you've answered that. Yes, sir.
A **I don't think so.**
Q Did you hear anything about an eight inch conceptual bust occurring during the course of construction that resulted in this grade line change?
A **What I had heard or what I had been told is that the grade was changed and it was changed based on a requirement for wheelchair accessibility to the units.**
Q And you didn't investigate any further than whatever was

you were told that led to that conclusion; correct?
A **Yes, that's true, other than reading this information.**
Q Now, you didn't read the deposition either of a man named Bill Hanuschak; did you?
A **The structural designer?**
Q Yes, sir.
A **No.**
Q The structural engineer?
A **Correct. No.**
Q Were you aware of the firm Hanuschak Kowalchuk or even Mr. Hanuschak personally before your involvement in this project?
A **Yes.**
Q And you're aware that he was a consultant for the owner on this project, or are you even aware of that?
A **Well, I haven't seen his contract. I don't know if it's with the architect or if it's with the owner, but I understand he provided structural engineering services for this job.**
Q An architect, at least as far as your understanding of the relationships on the project, was an agent of the owner, not the general; correct?
A **I haven't seen any of the documents and I do not know.**
Q Okay. Thank you, sir. I won't ask you about that relationship anymore. Did you receive, even though you



didn't read Mr. Hanuschak's deposition, a copy of an exhibit to Mr. Hanuschak's deposition that showed a detail of a sketch changing the configuration where the concrete block wall and the floor trusses intersected in the courtyards?
A **Yes. I think I've seen a detail showing the top cord bearing truss.**
MR. BROWN: Okay. Let's go off the record for one second, Charlie, if we could.
(A short recess was taken at this time.)
Q (By Mr. Brown.) Even had there not ultimately been a change in the grade line such that the grade as depicted in the drawings was where the grade ended up, do I take it from your flashing opinion, opinion number 2, that it would have been good idea to have installed at that juncture between the concrete blocks and the wooden construction members some sort of waterproof flashing type material?
A **Yes.**
Q Do you have any idea whether the waterproofing contractor actually recommended to either the owner, architect or general contractor that exactly that sort of detail be included?
MR. HULL: Exactly what sort of detail?
MR. BROWN: Flashing between the concrete



block and the wooden construction members in those courtyards.
MR. HULL: I'm going to object to the form of the question. We're really talking about two things. We're talking about flashing and something to protect the flashing. Which one are you talking about?
MR. BROWN: I'm not talking about anything but what I asked him, which is flashing.
THE WITNESS: I'm not aware of that.
MR. HULL: He did.
Q (By Mr. Brown.) Are you aware of whether any such flashing was installed during construction?
A **From the photos, you can see flashing. The liquid applied flashing was applied.**
Q What I'm talking about is a membrane that would lap over the top of the block and a wooden construction member sitting on top of the blocks?
A **There are photos that show the liquid applied material is up the Built-Right above the block.**
Q So what you're basing whatever it is that you're talking about there is from the photos alone; correct?
A **Yes.**
Q I'm talking about some sort of membrane type material in addition to any liquid flashing that you see in those photos.



A **Oh, oh, oh. I think there was a sheet material applied, I think it was Miradry, but it was later, I mean after -- after the siding was on.**
Q So whether any such thing was done initially during construction, you don't know?
A **I don't know.**
Q But that would have been something you would have recommended?
A **That they do do that?**
Q Yes, sir.
A **Yes.**
Q Okay. Now, you saw, and I think you answered a couple of questions about it, where the contract between the waterproofing subcontractor and the general specifically said to use liquid flashing as opposed to metal flashing; correct?
A **Yes.**
Q Do you know how that change to the contract came about? Do you know anything about that?
A **No.**
Q And did you see in the Swelltite material that the flashing that CETCO recommended at least back then for the Swelltite 3000 system was the liquid flashing?
A **M-2000.**
Q M-2000?

A **Yes.**
Q All right. I want to show you, and I think it was marked as Exhibit 47. My copy doesn't have it, have the number on it. Are you familiar with that document or have you seen that, I should say, in conjunction with your investigation here?
A **I have seen this.**
Q Do you have an understanding of what that is? Was it related to you what that represents?
A **It shows the top cord bearing truss.**
Q And what does it show in the circle?
A **In the detail?**
Q Yes, sir.
A **It shows the construction or the -- I shouldn't say the construction. It shows the top cord bearing truss bearing on wood blocking.**
Q And other than being provided with that document, did you either follow up to find out what the background to that document was or was it explained to you how that came about?
A **All I know is that this is what was finally provided. This top bearing cord truss was provided.**
Q And by provided, you mean that's how it was actually constructed out there on site?
A **I believe that's right.**



Q Do you have any idea or did you find out from any source whether that sketch, that design change, was ever transmitted to the trades in the field?
A **I don't know.**
Q And you understand from what you're looking at there that that was drawn by Hanuschak Kowalchuk, who you were already familiar with when you first got this assignment; right?
A **Yes, I believe it was. I believe that he drew this.**
Q And you knew that Hanuschak Kowalchuk is a structural engineering firm; is that right?
A **Yes.**
Q You also knew that Mr. Feges was the architect's representative on the project; correct?
A **I believe that's his role.**
Q Okay. And you knew, unless you only looked at the page right there, that this diagram -- well, actually, let me see. This document at least as marked as an exhibit was three pages, not just the drawing. Did you receive the whole three page document; do you know?
A **I think I have seen RFI 39.**
Q What's the date on that one?
A **That is December 12, '94.**
MR. RAU: '94?
THE WITNESS: '96. November 14th, '96.



MR. HULL: December, isn't it?
THE WITNESS: Yes. Let's try this again. The date on RFI 39 is December 14th, '96.
Q (By Mr. Brown.) Why don't you turn to the next page? Do you recognize that page as well?
A **I don't know that I seen that.**
Q What's that?
A **It's a fax transmittal of November 26, '96.**
Q And having read that, does that appear to be the fax cover sheet for the actual sketch itself from Mr. Hanuschak?
A **Yes.**
Q And who is that directed to?
A **To -- well, it's to Elness. I don't know whose initials this is.**
Q And Elness was the architect?
A **Yes.**
Q What are Mr. --
A **Yes. It's BRW. It's BRW/Elness to John Feges.**
Q And does Mr. Hanuschak give Mr. Feges some instructions in that fax cover sheet?
A **Does he give some direction?**
Q Does he give some instructions on what to do with the attached sketch to Mr. Feges on that sheet?
A **He has written, "Please review and issue to job site as appropriate."**



Q Now, would you agree that from your view of the detail in the circle on the sketch, that that represents a design change from the original design concept? I guess both what's in the circle and the broader view?
A **It probably does. It probably is a change in the structural design.**
Q It involves for one thing bearing truss, correct?
A **A top cord bearing truss, yes.**
Q And you earlier testified you weren't provided with any documents that revealed one way or another whether the trusses were too long such that they actually came out to the outer edge of the bearing CMU block as a precipitating reason for that sketch?
A **I wasn't aware of that.**
Q Because otherwise, if the truss, the wooden truss bore right in the middle of the block, there are blocks on the market, as you know from your professional experience, that are sort of half height that can take up the other half of that course; do you understand what I'm asking?
A **There are half high blocks, yes.**
Q Do you know whether Swelltite 3000 can be or at least is designed to be installed directly to untreated pine construction members? Pat had a better term for it, but -- dimensional lumber?
A **It's shown in CETCO's details as being applied directly**

**to wood lagging.**
Q And you didn't know --
A **I don't know that the wood lagging is pine.**
Q Or untreated?
A **Or untreated. But it shows it, illustrates it as being directly there.**
Q At any rate, the drawing in the circle, sir, on the first page of the exhibit by Mr. Hanuschak, would you agree that that's an appropriate waterproofing system, so to speak, for that area in the courtyards?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: I don't think this -- I don't think this is intended to show any particular waterproofing design.
Q (By Mr. Brown.) You didn't read Mr. Hanuschak's deposition, did you?
A **No. No, I haven't.**
Q If he testified it was, would that change your answer?
MR. HULL: I'm going to object. That is not what he testified to. If you want to set that up as a hypothetical, that's I suppose fine, even though it has nothing to do with reality.
THE WITNESS: I don't know what is intended here. This is his drawing.



Q (By Mr. Brown.) Whether he intended that or not, sir, -- and he was asked that question. Whatever his intentions were, I'm simply asking you -- and let me see the drawing so I can get the terminology correct -- whether a waterproofing membrane on the outer side of the wooden dimensional lumber and flashing at the locations depicted in that picture is the kind of system that you, you know, come up with your own brands for those various components, but whether those components and their locations are the kind of thing you would want to see in those locations in the courtyards?
A **You mean would I design it this way?**
Q I'm just asking if those are the kind of components and the locations for those kind of components that you would want to see installed in those areas of the courtyards as depicted in that circle?
A **I don't think this directs the contractor to install the waterproofing system like this.**
Q I'm not asking you what it directs, I'm just asking if those components and the location of those components are the kind of items you would want to see out in the courtyards in those areas as depicted in the drawing? And if you don't have an opinion --
A **I would like to see a waterproofing membrane, I would like to see flashing on the wall. I probably wouldn't**



**put it where it's shown on this drawing, but I would expect to see those kind of things on the wall.**
Q And do you know whether that drawing itself ever found its way -- you've already answered that question. Strike that. Do you know how many of the posts were repaired?
A **No.**
Q You answered Mr. Reilly's question earlier that it was at least your understanding you were given some information that the incidence of leaking was reduced after the posts that were repaired were repaired; correct?
A **I believe that after repairing some of the posts, the leakage, some leakage stopped.**
Q Okay. Were you ever told what the cost for the repair for each of the posts that was repaired amounted to?
A **No.**
Q Now, sounds like at least on one occasion in the past you were asked to go try to investigate the source of some leaking in a basement. Was that a residential basement?
A **I have, yes.**
Q All right. And I think at least the occasion that you testified about you did some actual excavation and testing and determined that there were leaks through a seam or some seams; do you remember that testimony?
A **Yes. Cracks.**
Q Right. And your repair, which was evidently part of what



you were hired to do in that case, was to repair those cracks or seams; correct?
A **Yes.**
Q Instead of tearing the whole system out and putting a whole new system in; is that right?
A **Yes.**
Q Now, you did have an opinion in your report that the system recommended by Mr. Campbell was a much more expensive system than what's in there now; correct?
A **The American Hydrotech?**
Q Yes, sir.
A **Yes. I believe it's more expensive.**
Q Did you ever ask Mr. Hull, by the way, -- well, that's going to be attorney-client privilege, won't it? Did you ever find out if the owner that hired Mr. Hull's client put any parameters upon the cost for whatever waterproofing system was bid at the initial stages of the Promenade project?
A **No.**
Q Now, the information that you got from Mr. Kong that the Hydrotech system is very expensive or much more expensive, was that the sole source of information you received to lead to that conclusion?
A **Yes.**
Q Did you have Mr. Kong investigate the cost of any other

systems to compare with the American Hydrotech?
A **Yes.**
Q What did he investigate and what did you learn, just that they were much less expensive?
A **They were less expensive. A membrane with granular bentonite.**
Q But satisfactory systems that you would be comfortable recommending for replacement work out at the Promenade?
A **Yes.**
Q Were you given any specific numbers by Mr. Kong?
A **Yes.**
Q What were they?
A **The American Hydrotech he estimated at eight dollars a square foot.**
Q What other systems and what square foot costs did you learn of?
A **EPDM over granular bentonite we thought would be about six dollars a square foot.**
Q Any other systems?
A **No.**
Q I want you to assume that the incidence of leaking that was still occurring when the post repairs were first undertaken had diminished significantly by the time the posts that were repaired were completed. Do you understand my hypothetical question so far?



A **So you're saying that the leaks that were occurring before the post repair was done, before it was completed?**
Q Yes, sir.
A **I mean they started some, but it wasn't all done. The incidence of leaks reduced before that?**
Q Reduced by the time the post repair work was completed significantly.
A **Okay.**
Q I want you to assume that. Rather than first recommend an entire replacement of the whole waterproofing system out there, would you recommend repairing the rest of the posts first to see if that does the job?
A **If I repaired one post, I would repair all the posts.**
Q Especially if it looked like that was working?
A **If I repaired one post, I would be worried about all 30 posts and I would repair all 30.**
Q Okay. Do you know if the posts were part of the original design, the posts installed directly to the precast?
A **I thought the posts -- what was contemplated was the post on the block.**
Q Do you know?
A **I don't know. I don't know.**
Q If you were told that the drawings actually depict concrete block piers beneath the posts and the posts run from the entryway slab up or stoop up and the concrete



piers run from below the slab down to the precast, would that be a better design in terms of -- well, I want you to assume that's what the drawings depict; all right?
A **Okay.**
Q If that was changed, that design, to what you know was ultimately installed out there, that being wooden posts secured directly to the precast, would that impact potentially the courtyard waterproofing, that change?
A **Both can be successfully waterproofed.**
Q Would it change -- would it impact courtyard waterproofing?
A **Yes. You would design the waterproofing differently.**
Q Do you know whether the waterproofing contractor was consulted regarding the decision to install wooden posts directly to the precast before any membrane was laid down?
A **I don't know.**
Q Would you expect, based on your experience and knowledge, that water would enter those buildings in the courtyards if dirt was installed at a level several inches above the CMU block but between the dirt and the walls themselves there was no waterproofing of any sort?
A **Would I expect leakage to occur?**
Q Yes, sir.
A **Yes.**
Q Why would you expect that?



A **There's no protection there, and water is likely to be there.**
Q Would you expect an architect who is well aware of that fact to know that, to know that leaking was expected?
A **Would I expect an architect to know that?**
Q Yes, sir.
A **Sure.**
Q Would you expect a general contractor to know that?
A **Sure.**
Q If a waterproofing contractor wasn't made aware that the dirt was going to be pushed to a level above where any waterproofing was installed, would you expect one or other of the architect or the general contractor to inform that subcontractor?
A **Well, I would expect the contractor would, the general contractor would. I think if it came to the attention of the architect, the architect would.**
MR. BROWN: That's all I have, sir. Thanks.

EXAMINATION

BY MR. VEITH:

Q My name is John Veith. I represent Chris Craft, the maker of the film, the 1.5 dissolvable film. I only have a couple of questions for you.
Were you provided with any product

literature relating to that film?
A **No.**
Q Were you provided with any technical data relating to the film?
A **No.**
Q Have you done any checking on your own to obtain information like that?
A **No.**
Q I thought that you testified about or used the term scrim sheet?
A **Yes.**
Q And I don't know what you meant by that?
A **A thin sheet, very thin.**
Q Were you referring to the film itself, then?
A **Yes.**
Q Have you reviewed the deposition of Tom Yogan?
A **No.**
Q How about the deposition of Andrew Verrall?
A **No.**
Q I think early on in your testimony you were asked questions by Mr. Reilly about an investigation you did of some condominiums or apartments or something like that where there was seams that were obviously failed?
A **Yes.**
Q Do you recall that?



A **Yes.**
Q Do you know whether there was any conclusion reached about why the seams failed in that case?
A **Poor seaming. Poor workmanship in putting the seams together.**
Q It was an installation error?
A **Yes.**
Q Have you ever testified before relating in any way to issues involving below grade applications of bentonite waterproofing which includes a dissolvable film?
A **No.**
MR. VEITH: That's all I have.
MS. HEYER: I don't have any questions at this time.
MS. REISBORD: I don't have any questions.
MR. BRISBOIS: I don't have any.
MR. HULL: Pat?

EXAMINATION

BY MR. REILLY:
Q Other than the time when I asked you questions earlier today about that employee of Promenade doing that hose testing by Unit 3-115, are you aware in the materials that you received of any other specific testing of leaks being done at the Promenade?
A **Where someone was actually trying to create the leak?**



Q Yes. I don't know if create the leak is a proper description. Perhaps locate the leak.
A **I don't recall any others. There may have been some, but nothing's coming to mind.**
MR. REILLY: All right. That's all the questions I have.
MR. HULL: Chad?

EXAMINATION

BY MR. STEPAN:
Q When Mr. Rau was asking some questions, he directed you to the subcontract between Weis and Waterproofing By Experts. He had asked you what -- I believe you testified -- let me back up. I believe you testified that you thought there were items in the subcontract that indicated to you that not enough consideration, or not enough weight was given to various components that you would like to have seen. Do you recall that?
A **Yes.**
Q And Mr. Rau followed up and asked you what items are you referring to, or something to that effect, and you pointed to the flashing item?
A **Yes.**
Q Are there any other items in that subcontract that would fit that bill?
MR. BROWN: I would object that he lacks



foundation.
THE WITNESS: I can't think of anything else.
Q (By Mr. Stepan.) And you've got the contract there in front of you and you're able to look at it; right?
A **Yes.**
Q And with regard to the flashing, you don't know what dialogue or discussions were had to arrive at what was put in the subcontract; is that right?
A **I do not know.**
Q Are you familiar with the term design-build as it's applied in construction projects?
A **Yes.**
Q What's your understanding of that term?
A **That it's to provide -- whoever is contracting for this, the owner is expecting that person to both design and build whatever system is being contracted for.**
Q Have you ever worked on a project where there has been design-build aspects?
A **Yes. Working on one now.**
Q Have you ever been part of a group that's doing the design and building?
A **Yes. Highway 52 in Rochester, we're part of the design-build team.**
Q Are there separate design professionals on that particular