**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Westfield Insurance Company,

Civil File No. OO-CV-987 JEL/JGL

Plaintiff

vs.

Weis Builders, Inc., Promenade Village Townhomes, LLC, Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants, and
Third Party Plaintiff

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Company,

Third Party Defendant and
Fourth Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth Party Defendant.

---

**Attached hereto is Exhibit B - a true and correct copy of the cited pages from the Deposition of William Arockiasamy taken on October 7, 2003.**

A **Yes.**
Q What were the issues in that case?
A **That was a residential structure. It related to movement of the building framing. That was considered to be the damages.**
Q And that didn't involve any waterproofing?
A **No.**
Q All right. Turn to the next page, then, which you've been asked to work as a consultant. There are four cases listed here. The first one listed is Foster Poultry Farms?
A **Yes.**
Q What were the issues that you were asked to address in that case?
A **That dealt with the adequacy of a storage silo for storing malt.**
Q When you say adequacy, are you talking strength of the construction?
A **Strength, yes.**
Q No waterproofing issues?
A **No.**
Q Number 2, Brookhill Corporation versus Continental, do you remember what the issues were that you were asked to consult on?
A **I'm not quite sure what that was all about. I don't**



**remember.**
Q Okay. If it comes back to you at a later date, please let me know?
A **Okay.**
Q Next one, JLT Group versus Granite State?
A **That was a partial collapse of a structural element in a parking ramp in Edina.**
Q What was the cause or -- was there a cause determined for the collapse?
A **Yes. That was the manufacturing of the precast unit and its attachment between the related units, connection.**
Q I assume that had nothing to do with waterproofing?
A **No.**
Q All right. And the final one is Roberts & Schaefer. What was that case about?
A **That dealt with the collapse of a coal storage silo in West Virginia and that didn't have any connection to waterproofing.**
Q Okay. Now, as you sit here today, are there any other cases that you can recall that either you've acted as an expert witness or as a consultant in that are not listed here?
A **No.**
Q The final page in this exhibit is your fee schedule?
A **Fee schedule.**



Q Is that the fees upon which you're working in this case today?
A **That is correct.**
Q Now, you were hired in this case by Mr. Sonnesyn's firm?
A **That is correct.**
Q What were you charged to do?
A **To provide an opinion as to the adequacy of the drain assembly, drain system.**
Q And were you asked to do any other evaluations other than the drain assembly?
A **The second part was whether that drain system as designed contributed or had any part in the leakage of water into the units.**
Q Have you ever in your career as an engineer worked on a project that included an apartment complex with below grade waterproofing?
A **No.**
Q When you were asked to look into this case, what did you do once you were advised what the scope of your work was to be?
A **I reviewed a set of drawings which were mechanical drawings showing the layout of the piping and layout of the drains.**
Q All right. And then what else did you do?
A **Then I performed some -- oh. I made a site visit to**



**become -- to make myself familiar with the project, then performed some calculations to check the adequacy or check the conformance of this drain system to the plumbing code.**
Q All right. What did that site visit entail as far as your activities out there?
A **I just walked from one building to another along the courtyard just to make myself familiar with the layout and configuration of the site. I also walked in one garage, that was Building 1, to see the bottom of the precast decks.**
Q What other activities or information did you obtain to assist in carrying out your duties in this case?
A **Then I had one of my other engineers to go back to the site to take an inventory of the drains as to how many there were and also to document their approximate locations.**
Q Then what next did you do?
A **Next we calculated the tributary areas, approximate tributary areas served by each of those drains to find out the worst case scenario and check whether that conformed to the plumbing code requirements.**
Q When you say plumbing code requirements, which codes or statutes were you looking at?
A **Minnesota Plumbing Code, I don't recall the numbers,**

**dealing with the drains.**
Q Are there any other codes, such as building codes, that would also apply?
A **Not for the drain system.**
Q Okay. Is there any other information that you put together or collected?
A **That would be it.**
Q Did you do any testing at the site?
A **No.**
Q Did you do any excavation of any areas at the site?
A **No.**
Q Were you present when anybody else did any excavations at the site?
A **No.**
Q Have you ever examined any of the materials used in the project?
A **Would you repeat the question?**
Q Yes. Have you, in other words, gotten a sample or through some source looked at materials that were used either as a sample of something that had been used or actually was dug up from the project or --
A **Yes. I have seen the floor drain or the drain assembly that was supposedly used in this project.**
Q Is that what's called the Fat Max drain?
A **Fat Max, yes.**



MR. SONNESYN: Pat, we have one back at the office, that Mr. Arockiasamy examined in our office. Is that what you're referring to?
THE WITNESS: Yes, uh-huh.
Q (By Mr. Reilly.) And other than that component, have you looked at, you know, in your hands or visually inspected any other components outside of looking at the site?
A **No, I haven't.**
Q And I understand you were provided with depositions and other materials that were created as a result of this case?
A **Yes.**
Q Including reports from various other people?
A **Yes.**
Q All right. Anything else that you relied on in forming your opinions in this case?
A **I have reviewed some of those documents. Some of them are reports issued by other engineers and I have also gone through depositions by some of them.**
Q Was there some logic or basis upon which you decided you'd look at some and not others?
A **Time.**
Q Okay. Since time is short, what caused you to choose "I'm going to look at this deposition but not that one, this report but not that one"?



A **I chose them based on where I could find information relevant to the topic that I'm working on.**
Q And that's the drains?
A **Drains.**
Q I'm going to show you what's been marked Exhibit 806, which is dated August 15th, 2003. And that is a three page document; is that correct?
A **Yes.**
Q And is that your signature on the last page, sir?
A **Yes, it is.**
Q And what is this document?
A **It's a report that I provided to Tomsche, Sonnesyn & Tomsche.**
Q Okay. Now, in this document, on the first page you list four documents that you reviewed, and basically they are four reports from other witnesses in this case; correct?
A **That is correct.**
Q The Inspec report, the Wiss, Janney report, the Raths, Raths & Johnson report and the Patrick Engineering report, correct?
A **That's correct.**
Q Other than what we've already discussed, what you've testified as to your site visit, all those sort of things, the documents you reviewed, was there anything else you did to prepare for issuing this report?



A **Not that I can think of.**
Q Okay. Now, you'll note -- turn to the second page, your opinions. Your first opinion indicates that the drain holes in the vertical PVC drain pipe was two and a half inches above the precast concrete; is that correct?
A **Above the level or top of the precast concrete.**
Q All right. And as you indicate in this first opinion, that there would be retention of approximately, and I'm not holding you to the exact depth, but there would be approximately two and a half inches, according to this, water would be on that precast concrete?
A **Yes.**
Q Have you designed drains in precast concrete yourself?
A **No.**
Q Have you ever designed a system where drains were installed in precast concrete?
A **No. Not on precast concrete.**
Q Okay. Are you aware of drains that could be used in a precast concrete plank that would allow the collar of the drain to be flush with the top of the plank?
A **I'm not familiar with a lot of those products, so I can't.**
Q Now, you've seen the Fat Max drain?
A **Yes, I have.**
Q To your knowledge, is there a way in which the Fat Max

THE WITNESS: Yes. If I want to clarify --
Q (By Mr. Reilly.) Sure. I'll clarify this. In other words, I think somewhere in your report you talk about the top parts of the drain, where they are at ground level; in other words, at the level of the sidewalks, the level of the grass. Do you understand what I'm talking about there?
A **Okay. At that level.**
Q And I think you indicated in your report that there is some ponding or collection of water that is not flowing into the drains in those areas?
A **Okay.**
Q Is my recollection correct?
A **That is correct. I don't recall exactly what I said.**
Q All right. We can get to it. But in any event, do you recall there being some water ponding and certain events on the surface?
MR. BYE: Are we talking the surface of the grass?
MR. REILLY: Surface of the grass. In other words, the top surface.
THE WITNESS: Based on my observation, I saw stagnant water.
Q (By Mr. Reilly.) Is that also a concern for a structural



engineer?
A **It's not -- in a way it is a concern for a structural engineer because he has to take into account the amount of water held. But generally it's not -- the structural engineering should include, allow for a certain amount of water.**
Q All right. Once again, if you're designing a drain system that includes surface drainage, you want to remove as much water as quickly as possible; correct?
A **That is correct.**
Q And you want to try to avoid in that design water that does not flow to the drain?
A **Water that does not?**
Q That does not ultimately flow to a drain?
A **Avoid that, is that what you're -- yes.**
Q Now, what as an engineer do you do to either eliminate or attempt to prevent that from occurring?
A **To avoid ponding and stagnant water?**
Q Yes.
A **At the ground level, you provide adequate slope for the water to flow towards that --**
Q To provide adequate slope, you need to have the drains at a lower level than the majority of the land around it; correct?
A **That is correct. And vice versa.**



Q Or obviously have the ground up -- I mean, the top of the drain has to be below the overall grade of the land so there is a slope to the drain?
A **That is correct.**
Q Without that slope, the water will not get to the drain, therefore it cannot go into the drain?
A **The surface water.**
Q Right.
A **Okay.**
Q There is always going to be some percolation of water in any permeable soil?
A **That is correct.**
Q And the purpose of those PVC holes is to take in that water; correct?
A **That is correct.**
Q Now, let's go to your third opinion. You reference a failure of the waterproofing system. Did you form any opinions as to what you meant by a failure of the waterproofing system?
A **Whatever system that was there to hold and intercept and prevent water from finding its way into the structure below or the space below, it's that system. I was talking about the failure of that system.**
Q So what you're saying is there is water leaking below the courtyards; right?



A **Yes.**
Q And the overall system, including materials, the structure, the way it was designed, all that was supposed to prevent that from occurring?
MR. HULL: Object to the form of the question.
THE WITNESS: In this case we are dealing with the drain system and the waterproofing system.
Q (By Mr. Reilly.) Okay. And the waterproofing system can be -- would you agree with me that it can be defeated by penetrating it, circumventing it?
A **Yes.**
Q Okay. Did you do any studies to determine whether this waterproofing system was either being penetrated or circumvented?
A **No, I did not.**
Q So you don't have an opinion as you sit here today what is causing the leaks in the waterproofing system?
A **If the drain system did not leak, then the waterproofing system allowed water to leak, whether it is all the things that you mentioned.**
Q But what I'm asking is you don't know why water is getting through the waterproofing system or around the --
A **I don't know.**
MR. SONNESYN: Make sure that Mr. Reilly

finishes his question.
Q (By Mr. Reilly.) Let me ask you the question. You don't know as you sit here today why water is getting below the courtyards into the garage areas?
A **I know in a general sense.**
Q But as to the specific causes of that?
A **No.**
Q And you were not hired to make that opinion?
MR. SONNESYN: Do you understand his question when he said you were not hired to make that opinion? Do you know what he's referring to?
Q (By Mr. Reilly.) The opinion as to the adequacy or inadequacy of the waterproofing system itself?
A **No. I was not hired to do that.**
Q And when you say in your number 4 inadequacy and failure of the waterproofing system, what I take from your prior testimony is what you're saying is there is water that is entering the building below the courtyard, so something's gone wrong to allow that to happen; correct?
A **Pardon me. I kind of missed that.**
Q Go back to your fourth point. You refer to inadequacy and failure of the waterproofing system, in your opinion?
A **Yes.**
Q What you're saying there is in a general sense, water is getting below the courtyard, and therefore something is



allowing that to happen?
A **That is correct.**
Q You do not know the specific cause of that water reaching there?
A **I can form the opinion that it has to do with the waterproofing, but what I don't know is specifically what happened to the waterproofing.**
Q For instance, if the water was entering above and behind the waterproofing system, just as a hypothetical question, in other words, it's entering through the walls of the building above where the waterproofing material is applied, and allowed to enter into the garages that way, you wouldn't have an opinion one way or the other whether that's occurring?
A **I wouldn't have an opinion.**
Q And you don't have an opinion as to any penetrations that may have been existing in the waterproofing system?
A **Yes.**
Q And you don't have any knowledge yourself of any failure, specific failure of the material used in the waterproofing system?
A **That's correct. I do not.**
Q Let's go to Exhibit 807. Take your time and look at that, if you would?
A **Okay.**



Q That's the October 3rd, 2003 report?
A **Yes.**
Q And is that your supplemental report, sir?
A **That is correct.**
Q And it looks like the last two pages include a service list and the front page is your letter to Ms. Heyer?
A **That is correct.**
Q Okay. What was your intent and purpose for providing this supplemental report?
A **We wanted to find out whether the drain system as designed and shown in the drawings, whether it conforms to the Minnesota State Plumbing Code requirements.**
Q And as I understand the basis for that examination is you compare the watershed for each drain and determine the size of the drain necessary to carry away an appropriate amount of water?
A **The size of the pipe.**
Q Right.
A **Okay.**
Q And that also requires a certain size of inlet grate as well?
A **That is correct.**
Q When you did the calculations, did you include the square footage of the roofs area that drained into the courtyards as well?



A **Yes, we did.**
Q And as to the standard for the amount of water entering into the drain system, do you use a certain standard for that?
A **Amount of water entering that?**
Q Yes.
A **That is incorporated into the plumbing code requirements.**
Q Do you know what type year storm, in other words, a ten year storm, a 50 year storm, 100 year storm, whatever is required to be met by the code?
A **I am not sure what type of a model storm, but it's rainfall, four inches an hour rainfall. The plumbing code numbers and their charts are based on four inches an hour rainfall.**
Q Okay. Did you determine that the size of the pipe in the system was appropriate for this application?
A **Size of the pipe, it was adequate for this installation.**
Q Okay. And as far as the drain, -- and I'm talking about the drain at ground level, at the level of the sidewalk, grass, whatever, the top of the drain?
A **The grate.**
Q The grate. That was appropriate for the size?
A **Yes. We found that that was adequate.**
Q And that was basically based upon a calculation that you did --

**engineer.**
Q And you indicated that Mr. Boyum was sent back out to the site on October 3rd to figure out if there was a discrepancy between the Larson plans and the Mikesh plans and what was on site; is that right?
A **That is correct.**
Q Was there any other reason why he went back out there on October 3rd?
A **No. That was the reason.**
Q And you indicated that you were not hired, or you stated earlier that you were not hired to analyze the adequacy of the waterproofing system; is that right?
A **That is correct.**
Q Do you have any plans down the road to offer any opinion regarding the adequacy of the waterproofing system?
A **Not at this point.**
Q In Exhibit 806, which you were asked about earlier, you state at opinion number 3 that leakage of water occurred due to the failure of the waterproofing system; is that right?
A **That is correct.**
Q Is that based upon what you read in the reports that are set forth on page 1 of your report?
A **Part of it was based on the reports I read.**
Q What was the other part based on?



A **Other part is that there was adequacy of the drain system and that there wasn't any indication that the drain system in itself caused the leakage, so it's a logical inference that something else came through for the water to flow.**
Q And when you put together the report that is Exhibit 806, you said you had not been out to the site; is that right?
A **That is correct.**
Q So what do you base your conclusion -- on what do you base your conclusion that the drain system didn't contribute to the leakage?
A **That was the purpose of the drain system, to hold the waters, intercept and prevent the water from leaking into the building, and the drain system was to receive and convey the water once the water gets to that point. So if water traveled, find it's way into the building, then it is the intercepting mechanism gave way.**
Q Did you do any testing to determine whether the drain system contributed to the leaks in any way?
A **No, I did not.**
Q And you know that the drain system allowed approximately two and a half inches of water to stand on the deck?
A **Correct.**
MR. SONNESYN: Objection, speculation.
Q (By Mr. Stepan.) Is that right?



A **Understood that.**
Q And the two and a half inches of water on the deck was a result of the type of drain that was selected; isn't that right?
A **I don't know whether I can say it was because of the type of the drain that was selected. It was a result of the assembly and the restrictions of that, that you cannot drill through the flanges or collar of that drain assembly.**
Q When you say drain assembly, what are you referring to?
A **The Fat Max.**
Q So the use of a Fat Max drain assembly on this project resulted in the two and a half inches of water on the deck; is that right?
A **In this particular case, we can say that, but I don't know about other drain assemblies might have similar restriction.**
Q But that's true in this case, the Fat Max caused there to be two and a half inches of water?
A **The connection of the Fat Max to the PVC pipe.**
Q As part of your work on this case, have you had an opportunity to look at any of the literature from the waterproofing manufacturer?
A **I have not had.**
Q Have you seen any installation instructions from the



waterproofing manufacturer on this case?
A **No, I have not.**
Q Have you seen the subcontract that J-Berd Mechanical entered into for this project?
A **I have seen it and browsed through it quickly.**
Q Have you seen any other contract for this project?
A **No, I have not.**
Q Were you hired to analyze the general contractor's role in this project?
A **No.**
Q Did you look at any of the architectural drawings for this project?
A **I was given a set of architectural drawings. I didn't spend a lot of time with it. My intent was to locate mechanical drawings and look at the plaza drain layout.**
Q Would the drainage at this site have been helped if the concrete deck had been sloped to the drains?
A **Not really.**
Q Why is that?
A **The drainage of the site depends on the grade or soil up on the top. Down at the bottom, the sloping of the precast panels or deck, the only thing that could have done is to reduce the amount of water that is held at the bottom.**
Q I'm sorry. Were you finished, or if you have more, go

example, ensuring the proper filter fabric or gravel or whatnot was installed around the vertical leaders in the courtyards?
A **The question was who would be responsible?**
Q Did you ever learn?
A **Not specifically.**
Q What's the last, number 6 on the front page, failed, is that caulking?
A **Uh-huh.**
Q At?
A **Accessory structures, like stairs.**
Q All right. And you photographed that condition in a number of locations; is that right?
A **Yes.**
Q What was the significance of adding that in your notes and comments?
A **It's a moisture or water entry point.**
Q Point 7 on the reverse side of this page states erosion of soil under the concrete rim at some locations?
A **Yes.**
Q And you have addressed that with Mr. Reilly already today; is that right?
A **I don't know.**
Q Are you referring to the concrete collars around the courtyard drains at the surface of the courtyards?



A **Yes. That's what I'm calling concrete rim.**
Q And that was significant because, obviously, when the collars and the grates that are set in those collars are higher than the surrounding soil, the water can't enter into those grates; right?
A **That is correct.**
Q Regardless of the slope of the courtyards?
A **That's true.**
Q Point 8 states damaged PVC pipe?
A **And dislocated grates.**
Q At?
A **The four inch pipe inlets.**
Q How many times did you observe that condition?
A **Could be either one or two.**
Q You don't have any idea of when that damage occurred or why; is that right?
A **No.**
Q You did not review any installation or product materials, literature created by the manufacturer of the waterproofing membrane; is that what you testified to?
A **Yes. I have not.**
Q You've never installed, either professionally or just for fun, any of the kind of waterproofing materials that were used in the Promenade project; is that fair to say?
A **No, I have not.**



Q Do you have any idea how Swelltite 3000 is to be installed in the kind of below grade applications that are in existence at the Promenade?
A **No.**
Q Is it fair to say that you were not asked to and you did not form an opinion as to whether the Swelltite 3000 membrane and components manufactured by CETCO were installed in accordance with CETCO specifications and installation instructions?
A **No, I was not.**
Q Do you have any intention of reading the rest of those reports and depositions after we're done here?
A **The ones I haven't read so far?**
Q Yes, sir.
A **Yes. I plan to go through some of those.**
Q Do you plan to go through all of them?
A **At least the reports and some of the depositions maybe.**
Q Can I get a commitment from you that if your review of that additional material alters or changes your opinions in any way that you'll let your counsel here know so that we can know?
A **I will.**
Q Do you know if Swelltite 3000 is designed and manufactured to withstand or be exposed to constant standing water such as is occurring at the Promenade?



MR. BYE: You're asking was it indeed or is it supposed to be?
Q (By Mr. Brown.) Is it supposed to be, to your knowledge?
A **I don't know.**
Q And I think you earlier testified that with respect to the one roofing project that your company was asked to investigate and analyze the sufficiency of the drain system on that roof, that there was waterproofing on top of that roof; is that right?
A **That was correct.**
Q There were both surface drains and waterproofing?
A **There was waterproofing, but we were not -- our primary work was not to check the drains but to make sure the structural was adequate for the condition the drain was designed at.**
Q Now, if water had been observed by your company on that occasion to be standing at a certain depth, say at two and a half inches at all times on that roof, despite the existence of waterproofing, would that have been an improper condition, in your opinion?
A **I wouldn't consider that improper for the purpose we were trying to do because our structural design was to account for water staying there.**
Q So whether that would have been bad for whatever kind of waterproofing was out there, that just wasn't your