UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - -

Westfield Insurance Company,

Plaintiff,

vs.

Weis Builders, Inc., Promenade Village Townhomes, LCC, Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA companies,

Defendants, and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Third-Party Defendant,
Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Plaintiff,

and

J Berd Mechanical Contractors, Inc.,

Third-Party Defendant and
Fourth-Party Plaintiff,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -

EXHIBIT 2

DEPOSITION OF

**JEFFREY SCHUH, P.E.**

15 October 2003

9:00 a.m.

DEPOSITION of JEFFREY SCHUH, P.E., taken pursuant to Notice and agreement of and between counsel, at 8009 34th Avenue South, Suite 200, Minneapolis, Minnesota 55425, at approximately 9:00 o'clock a.m. on October 15, 2003, before Paula E. Berg, Notary Public, County of Hennepin, State of Minnesota, to be used in the above-entitled cause.

APPEARANCES:

On Behalf of the Third-Party Defendant and Fourth Party Plaintiff J-Berd Mechanical:
Rolf Sonnesyn, Esquire
TOMSCHE, SONNESYN & TOMSCHE
610 Ottawa Avenue North
Minneapolis, MN 55422

On Behalf of the Third-Party Plaintiff Weis Builders:
Chad Stepan, Esquire
MEAGHER & GEER
4200 Multifoods Tower
33 South Sixth Street
Minneapolis, Minnesota 55402

A. That's either a perforated section or a slotted section of the PVC pipe that they would put in to get a water level.

(Whereupon, Deposition Exhibit No. 842 was marked for identification.)

BY MR. SONNESYN:

Q. Take a look at No. 842. What is No. 842? Again this we took from your file.

A. These are field notes that were prepared by Drew Ptak.

Q. And were they prepared when your crew was up here for the first site visit?

A. It was prepared by him as a result of his first site visit, yes.

Q. On the last page it refers to these hand augers. Do you see that?

A. Are you referring to auger #9, #10, #11, #12.

Q. Last page?

A. Yes.

Q. Are those the same augers, that same procedure that was referenced in the checklist?

A. On No. 841?

Q. Yes.

A. Those are the hand augers, yes.

Q. And so these are Mr. Ptak's notes?
A. Yes.
Q. And some of these, the way that I interpret some of these hand auger tests turned up dry soil. Is my interpretation correct?
A. That's what he notes is dry, yes.
Q. Let's just take the first one as an example. It says hand auger #9, courtyard #2. Do you see that?
A. Yes, yes.
Q. And then I can't read his handwriting there. Is it zero to 2 inches top soil?
A. Yes.
Q. And then 2 inches to 13 inches silty clay?
A. Yes.
Q. And then to the right what does that say?
A. I believe it says brown.
Q. Brown, and then 13 inches to 16 inches, what does that say?
A. Brown sand.
Q. Brown sand, wet?
A. Yes.
Q. And then underneath that, what does

that say, E-D-B?

A. End of boring.

Q. End of boring at?

A. 16 inches.

Q. 16 inches and then it says dry?

A. Right.

Q. Okay. So then if we --

MR. REILLY: It says something else there. There is a word there. I want to make sure it's complete.

THE WITNESS: Brown silty sand.

BY MR. SONNESYN:

Q. Sure, that's where the 13 inches to 16 inches level there was silty brown sand?

A. From 13 to 16 is brown sand, and then I believe it's brown silty sand, but I can go to the report.

MR. REILLY: Just for reference, what are you looking at?

THE WITNESS: In Exhibit Appendix B it has the various comments that he had taken.

BY MR. SONNESYN:

Q. Appendix B as in boy?

A. Yes.

Q. Appendix B of your report I take it is

where someone -- was it Mr. Ptak?

A. Yes.

Q. Took his handwritten notes and then put it into what, word processing?

A. Correct.

Q. Let's go back to Exhibit No. 842. The next entry, this is on the last page of Exhibit No. 842, it says H-A, that is presumably hand auger.

A. Yes.

Q. Number 10?

A. Yes.

Q. Courtyard #3, is that right?

A. Yes.

Q. And then again we have zero to 2 inches top soil, 2 inches to 13 inches silty clay. Is that black and brown?

A. Black and brown, yes.

Q. 13 inches to 17 inches brown silty sand. What does that next thing say?

A. S-M.

Q. S-M, what does that mean?

A. Silty sand.

Q. Silty sand, and then it says wet in parenthesis?

A. Yes.

Q. And then what does the bottom say there?

A. End of boring at 17 inches.

Q. Dry?

A. Dry.

Q. And then the next entry hand auger #11, courtyard #4, we would interpret it the same way?

A. Zero to 2 inches top soil, 2 inches to 15 inches brown silty clay, 15 inches to 17 inches brown silty sand wet, end of boring, 17 inches dry.

Q. And H, hand auger #12, courtyard #6?

A. Yes.

Q. Maybe again interpret his notes, please.

A. Zero to 2 inches top soil, 2 inches to 26 inches black silty clay. I can't read the -- I can't read the last. End of boring at 26 inches.

Q. Dry?

A. Dry.

(Whereupon, Deposition Exhibit No. 843 was marked for identification.)

BY MR. SONNESYN:

THE WITNESS: I would not consider that part of the surface water drainage system.

MR. SONNESYN: Let's mark this.

(Whereupon, Deposition Exhibit No. 845 was marked for identification.)

BY MR. SONNESYN:

Q. This is Exhibit No. 845, again it was in your file. What is 845, do you know?

A. I don't know specifically.

Q. Does 845 have anything to do, have any impact on the opinions that you have rendered?

A. I believe it has to do with the City of Eagan code for drainage requirements.

Q. What is the relevance?

A. Well, I think the code gives you the minimum standard that you would try to achieve for a drainage project.

Q. And when you say "the code" to what code are you referring to?

A. Well, the code would be, you know, if Eagan has a drainage code or if there is a code for surface water management you would evaluate that code and see how it would apply to your project and then use that with engineering judgment to see if you have designed it

appropriately.

Q. Have you reviewed that code?

A. I'm aware of the Eagan code and I've talked to the City of Eagan engineer.

Q. Have you reviewed the code itself?

A. I don't believe I've -- well, I looked at the code on the Internet. I can't remember if I've read the entire code.

Q. Did you print it off?

A. I don't remember printing it off.

Q. I didn't see it. We didn't see it in your file, so --

A. I don't recall printing it off.

Q. And when did you look at the code on the Internet? And when we talk about the code, you're referring to an Eagan code.

A. It would have been in the last two or three months.

Q. And I think you said that you talked to somebody at the City of Eagan.

A. Yes.

Q. When did you talk to somebody at the City of Eagan?

A. I don't recall the date.

Q. I'll show you your e-mail. I'm just

seeing if you remember off the top of your head.

A. It was within the last few months is my recollection.

(Whereupon, Deposition Exhibit No. 846 was marked for identification.)

BY MR. SONNESYN:

Q. I'll show you what has been marked as Schuh Deposition Exhibit 846. Actually this one, why don't we have copies for everybody.

MR. REILLY: Sure.

BY MR. SONNESYN:

Q. While we're waiting for the copies, you said that the soil is not part of the drainage system and the slope of the courtyards is not part of the drainage system. Correct?

A. Correct.

Q. And are the roofs of the townhouses themselves part of the drainage systems?

A. I would say no.

Q. And are the gutters or lack of gutters part of the drainage system?

A. Well, that would be dependent on how they're connected to -- if they had gutters with downspouts that are connected to storm sewers then I would say those are really part of the system.

A. I don't recall who they met with.
Q. They simply said somebody from the City of Eagan was there at the site visit?
A. No, they weren't at the site visit. They went to the City of Eagan's offices to inquire what are the general requirements for design of drain systems.
Q. I see. Let's go back to Exhibit No. -- do you have any other knowledge about their -- the information that they obtained from the City of Eagan during that first site visit?
A. I believe it's consistent with the information that I have here.
Q. All right. And that's here meaning Exhibit No. 846?
A. Correct.
Q. But do you have any other information that MaryJo and Drew obtained from their site visit about the information that they obtained from the City of Eagan?
A. No, I do not.
Q. So you have got an e-mail that you send to the -- an e-mail site at the City of Eagan and your response was from Eric Macbeth on August 4th, 2003. Is that right?

A. The first response, yes.

Q. Why are you making this inquiry on August 4th, 2003?

A. Because I was confirming what MaryJo and Drew had told me and to verify it to put in the standard of care section of the report dated August 12, 2003.

Q. And you got a response back from Eric Macbeth who directed you to John Gorder?

A. Yes.

Q. And there is an August 5, 2003 e-mail back from John Gorder, is that right?

A. Yes.

Q. And then there is also a handwritten note, presumably that is a telephone conference between the two of you?

A. Yes.

Q. Is your telephone call with him before or after Mr. Gorder's e-mail to you?

A. After.

Q. He e-mails you 8:03 a.m.?

A. Yes.

Q. And then you spoke with him later that day?

A. Yes.

Q. And your handwritten note says "spoke with John on August 5, 2003 for pipe design, 5-year storm for" --
A. Upstream.
Q. "Upstream pipes, 10-year storm for main pipe."
A. Yes.
Q. And then your initials?
A. Yes.
Q. Do you remember anything else about that telephone conversation with Mr. Gorder?
A. Yes.
Q. Tell me what you remember.
A. When I spoke -- the reason why I called him was the information that he gave to me was for a detention pond design.
Q. And that's you're talking about his August 5, 2003 e-mail at 8:03 a.m.?
A. Yes.
Q. And so that e-mail was for a detention pond?
A. That's really for a detention pond for a development.
Q. I see.
A. And my question to him was for an area

don't believe that the system is designed to follow the standard of care.

Q. So you think that the required standard of care was deviated from?

A. Yes.

Q. And the required standard of care is defined as you have defined it?

A. Well, the standard of care would be what an engineering firm would do in this certain circumstance, the majority of the engineering firms would do in this circumstance.

Q. When you say the majority of engineering firms, what majority is that? 99 percent or 51 percent?

A. I mean, if -- go back. If they have a code or requirement then you need to follow that as a minimum.

Q. And the code or requirement, is that the plumbing code?

A. I believe there are several codes that Eagan would have, but again the code is a minimum requirement. You have to look at it and see if there are other issues that could apply. Just following the code doesn't mean that the system is acceptable.

elevation?

THE WITNESS: Which is the inlet elevation.

BY MR. SONNESYN:

Q. So that's how you get to the inlet elevation?

A. That's how you can see that the top of foundation is lower than the inlet elevation.

Q. I think I understand.

A. Okay.

Q. On page three of your report you state, and this is at the bottom; "Because the main drains in the courtyard are considered to be collector sewers (they collect water from the courtyard and convey it to the detention pond), they should be sized to accommodate the 10-year storm event without ponding."

The basis of your assertion in that regard are the City of Eagan criteria. Is that correct?

A. I mean, the City of Eagan requires that for -- I'm going to say public improvements, they're going to require that for anything that is done in the street or any parking lots. But I'm saying in general that's -- I don't want to say

every project we're working on, but almost all projects that I can recollect working on require that you look at the 10-year storm event and make sure that you don't have ponding in areas that pedestrians are going to use, people are going to use.

Q. What is the source or authority that underlies that assertion that you just made? In other words, is there a hydrology textbook that you look at? Is there a civil engineering textbook that you look at or is this just based on your knowledge of the industry?

A. I'd have to go back and see which textbooks say it. I can say that we have done this for so long that it's more or less I'm going to call it a standard.

Q. I mean, is there a code like a building code? We have the building code, we have the plumbing code, you referred to the City of Eagan code. Is there a code out there or an industry code?

A. I guess I don't know of an overall code that's a standard. It could be in certain areas that they may have something different, depending on the locality. But I'm saying in

general this is a pretty recognized standard.

Q. I see. This is a logical time for a break or we can keep going. Do you have a preference?

MR. REILLY: Just so we're clear, we had the same problem we had with all experts, we have one day here to get it done. I have no problem with doing lunch, I just want to make sure that everybody is aware we have to be done about supper time about today.

MR. SONNESYN: I'm not going to be that much longer. I'm going to walk through the report. Let's go off the record here.

(Whereupon, a one hour recess was had.)

BY MR. SONNESYN:

Q. Let's look at page four of your report, and again that is exhibit -- I keep forgetting.

A. No. 836.

Q. No. 836. Page four of your report, Mr. Schuh, under STORM WATER MANAGEMENT SYSTEM. Are you with me?

A. Yes.

Q. Second paragraph, last two sentences.

"However, sketches and notes were" -- well, I guess it refers to the mechanical contractor J-Berd Mechanical and Mikesh and then it states; "No detailed plans or specifications were apparently produced for construction of the courtyard drainage system."

And I think I touched on this earlier. Did you look at some plans drawn by Mikesh?

A. I believe I recall seeing sketches or notes, but I don't remember seeing any real detailed plans or specifications.

Q. And those were for a drain system, were they not?

A. I believe it was for a drain system, yes.

Q. And the next thing in your report, it states "However, sketches and notes were provided to indicate that the system was likely designed following the Minnesota Plumbing Code for roof drainage." And I think we touched on that before.

You next assert; "It was not accordance with the City of Eagan requirements for storm water management systems." Do you see that?

A. Yes.

Q. Is it your testimony that the City of

Eagan requirements were required for this project?

A. I do not know if they were required.

Q. Down towards the bottom of page four, item number one refers to inlets, and those are the surface grates in the courtyards. Right?

A. Yes.

Q. And it says "These inlets were 6-inch diameter drains surrounded by a concrete collar." Correct?

A. Correct.

Q. And actually the inlet grates were nine inches in diameter, correct?

A. The grates are, yes.

Q. So that where it says 6-inch diameter drains, that figure of six inches, that's incorrect?

A. Based on what is out there, yes.

Q. Well, do you have any reason to assert that the surface grates were anything other than nine inches from the date of installation?

A. I don't know that they changed.

Q. And your calculations are in part based upon the inlet grates being six inches, correct?

A. Yes, yes.

made an inference as to the intent of the system if you have asserted a criticism of the system. Is my inference incorrect?

A. ... I think what we looked at was is the system able to keep the water more than a foot below the entry elevation or to keep water out, from seeping over the top of the foundation. We're saying that it's not.

Q. That really was the full extent of your analysis?

A. To evaluate that. We didn't look at if you had brought in the different material how would that also effect the ability to collect surface water.

Q. Well, wouldn't this soil have an effect on the ability of the system to drain?

A. It would have an effect on the ability to bring water to the system.

Q. Yes.

A. Yes.

Q. And thus the compensation of the soil -- well, let me back up. I mean, I gather from what you're telling me is that the soil isn't a terribly significant feature in the analysis that Patrick Engineering conducted. Is that

correct?

A. No, I'm saying that we have evaluated based on what is there and you're asking me what if they put something else there how would it affect the system and I'm saying we didn't look at if they would have put something else there.

Q. You don't know?

A. If they had put something else there it could cause other -- if you have more permeable material then less water would get to the surface drain, but then more water would get down to the, you know, down to the soil underneath it. I don't know what affect that would have on the system either.

Q. In other words, you do not have a criticism of the type of soil, is that correct?

A. Well, I didn't say that. What I'm saying is that --

Q. All right.

A. -- the type of soil has an effect on -- the clay soil keeps water at the surface, so if you have no slope to it water is going to be at the surface.

Q. Okay.

A. Okay. And there is top soil above

that so the clay soil should keep water near the surface rather than percolating down to the sand that is underneath.

Q. All right. Page 11 under Analysis Following Local Design Criteria. Under subheading Approach.

A. Yes.

Q. "The City of Eagan Building Department was the permitting authority for construction of the courtyard drainage system. Therefore, it is assumed the system would have needed to meet City standard." Do you see that?

A. Yes.

Q. And I think what you have -- in this instance Patrick Engineering made an assumption, correct?

A. That it would need to meet the City standard, yes.

Q. And I think you have testified that you don't know whether or not the City standard would have been needed to have been met, correct?

MR. REILLY: Object to the form of the question as being a misstatement of his prior testimony.

BY MR. SONNESYN:

Q. Well, tell me if I'm wrong or right. That's what I'm asking you is if what I just stated is your testimony?
A. I don't have anything from the City in writing that says that the City code is required for the courtyard.
Q. And I think you said before that you don't know if the City code is required for the courtyard. Is that correct?
A. My interpretation is that it would be.
Q. Well, do you know?
A. I didn't get anything from the City on that.
Q. So you don't know?
A. I don't know.
Q. It next asserts here on page 11; "The City Engineering Department requires the use of the Soil Conservation Service, (SCS) also known as the National Resource Conservation Service (NRCS) methodology to design surface water drainage systems." Do you see that assertion?
A. Yes, yes.
Q. And I gather from your testimony, I interpret your testimony to mean that you can't tell me definitively that the City Engineering

to allow the growth. The presence of water above the waterproofing in conjunction with the frost susceptible soil caused the heaving of sidewalks in the courtyards." Do you know that for a fact?

A. Based on the photographs and other information that I had in the file that that was a problem. Out there yesterday you could see that there was a lot of cracking of the sidewalks and other signs of that damage.

Q. But do you know that for a fact?

A. Other than the information that was provided to me I wasn't out there in the winter or the spring.

Q. What is the analysis that you used to reach that opinion?

A. One, you can look at the grain size distribution of the soil, which is the sand, and silty sand is very frost susceptible. And the fact that you had water near the bottom of the sand layer, it can wick that water up and by wicking it up and freezing it can cause ice lenses to form because there is water present in the, you know,

that lower two inches.

Q. All right.

A. And so the presence of that water in conjunction with the silty sand causes the ice lenses to grow.

Q. Again, the silty sand has a role in the phenomenon?

A. Yes.

Q. Did Patrick Engineering conduct any tests during the wintertime to confirm this opinion that you have asserted?

A. No, we were not there in the winter.

Q. There were no augers, there no hand auger holes dug, no test pits dug during the wintertime?

A. That's correct.

Q. Bottom of page 18.

A. Okay.

Q. It states; "Currently all runoff from the roof sheet flows onto the courtyard. This is not good practice considering the roof makes up approximately one-half of the tributary area to the courtyard drainage system." So the roof is

BY MR. BYE:

Q. I just want to make sure I didn't miss anything. I didn't see anything in your report where you render an opinion as to what caused any leaks on this property.

A. Correct.

MR. BYE: Okay. No further questions.

EXAMINATION

BY MR. STEPAN:

Q. Mr. Schuh, my name is Chad Stepan and I'm one of the attorneys for Weis Builders in this case and I have some questions for you here as well.

As part of your analysis of The Promenade Project did you take into consideration distance between the surface inlets in courtyards?

A. We considered that the inlets -- let me try to answer your question right. We considered that the inlets were separate but that water could move between one and the other one.

Q. Does distance -- I mean, did the

say one foot is okay, but the local code may say, no, you have to use two feet so then you use the local code requirement.

Q. And if I understand you correctly items number two and three on page two of your report, those are items that you have just found to be standards throughout your experience almost universally?

A. Me and other people in Patrick have all agreed that that's reasonable.

Q. Is that something that you found other engineers in the industry to believe is reasonable standards?

A. Yes.

Q. Now, we spent most of the time here today talking about the surface inlets. Did you do any analysis of the drain that sits on top of the deck?

A. The 8-inch perforated drain?

Q. Well, maybe I just missed it when you were talking about it or was confused by the terms. Moving from the top down, the surface, you have the concrete apron with the grate?

A. Right.

100-year event, wouldn't you?
A. Yes.
Q. Do you have any information, have you seen any evidence that water has actually gotten as high as the doorway thresholds in those plazas?
A. I don't remember seeing that information.
Q. And the basis for the application of this 100-year event is the Eagan Storm Water Management Plan. Is that correct?
A. That's the information that was provided to us by Eagan.
Q. Okay. And that information was provided in response to your e-mail, is that correct?
A. We --
Q. I'm looking at Exhibit No. 846.
A. We had requested that information from them, yes.
Q. Was it in response to your e-mail?
A. Well, we had that information before. There are other charts and data that provide that information. They confirmed it when I had sent that to John, I

grade at the center, but I --

Q. Okay. As you sit here now have you seen anything that said the grade at the edge of the building was raised to meet ADA requirements or a fair housing requirements?

A. I don't recall.

Q. Now, have you ever designed a drain system for inside of a building footprint?

MR. STEPAN: Objection as to form, vague.

THE WITNESS: Can you identify footprint to me?

BY MR. HULL:

Q. The confines of the foundation.

A. Well, I've had drainage systems under floor slabs for buildings.

Q. Okay. You have never designed any for plazas like this I understand earlier?

A. Not for a plaza, no.

Q. Mr. Stepan asked you about -- design/build contracts and you made some reference to being provided with a set of criteria.

A. Yes.

Q. Can you tell me what you meant by

A. Yes.

Q. Now I'd like to direct your attention to page 20, the last two sentences in the carry over paragraph. You state; "Continued seepage in the building should be expected unless improvements are made to prevent water from entering the building in locations above the waterproofing system. Merely lowering the inlets and providing gutters will not eliminate seepage problems."

Maybe I've just been here too long today. Are the statements on 19 and the two sentences on 20 consistent with each other or do they contradict each other?

A. I think they're consistent.

Q. They are? Can you explain to me why?

A. Because the comment on page 19 has to do with the 100-year condition where seepage through the area above the top of foundation is located eight inches lower than the 100-year condition so you can still get water seeping in at that location. You're looking at two different elevations.

A. Correct.

Q. If you had done all six fair to say that it's approximately three times the cost?

A. No, once you get it set up then it shouldn't be that much more.

Q. You've discussed at some length grates and how even the grate that is there still impinges the flow below what a 6-inch open pipe would be?

A. Right.

Q. What if the grate were domed?

A. If you had a dome or some type of grate that would help reduce the potential for clogging.

Q. And also increases the area that water can access into the open area of the grate, correct?

A. Potentially, depending on the type of grate that you pick.

Q. You referred to the methodology that you used I think is one which other engineers agree is reasonable.

A. I believe so.

Q. And in saying that, you're not

talking about mechanical engineers, I take it.

A. Correct.

Q. And can you point me to some text which would indicate that other engineers agree that this methodology is reasonable with respect to an application involving a garage roof slash plaza area?

A. As I sit here?

Q. Yes.

A. As I sit here I don't have a reference.

Q. And do you have any -- have you ever discussed or ever heard other engineers or ever read other engineers opining that this is the correct methodology to use with respect to the situation of a garage roof slash plaza deck area is as opposed to an exterior storm system?

A. I have not discussed it with anybody.

Q. Never seen that in writing anywhere?

A. I have not seen it in writing.

Q. You said that you didn't think that

**Schuh, Jeffrey**

**From:** John Gorder [JGorder@ci.eagan.mn.us]
**Sent:** Tuesday, August 05, 2003 8:03 AM
**To:** 'Schuh, Jeffrey'
**Cc:** Eric Macbeth
**Subject:** RE: Drainage Design Requirements

This is in response to your inquiry below to Eric Macbeth.

The storm sewer pipe system design event is a 10-year, 4.2 inch rainfall, for ponds it is a 100-year, 6 inch rainfall event.

The required freeboard is 3 feet above calculated 100-year high water level of a pond, with emergency overflows provided at or within 2 feet above the high water level. Easement is dedicated to 3 feet above the high water level, and that dictates where buildings can be placed or set back from water bodies.

A 30-foot un-graded buffer should be provided around all existing delineated wetlands.

I hope this answers your questions. If not, please contact me.

John Gorder, P.E.
City of Eagan
Assistant City Engineer
3830 Pilot Knob Road
Phone: 651-675-5645
Fax: 651-675-5694
jgorder@ci.eagan.mn.us

Spoke w/ John on 8/5/03
For pipe design -
5 yr storm for upstream pipes
10 yr storm for main pipe
JS

-----Original Message-----
From: Eric Macbeth
Sent: Monday, August 04, 2003 2:33 PM
To: 'Schuh, Jeffrey'
Cc: John Gorder
Subject: RE: Drainage Design Requirements

Jeffrey:

John Gorder, Eagan's Assistant City Engineer, is best suited to provide you the information you request. By copy of this response, I am asking him to respond to you.

Thanks.

Eric Macbeth
Water Resources Coordinator
City of Eagan
3501 Coachman Point
Eagan, Minnesota 55122-1211
Phone: (651) 675-5300
Fax: (651) 675-5360
Email: emacbeth@cityofeagan.com
WWW: http://www.cityofeagan.com/water_resources/water_resources.htm

DEPOSITION EXHIBIT
846 Schuh

-----Original Message-----
From: Schuh, Jeffrey [mailto:jschuh@patrickengineering.com]
Sent: Monday, August 04, 2003 2:24 PM
To: 'waterres@ci.eagan.mn.us'
Subject: Drainage Design Requirements

I tried to find the design criteria for new subdivision/residential developments on the web. Can you tell me where to locate them? What I am
looking for is the design storm events, the freeboard required for buildings, building setbacks from water bodies, what the storm sewer should
be designed for as far as flow rates for what storm event, etc. Please send
me a message regarding where to search for these items.

Jeffrey C. Schuh
Patrick Engineering Inc.
4970 Varsity Drive
Lisle, IL 60532
Phone 630-795-7212
Fax 630-724-9279