UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Westfield Insurance Company,

Civil File No. 00-CV-987 JNE/JSM

Plaintiff,

vs.

**WEIS BUILDERS' MEMORANDUM OF LAW IN OPPOSITION TO CETCO'S MOTIONS IN LIMINE**

Weis Builders, Inc., Healey Ramme Co., sued as Healey Ramme Company, CNA Insurance Companies, sued as CNA Insurance Company, Promenade Village Townhomes, L.L.C., and Valley Forge Insurance Company, one of the CNA Companies,

Defendants,

and

Weis Builders, Inc.,

Third Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Co.,

Third-Party Defendant and Fourth-Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

v.

Mikesh, Inc.,

Fourth-Party Defendant.

---

CETCO's motions in limine should be denied. There is reliable evidence that the water soluble film was defective and Mr. Campbell, Mr. Koziol, Mr. Chauvin and Mr. Camaya, among others, are entitled to testify regarding the defects. Further, the evidence related to other projects where CETCO's Swelltite 3000 was defective concern circumstances that are substantially similar to the circumstances at issue here and therefore the evidence of those other projects is relevant, admissible and should be allowed.[1]

**I. Campbell's opinions regarding the water soluble film are reliable and should be allowed.**

CETCO overstates the rigidity of the requirements for allowing expert testimony in this matter. The commentary to rule 702 states that "The intent of the Rule is to liberalize the admissibility standards for expert testimony." *Fed. R. Evid. 702, commentary*. The *Daubert* court explained that rigid requirements for expert testimony are at odds with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 588. Experts are permitted wide latitude to offer opinions,

---

1 Much of the background and supporting information for this memo was previously provided to the court in Weis' memo in opposition to CETCO's motion for summary judgment. Therefore, Weis incorporates the facts and arguments from that memo and will not repeat them here.

including those not based on firsthand knowledge or observation. *Daubert*, 509 U.S. at 592; see also *Bass v. Spitz*, 522 F.Supp. 1343 (ED Mich. 1981)(holding that experts may offer opinions based in part from factual assumptions not derived from their expertise) and *Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*, 128 F.Supp.2d 1148 (ND Ill 2001)(holding that expert will be allowed to testify regarding his opinions about cause of roof damage where he has formed opinions based on his experience with roofs in general and his inspection of the roof in question because rejection of expert testimony is the exception rather than the rule and cross examination, presentation of contrary evidence and careful instruction are the traditional and more appropriate means of attacking shaky but admissible evidence). The expert does not need to have encyclopedic knowledge of the subject matter. *Ellis v. K-Lan Co.*, 695 F.2d 157 (5th Cir. 1983). The "trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). Indeed, the court in *Daubert* affirmed that the appropriate way to deal with expert evidence is through cross examination; "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

Further, the *Daubert* court concluded that "the Rules of Evidence – especially Rule 702 – do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. And, proponents of the expert testimony do not have to demonstrate to the judge by a preponderance of the evidence that the assessment of the expert are correct, they only have to show by a preponderance of the

evidence that their opinions are reliable and reliability is a lower requirement than the merits standard of correctness. *In re Paoli*, 35 F.3d at 714.

In addition, while *Daubert* sets forth criteria that the courts can use to determine whether expert testimony is reliable, the criteria are not exclusive nor strictly enforced; "Of course, the *Daubert* reliability factors should only be relied on to the extent that they are relevant…and the district court must customize its inquiry to fit the facts of each particular case." *Jaurequi v. Carter Manufacturing Co., Inc.*, 173 F.3d 1076, 1083 (8th Cir. 1999). Among the other factors that can be considered are whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, the independence of the investigator and his staff, and the presence of methods and practices contrary to "good science." *Black v. Rhone-Poulenc, Inc.*, 19 F.Supp. 2d 592, 597 (D. WV. 1998) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.), cert. Denied 516 U.S. 869 (1995). If the expert testifies based on research independent of the litigation, this "provides important, objective proof that the research comports with the dictates of good science." *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378 (4th Cir. 1995)(holding that if the methodology is good enough for the real world it is good enough for a trial). Also, the focus is on the principles and methodology, not on the conclusions generated. *Daubert*, 509 U.S. at 595. If the Daubert framework were extended outside the realm of scientific testimony, "many types of relevant and reliable expert testimony – that derived substantially from practical experience – would be excluded." *United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997). The courts have also held that experts can draw conclusions from observations based on extensive and specialized experience. *Kumho Tire Co.*, 119 S.Ct. at 1178.; *see also Hartzler v. Wiley*, 277 F.Supp.2d 1114 (DC Kan

2003)(holding that witness was properly qualified as expert in action against builder and builder's company relating to construction of home because witness had three decades of experience as construction manager, had published articles on construction industry and had given presentations on construction industry).

In the end, to assist the trier of fact, which is the requirement of rule 702, the witness must be qualified, have a reasonable factual basis for the testimony, the testimony must be based on reliable methods and the testimony must be relevant to the facts at issue. *Kemp, at 2.* An expert's opinion must be excluded "only if it 'is so fundamentally unsupported that it can offer no assistance to the jury." *Archer Daniels Midland Co. v. Aon Risk Services, Inc.*, 356 F.3d 850, 858 (8th Cir. 2004) citation omitted. Under this criteria, Mr. Campbell's opinions regarding the water soluble film should be allowed.

Mr. Campbell is qualified to opine regarding the performance of the water soluble film at Promenade. He has many years of experience investigating, researching, writing and teaching about water leaks and waterproofing. He is currently the head of the waterproofing department at Inspec. *Ex. I, Campbell depo, pg. 7.* In that position, Mr. Campbell designs waterproofing projects from start to finish and investigates leaks. *Id. at. pg. 22.* Currently, about 40 percent of his work involves investigation of below ground water infiltration. *Id.* Prior to this project, he investigated a couple of dozen below grade waterproofing projects where the waterproofing was installed on a precast deck. *Id. at pg. 31.*

Prior to working at Inspec, he worked for 11 years at Brent Anderson Associates (a waterproofing and roofing contracting company). *Id. at pgs. 10, 15-16.* At Brent Anderson, he performed waterproofing consulting and he investigated waterproofing leaks. *Id. at 17-19.*

During that time, he investigated Swelltite products. *Id. at pg. 19-20.* Also, in 1997 he joined the American Society for Testing and Materials and he has published materials and given presentations regarding investigation of plaza water infiltration, waterproofing and subsurface water management, waterproofing techniques and products. *Id. at 11-12 and Ex. J, Campbell CV.*

Campbell also has a reasonable basis for his opinions and his methods are reliable. To begin with, Campbell's prior experience investigating, researching, teaching and writing about waterproofing systems and leak investigation provide him a reliable basis from which to operate. This basis is bolstered by the investigation he performed on this project. He made twenty test openings on site and evaluated the conditions exposed in each. According to Mr. Campbell, he conducted an investigation at Promenade that was the same type of investigation he would perform in any similar situation. *Ex. I, Campbell depo, pg. 34.* He added that "There's nothing more I could've done that would have resulted in a more complete assessment of the infiltration situation." *Id.*

In addition, during his investigation, he discovered, at four of the openings, that the water soluble film did not dissolve when it came into contact with water. Since the water soluble film is marketed as a product that will dissolve when it comes into contact with water, the fact that it did not dissolve at four separate locations provides reasonable grounds for Campbell to opine that the film is defective. While CETCO may argue that there is no evidence that enough water came into contact with the film for it to dissolve, there is no indication anywhere that a specific amount of water must reach the film before it dissolves. The product literature states that the film dissolves on contact with water. It did not do so here, and therefore, it is defective.

There is no case law or evidence to suggest that Campbell's observation of the failed film is an inadequate method on which to base expert testimony. Mr. Campbell investigated the site and discovered problems with the product at issue. There was no need to test because the test had already been done. The film was exposed to water and it did not dissolve.

Mr. Campbell's opinions regarding the film relate to this matter as the failure of the film led to water leaks. Mr. Campbell observed water on the concrete deck at the locations where the film did not dissolve. CETCO represents that the film must dissolve so that the bentonite can prevent water from moving laterally under the waterproofing and CETCO acknowledges that water moves along and through the decks at Promenade (*see CETCO memo for SJ, pg. 24*). Therefore, because water is present on the deck and the bentonite is not able to reach it because the film did not dissolve, the failure of the film to dissolve allows water to move along and through the deck. Consequently, the water will eventually pass through the porous deck or move to a place where it can exit the deck, i.e. a keyway joint, and enter a garage. It is undisputed that there were leaks in the garages. Hence, the failure of the film caused leaks at the site and the evidence relates to the facts at issue.

CETCO may criticize Campbell's opinion that the water will move laterally. However, the evidence and basic engineering principles indicate that it will. The water is going to try and find its way to the lowest point. Therefore, it is going to move until it reaches that location. Since the film did not dissolve (and it was specifically intended to stop lateral movement of the water) and water was discovered below the film on the concrete planks, it is only reasonable to conclude that the water will move laterally searching for an exit point. The evidence of leaks throughout the garages shows that the water did just that. It is not necessary to test this theory. It is based on

general principles and the evidence shows that it occurred.

Simply because Mr. Campbell was not an expert on CETCO products or water soluble film prior to this matter does not prevent him from investigating and making an expert opinion regarding the conditions he observed. He is knowledgeable in waterproofing and leak investigation. With that background he is capable of learning about the products at issue and opining on them.

It was not necessary for Campbell to rule out all other problems to state that the waterproofing was defective. He observed, first hand, that the film did not dissolve. The evidence is clear that the water soluble film did not do its job. Further, regardless of where the water infiltration started, it was the job of the waterproofing to keep it out of the building. The bentonite is supposed to prevent water that gets past the waterproofing from entering the building. It did not do that. There was water underneath the waterproofing that the bentonite could not reach because the film did not dissolve.

Contrary to CETCO's assertions, it was not necessary for Campbell to employ "the traditional scientific method." Campbell is qualified to analyze the waterproofing, the methodology he used – first hand observation of the product in the field – is reliable, and, as a result, his opinions regarding the waterproofing are reliable.

Since Campbell is qualified to investigate and opine regarding the waterproofing system and his opinions are based on an experienced and reliable background, reliable methodology, first-hand observations and straightforward conclusions, there is no basis for the exclusion of his opinions regarding the CETCO Swelltite 3000 waterproofing. CETCO's motion should be denied.

## II. Mr. Koziol and Mr. Chauvin also provide reasonable and reliable analysis of the waterproofing system and their opinions should be allowed as well.

There is no basis for excluding the waterproofing-related opinions of Koziol and Chauvin. Their opinions are reliable and based on sound methodology.

Like Campbell, Mr. Koziol is very experienced in water infiltration investigations. Koziol has been with WJE since 1982 and has been involved in more than 300 investigations of water leakage in roofs, plazas, foundations, and masonry walls. *Ex. K, Koziol qualifications.* He has been responsible for the solutions and repairs to many of the alleged problems. He also provides consulting to architects on waterproofing designs. *Id.*

While Mr. Chauvin is not as experienced as Koziol and Campbell, he has his share of experience as well. He has worked at WJE for five years and has performed hundreds of water leak investigations involving waterproofing systems. *Ex. N, Chauvin qualifications.*

Further, Mr. Chauvin and Mr. Koziol worked together to investigate the site. They attended the site inspections and analyzed documents related to the site. As a result, Mr. Koziol and Mr. Chauvin are qualified to opine regarding the waterproofing system at issue.

In addition, the methodology that they used is reliable. Mr. Chauvin and Mr. Koziol analyzed a number of the documents regarding the property, they attended two site inspections and Chauvin contacted a number of people throughout the many WJE offices to learn about the Swelltite 3000 products. *Ex. M, Chauvin Depo, pgs. 40-64.* During the inspections Chauvin and Koziol walked the site, went into units and garages, and inspected the exterior of the buildings and a number of test openings. *See Ex. Z to Weis memo opposing CETCO's motion for SJ, WJE report.* The test openings showed the waterproofing and drain systems. In reaching its findings,

WJE relied on the documentation it reviewed, Campbell's and others' reports, the National Roofing Council manual and its observations on site. *Id.* Simply because they relied in part on Campbell's analysis and other materials in addition to the site investigations does not render their analysis unreliable. To begin with, Campbell's analysis is well-founded. Also, it is common for parties performing investigations such as this to rely on the work that has preceded their own and the courts allow for such analysis. Also, while Campbell's analysis was part of Chauvin's and Koziol's analysis, it was only a part. Chauvin and Koziol also investigated the site, reviewed separate test openings, analyzed documents and utilized their own knowledge and background of waterproofing systems, the products at issue and water leaks.

There is nothing to show that Chauvin's and Koziol's analysis is based on something other than "good science" and therefore their opinions should be allowed.

The testimony that CETCO relies on to state that WJE did nothing on its own is not persuasive. Chauvin and Koziol report that their opinions stem from the review of the background materials, the site investigation and the Campbell report. And, presented as a whole, the report reflects that the statements in the report are the result of Chauvin's and Koziol's analysis of the site. *See Ex. Z to Weis memo opposing CETCO's motion for SJ, WJE report*

Further, there is no basis to the statement that Mr. Koziol and Mr. Chauvin do not have an independent basis for alleging any type of defect in the waterproofing. Mr. Chauvin discovered problems with the waterproofing at one of the test openings. *Ex. Q, Site report 4.* Also, based on WJE's and Mr. Koziol's prior experience with Swelltite 3000 and CETCO products, Koziol and Chauvin are knowledgeable of the defects in the products. Indeed, as discussed below, Mr. Koziol helped investigate water leaks at Comiskey Park where Swelltite 3000 was installed and

WJE determined that the Swelltite 3000 was defective. In addition, the National Roofing Counsel does not recommend a bentonite waterproofing product for this type of application and Mr. Chauvin and Mr. Koziol specifically state that they based their opinions in part on that determination. *See Ex. Z to Weis memo opposing CETCO's motion for SJ, WJE report.* Chauvin and Koziol have well-founded criticisms of the system and their evidence should not be excluded.

**A. Jon Camaya**

The opinions of Jon Camaya regarding the CETCO products should also be allowed. GID retained Jon Camaya to investigate the project. Mr. Camaya works for Israel Berger and Associates ("IBA"). IBA provides a number of construction related services concerning waterproofing work. *Ex. P, Camaya depo, pgs. 200-01.* In particular, IBA works with architects on waterproofing designs and it performs failure investigations. *Id. at pgs. 201-02.* Mr. Camaya monitors the installation of waterproofing materials, assists with the design of waterproofing systems and investigates alleged waterproofing failures. *Id. at pgs. 203-06.* His work includes the investigation of dirt-covered plazas over a useable space where the objective is to keep water out of the space. *Id. at. pg. 204.* Prior to working for IBA, Mr. Camaya performed leak investigations and participated in new designs within the waterproofing division of a company known as Prisco & Edwards (architectural design firm). *Id. at pgs. 211 and 213.* He is also a member of the Roofing Consultants Institute, an organization that promotes the education of architects and engineers and the construction industry regarding roofing and waterproofing. *Id. at pg. 229.* Further, Mr. Camaya reads periodicals regarding waterproofing and IBA maintains a library of information regarding waterproofing product information. *Id. at pgs. 229-32.*

Mr. Camaya's task at Promenade was to verify existing conditions of the below grade

waterproofing in the courtyards. *Id. at pg. 235*. He was charged with performing his own investigation and coming up with his own conclusions. *Id. at pgs. 237-38.* Mr. Camaya visited the site and investigated the units, the garages and test openings. *Id. at pg. 31.* In the test openings, Camaya observed a drain, a courtyard post and the waterproofing materials. *Id. at pgs. 35-36.* He also reviewed Campbell's materials and a copy of the drawings. *Id. at pgs. 25-28*.

Like Campbell, Koziol and Chauvin, Camaya's opinions regarding the waterproofing are reliable and should be admitted. He is qualified to perform a waterproofing/leak investigation, he investigated the site and is capable of making conclusions based on his observations. While he did not observe defects in the system first-hand, it is appropriate for him to rely on the investigation done before him. Further, in making his conclusions he relied on his own experience regarding bentonite waterproofing systems and leak investigations.

**B. <u>The introduction of evidence from experts other than Campbell is not cumulative.</u>**

Chauvin and Koziol report that they did not base all of their opinions on Campbell. Indeed, Campbell's analysis was only a part of their overall analysis. Koziol, Chauvin and the other experts offer additional grounds to establish that the waterproofing is defective. In particular, Chauvin and Koziol determined that it was not appropriate for the installation at hand and they also discovered an area where the film was problematic. Therefore, the reports are not duplicative and they will assist the jury in determining the claims made against CETCO.

**III. The evidence of defects in CETCO's Swelltite 3000 waterproofing systems at other sites concern circumstances that are substantially similar to the circumstances at issue here. Therefore, the evidence regarding the other instances of defective waterproofing system should not be excluded in this matter**.

Evidence of prior accidents may be admitted to prove notice on the part of the defendant

where the evidence is sufficiently similar in time, place, or circumstances. *First Security Bank v. Union Pacific Railroad Co.*, 152 F.3d 877, 879 (8th Cir. 1998) citation omitted. Under Rule 401, evidence of similar occurrences "might be relevant to the defendant's notice, magnitude of the danger involved, the defendant's ability to correct a known defect, the lack of safety for intended uses, *** the standard of care, and causation." *Kehm v. The Procter & Gamble Man. Co.*, 724 F.2d 613, 625 (8th Cir. 1983).

During the course of discovery, a number of other instances where CETCO's products were defective or caused problems came to light and many of them concerned circumstances substantially similar to those at issue here. There were allegations of defects in the CETCO products used at the following projects and the evidence regarding those defects should be included: Queens Tower Plaza, Army War College, Castro Commons, and the Medical College of Ohio. The following sets forth the similarities between the circumstances at the projects listed above and the Promenade project thereby illustrating that the evidence regarding these projects should be included in this case. While there are different conditions at each project, it must be recognized that CETCO does not place any limitations on the abilities of its products to function provided that they are used in a way that is acceptable to CETCO. In other words, as long as they are used on a project that is of the sort where the products can be used, the ability of the products to operate is not impacted by the project itself. Therefore, while the construction projects are not identical, the general conditions in which the CETCO materials are used are substantially similar, and the purpose of the CETCO products on those projects is the same as their purpose here.

**A. Queens Tower**

Swelltite 3000 was installed over the top of a cast-in-place concrete slab. A plaza was installed over the top of that. A parking garage existed below the plaza and slab. *Ex. A, Carpenter depo, pg. 116.* THP Limited Consulting Engineers reported that the Swelltite system failed as a result of inadequate sealing of seams between membrane sheets, and inadequate liquid flashing details at drains, turn-ups and other locations. *Ex. G, Queens Tower materials.*

Here, Campbell questions the adequacy of the seams. Based on Queens Tower, CETCO had notice that the seams were problematic and therefore the evidence regarding the seams at Queens Tower should be admitted.

Also, while the allegations of inadequate flashing may not reflect directly on the abilities of the products themselves, it is significant that CETCO knew prior to the Promenade project that parties failed to install appropriate flashings in conjunction with its system. Here, there is a dispute over who should have installed counter flashing at the termination of the waterproofing. CETCO knew that if such flashing was not installed leaks could result. Therefore, CETCO was obligated to, at the very least, recommend the use of such flashing and to make sure it was installed.

**B. Army War College**

Swelltite was installed beneath an outdoor plaza, over the top of a room where documents were stored. *Ex. A, Carpenter depo, pgs. 164-65.* During investigation, CETCO discovered that the seams of the Swelltite were not intact and that the seamtape pulled away from the seams. According to CETCO, the plaza on which the Swelltite 3000 was installed was experiencing movement and the movement of the plaza caused problems for the Swelltite. *Ex. H, Army War College materials.*

As stated above, the seams and seamtape are called into question in this matter and therefore the circumstances are similar to that of the Army War College. Also, in light of the problems created by installing the Swelltite on top of a flexible deck, CETCO should have known that installation on top of the precast planks in this matter would be inappropriate and it should not have recommended the system for this project. Consequently, the evidence related to Army War College should be allowed.

**C. Castro Commons**

Swelltite was installed below grade and on top of a concrete surface. In response to claims of leaks in 1996, CETCO reported that counter flashing is necessary because "any water which might come into contact with the exposed masonry block above-grade might migrate into the wall, travel downwards and enter the structure, circumventing the Swelltite membrane entirely." *Exs. C, D and E, Castro Commons materials.* CETCO added that the lack of counter flashing caused the integrity of the Swelltite to be breached. *Id.*

As stated above, the knowledge regarding counter flashing problems placed on CETCO the obligation to make sure that counter flashing work was performed on this project. Such notice of problems regarding its projects requires that the Castro Commons evidence be allowed.

**D. Medical College of Ohio**

At the Medical College, Swelltite 3000 was installed over a sub-basement. *Ex. A, Carpenter depo, pg. 72.* The Poggemeyer Design Group and Simpson Gumpertz & Heger, Inc., investigated the site and determined that the water-soluble film, which was to "completely dissolve on hydration," did not dissolve in the presence of water and was found in tact. *Ex. F, Medical College materials.* SGH reported that the film became "cross-linked, causing it to not

dissolve when wet." *Ex. B, Medical College Materials.* The Medical College even sent to CETCO a piece of the water soluble film from the site and CETCO tested it in water and the film did not dissolve. *Ex. A, Carpenter depo, pg. 73.* According to Patrick Carpenter, the results of the test surprised him because he expected the film to dissolve. *Id.*

SGH also reported that there was no counter flashing at the top of the waterproofing.

Here, the issue regarding the water soluble film is failure to dissolve when it comes into contact with water. The fact that it did not dissolve on another project places CETCO on notice that its product is defective and that it should take steps to make sure it will function appropriately.

**E. Comiskey Park**

Mr. Koziol investigated the use of Swelltite 3000 at Comiskey Park. *Ex. L, Koziol depo, pgs. 15-24.* The Swelltite was installed on structural concrete slabs on the concourse levels of the stadium. Insulation was installed on top of the Swelltite, followed by a topping slab of concrete. *Id.* After investigating the site, WJE determined that during clean-up water was washing away the bentonite from the waterproofing and leaks resulted. *Id.* In other words, the bentonite was failing to perform its job of absorbing water.

Here, the experts opine that bentonite is not appropriate for application on a horizontal precast deck. Since the bentonite was not appropriate for the waterproofing application on another horizontal application, the evidence of its failure at that location should be allowed in this matter.

**CONCLUSION**

CETCO's motions should be denied. Campbell, Chauvin, Koziol and Camaya are

qualified to offer opinions in this case and the opinions are based on good science and are reliable. Further, evidence of other similar accidents involving CETCO should be allowed as the circumstances in which they occurred are substantially similar to those at issue here and they show that CETCO had notice of the problems at issue here.

As a result, Weis Builders respectfully requests that the court deny CETCO's motions in limine.

Dated: September 17, 2004

s/ Chad J. Stepan

Michael D. Hutchens # 167812
Chad J. Stepan. #0279535
Meagher & Geer, P.L.L.P.
4200 Multifoods Tower
33 South Sixth Street
Minneapolis, MN 55402
(612) 338-0661

and

Dean B. Thomson, #141045
Jocelyn L. Knoll, #22988X
Fabyanske Westra & Hart, P.A.
800 LaSalle Avenue, Suite 1900
Minneapolis, MN 55402

***Attorneys for Defendant and***
***Third-Party Plaintiff Weis Builders, Inc.***

/1164412