# EXHIBIT INDEX TO AFFIDAVIT OF CHAD J. STEPAN IN SUPPORT OF WEIS BUILDERS' MEMORANDUM OF LAW IN OPPOSITION TO CETCO'S MOTIONS IN LIMINE

A. Excerpts from deposition of Patrick E. Carpenter taken on November 20 and 21, 2002

B. Letter from William M. Connelly to Munger Munger & Associates, Mosser Construction, Inc., CETCO and Meinhart Electric dated December 3, 2001

C. Letter from Stephen Silva, Jr. to Richard R. Dewey dated November 5, 1996

D. Letter from Jim McKay to Dave Moore dated May 12, 1993

E. Letter from Jim McKay to Dennis Boatwright dated May 24, 1993

F. Fax from Stacy Byrd to John Mazur dated August 17, 2001 with letter from CETCO to Roger Griebling dated August 15, 2001

G. Letter from Christopher W. Przywara, P.E. to Gregory E. Land dated July 8, 1998

H. Deposition Exhibit 318

I. Excerpts from deposition of David Campbell (Volume I) taken on August 26, 2003

J. Curriculum vitae of David W. Campbell, AIA

K. Curriculum vitae of Richard S. Koziol

L. Excerpts from deposition of Richard S. Koziol taken on October 10, 2003

M. Excerpts from deposition of Mark R. Chauvin taken on November 10, 2003

N. Curriculum vitae of Mark R. Chauvin

O. Chauvin Deposition Exhibit 853

P. Excerpts from deposition of Jon Camaya (Volumes I and II) taken on May 8, 2003 and May 9, 2003

Q. WJE Site Visit Report No. 4

/1162902

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company, )Court File No.
Plaintiff, )00-CV-987 JEL/
) JGL
vs. )
)
Weis Builders, Inc., Healey )
Ramme Co., sued as Healey )
Ramme Company; CNA )
Insurance Companies, sued )
as CNA Insurance Company; )
Promenade Village )
Townhomes, L.L.C.; )
Valley Forge Insurance )
Company, one of the CNA )
Insurance Companies, )
Defendants, )
)
and )
)



Weis Builders, Inc., )
Counter- )
Claimant, )
)
v. )
)
Westfield Insurance )
Company, )
Counter- )
Defendant, )
)
and )
)
Weis Builders, Inc., )
Third-Party )
Plaintiff, )
)
v. )
)
Promenade Village )
Townhomes, L.L.C., )
and Valley Forge )
Insurance Company, )
Third- )



Party )
Defendants, )
)
and )
)
Weis Builders, Inc., )
Cross- )
Claimant, )
)
v. )
)
Promenade Village )
Townhomes and Valley )
Forge Insurance Company, )
Cross- )
Defendants, )
)
and )
)
Promenade Village )
Townhomes, L.L.C., )
Cross- )
Claimant, )
)



v. )
)
Weis Builders, Inc., )
Cross- )
Defendant, )
)
and )
)
Weis Builders, Inc., )
Third- )
Party )
Plaintiff, )
)
v. )
)
Waterproofing by Experts, )
Inc.; BRW Elness Architects, )
Inc., n/k/a Elness )
Swenson Graham Architects, )
Inc., and Colloid )
Environmental Technologies )
Company, )
Third-Party )
Defendants, )

EXHIBIT A

)
and )
)
Colloid Environmental )
Technologies Company, )
Fourth- )
Party )
Plaintiff, )
)
and )
)
Chris Craft Industrial )
Products, Inc., )
Fourth- )
Party )
Defendant. )



The deposition of PATRICK E. CARPENTER, taken in the above-entitled cause before Diane Hromek, Certified Shorthand Reporter in the State of Illinois and Notary Public within the County of DuPage, at 1090 South Milwaukee Avenue, Wheeling, Illinois 60090, on November 20 and 21st, 2002, starting at 10:00 o'clock a.m., and at 8:00 o'clock a.m., respectively.



PRESENT:

MEAGHER & GEER, PLLP
By: Mr. Chad J. Stepan
33 South Sixth Street, Suite 4200
Minneapolis, MN 55402-3788
Telephone: 612-338-0661
Fax: 612-338-8384
E-Mail: cstepan@meagher.com
Appeared on behalf of the defendant Weis Builders, Inc., the Counter-Claimant Weis Builders, Inc., the Cross-Claimant Weis Builders, Inc., the Cross-Defendant Weis Builders, Inc., the Third-Party Plaintiff, Weis Builders, Inc.

FLYNN, GASKINS & BENNETT, LLP
By: Mr. Steve Gaskins
333 South Seventh Street, 29th Floor
Minneapolis, MN 55402
Telephone: 612-333-9500
Fax: 612-333-9579
Appeared on behalf of the Third-Party Defendants, Promenade Village Townhomes, LLC; and the Cross-Claimant Promenade Village Townhomes, L.L.C.

STICH, ANGELL, KREIDLER, BROWNSON & BALLOW
By: Mr. Leo I. Brisbois, Esq.
250 - 2nd Avenue South, Suite 120
Minneapolis, MN 55401
Telephone: 612-333-6251
Fax: 612-333-1940
Appeared on behalf of the Third-Party Defendant, Valley Forge Insurance Company, and the Cross-Defendants, Valley Forge Insurance Company.
(Appeared telephonically.)

MURNANE, CONLIN, WHITE & BRANDT
By: Mr. Mark Brown
444 Cedar Street, Suite 1800
Saint Paul, MN 55102
Telephone: 651-227-9411
Fax: 651-223-5199
Appeared on behalf of the Third-Party Defendants, Waterproofing by Experts, Inc.



COLEMAN, HULL & VAN VLIET, PLLP
By: Mr. William D. Hull
8500 Normandale Lake Boulevard, Suite 2110
Minneapolis, MN 55437
Telephone: 952-841-0201
Fax: 952-841-0041
E-Mail: wdhull@chvv.com
Appeared on behalf of the Third-Party Defendants, Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.

ERSTAD & RIEMER, P.A.
By: Mr. Patrick D. Reilly, Esq.
200 Riverview Office Tower
8009-34th Avenue South
Minneapolis, MN 55425
Telephone: 952-896-3700
Fax: 952-896-3717
Appeared on behalf of the Fourth-Party Plaintiff, Colloid Environmental Technologies Company.

FITZGERALD & CROSS
By: Mr. Joseph P. Callahan
233 South Wacker Drive, Suite 1950
Chicago, Illinois 60606-6308
Telephone: 312-715-5500
Fax: 312-715-5530
E-Mail: jcallaha@offic.com
Appeared on behalf of the Fourth-Party Defendant, Chris Craft Industrial Products, Inc.

TOMSCHE, SONNESYN & TOMSCHE, P.A.
By: Chandelle L. Hever
610 Ottawa Avenue North
Minneapolis, MN 55422
Telephone: 763-521-4499
Fax: 763-521-4488
E-Mail: Chever@tstlaw.com
Appeared on behalf of J. Bryd Mechanical.

site or through a sales desk. Mr. Scott Verne picked up the phone.
Q. And Mr. Verne referred Mr. Heart to you?
A. Correct.
Q. Did he refer, refer him to you on the first call?
A. No.
Q. Tell me what you knew about the history of the conversations between Mr. Heart and Mr. Verne.
A. The request was made for literature, past literature, current literature. Any, just any quizitive conversation from Mr. Pogmeyer to our, Mr. Scott Verne.
MR. BROWN: I am sorry, Mr. Pogmeyer?
THE WITNESS: I am sorry, Mr. Heart.
BY MR. GASKINS:
Q. When did the conversation occur, approximately?
A. Two years ago.
Q. Did Mr. Verne report to you what Mr. Heart had said and had been inquiring about?
A. After a period of time.



Q. Did he report to you in writing or in a conversation or both?
A. Conversation.
Q. Was there ever a memo exchanged concerning his conversation with Mr. Heart?
A. No, not that I am aware of.
Q. Do you know whether Mr. Verne took notes during the conversation?
A. No.
Q. What did Mr. Verne tell you about his conversation with Mr. Heart?
A. That he had extensive questioning from a consultant later to find out it was in regards to a specific project or product problem.
Q. Okay. Can you give me some more detail about that?
A. Mr. Heart calls and after, simply put, he inquires as if he is an engineer requesting information, and soon, down the road, claims he now has a problem.
Q. Okay.
And what sort of information was he requesting, according to Mr. Verne?
A. Installation details for several of



the Volclay waterproofing product lines, individual specifications -- I think that was about it, in general.
Q. Okay, and then, what was the problem that he described to Mr. Verne according to Mr. Verne?
A. "We have a building that leaks."
Q. And that's the Medical College of Ohio?
A. Yes.
Q. And, ultimately --
MR. REILLY: You have to say yes.
THE WITNESS: Yes.
BY MR. GASKINS:
Q. Ultimately, the call is referred to you. Do you call Mr. Heart or does he call you?
A. I think Mr. Heart called me.
Q. Okay. How many times did you talk to Mr. Heart?
A. By telephone? Once or twice -- and then attending meetings.
Q. All right.
Can you tell me, in substance, what occurred in the telephone calls and meetings



-- with respect to this issue or do we want to go one by one?
A. With -- with myself and Mr. Heart?
Q. Concerning the issues involved in the Medical College of Ohio, please tell me what happened.
A. Between who? Myself? Are you asking about the telephone calls, correct?
MR. REILLY: Wants a general view of what what the complaints were?
MR. GASKINS: Yes.
Thank you.
THE WITNESS: They had a problem of a leaky sub-basement for five years, and then decided to notify CETCO after a preliminary investigation, which I just described to you.
Within a few weeks, I attend a meeting in which there has been remediation work done on a building, one floor of the building, and they would like to have me present to discuss Volclay waterproofing.
I don't hear from them for several months, and then they ask for comments, for me to comment on a series of questions -- regarding

our waterproofing product line.
BY MR. GASKINS:
Q. Were these written questions?
A. Yes. So I respond and they hire a second expert or consultant.
Q. Who is who?
A. SG&H is the firm, Mike, Dean Rutela is the consultant.
MR. BROWN: Spell it.
THE WITNESS: I can't -- it is R-u-t-e-l-a.
Two meetings take place as to the discussion of the problem, and they ask me one question about water soluable film, and my response to their question was we have never had that problem. And two weeks later I receive a piece of film in the mail, and we do a simple bench test, and pretty, very simple, simple test of it, disintegrating or not. That was an issue.
BY MR. GASKINS:
Q. That was what?
A. That was the end of that issue.
My response then was it didn't -- you know, it did not dissolve in water.
And we have had subsequent



meetings since that time discussing possible repair details to their damage.
They damaged the waterproofing on the building exterior, vertical waterproofing, so we have been in discussion on how they can, and the contractor, can repair the damage to the exterior of the waterproofing of the building.
Q. So you are still in discussing concerning a remedy with them?
A. Yes.
Q. Okay.
To your understanding, what was Mr. Heart's view of the source of the leaking sub-basement?
A. Several drill holes and mismanagement of cover material, stairwell, maintenance, drainage, there's a -- a groove drainage canal that was improperly maintained and installed.
Q. What was your -- what was your understanding of any criticism he had of the Volclay waterproofing material?
A. That it dried and -- and was not installed properly.
Q. With respect to the material that



dried, what was, to your understanding, his view of the consequence of that?
Strike that, for just a second -- let me ask a more general question.
What did you understand his criticism of you to be of the Volclay?
A. Mr. Pogmeyer's criticism was that it, the product would not stop moisture, not water, but moisture getting into the concrete.
Q. All right.
A. Causing moisture to be on the interior side of the wall.
Q. Now, what does its drying out have to do with that?
A. Precisely. That is the only word I can think of.
Q. All right.
So if the bentonite dries out, once it has been wetted, does that have any effect on its waterproofing ability?
A. No.
Q. Did the experts claim, in that case, that it did have an effect on its waterproofing ability?



MR. REILLY: Well, object to the term "experts."
MR. GASKINS: The consultants.
THE WITNESS: Mr. Pogmeyer's?
MR. REILLY: Or Heart?
THE WITNESS: Oh, sorry.
Mr. Heart.
MR. GASKINS: I understand -- viewed that?
THE WITNESS: Viewed that it did.
BY MR. GASKINS:
Q. Okay, and how about the second expert, Mr. Rutela?
MR. REILLY: I am going to object to the form of the question, but go ahead and answer.
THE WITNESS: Could you restate the question for Mr. Rutela?
MR. GASKINS: Sure.
BY MR. GASKINS:
Q. With respect, you indicated in your earlier testimony that the Medical College of Ohio hired a second expert, SG&H.
MR. REILLY: Consultant.
MR. GASKINS: No, he said "expert."
No, all I am doing is using his

Q. What is it?
A. Industrial science.
Q. What is your educational background?
A. BA in Communications.
Q. Where did you get that degree?
A. Eastern Illinois University.
Q. Did you ever hear of the Two Pierce Place Warranty Claim?
A. No.
Q. Well, I want you to look at those documents, for a second.
Q. I am going to hand you what has been marked, what has been Bates stamped CET 132 through CET 44. I will ask that this group of documents be marked as the next exhibit.
(Document marked.)
BY MR. GASKINS:
Q. Would you look through that and tell me if that is your entire file on the Two Pierce Place Complaint?
A. What was your question?
Q. Can you tell me whether that is your entire, a copy of your entire file on the Two Pierce Place complaint?



A. No.
Q. You cannot tell me or it is not?
A. I cannot tell you if this is the entire file.
Q. Do you know what response, ultimately, was made to the Two Pierce Place people about what you were gonna be doing, if anything, concerning their Complaint?
A. No.
Q. Who can tell me that?
A. I don't know.
Q. By looking through that file, if there is, is there anybody that could answer that?
A. No, not at CETCO.
Q. I am sorry?
A. No, not at CETCO.
Q. Okay.
Who is Stu Jacobsen?
A. I don't know.
Q. Would you look at the last page of the letter dated August 22nd, to Mr. Steve Silva from Hydro Environmental Products Corp, which is CET 40.
A. Okay.



Q. Where this author, Mark Nelson, states, "In closing, my concern is not only protecting CETCO from liability, but also discovering the reason for the leaks. In order to do so, we would want to stay in contact with Stu Jacobsen, who is a qualified structural engineer. Furthermore, by following this matter closely, we can insure that CETCO's name and Swelltite's reputation do not get too badly tarished in this matter."
Do you know what Mr. Nelson was worried about in terms of CETCO's name and Swelltite's reputation?
A. No.
Q. And you are the person with the most knowledge concerning this --
A. Yes.
Q. -- warranty claim at your company?
A. Yes.
Q. Okay.
Okay, what do you know about Queens Tower Plaza, other than what you read on the Answer to Interrogatories?
A. I made one site visit and had some



discussions and involvement with that one.
Q. Okay. With respect to the Queens Tower Plaza, did it involve allegations of leaks?
A. Yes.
Q. Did it involve the application, I am sorry, did it involve the Swelltite product with a soluable film?
A. I don't know.
Q. Did it involve Swelltite bentonite product?
A. Yes.
Q. What product do you recall it involved?
A. I don't know. I think it was Swelltite, but I don't know the version.
Q. You don't know if it was 1000, 3000 or 6000?
A. I don't recall.
Q. Okay. Where was it? What kind of application was it?
A. A plaza deck with garage parking below.
Q. What was happening?
A. The concrete below was spauling and

Q. Okay.
A. Bentonite is a very -- aggressive to absorbing water by design. It absorbs water and swells. And will continue to swell.
The design of the product, in terms of its sealing and waterproofing abilities is to load or confine bentonite, so while it is trying to absorb and swell, the clay is actually -- sealing.
Q. Okay, but why does exposing it to water before you put it under pressure affect its ability to act as a waterproofing agent?
A. You don't -- you don't want to allow it to go into free swell, it is designed to have a load and then water, because you are creating, you are keeping the pressure on the seal rather than on free swelling.
Q. So if it free swells first then you put backfill on, it is liable to leak?
A. It has the potential.
Q. Okay.
How can you tell, if you examine a particular piece of your material after it's been in the field for awhile, whether or not



it has pre-swelled?
A. I don't know.
Q. Could you look at it and tell?
A. I don't know.
Q. Who would know?
A. I don't know.
Q. Okay, if you are dealing with a warranty claim, and you go out to a site, and you say, "Well, this was exposed to water before it should have been, before the backfill was put on," what are you looking for to tell you that that's what happened?
A. I would be looking for a large free swell product.
Q. What does the free swell look like? How does a free swell look different from a compressed swell?
A. Thickness and mastic consistency.
Q. Okay, so is it not as sticky or is it stickier?
A. I can't answer that question.
Q. Okay, mastic, to me, is still key, is that not right? What do you mean by "mastic"?
A. More of a real wet paste or a more of



a clay-type paste.
Q. Okay.
A. So "mastic" would be more clay type paste, and "free swell" would be more of a fluid.
Q. Okay, so it is bigger and runnier, yes?
A. No.
Q. Okay.
A. It is just bigger.
Q. It is just bigger, all right.
What did you mean by "fluid"? "More fluid"?
A. There is more fluid present in the clay.
Q. Does it look wetter? Have a wetter appearance?
A. No, it is just thicker.
Q. It is just thicker.
Army War College.
All right, tell me what happened with the Army War College.
First, before we do that, let's just go ahead and mark your Army War College documents, which are CETCO 1354 through 1423.



MR. REILLY: 135 --
MR. GASKINS: -- 54 through 1423.
(Document marked.)
BY MR. GASKINS:
Q. Would if you take a look at 318 and tell me what it is?
A. It looks to be an Army War College and other photographs of other Swelltite job files.
Q. Okay.
As presented to us, this all came in in a group as the Army War College documents.
Could you identify those that are not associated to Army War College?
A. 1355 through 1358, including 58.
Q. What are those pictures of?
A. Small, Swelltite projects throughout southern California, and it looks like the Ritz Carlton.
Q. Tell me what happened at the Army War College.
A. There I was present at an investigation last year that we looked through a ceiling panel in the Army War College War Room,

where they have very important documents.
In there was dripping from the concrete slab above.
So we went up top with the General, and pulled up pavers, large pavers, to discover that there was some re-swelling of Swelltite, meaning not enough load on the drain board, which was on the Swelltite.
After further investigation we found there was a discrepancy between the Army War College one, to use old pavers instead of what the spec called for, and we came to an agreement to replace, I think it was maybe 150 square feet, no, probably not that much, 40 square feet, the area as we see in 1359.
Q. Was there a shrinkage of the membrane?
A. At first it appeared that there was something of that sort, but we came to realize that the weight of the pavers, and the way the design was allowing water through the drain board, that there wasn't enough weight to confine the Swelltite. So while it was swelling, it was pulling that tape. So there was excessive swelling that gathered that day.



Q. Was it seam taped?
A. It was taped, that -- yes.
Q. One of the things that was brought up was that the Swelltite sheets there at the site actually measured approximately 1.5 inches less than a new sheet. Did you confirm that that was true or false?
A. No.
Q. What was it that made it appear, at first, that there was shrinkage, shrinkage of the Swelltite sheets?
A. A portion of the Swelltite tape was not adhered to the sheet.
Q. Did you measure the sheets?
A. No.
Q. All right.
By August of '01, you had received the memo, which is CET 1420 of that exhibit.
This, again, is Doctor Steve Shanley?
A. Yes.
Q. Now, where is the Army War College?
A. Carlisle, P. A.



Q. Okay.
In it, Steve Shanley says, "The plaza is experiencing random leaks"?
A. Yes.
Q. Okay. Do you agree that that was, in fact, the case?
A. No.
Q. Why not?
A. Because, upon my investigation, I saw one leak.
Q. What were the weather conditions at the time that you made your inspections?
A. Warm weather.
Q. Was there rain?
A. Coming -- coming into the fall.
Q. Was it raining?
A. Yes, it was, had just got done raining, actually.
Q. It what? Had just gotten done raining?
You observed one -- one leak?
A. Yes.
Q. And was it explained to you that there were other leaks?



A. Not at that time.
Q. Okay. Do you know what is meant by this sentence by your employee, Steve Shanley, "The plaza is experiencing random leaks"?
A. Probably that water was traveling and coming in at different spots in the ceiling.
Q. At different spots in the ceiling at different times?
A. Right.
Q. Okay, the exact source of the water was not known, according to Mr. Shanley, is that -- is that your understanding, also?
A. No, my understanding was we had pulled up papers per some photographs here, and we believe we reached the area that was the source of water.
Q. Okay, was that before or after this August 22, '01, memo to you?
A. After.
Q. And what was the source of the water?
A. I couldn't tell, exactly, two potentials. One was through the end of the slab had some, I think, some flashing problems, that was allowing water to get in between the two slabs.
Q. Okay.

CONFIDENTIAL

Medical College of Ohio

Governmental Affairs

William M. Connelly, J.D.
*Vice President for Governmental Affairs and General Counsel*

Raymon H. Mulford Library
3045 Arlington Avenue
Toledo, Ohio 43614-5805

Telephone 419-383-4559
Fax 419-383-3097
E-mail wconnelly@mco.edu

December 3, 2001

Munger Munger & Associates
Attn: Mr. Dave Wolfe
225 North Michigan Street
Toledo, Ohio 43624-4613
*(via facsimile and ordinary mail)*

Mosser Construction, Inc.
Attn: Mr. Charles H. Moyer
122 South Wilson Avenue
Drawer D
Fremont, Ohio 43420-0558
*(via facsimile and ordinary mail)*

CETCO
Attn: Mr. Patrick E. Carpenter
1500 West Shure Drive
Arlington Heights, IL 60004-1440
*(via facsimile and ordinary mail)*

Meinhart Electric
Attn: Mr. James Baker
1021 Custer Drive
Toledo, Ohio 43612
*(via facsimile and ordinary mail)*

Re: **Collier Nursing and Allied Health Building**
**Medical College of Ohio, Toledo, Ohio**

Gentlemen:

As we indicated to those who were present at the meeting on November 20, 2001, the results of the investigation by Simpson Gumpertz & Heger, Inc. are preliminary and based upon their investigation to date. Their investigation continues. Nonetheless, in order to provide information concerning the nature and scope of the problems and our belief as to the cause of the problems, we are providing these very preliminary conclusions for your consideration but subject to a change in the opinion of Simpson Gumpertz & Heger that may occur as a result of further investigation.

Following receipt of this report, we would like to schedule a meeting with you not later than the week of December 10th to explore resolution of this matter. If you wish, you may bring representatives of your insurance company or any other person you believe should be in attendance. We would like to be advised in advance of the identity of these people.

We understand there may be some reluctance to speak candidly about this matter so long as there is the risk of litigation. Your counsel can confirm for you that our discussions of November 20th, the enclosures to this letter, and any statements made by

EXHIBIT B

BYRD DEP
EX. NO. 377 ID
DATE: 1-29-03
DIANE HROMEK'S COURT REPORTERS, INC.
REPORTER: [illegible]

CET 1910

CONFIDENTIAL



any of us at our next meeting cannot be used by anyone as evidence, under rules favoring compromise over lawsuits.

We hope the enclosed will at least begin the process of amicable resolution of this problem.

Sincerely,

Bill Connelly

William M. Connelly

WMC:smc
Enclosure

CONFIDENTIAL

Simpson Gumpertz & Heger Inc.
Consulting Engineers
Boston / San Francisco / Washington, DC

# Memorandum

Date: 30 November 2001

To: File

From: Dean A. Rutila

Comm.: 21511 – Plaza Leakage Investigation, Collier Building, Nursing School and Allied Health School, Medical College of Ohio, Toledo, OH

Subject: Preliminary Conclusions Reported in 20 November 2001 Meeting

Dean A. Rutila and Mark K. LaBonté of Simpson Gumpertz & Heger Inc, presented a summary of our field investigation into leakage and our preliminary conclusions at our 20 November 2001 meeting. At the meeting were representatives of the Medical College of Ohio, its outside counsel on this building, the Ohio Attorney General's office, Munger and Munger Associates (the associate architect for the building), Mosser Construction (the contractor for the building), Meinhart Electric (the electrical subcontractor for the building), its insurance representatives, and Poggemeyer (consultants retained by the Medical College of Ohio).

These conclusions are preliminary and may change as additional information becomes available to us about the design, construction, and history of the building and those participating in the project.

## Preliminary Conclusions

1. Gutter (both the Architect and Contractor materially contributed to the problem)

### Design Defects

- Seal between deck waterproofing and EPDM liner (Swellite makes detail worse).
- No flashing over precast concrete curb along gutter.
- No protection for EPDM gutter liner.
- No gutter drain detail.

### Construction Defects

- Holes and open seams in gutter liner.
- Missing EPDM flashing at ends of gutters.

CET 1912

CONFIDENTIAL



- Open corners between deck waterproofing and EPDM gutter liner at ends of gutters.
- No gutter drain detail.

2. **Plaza Deck Membrane (both the Architect and Contractor materially contributed to the problem)**

Design Defects

- No Swelltite Membrane Design.
- Swelltite not equal to specified waterproofing for this plaza.
- Substitution approved not according to General Conditions of construction contract.
- Generic specifications do not address particulars of this project.
- Design relies on a few submitted manufacturer's details.
- No counterflashing for top of membrane.
- Termination of membrane below plaza wearing surface.
- Water behind precast concrete panels not controlled.
- Walkway column has no baseflashing detail.
- Specified water test and manufacturer's inspections (at least in part) not performed.

Construction Defects

- Not installed per manufacturer's details.
- M2000 missing at base flashing details.
- Membrane base flashing turns up against precast concrete and cast-in-place concrete, is trimmed low to the deck, placed in between layers of insulation, not confined at gaps in insulation.
- Column corners not flashed properly.
- Membrane found upside down.

Other Possible Defects

- Polyvinyl alcohol release film has become cross-linked, causing it to not dissolve when wet, creating a potential path for water migration.
- Membrane less durable than specified membranes because unconfined clay migration.

3. **Foundation Waterproofing (both the Architect and Contractor materially contributed to the problem)**

Design Defects

- Substitution not equal (particularly top 3 feet, and moisture vapor characteristics that increase vapor flow to interior).
- No counterflashing at top of waterproofing.
- Either waterproofing behind precast concrete was omitted as part of the design, or it remained part of the design with no controlled weep locations.
- Single seal joints at perimeter of precast concrete panels below grade.
- Project review during construction – no termination bar or seal at top of waterproofing, no protection board, no drainage stone along foundation.

Construction Defects

- No termination bar or seal at top of waterproofing, no protection board, no drainage stone along foundation.

Owner Defect? (some claim owner damaged waterproofing system with walkway work along north edge of south plaza, near enclosed walkway).

- Some facts point to construction defect.
- Some facts point to post construction damage (whether by the contractor or owner, or others).

4. **Curtain Wall (both the Architect and Contractor materially contributed to the problem)**

Design Defects

- No sill flashing.
- Single sealant joints at curtain wall perimeter and precast concrete joints.

Construction Defects

- Sealant defects.
- Installed flashing with holes and without watertight ends.
- Filled glazing pockets with sealant as repair attempt.

**Other Issues**

- Curtain wall appears to have shifted with stair tower movement. No evidence of structural defect.
- Installation of horizontal mullions across center vertical mullions not a defect.
- Condensation – wall finishes, HVAC remedial design.
- Perimeter footing drain – filled with sand.
- Precast Beanng – some joists have small bearing surfaces.

DAR111r-01-mg

CONFIDENTIAL

Ohio Department of Administrative Services
General Services Division
Office of the State Architect
4200 Surface Road
Columbus, Ohio 43228-1395

OhioDAS

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF RETURN ADDRESS. FOLD AT DOTTED LINE

CERTIFIED MAIL

7000 0520

JUL 31'01
OH

PB METER 7109680

$3.94

U.S. POSTAGE

COLLOID ENVIRONMENTAL … PANY
VOLCAY WATERPROOFING DI
ATTN: PATRICK CARPENTER
1350 W. SHURE DRIVE
ARLINGTON HEIGHTS, IL 60004-7805

60004-1441 88

CET 1916

CONFIDENTIAL

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Colloid Envir. Tech. Co.
Volclay Waterproofing Division
Attn: Patrick Carpenter
1350 W. Shure Drive
Arlington Hghts, Ill 60004

2. Article Number (Copy from service label)

7000 0520 0015 5544 1087

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (*Please Print Clearly*)

B. Date of Delivery

C. Signature

X

☐ Agent
☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

PS Form 3811, July 1999 Domestic Return Receipt 102595-00-M-0952

CETCO
COLLOID ENVIRONMENTAL TECHNOLOGIES COMPANY
1350 West Shure Drive • Arlington Heights, IL 60004-1440 • USA
(847) 392-5800 • Fax (847) 506-6150

NOVEMBER 5, 1996

Mr. Richard R. Dewey
President
DLC - Castro Commons
999 Baker Way
Suite # 300
San Mateo, CA 94404

RE: 1172 Castro St.

Dear Mr. Dewey,

This letter shall serve to follow up your recent correspondence (11/1/96) regarding the above referenced project. Per your request, what follows is CETCO's position relating to the anticipated scope of repairs at 1172 Castro St.

1. CETCO has long maintained that the required counter flashing (reference letter May 12, 1993 from CETCO's representative Jim McKay) was not installed and is the primary cause of the project's seepage. The referenced letter by Mr. McKay states that the use of a counter flashing "is recommended since any water which might come into contact with the exposed masonry block above-grade might migrate into the wall, travel downwards and enter the structure, circumventing the Swelltite Membrane entirely."

2. It is CETCO's understanding that, although specified, (bought and paid for by the project's Owner) the counter flashing was never installed. This area of responsibility clearly does not rest within CETCO's Warranty. The requirement of counter flashing is basic and sound construction practice.

   Furthermore CETCO maintains that the lack of counter flashing has caused the integrity of the Swelltite Waterproofing to be breached.

3. The above stated CETCO is still willing to participate in the remedial process at 1172 Castro St. in the following manner.

   a. Suggest an approved remedial repair method. Given the outlined facts and the history at 1174 Castro St., CETCO would suggest a repair methodology very similar to 1174. It is important to note that once approved by the Owner; CETCO is willing to incorporate these repairs under the scope of the Warranty issued 11/5/93 (as is being done on the 1174 project).

Byrd DEP
EX. NO. 332 ID
DATE: 1-28-03
DIANE HROMEK'S COURT REPORTERS, INC.
REPORTER: [illegible]
1-800-556-5554

EXHIBIT C



A Wholly Owned Subsidiary of AMCOL International

Printed on recycled paper.

CETCO



b. Participate in the scope of the repairs to the extent of paying for the remedial waterproofing materials utilized. This does not include any counter flashings, tools or equipment.

c. CETCO believes that the other associated costs:
-Removal of the overburden
-Removal of the damaged waterproofing (Swelltite)
-Labor to install (and "marry" to the old) a new system
-Replacement of the overburden
Should be borne of the original contractors. This belief is founded in the fact that CETCO's representative clearly outlined a need of counter flashing prior to the construction; and this was not provided.

d. CETCO is also willing to commit to the inspection of the remedial waterproofing prior to the overburden being placed, for the purpose of incorporating this work into the Warranty.

Please do not hesitate to contact either Mark Monroe (CETCO's Western Regional Manager located in Sacramento) or myself should you require any additional correspondence or clarification to this issue.

Best Regards,

Stephen Silva, Jr.
Group Manager
Building Materials Group

cc: M. Monroe (916) 395-8643
Project File



A Wholly Owned Subsidiary of AMCOL International

Printed on recycled paper.

FORRESTER & ASSOCIATES

300 VALLEY STREET • SUITE 205 • SAUSALITO, CALIFORNIA 94965 • Fax: (415) 331-1801 • (415) 331-7000

May 12, 1993

Mr. Dave Moore
Pacific Coast Waterproofing
113 G St. Ste. 203
Antioch, CA 94509

Reference: Castro Commons Parking Structure, Mountain View

Subject: Swelltite Waterproofing

Dear Dave:

Enclosed please find a sketch describing American Colloid Company's recommendations for waterproofing the below-grade masonry block walls on the above-referenced project.

Please note that the drawing shows a membrane applied to the exposed masonry block above finished grade. Although American Colloid does not manufacture such a product, it use is recommended since any water which might come into to contact with the exposed masonry block above-grade might migrate into the wall, travel downwards and enter the structure, circumventing the Swelltite Membrane entirely.

Please do not hesitate to contact me should you have any questions.

Sincerely,

FORRESTER & ASSOCIATES

Jim McKay

JDM/sw

Encl.

File.

cc: Mr. Stacy Byrd, American Colloid Co.

Byrd DEP
EX. NO. 333 ID
DATE: 1-28-03
DIANE HROMEK'S COURT REPORTERS, INC.
REPORTER: LON
1-800-556-5554

EXHIBIT D

FORRESTER & ASSOCIATES
300 VALLEY STREET • SUITE 205 • SAUSALITO, CALIFORNIA 94965 • Fax: (415) 331-1801 • (415) 331-7000

May 24, 1993

Mr. Dennis Boatwright
Pacific Coast Waterproofing
113 G St. Ste. 203
Antioch, CA 94509

Reference: Castro Commons, Mountain View

Subject: Swelltite 3000 Waterproofing

Dear Dennis:

I visited the jobsite this morning to review the Swelltite Waterproofing with your foreman. I also visited the site later in the day with Dave Moore.

As we discussed, I contacted the manufacturer regarding the problems your crew was having in installting the membrane. It appears that the water-soluble film had delaminated from the butyl rubber/bentonite portion of the roll creating a "bubble" effect which was preventing your crew from installing the membrane tightly against the wall. It was also noted that the rolls were shipped horizontally, and the cardboard cores were loose and easily pulled out from the rolls.

I understand that you contacted Stacy Byrd from American Colloid at the outset of the installtion, and that he recommended that a Hudson sprayer be used to dampen the sheets prior to installation in order to dissolve the film so that the sheets could lay flat against the wall. Your foreman indicated that this was extremely time consuming, however it appears that the installation is acceptable from the manufacturer's standpoint (east wall, except stair way area, and about half of the south wall), and that the materials installed in this fashion were tight against the wall.

When I returned to the site later in the day, your crew was installing the material much more quickly, primarily because your foreman discovered that by using a garden hose instead of the Hudson sprayer, the film was dissolving much more quickly.

I am sending a piece of the membrane back to the manufacturer for their examination and will contact you as soon as the cause of this delamination has been determined.

Regarding the termination detail, the manufacturer stated that the use of a metal termination bar along the top edge of the drain panel is acceptable for terminating the Swelltite Membrane as well, and the butyl tape/adhesive configuration we had previously discussed is not necessary.

Byrd DEP
EX. NO. 334 ID
DATE: 1-28-03
DIANE HROMEK'S COURT REPORTERS, INC.
REPORTER: LOH
1-800-556-5554

EXHIBIT E

Dave and I noticed that there were several penetrations through the wall that had not been fully grouted around. American Colloid requires that any such gaps be tightly packed with grout or sealant/backer rod, since bentonite products are not designed for open joints. I mentioned this to the general contractor, and Dave indicated that he would do likewise.

I also reviewed the installation along the retaining wall of the smaller on-grade structure, and it appeared to be properly installed (except for the termination, which had not yet taken place).

Please do not hesitate to contact me should you have any questions.

Sincerely,

FORRESTER & ASSOCIATES

Jim McKay

JDM/sw

cc: Mr. Stacy Byrd, American Colloid Co.

CONFIDENTIAL

CETCO

COLLOID ENVIRONMENTAL TECHNOLOGIES COMPANY

a wholly owned subsidiary of AMCOL International Corporation

# BUILDING MATERIALS GROUP

## FAX COMMUNICATION

TO: Western Waterproofing ATTN: John Mazur

DATE: Aug 17, 2001

FROM: STACY BYRD

NO. OF PAGES INCLUDING COVER 7

IF ALL PAGES ARE NOT RECEIVED OR IF UNREADABLE, PLEASE CALL IMMEDIATELY.

Copy of response letter for your review and files.

Byrd DEP
EX. NO. 336 ID
DATE: 1-28-03
DIANE HROMEK'S COURT REPORTERS, INC.
REPORTER: DH
1-800-556-5554


WATERSTOP-RX® BENTONITE CONRETE JOINT WATERSTOP

ADVANTAGES OVER CONVENTIONAL PVC OR RUBBER CONCRETE JOINT WATERSTOPS

- Reduces installtion time & labor costs by eliminating split-forming & splice welding
- Expansive properties seal small cracks and voids permanently
- Seals around penetrations & contours irregular surfaces
- Ideal when pouring against existing concrete

CET 1934






(800) 527-9948 • fax: (847) 506-6195

1500 WEST SHURE DRIVE ARLINGTON HEIGHTS, ILLINOIS 60004-1440 USA http://www.cetco.com


PROVIDING QUALITY WATERPROOFING PRODUCTS TO THE CONSTRUCTION INDUSTRY FOR OVER 30 YEARS

EXHIBIT F

CETCO
COLLOID ENVIRONMENTAL TECHNOLOGIES COMPANY
1500 West Shure Drive • Arlington Heights, IL 60004-1440 • USA
(847) 392-5800 • Fax (847) 506-6150
http://www.cetco.com

CONFIDENTIAL

August 15, 2001

Mr. Roger Griebling, Project Manager
Ohio Department of Administrative Services
General Services Division
Office of the State Architect
4200 Surface Road
Columbus, Ohio 43228-1395

Re: Project No. 310-1992-158
Howard L. Collier
Nursing and Allied Health Building
Medical College of Ohio at Toledo

Dear Mr. Griebling:

CETCO believes that it has properly responded to questions as they have arisen regarding the above referenced project. CETCO has participated in discussions and provided written responses to prior correspondence. This letter continues CETCO's practice of providing information in a timely manner by responding to the questions in the Poggemeyer Design Group (PDG) letter dated July 25th to Mosser Construction (CETCO received the PDG correspondence from Mosser Construction on July 31st – the day after your letter). Like other parties, CETCO has been committed to determining the cause and to developing corrective courses of action for the building.

Following are CETCO's responses to the PDG questions presented in the July 25th correspondence. For your convenience, each of the PDG questions is provided in "bold" text followed by our response.

**General**

**1. Confirm that the performance of CETCO Volclay Panel and Swelltite Composite Bentonite Membrane Waterproofing Systems meets or exceeds the performance of the originally specified Grace Construction Products Bituthene Waterproofing System with regard to:**

CETCO understands that the Architect had the responsibility for determining that Volclay Panel and Swelltite Waterproofing Systems met or exceeded the performance of the originally specified waterproofing system. CETCO further understands that the Architect approved the use of the Volclay Bentonite Systems as alternate materials. Therefore, CETCO is not in a position to comment with respect to the Architect's decision and subsequent approval. However, CETCO answers each bullet point under General question one.

**A. Water Penetration:** Both Bituthene and both the Volclay Waterproofing Systems have been successfully tested to block the passage of water under hydrostatic conditions.

**B. Moisture Vapor Permeability:** Though most waterproofing products reduce or slow the passage of vapor moisture, neither the Bituthene rubber-asphalt membrane or Volclay Waterproofing products are classified as moisture vapor barriers. Bituthene and Volclay Waterproofing products are designed to stop the passage of liquid moisture.

**C. Durability:** Volclay Waterproofing products are considered durable products. Bentonite waterproofing is an active product that has the ability to swell and seal minor damage.





A Wholly Owned Subsidiary of AMCOL International Printed on recycled paper.

CONFIDENTIAL

**D. Termination Procedures:** Standard termination procedures for Bituthene and Volclay Waterproofing products are very similar. Both recommend using trowel grade mastic and a rigid termination bar to secure the top edge near grade.

**E. Backfill Procedures:** Backfill operations for Bituthene and both Volclay Waterproofing Systems require that standard industry procedures for material, material placement and compaction be followed. With bentonite waterproofing, it is recommended that the backfill be compacted to an 85% Modified Proctor density.

**F. Repair Procedures**: Repair procedures are typically specific to job site conditions. Depending on the waterproofing system and the application it was used on, the repair procedures will be specific for that condition.

**G: Special Protection Criteria:** Passive rubberized-asphalt sheet waterproofing products require a protection course be installed over the membrane as standard practice prior to the backfill material being placed. Additionally, rubberized-asphalt membranes should be protected from direct prolonged sunlight prior to the backfill material being placed.

**H. Special Maintenance Criteria:** Volclay Panels and Swelltite do not require any special maintenance requirements once they have been installed. To our knowledge Bituthene does not require any special maintenance requirements once it has been installed.

**I. Limitations or restrictions on adjacent work such as landscaping:** With both Volclay Systems and Bituthene by WR Grace, adjacent work performed after the installation should be conducted without damaging the waterproofing. Landscaping operations after the initial backfill and compaction should be conducted with care as not to damage or displace any waterproofing installed. Typically, after any excavation the installed waterproofing system should be inspected and repairs provided as required.

**2. Confirm that the statement "This would make the entire job a complete Bentonite waterproofing system by American Colloid Corporation" means that the supply and installation of all waterproofing materials is to be in compliance with CETCO SpecData and Product Manuals that were current at the time of installation.**

Without context for the referenced statement, CETCO is not in a position to elaborate on the meaning of the statement beyond what it says.

**3. Confirm the production dates of CETCO materials shipped to Western Waterproofing for installation on this project.**

Historically Volclay Panels and Swelltite are shipped to the customers within one to six weeks of being produced. CETCO can not specifically confirm the production dates of CETCO materials shipped to Western Waterproofing for installation on this project because the 1994 shipment records were discarded. Like most businesses, CETCO discards old non-critical records from time-to-time. These specific documents were discarded prior to CETCO's knowledge of these inquires.

CONFIDENTIAL

**Volclay Bentonite Waterproofing Panels PDG Questions**

**1. Clarify confusion regarding use of Volclay Type 1-C Panels on vertical free standing walls, given that CETCO Form 5/95-5m Product Manual specifically states: "Volclay Type 1-C (Coated) Panels are not recommended for vertical free standing walls."**

We have no knowledge of any confusion as claimed in your question. The question concerns one phrase taken out of context from a product manual. The product manual further suggests that users have flexibility to work with Type 1-C Panels on free standing walls on specific projects for appropriate applications.

**2. Clarify confusion regarding 22 Sep 95 Mosser Construction, Inc correspondence (Hurford-to-Wolfe) and 28 Sep 95 Western Waterproofing Co. correspondence (Mazur-to-Hurford) proposing the use of Type 1 Panels, and the 5 Oct 95 Seals Inc. correspondence (Barron-to-Mazur) which refers to the use of Type 1-C panels.**

We have no knowledge of any confusion as claimed in your question. However, since we were not a direct party of the correspondence referenced, we are unable to comment on any aspect of the correspondence.

**3. Further to Mr. Patrick Carpenter's 14 May 01 verbal statement that CETCO changed the Type 1-C Panel technical characteristics and installation applicability at the approximate time this building was under construction, confirm the accuracy of this statement and clarify the procedures for determining whether Type 1-C Panels installed on this project were of the "old" or "new" technical design.**

The technical characteristics and installation applicability of the Type 1-C Panel did not change the effectiveness of the waterproofing system.

**4. Confirm the acceptability of Volclay Bentonite Waterproofing Panels without termination "at grade with rigid termination bar," embedding the "top edge of Panels in 2" (50mm) wide by ½" thick bead of Bentoseal," or a recommended "12" (300mm) strip of UV resistant flashing" as stipulated in the Dec 94 CETCO SpecData, and as shown in CETCO Form 5/95-5m Product Manual.**

It is acceptable to terminate the Volclay Panels at grade without a rigid termination bar as long as the Panels have been tightly fastened to the concrete substrate with mechanical fasteners and the Bentoseal detailing mastic has been installed continuously along the top edge of the Panels.

**5. Confirm the acceptability of backfilling with sharp #6 crushed stone without "a protection board to avoid damage during backfill and compaction" as stated in the Dec 94 CETCO SpecData.**

It is acceptable to backfill against Volclay Panels with #6 crushed stone without a protection board when the stone backfill is carefully placed in the hole and not just violently dumped against the Panels.

CONFIDENTIAL

**6. Clarify why Volclay Bentonite Waterproofing is "stuck to the wall like peanut butter in some locations, and does not appear to have ever been installed in other locations.**

The dry sodium bentonite in Volclay Panels, upon hydration, transforms into a thick monolithic gel the consistency of peanut butter. Hydrated bentonite gel exhibits good adhesion characteristics to surrounding materials, including concrete. Once installed, the bentonite remains in place by being confined between the compacted backfill and the foundation wall. Therefore, as long as the backfill is not removed, the bentonite will remain in place.

Without being provided additional information regarding the specific site conditions and site location, as well as, clarification regarding any excavation work that may have been conducted after the waterproofing installation, it would be improper for us to comment further.

**7. Clarify why the effectiveness of Volclay Bentonite Waterproofing appears to vary with the type of backfill material. The material seems to be most effective when granular fill and soil are used, and least effective with crushed stone.**

Volclay Bentonite waterproofing is effective with both granular soil fill and crushed stone when proper backfilling and compaction procedures are followed.

**8. Confirm the vapor barrier capabilities of Volclay Bentonite Waterproofing for resisting water vapor migration through concrete foundation walls.**

Like most commercially available waterproofing systems, Volclay Panels and Swelltite have a low permeability to moisture vapor. However, like rubberized-asphalt membrane waterproofing neither product is considered a vapor barrier.

**9. Provide technical criteria and basic details regarding the patching and repair of Volclay Bentonite Waterproofing.**

Standard repair procedures for Volclay Panels includes the removal of any product area deemed damaged by prehydration or physical damage prior to backfill or concrete topping placement. After removing the damaged product, a new Panel section is positioned and secured over the area where the new Panel patch material overlaps the undamaged previously installed waterproofing.

**VOLCLAY SWELLTITE 3000 COMPOSITE BENTONITE WATERPROOFING MEMBRANE PDG QUESTIONS**

**1. Explain why the "unique water soluble film" which is described in the Sep 94 CETCO Specdata as a film that is supposed to "completely dissolve upon hydration, "readily allowing the bentonite to be in direct contact with the structure" was found undissolved and intact.**

At this time, testing is being conducted to answer this question. Until the testing is completed and the results evaluated, we will not be able to provide an explanation for what is described in the question above.

**2. Further to Item 1, confirm the production date of Swelltite materials shipped to Western Waterproofing for installation on this project, and further confirm whether or not material age would have any effect on the soluble film's ability to dissolve.**

THP

THP LIMITED • CONSULTING ENGINEERS • 100 E. EIGHTH ST., CINCINNATI 45202-2133 • 513-241-3222

July 8, 1998

Queens Tower Plaza

Mr. Gregory E. Land
CMC Properties
10925 Reed Hartman Highway
Suite 200
Cincinnati, Ohio 45242

Subject: Queens Tower Plaza
Waterproofing Integrity Review
THP #98038

Dear Greg:

This letter summarizes our understanding (as reported by others) of the construction of the Queens Tower Plaza in 1996, and our review of the plaza's waterproofing integrity this year to date.

**Plaza Construction**

Original plaza features were completely removed, exposing the top of the cast-in-place concrete structural slab. Cetco's Swelltight 3000 waterproofing system was installed by Project Skills, with all overlapping seams between sheets supplementally sealed with Seamtape. Liquid flashing material was used at drains, at turnups and elsewhere in accordance with manufacturer recommendations.

Photos of the structural slab prior to membrane installation showed ponded areas throughout the slab. No supplemental overlays to promote drainage were installed on the structural slab prior to the membrane installation. ?

No supplemental drainage mat was installed over the membrane prior to topping slab installations. Cellular fill material was installed in the raised concrete slab areas, apparently to allow the self-leveling material to flatten the floor to accommodate the subsequent varying thickness stamped concrete slab installation. Driveway topping slab concrete was placed directly over the membrane. The cellular fill and concrete slabs were installed by Parker Concrete.

**Waterproofing Integrity Observations**

Originally, leakage into the garage below the plaza was concentrated in parking stalls at the west side of the garage beneath the driveway topping slab areas. Moisture sensitive chemical grout was pumped into leaking cracks and joints at several locations in the garage, generally along or near the west side of the site. This work was performed at first by Project Skills, then

EXHIBIT G

DEP
EX. NO. 315 ID
DATE: 11-20-02
DIANE HROMEK'S COURT REPORTERS, INC.
REPORTER: JOH
1-800-556-5554

WHO ? WHEN ?

an out-of-town contractor brought to the site by Cetco. Leakage has slowed, but not stopped, in the west side of the garage parking areas. Recently, extensive leakage has also occurred near the south end of the site, also beneath the driveway slab areas. No leakage of any consequence has occurred beneath the raised stamped concrete slab areas.

During our 3/17/98 meeting, THP raised concerns that shrinkage of driveway topping slab could have lifted the slab off the membrane waterproofing at several locations. Mr. Frank Varak with Cetco indicated the Swelltight membrane system would provide waterproofing protection if any such gap was 1/8 inch or less. These concerns prompted our recommendation to take cores in the driveway topping slab to evaluate the potential gap and the condition of the membrane below. Cores were taken at the south end of the driveway at current heavy leakage (Location No. 1), and in the driveway just to the north of the canopy, near the west side curb (Location No. 2). Records indicate no chemical grout was pumped in the vicinity of the south end (No. 1) core, but extensive grout was pumped in the vicinity of the core at the canopy (No. 2).

Core No. 1 revealed a 5-3/4" thick topping slab, then the Swelltight membrane system with reacted bentonite material swelled in a difficult-to-determine thickness gap between the topping slab and structural slab.

Core No. 2 revealed a 6-1/4" thick topping slab, then the Swelltight membrane with compressed bentonite material, then an approximately 1/10 inch thick layer of cured chemical grout on top the structural slab.

Other observations pertinent to the review include the leakage at the south end driveway occurring around a poorly consolidated full depth patch in the structural slab, and the recent installation of new urethane joint sealants throughout the stamped concrete area.

**Discussion and Recommendations**

There appears to be positive impacts of the cellular fill on the waterproofing performance of the Swelltight membrane system. The cellular fill was placed soon after the membrane installation, and likely acted to confine the membrane, isolate it from construction damage, and limit its exposure to other than minor water leaking through cracks and joints in the stamped concrete slab, which in turn slowly moves through the cellular fill.

In the driveway areas, shrinkage of the concrete topping slab may have lifted the slab somewhat at the west perimeter, but it does not appear the gap caused by the shrinkage exceeded the 1/8" tolerance reportedly acceptable for performance of the membrane. Original leakage through membrane system failures which occurred in these areas do not appear to have been due to greater than allowable confinement gaps on top the membrane. The subsequent chemical grout injection appears to have utilized the butyl rubber top layer of the membrane system as a confinement bladder to allow the lateral distribution of grout to fill the gap and substantially waterproof the affected area.

At excessive current leakage at the south end driveway area, the Swelltight membrane system has failed. An ill defined gap which may or may not be greater than the 1/8" tolerance exists at this location.

Aside from greater than allowable confinement gaps on top the membrane, a possible problems contributing to failures in the Swelltight membrane system include construction related damage, damage caused by freezing of entrapped water in ponded areas on the membrane, inadequate sealing of seams between membrane sheets, inadequate liquid flashing details at drains, turn-ups and elsewhere, and inadequate or potentially damaged membrane details at the west perimeter of the plaza, where the membrane was reportedly turned down the outside wall 12" to 18".

The cellular fill beneath the stamped concrete areas eliminated exposure to subsequent construction damage, and appears to have improved the confinement of the Swelltight membrane system and its seam sealing, termination and liquid membrane details. Similarly, surface drainage off the stamped concrete to frequent trench drains, coupled with recently installed and better quality joint sealants, limits the magnitude of water which can find its way eventually to the underlying membrane system.

Further investigation of problems in the driveway areas can be coordinated with repairs to the membrane. In the south end driveway area, defective concrete slab repairs require replacement, necessitating the localized removal of the topping slab and membrane in an approximately 4' by 4' area. A larger topping slab area, say 4' by 12', could be carefully removed to facilitate inspection of at least three seams between membrane sheets, plus a widespread inventory of the confinement gap provided by the topping slab. Such an investigation should yield the information necessary to determine if the waterproofing integrity of the membrane beneath the driveway slab areas can be salvaged with repairs, or if the driveway slabs should be removed to accommodate replacement of the membrane system.

Please call if you have questions or require any further assistance.

Very truly yours,

THP Limited

[signature]

Christopher W. Przywara, P.E.
Principal

[illegible]