UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL FILE NO.: 00-CV-987 JEL/JGL

---

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * * *

DEPOSITION OF: JON CAMAYA, VOLUME I OF II
TAKEN ON: THURSDAY, MAY 8, 2003
COMMENCING AT: 10:10 A.M.

* * * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586



and

Colloid Environmental Technologies, Co.,

Fourth-Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

v.

Mikesh, Inc.,

Fourth-Party Defendant.

---

EXHIBIT P



NOTES

Page Line



APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 - 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Company.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO BRISBOIS, Esq., Stich, Angell & Kreidler, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared via speakerphone representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE L. HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant and Fourth-Party Plaintiff J-Berd Mechanical Contractors, Inc.

BRIAN BAUMGARTNER, Esq., Baumgartner Law Office, LLP, 3320 West Owasso Boulevard, Shoreview, MN 55126, appeared via speakerphone representing Fourth-Party Defendant Mikesh, Inc.

LORI SEMKE, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, mn 55402-2440, appeared via speakerphone representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared via speakerphone representing Westfield Insurance Company.

**Berger were in contact with each other.**
Q You were given various documents before you ever went out to Minneapolis to see the Promenade Oaks site, correct?
A **That's correct.**
Q What were you given prior to going out for your site inspection?
A **The two sets of drawings and the copy of the disclosure report.**
Q Showing you what's previously been marked as Exhibit 540, is that a copy of the Promenade Oaks disclosure report that you were provided?
A **Yes. It seems a little thicker, though.**
Q It seems thicker than the one you remember?
A **Right, that I recall.**
Q Are there things in there that weren't included that you're able to identify?
A **I don't recall this table, the last table.**
Q The last page?
A **Right.**
Q That's GID 252?
A **Correct.**
Q Is there anything else that you don't recall being included in this document when it was first given to you?
A **Yes. Appendix C, D.**
Q So you were not provided with the pages of the document



relating to mold?
A **Correct.**
Q Was everything else, the rest of the document included in what you were given?
A **Yes. To my recollection, yes.**
Q Showing you also what's been marked as Exhibit 545, --
MR. REILLY: What's the exhibit number again?
MR. VEITH: 545.
Q (By Mr. Veith.) -- is that also a document that you were provided by GID when you were initially retained or in that general time frame?
A **Yes. I recall this cover but not the document being so hefty.**
MR. BROWN: I'm sorry. What was your answer, sir?
THE WITNESS: I recall the cover, but I don't recall it being this thick.
Q (By Mr. Veith.) Would you just look through that document and tell me if there's anything in there that you were not provided when you were retained by GID relative to the Promenade Oaks?
A **I believe that the version that I had only went up to page 8.**
MR. BROWN: Up to and including page 8?



THE WITNESS: Including page 8.
Q (By Mr. Veith.) Were you ever given the remaining pages?
A **No.**
Q Do you know where GID received these documents from?
A **No, I don't.**
Q Do you know who authored Exhibit 540, the Promenade Oaks Pending Litigation and Disclosure report?
A **I believe I met the gentleman. I don't know his name, I don't recall his name, but I believe he was out at Promenade Oaks the day I visited the site.**
Q Was it authored by someone other than Mr. Campbell from Inspec?
A **That I don't know. I do recall meeting Mr. Campbell.**
Q You do?
A **Right.**
Q But you don't know whether Mr. Campbell was the one who created Exhibit 540?
A **That's correct.**
Q Do you think it was someone other than Mr. Campbell or you just don't know?
A **I wouldn't know.**
Q Did GID provide you with any photographs prior to going out to Minneapolis?
A **No. Not prior.**
Q So the Exhibit 545 did not contain any photographs --



A **That's correct.**
Q -- when it was provided to you?
A **That's correct.**
Q Other than Exhibit 545 and Exhibit 540 and the two sets of architectural drawings, were you provided with any other documentation by GID prior to going to Minneapolis?
A **No.**
Q Was it your understanding that what you were being asked to do by GID was to review that documentation and then go out to Minneapolis to make a limited review of the site and verify what was contained in those reports?
A **Yes.**
MR. HULL: Object to form of the question.
Q (By Mr. Veith.) If you were to be retained to perform a full scale failure investigation, what would that entail?
A **Disclosure of all the documents.**
Q What kind, for example?
A **Original CDs, specs, details, architecturals, any test reports, progress reports, all submittals, progress photographs, video, contractors' reports, daily reports, correspondence from product manufacturers, entail field probes, material sampling.**
Q I'm sorry?
A **Material sampling, laboratory testing.**
Q Laboratory testing of what?

A **Of the samples.**
Q Okay.
A **Water testing, or testing, an overall survey, interviews with building staff or any parties involved with repair or any chore of response to any of the failures, interviews with residents. Off the top of my head, that's what I would start with.**
Q So this wasn't anything near that type of investigation?
MR. HULL: Objection, form of the question.
Q (By Mr. Veith.) Is that correct?
A **That's correct.**
MR. HULL: Same objection.
Q (By Mr. Veith.) For example, you weren't provided -- prior to issuing your report in this case, you weren't provided with most of the documents that you recited, correct?
A **That's correct.**
Q So I take it you reviewed this exhibit, you reviewed the documentation that GID initially provided you with, and then you went out for your site visit?
A **That's correct.**
Q How many times did you actually visit the site?
A **Twice.**
Q Do you know the dates?



A **I believe it was November 5th or 6th was the initial visit, and a second visit happened -- I don't recall the exact date, but it was a few weeks after that.**
Q When you went out for your first visit, who went with you?
A **From my office or was I accompanied by anyone?**
Q Yes. Were you accompanied by anyone?
A **No.**
Q Who was at the site on that visit November 5th or 6th?
A **Scott Vanderberg was there, I recall Mr. Campbell being there, Tim -- a gentleman, Tim Charbonea. I don't recall his last name exactly, but he was -- he is a contractor retained by GID to perform site work for that day. There were other gentlemen present, but I don't recall their names. One of them was definitely responsible -- he was part of the property management, I believe. He's the one that toured us through the property.**
Q Was it your understanding that you were collaborating with, so to speak, any other engineers, repair experts that GID had retained?
A **No. To my understanding, I was the only one that was working for GID.**
Q How long were you out at the site at that first visit?
A **The whole day.**
Q Eight hours?
A **Yes.**



Q And were you working alone or were you working with other individuals that day?
A **There was a group of us that were walking through the property. At one point or another, everyone went their own direction. I was mostly with Mr. Vanderberg.**
Q Would you tell me generally what your review of the site consisted of?
A **Mr. Vanderberg had I believe five or six probes excavated in different areas of the plaza and I reviewed those. There was a walk-thru of the spaces below the plaza, the private garage space, as well as some units, some private units that were either available or -- available for access or unoccupied.**
Q Anything else?
A **As well as a walk-thru, a walk-thru of the exterior. And the gentleman that took us on the tour was able to provide a few binders with photographs of the initial construction.**
Q Do you know who that was that had the binder of photographs?
A **I don't recall his name.**
Q It wasn't Mr. Campbell?
A **It wasn't Mr. Campbell.**
Q Was it the property manager?
A **I would say yes. I don't know if he was exactly the**



**property manager, but he was, to my understanding, present during initial construction and was still in the employ of the Promenade Oaks facility.**
Q Were the probes that you reviewed, the five or six probes that you described, were they all on one plaza?
A **No. They spread them out in different areas.**
Q And were they already excavated prior to your arrival?
A **Yes.**
Q And Mr. Vanderberg had had that done?
A **That's correct.**
Q Do you recall the layout of the Promenade Oaks Townhomes, how the buildings are laid out?
A **More or less, yes.**
Q Did you walk through all of the plazas?
A **Yes.**
Q Did you walk through all of the underground garages?
A **Yes.**
Q How many underground units did you go into?
A **Two. Two below grade units and one above grade.**
Q Do you know whether the five or six probes that were excavated for you to review were at the same locations that prior excavations had been done by Mr. Campbell or don't you know?
A **I don't know if they were -- I don't know if they had chosen areas that were already excavated. When I was**

**asked for preference, I said I would rather see areas that were not excavated during Mr. Campbell's review of the property. I didn't want a redundancy of the probes.**
Q Why was that? Why did you want to avoid redundancy?
A **I wanted to see conditions that had not been disturbed before my view of the condition.**
Q Do you know when the excavations that you reviewed were done?
A **Other than before I arrived on the site, no.**
Q Do you know, for example, whether it had rained or something after the excavations were dug or between the time they were dug and the time you arrived on site?
A **When I arrived on site, there was a drizzle, so --**
Q It was raining?
A **Right. There was a drizzle, and there was still snow on the ground thawing out.**
Q Do you remember what the temperature was, what it was like?
A **It was cold. I remember it was cold.**
Q I'm going to show you or ask you to look at -- it's page GID 232 of Exhibit 540 and ask you if you can identify for me on which plazas the test pits that you reviewed were located? Are you able to do that?
A **No. I could do that through the photographs, the file of digital photographs because I did photograph -- I did**



**photograph overviews of the plazas as well as the numbers on units where the probes were done. So I do recall, say, photographing residence X, Y, Z and saying the probe's here. Looking at this, I couldn't pinpoint where the areas were, but through the photographs, I could do that.**
Q How did you take those? Were they aerial photographs?
A **No. They were digital. They were on the ground, and if there was a probe done at the base of the wall against unit X, Y, Z, I took a picture of the door at X, Y, Z and took a picture of the probe.**
Q Would you take a look at Exhibit 592, and there are a number of photographs in that exhibit, and I wonder if these are the photographs that you're talking about?
A **Right. These are among -- these are some of the photographs that I took during that day.**
Q But not all of them?
A **Not all of them.**
MR. STEPAN: John, what is 592?
MR. VEITH: 592 is the December 4, 2002 field report.
MR. STEPAN: Thank you.
Q (By Mr. Veith.) Are the overview photographs that you were talking about contained within your field report?
A **No.**



Q Could you describe for me what different details were excavated for your review?
A **There was an excavation at a typical surface drain, there was an excavation at the base of a porch or a stoop where -- the main entrance of the unit. There were two of those excavations. There were two excavations at the base of the wall of a typical unit.**
Q Base of a vertical wall?
A **Base of a vertical wall, correct. And there were two probes like that.**
Q That's five?
A **Right.**
Q Was there another?
A **I don't recall what the last probe was.**
Q You're familiar with the fact that there is a courtyard and there is a building on either side of the courtyard?
A **Right.**
Q And there is a concrete deck underground that extends underneath one of the buildings but terminates at the vertical wall on the other side?
A **Yes.**
Q When you're talking about the base of the vertical wall, there were two of those excavations, were they on either side of a plaza or were they of the same detail?
A **No. They were on different sides. They were on opposing**



**sides but in different plazas.**
Q Okay. Tell me about the conditions as you saw them at the typical surface drain excavation? Did that go all the way down to the deck?
A **Yes, but they didn't disturb the drainage mat or the membrane below it. So it excavated down to the surface of the drainage mat.**
Q Were you able to see the clamping collar around the drain or was that submerged beyond what you could see?
A **It was visible. The clamping collar was visible.**
Q You couldn't see the actual waterproofing product itself in that detail?
A **Well, you'd have to pull back -- without pulling back the drainage mat or the protection board, you wouldn't be able to see that.**
Q And you didn't do that?
A **I pulled it back as far as I could to be able to view it, but because of the rain, more water was rushing in. So even if I had gotten down to the membrane, I wouldn't be able to see the interface of the membrane to the clamping ring. So there wasn't -- the conditions weren't conducive to being able to view a pristine waterproofing membrane, and cutting it was -- cutting anything out there was an option that I discouraged, especially if Mr. Charbonea wasn't prepared to re-seal the membrane.**

COPY



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL FILE NO.: 00-CV-987 JEL/JGL

---------------------------------------------------------

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: JON CAMAYA, VOLUME II OF II
TAKEN ON: THURSDAY, MAY 9, 2003
COMMENCING AT: 9:00 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586



and

Colloid Environmental Technologies, Co.,

Fourth-Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

v.

Mikesh, Inc.,

Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -



NOTES

Page Line



APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 - 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Company.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO BRISBOIS, Esq., Stich, Angell & Kreidler, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared via speakerphone representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE L. HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant and Fourth-Party Plaintiff J-Berd Mechanical Contractors, Inc.

BRIAN BAUMGARTNER, Esq., Baumgartner Law Office, LLP, 3320 West Owasso Boulevard, Shoreview, MN 55126, appeared via speakerphone representing Fourth-Party Defendant Mikesh, Inc.

LORI SEMKE, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, mn 55402-2440, appeared via speakerphone representing Defendant Promenade Village Townhomes, LLC.

CHRISTOPHER MALONE, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared via speakerphone representing Westfield Insurance Company.

INDEX

PAGE
Pursuant to Notice.................................. 196
WITNESS:
Jon Camaya.................................. 196
Examination by Mr. Hull.................. 196,359
Examination by Ms. Heyer...................... 291
Examination by Ms. Semke...................... 304
Examination by Mr. Brisbois.................. 323
Examination by Mr. Veith...................... 324
Examination by Mr. Reilly................ 328,370
Examination by Mr. Brown................. 329,372
Examination by Mr. Stepan..................... 346
Examination by Mr. Baumgartner................ 365
Witness excused............................. 374
SIGNATURE/CORRECTION PAGE.................... 375
CERTIFICATE PAGE............................ 376



THE CONTINUING DEPOSITION OF JON CAMAYA, is taken on this 9th day of May, 2003, at the Law Offices of McDermott, Will & Emery, 50 Rockefeller Plaza, 11th Floor, in the City of New York, New York, commencing at the hour of approximately 9:00 a.m. (Eastern Standard Time), pursuant to NOTICE:

JON CAMAYA,

called as a witness, being previously duly sworn, was examined and testified on his oath as follows:

EXAMINATION

BY MR. HULL:

Q Mr. Camaya, I just want to remind you you're still under oath from yesterday. And I'm Bill Hull, I represent Elness, Swenson & Graham, which was the architectural firm that did the original design on the Promenade Oaks Apartments and I've got a few questions for you.

When did you graduate from architectural school.

A **'92.**

Q And was that a four or five year program?

A **That was a four year program.**

Q And you ended up with a B.S.?

A **That's correct.**

Q And that was a B.S. in architecture?

A **Right.**

Q Did you have any specialties that you focused on or is it



a general architecture degree?

A **It's a general architecture degree.**

Q Can you give me some idea of the type of classes you take in the process of getting an architectural degree?

A **I took design classes, building construction, management, construction management, structural courses.**

MR. BRISBOIS: We're having difficulty hearing again. If you could speak up a little, please?

Q (By Mr. Hull.) Anything else?

A **I'm sure. I'd have to go look.**

Q What classes would you have had in architectural school that would bear some relevance to the work you're now doing at Israel Berger & Associates?

A **I'd say design, construction drawings, building construction, plan reading.**

Q Did you take any classes dealing with materials, building materials?

A **There was a class in strength of materials, and materials were also covered in building construction.**

Q What did you do, for example, in building construction class; what types of things did that cover?

A **Basic building construction practice, methods, materials.**

Q Would that have touched on any roofing and waterproofing materials?

A **Yes.**



Q And when did you join the Army Corps of Engineers?

A **In 1988.**

Q So that was before you were in architectural school or about the time you started?

A **About the time.**

Q What was your job in the Army Corps?

A **I was an enlisted man.**

Q And what did you do?

A **Assigned to the 469th, I was a specialist in the construction battalion. We worked with heavy construction equipment, we did renovation, repair, basic construction on existing facilities.**

Q Had you had any experience in the construction business before you joined the Army Corps of Engineers?

A **Nothing professional.**

Q Now, what type of renovations, repairs were you involved in in the Army Corps of Engineers?

A **Gutting of buildings and installation of interior work. Some exterior work as well.**

Q And I think did you also say you did some just general building construction there also?

A **Yes.**

Q Would that be new construction?

A **No.**

Q All part of the renovation and repair process?

A **That's correct.**
Q Were you actually doing the construction work yourself?
A **Yes.**
Q And you were going to architectural school at the same time, is that right?
A **Not during the full time, the first two years of full time, which encompasses boot camp and your initial training, and after that it's a reserve. So the first part of that is no, and then when you enter reserve duty and the time that you're referring to, yes, I was attending school at the time and serving.**
Q When did you actually start architectural school?
A **I enrolled in '86.**
Q So did you have two years, then go to the Army Corps for two years and then finish up?
A **About a semester, then I went in.**
Q And then when did you join -- what did you do after the Army Corps?
A **I worked for Mr. Berger.**
Q You're speaking of Israel Berger & Associates?
A **That's correct.**
Q And what business are they in?
A **They're exterior wall and roofing consultants.**
Q How many employees do they have?
A **Approximately 20.**



MR. BROWN: How many?
THE WITNESS: Approximately 20.
Q (By Mr. Hull.) And what were you hired to do when you started there?
A **Initially to perform quality control, control inspection, field monitoring.**
Q Give me some idea of the type of projects Israel Berger & Associates gets involved in?
A **Well, on the exterior wall, they consult on forensic projects; they consult on new construction; restoration; repair; landmark; historic structures; curtain wall, both high rise and smaller scale; masonry; EIFS walls; stone work; stone cladding; roofing and waterproofing, both sloped and low sloped; steep; sometimes control testing.**
Q Where does Israel Berger do its work? Is this a local company, a national, international?
A **There are both national and international projects.**
Q What is encompassed in the forensic work that Israel Berger does?
A **From what I've seen, we're involved with failure investigations, expert witness, peer reviews.**
Q What about with respect to new construction, what type of work does Israel Berger do?
A **They provide consulting to architects as they design, review of new construction prior to actual breaking of**



**ground construction, mock-up testing, test facility observation, monitoring, review of proposed contract documents such as drawings, detail specifications.**
Q And would that work be primarily in the area of exterior walls and waterproofing type work?
A **That's correct.**
Q Now, when you say part of what they do is consulting with architects as they design, could you be a little more specific and tell me what they would be consulting with them on, what they would be helping the architects with typically?
A **Reviewing the architect's initial design.**
Q For what?
A **For feasibility.**
Q But I mean what type of -- what components of the design, the waterproofing exterior wall designs or roofs or what?
A **All of the above. Everything to do with the exterior wall, with the roofing and waterproofing.**
Q Would part of that process be helping the architects develop designs and design criteria?
A **Yes.**
Q Now, you also specifically mentioned that Israel Berger is involved in waterproofing. Can you tell me what type of work the company does in connection with waterproofing?
A **They consult with architects as to what types of assembly**



**materials can be used, investigate the failures of waterproofing systems.**
Q Is Israel Berger involved at all in the design of waterproofing systems?
A **Yes.**
Q And would that be one of the things that they would be working with architects on, is the actual design of a waterproofing system?
A **That's correct.**
Q And what all would that include? Would that include preparation of drawings?
A **It may depending on -- depending on the scope of work requested by the architect.**
Q Would it include the development of waterproofing details?
A **Yes.**
Q Would it include advising the architect on the selection of materials?
A **Yes.**
Q And when you started out, you were doing quality control, inspections, field monitoring. Can you tell me what all that involved?
A **Yes. Israel Berger would provide a field inspector on projects that required part time or full time inspection or site monitoring on behalf of whatever party would request that service, whether it be the architect or the**

**client or the resident.**
Q And would that have involved new construction at all?
A **Yes.**
Q Would that be limited, though, to the waterproofing exterior wall construction?
A **Yes.**
Q Okay. Can you give me an example of some of the projects where you have performed those type of quality control inspections, field monitoring services?
A **Yes. Specific names?**
Q Well, I'm not so interested in the names as the type of projects.
A **Okay. I've monitored the application of deck coatings on concrete decks in exterior and below grade parking structures; I've monitored the installation of waterproofing assemblies in exterior walls; I've monitored the installation of new roofing assemblies, primarily flat and low sloped roofs; I've monitored the installation of below grade waterproofing in plazas; I've monitored the installation of curtain wall panels and installation of new window components; I've monitored the retrofit and repair of historic masonry structures and masonry buildings.**
Q Would any of that work have been similar to the type of waterproofing work that was done in the plazas at the



Promenade project?
MR. BROWN: Object to the form, vague.
MR. HULL: You can go ahead and answer that.
THE WITNESS: Are you asking me if there was -- if I monitored a project with material similar to?
Q (By Mr. Hull.) I'm not so interested in the materials as I am in the basic design of a structure where you would have a dirt-covered plaza over a usable space?
A **Yes.**
Q And the objective there would be to keep the water out of the usable space? Have you done projects like that?
A **Yes.**
Q What other jobs have you had, then, as you've progressed through your career at Berger besides the quality control, inspection, field monitoring type work?
A **I assisted and eventually performed controlled water testing and air leakage testing, performed adhesion tests, cohesion testing, coatings, sealants, cladding. I assisted and ultimately developed waterproofing details and specifications. I've reviewed submittals for projects.**
Q Anything else that you've done as you've progressed through your career at Berger?
A **Performed leak investigations, prepared reports,**



**participated in expert witness.**
Q Now, this quality control, inspection, field monitoring, you did that on new construction projects as well as renovation projects, is that right?
A **Yes.**
Q And your job there would be to make sure that the contractor was following the drawings and specifications and conducting its work, is that right?
MR. STEPAN: Objection as to form.
Q (By Mr. Hull.) Well, maybe you could tell me just a little bit --
A **Well, ultimately we're there to make sure that the work performs according to the approved drawings and specifications.**
Q Now, when you say you developed waterproofing details and specifications, what does that include?
A **In new construction or in renovation or just in general?**
Q Well, let's talk about both. First let's talk about new construction. What would you do to develop waterproofing details and specifications; what would that include?
A **Typically an architect would provide us with their design drawings and specify locations where they would require more detail design.**
Q And then what would you do?
A **We'd review the condition, we would design the detail**



**based on materials that we believed were appropriate.**
Q Now, when you say you'd design the detail, would you prepare drawings?
A **We prepare sketches. Drawings if the architect or client requested them.**
Q And what would the sketches show?
A **It would show the transitions, the -- they would show how the actual materials would be configured in the field as a finished detail.**
Q Now, you made a distinction between sketches and drawings. What is the difference?
A **Sketches are hand drawn, usually on eight and a half by eleven, maybe larger. Drawings we would classify as the sketch being transferred to a draftsman to convert into a hard line drawing, if not to scale, to scale, and if not hand drawn with hard lines to be put on a CAD form, a CAD type drawing.**
Q And then would your role in that be to prepare the sketches themselves?
A **Yes.**
Q And then would you transfer that to someone else in the office to do the CAD drawings or the hard line drawings?
A **Yes, typically.**
Q And Israel Berger does have draftsmen on staff?
A **Yes.**

A They are -- at the time, they were located in Lawrenceville, New Jersey.
Q And what business is Prisco & Edwards in?
A They're an architectural design firm.
Q Do they specialize in any particular areas?
A Institutional buildings, primarily educational.
Q I think yesterday you indicated you didn't have any license, you don't have an architectural license?
A Not at present.
Q What do you need to do, once you get an architectural degree, to get an architectural license?
A You need to first apply with the board, the NCARB board, to register yourself.
MR. BROWN: Which board?
THE WITNESS: The NCARB.
Q (By Mr. Hull.) What does that stand for?
A I forget what the C is, but it's basically the Architectural Registration Board, the National Architectural Registration Board, and they monitor your progress as an unregistered architect and you accumulate experience that would be vouched for by professional firms that have registered architects.
Q And how long do you need to do that, where you'd be working under the direction of a registered architect?
A The amount of experience, between three to five years



before you can qualify to take the registration exam.
Q And then you take the registration exam?
A That's correct.
Q Anything else that you need to do?
A You need to provide proof that you have been working for registered architects and engineers to the board, and there's usually a review of that evidence as well as your application.
Q And why haven't you gone through that process?
A It's -- it's lower on my priority list when compared to actual field experience, on actual projects in the field. I value the field experience more so than the professional degree that I can acquire later on.
Q What can you do as a licensed architect that you cannot do as an unlicensed architect?
A I cannot sign and seal drawings.
Q Anything else?
A Primarily that.
Q So how would that affect your work -- let's go back to Berger. You're developing waterproofing details and specifications. What part of that process can't you do?
A I can't sign or seal the elements of the design that I'm responsible for as a registered architect. It would have to go to a registered architect in the firm or a registered architect that we have an arrangement with as



a client. Primarily when you're consulting, that distinction is drawn before the work is actually done, whether or not our office will sign and seal details or the architect will sign and seal the details.
Q And you indicated that Israel Berger would work for, in some instances, architects, in some instances owners. Do you ever work for contractors?
A Yes.
Q And what type of work would you do for contractors?
A We would review shop drawings, submittals, provide site monitoring as well.
Q Why would a contractor hire a company like Israel Berger & Associates?
MR. STEPAN: Objection, foundation.
MR. REILLY: Calls for speculation.
MS. HEYER: Same objection.
THE WITNESS: For those reasons.
MS. SEMKE: What was the answer to that one?
THE WITNESS: For those reasons.
Q (By Mr. Hull.) What did you do at Prisco & Edwards?
A I was involved with the design of new construction, I was part of their roofing and waterproofing division, I performed leak investigations, reviewed construction drawings that were produced by Prisco & Edwards and



participated in new design.
Q So Prisco & Edwards had a roofing and waterproofing division?
A Yes.
Q So when you were reviewing construction drawings that Prisco & Edwards produced, what would your role in that process be?
A I would act as an in-house consultant to our designers when I was with the firm.
Q And your work would be focused on the waterproofing and roofing elements of the project?
A That's correct.
Q So you would be helping the design professionals in the firm develop the waterproofing details and specifications?
A That's correct, in addition to other tasks.
Q And what would those other tasks include?
A I would also assist in the development and review of specifications that they made. I'd also assist on the design end of it as well.
Q Did you do any field monitoring at Prisco & Edwards?
A Not to the degree that I did for Israel Berger & Associates. They don't provide -- "they" meaning Prisco & Edwards don't provide a similar service in terms of providing an on site staff member to act as an inspector for a full time or extended time period. Th

sample?
A **It was shown to the client.**
Q Could you tell from looking at it that the bentonite had not been activated?
A **Yes.**
MR. REILLY: Objection, lack of foundation.
Q (By Mr. Hull.) Did you say yes?
A **Yes.**
Q And how could you tell that?
MR. REILLY: Same objection.
THE WITNESS: Because I've seen bentonite activated.
Q (By Mr. Hull.) Could you tell from your investigation why the bentonite system didn't activate?
A **No, other than it didn't come into contact with a sufficient amount of moisture to activate it.**
Q So following your inspection of that property, did you prepare a report?
A **Yes. It was more of a memo.**
Q What did your report include?
A **A description of the findings and -- I'd have to look at the report. It was quite some time ago.**
Q Did it contain recommendations for a replacement system?
A **No. I don't recall that it did because they had -- they**



**had their system chosen already. It was more of a matter of whether or not they continued it over the tunnel or not.**
Q Did your recommendation suggest that they take the old system off and continue with the new system, then?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: I'd have to look at the report.
Q (By Mr. Hull.) Do you have any recollection of what your report recommended?
A **I believe that it would lean towards that.**
MR. REILLY: Same objection.
Q (By Mr. Hull.) Did you believe that you had enough information after one day's investigation to make a recommendation?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: No. I left that to the consultant that was assigned to the job.
Q (By Mr. Hull.) Any other projects that you worked at at Berger that come to mind?
A **That bear any relevance to Promenade Oaks or below grade?**
Q Yes. Below grade waterproofing.
A **No. None that come to mind.**



Q Okay. Now, you said that you were a member of the Roofing Contractors Institute, is that right?
A **The RCI is the Roofing Consultants Institute.**
Q Okay. And what is that?
A **It's an association of parties that are involved with roofing and waterproofing, architects, engineers and contractors.**
Q Is that a national organization?
A **I believe they're national now. At the time that I joined, they weren't.**
Q What do they do?
A **Their mandate is to promote the education of the architectural engineering, building construction industry and the most updated and sound information for roofing and waterproofing.**
Q Does the RCI have any publications?
A **Yes.**
Q And do you receive those publications?
A **Yes.**
Q And what type of publications do they have?
A **It's a monthly publication called Interface where they discuss new roofing products, legislations regarding building codes, pertinent roofing and waterproofing practices, methods, failures, studies, case analysis.**
Q And do you review those newsletters when you get them?



A **Yes, when I have a chance to.**
Q Are you an officer or have any other involvement than simply as a member of the RCI?
A **No. I'm just a member.**
Q And you also said that you were a member of the Construction Specifications Institute, is that right?
A **Yes.**
Q And what does that organization do?
A **It's also a membership-based organization of architects, engineers, developers, parties involved with architecture and building construction. They address a wider scope than RCI. Where RCI is more concentrated on roofing and waterproofing, CSI is more of building construction. They address the industry on a broader scope.**
Q Does CSI also have a publication?
A **Yes, they do.**
Q And what type of publication is that?
A **It's a magazine, a monthly magazine called The Construction Specifier.**
Q And what type of articles would be in that magazine?
A **Somewhere along the lines of RCI, of course with a broader scope. There's a column there on failures that our office contributed to.**
Q Are you involved other than as a member in CSI?
A **No. Just a member.**

Q Now, at RCI, would their publications discuss different types of waterproofing products?
A **Yes.**
Q Would it ever contain case studies or things like that?
A **I'm sure.**
Q Would it ever contain research studies on different types of waterproofing products?
A **Yes, I'm sure it would.**
Q Are you involved in any other professional organizations?
A **No.**
Q Do you receive any other publications that are relevant to your expertise in waterproofing and roofing and building envelopes?
A **No.**
Q Does Israel Berger subscribe to any other publications besides what comes from RCI and CSI?
A **Yes.**
Q Any that you come in contact with on a regular basis?
A **Well, whatever is in the conference room. Everything is made accessible to all staff members in the archive in the library.**
Q Yes. You mentioned that Israel Berger & Associates had a library. How big a library is that?
A **It's a collection of product binders, periodicals. I couldn't tell you how many volumes or articles there are.**



Q But there would be product information in there?
A **Yes. There's one section on product information.**
Q How many different types of waterproofing systems are there?
A **Exactly?**
Q Well, I don't mean exactly and I don't mean, you know, by product name, but are there categories of waterproofing systems?
A **Yes, to my understanding.**
Q Okay. Tell me what those are?
A **Well, it can be broken down into cold applied and hot applied. Under cold applied, it can be broken down into liquid-applied membranes, referred to as LAMs. These can be asphalt-based rubberized asphalt. These types can be reinforced or non-reinforced monolithic. These could be polyurethane or modified rubberized polyurethane. These can also be silicone. They can also be epoxy and resin-based. They can also be acrylic. That's all off the top of my head for the cold liquid applied.**

On hot applied, it can also be hot rubberized asphalt with reinforcement, or non-reinforced. It could be a traditional built up roof membrane. It could also be torch-applied modified bitumen membrane. It can be a sheetgood, fully adhered sheetgood membrane, peel and stick. It could be a prefabricated rubberized sheet,



which would include EPDM, neoprene. It could also be a chlorosulfonated polyethylene, something like Hypalon. It could also be a PVC sheet. I'm sure there are more.
Q Where would bentonite fall in?
A **It would depend on its configuration, whether it was trowel applied, panelized, in tubes. It's not a hot application.**
Q Now, you indicated under cold applied a number of products that were liquid membranes. Are there any cold applied non-liquid?
A **Cold applied non-liquid. Right. That would be the sheetgood.**

MR. BROWN: I'm sorry. For clarification, was that big list you just gave that ended up with PVC sheet, was that cold-applied materials?

THE WITNESS: No. Those were separate. Those were separate.

Q (By Mr. Hull.) Okay. And would the bentonite type product that was used at the Promenade, would that fall under the cold-applied sheetgoods category?
A **I would categorize it as that.**
Q So as I look at your list here, you've got cold-applied liquid membranes and cold-applied sheet goods, and then you have hot-applied products; would those be three categories?



A **Yes.**
Q Are there any other categories of waterproofing products?
A **Not that I can think of.**
Q And then you indicated that bentonite comes in several forms. Can you review those for me?

MR. REILLY: Objection, lack of foundation.

THE WITNESS: There's a trowel grade.

Q (By Mr. Hull.) Let me just back up for a second. Are you aware of different types of bentonite products?
A **In terms of manufacturers?**
Q No. Just different types. You mentioned sheetgoods, you mentioned troweled on. That's what I'm talking about. Are you familiar with different types of bentonite products?
A **I'm aware that it comes in different form.**
Q And did you develop that awareness from your experience working as a roofing and waterproofing consultant?
A **I'd come across information during that time, yes.**
Q Tell me the different forms, then, that bentonite comes in?

MR. REILLY: Objection, foundation.

THE WITNESS: I understand it can be troweled, that it comes in tubes, that it comes in biodegradable panels, and laminated to high density

polyethylene panels.
Q (By Mr. Hull.) What type was used at the Promenade?
A **I believe it was the type that was laminated to a high density polyethylene panel.**
Q Now, Israel Berger's task at the Promenade project was to evaluate and verify the existing conditions of the below grade waterproofing in the courtyards, is that right?
A **That's correct.**
Q Did you believe that you had sufficient background and experience to perform that work?
A **Yes.**
Q Before you went out to that project, you received a disclosure report that we talked about yesterday that was marked as Exhibit 540, is that correct?
A **Yes.**
Q Now, I think that you had testified that the Promenade Oaks Pending Litigation and Disclosure form document that you got was different than Exhibit 540. Was that your testimony?
A **That's correct.**
MR. REILLY: I'll object to the form of the question as inconsistent with his prior testimony. His prior testimony was that it was the same document only less pages and didn't include as much, is my recollection of his testimony.



Q (By Mr. Hull.) Okay. Is that correct?
A **That's correct.**
Q Same document, but included less pages?
A **Correct, to my recollection.**
Q Okay. And I believe your testimony was that there were certain exhibits attached to the end of the report that were not included in yours, is that correct?
A **That's correct.**
Q And can you tell me again what those were?
A **I don't recall the appendices in the rear of the report.**
Q Can I see that for just a second?
A **Sure.**
Q Did the Pending Litigation and Disclosure report that you received include any recommendations?
A **In 540?**
Q Yes.
A **No, not that I recall.**
Q Then the other thing you indicated you received were some drawings, is that right?
A **That's correct.**
Q Did you have anything else before you went out there to the site, for your initial site visit?
A **Other than the disclosure and the drawings?**
Q Yes.
A **No.**



Q You indicated at some point you got this Waterproofing Investigation Report from Inspec, is that correct?
A **Yes.**
Q Do you recall when that was?
A **It may have been at the same time I received the disclosure report, but I don't recall exactly when I got it.**
Q All right. And let me show you what we've marked as Exhibit 545, which is the Waterproofing Investigation Report by Inspec, and I think you testified yesterday that the report you got had fewer pages than Exhibit 545, is that correct?
A **That's correct.**
Q And where did the report you received leave off?
A **I don't recall --**
MR. STEPAN: Asked and answered.
Q (By Mr. Hull.) Go ahead.
A **I don't recall seeing Recommendations or Cost Estimates, the back end of that report.**
Q So when you went out there, had you seen any recommendations for remedial work that anyone else had prepared?
A **No. Anyone else? No.**
Q Was it your understanding that you were charged with the responsibility of conducting an independent investigation



and coming up with your own recommendations and conclusions?
A **Yes.**
Q Do you recall how many pages of drawings you actually got?
A **No, I don't.**
Q The report that you did contained copies of two details from the drawings, which would be pages 6 of 19 and 7 of 19 in your report, and I just want to see if you can tell me where you got those from. I'm going to show you what's been marked as Exhibit 34, which is a set of drawings, and I'll direct your attention to page A5.1. Was that the source of the drawings that are incorporated in your report?
A **Yes. It looks like the details of the sections.**
Q Do you recall reviewing the notes on that page prior to the time you went out to the Promenade Oaks apartment project?
A **Yes.**
Q Did you happen to notice note 3a?
A **Yes.**
Q Were you aware at the time you went out there that this was a design-build waterproofing system by the general contractor?
A **No.**
Q Was the first time you learned that yesterday while you

WJE | ENGINEERS ARCHITECTS MATERIALS SCIENTISTS

Wiss, Janney, Elstner Associates, Inc.
600 Highway 169 South, Suite 1520
Minneapolis, Minnesota 55426
952.545.0295 tel | 952.544.6954 fax
www.wje.com

# SITE VISIT REPORT NO. 4

| | | | |
|---|---|---|---|
| Date of Visit: | 26 to 28 August 2002 | Project Name: | Promenade Oaks |
| Date of Report: | 6 September 2002 | | |
| Reported By: | MRC | Owner: | Healey-Raeme |
| WJE Project No: | 2002.1499 | Prime Contractor: | Weis Builders |
| WJE Proj. Mgr: | B. Pashina | | |
| Weather: | 80 F, sunny | | |
| Work in Progress: | Review Investigative Work by Hydrologist and Inspection of Test Pits | | |

| Present at Site (during all or some of work): | Distribution: |
|---|---|
| MRC, WJE<br>Mark Brown, Attorney, (WBE)<br>Pat Riley, Attorney, (Cetco)<br>Terry Wederhoff, Management, Promenade Oaks<br>Drew Ptat, Patrick Engineeing (Hydrologist)<br>Mary Jo Mullen, Patrick<br>Mark Healy, Meagher & Geer<br>Chad Stepan, Meagher & Geer<br>Jerry Bren, Attorney, (Criscraft)<br>Mike Blaskowski, J-Berd Mecahnical (drains)<br>Sid Bhatt, MEM Engineering, (J-Berd)<br>Chandelle Herger, Attorney, (J-Berd)<br>Bob Cutter, Raths, Raths, and Johnson, (WBE)<br>Rich Koziol, WJE<br>Gary Nelson, Weis Builders | Rich Koziol, WJE |

## Discussion

1. Patrick Engineering created 3 test pits in the courtyard of Building 1 on 26 and 27 August 2002. The building and location of the test pits was selected randomly. Test Pit #1 was created at a drain location between units 218/220 and 219/217 and Test Pits #2 and #3 were created at the intersections of the horizontal and vertical waterproofing systems along the side walls of the courtyard (at units 222 and 221 on opposite sides of the courtyard).
   - Patrick created the openings using a shovel.
   - Each opening was approximately 3 ft. by 3 ft.
   - The insulation, waterproofing system, drainage mat, exterior wall construction, and vinyl siding were cut into at openings 2 and 3 by Bob Kudder to expose their respective condition and construction.
2. Weis Builders created 1 test pit (Test Pit #4) at an unrepaired stoop post location in the courtyard of Building 1 and enlarged one of the openings created by Patrick Engineering (Test Pit #3) on 28 August 2002. The locations of these openings were suggested by WJE.
   - Weis personnel created the openings using a shovel.
   - Each opening was approximately 5 ft. by 5 ft.

DEPOSITION EXHIBIT
Chauvin 854
(11-20-03)

EXHIBIT Q

- At the request of WJE, the drainage mat and waterproofing membrane were cut by Gary Nelson of Weis to expose their respective condition and underlying construction.

3. All openings or cuts through the waterproofing membrane and exterior walls were to be repaired by Weis Builders.
4. Additional Notes:
   - The courtyard drainage system was designed and installed by J-Berd Mechanical.
   - The sprinkler system is reportedly set to water the courtyards every morning in the early a.m. hours. The courtyards were noticeably damp each day of our inspection and the sprinkler heads needed to be shut off in the vicinity of the test pits that were created.
   - Along the side walls of the courtyard areas, the waterproofing membrane was installed in accordance with the design drawings which showed the membrane extending to the tops of the 8 in. concrete blocks.

Refer to the attached photographs, photograph log, and sketches for a summary of the uncovered conditions and construction at the test pit locations and for additional notes and observations from these site visits.

## Photograph Log

R1-1 Overall view of Test Pit #1 in the courtyard of Building 1. This opening was created by Patrick at a drain location in the vicinity of Units 218/220 and 219/217. Additional views of this Test Pit are shown in R1-2 through R1-6. This test pit was subsequently enlarged as shown in R1-12 although the waterproofing membrane, drainage mat, and flashing at the drains was not exposed to view. Note the following conditions:

- As shown in R1-3, the drain pipe was surrounded with approximately 3/4" aggregate but filter fabric was not installed over the height of the perforated drain pipe.
- As shown in the close-up view of R1-4 and R1-5, dirt was observed on the surface of the drain pipe and a small aggregate was observed in a drain pipe perforation. Also, standing water was observed around the base of the drain pipe.
- The insulation, water proofing, and drainage mat appeared to be terminated or cut short of the drain pipe base (determined by touch). No method of flashing between the base of the drain pipe and the termination of the waterproofing membrane could be discerned.
- The bottom perforations on the drain pipe were approximately 2" above the top surface of the waterproofing membrane.
- The drain pipe has 1/2 in. diameter perforations that are spaced approximately 1 in. apart around the circumference of the pipe.
- The cover for the drain was ~~removed~~ and R1-6 shows the condition of the drain pipe interior. Note that aggregate are present at the insertion point for the drain tile and that the drain tile enters this pipe in the upper half (i.e., was not installed near the bottom of the courtyard backfill).

R1-7 Overall view of soil being removed from the courtyard area during the creation of Test Pit #2 in the courtyard of Building 1. Note the several large stones/boulders (approx. 6 in. diameter) that were removed from the courtyard backfill during these efforts.

R1-8 Overall view of Test Pit #2. This opening was created by Patrick along the wall between Units 222 and 224. Additional views of this Test Pit are shown in R1-9 through R1-11. Note the following conditions:

- The opening was approximately 2.5 ft. deep.
- The method of flashing at the top of the CMU wall of the sunken 2nd level is shown in R1-13. A self-adhering membrane appeared to have been installed since the original construction and lapped over the upper termination point of the waterproofing membrane. Note the waterproofing membrane, insulation, drainage mat were terminated approximately 6 in. below grade.
- As shown in R1-14, the drainage mat was almost completely clogged with soil. A close-up view is shown in R1-16.
- Note that the bentonite in the waterproofing membrane had been activated at the top of this Test Pit and soil was present behind the membrane.
- As shown in R1-17, the width of the cut made through the waterproofing membrane was approximately 9 in.
- As shown in R1-18, soil was observed behind the drainage mat and the drainage mat was almost completely clogged.
- A close-up view of the activated bentonite in the waterproofing membrane is shown in R1-19.

R1-20 Overall view of Test Pit #3. This opening was created by Patrick along the wall between Units 225 and 223. Note the following conditions:

- A protection board was installed over the top of the insulation and the edge of the below grade concrete masonry wall as shown in R1-21. Note that the soil backfill extended approximately 4 in. above the bottom of the vinyl siding, as shown in this photograph. Also refer to R1-22.
- As shown in R2-1, note that the drainage mat was installed backwards at this opening (dimples facing the townhouse unit). The drainage mat was filled with soil as also shown in this photograph.
- The waterproofing and insulation was cut back by Mr. Kudder as shown in R2-2 and R2-3.
- The protection board was installed approximately 6 in. below grade as shown in R2-4.
- Mr. Kudder cut through the vinyl siding and Miradri flashing to expose the wall construction as shown in R2-5.
- The wall construction consisted of exterior sheathing and 2 x 6 wall studs at the level of the main floor trusses, as shown in R2-6. The main level floor were top chord bearing and rested on a 2 x 6 sill plate that was supported by a 4 in. thick CMU block placed on top of 8 in. CMU block sections, as shown in R2-7 and R2-8 and R2-9 and R2-10.
- And overall view of the wall opening is shown in R2-11.

R2-12 Overall view of Test Pit #2. An additional view is shown in R2-13.

R2-14 Additional view of Test Pit #3. Note the black material applied to the surface of the concrete block masonry units in the below grade portions of the townhouse unit walls (3-story side).

R2-15 Overall view of Test Pit #2. The vinyl siding and wall construction was cut by Mr. Cutter to inspect the conditions present. Observations were as follows:

- The exterior sheathing of the units and the interior wall framing (i.e., studs, insulation) extended below the tops of the CMU walls. It appeared that the CMU walls on this side of the courtyard (2-story side) were butted up against the exterior sheathing AFTER the exterior walls of the townhouse units were constructed in order to contain the courtyard backfill and for waterproofing purposes. Refer to attached sketches.

R2-16 Overall view of Test Pit #3. An additional view is shown in R2-17. This opening was approximately 5 ft. by 5 ft. This pit was widened by Weis Builders representatives at the request of WJE in order to further expose the waterproofing details at the intersection of the horizontal and vertical waterproofing membranes on the 3-story side of the courtyard. Additional observations were as follows:

- As soon as the courtyard fill was removed from the top of the insulation on top of the horizontal waterproofing membrane and drainage mat, the test pit willed with water to a depth of approximately 2 in, as shown in R2-18. This required the use of a water pump and bentoinite to limit further and continued water intrusion into the bottom of the test pit. Refer to R2-19, 20, and 21.
- The drainage mat was cut by Weis as shown in R2-20. Note that impressions from the drainage mat dimples were observed in the waterproofing membrane beneath, as shown in R2-21. Mr. Nelson from Weis reported that in his experience performing previous courtyard repairs, this indicated the waterproofing membrane was in good condition and the bentonite had not been activated (had not seen water). Also note that the horizontal drainage mat was relatively unclogged with dirt and debris.
- The insulation was removed along the length of the vertical wall exposed at this opening, as shown in R2-22. Note that the drainage mat was installed backwards and was clogged with soil as shown in R2-23 and R2-24. Note the presence of dirt/soil on the surface of the vertical waterproofing membrane as shown in R2-25 and R2-26.
- As also shown in R2-26, there was NOT a seam in the waterproofing systems at the intersection of the horizontal planks and vertical wall. The waterproofing was sealed along the seam between these two sections approximately 18 in. from the face of the vertical wall.

R2-27 Overall view of Test Pit #2. It appeared that the outer filter layer of the drainage mat was composed of a different material than what was observed at the other test pits. It appeared this material was a felt or fabric type material and may have contributed adversely to the clogging of the drainage mat with soil as previously reported herein and shown again in R2-28. The outer layer of the drainage mat at other test pits appeared to be composed of a plastic-type material.

R3-1 Overall view of Test Pit #3 following the water pumping work, installation ~~of bentonite~~ to prevent additional water penetration to the opening, and the removal of the insulation and drainage mat. Additional observations were as follows:

- A black sealant/mastic was applied along the joints in the precast members and at the intersections with the CMU walls of the townhouse units, as shown in R3-2 following the cutting of the waterproofing membrane. An additional view is shown in R3-3. As also shown in this photograph, note the bentonite in the waterproofing memebrane (being held up) does not appear to have been activated.
- A close-up view of the conditions exposed following the cutting of the waterproofing membrane is shown in R3-4. A close-up view of the waterproofing membrane is shown in

R3-5. Note that the plastic film on the backside of the bentonite is still intact and the bentonite is still hard. An additional sample is shown in R3-6.

- An overall view of the 2 waterproofing membrane samples retained by WJE and removed from Test Pit #3 is shown in R3-7.
- An additional cut was made through the waterproofing membrane as shown in R3-8 and R3-9. Note in R3-9, near the top of the waterproofing membrane the bentonite appears to have seen water and has been activated (at trailing end of original cut through waterproofing made by Patrick) but the bentonite lower down in the vertical waterproofing membrane (in the trailing end of the cut made by Weis) does not appear to have been activated.

R3-10 Overall view of Test Pit #4. This pit was made at an unrepaired post in the courtyard of Building 1 at Unit 222 by Weis Builders. The specific location of the opening was agreed upon by Weis and WJE. The size of the opening was approximately 5 ft. by 5 ft. Additional observations were as follows:

- A close-up view of the opening is shown in R3-11. Similar to Test Pit #3, water infiltrated the pit once the soil was removed from the surface of the rigid insulation installed on top of the drainage mat. The drainage mat was cut back by Mr. Nelson as shown in R3-12 and R3-13 and appeared relatively unclogged.
- The base of the wood stoop post is shown in R3-14. Also note the impressions from the drainage mat dimples in the bentonite waterproofing, away from the post location. Mr. Nelson reported that this likely indicated the bentonite had not been activated at this location.
- An overall view of the seams in the waterproofing and the seam tape installation is shown in R3-15 and R3-17. A close-up view of the post base is shown in R3-16.
- A material that appeared to be activated bentonite was observed in the corner of the Test Pit, as shown in R3-18.
- Because the post was unrepaired and had been exposed by the creation of the Test Pit, it was decided by all parties that a post repair could be installed by Weis. This involved cutting the base of the post as shown in R3-19. The concrete slab or the post at the entry stoop were not shored during this repair.
- The base of the post was removed and the flashing exposed as shown in R3-20. Note that the metal bracket that the posts were set into, before the waterproofing membrane was applied, is still attached to the base of the post, as shown in R3-21. Also note that the base of the post, was water-stained and the bracket and anchoring nails were surface corroded.
- Additional views of the test pit following the post removal are shown in R3-22 and R3-24.
- The wood post specimen was retained by WJE and is shown in R3-23. Note that the waterproofing material applied around the base of the post was generally loosely applied at the upper edges and would allow water to penetrate behind it, to the post.
- A close-up view of the top of the precast planks beneath the bottom of the post, following the removal of the post base flashing and waterproofing membrane in the vicinity of the post anchoring points, is shown in R3-25. Note that corrosion stains from the post bracket bottom were present on the top surface of the planks, indicating water had been wicking down through the posts, or along the posts, and had penetrated to the top surface of the planks.
- A black mastic-type material was applied around the base of the post, at the termination of the waterproofing membrane. This material is shown in R3-26.
- A sample of the waterproofing membrane removed from the vicinity of the post base is shown in R3-27 and R3-28. Note in these photographs that the edges of the bentonite had

WJE | ENGINEERS ARCHITECTS MATERIALS SCIENTISTS



been activated but the plastic film on the backside of the bentonite had not dissolved and was still in place. This sample was retained by WJE.

- It appeared that the waterproofing membrane was terminated short of the post base, after the posts had been installed in the metal anchoring brackets. The black mastic material identified in R3-26 was then applied between the ends of the waterproofing membrane and the base of the wood posts. An additional unidentified sealant-type material was applied between the black mastic and the top surface of the waterproofing membrane, around the perimeter of the post base. This material was easily peeled off of the black mastic type material and appeared incompatible with the mastic-type material (i.e., did not adequately seal the mastic-type material to the waterproofing membrane and may have allowed water to penetrate between the two).

**End Of Report**