# EXHIBIT INDEX TO CHAD J. STEPAN'S AFFIDAVIT IN SUPPORT OF WEIS BUILDERS' MEMORANDUM OF LAW IN OPPOSITION TO J-BERD'S MOTIONS IN LIMINE

A. Curricula vitae of Jeffrey C. Schuh, P.E., Arnold Seaberg, P.E., Andrew J. Ptak, P.E., and Mary Jo Mullen, P.E.

B. Hydrologic Investigation of the Promenade Townhomes prepared by Patrick Engineering, Inc. dated August 12, 2003

/1162888

# *JEFFREY C. SCHUH, P.E.*

## *SENIOR VICE PRESIDENT*

PATRICK ENGINEERING INC.



Mr. Schuh has over 20 years of professional experience in the design and management of civil engineering projects. He is responsible for directing the activities of more than 60 engineers, geologists, and technicians in all project phases from concept to final design. He is the project director for the design of earth and earth-supported structures, drainage studies and site improvement projects. He is also responsible for directing complete subsurface exploration and laboratory testing programs for building foundations, retaining walls, major embankments, major bridges, and geoenvironmental projects. He supervises the preparation of design/construction drawings and contract documents, and supervises work of staff engineers and technicians.

*EDUCATION*
M.S., Civil Engineering, Purdue University
B.S., Civil Engineering, Valparaiso University

*REGISTRATION*
Licensed Professional Engineer: IL, IN, TN, KY, WI, OH, MI, MN, KS, CO, MA, UT, VA, FL, MO, ND

*AFFILIATIONS*
American Society of Civil Engineers
Society of American Military Engineers

*AWARDS*
Chicago Young Civil Engineer of the Year Award, American Society of Civil Engineers, 1989

### *PROFESSIONAL EXPERIENCE*

**Drainage Evaluation,** College Church, *Wheaton, Illinois*
Project Director for the investigation and evaluation of a subsurface drainage system that failed, causing damage to basement structures. Oversaw the field investigation of drainage pipes, analyses to evaluate drainage system capacity, and report preparation.

**Metropolitan Water Reclamation District of Greater Chicago**, *Illinois*
Directed geotechnical investigation for new aeration and final settling tanks. Performed slope stability analyses and calculated earth pressures for tank wall design. Provided recommendations for deep foundation system design and construction.

**Buoyancy Investigation,** Willbros Engineers, Inc., *Illinois and Wisconsin*
Project Manager for on-the-ground survey and geotechnical investigations related to buoyancy compensation for the construction of the 36-inch-diameter Guardian Pipeline, which will extend 141 miles from the Joliet, Illinois pipeline hub to Ixonia, Wisconsin.

**36-Inch-Diameter Gas Pipeline - Interstate 88 Crossing**, *Rock Island County, Illinois*
Directed embankment stabilization project. Project included void-fill and compaction grouting to stabilize embankment soils that had loosened during pipeline boring activities. Performed forensic study to determine cause of embankment failure.

**Embankment Settlement,** *Lake County, Illinois*
Geotechnical investigation and instrumentation installation to determine cause of embankment settlement and wall movement. Installed inclinometers and settlement devices.

**Navy Pier Headlands, Seepage Control,** Illinois Dept. of Natural Resources, *Chicago, Illinois*
Geotechnical investigation, forensic analyses, and design of site improvements to minimize seepage through headlands and existing crib walls. Assisted in design of new sheetpile retaining walls and concrete caps. Permitted project with IDNR, Corps of Engineers, IEPA, and City of Chicago.

EXHIBIT A

# *JEFFREY C. SCHUH, P.E.*

*SENIOR VICE PRESIDENT*

**Valley View and North Libertyville Flood Levee Investigations**, DuPage County, *Libertyville and Glen Ellyn, Illinois*
Two levee sites investigated to determine technical feasibility of flood prevention. Geotechnical investigation included soil borings, *in situ* hydraulic conductivity tests, and piezometer construction. Soil profiles were developed and groundwater conditions evaluated. Hydraulic conductivity coefficients were determined. The report prepared provided recommendations for seepage control.

**Virginia Road Pit Expansion,** Meyer Material Company, *Crystal Lake, Illinois*
Performed groundwater investigation and study to determine allowable mining depth and to verify mining would not impact the Larsen Fen and Lake in the Hills Fen. Provided expert testimony at public hearing.

## *SIGNIFICANT ACHIEVEMENTS*

***Publications***

*Effects of Sampling Disturbance on Shear Strength of Glacial Till and Compacted Fill*

*Reinforced Earth® Wall Distress Caused by Embankment Failure - A Case Study*

# *ARNOLD SEABERG, P.E.*
## *CHIEF CIVIL ENGINEER*

PATRICK ENGINEERING INC.



*EDUCATION*
B.S., Civil Engineering, University of Illinois
M.B.A., Northwestern University

*REGISTRATION*
Licensed Professional Engineer: IL

*AFFILIATIONS*
American Society of Civil Engineers

Mr. Seaberg has over 40 years of varied experience in the fields of civil and municipal engineering with emphasis on site development and municipal/public works projects. He plans, coordinates and directs civil engineering services for site development and municipal/public works projects and clients. He supervises and takes part in associated project tasks such as preliminary planning, feasibility studies, engineering analysis, technical reports, site improvement design, construction drawings, cost estimates, specifications, contract bid documents, permit applications and construction phase services. He coordinates the services of outside consultants, manages large-scale and multi-disciplinary projects, and prepares and negotiates client-engineer agreements. He is responsible for management of firm's site development/municipal civil engineering functions and personnel and quality assurance for these engineering services.

### *PROFESSIONAL EXPERIENCE*

**Highlands of Elgin Golf Course,** *City of Elgin, Illinois*
Chief Civil Engineer for comprehensive site civil, geotechnical engineering and surveying services for design and construction of a new 27-hole golf course complex, including a clubhouse, driving range, maintenance facility and 35-acre lake.

**Tri-County State Park,** Illinois Department of Natural Resources/Capital Development Board, *Bartlett, Illinois*
Chief Civil Engineer for new state park facility on a 470-acre property. Site facilities include a Visitors Center/IDNR Regional Building, a day use/picnic area complex, four miles of walking and bike trails, and associated roads and parking lots. Also included are on-site sewage disposal systems, off-site water main, stormwater/wetland basins, and a trail bridge.

**Brookeridge Drainage Improvements,** DuPage County Department of Environmental Concerns, *Illinois*
Chief Civil Engineer for investigation of drainage and flooding problems within a 380-acre residential area, development of cost-effective solutions and preparation of construction plans and contract documents.

**Riverwood Assisted Living Community**, MMA, L.P., *Naperville, Illinois*
Chief Civil Engineer for senior citizen residential facility on an eight-acre parcel. Site improvements included necessary pavements, sanitary and water service utilities, drainage systems and stormwater basins.

**Crystal Tree Development**, *Orland Park, Illinois*
Chief Civil Engineer for 283-acre residential and golf course development, including six drainage systems with 12 detention basins, 5,000 feet of offsite water main, 4.5 miles of roads, an intersection improvement of IL Route 7, a 700-FPM deep well, an 18-hole golf course and a clubhouse facility complete with tennis courts and a swimming pool.

**Timber Trails Drainage Study**, Village of Oak Brook, *Oak Brook, Illinois*
Chief Civil Engineer for investigation of drainage conditions and problems along roadway systems of a 170-acre residential subdivision. Scope included the preparation of plans and a report recommending specific improvements.

# *ARNOLD SEABERG, P.E.*
## *CHIEF CIVIL ENGINEER*

**Western Acres Golf Course**, Lombard Park District, *Lombard, Illinois*
Chief Civil Engineer for investigation of existing drainage conditions and problems, development of drainage improvement alternatives, preparation of contract plans and documents, preparation of County stormwater permit application, including wetland studies. Assisted the Park District in choosing and implementing cost-effective solutions.

**Centennial Park**, Village of Orland Park, *Orland Park, Illinois*
Chief Civil Engineer for development of a 60-acre parcel of 120-acre site into a multi-use sports and aquatic facility complex complete with concessions, washrooms and maintenance building. Also included 4,000 feet of access drives and three parking lots (280 spaces).

**Development Regulations**, *Grundy County, Illinois*
Chief Civil Engineer for design, construction and administrative standards for all aspects of site development including roadways, stormwater management, sewage disposal and water supply.

**Winfield Creek Reach 9**, DuPage County Department of Environmental Concerns, *Illinois*
Chief Civil Engineer for examination of existing conditions and problems, consideration of alternative solutions, determination of best practical improvement program and preparing construction plans and contract documents for selected improvement services.

**Solid Waste Agency of Northern Cook County**, *Illinois*
Chief Civil Engineer for 86,000-s.f. solid waste transfer station facility with 30 acres of site development and ¼-mile-long widening and intersection improvement of U.S. Route 45.

**Andrew Corporation**, *Orland Park, Illinois*
Chief Civil Engineer for 95,000-s.f. industrial facility with 50 acres of site development, including a creek and wetland relocation, a 3,000-foot access road and a 550-car parking lot.

**Hamilton Townhomes,** Village of Bensenville, *Illinois*
Chief Civil Engineer for repair, replacement and expansion of sanitary sewer, water distribution and storm drainage systems and parking lot and sidewalk pavements and installation of new site security lighting facilities and landscaping throughout an 11-acre residential complex consisting of 54 buildings (220 dwelling units) and six parking lots.

**Memorial Park**, Glen Ellyn Park District, *Glen Ellyn, Illinois*
Chief Civil Engineer for redevelopment of a restricted three-acre area within an eight-acre park site to provide soccer field and softball field of regulation size and grading. Site improvements included earthwork, storm drainage system, stormwater basin, retaining walls, grading, topsoil and sodding.

# ANDREW J. PTAK, P.E.
## PROJECT MANAGER

PATRICK ENGINEERING INC.



*EDUCATION*
M.S., Geotechnical/Structural Engineering, University of Illinois
B.S., Civil Engineering, University of Illinois

*REGISTRATION*
Licensed Professional Engineer, IL

*TRAINING/CERTIFICATION*
IDOT Level II Bituminous and Concrete Certified

*AFFILIATIONS*
American Society of Civil Engineers
Chi Epsilon Honorary Society

Project Manager for geotechnical engineering projects. Responsible for geotechnical evaluations with emphasis on shallow/deep foundation systems, earth retention, and slope stability.

### PROFESSIONAL EXPERIENCE

**Embankment Settlement Study,** Rockford Blacktop Construction Company, *Rockford, Illinois*
Project Manager for investigation of new four-lane highway to determine cause of settlement. Services included review of existing soil data and reports performed by others; consolidation and time-rate settlement analyses; and preparation of investigation report.

**Renovation and Parking Garage,** The Chicago Bears Football Team, *Chicago, Illinois*
Project Manager and engineer for new Soldier Field renovation and underground parking garage geotechnical exploration.

**Geotechnical Evaluation,** The John Buck Company, *Chicago, Illinois*
Project Engineer for geotechnical evaluation of a 50-story high-rise building. Building used combined support of hardpan caissons for building shell and rock-socketed caissons for building core support.

**Geotechnical Evaluation,** Army Corps of Engineers, *Chicago, Illinois*
Responsible for geotechnical evaluation and design for the shoreline design segment from Montrose Harbor Project. Project Manager and engineer for batter pile tension load testing and analysis for Chicago Shoreline Project.

**Interchange Study,** Illinois Department of Transportation, *Chicago, Illinois*
Project Engineer for I-80/U.S. Rte. 45 interchange study and the Lawrence, Nagle Avenue/I-90 retaining wall geotechnical investigation.

**Wall System,** Shedd Aquarium, *Chicago, Illinois*
Project Engineer responsible for design of soil nail/shotcrete wall system and micropile underpinning for subbasement of Shedd Aquarium's Philippines Exhibit.

**High-Rise Buildings,** *Chicago, Illinois*
Project Engineer for geotechnical exploration for multiple proposed 40- to 50-story high-rise buildings.

**Seismic Analysis,** *Saline County, Illinois*
Geotechnical engineer for seismic analysis for existing Saline County landfill to steepen side slopes from 4:1 to 3:1 to increase capacity of landfill. Analysis included multiple slope stability analyses using XSTABL, earthquake analysis using SHAKE, and permanent deformation analysis using DISPLMT.

**Geotechnical Evaluation,** Army Corps of Engineers, *Chicago, Illinois*
Field engineer for the geotechnical evaluation of the Chicago shoreline existing sheetpile wall investigation. Duties included field coordination with Chicago Park District, Army Corps of Engineers, and the subcontractor

of construction services; and on-site inspection and evaluation of soil borings and test pits adjacent to sheetpiling.

**Warehouse Facilities,** *Chicago Suburbs*
Geotechnical engineer for numerous low-rise office/warehouse facilities in the Chicago area. Responsible for making recommendations for foundation design, earthwork, subgrade support and drainage considerations.

**Soil Survey and Analysis,** *Chicago Suburbs*
Geotechnical engineer for numerous roadway soil survey explorations and analyses. Recommendations included remedial procedure locations and requirements, drainage and material recommendations.

# MARY JO MULLEN, P.E.
## CIVIL ENGINEER

PATRICK ENGINEERING INC.



*EDUCATION*
B.S., Civil Engineering, University of Notre Dame

*REGISTRATION*
Licensed Professional Engineer: IL

*AFFILIATIONS*
American Society of Civil Engineers

Ms. Mullen is experienced in designing site improvements, performing hydraulic and hydrologic analyses, obtaining FEMA map revisions, preparing streambank stabilization analysis and plans, and drafting (CAD). She is responsible for engineering analyses and design of civil works projects. Duties include preparation of engineering plans and specifications and stormwater management permits at state, county and city levels. She also is involved with project management and construction inspection.

### PROFESSIONAL EXPERIENCE

**Letter of Map Revision Study,** BP Amoco, *Joliet, Illinois*
Conducted a full hydrologic and hydraulic study of a 320-acre industrial site for the purpose of remapping the floodplain of an unnumbered A zone.

**College Avenue Station,** Metra, *Wheaton, Illinois*
Designed site improvements for a new Metra Train station, including parking lot, platforms, utilities and services, and stormwater management. Performed all site stormwater management calculations, design and permitting.

**I-88 / Naperville Road Drainage Study,** DuPage County Highway Department, *Naperville and Lisle, Illinois*
Performed calculations for drainage and floodplain analyses for tollway and county highway improvements at Naperville and Warrenville roads and at Naperville Road and I-88 Tollway. Managed individual tasks for the analysis and prepared reports of findings.

**Western Acres Golf Course Drainage Improvements**, Lombard Park District, *Lombard, Illinois*
Prepared engineering plans for golf course improvements, which included addition of tees, expansion of ponds, and installation of new storm sewer. Designed ponds and vegetated swales to provide better drainage. Designed schemes to protect the pond shorelines and swale banks. Located and surveyed structures and other potential obstacles. Prepared DuPage County Stormwater Management Permit submittal.

**Riverwoods Assisted Living Facility**, MMA Partners, *Naperville, Illinois*
Prepared engineering plans and specifications for an assisted living facility. Performed hydrologic and hydraulic calculations and modeling to design the stormwater management system. Designed vegetated swales to improve water quality of runoff and protect adjacent wetlands. Prepared DuPage County Stormwater Management Permit submittal and Stormwater Pollution Prevention Plan.

**Wheaton Northside Park**, Wheaton Park District, *Wheaton, Illinois*
Used hydrologic and hydraulic modeling to analyze an online pond on Winfield Creek. Analyzed alternate control structures and channel modifications to take the pond offline. Performed hydrologic modeling to determine the viability of using bioengineering techniques to stabilize the streambanks and the pond shoreline.

**DuPage River Park Utility Improvements**, Naperville Park District, *Naperville, Illinois*
Designed force main and water main improvements for future concession stand at DuPage River Park. During construction, performed routine inspections, coordinated with contractor and client and redesigned elements based on field conditions.

# HYDROLOGIC INVESTIGATION OF THE PROMENADE TOWNHOMES

DEPOSITION EXHIBIT
836 Schuh

## PATRICK PROJECT NO. 9402.A0

## AUGUST 12, 2003

PREPARED BY:

PATRICK ENGINEERING INC.

4970 Varsity Drive
Lisle, IL 60532

(630) 795-7200
Fax (630) 434-8400

EXHIBIT B

# TABLE OF CONTENTS

**PROJECT DESCRIPTION** ..... 1

**SCOPE OF STUDY** ..... 1

**STANDARD OF CARE** ..... 2

**STORM WATER MANAGEMENT SYSTEM** ..... 4

**HISTORY OF SEEPAGE PROBLEMS** ..... 5

**FIELD INVESTIGATION** ..... 6
- Original Construction ..... 7
- Supplemental Construction ..... 7

**GEOTECHNICAL INVESTIGATION** ..... 9
- Geotechnical Field Investigation ..... 9
- Soil Testing ..... 9
- Results ..... 10

**HYDROLOGIC INVESTIGATION** ..... 11
- Analysis following Local Design Criteria ..... 11
- Analysis for Post-Construction Improvements ..... 13
- Historical Rain Event Analysis ..... 15
- Freeze/Thaw Cycle Analysis ..... 16
- Appropriate Design Recommendations ..... 18

**CONCLUSIONS** ..... 20

**EXHIBITS**
- Exhibit 1 – Typical Building Cross-section
- Exhibit 2 – Existing Conditions Building 1
- Exhibit 3 – Existing Conditions Building 5
- Exhibit 4 – Hydrologic Investigation Typical Soil Profile

**APPENDICES**
- Appendix A – Site Photographs
- Appendix B – Soil Condition Summary
- Appendix C – Laboratory Test Results
- Appendix D – Hydrologic Design and Methodology References
- Appendix E – Hydrologic Calculations
- Appendix F – Hydrologic Results Summaries

p:\lisle\murnane\9402.a0\rpts\hydrologic investigation\table of contents final.doc

## PROJECT DESCRIPTION

The Promenade Townhomes are located in Eagan, Minnesota, at the northwest corner of the intersection of Yankee Doodle Road and Lexington Avenue. Since construction of the townhomes in 1997, some areas of the underground parking garages, the stairwells, and residential units themselves have been subject to occasional seepage. The locations where seepage has been noted are either adjacent to or underlie an interior courtyard area between the units of each building. ***Exhibit 1*** shows the typical building sections, as designed by BRW ELNESS Architects, Inc., the Project Architect.

Patrick Engineering Inc. (Patrick) was retained by Iverson Reuvers, LLC, Erstad & Riemer, PA, and Brown & Carlson, PA to investigate the potential for ineffective drainage of surface water runoff from the courtyard areas to have caused the seepage. The purpose of this study was to determine if the site/civil design and construction of the courtyard and its drainage system was adequate to properly convey runoff away from the townhomes such that seepage and the resulting damage would not occur.

## SCOPE OF STUDY

The scope of Patrick's involvement was limited to the investigation of the drainage conditions within the courtyard areas, including the surface drainage and movement of water in the soils located above the waterproofing system. The scope included:

1. Providing an opinion on the standard of care that should be have been followed for design of the courtyard storm water management system.
2. Reviewing information on the design of the storm water management system for the Promenade Townhomes.
3. Performing a field investigation to observe site conditions and to gather information on select drainage features at the site and the soils used to construct the courtyard.

4. Performing hydrologic and hydraulic analyses for the areas tributary to the courtyards to determine the ability of the drainage system to handle the design storm events.

5. Providing opinions on the following:

   a) The adequacy of the design of the storm water management system to control surface water runoff.

   b) The potential for inadequate surface drainage to have caused the seepage into the townhomes.

   c) The potential for inadequate surface and groundwater drainage to cause frost heave of the sidewalks in the courtyards.

## STANDARD OF CARE

The design of storm water management systems generally is performed in accordance with the following criteria:

1. Local codes and requirements.
2. Underground pipe systems are designed to convey storm water runoff from a 10-year storm event without ponding at the ground surface.
3. The water level adjacent to inhabitable structures should be at least 1 foot below the lowest entry point for the runoff from the 100-year storm event.

Local codes and requirements are satisfied for project permitting, but may not be adequate for unusual circumstances. Such criteria are considered minimum design standards, and can be modified depending on the unique features of each project and client requirements.

The purpose of satisfying Item 2 is to minimize the potential for flooding at the ground surface for storms that have the probability of occurring once every 10 years. This criterion is typically required to minimize ponding in streets, parking lots, and other areas with pedestrian or vehicle traffic.

The purpose of satisfying Item 3 is to prevent the flow of water into residences for storms that have the probability of occurring once every 100 years. The one foot vertical clearance provides additional safety against flood damage to residences. For areas that do not have an emergency overflow area or where there is a limited outlet, or where flooding could be catastrophic, additional freeboard (vertical clearance) would be appropriate.

Patrick contacted the City of Eagan Engineering Department to verify the design criteria for the courtyard drainage system. Per the City of Eagen:

1. Storm sewers that are tributary to main collector sewers should be designed to accommodate the 5-year event without ponding.
2. Storm sewers that are considered collector sewers should be designed to accommodate the 10-year event without ponding.
3. The required freeboard is 3 feet above the calculated 100-year high water level of a pond with emergency overflows provided at or within 2 feet above the high water level.

Because the courtyards were not designed as detention ponds, it is not reasonable to require that the lowest entry point be located 3 feet above the design high water level in the courtyard. However, it is reasonable to provide the 1 foot vertical clearance between the high water level and the first floor entry. This is consistent with the City of Eagan design criteria: provide one foot of vertical clearance between the emergency overflow and the lowest entry point.

Because the main drains in the courtyard are considered to be collector sewers (they collect water from the courtyard and convey it to the detention pond), they should be sized to accommodate the 10-year storm event without ponding. Also, ponding in the courtyard under frequent events would, at a minimum, be inconvenient to residents, and under worst case conditions could result in flooding of units.

Therefore, it is Patrick's opinion that the courtyard should have been analyzed by a professional engineer and designed following standard engineering practice to meet the following criteria:

1. First floor entry elevations (and top of foundation) should be located a minimum of 1 foot above the high water level within the courtyard for a 100-year storm event.
2. The storm sewer pipe within the courtyard should be designed to accommodate the runoff from a 10-year storm event without ponding of water at the inlet.

## - STORM WATER MANAGEMENT SYSTEM

The storm water management system, outside the limits of the courtyards, was apparently designed by McCombs Frank Roos Associates, Inc. (MFRA) of Plymouth, Minnesota. Plan Sheet 3 D of 14 by MFRA presents the Grading and Erosion Control Plan for the areas outside the buildings, including the parking lots and roadways. This Plan does not indicate drainage structures within the courtyards. No information is shown in the Architectural Plan set dated August 19, 1996 to indicate the grading requirements for the courtyards.

Information provided in numerous depositions and subpoenaed documents indicates that the design of the courtyard drainage system was to have been performed as part of the mechanical contractor's contract. The Mechanical Contractor, J-Berd Mechanical reportedly subcontracted this responsibility to Mikesh, Inc. No detailed plans or specifications were apparently produced for construction of the courtyard drainage system. However, sketches and notes were provided to indicate that the system was likely designed following the Minnesota Plumbing Code for roof drainage. It was not in accordance with the City of Eagan requirements for storm water management systems.

Based on information reviewed by Patrick, the original courtyard storm water management system for the Promenade Townhomes was constructed of the following:

1. Inlets within each courtyard that collected surface water runoff from both the roofs and courtyard. These inlets were 6-inch diameter drains surrounded by a concrete collar. The drains were generally located near to above the surrounding ground surface.

2. The inlets were connected to a perforated 6-inch diameter PVC pipe that was connected into the bell end of a 6-inch diameter pipe that penetrated the top of the garage roof. The bell end of the pipe extended above the top of the roof. The lowest perforation was approximately 2 inches above the top of waterproofing. The top of the garages (bottom of the waterproofing) was not sloped to the drains, and therefore water ponds on the waterproofing at all times.

3. The drain passing through the roof eventually connects to a 10-inch diameter storm sewer that in turn discharges to a detention pond.

No as-built plans were prepared for the storm water management system. As such, inspection of the drainage system and documentation of system components was performed by Patrick as part of the field investigation. The results of Patrick's investigation are provided in a subsequent section of this report.

## HISTORY OF SEEPAGE PROBLEMS

The history of the leakage problems is summarized in the following documents:

1. A letter dated May 21, 1998 from Lisa Dahl of Healey Ramme Company to Thomas Weber. This letter indicates that leaking first began in July 1997 when there were two heavy rains in one week. The letter also indicates "building 6 (which did not leak) was built with a greater sloping to the center on the plaza deck. After this building was completed we were forced by the inspector to change our design, stating that the center slope was a problem for handicapped people." Other periods when leaks were identified occurred during periods of heavy rain. (Dates of August 1997, May 1998). The letter also stated that in the Spring of 1998 many of the leaks resurfaced as the ground thawed.

2. A letter dated June 11, 1998 from John Feges of Elness Swenson Graham Architects, Inc. to Peter Ramme of Healey Ramme Company. This letter indicates "standing water has been observed on the plaza during heavy down pours of rain (1 to 2 inches per hour)." It

also states "Experience has shown that Building No. 6 has not experienced the water leaks as in other building. The assumption is that Building 6 has more positive drainage; therefore, water moves away from the stoop quicker and does not allow water to buildup.

3. A letter dated May 27, 1999 from Peter Ramme of Healey Ramme Company to John Davis of the Eberhardt Company. This letter indicates that the plaza decks leaked in 26 locations as a result of the snow melting. In May 1999, the plaza decks had 82 leaks as a result of three rainfalls, the lowest being 1.5 inches and the highest being 3.5 inches.

4. Revised leak report dated September 4, 2002 from Steven Rau to All Counsel of Record. This document provides information on leaks between and including the dates 1/1/01 to 6/7/02. All leaks are associated with either rain or snow thaw.

## FIELD INVESTIGATION

On August 26 and 27, 2002, Patrick staff visited the project site. The purpose of the visit was to examine the as-built conditions of the courtyards, investigate the soils in the courtyards, and perform a survey of select features in two of the courtyards. This information was collected for future use in evaluating the ability of the courtyard drainage system to accommodate the design storm events in accordance with the Standard of Care.

As previously stated, no calculations for the design of the drain system nor construction drawings for the courtyards were made available to Patrick for this evaluation. Therefore it was necessary to visit each courtyard and determine the locations and sizes of sidewalks, landscaping, patios and drainage inlets. ***Exhibits 2 and 3*** show the plan view of the main surface features within the courtyards for Buildings 1 and 5. (These two buildings were selected for the evaluation of courtyard conditions because the majority of the seepage problems were identified at these locations in the Leak Report.) ***Exhibits 2 and 3*** are based on photographs, sketches, and measurements taken during the field visit and are meant to represent general site conditions. These exhibits are not intended to show all features present in the courtyards.

An important aspect of the as-built conditions shown in ***Exhibits 2 and 3*** is the layout and components of the original drainage system and the portions of the system that have been added since the original construction. The components for the original system and the added features are further described in the following paragraphs.

Original Construction. The drainage system in each courtyard relies on inlets to collect surface water and convey the water to the project storm sewer system. Each inlet in the two representative courtyards was located and measured. The main inlets were 6 inches in diameter with a 6-inch diameter grate at the ground surface. The inlet pipes (vertical pipes that extend from the ground surface to the top of the concrete roof of the garages) are perforated PVC risers 2 feet to 3 feet long. Each inlet is connected to a 6-inch diameter iron pipe that continued straight down into the garage and then through the garage floor. It is assumed that these pipes discharge into a main collector pipe located under the garage floor.

The parking lot storm sewer system was inspected in an attempt to locate the main collector pipe. Connections were located at manholes outside Building 1, Building 3, Building 4, and Building 6. Since no connections could be found for Buildings 2 or 5, it is assumed that the drainage from these buildings is collected and conveyed into the system of an adjoining building. Therefore, the courtyard drainage from Building 2 is assumed to be collected under the garage of Building 2 and conveyed to the collection system under Building 1. All of this flow is then discharged to the parking lot storm sewer system at the curb inlet located just north of and central to Building 1. It is assumed that the drainage for Building 5 connects similarly to Building 4.

Supplemental Construction. Following the original construction of the project, Promenade Townhome Management attempted to collect additional surface and subsurface flows by installing small drainage inlets at the corners of select patios. These small drains were located and measured during the field visit. In addition, the pipes connecting the drains were exposed, examined and measured. The inlets are 4-inch diameter PVC pipes. A 4-inch diameter perforated PVC pipe collects surface water from these inlets and conveys flow to the nearest 6-inch drain. The perforated PVC is wrapped with a geotextile fabric and a limited quantity of drainage material is backfilled around the pipe. The perforated PVC pipe could potentially

collect subsurface water as well. The installation of these inlets and pipes was purportedly sporadic and inconsistent, likely covering more problematic areas. At Building 1, the new drains were installed at every patio on the north side of the courtyard. Other courtyards only had drains at a few patio locations.

Part of Patrick's investigation included excavating a 2-foot by 2-foot pit around one inlet in the courtyard of Building 1 (see photographs in ***Appendix A***). This work was performed to examine the physical characteristics of the inlet and the material surrounding it. The PVC riser sections were perforated, apparently to allow subsurface water to enter the riser section. The perforations were approximately ¼-inch in diameter. The riser was wrapped with a geotextile fabric, however the fabric did not extend to the bottom of the perforations. The inlet was backfilled with drainage stone to approximately 6 inches around the outside diameter of the inlet pipe. The stone consisted of nominal ½-inch size crushed gravel. At the location where the inlet meets the drainage mat located on top of the garage slabs, approximately 2 inches of standing water was observed. This standing water was the result of the perforated riser being connected to the 6-inch iron pipe approximately 2 inches above the top of slab. Therefore the perforations could only remove water located at least 2 inches above the slab. (There is no feature present that will provide an avenue to drain the remaining 2 inches of water.)

Lastly, a simple survey was performed at Buildings 1 and 5 to determine relative elevations within the courtyards. The survey did not include determining the horizontal position of the features. In both courtyards, one drainage inlet was chosen to be the "benchmark" and it was designated an assumed elevation of 100.00. It is specifically noted that because the benchmark elevations are assumed for each courtyard, elevations between courtyards cannot be compared. All other drainage inlets, elevations at buildings and overflow elevations were determined relative to the benchmark inlet in each courtyard. The survey calculations can be found in ***Appendix D***. The elevations of surveyed features are reflected on ***Exhibits 2 and 3***.

## GEOTECHNICAL INVESTIGATION

Geotechnical Field Investigation. In addition to the hand-dug excavations performed in Courtyard #1, Patrick performed a series of hand-auger soil borings in the courtyards of buildings 1 through 6 to ascertain the soil types used in courtyard construction. A total of twelve (12) hand auger borings (HA-1 through HA-12) were performed in the courtyard areas. Four (4) hand auger borings made in both courtyards 1 and 5 were left open overnight to obtain 24-hour water level readings in the open boreholes.

The soil profile at each of the courtyards generally consisted of the following:

- Topsoil -- 0-3± inches
- Black to dark brown silt to clay, slightly organic (ML-OL to CL-OL) -- 3 inches to 15± inches
- Brown silty sand (SM) -- 15 inches to 24± inches.
- Foam insulation board -- 24 inches and deeper

*Exhibit 4* is a typical cross section through the courtyard area, showing the general types of soils that were encountered. One exception to this observed soil profile was at courtyard 6, where at boring HA-12 the silty sand layer was not encountered. *Appendix B* contains the Soil Condition Summary, which includes a description of the soil conditions encountered in each of the courtyards. Bulk composite samples were obtained of the silt to clay and drainage sand from the four (4) hand auger borings performed in Courtyard 1 for laboratory testing. All borings were backfilled by Patrick with soil cuttings or sand and re-sodded prior to leaving the site.

Soil Testing. Patrick performed Atterberg Limits Testing (ASTM D 4318), hydrometer and sieve analysis testing (ASTM D 422), constant head hydraulic conductivity testing (ASTM D 2434), and washed gradation testing on selected composite samples obtained from Courtyard #1. Atterberg Limits Testing was performed to ascertain soil plasticity to assist in soil classification and in estimating engineering properties of the soil. Generally, the more plastic a soil (i.e. the higher the plasticity index (PI)), the less permeable the soil. Hydrometer and sieve analyses

were performed to determine grain-size distributions for the various soil types and was used to estimate the engineering properties of the soil. Hydraulic conductivity testing was performed to ascertain the coefficient of permeability (k) of the silty sand drainage layer (i.e. performed to determine its drainage characteristics). ***Appendix D*** provides a summary of the test results.

Results and Analysis. The silt/clay soils below the topsoil are considered low permeability material. An Atterberg Limits Test performed on a composite sample of this material indicated a liquid limit of 43%, plastic limit of 27%, and a plasticity index of 16%. This soil classifies just below the A-line in the USGS classification system (ASTM D 2487) delineating ML from CL type soils. A 15-inch thick layer of this soil type will significantly limit the infiltration of storm water into the underlying soil and drainage structures. Based on the test results, this soil is plastic and will have associated low permeability. A Hydrologic Group C classification (soils having a moderately high run-off potential due to slow infiltration rates of 0.05 to 0.5 in/hr) was selected for subsequent hydrologic analysis of the courtyards. The clay soil also meets some criteria of Hydrologic Group D (soils having high run-off potential due to very slow infiltration rates less than 0.05 in/hr); however, the coloration of dark brown to black indicates the presence of organics in the soil that tends to increase porosity. Also, freeze/thaw effects will tend to increase the permeability. Therefore, a Group C classification is considered appropriate for use in evaluating the courtyard drainage system.

The underlying silty sand (SM) was tested for permeability in our laboratory. The soil had a measured permeability on the order of $2 \times 10^{-4}$ cm/sec under the lowest gradient tested. This test value is consistent with published literature for silty sand. It appears that the silty sand layer was provided to help collect and transport groundwater to the inlet. However, the overlying clay layer will tend to inhibit the percolation of surface water runoff such that significant horizontal flow through the sand layer to the inlet is not anticipated. Any water that does pass through the clay layer will tend to move vertically through the sand and into the underlying Aquadrain that conveys water to the outlet. This was confirmed during the site visit, as the sand layer was not saturated even though there was a precipitation event within the week prior to the visit.

## HYDROLOGIC INVESTIGATION

The analysis of the hydrologic conditions of the courtyard drainage system required the investigation of many different components. Among the areas of analysis are:

- Analysis based on local design standards and criteria
- Analysis of post-construction attempts to alleviate problems
- Analysis of recent historical rain events
- Study of freeze/thaw cycle effect on drainage system
- Recommendation of appropriate drainage design standards

The following sections present the approach, methodology, results and discussion for each listed analysis.

<u>Analysis Following Local Design Criteria</u>

*Approach*

The City of Eagan Building Department was the permitting authority for construction of the courtyard drainage system. Therefore, it is assumed the system would have needed to meet City Standards. The City Engineering Department requires the use of the Soil Conservation Service (SCS), also known as the National Resource Conservations Service (NRCS), methodology to design surface water drainage systems. Eagan utilizes the design rainfall amounts published by the US Weather Bureau and the SCS Type II rainfall distribution. These references can be found in ***Appendix D***. This data was used in combination with the SCS methodology to determine the effectiveness of the drainage system relative to the City Standards.

*Methodology*

The analysis followed local design standards using the SCS methodology and Technical Release 55 (TR-55). SCS methodology uses a specific design storm event over a 24-hour duration. TR-55 is a hydrograph routing methodology that converts a rainfall distribution (hyetograph)

into a runoff hydrograph (runoff flow versus time). The runoff hydrograph was then used to compare the flow into the system and the flow out of the system via the courtyard inlets at each time increment on the hydrograph. When there was an excess of flow into the system, ponding, or storage, occurs over the inlets. The survey of the courtyards was used to determine the amount of storage available at incremental elevations over the inlets. A relationship was also established between the water surface elevation (ponding elevation) and discharge rate for the system. The storage required at each time increment was used to determine the ponding elevation over the inlet at each increment. Flow out of the system was then determined for that ponding elevation, which was used as the flow out of the system for the next time increment.

The first step in this analysis was to analyze several inlet tributary areas individually. This was done to determine the capacity of a single inlet and its effect on ponding within each building's courtyard. The tributary areas are delineated in ***Exhibits 2 and 3***. Next, the entire courtyard area for Buildings 1 and 5 were analyzed as a whole to determine how the system works together, i.e., how each inlet works in conjunction with the other inlets and what the maximum elevation of ponding is within each courtyard.

*Results and Discussion*

A summary of the results of all hydrologic calculations is found in ***Appendix F***. The analysis results for the originally constructed drainage system, considering the local standards and generally accepted engineering standards, are summarized in tabular and graphical form. These tables and graphs show that there is ponding at Building 1 (Overall condition) in all modeled storm events, and that this ponding reaches the lowest adjacent building grade (ground surface at the building) in the 10- and 100-year storms. For Building 5, there is ponding for all modeled storm events (four total events were modeled; the 2-year, 5-year, 10-year, and 100-year events) and the ponding reaches the lowest adjacent building grade in all modeled storm events.

Typically, a storm sewer system would be designed to convey the 10-year storm event by gravity, with no ponding on the surface. The City of Eagan requires that all storm sewers be sized to drain a 5-year storm by gravity and storm sewers located in "low points" be sized to

accommodate a 10-year storm. Clearly, the drainage system in the courtyard does not meet this standard of care.

The drainage system in the courtyards of all buildings is built such that the rim of the inlet is less than one foot below the lowest grade adjacent to a building. As discovered during the site visit, the top of the building foundation is located below the ground surface (soil covers the siding), and information from the depositions indicates that the top of foundation is approximately 8 inches below grade. Therefore, the rims of the inlets are significantly less than one foot below the top of foundation, and in fact are near the grade of the top of foundation. Because of the relatively small vertical separation between the rims of the inlets and the entryways and tops of foundations, the drainage system should have been designed to convey all storm runoff away from the courtyards without any ponding. It is noted that even if this were done, because the top of foundation is located below the ground surface, there would remain the potential for seepage to enter the buildings at a location above the waterproofing and below the ground surface. John Feges acknowledged this problem in his letter to Peter Ramme dated June 11, 1998.

The modeling performed by Patrick demonstrates that the drainage system is not able to satisfy the City's freeboard criterion. No modeled storm events meet this criterion, as there is ponding to some degree for all events. Especially problematic is the 100-year storm, which not only contributes to the seepage problems but also results in a water surface higher than the lowest entry point of some of the units. This demonstrates that the drainage system is considerably under designed.

<u>Analysis for Post-construction Improvements</u>

*Approach*

When the Townhomes began having seepage problems, the owner or developer made attempts to address the drainage problems within the courtyard. As noted in the Field Investigation section of this report, perforated pipes and small diameter inlets were installed sporadically throughout the courtyards. Also, gutters were installed in some locations. These conditions were analyzed to evaluate their effectiveness.

*Methodology*

In analyzing the post-construction improvements made to the courtyards, the same general methodology was used as that followed for the Analysis following the Local Design Criteria. TR-55 was used to calculate the runoff hydrograph, ponding depth, and discharges. However, the elevation-discharge relationship was adjusted to account for the additional discharge capacity provided by the small patio inlets. Upon examination of the gutters that were installed after the original construction, it was determined further analysis would not be required to evaluate their effectiveness because the gutters do not redirect the flow away from the courtyards. Since the gutters merely concentrate the flow to one location in the courtyard, the overall hydrology was not significantly affected. The gutters and downspouts would need to be directed away from the courtyard, and directly into the main sewer system, to be effective.

*Results and Discussion*

The addition of the small, perforated pipe and small inlets adjacent to the patios changes the ponding elevation slightly. Only Building 1 was analyzed for this condition. Building 5 had fewer additional inlets and pipes, and therefore would have had less effect on ponding than the improvements to Building 1. The results of the analyses indicate that the ponding elevation for Building 1 stays the same for the 2-year event, which would be expected since the ponding elevation is below the rim elevations of the new inlets. However the other modeled events were lowered by approximately one tenth of a foot. The addition of these pipe and inlets slightly lowered the ponding elevation but does not alleviate ponding.

It is noted that the perforated pipes are located very near the ground surface. In most cases the pipe was buried 3 to 6 inches. Occasionally the pipe was exposed. Because the pipe is so shallow, it is unlikely it will capture any significant quantities of groundwater, and the surface area tributary to the pipes is very small such that even if surface water did reach the pipe, collection would be minimal. These pipes will only be effective in controlling groundwater in the area immediately above and adjacent to the bottom of the pipe.

## Historical Rain Event Analysis

*Approach*

Historical data is important to analyze and correlate with the storm events suspected of causing seepage. Promenade Townhome Management has kept a leak report documenting the times of seepage and possible causes of the seepage. (Refer to the report identified in the History of Seepage Problems section.) This report tracks leakage during specific days in which there was considerable snowmelt or a significant rain event.

Hydrologic analyses were performed for significant rainfall events of the past several years, especially those events documented in the leak report. These analyses were performed to assess the adequacy of the drainage system under conditions that likely occurred in the past year. For these analyses, historical rain data was obtained from the National Oceanic and Atmospheric Administration, National Climatic Data Center (NOAA/NCDC). This data provides daily and hourly rainfall amounts on a monthly basis for Minneapolis/St. Paul International Airport (MSP), located near Eagan.

*Methodology*

To analyze the recent historical rain events, the inflow-outflow methodology described above was again used, however the SCS methodology is no longer appropriate since it requires a storm that is 24 hours in duration. The storm events of interest were between 3 and 14 hours in duration. In order to calculate the inflow into the system, a rainfall hyetograph and runoff hydrograph were created. The hourly rainfall data from NOAA/NCDC was used and supplemented when possible by the Maximum Short Duration Precipitation Data, when available. This data was used to create the rainfall hyetograph. Next, a synthetic unit hydrograph was created to represent each courtyard (Buildings 1 and 5) based on its time of concentration. The hyetograph was then combined with the unit hydrograph using the methodology described in Applied Hydrology and Sedimentology for Disturbed Areas by Barfield, Warner and Haan (See ***Appendix D***). The historical hyetograph and created runoff hydrograph were then used to calculate ponding depths using the same methodology as the Local Design Criteria Analysis.

*Results and Discussion*

The analysis of the historical events shows that in rather intense storms, no matter how brief, ponding occurs over the inlets. Analysis of the significant storm events of April 6-7, 2001; April 22, 2001; May 6, 2001; and June 21, 2002 showed that only the April 6-7, 2001 and June 21, 2002 events were intense enough to cause ponding. The runoff from the April 22, 2001 event was low enough that a detailed analysis of ponding was not performed. The April 6-7, 2001 and June 21, 2002 storms had a brief duration with an intensity of greater than 1 inch/hour. During this time, the computer models predict that water ponded 1 to 4 inches over the inlets. The duration of these intensities was only 6 minutes for the April event and 11 minutes for the June event. In an intense storm of longer duration, ponding would likely be more severe and water would reach the elevation adjacent to the building or entryway.

The April 6-7 event reportedly caused seepage in one garage location in Building 1 and one garage location in Building 5. The April 22 event reportedly caused seepage into one garage location and a stairwell in Building 1 and no interior seepage in Building 5. No seepage was reported for the May 6th event. The latest date of the leakage reports that Patrick reviewed is June 7, so no report data was available to compare the results of the analysis to actual leakage in the buildings for the June 21, 2002 precipitation event.

<u>Freeze/Thaw Cycle Analysis</u>

*Approach*

The freeze/thaw cycle appears to play a role in the seepage problems as four out of the thirteen leak reports were identified during periods of snow melt. The average temperature at MSP is below freezing for 4 to 5 months a year and there is an average of 49.4 inches of snowfall per year. The 2 to 3 feet of earth in the courtyards is inevitably frozen solid for months at a time. The melting of piled up snow and the inability for subsurface drainage to be effective because of frozen ground conditions and possibly frozen drainpipes was investigated to assess how it contributes to the seepage.

*Methodology*

The freeze/thaw cycle in Minnesota was first researched with various state and data collection agencies. According to the 2001 Annual Local Climatological Data published by NOAA/NCDC, the average temperature over the past 60 years of record keeping has been below freezing from December to March. Additionally, the average temperature for November is 32.9 degrees Fahrenheit, just above freezing. The Minnesota State Climatology office also states that the typical frost depth in the state is approximately 1 meter and sometimes exceeds this depth. Through this research and conversations with these offices, conclusions can be made about the freeze/thaw effect on the courtyard drainage.

*Results and Discussion*

The freeze/thaw cycle has a significant effect on the courtyard drainage. The shallow soils over the garage slab are entirely within the frost depth of Minnesota. It is likely that these soils will be frozen for several of the winter months. The frozen clay soil will act as a totally impervious surface since the void spaces in the soil would be frozen solid. When analyzed using the SCS-TR-55 methodology, the ponding is more extreme than with non-frozen soils, as expected. In addition, if snow melts with the water equivalent of 1 inch, several inches of ponding would occur.

Another hazard of the shallow soils during the freeze/thaw cycle is that once the soil is frozen solid, it would not thaw evenly. The surface of the soil and outer areas adjacent to the building would thaw first. As snow along the building melts, it would try to drain towards the center of the courtyard, but would be restricted by unmelted snow and ice within the center of the courtyard. Water could not percolate down into the sand drainage layer because the clay would still be frozen. The water resulting from melting snow would be trapped and local saturation of the thawed soil and ponding will occur directly next to the building. Because the ground surface is above the top of foundation, seepage into the building is expected for this condition.

Frost Heave

The soils used to cover the waterproofing system consisted of silty sand overlain by clay and silt soil. The silty sand sample tested by Patrick had approximately 20% fines. This is consistent

with the test results by Braun Intertec dated October 8, 2001 that indicated the silty sand had 38.6% fines. Silty sand is highly susceptible to frost heave.

The waterproofing system was installed directly on the precast concrete slabs without any pitch to the drains. This, coupled with the fact that the subsurface drainage layer cannot completely drain because the outlet is restricted by the elevation of the perforations in the vertical PVC pipe, results in a permanent water source directly below the silty sand.

As the ground in the courtyard freezes, water within the soil forms ice lenses. These ice lenses grow and cause the ground to heave. Ice lens growth continues as long as free water is present to allow the growth. The presence of water above the waterproofing in conjunction with the frost susceptible soil caused the heaving of sidewalks in the courtyards.

## Appropriate Design Recommendations

*Approach*

The final segment of analysis was to determine what would be required to meet design standards and good engineering practices. The suggestions made as a result of this portion of the investigation provide insight to how the drainage system could have been designed, considering the site constraints, such that seepage problems could have been avoided.

*Methodology*

In order to develop an appropriate design of the drainage system, the same methodology (SCS/TR-55) was followed as for the Local Design Criteria Analysis. The elevation-storage relationships were changed to reflect a drainage design that meets the City's design requirements.

*Results and Discussion*

The development of a reasonable design to address general engineering practices and City standards considered the courtyard layout, roof layout and runoff collection system, and the need to meet ADA standards. The first, and simplest issue to address is the roof drainage. Currently, all runoff from the roof sheet flows onto the courtyard. This is not good practice considering that

the roof makes up approximately one half of the tributary area to the courtyard drainage system. Since it is entirely impervious, the peak flows into the drainage system are extremely high. An appropriate design would include gutters on the roofs throughout the courtyard and these gutters would direct the sheet flow to downspouts that would convey the runoff outside the courtyard drainage system. An SCS/TR-55 analysis of the as-built conditions with gutters shows that the peak water surface elevations in the courtyard would be reduced by several inches and the elevation would reach the lowest grade adjacent to the building in only the 100-year condition.

Next, the inlet pipes in the courtyard were evaluated and designed to be more effective. The SCS/TR-55 analysis entitled "With Gutters and Drainage Design" uses an elevation-discharge relationship based on the 6-inch pipe capacity instead of the inlet grate capacity, which in the as-built condition is highly restrictive. (The inflow rate into the inlet structure is controlled by the inlet grate, not by the inlet pipe.) The existing 6-inch pipes cannot accept the design inflows with the existing rim elevations. This is because additional head is needed on the inlet to increase the inflow rate. However, if all rims were to be lowered to an elevation of 99.8, the additional required inflow is attained and the pipes can handle all modeled storm events with virtually no ponding. Lowering the rims promotes better drainage because it allows all inlets to work together to collect and transport runoff. In the existing condition, the inlets within each courtyard are place at a variety of rim elevations. Those with higher rims do not collect water from the system while those with lower rims are relied upon to collect all of the water from the system. Lowering the rims to the same elevation causes the inlets work cooperatively as a system.

Since the 6-inch inlet pipe has the capacity to handle these design storm events, once the rims are consistently lowered, a grate should be selected that has a greater capacity than the pipe. A standard 12-inch grate produced by Nyoplast has an open area that is greater than the cross-sectional area of a 6-inch pipe. Nyoplast also makes 12-inch drains and frames that connect to a 6-inch pipe. Drawings by Nyoplast of the grate, frame, and drain are included in Appendix E.

It is noted that even if the above changes were made to the drainage system, the problem of having the top of foundation below the ground surface will continue to be an issue that is not

simple to resolve. Because the grade in the courtyard is essentially flat, seepage through the topsoil layer and towards the buildings will continue to occur. Continued seepage into the building should be expected unless improvements are made to prevent water from entering the building at locations above the waterproofing system. Merely lowering the inlets and providing gutters will not eliminate seepage problems.

## CONCLUSIONS

Based on the analyses that were performed, the following is concluded:

1. The surface water drainage systems in the courtyards at the Promenade Townhomes are inadequately designed based on the special circumstances surrounding the courtyard. The design does not meet City requirements and results in water ponding adjacent to the buildings.
2. Due to the extremely flat topography and small size of the courtyards, the drainage system should have been designed with additional safeguards. The system should have been designed to accommodate the 100-year storm without significant ponding. Any ponding resulting from the 100-year event should have been minimal and should not have resulted in a water surface within 1 foot below the top of foundation or any other opening that could be a conduit to seepage.
3. The top of foundation should not be located within one foot in elevation to the inlets. There needs to be more margin for potential ponding because the result of ponding is seepage into the buildings. The top of foundation should have been located above the surrounding grade to eliminate the potential for seepage to occur through the framed portion of the building.
4. Seepage may be the result of melting snow during periods of freezing weather. When the ground is frozen, melt water cannot reach the inlets or percolate into the drainage system. Instead, water can seep into thawed ground near the buildings and enter the units.

5. The drainage problems within the courtyard could have been significantly reduced if a well-designed surface drainage system were constructed. Such a system would have taken the special needs of the courtyard into consideration. A combination of adding gutters to the buildings to divert flow from the roof, lowering the rims of the inlets, and installing a larger grate and frame would have reduced, but not eliminated, the potential for ponding and subsequent seepage.

6. The precast concrete slabs should either have been sloped towards the drains or a topping should have been provided to promote subsurface drainage. Instead, with a flat drainage system that has no potential for complete drainage because of the configuration of the outlet pipe, there is a continual source of water on top of the waterproofing system.

7. Frost heave of soils in the courtyard is a direct result of using silty sand and silt to clay backfill above the subsurface drainage system. Silty sand is highly frost susceptible. A free draining, non-frost susceptible soil should have been used for backfill below all structures in the courtyard, including the sidewalks.

This report was prepared by PATRICK ENGINEERING INC.

Analyses Reviewed by: ______________________

Report Approved by: ______________________

p:\lisle\murnane\9402.a0\rpts\hydrologic investigation\final report 081203.doc

I hereby certify that this plan, specification, or report was prepared by me or under my direct supervision and that I am a duly Registered Professional Engineer under the laws of the State of Minnesota.

______________________

Date 8/13/03 Registration No. 21966

License expires 06/30/04