**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Civil File No. 00-CV-987 JNE/JSM

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc., Healey Ramme Co., sued as Healey Ramme Company, CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C., and Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

*and*

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a/ Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants.

*and*

Colloid Environmental Technologies Co.,

Fourth-Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

*and*

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

v.

Mikesh, Inc.,

Fourth-Party Defendant.

**CHRIS CRAFT'S MEMORANDUM OF LAW IN OPPOSITION TO J-BERD'S MOTIONS *IN LIMINE***

[Oral Argument Is Requested]

## INTRODUCTION

J-Berd Mechanical Contractors, Inc. ("J-Berd") has moved *in limine* to exclude certain opinions of Jeffrey Schuh ("Schuh"), the jointly retained expert of Waterproofing by Experts, Inc. ("WBE"), Colloid Environmental Technologies Company ("CETCO") and Chris Craft Industrial Products, Inc. ("Chris Craft"). Schuh has rendered opinions about the drainage system's relationship to surface water ponding, sidewalk heaving, and appropriate design standards.

Despite J-Berd's vigorous exhortations to the contrary, Schuh's testimony is relevant, reliable, and would be extremely helpful to the jury in this case. Chris Craft, therefore, respectfully requests this Court to deny J-Berd's motions *in limine.*

## I.

## JEFFREY SCHUH'S OPINIONS ARE RELEVANT AND RELIABLE.

Jeffrey Schuh's opinions are relevant because they directly establish that drainage conditions designed and/or installed by J-Berd in the courtyards at the Promenade were negligent and caused leakage by permitting water to circumvent the waterproofing membrane.

J-Berd contends Schuh's opinions are not relevant because he cannot identify the cause of the leaks. [See, J-Berd Memorandum at p. 9.] However, this is not an accurate portrayal of Schuh's intended testimony. Schuh has, in fact, made conclusions about general conditions existent at the Promenade where leaking occurred. Specifically, using real weather data and an accepted scientific / engineering methodology, Schuh concludes the as-built conditions of the drainage system were inadequate to prevent standing or ponding water from entering the buildings above the top of the foundation walls. [Ex. 836[1] at pp. 12-13, 17, 20-21.] Schuh has opined that, because of its design, the drainage system directed water to vulnerable locations above the buildings' foundations and above the waterproofing membrane, where it could seep into the building. [Ex. 836 at pp. 12-13, 17, 20-21; Schuh dep.[2] at p. 162.]

---

1 A copy of the Exhibit 36, the Patrick Engineering report, is Exhibit 1 attached to the Affidavit of Chandelle L. Heyer in Support of J-Berd Mechanical Contractors, Inc.'s Motions *In Limine*.

2 All deposition transcripts other than those attached to the accompanying Affidavit of Samuel J. Glover dated September 17, 2004 are already in the record and attached to the Affidavit of Chandelle L. Heyer in Support of

Unlike Promenade's expert, David Campbell, Schuh's opinions are derived from reliable data using a methodology universally recognized by the community of hydrology engineers. Moreover, Schuh performed various tests, and then checked the results of his analysis for consistency with the data, observations, and results of tests performed by others to ensure accuracy.

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony. Central to Rule 702 and the United States Supreme Court's ruling in *Daubert* is the concern for the relevancy, reliability, and helpfulness to the jury of the expert testimony in question.[3] *See generally Daubert*, 509 U.S. 579. The Court specifically explained an expert cannot testify as to a scientific conclusion unless it is based on "scientific knowledge" that "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds" that are obtained by someone with a "grounding in the methods and procedures of science." *Daubert,* 509 U.S. at 590 (*quoting* Webster's Third New Int'l Dictionary 1252 (1986)). In *Kumho Tire Company, Ltd. v. Carmichael*, the Court extended its holding in *Daubert* to apply to all expert testimony. 526 U.S. 137, 141 (1999).

Schuh's work in this case satisfies all of the *Daubert / Kumho* criteria. First, Schuh is eminently qualified. Schuh holds a master's degree in civil engineering, and is a licensed professional engineer in Minnesota. [Schuh dep. at p. 7.] His area of expertise is surface water analysis and design. [Schuh dep. at p. 14.]

Schuh not only conducted a site inspection and review, but also conducted research to gather real data and minimum design standards. Schuh gathered historical rainfall and climatological data from the NOAA / NCDC and the Minnesota State Climatology office. In addition, Schuh acquired soil samples from the Promenade courtyards and performed laboratory testing on those samples to determine their plasticity and permeability characteristics. This laboratory testing was performed using methodologies ascribed by the American Society for Testing and Materials (ASTM) including, Atterberg Limits Testing,

---

Defendant J-Berd Mechanical Contractors, Inc.'s Motions *In Limine* or the Affidavit of Samuel J. Glover dated September 2, 2004.

[3] A more complete statement of the rule from *Daubert* appears in Chris Craft's Memorandum of Law in Support of *Daubert* Motions and Motions *In Limine*. To avoid repetition, it is dealt with here only cursorily.

hydrometer and sieve analysis, and constant head hydraulic conductivity testing. Moreover, for the hydrologic portion of his investigation, Schuh adhered to the Soil Conservation Service (SCS) and Technical Release 55 (TR-55) methodologies relative to the design of surface water drainage systems.

In short, Schuh acquired relevant data from accurate sources, conducted research on the appropriate design standards, performed actual tests on materials acquired from the site, followed methodologies accepted by the relevant scientific community, and checked his work.

Schuh's research included determining the minimum level of freeboard needed between the top of the foundation walls and the 100-year storm water level. In doing so, Schuh drew on his professional experience and discussions with representatives from the City of Eagan. [Schuh dep. at p. 79 and 83.] J-Berd now challenges those results, but the fact of the matter is Schuh's analysis conforms precisely to requirements of Rule 702, *Daubert* and *Kumho.*

J-Berd claims Schuh's standards are "not sufficiently ascertainable," [*see,* J-Berd Memo at p. 11] but then cites Schuh's testimony wherein he says his standards are those found reasonable by engineers in the industry [Schuh dep. at p. 205.] As such, those are precisely the sort of reliable standards an expert <u>should</u> use. Furthermore, as an engineer specializing in surface water analysis and design, Schuh is uniquely qualified to testify as the standards that should be used to evaluate the viability of the drainage system installed by J-Berd at Promenade Oaks.

J-Berd criticizes Schuh's "reliance on the City of Eagan Code" for the notion that storm water management systems should be designed to accommodate, at a minimum, a 10-year storm without ponding. [J-Berd Memo at p. 16.] However, the very quote cited by J-Berd in 'support' of their assertion, undermines their argument. Schuh testified it is a widely recognized industry standard that a storm water management system be designed to that minimum standard. [Schuh dep. at pp. 128-29.] Having used that standard for so long, Schuh stated, "this is a pretty recognized standard." [Schuh dep. at pp. 129-30.] J-Berd has presented no evidence that, as an expert in surface water analysis and design, Schuh is anything less than eminently qualified to testify as to the standard of care in his industry. As far as the City of Eagan's requirements, Schuh testified only as to what he was told by representatives of the

City, which were consistent with his own understanding of the requisite standard of care. [Schuh dep. at pp. 128-30.]

J-Berd next accuses Schuh of not using reported data to arrive at his conclusions saying, "[a] scientist works with reported data to form a conclusion." [J-Berd Memo at p. 12.] However, working with reported data to form a conclusion is precisely what Schuh did. He used actual data from storms experienced by the Promenade during the time when leaking was claimed to have occurred. This data was used to test the drain system in simulation. [Ex. 836 at p. 15.]

Having unjustly criticized Schuh for not using real data, J-Berd then blames him for not analyzing hypothetical situations using hypothetical facts. For example, J-Berd accuses Schuh of being "unable to comment on what the effect would be if different soil were in the courtyards in relation to the ability of the courtyard [sic] to drain." [J-Berd Memo at p. 13.] J-Berd cannot have it both ways. J-Berd needs to decide whether it would like Schuh to conduct an engineering analysis of the real data, or address hypothetical situations.

A review of Schuh's report and his deposition testimony should be more than enough to reassure this Court that his opinions are reliable because he has used actual data from reliable sources and has utilized accepted engineering standards and methods.

## II.

## THE EVIDENCE SHOWS THAT THERE IS APPROXIMATELY 2" OF STANDING WATER ON THE PLAZA DECKS AT ALL TIMES.

J-Berd seeks to exclude evidence that there is roughly 2" of standing water on top of the Swelltite 3000 membrane at all times because, they argue, there is a factual dispute as to whether the depth is always 2". J-Berd's motion is flawed for several reasons.

First, there is an overwhelming amount of evidence that there is roughly 2" of standing water on the waterproofing membrane at all times. This is not expert opinion; it is the nearly universal observation of every witness who has ever looked into an excavation on the courtyards. In fact, J-Berd's own memorandum (at p. 5) refers to some of the best testimony on this subject, including that of Gary Nelson:

Q: Did you see water standing at the bottom of the subsequent excavations around those posts?

A: Yes.

Q: How deep.

A: About two inches.

[Nelson dep. at p. 107.]

Moreover, all of the parties' retained experts observed the same thing. [Kudder dep. 196; Koziol dep. at 110-11; Chauvin dep. 36-37; Campbell dep. vol. 1 at 144-45; Bhatt dep. at 52; Stehley dep. at 65-66.] Even J-Berd's own expert was in agreement.

Q And you know that the drain system allowed approximately two and a half inches of water to stand on the deck?

A Correct.

[Arockiosamy dep. 62.]

Whether or not the depth of the standing water is perfectly 2" at every location is a debate of no real consequence. The observations of the witnesses were clear that, while the water may have been a little more or a little less than 2", it was generally to that depth. Perhaps Robert Kudder stated it best in his deposition testimony:

Q Do you know that there are two inches of water everywhere on that membrane?

A. Well, I haven't excavated everywhere, but it's relatively level and there's drainage board to distribute the water in a horizontal direction, so I would expect there's water everywhere. It may or may not be two inches, but it's thereabouts.

Q. Do you know that for a scientific fact?

A. Well, if you have water where we were and there's drainage board and the plaza was built and the deck was built level, then the water would be everywhere but not necessarily the same depth I saw.

Q. Do you know that to be a scientific fact?

A. Well, that is a scientific fact.

Q. That there would be water everywhere?

A. Yes.

Q. Even though you haven't -- the only water you saw was at the pits that were dug?

A. That's correct.

[Kudder dep. at pp. 196-97.]

Kudder was correct that this standing water condition is fact; not expert opinion. Thus, even if there is differing evidence as to the depth of the standing water, or the constancy of it, the jury is entitled to hear all of that evidence and make its own decision.

There is abundant evidence that there is roughly 2" of standing water on top of the waterproofing membrane nearly all of the time. The witnesses who observed this condition, including expert witnesses, should be permitted to testify as to their observations.

**CONCLUSION**

For the foregoing reasons, this Court should deny J-Berd's motions *in limine*.

Respectfully submitted,

**BROWN & CARLSON, PA**

Dated: September 17, 2004 By: s/G. John Veith

G. John Veith (#241519)
Samuel J. Glover (#327852)
5411 Circle Down Avenue
Suite 100
Minneapolis, MN 55416
763.591.9950
763.591.9202 (facsimile)

*Counsel for Fourth-Party Defendant, Chris Craft Industrial Products, Inc.*