**EXHIBIT INDEX TO CHAD J. STEPAN'S AFFIDAVIT IN SUPPORT OF WEIS BUILDERS' MEMORANDUM OF LAW IN OPPOSITION TO WBE'S MOTION IN LIMINE SEEKING THE COURT'S INTERPRETATION OF THE WBE SUBCONTRACT**

A. Excerpts from deposition of Steve Messerich (Volume 2) taken on October 16, 2002

B. Excerpts from deposition of Prashant Desai (Volumes 1 and 3) taken on March 20, 2002 and April 25, 2002

C. Excerpts from deposition of Curt Johnson taken on April 7, 2003

D. Excerpts from deposition of Jim Timm taken on October 10, 2002

E. Excerpts of deposition of Kirk Velett taken on October 9, 2002

F. Excerpts of deposition of Jon Camaya (Volume 2) taken on May 9, 2003; Mark Chauvin taken on November 10, 2003; and John Wiegand taken on May 21, 2002

G. Drawing A5.1

/1163873

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Westfield Insurance Company,
Civil File No. 00-CV-987-JEL/JGL

Plaintiff,

vs.

Weis Builders, Inc., Promenade Village Townhomes, L.L.C., Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Third-Party Defendant and Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant.

** DEPOSITION OF STEVE MESSERICH **



Deposition of STEVE MESSERICH, Volume 2, taken pursuant to notice and agreement under the rules of civil procedure for the District Courts of Minnesota, and taken at 33 South Sixth Street, 4200 Multifoods Tower, Minneapolis, Minnesota, and taken on the 16th day of October, 2002, before Jonna Schrupp, a notary public in and for the County of Hennepin, State of Minnesota, commencing at 9:10 a.m.

HUBER COURT REPORTING
204 WILSON AVENUE NORTHEAST
ST. CLOUD, MN 56304
(320) 259-0824



I N D E X


| EXAMINATION OF WITNESS: | PAGE |
|---|---|
| Mr. Stepan | 253 |
| Ms. Heyer | 414 |
| Mr. Stepan | 420 |

DEPOSITION EXHIBITS

| | |
|---|---|
| Number 289, marked | 265 |
| Number 290, marked | 267 |
| Number 291, marked | 269 |
| Number 292, marked | 274 |
| Number 293, marked | 283 |
| Number 294, marked | 306 |
| Number 295, marked | 335 |
| Number 296, marked | 339 |
| Number 297, marked | 341 |
| Number 298, marked | 342 |
| Number 299, marked | 364 |
| Number 300, marked | 366 |
| Number 301, marked | 376 |
| Number 302, marked | 377 |
| Number 303, marked | 381 |
| Number 304, marked | 386 |
| Number 305, marked | 386 |
| Number 306, marked | 389 |
| Number 307, marked | 394 |
| Number 308, marked | 398 |
| Number 309, marked | 402 |
| Number 310, marked | 406 |
| Number 311, marked | 409 |





OBJECTION BY:

| | |
|---|---|
| Mr. Brown | 256 |
| Mr. Brown | 268 |
| Mr. Brown | 277 |
| Mr. Brown | 280 |
| Mr. Brown | 282 |
| Mr. Brown | 283 |
| Mr. Brown | 285 |
| Mr. Brown | 286 |
| Mr. Brown | 289 |
| Mr. Brown | 292 |
| Mr. Brown | 293 |
| Mr. Brown | 295 |
| Mr. Brown | 296 |
| Mr. Brown | 297 |
| Mr. Brown | 309 |
| Mr. Brown | 311 |
| Mr. Brown | 316 |
| Mr. Brown | 332 |
| Mr. Brown | 338 |
| Mr. Brown | 343 |
| Mr. Brown | 363 |
| Mr. Brown | 373 |
| Mr. Brown | 378 |
| Mr. Brown | 391 |
| Mr. Brown | 392 |
| Mr. Brown | 398 |
| Mr. Brown | 400 |
| Mr. Brown | 421 |


EXHIBIT A

276

210, would you take a look at that.
A (Witness complies.)
Q Do you see on the bottom third of the page it's a paragraph starting, "Cetco's recommendations for installation on the referenced project." Do you see that?
A Yes.
Q And there's a six item list setting out how Cetco would like the materials to be installed at Promenade, do you see that?
A Yes.
Q As you look at that six item list is that the way the installation occurred at Promenade?
A Correct.
Q Number one, the grouting, that was down by somebody other than Waterproofing By Experts; is that right?
A Yes.
Q Do you recall there being any problems with the grouting when Waterproofing By Experts went to put down its materials, did anybody from Waterproofing By Experts think there was a problem with the grouting?
A No.
Q A liquid flashing mastic was put over the joints that were grouted; is that right?

277

A The M2000, correct.
Q And at five, detail all penetrations with Vo-Clay M2000 liquid flashing mastic, do you see that?
A Correct.
Q Would that be in penetrations such as drains or any pipes coming up through the courtyards?
A Correct.
Q And was that done?
A Yes.
Q That liquid flashing around penetrations, would that essentially be how you tied in the waterproofing membrane to whatever object was making the penetration?
A Correct.
Q Was there anything else done in those areas to complete the tie-in?
A No.
Q Have you heard at all since this project has been complete that the drains on the precast planks, the waterproofing membrane wasn't tied into those drains?
A No.
Q There was no liquid flashing around them?
MR. BROWN: Object to the form.
A And I haven't heard that.

278

BY MR. STEPAN, CONTINUING:
Q Have you ever been out to the Southwind site?
A No.
Q Based on your testimony here it would be fair to say that nobody during the course of the Promenade project told you to use a waterproofing system similarly the same as the one that was installed at Southwind?
A No.
Q You indicated earlier that in recent months you've seen some details from Division 7 related to the Southwind project; right?
A Yes.
Q Do you recall if there was something like this (indicating), and what I'm showing you is a Division 7 letter to Bor-Son Construction dated October 31st, 1998, with attached waterproofing details.
A And the question is?
Q Is that what you saw when you said you saw Division 7 materials?
A No.
Q Let me show you another document just to see if this was what you were referring to, cover package is a Weis transmittal letter dated July 22nd, 1996,

279

and the second page is from Bor-Son to Division 7 October 4th, 1999, are those the Division 7 materials you saw?
A No.
Q Did you ever hear during the course of this project why ESG wasn't doing the design for the waterproofing?
A During the project?
Q Yes.
A No.
Q How about prior to the project?
A No.
Q Since the project's completion have you heard?
A Why they weren't doing it?
Q Yes.
A Yes.
Q And what were you told?
A I think something to the effect that it was a design-build and the owner was a hands-on and he was doing a lot of the design work.
Q And were you told why ESG wasn't taking on the waterproofing part?
A No.
Q You said design-build, what's your understanding of what a design-build project is?

280

A The interpretation would be that the general contractor becomes a designer and a builder and he has his own architectural and engineering staff and basically does it all.
Q Prior to this project had you worked on design-build projects before?
A Not that I'm aware of, no.
Q So this was your first one?
MR. BROWN: Object to the form, assumes facts not in evidence.
A Yes.
BY MR. STEPAN, CONTINUING:
Q Have you worked on any design-build projects since the Promenade project?
A Not that I'm aware of.
Q The definition you just gave me of your understanding of design-build, is that what you thought was going to happen on the Promenade project?
A That Weis Builders was the design-builder, yes.
Q Did you expect Weis to have its own architect or engineer put together plans for the waterproofing?
A Yes.
Q Is that what happened?
A Did they put together details for the

281

waterproofing?
Q Yes.
A No.
Q Did you ask them for details for the waterproofing?
A The details that were provided with the specifications, with the project specifications, were adequate for the project.
Q The details that you're referring to, is that the material you received from Cetco?
A Correct.
Q So you considered that to be the design for the waterproofing?
A That was the installation design, correct.
Q Did Waterproofing By Experts need any other details to do its waterproofing work?
A I needed a set of plans.
Q And you had that?
A Yes.
Q Anything else?
A No.
Q Let me show you what was marked as Exhibit 45, it's a subcontract between Weis and Waterproofing By Experts. Do you recognize that as the subcontract?
A Yes.
Q And you understand that subcontract set out

282

Waterproofing By Experts' responsibilities and rights on this job?
A Yes.
Q You understand it also set out what Weis's responsibilities and rights were on the job with regards to your work?
MR. BROWN: I'll just object to the extent it calls for a legal conclusion.
A I don't understand that.
BY MR. STEPAN, CONTINUING:
Q What was your understanding of what Weis's role was with regard to waterproofing on this project?
A They are a general contractor, they are my boss, they tell me what to do.
Q They weren't going to be doing any of the work themselves; is that right?
A The waterproofing work?
Q Yes.
A Correct.
Q You understood that the work that's set out in the subcontract agreement that Waterproofing By Experts was accepting full responsibility to do that work; right?
MR. BROWN: I'll object to the form, vague, and again to the extent it calls for a legal

283

conclusion.
A The waterproofing installation?
BY MR. STEPAN, CONTINUING:
Q Yes.
A Correct.
Q And whatever other work is detailed in the subcontract?
MR. BROWN: Same objection. If you have some specific questions about the subcontract, otherwise you can ask him if the words in there have a particular meaning to him.
A Well, I can't answer that because I can't read this anyway.
MR. STEPAN: Can you mark this, please.
(WHEREUPON, Messerich Deposition Exhibit Number 293 was marked for identification by the court reporter.)
Q Let me show you what's been marked as Exhibit 293, and it's a more legible copy, I believe, of the first two pages of the subcontract, Exhibit 45. Do you recognize that as being the subcontract?
A Yes.
Q And on 293, the back page, that's your signature under Waterproofing By Experts?
A Yes.

Q Can you take a look again at Exhibit 45, bring you to Exhibit F of Exhibit 45, are you there?
A Yes.
Q At the very bottom of Exhibit F it says, "This contract is for design-build waterproofing system for plaza areas." Correct?
A Pardon?
Q The very last sentence on Exhibit F says, "This contract is for design-build waterproofing system for plaza areas." Correct?
A Yes, correct.
Q What is your understanding of what that means?
A We would install the submitted waterproofing system for the manufacturer's specifications and utilizing the blueprints that I was given.
Q You say, "the submitted waterproofing system," is that the system that's detailed in the Cetco materials?
A That would be the Swelltite 3000 system, correct.
Q If you turn over to the next page, it says, "This subcontractor is completely responsible for providing and maintaining a water tight system." Correct?
A Correct.
Q And that's a responsibility that Waterproofing By



Experts undertook as a part of this subcontract; correct?
A Correct.
Q What did Waterproofing By Experts do on the project to satisfy that condition?
A They installed their system according to the plans and specs.
Q And what's your understanding of that phrase, "The subcontractor is completely responsible for providing and maintaining a water tight system."?
MR. BROWN: Object to the extent it calls for a legal conclusion. You can answer.
A Installing a system per the manufacturer's specifications.
BY MR. STEPAN, CONTINUING:
Q And what's your understanding of the part of that, "maintaining a water tight system," what does that mean to you?
A Maintaining a water tight system?
Q Yes.
A The guarantee.
Q So Waterproofing By Experts is guaranteeing that this is going to be a water tight system?
A Correct.
Q Do you believe that it's a water tight system



today?
A Yes, I do.
Q Despite the leaks that are occurring?
MR. BROWN: Object to the form, it's argumentative.
A Yes.
BY MR. STEPAN, CONTINUING:
Q There's several handwritten notes on this second page of Exhibit F, do you see those?
A Yes.
Q And there appear to be initials around those, do you know whose initials those are?
A (No audible response.)
Q For instance, the ones on the right hand side of the page?
A I believe they're Peter Desai's.
Q And the bottom left hand corner there's a set of initials, it's dated 02/26/97, are those your initials?
A Yes.
Q And are those your initials indicating that you accepted the terms that were on this page?
A I believe so, yes.
Q Do you see there's two lines, top of the page, two sentences that have been crossed out, do you see



that?
A Yes.
Q And the top one discusses drain tile, installation of drain tile?
A Yes.
Q Why was that eliminated?
A Cost issue.
Q Was that something you wanted taken out?
A To the best of my recollection it was a cost issue.
Q A cost issue for who?
A For Weis.
Q Did you object to taking out that item, the drain tile?
A No.
Q And then the next item that's crossed out concerns overflow scuppers, do you see that?
A Yes.
Q Do you know why that was taken out?
A Probably because we don't install scuppers.
Q So Waterproofing By Experts didn't want to take that on because you don't do that kind of work; is that right?
A Correct.
Q And then the next line down below scuppers says, "Includes monitoring the backfill operations to

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------

Westfield Insurance Company,

Plaintiff,

vs. Civil File No. 00-CV-987-PAM/JGL

Weis Builders, Inc.,
Promenade Village Townhomes, L.L.C.,
Healy Ramme Company, and
Valley Forge Insurance Company,
one of the CAN Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and
BRW Elness Architects, Inc., n/k/a
Elness Swenson Graham Architects, Inc.,
and Colloid Environmental Technologies
Company,

Third-Party Defendants.

------------------------------------

VOLUME III

The Deposition of PRASHANT DESAI, taken pursuant to Notice of Taking Deposition, taken before Barbara F. Schwegman, a Notary Public in and for the County of Washington, State of Minnesota, taken on the 25th day of April, 2002, at 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, Minnesota, commencing at approximately 9:27 a.m.



APPEARANCES:

ANDREA E. REISBORD, ESQUIRE, of the Law Firm of COUSINEAU, McGUIRE, ANDERSON, CHARTERED, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, Minnesota, 55416-5318, appeared for and on behalf of Plaintiff, Westfield Insurance Company.

CHAD J. STEPAN, ESQUIRE, of the Law Firm of MEAGHER & GEER, PLLP, 4200 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota, 55402-3788, appeared for and on behalf of Defendant and Third-Party Plaintiff, Weis Builders, Inc.

JOCELYN L. KNOLL, ESQUIRE, of the Law Firm of FABYANSKE, WESTRA & HART, P.A., Suite 1100, 920 Second Avenue South, Minneapolis, Minnesota, 55402, appeared for and on behalf of Defendant and Third-Party Plaintiff, Weis Builders, Inc.

STEVEN E. RAU, ESQUIRE, of the Law Firm of FLYNN, GASKINS & BENNETT, LLP, 333 South Seventh Street, Suite 2900, Minneapolis, Minnesota, 55402, appeared for and on behalf of Defendants, Promenade Village Townhomes, LLC and Healy Ramme Company.

LEO I. BRISBOIS, ESQUIRE, of the Law Firm of STICH, ANGELL & KREIDLER, P.A., The Crossings, Suite 120, 250 Second Avenue South, Minneapolis, Minnesota, 55401, appeared for and on behalf of Defendant, Valley Forge Insurance Company.

MARK S. BROWN, ESQUIRE, of the Law Firm of MURNANE, CONLIN, WHITE & BRANDT, P.A., 444 Cedar Street, Suite 1800, Saint Paul, Minnesota, 55101, appeared for and on behalf of Third-Party Defendants, Waterproofing By Experts, Inc.



APPEARANCES:

WILLIAM D. HULL, ESQUIRE, of the Law Firm of COLEMAN, HULL & VAN VLIET, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, Minnesota, 55437, appeared for and on behalf of Third-Party Defendant, BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.

PATRICK D. REILLY, ESQUIRE, of the Law Firm of ERSTAD & RIEMER, P.A., 200 Riverview Office Tower, 8009 34th Avenue South, Minneapolis, Minnesota, 55425, appeared for and on behalf of Third-Party Defendant, Colloid Environmental Technologies Company.

ALSO PRESENT: Katie Hull

*The Original is in the possession of Attorney William D. Hull.*

INDEX


| | Page |
|---|---|
| PRASHANT DESAI | |
| Cross-examination by Mr. Brown | 345 |
| Cross-examination by Ms. Reisbord | 458 |
| Cross-examination by Mr. Brisbois | 516 |


EXHIBITS


| | |
|---|---|
| Exhibit 182, 4-10-97, Weis Daily Report Form | 364 |
| Exhibit 183, 7-19-96, Bid confirmation from BA Assoc. | 366 |
| Exhibit 184, 4-3-97, Weis Daily Report Form | 389 |
| Exhibit 185, Top Bearing drawing | 425 |
| Exhibit 186, Typical Door/Stoop Section | 428 |
| Exhibit 187, Typical Stub Wall at Courtyard | 435 |
| Exhibit 188, Typical Stoop Detail | 440 |
| Exhibit 189, 4-29-97, Fax and drawing to John Feges | 449 |
| Exhibit 190, Typical Door/Stoop Section with drawings | 457 |
| Exhibit 191, 4-27-01, Expert Report of Mr. Beirise | 493 |
| Exhibit 192, Hand-drawn diagram by Mr. Desai | 501 |
| Exhibit 193, 8-19-99, Letter from GME Consultants | 504 |
| Exhibit 194, 2-12-98, Westfield Nonwaiver Agreement | 514 |
| Exhibit 195, 6-18-99, Promenade Tolling Agreement | 515 |




PRASHANT DESAI,
the Witness in the above-entitled matter, after having been first duly sworn, deposes and says as follows:

CROSS-EXAMINATION

BY MR. BROWN:

Q. Mr. Desai, my name is Mark Brown. I represent Waterproofing By Experts in this matter. This is day three, I think, of your depositions, and, according to your attorney, your last regular day and so we will all strive to make it as expeditious as possible. I'll just very briefly remind you of the rules of the road which I'm sure you've memorized by now. Make sure you let me finish my questions before answering. Make sure when you do answer, you answer verbally. If you don't understand my questions, please tell me and I'll try to rephrase so that you do; all right?

A. Okay.

Q. Have you had an opportunity to review anything between the date of your last deposition and today regarding this matter?

A. Just some correspondence from my counsel and just some project information.

Q. And I heard you talking off the record that

Page 358

estimator at the time who was working on this project.
Q. And then the last subline in line 6 says "review any special details with A/E," which is architect/engineer; is that right?
A. Correct.
Q. At that time who was the architect/engineer?
A. July of '96 it was -- it would be Kirk Villet or if John Feges got introduced, I'm not sure, but I'm not sure when did Kirk pull back and when did John come in.
Q. So was this -- did this list mean Les was to review special details regarding waterproofing with the architect?
A. Correct.
Q. Do you know if he did that?
A. I cannot -- I don't know.
Q. Do you know why he did that, why the general contractor representative was to go over special details regarding the waterproofing with the architect?
A. I think one -- can I look at that exhibit again, please?
Q. Sure (handing).
A. The reason why that item was on Les's list is we were trying to get bids for the waterproofing. We had an allowance, but we wanted -- I guess we had been requested to firm that allowance up with actual bids, and

Page 359

the reason why I say that is go to the second page of that same exhibit, "set up meetings for Monday with three bidders," meaning three subcontractors, "to bid the waterproofing." And my logic would say we wanted to make sure if there was anything special that the architect/engineer knew about any special details that we should be aware of, to get those incorporated as the subs were pricing out the systems.
Q. Special details in terms of the specs of the particular waterproofing system proposed? Is that what you mean?
A. No. At that time there was no proposed waterproofing system.
Q. So does "special details" mean requirements of the architect for the concept?
A. Correct or if there could be anything that they -- they may have "look out for this" or something that they may have experienced from the Southwind project or, you know, any history that they may have that we need to be aware of.
Q. And that's in keeping with your earlier testimony that the owner, and through the owner the architect, was very interested in keeping a tab on what was being proposed for waterproofing?
A. It was the whole team. I mean, it was the

Page 360

architect-owner-contractor meetings, and all three parties were involved in trying to get the best product.
Q. Now, you've been involved in many projects that have had design-build aspects I assume; is that right?
A. Yes.
Q. Have you ever been involved in a project other than Promenade where waterproofing was design-build?
A. Not to this extent, no.
Q. To any extent?
A. There may have been a smaller waterproof some elevator pits and there would not be any details on it. I couldn't tell you. Those are $2,000 waterproofing projects.
Q. Was it understood early on during the months reflected on these exhibits, and that is July of 1996 even before the final waterproofing bid was accepted, understood by you that waterproofing was going to be a design-build aspect of this project?
A. Correct.
Q. Do you know why that was?
A. The owner had problems on the Southwind project and they wanted one -- they felt the -- "they" meaning Healy Ramme felt that the architects cannot do justice to design. They're not the experts on it and you need to let the waterproofers who deal with waterproofing

Page 361

day in and day out provide the best design for it.
Q. Who is responsible for coordinating other aspects of the project that involved design with the waterproofing aspect to make sure they mesh properly on the site?
A. That would be -- it would be communications between Waterproofing going through Weis Builders to the architect combination.
(At this time Mr. Hull entered the room.)
BY MR. BROWN:
Q. Well, we'll get into that in a minute, and I suppose I can get into it right now. This bust that you described last time, that ultimately involved many design aspects that you said were somehow discernible from a close review of all the various drawings; correct?
A. Correct.
Q. Now, that's not a responsibility of the waterproofing subcontractor, is it?
MR. STEPAN: Well, what's not a responsibility?
MR. BROWN: Well, to coordinate all the drawings and architectural renderings and so forth to see if aspects unrelated to the waterproofing but that can have an effect on or be affected by the waterproofing worked together.

A. We did expect that from our waterproofing subcontractor.

BY MR. BROWN:

Q. You expected Steve Messerich's company to, what, hire their own architects to look at the plans to make sure that they meshed with the waterproofing system?

MS. KNOLL: Objection, harassment.

A. Whether it's their own architects or they did it themselves, that's spelled out, in my opinion, pretty clearly in their subcontract.

BY MR. BROWN:

Q. Why don't we take a look at that subcontract. By the way -- and I'll just be -- I'll maybe have to take this in smaller pieces. If, for example, there was a design regarding entrances, stairway entrances, and that design implicated other aspects of the project including waterproofing, are you saying that Waterproofing By Experts is somehow supposed to be involved in making sure that the design as originally conceived and drawn by the project architects is proper?

MS. KNOLL: Objection, improper hypothetical.

MR. REILLY: Are you or Mr. Stepan going to be representing this witness at this deposition?

MS. KNOLL: I can lodge an objection.



MR. REILLY: No, you can't, not if he's here. One counsel only represents the witness here. If you're both representing him, then I'm objecting to any reference you have in this deposition whatsoever, and I move the court for penalties if this continues.

MR. BROWN: You can answer the question.

THE WITNESS: Can you repeat the question?

MR. BROWN: Can I? I don't know if -- it can be read back probably.

(Whereupon the requested portion of the record was read aloud by the Court Reporter.)

A. I would say let the subcontract that we entered into answer that question. There should be some language making the -- or Waterproofing By Experts taking on that responsibility.

MR. BROWN: Okay. Well, I'll have you point that provision out in a second. Why don't we mark this.

(At this time Desai Deposition Exhibit Number 182 was marked for identification by the Court Reporter and Mr. Rau entered the room.)

BY MR. BROWN:



Q. I'm showing you what has been marked as Exhibit 182, and it's an April 10, 1997 Daily Report Form for Weis Builders authored by Les Lawson. During the course of a project and specifically with reference to the Promenade project, did you receive copies of these reports from time to time?

A. They were filed on-site. I didn't read through them or anything.

Q. Did you ever read one of them?

A. I'm sure I have.

Q. I'm going to direct you to -- and I'm going to have to read it because this is the only copy I have with me. The bottom line says -- and, by the way, Les Lawson was one of your project superintendents; is that correct?

A. Correct.

Q. Was he the lead project superintendent?

A. He was the lead project superintendent.

Q. So he's your immediate right-hand man?

A. All of them are my right-hand men.

Q. And you would expect Les Lawson to report to you significant issues on the project and he did that throughout this project; correct?

A. Correct.

Q. The bottom line says "Spoke with Paul Pearson, MFRA. He feels that it is the responsibility of the



architect to coordinate all drawings and revisions with Weis and the city. John Feges should send new site plan to city" -- I guess that's a separate point. Do you agree with that first sentence that it's the project architect's responsibility to coordinate drawings and revisions?

A. I would say that's Paul's -- Paul's opinion. I think it depends on who the owner contracted that piece of work with.

Q. Well, then let's look at that contract of yours and we'll see where it talks about coordinating drawings by the subcontractor; all right? And you did ultimately agree to accept the bid of Waterproofing By Experts over Brent Anderson and Associates; correct?

A. Yes.

Q. Even though Brent Anderson and Associates who did the waterproofing at Southwind, including the waterproofing at 3, 4, and 5, submitted a bid with the same specifications as used at Southwind?

A. We don't know if they were the same specifications. We weren't there building Southwind.

Q. You didn't have the architects pull the plans, like you said earlier, and double-check?

A. I don't recall whether we pulled them or not, what we had.

MR. BROWN: Let's mark this.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

-----------------------------------

Westfield Insurance Company,

Plaintiff,

vs. Civil File No. 00-CV-987-PAM/JGL

Weis Builders, Inc.,
Promenade Village Townhomes, L.L.C.,
Healy Ramme Company, and
Valley Forge Insurance Company,
one of the CAN Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and
BRW Elness Architects, Inc., n/k/a
Elness Swenson Graham Architects, Inc.,
and Colloid Environmental Technologies
Company,

Third-Party Defendants.

-----------------------------------

VOLUME I

The Deposition of PRASHANT DESAI, taken pursuant to Notice of Taking Deposition, taken before Barbara F. Schwegman, a Notary Public in and for the County of Washington, State of Minnesota, taken on the 20th day of March, 2002, at 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, Minnesota, commencing at approximately 9:04 a.m.



APPEARANCES:

ANDREA E. REISBORD, ESQUIRE, of the Law Firm of COUSINEAU, McGUIRE, ANDERSON, CHARTERED, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, Minnesota, 55416-5318, appeared for and on behalf of Plaintiff, Westfield Insurance Company.

CHAD J. STEPAN, ESQUIRE, of the Law Firm of MEAGHER & GEER, PLLP, 4200 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota, 55402-3788, appeared for and on behalf of Defendant and Third-Party Plaintiff, Weis Builders, Inc.

JOCELYN L. KNOLL, ESQUIRE, of the Law Firm of FABYANSKE, WESTRA & HART, P.A., Suite 1100, 920 Second Avenue South, Minneapolis, Minnesota, 55402, appeared for and on behalf of Defendant and Third-Party Plaintiff, Weis Builders, Inc.

STEVEN E. RAU, ESQUIRE, of the Law Firm of FLYNN, GASKINS & BENNETT, LLP, 333 South Seventh Street, Suite 2900, Minneapolis, Minnesota, 55402, appeared for and on behalf of Defendants, Promenade Village Townhomes, LLC and Healy Ramme Company.

LEO I. BRISBOIS, ESQUIRE, of the Law Firm of STICH, ANGELL & KREIDLER, P.A., The Crossings, Suite 120, 250 Second Avenue South, Minneapolis, Minnesota, 55401, appeared for and on behalf of Defendant, Valley Forge Insurance Company.

DANIEL A. BECKMAN, ESQUIRE, of the Law Firm of GISLASON & HUNTER, LLP, Suite 215 E, 9900 Bren Road East, Minnetonka, Minnesota, 55343-9666, appeared for and on behalf of Third-Party Defendant, Waterproofing By Experts, Inc.



APPEARANCES:

MARK S. BROWN, ESQUIRE, of the Law Firm of MURNANE, CONLIN, WHITE & BRANDT, P.A., 444 Cedar Street, Suite 1800, Saint Paul, Minnesota, 55101, appeared for and on behalf of Third-Party Defendants, Waterproofing By Experts, Inc.

WILLIAM D. HULL, ESQUIRE, of the Law Firm of COLEMAN, HULL & VAN VLIET, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, Minnesota, 55437, appeared for and on behalf of Third-Party Defendant, BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.

PATRICK D. REILLY, ESQUIRE, of the Law Firm of ERSTAD & RIEMER, P.A., 200 Riverview Office Tower, 8009 34th Avenue South, Minneapolis, Minnesota, 55425, appeared for and on behalf of Third-Party Defendant, Colloid Environmental Technologies Company.

ALSO PRESENT: John Feges, ESG
Peter Ramme, Healy Ramme

*The Original is in the possession of Attorney William D. Hull.*

INDEX


| | Page |
|---|---|
| PRASHANT DESAI | |
| Cross-examination by Mr. Hull | 5 |




EXHIBITS


| | |
|---|---|
| Exhibit 1, 11-15-96, Letter from Harold Dean Kiewel (Previously marked in Healy deposition) | 64 |
| Exhibit 3, 11-20-96, Memo to Mr. Feges (Previously marked in Healy deposition) | 73 |
| Exhibit 5, 11-14-96, Owner meeting number 8 minutes (Previously marked in Healy deposition) | 148 |
| Exhibit 6, Submittal from Waterproofing By Experts (Previously marked in Healy deposition) | 154 |
| Exhibit 8, 2-18-96, Owner meeting number 16 minutes (Previously marked in Healy deposition) | 159 |
| Exhibit 14, 7-16-96, Cost breakdown by Mr. Desai (Previously marked in Healy deposition) | 82 |
| Exhibit 16, 9-10-96, Changes to plans and specs (Previously marked in Healy deposition) | 124 |
| Exhibit 22, 11-7-96, Fax to Tom Healy (Previously marked in Healy deposition) | 156 |
| Exhibit 27, 9-26-96, Letter to Peter Ramme (Previously marked in Healy deposition) | 13 |
| Exhibit 30, Picture of interior of plaza (Previously marked in Healy deposition) | 59 |
| Exhibit 34, Packet of Promenade drawings | 14 |
| Exhibit 35, Packet of Promenade civil drawings | 14 |
| Exhibit 36, 9-19-96, Owner/contractor agreement | 19 |
| Exhibit 37, Pope Associates report | 30 |
| Exhibit 38, Letter from Timothy Reiner | 78 |
| Exhibit 39, 6-21-96, Handwritten notes by Mr. Desai | 89 |
| Exhibit 40, Hand-drawn diagram by Mr. Desai | 95 |
| Exhibit 41, 7-9-96, Bid from Waterproofing By Experts | 114 |
| Exhibit 42, 8-22-96, Bid from Waterproofing By Experts | 117 |
| Exhibit 43, 8-22-96, Bid from Waterproofing By Experts | 117 |
| Exhibit 44, CETCO product literature | 119 |
| Exhibit 45, 3-10-97, Weis Builders' subcontract agreement with Waterproofing By Experts | 127 |
| Exhibit 46, 10-22-96, Memo from Peter Desai | 153 |
| Exhibit 47, 12-14-96, RFI 39 | 157 |
| Exhibit 48, 2-21-97, Memo from Les Lawson | 166 |
| Exhibit 49, 4-10-97, Job site visit report | 167 |
| Exhibit 50, 4-15-97, RFI 101 | 168 |
| Exhibit 51, 4-15-97, Memo from Peter Desai | 170 |
| Exhibit 52, 4-29-97, Observation report by Hanuschak | 172 |
| Exhibit 53, 5-9-97, Memo from Mike Manzella and Curt Mareno | 176 |
| Exhibit 54, 6-23-97, RFI 104 | 180 |

Page 129

A. Uh-huh.
Q. -- that are to be encompassed within the scope of the work of Waterproofing By Experts; is that correct?
A. Correct.
Q. So at the time this contract was prepared, ESG had already issued their original plans and some revisions to those; is that right?
A. Correct.
Q. And Waterproofing By Experts of course had access to those before they signed this contract; is that correct?
A. Correct.
Q. Then the very last bullet on the first page says that "This is a design-build contract for waterproofing the plaza areas." Now, what is meant by "design-build" as used in that sentence?
A. Where are you at again?
Q. The very last sentence on the first page of Exhibit F.
MR. BROWN: Objection to the extent it calls for a legal conclusion.
MR. STEPAN: Same objection.
MR. BROWN: And also lacks foundation.
A. I guess what the intent here was after researching and talking to different -- three different

Page 130

vendors, looking at different systems, we turned around and put the -- at least told Waterproofing By Experts that they've got to be responsible for whatever to provide a watertight waterproofing system for the plaza.
BY MR. HULL:
Q. And they were supposed to both design and construct that waterproofing system --
A. Correct.
Q. -- isn't that correct?
A. Correct.
Q. And they were to do that in the context of the drawings that ESG had issued; isn't that right?
A. Correct.
Q. Now, who prepared Exhibit F?
A. That's my work of art.
Q. You go to some lengths in Exhibit F here to make absolutely sure there's no misunderstanding that Waterproofing By Experts is completely responsible for maintaining a watertight system; is that correct?
MR. BROWN: Object to that as the mischaracterization of evidence.
MR. REILLY: Join.
BY MR. HULL:
Q. Is that correct?
A. We had heard a lot of horror stories about the

Page 131

Southwind project and we wanted to make sure that we didn't fall into a similar situation here, and this is what the Waterproofing By Experts and CETCO were there selling us that "Hey, we'll take care of it. We've put on millions of square feet of this product," and they're willing to perform and we wanted to make sure I guess.
Q. It was your intention then to make certain that there wasn't any doubt in anybody's mind that Waterproofing By Experts was 100 percent responsible for any problems with this waterproofing system; is that correct.
MR. BROWN: Object; vague and as calling for a legal conclusion, calls for facts not in evidence.
MR. REILLY: Join.
MR. HULL: Not only that, you probably won't like the answer.
BY MR. HULL:
Q. Go ahead. You can answer the question.
A. The answer is yes. I mean, it's evident by --
Q. Now, you wanted to make the responsibility of Waterproofing By Experts clear because that was Weis Builders' responsibility also, wasn't it?
MR. STEPAN: Objection; calls for a legal conclusion, lack of foundation.
A. I guess the way I feel on this particular

Page 132

project is -- and beyond even this is that we tried to protect the owner every which way we could, knowing where some -- if we had some experiences, they had experiences, we tried to make the best out of them. I guess as far as our responsibility, to answer your question, I would say by that note yes, that's --
BY MR. HULL:
Q. Whose handwriting is this on the second page of Exhibit F?
A. Mine.
Q. I'd like you to take a quick look, if you would, there's a number 1 in a circle there. It says "vertical surfaces included" and then it looks like there's some initials.
A. Uh-huh.
Q. Whose initials are those?
A. Mine. Steve Messerich, rather than going through each one, he signed the bottom of the page.
Q. And where is that?
A. "SCM 2-26."
Q. Okay. All right. Now, I notice on here that there's a line that says "Includes installing drain tile of plaza in order to get water away from building" and that is eliminated; is that right?
A. Correct.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - -

Civil File #00-CV-987 JEL/JGL

Westfield Insurance Company,

Plaintiff,

vs.

Weis Builders, Inc., Promenade Village Townhomes, L.L.C., Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

- - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF CURT JOHNSON, taken pursuant to Notice and Agreement under the Rules of Civil Procedure for the District Courts of Minnesota, and taken at 4200 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota, and taken on the 7th day of April, 2003, commencing at the hour of 9:46 a.m., before Martin R. Huber, a Notary Public in and for the County of Stearns, State of Minnesota.



** CAPTION CONTINUED **

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Third-Party Defendant and Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant.

EXHIBIT C



I N D E X

EXAMINATION OF WITNESS: Page


| | |
|---|---|
| Mr. Stepan | 5 |
| Mr. Bye | 84 |
| Mr. Hull | 102 |
| Mr. Brown | 104 |
| Mr. Stepan | 127 |


OBJECTION BY: Page


| | |
|---|---|
| Mr. Bye | 22, 41, 42, 48, 79, 108, 109, 113, 114, 115, 116, 117, 118, 124 |
| Ms. Heyer | 23, 25, 74, 77, 79, 80, 82, 93, 94, 97, 99, 101, 103, 104, 106, 107, 109, 110, 111, 112, 113, 116, 119, 120, 121, 123, 127, 128, 129, 131 |
| Mr. Hull | 28, 37, 44 49, 93, 106, 130 |
| Mr. Brown | 97, 98 |
| Mr. Stepan | 103, 106, 107, 118 |


DEPOSITION EXHIBITS Page


| | |
|---|---|
| Exhibit 527 marked | 20 |
| Exhibit 528 marked | 50 |
| Exhibit 529 marked | 67 |
| Exhibit 530 marked | 68 |
| Exhibit 531 marked | 72 |
| Exhibit 532 marked | 74 |
| Exhibits 533-538 marked | 85 |




APPEARANCES

CHAD J. STEPAN, Attorney at Law, 33 South 6th Street, Suite 4200, Minneapolis, Minnesota 55402, appeared on behalf of Weis Builders.

STEVEN E. RAU, Attorney at Law, 333 South 7th Street, Suite 2900, Minneapolis, Minnesota 55402, appeared on behalf of Healey Ramme Company.

MARK GWIN, Attorney at Law, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, Minnesota 55416, appeared on behalf of Westfield Insurance Company.

LEO BRISBOIS, Attorney at Law, The Crossings, Suite 120, 250 Second Avenue South, Minneapolis, Minnesota 55401, appeared on behalf of Valley Forge Insurance Co.

WILLIAM D. HULL, Attorney at Law, 8500 Normandale Lake Boulevard, Suite 2100, Bloomington, Minnesota 55437, appeared on behalf of Elness Swenson Graham Architects.

MARK BROWN, Attorney at Law, 1800 U.S. Bancorp Piper Jaffray Plaza, 444 Cedar Street, St. Paul, Minnesota 55101, appeared on behalf of the Waterproofing by Experts, Inc.

PATRICK REILLY, Attorney at Law, 200 Riverview Office Tower, 8009 34th Avenue South, Minneapolis, Minnesota 55425, appeared on behalf of Colloid Environmental.

G. JOHN VEITH, Attorney at Law, 5411 Circle Down Avenue, Suite 100, Minneapolis, Minnesota 55330, appeared on behalf of Chris Craft Industrial Products.

CHANDELLE L. HEYER, Attorney at Law, 610 Ottawa Avenue North, Minneapolis, Minnesota 55422, appeared on behalf of J-Berd.

JONATHAN M. BYE, Attorney at Law, 4200 IDS Center, 80 South 8th Street, Minneapolis, Minnesota 55402-2205, appeared on behalf of Mikesh, Inc.

* * *

WHEREUPON, the following proceedings were duly had, to-wit:

CURT JOHNSON,

after having been first duly sworn, deposes and says as follows:

Page 17

A I would say Peter probably called us.
Q Are you familiar with the company known as NS Mechanical?
A Yes.
Q And how are you familiar with them?
A Well, they were somewhat of a direct competitor of ours.
Q Did they have any involvement on this project?
A I think they were supposed to get the project originally.
Q And why do you say that?
A Well, the plans and specifications and stuff indicated that they were already into the project when we got involved.
Q Did they end up doing any work on the project as far as you know?
A Not mechanical work, no.
Q Do you know why that is?
A I think Weis probably didn't feel they were large enough.
Q Why do you say that?
A I don't think they had the manpower. And at that particular time they were having financial problems, too.
Q Did you ever hear they went out of business?

Page 18

A Yes, they did.
Q Did you ever talk with Peter about NS Mechanical not being on the job?
A I doubt it very much.
Q Did you ever hear anybody from Weis tell you they didn't think NS was large enough to work on the job?
A More than likely. I would guess they probably told us that first, and then they probably went out of business second, you know.
Q So be fair to say that NS may have been involved first, you heard that Weis thought they weren't large enough, so they brought you --
A Right.
Q J-Berd, as well, and then NS ended up going out of business, so the whole job went to J-Berd?
A Yes.
Q I'm going to show you what's marked as Exhibit 401.
A Uh-huh.
Q Please take a look at that.
A Uh-huh. (Witness examines document.)
Q Have you seen that document before?
A Yes.
Q That's your signature on the second page?
A Yes.
Q What is this?

Page 19

A It's kind of a summary of what we talked about and planned on probably performing for them.
Q Proposal, if you will, for the Promenade project?
A Kind of states a few little things there.
Q Can you turn to the second page. At the top it says, "The following are requested changes we propose to use in lieu of the specified guidelines." Do you see that?
A Yes.
Q Then number 11 says, "Design/build engineering by us." Do you see that?
A Yes.
Q What is your understanding of what that means, design/build engineering by us?
A At this particular time we were going to hire, which we always did in the past, hire our own engineer. We worked with Dick Lindell Engineering.
Q Had you worked on design/build projects prior to this?
A A lot of them.
Q What's your understanding of what design/build project is?
A Design/build would -- we still do a lot of them. We hire an engineer with a license. And in this case it was Dick Lindell, and he would draw it out for us so

Page 20

our men could install it, probably.
Q When you sent this proposal to Weis, did you understand that mechanical work on the Promenade was going to be done design/build, or were you offering to do it design/build?
A We were offering to do it design/build.
Q And do you recall if Mr. Desai responded to this proposal?
A Yes.
Q And what was his response?
A First of all, he wanted to know what my engineer was going to charge, and I gave him an estimate of between 35 and $50,000. And at that point he said that they already had engineering somewhat done, and he didn't want to spend that 35 to $50,000. So they kind of guided us towards the plans that NS had.

(WHEREUPON, C. Johnson Deposition Exhibit 527 was marked for identification by the court reporter.)

Q Mr. Johnson, I'm showing you what's been marked as Exhibit 527, a one page document. Could you please take a look at that?
A (Witness complies.)
Q Have you had a chance to look at the Exhibit, sir?
A Now I have.