UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - -

Westfield Insurance Company,
Civil File No. 00-CV-987-JEL/JGL

Plaintiff,

vs.

Weis Builders, Inc.,
Promenade Village Townhomes, L.L.C.,
Healey Ramme Company, and
Valley Forge Insurance Company, one
of the CNA Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and
BRW Elness Architects, Inc., n/k/a Elness
Swenson Graham Architects, Inc., Colloid
Environmental Technologies Company, and
J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Third-Party Defendant and
Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant.

** DEPOSITION OF JIM TIMM **



Deposition of JIM TIMM, taken pursuant to notice and agreement under the rules of civil procedure for the District Courts of Minnesota, and taken at 33 South Sixth Street, 4200 Multifoods Tower, Minneapolis, Minnesota, and taken on the 10th day of October, 2002, before Jonna Schrupp, a notary public in and for the County of Hennepin, State of Minnesota, commencing at 9:15 a.m.

HUBER COURT REPORTING
204 WILSON AVENUE NORTHEAST
ST. CLOUD, MN 56304
(320) 259-0824



I N D E X


| EXAMINATION OF WITNESS: | PAGE |
| --- | --- |
| Mr. Stepan | 6 |
| Mr. Brown | 171 |

| DEPOSITION EXHIBITS | |
| --- | --- |
| Number 274, marked | 68 |
| Number 275, marked | 70 |
| Number 276, marked | 72 |
| Number 277, marked | 79 |
| Number 278, marked | 84 |
| Number 279, marked | 86 |
| Number 280, marked | 87 |
| Number 281, marked | 118 |
| Number 282, marked | 120 |
| Number 283, marked | 128 |
| Number 284, marked | 129 |
| Number 285, marked | 131 |
| Number 286, marked | 143 |
| Number 287, marked | 153 |
| Number 288, marked | 159 |





| OBJECTION BY: | |
| --- | --- |
| Mr. Hull | 32 |
| Mr. Hull | 35 |
| Mr. Hull | 37 |
| Mr. Hull | 38 |
| Mr. Hull | 39 |
| Mr. Hull | 44 |
| Mr. Hull | 45 |
| Mr. Hull | 49 |
| Mr. Hull | 50 |
| Mr. Reilly | 50 |
| Mr. Hull | 52 |
| Mr. Hull | 55 |
| Mr. Hull | 63 |
| Mr. Hull | 66 |
| Mr. Hull | 67 |
| Mr. Hull | 77 |
| Mr. Hull | 79 |
| Mr. Reilly | 80 |
| Mr. Hull | 80 |
| Mr. Gwin | 80 |
| Mr. Hull | 81 |
| Mr. Hull | 82 |
| Mr. Hull | 85 |
| Mr. Hull | 98 |
| Mr. Hull | 110 |
| Mr. Hull | 111 |
| Mr. Hull | 112 |
| Mr. Hull | 113 |
| Mr. Hull | 115 |
| Mr. Hull | 123 |
| Mr. Hull | 124 |
| Mr. Hull | 125 |
| Mr. Hull | 132 |
| Mr. Hull | 133 |
| Mr. Hull | 137 |
| Mr. Hull | 141 |
| Mr. Hull | 142 |
| Mr. Hull | 143 |
| Mr. Hull | 148 |
| Mr. Hull | 151 |
| Mr. Hull | 157 |
| Mr. Hull | 158 |
| Mr. Hull | 167 |
| Mr. Hull | 169 |
| Mr. Stepan | 169 |
| Mr. Hull | 171 |

A No.

Q Did you keep any notes for yourself?

A No.

Q Is it your understanding that aspects of this project were design-build?

A Yes.

Q What aspects were design-build?

A Primarily mechanical, electrical, courtyard waterproofing, and there could be others.

Q Those are the ones that you know of, though?

A Those are the primary ones.

Q What's your understanding of what design-build means?

A It can start with total design from a given framework to design within a scope parameter.

Q I'm sorry, I didn't hear that last part.

A Within a scope parameter, an outline spec, something of that nature.

Q What do you mean by total design?

A A total design of the aspects of that -- the scope of whatever that responsibility is, for that trade.

Q So say on any given project, say the mechanical work is design-build, it could be the mechanical contractor is going to design and build the entire mechanical aspect of the project, is that what you



mean?

A Correct.

Q What do you mean by design within the scope, parameter?

A Sometimes on a design-build project an outline specification or a scoping document is established to provide direction for that design.

Q On the Promenade project where would you place the mechanical and electrical design-build?

A I believe they received some scoping documents.

Q How about the courtyard and the waterproofing?

A I believe that they received our building as a background that essentially depicted the courtyards as a void for them to go forward from, with the parameters there would be soil out there and sidewalks.

Q So the building that Elness designed was essentially the scope and parameter for the courtyard and waterproofing design-build?

A Um-hum.

Q Is that a "yes"?

A Yes.

Q So would it be fair to say that the design of the building is going to have to be established so that whoever is going to do the courtyard and



waterproofing knows what they're going to have to deal with when they come in to do the work when they're developing their design?

A Could you rephrase that.

Q Sure. You said the design of the building as to the scope or parameter for the courtyard and waterproofing workers, so they knew what they were dealing with. So for them to be able to do their design the design of the building is going to have to be established so they know what they're working with, would that be fair to say?

A It was established.

Q And it would have to be so they know what they're working with; correct?

A It can vary.

Q Put it this way, if changes are made to the building, those changes are going to -- the building part I'm referring to is the building of the courtyard.

A Um-hum.

Q If changes are made to those areas those changes are going to have to be conveyed to the courtyard and waterproofing people because the scope and parameter of what they're dealing with has changed; correct?



A Are we talking about in terms of the Promenade project?

Q Yes.

A Yes.

Q At some point in the process the work that's done in the courtyard and the waterproofing is going to have to be tied in with the building; right?

MR. HULL: I'll object to the form of the question.

BY MR. STEPAN, CONTINUING:

Q They're going to have to be incorporated somehow, integrated?

A It depends on the design of the waterproofing.

Q In this case the waterproofing makes contact with the building, they're going to be incorporated?

A The design of the incorporation could be part of the waterproofing package.

Q If issues arose in the project with regard to tying in the waterproofing with the building who would you look to or whose responsibility did you believe it was to make sure that the building and waterproofing would be put together?

MR. HULL: I'll object to the form of the question.

A Could you rephrase it.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Westfield Insurance Company,
Civil File No. 00-CV-987-JEL/JGL

Plaintiff,

vs.

Weis Builders, Inc.,
Promenade Village Townhomes, L.L.C.,
Healey Ramme Company, and
Valley Forge Insurance Company, one
of the CNA Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and
BRW Elness Architects, Inc., n/k/a Elness
Swenson Graham Architects, Inc., Colloid
Environmental Technologies Company, and
J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Third-Party Defendant and
Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant.

** DEPOSITION OF KIRK VELETT **



Deposition of KIRK VELETT, taken pursuant to notice and agreement under the rules of civil procedure for the District Courts of Minnesota, and taken at 33 South Sixth Street, 4200 Multifoods Tower, Minneapolis, Minnesota, and taken on the 9th day of October, 2002, before Jonna Schrupp, a notary public in and for the County of Hennepin, State of Minnesota, commencing at 10:40 a.m.

HUBER COURT REPORTING
204 WILSON AVENUE NORTHEAST
ST. CLOUD, MN 56304
(320) 259-0824



I N D E X


| EXAMINATION OF WITNESS: | PAGE |
|---|---|
| Mr. Stepan | 6 |

| DEPOSITION EXHIBITS | |
|---|---|
| Number 260, marked | 44 |
| Number 261, marked | 47 |
| Number 262, marked | 69 |
| Number 263, marked | 93 |
| Number 264, marked | 94 |
| Number 265, marked | 95 |
| Number 266, marked | 96 |
| Number 267, marked | 97 |
| Number 268, marked | 101 |
| Number 269, marked | 103 |
| Number 270, marked | 104 |
| Number 271, marked | 105 |
| Number 272, marked | 108 |





| OBJECTION BY: | |
|---|---|
| Mr. Hull | 18 |
| Mr. Hull | 22 |
| Mr. Hull | 29 |
| Mr. Hull | 30 |
| Mr. Hull | 31 |
| Mr. Hull | 37 |
| Mr. Hull | 38 |
| Mr. Hull | 46 |
| Mr. Hull | 49 |
| Mr. Hull | 53 |
| Mr. Hull | 54 |
| Mr. Hull | 55 |
| Mr. Hull | 56 |
| Mr. Hull | 59 |
| Mr. Hull | 63 |
| Mr. Hull | 65 |
| Mr. Hull | 66 |
| Mr. Hull | 67 |
| Mr. Hull | 72 |
| Mr. Hull | 80 |
| Mr. Rau | 81 |
| Mr. Hull | 81 |
| Mr. Rau | 82 |
| Mr. Hull | 82 |
| Mr. Hull | 83 |
| Mr. Hull | 84 |
| Mr. Hull | 85 |
| Mr. Hull | 86 |
| Mr. Hull | 87 |
| Mr. Hull | 89 |
| Mr. Hull | 90 |
| Mr. Hull | 100 |
| Mr. Hull | 101 |
| Mr. Hull | 113 |
| Mr. Hull | 114 |
| Mr. Hull | 119 |
| Mr. Hull | 122 |
| Mr. Hull | 123 |
| Mr. Hull | 125 |
| Mr. Hull | 128 |
| Mr. Hull | 129 |
| Mr. Hull | 130 |
| Mr. Hull | 132 |
| Mr. Hull | 137 |
| Mr. Hull | 138 |
| Mr. Hull | 140 |
| Mr. Hull | 141 |
| Mr. Hull | 144 |

53

Q Do you believe it would have been helpful to provide to the contractors on the Promenade project -- to provide them waterproofing details that were used on the Southwind project?

MR. HULL: I'll object to the form of the question, calls for speculation.

BY MR. STEPAN, CONTINUING:

Q Do you believe that?

A Could you say that again.

Q Do you believe it would have been helpful to the contractors on the Promenade project to be provided with the waterproofing details that were used in the Southwind project?

MR. HULL: Objection to the form of the question.

A It may have.

BY MR. STEPAN, CONTINUING:

Q In what way?

MR. HULL: I'll object again to the form of the question.

A That it's a system that the owner is currently happy with.

BY MR. STEPAN, CONTINUING:

Q So for instance Exhibit 261, the ASI that we looked at earlier where it shows a detail, I'm looking at

54

design AR 4, and you see on there it's got waterproofing in the detail, does it not?

A Yes.

Q And there's flashing in the detail; correct?

A Yes.

Q So there's waterproofing detailed in this drawing?

A On that drawing, yes.

Q Do you think something like this would have been helpful to provide to the contractors on the Promenade project, here, here's a detail of what's used at Southwind and they're happy with that system?

MR. HULL: Object to the form of the question. You can go ahead and answer.

A I believe that the drawings were available if the contractor requested them.

BY MR. STEPAN, CONTINUING:

Q Did you tell the contractor that the Southwind drawings were available for review?

A I believe the owner made that known.

Q Did you hear the owner make that known?

A I don't recall.

Q What's the basis for your belief?

A Because the project was discussed at meetings, the Southwind project was discussed.

55

Q Do you recall anybody at those meetings saying, if you want to see the Southwind drawings we can make them available?

A I do not recall that.

Q As the architect for Healey Ramme on this project you want to make sure the project goes as smoothly as possible for the owner, don't you?

A Yes.

Q Would it have made sense to say, we worked on a similar project, we've got the drawings, here they are, they're available for you to take a look at?

MR. HULL: I'll object to the form of the question.

A I do not -- please say the question again.

BY MR. STEPAN, CONTINUING:

Q Does that make sense -- you said you want the project to go forward as smoothly as possible, wouldn't the project have been helped by somebody from Elness saying, we've got drawings of a similar project that we put together, we have the waterproofing system, details for waterproofing the courtyards, drainage plan, we'll make them available for you to look at?

MR. HULL: I'll object to the form of the question.

56

A I cannot say that the offer wasn't made to the contractor.

BY MR. STEPAN, CONTINUING:

Q You don't know whether it was made or not; right?

A Right.

Q My question was, wouldn't it have been helpful to make them available?

MR. HULL: I'll object to the form of the question, and I think we've been through that about four times now.

A I'm not saying -- if I said I think that the offer was made then I believe that it had merit to make the offer.

BY MR. STEPAN, CONTINUING:

Q Do you know who John Mikesh is?

A I do not.

Q Are you familiar with the term design-build?

A Yes.

Q What's your understanding of what design-build means?

A Depends on where it's used.

Q Where it's used?

A And how it's used.

Q What do you mean by that?

A I mean the term design-build is used to mean many

different things.
Q What meanings of design-build are you familiar with?
A Basically two, one is where the contractor is the actual -- the contractor hires the architect and engineers and there's a single point, another case is where engineering systems are to be designed by the contractor or subcontractors.
Q When you say engineering systems what do you mean by that, what kind of systems?
A Typically mechanical and electrical systems.
Q How many design-build projects have you worked on since you've been at Elness?
A Of what category?
Q Of the first category, where the contractor hires the architect and the engineer.
A I've personally -- for projects that have been completed -- have not worked on any.
Q How about of the second category?
A For mechanical and electrical probably 50 percent of the projects.
Q Is it your understanding that aspects of the Promenade project were design-build?
A Yes.
Q What category would you put the Promenade project



in, of the two categories you identified?
A The second.
Q Where the electrical and mechanical were going to be designed by the contractors or the subcontractors?
A Correct.
Q Put Promenade aside for a second, on the other projects you've worked on where the mechanical and electrical has been design-build does Elness provide specifications or some sort of parameters that will allow the contractor or subcontractor to know what they're supposed to design or build?
A Depends on the project.
Q Can you explain that to me, what do you mean by depends on the project, what are the variables?
A The variables are what's decided, what's going to be provided -- it depends on what information is decided on, what parameters the owner, typically the owner, wants to set, depends on what's provided ahead of time.
Q Would you agree with me that the contractor that's going to do the design-build work, mechanical contractor for example, is going to need to know some outline of what they're dealing with so they can know how their work is going to fit into the



rest of the project, would that be fair to say?
MR. HULL: I'll object to the form of the question.
A Would you repeat that.
BY MR. STEPAN, CONTINUING:
Q Sure. You would agree with me, wouldn't you, that the mechanical contractor, for example who's going to be doing design-build work on an Elness project, is going to need to know some outline of what's expected in the design-build work so they know what work they're supposed to do and how they can tie it in with the rest of the project?
MR. HULL: I'll object to the form of the question.
A They need to know that information, yes.
BY MR. STEPAN, CONTINUING:
Q What aspects of the Promenade project were design-build?
A From a mechanical electrical standpoint?
Q Are those the only two areas that were design-build, mechanical and electrical?
A Mechanical and electrical were design-build, those were two items of design-build.
Q Was all of the mechanical work on Promenade done design-build, to your understanding?



A Yes, it was all design-build.
Q Did Elness provide any specifications or parameters to the contractors as to what they were supposed to do for their design-build work, referring to the mechanical contractors?
A In this case, for mechanical and electrical, within the units themselves and within the buildings a mechanical engineer did give some outline specifications such as size of furnaces, where electrical was located, that kind of thing.
Q How about with regard to work in the courtyards?
A No, they were not responsible for any of that.
Q There was no specifications from Elness given to the contractors concerning the work in the courtyards?
A Not that I recall, no.
Q How did the contractors know what they were supposed to do?
A As I said, the contractor was responsible for designing the courtyard grading, drainage, installation, and waterproofing.
Q Now that was somehow going to have to be incorporated with the buildings around the courtyard, wasn't it?
A Yes.

COPY



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL FILE NO.: 00-CV-987 JEL/JGL

---

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * * *

DEPOSITION OF: JON CAMAYA, VOLUME II OF II
TAKEN ON: THURSDAY, MAY 9, 2003
COMMENCING AT: 9:00 A.M.

* * * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586



and

Colloid Environmental Technologies, Co.,

Fourth-Party Plaintiff,

v.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

v.

Mikesh, Inc.,

Fourth-Party Defendant.

-----------------------------

EXHIBIT F



NOTES

Page Line



APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 - 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Company.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO BRISBOIS, Esq., Stich, Angell & Kreidler, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared via speakerphone representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE L. HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant and Fourth-Party Plaintiff J-Berd Mechanical Contractors, Inc.

BRIAN BAUMGARTNER, Esq., Baumgartner Law Office, LLP, 3320 West Owasso Boulevard, Shoreview, MN 55126, appeared via speakerphone representing Fourth-Party Defendant Mikesh, Inc.

LORI SEMKE, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, mn 55402-2440, appeared via speakerphone representing Defendant Promenade Village Townhomes, LLC.

CHRISTOPHER MALONE, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared via speakerphone representing Westfield Insurance Company.

polyethylene panels.
Q (By Mr. Hull.) What type was used at the Promenade?
A **I believe it was the type that was laminated to a high density polyethylene panel.**
Q Now, Israel Berger's task at the Promenade project was to evaluate and verify the existing conditions of the below grade waterproofing in the courtyards, is that right?
A **That's correct.**
Q Did you believe that you had sufficient background and experience to perform that work?
A **Yes.**
Q Before you went out to that project, you received a disclosure report that we talked about yesterday that was marked as Exhibit 540, is that correct?
A **Yes.**
Q Now, I think that you had testified that the Promenade Oaks Pending Litigation and Disclosure form document that you got was different than Exhibit 540. Was that your testimony?
A **That's correct.**
MR. REILLY: I'll object to the form of the question as inconsistent with his prior testimony. His prior testimony was that it was the same document only less pages and didn't include as much, is my recollection of his testimony.



Q (By Mr. Hull.) Okay. Is that correct?
A **That's correct.**
Q Same document, but included less pages?
A **Correct, to my recollection.**
Q Okay. And I believe your testimony was that there were certain exhibits attached to the end of the report that were not included in yours, is that correct?
A **That's correct.**
Q And can you tell me again what those were?
A **I don't recall the appendices in the rear of the report.**
Q Can I see that for just a second?
A **Sure.**
Q Did the Pending Litigation and Disclosure report that you received include any recommendations?
A **In 540?**
Q Yes.
A **No, not that I recall.**
Q Then the other thing you indicated you received were some drawings, is that right?
A **That's correct.**
Q Did you have anything else before you went out there to the site, for your initial site visit?
A **Other than the disclosure and the drawings?**
Q Yes.
A **No.**



Q You indicated at some point you got this Waterproofing Investigation Report from Inspec, is that correct?
A **Yes.**
Q Do you recall when that was?
A **It may have been at the same time I received the disclosure report, but I don't recall exactly when I got it.**
Q All right. And let me show you what we've marked as Exhibit 545, which is the Waterproofing Investigation Report by Inspec, and I think you testified yesterday that the report you got had fewer pages than Exhibit 545, is that correct?
A **That's correct.**
Q And where did the report you received leave off?
A **I don't recall --**
MR. STEPAN: Asked and answered.
Q (By Mr. Hull.) Go ahead.
A **I don't recall seeing Recommendations or Cost Estimates, the back end of that report.**
Q So when you went out there, had you seen any recommendations for remedial work that anyone else had prepared?
A **No. Anyone else? No.**
Q Was it your understanding that you were charged with the responsibility of conducting an independent investigation



and coming up with your own recommendations and conclusions?
A **Yes.**
Q Do you recall how many pages of drawings you actually got?
A **No, I don't.**
Q The report that you did contained copies of two details from the drawings, which would be pages 6 of 19 and 7 of 19 in your report, and I just want to see if you can tell me where you got those from. I'm going to show you what's been marked as Exhibit 34, which is a set of drawings, and I'll direct your attention to page A5.1. Was that the source of the drawings that are incorporated in your report?
A **Yes. It looks like the details of the sections.**
Q Do you recall reviewing the notes on that page prior to the time you went out to the Promenade Oaks apartment project?
A **Yes.**
Q Did you happen to notice note 3a?
A **Yes.**
Q Were you aware at the time you went out there that this was a design-build waterproofing system by the general contractor?
A **No.**
Q Was the first time you learned that yesterday while you

were testifying here?
A **Yes.**
Q Does design-build have a particular meaning in the construction industry that you are aware of?
A **Yes. It's usually fast-tracked. It's usually equated with the term in-house; the same entity that designs also includes the same entity that builds.**
Q Have you been involved in any design-build projects before?
A **Not that I'm aware of.**
Q All right. So you went out to the project for a site visit and you were there one day?
A **Do you still want these?**
Q You can roll those up. You were at the project for one day, is that correct?
A **Yes.**
Q And you testified that you observed a number of excavations, is that right?
A **Yes.**
Q I think you referred to those as probes, is that correct?
A **Correct.**
Q And two of those excavations were near patio slabs, is that right?
A **Yes.**
Q I want you to focus on the first of those patio slab



excavations that you observed and I want you to tell me what you saw?
A **The first probe was approximately two-by-two, or two and a half by two and a half, dug deep enough to be able to view the bottom of the wooden post through the concrete slab and to show the plate that it rested on on the deck.**
Q Did you make any other observations from that first excavation?
A **Other than that the post was not in contact, directly in contact with the waterproofing and the deck, no.**
Q Post not in contact with the waterproofing?
A **Correct.**
Q Can you explain that a little more for me? I'm having trouble visualizing that, because the post -- was the post resting on the deck?
A **Not directly on the deck.**
Q What was it resting on?
A **It was resting on a plate.**
Q Can you describe what this plate looked like?
A **It resembled a section of insulation cut in rectangular form set underneath the base of the column. It was covered in mud, so it was difficult to determine exactly what the product was, but the way it was described was a post floating.**
Q How thick was this plate that it was resting on?



A **I'd say approximately two inches, from what I could see.**
Q Did anyone say anything to you about that while you were observing the excavation?
A **The gentleman that provided the progress photos described it as a post floating.**
Q Were there any other comments made as you were observing this initial excavation?
A **Other than it was described as part of a remedial repair, no.**
Q And did you discern any waterproofing at all either around the post or around this plate?
A **It was very difficult because of the amount of water and the mud. No. There was no clear view.**
Q You had described for us yesterday, or you identified for us some people that were there and you said there was a representative from the building?
A **Right.**
Q There was Mr. Campbell, is that right?
A **Right.**
Q Mr. Vanderberg?
A **Right.**
Q Yourself?
A **Right.**
Q Anybody else? Oh, Mr. Charbonea?
A **Right.**



Q Anybody else?
A **The workmen.**
Q Who were, you understood to be, employees of Mr. Charbonea's?
A **That's correct.**
Q Did you form any impressions from viewing that first excavation?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Objection, vague.
MS. HEYER: Objection, vague.
THE WITNESS: I don't understand what you mean by impression.
Q (By Mr. Hull.) Did you form any opinions about the waterproofing?
MR. REILLY: Objection, lack of foundation.
MR. VEITH: Objection, foundation.
THE WITNESS: Since the post was floating on the slab, it indicated to me that, in addition to the information that was part of remedial repair, that was a solution, not to have the wood post in direct contact with the deck through the waterproofing.
Q (By Mr. Hull.) Okay. You concluded, it was your opinion that the repair works was intended to keep the post from

COPY

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: MARK R. CHAUVIN
TAKEN ON: MONDAY, NOVEMBER 10, 2003
COMMENCING AT: 9:00 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562

2

and

Colloid Environmental Technologies Co.,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

3

NOTES

Page Line

4

APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Co.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

STACEY SEVER, Esq., Stich, Angell, Kreidler & Dodge, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant J-Berd Mechanical Contractors, Inc.

STEVEN GASKINS, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, MN 55402-2440, appeared representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared representing Westfield Insurance Company.

**be more of a legal issue and a legal interpretation of the phrase design-build and the wording of the contract and -- so no, we elected not to provide a summary or a letter or anything describing our view of that, of the contract.**

Q And does that answer, then, pertain to the last sentence of the third bullet point, which says, "MRC should review various information"?

A **Yes. Rich asked me to just dig through the file, pull that out and send him a copy of it because he had not seen it. At least I don't believe he had seen it. And then I believe we ended up receiving additional copies at or around that same time anyways.**

Q And the last bullet point is just another way of referring to the same issue; is that right?

A **Essentially, yes.**

Q And this is the last question. On page 3 of your final report, you have a topic headline Waterproofing System?

A **Yes.**

Q Now, where you say in the second sentence, "The selected system reportedly consisted of a Volclay Swelltite composite bentonite membrane," and goes on with some other points, when you say reportedly, what do you mean by that?

A **Essentially just that at that point I hadn't seen it yet and everything I had been -- everything I had reviewed**



**was that which had been reported by others in the way of Inspec, so it's essentially just a way of saying that because I couldn't positively identify it because I had never seen it at that time.**

Q Now that your investigation is completed and you're sitting here giving your deposition today, do you identify the same elements as being what makes up the waterproofing system as you've identified on page 3 of your report?

A **Yes.**

MR. BROWN: That's all I have. Thanks, sir.

MR. HULL: Want to take a break or go ahead?

MR. STEPAN: I'm fine.

THE WITNESS: I'm fine.

EXAMINATION

BY MR. HULL:

Q Mr. Chauvin, my name is Bill Hull and I'm going to have a few questions for you. Take a look, if you would, I think you've got in front of you some exhibits we previously marked, Exhibit 823, if you would? This is what it looks like. (Indicating.)

A **Okay.**

Q Should be three of them. Maybe I can give you that.

A **Thanks.**



Q Take a look at 823 there, if you would?

A **Okay.**

Q What is that?

A **It's a phone memo that I typed up when I was initially contacted by Mr. Stepan in regards to this project and our potential involvement.**

Q So you were the first contact at Wiss, Janney?

A **Yes.**

Q And you issued a report, then, on May 31st, 2002; is that correct?

A **Yes.**

Q So you essentially had from April 11th to May 31st to conduct your investigation and come up with your opinions; is that right?

A **Well, in a sense. We also conducted an investigation and formed opinions and work that was performed subsequent to May 31st. But at the time our report was issued, additional work such as was performed wasn't necessarily guaranteed.**

Q And did you feel that you needed to do any additional investigation prior to issuing your May 31st, 2002 report in order to do an adequate job?

A **No.**

Q And have your opinions changed from the time the May 31st, 2002 report was issued?



A **No.**

Q Now, you learned at some point in this investigation process and prior to issuing your May 31st, 2002 report that the plaza waterproofing system was a design-build system; is that right?

A **My understanding is that the courtyard waterproofing was, yes, a design-build system.**

Q And that means that the party that had the responsibility for -- that one party had the responsibility for both the design and the construction and installation of that waterproofing system; isn't that right?

MR. STEPAN: Objection to the form, foundation, calls for a legal conclusion.

MR. BROWN: Object to form.

THE WITNESS: Yes. I think my interpretation of that is that yes, the selected subcontractor would be responsible for the design and installation of the waterproofing.

Q (By Mr. Hull.) Now, one of the documents you reviewed in coming up with your final report were the project design drawings; is that correct?

A **Correct.**

Q Now, did you notice on there that they designated the plaza waterproofing system as a design-build component of the project?

A **Yes.**
Q And so you wouldn't expect, then, to find information about plaza waterproofing on those architectural drawings, would you?
MR. STEPAN: Objection, lack of foundation.
THE WITNESS: Not necessarily, no.
Q (By Mr. Hull.) Okay. Well, explain to me why you would expect, then, to find architectural drawing information about waterproofing if someone else was responsible for designing and installing that system?
A **Well, I think frequently guidelines can be given even if it is a design-build project that it may have to meet certain performance criteria or performance specifications that are provided that I guess contain the limits of the possible options for that design-build system and its subsequent forms, and so I think it varies depending on the particular project.**
Q Would those be design criteria?
A **They could be.**
MR. STEPAN: Objection, vague.
Q (By Mr. Hull.) And tell me what you would mean by design criteria? Give me an example of what that would entail?
A **Could be --**
MR. STEPAN: Objection, vague, lack of



foundation.
THE WITNESS: It could be performance criteria or material limitations, certain systems that are either prohibited or recommended.
Q (By Mr. Hull.) Now, you didn't see any limitations on the type of waterproofing systems that could be used for the courtyards in the project drawings or specifications, did you?
A **No, I did not.**
Q Did you ever see any design drawings of the waterproofing system?
A **No, I did not.**
Q Did you ever see any specifications for the courtyard waterproofing system?
A **I do not believe there were any, but no, I did not.**
Q Now, the purpose of that courtyard waterproofing system was to make sure that the water that entered the courtyard would not enter the building or the garages; isn't that right?
MR. BROWN: Objection.
THE WITNESS: I believe so, yes.
Q (By Mr. Hull.) And so under a design-build contract, the party that was responsible for designing and installing that courtyard system would be responsible for making sure that the water entering the plaza didn't enter the



building or the garages; isn't that right?
MR. STEPAN: Objection to the form, foundation, calls for a legal conclusion.
MR. REILLY: Also assuming facts not in evidence.
THE WITNESS: Yes.
Q (By Mr. Hull.) You have mentioned during your testimony that gutters would have been a good idea?
A **Uh-huh.**
Q Now, is it your opinion that the plazas could not be waterproofed unless there were gutters?
A **No.**
Q They could still be waterproofed even if there weren't gutters; isn't that right?
A **Yes.**
Q And those canopy posts that you talked about, I think you indicated that there was a problem with those that they may contribute to the water leaks there; is that right?
A **Yes.**
Q Did you, by the way, ever see any design details for waterproofing the canopy posts?
A **Aside from the RFI which was previously discussed, no.**
Q Okay. Dealing with those canopy posts, however, was an important part of having a waterproofing system that worked; isn't it?



MR. STEPAN: Objection as to form, vague.
THE WITNESS: I believe any opening or penetration in the waterproofing system is a critical detail, yes.
Q (By Mr. Hull.) So you would expect the person or the party that's responsible for the design and installation of the waterproofing system to at least be consulted about a construction component like that; wouldn't you?
MR. STEPAN: Objection as to form, foundation.
MR. REILLY: Assumes facts not in evidence.
THE WITNESS: Possibly, yes.
Q (By Mr. Hull.) You were asked some questions about the links, and there are links between I believe Buildings 1 and 2 and 4 and 5; is that right?
A **Sounds correct to me.**
Q And those links butt up against the end of plazas for those buildings; isn't that right?
A **Yes.**
Q So for example, the link between 4 and 5 would have the plazas for Buildings 4 and 5 butting up against it; is that right?
A **Yes.**
Q And you didn't -- did I understand your testimony that you

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

-----------------------------------

Westfield Insurance Company,

Plaintiff,

vs. Civil File No. 00-CV-987-PAM/JGL

Weis Builders, Inc.,
Promenade Village Townhomes, L.L.C.,
Healy Ramme Company, and
Valley Forge Insurance Company,
one of the CAN Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and
BRW Elness Architects, Inc., n/k/a
Elness Swenson Graham Architects, Inc.,
and Colloid Environmental Technologies
Company,

Third-Party Defendants.

-----------------------------------

The Deposition of JOHN RICHARD WIEGAND, taken pursuant to Notice of Taking Deposition, taken before Barbara F. Schwegman, a Notary Public in and for the County of Washington, State of Minnesota, taken on the 21st day of May, 2002, at 200 Riverview Office Tower, 8009 34th Avenue South, Minneapolis, Minnesota, commencing at approximately 9:38 a.m.



APPEARANCES:

ANDREA E. REISBORD, ESQUIRE, of the Law Firm of COUSINEAU, McGUIRE, ANDERSON, CHARTERED, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, Minnesota, 55416-5318, appeared for and on behalf of Plaintiff, Westfield Insurance Company.

CHAD J. STEPAN, ESQUIRE, of the Law Firm of MEAGHER & GEER, PLLP, 4200 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota, 55402-3788, appeared for and on behalf of Defendant and Third-Party Plaintiff, Weis Builders, Inc.

STEVEN E. RAU, ESQUIRE, of the Law Firm of FLYNN, GASKINS & BENNETT, LLP, 333 South Seventh Street, Suite 2900, Minneapolis, Minnesota, 55402, appeared for and on behalf of Defendants, Promenade Village Townhomes, LLC and Healy Ramme Company.

LEO I. BRISBOIS, ESQUIRE, of the Law Firm of STICH, ANGELL & KREIDLER, P.A., The Crossings, Suite 120, 250 Second Avenue South, Minneapolis, Minnesota, 55401, appeared for and on behalf of Defendant, Valley Forge Insurance Company.

MARK S. BROWN, ESQUIRE, of the Law Firm of MURNANE, CONLIN, WHITE & BRANDT, P.A., 444 Cedar Street, Suite 1800, Saint Paul, Minnesota, 55101, appeared for and on behalf of Third-Party Defendant, Waterproofing By Experts, Inc.

WILLIAM D. HULL, ESQUIRE, of the Law Firm of COLEMAN, HULL & VAN VLIET, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, Minnesota, 55437, appeared for and on behalf of Third-Party Defendant, BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.



APPEARANCES:

PATRICK D. REILLY, ESQUIRE, of the Law Firm of ERSTAD & RIEMER, P.A., 200 Riverview Office Tower, 8009 34th Avenue South, Minneapolis, Minnesota, 55425, appeared for and on behalf of Third-Party Defendant, Colloid Environmental Technologies Company.

*The Original is in the possession of Attorney William D. Hull.*

INDEX


| | Page |
|---|---|
| JOHN RICHARD WIEGAND | |
| Cross-examination by Mr. Hull | 4 |
| Cross-examination by Mr. Rau | 86 |
| Cross-examination by Mr. Stepan | 107 |
| Cross-examination by Mr. Brown | 181 |
| Recross-examination by Mr. Hull | 231 |
| Recross-examination by Mr. Stepan | 236 |
| Recross-examination by Mr. Brown | 241 |
| Cross-examination by Mr. Brisbois | 244 |
| Cross-examination by Ms. Reisbord | 248 |
| Continued recross-examination by Mr. Hull | 250 |
| Continued recross-examination by Mr. Stepan | 256 |
| Continued recross-examination by Mr. Brown | 256 |

EXHIBITS

| | |
|---|---|
| Exhibit 206, Voclay Swelltite 3000 product literature | 91 |
| Exhibit 207, Voclay Swelltite product literature | 97 |
| Exhibit 208, 5-21-97, Fax to Peter regarding warranty | 114 |
| Exhibit 209, 1-8-98, Fax to Frank Varak | 122 |
| Exhibit 210, 7-25-96, Letter to Bill Becker | 124 |
| Exhibit 211, Photocopy of photograph of courtyard | 149 |
| Exhibit 212, Photocopy of photograph of entryway | 151 |
| Exhibit 213, Photocopy of photograph of exterior wall | 154 |
| Exhibit 214, Photocopy of photograph of post | 155 |
| Exhibit 215, 6-27-97, Fax to John Feges with detail | 160 |
| Exhibit 216, 7-11-97, Fax to Les Lawson with detail | 162 |
| Exhibit 217, A5.1 top bearing detail revised 9/96 | 253 |




JOHN RICHARD WIEGAND,
the Witness in the above-entitled
matter, after having been first duly
sworn, deposes and says as follows:

CROSS-EXAMINATION

BY MR. HULL:

Q. Would you please state your full name and spell your last name for us?

A. John Richard Wiegand, W-I-E-G-A-N-D.

Q. And where do you live?

A. 6739 Elliot Avenue South in Richfield.

Q. Have you ever had your deposition taken before?

A. I believe I have some time ago, yes.

Q. Well, just to refresh your memory, I'll be asking you questions. Later on, some of the other lawyers will ask you questions. The court reporter will take down those questions and your answers verbatim, so if there's any misunderstanding about the question, if it isn't clear to you, I want you to ask me to clarify it. Will you do that?

A. Yes.

Q. Where do you work?

A. I'm an independent sales rep.

Q. Now, it says you contacted Mr. Varak. I'd like to know what you said to him when you called him.
A. I explained that water was coming into the units. There was some leakage problems out there.
Q. And what did he say in response?
A. General discussion as to cause, and he said he would make arrangements to come up to the site and visit it.
Q. Now, you say "general discussion about cause." Tell me what you said and what he said.
A. I basically said water was coming into the units, and per my observation it was coming -- per my observation and from my discussions with Weis Builders it was coming through the -- right under the doorway, into the units from under the doorway.
Q. Was any other source of water infiltration discussed with Weis Builders at that time?
A. Not that I can recall.
Q. Who at Weis Builders were you having those discussions with?
A. With project superintendent Les Lawson.
Q. And did Mr. Varak, when he came to Minneapolis, agree with your observations?
A. Yes.
Q. And Mr. Lawson had made the same observations?



A. Yes.
Q. How long after you initially contacted Mr. Varak did he come to Minneapolis?
A. As I recall, it was within a week after I called him.
Q. And then did you have a meeting at the site with Mr. Varak?
A. Yes.
Q. And who else participated in that meeting?
A. The waterproofing contractor and Les Lawson.
Q. Now, you say also in paragraph 3 here that "An inspection of the threshold reveals no flashing was used under these thresholds." Was that issue discussed at that meeting with Mr. Varak, Mr. Lawson --
A. I don't recall the specific discussions, but I assume it would have been.
Q. Do you recall what was said about the absence of flashing by anyone, and I'm talking about flashing that's referred to in paragraph 3 of your --
A. Correct.
Q. -- letter under the thresholds?
A. I refer to my notes that there was not a detail for the flashing, and other than that, I don't recall any discussion about the flashing.
Q. So did Mr. Lawson blame Waterproofing By



Experts for lack of flashing at that location?
A. I don't recall.
Q. Well, it says here in your notes that "he stated the waterproofing" -- "that no detail existed because this was a design-build job"; right?
A. Yes.
Q. And Waterproofing By Experts was the design-build waterproofing contractor; isn't that correct?
A. Yes.
Q. And Mr. Lawson also said that the waterproofing design recommendations were by Waterproofing By Experts; is that right?
A. Yes.
Q. And that sounds to me like he's suggesting that Waterproofing By Experts was responsible for determining whether or not a flashing should be installed there; is that correct?
A. It would appear so.
Q. Is that your understanding --
A. Yes.
Q. -- from that meeting?
A. Yes.
MR. BROWN: I'll object as vague. Understanding that that's what Les Lawson recommended or that --



MR. REILLY: Perhaps you should clarify that, Counsel.
BY MR. HULL:
Q. Yeah. Was it your understanding that Les Lawson was saying that that was the responsibility of Waterproofing By Experts to determine if a flashing was to be installed there?
A. I don't recall it being stated that way, no.
Q. Well, in substance was that your impression of what Mr. Lawson believed?
A. I'm not sure what he believed. Basically there was no flashing, and I can't recall what the specific answer was as to why there was no flashing other than the statement that this is a design-build contract and that Waterproofing By Experts is the design-build waterproofing contractor.
Q. What does "design-build" mean to you?
A. "Design-build" is generally the project is started without complete specifications and details and that can vary, and sometimes the project is started and then later specifications for other phases of the project are later written and developed.
Q. What was your understanding of what "design-build" meant in the context of the waterproofing work on the Promenade project, waterproofing work for the

plaza areas?
A. Well, based on -- based on comments by the general contractor, again it was a design-build contract and that Waterproofing By Experts was responsible for some of the waterproofing design in the complex.
Q. And who from the general contractor made those comments?
A. I don't recall who made the comments, but I would surmise it was Les since he was the one we visited with at the meeting.
Q. And you also said that Waterproofing By Experts -- that Weis Builders stated that Waterproofing By Experts was responsible for the design of some of the waterproofing. What do you mean by "some of the waterproofing"?
A. There's also an engineer and an architect involved and a general contractor, so it's kind of a team effort.
Q. I want to focus on the plaza areas; all right?
A. Uh-huh.
Q. What was your belief as to who was responsible for determining whether or not flashing should be installed under the door thresholds where it appeared water was entering the building?
MR. REILLY: Object to the form of the



question. It assumes he had a belief, assumes facts not in evidence. You can answer.
MR. BROWN: Also I'll object that it calls for a legal conclusion.
BY MR. HULL:
Q. You can answer the question.
A. Oh, I'm sorry. Would you restate it, please?
Q. What was your belief as to who was responsible for determining whether or not flashing should be installed under the door thresholds where it appeared water was entering the building?
MR. REILLY: Same objection.
A. And again, it would be a team decision by the general, the engineer, and the waterproofing contractor.
BY MR. HULL:
Q. And what do you base that opinion on?
A. Just my experience in working on design-build contracts or projects.
Q. Did you review the contract -- subcontract agreement between Weis Builders and Waterproofing By Experts in this case?
A. No.
Q. Did you review the project specifications in this case?
A. Yes.



Q. And what did the project specifications say about flashing at that location?
A. I don't recall.
Q. Do you recall if they said anything?
A. I don't believe there were any specifications for flashing on that.
Q. Now, it says here that Mr. Varak recommended a test application of Aquaseal. Do you recall that?
A. Yes.
Q. Did that occur at that meeting? Did Mr. Varak make that recommendation --
A. Yes.
Q. -- at that meeting?
A. Yes.
Q. And as I understand it, you were there, Les Lawson was there, and Steve Messerich was there; is that right?
A. Yes. If Steve wasn't there, then Al. There was someone there from Waterproofing By Experts.
Q. Was anybody else there to your recollection?
A. You know, there could have been and I don't remember.
Q. Was there any discussion about who was going to pay for the Aquaseal product?
MR. REILLY: For the product itself?



MR. HULL: Yeah.
MR. REILLY: Okay.
A. Not that I recall.
BY MR. HULL:
Q. Was there any discussion about who was going to perform the labor?
A. Yes.
Q. And who was that going to be?
A. It would be Waterproofing By Experts.
Q. And was there any discussion about who was going to pay for the labor?
A. The initial discussion was a test sample would be installed to determine if that would resolve the problem.
Q. And was there any discussion about who would pay for that test sample?
A. We basically agreed to furnish material and Waterproofing By Experts would install it.
Q. There's also a reference to Mr. Varak recommending a caulking be installed between the patio slabs and the building units; is that correct?
A. Yes.
Q. Tell me what you can recall about the discussions as they relate to caulking that location.
A. Basically after inspecting the slab, the patio