**EXHIBIT INDEX TO CHAD J. STEPAN'S AFFIDAVIT IN SUPPORT OF WEIS BUILDERS' MEMORANDUM OF LAW IN OPPOSITION TO ESG'S MOTIONS IN LIMINE**

A. Report of Pope Associates dated May 30, 2002

/1162743

POPE
ASSOCIATE

Architects
Interior Designers

May 30, 2002

**MEMORANDUM**

**Re:** **Promenade Townhomes**
**PAI File No.: 52133-01015**

**Subject:** **Drawing Review Notes**

**A. Re:** **General Review Comments.**

1. **Entry Stoop Elevation,**

a. It is not totally clear from the architectural drawings whether the architect intended that the unit entry stoops be generally at the same elevation as the unit's floor level. (As will be seen below, conflicting information exists.) For the purpose of this analysis, assume unit floor slab elevation at 100'-0". Where shown at all, which is at the unit entry stoops at the non-courtyard units, the stoops are shown to be at Elevation 99'-11½", ½" below the unit floor level (see *Garage Level Floor Plan*, all buildings). I believe it would be a correct assumption that the architect intended this to be the case at the courtyard stoops as well.

b. In *Detail 1/S1.7* the structural engineer shows the unit entry stoops, again at the non-courtyard units, to be at the level of unit's floor slab. There is no structural section through any of the courtyard side unit entry stoops.

2. **Grade Level.**

a. There is a conflict in the drawings as to where the grade level in the courtyards is supposed to be located, i.e. what elevation in relation to floor level.

b. All of the courtyard elevation drawings, including the larger scale elevation drawing on A3.7, show the unit entry doors (and, therefore, the entry stoop) and the exterior grade at the same level.

EXHIBIT A

1255 Energy Park Drive
St. Paul, MN 55108-511
Phone: (651) 642-9200
Fax: (651) 642-1101
www.popearch.com

c. For the most part, the building and wall sections (See especially *Section A5.1/4*) show grade level at the courtyard side of the units to be approximately 6" below the unit's floor level, with the unit's floor level being approximately at the same level as the exterior wall's bottom plate. These details show the exterior wall's bottom plate (the horizontal wood member to which the wall's studs are attached) to be anchored to the top course of four courses of concrete masonry (4 courses @ 8" ea. = 2'-8" high) sitting on top of the precast concrete plank that forms the ceiling of the underground parking garage.

d. However, *Detail A5.1/3* shows grade to be located at the top of the concrete block foundation wall, at approximately the same level as the bottom plate of a short wood-framed wall. If the wood used is not treated lumber, the detail would not be in compliance with the Minnesota State Building Code.

e. Structural *Detail 5/S1.7* shows approximately the same 6" gap between the wood framing and grade, but architectural references on structural drawings typically have little or no value, since the workman involved with more architectural issues, such as grading, waterproofing, etc. typically have no need to refer to structural drawings.

f. The building code requires a minimum 6" gap between grade and wood construction unless the wood is treated or of a type of wood that has a natural resistance to decay. Thus the grade level shown in Section A5.1/4 shows a code compliant relationship between grade and the bottom plate. On the other hand, translating the same method of construction to the elevation drawings would indicate that the exterior wall's bottom plate would be below grade.

3. **Grading and Sidewalks.**

a. There are no drawings that I have received that depict the design of the sidewalk system within the courtyards. The closest there is are Drawings L1 and L3 (Landscape) that give only the barest hints of a sidewalk layout, with no dimensions or elevations. The Architectural drawings refer the user to the Landscape drawings for the layout of the courtyards. The civil engineering drawings only provide the elevation at the top of the garage roof precast concrete planks.

b. The Project Meeting Notes, from October 1, 1996 (Meeting #2) through May 23, 1997 (Meeting #23) indicate the need for an apparently never delivered courtyard grading layout which, presumably, would have contained a sidewalk layout as well. We have yet to see any layout of the courtyard's grading or sidewalks, other than the minimal layouts shown on the original Landscape Drawings.

4. **Construction.**

a. The first building Weis constructed was Building #6. In their construction of the courtyard area for this building and, according to Weis personnel, Weis relied upon Section A5.1/4 for the basis of establishing grade and stoop levels: at the exterior walls, grade was set approximately 8" below unit floor levels, and the stoop elevation was set at ½" below that floor level.

b. Because the stoop is sloped downward (at a 1/4" per foot slope) toward the sidewalk, at the outside edge of the stoop this would have resulted in a step, approximately 6" high, between the unit entry sidewalk and the stoop. When this was observed by the on-site architect, he informed Weis that the State's Accessibility Code did not allow a step up to a stoop. Again according to Weis personnel, the on-site architect then designed and directed the re-grading of the grade beneath the entry sidewalks in order to eliminate the step. This re-grading entailed increasing the slope of the grade along the unit entry sidewalk until the sidewalk was raised by approximately 6" at its intersection with the stoop, thereby eliminating the step. At the architect's direction, and apparently to ensure positive drainage, the grade level against the exterior wall was also raised, by approximately 8".

c. Increasing the slope of the grade along the unit entry sidewalk caused the slope of the unit entry sidewalk to exceed the 1:20 maximum slope permitted by the Accessibility Code, to which the buildings were required to comply.

d. It was this excessive sidewalk slope condition that the City Building Inspector observed and subsequently directed that, at all future buildings, the unit entry sidewalks, as well as the central longitudinal sidewalks, needed to comply with the Accessibility Code's 1:20 maximum slope requirement. The grading and sidewalk slopes at Building #6 were allowed to stand as they were.

e. Beginning at the next building constructed, Building #5, and all subsequent buildings, the grade level throughout all of the courtyards was raised by approximately 8" in order to comply with the Accessibility Code's 1:20 maximum sidewalk slope requirement and to achieve a no-step-up condition at the unit entry stoops.

5. **Effect of Raising Grades.**

Raising the grade level against the building accomplished at least the following results:

a. Depending upon whether treated lumber was used or not where it originally had not been necessary, at least at Building #6, the raising of the grade adjacent to the building created a potential code violation by putting untreated wood below grade.

b. Raising the grade left at least 8" of the existing exterior wall below grade, without the protection of a waterproofing membrane. Leakage into the units was inevitable.

c. Raising the grade caused additional costs to be incurred when, later, the waterproofing had to be extended upward to prevent water leakage.

6. **Drainage.**

a. Raising the grade level against the building did not change the overall drainage conditions in the courtyards – the slope of the grade is dictated by the slope of the stoop and sidewalk. Because of this, raising the grade against the building did little to ensure proper drainage.

b. Since apparently no additional plaza drains were installed, the overall drainage conditions were, for the most part, left unchanged.

c. We understand that courtyard drainage conditions are extremely poor, and that even light rains can result in standing water in the courts.

d. It is my understanding that the number of drains to be installed in each courtyard was established by the Owner and Architect as a part of the design/build plumbing contractor negotiations, and that the number of drains was based upon the Owner's experience at a previous, similar project ("Southwind"). It was this decision, in my opinion, that was at the basis for the drainage/slope problems that were to come. The grading of the courtyards was an engineering design problem that should have been solved prior to determining the number of plaza drains needed. Also, as the Architect, ESG had a duty to set specific criteria and standards applicable to these areas. Anything short of that would be, in my opinion, simply a guess.

**B. Drawing Comments.**

1. **Civil Engineering Drawings:**

**C-3:** Grading & Erosion Plan – Shows Garage, Courtyard and Floor Elevations of each building; no grading of any kind is shown in the Courtyards.

2. **Landscape Drawings:**

**L-1:** Landscape Plan – Shows a 1" = 50' scale layout of the overall landscape, and hints, without dimensions or grades, at the layout of the sidewalks in the courtyards. This document could not have been used for the construction of the Courtyards, in my opinion.

3. **<u>Architectural Drawings:</u>**

**A1.1a** through **A1.6a** — <u>Plans - Buildings #1 - #6:</u>

a. The "Plan at Courtyard Level" drawing for each building contains the note: "*See Landscape Drawings for Courtyard Layout*". Since the Landscape Drawings do not have such a layout, the architectural drawings are in error. In fact, no layout of the Courtyards was provided on any drawing.

b. The elevations for non-courtyard unit entry stoops is provided, at ½" below floor level;

c. The general indication of stoop configuration at each unit is provided.

**A3.1** through **A3.7** — <u>Elevations – Building #1 - #6</u>:

a. All drawings show the exterior grade level all the way up to the level of the siding – the rock-faced block called for in some section drawings is not shown or indicated in any way..

b. All main unit entry doors are shown at the same level as the grade. As such, the stoop elevation should be at, or ½" below, grade level.

c. The elevation drawings show what appears to be raised slabs at the HVAC units, but this indication could also be the bottom rail of the called-for vinyl railing. The drawing is unclear.

**A4.1 & A4.2** — <u>Building Sections:</u>

a. All drawings show the Courtyard grade to be 6" below the floor level of the units. However, none of these sections is taken through an entry doorway.

**A5.1** — <u>Wall Sections:</u>

a. <u>Detail #3:</u> Grade level is shown at approximately the same level as the bottom plate of a short wood framed wall that is on top of four courses of concrete block masonry. If the wood is not treated, this design would not be in compliance with code requirements.

b. <u>Detail #4</u>: Grade level is shown to be 6" below floor level. If the buildings had been constructed

accordingly, there would have been a 6" step up at the entry stoop, at least along the exterior wall.

c. Detail #5: The detail clearly shows the stoop to be at floor level at the non-courtyard sides of the buildings. The Structural drawings (1/S1.7) show the same condition. No details of stoops at the Courtyard sides of buildings are provided. In my opinion, the same kind of stoop detail should have been drawn for both architectural and structural drawings, for the Courtyard side of the units.

d. Detail #6: This detail contains a note regarding grade elevation: *"Grade, 6" Min. Below Sill Plate. All Block Above Grade to be Rock Faced."*

**A6.1** Details:

a. Detail #5: This detail shows various plan view configurations of the stoops.

b. Detail #6: This detail provides information regarding typical metal guardrails and handrails, but does not mention or cover vinyl railings at HVAC units.

**A7.1** Stair Sections, Elevator:

a. Details #5 and #6: These details show grade to be 6" down from the bottom plate of the wood-framed exterior wall. The bottom plate is set on top of four courses of block (4 @ 8" ea. = 2'-8") w3hich have bee laid on top of the precast concrete planks of the garage roof.

4. **Structural Drawings**

**S1.1 through S1.6** a. All structural plan views at the Courtyard level carry the same note regarding the unit entry stoops:

*"6" Conc. Slab*
*Lt. Wt. Loose Fill*
*R/W #4 @ 12" E.W. Bott.*
*12" x 12" Edge Bm 2 #5 T&B*
*on 8" C.B. Perim.*
*(Typ. All Stoops on P/C Plank.)"*

**S1.7** b. Detail #1: This detail shows similar construction to what is called for in note above, except for piers at corners instead of concrete block walls supporting the stoop slab.

c. Detail #5: Shows concrete masonry wall condition at the Courtyard; shows grade at +/- 6" below sill plate.

d. Detail #9: This detail was issued as *Drawing SK2*, issued on 11/26/96. The drawing provides a revised truss bearing detail for the Courtyard Level that reduces the number of courses of concrete block from four to three in order to accommodate a new, top-bearing condition. A wood nailer and related truss support framing is used in place of the fourth course of block.

According to the data available to me, there is no record of this detail being transmitted to Weis by the architect. In fact, the record indicates that this detail was transmitted to the architect on 11/26/96 with a request that the architect review the detail and issue it to the jobsite "as appropriate". It was only following Weis's query on this subject to the structural engineer on 12/14/96 that the structural engineer issued the detail to Weis, not the architect. No architectural details are known to have been issued as a follow-up to this structural drawing.

In my opinion, in terms of the architect's role, the architect should have, at a minimum, issued *Drawing SK2* to Weis with directions on the transmittal regarding the details for waterproofing and flashing. As a matter of proper contract administration, the architect should have issued SK2 as a Construction Change Directive and, since additional work was involved with this revision, should have also issued a Request for Proposal to cover the additional costs.

5. **Mechanical Drawings**

| | | |
|---|---|---|
| **M1.1a** | a. | A total of Five Plaza Drains shown. |
| **M1.2a** | a. | A total of Five Plaza Drains shown. |
| **M1.3a** | a. | A total of Four Plaza Drains shown. |
| **M1.4a** | a. | A total of Five Plaza Drains shown. |
| **M1.5a** | a. | A total of Five Plaza Drains shown. |
| **M1.6a** | a. | A total of Four Plaza Drains shown. |

## C. Conclusions

Based upon the information available to me, I have arrived at the following conclusions as regards the architect's performance in relation to the subject matter discussed herein:

1. In my opinion the architect did not fulfill its responsibilities to the owner and/or the project and failed to exercise reasonable care as regards the preparation of documents and the observation of construction in that, at minimum:

a. There were significant inaccuracies in the architect's documents.

b. There were omissions in the architect's documents.

c. Neither the architect nor any consultant provided a grading plan for the interior courtyards.

d. The architect failed to provide timely information to the contractor as regards the grading of the courtyards, even after several requests.

e. The architect failed to direct the contractor to raise the level of the waterproofing when he directed that the grade level be raised.

f. The architect failed to properly coordinate all aspects of the project's design.

g. The architect failed to provide waterproofing and/or flashing details in relation to Structural Drawing SK2 when that drawing was issued. In my opinion, given the underground conditions being called for, the introduction of flashings was required at this location. In my opinion this was an architectural issue that was not a part of the design/build waterproofing contract. The flashing needed to be installed during the construction of the truss and wall systems, well before the waterproofing subcontractor would have been on the job.

In addition, *Drawing SK2* was not issued as a Construction Change Directive and, therefore, was not a Contract Document upon which Weis could rely. If Drawing SK2 were a drawing formally issued by the architect, it should have been accompanied by a Request for Proposal (which was not the case) because it clearly required extra work.

The architect's failure to exercise due care caused and/or contributed to the leaks.

2. In my opinion the re-grading of the courtyard could have been designed without raising the grade, or the waterproofing, along the exterior walls of the buildings, as follows:

a. In order to comply with what appears to be the architect's design intent, and the building code, there had to be a 6" elevation difference between the stoop and the adjacent grade, at least along the courtyard side of the exterior walls of the buildings. Thus the level of the grade at these locations would be at Elevation 99'-6". That grade level would then have had to be sloped such that, at the point where the stoop met the unit's entry sidewalk, the sidewalk would be at the same elevation as the

outside edge of the stoop (for safety reasons, there should be no grade level difference between the sidewalk and its abutting grade, at least in the vicinity of the normal path of travel).

b. The maximum slope of the stoop, as allowed by the building code, is ¼" per foot. Over the 6' depth of the stoop (actually 6'-6", but these calculations are rounded off for illustrative purposes) the stoop would therefore slope downward a total of 1½", to its end point at its intersection with the unit's entry sidewalk, where it would be at Elevation 99'-10".

c. From that point the pavement's slope would be slightly altered to match the maximum slope allowed by the accessibility code as the unit entry sidewalk ran to the central, longitudinal public sidewalk that ran the length of the courtyard.

d. The maximum slope of all these sidewalks, as dictated by the accessibility code, is 1:20. For this purpose, if we assume the central sidewalk to be 4' wide and that it runs down the middle of the 30' wide courtyard, the elevation of the unit entry sidewalk along its 6'-6" length, would drop a total of approximately 4" to Elevation 99'-6".

e. Thus, by my calculations, the elevation of the grade adjacent to the intersection of the entry and central sidewalks would be exactly the same as the elevation of the grade against the building, or Elevation 99'-6". In order to achieve positive drainage away from the sidewalks and stoops, the sod areas between unit entry sidewalks would need to be lowered, and each such area would need to contain its own plaza drain.

Since only 3-5 drains were installed in the courtyard at each building, in my opinion, complete drainage of the courtyards would not be possible, if all code and design conditions were to be met. It is for that reason that I believe the architect's omission, by not providing a grading design for the courtyards, was a significant failure in his responsibility to the project.

We trust the above memorandum satisfactorily responds to the request that we review this matter. If there are any questions, or further information required, please advise.

Prepared By:

**POPE ASSOCIATES INC.**

Marshall M. Levin, A.I.A.
Director of Architecture

F:\MARSHALL\52133\01015\053002reviewmemo.doc