**EXHIBIT INDEX TO CHAD J. STEPAN'S AFFIDAVIT IN SUPPORT OF WEIS BUILDERS' MEMORANDUM OF LAW IN OPPOSITION TO PROMENADE'S MOTIONS IN LIMINE**

A. Excerpts from deposition of Thaddeus Palmer taken on April 9, 2003

/1164443

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff,

vs. Civil File No. 00-CV-987(PAM/JGL)

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.; Promenade Village Townhomes; Valley Forge Insurance Company; Colloid Environmental Technologies Company; and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.; and Mikesh, Inc.,

Fourth-Party Defendants.

---



VOLUME I

The Videotaped Deposition of THADDEUS DUDLEY PALMER, taken pursuant to Notice of Taking Deposition, taken before Barbara F. Schwegman, a Notary Public in and for the County of Washington, State of Minnesota, taken on the 9th day of April, 2003, at One McKinley Square, Boston, Massachusetts, commencing at approximately 10:08 a.m.

APPEARANCES:

ANDREA E. REISBORD, ESQUIRE, of the Law Firm of COUSINEAU, McGUIRE, ANDERSON, CHARTERED, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, Minnesota, 55416-5318, appeared for and on behalf of Plaintiff, Westfield Insurance Company.

CHAD J. STEPAN, ESQUIRE, of the Law Firm of MEAGHER & GEER, PLLP, 4200 Multifoods Tower, 33 South Sixth Street, Minneapolis, Minnesota, 55402-3788, appeared for and on behalf of Defendant and Third-Party Plaintiff, Weis Builders, Inc.

STEVE GASKINS, ESQUIRE, of the Law Firm of FLYNN, GASKINS & BENNETT, LLP, 333 South Seventh Street, Suite 2900, Minneapolis, Minnesota, 55402, appeared for and on behalf of Defendants, Promenade Village Townhomes, LLC and Healey Ramme Company.

LEO I. BRISBOIS, ESQUIRE, of the Law Firm of STICH, ANGELL & KREIDLER, P.A., The Crossings, Suite 120, 250 Second Avenue South, Minneapolis, Minnesota, 55401, appeared for and on behalf of Defendant, Valley Forge Insurance Company.

EXHIBIT A



APPEARANCES:

MARK S. BROWN, ESQUIRE, of the Law Firm of IVERSON REUVERS, 8585 West 78th Street, Suite 230, Bloomington, Minnesota, 55438, appeared for and on behalf of Third-Party Defendants, Waterproofing By Experts, Inc.

WILLIAM D. HULL, ESQUIRE, of the Law Firm of COLEMAN, HULL & VAN VLIET, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, Minnesota, 55437, appeared for and on behalf of Third-Party Defendant, BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.

CHANDELLE L. HEYER, ESQUIRE, of the Law Firm of TOMSCHE, SONNESYN & TOMSCHE, P.A., 610 Ottawa Avenue North, Minneapolis, Minnesota, 55422, appeared for and on behalf of Third-Party Defendant, J-Berd Mechanical Contractors, Inc.

PATRICK D. REILLY, ESQUIRE, of the Law Firm of ERSTAD & RIEMER, P.A., 200 Riverview Office Tower, 8009 34th Avenue South, Minneapolis, Minnesota, 55425, appeared for and on behalf of Third-Party Defendant and Fourth-Party Plaintiff, Colloid Environmental Technologies Company.

G. JOHN VEITH, ESQUIRE, of the Law Firm of BROWN & CARLSON, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, Minnesota, 55416, appeared for and on behalf of Fourth-Party Defendant, Chris Craft Industrial Products, Inc.

BRIAN BAUMGARTNER, ESQUIRE, of the BAUMGARTNER LAW OFFICE, PLLC, 3320 West Owasso Boulevard, Shoreview, Minnesota, 55126, appeared for and on behalf of Fourth-Party Defendant, Mikesh, Inc.

JOSEPH G. SPRINGER, ESQUIRE, of the Law Firm of FREDRIKSON & BYRON, P.A., 4000 Pillsbury Center, 200 South Sixth Street, Minneapolis, Minnesota, 55402-1425, appeared for and on behalf of General Investment & Development Company.



APPEARANCES:

TIMOTHY J. HINKLE, ESQUIRE, GENERAL INVESTMENT & DEVELOPMENT COMPANY, IN-HOUSE COUNSEL, 600 Atlantic Avenue, Suite 2000, Boston, Massachusetts, 02210, appeared for and on behalf of General Investment & Development Company

ALSO PRESENT: Jason Moschella, videographer

*The Original is in the possession of Attorney William D. Hull.*

INDEX


| | Page |
|---|---|
| THADDEUS DUDLEY PALMER | |
| Cross-examination by Mr. Hull | 8 |
| Cross-examination by Mr. Reilly | 169 |


EXHIBITS


| | |
|---|---|
| Exhibit 539, 9-18-02, Brokerage package from Mr. Jaffe | 14 |
| Exhibit 540, 9-18-02, Pending Litigation and Disclosure | 22 |
| Exhibit 541, 7-25-02, Mold survey letter to Mr. Nelson | 38 |
| Exhibit 542, Executive Summary | 44 |
| Exhibit 543, 10-24-02, Offer letter to Mr. Jaffe | 76 |
| Exhibit 544, 10-25-02, Letter to Windsor Realty Fund | 78 |
| Exhibit 545, 5-1-02, Inspec Waterproofing report | 84 |
| Exhibit 546, 11-6-02, Criterium Engineers report | 87 |
| Exhibit 547, 11-12-02, Memo to Scott Vanderburg | 110 |
| Exhibit 548, 11-17-02, E-mail from Scott Vanderburg | 112 |
| Exhibit 549, 11-20-02, E-mail from Bob Tarasov | 118 |

Page 149

BY MR. HULL:
Q. All right. Let's go back to your memo. At one point you indicate that you had successfully negotiated the transaction to a $24.5 million purchase price with an additional $3 million payment made after three years. Now, how did you get from the 30 million in cash to there? Was there any consideration given to items other than the plaza waterproofing issues in this litigation?
A. Again, underwriting requires constant manipulation of the different amounts of data coming from the different groups that report to me on an acquisition. At the -- at the time, whatever had been given to me was encompassed in valuing it at 24.5 with a $3 million holdback. Additional data must have come in in order for me to change from there.
Q. Okay.
A. It comes in constantly.
Q. But at this point, at the point you were at 24.5 million with a $3 million holdback, that was based on all the information you had at that time, part of which was the litigation and the plaza waterproofing problems?
A. Right.
Q. Okay. Now, you indicate here that upon further due diligence, GID determined that the property was overcharging for utility reimbursement and that the current

Page 150

market structure would not hold in the current economic environment, and that led to a further reduction in the price; is that right?
A. That's what -- yes.
Q. Now, that further reduction down to 24 million with a $2 million holdback was based on something other than the plaza waterproofing issues and this litigation; isn't that right?
A. Yes.
Q. Okay. Now, in the last -- second to the last sentence of that second paragraph from the bottom, you refer to a $24 million purchase price and a $2 million additional payment. Were -- were you anticipating that you would be paying something close to $2 million at the end of three years?
A. No. That was a structure. I meant to substitute for "additional payment" the word -- the -- as in the holdback. I'd say a $24 million purchase price and a $2 million holdback which would be payable in year three. It's the -- just a modification of the terms that had been consistently discussed throughout the deal.
Q. All right. And then you go on to attach a present value of 25.4 million to that; is that correct?
A. Right.
Q. Now, aside from this litigation, I mean, isn't

Page 151

it true that you would expect to have heard about claims from tenants arising prior to the sale by now since --
A. Excuse me.
Q. -- five months after the sale?
A. Is it true that I would --
Q. Wouldn't you have expected to have heard about any claims the tenants had by now?
A. I have no expectation in that regard. They have as long as they have the legal right to make claims.
MR. BROWN: I'm going to object to that as nonresponsive.
BY MR. HULL:
Q. Well, you've been in this business for a long time. You're talking about tenants that would have had claims that existed prior to December of last year. I mean, based on your experience, don't you expect those people to notify the management company and the owner pretty promptly after they discover they have a claim?
MR. GASKINS: Objection, asked and answered.
MR. SPRINGER: Objection, asked and answered.
BY MR. HULL:
Q. You can answer that.
A. I have -- not being an attorney dealing with

Page 152

claims specifically on the property and being specifically involved in the acquisition and then moving onto acquisition of additional assets and not being in management, I would have, you know, no qualified opinion as to how long or how frequently people will give claims at properties.
Q. Who would you at GID think would have knowledge about what claims, you know, are likely to be made in acquisitions?
A. Legal counsel was involved in this transaction from the git-go and was advising me that I would --
MR. SPRINGER: Wait. I'm going to object on the attorney-client privilege. I'm going to instruct you not to answer the rest of that.
BY MR. HULL:
Q. Well, let me ask you this: Are you telling me that your legal counsel based on his experience in handling claims on other acquisitions would have knowledge about the likely -- likelihood of claims arising out of this transaction?
MR. SPRINGER: Objection, lack of foundation. You can answer that question only to the extent that you have a knowledge of that answer other than anything that your counsel has told you.
MR. GASKINS: I'll join in the