**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Westfield Insurance Company,

Civil File No.: 00-CV-987 JNE/JSM

Plaintiff,

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Counter-Claimant,

vs.

Westfield Insurance Company,

Counter-Defendant,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Promenade Village Townhomes, L.L.C. and Valley Forge Insurance Company,

Third-Party Defendants,

**CETCO'S RESPONSE TO J-BERD'S MOTIONS TO EXCLUDE SCHUH'S OPINIONS AND REFERENCE TO STANDING WATER ON TOP OF THE MEMBRANE**

and

Weis Builders, Inc.,

Cross-Claimant,

vs.

Promenade Village Townhomes and
Valley Forge Insurance Company,

Cross-Defendants,

and

Promenade Village Townhomes, L.L.C.,

Cross-Claimant,

vs.

Weis Builders, Inc.,

Cross-Defendant,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc.; BRW
Elness Architects, Inc., n/k/a Elness
Swenson Graham Architects, Inc., and
Colloid Environmental Technologies
Company,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant.

---

## INTRODUCTION

______Colloid Environmental Technologies Company ("CETCO") opposes J-Berd's motions to exclude reference to the amount of water on top of the membrane and to exclude the opinions of Jeffery Schuh.

## ARGUMENT

### I. THE OPINIONS OF JEFFERY SCHUH ARE ADMISSIBLE.

J-Berd asserts that Jeffery Schuh's opinions are not relevant to the issues involved in this case. In support for this contention, J-Berd asserts that Schuh cannot identify the cause of any of the leaks. Schuh was not retained to identify the cause of specific leaks. It was his charge to render opinions on the design of the drainage system at the Promenade as well as the system's ability or inability to effectively dispose of water within the courtyards. There is credible evidence that the courtyards did not have drainage systems in place sufficient to dispose of water introduced to them. It is anticipated that there will be proof that water was able to enter the building at the thresholds of the apartments which adjoin the courtyards. Therefore, Schuh's opinions that the design of the drainage system contributed to the water ponding at or near the

level of these thresholds are entirely relevant. Simply because Schuh does not render an opinion on the ultimate issue of the cause of the leaks does not render his related opinions irrelevant.

J-Berd also alleges that Schuh's opinions do not satisfy the standards set forth under *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) for admission of scientific evidence. *Daubert's* criteria consist of the following: Whether a theory or technique . . . can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; and whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id.* at 593-94.

J-Berd is critical of the supposed lack of standards utilized by Schuh. This criticism is without merit. To the contrary, he provides specific standards used in his analysis and provides testimony that the standards are routinely accepted and relied upon by other engineers in the industry. The standards are specific: "Underground pipe systems are designed to convey storm water runoff from a 10-year storm event without ponding at the ground surface." (Exhibit A, p. 2) Additionally, he cites: "The water level adjacent to inhabitable structures should be at least 1 foot below the lowest entry point for the runoff from the 100-year storm event." *Id.* Schuh's standards are plainly specific and easily ascertainable. This prong of the *Daubert* test is satisfied. *Id.* at 594.

J-Berd also takes issue with many of Schuh's opinions by claiming that he does not have sufficient data to support his opinions and that his opinions have not been sufficiently tested. Schuh utilizes weather data obtained from the National Oceanic and Atmospheric Administration, National Climatic Data Center, which provides daily and hourly rainfall amounts

for the Minneapolis/St. Paul International Airport, located near Eagan, Minnesota. (Exhibit A, p. 15) This data is used to identify the amount of rainfall occurring during various points in time at the Promenade. No party in this case has disclosed information establishing more precisely the amount of rainfall at the Promenade on any given day during the time leaks were experienced. The rainfall information relied upon by Schuh is certainly from a reliable source and is the most accurate estimate of actual rainfall amounts at the Promenade.

Furthermore, Schuh devotes numerous pages in his report to the detailed description of his on-site investigations. These investigations include a field analysis of the construction of the drainage system, a geotechnical investigation of the soils in the courtyards, and a hydrologic investigation of the movement and location of water introduced to the courtyards and drainage system. *Daubert's* requirement that the opinions be tested is met here. *Id.*

J-Berd further attacks Schuh's opinions because he is "unable to comment on what the effect would be if different soil were in the courtyards." (J-Berd memorandum, p. 13) This is baseless criticism because the performance of the drainage system under different soil conditions is entirely irrelevant to the case at bar. Obviously, in order to analyze drainage issues in the courtyards, an analysis of the soils actually present must be done. Schuh did this. Analysis of drainage effects in the event different soils were present would be a waste of time because of its lack of relevance to the issues in this case.

Schuh renders his opinions based on rainfall information gathered from a reliable source, in addition to careful on-site investigation of the courtyard construction, soil composition, and hydrological effects. The bulk of J-Berd's criticism of Schuh's opinions appears to be founded on the fact that he was not present at the Promenade when leaks were actually occurring. From

this, J-Berd argues that Schuh therefore cannot render opinions on the drainage system because he has not duplicated the exact conditions present at the Promenade when leaks were occurring. Schuh uses scientifically appropriate methods to determine the effects of storms of various severities. He has determined the watershed area, slopes, soil conditions, drain capacity, etc. He then uses the weather records to ascertain the amount and speed of rainfall of a particular storm. With this information he has the ability to determine the amount of ponding that will result. Simply because an expert is not present at the time an event occurs is not grounds upon which to exclude his or her opinions.

J-Berd also seeks to exclude Schuh's opinion that continued water seepage is expected at Promenade. While Schuh does render such an opinion, it is founded on sufficient data and investigation as outlined above. J-Berd argues that the opinion should be excluded because Schuh cannot identify the cause or source of the leaks. Schuh was not retained to identify the definitive cause or source of the leaks. Schuh's report states as much: "The purpose of this study was to determine if the site/civil design and construction of the courtyard and its drainage system was adequate to properly convey runoff away from the townhomes such that seepage and the resulting damage would not occur." (Exhibit A, p. 1) He was retained to analyze the design of the drainage system and its impact on the potential for water seepage into Promenade garages and living units. His investigations conclude that if rainfall occurs in sufficient amounts, given the soil make-up and construction of the courtyards, water cannot be removed from the courtyards at a rate sufficient to eliminate the possibility of ponding or water levels reaching a point where moisture can seep into living units. Schuh identifies potential (not definitive) leak sources. His opinions in this regard are therefore admissible.

## II. THE PARTIES CAN ARGUE THE EXTENT TO WHICH STANDING WATER ON TOP OF THE MEMBRANE EXISTED.

J-Berd seeks to preclude the parties from arguing that varying amounts of water were present on top of the waterproofing membrane at any given time. This is a fact question that must be decided by the jury and is not the proper subject of a motion in limine.

J-Berd points out that numerous people observed the existence of water at the bottom of holes dug in the courtyards. J-Berd takes issue, however, with the precise depth of the water at any given time. Allegedly, it was sometimes more than two inches, sometimes less. Precision-like measurement of the depth of the water is not at issue. The important fact that even J-Berd's memorandum identifies is that virtually all of the individuals witnessing holes dug to the bottom of the courtyards saw water at the bottom. The fact that numerous individuals all observed water at the bottom of the holes certainly gives rise to a reasonable inference that water was present on top of the membrane at any given time.

There is clearly a fact dispute regarding the existence, depth and frequency of standing water on top of the membrane. J-Berd agrees in its memorandum. (J-Berd's memorandum, p. 5) Simply because there is dispute over these issues does not mean that the parties adverse to J-Berd on the issue should be entirely precluded from even *arguing* its position in the first place. J-Berd's motion asks the Court to do this. CETCO and other parties should be allowed to present all of its evidence on the existence of water on top of the membrane. J-Berd will likewise have a full opportunity to cross-examine that evidence and put on its own evidence to counter these assertions. Ultimately, this is a jury question that should not be decided by the Court in a motion in limine.

## **CONCLUSION**

Based on the foregoing, CETCO asks that the Court deny J-Berd's motions in limine.

**ERSTAD & RIEMER, P.A.**

Date: September 17, 2004

By: s/ Patrick D. Reilly
Patrick D. Reilly (#90451)
Attorneys for CETCO
200 Riverview Office Tower
8009 - 34th Avenue South
Minneapolis, MN 55425
(952) 896-3700