# EXHIBIT A

COPY



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - -

Westfield Insurance Company,
Plaintiff,
vs.
Weis Builders, Inc., Promenade Village Townhomes, LCC, Healy Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,
Defendants,
Weis Builders, Inc.,
Third-Party Plaintiff,
vs.
Waterproofing by Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,
Third-Party Defendants,
and
Colloid Environmental Technologies Company,
Third-Party Defendant,
Fourth-Party Plaintiff,
vs.
Chris Craft Industrial Products, Inc.,
Fourth-Party Defendant,
and
J-Berd Mechanical Contractors, Inc.,
Third-Party Defendant and
Fourth-Party Plaintiff,
vs.
Mikesh, Inc.,

Fourth Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF
GARY A. NELSON
MAY 12TH, 2003
1:00 P.M.

We cleaned it out the best we could with the rough tools, and we'd take a rag and get down on our hands and knees, and a vacuum cleaner, suck all the rubble and junk out of there, and wipe it down completely with fresh clean rags, and keep switching rags until we got the surface cleaned up enough to determine what exactly the problem was.

Q. Did you penetrate the insulation board that was above the waterproofing?

A. Yes.

Q. Did you penetrate the drain board that was above the waterproofing?

A. Yes.

Q. Did you penetrate the waterproofing membrane?

A. No.

Q. Did you have to pump -- you said you pumped some water out of there. Do you recall there being a certain level of water that was standing at the bottom of those excavations when you got down to the surface?

MS. HEYER: Object to the form of the question

BY MR. BROWN:

Q. You can answer.

A. Yes.

MR. STEPAN: Objection, misstates. Are we still on the one to be dug, or are we expanding out?

MR. BROWN: Well, I never was beyond the one he dug.

MR. STEPAN: Well, in your question you said the posts.

BY MR. BROWN:

Q. Okay then. I mean the post. We'll start there.

A. Yes.

Q. The first post you ever excavated was done by the process you just described for me a moment ago; true?

A. Yes.

Q. Now, was that the same way you excavated the post that you assisted the experts with out in the courtyard this past summer; isn't that right?

A. Right.

Q. All right. And that's the same way you excavated all the posts that were ultimately dug up and remedial work performed too?

A. Yes.

Q. Right? Okay. Now with respect to the first one, though, and then I'll ask if every one subsequent

was the same way, but with respect to the first one, you saw water standing at the bottom of that hole?
A. Yes.
Q. How deep?
A. Two inches.
Q. Did you see water standing at the bottom of the subsequent excavations around those posts?
A. Yes.
Q. How deep.
A. About two inches.
Q. Did you ever have an understanding why there was two inches of water sitting at the bottom of those excavations?
A. Yes.
Q. Why?
A. I was told that that's the way the system was designed.
Q. Okay. By whom?
A. By who told me that?
Q. Yes.
A. I believe Peter Ramme mentioned that to me once.
Q. What did you think of that design?
A. I have no opinion.
MR. HEYER: Object to that question

understand how the system worked through the installers.
Q. Did you, included in that knowledge that you learned about the waterproofing system, did you come to learn at all anything about the drain system as well; or was it the waterproofing system that you learned more about?
A. I was more up to speed on the waterproofing. A drainage system, except for the one item I mentioned, there was no real indication that there was a problem with that, so we didn't focus on those issues.
Q. You also mentioned when you were talking about some post excavation, that you observed a couple of inches of standing water in a couple of those excavations. I'm just curious as to how? Did you measure in that area to come up with the two inches, or how did you come to find out that that was about what the area of water was?
A. Well, once the drain board and the foam is cut out of there, the foam is two inches thick, the drain board is a half inch thick. The water level typically reached at least in the area of the top of the foam. Sometimes it was more, sometimes was less, depending on how much

moisture was on the plaza. If you had a dry stretch during the summer, and there was minimal use of the irrigation system; because, there again, when we were digging out those holes, we didn't want them flooding our holes. And most of the irrigation went through areas that we built -- cut, had to dig these holes. So, as long as the irrigation system was off, the plaza would get a lot dryer, there would be a lot less moisture on there than the two inches that I indicated.

Q. And you referenced earlier a conversation with, I believe you said it was Mr. Healy, about the waterproofing system that you were told that that's how -- the way the system was designed. That was in reference to, I believe, your testimony with regard to the two inches of standing water. I'm just curious; other than that comment that he told you at some point, that's the way the system was designed; did he say anything else to you during that conversation?

A. Not that I recollect. I just know it was in reference to the fact that the system was designed to be under water pressure, not

# EXHIBIT B

COPY



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: DAVID CAMPBELL (VOLUME I)
TAKEN ON: TUESDAY, AUGUST 26, 2003
COMMENCING AT: 9:15 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562



and

Colloid Environmental Technologies Co.,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

---



NOTES

Page Line



APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Co.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO I. BRISBOIS, Esq., Stich, Angell, Kreidler & Dodge, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

ROLF E. SONNESYN, Esq., and CHANDELLE L. HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant J-Berd Mechanical Contractors, Inc.

STEVEN E. RAU, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, MN 55402-2440, appeared representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared representing Westfield Insurance Company.

CAMERON BOYD, Esq., Lindquist & Vennum, 4200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402-2274, appeared representing Fourth-Party Defendant Mikesh, Inc.

ALSO PRESENT: Kris Huether, Brown & Carlson.

**topsoil. The opening at the top was usually about 36 inches by 36 inches, so that by the time the sides taper down to the bottom there's still enough area revealed to work with. There is sod, topsoil, backfill material, extruded polystyrene insulation, a drainage composite sheet, the Swelltite waterproofing membrane and structural data. That is documented in here in a detail.**

MR. RAU: When you're tapping "in here," you're referring to your report?

THE WITNESS: Excuse me. I'm referring to my report.

Q (By Mr. Veith.) Why don't you tell me about the conditions of each layer as you went down through? You know, kind of in a chronological order walk me through the excavation?

A **I'd have to refer to my report.**

Q Go ahead. Just tell me where you are so I can follow along.

A **Uh-huh. I'm looking at detail C, titled Existing Condition At Precast.**

Q Okay.

A **And also as part of the title I identify that this is typical of DTOs number 1, number 2, number 6, number 12, number 15, 17 and 20.**

Q Now, before you start, let me just ask you, do you have an



independent memory of these openings or are you relying entirely on your report for what the conditions were?

A **Probably for the most part just relying on the report, with very few exceptions. I might remember some details particular to one location, but for the most part I'd have to rely on my report. It's been too long ago.**

Q Is this detail C the only documentation you have of this destructive test opening?

A **Yes.**

Q Okay. Why don't you go ahead?

A **First we encountered sod, then earth backfill, and I noted at the time it was poorly percolating, extremely high moisture content. There is a photo number 28 to substantiate that. Next, after getting through about two feet, two and a half feet of backfill we encountered the extruded polystyrene insulation. It was pink, which tells me it was a Foamular product. I lifted up the insulation and saw that the drainage composite sheet -- the dimples of the drainage composite sheet had been driven up into the underside of the insulation by the weight of the earth.**

Q Let me just back you up for a second. When you had excavated the dirt off the top of the insulation, how big around was that hole where you --

A **The hole down at the insulation or up at the top?**



Q You still see the top surface of the insulation, but you've excavated the dirt. How big is the hole at that point?

A **Probably in the neighborhood of two feet square. We could look at a photo, photo 28.**

Q At that point, when you saw the top surface of the insulation, did you see any water in the hole?

A **Yes.**

MR. BROWN: Excuse me. Photo 28 is DTO 2, I believe?

THE WITNESS: That's right.

Q (By Mr. Veith.) I think you're actually talking about 25?

A **Yes. DTO 1, photo 25.**

Q So before you had cut into the insulation, you were already seeing water at that point, correct?

A **At DTO number 1, I can't say for sure. It appears as though that was the case since we have the wet vac hose in photo 25 down there. However, we would've had the wet vac hose down there had we encountered water just under the insulation as well, so I can't say.**

Q Would you vacuum the water out before proceeding on to the next layer or would you just keep going down?

A **No. We would definitely vacuum the water out, yes.**

Q Would the vacuum be running continuously?

A **In the case of some DTOs, it was, yes.**



Q How about this one?

A **As far as number 1 goes, I can't say for sure.**

Q After you cut through the polystyrene, or the insulation, you pulled that out, what was the next thing that you saw?

A **The drainage, or composite drainage sheet, as it's called.**

Q Did you see any water at that point?

A **Again, I would have to refer to my detail. But since I am stating this detail is typical of all those DTOs, 1, 2, 6, 12, 15, 17 and 20, all the notes on here are true of all those DTOs. I don't mention one way or another whether there was water standing on top of the insulation or not.**

Q Well, if the statements made in Drawing C are true for all of these DTOs, that doesn't make sense to me because you've got a statement here that says parts of bentonite not in contact with concrete because of undissolved film and you're talking about it lists some DTOs where you didn't find undissolved film. So that can't be true, correct?

A **Correct.**

Q So we can't take it for granted that statements made in this sheet are going to be true for each of these DTOs?

A **No. I guess you're right. I meant this to be rather typical but maybe not exactly what all those DTOs are.**

your testimony this morning you referred to an updated Patrick Engineering report?
A **That's correct.**
Q Do you have that handy?
A **Yes, I do.**
MR. SONNESYN: Off the record.
(An off the record discussion took place at this time.)
Q (By Mr. Sonnesyn.) Okay. We're back on the record. If you look at your report, which is Exhibit 790, and -- let's see if I can find it here. It's on page 2, under B, Problem Issues, item number 2? You with me?
A **Yes.**
Q It says, "The courtyard drains do not seem to be draining the volume of water that they should," and you refer to photo number 2 --
MR. REILLY: 22.
MR. SONNESYN: 22. Thank you, Pat.
Q (By Mr. Sonnesyn.) And then when I look at 22, right here, it looks dry to me. Am I interpreting that photograph correctly?
A **You are. The reason for referencing the photograph in connection with that statement was simply to show what a drain looked like.**
Q I see. Again looking at Exhibit 790, your report, page 4



under Design Errors, Subsurface Drainage, item number 1, it says, "The waterproofing membrane was flat, not sloped to the drains." Refers to without adequate slope. Do you see that?
A **Yes, I do.**
Q What is the adequate slope for this project?
A **I wasn't hired to determine that. I can't say without having time to study the situation and calculate.**
Q You concluded, though, that the slope was inadequate?
A **I concluded that slope -- there needed to be slope.**
MR. STEPAN: Rolf, just so I'm clear, what slope? Are you talking about the slope of the membrane itself?
MR. SONNESYN: Oh, okay. Let's ask Mr. Campbell.
Q (By Mr. Sonnesyn.) Again looking at Exhibit 790, when you are referring to the waterproofing membrane was flat, not sloped to the drains, what slope are you referring to?
A **The slope of the membrane itself, immaterial of what it's sitting on. The slope of the membrane impacts the effectiveness of subsurface drainage.**
Q If you look at page 5 of Exhibit 790, under subpart e, "The lowest perforations drilled into the side of the drain were two and a half inches above the waterproofing membrane, --



A **Yes.**
Q -- which means that at least two and a half inches of water will always be resting on the membrane." What is your understanding of the process that went into the decision to drill holes into the side of the drain? Do you know anything about that?
A **On this particular project?**
Q Yes.
A **No, I don't.**
Q While we're on it, Exhibit 790, a little bit further down on page 5, it refers to the newer drain pipes? Do you see that in the paragraph right below subpart f?
A **Yes.**
Q What are the newer drain pipes? What is that describing?
A **Apparently there was a repair effort made in some locations by putting perforated PVC drain pipes just a few inches below the surface in order to take some of the water away in the earth.**
Q Are you talking about the drain tile?
A **The reason why we don't use tile any longer in the industry is it's not tile, it's PVC, polyvinyl chloride. But if we say tile all the time, then people won't know whether we really mean tile, which does still exist out there as well. So it would be incorrect to call it drain tile. It's perforated PVC.**



Q Oh, it's incorrect to call it drain tile?
A **That is right.**
Q The next paragraph refers to the drains, and it says, in your opinion, may some day contribute to the overloading of the structural capacity of the precast deck as the permanent water content of the soil keeps increasing. Do you see that?
A **Yes, I do.**
Q Is that speculation on your part?
A **Purely speculation. There is a bathtub situation created. Water is being delivered to the courtyard by virtue of the roofs and by directly being rained on. However, the drains are not keeping up with the surcharge of water that's being supplied. That was confirmed in my destructive test openings by the large quantities of water I encountered at each and every opening. I think it's a reasonable assumption that given enough time, and I don't know how much time, the earth could be so completely saturated that the resultant weight might exceed the design load of the structural precast plank.**
Q Did you measure the amount of water that was -- let's see. At each DTO you found water?
A **Yes.**
Q Was there any way to measure that water?
A **Only by recollection. I could -- there were DTOs where I**

content each year." We did cover that, didn't we?
A **Yes, we did.**
Q And you concluded that that's speculation?
A **Yes.**
MR. REILLY: It's four o'clock.
MR. SONNESYN: Okay. We'll just go off the record here.
(A short recess was taken at this time.)
Q (By Mr. Sonnesyn.) I'm going to ask another general question, Mr. Campbell. You've noted some what you deemed design and installation errors in relation to the subsurface drainage system, correct?
A **Correct.**
Q And those are set forth in your report marked as Exhibit 790?
A **That's correct.**
Q Are your opinions, do you consider them to be scientific opinions?
A **Which one are you referring to?**
Q Well, under Exhibit 790, page 4, subpart E, under Design Errors, Subsurface Drainage, items 1, 2, 3, 4, carries over up to the top of page 6.
A **Number 1 is my opinion based on widely accepted design practice.**
Q All right.



MR. BROWN: I'm sorry. Which one are we looking at?
MR. RAU: Page 4.
THE WITNESS: Number 2 was my describing of a fact.
Q (By Mr. Sonnesyn.) So that's a fact, actual observation rather than an opinion?
A **Correct. The first sentence of 3 is an opinion.**
Q Is that a scientific opinion?
A **No, it is not. Subletter a is a fact, subletter b is a fact, subletter c is a fact, subletter d is a fact, subletter e is a fact, subletter f is a fact, the following paragraph after subletter f is a fact, the following paragraph is an opinion. Number 4 --**
MR. BROWN: Was that a scientific opinion?
THE WITNESS: No, it was not. Number 4 is an opinion.
Q (By Mr. Sonnesyn.) All of number 4?
A **No. Top sentence number 4 is an opinion. Subletter a of 4 is an opinion, subletter b is a combination fact and opinion depending on the sentence you're referring to, subletter c is an opinion. I'm sorry. How far were we to go?**
Q I think that was it. Now, going back to page 5 of Exhibit 790, referencing subpart f -- I'm sorry -- subpart e about



the lowest perforations drilled into the side of the drain were two and a half inches, you said obviously the fact that -- where they were drilled, that's a fact?
A **Yes.**
Q But it says, "which means that at least two and a half inches of water will always be resting on the membrane." That part is an opinion, is it not?
A **In the absence of any other design provision to evacuate water on a flat deck, how would the water escape?**
Q So it's resting there because it's flat?
A **The membrane is flat.**
Q And we're back to the sloping inadequacy?
A **That's correct.**
Q All right. You've described all of the tests that you ran, correct?
A **Correct.**
Q I want to ask you about the drains themselves because in your report you talk about replacing the drains, and I think you've got in some materials some references to -- well, let me ask you this. Is there anything wrong with the drains themselves, the selection of the drains?
A **Could you describe what portion of the drain you're talking about?**
Q The top part that you see?
MR. RAU: The surface part?



MR. SONNESYN: The surface part, yes.
THE WITNESS: Apart from the fact that the spill elevation is well above the surrounding earth, there is nothing wrong with the device itself.
Q (By Mr. Sonnesyn.) All right. And when you refer to drains that Inspec prefers, again, that's professional preference on the part of Inspec?
A **It is.**
Q Was the selection of -- the courtyard drains that were used are called a Fat Max. Are you familiar with that description?
A **I'm heard the term, but I'm not familiar.**
Q Does the Fat Max violate any code that you know of?
A **Not that I know --**
Q Or does the use of the Fat Max in this application violate any code?
A **Not being familiar with it, I can't say.**
Q Did you identify any violation of codes, plumbing or building codes, in relation to the drainage system?
A **No, I didn't.**
MR. RAU: You know, Fat Max is a term like those other kind of terms that Mr. Sonnesyn --
MR. SONNESYN: What's that now? I like it.
MR. RAU: I know.

# EXHIBIT C

COPY



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL FILE NO.: 00-CV-987 JEL/JGL

---

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: JON CAMAYA, VOLUME I OF II
TAKEN ON: THURSDAY, MAY 8, 2003
COMMENCING AT: 10:10 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586

Q So you weren't able to see underneath the drainage mat?
A Only partially.
Q Only partially?
A Right. Only partially.
Q And you didn't pull back the membrane at all?
A No. The membrane was not destroyed or disturbed. That was a point that Mr. Vanderberg stressed as well.
Q That he didn't want to cut the membrane?
A Right. Not to disturb anything or cause anything that would result in any more interior leaks or damage to the property.
Q How much water was down there, if any?
A At the drain -- at the drain, there was probably a quarter inch of water. At other probes, there were two or three inches.
Q Was the level of the water above the drainage mat?
A No. Not in the condition that I viewed. You had to pick up the drainage mat and water would rush in under it.
Q Under the drainage mat?
A Right.
Q When you were looking at this excavated pit with the surface drain, Mr. Vanderberg and Mr. Campbell were both with you at that time?
A Yes.
Q Were you taking notes as you went through?

COPY



UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL FILE NO.: 00-CV-987 JEL/JGL

---

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies, Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: JON CAMAYA, VOLUME II OF II
TAKEN ON: THURSDAY, MAY 9, 2003
COMMENCING AT: 9:00 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586

Q If I could have you turn back to page 2 of Exhibit 592?
A (Witness complies.)
Q And under your observations with regard to drainage, the little i, you observed that "The area directly below the gutterless eave is typically compacted and depressed from dripping run-off, creating a depression in the landscaping along the base of the exterior wall. This results in negative slope towards the building and a depression for water to collect." My question is -- or actually, let me just follow that up with another observation that you made before I pose a question to you. Under the next subdivision, the little subdivision ii, or the little ii, you further observed that "The runoff from the roof falls to the courtyard and is intended to be collected at the surface level drains." And I'm wondering -- my question to you is this: Do you belive that the negative slope that you observed at the site, at the point where the water runs off from the roofs, do you believe that that negative slope contributed or affects the ability of the runoff to get to the surface drains?
A Yes.
Q If you could turn to page 11 of 592, photograph 10, and under -- or next to that photograph you have some observations, and the last observation is that the lowest perforations are set above the level of the deck. I just

wanted to clarify. You perhaps already testified about this. Did you personally observe this condition at the site, that the lowest perforations are set above the level of the deck?
A In the -- in the extension, yes. You mean the perforations in the extension?
Q Correct.
A Yes.
Q Did anybody during this site visit share with you any information as to why these particular drains or drain assemblies were selected for the site?
A No. No information was given.
Q And similarly, did anybody at the site, when you were there, share with you or tell you why the perforations start two or two and a half inches above the precast plank level?
A No.
Q And if you could go to page 18 of your document, 592? And the second full paragraph, and starting the second sentence in where you talk about "The flawed installation of the assembly's components responsible for this complicated and likely compromised the system's ability to properly drain," and then you go on and delineate a number of different things with regard to the drains. And similar to the question that I posed to you earlier, one

# EXHIBIT D

COPY

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 (JEL/JGL)

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.; Promenade Village Townhomes; Valley Forge Insurance Company; Colloid Environmental Technologies Company; and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: SCOTT VANDERBURG, VOLUME I
TAKEN ON: MONDAY, JUNE 30, 2003
COMMENCING AT: 9:00 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562

2

and

Colloid Environmental Technologies Company,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.; and Mikesh, Inc.,

Fourth-Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

3

NOTES

Page Line

4

APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 - 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Company.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO BRISBOIS, Esq., Stich, Angell & Kreidler, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared via speakerphone representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE L. HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared via speakerphone representing Third-Party Defendant J-Berd Mechanical Contractors, Inc.

LORI SEMKE, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, mn 55402-2440, appeared via speakerphone representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared via speakerphone representing Westfield Insurance Company.

A **Yes, sir.**
Q Tell me what you observed?
A **The drain had filter pipe -- I'm sorry. The pipe of the drain perforated had filter fabric wrapped around it and the stone that was around the base was fairly fine. It was -- it wasn't as big as like a river stone, like I would expect, but we opened it up further to determine if -- we had to go down lower to get to the actual penetration in the bottom of the drain itself to see if moisture was going through it, through the stone, through the fabric into the drain.**
Q And did you do that?
A **Yes, sir.**
Q So you went right down to the precast?
A **Yes, sir.**
Q Did you observe any standing water at the bottom of the hole?
A **It was very dry. I mean, it was -- it comparative -- there was no standing water.**
Q Okay. You said you made a couple of observations. One was that the type was perforated. Is there any significance to that, in your mind?
A **Well, it's meant to drain. The filter fabric under most applications by manufacturers is required to go over the stone, not behind the stone, which cause it to be lesser**



**or ineffective in preventing material to get to those drain holes, and some of the fabric was saturated with small fines out of this stone that was surrounding it preventing proper design criteria for this type of drain.**
Q Now, you made some comment about most manufacturers' criteria would have the filter fabric on the outside of the stone rather than on the inside?
A **Yes, sir.**
Q How did you become familiar with the design criteria like that?
MR. STEPAN: Objection as to form, vague.
THE WITNESS: Reading many, many engineering reports and repairing drains for many years, working with manufacturers.
Q (By Mr. Hull.) Now, you also mentioned the size of the stones. What was the significance of that to you?
A **I'm used to seeing stones that are a little larger and rounder because pointed or square stones tend to be more -- they can penetrate the waterproof system itself. The weight can push the stone into it. And I'm recalling the material seemed to be a type that with any movement, it would grind on itself and break up. So I'm going off of memory on that part, but --**
Q Did you make any observations about the drain assembly itself?



A **Sure.**
Q What did you see?
A **The drains were all sitting up two or three inches above the floor of the plaza level. The bottom of the perforations weren't down on the ground, they were up above the floor.**
Q What's the significance of that?
MR. BROWN: Can I just get a clarification? Are you talking about the precast surface that they were two or three inches above?
THE WITNESS: Yes, sir.
MR. BROWN: All right. Thank you.
MR. STEPAN: Objection to the form and foundation.
MS. HEYER: Objection, foundation.
THE WITNESS: Most waterproof systems I see, the perforations in the bottom of the drain for the lower level penetration are at grade level, not above grade level, thus allowing moisture to sit above it before it could drain into it, or sit below it before it could rise high enough to get into it.
Q (By Mr. Hull.) So you have seen drain assemblies that would be at the level of the precast rather than above it?
A **I have seen those.**
Q Have you ever run across this type of plaza design before?



MR. STEPAN: Object to form, vague.
THE WITNESS: Yes, sir.
Q (By Mr. Hull.) Can you tell me a little bit about in what context you've come across this?
MR. STEPAN: Same objection.
THE WITNESS: At Avalon, we built a property that had precast hollow core planking like this and we had a plaza level in it as well.
Q (By Mr. Hull.) And what was your role in that project?
A **I was basically representing management and writing the standards for acceptance for the management company from the construction company. So I ran the acceptance process of the building and the units for the management company.**
Q At the conclusion of construction?
A **During and at the end as well.**
Q All right. Any other observations about this second hole?
A **No, sir.**
Q Okay. What about the third hole? Where is that located, first of all?
A **That is the post base that you were talking about on the stoop that penetrates through the concrete porch.**
Q And what building is that at?
A **That's still at Building 1.**
Q And how did you select that location?

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

File # 00-CV-987 JEL/JGL

Westfield Insurance Company,

Plaintiff,

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

Weis Builders, Inc.,

Counter-Claimant,

vs.

Westfield Insurance Company,

Counter-Defendant,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF CHAD FILEK, taken pursuant to Notice and Agreement under the Rules of Civil Procedure for the District Courts of Minnesota, and taken at 33 South Sixth Street, Minneapolis, Minnesota, and taken on the 24th and 25th days of February, 2003, commencing at the hour of 9:12 a.m., before Martin R. Huber, a Notary Public in and



* CAPTION CONTINUED *

Promenade Village Town Homes, L.L.C. and Valley Forge Insurance Company,

Third-Party Defendants,

and

Weis Builders, Inc.,

Cross-Claimant,

vs.

Promenade Village Townhomes and Valley Forge Insurance Company,

Cross-Defendants,

and

Promenade Village Townhomes, L.L.C.,

Cross-Claimant,

vs.

Weis Builders, Inc.,

Cross-Defendant,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing by Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., and Colloid Environmental Technologies Company,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Fourth-Party Plaintiff,

and

Chris Craft, Industrial Products, Inc.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -



I N D E X


EXAMINATION OF WITNESS: Page

Mr. Stepan . . . . . . . . . . . . . 4
Mr. Rau . . . . . . . . . . . . . 173
Mr. Bye . . . . . . . . . . . . . 176
Mr. Brown . . . . . . . . . . . . 223
Mr. Reilly . . . . . . . . . . . . 276
Mr. Veith . . . . . . . . . . . . 288
Ms. Reisbord . . . . . . . . . . . 290
Mr. Hull . . . . . . . . . . . . . 294
Mr. Brisbois . . . . . . . . . . . 302
Mr. Hull . . . . . . . . . . . . . 303
Mr. Brisbois . . . . . . . . . . . 306
Mr. Stepan . . . . . . . . . . . . 307
Mr. Bye . . . . . . . . . . . . . 322
Mr. Rau . . . . . . . . . . . . . 331
Mr. Brown . . . . . . . . . . . . 333
Mr. Bye . . . . . . . . . . . . . 351
Mr. Stepan . . . . . . . . . . . . 352
Mr. Brown . . . . . . . . . . . . 354

OBJECTION BY: Page

Mr. Heyer . . . . . . . . . . . . 20, 23, 24, 26, 27, 28, 30, 32, 33, 37, 38, 40, 50, 58, 66, 67, 70, 75, 84, 95, 102, 103, 105, 106, 108, 115, 116, 119, 126, 128, 131, 132, 140, 148, 149, 150, 152, 167, 168, 170, 173, 175, 179, 180, 181, 182, 183, 194, 197, 201, 204, 208, 213, 215, 216, 217, 219, 222, 223, 224, 228, 229, 230, 233, 234, 237, 238, 239, 240, 241, 243, 244, 246, 250, 251, 252, 253, 254, 255, 257, 258, 259, 262, 263, 268, 270, 273, 274, 275, 277, 278, 279, 280, 281, 282, 283, 284, 286, 287, 288, 291, 296, 297, 298, 299, 300, 302, 304, 305, 307, 308, 309, 310,





318, 319, 320, 321, 322, 323, 324, 326, 328, 329, 330, 331, 332, 334, 336, 337, 339, 341, 342, 344, 347, 348, 349, 350, 351, 352, 354

Mr. Bye . . . . . . . . . . . . . 29, 85, 90, 102, 115, 119, 228, 243, 246, 275, 286, 336

Mr. Hull . . . . . . . . . . . . . 29, 30, 41, 109, 316, 321, 350

Mr. Stepan . . . . . . . . . . . . 217, 227, 246, 262, 263, 282, 285, 295, 296, 300, 304, 305, 348, 349

Mr. Brown . . . . . . . . . . . . 280, 352
Mr. Reilly . . . . . . . . . . . . 295, 299, 305
Mr. Veith . . . . . . . . . . . . 299

DEPOSITION EXHIBITS Page

Exhibit 401 marked . . . . . . . . 30
Exhibit 402 marked . . . . . . . . 45
Exhibit 403 marked . . . . . . . . 49
Exhibit 404 marked . . . . . . . . 52
Exhibit 405 marked . . . . . . . . 89
Exhibit 406 marked . . . . . . . . 117
Exhibit 407 marked . . . . . . . . 120
Exhibit 408 marked . . . . . . . . 121
Exhibit 409 marked . . . . . . . . 123
Exhibit 410 marked . . . . . . . . 125
Exhibit 411 marked . . . . . . . . 142
Exhibit 412 marked . . . . . . . . 145
Exhibit 413 marked . . . . . . . . 150
Exhibits 414-434 marked . . . . . 156
Exhibit 435 marked . . . . . . . . 168
Exhibits 436-441 marked . . . . . 176
Exhibit 442 marked . . . . . . . . 184
Exhibit 443 marked . . . . . . . . 187
Exhibit 444 marked . . . . . . . . 190
Exhibit 445 marked . . . . . . . . 199
Exhibits 446-449 marked . . . . . 219
Exhibit 450 marked . . . . . . . . 268
Exhibit 451 marked . . . . . . . . 276
Exhibits 452-453 marked . . . . . 333

Page 101

field supplied the vertical pipe.
MR. HULL: Who supplied that?
A The grate was supplied by Sioux Chief with the plaza deck drain.
MR. HULL: Who supplied the pipe?
A We did, field supplied.
BY MR. STEPAN, CONTINUING:
Q What does that mean, field supplied?
A We got the length of pipe from the wholesaler and cut it on the site and installed it.
Q Was the pipe perforated when you got it, or did you have to put the holes into the pipe?
A We perforated it.
Q You have the concrete and the precast deck, and you have to drill, core drill the holes. You said you did that work yourself?
A Correct.
Q Do you know, were the precast decks sloped at all?
A No.
Q Have you worked with precast decks before?
A Yes.
Q Is that something you typically see, the decks would be sloped towards the drains?
A A precast is not sloped, it's flat.
Q Have you ever seen a system where the precast has

Page 102

been installed, so you get a slope to the drain?
MS. HEYER: Are you talking before this project?
MR. STEPAN: Yes.
A Not with precast.
Q Do you know of any way to create a slope with the precast?
MR. BYE: Object as vague.
A With the concrete itself?
BY MR. STEPAN, CONTINUING:
Q So the deck is sloped?
MS. HEYER: Objection, foundation.
A With other materials other than the precast, yes.
BY MR. STEPAN, CONTINUING:
Q What other materials did you use?
A Insulation, concrete.
Q As far as you know, this deck was left flat?
A Yes, it was.
Q That cause you any concern?
A My design was the drain and the pipe.
Q Wasn't your issue to worry about?
A We didn't design the rest of the system, so --
Q You say your design was the pipe and the -- you used the terms your sign. What was your design?
A Design is what I mean is, off the mechanical plan, we

Page 103

were to install the deck drain, and the pipe, and a riser with the grate, and that's what we did.
Q So you bore the hole. Is there any detail work or anything done to that hole before the drain is set in it?
A No.
Q Is there a drain set in the hole?
A Yes.
Q And then is when the waterproofer comes in and does their membrane work and clamps the membrane into the drain?
A Correct.
Q Then you come in with the pipe, set it in there, and then after the fill comes in, and you put the grate on top?
A Correct.
Q Are you aware that there is about two inches on the deck where there are no perforations, water can't get to the drain?
A Yes.
MS. HEYER: Objection, vague.
BY MR. STEPAN, CONTINUING:
Q And you're aware at the time when you are assembling this drain in the deck and the drain at the top, that there was going to be a two-inch spot on the deck

Page 104

where water was not going to be able to get to the perforations of the drain?
A Yes.
Q Was that an issue discussed with anybody on site?
A Nothing was brought up about it.
Q Why was there a two inches where water was simply not going to drain off the deck, how did that result?
A That's where the vertical pipe glued into the drain. That's at the plaza level.
MS. HEYER: At the plaza level?
A At the precast level.
BY MR. STEPAN, CONTINUING:
Q Is there any way -- could you have set the drain down so it was flush in the deck? And by flush means there is not that two inches?
A No.
Q Why not?
A They would never have been able to hook the membrane up.
Q Showing you what's been marked as Exhibit 323, photograph, picture is one of the plaza areas, the precast deck. And appears to be one of the holes that you would have bored into the deck. And by looking at this picture, is that the deck drain there?

Page 269

pipe you drilled holes in; correct?
A Correct.
Q And the bottom of that is attached to a -- was it a six-inch PVC sleeve?
A Attached to the Fat Max drains, and that's where it's glued together.
Q And the reason, though, that the holes couldn't be drilled any lower than they were you said was because you said the code prohibited drilling where that connection was made; right?
A Any alteration of a connection.
Q So you knew that when you drilled those holes that there was going to be a gap of two inches above the top of the precast and the lower most perforation; correct?
A Yes.
Q Did you convey that detail, did you mention that that was going to be the case to any employee when you were doing this work?
A They had seen the full installation.
Q Before it was even put in?
A Correct.
Q And did you say you knew that these decks were flat?
A Yes.
Q You knew there was no concrete topping that was going

Page 270

to be applied to them to create a slope to drain?
A Upon working in the construction, I realized there was no sloping going to be done to the drain.
Q Did that concern you at all?
A I didn't design the system, so I figured they knew what they were doing.
Q You didn't consider slope to drain to the courtyards part of the courtyard drainage?
A We install the drain, the sloping is by others. If it's concrete, it's by concrete people, if it's dirt, it's by grading contractors.
Q So anyway, to answer my question, you didn't mention that observations, so to speak, to any of the other parties involved in this project?
MS. HEYER: Objection, vague. Which that are you referring to now, Mark?
BY MR. BROWN, CONTINUING:
Q You didn't mention the fact that once you knew there was going to be no sloping constructed on these precast decks, you didn't mention that to anybody else?
A Everybody else knew that it was going to be flat.
Q And not one person, at least in your presence or to your knowledge made any comments about that being a concern?

Page 271

A Not that I know of.
Q Had you ever been involved in a project other than Promenade, where you as a member of the mechanical contractor had to drill holes in a precast deck?
A Yes.
Q Which project?
A Many of them, lot of our work -- fair amount of our work is on precast garages like this.
Q The difference is, other than Promenade, one of the others have soil installed on top of the precast; correct?
A Correct, or with drains. I am referring more to the apartments on top of a garage and core drilling through.
Q So it's not just the soil on top of the precast at the Promenade that made that unique in terms of your experience, but the fact that the drains had to be installed or drilled, but that precast made it unique, as well?
A Correct.
Q Okay. Who's the water pipe foreman, I think you went through that.
A It was either Brad Smith or Mike Casper.
Q Did you say that water pipes were separate and distinct from the vertical drainage pipes in the

Page 272

courtyards?
A Water piping would have been the domestic water piping in the units.
Q So in terms of the person that had the most involvement and responsibility for the courtyards drainage system, that was yourself?
A Correct.
Q Did you take any photographs when you were out at the Southwind with Mr. Lawson?
A No, I did not.
Q Did you give the photographs you took in July of 1997, at those rainstorms, to anybody else?
A No.
Q Who was it that determined that the nine-inch size grate on the top of those courtyards was appropriate, from the top of the fill?
A I don't recall.
Q Did you make that determination?
A No. It was within our office.
Q It wasn't a supplier or manufacturer of the grate itself?
A Not that I know of. I do not know.
Q Talked about some things that you reviewed. Did you review any expert reports in preparation for your deposition?