**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Westfield Insurance Company,

Civil File No. OO-CV-987 JEL/JGL

Plaintiff

vs.

Weis Builders, Inc., Promenade Village Townhomes, LLC, Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants, and
Third Party Plaintiff

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Company,

Third Party Defendant and
Fourth Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth Party Defendant.

---

**Attached hereto is Exhibit C is a true and correct copy of the cited pages from the Deposition of Jeffrey Schuh, taken on October 15, 2003.**

seeing if you remember off the top of your head.
A. It was within the last few months is my recollection.
(Whereupon, Deposition Exhibit No. 846 was marked for identification.)
BY MR. SONNESYN:
Q. I'll show you what has been marked as Schuh Deposition Exhibit 846. Actually this one, why don't we have copies for everybody.
MR. REILLY: Sure.
BY MR. SONNESYN:
Q. While we're waiting for the copies, you said that the soil is not part of the drainage system and the slope of the courtyards is not part of the drainage system. Correct?
A. Correct.
Q. And are the roofs of the townhouses themselves part of the drainage systems?
A. I would say no.
Q. And are the gutters or lack of gutters part of the drainage system?
A. Well, that would be dependent on how they're connected to -- if they had gutters with downspouts that are connected to storm sewers then I would say those are really part of the system.





Q. So if there are gutters with downspouts those are part of the drainage system?
A. If they're connected to the storm drainage sewer system.
Q. While that's being passed around let me ask you this question. If there was a downspout -- I think that you mentioned there are some downspouts that you observed that carry water -- that don't carry water to the inlet.
A. Correct.
Q. Therefore that downspout, that gutter and downspout is not part of the courtyard drainage system. Is that correct?
A. As it is now, right.
Q. Okay. Let's look at exhibit -- what is that marked please?
A. No. 846.
Q. No. 846. On the second page of No. 846 is an e-mail from you to somebody.
A. Right.
Q. Water -- it's a web site or e-mail site of Eagan?
A. That was their general address for questions.
Q. And then you got a -- that was August





4th, 2003, is that right?
A. Yes.
Q. Was the August 4th, 2003 e-mail that we see on the second page of No. 846 your first inquiry into the City of Eagan code?
A. That was mine and MaryJo and Drew had met with them on their first visit.
Q. Met with who?
A. The City of Eagan engineering department.
Q. How do you know that?
A. Because they told me they met with them.
Q. So MaryJo and Drew met with somebody from the City of Eagan at their first visit?
A. Yes.
Q. Are there notes in the file to reflect that fact?
A. I'd have to go through the file.
Q. Where would you look for it?
A. It's all in a big box.
Q. Well, I'm sorry, I didn't ask a very good question. I would think that this would be field notes or something like that.
A. If they had field notes that's where





it would be located or it could be a copy of this Exhibit No. 845 could have been what they brought back. I don't know.
Q. You would -- the first place that you would look in that big box of exhibits would be their field notes?
A. Field notes or logs or anything, uh-huh.
Q. Well, how do they keep track of their activity?
A. Usually would be a field note.
Q. And then you also mentioned logs. Do they keep a log?
A. That's what Drew Ptak had for his hand augers.
Q. Oh, I see. So let's go back to that exhibit so we know what we're talking about. If we look at Exhibit No. 842 these are Drew, Andrew Ptak's logs?
A. That's a field book.
Q. Field book?
A. Right.
Q. Same thing as a log?
A. Yes.
Q. All right. So to find out who MaryJo

and Drew met with from the City of Eagan during that first site visit, we would look at their field notes or somebody's logs?
A. Or contact them and ask them.
Q. All right. Well, in terms of looking at the file.
A. Looking at the file, correct.
Q. Where are MaryJo and Andrew Ptak now?
A. MaryJo is with FEMA.
Q. FEMA?
A. Yes.
Q. Is that the federal --
A. Federal Emergency Management Agency.
Q. Where is that?
A. It's in Chicago.
Q. Okay.
A. Andrew is with Geo Services, Inc.
Q. Where is Geo Services?
A. It's in the Chicagoland area. I don't know the exact town.
Q. So they're still in Chicago?
A. Yes.
Q. MaryJo and Drew did not tell you specifically with whom they met from the City of Eagan?





A. I don't recall who they met with.
Q. They simply said somebody from the City of Eagan was there at the site visit?
A. No, they weren't at the site visit. They went to the City of Eagan's offices to inquire what are the general requirements for design of drain systems.
Q. I see. Let's go back to Exhibit No. -- do you have any other knowledge about their -- the information that they obtained from the City of Eagan during that first site visit?
A. I believe it's consistent with the information that I have here.
Q. All right. And that's here meaning Exhibit No. 846?
A. Correct.
Q. But do you have any other information that MaryJo and Drew obtained from their site visit about the information that they obtained from the City of Eagan?
A. No, I do not.
Q. So you have got an e-mail that you send to the -- an e-mail site at the City of Eagan and your response was from Eric Macbeth on August 4th, 2003. Is that right?





A. The first response, yes.
Q. Why are you making this inquiry on August 4th, 2003?
A. Because I was confirming what MaryJo and Drew had told me and to verify it to put in the standard of care section of the report dated August 12, 2003.
Q. And you got a response back from Eric Macbeth who directed you to John Gorder?
A. Yes.
Q. And there is an August 5, 2003 e-mail back from John Gorder, is that right?
A. Yes.
Q. And then there is also a handwritten note, presumably that is a telephone conference between the two of you?
A. Yes.
Q. Is your telephone call with him before or after Mr. Gorder's e-mail to you?
A. After.
Q. He e-mails you 8:03 a.m.?
A. Yes.
Q. And then you spoke with him later that day?
A. Yes.





Q. And your handwritten note says "spoke with John on August 5, 2003 for pipe design, 5-year storm for" --
A. Upstream.
Q. "Upstream pipes, 10-year storm for main pipe."
A. Yes.
Q. And then your initials?
A. Yes.
Q. Do you remember anything else about that telephone conversation with Mr. Gorder?
A. Yes.
Q. Tell me what you remember.
A. When I spoke -- the reason why I called him was the information that he gave to me was for a detention pond design.
Q. And that's you're talking about his August 5, 2003 e-mail at 8:03 a.m.?
A. Yes.
Q. And so that e-mail was for a detention pond?
A. That's really for a detention pond for a development.
Q. I see.
A. And my question to him was for an area

that was not really designed for detention but was adjacent to buildings what would the City generally require to make sure that there was no flooding potential for the building.
Q. Okay. So your question to Mr. Gorder was for an area not designed for what?
A. For detention.
Q. For detention. Yes?
A. What would their requirements be to assure there would not be flooding of an adjacent structure.
Q. Do you have any other notes in relation to the question that you asked him other than what we see here on Exhibit No. 846?
A. Nothing written.
Q. All right. What was his response to your question?
A. The response was that it would be reasonable to require one foot of freeboard between the high water level and the top of foundation, or the lowest entry point.
Q. So Mr. Gorder said it would be reasonable to require one foot of freeboard?
A. Correct.
Q. Yes?





A. Between the high water level and the top of foundation for the building.
Q. Between the high water level and the top of the foundation?
A. Correct.
Q. For the building. Correct?
A. Yes.
Q. Did Mr. Gorder say anything else that you recall?
A. We spoke about the 5-year storm for the pipe design and the 10-year storm for the main pipes to make sure the pipes were sized appropriately to remove water which is consistent with their design of, you know, sewers and culverts for storm water management outside of buildings.
And then I recall mentioning this was for the Promenade and would this one foot requirement be appropriate for a courtyard area next to a building and his response was that it would be, the one foot requirement would be appropriate.
Q. Can you remember anything else about your conversation with Mr. Gorder?
A. No, I don't remember anything else.





Q. You testified that Mr. Gorder said it was reasonable to require one foot of freeboard between the high water level and the top of the foundation for the building.
A. Yes.
Q. What is the -- what is one foot of freeboard? What is that?
A. That's basically the vertical distance between the high water level, where the highest the water level can go and the entry, the lowest entry point to a structure.
Q. Is it possible to draw a diagram to explain visually what you're conveying to me?
A. We could just show it on the wall here I suppose is okay.
Q. Well, I would rather have it drawn if you don't object to that.
A. No, that's fine.
MR. SONNESYN: Why don't we go ahead and mark that.
(Whereupon, Deposition Exhibit No. 847 was marked for identification.)
MR. REILLY: I assume that this is for illustrative purposes only?
MR. SONNESYN: Yes, for illustrative





purposes.
MR. REILLY: Okay.
BY MR. SONNESYN:
Q. Is it okay if I look over your shoulder?
A. Sure.
Q. We have gotten marked as Exhibit No. 847, and this is a diagram for illustrative purposes and this is a side view?
A. It's a cross section.
Q. A cross section view?
A. Yes.
Q. And so is this the wall here?
A. That's a foundation.
Q. That's the foundation. Maybe you could label that. So we have a foundation. And then so the lowest point, the lowest entry point into the structure is at the top of the foundation, is that correct?
A. It could be. It could be a window well, it depends on where you're at. It's where water can enter the building.
Q. And freeboard, you have freeboard written over on the right here.
A. Correct.

order to be removed by the pipes, correct?
A. Well, or it soaks in the ground in this case and will eventually make it's way over to the perforated pipe.
Q. And the type of soil that is in that courtyard, is it your testimony that that's not part of the courtyard storm management system?
A. I don't believe it was designed to be part of the storm water management system.
Q. What is your testimony? Is it part of the courtyard storm management system?
A. I wouldn't call it part of it, no.
Q. And the aqua drain drainage boards, that's not part of the courtyard storm management system, is that correct?
A. That's correct.
Q. Is the courtyard storm management system synonymous with a drainage system?
A. Well, surface drainage, it's a surface drainage system.
Q. So courtyard storm management system is synonymous with surface drainage system?
A. I would say that's true, yes.
Q. Number (2) under SCOPE OF STUDY which is on page one of the report states "The scope





included reviewing information on the design of the storm water management system for The Promenade Townhomes."
A. Correct.
Q. And have we talked about all of the information? Have you given a description of all of the information that Patrick Engineering reviewed in that regard?
A. I don't know if we talked about all of it. We evaluated data that was provided on the external system just to see if it could have been a -- by looking at it so see if it could have been a restrictor to flow. It doesn't appear that it is, so we then focused on the design of what was inside of the courtyard areas.
Q. On page two, STANDARD OF CARE, it states; "The design of storm water management systems generally is performed in accordance with the following criteria: Local codes and requirements. Underground pipe systems are designed to convey storm water runoff from a 10-year storm event without ponding at the ground surface. Number 3, the water level adjacent to inhabitable structures should be at least one foot below the lowest entry point for the runoff from





the 100-year storm event."
Can I talk about those three points or am I taking those out of context?
A. I think you can talk about those three.
Q. All right. You say that "The design of storm water management systems generally is performed in accordance with the following criteria" and then item number one is "Local codes and requirements." Are those the Eagan requirements that you testified about earlier?
A. Those would be for the locality that you do your work.
Q. When you used the term "generally" in that preparatory sentence for STANDARD OF CARE, does that also mean for this project?
A. I think in general for this project. These are the requirements that if I was to work on a project I would say I would look at these items and there could be other site specific requirements. You may do something in addition to these or more stringent than these, but in general this is what Patrick Engineering would follow for a project.
Q. That's what Patrick Engineering would





follow, is that right?
A. Yes.
Q. What is the standard of care that is required, or that was required for the Promenade courtyard project?
MR. BYE: Objection, lack of foundation, vague.
MR. REILLY: I'll object as vague, overly broad.
BY MR. SONNESYN:
Q. Do you understand my question?
A. Could you rephrase?
Q. What was the standard of care that was required for the courtyard drains?
MR. REILLY: Same objection.
THE WITNESS: I believe that our opinion on the standard of care is contained in the document here.
BY MR. SONNESYN:
Q. Is that was what was required?
A. Well, what's required is that you design a system to protect human health and the environment and Eagan has a code for storm water systems that both the code that they have and these general practices weren't followed, so I

don't believe that the system is designed to follow the standard of care.

Q. So you think that the required standard of care was deviated from?

A. Yes.

Q. And the required standard of care is defined as you have defined it?

A. Well, the standard of care would be what an engineering firm would do in this certain circumstance, the majority of the engineering firms would do in this circumstance.

Q. When you say the majority of engineering firms, what majority is that? 99 percent or 51 percent?

A. I mean, if -- go back. If they have a code or requirement then you need to follow that as a minimum.

Q. And the code or requirement, is that the plumbing code?

A. I believe there are several codes that Eagan would have, but again the code is a minimum requirement. You have to look at it and see if there are other issues that could apply. Just following the code doesn't mean that the system is acceptable.





Q. Was the plumbing code followed, the Minnesota Plumbing Code followed in this application?

A. I personally didn't evaluate to verify that it was followed, but I know other people -- there are depositions and reports that other people have looked at.

Q. I'm not asking about what other people have said. I'm asking you for your opinion.

A. My opinion is the plumbing code really doesn't apply to this situation.

Q. And the basis of your assertion that the plumbing code is inapplicable is what?

A. My review of my documents was that, one, this would need to be a roof, which it's a landscaped area.

Two, the plumbing code doesn't really evaluate the potential for back up into the buildings. This is directly adjacent to a building.

And the selection of drains does result in the build up of head over the roof drain and build up of head over this area since it's so flat would cause water to back up into the building areas.





Q. Okay. So are those the reasons?

A. As I sit here now.

Q. All right. The plumbing code is inapplicable because the plumbing code applies to a roof?

A. Well, at least I believe the sections that other people were referring to was for a roof drainage system.

Q. I see. And your assertion is that this -- that that's one of the reasons that the plumbing code is inapplicable. Is that right?

A. Correct.

Q. And that the plumbing code does not evaluate the situation in relation to back up into a building?

A. Well, it assumes that you have a roof that you have 100 percent runoff from the roof, and then so it doesn't evaluate the potential for a back up into an adjacent structure.

Q. And the third reason the plumbing code is inapplicable is the selection of the drain?

A. Well, I made the assumption when people read that code is that there is no build up of water pressure on the top of the roof, but in actuality you need some build up on top of the





roof for the drain to remove the water. And so this area is to flat that in order for that drain to work properly, you would need to have a ponding of water at the surface which because the site is so flat if you have a ponding of water at the surface it's going to back up into the building.

Q. And when you talk about the area or surface being so flat, you're talking about the courtyard surface?

A. Correct.

Q. Where people walk around?

A. Correct.

Q. So because the courtyard surface is so flat that's another reason why the plumbing code is inapplicable, is that correct?

A. Well, it's just the assumptions that are made in selecting the drains. You do have a head build up over the drain.

Q. What is a head build up?

A. It's just the height of water above the roof.

Q. Yes?

A. You have to have water build up above the roof for the drain to remove an adequate quantity of water from the roof to meet the code.

Q. All right. Do you know whether or not flooding at the ground surface occurred at Promenade?
A. I understand that it did.
Q. And do you understand -- when did it happen?
A. I'd have to go through the notes, but I recall there were descriptions that there was ponding.
Q. Well, is ponding equivalent to flooding at the ground surface?
A. It's terminology. I would say if you have water standing on the surface it's being flooded.
Q. So ponding equals flooding?
A. In this case I would say that it's the same thing.
Q. It next states in that same item on page two, "This criterion is typically required to minimize ponding in streets, parking lots and other areas with pedestrian or vehicle traffic."
When you assert that this criterion is typically required, to what are you referring? What standards are you referring?
A. This is the 10-year event.





Q. But when you assert that it's typically required, by whom is it typically required?
A. By either the permitting authority or engineers would normally design for that.
Q. And by "typically" you're talking about sort of around the country?
A. Right, it's a general statement.
Q. I see. On page three of your report, third paragraph, it starts; "Because the courtyards were not designed as detention ponds" so I guess we agree that they were not designed as detention ponds.
We have heard -- well, the courtyards were not designed as ponds in any respect, correct?
A. Not that I'm aware of, right.
Q. You state in this next sentence; "However, it is reasonable to provide the one foot vertical clearance between the high water level and the first floor entry." And you say; "This is consistent with the City of Eagan design criteria; provide one foot of vertical clearance between the emergency overflow and the lowest entry point."
What specific criterion or criteria is





the one foot vertical clearance consistent with?
A. They had mentioned back on the e-mail that you needed to provide three foot freeboard and an emergency overflow at two feet.
Q. Yes?
A. So three minus two is the one. So they want one foot of freeboard between the lowest entry point and the top of the water or the overflow, the overflow point. That's what they would require for a detention pond.
Q. Was the one foot freeboard exceeded at the Promenade Project?
A. Well, the vertical distance between the top of the grates or the inlets and the first doorway is less than a foot.
Q. Less than foot. How much is it?
A. I would have to look at our -- I mean, just if you go out there I would say it's less than half a foot. It's about a half a foot.
Q. You're basing that on sort of eyeballing it, is that right?
A. Well, and there were survey points in Exhibit No. 2 and Exhibit No. 3.
Q. This is from your report?
A. Correct.





Q. Okay. You and I are both looking at Exhibit No. 2. What is significant here in relation to the freeboard?
A. Well, you can see for example if you look at area 2, do you see a little 2 on the top?
Q. Yes.
A. It's got 99.96 is the grade elevation.
Q. Yes?
A. And then the elevation at the right at the ground surface, near the doorway there, the concrete pad is 100.54.
Q. Yes?
A. So right there you have .58 feet difference between the top of the inlet and the ground surface outside of the building, which is above the top of foundation. So top of foundation is my recollection looking at photographs, maybe eight inches or so, somewhere around there, below the ground surface. If you take .58 feet and eight inches is around .66 feet, at that location the top of foundation is below the top of the inlet at that spot.
Q. At that spot?
A. At that spot.
Q. At that spot the inlet --