# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

File # 00-CV-987 JEL/JGL

Westfield Insurance Company,

Plaintiff,

vs. VOLUME I

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF ROBERT J. STRACHOTA, taken pursuant to Notice and Agreement under the Rules of Civil Procedure for the District Courts of Minnesota, and taken at 200 Riverview Office Tower, 8009 34th Avenue South, Minneapolis, Minnesota, and taken on the 27th day of August, 2003, commencing at the hour of 9:25 a.m., before Martin R. Huber, a Notary Public in and for the County of Stearns, State of Minnesota.



* CAPTION CONTINUED *

Waterproofing by Experts, Inc.; BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., and Colloid Environmental Technologies Company,

Third-Party Defendants,

and

Colloid Environmental Technologies Company,

Third-Party Defendant and Fourth-Party Plaintiff,

vs.

Chris Craft, Industrial Products, Inc.,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -



I N D E X


EXAMINATION OF WITNESS: Page

Mr. Stepan . . . . . . . . . . . . . 6

OBJECTION BY: Page

Mr. Brown . . . . . . . . . . . . 35
Mr. Gaskins . . . . . . . . . . . 58
Mr. Brown . . . . . . . . . . . . 59
Mr. Gaskins . . . . . . . . . . . 60
Mr. Gaskins . . . . . . . . . . . 69
Mr. Gaskins . . . . . . . . . . . 70
Mr. Veith . . . . . . . . . . . . 78
Mr. Brown . . . . . . . . . . . . 78
Mr. Reilly . . . . . . . . . . . . 92
Mr. Gaskins . . . . . . . . . . . 94
Mr. Reilly . . . . . . . . . . . . 110
Mr. Reilly . . . . . . . . . . . . 111
Mr. Reilly . . . . . . . . . . . . 113





DEPOSITION EXHIBITS Page

Exhibit 797 marked . . . . . . . . 7
Exhibit 798 marked . . . . . . . . 9
Exhibit 799 marked . . . . . . . . 13
Exhibit 800 marked . . . . . . . . 43
Exhibits 801-802 marked . . . . . 44
Exhibit 803 marked . . . . . . . . 93
Exhibit 804 marked . . . . . . . . 119


** Deposition Exhibits 801 and 802 were retained by Mr. Strachota.

And as you read our appraisal, you'll see that it starts out with the big picture of the economy in general, starts to focus on Minneapolis-St. Paul, then Eagan, then the subject property, then highest and best use questions, which is the start of the valuation. And then from the highest and best use, you apply the various approaches to value.
Q What does that phrase mean to you, highest and best use?
A Highest and best use is that use that maximizes the value of the property, considering all of the physical, legal, and economic influences that affect the property.
Q So back to this project -- Well, is there anything else just in general, in a general sense what you typically do when you put together an appraisal like this? We have gotten to the point now you're assembling the appraisal. Is there anything else that happens beyond that?
A You mean in terms of how we ultimately deliver the appraisal to someone?
Q You assemble the appraisal, you come up with a final draft, and the appraisal is provided to the client, and then --
A There's a review procedure in our office where we



assemble the narrative. We have people who check mathematics, we have people who check the grammar, and then it goes to final draft for approval. And in this case, I would be the person approving this. I am the senior person on the assignment. And then we produce and publish the report, and we deliver it to the client.
Q You said Mr. Flaherty had a material contribution on this project. What was his role, starting with the first appraisal?
A John's role probably was the same in the first appraisal as it was in the second appraisal. John has been an appraiser since the early 1980s and has made it a specialty to know multi-family here in Minnesota as well as around the country. Because this was an important multi-family assignment, I asked John to have a material participation in this assignment, and John and I worked closely in preparing this appraisal.
It would be difficult for me to distinguish tasks with John because we work so closely. John and I have worked together now over 20 years, and we're in regular contact all day long, and we share so many things. And I would suggest to you that we were just -- in this, these two assignments, we were just



continually back and forth sharing efforts in preparing this appraisal.
Q You said this was an important multi-family assignment. What do you mean by that, that it was important?
A Well, it's important in the sense that I knew that it was going to receive a lot of scrutiny. It's not any less important than any other assignment in our office. But this kind of assignment, in my view, deserves more careful analysis than something we might just do for mortgage financing reasons, which is a more run of the mill type of an appraisal.
Q Is that because it's part of a lawsuit or --
A Not necessarily part of a lawsuit, I just knew that it had a higher test of scrutiny.
Q Test of scrutiny from where?
A From a lot of bright people like yourself that are going to be reading this thing and asking a lot questions, and so --
Q You probably assume too much there with regard to me anyway. There is plenty of bright people at this table, though.
You stated that you don't recall who contacted you regarding Promenade initially. What's the first thing that you recall about this



assignment, first meaning farthest back?
A Quite honestly, I just don't have a clear memory of how we got going with this assignment. And you need to understand that it's not particularly important to me as to who got us started. What's really important to me as an appraiser is doing the valuation, and I focus on that. I don't keep track of the lawyers or the developers or the lenders. It's -- again, my focus as an appraiser is to make sure my values are right. I'm not concerned with who contacted me.
Q You indicated that typically you will sit down at the front end and have quite a bit of discussion to determine what's going on. Did that happen here?
A Yes.
Q Who was involved with those discussions?
A It would have been Mr. Flaherty, Mr. Kolinger, and Mr. Herber.
Q How about anybody from Promenade's side informing you of what's going on?
A Well, when you asked me the question, I thought you were asking me relative to what goes on in our company. And in our company, I usually don't involve the client in any discussion. I mean, I think it's our decision as to whether we're going to do the appraisal and whether we have the competency to do

Page 65

A No.
Q Let's move ahead to the first data table of this letter, the one that projected base unit rents.
A Yes.
Q Let me back up for a second. Are you familiar with the term cross shop, cross shopping property?
A Yes.
Q What is your understanding of that term?
A Well, I think there are people who -- and I assume we're talking about apartments only. Cross shopping occurs in other products, too. But as it relates to apartments, people will go to different complexes, and they will go to the first one and try to maximize the economic package, and then take that economic package and go to the next one, the next owner, and say, well, now I can get such and such from this one. I want you to give me this, too. Otherwise I'm not going to come to your property. And then they try to get the most out of that one. And they go to a third one, and they try to do the same thing over there. So they are cross shopping between owners and trying to maximize the economic package they can get.
Q And in your experience do you find that prospective renters may cross shop, they cross shop properties of like quality, you know, for instance, a class A to a

Page 66

class A as opposed to a class A to a class C?
A Well, I think generally people make a decision as to what quality of housing they want, and they cross shop projects within the general quality level. It's kind of rare that somebody will cross shop between a class A and class C, because the class A owner is going to say, I'm not matching the class C owner. I don't have to do what that guy needs to do to get his unit. And usually, as you go down from A's to D's, the giveaway package gets greater because, again, the class A leads the market.
Q Who do you consider to be competitors of Promenade?
A The properties that are -- that you mentioned before that are A's and B product in the Eagan market.
Q Aldon Pond, Avalon, and Thomas Lake?
A Yeah, those are three of the lead properties.
Q Would you also consider to be the class A's that are in Woodbury, Grand Reserve, Avalon at Woodbury, those properties as well?
A It depends on what context you're asking me. As you asked me about cross shopping, consumers think that when they cross shop apartments that they are -- they go from one to the other, that the owners don't know what's going on. I mean, the people who own these projects are all very sophisticated. They all know

Page 67

what's going on in everybody's project all around the Twin City area. They all keep an eye on what's going on in Woodbury and Maple Grove and Plymouth and so on, and they see what kinds of trends are being set.

So in the big picture, the owner has to watch that, see what kinds of rent levels are being accomplished, because ultimately the owner is building this property to create value for a potential buyer. And when that buyer comes to town, he doesn't say I am only going to buy a project in Eagan. I'm coming to town to buy a rental project in Eagan. No one does that. They come to Minneapolis-St. Paul, and they say I want to buy a good quality rental project in the Minneapolis-St. Paul market, and that gives them a lot of alternatives. So the owner has to keep track of all these other projects relative to his project so that he remains competitive with what's going on with the projects. Now, that's at the owner level. The sophisticated owner, investor level.

Now, cross shopping as it relates to the individual person renting here, typically people make a decision to live in a community. And there are some people that, you know, will shop in Woodbury, and Eagan, and Chanhassen, and Plymouth, but that's

Page 68

pretty unusual because people make their decision to live in a community first as a result of where they work, and then as a result of where they go to church, and where they like to shop, and where their friends are. That that's what drives that decision. And it's not too often that you see people jumping from all these different communities that I talked to you about. So the typical cross shopper is trying to cross shop within the Eagan market, between the projects that we have talked about. There is some cross shopping that goes on between Woodbury and Eagan, or Chanhassen and Eagan, but that's kind of rare. That only occurs -- kind of unique points in time, young people that are highly mobile, and they are just going to make a decision to live in a cheap -- get the best deal, and they'll drive through traffic and, you know, this is a temporary housing decision. Generally people are rooted in their community, so the cross shopping occurs within the community.
Q Back to the Eagan market for a second. Other than the three properties we talked about, Aldon Pond, Thomas Lake and Avalon at Town Center, are there other properties in Eagan that you consider to be competitors of Promenade?

A Right now those are the big three.
Q Are those the three at the time of your appraisal in December?
A Yes, and they remain so today.
Q Now, it's my understanding there is another term of art, if you will, but in real estate there's a rental market of comparable, competitors and comparables. Are you familiar with that --
A Yes.
Q -- distinction as well? What is your understanding of a comparable?
A You're going to have to be more specific because we have comparables for lots of different reasons in real estate, and I need to know in what context you want me to comment on.
Q What properties do you believe are comparable to Promenade?
MR. GASKINS: Objection, vague.
BY MR. STEPAN, CONTINUING:
Q Do you understand the question?
A I really don't. You have to be more specific in terms of what you want me to comment. I don't know what you mean by that.
Q How about with regard to design, quality, marketing position?



MR. GASKINS: Objection, vague.
BY MR. STEPAN, CONTINUING:
Q Do you understand the question?
A If you want to talk about design, I can talk about design.
Q Let's start with design.
A Design, there are comparables that we put in our report that are products that are similar to the subject, and we study those from a design perspective. We want newer state of the art kind of housing that has the townhouse kind of concept of living. So those properties I view as comparable.
Q It sounds like you have a number of different ways you use comparable in your work. Based on your experience, what other properties or what other ways of determining what properties are out there are comparable to Promenade? You've got design. You referenced some of the properties in your report. Are there other ways to come up with a comparable property?
A Yes, and I would refer you to the report because we lay out, I think, some of the major criteria that we appraisers would use.
Q What page in the report, or pages?
A Page 99. For instance, on page 99, we talk about



physical characteristics when talking about comparability, and we list various criteria. And those are units of comparison or comparability that we use.
(WHEREUPON, a noon recess was taken.)
Q Mr. Strachota, in putting together your appraisal, the second one, in the income capitalization approach, particularly at page 113, you have some properties that you compare Promenade to. How did you arrive at those properties being the basis for comparison?
A We went around the Metropolitan area in the different submarkets, and in each of the various communities, these submarkets have similar kinds of properties as the subject property. And we identified these properties in those submarkets, and there are other class A kinds of properties. And I selected these eight because I thought they were, you know, somewhat relevant to the subject's quality and condition and so on.
Q Why didn't you select any properties from Eagan?
A In the Eagan market, since this property leads the market in Eagan, all of the comparables would be inferior in quality and rent level with the subject. I wanted to identify other properties that were



within their submarkets at the same level as the subject property.
Q Did you ever have any discussions with anybody from Promenade or Healey Ramme regarding what they considered to be their main competitors?
A Yes, in a general way.
Q Who did you speak to?
A I would usually have those discussions with Peter Ramme.
Q And what did you discuss with Peter Ramme regarding that?
A We would discuss the -- of course, the status of this property within its submarket, and what properties he felt were operating similarly in other submarkets, and he would view his properties that were kind of on par with his in those submarkets. And so we would discuss different projects. And he, if I recall correctly, he often referenced the Woodbury market. He watched the Woodbury market and the kind of products that were going up there. My impressions were that he wanted his properties to kind of stay on par with those because he wanted to create the kind of value in his property that buyers would be attracted to and would view these other properties like the ones in Woodbury as being comparable.

Page 117

So then going down, we make adjustments for differences. In this first sale it's zero percent. So we say there is nothing to deal with here in property rights conveyed, no adjustment, zero. And then financing at zero, there is no adjustment. That is why $14,124 just keeps going down. Conditions of the sale, we say no, there is nothing to deal with there. Again, zero. So the price keeps -- the price per unit keeps sliding down at 14,124.

Then we come to market conditions or time. And here we say we have got to adjust this sale 6p percent. And the reason for that is, we have a time difference between when the sale occurred and when we're doing the appraisal here. And so I changed the comparable. You make the comparable, you try to make it look like the subject. So we adjust it to the time frame of when I am doing the appraisal, and in this case it's 6 percent. So adjusting it upwards6 percent, because this sale occurs before the date of the appraisal, and we're in an escalating market, we're going up 6 percent.

And then we have physical characteristics that we're going to consider. The first is location, and you can see that we make no adjustment for location. So we're saying from a market perspective,

Page 118

this comparable is on par locationally as the subject. Zoning, we make no adjustment for that. So we say the zoning is similar, it would allow for density.

The density adjustment -- excuse me, I misspoke. The zoning, there was no difference, but there is a density difference on this particular one. This one actually has pretty heavy density. We're allowed to put 21 units per acre on this land, whereas the subject you can only put about 10 units per acre, and that affects value. So on a per unit basis, when you have more units, the unit value dilutes; it goes down. So we have to bring this up 10 percent because it's more valuable when you don't have as much density.

And then the next adjustment, shape. We say that this comparable has a better shape than the subject, so we say it's superior. So we're bringing it down 5 percent. It's 5 percent better than the subject. And then the topography and soil conditions are better on this comparable than the subject, so we're bringing this one down. We're trying to make it have similar topography and soil conditions as the subject land.

Then you balance all those adjustments out,

Page 119

and it turns out that we're going to be adjusting down 5 percent from the original sale price for the differences that we have identified. And the adjusted price is 14,222 as opposed to what we started out with.

Q The adjustments you make, how do you arrive at those figures? Are they assumptions?

A They are judgments. They are an appraiser's judgment. And you will find that some appraisers have completely different views on things.

Q Are these judgments for this particular table, the comparable land sales, the adjustments that were made, are they adjustments you made or are they adjustments Mr. Flaherty made?

A Both John and I made them. Both of us fully endorse everything in this report and are in agreement with everything in this report.

(WHEREUPON, Strachota Deposition Exhibit 804 was marked for identification by the court reporter.)

Q Mr. Strachota, I've marked as Deposition Exhibit 804 the initial reports that you produced May 1, 2002. I just handed that to you. Do you agree that's your first appraisal report?

A Yes.

Page 120

Q This methodology you have used to value the land, is there a name for that methodology? Is there a title to the approach you took?

A There really isn't. It's just an adjustment process.

Q As far as the whole process, starting with selecting the properties, making the adjustments, determining the mean value per unit, et cetera, is there a name for it or just a process you do?

A We're talking about the land analysis, which begins on page 83, and it's the first step. It's Roman Numeral number I, the first step in the cost approach to value. So it's the land analysis within the cost approach.

Q And where does the land analysis come from? Where did you learn that?

A It's one of the fundamental approaches to measuring value that I learned early on in doing appraisals.

Q The value that other appraisers use?

A I would think most appraisers would use this approach.

Q Do you know if they do?

A I don't know for sure. I would think they do though.

Q How often do you evaluate other appraisers, if ever, appraisals done by other appraisers?

A I really don't do much of that anymore. I used to

Page 165

go nine more years beyond that first year. And then we capitalize those ten years of income into value. And ten years, we're finding typically that property like this is held by investors between seven and ten years, so that's why we appraisers often use a ten-year holding period.
Q Which do you ultimately -- here it appears you rely on the direct capitalization method ultimately; is that right?
A I think I probably relied a little bit more on the direct cap, but they're both so close. I can't say I rely on one a whole lot more than the other because we use both. We reference at the bottom of page 134 that we use both. And what did I select? I selected 38 million by the income approach, which is closer to the discounted cash flow. I would not necessarily interpret that to mean that I think the discounted cash -- that the discounted cash flow is better than the direct capitalization method.
Q The assumptions that you make going out over these ten years out, what are those assumptions based on?
A They are based on information that we obtain from buyers in the marketplace that are buying property. So people like the group that bought this property, they will do a discount cash flow analysis, and we

Page 166

will ask them, what were the inputs in your discounted cash flow. How fast did you grow rents? How fast were you growing expenses? What was your cap rate out in the 11th year. And we get that information and keep track of it. Then we use it to make judgments about what's appropriate for the appraisal.
Q Do you recall any buyers that you talked to to help you do your discounted cash flow for this appraisal?
A Specifically for this appraisal? I wouldn't have talked to anybody -- Let me think. On these buyers -- some of these buyers are regular clients of ours, and we will get information about the discounted cash flow from them. And I don't remember if I specifically talked to any of these people regarding Promenade Oaks, but I may have specifically talked to them about apartment buildings in general during the time frame of this appraisal.
Q Do you remember whether you did or not?
A I'm sure I did.
Q Would that be in the notes in your file?
A I may or may not have notes in the file.
Q Which buyers in the three-ring binder would you have talked to?
A We do work for Lend Lease, L & B, AEW, Stewart and

Page 167

Invesco, so it would be one of those. I don't know the others. I know of them, but I don't know them.
Q The numbers you put in for your calculation of discounted cash flow, are those all assumptions?
A They are all assumptions. They are all, I should say, judgments that I make based on assumptions that buyers are using today when they are using the discounted cash flow.
Q On page 133 you have got a present value factor of 10.25 percent?
A Yes.
Q How did you arrive at that?
A That's an input that we get from investors. So we'll ask investors what's the current PV that you are using for buying apartment property.
Q Who did you ask to get that present value for this appraisal? Who did you talk to to come up with this number?
A I wouldn't know that by memory. That's something we do in the regular course of our library research, and we update it quarterly, I think, in our office. Then we use it for all our appraisals.
Q You update the present value quarterly?
A Yes.
Q Based on the information you take in at your office?

Page 168

A Correct. It seems like every quarter that information changes, and investors' rates of return change.
Q Are there certain periodicals that you refer to?
A There are periodicals that contain that information also that we'll rely on.
Q What periodicals?
A Real Estate Research Corporation has a periodical that we use. Peter Corp has a research report that he does out of New York. The American Council of Life Insurance Companies has a regular quarterly report that we get. Those are some of the top three that we probably rely on.
Q How did you determine the terminal cap rate?
A The same. That information is in the same studies we just discussed.
Q And could be found in the periodicals you just referenced?
A Correct.
Q When you do a sales comparison analysis, is there typically a certain amount of sales that you like to be able to compare to?
A No, I don't think there is anything like that.
Q Are you familiar with the GVA Market Advisor Apartment Trends Report?

# EXHIBIT H

COPY



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: DAVID CAMPBELL (VOLUME I)
TAKEN ON: TUESDAY, AUGUST 26, 2003
COMMENCING AT: 9:15 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562



and

Colloid Environmental Technologies Co.,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -



NOTES

Page Line



APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Co.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO I. BRISBOIS, Esq., Stich, Angell, Kreidler & Dodge, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

ROLF E. SONNESYN, Esq., and CHANDELLE L. HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant J-Berd Mechanical Contractors, Inc.

STEVEN E. RAU, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, MN 55402-2440, appeared representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared representing Westfield Insurance Company.

CAMERON BOYD, Esq., Lindquist & Vennum, 4200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402-2274, appeared representing Fourth-Party Defendant Mikesh, Inc.

ALSO PRESENT: Kris Huether, Brown & Carlson.

INDEX

PAGE
Pursuant to Notice.................................. 6
WITNESS:
David Campbell................................ 6
Examination by Mr. Veith...................... 6
Examination by Mr. Sonnesyn................... 139
Examination by Mr. Boyd....................... 162
Witness Excused.............................. 164
Signature/Correction Page..................... 166
Certificate Page............................. 167

OBJECTIONS:
By Mr. Hull....... 66
By Ms. Heyer...... 71
By Mr. Reilly..... 89,95,106,159
By Mr. Rau........ 132
By Mr. Stepan..... 159,160,160

INDEX OF EXHIBITS

EXHIBIT NO. DESCRIPTION PAGE
Campbell No. 788....Professional Profile................ 6
Campbell No. 789....Proposal Dated Nov. 8, 2001......... 39
Campbell No. 790....Waterproofing Investigation Report.. 45
Campbell No. 791....Misc. Notes and Questions........... 60
Campbell No. 792....Contractor Assistance Request Form.. 73
Campbell No. 793....Diagrams of Promenade Oaks.......... 76
Campbell No. 794....Diagram, Site Plan A................ 77
Campbell No. 795....Box of Samples of Insulation (Retained by Mr. Rau)............... 89
Campbell No. 796....Inadequacies of the Existing Waterproofing Membrane............. 124

\# The original exhibits (except Exhibit No. 795) and original transcript are in the possession of Attorney G. John Veith.



THE DEPOSITION OF DAVID CAMPBELL, is taken on this 26th day of August, 2003, before Charles G. Williamson, a Notary Public in and for the State of Minnesota, County of Hennepin, at the Law Offices of Brown & Carlson, 5411 Circle Down Avenue, Suite 100, in the City of Minneapolis, Minnesota, commencing at the hour of approximately 9:15 a.m., pursuant to NOTICE:

* * * *

(Campbell Deposition Exhibit Number 788 was marked for identification at this time.)

DAVID CAMPBELL,

called as a witness, being first duly sworn, was examined and testified on his oath as follows:

EXAMINATION

BY MR. VEITH:

Q Good morning, Mr. Campbell. Would you please state your full name for the record?
A **David William Campbell.**
Q And could you state your current business address, please?
A **Inspec Incorporated, 5801 Duluth Street, Golden Valley, Minnesota, 55422.**
Q Mr. Campbell, you have been deposed before?
A **No, I haven't.**
Q You've never been deposed?
A **Correct.**
Q Have you ever testified under oath?



A **No.**
Q A couple of things about testifying. When the court reporter is taking things down, I would like you to try and keep in mind this is not like normal conversation, only one of us can talk at a time, okay, because Charlie needs to be able to take us down and he can't do both of us at the same time.
A **Okay.**
Q Also, you need to answer verbally. You need to answer out loud either a yes or a no. The court reporter can't take down shrugs, nods of the head, that sort of thing, okay?
A **Right.**
Q And then lastly, if you don't understand a question, please let me know and I will try and rephrase it for you or reask the question, okay?
A **Understood.**
Q If you answer a question, I will assume that you understood my question; is that fair?
A **Yes.**
Q What is your present position with Inspec?
A **I'm an architect and head of the waterproofing department at Inspec.**
Q I'm showing you Exhibit 788, which looks like a copy of your Professional Profile, I guess your resume, if you will?



A **Correct.**
Q I'd like to know when you received your bachelor of architecture degree from the University of Minnesota because it's not identified on it?
A **Bachelor of architecture I received in 1976.**
Q Okay. And what about your bachelor of environmental design; when did you get that?
A **I'm hesitating because I may have confused the two. I received a bachelor of environmental design first. That's correct. I got bachelor of environmental design in 1976, bachelor of architecture was 1977.**
Q So you went to college, then, for five years, or how did that work?
A **Just one quarter shy of seven years.**
Q Where did you do your foreign study?
A **Many countries in western Europe. I could name them off, if you wish.**
Q Well, what kind of architecture were you studying when you were over there?
A **The emphasis of the three month study focused primarily on gothic architecture, tensile structures and historic architecture in general.**
Q What's a bachelor's of environmental design? What is environmental design?
A **It's related to architecture, but it's not a professional**

**degree. It deals with issues of the environment, natural environment, but oddly enough, it also includes instruction on how to problem solve in general. I never did understand myself just how that went along with that degree, but I -- that's the best I can recollect. It's been so long. It was a degree that I was advised to get by an advisor because it was related to architecture, so I did.**
Q Sounds like something you don't use every day, though?
A **Correct.**
Q Okay. What did you have to do to become a licensed architect?
A **I understand it's a little different now, but what I had to go through was get the professional degree, which is the bachelor of architecture, go through an apprenticeship for four years, during which time you have to function underneath a licensed architect for four years, satisfy a requirement of varied experiences during that four year apprenticeship, after which time you're a candidate to take the state license exam, and when you pass the exam, you are a licensed architect.**
Q Where did you do your apprenticeship?
A **One firm was Glen Cording Associates.**
Q How do you spell Cording?
A **C-O-R-D-I-N-G. Another firm was Krysunski, Krank and**



**Erickson.**
Q Get the spellings later.
A **KKE. They don't go by Krysunski, Krank and Erickson anymore. KKE is their common name. Brent Anderson Associates. A bit of clarification. Brent Anderson Associates today is a waterproofing and roofing contracting company who has done work for Healey Ramme in the past. They're not really involved in this case. But when I worked for Brent Anderson Associates, it was strictly a design entity. Brent Anderson dissolved the design entity after I had left, took the name and applied it to his construction company, but when I worked for him, Brent Anderson Associates meant Architects and Engineers.**
Q Do you know when Brent Anderson changed focus?
A **He had both the construction entities as well as the design firm while I was with him. However, he switched all his emphasis to just the construction end of it. I believe that was about 11 years ago.**
Q When did you become members of the American Institute of Architects?
A **Very shortly after I became licensed, and that was eight years ago.**
Q So you received your license in what, 1996, 1995?
A **Eight years ago, whatever that --**



Q When did you join the American Society for Testing and Materials?
A **Approximately 1997, I believe.**
Q You have a list of or a section in your Professional Profile for published materials. Is that a complete list?
A **Yes, it is.**
Q And what about the relevant talks and seminars; is that a complete list of talks and seminars that you've given or do you have more to add to that?
A **Now, I notice this is not my most current profile. The Published Materials in the more current version is the same, but I think there were one or two things added under Relevant Talks and Seminars. And also there was another award, another item under Awards that's not shown here.**
Q When we're done here today, would you please get a copy of that and provide it, an updated version?
A **Sure. Let me just review Relevant Talks and Seminars here to answer your question.**
MR. RAU: I didn't know there was one.
THE WITNESS: Yes. I got that here. Actually, I think Relevant Talks and Seminars is current.
Q (By Mr. Veith.) You think it's current?
A **Yes.**
Q Do you know where we could get a copy of your book, Earth



Integrated Structures?
A **Yes. It's not been in print for a long, long time.**
Q Why is that? I was curious.
MR. RAU: It's such a best seller.
THE WITNESS: I have one copy. I only have one copy. I could certainly loan it to somebody who's interested, but I would like it back.
Q (By Mr. Veith.) Okay. I think that might be something we'd like to do. Who is Sarnafil?
A **Sarnafil is a manufacturer based in Switzerland, a manufacturer of a polyvinyl chloride waterproofing membrane, and they also manufacture other waterproofing products and related products. They have manufacturing and distribution facilities in the U.S., but the mother company is in Switzerland.**
Q Do you have some kind of a working relationship with that business or how did you come to be giving a seminar there?
A **I've developed somewhat of a reputation in the industry for understanding waterproofing. They invited me to speak to their group. I had specified Sarnafil products in the past.**
Q You mention in your profile that you have presented to many architectural and engineering firms. Which ones?
A **Miller Dunwoody Architects, Architectural Alliance Architects, HNTB Engineers. There's a fourth that**

**escapes me right now.**
Q Elness Swenson Graham?
A **No. I'm sorry. I know there's a fourth, I just can't remember.**
MR. RAU: If it comes to your mind, we can --
Q (By Mr. Veith.) Who was your first employer after completing your college degrees?
A **Glen Cording Associates.**
Q And how long were you there?
A **I had worked for Glen summers while I was going to college; three summers, as a matter of fact. Then I worked for him after graduation for approximately three years.**
Q What were you doing for Glen Cording?
A **Preliminary and schematic building design, construction document drafting, construction drawing drafting, site observation, model building. I think that sums it up.**
Q So you would've worked there till about 1980; does that sound right?
A **Yes, approximately.**
Q And where did you go after that?
A **I believe Krysunski, Krank & Erickson, KKE, right after that.**
Q Were you doing the same types of things? Was there



anything different that you were doing?
A **Same types of things but in greater depth. Also, I was doing site planning as well at KKE.**
Q How long were you at KKE?
A **Eight months.**
Q And then you went to Brent Anderson after that?
A **No. After KKE I went to Cole Publications, not an architectural-related job. It was a sales job.**
Q What got you into that?
A **Money. I had a very difficult time finding architectural positions right then due to the economy. I had a wife, so I took what I thought was a lucrative sales job at the time as a temporary measure until I could find an architectural position.**
Q What was your next architectural position, then?
A **Northeast Planning and Design.**
Q Were you still in your apprenticeship at this point?
A **Yes. Had not taken the license exam yet.**
Q What were you doing for them?
A **House designs exclusively.**
Q Residential, single family residential?
A **Yes. Single family residential. We did have a few multifamily, but primarily single family.**
Q And what was the period of time that you were with Northeast Planning?



A **Boy, I'd have to look at my own employment history resume, but I think approximately three years.**
Q Do you have a resume with your employment history?
A **Yes. I don't have it with me.**
Q And you'd be happy to provide that to me?
A **Oh, certainly. It would clear up some of these dates that I'm not too sure of.**
MR. RAU: Dave, is it available at your office?
THE WITNESS: Yes, I think it is.
MR. RAU: Maybe during one of the breaks we can have someone fax it over if you want.
THE WITNESS: Sure.
MR. VEITH: That would be good.
Q (By Mr. Veith.) All right. Up until this point, had you done anything with waterproofing ever?
A **The first involvement with waterproofing I had was 18 years ago when I was working for Brent Anderson Associates.**
Q Was that the job after Northeast Planning?
A **Yes. Brent Anderson Associates was after Northeast Planning.**
Q So did you leave Northeast Planning to go to Brent Anderson?
A **No. Northeast Planning laid me off.**



Q What was the reason for that?
A **Lack of work.**
Q How long were you out of work after that?
A **Approximately two weeks.**
Q And then you went to Brent Anderson?
A **Correct.**
Q What did you do for Brent Anderson?
A **A bit of clarification. At that time, the firm that became known as Brent Anderson Associates was initially named Earth Integrated Technics Incorporated. The reason I hesitate is the name changed so many times before I finally decided on something. But Earth Integrated Technics Incorporated, I believe. That's also on the employment history resume.**
Q How long were you at Brent Anderson?
A **I worked for him for a total of 11 years, I believe.**
Q Could you give me the years?
A **Earth Integrated Technics began and I was with it from its inception.**
Q And when was that?
A **I believe it was 1983.**
Q Okay.
A **And then the name changed maybe three or four years after that and I left Brent Anderson Associates in 1993, I believe it was.**

Q What were you doing for Brent Anderson? I think I asked that before but I didn't really get an answer from you on that.

A **Can I assume when you refer to Brent Anderson Associates you're referring to --**

Q Yes.

A **-- the firm that Brent owned regardless of its name?**

Q Unless things changed with the name change. Did your job duties change at all?

A **Not as a result of that name change transition; for other reasons. Our involvement in our architectural concentration changed. But in the entire time span I worked for Brent Anderson I was involved in all aspects of building design. By that I mean client contact, marketing, schematic design, design development, construction documents, specification writing and site observation, construction observation I should say, for a wide variety of building types.**

Q Multifamily housing?

A **I don't believe we ever did any multifamily housing. And also, in approximately 1995, shortly after Earth Integrated Technics was founded, we also started doing waterproofing consulting for other architectural firms. We had developed a certain level of expertise in waterproofing design as a result of the earth-sheltered**



**houses we were designing and other architectural firms hired us as consultants on their design projects.**

Q Is that what you mean when you told me that the architectural focus changed?

A **The architectural focus of my 11 years with Brent changed for many reasons or changed in many ways. There was another time, I believe this was around 1987, where Brent Anderson bought out another small architectural firm, Charles Diekens Associates, and Charles Diekens Associates had been bank designers, they designed credit unions and banks exclusively. We hired Chuck Diekens, the principal, part time, and Phil Blasko, their registered architect, full time as part of that acquisition.**

So from that point on, Brent Anderson Associates was now also designing banks as well as earth integrated homes, small office buildings and waterproofing consultation.

Q What is an earth integrated home?

A **Simply a home that has either earth on the roof or earth bermed up along the sides or both. It's integrated with the earth, in other words.**

Q Okay. What did you do after you left Brent Anderson?

A **I was unemployed for approximately nine months and I came to where I was hired by Inspec.**



Q While you were at Brent Anderson, and I'm talking collectively from 1983 to 1993, what percentage of your practice was devoted to investigating water leakage issues as opposed to designing?

A **In terms of revenue or time involvement?**

Q Time involvement.

A **Ten to fifteen percent.**

Q When is the first time you had ever done anything related to investigating water leak issues at Brent Anderson?

A **Probably very shortly after the firm started. I'd be guessing, but I would say around 1984, 1985.**

Q And was that investigating earth integrated homes, then, leak issues with those types of buildings?

A **I'm assuming it would have to be since that was the only building type we were involved with at that time.**

Q Do you recall what types of products you were using or involved with in those water leak investigations?

A **I don't understand the question. Design is one thing, investigation of somebody else's products is another. You mean what products we were encountering during the investigation?**

Q Yes.

MR. RAU: And you're talking about the first investigation?

MR. VEITH: Well, I'm talking about during



his time at Brent Anderson.

THE WITNESS: Oh, during the entire time?

MR. VEITH: Yes.

THE WITNESS: A wide variety of products. What the industry refers to as peel and stick waterproofing membranes, for example. Single ply membrane such as EPDM or butyl rubber, bentonite composite membranes such as paraseal, Swelltite, granular bentonite with a containment sheet of ten mil polyethylene. There was probably -- I probably encountered hot fluid applied rubberized asphalt membranes.

Q Sounds like you're guessing?

A **No. I did encounter hot fluid applied like rubberized asphalt membranes at least once during my time with Brent Anderson Associates.**

Q Do you remember what formulations of Swelltite you were dealing with back then?

A **I can't say for sure, no.**

Q All right. The next job after that? You were unemployed for a period of time?

A **When I came to Inspec.**

Q That's when you came to Inspec?

A **Right.**

Q In Exhibit 788, you say that you've been with Inspec since 1994, correct?

A **I think that's right, yes.**
Q And then it says you have devoted the last 16 years to the study, investigation and design of below ground waterproofing and drainage systems?
A **Correct.**
Q So would all of that experience either be at Inspec or Brent Anderson?
A **Yes, that's right.**
Q Okay. What positions have you -- well, how did you come to the Inspec job?
A **My mother saw an article in the paper describing that Dick Phillips had become president of Inspec. I had been dropping my resume out of airplanes and been unsuccessful in getting too many interviews, and I said, "Okay, Mom, I'll give them a call." It turns out they were interested in expanding their design service to include below ground waterproofing. They had already developed a good reputation for themself in the area of roofing design and wall restoration. They wanted to round out their building envelope approach to solving building problems by adding below ground waterproofing. With my experience at Brent Anderson Associates, they hired me with the intent of doing waterproofing projects and maybe some day developing it further into a department, which is what they did.**



Q What positions have you held at Inspec?
A **I was a project manager the day I was hired, and from there I became department head of the waterproofing department.**
Q When did that happen?
A **I was named department head, it was 1998.**
Q Did that involve a change in responsibility of any kind?
A **Very definitely.**
Q What was the nature of your job as project manager?
A **Design, all aspects of design of waterproofing projects, managing the project from start to finish, all the way through the bidding process.**
Q Is that all, is that all you were doing?
A **Also construction observation.**
Q As project manager, were you involved in investigation of water leak issues?
A **Yes. We also did investigations.**
Q Would you tell me about what you were involved in in that regard?
MR. BROWN: As a project manager?
MR. VEITH: Yes.
THE WITNESS: The investigation of a leak would -- sometimes we would carry out an investigation as a matter of verifying existing conditions in preparation for a design, for the design project. Other times we



would do an investigation as a service all by itself without any intent of going on making that a design project. But in both cases it pretty much involved the same thing. We would do destructive test openings, identify, verify existing materials and conditions. Sometimes it involved water tests to verify where the water was coming in, how it was getting through the structure. We would document this information with photographs, sketches. We would analyze the information and put it all together in an investigation report.
Q (By Mr. Veith.) What changed when you became head of waterproofing department?
A **I continued to do everything I had done before as a project manager, just fewer projects. In addition to that, I now had to oversee and train people. At first only one or two. Today we have a total of five in our department. But I hire and train and review the work of those in my department as well as still doing investigations personally and design projects personally.**
Q Are the people that you're overseeing and training, are they also licensed architects?
A **No. None of them are.**
Q What are they?
A **Two have architectural degrees. Excuse me. Three have architectural degrees, one has a construction background.**



**Then there's another individual who's not formally part of my department but I borrow him from another department from time to time. He's a licensed engineer.**
Q What percentage of your job while you were project manager was devoted to investigation of water leak issues as opposed to design?
A **During my entire stay at Inspec?**
Q Well, just during project manager first and then I'll ask about that.
A **I would say 25 percent of my time.**
Q What was the other 75 percent, design?
A **Design, uh-huh.**
Q How about after you became head of the department?
A **It increased. I would say 40 percent of my involvement was investigation, below ground water infiltration investigation.**
Q Did you review anything in preparation for your deposition today?
A **Yes.**
Q What did you look at?
A **I reviewed my own report again, I reviewed my Professional Profile again, I read an updated report by Patrick Engineering which Flynn & Gaskins forwarded to me.**
Q An updated what?

A **An updated version of a report issued by Patrick Engineering.**
Q Anything else that you reviewed?
A **I reviewed CETCO product literature that involved the Swelltite product, both the literature that was published for the first version of Swelltite as well as literature published for subsequent versions of Swelltite. Over the last four months, as Flynn, Gaskins & Bennett would forward depositions to me, I would review those.**
Q You reviewed depositions in preparation for today or you're talking now about other things you've looked at?
A **Just other things I've looked at.**
Q Anything else you've reviewed in preparation for today?
A **Flynn, Gaskins & Bennett loaned to me a videotape of general things.**
Q How to be a witness?
A **Yes. I believe that's it.**
Q That's it?
A **Uh-huh.**
Q Have you ever served as an expert witness before?
A **Never have.**
Q Prior to the Promenade Oaks project, had you ever encountered Swelltite 3000 before?
A **Yes, I did on one occasion, but I would have to do some digging to find out just the circumstances surrounding**



**that. I don't recall the project or the occasion. The reason why I know I have encountered it before is because I remember wondering about the effectiveness of the bentonite component of the Swelltite product and then seeing it again on the Promenade project brought it back to mind.**
Q What would you need to do to find out what your prior experience was with the Swelltite 3000?
A **What would I need to do to find out what that occasion was?**
Q Yes.
A **I'd have to go back through files at Inspec. I'm hoping it was during Inspec. It may have been during my years with Brent Anderson Associates, and that would be extremely difficult, if not impossible.**
Q So this experience was a significant period of time prior to getting involved with this situation?
A **What do you mean by significant?**
Q A long period of time, a number of years?
A **A number of years, yes.**
Q Any other concerns you had about it when you first experienced? You said you wondered about the bentonite. Was that your only concern?
A **The -- yes. I'd have to say yes.**
Q You don't remember the location of that project?



A **No, I don't.**
Q You don't remember the type of construction that it was used on?
A **No, I really don't. My memory is very vague on that.**
Q You don't remember the geometry of how it was applied?
A **I seem to remember it was a horizontal application, but that's all I remember about that.**
Q Do you remember whether it was a plaza or what was the nature of the horizontal application?
A **I really can't say.**
Q Do you remember what the issue was and why you were concerned with the Swelltite 3000?
A **I can assume because there was leaks.**
Q I don't want you to assume, I want you -- if you remember?
A **I don't remember.**
Q Have you ever recommended the use of Swelltite 3000 for an application?
A **No, I haven't.**
Q Have you ever recommended the use of other formulations of Swelltite for construction application?
A **No.**
Q Do you know what other, if any, formulations of Swelltite you've had experience with prior to Promenade?
A **No.**
Q Do you recall any specific instances where you worked with



other formulations of Swelltite prior to Promenade?
A **Well, like I say, there was that one incident where I encountered Swelltite once before, but --**
Q That's the only time?
A **That's the only time.**
Q Okay. Prior to working on the Promenade project, had you ever had any familiarity with or experience with a waterproofing membrane, a bentonite membrane using a polyvinyl alcohol film or water-soluble film?
A **No.**
Q Was Promenade Oaks the first project where you had ever had any experience with a polyvinyl alcohol film on a waterproofing membrane?
A **I don't recall whether my first experience with Swelltite was a version that had the water-soluble film or not, so I don't know whether Promenade was the first occasion or not.**
Q Have you reviewed -- you're familiar with, at least as we sit here today, you know what the composition of the Swelltite 3000 membrane is, correct?
A **Yes.**
Q Do you know what the chemical makeup of the film is?
A **No, I don't.**
Q Do you have any understanding of the chemistry of the film or how the film works?

A **I think so, yes.**
Q Tell me about your first visit to the site?
A **I walked up on the earth-covered courtyards. I believe we were outside first.**
Q Who is "we"?
A **Tom Healey, I believe, was with me. I'm not certain of that, but I think so. Somebody was with me. And then we went down into the garages and looked through all six garages and went into some units that had experienced water infiltration in the past.**
Q Do you know which units those are?
A **No, I don't. As well as some elevator towers that had experienced water infiltration in the past.**
Q How long were you out there?
A **I can't say for sure. Approximately two hours.**
Q Did you take any notes or make any documentation while you were walking around out there? And again, we're just talking about this initial visit.
A **Initial visit, right. I think I probably would have.**
Q Do you know where those notes are?
A **In the file that I left at Flynn, Gaskins & Bennett, I imagine.**
MR. VEITH: Were those in the stack of documents, Steve, that you gave us?
MR. RAU: No. Of course they were. I



don't know whether -- I haven't been through to determine whether there are notes there. You got his file intact, so if they're there, they're there.
Q (By Mr. Veith.) As you walked through the courtyards, what did you observe? Anything stand out?
A **The fact that the concrete collar around the drains in a great number of cases were elevated above the surrounding side, which indicated water would have to reach quite a high level to enter the drains. I think that was one of the first things I noticed right off the bat.**
I noticed an unusual amount of sidewalk cracking, unusual amount for sidewalks that were as recently installed as they were. I noticed finished grade in quite a number of locations was up covering the vinyl siding of the units. I noticed there was an irrigation system.
Q In the courtyards?
A **In the courtyards, right. It was -- I was made aware of where the repairs had been done recently by Weis Construction, Weis Builders.**
Q Was Mr. Healey pointing that stuff out to you?
A **I don't recall who was pointing it out to me. Somebody was with me at the time. It might have been either Mr. Healey or Terry. I really can't say which. My notes probably say. I remember noticing what I think was a PVC**



**clean-out breaking the surface and I was told later that this was where some shallower perforated PVC drains had been installed as a repair measure. I noticed there were no gutters on the roof right away and it appeared initially as though all roof water was emptying right into the courtyards. I noticed there was pre-finished sheet metal flashing that extended below grade. I noticed it because that's not good practice and it stood out in my mind.**
I think that about sums up my initial observations.
Q Did you walk all of the courtyards?
A **Yes. All six.**
Q And you can't remember whether it was Mr. Wiederhoft with you or Mr. Ramme with you?
A **Not that very first time, no, I can't.**
Q Do you remember any of the conversation you had with those gentlemen during these walk-throughs?
A **I know we discussed the extent of infiltration since very shortly after the buildings were constructed. They talked in detail about the types of infiltration they had experienced both in the units and in the garage. I remember Tom Healey on one occasion, I don't know whether it was the initial site visit or not, but on one occasion Tom Healey talked about how because of fire access they**



**had to redesign the link between Building 1 and 2. Whether this had any bearing on the infiltration or not, I had no idea of knowing at that time.**
Other than just talking about the infiltration history at length, that's all I can recollect.
MR. VEITH: Okay. Why don't we take a break.
(A short recess was taken at this time.)
Q (By Mr. Veith.) Why don't you tell me about what your observations were, things that stood out to you as you walked through the garages, again during your initial site visit?
A **I observed approximately eight active leaks originating from precast joints, concrete block walls, other various details. But the vast majority of what I observed was simply evidence of previous water infiltration.**
Q The eight active leaks that you saw, you said joints in the precast and CMU walls and then various other details. What are the various other details?
A **They were all unique in their own right. I'd have to point to a map to show you. Various junctures of structures coming together. They were all different from one another.**
Q What kind of a map?

Q What are the tick marks across some of the checks that you have in the margin? What does that mean?
A **I have no idea. I usually don't do that. I don't know why I might have done that on this occasion.**
Q Three lines down on the first page of the Deficiencies section it talks about the post, frame nailed through waterproofing into precast. Do you see that?
A **Uh-huh.**
Q Do you know whether the waterproofing actually went under the frame that was nailed to the precast?
A **I wouldn't have said that if I didn't believe it was.**
Q Do you know whether that's true?
A **Yes, it is true.**
Q Where did you observe waterproofing continuously extending under posts?
A **I made destructive test openings at two posts. I don't recall which one I saw that at.**
Q Could you identify it by looking at your report?
A **Probably not which detail, you know.**
Q Did you document the DTOs?
A **As to the locations?**
Q Yes. I mean, did you document the conditions of each DTO as you reviewed it?
A **Yes.**
Q Did you document it by taking notes of the conditions?



A **By making quick little field sketches.**
Q You made field sketches and you made photographs?
A **Uh-huh.**
Q Did you do anything else to document the conditions in each DTO?
A **No. Just took samples and the sketches.**
Q The quick little field sketches, are they just handwritten sketches that you draw on a piece of paper?
A **Yes. They're pretty crude, they're pretty messy.**
Q Do you keep those?
A **No. After I have incorporated those more formally, had them CAD drafted, I usually toss those.**
Q Why?
A **It's just what I always do. It keeps the file from getting too full.**
Q So those sketches are gone?
A **Yes.**
Q Would those sketches be the only way you would know where you saw the condition that you're describing here on the third line?
A **Unless I saw it at both post DTOs, that's correct.**
Q A few lines down from that where you start talking about drains, it says you saw flooded -- in parentheses -- you saw flooded membrane with no water spilling in drain.
A **I'm sorry, how many lines down?**



Q Oh, it's about -- I'm one, two, three, four lines below the last post entry.
A **Okay. Saw flooded membrane with no water spilling in drain. Yes.**
Q Are you able to tell us at what locations you saw that condition?
A **I saw that at both of the DTOs which I took at a drain.**
Q And we'd be able to identify those by looking at your report if we wanted to, right?
A **That's correct.**
Q The line below that talks about a survey of how well drains work. Did you do that?
A **Yes, I did. It was simply a visual survey. I removed the grate of every drain on the property in the courtyards and just visually looked inside and noted how much water was dripping in. It was not scientific, it was just visual. And it was -- it was after we had had a couple days of good rain, so I assume that the surcharge of water in the earth was pretty substantial and that if the drains were working, it certainly would appear so if I just looked in.**
Q What was your assessment as a result of the survey? What conclusions did you reach?
MS. HEYER: Objection, foundation.
THE WITNESS: In virtually all the drains,



nothing was entering in through the top grate. There was very little water entering in through the repair perforated PVC that was installed after construction. There was very little water, and in many cases none at all entering through the perforated PVC collar which connected the top frame of the grate with the bottom bolt. My overall assessment was that the vast majority of drains were not draining the way they should after having had two days of the rain we had.
Q (By Mr. Veith.) Do you know the dates when you did your destructive test openings?
A **Not offhand, but I can look it up.**
Q Where would you look?
A **I have a planner that I use, a Franklin planner. That would be one way. I might even say in the report when I did the destructive test openings.**
MR. RAU: Photos.
MR. VEITH: I'm sorry, Steve?
MR. RAU: I'm wondering aloud whether the photos have any dating on them.
THE WITNESS: No, they don't.
Q (By Mr. Veith.) Do you know whether the destructive test openings were excavated in November 2001, shortly after your proposal?
A **I can't say for sure whether it was in November or not.**

Q Well, if you're done with your answer, I guess you've answered my question.
A **Yes.**
Q Why don't you pull out the sample from number 1?
A **(Witness complies.)**
MR. REILLY: By the way, has the box been made an exhibit now?
MR. VEITH: I think we did. Oh, we didn't? We better do that.
(Campbell Deposition Exhibit Number 795 was marked for identification at this time.)
THE WITNESS: In the case of DTO number 1, I did save a piece of insulation apparently. There's also a sample of the drainage board or drainage composite sheet minus the fabric apparently. The fabric must have, I assume, just come off. No, here's the fabric. It's no longer adhered because of the water.
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Here's one sample of the Swelltite. In this case, apparently the hydrated bentonite component left or debonded from the plastic component of the material, and in this case there is a scant amount of film remaining on the bentonite that did come along with the plastic component.



Q (By Mr. Veith.) Do you know whether this sample is in the same condition that it was when you removed it?
A **This is only the second time these bags have been opened. The first time was --**
Q I understand that, but do you understand my question?
A **Yes. The answer is yes.**
Q So when you took this -- well, first of all, this is what, a one and a half by two and a half inch piece?
A **Yes.**
Q Why did you take -- is there any significance to the size of the sample?
A **Apparently, if the sample doesn't have all the bentonite component that go along, correspond with the plastic sheet, it's only because in its hydrated state it wasn't something you could collect up. I always tried to keep the bentonite component with the size of the plastic sheet whenever possible. So if it's absent, it just wasn't something you could -- it was too mushy. You just couldn't collect it up apparently.**
Q Prior to doing these destructive test openings, had you ever seen hydrated Swelltite?
A **I can't say for sure if it was hydrated or not, but I did see Swelltite that one other time we talked about earlier, that one I couldn't recall which project it was connected with.**



Q What's your basis for -- well, are you saying this is hydrated?
A **Partially hydrated. That piece there was partially hydrated.**
Q Which part of the bentonite is hydrated and which isn't?
A **The bentonite is mixed in with another compound to serve as a medium. I know this just from reading the CETCO literature and the --**
Q Well, when I'm using the word bentonite, I'm referring to the compound. So which part of this compound here, which part of this sample is hydrated?
A **This part right here is just barely hydrated. It's not hydrated very much any longer.**
Q What do you mean by it's not hydrated any longer?
A **I'm assuming that it's lost a little bit of its hydration in the many months it's been in this bag.**
Q Are you familiar with the characteristics of bentonite?
A **Very much so.**
Q Do you know whether it can lose hydration?
A **I'm not -- I'm familiar with bentonite as a material and its behavior, but when you mix it with the medium that CETCO does, I'm not familiar with that.**
Q So as far as -- this is all of the undissolved film that you pulled out of that first destructive test opening, what's shown here in this sample?



A **There is another piece. That's also the film. This very likely came off other parts of the plastic; that's why it's in the bag. So that's the balance of the film that I was able to recover in DTO number 1.**
Q Looks like the film is partially hydrated -- or partially dissolved. Do you agree?
A **I would agree.**
MR. REILLY: John, may I talk to you just a second?
MR. VEITH: Sure.
(An off the record discussion took place at this time.)
Q (By Mr. Veith.) When you removed the Swelltite sample from destructive test opening number 1, you were able to see the concrete?
A **Yes, I was. There were -- let me take that back. I don't know whether I did or not in the case of DTO number 1.**
Q Because you don't remember DTO number 1?
A **The reason why is because --**
MR. RAU: Do you want him to answer your question? Which one, the first one or the second one, Mr. Veith?
Q (By Mr. Veith.) Well, let's start with do you remember DTO number 1?

**topsoil. The opening at the top was usually about 36 inches by 36 inches, so that by the time the sides taper down to the bottom there's still enough area revealed to work with. There is sod, topsoil, backfill material, extruded polystyrene insulation, a drainage composite sheet, the Swelltite waterproofing membrane and structural data. That is documented in here in a detail.**

MR. RAU: When you're tapping "in here," you're referring to your report?

THE WITNESS: Excuse me. I'm referring to my report.

Q (By Mr. Veith.) Why don't you tell me about the conditions of each layer as you went down through? You know, kind of in a chronological order walk me through the excavation?

A **I'd have to refer to my report.**

Q Go ahead. Just tell me where you are so I can follow along.

A **Uh-huh. I'm looking at detail C, titled Existing Condition At Precast.**

Q Okay.

A **And also as part of the title I identify that this is typical of DTOs number 1, number 2, number 6, number 12, number 15, 17 and 20.**

Q Now, before you start, let me just ask you, do you have an



independent memory of these openings or are you relying entirely on your report for what the conditions were?

A **Probably for the most part just relying on the report, with very few exceptions. I might remember some details particular to one location, but for the most part I'd have to rely on my report. It's been too long ago.**

Q Is this detail C the only documentation you have of this destructive test opening?

A **Yes.**

Q Okay. Why don't you go ahead?

A **First we encountered sod, then earth backfill, and I noted at the time it was poorly percolating, extremely high moisture content. There is a photo number 28 to substantiate that. Next, after getting through about two feet, two and a half feet of backfill we encountered the extruded polystyrene insulation. It was pink, which tells me it was a Foamular product. I lifted up the insulation and saw that the drainage composite sheet -- the dimples of the drainage composite sheet had been driven up into the underside of the insulation by the weight of the earth.**

Q Let me just back you up for a second. When you had excavated the dirt off the top of the insulation, how big around was that hole where you --

A **The hole down at the insulation or up at the top?**



Q You still see the top surface of the insulation, but you've excavated the dirt. How big is the hole at that point?

A **Probably in the neighborhood of two feet square. We could look at a photo, photo 28.**

Q At that point, when you saw the top surface of the insulation, did you see any water in the hole?

A **Yes.**

MR. BROWN: Excuse me. Photo 28 is DTO 2, I believe?

THE WITNESS: That's right.

Q (By Mr. Veith.) I think you're actually talking about 25?

A **Yes. DTO 1, photo 25.**

Q So before you had cut into the insulation, you were already seeing water at that point, correct?

A **At DTO number 1, I can't say for sure. It appears as though that was the case since we have the wet vac hose in photo 25 down there. However, we would've had the wet vac hose down there had we encountered water just under the insulation as well, so I can't say.**

Q Would you vacuum the water out before proceeding on to the next layer or would you just keep going down?

A **No. We would definitely vacuum the water out, yes.**

Q Would the vacuum be running continuously?

A **In the case of some DTOs, it was, yes.**



Q How about this one?

A **As far as number 1 goes, I can't say for sure.**

Q After you cut through the polystyrene, or the insulation, you pulled that out, what was the next thing that you saw?

A **The drainage, or composite drainage sheet, as it's called.**

Q Did you see any water at that point?

A **Again, I would have to refer to my detail. But since I am stating this detail is typical of all those DTOs, 1, 2, 6, 12, 15, 17 and 20, all the notes on here are true of all those DTOs. I don't mention one way or another whether there was water standing on top of the insulation or not.**

Q Well, if the statements made in Drawing C are true for all of these DTOs, that doesn't make sense to me because you've got a statement here that says parts of bentonite not in contact with concrete because of undissolved film and you're talking about it lists some DTOs where you didn't find undissolved film. So that can't be true, correct?

A **Correct.**

Q So we can't take it for granted that statements made in this sheet are going to be true for each of these DTOs?

A **No. I guess you're right. I meant this to be rather typical but maybe not exactly what all those DTOs are.**

MR. RAU: I don't think he finished the question you asked earlier.
MR. VEITH: Well, I don't care. There's no trick to this.
MR. RAU: I know there isn't, but if you ask him three questions, I want the record to be clear as to what he's being responsive to.
Q (By Mr. Veith.) Did you see the concrete? He said, "I don't know."
A **In the case of DTO number 1, I can't say. I don't remember.**
Q And the reason that you can't remember -- the reason that you don't know is because you can't remember?
A **It's because in the case of some DTOs on the horizontal deck, there was a mastic accessory product that CETCO recommends be used on top of the keyway joints before the Swelltite is put on top.**
Q Okay. But if Mr. Rau is going to make me do this question by question, I want an answer to my question. My question is, you can't remember DTO number 1, you're relying entirely on this photo and on the sketch, Drawing C, I think it was?
A **I remember quite a bit about it specifically, but I don't remember everything about it. I don't remember if I saw the concrete or not.**



Q What evidence do you have that water came into contact with the parts of the film that aren't dissolved?
A **There was water underneath the Swelltite. In every one of the cases -- excuse me. In four of the cases where I found film intact, there was water underneath the Swelltite membrane.**
Q What did that look like? Was it just damp?
A **Dampness, yes.**
Q Now, how do you remember this -- I mean, you don't remember this destructive test opening, so if you don't remember this destructive test opening, how do you know -- what evidence do you have that water -- let me finish my question -- that water came in contact with this film that's not dissolved? I mean, you can't remember?
A **If this was one of the two that I did not find water in the membrane, you're right.**
Q And you don't know if this is one of the two, right?
A **That is correct.**
MR. BROWN: Just to be clear for the record, one of the two what, DTOs?
THE WITNESS: There are six DTOs where I found film remaining on the sample of Swelltite. For only four of those did I find water under this Swelltite membrane.
MR. RAU: So there's only partial failure,



66 percent.
MR. REILLY: I'll object to your description of whatever it is, counsel.
MR. RAU: You can object all you want.
MR. REILLY: If you're going to testify, we'll put you under oath.
MR. RAU: Okay. Let's go.
Q (By Mr. Veith.) When you excavated, did you ever make any dams around the Swelltite area where you were going to cut out the sample before actually removing a sample to prevent water from getting in?
A **No, we didn't.**
Q You didn't use any other types of precautions to prevent water from getting through the membrane when you were cutting it other than using that vac, is that right?
A **That's correct.**
Q What did you use to patch it back up?
A **We used granular bentonite, quite a bit of it, and a containment sheet of EPDM rubber on top of that.**
Q How did you seal it?
A **Bentonite will self-seal to the surface of the Swelltite, especially under the load that all this earth would apply to once it was hauled back, using the same principle as the Swelltite material itself.**
Q Did you have to hydrate the bentonite to seal it?



A **No. If water never reaches the repair bentonite, there's no reason for it to seal. If water reaches the repair bentonite, it will hydrate and seal just like bentonite does.**
Q Did you put insulation back -- you know, did you fix the drain tile?
A **We did.**
Q How did you fix those parts up as you're filling it?
A **We left -- we did not put the drainage composite sheet back. However, we did replace the insulation.**
Q So you just left it without the drainage sheet out there?
A **That's correct.**
Q Did that concern you, leaving that out?
A **Not at all.**
Q Why not?
A **Because there was water under the drainage sheet, within the drainage sheet. As long as the membrane was repaired. There was already water between the membrane and the underside of the drainage sheet throughout the whole project, so interrupting the drainage sheet would have no effect on the watertightness of the system.**
Q In any of the destructive test openings, did you ever remove a sample of the membrane involving a seal or a seam between two overlapping layers?
A **Never encountered a seam. I was hoping I would, but I**

**never did. It's a hit or miss situation.**
Q All right. Let's go to the next one that you said had film in it. That's number 4? First of all, can you tell me why you chose that location?
A **I chose DTO number 4 location -- I chose the location for DTO number 4 based on what Terry had told me. He said there was water entering that elevator shaft, or there had been in the past. And I also wanted to take a look at a vertical wall application of a waterproofing adjacent to an elevator shaft, so that's why I picked that one.**
Q Was there any evidence that you had found before making this opening that this might be a source of a leak other than Terry's statement or was it hit or miss, as you were saying?
A **No. It was just based on Terry's statement, right.**
Q Okay. How big was this particular opening?
A **Like I said, I'd have to look at a picture.**
Q It's photos 31 and 32?
A **We had to cut through the sidewalk. It's approximately 30 inches square at the sidewalk opening.**
Q And that's based on your view of the photograph?
A **It is.**
Q Okay.
A **And also you can count the brick coursing on the wall.**



Q In which photograph now?
A **Photograph 31. We have two bricks approximately eight inches apart, so I'm wrong on that. It's more like 16 inches square.**
Q Based on the size of the brick?
A **The length of the brick, yes.**
Q Length of the brick?
A **Yes.**
Q Can you tell me what materials we're looking at in photo 31? Maybe you can tell because I see a lot of black and I'm not sure what it is we're looking at?
A **The blue material is extruded polystyrene insulation like we've seen before, but this is a Dow product. That's why it's blue.**
Q What is the black material between those two pieces of insulation?
A **Most likely the --**
Q Well, do you know what it is?
A **I'd have to refer to my report. On the lower half, the lower half of the black area is composite drainage sheet.**
Q Well, what are you looking at right now? You're not looking at the photograph, right? Can you tell by looking at the photograph what that is?
A **No.**
Q You'd have to rely on your sketch, and your sketch is



which one?
A **E.**
Q Okay. So based on sketch E, what do you think that material is?
A **The lower half is, which would also be dark, is the composite drainage sheet, whereas the upper half, because the drainage capacity sheet stops short, stops at mid-wall, the upper half then would be the Volclay Swelltite which also has a black back.**
Q Okay. Now, when you say the lower half, are you talking about the horizontal part of the deck in photograph 31?
A **No. When I said the lower half, I meant of the vertical wall, the lower half. But now I see by photo 32 that when I took the photo, the composite drainage sheet has already been removed. So I'm correcting myself to say that in photo 31, what we're looking at for the full height of the wall is the Swelltite product.**
Q So on the vertical part of the wall, on the vertical wall, you have not removed any Swelltite?
A **At the time this photo was taken, that's correct.**
MR. RAU: In reference to which photograph?
THE WITNESS: I would have taken both these photographs at the same time.
Q (By Mr. Veith.) Okay. So in both of these photographs,



we're looking on the vertical wall at the top of the Swelltite still in place?
A **Yes.**
MR. RAU: And "these photographs" are referring to photographs 31, 32, just so it's clear.
MR. VEITH: Thank you.
Q (By Mr. Veith.) What about on the horizontal part of this excavation; what are we looking at here?
A **At the time the photo was taken, I have removed the composite drainage sheet -- I've removed the insulation first, then the composite drainage sheet, and I've scraped up some of the -- I've scraped up some of the granular bentonite that was placed on top of the Swelltite membrane.**
Q I'm not real clear on that, what you were just talking about, so let's deal with photograph 32 because I think that's more clear. On the horizontal part that you've excavated out, there's some composite drainage sheet, and it looks like there's a cut in the drainage sheet, is that right?
A **Right.**
Q Okay. What have you cut away out of that drainage sheet, if anything?
A **The entire composite drainage sheet, which is comprised of filter fabric and the plastic core.**

Q So at this point we're looking at the top of the Swelltite? You haven't removed any Swelltite, is that right, in this photograph?
A **That's correct.**
Q Now, when you said you scraped off some granular bentonite, how did that granular bentonite get there?
A **I have no idea. It was there and I documented it in detail E.**
Q Can you tell me where in E that you've documented the granular bentonite? Maybe I'm just not seeing it.
A **Sure. It says Bentonite Waterproofing, second note from the bottom. It's graphically depicted by a stipple, stipple pattern.**
Q Okay. Let's have a look-see at the sample.
A **We've got composite drainage sheet first.**
Q First of all, let's take a look at the label on it. This is labeled DTO 2-3. What is that referring to, because I thought we were referring to DTO 4?
A **Building 2 and DTO 3. I sometimes use a different labeling system out in the field than when I put the report together. It was getting so complicated having two numbers and having the plan on here so small, I decided to change the numbering system to just a simple 1, 2, 3, 4, 5, 6, 7.**
Q Well, how can we make this connection between what the



label is on this baggy and what the number is in your report?
A **Because I say that's where it came from.**
Q Other than that?
A **That's all. I had two different systems for labeling bags when I was out there. I don't know why.**
Q Why don't we back up and take a look at the first sample we looked at?
A **Sure. This one is 1-A, which means Building 1 and DTO A. I did this DTO when I was out there on a different occasion. Remember I was out there on two different occasions doing destructive test openings. I had a numbering system for DTOs or a labeling system whereby the building was first and then DTO sequence was using a letter. Another time when I was doing DTOs I used the building number and then I used a numeral to indicate which detail it was. But when I started putting the report together, I realized I had used two different systems and so I had to get rid of both of them and simplify it and just go 1, 2, 3, 4 up to 20 when I wrote the report.**
Q But there's no way for us to verify other than you say it is that this is where it came from?
A **That's correct.**
Q Is there any rhyme or reason as to when you'll use one



system versus another system?
A **No.**
Q Are the dates on the baggies the date that the sample was removed?
A **Very definitely, yes.**
Q So you would have removed -- is this the one from destructive test opening number 1?
A **Yes.**
Q So you would have removed this sample on January 15th of 2002?
A **That's correct.**
MR. RAU: And by "this," you're referring to the bag that says Promenade Oaks, 1502 1-A?
MR. VEITH: Right.
MR. RAU: Just so that we're completely clear.
MR. VEITH: That's right.
Q (By Mr. Veith.) All right. And then with respect to DTO -- and I'm reading off the bag now -- DTO 2-3, you removed that sample November 28th, 2001?
A **That's correct.**
MR. RAU: Well, counsel, it's your record and your time, so I just want to make sure you use it efficiently.
Q (By Mr. Veith.) Let's take a look at the sample now.



A **This right here is the Swelltite, and you can see by the wrinkle the film that's still present on top of this piece here.**
Q I'm not sure I can see a wrinkle. Maybe you can show me where the wrinkle is because I don't see it other than unless you're talking about folds, that the sample is folded up? By the way, how did the sample get folded up?
A **When I stuck it in the bag. It was bent like this because I took the sample at the inside corner of the cut. You can see that that top material is a thin plastic film and it appeared to me as though by these wrinkles that it is common to the whole sheet here, especially by the sheen that I see here. I didn't want to chance damaging the evidence by pulling at it or trying to remove it.**
Q Can you tell me where the film is?
A **Yes. Over this entire piece, from here to here. Bentonite wouldn't have a sheen like that. And based on the fact that I can pull an edge up of a material, it doesn't seem to stop anywhere.**
Q So the way that you know film is there is by color?
A **No. By sheen.**
Q What do you mean by sheen?
A **It reflects, it's shiny. It's shinier than bentonite alone would be.**

Q Other than that shininess, is there any other evidence that there's film on that?
A **The corner. I don't want to destroy the evidence, but it looks as though the film that you see on the edge here continues over the entire sheet. To me it does.**
Q What evidence do you have that water came into contact with the areas where you think there's film on it?
A **Because the bentonite -- it was not fully hydrated, it was partially hydrated and it wrinkled up around the edges, pulled away from the material.**
Q What areas of the bentonite are you saying are partially hydrated?
A **These edges right here.**
MR. BROWN: The bentonite or the --
MR. VEITH: I thought he said bentonite.
MR. BROWN: Hydrated bentonite?
MR. VEITH: Partially.
THE WITNESS: The bentonite right here has been partially hydrated.
Q (By Mr. Veith.) On the one end of the sample, the end of it?
A **Right. The bentonite underneath the center portion very likely has not been hydrated. It's too close to the original thickness of the Swelltite.**
Q So what evidence do you have that water came into contact



with it at that point where you don't think it's activated?
A **Well, as I said, this is the only part that looks like it's been activated. The center of this probably has not been.**
Q You would agree with me that you don't see any film here at the point where you think the film -- where the bentonite started to activate, correct?
A **I can't agree with you yet until I've torn this apart.**
Q Well, you don't see any visually, right?
MR. RAU: Well, let's refrain from tearing it apart.
THE WITNESS: Exactly.
Q (By Mr. Veith.) You don't see any, though, do you?
A **No. If bentonite had not come in contact -- excuse me. If water had not come in contact with the bentonite component of this sample, you'd see a sample that looked just like you pulled it out of the catalog.**
MR. REILLY: Object, foundation.
THE WITNESS: Or very closely to it. It would not look like this.
Q (By Mr. Veith.) Is there any other evidence?
A **On this sample or do you mean other DTOs?**
Q Any evidence that you have about water coming in contact with that?



A **No.**
Q Okay. You can put that back, too. Now, you said that you took the sample -- this sample covers both, a portion of the vertical and the horizontal wall, or the horizontal floor and the vertical wall?
A **Yes.**
Q And that's why it's bent in this shape?
A **I believe so, yes.**
Q But wouldn't it, if that were true, then --
A **You're right.**
Q Wouldn't the brown side of the Swelltite be against the concrete?
A **No. You're absolutely right. So maybe that is not the reason why it's bent.**
Q So you don't know why it's bent?
A **No. That's true.**
MR. REILLY: He testified that that was from an inside corner.
THE WITNESS: Yes.
MR. REILLY: Thank you.
Q (By Mr. Veith.) What did you use to patch that part of the membrane in that corner area, especially on the vertical wall?
A **If it was on the vertical, I used a mastic, a roofing mastic in conjunction with an EPDM rubber sheet and then**



**built-up granular bentonite around that as well as over the horizontal patch.**
Q So you used granular bentonite on both the vertical and the horizontal?
A **That's correct.**
Q Did you repair or replace the drainage sheet or did you just leave it out?
A **Just left it out.**
Q How about the insulation?
A **Insulation we always put back.**
Q Is that the case for all of these destructive test openings; when you took the composite drainage sheet out, you just left it out?
A **That's correct.**
Q You didn't put in any kind of replacement for it?
A **No.**
Q Now, as I'm looking at Drawing E of your report, I don't see any mention of undissolved film on this drawing. Do you?
A **No.**
Q Did you prepare this drawing yourself?
A **I sketched it and gave it to a technician to CAD draft.**
Q Who is WFM?
A **William, and I don't know his middle name, but William Miller.**

picture. What are we looking at in the bottom of the picture there?
A **Which picture?**
Q 37. I'm sorry.
A **We're looking at mud, muddy water on top of the drainage composite sheet. The insulation has been removed, but the drainage composite sheet is still there with muddy water on top.**
Q So the horizontal part of this, you didn't remove any membrane?
A **Not at the time of the photograph.**
Q How about on the vertical wall; have you taken any Swelltite off the vertical part in either photograph 37 or 38?
A **It appears as though I have removed not only some of the Swelltite but also some of the flashing, self-adhering flashing that goes up over the top of the CMU and knee wall.**
Q Do you know whether the sample that you took out of DTO 7 came from the horizontal portion of the DTO or off the vertical wall?
A **It was off the vertical wall.**
Q How do you know that?
A **Because whenever I took a sample from the horizontal -- well, in this case it was so flooded. I remember now**



**because if you look in photograph 37, the arrow is pointing to something white. That was an electrical cord, and when we discovered that, we didn't know whether it was hot or not, so we didn't want to chance cutting it or another cord that's hidden, so we did not take a cut through the horizontal at that DTO for that reason.**
Q Okay. Where's the sample? Let's identify the bag.
A **I am opening up bag DTO 2-6, dated 11/28/01, some composite drainage sheet with a non-woven filter fabric indicating a wall installation. Typically I found the woven filter fabric version on the horizontal. This is the Swelltite product. The bentonite is barely hydrated and there appears to be a film --**
MR. RAU: Not a sheen?
THE WITNESS: A film on top of the bentonite component here. It looks like it's present over here, too, based on that discoloration.
Q (By Mr. Veith.) Actually, there is not a sheen, is there?
A **No, there isn't.**
Q Okay. So where is the -- well, this bentonite doesn't look activated to me. Am I wrong? It doesn't look anywhere like it's activated to me.
A **Based on thickness, it does appear to be just slightly thicker than the original product. And also based on the fact that it's pulling away from the plastic component to**



**the product tells me that there's a very small amount of hydration there.**
Q Okay. Now, --
MR. REILLY: Before you do that, John, can you tell which side is the top and which is the bottom of that? In other words, this is a vertical piece of material. What side was closest to the roof and what side was closest to the ground?
THE WITNESS: In all cases throughout all my DTOs, the product was properly installed in that the bentonite and film side was towards the concrete.
MR. REILLY: What I'm saying is was this up? In other words, it was this way. Do you know which side was closest to the -- it was like this. Is this the right way, or should it be the other way, if you can tell? (Indicating.)
THE WITNESS: It was like this. And the reason I know that is because this is the Swelltite right on this -- this product that laps over it, shingle laps over the top, is the self-adhering peel and stick product which continues up and on the ledge.
MR. REILLY: So the part that's thicker is near the top?
THE WITNESS: That's correct.
MR. REILLY: All right.



(A short recess was taken at this time.)
Q (By Mr. Veith.) All right. Let's get out the next -- the next destructive test opening is what, 9?
A **Would be 9.**
Q Okay.
A **The bag I'm opening is labeled 2-C, dated January 15th, 2002.**
MR. RAU: Mr. Campbell, let me make a suggestion. Usually Mr. Veith has a bunch of preliminary questions before he asks you to open a bag, so wait until he does that given the delicacy of the materials in there. And maybe he's asking you to do that right now. I don't know.
MR. VEITH: I am.
MR. RAU: Okay.
Q (By Mr. Veith.) Let's figure out which photographs will go with this opening. 41 and 42, it looks like, of your report, right?
A **That's correct.**
MR. REILLY: I'm sorry, John. What DTO are we on now?
MR. VEITH: 9.
MR. REILLY: Thank you.
Q (By Mr. Veith.) Now, are you able to tell me from these photographs where you took the Swelltite sample from?

A **No, I'm not.**
Q In either of these photographs -- were these photographs taken before any removal of Swelltite?
A **Apparently they were.**
Q Is that blue knife, or is that blue tool in 42, is that the knife you used to cut the Swelltite out?
A **Yes.**
Q When you cut out the Swelltite, do you pull it out with your hand? What do you do? You hold the top part, you cut and you pull the Swelltite away from the wall a little bit as you're cutting? How do you do that?
A **Since my plan is to remove the sample, not just fold it back, I cut all four edges with the blue knife that you see in the photograph. Then if it's hydrated, then I'll use a putty knife to pull it away from the surface. If it's not hydrated, I seem to remember one case it just came off quite easily.**
Q So are you pulling it from the top out?
A **On the vertical? Are you talking about a vertical removal or horizontal?**
Q Well, either?
A **On a vertical, if it were bonded to the substrate and I used a putty knife, I'm sure I would come up from below. On the horizontal, if the bentonite were hydrated, it wouldn't matter at which direction I used the putty knife**



**to remove it.**
Q Let's see the sample. Which baggy is it? Why don't you tell us what the label is?
A **The bag I'm about to open is labeled 2-C, dated January 15th, 2002.**
Q Let's just look at the Swelltite. I don't need to look at the -- what are you pulling apart?
A **I'm trying to remove the Swelltite from this other material.**
Q What is the other material that you're pulling apart?
A **This is a filter fabric.**
Q It looks like it's been bonded to the Swelltite or something?
A **Yes, it does. I think it happened in the bag. Here's what we're looking for. This is a sample of Swelltite. I'm saying the film is still on there. That's my opinion.**
Q What is that based on?
A **Based on just visual examination the way the surfaces wrinkle like that. Bentonite wouldn't do that. This looks like this is film material right here that's pulled away.**
Q It doesn't look to me like that bentonite is hydrated, is that right?
A **This has been hydrated. Not fully hydrated, but it has**



**been.**
Q Well, what areas? At the ends?
A **The entire thing. Because I've seen the Swelltite product before installation and it is not this thick. This is not full hydration. It would have a lot more -- it would swell quite a bit more.**
Q You know, what's your view of how thick that is?
A **Well, I'm just going by visual, but that's definitely thicker than the Swelltite product samples I have.**
Q And we're talking about a sample that's maybe one and a half inches by three inches?
A **(Witness nods head in the affirmative.)**
Q What's this other -- is this a Swelltite sample, too? What is this?
A **It looks like this was --**

MR. REILLY: Don't want you to take it apart, sir.

THE WITNESS: Okay. It looks like this was Swelltite as well. No. Excuse me. I'm not going to commit to what this is. No. I will commit to what this is. This is a peel and stick flashing product that's used after the Swelltite material stops.

Q (By Mr. Veith.) The next opening is number 14, is that right, sir?
A **I'm checking here. 14, DTO 14. That's correct.**



Q And that's just at a vertical wall, right?
A **Yes, that's correct.**
Q Are there any photos? Yes. Numbers 51 and 52.
A **That's correct.**
Q Okay. In either of these photos, numbers 51 or 52, have you removed the Swelltite yet?
A **No.**
Q Okay. Since I see a vacuum in photograph 51, is it safe to assume that there was water on top of the membrane?
A **Yes.**
Q Do you have a recollection of how much water was there on top, how deep it was?
A **I do not with respect to DTO 14.**
Q Do you know where the sample was removed from when it was removed from the vertical versus the horizontal?
A **I don't. I'd have to look at the sample.**
Q Can you tell from looking at the sample?
A **Perhaps.**
Q Okay.
A **I'm opening up bag 5-1, dated November 28th, 2001.**
Q Well, if it's --

MR. RAU: David, explain what you're doing on the record and the problem you're having so that it's memorialized.

THE WITNESS: Okay. A piece of the

Swelltite sample has stuck to the inside of the bag. I'm having a hard time removing. Or at least what I think is the Swelltite sample.
Q (By Mr. Veith.) Can you tell whether you removed it from the horizontal or the vertical looking at that piece?
A **No, I can't.**
Q That doesn't -- go ahead.
A **No, I can't answer your question.**
Q You would agree that the bentonite is not hydrated there?
A **That's correct.**
Q Can I see that?
A **Right now I'm still trying to determine whether that in fact is Swelltite.**
Q You're not sure if this is Swelltite even, huh?
A **No, I'm not. When not hydrated at all, Swelltite is very similar to a peel and stick flashing in appearance, but let me just look a little further. I can't say for certain whether it's the Swelltite or the peel and stick flashing product.**
Q All right. Is there any other samples in there?
A **No. That was the only membrane sample.**
Q Did you read the baggy into the record so we all know what you were looking at?
A **I did, yes.**
Q All right. I think that brings us to 17, is that right,



DTO 17?
A **That's correct.**
Q That's the last one. And DTO 17 was just an excavation down to the horizontal deck, is that right?
A **That's correct.**
Q In the middle of the courtyard of Building 5?
A **That's correct.**
Q Now, the photographs that would go with DTO 17 are photographs 57 and 58?
A **That's correct.**
Q In photograph 17, it looks like --
MR. REILLY: It says photograph 57.
Q (By Mr. Veith.) I'm sorry. Photograph 58. Are you with me?
A **Yes.**
Q In photograph 58, what has been excavated? What point are you down to, because I can't really tell? Maybe you can.
A **We have removed the sod and all backfill down to the insulation and I have removed a section of insulation.**
Q To your knowledge, have you removed anything else by the time of this photo?
A **No.**
Q And is that a vacuum pipe? What is that in photograph 58?
A **Which pipe? There are two.**
Q Oh. Your picture is better than mine. That doesn't look



like a pipe. This one that looks like it goes down to the bottom?
A **We suspect that that's an irrigation pipe.**
Q Okay. Let's see the sample.
A **I'm opening bag dated November 28th, 2001, 5-2. This is a sample of Swelltite. The bentonite was at one time partially hydrated because of the cracking, because of the pulling away from the plastic component, and the film is clearly on top.**
MR. RAU: Kind of a partial sheen.
THE WITNESS: There's the film. Yes, there's the film.
Q (By Mr. Veith.) What evidence do you have that water came in contact with the bottom of that sample, with the film?
A **The bentonite is partially hydrated. As I mentioned before, four of the six locations where film was present I saw water under the membrane, which means water was in contact with the film. I can't say for sure whether 17 was one of the four, but --**
Q Can you tell me any of the four DTOs where you found water for certain below the membrane?
A **Identify which ones had water below?**
Q Yes.
A **No, I can't.**
Q There is no documentation anywhere?



A **My report doesn't say that. No, there isn't.**
Q Okay.
A **My point -- the document talks about that in the body of the text, but I don't have those locations on the plan.**
(Campbell Deposition Exhibit Number 796 was marked for identification at this time.)
Q (By Mr. Veith.) Showing you Exhibit 796, can you tell me what that is?
A **This is a CAD-drafted drawing illustrating how water could enter the seam of Swelltite if the film had not decomposed the way it's designed to, and also how it could migrate under the Swelltite if that film had not dissolved.**
Q Did you write the text?
A **I did.**
Q Let's start with -- well, did you draw the drawing in this or did somebody else do that?
A **I sketched it and it was CAD drafted like the other drawings by another technician.**
MS. REISBORD: Is this drawing in the report?
MR. VEITH: No, it's not. It's not in the report.
THE WITNESS: This is in the report, sure.
MR. SONNESYN: Let's go off the record.

I recovered some four year old film still intact." Now, just dealing with that language that you've written, is that the only evidence you have that the water-soluble film must not dissolve right away, the fact that it's four years old, or do you have something else?
A **I have just the samples we've looked at, which is a four year old installation and the film is supposed to dissolve prior to that.**
Q I understand that, the age of the samples. Is there anything else that you have?
A **No.**
Q In Exhibit 796, this drawing indicates -- it looks like there's an indication for seam tape in that drawing. Do you see that?
A **That's correct.**
Q But that is missing from Drawing O in your final report?
A **When I did the first draft that shows the seam tape, I was making the incorrect assumption that the product was installed with seam tape. I realized that I was making an assumption. I had not encountered a seam. So I really didn't know one way or another whether there was seam tape there.**
Q And you would agree that if you're making an assumption, that's not necessarily a good thing? It doesn't lead necessarily to an accurate result, right?



A **I realized if I hadn't seen it, I can't put it in my report.**
Q If you don't know something to be true, you don't want it in your report, right?
A **Apart from my experience with waterproofing and my opinion. I'll put opinions in my report, certainly, based on my experience.**
Q If you don't know something to be true, you don't want it in your report, right?
A **I will put opinions in my report.**
MR. RAU: Just answer his question, Dave.
Q (By Mr. Veith.) Right?
A **Repeat one more time.**
Q If you don't know something to be true, you don't want it in the report, right? You don't want to make assumptions?
A **That's true.**
Q If that's true, why are you assuming that the tape wasn't used? In Drawing O, why are you assuming that there's no tape in this drawing?
A **Because it's actually immaterial. I realized one way or another it's immaterial because based on what we read in the literature with regard to the architect specifying the use of the tape or not, it tells me that the manufacturer gives the tape no waterproofing characteristics at all and therefore is immaterial in**



**evaluating the watertightness of the seam.**
Q Did you look to see if there were any specifications for using seam tape at Promenade Oaks?
A **I looked, but I couldn't see -- it wasn't clear to me in the specifications whether it was to be used or not.**
Q So then you assumed that it wasn't based on the product literature, Exhibit 206, correct?
A **I really -- the absence of the tape in detail O is not to indicate there wasn't any. This is an illustration, this isn't a DTO. This is an illustration showing an idea. It's not an actual condition I encountered at the site, so therefore the tape I deemed as irrelevant to get the point across I was trying to make.**
Q Did you do any hydrostatic pressure testing at the site?
A **No, I didn't.**
Q Was it your opinion that there was inadequate lateral containment pressure at some locations for the bentonite?
A **Yes. Yes, it was my opinion.**
Q If you did no hydrostatic pressure testing, how would you know that? What's the basis for that?
A **I couldn't quantify it, but I do know that you don't get 20 pounds of containment pressure four inches below earth, the surface of earth. How much pressure there is, I don't know because I ran no tests. But it's certainly less than the 20 pounds required by the manufacturer.**



Q Why did you decide not to do any tests on that issue?
A **Because it was obvious it was well below the 20 pounds per square foot required.**
Q What did you base that on?
A **It was four inches below the surface and my years of experience as an architect and doing investigations in the earth.**
Q Did you ever determine how long the grout had been allowed to cure in the keyway joints?
A **No, I didn't.**
Q Did you ever determine how long the liquid flashing at the joints had been allowed to cure?
A **No.**
Q What is Exhibit 793?
A **This is a site plan of the Promenade Oaks development with reduced plans from their construction documents. And the last sheet is another site plan of the development but is not a construction document, it's simply indicating which -- what the unit numbers are.**
Q Do the pages of Exhibit 793 go together as a packet in your file? I mean, did you put this together as a packet for your use or reference?
A **Yes. Yes, I did.**
Q What is it? What is it documenting?
A **It's in one of my earlier visits to the site loosely**

your testimony this morning you referred to an updated Patrick Engineering report?
A **That's correct.**
Q Do you have that handy?
A **Yes, I do.**
MR. SONNESYN: Off the record.
(An off the record discussion took place at this time.)
Q (By Mr. Sonnesyn.) Okay. We're back on the record. If you look at your report, which is Exhibit 790, and -- let's see if I can find it here. It's on page 2, under B, Problem Issues, item number 2? You with me?
A **Yes.**
Q It says, "The courtyard drains do not seem to be draining the volume of water that they should," and you refer to photo number 2 --
MR. REILLY: 22.
MR. SONNESYN: 22. Thank you, Pat.
Q (By Mr. Sonnesyn.) And then when I look at 22, right here, it looks dry to me. Am I interpreting that photograph correctly?
A **You are. The reason for referencing the photograph in connection with that statement was simply to show what a drain looked like.**
Q I see. Again looking at Exhibit 790, your report, page 4



under Design Errors, Subsurface Drainage, item number 1, it says, "The waterproofing membrane was flat, not sloped to the drains." Refers to without adequate slope. Do you see that?
A **Yes, I do.**
Q What is the adequate slope for this project?
A **I wasn't hired to determine that. I can't say without having time to study the situation and calculate.**
Q You concluded, though, that the slope was inadequate?
A **I concluded that slope -- there needed to be slope.**
MR. STEPAN: Rolf, just so I'm clear, what slope? Are you talking about the slope of the membrane itself?
MR. SONNESYN: Oh, okay. Let's ask Mr. Campbell.
Q (By Mr. Sonnesyn.) Again looking at Exhibit 790, when you are referring to the waterproofing membrane was flat, not sloped to the drains, what slope are you referring to?
A **The slope of the membrane itself, immaterial of what it's sitting on. The slope of the membrane impacts the effectiveness of subsurface drainage.**
Q If you look at page 5 of Exhibit 790, under subpart e, "The lowest perforations drilled into the side of the drain were two and a half inches above the waterproofing membrane, --



A **Yes.**
Q -- which means that at least two and a half inches of water will always be resting on the membrane." What is your understanding of the process that went into the decision to drill holes into the side of the drain? Do you know anything about that?
A **On this particular project?**
Q Yes.
A **No, I don't.**
Q While we're on it, Exhibit 790, a little bit further down on page 5, it refers to the newer drain pipes? Do you see that in the paragraph right below subpart f?
A **Yes.**
Q What are the newer drain pipes? What is that describing?
A **Apparently there was a repair effort made in some locations by putting perforated PVC drain pipes just a few inches below the surface in order to take some of the water away in the earth.**
Q Are you talking about the drain tile?
A **The reason why we don't use tile any longer in the industry is it's not tile, it's PVC, polyvinyl chloride. But if we say tile all the time, then people won't know whether we really mean tile, which does still exist out there as well. So it would be incorrect to call it drain tile. It's perforated PVC.**



Q Oh, it's incorrect to call it drain tile?
A **That is right.**
Q The next paragraph refers to the drains, and it says, in your opinion, may some day contribute to the overloading of the structural capacity of the precast deck as the permanent water content of the soil keeps increasing. Do you see that?
A **Yes, I do.**
Q Is that speculation on your part?
A **Purely speculation. There is a bathtub situation created. Water is being delivered to the courtyard by virtue of the roofs and by directly being rained on. However, the drains are not keeping up with the surcharge of water that's being supplied. That was confirmed in my destructive test openings by the large quantities of water I encountered at each and every opening. I think it's a reasonable assumption that given enough time, and I don't know how much time, the earth could be so completely saturated that the resultant weight might exceed the design load of the structural precast plank.**
Q Did you measure the amount of water that was -- let's see. At each DTO you found water?
A **Yes.**
Q Was there any way to measure that water?
A **Only by recollection. I could -- there were DTOs where I**

# EXHIBIT I

# PROFESSIONAL PROFILE

**DAVID W. CAMPBELL, AIA – WATERPROOFING DEPARTMENT MANAGER**
INSPEC, INC.
5801 DULUTH STREET
MINNEAPOLIS, MN 55422
(763) 546-3434

**EXPERIENCE**

David has been employed with INSPEC, INC., since 1994. He is a licenced architect and is currently the manager of the Waterproofing Department. During his career, he has been involved in the design of a wide variety of building types, including earth-integrated structures, commercial structures, and residential. He has devoted the last 16 years however to the study, investigation, and design of below-ground waterproofing and drainage systems.

**PROFESSIONAL AFFILIATIONS**

American Institute of Architects (AIA)
American Society for Testing and Materials (ASTM)

**EDUCATION**

University of Minnesota, Bachelor of Environmental Design
University of Minnesota, Bachelor of Architecture
Foreign Study. Studied architecture in Europe under the auspices of the University of Minnesota.

**REGISTRATION**

Minnesota, Registered Architect, Registration Number 24188
Wisconsin, Registered Architect, Registration Number 9152-005

**PUBLISHED MATERIALS**

- Article – "The Investigation of Plaza Water Infiltration" (modified from previous article) RCI Interface Magazine, October 2001
- Article – "Leaky Plazas Pose Inspection Problems" Facilities Engineering Journal, February 2001
- Book – "Earth Integrated Residential Designs" (co-authored), Webco Publishing

**RELEVANT TALKS AND SEMINARS**

- "Waterproofing and Subsurface Water Management" presented to Sarnafil, Inc. at their Annual Midwest Regional Conference on September 13, 2001
- "Waterproofing and Subsurface Water Management" presented as part of AIA Minnesota's Continuing Education Program, April 2001
- "The Thorough Investigation of Water Infiltration in Plaza Deeks" presented twice to the RCI Building Symposium, October and December 2000
- "Waterproofing Techniques and Products" presented to many architecutral and engineering firms in the Minneapolis area

DEPOSITION EXHIBIT
Campbell 788

INSPEC, INC.

# PROFESSIONAL PROFILE

## AWARDS

- CEC Engineering Excellence Honor Award, Northrop Plaza Restoration (presented to INSPEC, INC.)
- RCI Document Competition, First Place, Life Sciences Greenhouse Waterproofing, University of Minnesota (presented to INSPEC, INC.)

## WATERPROOFING DESIGN EXPERIENCE AT INSPEC, INC. (ALSO SEE ATTACHED)

- Health Science Plaza Replacement, University of Minnesota
- Minnesota State Capitol Terrace Renovation, State of Minnesota
- Minneapolis/St. Paul International Airport, Green Concourse, Metropolitan Airports Commission
- Northrop Plaza Restoration, University of Minnesota
- Labyrinth Plaza Restoration, Minneapolis Institute of Art
- Glensheen Historical Mansion Terrace Restoration, University of Minnesota, Duluth
- Cargill Lake Office Courtyard Restoration, Cargill, Inc.
- Williamson Hall Renovation, Phase II, University of Minnesota
- Tri-County Hospital Tunnel Waterproofing, Tri-County Hospital
- Central Elementary School Leak Repairs, IDS #108, Norwood, Minnesota
- Kansas State Capitol Addition and Restoration, State of Kansas
- West Bank Bridgehead Plaza, University of Minnesota

## WATERPROOFING DESIGN EXPERIENCE PRIOR TO INSPEC, INC.

- Boston Subway
- Los Angeles Subway
- Hyatt Regency Waikaloa Hotel Complex, Hawaii
- Underground Telecommunications Building, University of Minnesota
- Provided consulting services to such waterproofing product manufacturers as Owens Corning, Paramount Technical Products, and Platon of Norway

INSPEC, INC.

## PARTIAL LIST OF PREVIOUS WATERPROOFING PROJECTS

1. **Health Science Plaza Renovation**
   University of MN - Minneapolis Campus
   Area: 54,000 square feet
   Contact: Wayne Sisel 612-625-3827
   sisel001@tc.umn.edu

2. **MN State Capitol Exterior Terrace Renovations**
   St. Paul, MN
   Area: 45,000 square feet
   Architect: Miller-Dunwiddie Architects
   Contact: Ken Schwartz 612-337-0000
   kschwartz@millerdunwiddie.com

3. **Cargill Lake Office Courtyards**
   Cargill, Inc.
   Minnetonka, MN
   Area: 8,000 square feet
   Contact: Blaine Bartz 612-742-6152
   blaine_bartz@cargill.com

4. **MN State Capitol Dome Lantern**
   St. Paul, MN
   Area: 800 square feet
   Architect: Miller-Dunwiddie
   Contact: Ross Stickley 612-337-0000
   rstickley@millerdunwiddie.com

5. **Central Elementary School Leak Repairs**
   Independent School District #108
   Norwood, MN
   Contact: John Gates 612-467-2272

6. **GTC East Vertical Circulation**
   Minneapolis/St. Paul International Airport
   St. Paul, MN
   Area: 40,000 square feet

7. **Minneapolis/St. Paul Airport Tunnel & Foundation Waterproofing**
   Green Concourse Expansion – Phases I and II
   Area: 100,000 square feet
   Architect: Architectural Alliance
   Contact: Dan Peterson 612-794-9226
   dpeterso@archalliance.com

8. **Northrop Auditorium Plaza Restoration**
   University of Minnesota – Minneapolis Campus
   Area: 29,000 square feet
   Contact: Kent Dirks 612-624-2326
   dirksk@facm.umn.edu

9. **Williamson Hall Plaza Restoration**
   University of MN - Minneapolis Campus
   Area: 18,000 square feet
   Architect: BKPV Architects
   Contact: Chuck Koncher 612-624-0828
   koncherc@facm.umn.edu

10. **Minneapolis Institute of Art Plaza Restoration**
    Minneapolis, MN
    Area: 1,400 square feet
    Architect: Damon Farber Landscape Architects
    Contact: Damon Farber 612-332-7522
    dfarber@dfalandscape.com

11. **Glensheen Mansion Terrace Restoration**
    University of MN - Duluth
    Area: 4,000 square feet
    Contact: Dan McClelland 218-724-8864
    glen@d.umn.edu

12. **West Bank Bridgehead Plaza Restoration**
    University of Minnesota – Minneapolis Campus
    Area: 33,000 square feet
    Contact: Gayle Gedstad 612-625-4312
    kross@facm.umn.edu

13. **Tri-County Hospital Tunnel Waterproofing**
    Wadena, MN
    Area: 6,000 square feet
    Contact: Dennis Miley 218-631-3510

14. **Earth Sheltered Wateproofing Replacement**
    Animal Care Facility
    I.S.D. 917 – Dakota County
    Area: 8,000 square feet

15. **Friendship Village Garage/Commons Expansion**
    Architect: Architectural Alliance
    Life Care Services
    Contact: Stuart Stephens 612-726-9012
    Bloomington, MN
    Area: 28,000 square feet
    Architect: Aldrian – Guszkowski, Inc.
    Contact: Armin Bischoff 262-789-6060
    proj@agarch.com

16. **Kansas State Capitol**
    Topeka, Kansas
    Area: Over 500,000 square feet
    Architect: Treanor Architects
    Contact: Vance Kelley vkelley@mtapa.com

5801 Duluth Street • Minneapolis, MN 55422 • Ph. 763-546-3434 Fax 763-546-8669
555 West Layton Ave., Suite 420 • Milwaukee, WI 53207 • Ph. 414-744-6962 Fax 414-744-6981

INSPEC, INC.

Engineering & Architectural services for roofs, pavements, and building exteriors.

# FEE SCHEDULE – FORENSIC AND PRE-PURCHASE/DUE DILIGENCE

Valid November 1, 2001 – October 31, 2002

## 1 PERSONNEL SERVICES

| | Regular Time Per Hour |
|---|---|
| 01 Principal | $150.00 |
| → 02 Professional Engineer/Registered Architect | $130.00 |
| 03 Thermographer/Project Manager | $95.00 |
| 04 Technical Staff | $85.00 |
| 05 Office Personnel | $50.00 |

## 2 EXPENSES

| | |
|---|---|
| 01 Automobile Mileage, per mile | $0.47 |
| 02 Meals, per day | $40.00 |
| 03 Per Diem, Meals and Motel, per day | $110.00 |
| 04 Airfare, Car Rental, Parking, other job related costs | Actual cost x 1.10 |
| 05 Infrared Camera, per hour | $200.00 |
| 06 Additional Professional or Contractor Services | Invoice x 1.10 |

## 3 FIELD SAMPLING

| | |
|---|---|
| 01 Personnel Services as in #1 above | |
| 02 Built-up Roof Sample Analysis for material quantities and workmanship, per sample | $95.00 |
| 03 Single-ply Thickness Determination, per sample | $40.00 |
| 04 Wind Uplift Test (F.M. 1-28 and 1-52), cutting and patching existing roof by others, each | $200.00 |
| 05 Fastener Withdrawal Test | $80.00 |

## 4 LABORATORY TESTING

| | |
|---|---|
| 01 Built-up Roof Systems | |
| A. Roof Samples (4" x 36" or 12" x 12") | |
| 1. Without flood coat or gravel, ASTM D 3617 | $95.00 |
| 2. Sampling analysis of BUR, surfacing inclusive, ASTM D 2829 | $250.00 |
| 3. Core sample for ply determination | $30.00 |
| B. Analysis of Bitumen | |
| 1. Softening Point, ASTM D 36 | $60.00 |
| 2. Penetration, ASTM D 5 | $60.00 |
| 3. Flash Point, ASTM D 92 | $70.00 |
| C. Moisture Tests | |
| 1. Felt only, ASTM D95 | $80.00 |
| 2. Built-up Roof Membrane, ASTM D 95 | $135.00 |
| 3. Thermal Roof Insulation, oven dry method | $55.00 |
| D. Mineral Aggregate, ASTM D 1863, Sieve Analysis, ASTM C 136 | $50.00 |
| 02 Single-ply Systems | |
| A. Membrane Thickness | $40.00 |
| B. Durometer Hardness, ASTM D 2240 | $45.00 |
| C. Insulation Density | $35.00 |
| D. Ballast-mineral Aggregate, Sieve Analysis, ASTM C 136 | $50.00 |
| 03 Pavement Systems | |
| A. Coarse and Fine Aggregate | |
| 1. Sieve Analysis, ASTM C 136 | $50.00 |
| 2. Wash Sieve, ASTM C 117 | $30.00 |
| B. Extraction and Sieve Analysis, ASTM D 2172, C 136, and C 117 | $125.00 |
| 1. Extraction only, ASTM C 2172 | $75.00 |
| C. Density and Thickness of Bituminous Core, ASTM D 2726 | $40.00 |
| D. Marshall Density Determination of Bituminous Sample, ASTM D 1559 | |
| 1. 50 blows per end, per set of three specimens | $80.00 |
| 2. 75 blows per end, per set of three specimens | $100.00 |
| E. Rices Specific Gravity | $60.00 |

5801 Duluth Street • Minneapolis, MN 55422 • Ph. 763-546-3434 Fax 763-546-8669
555 West Layton Ave., Suite 420 • Milwaukee, WI 53207 • Ph. 414-744-6962 Fax 414-744-6981

INSPEC, INC.

Engineering & Architectural services for roofs, pavements, and building exteriors.

# FEE SCHEDULE

Valid November 1, 2001 – October 31, 2002

## 1 PERSONNEL SERVICES

| | | Regular Time Per Hour | Overtime Per Hour |
|---|---|---|---|
| 01 | Principal | $140.00 | |
| → 02 | Professional Engineer/Registered Architect | $110.00 | |
| 03 | Supervisor | $100.00 | |
| 04 | Thermographer/Project Manager | $90.00 | |
| 05 | Technical Staff | $75.00 | $95.00 |
| 06 | Office Personnel | $50.00 | $65.00 |

## 2 EXPENSES

| | | | |
|---|---|---|---|
| 01 | Automobile Mileage, per mile | $0.47 | |
| 02 | Meals, per day | $40.00 | |
| 03 | Per Diem, Meals and Motel, per day | $110.00 | |
| 04 | Airfare, Car Rental, Parking, other job related costs | Actual cost x 1.10 | |
| 05 | Infrared Camera, per hour | $220.00 | |
| 06 | Additional Professional or Contractor Services | Invoice x 1.10 | |

## 3 FIELD SAMPLING

| | | |
|---|---|---|
| 01 | Personnel Services as in #1 above | |
| 02 | Built-up Roof Sample Analysis for material quantities and workmanship, per sample | $105.00 |
| 03 | Single-ply Thickness Determination, per sample | $45.00 |
| 04 | Wind Uplift Test (F.M. 1-28 and 1-52), cutting and patching existing roof by others, each | $220.00 |
| 05 | Fastener Withdrawal Test | $85.00 |

## 4 LABORATORY TESTING

**01** Built-up Roof Systems

- A. Roof Samples (4" x 36" or 12" x 12")
  1. Without flood coat or gravel, ASTM D 3617 ..... $105.00
  2. Sampling analysis of BUR, surfacing inclusive, ASTM D 2829 ..... $270.00
- B. Analysis of Bitumen
  1. Softening Point, ASTM D 36 ..... $65.00
  2. Penetration, ASTM D 5 ..... $65.00
  3. Flash Point, ASTM D 92 ..... $75.00
- C. Moisture Tests
  1. Felt only, ASTM D95 ..... $85.00
  2. Built-up Roof Membrane, ASTM D 95 ..... $140.00
  3. Thermal Roof Insulation, oven dry method ..... $60.00
- D. Mineral Aggregate, ASTM D 1863, Sieve Analysis, ASTM C 136 ..... $55.00

**02** Single-ply Systems

- A. Membrane Thickness ..... $45.00
- B. Durometer Hardness, ASTM D 2240 ..... $50.00
- C. Insulation Density ..... $40.00
- D. Ballast-mineral Aggregate, Sieve Analysis, ASTM C 136 ..... $55.00

**03** Pavement Systems

- A. Coarse and Fine Aggregate
  1. Sieve Analysis, ASTM C 136 ..... $55.00
  2. Wash Sieve, ASTM C 117 ..... $35.00
- B. Extraction and Sieve Analysis, ASTM D 2172, C 136, and C 117 ..... $130.00
  1. Extraction only, ASTM C 2172 ..... $80.00
- C. Density and Thickness of Bituminous Core, ASTM D 2726 ..... $45.00
- D. Marshall Density Determination of Bituminous Sample, ASTM D 1559
  1. 50 blows per end, per set of three specimens ..... $85.00
  2. 75 blows per end, per set of three specimens ..... $105.00
- E. Rices Specific Gravity ..... $65.00

# EXHIBIT J

ORIGINAL



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Westfield Insurance Company, )Court File No.
Plaintiff, )00-CV-987 JEL/
) JGL
vs. )
)
Weis Builders, Inc., Healey )
Ramme Co., sued as Healey )
Ramme Company; CNA )
Insurance Companies, sued )
as CNA Insurance Company; )
Promenade Village )
Townhomes, L.L.C.; )
Valley Forge Insurance )
Company, one of the CNA )
Insurance Companies, )
Defendants, )
)
and )
)



Weis Builders, Inc., )
Counter- )
Claimant, )
)
v. )
)
Westfield Insurance )
Company, )
Counter- )
Defendant, )
)
and )
)
Weis Builders, Inc., )
Third-Party )
Plaintiff, )
)
v. )
)
Promenade Village )
Townhomes, L.L.C., )
and Valley Forge )
Insurance Company, )
Third- )



Party )
Defendants, )
)
and )
)
Weis Builders, Inc., )
Cross- )
Claimant, )
)
v. )
)
Promenade Village )
Townhomes and Valley )
Forge Insurance Company, )
Cross- )
Defendants, )
)
and )
)
Promenade Village )
Townhomes, L.L.C., )
Cross- )
Claimant, )
)



v. )
)
Weis Builders, Inc., )
Cross- )
Defendant, )
)
and )
)
Weis Builders, Inc., )
Third- )
Party )
Plaintiff, )
)
v. )
)
Waterproofing by Experts, )
Inc.; BRW Elness Architects, )
Inc., n/k/a Elness )
Swenson Graham Architects, )
Inc., and Colloid )
Environmental Technologies )
Company, )
Third-Party )
Defendants, )

)
and )
)
Colloid Environmental )
Technologies Company, )
Fourth- )
Party )
Plaintiff, )
)
and )
)
Chris Craft Industrial )
Products, Inc., )
Fourth- )
Party )
Defendant. )



The deposition of PATRICK E. CARPENTER, taken in the above-entitled cause before Diane Hromek, Certified Shorthand Reporter in the State of Illinois and Notary Public within the County of DuPage, at 1090 South Milwaukee Avenue, Wheeling, Illinois 60090, on November 20 and 21st, 2002, starting at 10:00 o'clock a.m., and at 8:00 o'clock a.m., respectively.



PRESENT:

MEAGHER & GEER, PLLP
By: Mr. Chad J. Stepan
33 South Sixth Street, Suite 4200
Minneapolis, MN 55402-3788
Telephone: 612-338-0661
Fax: 612-338-8384
E-Mail: cstepan@meagher.com
Appeared on behalf of the defendant Weis Builders, Inc., the Counter-Claimant Weis Builders, Inc., the Cross-Claimant Weis Builders, Inc., the Cross-Defendant Weis Builders, Inc., the Third-Party Plaintiff, Weis Builders, Inc.

FLYNN, GASKINS & BENNETT, L.L.P.
By: Mr. Steve Gaskins
333 South Seventh Street, 29th Floor
Minneapolis, MN 55402
Telephone: 612-333-9500
Fax: 612-333-9579
Appeared on behalf of the Third-Party Defendants, Promenade Village Townhomes, L.L.C. and the Cross-Claimant Promenade Village Townhomes, L.L.C.

STICH, ANGELL, KREIDLER, BROWNSON & BALLOW
By: Mr. Leo I. Brisbois, Esq.
250 - 2nd Avenue South, Suite 120
Minneapolis, MN 55401
Telephone: 612-333-6251
Fax: 612-333-1940
Appeared on behalf of the Third-Party Defendant, Valley Forge Insurance Company and the Cross-Defendants, Valley Forge Insurance Company
(Appeared telephonically.)

MURNANE, CONLIN, WHITE & BRANDT
By: Mr. Mark Brown
444 Cedar Street, Suite 1800
Saint Paul, MN 55102
Telephone: 651-227-9411
Fax: 651-223-5199
Appeared on behalf of the Third-Party Defendants, Waterproofing by Experts, Inc.



COLEMAN, HULL & VAN VLIET, PLLP
By: Mr. William D. Hull
8500 Normandale Lake Boulevard, Suite 2110
Minneapolis, MN 55437
Telephone: 952-841-0201
Fax: 952-841-0041
E-Mail: wdhull@chvv.com
Appeared on behalf of the Third-Party Defendants, Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc.

ERSTAD & RIEMER, P.A.
By: Mr. Patrick D. Reilly, Esq.
200 Riverview Office Tower
8009-34th Avenue South
Minneapolis, MN 55425
Telephone: 952-896-3700
Fax: 952-896-3717
Appeared on behalf of the Fourth-Party Plaintiff, Colloid Environmental Technologies Company.

FITZGERALD & CROSS
By: Mr. Joseph P. Callahan
233 South Wacker Drive, Suite 1950
Chicago, Illinois 60606-6308
Telephone: 312-715-5500
Fax: 312-715-5530
E-Mail: jcallaha@offic.com
Appeared on behalf of the Fourth-Party Defendant, Chris Craft Industrial Products Inc.

TOMSCHE, SONNESYN & TOMSCHE, P.A.
By: Chandelle L. Heyer
610 Ottawa Avenue North
Minneapolis, MN 55422
Telephone: 763-521-4499
Fax: 763-521-4488
E-Mail: Cheyer@tstlaw.com
Appeared on behalf of J. Bryd Mechanical.

term. Second expert from SG&H. And the name, whether he is an expert or not, that's how you thought of him, right?
THE WITNESS: No.
BY MR. GASKINS:
Q. Okay. What --
A. SG&H is a consulting firm.
Q. All right.
Mr. Rutela is the second consultant, and you did not I think he was an expert, is that true or false?
A. True.
Q. Okay.
A. I do not think he is an expert.
Q. Okay, what was Mr. Rutela's view of the drying out of the bentonite, if he had one?
A. I don't recall his view.
Q. Okay.
All right, let's go back to the -- let's go back to the first consultant from Pogmeyer.
He further thought that the Volclay had not been installed properly, is that right? That is what you understood him?



A. I think so, that is what I understood.
Q. Did he provide you with any written materials that voiced his complaints?
A. On that specific matter, no.
Q. Okay.
This is something he told you about?
A. No.
Q. How did you learn that he felt that the Volclay was not installed properly?
A. Through meetings -- with other folks.
Q. Okay.
A. With him present.
Q. Well, tell me, tell me about the meeting. How did you -- who all was there and how did you get the information? When is the first meeting?
MR. REILLY: What can we do? You want him to answer?
BY MR. GASKINS:
Q. When is the first meeting that you attended with Mr. Heart?
A. It was approximately two weeks after he initially contacted our office.



Q. Who was present at the meeting?
A. Around 15 people.
Q. Who?
A. Primarily from two from Pogmeyer, the waterproofing contractor, the owner of the facility, Medical College of Ohio; the engineering firm that did the original design, architectural engineering firm, and the general contractor.
Q. And who all from CETCO?
A. Myself.
Q. That's all?
A. Correct.
Q. Okay.
At this first meeting, did you learn that Mr. Heart was complaining that the bentonite Volclay bentonite had dried out?
A. What I learned at that meeting was -- his question about how bentonite or Volclay works.
Q. Okay, so it was your understanding, as a result of that meeting, that he did not understand how bentonite worked?
A. To a degree.
Q. And did you explain to him how it worked?



A. In general.
Q. So, was his -- where was his misunderstanding, to your knowledge?
A. That bentonite would allow moisture to pass through, at a higher rate, at a higher rate than, you know, was in the specification.
Q. I am going to short, see if I can shortcut this, for a second.
Did you arrive, at any time, at a conclusion concerning whether your product had any role in the leaking at the Medical College of Ohio?
A. No.
Q. All right.
With respect to the material on which you performed a bench test, that is the soluable film, did you determine that that was, in fact, soluable film that was water soluable film that was on your product?
A. No.
Q. Was it not the soluable film that was on your product?
A. It was a piece of soluable film that was sent from the project.

Q. Okay, so it was represented to you as having been on your product?
A. Yes.
Q. Was there a test that you performed to verify that, in fact, it was your product or was not?
A. No.
Q. All right, so you don't know whether it was or not?
A. No.
Q. Okay.
Did you take it as a given in your business response that it was film that was on your product?
A. Yes.
Q. Okay.
Now, you did a bench test on that, and you determined that the sample that you had did not dissolve in water?
A. Yes.
Q. And it should have dissolved in water, true?
MR. REILLY: Object, argumentative.
THE WITNESS: Repeat the question.



BY MR. GASKINS:
Q. The sample that you tested should have dissolved in water?
A. Not necessarily.
Q. What was the test designed to show?
A. If it would dissolve in water or not, I have no –
Q. Why did you care whether it dissolved in water or not?
A. Because the product, as shipped from our plant, is designed to have the water soluable film dissolve in water.
Q. All right.
Is it fair to say that you expected on the bench test that this film would dissolve in water?
A. Yes, it's fair to say.
Q. What is the consequence to the characteristic of waterproofing that the water soluable film does not dissolve?
MR. REILLY: If you know. Don't guess.
THE WITNESS: I don't know.
MR. REILLY: Once again, this witness is not being offered for the engineering of this



product.
THE WITNESS: I don't know.
BY MR. GASKINS:
Q. In handling the claim for the Medical School of Ohio, did you come to a working conclusion about what the consequence of the failure to dissolve in water was?
A. No.
Q. Were you informed by any person outside CETCO what the possible consequences are?
A. No.
Q. Did anyone outside CETCO tell you what their theory was concerning the consequences of the failure of the film to dissolve in water?
A. Yes.
Q. Okay. What were the theories that were described to you and who described them?
A. A couple of people, one Tom Heart, had a theory that this would inhibit the product from waterproofing properly.
Q. And how?
A. I don't know.
Q. Did you inform anyone back at CETCO, I am sorry, back at CETCO, of this theory?



A. No.
Q. You kept it to yourself?
A. Outside Stacy Byrd, no one else – I had a discussion with.
Q. What did you say to Mr. Byrd?
A. I don't recall.
Q. What did you say, in substance, to Mr. Byrd?
A. I asked him if he had ever, ever seen or heard of this before.
Q. Of the water soluable film not dissolving?
A. Uh-huh.
Q. And of the failure to dissolve causing leakage?
A. The water soluable film not dissolving.
Q. Causing leakage?
A. Water soluable film not dissolving.
Q. Okay, so you never asked him if he had ever encountered a water soluable film not dissolving and causing leakage?
MR. REILLY: That is not what he said.
Keep asking the same questions,

repetitious. He has told you what he asked him.
MR. GASKINS: Okay.
BY MR. GASKINS:
Q. We started talking about Mr. Heart's theory, remember? Mr. Heart's theory was the water soluable didn't dissolve, the water soluable film did not dissolve, and this resulted in leakage, correct?
A. Yes.
Q. You talked to Mr. Byrd and you asked him about the first part but not the second part, true or false?
A. True.
Q. All right.
Was it -- did Mr. -- did you have the idea, in your conversation, that Mr. Byrd understood that this would cause the membrane not to be waterproofed?
MR. REILLY: Objection, it calls for an assumption, speculation as to what this other person was thinking.
MR. GASKINS: That's okay.
THE WITNESS: Not to my knowledge.
MR. GASKINS: All right.



BY MR. GASKINS:
Q. Now, as you indicated, you were marketing this across the country as film that would dissolve once it was installed and under pressure and wet, right?
A. In general, yes.
Q. In general?
I mean, is there something specific that was wrong about what I had said?
A. We market Swelltite as a waterproofing product. Under combining pressure it becomes in contact with water, it swells, and creates a waterproofing barrier.
Q. In connection with that, you, one of the component parts of the component, Swelltite, included a water soluable film, true?
MR. REILLY: What time?
MR. GASKINS: At the time you sold it to the Miami or the Ohio hospital?
THE WITNESS: Not to my knowledge.
BY MR. GASKINS:
Q. How did -- how -- what was your understanding about how they came to have your product with water soluable film on it?



A. We market to them Swelltite as a bentonite waterproofing barrier backfill, install, backfill water comes in contact with the product, it provides a waterproofing barrier.
Q. Okay. What were the components of the Swelltite they bought, to your understanding?
A. Three major components were membrane, bentonite/butyl, compound, and I -- I don't recall us marketing water soluable film.
Q. Well, was the water soluable film that third layer?
A. Yes.
Q. And you sold it with that third layer on there?
A. Correct. We market, if you were to ask me what was this product, I would say it is bentonite-butyl compound and membrane.
Q. Okay.
So you sell it with the film on it, the water soluable film on it, you used to, right?
A. Yes.
Q. And the Medical College of Ohio bought it with the water soluable film on it, true?



A. Yes.
Q. And you expected the water soluable film to dissolve, true?
A. Yes.
Q. All right. And what did you think the consequence would be if it did not?
MR. REILLY: Objection, already asked and answered.
THE WITNESS: Repeat your question.
BY MR. GASKINS:
Q. What did you think the consequence would be if the water soluable film did not dissolve?
MR. REILLY: Same objection.
THE WITNESS: None.
MR. GASKINS: Okay.
BY MR. GASKINS:
Q. Today, what is your understanding of the consequence of the water soluable film not dissolving in application?
MR. REILLY: Same objection.
THE WITNESS: None.
BY MR. GASKINS:
Q. That it has no effect?