**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Court File No. 00-CV-987 JEL/JSM

Westfield Insurance Company,

Plaintiff,

v.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Counter-Claimant,

v.

Westfield Insurance Company,

Counter-Defendant,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Promenade Village Townhomes, L.L.C. and Valley Forge Insurance Company,

Third-Party Defendants,

and

**PROMENADE VILLAGE TOWNHOMES, L.L.C.'S MEMORANDUM OF LAW IN OPPOSITION TO COLLOID ENVIRONMENTAL TECHNOLOGIES COMPANY, WATERPROOFING BY EXPERTS, INC., AND CHRIS CRAFT INDUSTRIAL PRODUCTS, INC.S' DAUBERT MOTIONS IN LIMINE**

Weis Builders, Inc.,

Cross-Claimant,

v.

Promenade Village Townhomes, L.L.C.
and Valley Forge Insurance Company,

Cross-Defendants,

and

Promenade Village Townhomes, L.L.C.,

Cross-Claimant,

v.

Weis Builders, Inc.,

Cross-Defendant,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

v.

Waterproofing by Experts, Inc.; BRW
Elness Architects, Inc., n/k/a Elness
Swenson Graham Architects, Inc., and
Colloid Environmental Technologies
Company,

Third-Party Defendants,

and

Colloid Environmental Technologies
Company,

Fourth-Party Plaintiff,

| | |
|---|---|
| and | ) |
| | ) |
| Chris Craft Industrial Products, Inc., | ) |
| | ) |
| Fourth-Party Defendant. | ) |
| | ) |
| and | ) |
| | ) |
| J-Berd Mechanical Contractors, Inc., | ) |
| | ) |
| Third-Party Defendant and<br>Fourth-Party Plaintiff, | )<br>) |
| | ) |
| v. | ) |
| | ) |
| Mikesh, Inc., | ) |
| | ) |
| Fourth Party Defendant. | ) |

---

## INTRODUCTION

Third- and Fourth-Party Defendants CETCO, Waterproofing By Experts and Chris Craft (collectively herein "Contribution Defendants") move to exclude or limit the testimony of David Campbell ("Campbell") under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993). Promenade, the proponent of Campbell's testimony in its case against Weis, submits this memorandum in support of the admissibility of Campbell's entire testimony. Campbell, a waterproofing designer by profession and an architect by training, will assist the jury's understanding of the issues in this case because he explains the technical aspects of the waterproofing of the plaza decks at Promenade, relates his visual observations, and provides conclusions from those observations about the causes of the continued leaking of the plaza decks.

This Court should rule Campbell's observations and opinions admissible because they rest on a reliable foundation and are relevant to the inquiry at hand. In the alternative, the Court

should overrule the objections at this point because they amount to dispositive motions as to Weis' claims against the third- and fourth-party defendants, and wait to hear Campbell's opinion in context at trial or hold a hearing at which the Court can listen to and evaluate the expert's opinions. *See Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999) ("The trial court must have the same kind of latitude in deciding how to test an expert's reliability and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable.")

The Contribution Defendants all assert that Campbell's opinions and testimony relating to the Swelltite 3000 installed on the plaza decks at the Promenade townhomes do not comply with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Defendants argue that Campbell's reasoning and methodology was not reliable because he failed to perform testing and, consequently, his opinion is not relevant because it allegedly amounts to speculation. They are wrong.

The Defendants fail to recognize or acknowledge that Rule 702 of the Federal Rules of Evidence and the *Daubert* principles reflect a liberalization of the rules governing admissibility and that exclusion is the exception rather than the rule. *See Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991) (as quoted in *Jensen v. Eveleth Taconite Co.*, 130 F.3d 1287, 1298 (8th Cir. 1997)). *Daubert* did not "work a seachange over federal evidence law"; the trial court's gatekeeper role is not a replacement for the rigors of cross-examination and the adversary system. *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F. 3d 1074,1078 (5th Cir. 1996).

---

[12] Defendants suggest flood-testing to determine the source of leakage. The Promenade had tenants living on site and intentionally causing leakage would not have been practical.

**FACTS**

The six concrete plaza decks at the Promenade Oaks luxury apartment complex were supposed to be waterproof. They leaked from the time the construction was completed in 1997 until Promenade was forced to sell the project in December 2002. Promenade sued Weis, whose responsibility it was to design and build the plaza deck waterproofing system. (Rau Affidavit at ¶ 15, Ex. L). Weis, in turn, sued Waterproofing By Experts, the subcontractor to which it delegated its waterproofing responsibilities. Waterproofing By Experts in turn sued CETCO, the manufacturer of Swelltite 3000, a dual system waterproofing membrane that utilizes both a polyvinyl chloride (PVC) membrane and Bentonite to keep the plaza decks watertight, which they were not. Finally, CETCO sued Chris Craft, the manufacturer of a polyvinyl alcohol (PVOH) film that was supposed to dissolve but, in 20% of the test holes dug in the Promenade plaza deck, did not, thereby preventing the Swelltite's Bentonite component from swelling tight.

Prior to installation, Swelltite 3000 has 3 layers: a polyvinyl chloride (PVC) membrane, Bentonite, and the Chris Craft PVOH film. The PVC faces the soil. The Bentonite which is a clay-like waterproofing material, faces the deck, but on installation is separated from the deck by the PVOH film. The PVC is designed to be watertight. Nevertheless, if water circumvents the PVC in any way or if the PVC is penetrated, then the PVOH film is supposed to dissolve upon being exposed to water, the intruding water is supposed to hydrate the Bentonite, and the Bentonite is supposed to swell and provide a watertight barrier. But, if the PVOH does not dissolve, the Bentonite will not work – and the water will flow to the concrete deck looking for a place to leak. And at the Promenade, leak it did.

Promenade retained INSPEC, Inc. ("INSPEC") to undertake an investigation of the water leakage originating from the plaza decks at the Promenade townhomes. Campbell was INSPEC's principal for the project. He is a licensed architect and has been involved in waterproofing design and investigation for over 17 years. (Campbell Depo. (Vol. I), at p. 10, 21, Rau Affidavit at ¶ 11, Ex. H). During his 17 year career, Campbell designed waterproofing systems and over the last seven years has spent 40% of his time working on water intrusion investigations for commercial purposes. (Campbell Depo. (Vol. I), at p. 24, Rau Affidavit at ¶ 11, Ex. H). Until his retention in this case, Campbell had never testified as an expert witness. (Campbell Depo. (Vol. I), at p. 25, Rau Affidavit at 11, Ex. H).

In investigating the leaks at the Promenade, the problem confronting Campbell was that Promenade Oaks was an occupied townhome rental complex with residents, and the plaza decks were covered with soil and landscaping. Like other experts in this case, INSPEC undertook a comprehensive investigation of historical information relating to the construction of the town homes and subsequent history of leaks. (Campbell Report, Rau Affidavit at ¶ 16, Ex. M). Campbell's investigation, like the investigations of the other experts in this case, included a visual survey of the evidence of water infiltration at the site, as well as a visual survey of the performance of all 30 courtyard drains. Campbell, like the other experts in this case, then evaluated all available data: construction drawings, leak reports that were kept in the ordinary course of business at Promenade by people who saw the leaks, and the product literature for the Swelltite 3000 product (*See* Campbell Report, Rau Affidavit at ¶ 16, Ex. M). Most importantly, INSPEC dug holes in 20 spots (the Destructive Test Openings, or "DTO's") throughout all six plazas so that Campbell could see what was happening underneath the landscaped surface of the plaza decks. The other experts relied on Campbell's observations at the DTOs, except that

Robert Kudder (the expert shared by the Defendants moving to exclude Campbell's opinion because of his alleged unreliable methodology) dug 4 DTOs of his own. Campbell's observations at each of those DTO's together with the historical information he was provided, formed the basis for the opinions articulated in the INSPEC report and at Campbell's deposition. Naturally, Campbell drew on his experience with waterproofing design, construction, and materials, including PVC and Bentonite (*See* Campbell Depo. (Vol. I, Rau Affidavit at ¶ 11, Ex. H).

As a result of his observations at the DTOs, Campbell found many things awry. What the Contribution Defendants do not want Campbell to testify about is what he found out about the Swelltite when he looked at it, and what logically flows from what he saw. What he found was that in 20% of the DTO's, water was present at the concrete deck below the waterproofing; the PVOH film was undissolved; and the Bentonite was unhydrated, had not swelled, and was not tight. Campbell concludes that when the film does not dissolve the waterproofing will not work. The conclusion the jury is likely to draw from the testimony, and one it will be entitled to draw, is that the product failed in significant portions of the deck.

Campbell is a professional waterproofer with experience and knowledge of how water flows, what materials will make a surface or building waterproof, and how to apply them. Campbell also understands what happens to make a waterproofing material or system not waterproof. Therefore, his opinions are relevant to establish for Promenade that (1) the plazas leak, (2) that the precise reason for any particular leak cannot be known and therefore (3) the only way to fix the leaks reliably is to dig up the plaza and start over. Campbell's examination of the materials and phenomena at the site and the implications of his observations will be important and helpful to the jury.

To the extent technical methodology was used, that methodology is based principally on visual observation as well as the general knowledge of the properties of how water moves. Campbell's conclusions about the efficacy of the Swelltite membrane are based on his specific understanding of how Bentonite works based on his past experience with other Bentonite waterproofing materials, the generally accepted knowledge of how Bentonite works in the waterproofing community, his review of CETCO's published specifications and suggested application techniques for Swelltite, his observations of active leaks, his understanding of historical past leaks and the efforts that were made to remedy the leaks at the Promenade. (Campbell Report, CETCO Product Literature, Rau Affidavit at ¶ 16, Ex. M, ¶ 14, Ex. K). There is nothing novel or unique in the waterproofing industry about Campbell's observations or the inferences he makes from the facts gathered in his investigation, and his knowledge of that technical area will help the jury understand the conditions present at the Promenade Oaks Townhomes. These opinions may also be helpful to apportion some of Weis' fault to other parties.

## ARGUMENT

### I. Campbell Is Qualified To Testify

Expert opinion testimony is permitted under the Federal Rules of Evidence when a witness "is qualified as an expert by knowledge, skill, experience, training or education" and if that specialized knowledge will assist the trier of fact. *Smith v. BMW America, Inc.*, 303 F.3d 913, 918 (8th Cir. 2002) (quoting Fed. R. Evid. 702). Campbell possesses experience and training specifically in waterproofing and was educated as an architect. Campbell is a licensed architect who for the past seventeen years has been involved in issues concerning the

waterproofing of structures. Campbell has designed waterproofing systems and has spent a substantial amount of time investigating water leak problems.

The Advisory Committee Notes to the 2000 Amendments to Federal Rule of Evidence 702 speak to the issue of the "reliability" of Campbell's expertise in the area of waterproofing. Those comments that are pertinent to the Defendants' arguments emphasize that "[s]ome types of expert testimony will be more objectively verifiable . . . than others." *Id.* These comments simply underscore the obvious fact that some types of expertise are easily identified as specific scientific or technical disciplines and others are not.

Here, the Defendants suggest that Campbell is not qualified to testify about the defects he observed at the DTOs because he has rarely worked specifically with Swelltite and because Campbell conceded that he does not understand the physical chemistry that causes the Bentonite to swell and get tight nor the chemistry which causes the PVOH film to dissolve when exposed to water. These arguments might be persuasive if Campbell's testimony were proffered to show a design defect in the Swelltite like the testimony excluded in *Jaurequi v. Carter Manufacturing Co., Inc.*, 173 F.3d 1076 (8th Cir. 1999) or *Peitzmeier v. Hennessy Industries, Inc.*, 97 F.3d 293 (8th Cir. 1996). Campbell's opinions and inferences about the Swelltite, however, are not being offered to prove a design defect in Swelltite. Rather, these opinions relate to a functional defect in the product installed at the plaza decks. Campbell's basis for concluding that the unhydrated Swelltite with undissolved PVOH film attached to it in a wet environment is defective were CETCO's literature about how the Swelltite should work and be installed and the general knowledge of how Bentonite works. Campbell's visual observations simply confirm the failure of the product. It may have failed because it was a poor design. It may have failed because of a manufacturing problem involving the Swelltite, the Bentonite, or the PVOH film. We do not

know, but it is not important in Promenade's case against Weis what the root cause of the failure is. It is very important to understand the facts of the failure and its consequences.

Notwithstanding these differences, Defendants suggest that Campbell's opinions are akin to the expert testimony that was excluded in the *Jaurequi* case. In that case, expert testimony from a mechanical engineer and a human factors engineer who proffered design and warning opinions regarding a piece of agricultural machinery upon which the plaintiff was injured were excluded. 173 F.3d at 1080. One of the many fatal weaknesses in the engineer's testimony was that the engineer had never seen the agricultural product operate in the field, he had never attempted to construct or draw a suggested device nor test its utility as a safety device or its compatibility with the agricultural product's proper function. The human factors expert had never created or designed a warning device that would have been more appropriate nor had he ever tested such a warning device's effectiveness. Campbell is not like the experts in *Jaurequi*. He has designed numerous waterproofing systems that have been put in place, has investigated numerous waterproofing systems to arrive at ways to fix them, and proposed one such system as a fix at the Promenade. Campbell is clearly qualified to testify about waterproofing design, construction and efficacy.

## II. Campbell's Testimony Satisfies the *Daubert* Principles

Defendants focus on two of the enumerated, nonexclusive *Daubert* principles to suggest that Campbell's testimony does not comply with *Daubert*. First, Defendants suggest that Campbell's methodology is improper. Second, the Defendants suggest that Campbell's inability to test his theory renders his testimony unreliable and speculative. Defendants, however, fail to acknowledge that the *Daubert* factors were designed to be neither exclusive nor exhaustive. *See* Federal Rule of Evidence 702, Advisory Committee Notes, 2000 Amendments.

It bears emphasizing that *Daubert* requires a focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594. Defendants' arguments that Campbell's alleged failure to satisfy each of the individually enumerated, nonexclusive *Daubert* factors is a rigid and mechanistic application and interpretation of the *Daubert* gatekeeping function. Not all theories are subject to testing or peer review and *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1176 (1999) reemphasized the case-specific application of *Daubert*. *See, e.g., Tyus v. Urban Search Management*, 102 F.3d 256 (7th Cir. 1996) (observing that *Daubert* factors do not always neatly apply to a discipline). *Blandin Paper Company v. J & J Industrial Sales, Inc.*, (U.S. Minn., Civ. No. 02-4858 ADM/RLE) (September 2, 2004) (rejecting a *Daubert* summary judgment motion where plaintiff's theory was not tested or subjected to peer review and publication).

In contrast to the experts in *Jaurequi* who had never seen the agricultural product operate in the field, Campbell, just like the Defendants' experts, has observed firsthand the conditions below the surface of the plaza decks and has reached conclusions about those conditions. Moreover, Campbell has recommended a fix, and has previous commercial experience with the fix he suggested. His opinions are based on the factual observations he made – they are not based on rank speculation.

*Daubert's* primary focus is on the reliability of the reasoning or the methodology. 509 U.S. at 582. Campbell's testimony is based on reliable, common sense reasoning and is also based on a reliable, accepted methodology.

**A. Reasoning**

Campbell's testimony will focus on what he discovered after digging 20 DTO's at the Promenade plazas. No foundational basis for objecting to testimony about what Campbell saw at

those 20 DTO's can possibly exist. Moreover, it is difficult to conceive of any argument that would suggest that what Campbell saw was not probative on the issue of why the plaza decks leak.

What did Campbell find? Twenty percent of his test sites showed water standing beneath undissolved film and unhydrated Bentonite on the deck. What is there to test? Nothing. It is what he found. In 20% of the test sites the film did not dissolve and the implications are that the waterproofing was not working as advertised and intended. Moreover, that observation, which Defendants call an opinion, is corroborated by a test of a sample of Swelltite that a CETCO employee described as being from the leaking plaza at the Medical School of Ohio. The Swelltite was placed in a glass of water and the PVOH film did not dissolve. (Patrick Carpenter Depo., Rau Affidavit at ¶ 13, Ex. T).

The implications of this observation are obvious: water is free to move beneath undissolved film. As hydrostatic pressure increases water will move and will seek places of lower pressure-seams, grout, and concrete posts – and water will find a place to leak! Although the Contribution Defendants do not want a waterproofing designer with 17 years of experience who is not a professional expert witness to say it, there is no reason in law or logic why he cannot. With Campbell, there is no *ipse dixit;* there is no wide analytical gap. His method is simple and the implications clear. Water is moving around under approximately 20% of Promenade's decks because the film did not dissolve. Under that proportion of the deck, half of the Swelltite dual system, the Bentonite half (which is just as important as the PVC half (*See* Robert Kudder Depo. at p. 64, Rau Affidavit at ¶ 18, Ex. O), is not working as it was intended because it is not hydrated. No further testing is required, and *Daubert* does not require

unnecessary or impractical testing. Inferences from known facts and established principles are an acceptable means of reasoning and arriving at an opinion.

The reliance by a variety of other experts in this case on the observations that Campbell made speaks volumes about the reliability of his testimony and is a form of peer review. To the extent that Defendants contest the reliability of what Campbell saw, then that testimony is clearly an appropriate subject for cross examination, just as is the testimony of a witness who stated that the light was red, not green or yellow. Similarly, Defendants surely cannot contest Campbell's reliance on CETCO literature describing how Swelltite should work.

The Defendants' arguments about Campbell's reasoning ignore four undisputed facts about his testimony. First, the necessity for Bentonite to become wet in order to serve as an effective waterproofing substance is a universal truth in the waterproofing business. Put differently, none of the parties in this case dispute the fact that Bentonite must be wet and must be exposed to pressure in order to serve as an effective waterproofing barrier. The Contribution Defendants' expert's opinion is premised on a similar assumption. Second, with respect to the leaks that exist at Promenade, virtually every expert witness agrees that it would be difficult, if not impossible, to identify the precise source of the leaks. The only agreed-upon means of determining the precise source of the leaks at Promenade, is to completely dig up and remove all the soil in the plazas. Third, it is also a universally accepted truth that water is subject to gravity and that hydrostatic pressure makes water move. To understand and agree that water seeks the lowest pressure does not require any specialized knowledge nor can there be any dispute about that fact. Fourth, the bases for Campbell's opinions are not premised on understanding the *chemistry* that causes Bentonite to swell, nor are they premised upon the *chemistry* of how Chris Craft's polyvinyl alcohol ("PVOH") film component works. Rather, Campbell's expert opinions

are based on his observations, the universally agreed-upon means by which Bentonite operates as a waterproofing barrier, the fact that gravity operates upon water, the physical specifications of the plaza decks, the history of leaks at the Promenade Project, and logical inferences that he makes from those facts.

The contribution Defendants argue specifically that Campbell should not be allowed to testify about leaks at seams because he never saw leaks at seams and seamtape was used at the project.

The Defendants' arguments about the seam tape fail to acknowledge, or perhaps ignore, four essential points. First, the CETCO literature describing the correct way of installing the Swelltite 3000 never requires or dictates that CETCO Seamtape be used. Use of Seamtape in the CETCO literature is permissive and not mandatory. (*See* Affidavit of David Campbell, ¶ 4). It is called for only when "conditions merit its use." *See* CETCO Product Literature, Rau Affidavit at ¶ 14, Ex. K). Thus, a rational and logical inference that can be made from CETCO's literature is that Seamtape is not essential in creating a waterproof barrier. Second, Campbell's opinion about the infiltration of water through seams does not presuppose that the material that makes Seamtape is not waterproof; rather Campbell's opinion is based on his understanding and experience that not all adhesives are waterproof. (*See* Affidavit of David Campbell, ¶ 4). Third, as this Court knows, the Seamtape's waterproofing qualities are being tested pursuant to this Court's order. Until those tests are completed, examining both the waterproofing qualities of the tape itself as well as the adhesive, a decision that there were seam leaks is premature. Finally, Campbell's opinion describes how undissolved film will lead to leaks at seams if the tape adhesive is not waterproof, if tape is omitted at seams, (*See* Affidavit of David Campbell; Rau Affidavit ¶ 17, Ex. N) or if the tape is misapplied. The way the Swelltite system operates, if

there is a leak at a seam, the Bentonite will take care of it. Because of the undissolved film, in this case it won't. Campbell should be free to describe why a leak at a seam will not "self-heal" in any event.

In the final analysis, the Defendants are disputing the factual basis for Campbell's expert opinion, not his reasoning. As the Eighth Circuit held in *Bonner v. ISP Techs, Inc.*, 259 F.3rd 924, (8th Cir., 2001):

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. **Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, must such testimony be excluded.**

1259 F.3d at 929 (emphasis added).

**B. Methodology**

When addressing issues of methodology the Supreme Court recognized after *Daubert* that "conclusions and methodology are not entirely distinct from one another." *General Electric v. Joiner*, 522 U.S. 136, 146 (1997). An expert should not be excluded because his opinions are "wrong" but may be excluded if opinions stem from an unreliable methodology. Robert J. Shaughnessy, *Daubert After a Decade*, 30 LITIGATION 19, 23 (Fall 2003) (hereinafter "LITIGATION"). *See also Ruiz-Trache v. Pepsi Cola*, 161 F.3d 77, 85 (1st Cir. 1998) (*Daubert* neither requires nor empowers trial courts to judge the correctness of competing theories).

Defendants argue that Campbell's methodology was one he developed himself and is not accepted in the relevant community. But, Campbell's methodology was developed outside the litigation context. It is a methodology designed to determine where leaks are, what is causing them, and how to fix them. The technique is simple, straightforward, and reliable. Study the construction drawings, explore the leak history (where, when, how often, how much), and dig

test holes to see what is down there. And the method has been accepted by all experts in this case -- members of the relevant scientific community.

Shaughnessy observes in his article that in attacking an expert witness under *Daubert*, "the challenging party will need to support its motion with declarations and … testimony from one or more single 'attack' experts of its own who can explain to the court why the method employed by the challenged expert is not reliable." 30 LITIGATION at 22 (Fall 2003). Here, Defendants fail to identify an alternative scientifically reliable methodology for investigating the plaza decks water leaks. The Defendants instead challenge the conclusions resulting from Campbell's methodology not the methodology itself.

No affidavits or treatises are provided that suggest that the methodology Campbell used in his investigation was flawed or unreliable and that an alternative methodology exists. The Defendants' failure to identify or suggest a practical alternative means of investigating and analyzing the leakage problem at Promenade is, or should be, fatal to their motions.[2] The reason for this failure to suggest an alternative methodology is also telling: the Defendants' joint liability expert Kudder[3] utilized methods similar to those that INSPEC and Campbell used. The inherent hypocrisy in Defendants' critique of Campbell's methodology is reason enough to deny their motions. Kudder made observations at four test pits dug in the courtyard of Building Number 1. From the observations made at these four pits as well as historical information and manufacturing data, Kudder concludes that the Swelltite 3000 worked properly on every single plaza deck and that the leaks at Promenade are exclusively a product of poor design and construction sequencing. The vast divergence between Kudder's conclusions and Campbell's underscore the Advisory Committee Notes to the 2000 Amendments to Federal Rule of Evidence

[3] Kudder, in contrast to Campbell, is a professional witness for a broad variety of engineering problems.

702 observation that "experts can reach different conclusions based on competing versions of the facts."

**III. Campbell's Testimony Is Relevant**

After determining that the proffered testimony is reliable under *Daubert* and Fed. R. Evid. 702, the trial judge must then make a determination of relevancy or "fit" (i.e., does the evidence or testimony relate to any issue in the case?). Problems of fit exist when the expert opinion does not relate to facts or data that has been adequately established in the case. In determining "fit," a court will perform the same analysis in a science-rich case as it would in a routine motor vehicle accident. *Daubert*, 113 S.Ct. 2786, 2796 (1993). For example, in an automobile case, a court should exclude an expert's opinion that excessive speed caused an accident when there is no evidence in the record from which an inference of speed can be drawn.

Another example of testimony that was excluded properly because of a failure to fit would be the experts' testimony in *Jaurqui*. There both the engineer and human factors expert testified about the adequacy of warnings that were painted over the agricultural machine. 173 F.2d at 1084. Because the warnings had been painted over many times, the alleged inadequacies of the warnings could not have been a cause in fact of the injuries. *Id.* Here, Campbell's visual observation of Swelltite 3000 in a water-rich environment that was not swollen and to which undissolved PVOH film is still attached is a fact established in the record.

Campbell's testimony is proffered to provide the jury a "global" understanding of the water leak problems at the plaza decks. No one seriously has disputed the fact that a leak problem existed; nevertheless, there is a broad variety of opinions about the source of the leaks. Here Campbell's global testimony is relevant, reliable, fits the issues, and should be admissible. Recently, the Eighth Circuit reversed a summary judgment decision granted on *Daubert* grounds

because the opinion of a "global" expert was excluded. *See Smith*, 308 F.2d at 919-20 (citing *Clark v. Heidnick*, 150 F.3d 912, 915 (8th Cir. 1998)). One significant question in this case is "why do the decks leak?" Campbell's thorough, methodical, and comprehensive review of the problem is relevant to that question.

**CONCLUSION**

Based on the foregoing, Promenade respectfully requests this Court to deny the Defendants' *Daubert* motions and to admit Campbell's testimony into evidence in its entirety.

Respectfully submitted,

Dated: September 17, 2004

**FLYNN, GASKINS & BENNETT, L.L.P.**

s/ Steven E. Rau

Steve W. Gaskins, #147643
Steven E. Rau, #147990
333 South Seventh Street
Suite 2900
Minneapolis, MN 55402
612-333-9500 Telephone
612-333-9579 Facsimile
***Attorneys for Defendant Promenade Village Townhomes, L.L.C.***