**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Westfield Insurance Company,

Plaintiff,

vs.

Weis Builders, Inc., Promenade Village Townhomes, LLC, Healey Ramme Company, and Valley Forge Insurance Company, one of the CNA Companies,

Defendants, and

Weis Builders, Inc.,

Third Party Plaintiff,

vs.

Waterproofing By Experts, Inc., BRW Elness Architects, Inc., n/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Company, and J-Berd Mechanical Contractors, Inc.,

Third Party Defendants,

and

Colloid Environmental Technologies Company,

Third Party Defendant and
Fourth Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth Party Defendant.

and

Civil File No. OO-CV-987 JEL/JGL

**THIRD PARTY DEFENDANT WATERPROOFING BY EXPERTS, INC.'S SUBSTITUTED MEMORANDUM OF LAW IN OPPOSITION TO THIRD PARTY DEFENDANT J-BERD MECHANICAL CONTRACTORS, INC.'S MOTIONS IN LIMINE**

J-Berd Mechanical Contractors, Inc.,

Fourth Party Plaintiff,

vs.

Mikesh, Inc.,

Fourth Party Defendant.

---

## INTRODUCTION

Third-Party Defendant Waterproofing by Experts, Inc. ("WBE") opposes Third-Party Defendant J-Berd Mechanical Contractors, Inc. ("J-Berd") motions in limine. First, there is no valid basis for J-Berd's argument for excluding the virtually undisputed evidence that approximately two inches of water is standing on the horizontal surface of the waterproofing membrane at all times, or for excluding evidence correlating the 2 ½ to 3 inch gap between the horizontal surface and the lowest perforations on the vertical drain pipes installed by J-Berd and the standing water.

Second, the seven opinions by Mr. Schuh set forth in the Patrick Engineering hydrologic investigation report J-Berd asks the Court to exclude are particularly relevant and reliable and therefore admissible under Rule 702 of the Federal Rules of Evidence. J-Berd's motions should accordingly be denied.

## ARGUMENT

### I. THERE IS NO BASIS FOR J-BERD'S ARGUMENT TO EXCLUDE EVIDENCE OF TWO INCHES OF STANDING WATER ON THE PLAZA DECK SURFACES AND THE RELATIONSHIP BETWEEN THAT WATER AND OF THE SUBSURFACE DRAINAGE SYSTEM DESIGNED AND INSTALLED BY J-BERD.

J-Berd asks the Court for a ruling in limine prohibiting testimony to the effect there are approximately two inches of standing water on the horizontal surface of the courtyards at all times and that the characteristics of the drainage piping system designed and installed by J-Berd caused or contributed to the presence of that standing water. J-Berd's motion must be denied for several reasons.

First, if there is any evidence in this case upon which the parties can generally agree, it is that there is standing water roughly two inches deep on the plaza decks. This evidence is far from speculative or a mere "theory" as suggested by J-Berd. The evidence is in the form of eyewitness testimony from virtually every liability expert, as well as numerous employees of the parties, all of whom observed the standing water. Curiously, J-Berd chooses to cite some of this very eyewitness testimony in support of its motion, when in fact that testimony is perhaps the foremost reason for denying the motion.

Apparently J-Berd's selection of deposition testimony was intended to somehow demonstrate that some of those witnesses could not say there is precisely 2 ½ inches of standing water at all times, but that misses the point. Every witness who had an opportunity to observe the bottom of the courtyards (primarily by looking in destructive test openings excavated at various times by various experts) uniformly observed standing water on the horizontal deck. They also uniformly agreed there was some correlation between the presence of that water and the fact the lowest perforations in the vertical drainpipes designed and installed by J-Berd terminated 2 ½ or 3 inches above the decks.

J-Berd's own experts observed the same conditions and reached the same conclusions. Sid Bhatt, a metallurgist retained by J-Berd to investigate the drainage system, specifically attributed the presence of roughly 2 ½ inches of standing water to:

> The fact that the holes or perforations in the side of the riser are roughly 2 ½ inches above the concrete deck is one of the principle reasons for the standing water. The second reason would be the fact the concrete deck or the drain mats above it do not incorporate a slope bringing the water positively toward the risers.

(J-Berd Memo. at 8). William Arockiasamy, J-Berd's other expert retained for the purpose of analyzing the courtyard drain system, similarly testified as follows:

> Q: So the use of a Fat Max drain assembly on this project resulted in the 2 ½ inches of water on the deck; is that right?
>
> A: In this particular case, we can say that, but I don't know about other drain assemblies might have similar restriction.
>
> Q: But that's true in this case, the Fat Max caused there to be 2 ½ inches of water?
>
> A: The connection of the Fat Max to the PVC pipe.

(Ex. A., Aff. Of Brown, Arockiasamy Depo. at 63).

Similarly, Chad Filek, the J-Berd employee in charge of the design and installation of the courtyard drainage system, testified as follows:

> Q: Are you aware there is about 2 inches on the deck where there are no perforations, water can't get to the drain.
>
> A: Yes.
>
> Q: You are aware at the time when you are assembling this drain in the deck in the drain at the top, that there was going to be a 2-inch spot on the deck where water was not going to get to the perforations of the drain?
>
> A: Yes.
>
> Q: Was that an issue discussed with anybody on site?
>
> A: Nothing was brought up about it.
>
> Q: Why was there 2 inches where water was simply not going to drain out the deck, how did that result?
>
> A: That's where the vertical pipe glued into the drain. That's at the plaza level. At the precast level.

(Ex. B, Aff. of Brown, Filek depo. at 103-104).

At bottom (no pun intended), it appears J-Berd's argument for exclusion is that the evidence is disputed that standing water exists on the deck at all times and the extent to which the perforations in the vertical drainpipe contribute to that condition. WBE contends that this evidence is not genuinely in dispute. Even if it is, the jury, and not the court, must resolve that dispute. A motion in limine is not the appropriate mechanism for deciding issues of fact. J-Berd's Motion in Limine to exclude evidence of the depth and constancy of standing water on the plaza decks and the causal connection between that condition and J-Berd's drainage system should accordingly be denied.

## II. MR. SCHUH'S OPINIONS ARE PARTICULARLY RELEVANT AND RELIABLE AND SHOULD BE ALLOWED UNDER RULE 702.

J-Berd's arguments for excluding Mr. Schuh's opinions are similarly unavailing. Mr. Schuh's opinions have all the hallmarks of relevancy and reliability required for admissibility under Rule 702. Mr. Schuh is a civil engineer who was retained by WBE, CETCO and Chris Craft to investigate the drainage conditions within the courtyard areas. This included the surface drainage and movement of water in the soils located in the courtyard plazas above the waterproofing system. The scope of the study, conducted with the aid of several civil engineers and other professionals employed by Patrick Engineering, Inc., included:

1. Providing an opinion on the standard of care that should have been followed for design of the courtyard's storm water management system.
2. Reviewing information on the design of the storm water management system for the Promenade Townhomes.
3. Performing a field investigation to observe cited conditions and to gather information on select drainage features at the site and the soils used to construct the courtyard.
4. Performing hydrologic and hydraulic analysis for the areas tributary to the courtyards to determine the ability of the drainage system to handle the design storm events.
5. Provide an opinion of the following:

a. The adequacy of the design of the storm water management system to control surface water runoff.
b. The potential for inadequate surface drainage to have caused the seepage into the townhomes.
c. The potential for inadequate surface and groundwater drainage to cause frost heave of the sidewalks in the courtyards.

(Exhibit 1, August 12, 2003, hydraulic investigation report, at pages 1-2, Aff. of Heyer in support of J-Berd's Motions in Limine).

J-Berd employs somewhat of a "shotgun" strategy in presenting its argument, thereby making an orderly rebuttal somewhat difficult. However, what J-Berd does do is cite excerpts of Mr. Schuh's deposition testimony from which it levels conclusory and unsubstantiated charges of unreliability. J-Berd fails to address the overall methodology employed by Patrick Engineering and the foundation for Mr. Schuh's opinions.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702, which was amended in 2000 to reflect the analysis in Daubert v. Merrill Dow Pharmeceuticals, Inc., 509 U.S. 579 (1993), requires the district court to act as a gate-keeper and ensure the reliability and relevancy of expert testimony. Blandin Paper Co. v. J & J Industrial Sales, Inc., 2004 WL 1946388 (D. Minn. Sept. 2, 2004), citing Fed. R. Evid. 702, cmts. to 2000 Amendments. While the Court in Daubert listed a number of factors a court can consider in determining the admissibility of expert testimony, it is clear that not all of the listed factors can apply to every type of expert testimony. See, Kumho Tire Co., Ltd. v. Carmichael, 526 U.S.

137, 149 (1999) ("We conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").

> Some types of expert testimony will be more objectively verifiable and subject to the expectations of falsify ability, peer review and publication, than others. Some types of expert testimony will not rely on anything like the scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise. The trial judge in all cases in proffered expert testimony must find that it is properly grounded, well reasoned and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experiencing the expert's field and the expert must explain how the conclusion is so ground.

Fed. R. Evid. 702, cmts. to 2000 Amendments (citation omitted).

Moreover, a proponent of the evidence does "not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable … the evidentiary requirement of reliability is lower than the merits standard of correctness." In re Paoli R.R. Yard PCB Litigation, 35 F. 3d 717, 744 (3d Cir. 1994).

Finally, Rule 702 expressly provides that an expert may be qualified on the basis of experience alone, or experience in conjunction with other knowledge, skill, training or education. See, e.g., Tassin v. Sears Roebuck, 946 F. Supp. 1241, 1248 (M.D. La. 1996) (An engineering expert's opinion need not necessarily have been tested, peer reviewed or find general acceptance, but it "must, however, rest on more than speculation, he must use the type of information, analyses and methods relied on by experts in his field, and the information that he gathers and the methodology he uses must reasonably support his conclusions. If the expert's opinions are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches, then rigid compliance with Daubert is not necessary."). See also, Mitchell v. Gencorp, Inc., 165 F.3d 778, 781 (10th Cir. 1999):

> "The [proponent] need not prove that the expert is undisputably correct or that the expert's theory is "generally accepted" in the scientific community. Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements."

Applying those principles to Mr. Schuh's opinions and the underlying methodology and basis for arriving at those opinions dispels all doubts as to their reliability and relevance under Rule 702.

**A. Mr. Schuh's opinions are relevant.**

J-Berd first advances the nonsensical argument that Mr. Schuh's opinions are irrelevant because he cannot identify the cause of the leaks. The test of relevance under Rule 702 is whether the opinion offered by the expert is sufficiently related to the facts of the case such that it will aid the jury in resolving the factual dispute. Lauzon, 270 F.3d at 694, citing Daubert, 509 U.S. at 591. There can be little doubt each and every one of Mr. Schuh's opinions and conclusions will be helpful to the jury (Schuh report at 20-21).

The fundamental question in this case is why and how water entered the structure at Promenade. All of the opinions expressed by Mr. Schuh's August 12, 2003, report and his November 12, 2003, addendum report (Ex. 3, Aff. of Heyer) contribute to answering that question. He concludes the courtyard areas were not designed to incorporate an appropriate storm water management system which would prevent water from collecting and ponding on the surface of the courtyards. The courtyards as currently designed do not prevent water from ponding at a level high enough and close enough to the buildings to allow seepage through unprotected wall structures. The storm water management system also fails to properly collect and direct surface and subsurface water out of the courtyards with sufficient quantity and speed. Schuh's opinions ably pass the relevancy test under Rule 702.

**B. Schuh's Opinions are Reliable.**

Although unclear, it appears much of J-Berd's argument is focused on the supposed failure of Schuh's opinions to satisfy the four Daubert criteria.

First, J-Berd appears to argue the standard of care Mr. Schuh concludes was not met in this case is "not sufficiently ascertainable." It is unclear what J-Berd means by "ascertainable." Mr. Schuh expressly testified that items no. 2 and 3 of his storm water management system design criteria are generally recognized by other engineers in the industry (J-Berd Memo. at 11).

J-Berd's second criticism of Mr. Schuh is that he has not designed a courtyard drainage system similar to the Promenade project. Id. As a preliminary matter, neither have any of the other experts. If that was the test, no expert should be allowed to testify in this case. Again, Daubert principles have less use in fields like design engineering, where "general acceptance" is the norm, not the exception. Teledyne Republic/Sprague, 870 F. Supp. 408, 410 (D. Mass. 1994); Lappe v. American Honda Motor Co., 857 F. Supp. 222 (N.D. N.Y. 1994) (Daubert analysis inapplicable where expert bases opinions on facts, an investigation, and traditional technical/mechanical expertise). As Judge Montgomery observed, the failure of a party's experts "to meet all four Daubert factors does not affect their admissibility under Rule 702 as long as the proponent utilizes other measures supportive of its expert's opinion." Blandin Paper Co. 2004 WL 1946388 *5, citing Daubert, 509 U.S. at 593-94.

J-Berd's third criticism of Mr. Schuh is the prediction in his November 12, 2003, addendum that certain storms in 2001 and 2002 would have caused ponding over the inlets in J-Berd's system, and water would have reached the elevation adjacent to the building or entryway in an intense storm of longer duration (J-Berd Memo. at 12). J-Berd suggests Schuh's "prediction" in that regard – which was based on actual data it gleaned from meteorological data and based on sophisticated computer modeling – was somehow speculative. J-Berd makes the

same assertion with respect to Schuh's opinion in his addendum report that there is ponding at Building One on all modeled storm events, and that the ponding reaches the lowest adjacent building grade in the 100-year storm event. For Building 5, there is ponding for all four modeled storm events and the ponding reaches the lowest adjacent building grade in the 5, 10 and 100-year events. Id.

The text of the quoted excerpts from Schuh's addendum itself betrays the weakness of J-Berd's contention. Schuh expressly states the results of Patrick Engineering's analysis of the originally constructed drainage system "considering the local standards and generally accepted engineering standards" show this ponding condition.

Moreover, the suggestion the fact Schuh did not personally observe the ponding somehow renders his expert opinion unreliable is baseless and ignores the spirit and intent of Rule 702. See, e.g., Nutrasweet Co. v. X-L Engineering Co., 227 F.3d 776, 789 (7th Cir. 2000), reh'g denied (Oct. 6, 2000) (Expert's opinions based on analysis derived from groundwater migration test results, soil degradation, aerial photographs and other information were not unreliable simply because he did not have essentially "direct" evidence of source of contaminant dumping or "specialized knowledge" that defendant was the source, because "as an expert witness, Dr. Ball was not required to have direct evidence or a personal observation that X-L was illegally dumping VOCs. As an expert witness, Dr. Ball could use his "specialized knowledge" of reliable techniques and methods (as opposed to "specialized knowledge" of the incident in question) to form an opinion." See also, United States v. 14.38 Acres of Land, 80 F.3d 1074, 1078-1079 (5th Cir. 1996) (proposed testimony of civil engineering expert that defendants' property was more likely to be damaged in a major flood than in pre-project conditions on the

basis of geological survey map review, Corps of Engineer data, and aerial photographs admissible despite inability to predict extent of flooding).

J-Berd also contends Mr. Schuh's opinions formed on the basis of the computer modeling are flawed because it is not subject to testing (J-Berd Memo. at 13). Again, the proper inquiry is whether Schuh used the types of information, analyses and methods relied on by experts in his field, and the information gathered and the methodology used must reasonably support his conclusions. Tassin, 946 F. Supp. at 1248. A review of Mr. Schuh's report and the appendices to that report unmistakenly demonstrate Schuh's opinions more than satisfy those requirements.

Schuh and his colleagues at Patrick Engineering performed a number of investigations as a part of their overall study. These investigations included a field investigation, a geotechnical investigation and a hydrologic investigation.

The field investigation involved a two-day site visit by Patrick staff (two civil engineers with specialities in hydrology studies) to examine the as-built conditions at the courtyards, investigate the soils in the courtyards and perform a survey of select features in two of the courtyards. That information was collected to use in the evaluation of the ability of the courtyard drainage system to accommodate the design storm events in accordance with the standard of care (Schuh report at 6). Part of that portion of the investigation included excavating two foot by two foot pits around one inlet in the courtyard of Building 1 to examine the physical characteristics of the inlet and materials surrounding it. Id. at 7. It was in this pit that the very details characteristic of J-Berd's piping system were observed and analyzed. Id. Those observations lead the investigators to conclude "the perforations could only remove water located at least two inches above the slab." Id. The building survey also included a determination of relative elevations within the courtyards off of which all other drainage inlets, elevations at buildings and

overflow elevations were taken. The survey calculations were then documented in appendix D to the report.

The geotechnical investigation included the performance of a series of hand-auger soil borings in the courtyards of all six buildings to ascertain soil types. Exhibit 4 is a typical cross-section showing the general soil types encountered. Appendix B contains a soil condition summary. Patrick then had the soil samples tested using the Atterberg limits testing (ASTM D 4318), hydrometer and civ analysis testing (ASTM D 422), constant head hydraulic conductivity testing (ASTM D 2434), and washed gradation testing. The purposes for each test are explained on pages 9 and 10 of the August 12 report. Appendix D summarizes the test results. The results and analysis are also chronicled on page 10. Based on the test results, the engineers concluded "this soil is plastic and will have associated low permeability." They further concluded the overlaying clay layer would inhibit the percolation of surface water runoff. Id.

Finally, the hydrologic investigation was performed with the primary purpose of analyzing the existing storm water management system to see if water would back up above the drain inlet and the system's ability to keep water more than one foot below the entry elevation or to keep water from seeping over the top of foundation (Schuh deposition at 137). Schuh determined the one foot "free board" standard (meaning water ponding in a 100- year storm event – which in turn meant 6 inches in 24 hours) – was the appropriate standard for the Promenade courtyards based on general engineering principles and confirmed by Eagan's City Engineer (Schuh depo. at 85-86).

The hydrologic investigation involved several areas of analysis, including local design standards and criteria; post-construction attempts to alleviate problems; recent historical rain

events; study of freeze/thaw cycle effect on drainage systems; and recommendation of appropriate drainage design standard (Schuh report at 11).

The report presents in detail the approach, methodology, results and discussion for each listed analysis.

Analysis Following the Local Design Criteria

*Approach*

Schuh assumed the system would have been required to meet the City standards. Eagan's engineering department requires the use of the soil conservation service (SCS) also known as the National Resource Conservations Service (NRCS) methodology to design surface water drainage systems. Eagan uses the design rainfall amounts published by the U.S. Weather Bureau in the SCS Type II Rainfall Distribution. Those references are contained in appendix D to the report. That data was used in combination with the SCS methodology to determine the effectiveness of the drainage system relative to those standards.

*Methodology*

The analysis followed local design standards using the SCS methodology and Technical Release (TR-55). SCS methodology uses a specific design storm event over a 24-hour duration. TR-55 is a hydrograph routing methodology that converts a rainfall distribution into a runoff hydrograph. Inflow and outflow of the system via the inlets were compared at each time increment in the hydrograph. Ponding occurred when there was an excess of inflow. Each inlet tributary area was analyzed individually to determine capacity and its effect on ponding within each courtyard. The entire courtyard area for Buildings 1 and 5 were then analyzed to determine how each inlet works in conjunction with the other and what the maximum elevation of ponding was within each courtyard.

*Results and Discussion*

Appendix F contains the hydrologic calculations. (Note that the supplemental report contains revised calculations which were done when Schuh discovered the first set was based on 6-inch rather than the existing 9-inch surface grates). The report makes clear the results were based on consideration of local standards and generally accepted engineering standards. The report concludes the drainage system in the courtyards does not meet the applicable standard of care, which requires the system to convey the 10-year rain from a 10-year storm event by gravity with no surface ponding (Schuh report at 12). The inlet rims for the existing system were less than one foot below the lowest grade adjacent to the buildings (due in large part to the installation and grade above foundation) and, in fact, are near the grade. In short, since no modeled storm events meet the 12-inch freeboard criterion, there is ponding for all events, with the 100-year storm events, the potential for water seepage and a water surface higher than the lowest entry point at some buildings. This Schuh concluded demonstrated that the drainage system was considerably underdesigned. Id.

The report also discusses the historical rain event analysis, beginning at page 15. Hydrologic analyses were performed for significant rainfall events for the previous several years, particularly those documented in the leak reports compiled by Promenade. The purpose of the analysis was to determine the adequacy of the drainage system under conditions that likely occurred in the previous year. Historical rain data was obtained from the National Oceanic and Atmospheric Administration.

The methodology employed to calculate the inflow into the system was the creation of a rainfall hyetograph and runoff hydrograph. The methodology described in Appendix D, "Applied Hydrology and Sedimentology for Disturbed Areas" by Barfield, Warner & Haan, was

then used to combine the hyetograph with the unit hydrograph which in turn were used to calculate ponding depths using the same methodology as the local design criteria analysis (Schuh report at 15).

The results reported were those in part criticized by J-Berd at page 13 of its memorandum in support. Mr. Schuh's opinions were formed on the basis of Patrick Engineering's hydrologic and historical rain event analyses, are therefore plainly "based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and [provide] a reasonable link between the information and procedures he uses and the conclusions he reaches." Tassin, 946 F.Supp. at 1248. Consequently, they are eminently reliable.

The same type of rigorous methodology and factual data were employed in Patrick's freeze/thaw cycle analysis. That analysis is discussed beginning at page 16 of the August 12, 2003, report. Schuh noted the earth fill would be frozen solid throughout the winter months due to the climatological conditions experienced in the Twin Cities area. He therefore investigated the phenomenon of melting snow and the drainage system's inability or ineffectiveness in frozen ground conditions to assess its contribution to seepage (Schuh report at 16).

The methodology employed involved first researching various state and data collection agencies regarding freeze/thaw cycle in Minnesota. The report references the 2001 annual local climatological data published by NOAA/NCDC for average temperature over the previous several decades. Patrick also checked with the Minnesota State Climatology Office to ascertain the typical frost depth. Conclusions were made from the data gathered through this research about the effect on the courtyard drainage of freeze/thaw (Schuh report at 17).

Schuh concluded the freeze/thaw cycle significantly affected the courtyard drainage. He concluded based on the TR55 methodology that ponding would be more extensive than with

non-frozen soils. Uneven thaw would lead to ponding directly next to buildings, resulting in seepage into the buildings.

J-Berd's only response to this analysis is that Schuh had no direct evidence that ponding did occur during the wintertime at Promenade or that such ponding contributed to leakage because he was at the Promenade during the winter. Again, an expert can and almost always does render opinions that do not depend upon "direct evidence." Nutrasweet Company, 227 F.3d at 789.

Finally, J-Berd contends that Schuh's opinions rely upon the applicability of the City of Eagan Engineering Code (J-Berd Memo. at 16-17). As noted, Mr. Schuh did take pains to speak with the city engineer to determine specifically whether the one foot freeboard requirement would apply to the Promenade courtyards. He was told it would (Schuh depo. at 78-86). However, Schuh made clear during his deposition that information gleaned from the city engineer simply confirmed his assessment, based upon sound engineering principles, that a 12 inch freeboard standard was appropriate (Schuh depo. at 109, 122). Indeed, he testified Patrick Engineering would have designed Promenade's storm water management system using that standard, and that the standard is what the majority of engineering firms would follow. Id. at 107-109.

In short, J-Berd's attempt to characterize Schuh's opinions as unreliable must fail. Schuh's opinions are founded on sound engineering principles and rigorous scientific methodology using extensive data and factual information. Moreover, the data and methodology used and the conclusions he reaches "fit" the facts of this case as required by Rule 702 and case law interpreting the rule. Mr. Schuh's opinions easily satisfy the criteria for admissibility. Therefore, J-Berd's motion should be denied.

Dated: September 21, 2004.

IVERSON REUVERS, LLC.

By___s/ Mark S. Brown___

Mark S. Brown, #226774
Attorneys for Waterproofing By Experts
9321 Ensign Ave. South
Bloomington, MN 55438
(952) 548-7200