COPY

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Westfield Insurance Company,

Plaintiff, Civil File No. 00-CV-987 JEL/JSM

vs.

Weis Builders, Inc.; Healey Ramme Co., sued as Healey Ramme Company; CNA Insurance Companies, sued as CNA Insurance Company; Promenade Village Townhomes, L.L.C.; Valley Forge Insurance Company, one of the CNA Insurance Companies,

Defendants,

and

Weis Builders, Inc.,

Third-Party Plaintiff,

vs.

Waterproofing By Experts, Inc., and BRW Elness Architects, Inc., a/k/a Elness Swenson Graham Architects, Inc., Colloid Environmental Technologies Co., and J-Berd Mechanical Contractors, Inc.,

Third-Party Defendants,

* * * * * *

DEPOSITION OF: RICHARD D. STEHLY, P.E.
TAKEN ON: THURSDAY, OCTOBER 9, 2003
COMMENCING AT: 9:30 A.M.

* * * * * *

CHARLES G. WILLIAMSON, Court Reporter
4209 113th Street West
Bloomington, MN 55437
Telephone: 952-888-8586
Fax: 952-888-3562

2

and

Colloid Environmental Technologies Co.,

Fourth-Party Plaintiff,

vs.

Chris Craft Industrial Products, Inc.,

Fourth-Party Defendant,

and

J-Berd Mechanical Contractors, Inc.,

Fourth-Party Plaintiff,

vs.

Mikesh, Inc.,

Fourth-Party Defendant.

3

NOTES

Page Line

4

APPEARANCES:

PATRICK D. REILLY, Esq., Erstad & Riemer, P.A., 200 Riverside Office Tower, 8009 34th Avenue South, Minneapolis, MN 55425, appeared representing Third-Party Defendant and Fourth-Party Plaintiff Colloid Environmental Technologies Co.

G. JOHN VEITH, Esq., Brown & Carlson, P.A., 5411 Circle Down Avenue, Suite 100, Minneapolis, MN 55416-1311, appeared representing Fourth-Party Defendant Chris Craft Industrial Products, Inc.

CHAD J. STEPAN, Esq., Meagher & Geer, P.L.L.P., 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402-3788, appeared representing Defendant Weis Builders, Inc.

LEO I. BRISBOIS, Esq., Stich, Angell, Kreidler & Dodge, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401, appeared representing Defendant Valley Forge Insurance Company.

MARK S. BROWN, Esq., Iverson Reuvers, LLC, 250 Townline Plaza, 8585 West 78th Street, Bloomington, MN 55438, appeared representing Third-Party Defendant Waterproofing By Experts, Inc.

WILLIAM D. HULL, Esq., Coleman, Hull & Van Vliet, PLLP, 8500 Normandale Lake Boulevard, Suite 2110, Minneapolis, MN 55437, appeared representing Third-Party Defendant Elness Swenson Graham Architects, Inc.

CHANDELLE HEYER, Esq., Tomsche, Sonnesyn & Tomsche, P.A., 610 Ottawa Avenue North, Minneapolis, MN 55422, appeared representing Third-Party Defendant J-Berd Mechanical Contractors, Inc.

STEVEN E. RAU, Esq., Flynn, Gaskins & Bennett, LLP, 2900 Metropolitan Centre, 333 South Seventh Street, Minneapolis, MN 55402-2440, appeared representing Defendant Promenade Village Townhomes, LLC.

ANDREA E. REISBORD, Esq., Cousineau, McGuire & Anderson, 600 Travelers Express Tower, 1550 Utica Avenue South, Minneapolis, MN 55416-5318, appeared representing Westfield Insurance Company.

5

INDEX

PAGE


Pursuant to Notice.................................. 6

WITNESS:
Richard D. Stehly, P.E....................... 6
Examination by Mr. Reilly............ 6,142,148
Examination by Mr. Stepan............... 75,143
Examination by Mr. Rau.................. 94,147
Examination by Mr. Brown.................... 104
Examination by Mr. Veith.................... 140
Witness Excused............................ 149
Signature/Correction Page................... 150
Certificate Page........................... 151


INDEX OF EXHIBITS


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit No. 812...... | Resume of Richard D. Stehly....... | 7 |
| Exhibit No. 813...... | Report Of Building Water-Proofing, October 9, 2002......... | 35 |
| Exhibit No. 814...... | Report of Building Water-Proofing, August 11, 2003......... | 35 |
| Exhibit No. 815...... | Letter Dated August 14, 2003...... | 36 |


# The original exhibits and original transcript are in the possession of Attorney Patrick D. Reilly.

6

THE DEPOSITION OF RICHARD D. STEHLY, P.E., is taken on this 9th day of October, 2003, before Charles G. Williamson, a Notary Public in and for the State of Minnesota, County of Hennepin, at the Law Offices of Erstad & Riemer, 200 Riverview Office Tower, 8009 34th Avenue South, in the City of Minneapolis, Minnesota, commencing at the hour of approximately 9:30 a.m., pursuant to NOTICE:

* * * *

(Deposition Exhibits 812, 813, 814 and 815 were marked for identification at this time.)

RICHARD D. STEHLY, P.E.,

called as a witness, being first duly sworn, was examined and testified on his oath as follows:

EXAMINATION

BY MR. REILLY:

Q Sir, for the record, could I have your full name, please?
A **Richard Donald Stehly.**
Q And Mr. Stehly, could you give us your home address, please?
A **708 North First Street, Minneapolis, Minnesota.**
Q Today, Mr. Stehly, we will be taking your deposition. Have you ever had your deposition taken before?
A **Yes.**
Q How many occasions?
A **I don't keep track. More than 20.**

7

Q Okay. So you understand basically how a deposition takes place and basically you need to answer verbally?
A **Yes.**
Q And if you don't understand my question, please let me know, I'll be happy to rephrase it or repeat it.
A **I will.**
Q And we both can't speak at the same time; you understand that?
A **Yes.**
Q How many depositions have you given in the year 2003?
A **You know, I don't keep track by year either. I can't think of any at the moment.**
Q What's the last deposition you can recall giving?
A **I gave a deposition in a matter between Anchor Block Company and a block company up by Alexandria, London -- New London.**
Q And what were the issues in which you were testifying?
A **It's a patent infringement case and I was testifying about my work when I was employed at Anchor Block Company.**
Q Okay. I'm going to show you Exhibit Number 812. Do you recognize that document, sir?
A **Yes.**
Q And what is that?
A **It's a copy of my resume.**

8

Q And is that up-to-date?
A **I believe it is.**
Q Okay. Let's just talk briefly about your education, if we can. Have you ever taken any courses that involve waterproofing issues?
A **I don't recall any.**
Q Have you ever taken any seminars involving waterproofing issues?
A **I may have, but I don't recall any.**
Q Okay. Have you ever attended any programs put on by any manufacturers of waterproofing products?
A **Yes.**
Q Okay. Where has that taken place and with whom?
A **At Twin City Testing.**
Q Okay. And do you recall the manufacturers who provided that information to you?
A **Dowell had provided one seminar.**
Q How do you spell that, sir?
A **D-O-W-E-L-L. And then American Colloid had provided another.**
Q Anybody else?
A **Those are the only two that I can recall that dealt with bentonite. I have heard Brent Anderson speak about bentonite waterproofing, but I don't recall that being a seminar specifically on waterproofing.**

9

Q And when I asked you about waterproofing in any of these questions, I didn't mean to limit it to bentonite waterproofing, I meant waterproofing in general.
A **Yes.**
Q Would your answers to any of those prior questions change because of that understanding?
A **No. I can't recall any others.**
Q Okay. Let's talk about the seminar you attended with Dowell. What topics were covered in that, if you can recall?
A **Just the general nature of bentonite and the use of bentonite for containment in sewage lagoons, high sodium bentonite.**
Q Do you know when that seminar was given?
A **Oh, I think that would have probably been in the '70s. We had been doing some work for them.**
Q Did you receive any materials as a result of that seminar?
A **I probably did, but I don't know that I have them.**
Q Is there anything that you learned in that seminar or which you are basing your opinions on today?
A **I can't think of any.**
Q And you said you attended a seminar put on by American Colloid?
A **Yes. They also had come to our office, a lunch type engineering seminar.**

10

Q Do you remember any of the topics that were covered in that seminar?
A **Just general usage of bentonite, what it is and how it's used.**
Q And do you recall approximately what time that was?
A **That probably was in the '70s as well.**
Q Do you remember any of the people involved?
A **No, I don't.**
Q Is there anything in that seminar which contributes to the formation of your opinions in this case?
A **I can't think of anything specific.**
Q And you said you may have attended a seminar or workshop with Brent Anderson?
A **I've heard him speak.**
Q And in what context?
A **I can't recall the -- it may have been something about a masonry conference or a concrete conference, but he had talked about use of bentonite materials for waterproofing, waterproofing of various types.**
Q Okay. Any information that he provided that you used in forming your opinions in this case?
A **I can't think of any.**
MR. BROWN: Pat, did he say when that was?
MR. REILLY: I haven't got to that yet.
Q (By Mr. Reilly.) When were those talks?

11

A **I don't know specifically when. I would think it was late '80s, early '90s.**
Q Any other educational opportunities that you have attended, whether seminars or whatever, regarding waterproofing that you can recall? And waterproofing is not limited just to bentonite waterproofing.
A **Understand. I can't think of any.**
Q Okay. I'd like to go over your employment a little bit, but when you graduated from the University of Minnesota, did you have a specialty in the civil engineering field at that time?
A **I had earned a bachelor's of science in civil engineering.**
Q And was there any specialty that you were focusing on?
A **I have taken a lot of courses in soil engineering and also structural analysis.**
Q And it appears that at the time you graduated from the University of Minnesota, you were employed at Twin City Testing?
A **Yes.**
Q Could you just briefly tell us what Twin City Testing did as a company during the 1971 to 1988 period you worked there?
A **They were an independent testing laboratory. They offered testing services in concrete, steel, glass,**

12

**roofing, masonry, soil engineering, consumer product testing and some mechanical testing.**
Q Okay. Do you recall during that period of time doing any testing on bentonite waterproofing?
A **Yes.**
Q How many times?
A **Oh, I would guess -- I don't know exactly, but I would guess maybe up to 50 times.**
Q And could you generally tell us the context in which these testings were being done?
A **Most of it had to do with liners for sewage lagoons that were made from the soil, a bentonite mixture, are the ones I'm familiar with.**
Q And what kind of testing was being done by your company at that time of the bentonite products?
A **Permeability testing.**
Q What do you mean by that? Could you describe that in layman's terms?
A **Yes. It's just to measure the rate at which water will pass through the soil-bentonite mixture.**
Q And why were these tests being run?
A **To meet a requirement, a leakage requirement for the sewage lagoon.**
Q Do you recall having any concerns or problems with the bentonite products that you were testing at that time?

A **There are concerns. Our work was primarily to determine how much bentonite would be needed to be added to a specific soil to meet a seepage criteria.**
Q Okay. Do you know the companies that were supplying the bentonite material at that time?
A **I think American Colloid provided some, I think Dowell supplied some, and there were probably others. Most of the bentonite was coming from the west; Wyoming, South Dakota, Montana, that area.**
Q Okay.
A **And there may have been others.**
Q Based upon your testimony, it's my understanding that Twin City Testing was being hired to determine the amount of bentonite to be used in a certain application?
A **Yes.**
Q Were they being hired to determine whether bentonite should be used at any event? In other words, the first question, should we use bentonite? Was that something that Twin City Testing was being asked to determine?
A **It is not common for Twin City Testing to determine that. Someone else -- usually a sanitary engineer would decide what the system was going to be.**
Q And was bentonite the system of choice in that industry?
A **For a period of time, it was very popular.**
Q Did that change over time?



A **I don't know if it's being used a great deal now or not. I couldn't tell you.**
Q I see you left Twin City Testing in 1988. Why did you do that?
A **I had an opportunity to work at Anchor Block Company and be an owner of Anchor Block Company.**
Q Well, going back to Twin City Testing, did you ever deal at all with bentonite panels or sheets as opposed to raw bentonite in your testing at Twin City Testing?
A **I don't recall us testing the sheets. I was aware of their use as a waterproofing system, would see them on projects.**
Q Okay. During the some 17 years you were at Twin City Testing, did you ever do any design work in engineering?
A **Yes.**
Q What kind of design work did you do?
A **The soil engineering work that dealt with providing recommendations for foundation types and loadings I would refer to as design, and I did do that and we did do that. I also designed mixtures for concrete and also designed mixtures for borders, which I would refer to as design, and the company did that work and I did that specifically as well.**
Q At any time did you ever do any design work on residential facilities such as apartment complexes or condo complexes



or anything like that?
A **No.**
Q Did you ever deal with any below grade waterproofing in the context such as at the Promenade with courtyards or below grade living exposures?
A **Yes.**
Q In what context did you do that kind of work?
A **Our most common experience, or most common request was when there were leaking facilities, basements leaking, plazas leaking, that type of thing.**
Q And what would Twin City Testing's involvement be in that?
A **We would examine the building construction, determine source of leaks, provide suggestions for remediation.**
Q In any of those jobs, would bentonite waterproofing ever be involved, to your knowledge?
A **I'm sure there were, but I can't think of one specifically. There may have been a bank in Ridgedale. I believe there was. There was a bank in Ridgedale. I think there was an underground tunnel. There was some leakage associated with that. But other than that, I can't think of any specific one.**
Q Do you recall the product used in the bank in Ridgedale?
A **I think it was a spray-applied bentonite, but I don't know whose it was. I can't remember whose it was.**
Q The kind that Mr. Anderson uses?



A **Probably similar.**
Q And do you recall what the problems were with that application?
A **I can't. I can't recall.**
Q Now, you said you would do an actual leak investigation in certain circumstances?
A **Yes.**
Q Would that require going out into the field and doing testing?
A **Yes.**
Q Tell me what the process that you at Twin City Testing did in the 1971-1988 period to do a leak investigation?
A **Well, it usually is -- the work is usually tailored to the project because all the projects are different. But in a -- most common would be a basement of a residence has leaking, has leakage, and you would examine the inside of the basement, try and determine where the water was coming through, determine what the construction was, often include excavation of soil on the outside, again, to look at what the construction was, try and determine the source or the location of the penetration. We would also look at drainage issues, slope of the ground around the foundation, presence of gutters, downspouts.**
Q Now, when you're trying to locate where a leak is coming from, because water can travel, it's a difficult

proposition; is it not?
A It can be very obvious and it can also be very, very difficult. You can have both situations.
Q All right. In order to determine and remedy a situation, how did you back in those days attempt to locate the source of the leak if it wasn't obvious?
A Well, sometimes we would even use dyes and put it in water and spray it on an area and try and see if we could determine its source.
Q Would you localize that area from the surrounding area so that you knew what particular location you were testing at any one time?
A You would try.
Q And how would you do that?
A Well, you could -- if you were using a hose and a spraying apparatus, you could try and mask off the area which you were spraying and try and dike the area so the water wouldn't run laterally from the area that you were trying to introduce it to see if that was causing a problem. You could do flood tests where you actually flood an area. Here again, you could flood the whole area or you could sandbag and area and flood a section.
Q So if you had a particular concern about one location on the structure, you would try to localize that structure area to do the test; correct?



A Yes.
Q And if that indicated a leak, you'd know that's at least one of the sources for that leak?
A Yes.
Q There could be others if that did not solve the problem?
A Yes. And as you can appreciate, water can travel a long ways laterally and it can be sometimes a very difficult task to find its entry point.
Q And did you find that to be a common experience in your leak investigations while at Twin City Testing, that water would travel and could present a difficult problem in locating an individual leak?
A Yes.
Q Did you ever do any leak investigations in major residential construction projects such as apartment complexes or condominium projects that you can recall?
A Yes. There were a couple that I had done. One was a courtyard. I can't remember -- I don't have the files from Twin City Testing. I can't remember the name of the project.
Q Do you remember where the project was located?
A No.
Q And do you remember the nature of the courtyard, where it was, what it was over, that sort of thing?
A I thought it was over a precast plank, but I think the



soils were clays, if I remember right.
Q Do you remember the nature of the waterproofing material?
A I think it was a membrane of I think EPDM.
Q Can you tell us what that EPDM stands for?
A Well, it would be a single sheet of material.
Q Of butyl material?
A Similar.
Q Do you recall what your determination was at that job?
A In that case, some of the seams weren't completely sealed, so it leaked between the seams.
Q And how did you determine that?
A Dug it up.
Q And then what did you do once you dug it up?
A Looked at it.
Q And you saw the seams were not sealed?
A You could actually peel some of them back, yes. There were penetrations through it.
Q Could you see that water had penetrated through those seams visually?
A Yes.
Q So you didn't need to do a specific test to determine that?
A No. It was pretty obvious.
Q And when you got those seals sealed up, did that relieve the problem?



A Yes.
Q You didn't have to replace the entire membrane?
A No.
Q Now, earlier you testified that some of the things you would look at would be gutters and downspouts; do you remember saying that?
A Yes.
Q And what would be the basis for looking at gutters and downspouts?
A To determine where the discharge of the water was from the roof in residences. It's not unusual to have backfill against the wall subside a little bit, and so the drainage is not always positive away from the wall which it needs to be to keep from accumulating water next to the wall.
Q And that would be true in a residential and a commercial or a multifamily construction; you want to have the slope of the ground away from the wall?
A In most cases, yes. Yes, this is preferred.
Q And that's because you want to move as much water away from that structure as fast as you can?
A If you are successful in diverting the water away from a foundation, it's less likely that it will enter the foundation.
Q And that's one of the reasons why landscaping usually has

a slope away from walls, whether they're blocks, concrete, wooden, whatever; correct?
A **Well, it's been my observation that landscaping has all sorts of slopes, some good, some bad, and they don't always think that it's going to cause a problem with drainage.**
Q Optimistically, or optimally, I should say, the best way would be to slope it so that the high point is against the wall and it slopes away from the wall?
A **That would be better.**
Q From a water penetration issue point of view at least?
A **Yes. For typical residences or typical apartments.**
Q Okay. In certain circumstances, would you recommend gutters be placed in a building to move the water away from that area?
A **I have.**
Q Now, you understand in Minnesota we have things called ice dams and ice buildup and all that sort of thing. Do you still recommend gutters even though that possibility exists?
A **I have.**
Q Why?
A **Because it helps collect the water that would run off the roof and collect it and you can then discharge it a long ways away from the foundation. You can direct it better**



**than if it just comes off the eave.**
Q Once again, you're moving water away from what could be a problem area?
A **Yes.**
Q Any other leak investigations that you can recall other than the one courtyard where there was waterproofing problems over either an occupied or garage type space that you dealt with at Twin City Testing?
A **I'm sure there are others. I just can't recall the specific -- anything specific.**
Q Okay. The next job was president and partner at Anchor Block Company for about a year or so?
A **Yes. Year and a half.**
Q And did you go in as president or did you get elected to president after you were there?
A **I was the president of the firm from the day I started.**
Q Now, going back to Twin City Testing, I understand that company went out of business at one time, did it not?
A **No.**
Q Did it change names?
A **Yes.**
Q Is it still in business, then, under a different name?
A **Yes.**
Q What is its present name?
A **Well, the history is it was purchased by Huntington**



**International Holdings, and I left when they were the owners. It was sold to Maxim, and then Maxim closed many of its offices but then sold the Minneapolis/St. Paul office to Stork, and now it's referred to as Twin City Testing-Stork.**
Q As I recall, they used to be out in the Minnetonka, Mound area, something like that?
A **No. They are in the Midway at 280 and 94.**
Q All right. At Anchor Block, I understand they make CMU blocks; correct?
A **Yes.**
Q What other products did Anchor make during the time you were there?
A **Some segmental retaining wall blocks, but the primary business was concrete block.**
Q Based upon your education and training, did you have a familiarity with concrete block before you went to work at Anchor Block Company?
A **Yes.**
Q And you've been out to the Promenade and inspected it; correct?
A **Yes.**
Q And the walls of the courtyards, they are made out of CMU block?
A **Yes.**



Q Is that block water permeable?
A **No.**
Q Why do you say that? What's the basis for that?
A **Well, water will go through it.**
Q So it is permeable?
A **Are you asking is it impermeable?**
Q No, no. I asked you is it permeable and you said no?
A **Water will go through it.**
Q Okay. So it is permeable?
A **Yes.**
Q Okay. I think we misunderstood each other. We'll start this again. Will water go through block?
A **Yes.**
Q Okay. So that it has to be waterproofed in order to prevent water from getting into it if it's a construction where you want to keep water from entering one side of the block, keeping one side of the block dry at all times?
A **Well, it depends on the nature of the situation. Most often it's damp-proofed, but when there is going to be hydrostatic pressure, meaning water will sit on it, then it would have to be waterproofed.**
Q And could you describe the difference between damp-proofing and waterproofing, please?
A **Well, it would be the materials that you would use, and when you're trying to waterproof something, you're**

**expecting hydrostatic forces, so you need a much more robust scheme or system to keep things from penetrating. Damp-proofing is typically not as robust, it's probably a mastic on the surface with a thin, maybe six mil poly pushed into it, sheet, and it's nowhere near as tough to penetrate.**
Q And when you say hydrostatic pressure, do you mean that water will be actually resting on or against the waterproofing material?
A **Yes.**
Q And opposed to being just running along that material?
A **Correct.**
Q So for instance, the side of my house doesn't have to be waterproofed, but it has to be damp-proofed?
A **Well, if your basement is below the water table, then you would want to waterproof it because the water table would rise up and there would be hydrostatic forces against the foundation wall. Hopefully that isn't the case in your house. But if it is a normal situation, you're above the water table, and in that case damp-proofing would be appropriate.**
Q All right. At Anchor Block Company, in your work there, were you ever involved in any waterproofing issues?
A **Leakage issues with masonry, some complaints about basements leaking, some complaints about above grade**



**leakage through block, especially lightweight block.**
Q When you say above grade, you mean above the surface?
A **Above the ground.**
Q How is the water getting into the block in an above grade application?
A **Rain.**
Q Were these walls that were not supporting other structures; in other words, they were like a knee wall?
A **This was a warehouse, walls for warehouses.**
Q At Anchor Block, did you actually do construction or was it as a material supplier?
A **Material supplier.**
Q Did you supply at Anchor Block any of the components that might go into a block wall system, such as mortar?
A **We would supply Portland cement, hydrated lime. We would also make arrangements for masonry sand. We did not offer any blended mortar products.**
Q Did you supply any flashing type materials?
A **I don't recall us supplying any flashing.**
Q Did you supply any damp or waterproofing materials?
A **I don't recall us supplying any of that.**
Q Why did you leave Anchor Block in 1989?
A **My partner wanted to buy my interest in the company, so I sold it to him.**
Q And did you become the principal, then, at American



Engineering Testing, Inc.?
A **Yes. I'm a founder.**
Q And that's from 1989 to the present?
A **Yes.**
Q What does American Engineering Testing, Inc. do?
A **Independent testing laboratory similar to Twin City Testing.**
Q Are there parameters to which American Engineering Testing, Inc. limits themselves in the field of testing? In other words, are there things you will test and things you won't test?
A **We don't do any chemistry. Well, I shouldn't say any. We do some stack gas emission testing, but we don't typically run chemistry tests. We would use an outside consultant for that.**
Q Anything else to limit your testing at the company?
A **We don't do any consumer product tests, testing, which Twin City Testing does.**
Q Anything else that you can say that limits your scope of what you do?
A **Not that I can think of.**
Q Okay. As the principal at American Engineering Testing, what have been your duties from 1989 to the present?
A **Well, I do work for clients, I review a lot of work that is done by others, I'm a member of the board of direction**



**and worry about the business or work on the business, the business aspects of our company.**
Q Are you the chief operating officer of the company?
A **There are actually two operating companies, American Engineering Testing and American Petrographic Services. Terry Swor is the chief operating officer for the American Engineering Testing.**
Q What is American Petrographic? What is that company?
A **That's another service that is mostly diagnosing problems with concrete, and Scott Walter is the chief operating officer of that.**
Q Is American Engineering Testing, Inc. a Chapter S corporation?
A **No. It's C, but it's -- it's owned by American Consulting Services, which is a C corporation.**
Q And who owns American Consulting Services?
A **Two-thirds of it's owned by our employees, I own a great deal and Terry Swor owns a great deal.**
Q I see you've given a multitude of lectures. Have any of your lectures ever discussed or been involved with waterproofing issues?
A **Yes. More in the application of sewage lagoons and liners for those kinds of constructions rather than a residence or a commercial building.**
Q Have you ever given any lectures that included discussions

of bentonite waterproofing in residential or industrial building applications?
A **I don't recall any.**
Q Have any of your publications had anything to do with waterproofing per se?
A **I can't recall publishing anything specifically about waterproofing.**
Q And I see you have a patent for P-O-Z-Z-A-M-E-N-T, Pozzament?
A **Yes.**
Q And what is Pozzament?
A **It is a pozzalin that can be used in concrete and it's coming from the production of alum using the Bayer process.**
Q What is pozzalin?
A **Pozzalin is an ancient building material that reacts with lime and forms a calcium silicate hydrate binder which is similar to the binder in Portland cement.**
Q And if I were to ask you what is pozzalin made out of, as a lay person, how would you describe it?
A **The very first ones were volcanic ash. They were mined in the Bay of Naples near the town of Pozzuoli by the Romans.**
Q So it's a natural occurring mineral?
A **Yes. Volcanic ash, which is also the precursor for**



**bentonite.**
Q Have you ever done any studies yourself on bentonite products or bentonite itself?
MR. HULL: I'll object to form of the question. What do you mean by studies?
THE WITNESS: I've done a lot of testing with it, but I don't know that I've done -- I wouldn't characterize the work that I have done as research, just more a case of just an application of the material.
Q (By Mr. Reilly.) In this case, you were hired by Mr. Hull to do a review of the waterproofing system at the Promenade Oaks Apartments?
A **Yes.**
Q And what was the charge that you were given by Mr. Hull as to what you were expected to do in this particular situation?
A **He wanted me to review information that had been generated about the courtyards and render opinions.**
Q Okay. Did you rely on any guidelines, standards or statutes regarding waterproofing in your review?
A **I did look at the National Roofing Contractor Association's manual. I did look at a couple of sections in the Uniform Building Code. I think it was the '94 edition.**
Q Anything else?



A **Not that I can think of.**
Q Okay. Other than reviewing the documents that Mr. Hull supplied you in these two standards, manual and standards, did you review any other materials?
A **Yes.**
Q What other materials did you review?
A **I looked at the project drawings, Division 7 of the specifications.**
Q And what did that Division 7 pertain to?
A **I think that was waterproofing. Thermal and moisture protection is what it is, and Section 07110 is waterproofing.**
Q Okay.
A **I looked at the owner/contractor agreement; I looked at the agreement between Weis and Waterproofing By Experts; I looked at the bid from Waterproofing By Experts; I looked at technical information from CETCO; I looked at an expert report from Pope and one from Christopher Beirise; I looked at a report from Inspec; I looked at a report from Wiss, Janney, Elstner; I looked at a report from Raths, Raths & Johnson; I looked at a report from Israel Berger; I looked at a bid estimate, I think, from DeMara; I looked at some depositions which I've got listed in my report.**
Q Okay. Take me through, then, what you did in your



investigation in this to complete this review for Mr. Hull?
A **Well, I think I visited the site three times, and the last I think was July 12th, 2002. I think my report says 2000, but I think that's a typo.**
Q And what did you do in those visits? Let's take one at a time. The first site visit, what did you do?
A **The first time was just to walk the grounds on the outside and look at the general configuration of things and become familiar with the layout of the project. The second time was again pretty much on the outside, but we also had access to I think the garage and Buildings 1 and 2 and the link that's between there.**
Q Okay.
A **I made no excavations in any of the times I was there.**
Q All right.
A **The third time was with Tom Healey, and again we walked the exterior but to a much greater extent all of the buildings, walked through some of the interiors, walked through some of the garages, went inside some of the units, and that was the third trip.**
Q All right. What else did you do to investigate the situation for your review?
A **I read and reviewed all of the documents that I have listed, which is common. This is what is typically done.**

Q Prior to this case, have you ever dealt with Swelltite in any of its forms?
A **I don't recall having dealt with them.**
Q Have you since dealt with any project involving Swelltite?
A **No. Not that I know of.**
Q Did you do anything other than reviewing CETCO literature to familiarize yourself with Swelltite?
A **I don't believe so. I didn't get any samples or anything like that, no.**
Q I assume you're not familiar with the chemical composition of the Swelltite materials?
A **I assume it's a high grade sodium bentonite, but I don't know that for a fact.**
Q And how about the other components of the Swelltite other than the bentonite, are you familiar with any of those?
A **Only what's disclosed in their information sheets.**
Q And what's your understanding?
A **That there is a protective -- well, I need to look if it's polyethylene. I'm probably going to say it's the wrong thing, but I'd have to look. There's a protective sheet on the face.**
Q Okay. Let's just call it the protective sheet.
A **Okay. And whether it's polyethylene or not, I'd have to look at the data sheets. And then there's a -- I think it's one and a half mil thick water-soluble, probably**



**referred to as a scrim sheet on one face of the membrane.**
Q And that includes the bentonite material?
A **There is bentonite between it and the protective material.**
Q And that sheet, is that the film you're talking about, the water-soluble --
A **Yes. The water-soluble film.**
Q Did you do any testing yourself of any Swelltite film, protective sheet or bentonite materials?
A **No.**
Q Did you bring with you, sir, the National Roofing Contractors Association manual to which you refer in your report?
A **No. I have it on a CD disk. I don't have it in printed form.**
Q What I would ask, then, sir, is that you would provide a copy of the pages you referred to in your report to your counsel so that he can send copies to us?
A **Sure.**
Q Can you do that?
A **You bet.**
Q Have we covered all the things that you did to inform yourself of the details and the issues involved in this project?
A **Well, I can't think of anything else.**



Q Okay. You have issued a report of October 9th, 2002; correct?
A **Yes.**
Q I'm going to show you what's been marked Exhibit 813. Would you take a look at that, please?
A **(Witness complies.)**
Q Have you had a chance to look at that, sir?
A **Yes.**
Q Is that a copy of your first report of October 9th, 2002?
A **Yes.**
Q Is there any -- there's nothing missing; that's your total report? Just want to make sure we have the whole thing.
A **I believe it is.**
Q All right. I'm going to show you what's now been marked as Exhibit Number 814. I believe it's a six page document. Would you take a look at that, please?
A **(Witness complies.) Yes.**
Q All right. Is that a complete copy of your August 11th, 2003 report?
A **I believe it is.**
Q What caused you to issue a new report in August of 2003?
A **I was asked to look at some additional information.**
Q What additional information did you review?
A **A deposition of Gary Nelson, deposition of Scott Vanderburg, some deposition exhibits from John Feges,**



**also some exhibits from Chad Filek, some exhibits from Patrick Carpenter, exhibits from Steve Messerich and Al Thoreen. Also, I think I was given this Project Manual-Promenade Oaks Townhomes Courtyard Waterproofing, some waterproofing bids, and then some Larson Engineering drawings.**
Q Was this information provided to you by Mr. Hull?
A **Yes.**
Q Have you received information from anybody other than Mr. Hull and your own review of the standards, et cetera, in your preparation for working on this case?
A **I can't think of any other.**
Q I'm going to show you a letter that was faxed to you apparently on August 14th, 2003 from Mr. Hull?
A **Yes.**
Q And that has been marked as Exhibit --
A **815.**
Q 815. Thank you.
MS. REISBORD: Pat, what was the date on the letter?
MR. REILLY: August 14th, I believe.
MS. REISBORD: 2003?
MR. REILLY: 2003.
Q (By Mr. Reilly.) Did you receive that letter from Mr. Hull, sir?

A **Yes.**
Q And did you receive this after you completed your second report?
A **Well, the dates seem to suggest so.**
Q Okay. Well, what do you remember?
A **I think I sent him a draft to review and I think this letter is probably in response to that draft.**
Q Okay. Do you know whether this letter then was used to assist you in preparing your final report?
A **I would -- I would have thought so, yes. From reading it, I would think so, yes.**
Q Do you have a copy of that draft that predated this letter?
A **I don't have it in this file, but I could recover it from our computers.**
Q I'm going to ask you to do that?
A **Sure.**
MR. REILLY: Counsel, I would ask a copy of that draft.
Q (By Mr. Reilly.) Is the report marked as Exhibit 814 your final report, as far as you know, in this case?
A **Yes.**
Q Let's address the opinions and conclusions and so forth in that report. But before we do, in your materials -- I'm not going to mark this until I know there's a reason to --



was some materials from the Uniform Building Code, 1994 Edition, and Appendix Chapter 18, three pages of it. Apparently that was in your file?
A **Yes.**
Q Did you review this material and use it in forming your conclusions?
A **I was looking -- I did review it before I formed my -- or wrote my report.**
Q Did it have any impact on your opinions or conclusions?
A **No.**
Q All right. Does it affect your assessment of the appropriateness for bentonite waterproofing materials in this application, the UBC?
A **I didn't see any specific prohibition for the use of bentonite, and that's what I was looking for.**
Q Now, your first conclusion in your report of August 11, 2003 is that the use of a bentonite membrane was inappropriate for this design and it should not be used on a horizontal surface which will be exposed to standing water. What is the basis for those opinions?
A **That is my opinion. It is also the opinion of the National Roofing Contractors Association.**
Q And what is the basis for that opinion?
A **Would be my experience, my judgment, my engineering judgment.**



Q Now, the material that we're dealing with here, Swelltite, is not solely a bentonite material; correct?
A **There are other materials in the membrane; that's true.**
Q Including I think what you called a protective material --
A **Yes.**
Q -- that also acts as a waterproofing material?
A **Yes, it would. And protection.**
Q Is that similar to sheet goods that are normally used in waterproofing?
A **It would be similar.**
Q And sheet goods such as that, is that appropriate for a horizontal surface exposed to standing water?
MR. HULL: Object to the form of the question.
THE WITNESS: In this case it may be a little bit thinner than what you would want to use. I would need to go back and see how thick it is, if it's 30 mils thick or 20 mils thick. You would want something in this application that was thicker, but it could be of that type.
Q (By Mr. Reilly.) Do you know whether the National Roofing Contractors Association in its roofing and waterproofing manual discusses Swelltite per se as opposed to generic bentonite material?
A **I hadn't seen anything specific about Swelltite in my**



**review of the manual.**
Q Okay. You have dealt in the past with bentonite being sprayed on?
A **Yes.**
Q And in your opinion, that would not be appropriate for this application?
A **I wouldn't use it in that way.**
Q And why is that?
A **As the primary membrane?**
Q Yes.
A **I would use something that is more reliable in this regard.**
Q Why is sprayed-on bentonite not reliable in this application?
A **Well, I think it is easy to scratch it, gouge it, rub it off. In this application, too, you would need water to activate it. Usually there's some leakage associated with that. That's probably not a good thing either in this application, in my opinion.**
Q If you used a sprayed-on bentonite and you put over it a butyl or polyethylene or some kind of cover and sealed that as well, could that be an acceptable application in this --
A **That would be a very good application. What it would do is anything that got through the butyl would tend to get**

**isolated by the bentonite and so it wouldn't tend to travel horizontally.**

Q Isn't that the basic theory of Swelltite, as you understand?

A **I don't know what the basic theory of Swelltite is.**

Q Okay. But you do know that it has, and you're not sure what the makeup of it, but a butyl or polyethylene cover and then underneath that bentonite material?

A **Yes. And then a water-soluble, I think it's a mil and a half thick sheet.**

Q Did you ever review the depositions of Stacy Byrd, the person who invented this product?

A **No.**

Q Do you think that might have been of some assistance to you?

A **Well, it may or may not. I mean, it would be interesting, certainly. I don't know that it would change my opinion. I don't think it would change my opinions, but --**

Q Do you believe that the more information you have, generally, the better your chances are of making an appropriate assessment of the situation?

MR. HULL: I'll object to the form of the question as vague.

THE WITNESS: I don't think volume



improves anything. If you have the right information to review, it improves everything.

Q (By Mr. Reilly.) All right. And therefore, you're interested not only in quantity but in quality?

MR. HULL: Object. That mischaracterizes the testimony.

THE WITNESS: I think the quality of the information is important.

Q (By Mr. Reilly.) Now, you indicate in your first conclusion that because the courtyard drains will allow an accumulation of at least two inches of water on the membrane, it creates an exposure to standing water?

A **Yes.**

Q And that is why you believe this membrane would not be appropriate?

MS. HEYER: Object to the form of the question.

Q (By Mr. Reilly.) Is that correct?

A **I think that I would not use bentonite in this situation where there's going to be standing water on the surface.**

Q If the subsurface drainage was such that there was an appropriate slope and there was an appropriate drain so that water would drain off the waterproofing and not leave any standing water on it, would you have an opinion whether the membrane would be appropriate or not?



MS. HEYER: Object to the form of the question.

THE WITNESS: So if you were to configure your waterproofing so there would be no standing water, would a bentonite membrane be appropriate? The way I read the Roofing Contractors Association's manual, I don't think they would recommend against it. Whether I personally would recommend the use of the bentonite as the membrane, I may or may not.

Q (By Mr. Reilly.) Okay. You haven't thought that all the way through?

A **It would be specific to the job and how well I thought things would drain and how damaging it is when there's a leak. If you have something that is like a tunnel or like, you know, something that there isn't going to be a real, real problem with a leak, I would be inclined to use it. Where there's a real problem with interior surfaces and things like that, I probably wouldn't use it.**

Q Let me -- apparently you're not familiar with the way Swelltite is installed, or are you? Let me ask you, are you familiar with the way Swelltite is installed?

A **I've only seen photos of what was on this job. I haven't seen any installed.**

Q And are you aware that the top layer of the Swelltite,



which is this butyl or polyethylene layer, acts as a waterproofing membrane?

A **It will.**

Q And that if the seams are sealed or overlapped enough, that it will make a continuous waterproofing membrane?

A **Well, if they are overlapped a lot, it may or may not make a continuous membrane. You have to have a seal, and if they were to be sealed, then they would.**

Q And then the bentonite in the waterproofing, which would be beneath that layer and above the substrate in this case, concrete, would be a secondary protection; would it not?

A **Well, you could think of it that way. You have that one and a half mil water-soluble layer that's underneath the bentonite portion of the membrane, but I suppose you could think of it as that. I think more, in this system more is the -- bentonite is being the primary water stopper.**

Q Water will not get to the bentonite if it doesn't pass through that material that's above it?

A **That's right.**

Q And if that material keeps the water out, then the bentonite will not activate, will not need to activate; correct?

A **Correct.**

Q And as you understand it, the water-soluble film that's beneath that would not activate because it doesn't get wet?
A **Right.**
Q So --
A **But at the seams, at the edges, for this scheme to work, there has to be a seal. There has to be a seal between the upper sheet of Swelltite and the lower sheet of Swelltite where the lap is, right? So there has to be some moisture to dissolve the mil and a half water-soluble layer, there has to be some moisture that would activate the bentonite, and then there has to be some pressure to push those two leaves together to create a seal.**
Now, you're right, in the main run or the main field of the membrane, if no water goes through the outer layer, there would be no activation of the bentonite in that zone and there would be no dissolving of the sheet, the mil and a half sheet underneath.
Q All right. So it is, in your opinion, where the edge of the seam would be exposed, maybe an inch or two overlap, but it would be in that situation the seam on the top layer of the Swelltite, that edge, it would have to have activated bentonite to seal the seam?
A **Yes. And I think the overlap is six inches, isn't it?**



Q Whatever --
A **Whatever it is.**
Q Whatever it is. And it doesn't need to activate the entire overlap, it just needs to activate enough of that bentonite to create a seal?
A **Yes.**
Q If there is seam tape over that seam, then the bentonite doesn't have to activate unless it gets exposed to water?
MR. HULL: Well, I'm going to object to the form of the question. I think it assumes that the seam tape is impermeable.
THE WITNESS: If the seam tape creates a seal that's entirely effective and there's no leakage through the seam tape, then there would be no activation of the edge of the bentonite.
Q (By Mr. Reilly.) Assuming that the seam tape is not permeable, assuming that the material that the Swelltite is made out of above the bentonite is not permeable, and assuming the seam tape were on the seams, then the bentonite would in fact be a secondary protective mode in this application?
A **It would function that way.**
Q All right. And in that scenario, its purpose would be -- for instance, if a puncture from a nail or something went through that first layer, the bentonite is meant to swell



around that and stop the leak?
A **Well, it will localize it so it doesn't travel horizontally.**
Q And will it swell and stop the leak if, for instance, a nail were to penetrate the waterproofing material?
A **It may.**
Q Have you done any testing to determine the manner in which Swelltite operates in this application?
A **I haven't tested the Swelltite.**
MR. HULL: Pat, is this a good time to take a break?
MR. REILLY: Sure.
(A short recess was taken at this time.)
Q (By Mr. Reilly.) Now, in your first conclusion you talk about there being an accumulation of at least two inches of water on the membrane?
A **Yes.**
Q And that is based upon information you received from other people; in other words, from the materials that you reviewed?
A **Yes.**
Q It's nothing that you determined on your own independently?
A **I did not.**
Q All right. You have learned, apparently, that the drains



are two inches -- the lowest portion of the drains that accept water are two inches above the precast concrete planks?
A **I believe the perforations in the drain body are located two inches above the concrete plank.**
Q And have you also learned whether there is a slope to the substrate underneath the waterproofing?
A **I haven't made any independent measurements, but I believe it to be pretty flat.**
Q All right. Would you agree that, first off, it would be appropriate to have a slope in that substrate underneath the waterproofing to the drains?
A **It's appropriate to have it flat or it could slope.**
Q Would sloping be better than flat?
A **Either is workable.**
Q How do you work it being flat?
A **If it were flat, I would probably -- or I would taper something above it.**
Q Okay. So to allow the water that permeates through the soil to still have gravity flow?
A **Yes.**
Q So whether the substrate is flat or the substrate is built up in some manner to allow the waterproofing to be sloped, in some way the waterproofing should be sloped, in your opinion?

A **Yes. It would be helpful to have it drain, yes.**
Q And would you agree, then, that the drains should be the lowest spot in that courtyard, in the bottom of the courtyard so that all the water would flow to the drains?
A **It would be helpful if they were at the lowest point so that they would drain completely the membrane.**
Q It is not good practice, is it, to allow standing water to remain on waterproofing indefinitely?
A **It is not.**
Q The same thing like a roof or anything you want to keep dry, you want to get the water off it as completely and as quickly as possible?
A **Usually the criteria is 48 hours.**
Q All right. But the more you get off and the faster you get it off, the better it is; correct?
A **Usually.**
Q Is there any reason why you wouldn't want to do that?
A **I can't think of any.**
Q Okay. Now, your next conclusion regarding the perimeter walls indicates, first off, that flashing should have extended above the ground at least six inches and preferably one foot. And you're talking at the soil level, at the top of the soil, the flashing should extend at least six inches to a foot above that?
A **Yes.**



Q Were you aware of why the ground level in the courtyards was higher than the block walls?
A **Yes.**
Q Why was that?
A **The -- I understand the grade was changed regarding some issues of handicap access.**
Q Did you ever become aware that the design of the trusses that were installed were changed prior to their installation?
A **Yes. I believe they were changed to a top cord bearing truss.**
Q And did you also learn that the top cord bearing trusses that were ultimately used were longer than the ones they originally anticipated using?
A **Wasn't aware of that.**
Q All right. Are you aware that because of the use of the trusses, a layer of block, a row of block was removed from the walls supporting those trusses?
MR. HULL: I'll object to the form of the question.
THE WITNESS: I wasn't aware of that.
Q (By Mr. Reilly.) Would you agree that it is inappropriate to have untreated dimension lumber below grade?
A **No.**
Q Why not?



A **I think it depends on the situation. If it is properly waterproofed, I don't know that it will matter if it's treated or not.**
Q Do you know whether it violates building code to have untreated construction grade lumber below grade?
A **There are some references in the building code to using untreated lumber in certain situations below grade.**
Q Isn't it true that even in a normal situation where the grade doesn't come up above the block that the lowest piece of wood, the wood that is sitting on top of the block, is supposed to be treated lumber underneath the Uniform Building Code?
MR. HULL: Could you read that question back?
MR. REILLY: I'll rephrase it.
Q (By Mr. Reilly.) There's a piece of wood to which the vertical members attach that is laid on top of the block. What is that called?
A **A sill plate.**
Q A sill plate. Are you aware that in the UBC and in the Minnesota Building Code, that that sill plate is supposed to be treated wood?
A **I'm not certain that's exactly right, but it would be best to look at the citation.**
Q Now, did you yourself see the flashing as it exists at the



Promenade in the area you're describing in your second conclusion?
A **No. I've only seen photos.**
Q Okay. Were you able to see the level of the ground as it compares to the construction of the building itself while you were out there?
A **Yes.**
Q Is it above the siding, the bottom of the siding out there?
A **In some locations.**
Q Would that be something that would be contrary, in your opinion, to good practice?
A **It usually is not desirable to have it extend up to the siding.**
Q Do you know whether that violates building code?
A **Don't know if it violates a specific provision of the '94 building code.**
Q Do you know who put the flashing on that you're discussing, the liquid flashing, in conclusion number 2?
A **Who put it on physically?**
Q Yes.
A **No, I don't.**
Q Do you know whether this was done as a repair subsequent to the initial construction of the project?
A **Are we talking about the Miradry sheet?**

Q Yes. Is that what you're talking about, liquid applied flashing, Miradry?
A **The liquid applied is the CETCO product.**
Q Okay.
A **Is it the M-2000, I think, is the reference?**
Q All right.
MR. BROWN: Are you asking what he saw in the photographs?
MR. REILLY: No. I'm asking -- let's back up a little bit.
Q (By Mr. Reilly.) Do you know whether there is flashing, Miradry out there now?
A **I believe there is.**
Q Is that over the applied flashing, liquid applied flashing?
A **Yes.**
Q Okay. Do you know whether at the time the waterproofing was first installed and completed by Waterproofing By Experts the grade was intended to be above or below the top of block?
A **The drawing indicates it would be below.**
Q Do you know when the change was ultimately made to raise the grade above the top of block in relation to when the waterproofing was initially applied?
A **I don't know when that happened.**



Q You indicate that the flashing below ground was unprotected and that you recommend some kind of metal covering to be used?
A **Yes.**
Q Is that in any application where flashing of a building or liquid flashing is used or a waterproofing membrane is used that is subject to being damaged in the manner in which you're describing here?
A **Should you apply a flashing over it?**
Q A metal flashing.
A **I think it's a good practice.**
Q Okay. Is the metal flashing designed to keep water out or is it meant really to protect the underlying protective flashing from being damaged?
A **Well, it can do both, but it's there to protect the flashing that's under it.**
Q Okay. Do you have any concern with the flashing that was there as far as keeping water out as opposed to protecting it from damage?
MR. HULL: Object to the form of the question. Are you talking about the liquid flashing or are you talking about the Miradry?
MR. REILLY: Let's start with the liquid flashing.
THE WITNESS: The liquid flashing, the



M-2000, I have concern about it leaking.
Q (By Mr. Reilly.) Why?
A **I think it is not very robust, could easily be scratched or torn or breached and cause a leak.**
Q Do you have any evidence that that occurred?
A **There is evidence of a lot of leaks. I don't know -- I don't have any firsthand evidence.**
Q Okay. And did you see any place where that flashing existed without Miradry over the top of it?
A **I think it existed without Miradry over it at one time and the Miradry was applied later as a correction to leaks.**
Q Do you have any problem with the Miradry?
A **No.**
Q So as you understand it to be now with the Miradry over the liquid flashing, you feel that that's an appropriate system out there?
A **If there are places where the Miradry is exposed to -- if it were exposed to weed whackers and, you know, things like that, it would be better to protect it.**
Q Okay. And then you put some metal or something heavier --
A **Metal. Yes, yes.**
Q Now, going to your opinion number 3 regarding the canopy posts, are you aware of who gave the drawing designs on how to flash the canopy posts?



MR. HULL: I'll object to the form of the question. I'm not sure anybody did. I think it assumes facts not in evidence.
THE WITNESS: I am not aware of any drawings showing any details of the waterproofing system for the job.
Q (By Mr. Reilly.) Were you given any exhibits from Mr. Feges's deposition?
A **Yes.**
Q And do you have them with you today?
A **I was given Exhibits 111 through 119. They're photos.**
Q Have you seen the RFI of John Feges dated 12/13/1996, which is Deposition Exhibit Number 100?
A **Yes.**
Q And you'll see the response that Mr. Feges gave at the bottom; do you see that?
A **Yes.**
Q And it says post to extend to precast end --
A **Secured.**
Q -- secured by a galvanized post bracket fastened to the precast. Waterproof --
A **Contractor.**
Q -- contractor should wrap post with membrane and secure with adhesive. Do you see that?
A **Uh-huh.**

Q Is that what was done out there?
A **No.**
Q What was different?
A **A liquid flashing was applied to the post.**
Q Can water enter that post at ground level?
A **Yes.**
Q And could it go all the way down through the post to the precast?
A **Sure.**
Q Would it be, in your opinion, the best method to waterproof that post to place the membrane between the post and the substrate?
A **You could do either. I mean, you could put it under the post or you could run membrane up the post.**
Q How far would you have to run the membrane up the post?
A **Well, I would try and flash at least to a point six inches, a foot above the ground, and then I would protect it and then probably cut in a reglet into the post so water couldn't get between the post and whatever your construction is. I think that would be the most -- if you were not to go underneath the post, that would be the most reliable.**
Q Would your first preference be to go underneath the post, if possible?
A **Sure.**



Q So that you would have a continuous waterproofing material underneath the post?
A **Yes.**
Q And ultimately are you aware that repairs were done to those posts?
A **I think they've been repaired. I'm not certain I know what the repair is. I'd have to go back and look.**
Q If I were to -- hypothetically let's assume that the repairs included cutting the post at the bottom where it's attached to the substrate, putting in waterproofing underneath, putting a pad and then allowing that to sit on that pad; would that be an appropriate repair, in your opinion?
A **Well, you would have to remove the bracket.**
Q Right. The bracket is removed. In other words, everything that's touching the substrate has been removed.
A **So you remove the bracket, you patch the concrete. Then you say you cut the post, you put the membrane back, or a membrane, you put a membrane there.**
Q You repair the membrane.
A **Okay. And then you put the bracket back on?**
Q No. You put a footer, a pad --
A **A block?**
Q A block, a pad or something underneath and just sit the post on the pad.



A **Well, from a waterproofing perspective, that sounds good. The only thing you'd want to make sure is that the post -- if the post was anchored to the precast for a reason, without it moving laterally, sitting on a block of concrete is not quite the degree of fixity if you had a bracket that's attached to the precast. But that may be inconsequential. It may not matter.**
Q You don't know whether it has to be --
A **No.**
Q -- attached to the precast or not?
MR. HULL: I'm going to object to this line of questioning on the grounds that it's an incomplete hypothetical. The condition has changed dramatically from when it was originally constructed to when the repairs were made.
Q (By Mr. Reilly.) In any event, if the repairs included a repair to the waterproofing membrane that allowed the waterproofing membrane to be continuous underneath the -- without any penetrations in that area, that would be, in your opinion, the best fix; would it not?
A **It would be a good fix.**
Q Okay. Going to conclusion number 4, this again goes to the fact that there is two inches of standing water as a result of the drains being higher than the substrate, correct?



MS. HEYER: Object to the form of the question.
THE WITNESS: The perforations in the drain are positioned so that they're two inches above the concrete.
Q (By Mr. Reilly.) And so the lowest perforation is actually above the drainage mat, the Aquadrain drainage mat?
A **That's my understanding.**
Q So that the Aquadrain drainage mat can't drain because the water has to get above it to get into the holes of the drain?
MS. HEYER: Object to the form of the question.
MR. REILLY: Go ahead.
THE WITNESS: It becomes a reservoir.
Q (By Mr. Reilly.) Okay. In other words, somebody else has mentioned it kind of describing it as a bathtub?
A **It is.**
Q Okay. Your next conclusion is the soil fill was inappropriate, and you describe it as there being a need for a non-frost susceptible soil. What do you mean by that? What's a non-frost susceptible soil in Minnesota in this application?
A **Clean soil.**

Q And that will -- why do you call that non-frost susceptible? Why isn't it susceptible to frost?
A **Because the voids in the soil are such that ice lenses will form.**
Q And why is this important?
A **If you are going to have a waterproofing system that you have standing water in and if you are going to use a soil that is susceptible to frost heave, during the winter, it's likely that you will have frost heave.**
Q Would this concern of frost heave be lessened if the water were totally drained, allowed to be -- or capable of being totally drained in the subsurface of the courtyard?
A **Yes.**
Q So that the fact that there is continuous standing water contributes to the problem of frost heaves?
A **Yes.**
MS. HEYER: Object to the form of the question.
THE WITNESS: Yes.
Q (By Mr. Reilly.) Your next point is that basically sloping the membrane in some way would have been desirable, essentially; correct?
A **Yes.**
Q And that's so that drainage of the subsurface water, the water that gets below the top of the surface of the



ground, will be able to drain quickly and efficiently off the waterproofing membrane?
A **So there won't be any standing water on the membrane.**
Q Okay. And if you purchased the best, the most expensive waterproofing membrane money can buy, would it be fair to say you'd still want to slope the membrane?
A **Yes.**
Q And why do you want to do it even if you bought the most expensive waterproofing membrane money could buy?
A **It will last longer if it's not standing in water.**
Q Sooner or later it will leak?
A **Yes.**
Q And that leakage will be delayed if there's a slope in the drain and it's allowed to drain?
MS. HEYER: Object to the form of the question.
THE WITNESS: Yes.
Q (By Mr. Reilly.) Okay. Now, your next point is that the waterproofing system was constructed without drawings. Why was that a concern?
A **I think it is important that drawings be prepared of what is going to be built.**
Q All right. Did you find any drawings regarding the waterproofing system?
A **No.**



Q Do you know if any as-built drawings of this project were made?
A **I don't.**
Q Now, in number 8, it says, "The use of explosive powder driven nails to attach the canopy post boot to the precast concrete was poor practice."
A **Yes.**
Q And that is because the powder driven nails damage the concrete that they're being driven into; correct?
A **Precast concrete, they tend to shatter.**
Q And if it goes into where the hollow core is, you end up with a large damaged portion of the concrete with a hole penetrating into the core?
A **Yes.**
Q And that can allow water to penetrate into the core?
A **And then move laterally.**
Q Now, your last conclusion is the waterproofing membrane that has the American Hydrotech is vastly superior to that provided and much more expensive; correct?
A **Yes.**
Q The choice of a membrane -- and you've recommended in this case, for instance, a less expensive one than American Hydrotech; correct?
A **Yes.**
Q There are various options you can go with that will still



be an appropriate waterproofing system here; correct?
A **Yes.**
Q And even if you used the American Hydrotech or the EPDM or polymer-modified bitumen sheet membrane that you suggest, you would still want the subsurface drains to completely drain all the subsurface water?
A **Be preferable.**
Q You would still want it to be sloped?
A **It would be preferable.**
Q And without those things, would you still have concerns that even with the American Hydrotech, the EPDM or the polymer-modified bitumen sheet membrane would still be at risk in failing?
A **It would probably shorten the life of those systems.**
Q All right. At any time were you able to determine what leaks were caused by any particular problem or situation at the Promenade?
A **No.**
Q Were you aware that there are links between Building 1 and 2, for instance; there's a link between those two?
A **Yes.**
Q Do you know how that area was waterproofed?
A **I don't know that it's different than this. No, I don't.**
Q All right. Did you see any active leaks at the time you visited the site on those three visits?

A **No.**
Q And did you visit those sites at any time when it was raining out?
A **I don't recall it raining on any of the three.**
Q Given the fact that there is this permanent amount of water that's on the waterproofing membrane, in this case somewhere up to two inches of water, and that's what you believe existed at this condition; correct?
MS. HEYER: Object to the form of the question.
THE WITNESS: It can be as much. Well, it could be more, but it can.
Q (By Mr. Reilly.) Unless it evaporates, it's going to be there; correct?
MS. HEYER: Object to the question.
THE WITNESS: Or it leaks out.
Q (By Mr. Reilly.) Okay. And assume that the testimony has been from some of the employees of Promenade that it only leaks when it rains in the Promenade complex, would you agree that the waterproofing membrane must be being circumvented as opposed to penetrating to cause the leaks when it rains?
MR. HULL: I'll object to form of the question.
MS. HEYER: Same objection.



THE WITNESS: By circumvented, do you mean to go around the edge of it?
MR. REILLY: Yes, somehow.
THE WITNESS: Rather than to go through it?
MR. REILLY: Yes.
THE WITNESS: I think either could be happening.
Q (By Mr. Reilly.) And if there is no leakage, even though there's two inches of water sitting on top of the waterproofing, would you agree that it's doing its job?
MS. HEYER: Object to the form of the question.
MR. HULL: You're asking him to assume that; is that correct?
THE WITNESS: Assuming that there is two inches of water on the horizontal portion of the --
Q (By Mr. Reilly.) Well, you've assumed that from your conclusion. You said that there are two inches of water; did you not?
A **There can be. There can be.**
Q Okay. At least I think is what you said?
A **Yes. It will allow it to accumulate. Not saying that it's there, but the configuration will allow it to be that deep.**



Q And assuming that there is not ongoing leaks, except when it rains, isn't that indicative to you that that waterproofing is holding those two inches of water out of the garages and out of the living space?
MR. HULL: I'm going to again object to the question as an incomplete hypothetical. Are you asking him to assume that there is in fact two inches of water there?
THE WITNESS: If you assume there is two inches of water there and there is no leaks, then that portion of membrane that is under water is functioning properly.
Q (By Mr. Reilly.) All right. Are you aware of any evidence to show that there are any leaks presently occurring that are a result of penetrations of the membrane in the vertical surface?
A **I don't have any evidence.**
Q Okay. Are you aware of whether the type of siding used on these buildings -- let me ask you this. Are you aware of what type of siding was used on these buildings?
A **I think it was described as vinyl siding.**
Q Whether that allows water to get through?
A **I would expect it would.**
Q And if it does, what do you have to do to prevent that water from getting behind the waterproofing, into the CMU



walls and down to the garages beneath?
A **Well, I think you would put a 15 pound felt paper behind the vinyl siding and you would run it down over the flashing of the waterproofing system.**
Q Do you know whether that was done here?
A **I don't know.**
Q If it was not, or if it was not completely done, could that allow water to circumvent the waterproofing system in the courtyards?
A **You could have leaks through the wall above the waterproofing system.**
Q Okay. You also, I assume, have read some materials regarding the problems that they discovered at the entrances to some of the apartments in the courtyard areas?
A **Yes.**
Q You're also aware that they did repairs to those areas?
A **I believe it was Aquaseal injection.**
Q Okay. And then they ultimately tore up some of the patio cement pads and raised the waterproofing level; are you aware of that?
A **They removed some of the concrete entrances?**
Q Yes.
A **I wasn't aware of that.**
Q Were you aware that as a result of that, the number of

leaks diminished considerably?
A **I was not aware that they did this and I'm not aware that this stopped the leaks considerably.**
Q Were you aware that they made repairs to the areas of the bottom of the wooden posts of some sort?
A **Yes.**
Q And are you aware that as a result of those repairs, the number of leaks diminished?
A **I believe that's true.**
Q Okay. Are you aware that a water test was performed by an employee of Promenade at or about the area of Unit 3-115?
A **No.**
Q I'm going to ask you to hypothetically assume that the man took a hose to the area of the courtyard immediately adjacent and above where Unit 3-115 exists and ran that hose for seven hours so that there would be enough water in the area and found that there was no leaking going on as a result of that, and then for 15 minutes he put the hose up against the wall, the concrete block wall that extended at the end of the courtyard, and within that 15 minutes he had leakage into 3-115.
A **This is an end wall?**
Q An end wall of the courtyard in Building 3. And that 3-115, by the way, is a unit that's had a history of leaks. Would that be an appropriate test to determine the



cause or the location of the -- the avenue of the water getting into the apartment?
A **Sure.**
Q Would that be consistent with the source of the water being through the knee wall as opposed to through the waterproofing membrane?
A **Well, it probably is. Running a hose for seven hours in this area may or may not reveal breaches in the waterproofing system. You'd probably want to dig a hole and see how much water you're accumulating in the soil before you made that kind of a judgment.**
Q All right. But hitting the water on the wall and then having an immediate -- or not immediate, but within 15 minutes is indicative -- is the way you would test it, for instance, if you could?
A **Yes.**
Q And if you did have that result, you would then come to the conclusion, would you not, that you would have to do something to prevent water permeating into that wall?
A **Sure.**
Q What would you do in those knee walls?
A **Well, you could put a water repellent on, you could tuckpoint the wall, you could put a metal panel in front of it. There's a number of things that you could do.**
Q In the links -- well, there's two link areas. There's one



between 1 and 3 and one between I think 5 and 6. Did you look at both of those?
A **You mean between 1 and 2?**
Q 1 and 2, yes. Excuse me. 5 and 6 -- 4 and 5. Excuse me. Let's start again. There are two links; one between 1 and 2 and 4 and 5. Did you look at both of those links?
A **Yes.**
Q And did you find that there was areas where, for instance, the stairs in those areas had separated from the walls and that there were -- an area of separation between the stairs and the wall?
A **I believe there are some of those types of defects.**
Q Did you find cracks in the cement in the top of those areas?
A **Cement is a powder.**
Q Okay. Concrete?
A **Concrete is a solid material.**
Q Thank you. Concrete.
A **Yes.**
Q Did you find that there was caulking that was missing in some of the areas that should have been caulked in those areas?
A **Yes.**
Q Are those all sources of possible water intrusion?
A **Yes.**



Q Okay. Do you know what kind of waterproofing was done in any of those areas at the time the building was built?
A **No. I don't know that it's different than what is described elsewhere.**
Q Do you know who did the waterproofing in those areas?
A **No.**
Q Did you yourself determine that water-soluble film on the face of the Swelltite was still intact in some places?
A **No.**
Q Did you make any determination that the film failed to dissolve when coming in contact with water?
A **I didn't make that determination.**
Q Are you able to determine that the membrane did not seal at the lapped edges where film remains?
A **I haven't observed that. I haven't done any tests out there.**
Q And that information that you've included in your report is solely as a result, is it not, of Mr. Campbell's, Inspec's report?
A **Yes.**
Q And you have no idea whether his conclusions are correct or not; is that true?
A **I assume they are. I mean I'm relying on them.**
Q You're relying on them?
A **Yes.**

73

Q But as far as the testing or the methodology he does to come to that conclusion, you're not aware of that?
A **No.**
Q Do you know his expertise or ability to make those judgments?
A **Mr. Campbell?**
Q Yes.
A **He has a good reputation, if that's what you mean, in the waterproofing area.**
Q Has he ever worked with Swelltite, to your knowledge?
A **That I don't know.**
Q In your work at Twin City Testing, in order to determine whether a product such as Swelltite was operating precisely, there would be a significant amount of testing that would be necessary to do that; correct?
A **You could test it to see if it works the way it's supposed to work.**
Q And that would have a protocol?
A **Well, I don't know if it would have one or you would make one up.**
Q Exactly.
A **I mean, you can design a test that could evaluate that.**
Q And you would use a scientific method to do that?
A **Well, I wouldn't think it was scientific, but maybe others would disagree.**

74

Q I mean, you would attempt to follow the scientific method?
A **Yes.**
Q And take me through what the scientific method --
A **If you mean test and observe as being scientific method, that's what I would do, yes.**
Q If you come up with a hypothesis, you then test it, you observe; if it doesn't meet your original hypothesis, you would adjust your hypothesis to meet what the testing shows?
A **Yes.**
Q Do you know if that was ever done in any of the conditions out there in this matter?
A **For the Swelltite membrane?**
Q Let's start with the Swelltite membrane.
A **I don't know of any tests that were run on the Swelltite membrane.**
Q How about with the --
A **The liquid applied flashing?**
Q The liquid applied flashing?
A **I don't know of any tests that were run on the liquid flashing.**
Q How about where the posts were attached to the substrate; any testing done there?
A **Other than observation, not that I know of.**
Q Any testing done to determine the effect of the two inches

75

of water on the membrane?
MS. HEYER: Object to the form of the question.
THE WITNESS: I don't know of any deterioration tests that have been done.
Q (By Mr. Reilly.) And just to make sure I understand, as you sit here today, you cannot identify one leak that is as a result of either a defect in the design, the manufacture or the installation of the Swelltite membrane; is that true?
A **That's true.**
MR. REILLY: I have no other questions. Let's just take about a two minute break.
(A noon recess was taken at this time.)

EXAMINATION

BY MR. STEPAN:
Q Mr. Stehly, my name is Chad Stepan. I'm one of the attorneys for Weis Builders in this matter. I've got some questions for you as well and I may bounce around a little bit in following up on what Mr. Reilly had to ask you.
Are you an architect, sir?
A **No.**
Q Have you had any training as an architect?
A **I've taken architecture courses in college. I think I've taken two.**

76

Q Two courses in college?
A **Yes.**
Q Were you asked to analyze the architectural drawings for this project?
A **No.**
Q Asked to offer any criticism about them?
A **I was asked to review them and look at them. If I saw something that I would view as a criticism, I think I was expected to tell Mr. Hull that.**
Q Did you have any criticisms as you went through?
A **No.**
Q The documents that you reviewed you talked about here earlier today and that are also listed in your report, were those documents provided to you by counsel or did you have an opportunity to go through project materials and select documents?
A **They were given to me.**
MR. HULL: But if you would like to give him some other documents, I'm sure he'd be happy to review them.
Q (By Mr. Stepan.) Did you have a chance to analyze the mechanical drawings in this project?
A **I don't recall seeing mechanical drawings.**
Q During the course of your work, have you had an opportunity where you've relied on recommendations from a

77

manufacturer of a product to include that particular product in something you're designing?
MR. HULL: I'll object to the form of the question as vague.
THE WITNESS: Are you asking me in a general way, are there things that I have designed and I have relied on a supplier to give me information about it?
MR. STEPAN: Yes. You're designing a project, just generally, and looking for certain material to use and manufacturers provide to you their literature, recommend to you, hey, our material will work for this particular project. Is that the kind of information you rely on from the manufacturer?
THE WITNESS: Yes.
Q (By Mr. Stepan.) Would you say that it would be reasonable, for instance, as part of this project, if the waterproofing manufacturer were to recommend the Swelltite 3000 for this application, for others in the project to rely on those recommendations, that it would be reasonable?
MR. HULL: I'm going to object to the form of the question as an incomplete hypothetical.
Q (By Mr. Stepan.) Do you understand the question, sir?
A **Yes. If the people that you are speaking about receive information from a supplier and they don't know anything**

78

**about the design of waterproofing systems, I think they should not rely on the information that's being given to them as being necessarily proper.**
Q Why is that?
A **Because if they don't know -- if they're not -- if they're not skilled or if they aren't a waterproofing designer, they don't have the judgment that they need to evaluate the suitability for the claims that are being made about those products.**
Q How do they gain the ability to make a judgment, then?
A **Well, either they go hire someone who is a designer or they invest the time and effort, the learning, so that they can be a designer. One or the other.**
Q Would you consider a waterproofing subcontractor to be somebody who's got knowledge enough to make a determination based upon what the manufacturer has told them about their project?
MR. BROWN: Object that it lacks foundation. Improper hypothetical, too.
THE WITNESS: I think a waterproofing contractor would be knowledgeable about the means and methods of installing waterproofing. They may not necessarily be skilled in designing a waterproofing system.
Q (By Mr. Stepan.) If the waterproofing manufacturer comes

79

to the waterproofing subcontractor and says, "Our product is applicable for the project you're going to be working on," is it reasonable for the waterproofing subcontractor to rely on that manufacturer's representation?
A **Yes. I think -- I think that is fair that he could -- that he should be able to rely on that, but I don't believe it is necessarily -- I don't believe it necessarily makes the claims of the supplier true, that it is an appropriate system.**
Q Were you aware that the mechanical engineer in this project originally specified one sort of drain for the courtyards and that a different kind of drain was ultimately installed?
MS. HEYER: Would you repeat the question?
MR. STEPAN: Would you read it back, Charlie?
(The court reporter read back the last question at this time.)
THE WITNESS: No.
Q (By Mr. Stepan.) As part of your assignment on this case, were you hired to analyze the general contractor's work?
A **No.**
Q Have you ever been a general contractor?
A **No.**
Q You're not here to offer any opinions regarding the

80

general contractor's work; is that right?
A **I'll only answer whatever questions I'm asked.**
Q Are you here to offer opinions regarding the general contractor's work on this case?
A **If I know something about the general contractor's work and you ask me a question about it, I will answer.**
Q Do you have any plans to offer any opinions regarding whether the general contractor on this case met the standard of care for a general contractor?
MR. HULL: I'm going to object to the form of the question. It's so vague. Are you asking him about anything in particular about the general contractor?
Q (By Mr. Stepan.) Do you understand the question, sir?
A **I understand the question. I have no plan.**
Q Take a look at Exhibit 814, the August 11th, 2003 report. The introductory paragraph says, "The purpose of our work --" the very last sentence says, "The purpose of our work was to provide an opinion about the suitability of the design and construction." Do you see that?
A **Yes.**
Q Did anybody else from American Engineering Testing assist you in putting together this report, any part of the analysis?
A **I did obtain some information from Wing Kong.**
Q Could you spell that, please?

A **W-I-N-G, K-O-N-G.**
Q Is that a man or a woman?
A **Man.**
Q Is Mr. Kong an engineer?
A **Yes.**
Q Works for American Engineering Testing?
A **He did, yes.**
Q What information did you obtain from Mr. Kong?
A **The American Hydrotech system, a membrane system, I asked him what he thought it would cost.**
Q Did you ask him anything else?
A **I don't recall anything else.**
Q Did you receive assistance from anybody else at American Engineering Testing for this project?
A **No.**
Q Did you seek any assistance from anyone outside of American Engineering Testing for this project?
A **No.**
Q Item number 5 in your report, which is on page 2, where you discuss the fill, you say that the fill was inappropriate; is that right?
A **Yes.**
Q Did you ever see a specification for the fill in this project?
A **Yes.**



Q And did you form an opinion as to whether or not the soil met the specification?
A **The only reference I saw to it was on a drawing that asked for earth fill, and this would be earth fill.**
Q I understand that, based on what you talked about earlier, there's frost susceptible soil and non-frost susceptible soil and how the soil plays in with regard to possible heaving of the ground during freeze-thaw cycles. The soil that's out there now, I understand it may hold water longer or be susceptible to heaving based on what you've said. Is the water that hits the surface of the soil that's currently out there ultimately going to get to the bottom of the deck or will that soil simply trap the water and hold it?
MR. BROWN: Objection, foundation.
THE WITNESS: Well, some of the water will be diverted by the drains that are at the surface, some of the water will percolate through and eventually be held by the membrane. So you have some of both.
Q (By Mr. Stepan.) So the water that doesn't go through the drain system will ultimately get down to the membrane; isn't that right?
A **Yes.**
Q Did you ever see any evidence that the attachment of the posts, the canopy posts to the courtyard actually



shattered or damaged the precast deck?
A **No.**
MR. HULL: Was that question -- did you ask him if he actually saw it?
MR. STEPAN: Yes.
Q (By Mr. Stepan.) Did you ever see any photographs that showed such damage?
A **I don't recall seeing any.**
Q Did you ever see the contract that the architect entered into with the owner?
A **The architect's contract with the owner?**
Q Yes.
A **I don't know that I've seen that.**
Q I know it's not listed here in your report as one of the things you reviewed.
A **I don't recall seeing it.**
Q Did you ever ask to see it?
A **No.**
Q On page 2 of your report, the bottom, there is a paragraph entitled Background Information and you state in the last sentence in that paragraph that leaks remain a chronic problem. Do you see that?
A **Yes.**
Q What is that based on?
A **I've been given information about leaks and logs of leaks.**



Q And it seems to me that on page 4 of your report you kind'a summarize the leak information you received into a chart; is that right?
A **Yes.**
Q So your information is as of May 8th, 2002; is that right?
A **That table is, yes.**
Q Do you have any information beyond that date that would indicate to you that the leaks remain a chronic problem?
A **The Promenade Oaks Pending Litigation and Disclosure is September 18th, 2002, and there is an update of leaks to September 16th, 2002.**
Q So that's what you would point to?
A **Yes.**
Q What do you mean by chronic problem?
A **Continues to occur.**
Q So would that be chronic if it was just one leak?
A **No. I don't think -- I would not characterize one leak as chronic, but many leaks repeating.**
Q So many leaks repeating is what you would characterize as chronic?
A **Yes.**
Q The top of page 3 of your report you state, "The project documents place the responsibility for the design and construction of a watertight system in the plazas on the

contractors." Where did you get that information?
A **It's in the notes to drawing A5.1, item 3a.**
Q Anywhere else?
A **I don't recall seeing it anywhere else. I think it's -- I know it's on this drawing.**
Q You point out as part of the background information on page 3 that a credit of $22,000 was offered if two inches of insulation was used instead of three inch insulation. Do you see that?
A **Yes.**
Q What is the significance of that? Why did you point that out?
A **I'm just describing the bid tendered by Waterproofing By Experts. I have no particular significance of including it. It's just what was on the bid.**
Q The next paragraph down, last sentence you say, "We understand the drains were selected by the contractor and installed by the mechanical subcontractor." Where did you learn that the drains were selected by the contractor?
A **Mr. Hull.**
Q And do you know -- which contractor are you referring to there?
A **The mechanical subcontractor.**
Q It's your understanding that the mechanical subcontractor selected the drains?



A **Oh, no. I was thinking Weis. I don't know for a fact.**
Q And that's based on what you heard from Mr. Hull?
A **That's my understanding.**
Q Did you ever observe any of Inspec's destructive test openings?
A **No.**
MS. REISBORD: Chad, you're talking about physically observe it?
MR. STEPAN: Yes. On site. Did you ever --
THE WITNESS: No.
Q (By Mr. Stepan.) Are you aware of any repairs that Promenade made to the site itself or had hired somebody to make repairs on its behalf?
A **I can't think of any.**
Q You haven't been told that the Promenade did that?
A **I would guess they probably would, but I don't know -- I can't remember any that they have.**
Q On page 5, you've got the review information. It's a list of the information that you reviewed as part of your analysis; isn't that right?
A **Yes.**
Q It says Summary Judgment Brief. What is that?
MR. HULL: Counsel, that's incorrect. We'll show you the document. And I believe it was a



memorandum submitted by Promenade or possibly by you to the court for purposes of providing a factual history of the project.
MR. BROWN: We're thinking you're really ahead of the game here, Bill. I was going to get on West Law when I got home.
THE WITNESS: I don't think it's that one, though.
MR. HULL: No. Maybe at a break we could dig that out for you. I think it's in here, in one of the documents.
THE WITNESS: Okay. Is that it?
MR. HULL: Let's see.
THE WITNESS: I think that's it.
MR. HULL: Yes, I think maybe it was. So I stand corrected. It was a draft.
MR. STEPAN: Go off the record for a second here.
(An off the record discussion took place at this time.)
Q (By Mr. Stepan.) Farther down the list, sir, you reference a waterproofing warranty. What is that?
A **I believe it was just a form called Warranty Form.**
Q From the manufacturer or from the subcontractor?
A **It's from CETCO.**



Q Just -- was it a sample?
A **Yes.**
Q You also reference that you reviewed a Pope Associates letter of April 20th, 2001. Do you recall looking at that?
A **Yes.**
Q Do you recall having any disagreement with what was put forth in that letter?
A **Yes.**
Q What did you disagree with?
MR. HULL: I'll object to the form of the question as overly broad.
THE WITNESS: That the cause of the problem was a change in grade associated with the sidewalk. The need for the sidewalks to be handicap accessible is what I think the gist of Pope's criticism was.
Q (By Mr. Stepan.) And why did you disagree with that?
A **I don't think the change in grade has got anything to do with the failure of the waterproofing system.**
Q Did you ever see any additional reports that Pope put together in this case?
A **I can't recall any. I think it's just this one of April 20th.**
Q Did you agree with Pope's assertion that the architect was

responsible for making sure that the courtyards would meet handicap requirements?
A **I don't believe the architect is responsible for the construction.**
Q Is the architect responsible for making sure it provides a design that meets the applicable codes?
MR. REILLY: Object, lack of foundation.
MR. BROWN: Yes. Second.
THE WITNESS: I haven't seen their contract and I don't know what's in their contract.
Q (By Mr. Stepan.) Did you ever ask Mr. Hull to see any additional information other than what was provided to you.
A **No.**
Q Earlier today when Mr. Reilly was asking you questions, you indicated that when you worked for Twin City Testing, part of your work would be to try to determine how much bentonite would be needed for I think a particular system. I think in particular you were talking about sewage lagoons; do you recall that?
A **Yes.**
Q Would it be fair to take from that that you think at some point if you have too little bentonite, it's not going to be a sufficient waterproofing?
A **Yes.**



MR. REILLY: Well, I'm going to object to the form of the question. He was talking about mixing soils with bentonite. And it's a misstatement of prior testimony.
Q (By Mr. Stepan.) Would you agree that a bentonite waterproofing system needs a certain amount of bentonite to function as a waterproofing system; there has to be a thickness of bentonite?
A **Yes.**
Q Do you have an idea of what that level is?
MR. VEITH: Objection, lack of foundation.
MR. REILLY: Lack of foundation.
THE WITNESS: You're asking me what the minimum thickness should be?
MR. STEPAN: Yes.
MR. BROWN: Object as an inadequate hypothetical.
MR. RAU: The new pet peeve objection.
THE WITNESS: I don't know what that would be.
Q (By Mr. Stepan.) At the Promenade project, would damp-proofing be sufficient for the vertical walls, in your opinion, or is a waterproofing system necessary?
A **In the courtyard?**
Q Yes.



A **I don't believe damp-proofing would be sufficient.**
Q Because there's hydrostatic pressure on the vertical walls?
A **Yes.**
Q And that's why damp-proofing wouldn't be sufficient?
A **Correct.**
Q Did you ever receive any explanation or any information as to the events that occurred in constructing the link between Buildings 1 and 2?
A **I understand there was a need to be able to get a fire truck through the link.**
Q What do you know about that?
A **Other than that they needed to get a fire truck through the link and the doors needed to be big enough to get the fire truck through the link, I can't think of anything else.**
Q Were you told how that impacted the design of that link?
A **Are you talking about the structural design?**
Q The architectural and structural design for that link?
A **No.**
Q Were you told how it impacted construction, the fact that there was going to be a need to get a fire truck through the link?
A **No.**
Q Earlier today, in relation to discussing conclusion number



1 of your report, you indicated, or it sounded like you indicated that in your opinion, you wouldn't use a bentonite waterproofing if what was being waterproofed would be sensitive to leaks, such as a living area; is that fair to say?
MR. REILLY: Objection. I'm going to object. It's a misstatement of prior testimony.
THE WITNESS: Because bentonite to function needs water to activate it, it's likely that some leakage will occur, and I would not use this where any leakage is going to be a problem.
Q (By Mr. Stepan.) Such as a situation where you're trying to keep water out of living areas?
A **Yes.**
Q You mention that the usual criteria for the amount of time it would be okay to allow water to remain on a waterproofing is 48 hours?
A **I believe that's correct.**
Q Where does that number come from?
A **I think it's from the National Roofing Contractors Association.**
Q You mentioned that a drawing you had looked at indicated that the grade at the Promenade project was to be below the top vertical block wall in the courtyards; is that right?

93

A **Yes.**
Q Was that an architectural drawing you saw that on?
A **Yes.**
Q Which drawing?
A **A5.1.**
Q Which detail?
A **Detail 4 and detail 3.**
Q Those are the details that kind'a show a cross section looking across the widths of the courtyards with the wings of the building on each side?
A **Yes.**
Q As part of your work, did you do any analysis as to whether the number of drains on site was appropriate?
A **No.**
Q Did you analyze whether the size of the drain grates was appropriate?
A **No.**
Q Did you analyze whether the size of the pipe for the courtyard drains was appropriate?
A **No.**
Q Do you plan on doing any such analysis?
A **I don't.**
Q And I apologize if Mr. Reilly asked you this already. Do you have any plans to do any additional testing or analysis at this point?

94

A **I don't.**
Q How did you come about looking to the National Roofing Contractors Association literature in your analysis?
A **It's a common reference.**
Q Something you've relied on before?
A **I've looked at it before.**
Q Something that other people in your company, American Engineering Testing, rely on?
A **Yes.**
Q Something that other people in the industry rely on, as far as you know?
A **I believe they do.**
Q Are you able to make any determination whether any leaks that may still exist at the site are the result of original construction or are the result of any repairs that were done?
A **No.**
Q Do you have mechanical engineers on staff at American Engineering Testing?
A **Yes.**
Q Did you consult with any of them regarding this project?
A **No.**
MR. STEPAN: That's all I have for now, sir. Thank you.
EXAMINATION

95

BY MR. RAU:
Q Mr. Stehly, we've met before. My name is Steve Rau and I represent the owner in this case. I have a couple of questions for you.
First, in reviewing all the documents relative to this project, and in addition, the architectural drawings, do you have an opinion about what factors should have been considered in designing a waterproofing system for the plaza deck?
A **Yes.**
Q And what are those factors, sir?
A **Factors I think that are important is that the system is going to rest on precast plank that are positioned relatively flat. It's in Minnesota, so there's going to be freezing, there's going to be sidewalks and stoops resting on this, you've got spaces that are going to be adjacent to it which people are trying to live in, and it's going to be a real, real pain to have to fix anything that leaks because access is limited.**
Q So those are the factors that you would consider. Do you have an opinion about what components would be essential for designing a waterproofing system for this plaza deck?
A **Well, the components that are important are the membrane itself, the flashing, the protection in the flashing, the fill that's going to be used to achieve grade in the**

96

**courtyard, insulation that you would use.**
Q Did you consider diversion of water to be a component?
A **I think that you have to expect that you have to create a bathtub that won't leak because there is a significant amount of water that's going to accumulate in the plazas regardless of what you would do regarding diversion.**
Q And when you talk about diversion, that would also include gutters; wouldn't it?
A **Roof.**
Q And if you are going to create a bathtub, the key here is to create a bathtub that doesn't leak; correct?
A **Yes.**
Q And drains well?
A **Yes.**
Q In any of the project documents that you reviewed, did you see any documents suggesting that any of those components were considered by the general contractor?
MR. BROWN: Object to the form.
MR. STEPAN: Objection as to form.
THE WITNESS: By the general contractor?
MR. STEPAN: And foundation.
THE WITNESS: Well, they may have been considered, but I don't think they were given sufficient weight.
Q (By Mr. Rau.) And the question was whether you saw any

97

documents that articulated a concern about those factors?

MR. STEPAN: Same objections.

THE WITNESS: There is some information on the bid from Waterproofing By Experts, or the contractor, Waterproofing By Experts with Weis that suggests that the contractor, general contractor did not provide enough consideration for the condition this plaza would put the waterproofing system in.

Q (By Mr. Rau.) And you believe that's in the contract between --

A **Waterproofing By Experts and Weis.**

Q Okay. Is that --

A **It's actually the contract. On Exhibit F, regarding flashing, it has a notation no metal, only liquid and membrane.**

Q (By Mr. Rau.) Okay. In addition, Mr. Stehly, in reviewing the architectural drawings for this project, did you see anywhere any details for how the waterproofing should be applied?

A **No.**

Q Did you see any details for the flashing, the liquid flashing you're referring to?

MR. STEPAN: In the architectural drawings?

MR. RAU: In the architectural drawings.

98

THE WITNESS: No.

MR. BROWN: I'm going to object in terms of vagueness as to what you mean by details.

MR. STEPAN: I join.

THE WITNESS: No.

Q (By Mr. Rau.) Did you see any details that showed the installation of the drains on the plaza decks?

A **No.**

Q Now, forgive me for a minute, but could you find the technical data sheets of CETCO that you said you reviewed in your pile there, sir? And just for the record, the document that the witness was previously referring to was a previously marked exhibit. I don't remember what it is, but it's --

MR. BROWN: At the bottom.

MR. RAU: There it is, 45. Okay.

THE WITNESS: There's another set.

Q (By Mr. Rau.) First let's look at the first packet you gave me. One was the sample warranty that you referred to when I think Mr. Reilly was examining you. The next is ESG01825. Would you consider this a technical product or an advertisement for Volclay?

MR. STEPAN: Objection, lack of foundation.

MR. REILLY: I'll object that it calls for

99

speculation of this witness with no foundation.

THE WITNESS: I think it's intended to be technical information about the Volclay system. It might be used in a marketing manner, but --

Q (By Mr. Rau.) One of the sections there is why the membrane is so effective. Do you see that section?

A **Yes.**

Q Did you read that, sir?

MR. BROWN: Did he?

Q (By Mr. Rau.) Did you read it?

A **Yes.**

Q Does it mention anywhere that the reason the system is effective is because the Volclay acts as a backup to the geo membrane liner as a water deterrent?

A **I didn't read that.**

Q What did you read?

A **Well, my impression is that that is the membrane and the sheet over the top of it is to protect it.**

Q To protect what?

A **The bentonite membrane.**

Q And the bentonite membrane serves what function?

MR. REILLY: Object, calls for speculation. This witness has no experience in this area.

MR. RAU: None whatsoever, right.

MR. REILLY: No, he doesn't.

100

THE WITNESS: The bentonite -- I believe they think the bentonite is the membrane that keeps water out, and the liner, quoting, the liner protects the Volclay bentonite compound from inclement weather and potential construction-related damage.

MR. BROWN: Are you asking him for his knowledge, Steve, or just for him to read that document?

MR. RAU: I'm asking him what he believes that document is representing.

MR. BROWN: Well, he just read a paragraph. We can do that. I object to the nonresponsiveness of his answer.

MR. RAU: Object away, Mark. I'd be disappointed if you didn't.

Q (By Mr. Rau.) Let me now direct your attention to ESG01832. Do you see those plans?

A **Yes. These details?**

Q Yes, sir.

A **Yes.**

Q Are those details for the Promenade project?

A **No.**

Q Could they serve as details for the Promenade project?

MR. STEPAN: Objection as to form and foundation.

THE WITNESS: I believe they're intended

101

to show how the system can be installed and can be used.
Q (By Mr. Rau.) Could they be used as details or held out to be details in the construction of a particular building?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: Yes.
Q (By Mr. Rau.) They could?
A **Yes. These are their suggestions.**
Q But they're not specific as to the building; are they?
A **No. They're illustrating typical building conditions.**
Q Okay.
A **For different things.**
Q Right. These details might not take into account whether a system is going to be solely on a flat precast deck; do they?
MR. BROWN: Objection, foundation.
MR. STEPAN: Join.
THE WITNESS: One detail shows a structural slab that looks flat. This is the one in the upper left.
Q (By Mr. Rau.) But it also talks about a slope; doesn't it?
A **Yes. But the slab itself is -- I think looks like it's flat.**

102

Q Those details wouldn't take into account freeze-thaw cycles; would they?
MR. REILLY: Objection, lack of foundation.
MR. STEPAN: Same objection.
THE WITNESS: I think CETCO is expecting these constructions to go through freezing and thawing.
Q (By Mr. Rau.) Do they take into account whether there is a top bearing or bottom bearing truss at the intersection of the precast and the vertical wall?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: That's not illustrated in these details.
Q (By Mr. Rau.) Do they take into account a specific type of drain?
A **Yes.**
MR. REILLY: Same objection.
THE WITNESS: A specific drain.
Q (By Mr. Rau.) A specific drain?
A **Yes.**
Q A specific drain make?
A **I don't know that they indicate the actual drain, but they show a drain.**
Q Correct.

103

A **I mean they show general situations. They show some membrane over wood, they show some membrane over masonry, some membrane over soil.**
Q Would you expect something more than those drawings for the designing and building of a waterproofing for the plaza deck at the Promenade?
A **Yes.**
Q And who would you expect those drawings to be done by, sir?
MR. STEPAN: Objection as to form and foundation.
THE WITNESS: I would expect them to be done by somebody who is a waterproof designer.
Q (By Mr. Rau.) In your opinions here, you referenced the absence of -- in paragraph 7, the absence of as-built drawings of the construction. What's the significance of that to you, sir?
A **Well, there are no drawings that I saw of the waterproofing system, contemplated or as-built; neither.**
Q Why would having drawings of the waterproofing system be useful?
MR. STEPAN: Objection, vague.
THE WITNESS: It permits the people that are doing the construction to follow someone's design. It also permits others to be informed about what the design

104

is. And then for the owner, it would provide a record of what actually was constructed should the owner need to do something like make a change or investigate a leak or -- there would be information about what was actually done.
Q (By Mr. Rau.) And such drawings also would suggest that someone actually thought about a design; wouldn't they?
MR. REILLY: Objection to as to form.
MR. BROWN: Objection.
MR. STEPAN: Join.
THE WITNESS: Well, you can't make the drawing without thinking about the design.
MR. RAU: Thank you, Mr. Stehly.

EXAMINATION

BY MR. BROWN:
Q Can you make drawings without thinking about what you're doing? Do you think that's possible?
MR. RAU: And Mark's going to start with a swing and a miss.
THE WITNESS: Can you make a drawing without thinking about what you're doing?
MR. BROWN: Yes, sir.
THE WITNESS: I don't think you can make a drawing without thinking about what you're doing.
Q (By Mr. Brown.) Think you can make a drawing, such as architectural drawings in this project, without thinking

105

about how they may implicate other features?

MR. HULL: I'll object to this as vague.

THE WITNESS: So I understand, are you saying can you make a drawing about something and not consider impacts on other elements?

MR. BROWN: Yes, sir.

THE WITNESS: Yes.

Q (By Mr. Brown.) Do you know if that occurred in the drawing of the architectural plans in this case?

MR. HULL: Object, foundation.

MR. BROWN: That's why I asked him if he knew.

THE WITNESS: You want me to -- you're asking me if I know that the architectural drawings were made without consideration of other features?

Q (By Mr. Brown.) I'm asking if you know one way or another?

A **I don't.**

Q So in the same way, you don't know if the entities involved in various aspects of waterproofing and water drainage did not think about their proposals as you earlier suggested, correct, because that would be requiring reading their minds?

A **I don't believe that the people that submitted proposals or designs for the waterproofing system didn't think**

106

**about the waterproofing system. I don't believe that.**

Q Do you know one way or another?

A **No, I don't.**

Q All right. And I don't see here, sir, on your list of documents reviewed -- and I guess I'll tick them off. I don't see that Steve Messerich's deposition transcripts were provided to you for your review; is that right?

A **I only received some of the exhibits.**

Q Do you know who Steve Messerich is?

A **Yes.**

Q Who?

A **I think he's the president of Waterproofing By Experts.**

Q Do you think the president of Waterproofing By Experts might have been a guy whose testimony might have helped you out in determining whether at least his part of the project was thought about or not?

A **I'm sure he thought about his part of the project.**

Q Did you read Al Thoreen's deposition transcript?

A **No.**

Q Did you read the deposition transcript of any of Mr. Hull's client's employees?

A **No. Not that I know of.**

Q Did Mr. Hull, by the way, retain you for the purposes of assessing the sufficiency and the professionalism of his client's work on this project?

107

A **If I saw something in my review of the documents that would indicate that the architect did something that I believe to be wrong, I would have told Mr. Hull that was the case and it would appear in my report.**

Q I'm asking you if Mr. Hull retained you with that specific assignment, to assess the professionalism and sufficiency of his client's work on the Promenade project?

A **It was never stated specifically like that, but it's my understanding that I was to review, from the information that I got, all aspects of it, whether it implicated an architect or a contractor or a supplier.**

Q Now, you did see an RFI that you talked earlier about that was drawn by Mr. Feges; you remember looking at that earlier this morning?

A **Yes.**

Q And do you know what an RFI is?

A **Request for information.**

Q That's a typical document on a construction project, at least based on your experience and background; is that right?

A **Yes.**

Q And do you have an understanding of who authored the response to that RFI, who he was and what his role in the project was?

A **Mr. Feges?**

108

Q Yes, sir.

A **Yes.**

Q What's your understanding of Mr. Feges's role and responsibility on the project?

A **I think he was the architect's representative for this project.**

Q What's your understanding of an architect's representative on a project like this? Let me restate that. What's your understanding of the role and responsibilities of an architect's representative on a project such as the Promenade?

A **They're often there to help interpret information, drawings, specifications. It's common.**

Q It's common to also give directives regarding various design and construction features; is that right?

A **I think it's pretty rare that an architect would give a directive.**

Q If it's requested and the architect did give a directive, would you expect that it would be followed by the person or entity that requested it?

A **I don't know of --**

MR. HULL: Object to the form of the question as vague.

THE WITNESS: I don't know of any situations where architects have directed the work.

Q (By Mr. Brown.) And you didn't read Mr. Feges's deposition transcript; correct?
A **I only saw deposition exhibits.**
Q Did you ask for the deposition transcripts of the architect's employees that were involved in the Promenade?
A **No.**
Q Did you ask for any of the documents that you reviewed or is it simply a matter of you reviewed what Mr. Hull provided you?
A **I reviewed what Mr. Hull provided me.**
Q So I take it from that answer that similarly, you did not ask for any of the deposition transcripts of the waterproofing contractors on the project?
A **I did not.**
Q You didn't ask for any of the deposition transcripts for the general contractor's employees on the project?
A **No.**
Q And you did not ask for any of the deposition transcripts for the entity -- before I even ask you that, are you even aware if there was a separate contractor that was responsible for designing and installing the courtyard drain and drainage systems?
MS. HEYER: Object to the form of the question.
THE WITNESS: A contractor separate of



Weis?
MR. BROWN: Yes, sir.
THE WITNESS: Between the owner and that contractor?
Q (By Mr. Brown.) Are you aware if there was a company, an entity which was a party to the Promenade project which had a separate contract for designing and installing courtyard drain and drainage systems?
MS. HEYER: Object to the form of the question.
THE WITNESS: I believe there is a contract between Weis and someone for the drains. I don't believe there's a contract between the owner and someone to provide drains.
Q (By Mr. Brown.) I don't believe I said owner. If I did, I misspoke. I just asked if you knew if there was an entity involved in the Promenade project that had a responsibility for designing and installing courtyard drain and drainage systems?
A **I don't know who that is.**
MS. HEYER: Same objection.
Q (By Mr. Brown.) Do you know if there was a company that had that responsibility, --
A **I don't.**
Q -- whether you read it or not?



A **I haven't seen the contract. I don't know. I think there was.**
Q How did you find that out?
A **Because the drains are there.**
Q Well, do you know --
A **And I don't think they just showed up.**
Q You don't know who was responsible for putting those drains there, though, I take it?
A **No, I don't.**
Q Do you think it might be important to find out the specifics of what was underground when you were walking through there in terms of the drain and drainage system and see exactly how that bore upon the assignment Mr. Hull did give you?
MS. HEYER: Object to the form of the question.
THE WITNESS: Beyond the work that Inspec had done, beyond what they had done?
Q (By Mr. Brown.) Did you consider your review and reliance upon Inspec's report to be a thorough scientific investigation such as you gave Mr. Reilly in terms of a definition?
A **I don't think it's necessary for me to go dig up the courtyard to render opinions in this matter, and I do rely on the work that Inspec has done.**



Q But you didn't rely on the work that any other investigators in terms of architects or engineers or other experts in their respective fields did, just Mr. Campbell, if I understood your testimony correctly?
A **Well, I also have reviewed the work that Wiss, Janney Elstner has done.**
Q Did you rely upon that? Did you agree with the opinions Wiss, Janney's engineers rendered in support for your opinions here?
A **I think my opinions are similar to Wiss, Janney's opinions.**
Q Were there any opinions in Wiss, Janney's report as you recall as you sit here that you disagreed with?
MR. HULL: I object to the question as vague. If you want to show him the report and let him go through it, that's fine.
MR. VEITH: I join in the objection.
THE WITNESS: I can't recall anything just sitting here.
Q (By Mr. Brown.) What other expert reports did you review?
A **Raths, Raths & Johnson, Mr. Kudder.**
Q And first of all, were you familiar with the Wiss, Janney firm prior to your involvement in this project?
A **I am.**
Q You've worked with them on projects in the past; is that

113

right?
A I usually am on the other side of the table from where they are.
Q Had you heard of Raths, Raths & Johnson prior to your involvement in this project?
A Yes.
Q Have you worked with or against them in previous cases?
A I have done both. I have done work for Raths, Raths & Johnson and I have also been in cases where I am working on the same project they are but different clients.
Q Did you rely upon any of the opinions in the Raths, Raths & Johnson report in formulating your opinions in this case?
A No.
Q Why not?
A I don't agree with his opinions.
Q Which opinions do you not agree with?
MR. HULL: Object again on the grounds that it's vague, form of the question.
THE WITNESS: I don't agree that the leakage was exacerbated by directives for out of sequence installation of entryway posts and changes in design grade. I don't agree that reported leaks probably have causes unrelated to courtyard waterproofing. I don't agree that the investigations done by others haven't been

114

thorough and systematic.
Q (By Mr. Brown.) Okay. Those are the opinions by Mr. Kudder that you disagree with, then; correct?
MR. REILLY: What was the answer to the last question before this, please? I didn't hear it. But the last thing that he said he didn't agree with. Charlie, could you read it back?
(The court reporter read back the record at this time.)
THE WITNESS: And I don't believe -- or I don't agree that the leakage experienced at Promenade Village and Townhouses is due to design deficiencies of Elness, although that isn't stated specifically in this document.
Q (By Mr. Brown.) Even though -- but you don't agree with it anyway?
A It isn't specifically stated that way. It said design deficiencies and inconsistencies, and I'm assuming he means Elness. Doesn't say it specifically.
Q You agreed with Mr. Reilly's definition of a scientific evaluation or investigation. I don't know -- I think you said people quibble over whether they would use the word scientific, but he gave a description of a type of investigation and you agreed with him; correct?
A I think we were talking about the scientific method.

115

Q Method, correct. And you agreed with the lay person's definition, anyway, that Mr. Reilly gave, right?
A Yes.
Q Now, you didn't perform a scientific method in terms of investigating, for example, whether there were leaks or potential leaks by way of the vinyl siding; you agree with that, right?
A I didn't make any independent investigations.
Q Right. You relied upon the documents that you were supplied?
A Yes.
Q All right. I don't think that there is anything -- I just want a clarification. I assume that the July 12th, 2002 walk-through that you did at the project with Mr. Healey was with a bunch of other people also; correct?
A Yes.
Q You never had a walk-through just with you and Mr. Healey at that project; did you?
A No. I don't recall that.
Q Have you ever interviewed Mr. Healey in connection with your work on this project?
A Separate of the time we were together?
Q Yes.
A No.
Q And when "we," are you pointing only to Mr. Hull?

116

A Yes.
Q So then I do need clarification. Were you at the Promenade with just your attorney and Mr. Healey on an occasion?
A No.
Q Okay.
A No. There was a lot of people there.
Q All right. That was just basically a tour that Mr. Healey conducted through the garages and the courtyards at the project; correct?
A Yes.
Q All right. And that was the last time you were there?
A I think so.
Q A year and some months ago anyway?
A I think so. I think that's right. I was there before that.
Q And any data or information you have received about the continuance of any leaks or water infiltration is contained in the documents in your file; is that right?
A Yes.
Q You haven't been told or received information outside of the scope of those documents in terms of whether or, if so, to what extent there are any leaks or water infiltration still occurring at the Promenade; is that right?

A **That's correct.**
Q And the time that you were there in July of 2002, do you recall if Mr. Healey took you through all the garages in the project?
A **I don't know that we went through every garage.**
Q A number of them?
A **Yes.**
Q Did you take any photographs on that tour?
A **No.**
Q Do you know or recall as you sit here today whether you observed any active leaks in the garage areas during that occasion?
MR. REILLY: Objection, asked and answered.
MR. BROWN: Did you ask that already?
MR. REILLY: But you can answer.
THE WITNESS: I didn't see any.
Q (By Mr. Brown.) So whatever information you have that there is or there was at some time up until July of 2002, anyway, chronic leaking at the Promenade was hearsay, it was information you received from someone else?
A **I didn't observe it directly.**
Q All right. On those occasions where you have been involved -- and maybe I misunderstood some of your earlier testimony. Have you been involved in your professional



career in designing waterproofing systems at least for, for example, lagoons?
A **I haven't -- I haven't designed lagoon systems. I have not.**
Q All right. What has been your role? Maybe you can help correct --
A **It would be to determine the amount of bentonite necessary for a specific soil to provide a lagoon of a maximum amount of leakage in that regard.**
Q And then you would make that determination and order the bentonite from a supplier?
A **I wouldn't, but a contractor would.**
Q So would you have been considered -- I'm misunderstanding here. What would have been your title on that kind of a project?
A **We would be a consultant. We would either be working for the owner or for another consultant, like the designer of sanitary lagoon systems.**
Q And then the owner --
A **A municipal consultant.**
Q And would there be a written contract with the owner in that kind of a project?
A **No, not necessarily.**
Q And then would there also be a general contractor?
A **You mean with us you're saying?**



Q Yes, sir.
A **No. Not always.**
Q And then there would also be a general contractor that the owner would hire to do the work?
A **Yes.**
Q And then in the case of these lagoon projects, the general contractor would order the bentonite; is that how it works?
A **Yes.**
Q From some supplier out in Wyoming or wherever?
A **Yes.**
Q And then would there be a separate subcontractor that would actually install the bentonite?
A **Depends on who it was. Some are capable of doing their own. Others would hire someone to do that for them.**
Q In the cases where there is a subcontractor that's actually installing the bentonite, would they provide formal architectural or design drawings of that installation?
A **No.**
Q Who supplied those kind of documents on those kind of projects?
A **In those cases usually the municipal consultant, the designer to the owner.**
Q The owner is a municipality usually in those cases?



A **Yes.**
Q All right. I take it that the documents that Mr. Rau pulled out of your file that were created by CETCO or American Colloid were the universe of CETCO documents that you ever, received from Mr. Hull anyway?
A **The two sets of documents that I received I believe are coming from CETCO and they are a part of all of the documents that CETCO would have dealing with bentonite membrane systems.**
Q Who did you get those from?
A **Mr. Hull**
Q All right. Did you do some independent investigation to determine whether in fact that is the sum and substance of the documents that were ever furnished to anybody else in the Promenade project created by CETCO?
A **No.**
Q Would that be important for you to know exactly all the documents that American Colloid/CETCO furnished to the parties to the Promenade project?
A **Well, it may or may not be. It just depends on what they are.**
Q Did you hear anything or read anything about what's been referred to as a waterproofing meeting prior to construction actually getting under way on the Promenade project?

121

A **I don't remember reading anything about that.**
Q Do you have any knowledge of whether the owner, architect and general contractor were given a formal demonstration of the American Colloid product, the Swelltite 3000, had any questions about the product and how it would work on the conceived project answered and were furnished with samples of the product as well as literature? Are you aware of that occurring at all?
A **No.**
Q Are you aware of any objection or request for additional information beyond what American Colloid provided either at that meeting or any other time lodged by the architect, the general contractor or the project owner?
A **No.**
Q You are aware that there was an architect on the project, I assume?
A **Yes.**
Q All right. And would it be your understanding that in terms of the Promenade project, one of the roles of the architect would be to act as sort of a liaison between the owner group and the entities in the field in terms of making sure that the overall concept was meshing with the various construction components?
A **I haven't read the contract between the owner and the architect. I don't know what the scope of work agreed to**

122

**was.**
Q Go through a couple of your opinions here for a second for some clarification. One of the opinions, and I think it was number 2, talks about flashing on page 1 of your report?
A **Yes.**
Q And by the way, and I don't know that I saw -- maybe it was asked of you, whether your second opinion is any different in terms of its text as written in the exhibit than what it was before Mr. Hull commented on your draft? And let me ask it in a more simple way. Do you know if you changed your second opinion in response to Mr. Hull's comments?
A **I don't know. I will try to find a copy of that draft so that you can compare them.**
Q Okay. Do that. Thanks. Now, you already testified that there was an original drawing by Elness Swenson Graham that depicted the grade line in the courtyards terminated at a point some inches below the top of the CMU; correct?
A **In the courtyard.**
Q Yes, sir.
A **Yes.**
Q And you also, I take it from your answer to Mr. Rau's question, reviewed some of the CETCO documentation that's in your file anyway; correct?

123

A **I reviewed it all. I read it all.**
Q And you understand that the Swelltite 3000 material, at least as specified in the manufacturer's literature, is a product that is exclusively used for below grade applications; correct?
A **In some of the CETCO details, they show -- they show some above grade applications of Swelltite.**
Q Why don't you tell me which one you're talking about?
A **I'm looking at ESG01832. These are details of Volclay Swelltite.**
Q Can I see what you're looking at?
A **Yes. The detail in the center is a covering of a masonry wall, the detail in the lower right is covering a wood wall, and the one in the lower left is covering a lagging, wood lagging, which would be above grade, I think.**
Q Do you know?
A **I don't know. That's the way I would interpret the drawing.**
Q Well, the first sentence under Product Description on the first page of this same document in your file, numeral 3, Product Description, Basic Use, Volclay Swelltite membranes are designed for waterproofing below grade vertical and horizontal structural surfaces, which is what we're dealing with in the Promenade; is that right?

124

A **Yes.**
Q At any rate, let's get to the meat of this. As initially conceived, anyway, and based on the drawing that you saw, A5.1 or A1.5, whichever one it was, the liquid flashing would have been several inches above the grade line had the grade line stayed where it's depicted in that drawing; correct?
A **Probably.**
Q And do you know whether the installers of the Swelltite system were consulted about the change that resulted in the grate being installed at a level some several inches above the top of the CMU blocks during construction?
A **I don't know.**
Q Did you read Mr. Desai's deposition transcripts, by the way?
A **Peter?**
Q I think you've answered that. Yes, sir.
A **I don't think so.**
Q Did you hear anything about an eight inch conceptual bust occurring during the course of construction that resulted in this grade line change?
A **What I had heard or what I had been told is that the grade was changed and it was changed based on a requirement for wheelchair accessibility to the units.**
Q And you didn't investigate any further than whatever was

you were told that led to that conclusion; correct?
A **Yes, that's true, other than reading this information.**
Q Now, you didn't read the deposition either of a man named Bill Hanuschak; did you?
A **The structural designer?**
Q Yes, sir.
A **No.**
Q The structural engineer?
A **Correct. No.**
Q Were you aware of the firm Hanuschak Kowalchuk or even Mr. Hanuschak personally before your involvement in this project?
A **Yes.**
Q And you're aware that he was a consultant for the owner on this project, or are you even aware of that?
A **Well, I haven't seen his contract. I don't know if it's with the architect or if it's with the owner, but I understand he provided structural engineering services for this job.**
Q An architect, at least as far as your understanding of the relationships on the project, was an agent of the owner, not the general; correct?
A **I haven't seen any of the documents and I do not know.**
Q Okay. Thank you, sir. I won't ask you about that relationship anymore. Did you receive, even though you



didn't read Mr. Hanuschak's deposition, a copy of an exhibit to Mr. Hanuschak's deposition that showed a detail of a sketch changing the configuration where the concrete block wall and the floor trusses intersected in the courtyards?
A **Yes. I think I've seen a detail showing the top cord bearing truss.**
MR. BROWN: Okay. Let's go off the record for one second, Charlie, if we could.
(A short recess was taken at this time.)
Q (By Mr. Brown.) Even had there not ultimately been a change in the grade line such that the grade as depicted in the drawings was where the grade ended up, do I take it from your flashing opinion, opinion number 2, that it would have been good idea to have installed at that juncture between the concrete blocks and the wooden construction members some sort of waterproof flashing type material?
A **Yes.**
Q Do you have any idea whether the waterproofing contractor actually recommended to either the owner, architect or general contractor that exactly that sort of detail be included?
MR. HULL: Exactly what sort of detail?
MR. BROWN: Flashing between the concrete



block and the wooden construction members in those courtyards.
MR. HULL: I'm going to object to the form of the question. We're really talking about two things. We're talking about flashing and something to protect the flashing. Which one are you talking about?
MR. BROWN: I'm not talking about anything but what I asked him, which is flashing.
THE WITNESS: I'm not aware of that.
MR. HULL: He did.
Q (By Mr. Brown.) Are you aware of whether any such flashing was installed during construction?
A **From the photos, you can see flashing. The liquid applied flashing was applied.**
Q What I'm talking about is a membrane that would lap over the top of the block and a wooden construction member sitting on top of the blocks?
A **There are photos that show the liquid applied material is up the Built-Right above the block.**
Q So what you're basing whatever it is that you're talking about there is from the photos alone; correct?
A **Yes.**
Q I'm talking about some sort of membrane type material in addition to any liquid flashing that you see in those photos.



A **Oh, oh, oh. I think there was a sheet material applied, I think it was Miradry, but it was later, I mean after -- after the siding was on.**
Q So whether any such thing was done initially during construction, you don't know?
A **I don't know.**
Q But that would have been something you would have recommended?
A **That they do do that?**
Q Yes, sir.
A **Yes.**
Q Okay. Now, you saw, and I think you answered a couple of questions about it, where the contract between the waterproofing subcontractor and the general specifically said to use liquid flashing as opposed to metal flashing; correct?
A **Yes.**
Q Do you know how that change to the contract came about? Do you know anything about that?
A **No.**
Q And did you see in the Swelltite material that the flashing that CETCO recommended at least back then for the Swelltite 3000 system was the liquid flashing?
A **M-2000.**
Q M-2000?

129

A **Yes.**
Q All right. I want to show you, and I think it was marked as Exhibit 47. My copy doesn't have it, have the number on it. Are you familiar with that document or have you seen that, I should say, in conjunction with your investigation here?
A **I have seen this.**
Q Do you have an understanding of what that is? Was it related to you what that represents?
A **It shows the top cord bearing truss.**
Q And what does it show in the circle?
A **In the detail?**
Q Yes, sir.
A **It shows the construction or the -- I shouldn't say the construction. It shows the top cord bearing truss bearing on wood blocking.**
Q And other than being provided with that document, did you either follow up to find out what the background to that document was or was it explained to you how that came about?
A **All I know is that this is what was finally provided. This top bearing cord truss was provided.**
Q And by provided, you mean that's how it was actually constructed out there on site?
A **I believe that's right.**

130

Q Do you have any idea or did you find out from any source whether that sketch, that design change, was ever transmitted to the trades in the field?
A **I don't know.**
Q And you understand from what you're looking at there that that was drawn by Hanuschak Kowalchuk, who you were already familiar with when you first got this assignment; right?
A **Yes, I believe it was. I believe that he drew this.**
Q And you knew that Hanuschak Kowalchuk is a structural engineering firm; is that right?
A **Yes.**
Q You also knew that Mr. Feges was the architect's representative on the project; correct?
A **I believe that's his role.**
Q Okay. And you knew, unless you only looked at the page right there, that this diagram -- well, actually, let me see. This document at least as marked as an exhibit was three pages, not just the drawing. Did you receive the whole three page document; do you know?
A **I think I have seen RFI 39.**
Q What's the date on that one?
A **That is December 12, '94.**
MR. RAU: '94?
THE WITNESS: '96. November 14th, '96.

131

MR. HULL: December, isn't it?
THE WITNESS: Yes. Let's try this again. The date on RFI 39 is December 14th, '96.
Q (By Mr. Brown.) Why don't you turn to the next page? Do you recognize that page as well?
A **I don't know that I seen that.**
Q What's that?
A **It's a fax transmittal of November 26, '96.**
Q And having read that, does that appear to be the fax cover sheet for the actual sketch itself from Mr. Hanuschak?
A **Yes.**
Q And who is that directed to?
A **To -- well, it's to Elness. I don't know whose initials this is.**
Q And Elness was the architect?
A **Yes.**
Q What are Mr. --
A **Yes. It's BRW. It's BRW/Elness to John Feges.**
Q And does Mr. Hanuschak give Mr. Feges some instructions in that fax cover sheet?
A **Does he give some direction?**
Q Does he give some instructions on what to do with the attached sketch to Mr. Feges on that sheet?
A **He has written, "Please review and issue to job site as appropriate."**

132

Q Now, would you agree that from your view of the detail in the circle on the sketch, that that represents a design change from the original design concept? I guess both what's in the circle and the broader view?
A **It probably does. It probably is a change in the structural design.**
Q It involves for one thing bearing truss, correct?
A **A top cord bearing truss, yes.**
Q And you earlier testified you weren't provided with any documents that revealed one way or another whether the trusses were too long such that they actually came out to the outer edge of the bearing CMU block as a precipitating reason for that sketch?
A **I wasn't aware of that.**
Q Because otherwise, if the truss, the wooden truss bore right in the middle of the block, there are blocks on the market, as you know from your professional experience, that are sort of half height that can take up the other half of that course; do you understand what I'm asking?
A **There are half high blocks, yes.**
Q Do you know whether Swelltite 3000 can be or at least is designed to be installed directly to untreated pine construction members? Pat had a better term for it, but -- dimensional lumber?
A **It's shown in CETCO's details as being applied directly**

to wood lagging.
Q And you didn't know --
A I don't know that the wood lagging is pine.
Q Or untreated?
A Or untreated. But it shows it, illustrates it as being directly there.
Q At any rate, the drawing in the circle, sir, on the first page of the exhibit by Mr. Hanuschak, would you agree that that's an appropriate waterproofing system, so to speak, for that area in the courtyards?
MR. REILLY: Objection, lack of foundation.
THE WITNESS: I don't think this -- I don't think this is intended to show any particular waterproofing design.
Q (By Mr. Brown.) You didn't read Mr. Hanuschak's deposition, did you?
A No. No, I haven't.
Q If he testified it was, would that change your answer?
MR. HULL: I'm going to object. That is not what he testified to. If you want to set that up as a hypothetical, that's I suppose fine, even though it has nothing to do with reality.
THE WITNESS: I don't know what is intended here. This is his drawing.



Q (By Mr. Brown.) Whether he intended that or not, sir, -- and he was asked that question. Whatever his intentions were, I'm simply asking you -- and let me see the drawing so I can get the terminology correct -- whether a waterproofing membrane on the outer side of the wooden dimensional lumber and flashing at the locations depicted in that picture is the kind of system that you, you know, come up with your own brands for those various components, but whether those components and their locations are the kind of thing you would want to see in those locations in the courtyards?
A You mean would I design it this way?
Q I'm just asking if those are the kind of components and the locations for those kind of components that you would want to see installed in those areas of the courtyards as depicted in that circle?
A I don't think this directs the contractor to install the waterproofing system like this.
Q I'm not asking you what it directs, I'm just asking if those components and the location of those components are the kind of items you would want to see out in the courtyards in those areas as depicted in the drawing? And if you don't have an opinion --
A I would like to see a waterproofing membrane, I would like to see flashing on the wall. I probably wouldn't



put it where it's shown on this drawing, but I would expect to see those kind of things on the wall.
Q And do you know whether that drawing itself ever found its way -- you've already answered that question. Strike that. Do you know how many of the posts were repaired?
A No.
Q You answered Mr. Reilly's question earlier that it was at least your understanding you were given some information that the incidence of leaking was reduced after the posts that were repaired were repaired; correct?
A I believe that after repairing some of the posts, the leakage, some leakage stopped.
Q Okay. Were you ever told what the cost for the repair for each of the posts that was repaired amounted to?
A No.
Q Now, sounds like at least on one occasion in the past you were asked to go try to investigate the source of some leaking in a basement. Was that a residential basement?
A I have, yes.
Q All right. And I think at least the occasion that you testified about you did some actual excavation and testing and determined that there were leaks through a seam or some seams; do you remember that testimony?
A Yes. Cracks.
Q Right. And your repair, which was evidently part of what



you were hired to do in that case, was to repair those cracks or seams; correct?
A Yes.
Q Instead of tearing the whole system out and putting a whole new system in; is that right?
A Yes.
Q Now, you did have an opinion in your report that the system recommended by Mr. Campbell was a much more expensive system than what's in there now; correct?
A The American Hydrotech?
Q Yes, sir.
A Yes. I believe it's more expensive.
Q Did you ever ask Mr. Hull, by the way, -- well, that's going to be attorney-client privilege, won't it? Did you ever find out if the owner that hired Mr. Hull's client put any parameters upon the cost for whatever waterproofing system was bid at the initial stages of the Promenade project?
A No.
Q Now, the information that you got from Mr. Kong that the Hydrotech system is very expensive or much more expensive, was that the sole source of information you received to lead to that conclusion?
A Yes.
Q Did you have Mr. Kong investigate the cost of any other

137

systems to compare with the American Hydrotech?
A **Yes.**
Q What did he investigate and what did you learn, just that they were much less expensive?
A **They were less expensive. A membrane with granular bentonite.**
Q But satisfactory systems that you would be comfortable recommending for replacement work out at the Promenade?
A **Yes.**
Q Were you given any specific numbers by Mr. Kong?
A **Yes.**
Q What were they?
A **The American Hydrotech he estimated at eight dollars a square foot.**
Q What other systems and what square foot costs did you learn of?
A **EPDM over granular bentonite we thought would be about six dollars a square foot.**
Q Any other systems?
A **No.**
Q I want you to assume that the incidence of leaking that was still occurring when the post repairs were first undertaken had diminished significantly by the time the posts that were repaired were completed. Do you understand my hypothetical question so far?

138

A **So you're saying that the leaks that were occurring before the post repair was done, before it was completed?**
Q Yes, sir.
A **I mean they started some, but it wasn't all done. The incidence of leaks reduced before that?**
Q Reduced by the time the post repair work was completed significantly.
A **Okay.**
Q I want you to assume that. Rather than first recommend an entire replacement of the whole waterproofing system out there, would you recommend repairing the rest of the posts first to see if that does the job?
A **If I repaired one post, I would repair all the posts.**
Q Especially if it looked like that was working?
A **If I repaired one post, I would be worried about all 30 posts and I would repair all 30.**
Q Okay. Do you know if the posts were part of the original design, the posts installed directly to the precast?
A **I thought the posts -- what was contemplated was the post on the block.**
Q Do you know?
A **I don't know. I don't know.**
Q If you were told that the drawings actually depict concrete block piers beneath the posts and the posts run from the entryway slab up or stoop up and the concrete

139

piers run from below the slab down to the precast, would that be a better design in terms of -- well, I want you to assume that's what the drawings depict; all right?
A **Okay.**
Q If that was changed, that design, to what you know was ultimately installed out there, that being wooden posts secured directly to the precast, would that impact potentially the courtyard waterproofing, that change?
A **Both can be successfully waterproofed.**
Q Would it change -- would it impact courtyard waterproofing?
A **Yes. You would design the waterproofing differently.**
Q Do you know whether the waterproofing contractor was consulted regarding the decision to install wooden posts directly to the precast before any membrane was laid down?
A **I don't know.**
Q Would you expect, based on your experience and knowledge, that water would enter those buildings in the courtyards if dirt was installed at a level several inches above the CMU block but between the dirt and the walls themselves there was no waterproofing of any sort?
A **Would I expect leakage to occur?**
Q Yes, sir.
A **Yes.**
Q Why would you expect that?

140

A **There's no protection there, and water is likely to be there.**
Q Would you expect an architect who is well aware of that fact to know that, to know that leaking was expected?
A **Would I expect an architect to know that?**
Q Yes, sir.
A **Sure.**
Q Would you expect a general contractor to know that?
A **Sure.**
Q If a waterproofing contractor wasn't made aware that the dirt was going to be pushed to a level above where any waterproofing was installed, would you expect one or other of the architect or the general contractor to inform that subcontractor?
A **Well, I would expect the contractor would, the general contractor would. I think if it came to the attention of the architect, the architect would.**
MR. BROWN: That's all I have, sir. Thanks.

EXAMINATION

BY MR. VEITH:
Q My name is John Veith. I represent Chris Craft, the maker of the film, the 1.5 dissolvable film. I only have a couple of questions for you.
Were you provided with any product

141

literature relating to that film?
A **No.**
Q Were you provided with any technical data relating to the film?
A **No.**
Q Have you done any checking on your own to obtain information like that?
A **No.**
Q I thought that you testified about or used the term scrim sheet?
A **Yes.**
Q And I don't know what you meant by that?
A **A thin sheet, very thin.**
Q Were you referring to the film itself, then?
A **Yes.**
Q Have you reviewed the deposition of Tom Yogan?
A **No.**
Q How about the deposition of Andrew Verrall?
A **No.**
Q I think early on in your testimony you were asked questions by Mr. Reilly about an investigation you did of some condominiums or apartments or something like that where there was seams that were obviously failed?
A **Yes.**
Q Do you recall that?

142

A **Yes.**
Q Do you know whether there was any conclusion reached about why the seams failed in that case?
A **Poor seaming. Poor workmanship in putting the seams together.**
Q It was an installation error?
A **Yes.**
Q Have you ever testified before relating in any way to issues involving below grade applications of bentonite waterproofing which includes a dissolvable film?
A **No.**
MR. VEITH: That's all I have.
MS. HEYER: I don't have any questions at this time.
MS. REISBORD: I don't have any questions.
MR. BRISBOIS: I don't have any.
MR. HULL: Pat?
EXAMINATION
BY MR. REILLY:
Q Other than the time when I asked you questions earlier today about that employee of Promenade doing that hose testing by Unit 3-115, are you aware in the materials that you received of any other specific testing of leaks being done at the Promenade?
A **Where someone was actually trying to create the leak?**

143

Q Yes. I don't know if create the leak is a proper description. Perhaps locate the leak.
A **I don't recall any others. There may have been some, but nothing's coming to mind.**
MR. REILLY: All right. That's all the questions I have.
MR. HULL: Chad?
EXAMINATION
BY MR. STEPAN:
Q When Mr. Rau was asking some questions, he directed you to the subcontract between Weis and Waterproofing By Experts. He had asked you what -- I believe you testified -- let me back up. I believe you testified that you thought there were items in the subcontract that indicated to you that not enough consideration, or not enough weight was given to various components that you would like to have seen. Do you recall that?
A **Yes.**
Q And Mr. Rau followed up and asked you what items are you referring to, or something to that effect, and you pointed to the flashing item?
A **Yes.**
Q Are there any other items in that subcontract that would fit that bill?
MR. BROWN: I would object that he lacks

144

foundation.
THE WITNESS: I can't think of anything else.
Q (By Mr. Stepan.) And you've got the contract there in front of you and you're able to look at it; right?
A **Yes.**
Q And with regard to the flashing, you don't know what dialogue or discussions were had to arrive at what was put in the subcontract; is that right?
A **I do not know.**
Q Are you familiar with the term design-build as it's applied in construction projects?
A **Yes.**
Q What's your understanding of that term?
A **That it's to provide -- whoever is contracting for this, the owner is expecting that person to both design and build whatever system is being contracted for.**
Q Have you ever worked on a project where there has been design-build aspects?
A **Yes. Working on one now.**
Q Have you ever been part of a group that's doing the design and building?
A **Yes. Highway 52 in Rochester, we're part of the design-build team.**
Q Are there separate design professionals on that particular

project that aren't said to be part of the design-build
team in that the owner has retained them --
A **Separate of the design-builders?**
Q Yes.
A **Well, I don't know. On the Highway 52 job, I don't know if the owner has hired someone outside the design-build or not.**
Q Have you ever worked in a situation where that's the case, where part of the project is the owners hired an architect, let's say, and another part of the project is design-build?
A **Aware of a component of it is design-build?**
Q Yes.
A **Oh, okay. Yeah -- no. I don't think it's as common, but there are some. The Metrodome, the movable grandstands were design-build for that particular component and the rest was not.**
Q Were you involved in that project?
A **Yes.**
Q In the design-build component?
A **No, no, no. Working for the owner, testing all the -- quality control during construction. I mean, it happens, but --**
Q Would it be your expectation that if the design professional who is not -- well, let me back up. Are you



familiar with the relationships that were set up in this project as far as the owner hired the architect; are you familiar with that?
A **I believe that's true.**
Q And then there were components of the project said to be design-build?
A **Which this waterproofing is one.**
Q Is that your understanding?
A **Yes.**
Q Would it be your expectation that it would be good practice for the architect, if the architect did some work on this project, or any other of the design professionals, say the civil engineer, did work on this project that is going to impact the design-build aspects, that they would work with the design-build people to make sure that the architect's work was going to coordinate with the design-builder's work?
A **There certainly should be some interaction. It may be that the drawings -- the architect may believe that the drawings contain all the necessary information that the design-builder really needs. He may feel that way. So that there doesn't need to be a lot of interaction between the two.**
Q But whether it's a detail showing the change the architect's made or some communication, there should be



some communication, whether it's a drawing, a detail or verbally, to make sure that everybody's on the same page; would that be fair?
A **Certainly the architect needs to provide information about his design and what he is expecting to be built and it needs to mesh with this particular component, sure.**
Q The design-build component?
A **Sure. Sure, it does.**
MR. STEPAN: That's all the questions I have for you, sir. Thank you.

EXAMINATION

BY MR. RAU:
Q Just as the architect needs to provide information regarding his design so that it meshes with the design-build aspect that Mr. Stepan is talking about, certainly doesn't the individual doing the design-build have the same obligation to provide information to the architect to make sure that that meshes properly?
MR. BROWN: I would object to the form of the question, vague.
THE WITNESS: The architect and the general contractor and everyone else on the team, sure, that impacts.
Q (By Mr. Rau.) Now, we've talked about the design-build and you've referenced the subcontract between Weis and



Waterproofing By Experts. Given the fact that Waterproofing By Experts was assuming the obligation to design and build this waterproofing system, would you expect that they would provide the contractor with some sort of plans and specifications?
MR. BROWN: I think he's asked and answered that stuff already, but I'll object on foundational grounds.
THE WITNESS: Yes.
Q (By Mr. Rau.) And would it surprise you if the documents that I showed you from CETCO were proffered by Waterproofing By Experts and Weis as the design specifications for this particular building?
MR. STEPAN: Objection as to form, assumes facts not in evidence.
THE WITNESS: I would be surprised by that and I don't consider that a design.
Q (By Mr. Rau.) Why?
A **Because they should be providing details or drawings that are specific to this project.**
MR. RAU: Thank you.
MR. BROWN: No questions.
MR. HULL: Is that it, guys?

EXAMINATION

BY MR. REILLY:

149

Q Have you ever worked as a general contractor on a project?
A **No.**
Q Have you ever worked as a waterproofer on a project?
A **No.**
MR. REILLY: I have no other questions.
MR. HULL: We'll read and sign.
(Witness excused.)
(The deposition was adjourned at approximately 3:15 p.m.)
(End of Record.)

150

DEPOSITION SIGNATURE/CORRECTION PAGE

I, RICHARD D. STEHLY, P.E., do hereby certify and state, that I have read and examined the typewritten transcript of the deposition taken of me, at the time and place therein named, consisting of the preceding 149 pages, and find the same to be true and correct. (Except as follows:)

PAGE NO. LINE NO. CORRECTION/REASON

Dated this ______ day of __________, 2003.

______________________
Richard D. Stehly, P.E.

RETURN THIS SHEET TO: Charles G. Williamson, Court Reporter, 4209 113th Street West, Bloomington, MN 55437.

151

NOTARY-REPORTER'S CERTIFICATE

STATE OF MINNESOTA)
ss.
COUNTY OF HENNEPIN)

I, Charles G. Williamson, a Notary Public within and for the County of Hennepin, and State of Minnesota, do hereby certify:

That I reported the deposition of Richard D. Stehly, P.E., on the 9th day of October, 2003, in Minneapolis, Minnesota, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed under my direction and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition by the witness was not waived.

WITNESS my hand and seal this 23rd day of October, 2003.

______________________
Charles G. Williamson
Notary Public
Hennepin County, Minnesota

My Commission Expires January 31, 2005.